2 TO G


●ORIGINAL●


8-12-02

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VINCENZO MAZZAMUTO,<br>          Plaintiff | : | Case No. 1:01-CV-1157 |
| v. | : | |
| UNUM PROVIDENT<br>CORPORATION, PAUL<br>REVERE LIFE INSURANCE<br>COMPANY and NEW YORK<br>LIFE INSURANCE COMPANY,<br><br>          Defendants | : | JUDGE KANE |

FILED
HARRISBURG, PA
AUG 0 9 2002
MARY E. D'ANDREA, CLERK
Per ___ Deputy Clerk

## DEFENDANTS' STATEMENT OF MATERIAL FACTS

STEVENS & LEE
E. Thomas Henefer
Attorney I.D. No. 55773
Kirk L. Wolgemuth
Attorney I.D. No. 45792
111 North Sixth Street
P.O. Box 679
Reading, Pennsylvania 19603
(610) 478-2000

Attorneys for Defendants

1. Plaintiff alleges claims for bad faith, under 42 Pa. C.S.A. § 8371, and breach of contract arising from the denial of his claim for disability benefits based on back and psychiatric conditions.

2. Defendants UNUMProvident Corporation ("UNUMProvident"), The Paul Revere Life Insurance Company ("Paul Revere") and New York Life Insurance Company ("NYL") move for summary judgment.

3. The deadline for expert reports was June 28, 2002. Although plaintiff claims to be medically disabled, he has not designated any medical expert.

4. Rather, he relies solely on an expert in insurance practices.

5. He also relies on testimony from his treating physician, Dr. Douglas J. Bower, an internist, who has not been designated as an expert under Rule 26, and who admits he is not an expert on back conditions and is not board certified in psychiatry or psychology.

6. Plaintiff is a restaurant owner who seeks disability benefits under a disability policy (the "Policy") issued by NYL. (Summary Judgment Appendix [hereinafter "App."], Exhibit A (copy of policy produced by plaintiff in discovery)).

7. Pursuant to a reinsurance agreement, Paul Revere is responsible for administering claims under the Policy and paying any Policy benefits that may be owed.

8.  The Policy insures against either "total" or "residual disability" based on the insured's "regular occupation." Total disability is defined, in relevant part, as:

> From the start of a total disability until 2 years after the Income Starting Date, total disability means that the Insured cannot do the substantial and material duties of his or her regular job.

(App., Exh. A at 699).

9.  The Policy further defines the term "Regular Job" as: **Regular Job** The <u>occupation</u>, or occupations if more than one, in which the Insured is engaged when a disability starts." (App., Exh. A at 699 (emphasis added)).

10. The Policy also provides for "residual disability" where the insured is not totally disabled. In general, this provision provides for payment of partial benefits if the insured has a loss of income greater than 20% which is caused by the same or a related injury or sickness that gave rise to the initial claim for disability benefits. (App., Exh. A at 714).

11. Claims are not payable until "all information that is necessary for [Paul Revere] to make a decision is received." (App., Exh. A at 703 ("Time of Payment of Claim")).

12. The insured's first obligation is to provide notice of claim "within 30 days after a disability starts or a covered loss occurs, or as soon as this can reasonably be done." (App., Exh. A at 703 ("Notice of Claim")).

13. Next, claim forms are sent out which the insured must fill out and return. (App., Exh. A at 703 ("Claim Forms")).

14. The Policy's proof of loss provision requires the insured to provide periodic "written proof of disability" during the period when benefits are payable. (App., Exh. A at 703 ("Proof of Disability or Loss")).

15. Plaintiff applied for the NYL policy on June 3, 1993. (App., Exh. B at 320-330).

16. In the application, plaintiff said his occupation was "President of First Class Restaurant." (Id. at 330).

17. Next, when describing his "[e]xact duties, including percentage of time spent performing any manual or supervisory duties and traveling," plaintiff said his duties were "executive, office duties only." (Id.)

18. Plaintiff has a history of lower back problems which were successfully treated over the years through periodic epidural steroid injections.

19. In 1996, however, plaintiff had two slip-and-fall incidents in January and March 1996 and sought disability benefits. (App., Exh. B at 17).

20. Plaintiff told NYL he worked 40 hour weeks and listed his important duties as "manage employees, work schedules; book work; deal with food companies; phone; and administration and office duty." (App., Exh. B at 42-43).

21. In his deposition, plaintiff claimed he was mistaken when he wrote 40 hours a week (App., Exh. C at 69-71), although he said he worked 40 hours a week again in 2000. (App., Exh. B at 540).

22. He confirmed the accuracy of the remaining information. (App., Exh. C at 71).

23. Plaintiff provided an attending physician statement of disability ("APS") from his physician, Dr. Douglas Bower, who said plaintiff had been unable to work from April 3, 1996 to October 23, 1996. (App. Exh. B at 15, questions 2(B) and 6(B)).

24. Dr. Bower also gave restrictions and limitations ("R&Ls") on plaintiff's return to work as follows: "to avoid prolonged standing for greater than 10-15 minutes at a time, to try to avoid bending at the waist or lifting objects greater than 10 lbs., or to avoid continuous walking of greater than 15-20 minutes at a time." (App., Exh. B at 13).

25. NYL investigated a possible rescission questioning whether plaintiff had fully disclosed on his application his history of back problems. (Id. at 81, 83).

26. But after receiving additional information, NYL decided not to pursue rescission. (Id. at 151-52 and 191-92).

27.     Instead, without having any medical review of the records, NYL elected to pay benefits for the limited period of July 2, 1996 through October 23, 1996 (the date by which plaintiff had recovered). (Id. at 216-217).

28.     In July 2000, plaintiff suffered a heart attack and was transported to the hospital by ambulance.

29.     He claims that during the ambulance ride, he injured his back when the ambulance hit a bump in the road.

30.     Although the alleged injury occurred in July, Paul Revere did not receive notice until September 2000. (App., Exh. B at 556-557; Exh. D at 11-12).

31.     That same month, both NYL and Paul Revere sent plaintiff claim forms, along with an explanation that Paul Revere would administer the claim pursuant to a reinsurance agreement. (App., Exh. B at 552-553).

32.     Plaintiff's claim forms were not received until December 15, 2000 (after another request by Paul Revere on November 1, 2000). (App., Exh. B at 550 and 551).

33.     When asked to "list the duties of your occupation at the time of your disability," plaintiff responded: "Executive - 50%" and "Office - 50%." (Id. at 549).

34.     He said his occupation was "President" (Id. at 548), and that his duties were 50% executive duties and 50% office duties. (Id. at 547).

35. He also described his occupational duties as involving 40 hours a week (Id. at 540), with 50% of his time supervising employees; 25% bookkeeping, and 25% other office duties. (Id.).

36. He also said he "occasionally" had to lift or carry five-pound objects. (Id. at 539).

37. Plaintiff further said he had to sit for 3.5 total hours (as opposed to at a time), stand for 3.5 hours and walk for 1 hour. (Id.).

38. Plaintiff signed the application and certified that his answers were "complete and true." (Id. at 539).

39. He also said he "cannot perform my duties under the stressful situation. My chest is painful and I am fearful for my life." (Id. at 540).

40. Dr. Bower also completed APS forms noting, among other things, that plaintiff had "objective findings" of a cardiac catheterization on July 24, 2000, and had "subjective symptoms" of "anxiety, worry, low back pain." (Id. at 546).

41. Dr. Bower also identified R&Ls of "no prolonged standing, no heavy lifting (2nd to back)" and "cannot work in a stressful situation." (Id.).

42. On January 4, 2001, plaintiff's counsel faxed Paul Revere a November 3, 2000 letter from Dr. Bower which said plaintiff's cardiac condition may not be disabling. (Id. at 531).

43.  But Dr. Bower claimed plaintiff's back problems were disabling. (Id.).

44.  Finally, Dr. Bower said plaintiff had "stress and anxiety which has been provoked because of his recent cardiac problems." (Id. at 532).

45.  On January 15, 2000, Paul Revere wrote plaintiff about the status of the claim which was delayed by the late submission of the claim forms. (Id. at 529-530).

46.  Further, the letter noted that medical records had been requested and that, consistent with Policy, the claim was not payable until all information necessary for Paul Revere to make a decision is received. (Id.).

47.  Finally, Paul Revere asked plaintiff for an occupational description and a progress report. (Id.).

48.  In his January 18, 2001 occupational form, plaintiff claimed his job required him to stand most of the time. (Id. at 345).

49.  His statements were inconsistent with his prior statements about his occupational duties, such as his statement in November 2001 about the amount of time he spent sitting, standing and walking. (Compare App., Exh. B at 345 and 539).

50.  They were also inconsistent with the descriptions of the specific duties plaintiff outlined on the same form, none of which reflect a need to stand "most of the time."

51. Instead, they refer to (1) bookkeeping; (2) office duties; and (3) employee administration. (Id. at 345).

52. Paul Revere received medical records from Carlisle Hospital in late January 2001. (App., Exh. B at 437-505).

53. On or about March 1, 2001, Paul Revere received records from Dr. Bower's office. (Id. at 387-436).

54. The Carlisle records revealed that plaintiff had periodic epidural steroid injections for his back. (App., Exh. B at 482-503).

55. For example, in October 2000 treatment notes, plaintiff's physician noted "[h]e has spinal stenosis and does reasonably well [with] an injection or 2 once a year." (App., Exh. B at 503).

56. Dr. Bower's treatment records also did not indicate a disability (despite his November 2000 narrative letter).

57. The November 29, 2000 treatment notes reflect that plaintiff's back problems and anxiety were being treated successfully with medication. (Id. at 434).

58. The January 11, 2001 treatment notes reflect no cardiac impairment and that plaintiff's anxiety was stable.

59. While plaintiff was apparently considering another epidural steroid injection, there is no indication that his back was any worse than it was previously when he obtained epidural injections and continued to work.

60.  Indeed, the treatment notes reflect that he was "exercising without difficulty." (Id.).

61.  Paul Revere then arranged for a medical review by Dr. John Clarke, M.D. (App., Exh. B at 381, 378-379).

62.  Dr. Clarke found no cardiac impairment nor "any information to support a present cardiac impairment related to stress." (Id. at 378).

63.  Dr. Clarke noted that plaintiff had prior episodes of trauma-related exacerbation of his back condition but had been able to return to work "and there does not appear to have been any significant structural change in his condition associated with the recent exacerbation." (Id.).

64.  On April 20, 2001, Paul Revere rendered its decision to deny the claim (App., Exh. F, Exh B at 369-370 and 358-360).

65.  In the letter, Paul Revere reviewed the medical and occupational information and concluded that plaintiff's submissions did not prove he was entitled to benefits under the policy.

66.  Plaintiff requested reconsideration of Paul Revere's decision on May 8, 2001. (App., Exh. B at 367-368).

67.  His attorney challenged Paul Revere's understanding of plaintiff's occupational duties. (Id. at 360).

68.  On May 23, 2001 Paul Revere denied plaintiff's request for reconsideration. (Id. at 361-362).

69. Paul Revere offered to review any new information through a further appeal; however, plaintiff filed suit instead.

70. Following a "small" heart attack and angioplasty in July 2000, plaintiff's heart function was normal (App., Exh. G at 14).

71. He was not under any cardiac restrictions after rehabilitation. (Id. at 17).

72. Dr. Bower confirmed that plaintiff's heart condition "does not limit him at all" (Id. at 49), is "not in any way disabling at this point" (Id. at 58), and does not prevent him from working (Id. at 61).

73. As for the back condition, Dr. Bower concedes that "I am not an expert in back conditions." (Id. at 7).

74. Further, his office notes frequently noted that plaintiff's back problems were stable or well-controlled on medication.

75. An early 2001 EMG study found no abnormalities. (Id. at 28-30).

76. Dr. Bower provided R&Ls which included no prolonged standing for more than 15-30 minutes (Id. at 46), and no lifting of more than 20 pounds (Id. at 48).

77. He conceded that he did not have a good grasp of plaintiff's occupational requirements and how those requirements related to his restrictions. (Id. at 50-51).

78. Dr. Bower conceded that if plaintiff's back was the only problem, he could perform the occupational duties he described to Paul Revere (i.e., 20% bookkeeping, 20% office duties and 60% supervising employees). (Id. at 54-57 and 59).

79. Dr. Bower has treated other patients with similar back problems who have returned to sedentary or light duty work. (Id. at 51-52).

80. Dr. Bower also conceded that another physician could examine plaintiff's records and conclude that he can to perform light or sedentary work. (Id. at 53).

81. Although plaintiff's only purported expert witness (Gordon Rose) says there are no psychiatric issues, Dr. Bower relies largely on plaintiff's alleged psychological problems.

82. Dr. Bower thinks the alleged psychological problems represent plaintiff's "biggest" problem. (Id. at 44).

83. Dr. Bower is not a psychologist or psychiatrist, has not performed the necessary testing. (Id. at 36).

84. Dr. Bower formally diagnosed plaintiff with depression in July 2001. (Id. at 35).

85. He has not referred plaintiff to a psychologist claiming that there were few viable options in the geographic area. (Id. at 44-45).

86. Dr. Bower summarized his opinion by stating that while plaintiff's back condition was "a big limitation," plaintiff's "primary problem" was his psychiatric problem. (Id. at 58).

87. Plaintiff's restaurant has a room with a desk where he handles paperwork like ordering supplies. (App., Exh. C at 9-11).

88. This room also has a window from which plaintiff can sit and observe the customers and his employees. (Id. at 10, 81).

89. Plaintiff also described a "typical" day in which he would welcome customers, operate the cash register, pay bills, order supplies, take food orders from customers. (Id. at 17-19).

90. Plaintiff would very rarely, such as once a month, need to go with a customer to a table. (Id. at 18).

91. Also, plaintiff would fill in cooking "once a month maybe, once every two months," if an employee did not show up. (Id. at 19).

92. Plaintiff was not involved with cleaning. (Id. at 18).

93. Plaintiff also claimed that the various occupational descriptions he provided to NYL and Paul Revere did not disclose all of the tasks he actually performed at the restaurant. (App., Exh. C at 72-73).

94. He agrees the information he provided in the forms could mean different things to different people. (Id. at 69).

95. He concedes therefore that someone reviewing the forms might not understand that he works the cash register and may need to wait on tables or cook once a month. (Id. at 85).

96. While plaintiff thinks this should be apparent to someone familiar with restaurants (Id. at 86), he agrees there are many different types of restaurants and restaurant owners. (Id. at 86-88).

97. Plaintiff also testified that he can stand for intervals of 15 to 30 minutes. (Id. at 31).

98. He can walk for 35-40 minutes on flat surfaces. (Id. at 32).

99. Plaintiff's tax returns reveal significant stock trading activity.

100. Plaintiff engaged in close to $6 million in stock trades in 2000 alone. (Id. at 49-51; App., Exh. G).[1]

101. Plaintiff confirmed he made these investment decisions on his own, followed the market closely and made his trades by computer. (Id. at 49, 53-54).

102. Many stocks were held for as little as a day or two. (Id. at 49)

103. Plaintiff lost over $300,000 in 2000 and over $70,000 in 2001. (App., Exh. G).

104. Plaintiff claims that losing this much money did not bother him and made him neither anxious nor angry. (App., Exh. C at 54).

---

[1] Exhibit G contains the Schedule D from plaintiff's 2000 and 2001 individual tax returns.

105.    Discovery into plaintiff's claim for Social Security Disability Income ("SSDI") benefits has revealed the following records:

- An August 29, 2001 denial of benefits because there are positions he could perform which are "simple, unskilled work" positions. (App. Exh. J (compilation of records from SSDI file) at 4);

- A June 18, 2001 report by Dr. Laurence Goldstein finding plaintiff capable of light work and noting R&Ls that allow him to occasionally lift up to 20 pounds and frequently lift 10 pounds; stand or walk for about 6 hours in an 8 hour work day and sit for about 6 hours in an 8 hour work day. (Id. at 1-3); and

- A July 13, 2001 psychological IME report which does not appear to support plaintiff's claim of a *disabling* psychiatric condition. (Id. at 5-9). In fact, Paul Revere had these records reviewed by a board certified psychiatrist, Dr. Abram M. Hostetter, who opined that the records provide insufficient evidence of a psychiatric disability.

106.    After the close of discovery, plaintiff's counsel produced a July 25, 2002 Social Security Decision awarding plaintiff SSDI benefits. (Id. at 12).

107.    The ALJ found plaintiff could, among other things, "sit 4 hours per 8-hour workday with a sit/stand option." (App., Exh. J at 14).

108.    The ALJ referred to and gave "significant weight" to an opinion by Dr. Bower dated April 16, 2002.

109.    This opinion was not produced in discovery until August 8, 2002 and was not submitted by plaintiff to Paul Revere to provide "proof of loss" under the policy.

110.    Dr. Bower's April 16, 2002 letter implies that the back condition alone is disabling. (App, Exh. J at 10 ("Despite this aggressive therapy,

Mr. Mazzamuto is still severely limited in his ability to stand, bend or sit for prolonged periods of time and is unable to work.")).

111. Dr. Bower's letter does not disclose his statement in his deposition that he is not an expert on back problems.

112. Paul Revere has designated Dr. Hostetter as one of its expert witnesses.

113. Dr. Hostetter has opined that plaintiff has provided insufficient evidence of a psychiatric disability. (App., Exh. K).

114. Paul Revere has also designated Robert T. Steinman, M.D., a board certified physiatrist.

115. Dr. Steinman has opined, among other things, that (1) plaintiff's back condition does not prevent him from working at the restaurant; (2) his alleged need to stand behind a counter does not mean he is disabled; (3) plaintiff could work by alternating between sitting and standing; (4) that the trauma-induced problems in 1996 are not comparable to the ambulance ride in 2000; and (5) that any orthopedic impairment from the ambulance ride should be resolved by now. (App., Exh. L).

116. Plaintiff has not designated any medical experts.

117. Instead, his only designated expert is an insurance practices expert, Gordon Rose.

118. Mr. Rose is not a physician.

119. Mr. Rose has opined that plaintiff's disability claim is limited to his back problems and has nothing to do with psychological problems. (App., Exh. H).

STEVENS & LEE

By *E. Thomas Henefer*
E. Thomas Henefer
Attorney I.D. 55773
Kirk L. Wolgemuth
Attorney I.D. 45792
111 North Sixth Street
P.O. Box 679
Reading, PA 19603-0679

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I, E. THOMAS HENEFER, ESQUIRE, certify that on this date, I served a certified true and correct copy of the foregoing Statement of Material Facts In Support of Defendant's Motion for Summary Judgment upon the following counsel of record, by hand delivery as follows:

> Richard C. Angino, Esquire
> Angino & Rovner, P.C.
> 4503 N. Front Street
> Harrisburg, PA 17110

*E. Thomas Henefer*

Date: 8/9/02