ORIGINAL

FILED
HARRISBURG, PA

AUG 2 6 2002

MARY E. D'ANDREA, CLERK
Per_____

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VINCENZO MAZZAMUTO,<br>   Plaintiff, | CIVIL ACTION – LAW |
| v. | NO. 1:CV-01-1157 |
| | JUDGE KANE |
| UNUM  PROVIDENT  CORPORATION;<br>PAUL   REVERE   LIFE   INSURANCE<br>COMPANY;   and   NEW   YORK   LIFE<br>INSURANCE COMPANY<br>   Defendants | JURY TRIAL DEMANDED |

### PLAINTIFF'S BRIEF CONTRA
### DEFENDANTS' MOTION IN LIMINE

## II.    COUNTERSTATEMENT OF FACTUAL AND PROCEDURAL HISTORY

Plaintiff adopts and incorporates the factual history referenced in his Motion for Partial Summary Judgment and Brief in Support of same and Brief Contra Defendants' Motion for Summary Judgment.

Dr. Bower has been Mr. Mazzamuto's family physician since 1992. In response to requests from Defendants as to Mr. Mazzamuto's July 2000, disability claim, Dr. Bower, commencing with November 3, 2000, submitted numerous reports as to Mr. Mazzamuto's medical history, treatment and condition and expressed his opinion as to Mr. Mazzamuto's total disability. These reports appear at Exhibits C & D to Exhibits in Support of Plaintiff's Motion

for Partial Summary Judgment (**PMSJ**)  Defendants also requested and obtained all of Dr. Bower's medical records.   Exhibit B, pp. 387-436 to Defendants' Appendix in Support of Motion for Summary Judgment (**DMSJ**).  Thirdly, Defendants deposed Dr. Bower on April 16, 2002.  **PMSJ Ex. E. and DMSJ Ex. G.**  Dr. Bower also submitted a report on April 16, 2002, which formed the basis for a Social Security determination on July 25, 2002, that Mr. Mazzamuto is totally disabled.  Dr. Bower also submitted reports and statements in 1996 that resulted in New York Life's finding that Mr. Mazzamuto was disabled in 1996.

Dr. Bower's deposition is 70 pages in length.  Commencing at page 5, defense counsel asked questions about Dr. Bower's educational background and experience.  Dr. Bower testified that he had been practicing medicine continuously since 1988, p. 5.  He stated that he was board certified in internal medicine, a partner in Masland Associates, and described the practice of internal medicine as:

> A    The practice of internal medicine is basically the non surgical adult medical practice.  We take care of most chronic adult illnesses that don't require surgery.  Here at our practice we also do a lot of what's called primary care which is seeing people for acute problems such as, you know, sprains and strains and colds in addition to taking care of chronic medical conditions like high blood pressure, kidney disease, arthritis, things of that sort.

p. 6.

Although Dr. Bower admitted that he is not "an expert in back conditions" (p. 7), he was merely indicating that he was not an orthopedic surgeon or specialist.  Defendants, however, sought his opinion by requesting physician statements, and Dr. Bower has been completing physician's statements for Defendants for Mr. Mazzamuto since October 23, 1996, p. 65.  Dr. Bower told Defendants in his October 23, 1996, statement that Mr. Mazzamuto had been disabled from April 3, 1996, through October 23, 1996, for a low back and central spinal stenosis, p. 65.  Dr. Bower has completed similar forms at different intervals since 1996.  Dr.

Bower has been telling New York Life his assessment and expressing his opinion as to Mr. Mazzamuto's degree of disability since 1996, pp. 65, 66. UNUM's Manual recognizes the primary importance of reports and physician statements from treating physicians. Exhibit C to Plaintiff's Appendix Contra Motion for Summary Judgment (**App**).

Dr. Bower is personally familiar with Mr. Mazzamuto's work history. He recognizes that Mr. Mazzamuto has worked in pizza restaurants since he came from Italy up until he was totally disabled in 1996 and then continued to work until he had his heart condition in July of 2000 (pp. 66, 67) and that he has been totally disabled from a combination back and anxiety condition since July 22, 2000. On April 16, 2002, Dr. Bower stated for Social Security purposes that Mr. Mazzamuto is totally disabled even if one excluded his "anxiety" condition. Exhibit A to Plaintiff's Brief Contra Defendants' Motion in Limine (**PCMIL**).

When specifically asked as to whether Mr. Mazzamuto's central spinal stenosis back condition, would get better or worse over time, his answer was: "It gets worse over time." Bower depo, p. 67. The spinal stenosis would not go away. The low back pain "will worsen because the arthritis and the disc disease that he's got will get worse." Bower depo, p. 67. Dr. Bower said that there was no difference in the type of work Mr. Mazzamuto did in 1996 and 2000 "same job." Bower depo, p. 67.

When asked as to whether Defendants had any medical basis for paying Mr. Mazzamuto in 1996 and not in 2000, Dr. Bower said he could not medically understand the insurance company's position, Bower depo, p. 68. Dr. Bower stated that as an internist, the majority of his patients are older adults, that many of these patients have <u>back problems</u> and <u>anxiety</u>, and he sees and treats these patients for <u>back problems, anxiety, and heart conditions</u>, Bower depo, p. 68.

Q      And you feel you're qualified to treat them; is that right?

A      I do.

Q       And not only being qualified to treat them, are you qualified to be able to express a medical opinion as to whether you feel they're disabled from doing types of work if the types of work are described to you?

A       I think so.

Q       And in this particular case with Mr. Mazzamuto, you have not only what he's told you but you've – I think you said 10, 15 times at least have been to his restaurant; is that right?

A       Correct.

Q       So you've seen with your own eyes what he does; is that right?

A       I've seen what goes on in the restaurant, correct.

Q       When you see him and he's standing behind a counter that's four feet tall, you see a man that has to stand; is that right?

A       Correct.

Q       And when you see the kinds of cans that are around that have the product for the pizza, you assume somebody has to from time to time pick up those cans and things; is that right?

A       Correct.

Q       And even pizzas have some weight to them; is that right?

A       Oh, yes, of course.

* * *

Q       But you have directly witnessed his cooking; is that right?

A       Correct.

Q       And you've witnessed the small type of operation that is there; is that right?

A       Correct.

Q       And you've witnessed that the people performing those operations have to do a variety of tasks; is that right?

A       Lots of different movements and motions.

Q    And as far as you know, Mrs. Mazzamuto has assumed over the last few years virtually all if not all of the tasks that Mr. Mazzamuto was doing before.

A    My understanding again is that she's been doing much more of the supervisory work that goes on there.

Bower depo, pp. 68-70.

As to Gordon K. Rose, CLU, he has submitted two expert reports and his curriculum vitae in accordance with Fed.R.Civ. 26. **PCMIL Ex. B.**

## III.    ARGUMENT

First of all, Dr. Bower, as a treating physician, does not fit within the mandatory disclosure and report submission of Rule 26(a)(2)(b):

Rule 26(a)(2) Disclosure of Expert Testimony

\* \* \*

(b)    Except as otherwise stipulated or directed by the court, this disclosure shall with respect to a witness <u>who is retained or specially employed to provide expert</u> testimony in this case or his duties as an employee of the party regularly involved giving expert testimony be accompanied by a witness report prepared and signed by the witness.  (emphasis supplied)

<u>See</u>, 10 Fed. Proc, L.Ed §26:37 Report prepared by expert:

For convenience, FRCP 26 and revised FRCP 30 continue to use the term "expert" to refer to those persons who will testify under FRE 702 with respect to scientific, technical, and other specialized matters.  The requirement of a written report in FRCP 26(a)(2)(B), however, applies <u>only to those experts who are retained or specially employed to provide such testimony</u> in the case or whose duties as an employee of a party regularly involve the giving of such testimony. <u>A treating physician for example, can be deposed or called to testify at trial without any requirement for a written report</u>.

pp. 353, 354, emphasis supplied.

Fed.R.Civ.P. 26(b)(4)(A) permits a party to

depose any person who has been identified as an expert whose opinions may be presented at trial.  If a report from the expert is required under subdivision (a)(2)(B), the deposition shall not be conducted until after the report is provided.

Defense counsel availed himself of Rule 26(b)(4)(A) and did not require that a report be provided before he took Dr. Bower's deposition. He, therefore, waived any possible prerequisite of a report.

The purpose of requiring that reports be submitted to opposing counsel is to make sure that opposing counsel is not unfairly surprised by the testimony of an expert witness at trial or in his deposition. In the instant case, Defendants requested and received numerous reports, had medical authorizations to communicate with Dr. Bower, obtained all of Dr. Bower's medical records, and in addition, took Dr. Bower's deposition. Defendants cannot possibly contend that they will be prejudiced by any testimony that Dr. Bower may give at trial and/or the utilization of the deposition that defense counsel took of Dr. Bower.

Defense counsel devotes virtually his entire brief to <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) <u>which has absolutely nothing to do with this case</u>. This is a simple case of a family doctor expressing an opinion as to his patient whom he has treated for many years and who is familiar with the medical history of his patient, his medical records and test results, and in addition the type of work he does.

Mr. Mazzamuto's condition is similar to many other patients that Dr. Bower has diagnosed and treated over the past 14 years since he started his practice of internal medicine in 1988. Dr. Bower undoubtedly has submitted numerous reports for such patients for back, heart, and anxiety conditions for a variety of purposes, including medical expense reimbursement, characterization of condition, necessity of treatment, reasonableness of hospital stay, time off from work, accident and work-related injury plus partial and total disability. There is no question that, as part of his treatment, Dr. Bower orders x-rays, other tests, medications, refers for physical therapy, etc. Family doctors testify in court regularly in automobile accident cases,

medical malpractice cases, and routinely are deposed for workers' compensation matters, for back conditions, anxiety, etc. There is no question that Dr. Bower by education, experience, and testimony has been found board certified in internal medicine, and internal medicine means diagnosing and treating individuals with back and anxiety problems. See, Bower deposition, pp. 6, 68-70. Up until the recent amendments to the medical malpractice law, family doctors were permitted to testify as to the violation of the standard of care as to specialists such as orthopedic surgeons, psychiatric conditions, etc. so long as they treated patients for similar conditions.

In terms of qualifications, the textbook law is clear in this regard:

**§80:207. Qualifications of witness as expert**

Under FRE 702, a witness must qualify as an expert by reason of knowledge, skill, experience, training, or education in order to testify on matters which are scientific, technical, or specialized in nature. An expert may qualify on the basis of any one of the these [sic] five attributes, and it is error for a trial judge to rule an expert unqualified simply because he lacks one of the five.

33A Fed Proc, L Ed, §80:207, p. 262.

**§80:208. –Level of expertise**

To testify as an expert, the prospective witness need not have certificates of training or memberships in professional organizations and need not be an outstanding practitioner in the field in which he professes expertise. The witness need not be a specialist simply because his field contains recognized specialties. A lack of specialization affects the weight of the opinion, not its admissibility; an expert witness is not confined to his area of practice, but may testify concerning related applications. For example, a cardiologist is qualified to give medical opinions as to the plaintiff's mental state as it relates to the plaintiff's heart condition even though the cardiologist is not a psychiatrist. Similarly, a cardiologist is qualified to give an opinion on the relationship between the deceased's heart problems and his death; he is not required to be a pathologist to give such an opinion. Moreover, the fact that three testifying pathologists disagree with the cardiologist's opinion as to the cause of death does not render the cardiologist disqualified; the conflict among the experts testifying is grist for the jury. In addition, the fact that an expert does not have a degree or license in his professed specialty goes to the weight of the testimony rather than its admissibility. An expert does not have to be able to testify with absolute certainty; the expert's certainty or lack thereof goes to the weight of the testimony

and not its admissibility.  However, there is a threshold level of expertise which the witness must exceed to be qualified as an expert.

33A Fed Proc, L Ed §80:208, pp. 265-266.

Under §80:208 Level of expertise, <u>Heinze v. Heckler</u> 581 F.Supp. 13 (E.D. Pa. 1983) is referenced, as well as the Fifth Circuit case of <u>United States v. Viglia</u>, 549 F.2d 335 (5th Cir. 1977) and the Eighth Circuit case <u>Holmgren v. Massey-Ferguson, Inc.</u>, 516 F.2d 856 (8th Cir. 1975).

The <u>Heinze</u> case involved a treating physician cardiologist who was determined to be qualified to testify as to his client's neurosis even though he was not a psychiatrist:

> Although Richard may be able to engage in mild sedentary activities on a sustained basis when viewing his organic physiologic cardiac findings, we have found that his anxiety state combined with his cardiac condition has resulted in his inability to do any sustained work because of the frequent episodes of pain, shortness of breath and discomfort.

Quoted testimony of treating physician in <u>Heinze</u>, 581 F.Supp. at 14.

On the subject of expert testimony and qualifications, <u>see</u>, 2 McCormick on Evidence Fifth Edition 1999, Chapter 3 §13, pp. 58, *et seq.*:

> In the past two decades, the use of expert witnesses has skyrocketed ... 86% of the trials ... 3.3 experts per trial ...

> \* \* \*

> *The witness's qualification as an expert.*  Second, the witness must have sufficient skill or knowledge related to the pertinent field or calling that his inference will probably aid the trier in the search for truth.  The knowledge may be derived from reading alone in fields (education), from practice alone in other fields (experience), or as is more commonly the case from both.  While the court may rule that a certain subject of inquiry requires that a member of a particular profession, such as a doctor, engineer, or chemist be called, usually a specialist in a particular branch of a profession is not required.  <u>The question is not whether this witness is more qualified than other experts in the field; rather, the issue is whether the witness is more competent to draw the inference than the lay jurors and judge.</u>  (emphasis supplied)

2 McCormick on Evidence Fifth Edition 1999, Chapter 3 §13, pp. 59-61.  Miller v. Pillsbury Co.,

211 N.E.2d 733 (Ill. 1965) is cited for:

> the trend is to permit expert testimony in matters which are complicated and
> outside the knowledge of the average person, and even as to matters of common
> knowledge and understanding where difficult of comprehension and explanation.

United States v. Viglia, 549 F.2d 335 (5th Cir. 1977) held that a physician with no

experience in treating obesity could give an opinion on the use of a controlled substance

allegedly used for obesity.

As to Gordon K. Rose, his curriculum vitae which has been supplied to defense counsel

aptly supports his qualification to express the opinions in his reports.  Defense counsel chose not

to take Mr. Rose's deposition and, therefore, has no basis in challenging Mr. Rose's

qualifications.  As to the use of insurance experts in bad faith cases, virtually every bad faith case

has an insurance expert with plaintiffs calling one and defense calling another.  See, Plaintiff's

Brief Contra Defendants' Motion for Summary Judgment.  Also see, Kraeger v. Nationwide

Mut. Ins. Co., 1997 U.S.Dist. LEXIS 2726 (1997).  **Exhibit C** to this Brief.

Plaintiff's expert Gordon Rose should be permitted to testify because his testimony is

based on facts developed in the discovery in this case and his own knowledge gained in his own

experience  in the insurance industry, his testimony is relevant, and it will aid the trier of fact,

i.e., the jury, to understand how an insurance company ought to handle a claim for disability.

The pertinent Federal Rules of Evidence provide:

Rule 702.  Testimony by Experts

> If scientific, technical, or other specialized knowledge will assist the trier
> of fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training, or education, may
> testify thereto in the form of an opinion or otherwise, if (1) the testimony is based
> upon sufficient facts or data, (2) the testimony is the product of reliable principles
> and methods, and (3) the witness has applied the principles and methods reliably
> to the facts of the case.  (emphasis supplied)

Likewise, in Pennsylvania, a witness is qualified to offer an expert opinion where the witness possesses more expertise than is within the ordinary range of training, knowledge, intelligence or experience, Miller v. Brass Rail Tavern, Inc., 541 Pa. 474, 481, 664 A.2d 525, 528 (1995). To be qualified to testify in a given field, a witness normally needs only to possess more expertise than is within the ordinary layman range of training, knowledge, intelligence or experience. Ordinarily, therefore, the test to be applied is whether the witness has a reasonable pretension to specialized knowledge on the subject matter in question. Id. at 480-481, 664 A.2d at 528. Under either Rule 702 or Pennsylvania law, Mr. Rose is obviously qualified as an expert, aware of the professional standards with respect to an insurer's handling of a claim for benefits under a policy.

Defendants' reliance on Dattilo v. State Farm, 1997 U.S. Dist. LEXIS 16188 (E.D. Pa. 1997) and Bergman v. United Services Automobile Association, 742 A.2d 1101 (Pa. Super. 1999) is misplaced and unavailing. In Dattilo, plaintiffs offered the testimony of an expert who did not look at Defendant's file, and did not offer any reason for his opinion that State Farm acted in bad faith. Not surprisingly, the court concluded that the "so-called expert" had nothing of value to offer. In contrast, instantly, plaintiff's expert, Mr. Rose, reviewed, inter alia, the applicable disability income policy, the application for the policy, the 1997 claim file, procedure notes of 15 visits to Dr. Ted Kosenske for treatment for spinal stenosis and back pain, correspondence from UNUM, New York Life, and Paul Revere indicating that the claim form had been mishandled by the insurance companies, Dr. Bower's November 3, 2000 letter to Paul Revere stating the basis for Mr. Mazzamuto's disability, Mr. Mazzamuto's occupational description as submitted to New York Life, hospital reports regarding Mr. Mazzamuto's back treatments, additional correspondence in connection with the claim handling. Based on 18 years

in the employ of insurance companies <u>including New York Life</u>, a defendant in this case, and <u>30 years of teaching about life insurance and disability insurance</u>, Mr. Rose certainly can offer an opinion that there were inordinate delays by UNUM in processing this claim and/or denied the claim without adequate grounds. Mr. Rose can also assist the jury with respect to referencing Defendants' Manual for Handling Claims and Pennsylvania Unfair Insurance Practices Act which is referenced and adopted in Defendants' Manual.

In <u>Bergman</u>, the issue presented was whether expert testimony should be <u>required</u> in bad faith cases. Superior court determined not to adopt a per se rule but to leave the question of admission or exclusion of expert testimony within the sound discretion of the trial court. In so doing, Superior Court noted that an expert witness is one who possesses knowledge not within ordinary reach or understanding, and who, because of this knowledge, is specially qualified to address a particular subject. 742 A.2d at 1105. Mr. Rose certainly meets this description. When a witness is offered as an expert, the first question the trial court should ask is whether the subject to be addressed by the witness is "so distinctly related to some science, profession, business or occupation" that it is beyond the understanding of the average layperson. 742 A.2d 1101. Certainly, the average layperson does not handle claims for insurance benefits. "If the facts can be fully and accurately described to the fact-finder, who, without special knowledge or training, is able to estimate the bearing of those facts on the issues in the case, then the opinions of witnesses are inadmissible because they are unnecessary in the search for truth. . . . The primary purpose of the expert testimony must be to assist the trier of fact in understanding complicated matters . . . " <u>Bergman</u>, 742 A.2d at 1105. The <u>Bergman</u> court noted that while expert testimony is not mandated in all bad faith cases, expert testimony on the issue of bad faith

or an insurer's duty of care is admissible, though not required, where the trial court deems it relevant. 742 A.2d at 1107.

Notably, Bergman involved a bench trial. The trial court whose decision Superior Court affirmed, itself noted that whereas the court did not consider it needed the assistance of an expert in that particular case, an expert might be helpful to a jury in a similar action.

> [I]t [is] a different analysis as to whether or not you need an expert [in federal court], because you have a jury that may not be familiar with the handling of claims, procedures involved in claims. It has been my experience that in a non-jury case, you [do not] have the same analysis."

742 A.2d at 1110. As both the trial court and Judge Cirillo noted in his concurring opinion, this is an important distinction to make. Ibid.

Plaintiffs urge this Honorable Court to adopt the reasoning of the trial court in Bergman and of Judge Huyett in Kraeger v. Nationwide, 1997 U.S. Dist LEXIS 2726 (E.D. Pa. 1997). Judge Huyett repeated the rule that

> In general, whether expert testimony is permitted depends on whether the expert's knowledge is likely to assist the trier of fact to arrive at the truth. F.R.E. 702; *Hines v. Consolidated Rail Corp., 926 F.2d 262, 272-73 (3d Cir. 1991).* Testimony about how insurance claims are managed and evaluated and the statutory and regulatory standards to which insurance companies must adhere could be helpful to the jury in evaluating whether the claim in the instant case was handled in bad faith. . . . [The expert's] opinion, based upon his expertise and experience, that Defendant had no reasonable basis for its actions could be helpful to the jury.
>
> . . . Defendant claims that [the expert] is not qualified to testify as an expert in the area of bad faith insurance claim handling practices. The Court of Appeals for the Third Circuit has held 'a broad range of knowledge, skills, and training qualify an expert as such' and has 'eschewed imposing overly rigorous requirements of expertise.' *United States v. Velasquez, 33 V.I. 265, 64 F.3d 844 (3d Cir. 1995). . . .*
>
> Defendant argues that Daubert restricts [the expert's] testimony. [The expert's] testimony is not 'scientific' or 'technical' pursuant to F.R.E. 702, but consists of 'specialized knowledge.' The factors listed in Daubert do not apply to

this type of testimony.  However, the rationale behind Daubert, that a foundation
and relevance must be demonstrated for testimony to be admissible, remains true.

1997 U.S. Dist. LEXIS 2726, pp. 1-2.  Finally, Judge Huyett would allow the expert witness to

base his opinions and testimony on statutes:  "Plaintiffs only need to show that the statutes are 'of

a type reasonably relied upon by experts' in the field if they are otherwise inadmissible.  F.R.E.

703.  It would be reasonable for experts in bad faith insurance practices to look to the relevant

statutory and regulatory requirements in examining the reasonableness of an insurer's actions."

Ibid.

      In sum, Plaintiff's expert, Mr. Rose, is eminently qualified to offer an expert opinion to

aid the trier of fact in this case, i.e., the jury, to evaluate the questions of fact which will be raised

at trial.  The court should permit Mr. Rose's testimony.

Respectfully submitted,

ANGINO & ROVNER, P.C.

Richard C. Angino, Esquire
I.D. No. 07140
4503 N. Front Street
Harrisburg, PA  17110
(717) 238-6791
Attorney for Plaintiff

Date:  8/26/00

From : McGraw Hait & Deitchma     PHONE No. : 975 9446          Aug. 08 2002  4:06PM  P01

# MASLAND ASSOCIATES, INC.
## INTERNAL MEDICINE

MEDICAL ARTS BUILDING     220 WILSON STREET, CARLISLE, PA  17013     (717) 249-1929

DAVID S. MASLAND, M.D.
RETIRED

JOSEPH F. BRAZIE, M.D.
HEMATOLOGY

FRANK P. CASTRINA, M.D.
PULMONARY

LARRY S. RANKIN, M.D., F.A.C.C.
CARDIOLOGY

DEBRA D. TAYLOR, M.D.
INTERNAL MEDICINE

LESTER L. HIMMELREICH, III, M.D., F.A.C.P.
INTERNAL MEDICINE

TERRY A. ROBISON, D.O.
INTERNAL MEDICINE

PHILIP A. NEIDERER, D.O.
INTERNAL MEDICINE

DOUGLAS J. BOWER, M.D.
INTERNAL MEDICINE

April 16, 2002

Ms. Trudy McGraw
The Wellington
17 East High Street, Suite 101
Carlisle, PA  17013

Dear Ms. McGraw:

I'm writing to you in regards to my patient, Vincent Mazamutto, to clarify his current medical conditions.

As I mentioned to you in past correspondence, Mr. Mazamutto has three primary medical conditions.  His first problem revolves around severe low back pain which has been chronic and unrelenting despite numerous aggressive interventions.  He's been on multiple medications, received therapy from the pain clinic, received local epidural steroid injections and numerous prescription medications - all with only partial success.  Despite this aggressive therapy, Mr. Mazamutto is still severely limited in his ability to stand, bend or sit for prolonged periods of time and is unable to work.

His second, and perhaps most severe problem, is that of his chronic anxiety and depression.  This has become especially manifest over the last several years and has proved to be somewhat refractory to multiple medical interventions.  This problem was complicated by his third problem which is that of coronary artery disease.  As the result of his heart problems, Mr. Mazamutto is extremely fearful of suffering a heart attack and dying.

At the present time I feel that Mr. Mazamutto is being treated maximally but the combination of the three previously mentioned conditions still renders him unable to work.  Because of his severe anxiety, he is unable to even consider the possibility of back surgery as he is extremely fearful that the surgery will render him either paralyzed or induce further myocardial infarction.  As such, I



*Trudy McGraw*
*April 16, 2002*
*Page 2*

*do not think it is wise to pursue this option.   We'll continue our efforts with medical therapy in an effort to improve Mr. Mazamutto's quality of life , but I feel we have probably plateaued in our abilities to improve his level of function.  As such, it has been our recommendation that he not return to work.*

*If you have any questions, concerns or other specific issues which you'd like me to address, please don't hesitate to call.*

*Sincerely,*

*Douglas J. Bower, M.D.*

*DJB/ro*

7-12-02; 7:07AM;ANGINO AND ROVNER                    ;238 2169        # 3/

**Gordon K. Rose, CLU, ChFC**
**735 Virginia Rail**
**Kiawah Island**
**SC 29455**
**Ph 843 768 6669**
**Fax 843 768 0344**
**E-Mail GKROSECLU@aol.com**

Richard C. Angino                                    July 11, 2002
Angino & Rovner
4503 N. Front St.
Harrisburg, PA 17110-1708

RE: Vincenzo Mazzamuto

Dear Mr. Angino:

I have received and reviewed the reports from Drs. Steinman and Hostetter. The following will be a supplement to my June 13, 2002 report and the previous supplement dated June 21, 2002.

Dr. Hostetter concluded his report by stating, "Therefore as noted above, it would be necessary to have Mr. Mazzamuto seen in person by a psychiatrist in order to determine his degree of psychiatric impairment." Neither Mr. Mazzamuto, nor his representatives have claimed that his disability was due to a mental condition. Mr. Mazzamuto had mentioned he was apprehensive about returning to work, but it was clear his inability to stand for periods of time, due to his back condition, was the cause of the disability. The definition of disability in the policy as discussed in my report, clearly covers Mr. Mazzamuto's situation. Bringing in a psychiatrist, 2 years after the disability, can only be regarded as a delaying action by UNUM.

Dr. Steinman wrote his report without examining Mr. Mazzamuto. As I read Dr. Steinman's report, the Dr. is suggesting that Mr. Mazzamuto is disabled when he states, "Mr. Mazzamuto should lean on the counter with his forearms"..."Also place a bar stool with a back support". As previously stated the definition of disability in the policy is "the insured can not do the substantial and material duties of his regular job". To do his regular job, Mr Mazzamuto must stand behind the counter, not lean on it or sit on a stool.

I have also reviewed the report from the Pennsylvania Bureau of Disability Determination. I was under the impression earlier that Mr. Mazzamuto had been approved for Social Security Disability benefits. At this point I do not know if he has been approved or not. However, page 6 of the report of Stanley E. Schneider, EDD under II MAKING PERFORMANCE ADJUSTMENTS

1. Understand, remember and carry out complex job instructions..........................Poor/none
2. Understand, remember and carry out detailed, but not complex job instructions........Poor/none
3. Understand, remember and carry out simple job instructions...............................Poor/none

It would appear that Dr. Schneider is of the opinion that Mr. Mazzamuto is disabled.

7-12-02; 7:07AM;ANGINO AND ROVNER                    ;238 2169              # 4

Page 2.

Whether or not Social Security approves the claim does not alter the fact that the disability policy owned by Mr. Mazzamuto has a much more liberal definition of disability than the definition used by the Social Security Administration.

New York Life has granted Waiver of Premium benefits on a life policy owned by Mr. Mazzamuto. In my June 21, 2002 addendum to my report I mistakenly thought the premiums had been waived on the disability policy. It is true that a decision to waive premiums on a life policy does not automatically mean that disability benefits under a disability policy will be paid. However, in this case the definition of disability is more liberal in the disability policy, than the definition of disability in the life policy. If Mr. Mazzamuto is disabled under the life policy definition, he is definitely disabled under the disability policy. Claims people at UNUM are very familiar with these definitions, but still continue to deny the claim.

For 2 years UNUM has deliberately delayed this claim, by requesting additional information. UNUM spent a great deal of time, investigating the heart condition, even though the claim was due to a back injury. Now they have spent time getting information regarding a mental condition. For 2 years, UNUM has had the right to call for an Independent Medical Exam, and they have not done so. This would have been standard procedure when they did not believe the statements of Dr. Bowers.

To continue to deny this claim, even after New York Life decided Mr. Mazzamuto was disabled under the Waiver of Premium for Disability clause, and Dr. Schneider has answered "Poor/None" on all 3 questions is truly outrageous behavior. It is this type of behavior by some insurance companies, that has led to the passage of Bad Faith Laws.

Very truly yours,

Gordon K. Rose

**.don K. Rose, CLU, ChFC**
**735 Virginia Rail**
**Kiawah Island**
**SC 29455**
**Ph 843 768 9060**
**Fax 843 768 0344**
**E-Mail GKROSECLU@aol.com**

Richard C. Angino                                    June 21, 2002
Angino & Rovner, P.C.
4503 North Front Street
Harrisburg, PA 17110-1708

      Re:   Vincent Mazzamuto

Dear Mr. Angino:

I have read the letter, to Mr. Mazzamuto, from Therese A Sindelar of the New York Life Insurance Company, dated June 14, 2002. Due to the contents of that letter, I wish to add the following to my report, dated June 13, 2002.

As stated in my June 13 report the definition of disability is found on page 5 of the policy. ..."total disability means that the insured can not do the substantial and material duties of his or her regular job."

The Waiver of Premium Benefit found on page 7 of the policy states in part....."We will waive those premiums that fall due on or after that income starting date and during that disability" Since disability is defined only once in the policy, the same definition of disability applies to the waiver of premium benefit as applies to the disability income benefit.

Although Ms. Sindelar is mistaken when she quotes a different definition of disability in the second paragraph of her letter, she does come back to the policy definition in her third paragraph.

New York Life has decided that Mr. Mazzamuto was disabled on July 22, 2000. They have agreed to waive the premium and have refunded all premiums paid since August, 2000.

The disability policy on Mr. Mazzamuto is a New York Life policy. New York Life has decided that Mr. Mazzamuto has been disabled as Mr. Mazzamuto has claimed. It is outrageous that UNUM has refused to pay this claim. The delays in the claim handling by UNUM were well below industry standards and fell short of the promises for timely handling of claims as stated in the policy. The Social Security Administration has decided that Mr. Mazzamuto is disabled. UNUM has no basis for denying this claim.

Very truly yours,

Gordon K. Rose

# Gordon K. Rose, CLU, ChFC
## 735 Virginia Rail
## Kiawah Island
## SC 29455
## Ph 843 768 9060
## Fax 843 768 0344
## E-Mail GKROSECLU@aol.com

Richard C. Angino                                June 13, 2002
Angino & Rovner, P.C.
4503 North Front St.
Harrisburg, PA 17110-1708

        Re:  Vincenzo Mazzamuto

Dear Mr. Angino:

I have reviewed the materials you sent to me on the above case. You requested a comprehensive report and the following report includes my opinions.

The materials I have reviewed are as follows.....

1. New York Life disability income policy #H8520057 issued March 2, 1993 on the life of Mr. Mazzamuto.
2. The application for the policy and the New York Life underwriting file.
3. The 1997 claim file following Mr. Mazzamuto's first claim for benefits.
4. The Procedure notes of 15 visits to Dr. Ted Kosenske from July 10, 1996 to Oct 18, 2000
5. Sept 28, 2000 letter from UNUM advising where to present claim.
6. Sept. 29, 2000 letter from New York Life advising to send claim to Paul Revere.
7. Oct. 11, 2000 letter from Paul Revere confirming receipt of claim materials.
8. Nov. 1, 2000 letter from Ms. Magner , stating that the claim form had not been received.
9. Nov. 3, 2000 letter from Dr. Bowers to Paul Revere.
10. The completed claim form and authorization to release information.
11. UNUM Action log, set up on Jan 4, 2001.
12. Ms. Magner letter to Mr. Mazzamuto dated Jan. 15, 2001
13. Occupational description completed by Mr. Mazzamuto Jan. 18, 2001
14. Carlisle Hospital reports, requested Jan 22, 2001.
15. Rehabilitation review completed by Jack Fogerty Feb 2, 2001
16. Claim department phone memo, Feb. 13, 2001
17. Letter from Peter J. Russo, Mar. 19, 2001
18. Magner response to Russo, Mar. 20, 2001
19. Letter from Russo to Magner, Mar. 26, 2001
20. 5 page letter from Magner to Russo, Apr. 20, 2001
21. Letter from Richard Angino to Ms. Magner, May 8, 2001
22. Letter from Magner to Angino  May 23, 2001
23. Carlisle Hospital admission records, July 22, 2000

Page 2.
24. Complaint filed June 26, 2001
25. Deposition of Melissa Ann Mulroy
26. Deposition of Dr. Clarke.
27. Deposition of John W. Fogarty
28. Deposition of Dr. Douglas Bower.
29. Dr. Taylor file

It is my understanding that the following events occurred. Mr. Mazzamuto had made the timely payment of premiums to keep the insurance policy in force. In 1996, Mr. Mazzamuto fell on the ice and injured his back. A claim was submitted to New York Life. After first denying the claim, New York Life decided that they did not have grounds to deny and paid the claim.

After a relatively short period of time Mr. Mazzamuto returned to work full time. However, he continued to suffer from back pain and often visited his Doctor. In July 2000, Mr. Mazzamuto had a heart attack. While being taken to the hospital in an ambulance, Mr. Mazzamuto's back was re injured. After being discharged from the hospital Mr. Mazzamuto attempted to return to work. However, Dr. Bower was clear in his advice that Mr. Mazzamuto not go back to work. Mr. Mazzamuto has not returned to work and filed a claim for disability benefits.

The transfer of the New York Life disability insurance business to Paul Revere and the ensuing mergers of companies, caused a great deal of confusion. Mr. Mazzamuto was a victim of this confusion. Mr. Mazzamuto was informed by Paul Revere in a letter dated Oct. 11, 2000 that claim materials had been received. Ms. Magner wrote to Mr. Mazzamuto on Nov 1, 2000 that the claim form had not been received. At one point the company claimed that the claim file had been lost. This confusion continued from Sept. 28, 2000 until Jan 4, 2001 when UNUM finally set up the "Action Log" for the claim process. None of this confusion was the fault of Mr. Mazzamuto, who by this time should have been receiving benefits from his policy.

Ms Magner wrote to Mr. Mazzamuto on Jan 15, 2001. She stated that with the 90 day elimination period, benefits would begin to accrue on Oct 20, 2000. Ms. Magner stated " Your policy requires that written notice of claim must be given to us within 30 days after a disability starts or a covered loss occurs.." An insured, who knows they have a 90 day elimination period, may reasonably assume that no "covered loss has occurred" until the end of the 90 day period. Mr. Mazzamuto already had confirmation from Paul Revere that claim materials had been received prior to Oct. 20. Ms. Magner attempted to use the "notice clause" to explain why the evaluation of the claim may be delayed. Note: the claim had already been delayed almost 3 months when she wrote the letter.

Page 3.

The Jan. 15, 2001 letter also mentioned that they were requesting medical records from Dr. Bower. Dr. Bower had written on Nov. 3, 2000 and had given a complete description of Mr. Mazzamuto's condition, including the statement "At the present time he is not able to do the work required in running his restaurant because he can not stand for a prolonged period of time, has difficulty bending, and is restricted from heavy lifting. It is unlikely that he will be able to return to work in the foreseeable future." It was clear that the disability was due to the back problem rather than the heart condition.

An "Occupational Description" form was also enclosed in the Jan. 15, 2001 letter. Mr. Mazzamuto completed the form on Jan. 18, 2001. In the last section of the first page Mr. Mazzamuto states, "My job requires me to stand most of the time. I am also stressed-which causes tightness in my chest then I have chest pain and shortness of breath. Also by standing my back problem is aggrevated. I have been under treatment for back pain since 1996."

UNUM requested Carlisle hospital records. A rehabilitation review was conducted by Jack Fogerty. After considerable delay Ms. Magner wrote to Peter Russo on March 20, 2001. In my 50+ years in the life and health insurance business and insurance education, I have heard many excuses for delay. The excuse for delay contained in the second paragraph sets a new low standard for excuses. "The reason you have not heard from us is because Mr. Mazzamuto's claim file is still with our medical department. We apologize for the delay, however, please note that the physician who will be reviewing Mr. Mazzamuto's claim file works a part time schedule." This is now 5 months after benefits should have been paid.

Although Ms. Magner promised immediate attention on March 20 it was April 20 before the decision to deny was sent.

The following opinion of UNUM's denial is based on my review of the documents and my extensive experience with disability insurance, which includes the following.
   A field agent with New York Life when they entered the disability field in 1951.
   The New York Life Agency Instructor in Erie PA which included disability insurance training.
   New York Life's Regional Sales Supervisor for disability insurance, conducting seminars in New York Life offices in PA, NJ, MD and DE.
   Supervisor of Accident and Health Insurance Sales in New York Life's Home Office which included a close working relationship with A&H Underwriters and Claims people.
   As Director of Education for Columbus Mutual, in the Home Office in Columbus Ohio, was responsible for Disability Insurance training of agents and liaison between agents and Home Office Underwriters and Claims people.
   Instructed CLU courses that included disability income for 25+ years.
   While a Vice President of the American College In Bryn Mawr, PA I was often called on to lead seminars on Disability Insurance for other professionals, primarily CPA firms.
   Attached is a list of cases in which I have given depositions or court testimony. 6 involve disability insurance.

As we discussed my fee is a flat $175 per hour for any time spent on a case, plus regular travel expenses.

Page 4.

It is my opinion that this claim should have been approved as early as November 2000 with back payments plus interest to October 2000, for the following reasons....

1. Notice of claim had been sent in during the elimination period.
2. Dr. Bowers letter was clear that Mr. Mazzamuto could not return to his job.
3. The definition of total disability in the policy is stated on page 5 of the policy under TOTAL DISABILITY "From the start of a total disability until 2 years after the income starting date, total disability means that the insured can not do the substantial and material duties of his or her regular job." This definition is one of the more liberal definitions of disability found in the disability insurance business. It was used to aid in the sale of disability insurance as it stressed "his or her regular job" . It does not refer to the job the insured had when he applied for the policy. It does not refer to his job title. It simply and clearly states "substantial and material duties" and Mr Mazzamuto's job required standing a substantial part of the time, and he and his Doctor said he could not do that.
4. If the claims people were unwilling to take the word of the insured and his Doctor, they should have requested another medical opinion. See page 9 of the policy under the heading EXAMINATION of the INSURED- "While a claim under this policy goes on, we have the right to have the insured examined, at our expense, by physicians approved by us, as often as reasonably required." I am at a loss to know why the company did not request an Independent Physical Exam. Getting IPE's is a common practice and could have served to bring a quick decision with grounds for denying the claim if Mr. Mazzamuto and Dr. Bowers were lying or avoiding a needless waste of time and money if they were telling the truth.
5. The fact that the Social Security Administration has approved Mr. Mazzamuto's claim for disability is significant. It is general knowledge that the Social Security definition of disability is very narrow. If Mr. Mazzamuto qualifies for Social Security disability, there is no question that he qualified under the New York Life definition, at the time he submitted the claim.

Rather than paying the claim, the company embarked on a series of steps that continued to delay the claim.

1. In January 2001 an investigator was assigned to visit the site and talk to Mr. Mazzamuto. It was 2 and one-half months later when the investigator finally visited. There should have been at least a weekly follow up urging the investigator to complete the assignment.
2. The claims people engaged in lengthy discussions about Mr. Mazzamuto's heart condition. This was a waste of time, because it was irrelevant whether it was a back problem or a heart problem. The only relevant question was, could Mr. Mazzamuto perform the regular duties of his job, and the answer was, no.
3. The company challenged the claim on the basis of an occupational form and completely ignored Mr. Mazzamuto's statement on that form that "My job requires me to stand most of the time"

Page 5.

4. The 5 page April 20, 2001 letter from Ms Magner to Mr. Russo is filled with irrelevant discussion and ignores the basis for the claim.

   a. The first page goes into "Residual disability" when the claim is for "Total disability".

   b. The last paragraph on page one and the first four paragraphs on page two discuss Mr. Mazzamuto's occupation in terms of titles and ignores the fact that he has to stand most of the time.

   c. The heart condition is discussed at great length on pages two and three. This was not the issue.

   d. Page three gets to the issue of the back problem. The last paragraph on page four can be read as an admission that Mr. Mazzamuto is disabled. ... "his physicians restrict him from prolonged standing or walking, heavy lifting, and bending. His job does not appear to involve lifting" (No one ever claimed that it did) "The degree to which he is required to stand or walk for a prolonged, uninterrupted period of time, over 15-20 minutes at a time, is not clear." After all the months of investigating and questioning it should have been clear that Mr. Mazzamuto's job required standing for prolonged periods of time and he was unable to do so.

   e. The first paragraph on page five "Based on all medical information in Mr. Mazzamuto's claim file...". Again, this completely ignores Dr. Bowers and Mr. Mazzamuto's statements that he could not and should not go back to work.

New York Life issued the policy and paid a claim for Mr. Mazzamuto's back problem. The back condition is worse and UNUM has denied the claim.

The inordinate delays by UNUM in processing this claim, and then denying the claim without grounds for denial, is an example of why insurance companies do not have the faith of the public. Although I am not a Lawyer, I am familiar with Bad Faith laws that states have enacted to deal with this problem. In my opinion those laws should apply in this case.

Very truly yours,

Gordon K. Rose



**Gordon K. Rose, CLU, ChFC**
*735 Virginia Rail*
*Kiawah Island*
*SC 29455*
*Ofc. Ph 843 768 9060*
*Fax 843 768 0344*
*P43*

## EMPLOYMENT

**1989 - Present.** Self-Employed, Insurance Education Consulting

**1969- 1989** The American College, Vice President

**1963- 1969** Columbus Mutual Life Insurance Company
2 years, Director, Education and Training
4 years, Agency Department Officer

**1951- 1963** New York Life Insurance Company
5 years, sales agent
5 years, agency management
2 years, Home Office

## EDUCATION

**B.S. Penn State-** 1950
**CLU, The American College-** 1957
**Agency Management** Diploma, TAC 1961
**Agency Officers School-** LIAMA- 1967
**ChFC, TAC, 1982**

## TEACHING EXPERIENCE

**1965 - 1995** CLU/ChFC Class Instructor- Primarily classes in ...
Law and the Life Insurance Contract
Life Insurance
Employee Benefits
Agency Law
Financial Planning

CIC Class Instructor in Life Insurance Section

**Page 2**.

## PROFESSIONAL ACTIVITIES

**1988- 1989**   President, Society of Insurance Trainers and Educators (a National Association of 600 insurance trainers and educators, from 300+ companies.) Member since 1969.

**1965, Present**   Board Member, Griffith Foundation for Insurance Education.

**Member, American Society** CLU/ChFC for 40 years, and a member of ASCLU/ChFC Directors Council.

**Member, International** Foundation Employee Benefit Plans

**Past President-** Rotary Club of Ardmore, PA

## FAMILY

**Married-** Aug 15, 1953 to Sally Winder Rose

  **Daughter-** Pat Rose Larkowich- Publicist in San Fran, CA

  **Son- Ted Rose-** Film Editor- Hollywood, CA

  **Six Grandchildren**

## HOBBIES

Golf and Bridge

## DEPOSITIONS AND COURT APPEARANCES

The following is a complete list of all my depositions and court appearances

Prudential V. C.J. Simon
Retained by Plaintiffs Attorney
Shanley and Fisher, Morristown, New Jersey
Court testimony, June 1985

Zinberg V. Federal Kemper
Retained by Plaintiffs Attorney
Harry S. Rosenthal, Jenkintown, PA
Deposition and Court testimony April 1986

Norma L. Williams V. Mass Mutual Life Insurance Company
Retained by Plaintiffs Attorney
Williams and Blizzard, Houston, Texas
Deposition October 1986

Gerald Cooney V. Colorado Bar Association
Retained by Plaintiffs Attorney
Bell and Pollock, Littleton, Colorado
Deposition Sept. 1989

Thomas E. Craig V. Indiana, Michigan Electric Co
Retained by Plaintiffs Attorney
Lawrence and Schletker, Covington, Kentucky
Deposition December 1989

Vernon R. Berg Sr. V Transamerica Insurance Co. et al
Retained by Defendants Attorney
Terwilliger, Wakeen, Piehler and Conway, Stevens Point, WI
Deposition and Court testimony Feb. 1990

Yoon V Investors Life Insurance Co.
Retained by Plaintiffs Attorney
Oppenheimer, Wolff and Donnelly, Chicago. IL
Court testimony June 1990

Shepard V. Cal Farm Insurance
Retained by Plaintiffs Attorney
Thorsnes, Bartolotta and McGuire, San Diego, CA
Deposition Sept. 1990

page 2

Niess V. Northern Life
Retained by Defendants Attorney
Buckingham, Doolittle and Burroughs  Akron, Ohio
Deposition and Court Testimony  Oct. 1991

Park V. The Equitable Life Assurance Society
Retained by Plaintiffs Attorney
Frank and Rocca   Phila. PA
Court testimony  October 1992

June S. Rose V. Allstate Insurance Company
Retained by Defendants Attorney
Comstock, Springer and Wilson  Youngstown, Ohio
Deposition  June 1993

Minnesota Mutual V. Judith C. Loring
Retained by Defendants Attorney
King and Blackwell  Orlando, Florida
Deposition  May, 1993

Jacqueline Raines Dunlap V. Sun Life Assurance Co. of Canada and
                              Great West Life Assurance Company
Retained by Plaintiffs Attorney
Sharpe and Buckner  Rockingham, NC
Deposition  May, 1994

Whipple V. Brubaker
Retained by Plaintiffs Attorney
Tunney Lee King  Columbus, Ohio
Deposition  April 1995

Castle V. Modern Life Insurance Co.
Retained by Plaintiffs Attorney
Shughart, Thomson and Kilroy  Kansas City, MO
Deposition  June, 1995

VEBA of Independent Electric Supply V Stephen R. Ross et al.
Retained by Plaintiffs Attorney
Littler, Mendelson, Fastiff, Tichy & Mathiason ( Bill Terheyden )
Deposition Jan. 1996

Page 3.

Darling V. Savers Life
Retained by Plaintiff's Attorney
Drose, Davidson & Bennett
Charleston, SC
Deposition, July 1996

Hagley V. Paul Revere Insurance Company
Retained by Plaintiff's Attorney
Forry, Ullmam, Ullman & Forry
Reading, PA
Video taped testimony for Court
October, 1996

Thomas Kaleel, et al. V. James Menighan
Retained by Defendant's Attorney
Comstock, Springer & Wilson
Youngstown, Ohio
Deposition, Dec. 1996

Robert White V. Lang Kruke et al.
Retained by Life Agent Kruke's Attorney
Brewer, Cooney & Lane
Hamilton, Ohio
Deposition, Jan. 1997

Migliaccio Rand V. Acacia Mutual Life Insurance Company
Retained by Acacia's Attorneys- Peabody & Brown
Washington, DC
Deposition Dec. 1997

Page 4.


Mark Solomon, Etc. V. Mass Mutual Life Insurance Company
Retained by Plaintiffs Attorney
Greenfield & Rifkin , Ardmore, PA
Court Testimony- December, 1998


Burkert v. The Equitable Assurance Society of the U.S.
Retained by Plaintiff's Attorney
Abraham, Bauer & Spalding
Philadelphia, PA
Deposition September, 2000


Beever v. Cincinnati Insurance Company
Retained by Defendant's Attorney
Litchfield & Cavo
Chicago, Illinois
Deposition, Aug. 15, 2001


Worrell v. American States
Retained by Plaintiff's Attorney
LaBarre & Young
Springfield, Illinois
Deposition, April 3, 2002

3 of 100 DOCUMENTS

**JUDITH KRAEGER AND PHILIP KRAEGER, Plaintiffs v. NATIONWIDE MUTUAL INSURANCE COMPANY, Defendant**

**CIVIL ACTION No. 95-7550**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1997 U.S. Dist. LEXIS 2726*

**February 28, 1997, Decided**

**March 7, 1997, FILED**

**DISPOSITION:**
[*1]  Defendant's Motion in Limine Regarding the Testimony of Plaintiffs' Expert DENIED.

**COUNSEL:**
For JUDITH M. KRAEGER, PLAINTIFF: RONALD C. MESSMANN, JOSEPH F. RODA, P.C., LANCASTER, PA USA. JOSEPH F. RODA, RODA & NAST, P.C., LANCASTER, PA USA. ERIC L. KEEPERS, RODA AND NAST, LANCASTER, PA USA. For PHILIP H. KRAEGER, PLAINTIFF: RONALD C. MESSMANN, (See above). JOSEPH F. RODA, (See above). ERIC L. KEEPERS, (See above).

**JUDGES:**
HUYETT, J.

**OPINIONBY:**
HUYETT

**OPINION:**

**MEMORANDUM & ORDER**

**HUYETT, J.**

**FEBRUARY 28, 1997**

Plaintiffs Judith and Philip Kraeger ("Plaintiffs") have offered an expert witness, Michael S. Barranco, in this insurance bad faith case.

Plaintiffs originally suggested four topics about which this expert might testify: (1) that Defendant Nationwide Mutual Insurance Company ("Defendant") acted in bad faith in the instant case; (2) that Defendant acts in bad faith as a general business practice; (3) how insurance claims are managed and evaluated; and (4) the statutory and regulatory standards to which insurance companies must adhere. At oral argument, counsel for Plaintiffs stated that instead of asking (1) and (2) above, Plaintiffs would ask the expert "whether there was any reasonable [*2]  basis, in his experience within the insurance industry, for the actions of Nationwide that are at issue in this case." Defendant has moved in limine to preclude this expert, making several arguments.

First, Defendant claims that Mr. Barranco's testimony should be completely precluded because there is no recognized body of experts in the area of bad faith insurance claims handling. There is no requirement that an expert's field of expertise be one in which a recognized body of experts exists. See F.R.E. 702. Thus, this contention is without merit.

Second, Defendant claims that Mr. Barranco's testimony should be precluded because there has been no showing that expert testimony is proper. In general, whether expert testimony is permitted depends on whether the expert's knowledge is likely to assist the trier of fact to arrive at the truth. F.R.E. 702; *Hines v. Consolidated Rail Corp., 926 F.2d 262, 272-73 (3d Cir. 1991).* Testimony about how insurance claims are managed and evaluated and the statutory and regulatory standards to which insurance companies must adhere could be helpful to the jury in evaluating whether the claim in the instant case was handled in bad faith. n1 Whether [*3]  this testimony is admissible will depend on the context in which it is offered at trial. Mr. Barranco cannot testify that Defendant "violated 42 Pa. C.S.A. § 8371" or that Defendant acted in "bad faith." These are

1997 U.S. Dist. LEXIS 2726, *

legal conclusions. However, Mr. Barranco's opinion, based upon his expertise and experience, that Defendant had no reasonable basis for its actions could be helpful to the jury.

> n1 However, Mr. Barranco's opinion that Nationwide in fact violated certain statutes, such as the Unfair Insurance Practices Act, would not appear to be relevant or helpful to the jury.

Third, Defendant claims that Mr. Barranco is not qualified to testify as an expert in the area of bad faith insurance claim handling practices. The Court of Appeals for the Third Circuit has held "a broad range of knowledge, skills, and training qualify an expert as such" and has "eschewed imposing overly rigorous requirements of expertise." *United States v. Velasquez, 33 V.I. 265, 64 F.3d 844 (3d Cir. 1995)*. Mr. Barranco's resume shows [*4] that he qualifies as an expert on the issue of bad faith insurance claims handling. n2

> n2 Mr. Barranco's resume reveals that he has attended the College of Insurance and the Royal-Globe Insurance Companies' Claim and Loss Adjusters' Training Program; practiced as an attorney in the field of insurance litigation; worked at insurance companies holding various positions including claims supervisor, manager of corporate affairs and corporate security, adjuster, member of claims and underwriting committee, general counsel; and authored various publications including "Good Faith and Bad Faith in Substance," presented at "Bad Faith Litigation in Florida" seminars. Currently, Mr. Barranco is an insurance and reinsurance consultant.

Defendant argues that Daubert restricts Mr. Barranco's testimony. Mr. Barranco's testimony is not "scientific" or "technical" pursuant to F.R.E. 702, but consists of "specialized knowledge." The factors listed in Daubert do not apply to this type of testimony. However, the rationale [*5] behind Daubert, that a foundation and relevance must be demonstrated for testimony to be admissible, remains true.

Fourth, Defendant claims that Mr. Barranco should not be permitted to base his testimony on other bad faith cases in which Nationwide was a party. Counsel for Plaintiffs stated at oral argument that he will not elicit this testimony. Thus, this argument is moot.

Fifth, Defendant claims that Mr. Barranco should not be permitted to base his opinions and testimony on the statutes cited by Mr. Barranco as they are not of the type upon which experts in bad faith would rely and they are not cited accurately. Plaintiffs only need to show that the statutes are "of a type reasonably relied upon by experts" in the field if they are otherwise inadmissible. F.R.E. 703. It would be reasonable for experts in bad faith insurance practices to look to the relevant statutory and regulatory requirements in examining the reasonableness of an insurer's actions. Thus, this contention is without merit.

Sixth, Defendant claims that Mr. Barranco's conclusion that "Nationwide handles its policy holders' claims improperly and in bad faith as a general business practice" should be precluded [*6] because it is not relevant to any claim made by Plaintiffs and because it is more prejudicial than probative. Counsel for Plaintiffs stated at oral argument that he will not elicit this testimony. Thus, this argument is moot.

For the foregoing reasons, Defendant's Motion in Limine Regarding the Testimony of Plaintiffs' Expert will be **DENIED**. Defendant may make appropriate objections at trial concerning the testimony of this expert.

**An appropriate order follows.**

**HUYETT, J.**

**ORDER** - ENTERED: 3/10/97

**HUYETT, J.**

**FEBRUARY 28, 1997**

For the reasons stated in the foregoing memorandum, Defendant's Motion in Limine Regarding the Testimony of Plaintiffs' Expert is **DENIED**.

**IT IS SO ORDERED.**

**HUYETT, J.**

## CERTIFICATE OF SERVICE

I, Richard C. Angino, Esquire, hereby certify that a true and correct copy of the foregoing

**PLAINTIFF'S BRIEF CONTRA DEFENDANTS' MOTION IN LIMINE** was served by

United States first-class mail, postage prepaid, upon the following:

E. Thomas Henefer, Esquire
Stevens & Lee
111 North Sixth Street
P. O. Box 679
Reading, PA 19603-0679
        Counsel for Paul Revere Life Insurance Company and New York Life Insurance
        Company

_____
                                Richard C. Angino

Dated:  8/26/00