*34*
*8/27/02*

ORIGINAL

FILED
HARRISBURG, PA

AUG 2 6 2002

MARY E. D'ANDREA, CLERK
Per_____

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VINCENZO MAZZAMUTO,<br>    Plaintiff, | CIVIL ACTION – LAW |
| v. | NO. 1:CV-01-1157 |
| UNUM PROVIDENT CORPORATION;<br>PAUL REVERE LIFE INSURANCE<br>COMPANY; and NEW YORK LIFE<br>INSURANCE COMPANY<br>    Defendants | JUDGE KANE<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF'S BRIEF CONTRA
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I.    COUNTERSTATEMENT OF FACTUAL HISTORY**

At the outset, Plaintiff challenges Defendants' filing of their Motion for Summary Judgment as being frivolous, not in good faith, contrary to the spirit of motion pleading, and totally unsupported by undisputed facts and law.

On April 23, 2002, Plaintiff's counsel took the deposition of Melissa Mulry, the claims adjuster who handled Mr. Mazzamuto's July 22, 2000, claim for disability benefits that resulted in this lawsuit. Mrs. Mulry's (formerly Magner) deposition with referenced file records in chronological order accompany this brief as **App. Ex. A** (Plaintiff's Appendix Contra Motion for Summary Judgment). The following is an undisputed chronology taken from Defendants' records and Mrs. Mulry's deposition.

**1993** – Mr. Mazzamuto purchased his <u>New York Life</u> disability policy.  Ex. A to Exhibits in Support of Plaintiff's Motion for Partial Summary Judgment (**PMSJ Ex. A**).

**1996/97** – Mr. Mazzamuto made a 1996 disability claim based upon the aggravation of a pre-existing back condition and eventually was paid in 1997 by <u>New York Life</u> (**PMSJ Ex. L**).

**7/22/00** – date of disability – first day treated for present claim (**App. Ex. A**, depo Ex. P-1, NYLCL00557).

**9/06/00** – Notice of claim (**App. Ex. A**, p. 14).

**9/27/00** –Second notice of claim (**App. Ex. A**, p. 16.).

**9/29/00** – On <u>New York Life</u> letterhead with an address of <u>51 Madison Avenue</u>, New York, New York.  Mr. Mazzamuto was told that <u>New York Life</u> had

> entered into a reinsurance agreement with <u>Paul Revere</u> Life Insurance Company, a subsidiary of the <u>UnumProvident</u> Corporation, <u>under which they</u> will <u>administer</u> <u>and service, as an agent</u> for New York Life, <u>our</u> individual disability income policies.
>
> * * *
>
> All future correspondence pertaining to your claim should also be sent to this address.

Ex. B to Defendants' Appendix in Support of Motion for Summary Judgment, NYLCL00553 (**DMSJ Ex. B**), emphasis supplied.   <u>Also see</u>, similar letter dated 9/28/00 from UNUM, 18 Chestnut Street, Worcester, Massachusetts.  <u>Id</u>. at 00554

**10/10/00** – Mr. Mazzamuto's claim was assigned to Melissa Mulry (**App. Ex. A**, p. 20).

**10/11/00** – Confirmation of receipt of "claims materials" by Paul Revere Life Insurance Company and acknowledgment that Melissa Magner (Mulry) was claims representative (**App. Ex. A**, depo Ex. P-1, NYLCL00552).

**10/19/00** – Defendants indicated in two notes that Mr. Mazzamuto's file was missing (**App. Ex. A**, p. 23).

**11/1/00** – The Mazzamutos were told that the <u>New York Life</u> Insurance Company disability claim was being transferred to <u>UNUM</u> for administration (**App. Ex. A**, pp. 23, 24, 25)

**11/1/00** – Although Paul Revere had acknowledged receipt of "claims materials" on 10/11/00, Melissa Mulry wrote to Mazzamuto stating that <u>she</u> had not <u>as yet</u> received his claim form and an additional application form was being sent to him (almost 2 months since first notice and three weeks since assigned claim).

Mrs. Mulry's letterhead is <u>UNUM</u>, and the bottom of the page states:

<u>UnumProvident Corporation</u>
The <u>Paul Revere</u> Life Insurance Company as <u>administrator</u> for <u>New York Life</u>
Insurance Company
<u>18 Chestnut Street</u>, Worcester, Massachusetts 01608-1528 (emphasis supplied)

<u>There is no explanation as to what this all means, UNUM, UnumProvident, Paul Revere, New York Life</u>.  There is no question that Mr. Mazzamuto bought a <u>New York Life</u> disability policy.

**11/3/00** – At Defendants' request, Mr. Mazzamuto's doctor Bower sent a report to <u>both:</u>

Paul Revere Life Insurance Company          New York Life Insurance Company
New York Life Customer Care Center          51 Madison Avenue
P. O. Box 15001                             New York, New York 10010
Worcester, MA  00615-001

**App. Ex. A**, depo Exh. P-1.  Neither of these addresses is the <u>18 Chestnut Street address</u>, but they are the addresses given to Mr. Mazzamuto and Dr. Bower

long history of low back pain and in fact for many years has undergone numerous treatments and physical therapy and MRI in the past did reveal central spinal stenosis which gradually worsened to a maximum at the L3-L4 level and extends from L2 to L5.  This has given him periodic problems with lower back discomfort, symptoms of radiculopathy and urinary irritability.  Prolonged standing and heavy lifting have aggravated it.  He has been seen in physical therapy, treated in a local Pain Clinic with local injections as well as prescription analgesics, non-steroidal anti-inflammatory agents and other atypical chronic pain medications.

Mr. Mazzamuto's condition was complicated this year when he was admitted to the hospital on July 22nd with new onset angina and a small subendocardial myocardial infarction …

As the patient has attempted to return to work after his recovery from his heart attack, his back has worsened again, also the stress and anxiety which has been provoked because of his recent cardiac problems and manifested themselves with significant anxiety when he is back in a work situation.

* * *

At the present time he is not able to do the work required in running his restaurant because he cannot stand for a prolonged period of time, has difficulty bending, and is restricted from heavy lifting. It is unlikely he will be able to return to work in the foreseeable future.

**App. Ex. A**, pp. 26-35. Mrs. Mulry testified that <u>she</u> did not receive this letter sent to Paul Revere and New York Life until Mr. Mazzamuto's lawyer sent it to her in a packet of claim materials received on December 15, 2000. **App. Ex. A**, pp. 26-28.

**11/15/00, 11/22/00** – Mr. Mazzamuto and Dr. Bower completed two separate applications and physician's statement with different headings and addresses:

<u>New York Life Insurance application</u>, 51 Madison Avenue, New York, NY 10010:

primary diagnosis 414.01 V45.87, 410.70 secondary diagnosis: 729.1

In your opinion is the patient able to work at this time? No.

(a)     The patient was unable to work from 7/22/00 to present

16.     Restrictions and limitations – cannot be in stressful situations, no prolonged standing no lifting

**App. Ex. A**, pp. 41-44. and depo Exh. P-1.

New York Life Insured's statement of Occupational Duties and Employment completed by Mr. Mazzamuto.

10.     Cannot perform my duties under the stressful situation. My chest is painful and I am fearful for my life.

Mr. Mazzamuto signed authorization for Defendants to obtain medical records

<u>UNUM application</u> completed by Mr. Mazzamuto and Dr. Bower completed <u>another</u> Attending Physician Statement for <u>UNUM</u>:

Subjective symptoms anxiety, worry, low back pain
Restrictions no prolonged standing, no heaving lifting (2nd to back)
Limitations cannot work in stressful situations
Treatment 7/22/00-10/04/00

**App. Ex. A**, depo Exh. P-1.

**12/15/00** – Mrs. Mulry admits UNUM application and physician's statement plus November 3, 2000, Bower report received <u>by UNUM</u> from Mr. Mazzamuto's attorney. **App. Ex. A**, p. 49.

Mr. Mazzamuto had received application forms and other documents from the <u>various different Defendant</u> companies to complete, including a set from <u>Paul Revere</u>, a set from <u>New York</u>, a set from <u>UNUM</u> and at least a second set from <u>New York</u>. **App. Ex. A**, pp. 45, 46. Nevertheless, Mrs. Mulry contended that she did not receive <u>any</u> of these documents until she received a packet of claim materials <u>from Mr. Mazzamuto's attorney on December 15, 2000</u>.

**1/04/01** - Mrs. Mulry's <u>first</u> conversation with Mr. Mazzamuto was <u>two days shy of four months</u> from time first notice sent, three months from when Paul Revere acknowledged receipt of claim application and assigned Mrs. Mulry to the file, <u>two and a half months</u> after Defendants lost Mr. Mazzamuto's claim application, <u>two months</u> from when Mrs. Mulry sent Mr. Mazzamuto another set of documents and three weeks since documents received by UNUM. No one knows where the documents sent to New York Life or Paul Revere are. **App. Ex. A**, p. 48.

It was not her normal practice to wait two months before doing something on the file. **App. Ex. A**, pp. 51, 52.

**1/08/01** – Action plan prepared -- It was not her normal practice to wait so long. **App. Ex. A**, pp. 52, 53, 54

**1/09/01** – Mrs. Mulry requested the 1996/1997 claim file. **App. Ex. A**, pp. 55, 56:

Learned "low back pain with a central spinal stenosis back in April the 13th of '96". **App. Ex. A**, pp. 55, 56. Received entire 1996 claim file including <u>all medical</u> records from prior claim. **App. Ex. A**, pp. 56-60. New York Life admitted as to Mr. Mazzamuto's 1996 disability back claim.

> "Since we can't deny on PE [physical exam] or rescind on fraud provision, I am
> recommending we accept liability for the period of td"

**App. Ex. A**, p. 60.  New York Life paid disability involving Mr. Mazzamuto's central spinal

stenosis back problem.  In his reports, Dr. Bower said back condition had worsened since 1996.

Mrs. Mulry admitted that Mr. Mazzamuto was doing the same kind of work in 2000 as he was in

1996 when he was found to be disabled as a result of his back condition. **App. Ex. A**, p. 62.

**1/11/01** – Dr. Bower completed still another report. **App. Ex. A**, p. 80.

**1/15/01** – Despite the receipt of Dr. Bower's November 3, 2000, report (**App. Ex. A**, depo Exh.

P-1) and numerous other records from Dr. Bower, the entire 1996 file, a medical authorization

from Mr. Mazzamuto, Mrs. Mulry wrote to Mr. Mazzamuto stating that medical records were

being requested from Dr. Bower and Carlisle Hospital and that such information would be

needed before they could determine their liability:

> Your policy states that a claim will be payable when all information that is
> necessary for us to make a decision is received.

Mr. Mazzamuto again had to complete another occupational description form in full, as well as

obtain another progress report from Dr. Bower. **App. Ex. A**, p. 63-70.

**1/16/01** –Dr. Bower completed still another physician's report. **App. Ex. A**, p. 77.

**1/16/01** – Mrs. Mulry assigned an adjuster to do field report. **App. Ex. A**, p. 120.  Not completed

for 2-1/2 months until April 4. **App. Ex. A**, pp. 120, 121.  box had been checked for 30 days.

**1/18/01** – Dr. Bower completed still another progress report. **App. Ex. A**, p. 78.   Same

information requested and provided over and over by Dr. Bower:  "chronic back pain and

anxiety". **App. Ex. A**, p. 79

**1/18/01** – When asked "how has the disability interfered with the performance of your job" and

"please describe sitting, standing and walking requirements and limitations."  Mr. Mazzamuto

answered:

> My job requires me to stand most of the time. I am always stressed which causes tightness in my chest. Then I have chest pain and shortness of breath. Also by standing my back problem is aggravated. I have been under treatment for back pain since 1996.

**App. Ex. A**, pp. 83-85, emphasis supplied.

Ignoring what Mr. Mazzamuto told them, without a physical exam and/or any knowledge of what Mr. Mazzamuto had to do in the day-to-day running of his pizza restaurant, UNUM took the position that the general duties of bookkeeping, office work, employee administration noted on Mr. Mazzamuto's application and other forms did not require standing. **App. Ex. A**, p. 94. UNUM relied upon an in-house disability case manager, nurse, and vocational occupational individual all of whom ignored Mr. Mazzamuto's statement that he had to stand most of the time to do his job in denying his claim. **App. Ex. A**, pp. 98-99.

**1/22/01** – Defendants sent still another letter to Dr. Bower and Carlisle Hospital for medical records. **App. Ex. A**, pp. 71-75. Mrs. Mulry admitted that these form requests were routinely sent out to doctors on a 30-day interval basis. **App. Ex. A**, p. 76. Mrs. Mulry admitted that Mr. Mazzamuto's back problems in 1996 in and of itself was sufficient to receive disability payments. **App. Ex. A**, p. 82. Defendants, however, after being told by Dr. Bower that Mr. Mazzamuto's back condition had worsened over the four years, refused to pay in 2000 and 2001 because their in-house medical consultants did not feel he was disabled. **App. Ex. A**, p. 82.

**3/19/01** –Mr. Mazzamuto's attorney wrote to Defendants as to the reasons why the investigation was taking so long. **App. Ex. A**, pp. 99-100.

In-house physician Dr. Clarke expressed an opinion as to non-disability related to Mr. Mazzamuto's cardiac condition. He did, however, note:

> With respect to his back pain, Mr. Mazzamuto has a long history of lower back pain in association with a degree of spinal stenosis on MRI. In the absence of radiculopathy on physical exam or other studies, this appears to be soft tissue in origin.

**App. Ex. A**, pp. 101-109, particularly p. 109.

> He indicates that the pain increased with prolonged standing and his physician has restricted him from prolonged standing.

**App. Ex. A**, p. 110.  Mrs. Mulry said that she denied the claim "because I do not feel his occupation required prolonged standing or walking or heavy lifting or bending … because he did mostly managerial and administrative duties, and I feel that those could be performed sitting…  I didn't ignore it[what he said that he had to stand all the time or most of the time] but I feel that his – he could perform the duties of his occupation sitting."  **App. Ex. A**, p. 111, emphasis supplied.

**3/28/01** –Mr. Mazzamuto's attorney called Defendants stating "he [Mr. Mazzamuto] is only one of two cooks and does everything at the restaurant."

**4/4/01** – Defendants' adjuster, in his field report noted Mr. Mazzamuto was described as "limping", favoring his right leg, hunched forward, out of breath, majority of weight was on left side, pleasant, cooperative, answered questions fully, father had a stroke and three heart attacks and afraid he might have one and die "While working at the business, he gets nervous and sometimes loses his temper."  "He's afraid if that happens he may have another heart attack." "Secondly, he stated that when he was put in an ambulance when he had his heart attack and was transported to the hospital, he re-injured his back."  "Claims that his back is as bad now as it was in 1996."  They paid in 1996 but won't pay now."  **App. Ex. A**, pp. 123-128, emphasis supplied.

> Q.    Says he has numbness in his right leg. … can't bend … when he sleeps, he sleeps on his stomach with pillows under his stomach, ankle, and head … as far as sitting, standing or walking, he stated he can only do these activities for about 20 or 30 minutes before changing positions….

**App. Ex. A**, p. 140.  Mrs. Mulry went on to say that she did not believe that medical records support that his back was worse than 1996.  May have been the same.  On the review of restrictions and limitations that Dr. Bower placed on insured, Mrs. Mulry did not feel that the

restrictions and limitations would prevent him from performing the duties of his occupation. **App. Ex. A**, p. 129. She felt that the restrictions and limitations in 1996 were the same as 2000. She admitted the job was the same in 1996 as 2000. **App. Ex. A**, p. 129. Mrs. Mulry continued to rely on Dr. Clarke who stated that there did not appear to be any significant structural change in his condition associated with the recent exacerbation "so my understanding of that statement is there doesn't appear to have been a change from 1996 to [2000]" **App. Ex. A**, p. 131.

Mrs. Mulry stated that the basis for their denial of Mr. Mazzamuto's claim was Dr. Clarke's report:

> I believe that again based on the duties of his occupation, and based on the restrictions and limitations that Dr. Bower placed on Mr. Mazzamuto, I believe that he could perform the duties of his occupation perhaps with accommodations, he could sit performing the duties.
>
> * * *
>
> He [Dr. Clarke] doesn't indicate who says that. He just says "the degree to which he's required to stand or walk for prolonged uninterrupted periods of time over 15 to 20 minutes at a time is not clear. I believe that the insured may have stated this, that after 15 to 20 minutes he experiences pain, but I don't believe a physician said that.
>
> * * *
>
> Again, I don't believe that his job required him to stand most of the time.

**App. Ex. A**, pp. 134-135, emphasis supplied.

> * * *
>
> He may have stood most of the time but, again, I believe he could perform those duties sitting. I don't see why he couldn't.

**App. Ex. A**, p. 136, emphasis supplied. Mrs. Mulry admitted that she did not know where Mr. Mazzamuto worked and what his duties were or that he stood behind a tall counter and that he couldn't sit behind a tall counter and function effectively or that he took money at the cash register. **App. Ex. A**, pp. 136, 137. "... Again, I believe with accommodations he could

perform the <u>duties of his occupation</u>." **App. Ex. A**, p. 137. "I don't … first of all, <u>I don't believe</u>

he took money. <u>I don't recall</u> that being a duty of his occupation but I <u>believe that he could</u> …

<u>he could sit with accommodation. He wouldn't have to sit behind a counter.</u>" **App. Ex. A**, pp.

137, 138.

> So you turned down this man, and he has not been able to collect any disability
> insurance, for which he paid, for almost two years <u>without you even knowing</u>
> <u>where he had to stand, is that right</u>?
>
>                                               * * *
>
> A.    <u>Correct</u>.

**App. Ex. A**, p. 138, emphasis supplied.

> <u>Did you ever send him to some doctor to have him examined</u>?
>
> A.    <u>No, we did not</u>.

**App. Ex. A**, p. 140, emphasis supplied.

> <u>So you denied his claim without even having him examined, is that right</u>?
>
> A.    <u>Correct</u>.

**App. Ex. A**, p. 140, emphasis supplied.

**4/20/01** – Mrs. Mulry sent letter denying Mr. Mazzamuto's disability claim. **DMSJ Ex. F**.

**5/8/01** – Mr. Angino wrote a letter to Mrs. Mulry summarizing Mr. Mazzamuto's claim and

suggesting that Defendants would be guilty of bad faith if they did not pay the claim on the basis

of the existing record.

> 3-ring binder of records
>
> Italian immigrant
>
> Family restaurant business
>
> 1993 disability policy
>
> April 20, 2002, letter – not paying because <u>she believes</u> he can do job

Job requires working long hours, standing on feet, greeting guests, circulate, substitute for others, lift and bend.  Doctors told him he cannot continue working.  <u>If case can be settled promptly through exchange of correspondence, little by way of fee and expenses. If required to start suit, bad faith claim.</u>  **DMSJ Ex. B**, NYLCL00365.

**5/23/01** – Without any investigatory action responsive to Plaintiff's counsel's 5/8/01 letter, , Mrs. Mulry stated that Defendants were sticking with their April 20, 2001, position.  **DMSJ Ex. B**, NYCL00362

**6/26/01** – Suit filed

**7/12/01** - Dr. Schneider submitted report for Social Security Administration.  **PMSJ Ex. F.**

**4/16/02** – Defendants took Dr. Bower's deposition.  **DMSJ Ex. G**.

**6/13/02** - Plaintiff's filed first expert report.  **DMSJ Ex. H**.

**6/14/02** - New York Life agreed Mr. Mazzamuto disabled as to his life insurance premium.  **PMSJ Ex. H**.

**6/27/02** - Defendant Dr. Steinman expert report – never examined patient – opinion from records can work from orthopedic standpoint with accommodations.  **DMSJ Ex. L**.

**6/28/02** - Defendant Dr. Hostetter expert report – never examined patient – cannot express opinion.  **DMSJ Ex. K**.

**7/11/02** - Plaintiff's filed second expert report. **DMSJ Ex. H**.

**7/25/02** - Mr. Mazzamuto found totally disabled by Social Security Administration

**8/9/02** – Defendants filed Motion for Summary Judgment and Motion in Limine.

**8/15/02** – New York Life re-confirmed that Mr. Mazzamuto is totally disabled and need not pay life insurance premiums.  **App Ex. B**.

**8/22/02** – Plaintiff's counsel received from expert Rose transmitting article from former UNUM employee: "Doctor's Suit Asserts UnumProvident Had Policy Of Denying Claims:"

      The suit, filed June 28, was brought by Patrick Fergal McSharry, a doctor who once worked as a medical director for UnumProvident in Chattanooga., Tenn. He claims the company employed doctors "to provide language and conclusions supporting denial of claims."

**App. Ex. C**.

## IV.   <u>ARGUMENT</u>

      In response to Plaintiff's request, Defendants supplied UNUM's claim manual. Relevant sections are attached as **App. Ex. D**.

      It is designed and intended to be a reference guide to claims professionals and others in the Customer Care Center on the handling of claims …

1)     Every claim … is different and must be decided on its own unique … facts …

2)     In the handling of each claim, the Customer Care Center will strive to comply with <u>all applicable laws</u>. In support of that goal, this Manual contains <u>overviews of a variety of legal rules and guidelines</u> … (emphasis supplied)

* * *

<b>States: Pennsylvania</b>

Unfair Claims Settlement Practices Act and Other Claims Handling Laws: Pa.Adm.Code 146.1 et seq.; Pa.St.Ann. 1171.5(10).
1.     Adopted law similar to NAIC Model; for general provisions see NAIC Model Act and Regulations.
2.     Specific Time Restrictions:
<u>Acknowledge receipt of notification of claim: 10 days</u>
<u>Provide necessary claim forms: 10 days</u>
<u>Respond to communications from claimant: 10 days</u>
<u>Begin investigation of claim: None</u>
<u>To complete investigation of claim: 30 days</u>
<u>Notify claimant that more time is needed to review claim: 15 days after receipt of proofs of loss</u>
<u>Send follow-up letters that investigation is incomplete: 30 days from the date of the initial notification requesting more time, and then 45 days thereafter</u>.
<u>Accept or deny claim after receipt of proofs of loss: 15 days</u> (emphasis supplied)

      The Manual goes into great detail as to "<u>Guidelines for Evaluating an Occupation</u>:"

In determining what an insured's own occupation should be, consider the following:

- What were the material and substantial duties the claimant performed?
- How did the insured spend his time?
- From what activities was his income generated?

The insured's "own occupation" or "regular occupation" is the occupation which the insured was engaged in at the time of the disabling injury or sickness.

The following sources can be used to establish the insured's occupation:
- appointment books, calendars, schedules (including surgical schedules), or other evidence of how the insured spent his time prior to disability;
- billings;
- job description, personnel file, etc., if the insured is an employee of a firm that generates such materials;
- evidence of earned income W-2s, tax returns, etc.;
- authored works such as reports, memoranda, publications, etc.;
- timesheets; and
- vocational resources such as Dictionary of Occupational Titles, Occupational Outlook Handbook etc. (emphasis supplied)

\* \* \*

**Job vs. Occupation Assessment**
The essence of the job vs. occupation or own occupation assessment is a comparison of the specific duties performed prior to disability with the occupational duties as generally performed in the national economy.

The term "occupation" is often interpreted to be the same as a "job." This interpretation is incorrect as a job differs from an occupation in that a job is a set of specific duties performed at a particular employer whereas an occupation is a broader description of the type of work as is generally performed in the national economy. (emphasis supplied)

The Manual discusses "Attending Physician Statement" and "Claimant Statement" and suggests that they should be received at least quarterly on the "Rationale" that circumstances may be changing. Otherwise, 12-36 month intervals.

The Manual provides assistance in evaluating a claim in the following order:

- Contractual Provisions
- Claimant Activities
- Occupational Duties
- Financial Information

- Medical Information

As illness or injury is at the foundation of every claim, medical information is fundamental to an understanding of a claimant's restrictions and limitations, opportunity for recovery, and capacity for return to work.

* * *

During the claims evaluation process, medical information should be assessed for its credibility and relevance.  <u>There are a number of avenues, beyond the treating healthcare provider, available</u> for obtaining an assessment of the medical information and/or the claimant's restrictions and limitations including:

- <u>Independent Medical Examination</u> (IME)
- <u>Functional Capacity Evaluation</u> (FCE)
- <u>Internal Medical Personnel</u>

"File Documentation" is emphasized.

Although Defendants' Manual directs the professional to the contractual provisions, claimant activities, occupational duties, financial information and medical information and suggests numerous sources for determining an insured's job, specific duties, claimant activities, occupational duties, financial information, and medical information from "the treating health care provider," as well as IMEs and FCEs, Defendants' Motion for Summary Judgment and Statement of Facts ignores all of these sources and relies on general occupational descriptions provided by the New York Life agent who sold the policy and some general information supplied by Mr. Mazzamuto.  <u>Defendants' agent and experts candidly admit no knowledge whatsoever as to what Mr. Mazzamuto actually did at the time he became disabled.</u>

The bottom line is that Defendants' Motion for Summary Judgment does not begin to approach the standard of proof required for such a motion.  It is a waste of valuable court and counsel time to have to respond and/or adjudicate such issues under the well-established summary judgment standard.

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is <u>no genuine issue as to any material fact</u>, and … the moving party is <u>entitled to a judgment as a matter of law</u>." Fed.R.Civ.P. 56(c).  A fact is

"material" if proof of its existence or non-existence <u>might affect</u> the outcome of the suit under the applicable law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L.Ed. 2d 202, 106 S. Ct. 2505 (1986).* A dispute is "genuine" <u>if the evidence "is such that a reasonable jury could return a verdict for the non-moving party</u>." Id.

<u>Krisa v. The Equitable Life Assurance Society</u>, 113 F. Supp.2d 694, 700 (M.D. Pa. 2000) (emphasis supplied).

Plaintiff does not dispute that it is Plaintiff's burden to prove that he is "disabled" as defined in the policy and to prove that Defendant breached its obligation to pay benefits" and that Plaintiff has the burden of proof under an "occupational" disability policy to prove that he is disabled within the occupational definition of the policy. <u>See</u>, <u>Provident Life</u> and <u>Paul Revere</u> cases referenced on pages 16 and 17 of Defendants' Brief.

Plaintiff has filed a Motion for Partial Summary Judgment where the uncontested facts and law clearly show that Plaintiff is totally disabled in terms of the New York Life disability policy and was so found by New York Life under a similar, if not more restrictive definition of total disability under Mr. Mazzamuto's life insurance policy, as well as under the very strict standard required for Social Security disability. Following Defendant's own Manual "Guidelines for Evaluating an Occupation," it is clear that Defendants did not do what the Manual requires in "Establishing Occupation" and "Job vs. Occupation Assessment."

Plaintiff refers the Court to Judge Vanaskie's opinion in <u>Krisa</u> with respect to his holdings on plaintiff's breach of contract claims, as well as Krisa's bad faith claim. <u>Also see</u>, Simon v. UnumProvident Corp., 2002 U.S. Dist. LEXIS 9331 (E.D. Pa. May 23, 2002).

Although Judge Vanaskie granted Equitable Life's motion for partial summary judgment as to Krisa's bad faith claim, his decision was based upon the particular factual circumstances of the case, and he did not express any opinion "on whether Krisa is entitled to a jury trial on his

post-litigation bad faith claims." <u>Krisa</u>, 113 F.Supp.2d at 705.  <u>See</u>, <u>Simon</u>, <u>supra</u> and <u>Polselli v.</u>

<u>Nationwide Mut. Fire Ins. Co.</u>, 23 F.3d 747 (3d Cir. 1994).

This diversity case is controlled by Pennsylvania substantive law.  The principal Supreme

Court case dealing with total disability is <u>Cobosco v. Life Assurance Co. of Pennsylvania</u>, 419

Pa. 158, 213 A.2d 369 (1965).  The Pennsylvania Supreme Court agrees that it is an insured's

obligation under an occupational disability policy to prove disability with respect to her

particular occupation "hardware merchant."

> In our opinion, where, as here, the question of "total disability" must be decided in the context of the ability of the insured to perform the acts or duties necessary to the operation of a business owned by him, the cases hold that the insured must prove that the personal efforts that he himself is capable of making in the operation of the business are insubstantial and unimportant, by reason of their low quality or quantity, in relation to the character and amount of work required to carry on the business.  (citing numerous cases)

> \* \* \*

> The insurance company has argued that we should consider the substantiality and importance of Mrs. Cobosco's efforts only in relation to the duties of supervising and managing the store rather than in relation to all the duties involved in the operation of the store.  The argument is based upon the fact that, in her insurance application, Mrs. Cobosco noted her "duties" as "manager supervisory".  Even if we were to accept the insurance company's argument, the jury might have reasonably concluded that the limited amount of time that she was able to spend in the store prevented Mrs. Cobosco from making a substantial and important contribution to the fulfillment of the duties of a manager and supervisor.  Moreover, we do not agree with the insurance company's argument.  Mrs. Cobosco was insured against her inability to "perform duties of any gainful occupation for which [she] may be reasonably fitted by reason of training, experience and accomplishment," which, under the facts of this case, means inability to perform duties of operating her hardware store.  The occupation which Mrs. Cobosco noted in her insurance application was that of a "hardware merchant".  This occupation reasonably implies the whole range of duties included in the operation of the hardware store and not just "manager supervisory" duties. (citing authority) Thus, both her occupation, in fact, and that stated in her policy includes more than manager supervisory duties.

<u>Cobosco</u>, 419 Pa. at 166, 169-170.  <u>Also see</u>, <u>Brosnan v. Provident Life and Accident Ins. Co.</u>,

31 F. Supp.2d 460 (E.D. Pa. 1998).  The Eastern District held that Dr. Brosnan's occupation was

"anesthesiologist" and not medical doctor and, consequently, he was entitled to total disability benefits even if he could and was regularly employed following his disability as a "doctor."

The instant case involves the Defendants' policy definition of "job" which Defendants' Manual admits is even more restrictive than "occupation." It is not a question of what presidents and owners or general managers do <u>generally</u>. What <u>specifically</u> did Mr. Mazzamuto do as the owner/operator of a pizza restaurant? It is not a question of <u>general</u> type of activities of administration, bookkeeping or supervision. What were Mr. Mazzamuto's <u>specific</u> daily activities? Did he stand or sit, bend or lift, how much, how often? To answer these questions, one needs to conduct an investigation, to go to the site, to talk to Mr. and Mrs. Mazzamuto, his employees and customers, to take pictures, obtain statements, see what Mr. Mazzamuto's replacement does. What do other owners of small pizza restaurants do, etc.?

This case involves delay in responding to communications, excessive response time in engaging an investigator and conducting an investigation, inadequacy of investigation, failure to find out what Mr. Mazzamuto actually did at his job, relying on general statements in writing rather than specific statements given, failing to engage a doctor to examine Mr. Mazzamuto, ignoring Mr. Mazzamuto's statement that he has to stand most of the time, denying Mr. Mazzamuto's claim because Defendants' adjuster felt that he could work in a sitting position, ignoring the definition of "disability" or "job" in the policy, relying upon in-house "experts," ignoring the facts, ignoring the opinions of Dr. Bower, Schneider, the Carlisle Hospital records, New York's denial of disability under its disability policy in the face of the finding of total disability under New York's life policy on two separate occasions, and the finding of total disability by the Social Security Administration.

On the issue of bad faith, there is certainly a factual issue as to whether an insurance company is guilty of bad faith under the factual circumstances of this case.  See, Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 752 (3d Cir. 1994):

> On the other hand, the court should consider whether Nationwide's delay in responding to communications from Polselli, its poor response time in engaging an investigator and in conducting the investigation and its handling of the settlement negotiations suggest that Nationwide did not "accord the interest of its insured the same faithful consideration it gives its own interest."  citing *Cowden v. Aetna Cas. & Surety Co.*, 389 Pa. 459, 134 A.2d 223, 229 (1957).

As to the use of experts in bad faith cases, they have been used by both sides in virtually all cases.  The Third Circuit's decision in Dinner v. United Services Automobile Ass'n Cas. Ins. Co., 2002 U.S. App. LEXIS 3408; 29 Fed. Appx. 823 (3d Cir. 2002), upheld the trial court's decision to admit or exclude certain expert testimony but not all expert testimony under the abuse of discretion standard noting that every violation of the Unfair Insurance Practices Act is not *per se* a violation of the bad faith standard, and acknowledging that the trial court did allow plaintiff's expert to testify about a number of instances of perceived misconduct based on her knowledge of the case and the insurance industry.

Plaintiff's counsel was trial and appellate counsel in Klinger v. State Farm Mut. Auto Ins. Co., 115 F.3d 230-233 (3d Cir. 1997) and also Syracuse Exploration Company v. Northbrook Property & Cas. Ins. Co., 216 F.3d 1077 (3d Cir. 2000).

In both Klinger and Syracuse, experts were used.  As a point of fact, in Syracuse, defendant, over plaintiff's counsel's objection, was permitted to call a lawyer to testify, who was an author of a bad faith textbook.  He was permitted to testify over our Plaintiff's counsel's objection that he was an authority on "bad faith," that lawyers and judges rely upon his book, that his book is cited by judges, and in his opinion the insurance company in the Syracuse case was not guilty of bad faith.  Judge Caldwell ruled this was proper.  **App. Ex. E**.  The Third Circuit affirmed.  **App. Ex. F**.  The U.S. Supreme Court refused to grant certiorari.  **App. Ex. G.**

Plaintiff's counsel has also been successful in entering evidence and submitting points for charge referencing the Unfair Insurance Practices Act, *e.g.* points in <u>Syracuse</u>. **App Ex. H**. <u>Also see</u>, <u>Romano v. Nationwide Mut. Fire Ins. Co.</u>, 435 Pa. Super. 545, 646 A.2d 1228 (1994); <u>O'Donnell v. Allstate Ins. Co.</u>, 1999 Pa. Super. 161, 734 A.2d 901 (1999).

Bad faith actions are not limited to bad faith in denying claims but also may extend to bad faith insurer's investigatory practices, as well as bad faith conduct of an insured during the pendency of litigation. <u>O'Donnell v. Allstate Ins. Co.</u>, <u>supra</u>, <u>Romano v. Nationwide</u>, <u>supra</u>, <u>Certainteed Corp. v. Federal Ins. Co.</u>, 913 F. Supp. 351, 360-61 (E.D. Pa. 1995); <u>McFarland v. United States Fidelity & Guarantee Co.</u>, 818 F. Supp. 108, 110-11 (E.D. Pa. 1993); <u>Rottmund v. Continental Ins. Co.</u>, 813 F. Supp. 1104, 1109 (E.D. Pa. 199_). <u>Also see</u>, <u>Polselli</u>, <u>supra</u> and <u>Krisa</u>, <u>supra</u>.

In addition to the references in Defendants' Manual, the following are relevant Unfair Insurance Practices Act provisions and relevant regulations which Defendants have violated:

**40 P.S. §1171.5**

(i) Misrepresenting pertinent facts or policy or contract provisions relating to coverages at issue.

(ii) Failing to acknowledge and/or fail to act promptly upon written or oral communications with respect to claims arising under insurance policies.

(iii) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies.

(iv) Refusing to pay claims without conducting a reasonable investigation based upon all available information.

\* \* \*

(vi) Failing to attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's liability under the policy has become reasonably clear.

(vii)  Compelling persons to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts due and ultimately recovered in actions brought by such persons.

40 P.S. §1171.5.  Defendants are guilty of violating all of the above subsections.

Unfair Insurance Practices Act - Regulations, Title 31, §146.1, et seq.

### §146.5  Failure to acknowledge pertinent communications.

(a)    Every insurer, upon receiving notification of a claim, shall, within 10 working days, acknowledge the receipt of the notice unless payment is made within the period of time.  If an acknowledgment is made by means other than writing, an appropriate notation of the acknowledgment shall be made in the claim file of the insurer and dated.  Notification given to an agent of an insurer shall be notification to the insurer, dating from the time the insurer receives notice.

(b)    Every insurer, upon receipt of an inquiry from the Department respecting a claim shall, within 15 working days of receipt of the inquiry, furnish the Department with an adequate response to the inquiry.

(c)    An appropriate reply shall be made within 10 working days on other pertinent communications from a claimant which reasonably suggest that a response is expected.

(d)    Every insurer, upon receiving notification of claim, shall provide within 10 working days necessary claim forms, instructions and reasonable assistance so that first-party claimants can comply with the policy conditions and reasonable requirements of the insurer.  Compliance with this subsection within 10 working days of notification of a claim shall constitute compliance with subsection (a).

§146.6  Standards for prompt investigation of claims

Every insurer shall complete investigation of a claim within 30 days after notification of claim, unless the investigation cannot reasonably be completed within the time.  If the investigation cannot be completed within 30 days, and every 45 days thereafter, the insurer shall provide the claimant with a reasonable written explanation for the delay and state when a decision on the claim may be expected.

§146.7  Standards for prompt, fair and equitable settlements applicable to insurers.

(a)    Acceptance or denial of a claim shall comply with the following:

(1)    Within 15 working days after receipt by the insurer of properly executed proofs of loss, the first-party claimant shall be advised of the acceptance or denial of the claim by the insurer.  An insurer may not deny a claim on the grounds of a specific policy provision, condition or exclusion unless reference to

the provision, condition or exclusion is included in the denial. The denial shall be given to the claimant in writing and the claim file of the insurer shall contain a copy of the denial.

* * *

(b)    If a claim is denied for reasons other than those described in subsection (a) and is made by any other means than writing, an appropriate notation shall be made in the claim file of the insurer.

(c)    The following provisions govern acceptance or denial of a claim where additional time is needed to make a determination:

(1)    If the insurer needs more time to determine whether a first-party claim should be accepted or denied, it shall so notify the first-party claimant within 15 working days after receipt of the proofs of loss giving the reasons more time is needed. If the investigation remains incomplete, the insurer shall, 30 days from the date of the initial notification and every 45 days thereafter, send to the claimant a letter setting forth the reasons additional time is needed for investigation and state when a decision on the claim may be expected.

(2)    Where there is a reasonable basis supported by specific information available for review by the insurance regulatory authority for suspecting that the first-party claimant has fraudulently caused or contributed to the loss by arson or other illegal activity, the insurer is relieved from the requirements of this subsection; provided, however, that the claimant shall be advised of the acceptance or denial of the claim by the insurer within a reasonable time for full investigation after receipt by the insurer of a properly executed proof of loss.

Also see, The Birth Center v. The St. Paul Companies, Inc., 1999 Pa. super. 49 727 A.2d 1144 (1999) for additional discussion of "bad faith" law in Pennsylvania. Also see, Simon v. UnumProvident Corp., 2002 U.S. Dist. LEXIS 9331 (E.D. Pa. May 23, 2002) for background information as to possible joint responsibility of UNUM, Paul Revere, and New York Life and Defendants' possible "bad faith" of requiring duplicate and triplicate and weekly, bi-weekly and monthly filings by Plaintiff and his doctors.

At this point, Plaintiff's counsel does not know the position Defendants are taking as to sole or joint responsibility of the various Defendants in administering, deciding, and paying insureds under New York Life disability policies. Mrs. Mulry testified in her deposition that she herself does not know the legal ramifications of the se various companies, *i.e.,* UNUM,

UnumProvident, Paul Revere, New York Life. Even Defendants' filing of their Motion for Summary Judgment and Motion in Limine without any legal or factual basis whatsoever can be found by a jury to be acts of bad faith. Plaintiffs will be filing a Motion to Extend the Deadline for Filing Expert Reports to add Dr. Patrick Fergal McSharry on the basis of his lawsuit against UnumProvident. **App. Ex. C**.

Respectfully submitted,

ANGINO & ROVNER, P.C.

Richard C. Angino, Esquire
I.D. No. 07140
4503 N. Front Street
Harrisburg, PA 17110
(717) 238-6791
Attorney for Plaintiff

Date: 8/26/02

Page 1

```
 1           UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2

 3

 4  VINCENZO MAZZAMUTO,
          Plaintiff
 5
    VS.              C.A. NO. 1:CV-01-1157
 6
    UNUM PROVIDENT CORPORATION;
 7  PAUL REVERE LIFE INSURANCE
    COMPANY; and NEW YORK LIFE
 8  INSURANCE COMPANY,
          Defendants
 9

10

11

12      DEPOSITION of MELISSA MULRY taken at the

13  request of the plaintiff pursuant to Rule 30 of

14  the Federal Rules of Civil Procedure before

15  Dianne G. Rutan, a notary public in and for

16  the Commonwealth of Massachusetts, on

17  April 23, 2002, commencing at 9:00 A.M. at

18  41 Elm Street, Worcester, Massachusetts.

19

20

21

22

23

24
```

Page 2

```
 1  A P P E A R A N C E S :

 2

 3  FOR THE PLAINTIFF:

    RICHARD G. ANGINO, ESQ.
 4  ANGINO & ROVNER, P.C.
    4503 North Front Street
 5  Harrisburg, Pennsylvania  17110-1708

 6
    FOR THE DEFENDANTS:
 7
    E. THOMAS HENEFER, ESQ.
 8  STEVENS & LEE
    111 North Sixth Street
 9  P.O. Box 679
    Reading, Pennsylvania  19603-0679
10
         - and -
11
    EDWARD T. CORRIGAN, ESQ.
12  UNUMPROVIDENT
    18 Chestnut Street
13  Worcester, Massachusetts  01608

14

15

16

17

18

19

20

21

22

23

24
```

Page 3

```
 1              I N D E X

 2      DEPONENT: MELISSA MULRY

 3                            PAGE

 4  EXAMINATION BY MR. ANGINO      4

 5

 6

 7

 8

 9           EXHIBITS

10                            PAGE

11  P-1 Packet of documents       4

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 4

1      (Plaintiff's Exhibit No. 1 premarked.)

2

3          MELISSA MULRY, SWORN

4

5  EXAMINATION BY MR. ANGINO:

6      Q.  I'm going to be taking this

7  deposition for both discovery and potential use

8  at trial.  So if you have any objections to any

9  of the questions --

10          MR. HENEFER:  You don't want to have

11  the usual stipulations then?

12          MR. ANGINO:  No, no.

13          MR. HENEFER:  Okay.

14      Q.  What is your full name?

15      A.  Melissa Ann Mulry.

16      Q.  What is your home address?

17      A.  I'll give my business address.

18      Q.  That's fine.

19      A.  18 Chestnut Street, Worcester,

20  Massachusetts.

21      Q.  And how long have you worked for the

22  particular company that you work for?

23      A.  In September, it will be four years.

24      Q.  What is the name of the company that

**MAZZAMUTO V. UNUMPROVIDENT**     CondenseIt!™     **M. MULRY, 4/23/2002**

Page 5

1 you work for?
2     A.  UNUMProvident Corporation.
3     Q.  Where had you worked before this?
4     A.  I was actually right out of college.
5 I graduated from college in 1998.  Prior to
6 that, when I was in college I worked for the
7 Devereux Foundation.
8     Q.  What college did you go to?
9     A.  Anna Maria College, Paxton,
10 Massachusetts.
11     Q.  And when you came to work for UNUM,
12 in what capacity did you come?
13     A.  What do you mean "what capacity"?
14     Q.  What were you hired to do?
15     A.  Claim representative.  I was actually
16 an assistant claim representative.
17     Q.  Did you have to go to any particular
18 school or training?
19     A.  I had three months of training before
20 I was released to my department.
21     Q.  Would that be on-the-job training?
22     A.  I had contract training -- I'm not
23 exactly sure -- but I had contract training and
24 some on-the-job training.  But most of it was --

Page 6

1 actually I had three months of training prior to
2 even any on-the-job training.
3     Q.  And were there certain books or
4 written material provided to you during this
5 course of training?
6     A.  Yes.
7     MR. ANGINO:  Off the record.
8     (Discussion off the record.)
9     Q.  Back on the record.  With regard to
10 working as a claims representative, were there
11 certain procedures and protocols involved?
12     A.  Yes.
13     Q.  And are those in writing?
14     A.  I'm not sure.
15     MR. ANGINO:  Off the record.
16     (Discussion off the record.)
17     Q.  Back on the record.  New claim, what
18 is the procedure that you follow?
19     A.  Handling a new claim?  We would --
20 first I would review all of the benefit
21 information, the contracts and I would review
22 the claim form in its entirety and I would
23 contact the insured by telephone, to do a
24 telephone interview.

Page 7

1     Q.  Let's assume that a claimant, an
2 insured, goes to his agent and reports the
3 claim.  And that report comes to you.  What's
4 the first step?
5     A.  The report comes from the agent?
6     Q.  Yes.
7     MR. HENEFER:  Do you mean like a
8 verbal report, or an actual claim form?
9     MR. ANGINO:  A verbal report.
10     MR. HENEFER:  Verbal report.  Okay.
11     A.  I would then speak with the agent and
12 ask that he submits the necessary claim forms to
13 proceed.
14     Q.  Let's take the other alternative, the
15 claimant or the insured calls, what do you do?
16     A.  If I don't have the claim form, again
17 I would ask for the claim forms to review.
18     Q.  And when we talk about a claim form,
19 is that an application for benefits?
20     A.  Yes.
21     Q.  So that the first step when you
22 receive an oral report, whether it come from an
23 agent or whether it come from the insured, or
24 even if it were a written notice, your first

Page 8

1 would be to send a claim form?
2     A.  Exactly.  Yes.
3     Q.  When you're dealing with individuals
4 from other states, did you have any training in
5 terms of like unfair insurance practices law in
6 a state such as Pennsylvania?
7     A.  Not that I recall.
8     Q.  How about in terms of Massachusetts?
9     A.  I don't recall.
10     Q.  So that at the present time, are you
11 aware that there are time lines in which things
12 have to be done?
13     A.  I am aware of time lines, not
14 specific.
15     Q.  What are the time lines of which you
16 are aware?
17     A.  I am aware that certain states there
18 are time lines.  I don't know any specific
19 Pennsylvania.  I do know that we were instructed
20 to handle mail within seven to ten business
21 days.
22     Q.  So mail within seven to ten business
23 days?
24     A.  Mm-hmm.

Page 9

1    Q.  How about telephone calls, responding
2  to?
3    A.  At the time there were no specific
4  guidelines that I can recall.
5    Q.  So that if you get a telephone call,
6  you're not aware of any specific time line to
7  respond to that telephone call?
8    A.  Correct.
9    Q.  You get a letter, you're supposed to
10  respond within seven to ten days?
11    A.  (Witness nods.)
12    Q.  Is there a time period in which you
13  need to make a decision of which you're aware?
14    A.  Not that I know off the top of my
15  head.
16    Q.  Is there any time period when you get
17  a notice of a claim that you need to send out
18  the application or the claim form?
19    A.  I'm not sure.  I don't -- our intake
20  department handles that.  So I don't actually
21  send out the claim forms myself.
22    Q.  Your department would be called what?
23    A.  The claims department.
24    Q.  So you're the claims department.

Page 10

1    A.  Mm-hmm.
2    Q.  And you say there's an intake
3  department?
4    A.  Yes.
5    Q.  And the intake department, what do
6  they do?
7    A.  They actually set up the claim.  They
8  would set it up on the computer and they would
9  receive the telephone call, and then they would
10  actually send out the claim forms.
11    Q.  So, really, you get involved when the
12  case is assigned to you?
13    A.  Correct.
14    Q.  Intake handles it before you get
15  involved?
16    A.  Yes.
17    Q.  All right.  So that once you get
18  involved, there's already written claim forms;
19  is that right?
20    A.  Typically.  In this case, there
21  wasn't, but typically speaking, that's how it
22  should work.
23    Q.  And since you're saying what happened
24  in this particular case, in contra-distinction

Page 11

1  from other cases, you've obviously reviewed the
2  file?
3    A.  Correct.
4    Q.  And you've gone over the file with
5  your attorney?
6    A.  Yes.
7    Q.  I'm not going to get into
8  specifically what.  But you've discussed the
9  case with your attorney; right?
10    A.  Yes.
11    Q.  What I've done, I've marked as
12  Plaintiff Exhibit No. 1 a packet of papers which
13  are in front of you.
14    A.  Okay.
15    Q.  And there's another packet for your
16  attorney.  And what I'm going to do is I'm going
17  to proceed chronologically.  I've set this
18  packet of papers up in a chronological fashion,
19  as best as I could.
20    A.  Okay.
21    Q.  And what I'm going to ask you are
22  questions dealing with these papers.
23    A.  Okay.
24    Q.  All right.  Each of these papers

Page 12

1  carried a Bate stamp number and I will
2  occasionally refer to the Bate stamp number.
3  I'm going to ask you try to keep them in the
4  order in which they are set up, because when
5  this case comes to trial this is the order in
6  which the deposition is being taken.  Do you
7  understand?
8    A.  I understand.
9    MR. HENEFER:  The first page,
10  Richard, I think the Bate's number might have
11  been cut off.  I can locate that for you if you
12  want.
13    MR. ANGINO:  At the appropriate time,
14  we can do that.
15    Q.  And what I'm going to ask you is, you
16  have occasion to use the word "uh-huh."  I'm
17  going to ask for yes or no.
18    A.  Okay.
19    Q.  It will be easier when we get to
20  court.  Okay is even fine.  But uh-huh is a
21  difficult thing for the jury to understand.
22  Okay?
23    A.  Okay.
24    Q.  The first paper is one carrying an

**MAZZAMUTO V. UNUMPROVIDENT**    **CondenseIt!**™    **M. MULRY, 4/23/2002**

Page 13

1  attorney's name, it's Peter J. Russo.  Do you
2  see that?
3      A.  Yes.
4      Q.  And although the date of the
5  particular letter is March 26, 2001, the reason
6  it is first is it referenced that in July you
7  were first provided verbal notice of a claim.  Do you
8  see that?  Second paragraph, mid part of the
9  second paragraph.
10     A.  Mm-hmm.
11     Q.  There you go again.
12     A.  I'm sorry.  Yes.  I see that.
13     Q.  Are you aware that there was a verbal
14  notice in July of the year 2000 with respect to
15  a claim by Mr. Mazzamuto?
16     A.  Yes.
17     Q.  And can you tell us what form that
18  July notice took?
19     A.  What do you mean?
20     Q.  It's verbal.  Was it a telephone
21  call?
22     A.  I believe it was a telephone call.
23     Q.  To whom?
24     A.  I believe to our intake department.

Page 14

1      Q.  So in July, there's a telephone call
2  to your intake department.  What happened to
3  that July telephone call?
4      A.  I'm not sure.  I would have to look
5  through the file, but I believe I actually, it's
6  the second page right here.
7      Q.  Well, that particular second page is
8  carrying a date as I see it of September.
9  Right-hand, down at the bottom, 9/6/2000.  Do
10  you see that?
11     A.  Yes.
12     Q.  What about the July call?
13     A.  I would have to look through the
14  file.  I may have been confused with this date
15  here.
16         MR. HENEFER:  The witness is pointing
17  to the date that says "first date treated."
18     Q.  Yes, there is a date of disability of
19  7/22.  Do you see that?
20     A.  Yes.
21     Q.  But this particular document, which
22  is carrying a Bate stamp of 557 is showing a
23  9/6/2000 date recorded by a Diann Jarvis.  Do
24  you see that?

Page 15

1      A.  Yes.
2      Q.  So that, if there was a verbal notice
3  in July, do you know where the document is for
4  that verbal notice?
5      A.  I would not -- if it wasn't in the
6  claim file, then I would not have known about
7  the July.  If it existed, I don't know where it
8  would have been.  But their normal procedure is
9  to document it on this form.
10     Q.  And what we are looking at is an
11  initial setup form for a new claimant; is that
12  right?
13     A.  Yes.
14     Q.  So there's no question in your mind
15  that the claimant contacted your intake
16  department at least as early as September the
17  6th.  Is that right?
18     A.  That's right.
19     Q.  And the normal procedure would be
20  once that contact is made, written documents,
21  and application should have been sent to the
22  claimant.  Is that right?
23     A.  Correct.
24     Q.  Now, I've gone through the file, and

Page 16

1  I don't see written documents having been sent
2  to the claimant, say, within a week or ten days
3  after September 6, 2000.  Is that accurate?
4      A.  I'm not sure.  I'd have to look
5  through the claim file.
6      Q.  Well, do you have any knowledge that
7  there were written documents sent?
8      A.  I don't.
9         MR. HENEFER:  Sent when?
10     Q.  Sent within seven to ten days of the
11  date of 9/6/2000?
12     A.  I'm not sure when they sent the
13  forms.
14     Q.  Apparently, there's another document
15  of an initial setup form almost identical except
16  the one doesn't have that there was a prior
17  claim, the second form, which carries the Bate
18  stamp of 556, says there was a prior claim in
19  1996.  Is that accurate?
20     A.  Yes, that's accurate.
21     Q.  This time a Kimberly Barbee is
22  getting the information.  Is that right?
23     A.  Yes.
24     Q.  So that, there were to be documents

**MAZZAMUTO V. UNUMPROVIDENT    CondenseIt!™    M. MULRY, 4/23/2002**

Page 17

1 sent after this 9/6 call, there should have been
2 documents sent after the 9/27 call, is that
3 right? Normal procedure.
4    A. Normal procedure, yes.
5    Q. The next thing we see in this series
6 of documents as I've been able to put them
7 together --
8    A. Mm-hmm.
9    Q. You said uh-huh.
10    A. I'm sorry.
11    Q. That's all right. I'll have to keep
12 reminding you of that.
13    A. It's a habit. I'm sorry.
14    Q. That's all right. The next document
15 I'm looking at is carrying a date of October 11,
16 2000 with a Bate stamp of 552. Do you see that?
17    A. Yes, I do.
18    Q. While we're still in the opening
19 stages of this deposition, as I said, I've tried
20 to set them up in chronological fashion. And
21 you said I can't be certain without looking at
22 the documents. If after this deposition is
23 completed, and if after you have a chance to
24 look at the documents, you find things that in

Page 18

1 any way contradict what we're talking about
2 here, would you --
3    MR. HENEFER: She'll confer with
4 counsel.
5    MR. ANGINO: That's what I was going
6 to say. Confer with counsel.
7    Q. We want you to be accurate in terms
8 of what you said.
9    A. Okay.
10    MR. HENEFER: I'm noticing as we go
11 through this, Richard, that there are some
12 documents that are missing from your
13 compilation. Just to let you know. For
14 example, there are some letters that went out at
15 the end of September.
16    MR. ANGINO: I couldn't find them.
17 That's why I'm saying, if there were letters
18 that went out, then I don't have them. Because
19 I've gone through this file very meticulously to
20 try to put together, you know, a
21 chronological --
22    MR. HENEFER: We should probably go
23 off the record.
24    (Discussion off the record.)

Page 19

1    MR. ANGINO: Let's continue.
2    MR. HENEFER: Still off the record.
3    (Discussion off the record.)
4    MR. ANGINO: Back on the record.
5    Q. I've been given by counsel a letter
6 of September 29, 2000, which is addressed to
7 Mazzamuto, it's coming from disability income
8 claims. And it states that -- "It's our
9 understanding that you wish to present a claim
10 under your individual disability policy."
11    Is that correct?
12    A. Yes.
13    MR. HENEFER: Just so the record's
14 clear Bates label 553.
15    Q. Would this be the intake's form
16 letter in response to a telephone call?
17    A. Yes.
18    Q. The next letter that I have is
19 October the 11th, and you probably have
20 something before that, that somehow got mixed up
21 in my form.
22    MR. ANGINO: But, may I borrow this
23 one for a second?
24    MR. HENEFER: Yes.

Page 20

1    Q. There is a particular document
2 carrying the Bate stamp of 563. And it appears
3 to be something that is used in order to assign
4 a claim. Is that accurate?
5    A. Correct.
6    Q. Because it says off to the right,
7 assigned 10/10/2000. Is that right?
8    A. Yes.
9    Q. So that the very next day after a
10 10/10 assignment is indicated, there is a 10/11,
11 or October 11th letter to Mr. Mazzamuto saying
12 that you have been assigned the claim. Is that
13 right?
14    A. That's right.
15    Q. Now, you said normally by the time
16 you get assigned the claim, a disability form
17 has already been -- an application has been
18 filled out. Is that right?
19    A. Normally.
20    Q. But in this particular case, it
21 hadn't?
22    A. It hadn't. Correct.
23    Q. So, when it's assigned to you and
24 there is no disability claim filled, or



Page 21

1 application filled, what's your responsibility?
2    A.  Typically, I would send out the claim
3 form myself, if it hadn't been received.
4    Q.  But, again, in this case you didn't?
5    A.  I believe I did.
6    Q.  On October 11th, at that time?
7    A.  No.  Sometime after that, I did send
8 out the claim form.
9    Q.  When?
10    A.  I'd have to look.
11    Q.  Does your attorney have a document
12 which will show us when you sent out a form?
13    A.  It's not in here, but he should have
14 it because I reviewed that yesterday.  I saw
15 that in there.
16       MR. HENEFER:  I'm handing opposing
17 counsel a November 1, 2000 letter Bates number
18 551.  No waiver of the privilege intending by
19 the fancy yellow highlighting, Richard.
20    Q.  I've been handed by counsel, a letter
21 November 1st, 2000.  Again, a document I didn't
22 have that didn't make sense to me when I went
23 through, in terms of why forms were then filled
24 out.  So this is another document I'd like to

Page 22

1 receive a copy of.
2       It has your signature, and it's written
3 to Mr. Mazzamuto.  It's stating that a claim had
4 been submitted to him.
5       How do you know that a claim had been
6 submitted to him?
7    A.  Could I see the letter?  I knew the
8 claim form had been submitted because of the
9 letter that he just showed you that we sent him
10 claim forms.  But I had yet to receive those
11 forms.
12       MR. ANGINO:  May I see that letter
13 again?
14       MR. HENEFER:  I'm handing counsel
15 document number 553.
16    Q.  So this particular document said a
17 claim form had been sent at that time.  So, you
18 hadn't received the claim form.  So you sent a
19 second claim form?
20    A.  Correct.
21    Q.  The next document appears to be a
22 lost file kind of document, carrying number 536
23 and after that's 535.  Do you see those two
24 documents?

Page 23

1    A.  Yes, I do.
2    Q.  They are carrying the name Michelle
3 Bachini.  Both carrying the date of 10/19/2000.
4 They have two different time periods.  One's at
5 9:16:23; the other one 9:28:08 a.m.  They both
6 reference Mazzamuto H3236167.  Is that correct?
7    A.  Correct.
8    Q.  Is this a form used by UNUM in terms
9 of missing files?
10    A.  Typically, yes.
11    Q.  Do you know what happened, how
12 Mazzamuto's file got missing?
13    A.  I'm not exactly sure, but, at the
14 time the New York Life had just been -- the New
15 York Life block of business had just been
16 forwarded to us from New York.  So I believe
17 they were in a different location, and that's
18 what the purpose of this e-mail was.
19    Q.  So, for us to understand the factual
20 circumstances at or about the time when this
21 claim was being made, was there some form of
22 merger or something going on, or a block of
23 business being transferred or something along
24 that line?

Page 24

1    A.  Yes.  We were going to be
2 administering the New York Life Insurance
3 Company disability claims.
4    Q.  That's my next question.  I'm going
5 to take you back to the second document from the
6 beginning.  If you could just go back to that.
7 Keep going.
8       The setup forms, there is a whole
9 section called line of business, PLA.  What's
10 that?
11    A.  Provident Life and Accident.
12    Q.  PLC?
13    A.  Provident Life and Casualty.
14    Q.  Paul Revere.  TNE?
15    A.  The New England.
16    Q.  Equitable.  John Hancock.  Provident
17 Mutual.  MPA?  What's MPA?
18    A.  I'm not sure what MPA is.
19    Q.  Northwest.  Great West.  General
20 American and New York Life.  And New York Life
21 is checked; is that right?
22    A.  Correct.
23    Q.  As a claims representative do you
24 work on all these different lines of business?

Page 25

1  A. No.
2  Q. I don't see UNUM mentioned there.
3  A. At the time I do not believe we were
4  handling UNUM. In the Worcester office, I do
5  not believe we were handling the UNUM block of
6  business at the time of this document.
7  Q. What block of business were you
8  handling at the time?
9  A. At the time I was handling the New
10 York Life.
11 Q. Just the New York Life?
12 A. At the time, correct.
13 Q. And how did this happen to go from
14 New York Life to UNUM, this block of business,
15 so to speak that involved Mr. Mazzamuto?
16 A. The name of our company is
17 UNUMProvident. So I'm --
18 Q. Did they buy New York Life as far as
19 you know?
20 A. I'm not positive of the legalities
21 of it, but I know that we were administering the
22 block of business.
23 Q. So you were administering both New
24 York Life and UNUM business?

Page 26

1  A. UNUM at the time, I do not think so.
2  Paul Revere, yes.
3  Q. So you were handling New York Life
4  and Paul Revere. Any other companies?
5  A. At the time, I do not believe I was
6  handling Paul Revere. But I was prior to New
7  York Life. Then I began handling New York Life.
8  Q. Okay.
9  A. No other blocks of business.
10 Q. The next document I'm looking at is
11 carrying a date of November 3rd, 2000. Do you
12 see that?
13 A. Yes.
14 Q. Is there any letter that you have in
15 your file that would have preceded or brought
16 this response from the doctor, of which you're
17 aware of?
18 A. I believe -- I believe this was after
19 my telephone call with Mr. Mazzamuto where he
20 asked me to contact his attorney's office to get
21 this document.
22 Q. No, that would have been in January.
23 This is a November document.
24 A. I understand. But this was in

Page 27

1  Mr. Russo's office. That was not given to me at
2  the time of claim. Mr. Mazzamuto indicated to
3  me that he did not have him send it with the
4  claim form.
5  Q. But this has been sent, it's carrying
6  the date of November 3, 2000. It went to New
7  York Life Insurance Company.
8  A. Correct. It was faxed to me on
9  January 4th, at the top.
10 Q. But what I'm saying is, do you know
11 why something that went to Paul Revere and New
12 York Life didn't come to you prior to January?
13 A. The only thing I know is from what
14 Mr. Mazzamuto told me. It's documented in my
15 phone conversation. That he indicated to his
16 attorney's office -- actually, I'm sorry. His
17 attorney indicated to him that they did not need
18 to send this because it was regarding a back
19 condition and he was filing a claim for a heart
20 condition.
21 Q. My point, though, is: You're not
22 questioning that on November 3rd this particular
23 letter went to Paul Revere and went to New York
24 Life?

Page 28

1  A. I do not believe this went to the
2  Paul Revere Life Insurance Company. I believe
3  this went to Mr. Russo's office. I did not
4  receive this claim form until Mr. Russo's office
5  gave it to me on January 4th.
6  Q. I know, but are you saying a letter
7  was prepared and wasn't sent?
8  A. Correct.
9  MR. HENEFER: Objection. I think she
10 said that it was sent to Mr. Russo's office.
11 THE WITNESS: Correct.
12 MR. HENEFER: It was provided to
13 Mr. Russo.
14 A. It wasn't provided directly to me.
15 Q. My point, though, is, is there a New
16 York Life Insurance Company at 51 Madison
17 Avenue, New York, New York?
18 A. Yes.
19 Q. Is there Paul Revere Life Insurance
20 Company, New York Life customer care center?
21 A. Correct.
22 Q. And is it a P.O. Box 15001,
23 Worcester, Massachusetts?
24 A. I believe so. I'm not sure of the

**MAZZAMUTO V. UNUMPROVIDENT    CondenseIt!™    M. MULRY, 4/23/2002**

Page 29

1  exact P.O. Box address.
2      Q.  You said one of your servicing
3  companies or lines of business is Paul Revere.
4  Is that right?
5      A.  Correct.
6      Q.  And do you have any knowledge as to
7  whether Paul Revere has a P.O. Box?
8      A.  Yes, Paul Revere does have a P.O.
9  Box.
10     Q.  And as far as you know, would this be
11  the P.O. Box 15001?
12     A.  That would be a guess.
13     Q.  Your attorney is writing down, and
14  what I'd like to find out is if Paul Revere
15  and/or New York Life Insurance Company received
16  this letter in November.  You know, you received
17  it in January.  But I'd like to know if they
18  received it?
19     A.  Okay.
20     Q.  Okay.  Whether they received it and
21  didn't send it to you or whatever happened, the
22  letter does seem to indicate that the doctor is
23  saying what is wrong with Mr. Mazzamuto.  Is
24  that right?

Page 30

1      A.  Correct.
2      Q.  And he goes on to say, "I find it
3  difficult to coherently fill out the forms as
4  his medical problems are several."
5          Do you see that?
6      A.  I do see that.
7      Q.  So knowing the English language,
8  apparently this doctor had received certain
9  forms to fill out.  Is that right?
10     A.  Correct.
11     Q.  And he says, "Mr. Mazzamuto has had a
12  long history of low back pain."  That's what he
13  first says?
14     A.  Correct.
15     Q.  Is that what he says?
16     A.  Yes.
17     Q.  And in terms of describing injuries,
18  is that the first injury that he described,
19  Mr. Mazzamuto has had a long history of low back
20  pain"?
21     A.  Correct.
22     Q.  "And, in fact, for many years has
23  undergone numerous treatments and physical
24  therapy and MRI in the past did reveal central

Page 31

1  spinal stenosis which gradually worsened to a
2  maximum L3-L4 and extends to L2 to L5."  Do you
3  see that?
4      A.  Yes.
5      Q.  "This has given him periodic problems
6  with lower back discomfort, symptoms of
7  radiculopathy and urinary irritability."
8          Do you know what those words mean?
9      A.  Some of them.  Not all of them.
10     Q.  He's saying that he's had lower back
11  discomfort; he's had radiating pathology, means
12  disease; and urinary irritability.  Do you see
13  that?
14     A.  Yes, I do.
15     Q.  "Prolonged standing and heavy lifting
16  have aggravated.  He has been seen in physical
17  therapy; treated in a local pain clinic with
18  local injections as well as prescription
19  analgesics, nonsteroidal anti-inflammatory
20  agents and other atypical chronic pain
21  medications."  Do you see that?
22     A.  Yes.
23     Q.  You agree, all that deals with his
24  back; is that right?

Page 32

1      A.  Correct.
2      Q.  And all of that is communicating to
3  Paul Revere and New York Life Insurance Company,
4  Mr. Mazzamuto has a back problem.  Is that
5  right?
6      A.  Correct.
7      Q.  It then goes on to say,
8  "Mr. Mazzamuto's condition was complicated this
9  year."  Is that right?
10     A.  Yes.
11     Q.  And then he discusses the heart
12  situation.  Is that right?
13     A.  Yes.
14     Q.  Goes on to talk about a readmission;
15  is that right? Third paragraph.
16     A.  Yes, I see that.
17     Q.  He then goes on and says, "As the
18  patient has attempted" -- Do you see "attempted"
19  to return to work"?
20     A.  Yes.
21     Q.  -- "after his recovery from his heart
22  attack, his back was worsened again."  Is that
23  what he says?
24     A.  Correct.

Page 33

1    Q. "Also the stress and anxiety which
2  has been provoked because of his recent cardiac
3  problems and manifested themselves with
4  significant anxiety when he is back in work
5  conditions." Do you see all of that?
6        MR. HENEFER: Actually, "work
7  situation."
8    Q. "In a work situation." Do you see
9  that?
10   A. Yes.
11   Q. Are you aware that your insurance
12 company took the deposition of the doctor who
13 authored this report?
14   A. Yes.
15   Q. And have you been told what the
16 doctor said?
17   A. No.
18   Q. When you get a copy of the
19 deposition, I'm going to basically state for you
20 to assume that he said the same thing in his
21 deposition now as he said back on November the
22 3rd, 2000.
23   A. Okay.
24       MR. HENEFER: I just want the record

Page 34

1  to reflect that the Plaintiff's Exhibit 1, does
2  not have a second page of Dr. Bower's
3  November 3rd letter.
4        MR. ANGINO: I think it's just his
5  name. Is there more?
6        MR. HENEFER: No. Actually there's
7  quite a bit of information on it.
8        MR. ANGINO: Let's make it complete
9  then.
10       MR. HENEFER: I'm a little confused
11 about your last instruction about assuming what
12 Dr. Bower said. I want to note an objection on
13 the record to that.
14       MR. ANGINO: That's fine.
15   Q. The second page of the letter, and we
16 do want it to be complete, it says, "While his
17 heart condition has currently stabilized and
18 should hopefully not pose a great limitation on
19 him in the future, the amount of weight he has
20 gained from his smoking cessation has
21 exacerbated his chronic and progressive back
22 problem. At the present time he is not able to
23 do the work required in running his restaurant
24 because he cannot stand for a prolonged period

Page 35

1  of time; has difficulty bending and is
2  restricted from heavy lifting. It is unlikely
3  he will be able to return to work in the
4  foreseeable future."
5        Is that what Dr. Bower told New York and
6  Paul Revere in a letter of November 3rd?
7    A. Yes.
8    Q. So that obviously your attorney has
9  made a note, and if New York Life and Paul
10 Revere got that letter in November, they would
11 have known from that time what Dr. Bower said
12 with regard to disability; is that right?
13   A. If it was received by Paul Revere.
14   Q. There is, however, the next document
15 which is an UNUM document, as I see it. A
16 single-page document.
17   A. I believe our documents are out of
18 order from each other because I have a different
19 document.
20   Q. Which one do you have in between?
21   A. The telephone conversation.
22   Q. Yours are probably in better order
23 than mine.
24   A. Okay.

Page 36

1    Q. Let me take a look at yours. Yes,
2  yours is out of order. That's a January date.
3  Put it to the side until we get to that.
4    A. Sure.
5    Q. The next document is carrying a date
6  of November 15th. Do you see at the bottom of
7  that page?
8    A. I see that.
9    Q. So whether or not New York and Paul
10 Revere received the letter of November the 3rd
11 in the normal course of mail delivery, there is
12 no question that there is a document by UNUM
13 dated by Dr. Bower, 11/15/2000. Is that right?
14   A. Correct.
15   Q. And that document when it talks about
16 subjective symptoms talks about anxiety. Is
17 that right?
18   A. Yes.
19   Q. Which is in the letter of
20 November 3rd; is that right?
21   A. Correct.
22   Q. It talks about worry, which anxiety
23 and worry is in the November 3rd letter; is that
24 right?

**MAZZAMUTO V. UNUMPROVIDENT**    CondenseIt!™    **M. MULRY, 4/23/2002**

Page 37

1    A.  I'm not sure if worry.  But I
2  remember anxiety.
3    Q.  Low back.  Do you see that?
4    A.  I see that.
5    Q.  And these are the symptoms that are
6  mentioned; is that right?
7    A.  Correct.
8    Q.  There's no symptom mentioned there
9  with regard to the heart, is there?
10    A.  Symptoms, no.
11    Q.  Symptoms are anxiety, worry, and low
12  back.  Is that right?
13    A.  Correct.
14    Q.  And objective findings is the cardiac
15  catheter; is that right?
16    A.  Correct.
17    Q.  The restrictions are no prolonged
18  standing, no heavy lifting.  Do you see that?
19    A.  Yes.
20    Q.  And do you see where it says
21  "secondary to back"?
22    A.  Second to back, yes.
23    Q.  And when he's telling you what the
24  limitations are, he's saying cannot work in

Page 38

1  stressful situations.  Do you see that?
2    A.  Yes.
3    Q.  And it goes on to say that the date
4  of his first visit for this particular condition
5  is 7/22/2000.  Is that right?
6    A.  Correct.
7    Q.  And date of the last visit was
8  10/04/2000.  Is that right?
9    A.  Correct.
10    Q.  And it goes on to be signed by
11  Dr. Bower and dated by Dr. Bower.  Is that
12  right?
13    A.  Correct.
14    Q.  So he's saying he can't work in
15  stressful situations; right?
16    A.  Correct.
17    Q.  The next document is actually a
18  medical provider's statement.  Can you tell me
19  the difference between the document that's
20  called an attending physician's statement and a
21  medical provider's statement?
22    A.  I believe this was the form that the
23  UNUMProvident Corporation used.  And this is the
24  form that the New York Life Insurance Company

Page 39

1  used.  And it appears he completed both forms.
2    MR. HENEFER:  The record reflect, the
3  New York Life is the one entitled "Medical
4  Provider's Statement."
5    THE WITNESS:  Correct.
6    Q.  Again, obviously, the doctor has
7  received a New York form.  Is that right?
8    A.  Correct.
9    Q.  Would that tell you something as to
10  whether or not he sent a letter to New York
11  Life?
12    A.  That would be an assumption.  I'm not
13  sure.
14    Q.  But, would you assume from your
15  practice of being a claims rep that if someone
16  fills out a form, that somebody sent him a form
17  to fill out?
18    A.  Correct.
19    Q.  That's what I'm saying.  Somebody
20  would have had to have sent him a form from UNUM
21  and somebody would have had to send him a form
22  from New York Life.  You don't think he did this
23  on his own, do you?
24    A.  No.

Page 40

1    Q.  So, do we have any letter showing
2  UNUM sending him a form and New York Life
3  sending him a form?
4    MR. HENEFER:  Yes, we referred to the
5  New York Life letter previously.  And there's a
6  UNUM letter.
7    MR. ANGINO:  Of the same type.
8    MR. HENEFER:  Of the same type dated
9  September 28, 2000, Bates number 554, which says
10  among other things "enclosed please find a claim
11  form."
12    MR. ANGINO:  Okay, so as we go through
13  this deposition we'll have the things I'm
14  missing, and we can fill those in hopefully at
15  that point.
16    MR. HENEFER:  I'm disappointed to
17  hear that there's pages missing from the
18  document production, Richard.  Rather than have
19  somebody from your office go through and make
20  sure that each numbered pages -- each of the
21  numbered pages are missing or not missing,
22  apparently there's some gaps in this.  I'm
23  seeing in the exhibit, you know, you have number
24  551, then 555, and my file has the intervening

Page 41

1 documents.
2     So what I will do is, I will just have a
3 complete new set of this made and ship it back
4 out to you.
5     MR. ANGINO: I appreciate that.
6     (Discussion off the record.)
7  Q. We have what you said is the New York
8 Life document.
9  A. Correct.
10  Q. And obviously you had, in your file,
11 both the New York and the UNUM forms; is that
12 right?
13  A. Correct.
14  Q. So you had the information that was
15 in both of these; is that right?
16  A. Yes.
17  Q. And, in terms of the medical
18 provider's statement, there are primary
19 diagnoses that are in numbers. Do you know what
20 those numbers mean: 414.01?
21  A. I don't know what they mean.
22  Q. And there are other numbers there, I
23 assume that they're probably correlated with
24 certain medical conditions. Is that right?

Page 42

1  A. Correct.
2  Q. And when the New York form asks,
3 "when the symptoms first appear," and says
4 "7/22." Is that right?
5  A. Correct.
6  Q. And that's consistent with the UNUM
7 form; is that right?
8  A. Yes.
9  Q. And it goes on to say about
10 treatment. And that would be consistent with
11 the UNUM form, when he was treated. Is that
12 right?
13  A. Yes.
14     (Discussion off the record.)
15  Q. Back on the record. It goes to the
16 second page of the New York form. And it says,
17 number 15 -- I'm sorry, number 13. "In your
18 opinion is the patient able to work at this
19 time?" And he put a circle for "no."
20     First there was a mark, but that was
21 crossed out.
22     He then goes on to say, "based on
23 objective findings in your medical opinion the
24 patient was unable to work from July the 22nd to

Page 43

1 the present." Correct?
2  A. Correct.
3  Q. Then goes through the restrictions;
4 is that right?
5  A. Yes.
6  Q. And, apparently, was filled out and
7 signed the same day, 11/15, for both of these
8 documents. Is that right?
9  A. Yes.
10  Q. So he's telling the insurance
11 company, this man hasn't been able to work, he's
12 been disabled, and he's been disabled for three
13 or four months. Is that right?
14  A. Correct.
15  Q. The next form is the disability form
16 which we've all been talking about in terms of
17 the claims form. Is that right?
18  A. Correct.
19  Q. And that, likewise, apparently was
20 filled out on the November 22nd. Is that right?
21  A. Yes.
22  Q. And that particular document is
23 carrying a Bate stamp, somewhere, I assume. Is
24 that 22023, could that be it? At the bottom?

Page 44

1     MR. HENEFER: No. That's not it. In
2 the Bates labeling that document would be Bates
3 number 544 and 543.
4  Q. Do you know when this particular
5 document was received?
6  A. This particular document, no. I
7 believe one of them was received on December
8 15th, but I'm not sure.
9  Q. This one's carrying a date of
10 November 22nd. Right?
11  A. Correct.
12  Q. And the next document that you see is
13 also carrying a November 22nd date. Is that
14 right?
15  A. The day Mr. Mazzamuto signed it,
16 correct.
17  Q. And this is the employer section; is
18 that right?
19  A. Yes.
20  Q. And there's another document --
21     MR. HENEFER: That last document,
22 just so the record's clear, Bates number 548 and
23 547. Sorry for interrupting.
24     MR. ANGINO: Please do. There is

Page 45

1 another document, what is that document Bate
2 number?
3         MR. HENEFER: That is numbers 540 and
4 539.
5    Q. Apparently, Mr. Mazzamuto is getting
6 forms from different companies to file. Is that
7 right?
8    A. It appears.
9    Q. The first one is New York. The
10 second is UNUM. The third is New York. Is that
11 right?
12   A. Correct.
13   Q. Is this some kind of company mix-up,
14 or should he be receiving forms from two
15 different companies?
16   A. No.
17   Q. What happened?
18   A. I have no idea. I didn't send them.
19 The New York forms, I didn't send him.
20   Q. So somebody sent him New York forms.
21 Did you send the UNUM form?
22   A. I did send one UNUM form after I did
23 not receive the form that our intake department
24 had given him.

Page 46

1    Q. But you didn't send this one?
2    A. It would look exactly like that.
3    Q. But you didn't send this one, though,
4 that is signed November 22nd?
5    A. I don't know which one he completed.
6 But they look exactly the same.
7    Q. Okay. Well, the third form, which,
8 please, assist me again?
9         MR. HENEFER: This is the insured's
10 statement of occupational duties and employment.
11        MR. ANGINO: Right.
12        MR. HENEFER: That is 540 and 539.
13   Q. He says, "I cannot perform my duties
14 under the stressful situation. My chest is
15 painful and I am fearful for my life." Is that
16 what it says?
17   A. Yes, it does.
18   Q. Next form, seems to have been cut
19 off, doesn't seem to have any great importance
20 at this point. The next document is where this
21 one comes in that you had been holding out.
22   A. Okay.
23   Q. By this time -- and "by this time"
24 I'm talking about this document of January 4th

Page 47

1 of '01?
2    A. Mm-hmm.
3    Q. Yes.
4    A. Yes. I'm sorry.
5    Q. New York Life, UNUM, Paul Revere,
6 whatever we have documents that go back to
7 September; is that right?
8    A. Yes.
9    Q. So, October, November, December,
10 January -- four months have gone by. Is that
11 right?
12   A. Not since I received the claim form,
13 but.
14   Q. From the documents that we have. The
15 first one's September 9th. And you're now at
16 January 4th. Is that right?
17   A. Yes.
18   Q. Okay. What I'm suggesting to you is
19 if we count the months, it's five days shy of
20 four months. Is that right?
21   A. I'm confused on what you mean, count
22 the months.
23   Q. The very first intake form was
24 9/6/2000?

Page 48

1    A. Correct.
2    Q. If you go to January 4th of 2001,
3 it's two days short of four months?
4    A. Yes.
5    Q. Okay. That's all I'm saying.
6    A. Okay.
7    Q. And your phone conversation then was,
8 the first, at least recorded phone conversation
9 that at least I have. Do you have any other
10 phone conversation documentation?
11   A. This is my first conversation with
12 the insured.
13   Q. Okay. So you were assigned this
14 claim on October the 10th?
15   A. Correct.
16   Q. What did you do from October 10th,
17 November 10th, December 10th to January? What
18 did you do for three months?
19   A. I was waiting for the claim form. We
20 don't contact our insureds until we actually
21 have the claim forms in our hand.
22   Q. So, is there any policy or procedure
23 set up when you are assigned a claim to wait
24 three months to do something?

Page 49

1      MR. HENEFER: Objection. You can
2  answer.
3      Q. You can answer.
4      A. I don't believe there's any policy,
5  but from what I've been told, we would wait
6  until we have the claim form so there's
7  something to discuss.
8      Q. Do you know what happened to this --
9  these forms that are all carrying dates of
10 November 15th from the doctor and November the
11 22nd from the claimant?
12     A. If you see one of the documents has a
13 date stamp of December 15th, that's when it was
14 actually received in our company.
15     Q. One of them. What about the other
16 ones?
17     A. They were attached.
18     Q. So what about the doctor's form?
19     A. They were all attached.
20     Q. So all of this came in on December
21 15th, as far as you know?
22     A. Correct.
23     Q. Was there any transmittal letter or
24 anything that accompanied them?

Page 50

1      A. Not that I recall.
2      Q. So, what you're saying is although
3  the case was assigned to you in October, if they
4  didn't send it for a year, you'd just keep
5  waiting?
6      A. No, I would follow up as I did.
7  Follow up in writing for the claim form.
8      Q. When?
9      MR. HENEFER: When did she follow up?
10 Or when would she?
11     MR. ANGINO: Yes. When did she.
12     MR. HENEFER: When did she. I think
13 we referred to that letter earlier.
14     THE WITNESS: Yes.
15     MR. HENEFER: I don't want to
16 interfere, but I think we referred to her
17 November 1, 2000 letter, which was Bates number
18 551.
19     Q. That was my point, though, from that
20 November 1st date --
21     MR. HENEFER: Until the claim forms
22 was received.
23     Q. -- until the claim forms was
24 received, was a period of at least six weeks; is

Page 51

1  that right?
2      A. Correct.
3      Q. And you didn't follow up during that
4  six-week period?
5      A. I don't know if I did or not.
6      Q. I mean, we have no letter either in
7  my files or in your counsel's files?
8      A. Correct.
9      Q. And we have nothing that shows that
10 you did anything on this file at least for a
11 two-month period, from November, saying send me
12 -- here's a follow-up form, or second form,
13 until January the 4th. Is that right?
14     A. Correct.
15     Q. Can you tell me whether that's your
16 normal practice?
17     A. It's not normal practice to do --
18 What is your question? I'm sorry. The normal
19 practice --
20     Q. Would your normal practice, if you
21 have a file that's been assigned to you to wait
22 two months before you do something else on that
23 file?
24     A. No, it's not normal practice.

Page 52

1      Q. That wouldn't be normal practice, no.
2  I assume just from talking to you, you'd like to
3  move these files along; is that right?
4      A. Correct.
5      Q. And the law requires that you move
6  files along?
7      MR. HENEFER: Objection.
8      Q. Do you understand that?
9      A. I'm not sure of the specific laws.
10     Q. Okay. Are there procedures and
11 protocols within the companies that you work
12 that require you do something in a two-month
13 period like this?
14     A. The only procedure I'm aware of is
15 after receipt of claim forms, when we will
16 contact insureds.
17     Q. So, just for the sake of argument, if
18 claim forms didn't come to you for a year, I
19 mean, you feel it would appropriate not to do
20 anything until you receive those claim forms?
21     A. I don't feel that it would be
22 appropriate, no.
23     Q. Sure. So, after this phone call in
24 January, we now have something called an action

Page 53

1  plan. Is that right?
2      A.  Correct.
3      Q.  And that's carrying the date of
4  January the 8th of '01. Is that right?
5      A.  Correct.
6      Q.  Would this in your normal situation,
7  and I'm gathering Mazzamuto isn't quite normal,
8  you, in being a conscientious employee would
9  want to have an action plan from the time that
10 you would have a file assigned to you. Is that
11 right?
12     A.  No.
13     Q.  No, you wouldn't. Okay. Go ahead.
14 Tell me.
15     A.  If I didn't have the claim forms,
16 there wouldn't be an action. I wouldn't know,
17 waived on -- I didn't have any types of
18 documents in the claim file. I would complete
19 this after I had reviewed the documents and
20 spoke to the insured.
21     Q.  So, it's very important that you get
22 that claim form. Is that right?
23     A.  Correct.
24     Q.  I mean, until you get that claim

Page 54

1  form, everything else is being held up; is that
2  right?
3      A.  Correct.
4      Q.  You need the claim form to prepare
5  the action plan?
6      A.  Yes.
7      Q.  Okay. So that, you received at least
8  in a documented fashion, December 15th, is that
9  what you said?
10     A.  That's when it was received at our
11 company.
12     Q.  In your company, it was received on
13 December 15th. How about you personally?
14     A.  I'm not sure when I personally
15 received it. It would have been within -- I'm
16 assuming a couple of days from December 15th.
17     Q.  Okay. But it was followed up with a
18 call on January the 4th, and then an action plan
19 on January the 8th. Is that right?
20     A.  That's right.
21     Q.  Now, one of the first things -- and I
22 have these attached for a reason. Part of the
23 action plan involved finding out if there had
24 been a former claim. Is that right?

Page 55

1      A.  It wasn't part of the action plan,
2  but it was -- I did follow up -- we did follow
3  up for the prior claim.
4      Q.  There is a request on January the 9th
5  at 9:15 a.m. with a Bate stamp of 236 to the
6  records operations in Chattanooga. Is that
7  where the records of kept in Chattanooga?
8      A.  I believe so, yes.
9      Q.  All right. Did you make this claim
10 request or did somebody else? It says Robin
11 Andrews, what's that?
12     A.  She was my claim assistant at the
13 time. But I would have asked her to get that.
14     Q.  So you asked Robin to get the prior
15 claim form. And that's why you are being copied
16 with it. Is that right?
17     A.  Correct.
18     Q.  And what you actually receive
19 therefore is disability claim information, which
20 is the next page, which is carrying a Bate stamp
21 of 233; is that right?
22     A.  Correct.
23     Q.  And it's telling you that he had a
24 low back pain with a central spinal stenosis

Page 56

1  back in April the 13th of '96. Is that right?
2      A.  Correct.
3          MR. HENEFER: Off the record for a
4  second.
5          (Discussion off the record.)
6          MR. HENEFER: Back on the record.
7      Q.  Back on the record. You received not
8  only these three pages that are here, but the
9  entire claim file. Is that correct?
10     A.  Correct.
11     Q.  And we'll come to that later in the
12 questioning process but I'm glad that defense
13 counsel has made it clear that you knew all that
14 was in that prior claim form file in January of
15 2001; is that right?
16     A.  That's right.
17     Q.  And, therefore, knowing that, you had
18 access to, in January of 2001, medical records.
19 Is that right?
20     A.  From the prior claim?
21     Q.  From the prior claim?
22     A.  Yes. Whatever was in the claim file.
23     Q.  And we'll get to that. But if there
24 are medical records, you had access to them. Is

Page 57

1 that right?
2    A. If there were medical records, if
3 they were in there, yes, I would have had
4 access.
5    Q. You would have had access to the fact
6 that -- would it have been New York Life at that
7 time?
8    A. Yes.
9    Q. That New York Life was attempting to
10 not pay the claim based on fraud. You would
11 have had that access to those records?
12    A. I believe so, yes.
13    Q. You would have had access to the
14 record that they were investigating nonpayment
15 to the point where the agent who had written the
16 policy communicated with New York Life. Is that
17 right?
18    A. Yes.
19    Q. You would have had the access to the
20 records that concluded that they had no basis
21 for denying the claim?
22    A. Yes.
23    Q. And the conclusion was that they had
24 no basis for denying the claim, not only as to

Page 58

1 fraud, but also as far as disability, you had
2 access to those documents?
3    A. I'm not sure what the documents said,
4 but I do realize that they didn't -- remember
5 that they didn't pursue it. I'm not exactly
6 sure what the document it.
7    Q. Well, we can go a little bit out of
8 order here. There is a particular document that
9 looks like that. If you go through your series
10 of files, and I think your attorney has come to
11 that particular set of documents.
12    A. I found it.
13    Q. Kind of just put that sideways, we'll
14 go back to those. You see this stack of
15 documents which has a large black clip and it
16 has a smaller clip there?
17    A. Yes.
18    Q. I'm suggesting that this packet of
19 documents appears to be a packet of documents
20 that deal with the other claim --
21    A. Yes.
22    Q. -- would you agree?
23    A. I agree.
24    Q. And they do have physician's

Page 59

1 statements and things such as that.
2    A. Yes.
3    Q. I'm going to suggest to you that in
4 response to a question that I asked you, if you
5 go back five pages, you will see something
6 called "Claim Referral Memoranda." Back from
7 the back, from the rear.
8    A. Okay.
9    Q. You have that. My question to you
10 was that they determined that they had no basis
11 for denial either on fraud or on the basis of
12 disability. And I'm going to read to you that
13 claim referral memorandum, which carries the
14 date of 4/16/97.
15    "Please see response of 3/7/97. This is
16 to McCarthy from Gloria Phillips" --
17        MR. HENEFER: Phelps.
18        MR. ANGINO: Phelps. I'm sorry.
19 Please see your response of 3/7/97 to my 3/7
20 referral and note OGC." Can you tell me what
21 that is?
22    A. I don't know.
23    Q. Okay. "Reply of 4/15/97 to my memo of
24 7/11/97" --

Page 60

1        MR. HENEFER: 4/11.
2        MR. ANGINO: Is that 4/11/97?
3    Q. -- "since we can't deny on PE."
4 Physical exam, is that what that is?
5    A. I'm not sure.
6    Q. He's saying, though, "we can't deny
7 on PE"; right?
8    A. Mm-hmm.
9    Q. -- "or rescind on fraud provision. I
10 am recommending we accept liability for the
11 period of TD." Do you see that?
12    A. Yes.
13    Q. So, when I had asked you before about
14 after attempting to deny on fraud, they couldn't
15 deny on physical exam or whatever PE stands for,
16 they paid the claim. Is that right?
17    A. Correct.
18    Q. Now, as far as you know that prior
19 disability involved the back, did it not?
20    A. Correct.
21    Q. And it involved a stenosis, at least
22 to some extent because that was the basis upon
23 which there was attempted denial on the basis of
24 fraud. Is that right?

Page 61

1    A.  Correct.
2    Q.  That the stenosis had not been
3  revealed in the original application; is that
4  right?
5    A.  Yes.
6    Q.  Do you know what stenosis is?
7    A.  I'm not a hundred percent positive.
8  I have an idea, but.
9    Q.  Okay.  But you do understand that the
10  reference to L numbers or lumbar numbers?
11    A.  Yes.
12    Q.  They do involve the back?
13    A.  Yes.
14    Q.  So that as far as you knew back in
15  1996, Mr. Mazzamuto had a back problem.  Is that
16  right?
17    A.  Correct.
18    Q.  And made a claim for a back
19  disability; is that right?
20    A.  Correct.
21    Q.  And was paid by New York Life on the
22  basis of that back disability.  Is that right?
23    A.  Correct.
24    Q.  You had, in your possession as of

Page 62

1  January documents from his same doctor,
2  Dr. Bower; is that right?
3    A.  Yes.
4    Q.  Saying that the back condition has
5  worsened over the years; is that right?
6    A.  I don't remember what the --
7    Q.  Well, they say what we went through
8  that they said.  Is that right?
9    A.  Are you talking about the documents I
10  received, or the first documents?
11    Q.  The first documents that we went
12  through.  I'm talking about all the documents
13  that we've gone through in this deposition.
14    A.  Yes, it did say that.
15    Q.  As far as you knew in January,
16  Mr. Mazzamuto was doing the same kind of work in
17  1996 as he was in 2000.  Is that right?
18    A.  Correct.
19    Q.  So, if he was doing executive or
20  administrative or standing or sitting, as far as
21  you know, it was the same kind of work; is that
22  right?
23    A.  Yes.
24    Q.  So, New York Life in 1996 from your

Page 63

1  review of the documents did not contend that his
2  back condition did not disable him for the type
3  of work he was doing.  Is that right? Did you
4  see anything in the documents that contended to
5  that?
6    A.  No, I didn't.
7    Q.  So, the situation is as of January
8  he's making a claim through his own application
9  and through his doctor's filings that he can't
10  do the work because of his back condition,
11  because of anxiety, because of fear.  Is that
12  right?
13    A.  Yes.
14    Q.  What happens then is that you write a
15  letter on January 15th, which, again, I can't
16  find a Bate stamp number.
17       MR. ANGINO:  Off the record.
18       (Discussion off the record.)
19       MR. HENEFER:  Back on the record.
20  The January 15th letter, the numbers are 530 and
21  529.
22    Q.  This letter came from you; is that
23  right?
24    A.  Correct.

Page 64

1    Q.  And you're saying at the outset that
2  you are going to explain the status of his
3  claim.  Is that right?
4    A.  Correct.
5    Q.  And the first thing you do is explain
6  that there is a 90-day elimination period.  Is
7  that right?
8    A.  Yes.
9    Q.  And if everything went the way it was
10  intended to go, he should have been receiving
11  payments that would have started as of a
12  disability occurring on October 20th?
13       MR. HENEFER:  Objection to the form.
14  You can answer.
15    A.  If he was eligible for benefits then
16  benefits would have began to be -- the paid to
17  date would be October 20th -- I'm sorry.  The
18  beginning date would be October 20th.
19    Q.  That was my question.  Now, you state
20  that the policy requires written notice of a
21  claim must be given to us within 30 days after a
22  disability starts.  Is that what you said?
23    A.  Yes.
24    Q.  There's mention of an oral notice in

Page 65

1 July, at least in Russo's letter. Is that
2 right?
3     A. That's right.
4     Q. You did have written or some form of
5 verification of the notice as of September the
6 6th; is that right?
7     A. I do not believe I received written
8 notification of claim until December 15th.
9     Q. Well, what you're saying is written
10 notice. Is there a difference between a notice
11 and an actual claim form?
12     A. Yes, but I don't believe I received a
13 written notice of claim. I don't recall.
14     Q. Well, you mean if --
15     A. Verbal.
16     Q. You mean if an insured calls you, and
17 you've recorded it --
18     A. That's not written notice of claim.
19     Q. That's not written notice of claim.
20 So did you see anything in any of the intake
21 forms where someone in the intake department
22 wrote to Mr. Mazzamuto or Mrs. Mazzamuto and
23 said calling us is not enough, you've got to
24 send us something in writing. Did you see

Page 66

1 anything like that?
2     A. No.
3     Q. But, what you're saying, in your
4 January letter, is the fact that you called and
5 you called potentially three times -- I'm just
6 saying potentially. If we assume there's a call
7 in July, there's a call on September the 6th,
8 there's another call on July 8th or 9th. You're
9 saying these calls aren't notice. Is that what
10 you're saying?
11     A. I didn't say it wasn't notice. I
12 said it wasn't written notice.
13     Q. Are you saying it's a difference
14 whether somebody calls on the phone or writes?
15     A. I'm saying that verbal notice isn't a
16 written notice. That's all I'm saying.
17     Q. Does it result in any different
18 handling of the file whether someone calls or
19 writes?
20     A. No. I was just letting him know that
21 the policy --
22     Q. He didn't send a written notice?
23     A. Correct.
24     Q. You're just letting him know that he

Page 67

1 didn't send a written notice?
2     A. Correct.
3     Q. And that's what's required under the
4 policy?
5     A. Correct.
6     Q. And you're saying because he didn't
7 send a written notice within the time frame the
8 evaluation may be delayed?
9     A. Correct.
10     Q. Why? Why would you delay something if
11 someone calls you rather than writes to you?
12     A. That's not what the statement said.
13 I said, "our evaluation may be delayed." I was
14 just letting him know that sometimes my
15 statement -- my statement meant sometimes
16 information may take longer to gather, seeing
17 there was months of documents we needed.
18     Q. But my question is very simple. "As
19 your written notice was not submitted within
20 this time frame, our evaluation of your claim
21 may be delayed."
22     Can you tell me how a written notice or
23 an oral notice would change an evaluation?
24     A. Written notice, we would have an

Page 68

1 authorization which would allow us to get
2 medical records so on and so forth. With the
3 verbal phone call, there is no documents that we
4 could even obtain.
5     Q. If I -- if Mr. Mazzamuto or
6 Mrs. Mazzamuto instead of calling sent you a
7 note, my husband was disabled as of July the
8 27th, how would that give you any authorization?
9     A. It wouldn't.
10     Q. Well, you're saying here, written
11 notice was not submitted. Written notice can
12 say exactly the same thing as oral, can it not?
13     A. Our company does have written notice
14 of claim forms. It's a different form than
15 this. They're provided those forms with their
16 -- I believe, with their -- when they're issued
17 their policy. I know for UNUM we have those,
18 and they do have an authorization. I'm not sure
19 if he was given those forms or not, though.
20     Q. Well, what I'm saying to you is you
21 don't know if he was given the forms, you don't
22 know if he kept the forms?
23     A. Correct.
24     Q. How is this man to know when you say

Page 69

1 written notice of claim, this is referring to a
2 specific designated document rather than
3 something being in writing rather than oral? How
4 would he know that?
5    A. He doesn't know. But we didn't
6 receive his claim form.
7    Q. Now, you then go object to say
8 "please note that we have requested your medical
9 records."
10    A. Mm-hmm.
11    Q. If I received this, I would have
12 thought you had just requested his medical
13 records. When had you first requested his
14 medical records?
15    A. I would have to look through the
16 file. That would be in the file.
17    Q. Well, don't you think this paragraph
18 is a little, I would say, deceiving?
19    MR. HENEFER: Objection.
20    A. No, I don't.
21    Q. "Please note that we have requested
22 your medical records from Dr. Douglas Bower and
23 Carlisle Hospital. This information is needed."
24    You're saying this information is

Page 70

1 needed; is that right?
2    A. Correct.
3    Q. You had already received, you said,
4 on December the 15th?
5    A. Those were not medical records. That
6 was the claim form. That was a medical
7 provider's statement. Medical records are
8 different.
9    Q. Are you saying if a doctor sends you
10 a letter of November the 3rd, the doctor sends
11 two different physician's statements, medical
12 provider's statements, that those aren't medical
13 records?
14    A. Correct. Complete medical records.
15    Q. Well, is there some reason, if you
16 wanted complete medical records, you didn't ask
17 for complete medical records when you took over
18 the file?
19    A. I believe I did.
20    Q. Well, do you have something here
21 showing when you wrote to Carlisle Hospital and
22 you wrote to Dr. Bower for records?
23    A. Yes, I do. I believe it's in the
24 file.

Page 71

1    Q. Can I see it?
2    A. Here they are. I gave this form to
3 my claims assistant, who then requested the
4 medical records. And here are the requests.
5 They're all in these. They go from there to.
6    Q. What are the dates, please?
7    A. I gave this internal medical records
8 request to my claims assistant on January 15th,
9 2001. And she then sent letters to his -- to
10 Dr. Douglas Bower and to the hospital on
11 January 22nd, 2001.
12    Q. That was my point.
13    A. I'm sorry. I didn't know you didn't
14 have the documents.
15    Q. My point is, a man calls up, or his
16 wife calls up in July.
17    A. Mm-hmm.
18    Q. Calls again twice in September. What
19 would it take you to send him a medical
20 authorization?
21    A. We did send the claim forms, which on
22 -- if you see the claim form, there's an
23 authorization on the back of the form.
24    Q. Did he complete those?

Page 72

1    A. Yes. I did not receive that until
2 December 15th.
3    Q. So, why do you go from December 15th
4 to January 15th to send for the medical records?
5 Why a month?
6    A. I don't know.
7    Q. I mean, these are all forms; is that
8 right?
9    A. Correct.
10    Q. So, I mean, at worst, you get things
11 in December 15th because there's not been
12 follow-ups you know from October 11th, when you
13 were assigned the file --
14    A. Mm-hmm.
15    Q. -- but here's another month goes by
16 and this man is not working according to what
17 you know. Is that right?
18    A. Correct.
19    Q. I mean, I don't want to be flip or
20 anything, and your attorney can make an
21 objection, and the judge could make a decision
22 on the particular issue. You realize when
23 people take out disability insurance, that it's
24 taken out for the purpose of being paid if

Page 73

1  they're disabled?
2     A.  Correct.
3     Q.  And they need that money when they're
4  disabled.  Is that right?
5     A.  That would be an assumption, but.
6     Q.  And a month without a paycheck, would
7  you think, would be a meaningful thing?
8     A.  I'm not sure.
9     Q.  Would a month without a paycheck be
10  something meaningful?
11     A.  No.
12     Q.  Three months without a paycheck,
13  would that be meaningful to you?
14     A.  I'm not sure I understand the
15  question.
16     Q.  Well, what I'm saying is people take
17  out disability insurance.  Is that right?
18     A.  Correct.
19     Q.  And back in 1996 when Mr. Mazzamuto
20  first had a claim, he had a six-month waiting
21  period; do you remember?
22     A.  No, I don't.
23     Q.  Do you know that he changed it from
24  six to three months because he didn't want to go

Page 74

1  longer than three months without a paycheck.
2  Did you know that?
3     A.  I don't recall.
4     Q.  Okay.  We'll get to that?
5     A.  Okay.
6     Q.  In the form of letters.
7     A.  Sure.
8     Q.  But, we have a situation where phone
9  calls are made in September, and we're now in
10  December 15th.  And you admit that at least as
11  of that time you have the forms you need to go
12  ahead with an action plan, but another month
13  goes by before there's a request for medical
14  records; is that right?
15     A.  Correct.
16     Q.  And you go on to tell him, "this
17  information is needed before we can determine
18  our liability."  Is that right?
19     A.  Correct.
20     Q.  And you're now also sending him an
21  occupational description form in full.  Is that
22  right?
23     A.  Mm-hmm.
24     Q.  Yes.

Page 75

1     A.  Actually, we asked for him to
2  complete it in full.
3     Q.  Right.  You had previously sent him
4  an occupational form that he had completed; is
5  that right?
6     A.  Yes.
7     Q.  Why do you need another one?
8     A.  The second form we sent him was more
9  specific.  It was just to obtain further
10  clarification.
11     Q.  Why did you send him the more
12  specific one at first?
13     A.  We wouldn't have known we needed more
14  specific occupational information until we
15  reviewed the prior one that he submitted.
16     Q.  And now you're asking for a progress
17  report.  Is that right?
18     A.  Correct.
19     Q.  The forms you received were dated
20  November 15th by the doctor.  Is that right?
21     A.  I believe so.
22     Q.  What did you think had happened
23  between December -- between November 15th to
24  January 15th?

Page 76

1     A.  I wouldn't know what had happened.
2  That's the purpose of having him complete an
3  additional claim form.
4     Q.  And is there a policy at New York and
5  UNUM as to how often you're going to have these
6  doctors fill out these forms?
7     A.  There isn't.  But his policy requires
8  proof of loss.
9     Q.  How often do you send them out?
10     A.  Each claim is handled on its own
11  individual basis.  But policies are payable at
12  the expiration of 30 days subject to proof of
13  loss.
14     Q.  I went through a whole series, it
15  seems like you're asking this doctor every month
16  to fill out a form; is that right?
17     A.  I don't recall.
18     Q.  So that, do you think that's a little
19  burdensome every month for a doctor to fill out
20  a form?
21     A.  No.
22     Q.  Next thing we see is a monthly
23  progress report; is that right?
24     A.  Correct.

Page 77

1    Q.  And it's dated January 16th; is that
2  right?
3    A.  Yes, that is right.
4    Q.  My gosh, send out something on
5  January 15th, and you have something on
6  January 16th?
7    A.  No, I didn't get this, I believe,
8  until the 22nd.
9    Q.  No, but I'm saying it's signed the
10  very next day, January 16th is it not?
11    A.  Correct.  I could have overnighted it
12  to him.  I'm not sure.  That would be an
13  assumption.
14    Q.  So if you overnighted something on
15  January 15th, you felt it was an important thing
16  to get.  Is that right?
17    A.  That would be an assumption.
18    Q.  Well, what we have is at least
19  acknowledgment that there's a monthly progress
20  report dated January 16th.  Is that right?
21    A.  Signed by him on January 16th,
22  correct.
23    Q.  And I don't have a Bate stamp for
24  that.

Page 78

1        MR. ANGINO:  Do you have a Bate stamp
2  for that?  I'm sorry for this, but.
3        MR. HENEFER:  I don't.  I don't have
4  that.
5    Q.  All right.  Well, if we keep them in
6  the same order, we'll know what they are.  We
7  have another attending physician's report,
8  January 18th.  Is that right?
9    A.  Correct.
10    Q.  And if you were to take that
11  statement and go back to the November
12  statement --
13    A.  Which statement are you referring to?
14    Q.  Attending physician's statement,
15  which is dated January 18th with the UNUM
16  statement.  They're both called attending
17  physician's statements; is that right?
18    A.  Correct.
19    Q.  He told you back on November the
20  15th, that the subjective symptoms were anxiety,
21  worry, low back pain.  Right?
22    A.  Correct.
23    Q.  On January 18th, he says, "CAD S/P
24  non QMI, chronic low back pain, anxiety."  Is

Page 79

1  that right?
2    A.  Correct.
3    Q.  So he's telling you basically the
4  same thing.  Is that right?
5    A.  The CAD is a little bit different.
6  But the chronic back pain and anxiety, those are
7  the same on both forms.
8    Q.  I think in the first form, it appears
9  as objective findings, cardiac, do you see that
10  under there?
11    A.  Yeah.  The CAD and cardiac cath are
12  different.
13    Q.  He's telling you this man has
14  chronic, do you know what the word "chronic"
15  means?
16    A.  Yes.
17    Q.  What does it mean?
18    A.  It's there all the time.
19    Q.  Sure.  So, if he had chronic pain in
20  November, he's got chronic pain in January.  He
21  had anxiety in November.  He has anxiety in
22  January; right?
23    A.  Correct.
24    Q.  As far as his office visits, there

Page 80

1  were two more visits.  November 29th and
2  December 19th.  Is that right?
3    A.  And January 11th, it looks like.
4    Q.  Okay.  And January 11th.
5        MR. HENEFER:  Off the record for a
6  second.
7        (Discussion off the record.)
8    Q.  In November, he says, he cannot work
9  in stressful situations.  Is that right?
10    A.  That's right.
11    Q.  And here he's telling you, "unlikely
12  to be able to return to his work secondary to
13  back."  Is that right?
14    A.  That's correct.
15    Q.  So, now, you receive by a
16  January 18th date, at least these two UNUM forms
17  in addition to the New York forms.  And by this
18  time, the November 3rd form.  Is that right?
19    A.  Well, I didn't receive this one on
20  the 18th.  I received it on the 22nd.
21    Q.  On the 22nd.  I said in January.
22    A.  Okay.  Yes, I did.
23    Q.  So, as of January, now, you admit
24  that you had this November 3rd letter from

**MAZZAMUTO V. UNUMPROVIDENT    CondenseIt!™    M. MULRY, 4/23/2002**

Page 81

1 Dr. Bower. Is that right?
2    A. That's correct.
3    Q. And that November 3rd letter from
4 Dr. Bower -- you have it there?
5    A. I have the first page, not the second
6 page.
7    Q. That's fine. Was descriptive of a
8 long history of low back pain. Is that right?
9    A. Correct.
10    Q. With many years of numerous
11 treatment. Is that right?
12    A. Yes, that is correct.
13    Q. Physical therapy, MRIs, et cetera.
14 Is that right? Physical therapy and MRI in the
15 past.
16    A. Correct.
17    Q. Gradually worsen. Do you know what
18 the words "gradually worsened" meant?
19    A. Yes.
20    Q. That it's worse in 2000 than it was
21 before. Is that right?
22    A. I would assume that he meant
23 something like that.
24    Q. And he goes on to tell you all the

Page 82

1 problems coming from that back. Is that right?
2    A. That's correct.
3    Q. And you've got now two statements as
4 far as the chronicity, the chronic nature of his
5 back problem; is that right?
6    A. Correct.
7    Q. And this back problem back in 1996 in
8 and of itself was sufficient to receive
9 disability payments. Is that right?
10    A. I believe so.
11    Q. Why didn't you pay him based on his
12 back problems in January of 2001?
13    A. We had forwarded his claim file to
14 our in-house medical consultants for review.
15 And as a result of that review, did not feel he
16 was eligible for benefits.
17    Q. Well, you didn't do that until about
18 two more months later; right?
19    A. Correct. We waited until we had his
20 complete medical records.
21    Q. So, the situation is as of January,
22 you now have Dr. Bower giving you multiple
23 attending physician reports as well as that
24 letter of November the 3rd. And you've gotten

Page 83

1 this more complete occupational description
2 dated January 18, '01; is that right?
3    A. That's correct.
4    MR. ANGINO: Do we have any Bate
5 stamp number for that? Occupational description.
6    MR. HENEFER: Pages 344 and 345.
7    Q. And Mr. Mazzamuto is asked to
8 describe "How has the disability interfered with
9 the performance of your job?" Is that right?
10    A. Yes.
11    Q. "Please describe, sitting standing
12 and walking requirements and limitations." Do
13 you see that?
14    A. Yes, I do.
15    Q. He says,"my job requires me to stand
16 most of the time." Do you see that?
17    A. Yes.
18    Q. "I am always stressed." Do you see
19 that?
20    A. Yes.
21    Q. "Which causes tightness in my chest.
22 Then I have chest pain and shortness of breath.
23 Also, by standing, my back problem is
24 aggravated. I have been under treatment for

Page 84

1 back pain since 1996."
2    So, in his own layman-like way, did he
3 tell you why he's disabled?
4    MR. HENEFER: Objection to the form
5 of the question. But you can answer.
6    A. I believe he answered the question
7 how has the disability interfered with the
8 performance of your job.
9    Q. His doctor says he can't stand for
10 long periods of time. Is that right?
11    A. I believe so.
12    Q. His job is stressful and causes him
13 anxiety. Is that right? Is that what the doctor
14 says?
15    A. I believe he gave a finding of
16 anxiety.
17    Q. "Chronic low back pain, anxiety." Is
18 that what he says?
19    A. Yes, he says that.
20    Q. And here's a treating doctor, who's
21 been treating him throughout this entire period
22 of your records, at least from '96 to the
23 present, saying he's disabled. Is that right?
24    A. That's correct.

Page 85

1    Q. And as of January 18th, which is the
2  date of this particular document, you hadn't
3  decided to pay him. Is that right?
4    A. Correct.
5    Q. So, we then have January 22nd. This
6  is where Mr. Fogarty gets into the picture. Or
7  had Mr. Fogarty been in earlier than this?
8    A. I believe this is the first time he
9  looked at the claim file.
10   Q. What is Mr. Fogarty's position in
11 relation to your position?
12   A. I believe Mr. Fogarty reviewed the
13 occupational information and summarized it.
14   Q. So we at least will have something to
15 ask Mr. Fogarty. We'll put that to the side in
16 the file. All right.
17      But Mr. Fogarty had an opportunity to
18 also review the file and comment on the file.
19 Is that right?
20   A. On the occupational information.
21   Q. What did you say Mr. Fogarty is?
22   A. He's a vocational rehabilitation
23 consultant.
24   Q. Is he employed by UNUM?

Page 86

1    A. Yes, he is.
2    Q. So that UNUM actually employs
3  occupational consultants, doctors?
4    A. Yes.
5    Q. And they are utilized in making
6  decisions. Is that right?
7    A. They're used as a resource.
8    Q. And this was the first attempt to get
9  in-house people to review his situation?
10   A. I believe so, yes.
11   Q. The next document I have is called
12 "research analysis." And I assume what happened
13 is there was a request for some business
14 information. Is that right?
15   A. Correct.
16   Q. And there is a packet of material
17 which I have with a clip at the top, which all
18 apparently is part of what you received from
19 that request. Is that right?
20   A. No. I believe in this clip that I
21 have, there's medical records in here.
22   Q. Okay.
23   A. So it may be -- I don't know if it's
24 out of order or.

Page 87

1    Q. Whatever. In some way or another,
2  you got all this information?
3    A. Correct.
4    Q. And these records clearly give you a
5  whole history of Mr. Mazzamuto's medical
6  condition; is that right?
7    A. I'm not sure. I would have to review
8  all of the records.
9    Q. Well, I'm going to suggest to you,
10 and we're in a deposition, and if I'm
11 inaccurate. I'm looking at things carrying
12 dates of 2000. I'm looking at things carrying
13 dates of 1997, '96. Just a scan of it would
14 appear that there are documents from '96 through
15 2000; is that right?
16   A. Correct.
17   Q. So you had the benefit of all that
18 information; is that right?
19   A. Correct.
20   Q. The next document I'm looking at is
21 also carrying Fogarty's name. I'm going to turn
22 that to the side, too, because otherwise we
23 won't need him to come.
24      MR. CORRIGAN: Off the record.

Page 88

1      (Discussion off the record.)
2    Q. And the next document, is that
3  another Fogarty document?
4    A. This document.
5    Q. Goes with the other one?
6    A. Correct.
7    Q. I'm going to turn those two to the
8  side.
9    A. I believe it goes with the first one.
10   Q. It goes with the first one.
11   A. I'm not sure as this is all out of
12 order.
13   Q. Carrying January 31st?
14   A. Actually it goes with the second.
15   Q. It goes with the second, because the
16 first is January 22nd.
17   A. Yes.
18   Q. Now, we have a new name, Jill
19 Cariglia. Is that who that is?
20   A. Correct.
21   Q. Tell me who she is.
22   A. She is a disability case manager.
23   Q. And who had brought her into the
24 equation?

Page 89

1    A. I did.
2    Q. What did you want to get from her?
3    A. Her job is to review medical records
4  once they come in and determine if all pertinent
5  information is in the claim file. And then it
6  would be her job to forward the claim file to
7  our medical consultants for review.
8    Q. Although I'm going to be asking
9  Fogarty some questions, I think it might be
10  appropriate for us to just go back again. Since
11  you were the claims representative.
12    Fogarty was giving you his opinion; is
13  that right?
14    A. I would have to review.
15    Q. Well, just take a look. Appears to
16  be message of January 22nd, 2001. Date printed
17  of February 2nd of 2001.
18    A. I don't believe this is an opinion.
19  I believe it's -- he is summarizing the factual
20  information from the claim file.
21    Q. Now, in his summarizing the factual
22  information from the claims file, does he make
23  any mention of Mr. Mazzamuto's statement "my job
24  requires me to stand most of the time. I am

Page 90

1  always stressed, which causes tightness in my
2  chest; then I have chest pain and shortness of
3  breath. Also, by standing, my back problem's
4  aggravated."
5    Does he mention any of that in his
6  review of the file?
7    A. I just have to review the document.
8    Q. Sure.
9    A. I don't believe he specifically
10  writes that statement. I don't see what you
11  just read to be in this.
12    Q. And if we take a look at his next.
13  He's saying "after reviewing a recent telephone
14  conversation between CCS" -- Who's that?
15    A. Me. Stands for customer care
16  specialist.
17    Q. -- "and the insured." So he had
18  talked to you; right?
19    A. He reviewed the telephone
20  conversation between Mr. Mazzamuto and I. He
21  reviewed the document.
22    Q. So he's saying he's prevented from
23  working because of his back. Is that right?
24    A. He's saying that Mr. Mazzamuto feels

Page 91

1  that he is prevented from working by his back.
2    Q. Yeah. Now, he's saying for the
3  majority of the time, Mr. Mazzamuto indicated he
4  would prepare books and make orders and the
5  like. Now, that's not what he says, though, in
6  that statement, where he says he's on his feet
7  all the time; is that right?
8    A. Correct.
9    Q. So, I mean, you had recorded in your
10  January telephone call what you felt should be
11  put into the note. Is that right?
12    A. I recorded what Mr. Mazzamuto
13  indicated to me.
14    Q. But it wasn't a taped phone call, was
15  it?
16    A. No.
17    Q. We don't know what words he used. We
18  don't know all of what he said. Do we?
19    A. Not word for word, no.
20    Q. And, I mean, you'd have to admit that
21  you are employed by UNUM; is that right?
22    A. Correct.
23    Q. And your job is to work for UNUM; is
24  that right?

Page 92

1    A. Correct.
2    Q. So that when he's talking about the
3  condition here, he's not saying anything about
4  what Mr. Mazzamuto or what his doctor is saying
5  about how much he has to stand or anxiety or
6  anything like that, is he?
7    A. Is Jack saying?
8    Q. Jack's not saying any of that, is he?
9    A. I don't believe so, no.
10    Q. And now we're up to Jill. Jack and
11  Jill. What we have is a date of February 22nd.
12  Is that right?
13    A. Correct.
14    Q. And Jill says, "this is a 45-year-old
15  male."
16    MR. ANGINO: Off the record.
17    (Discussion off the record.)
18    Q. "45-year-old male with a history of
19  chronic low back pain."
20    So she's saying, he's got a history
21  of chronic low back pain. Is that right?
22    A. She's saying that, yes.
23    Q. She goes through the medical records;
24  is that right?

Page 93

1    A. Correct.
2    Q. See, again, this individual does not
3    mention that he's on his feet most of the time,
4    such as what he said in his January report. Is
5    that right?
6    A. Correct.
7    Q. So that we now have Jack and Jill
8    both not mentioning that he's on his feet most
9    of the time, at least if you believe what he
10    says in his report. Is that right?
11    A. I believe they summarize the
12    occupational duties for him as Jill says here.
13    Described his duties as bookkeeping, office
14    duties, employee administration.
15    Q. The occupational duties form is where
16    he says this, is it not?
17        MR. HENEFER: You can work off that.
18        THE WITNESS: Thank you.
19    Q. I mean right at the bottom of the
20    page there, don't he say, "My job requires me
21    to stand most of the time, I'm always stressed
22    which causes tightness in my chest then I have
23    chest pain and shortness of breath. Also, by
24    standing, my back problem is aggravated. I've

Page 94

1    been under treatment for back pain since 1996"?
2    I mean, if you were going to summarize this
3    report, wouldn't that be part of it?
4    A. Well, I believe the bookkeeping
5    thing, office duties, and employee
6    administration, I believe that he does not have
7    to stand to perform those duties of his
8    occupation.
9    Q. Well, what you believe. What did he
10    say?
11    A. He says he stands. And this
12    information was provided to Jack and Jill.
13    Q. But neither one mentions that he said
14    that he has to stand most of the time, does it?
15    A. It does not appear to say that in the
16    review.
17    Q. It doesn't talk about his being
18    stressed, does it?
19    A. I don't believe it does.
20    Q. You'd have to say, therefore, it's
21    selected. They have not summarized this part of
22    it; is that right?
23    A. That would be an assumption. I don't
24    know why they didn't include that.

Page 95

1    Q. You don't know why they didn't?
2    A. Correct.
3    Q. All she's addressing is the cardiac
4    standpoint. Is that right? "It appears from a
5    cardiac standpoint," is that what she's saying?
6    A. "It appears from a cardiac
7    standpoint." She does address the back in the
8    first paragraph.
9    Q. No, no. But in terms of her
10    conclusions in her second paragraph, "based on
11    medical records for review and occupational
12    duties, it is difficult to see how RL applied to
13    insured when it appears that the majority of his
14    occupation does not include heavy lifting or
15    prolonged standing." Is that what she says?
16    A. Yes, she does .
17    Q. "Insured's back condition is a
18    chronic condition that he has had for many years
19    and it has not affected his occupational duties
20    yet." Do you see that?
21    A. Yes.
22    Q. That's totally incorrect, is it not?
23        MR. HENEFER: Objection.
24    A. You'd have to ask Jill.

Page 96

1    Q. No, no. I mean, we know he was
2    disabled in 1996 from his back problems, did we
3    not?
4    A. I think the word "disabled" is a
5    broad term. I mean, I believe they paid
6    benefits for a period of time.
7    Q. They paid benefits in 1996 and 1997
8    for a back condition; right?
9    A. Correct.
10    Q. And it was the same policy that he's
11    making a claim for in the year 2000. Is that
12    right?
13    A. Correct.
14    Q. And according to the doctor, his back
15    condition worsened, did it not? According to
16    what he said?
17    A. Correct.
18    Q. So that, if he says that it hasn't
19    affected his occupational duties, from what you
20    know, it has. Is that not correct?
21    A. I believe it did. What you said, it
22    did.
23    Q. Sure. From the records you had, the
24    back condition had affected his duties; is that

Page 97

1  correct?
2      A. Correct.
3      Q. And she goes on to say, "it appears
4  from a cardiac standpoint, that the insured is
5  stable. And that any chest pains he is having
6  are not cardiac in nature." Is that what she's
7  saying?
8      A. She does say that.
9      Q. So if he's getting pain from anxiety,
10 she's not mentioning that; right?
11     A. She doesn't mention anxiety, no.
12     Q. Next document, we do have a Bate
13 stamp, 381. Do you see that?
14     A. Yes.
15     Q. It's called "Clinical Review
16 Request." So Jill is now requesting a review by
17 whom?
18     A. She's referring this to Dr. Clarke.
19     Q. So, we've had two people at this
20 point. And, again, would this be a normal
21 sequence of types of individuals to review
22 something like this?
23     A. Yes.
24     Q. And, again, for my clarity, Jill does

Page 98

1  what type of review?
2      A. Jill is a disability case manager.
3  She's actually a nurse.
4      Q. Okay. That's what I was looking for.
5  The types of -- her background is nursing.
6      A. Correct.
7      Q. The first individual's background
8  would be?
9      A. Vocational occupational. Mr. Fogarty
10 you mean?
11     Q. Yes. Is that what he would be
12 trained in?
13     A. Correct.
14     Q. Now we're talking review by a
15 doctor?
16     A. Correct.
17     Q. And would Jill be providing this
18 history?
19     A. Yes.
20     Q. Okay. So he does say this man has
21 had chronic low back pain. Is that right?
22     A. Jill says that, correct.
23     Q. And that he had a myocardial
24 infarction?

Page 99

1      A. Correct.
2      Q. She doesn't say anything about what
3  he does or doesn't do, and doesn't mention
4  anxiety; is that right?
5      A. She doesn't. But the entire claim
6  file would be referred to Dr. Clarke.
7      Q. What's the CRS response section, 380,
8  the next document?
9      A. That's a clinical review specialist.
10 We have nurses that actually review medical
11 records as well.
12     Q. Is there any -- is this the way it
13 appears, it's blank at the bottom?
14     A. Yeah, all that -- if a clinical
15 review specialist reviewed it, they would have
16 written a response there. But it's blank.
17     Q. It's blank. So this is not of any
18 great importance, 380?
19     A. Correct.
20     Q. The next we have a letter from Peter
21 Russo dated March 19th. Is that right?
22     A. That's correct.
23     Q. And he's wondering why this thing is
24 taking so long. Is that generally what it says?

Page 100

1      A. Correct.
2      Q. We then have a letter from you to
3  Russo. Is that right?
4      A. That's correct.
5      Q. And you're explaining why it's taking
6  so long; is that right?
7      A. Correct.
8      Q. Second to last paragraph, you
9  emphasize that you didn't receive the claim form
10 until December 15th. Is that right?
11     A. Correct.
12     Q. And you mention it was approximately
13 five months after his claim date of disability.
14 Is that right?
15     A. Correct.
16     Q. "If we had received his claim form
17 within the required time frame, as stated in his
18 policy, 30 days after disability starts or a
19 covered loss occurs, then our evaluation of his
20 claim may not have been delayed."
21         Were you basically saying here that
22 Mr. Mazzamuto was at fault?
23     A. No.
24     Q. What were you saying?

**Page 101**

1  A. I was saying that we did not receive
2 his claim form until December 15th, which was
3 approximately five months after his claim date
4 of disability. And that we had received it
5 prior, then it may not have taken so long to
6 complete our evaluation of his claim.
7  Q. We then have that initial letter that
8 I started this whole process with of March 26th
9 letter. The very first page. Very first page.
10 Just turn the whole thing over.
11  Again, basically was complaining about
12 the time?
13  A. Correct. I have that.
14  Q. We now have the medical review. Is
15 that right?
16  A. Yes.
17  Q. And the medical review, we'll be
18 asking Dr. Clarke some questions about that.
19 But from your standpoint what he discusses here
20 is basically -- Strike that.
21  Dr. Clarke's report expresses an opinion
22 that seems to be limited to his cardiac
23 condition. Does it not?
24  A. No, I believe he does comment on his

**Page 102**

1 back condition.
2  Q. Well, let's go through the report and
3 get to his opinion, which is, I think towards
4 the end.
5  MR. ANGINO: This may be a good time.
6 Five after 11. Take a break. Five minutes.
7  (Recess taken.)
8  MR. ANGINO: Back on the record.
9  Q. We were discussing Dr. Clarke's
10 report, which is carrying a date of March 27,
11 2001. Do you see that there?
12  A. Right I do.
13  Q. And he starts off by discussing,
14 "this 45-year-old restaurant owner whose medical
15 records are presented for review." Is that
16 right?
17  A. Correct.
18  Q. He does recognize that in the claim
19 progress form dated January 18, '01
20 Mr. Mazzamuto wrote, quote, "my job requires me
21 to stand most of the time. I am always
22 stressed, which causes tightness in my chest,
23 and then I have chest pain and shortness of
24 breath. Also, by standing, my back problem is

**Page 103**

1 aggravated."
2  So he's only one of these three
3 interviewers to actually recognize and quote
4 Mr. Mazzamuto. Is that right?
5  A. Correct.
6  Q. The other ones refer to your
7 telephone interview, but he includes both: the
8 telephone interview and the quote. Is that
9 right?
10  A. Yes.
11  Q. He also quotes the attending
12 physician's report of November 15th. Is that
13 right?
14  A. Yes. Correct.
15  Q. And he says, "he has symptoms of
16 anxiety, worry, and low back pain." Is that
17 right?
18  A. Correct.
19  Q. No prolonged standing. Is that
20 right?
21  A. With restrictions of no prolonged
22 standing.
23  Q. So he has a restriction that he
24 shouldn't stand long; is that right?

**Page 104**

1  A. He's stating that Dr. Bower said
2 that, correct.
3  Q. So, if you put the two things in
4 combination, my job requires me to stand most of
5 the time and Dr. Bower saying he shouldn't stand
6 for prolonged time. That would be a
7 restriction; is that right?
8  A. Correct.
9  Q. Okay. He also says that he tried to
10 return to work. Is that right?
11  A. Correct.
12  Q. But it made his back worse; is that
13 right?
14  A. He's saying that Dr. Bower wrote
15 that, correct.
16  Q. And that it had increased the anxiety
17 at work because of the stress. And that he
18 could not return to work at the time related to
19 the restrictions from prolonged standing, heavy
20 lifting, and bending. Is that right?
21  A. Again, he's saying, yeah, Dr. Bower
22 stated that. Correct.
23  Q. He's then saying, Dr. Bower on
24 January 18th says he can't return to work

**MAZZAMUTO V. UNUMPROVIDENT**       CondenseIt!™                    **M. MULRY, 4/23/2002**

Page 105

1 because of his back problems. Is that right?
2      A. That's right.
3      Q. He then discusses the CAD. Is that
4 right?
5      A. Correct.
6      Q. First two paragraphs are with respect
7 to the CAD. And then with respect to his lower
8 back pain, Mr. Mazzamuto has a long history of
9 lower back pain. Is that what he goes through
10 here?
11     A. Third paragraph after clinical
12 summary?
13     Q. Yes.
14     A. Okay, yes, I see that.
15     Q. And he talks about the medications;
16 is that right?
17     A. Yes.
18     Q. Talks about spinal stenosis?
19     A. Mm-hmm.
20     Q. CT scan, MRI. Is that right?
21     A. Yes.
22     Q. Pain described as burning located
23 centrally in lower back extending down the
24 lateral thighs to the knees. Do you see that?

Page 106

1      A. Yes.
2      Q. "Although prolonged standing was said
3 to lead to leg numbness, no abnormality on
4 neurologic exam was reported." Is that right?
5      A. Correct.
6      Q. Started bothering him after three
7 hours of standing. Is that right? He reports in
8 office visit?
9      A. An office visit, correct.
10     Q. Goes on to say, "his back pain
11 reportedly increased again following hitting a
12 bump during his ambulance ride to the hospital
13 in July 2000. His most recent epidural
14 injections were on October 18 and January 3rd,
15 2001." Is that right?
16     A. January 31st, 2001. Correct.
17     Q. So here's a man, who according to
18 this, has had an increase in his back pain and
19 need for epidural injections in October and
20 January; is that right?
21     A. That's right.
22     Q. So in response to questions, he's
23 discussing, with respect to his CAD, then goes
24 on; is that right?

Page 107

1      A. Correct.
2      Q. And he says, there's no basis to
3 support a cardiac impairment. Is that right?
4      A. I'm sorry. Where are you?
5      Q. "On the basis of the above" -- second
6 paragraph -- "there is no information to support
7 a cardiac impairment which would preclude work
8 involving sedentary to light physical activity."
9 Do you see that?
10     A. Yes, I do.
11     Q. "His physician has restricted him
12 from stressful situations, but there does not
13 appear to be any information to support a
14 cardiac impairment related to the stress."
15        Is he saying the cardiac condition is
16 not physically causing the stress?
17     A. You would have to ask Dr. Clarke.
18     Q. Okay. And we will. When you read
19 this, though, how did you read it?
20     A. I read it as exactly what he said,
21 "there does not appear to be any information to
22 support a present cardiac impairment related to
23 stress, either in terms of a significant stress-
24 induced rhythm disorder or angina."

Page 108

1      Q. Those are physical things, not
2 emotional things like anxiety; is that right?
3      A. I believe he's talking --
4      Q. Physical disability?
5      A. About his physical cardiac
6 impairment.
7      Q. Not emotional --
8      A. I don't see that he says anything
9 about emotional.
10     Q. Okay. Did you have any part to play
11 in the denial of the disability claim?
12     A. Yes.
13     Q. So you were a person who participated
14 in that?
15     A. Yes.
16     Q. Did you make the decision, or did you
17 have to get somebody else to agree with your
18 decision?
19     A. I had my consultant -- she actually
20 signed my denial of benefits letter. But I
21 essentially made the decision working under her,
22 her guidance.
23     Q. So you were then the person who
24 denied his claim.

**MAZZAMUTO V. UNUMPROVIDENT     CondenseIt!™     M. MULRY, 4/23/2002**

Page 109

1  A.  Correct.
2  Q.  So that's why all of this is
3  important.  He's saying here, he has no cardiac
4  physical impairment.  Is that right?
5  A.  He doesn't use the word  "physical."
6  Q.  No, but what he says is physical, is
7  it not?  I mean, do you see anything here that
8  talks about impairment because of anxiety?
9  A.  He's not discussing anxiety.  He's
10  talking about his cardiac impairment.
11  Cardiovascular.
12  Q.  He then goes on to say, "with respect
13  to his back pain, Mr. Mazzamuto has a long
14  history of lower back pain in association with a
15  degree of spinal stenosis on MRI.  In the
16  absence of a radiculopathy on physical exam or
17  other studies, this appears to be soft tissue in
18  origin."
19      Do you know what soft tissue means?
20  A.  Not, no.
21  Q.  There's bones, then there's nerves,
22  muscles, and tendons.  Do you know which is the
23  soft tissue?
24  A.  I would assume it would be muscles.

Page 110

1  I'm not.
2  Q.  And nerves?
3  A.  Yeah.
4  Q.  Okay.  So, you're making a decision
5  to deny this claim, but you don't know what soft
6  tissue is?
7  A.  I don't believe I would need to know
8  what soft tissue is because I'm not a medical
9  doctor.
10  Q.  Okay.  He states, "he indicates that
11  the pain is increased with prolonged standing.
12  And his physician has restricted him from
13  prolonged standing."
14      Is that what he says?
15  A.  Dr. Clarke is stating what the
16  insured indicates, Mr. Mazzamuto.
17  Q.  And what the physician stated?
18  A.  Correct.
19  Q.  Why isn't he disabled if he,
20  Mazzamuto, says pain is increased with prolonged
21  standing, and the physician says he can't stand?
22  Why isn't he disabled?
23  A.  You would have to ask Dr. Clarke.
24  Q.  No, no.  I'm asking you.  You made

Page 111

1  the decision to deny his claim.
2  A.  Because I do not feel his occupation
3  required prolonged standing or walking or heavy
4  lifting or bending.
5  Q.  Why?
6  A.  Because he did mostly managerial and
7  administrative duties.  And I feel that those
8  could be performed sitting.
9  Q.  Did you ignore what he said?  I have
10  to stand all the time, most of the time?
11  A.  I didn't ignore it, but I feel that
12  his -- he could perform the duties of his
13  occupation sitting.
14  Q.  Do you know anything about his work?
15  A.  From what the insured indicated to
16  me, yes, I do.  I do know that it was a small
17  restaurant.
18  Q.  Have you ever been to pizza
19  restaurants?
20  A.  I have, yes.  We had a field
21  representative visit his restaurant.
22  Q.  We're going to go to that, but, so if
23  the man says to you, that he has to stand most
24  of the time or all the time or whatever he says

Page 112

1  in his words there, and his doctor says he can't
2  do that, you as a claims representative, don't
3  you have to take that into account?
4  A.  Yes, we take everything into
5  consideration.
6  Q.  Are you aware from anything that has
7  been told to you by your education, training,
8  supervisors, teachers that you have to give the
9  insured the same benefit as you do your
10  employer?  Have you been told that by anybody?
11  A.  As your employer?  I'm confused by the
12  question.
13  Q.  Well, you're employed by UNUM; is
14  that right?
15  A.  Correct.
16  Q.  But you have insureds who basically
17  pay premiums.  Is that right?
18  A.  Correct.
19  Q.  So, in terms of treatment, you have
20  to treat them as equal.  Is that correct?
21  A.  Correct.
22  Q.  That's what I'm saying.  He goes on,
23  Dr. Clarke, to say, "his job does not appear to
24  involve heavy lifting."  Is that right?

**MAZZAMUTO V. UNUMPROVIDENT**    CondenseIt!™    **M. MULRY, 4/23/2002**

Page 113

1  A.  Correct.
2  Q.  "The degree to which he is required
3 to stand or walk for prolonged uninterrupted
4 periods of time over 15 to 20 minutes at a time
5 is not clear."  Is that what he says?
6  A.  He does say that.
7  Q.  But, earlier on, he did quote by
8 saying, "my job requires me to stand most of the
9 time."  Is that right?
10  A.  Correct.
11  Q.  So he had that information; is that
12 right?
13  A.  Correct.
14  Q.  "It should also be noted that lower
15 back pain tends to wax and wane."  Do you know
16 what that means?
17  A.  Come and go.
18  Q.  "And also he appears to have had
19 prolonged exacerbations after episodes of
20 trauma, slipping on ice and a bump during the
21 ambulance ride, the discomfort has subsided in
22 the past."
23      So he's saying that the back pain
24 subsided enough from his 1996 episode that he

Page 114

1 was then able to go back to work in 1997.  Is
2 that right?
3  A.  I'm not sure of the exact dates, but
4 he is -- the first part of what you said is
5 correct.  That it --
6  Q.  At least enough to return to work.
7  A.  Return to work, correct.  I'm not
8 sure of the exact date he went back to work,
9 but, correct.
10  Q.  But, there's no indication that he
11 did go back to work after this episode of back
12 pain.  Is that right?
13  A.  I don't know if he went back to work.
14  Q.  But, I mean, you have no evidence
15 that he went back to work?
16  A.  Correct.
17  Q.  Next document, which is 3/28, can you
18 tell me what that is, carrying the Bate stamp of
19 377.
20  A.  This is a management referral
21 completed by my consultant.
22  Q.  Whose name is?
23  A.  Diane Cahill.
24  Q.  I'm going to just read it for the

Page 115

1 record and we can go from there.
2      "Please complete the action plan and
3 log."
4      Isn't that something that we had seen
5 earlier, back in January, an action plan or
6 something?
7  A.  Yes.
8  Q.  And what had not been completed in
9 the action plan that you had to complete?
10  A.  I believe she was referring to the
11 log.  The action plan was completed because she
12 signed it on January 8th.  But the log is the
13 chronological order of what was happening in the
14 claim file.
15  Q.  You hadn't done that?
16  A.  I must not have had it -- I don't
17 know if it was fully completed, partially
18 completed, I'm not sure.
19  Q.  Do we have any evidence that it had
20 even been started?
21  A.  I'm not sure.
22  Q.  Normally with handling a file from a
23 claims department, don't you have to follow a
24 sequence of time in what you're doing at

Page 116

1 different times? Isn't that the normal
2 procedure?
3  A.  Well, the normal procedure would be
4 to complete the action log.
5  Q.  She goes on to say, "according to the
6 restrictions and limitations placed on
7 Mr. Mazzamuto, and his occupational description,
8 I'm not clear as to why he is unable to return
9 to work.  While we await the medical records."
10      This doesn't seem to make any sense.
11 You had the medical records by March 28th?
12  A.  Yes.  I believe what happened was the
13 medical records were with Jill Cariglia, the
14 clinical review specialist.  And Diane was not
15 aware that they were in Jill's possession.
16  Q.  I was going to say, certainly by
17 March 28th, you had all the medical records that
18 you wanted; right?
19  A.  Correct.
20  Q.  Okay. "A field visit might help clear
21 up what Mr. Mazzamuto considers his restrictions
22 and limitations.  We should also advise" --
23 who's this?
24  A.  Advise him.

**MAZZAMUTO V. UNUMPROVIDENT      CondenseIt!™                M. MULRY, 4/23/2002**

Page 117

1  Q.  -- "that we are having some
2 difficulty getting the records."
3      You weren't having any difficulty
4 getting the records; right?
5  A.  At first we were.  And I believe that
6 this document is actually dated --
7  Q.  March 28?
8  A.  -- February 28th.  I believe she
9 changed it to a two.
10  Q.  Oh, really.  Okay.
11  A.  But at this point, we did have the
12 medical records.
13  Q.  What's her position in relation to
14 you?
15  A.  She's my consultant.
16  Q.  A consultant.  Tell me what a
17 consultant is.
18  A.  She's a resource.
19  Q.  She's not your superior?
20  A.  I have a consultant who I directly
21 report to.  And then above her I have a manager
22 or a director.
23  Q.  But they're both superior to you?
24  A.  Correct.

Page 118

1  Q.  So your consultant is your
2 intermediate supervisor?
3  A.  Correct.
4  Q.  I'm just trying to get the chain of
5 command.  Okay.
6      The next thing I see is March 28th.
7 Looks like a claim form memo, person calling
8 attorney.  Do you see that?
9  A.  Yes.
10  Q.  3/28.  I don't have a Bate stamp
11 number for that.  Says, "called attorney, read
12 him medical evaluation over the phone.  He
13 feels" -- What is that: "I OCC"?
14  A.  It's insured.  Means insured.
15  Q.  -- "insured's occupation is stated
16 wrong.  Well that's how I wrote it."  What does
17 that mean?
18  A.  "Insured wrote it."
19  Q.  "Insured wrote it.  He said he is
20 only one of two cooks and does everything in the
21 restaurant.  I said he didn't indicate that.  He
22 said he thought this application indicates that
23 when they completed app, he thought it was more
24 extensive.  No" -- What's that?

Page 119

1  A.  "No, I looked at application."  I
2 must have looked at the application while on the
3 phone with him.
4  Q.  Who completed the application?
5  A.  I would have to look at the
6 application.
7  Q.  Well, you know from the record, it
8 says the agent, it was his handwriting, do you
9 not?
10  A.  Again, I would have to review the
11 application.  I don't remember.
12  Q.  Well, it was done in terms of his
13 earlier claim for disability in 1996, one of the
14 things they were concerned at that time was
15 whose handwriting was the application.  And
16 don't you remember that the claimant was asked
17 to answer certain questions.  And one of which
18 was, who filled out the application, he said he
19 didn't.  Do you dispute that?
20  A.  I remember the questionnaire, I don't
21 remember the exact questions.
22  Q.  So, an agent is filling out an
23 application to get business.  Is that right?
24  A.  He's filling out an application so

Page 120

1 the insured can get disability coverage.
2  Q.  And he's to get a premium; right?
3  A.  I'm not sure how that works.
4  Q.  You're not sure that people who write
5 policies get paid?
6  A.  No, I'm sure that they get paid.  I
7 don't know how the financial aspect works.
8  Q.  But I'm saying if the person doesn't
9 get the insurance, the agent doesn't get paid;
10 right?
11  A.  That would be an assumption.  I'm not
12 sure if they have salary.  I don't know.
13  Q.  Well, you remember from the
14 application it says "first-class restaurant"; is
15 that right?
16  A.  I don't remember.  Again, I'd have to
17 review the application.
18      MR. HENEFER:  That phone memo is 371.
19  Q.  We then have the field report; is
20 that right?
21  A.  Correct.
22  Q.  And this individual's assigned to do
23 this field report on January 16th; is that
24 right?

Page 121

1    A. Correct.
2    Q. And it has a Bate stamp of 376.
3    A. Yes.
4    Q. And I'm glad you're giving me
5 complete copy, because some of this is blocked
6 out, where I can't read parts of this report.
7        But although he was assigned to go out
8 to do this report on January 16th, it indicates
9 he didn't do it until April 4th. Is that right?
10    A. Correct.
11    Q. Do you know why February, March, and
12 April -- two and a half months went by to do
13 this?
14    A. I don't know.
15    Q. From my involvement in other
16 insurance cases, when assignments are made for
17 field reports, aren't they supposed to be done
18 within 30 days or less?
19    A. In my actual referral, there's a box,
20 and I had checked off 30 days, but I believe,
21 and I'm not a hundred percent positive, that
22 this may have taken a little bit longer because
23 we had also asked him to go out to the
24 restaurant as well as meet the insured.

Page 122

1    Q. So your box has the 30 days that I've
2 mentioned; is that right?
3    A. Correct.
4    Q. Are there earlier times that you can
5 mark off, sooner?
6    A. 15.
7    Q. 15, 30. Is there any other time
8 period?
9    A. 60.
10    Q. Any other time?
11    A. I don't believe so. I'd have to look
12 at the form.
13    Q. So, again, I assume we'll get a Bate
14 stamp form for that. I didn't see anything
15 there as far as the request for it. But I just
16 knew from other things that there are these
17 numbers that appear. And there's no number that
18 appears beyond 60 days, is there?
19    A. No.
20    Q. So, April 4th would be two and a half
21 months, which if we do the arithmetic will be
22 75 days; is that right?
23    A. Approximately correct.
24    Q. So, this particular customer who

Page 123

1 first made a verbal notice potentially in July,
2 certainly in September, we have -- you
3 definitely getting the records on December 15th.
4 You're doing certain things on January 15th. We
5 now have until April 4th, until we're getting a
6 field report. Is that the history so far?
7    A. Correct.
8    Q. Correct. That he's interviewing this
9 individual in his home. Is that right?
10    A. Correct.
11    Q. Do you know the time of day that he's
12 interviewing him?
13    A. I do not believe he indicates the
14 time of day.
15    Q. Whatever it is, the man isn't at
16 work; is that right?
17    A. Correct. He's at home.
18    Q. He's describing the man by his height
19 and approximate weight, how he's dressed, things
20 like that. Is that right?
21    A. Correct.
22    Q. He's describing somebody whom as he
23 escorts this agent, or escorts this field
24 representative, he's observing limping. Is that

Page 124

1 right?
2    A. Correct.
3    Q. Favoring his right leg; is that
4 right?
5    A. Correct.
6    Q. He's also hunched forward slightly;
7 is that right?
8    A. Correct.
9    Q. "During the interview, he stated he
10 gets out of breath quite frequently, but he was
11 able to talk at length without gasping for air."
12 Is that right?
13    A. Correct.
14    Q. So the man can talk, is that right,
15 according to this?
16    A. According to what Mr. Coar says,
17 correct.
18    Q. Interview's conducted at the kitchen
19 table; is that right?
20    A. Yes.
21    Q. During that time, the insured's
22 seated. Is that right?
23    A. Yes.
24    Q. Interview of approximately one hour,

Page 125

1 20 minutes. Is that right?
2    A. Yes.
3    Q. He notices that while the insured is
4 seated, he has the majority of his weight on his
5 left side. Is that right?
6    A. Yes.
7    Q. "Pleasant, cooperative, and did
8 answer my questions fully." Is that what he
9 says?
10    A. He does.
11    Q. Goes through the medical; is that
12 right?
13    A. Mm-hmm. Yes.
14    Q. Says that insured is seeing two
15 physicians; is that right?
16    A. Yes, he does.
17    Q. Mentions prescriptions that he's
18 taking; is that right?
19    A. Correct.
20    Q. Says there's two reasons why he can't
21 go back to work; is that right?
22    A. That's correct.
23    Q. "First and foremost is that with his
24 heart, he has shortness of breath and has to

Page 126

1 catch his breath quite frequently." Is that
2 what he says?
3    A. He does.
4    Q. "Doesn't have any pain in his heart
5 or back anymore, but the shortness of breath
6 concerns him." Is that what he says?
7    A. He does.
8    Q. Goes on to say that his father had a
9 stroke and three heart attacks and it killed
10 him; is that right?
11    A. That's right.
12    Q. He's afraid that he might have one
13 and die; is that right?
14    A. That's right.
15    Q. "While working at the business, he
16 gets nervous and sometimes loses his temper"; is
17 that right?
18    A. That's right.
19    Q. "He's afraid if that happens, he may
20 have another heart attack"; is that right?
21    A. Correct.
22    Q. "Secondly, he stated that when he was
23 put in the ambulance when he had his heart
24 attack and was transported to hospital, he

Page 127

1 re-injured his back"; is that right?
2    A. Mm-hmm. Yes.
3    Q. "Claims that his back is as bad now
4 as it was in 1996," is that what he says?
5    A. Yes, he does.
6    Q. So he's telling this representative,
7 I was disabled in 1996, my back was bad then,
8 I'm just as bad now. Is that right?
9    A. No, he doesn't say he was disabled.
10 He just stated that his back was as bad now as
11 it was in 1996.
12    Q. I added that --
13    A. Right.
14    Q. -- you know, as literary, but he was
15 disabled in 1996. At least you paid for it;
16 right? New York Life paid a period of benefits,
17 correct, back in 1996?
18    A. Correct.
19    Q. And he's saying his back is as bad as
20 it was then?
21    A. He is saying that.
22    Q. I'm just as a lawyer saying if his
23 back is as bad at the time of this interview as
24 it was in 1996, and New York paid in 1996, can

Page 128

1 you tell me why you didn't pay in 2001?
2    A. He did return to work sometime
3 around, I don't know if it was 1996 or 197. But
4 after forwarding all information to our medical
5 consultants, we determined that he was
6 ineligible for total disability benefits.
7    Q. In 2001?
8    A. Correct.
9    Q. But, can you give me the logical
10 reason that if somebody is as bad in 2000, 2001,
11 just from the back, as he was in 1996, and if
12 the medical records show that his condition
13 worsened, at least from Dr. Bower, why you would
14 pay in 1996 and not pay in 2000?
15    MR. HENEFER: Objection to the form.
16 You can answer.
17    A. There's kind of a lot of questions
18 there. Can you rephrase the question?
19    Q. Sure. It's one question.
20    A. Okay. It was long, so I forgot the
21 first part of it.
22    Q. Sure. Assuming that this record, the
23 papers that we've gone through today, the papers
24 you had available to you, show, one, that he had

Page 129

1 a back condition in 1996; that you paid, or New
2 York paid for that back condition in 1996. His
3 back condition is at least as bad, if not worse
4 in the year 2000, 2001, and you don't pay. Can
5 you tell me why?
6    MR. HENEFER: Objection to the form.
7 But you can answer.
8    A. I do not believe the medical records
9 supported that his back was worse or as bad as
10 it was in 1996. I believe it may have been the
11 same. But upon review of the restrictions and
12 limitations that Dr. Bower placed on the
13 insured, we did not feel that those restrictions
14 and limitations would prevent him from
15 performing the duties of his occupation.
16    Q. Weren't those restrictions and
17 limitations the same in 1996 as they were in
18 2000?
19    A. I'm not sure. I would have to look
20 at --
21    Q. Wasn't his job the same in 1996 as it
22 was in 2000?
23    A. His job was, correct.
24    Q. So if his job was virtually the same.

Page 130

1 So if his back were even just the same --
2    A. He did return to work in, sometime in
3 1996 or 1997. We did not see a change in his
4 back condition that would have prevented him
5 from returning to work. He was working then, we
6 didn't see why he wasn't able to work in 2001
7 with that same back condition.
8    Q. Are you saying, therefore, that you
9 didn't see any exacerbation?
10    A. I did see that Mr. Mazzamuto stated
11 that the ambulance ride exasperated (sic) his
12 back condition. But, after review of
13 Dr. Clarke's medical review, that's what we
14 based our determination on that we did not feel
15 he was eligible for total disability benefits.
16    Q. Well, I'm not going to argue with you
17 on the point of Dr. Clarke's record, but
18 Dr. Clarke does not address that he's not
19 disabled as far as a back condition goes.
20    Show me where he does?
21    A. Dr. Clarke would not indicate, in his
22 review that he is not disabled. That would be
23 my determination. However, Dr. Clarke -- excuse
24 me, Dr. Clarke does indicate that "there does

Page 131

1 not appear to have been any significant
2 structural change in his condition associated
3 with the recent exasperation (sic)." He also
4 indicated that his discomfort has subsided in
5 the past, at least enough to return to work.
6    Q. But it didn't say it subsided this
7 time, did he? Does he say that it subsided this
8 time?
9    A. No. But he says, there does not
10 appear to have been any significant structural
11 change in his condition associated with the
12 recent exacerbation. So my understanding of
13 that statement is there doesn't appear to have
14 been a change from 1996 to --
15    Q. Do you know what the word
16 "structural" means?
17    A. I'm not exactly sure how to define
18 it, but.
19    Q. Structural. For instance, if you've
20 got stenosis, if you've got arthritis. A
21 structural change would be a worsening in what
22 you can see in the structure. Would you accept
23 that?
24    A. Yes.

Page 132

1    Q. Okay. All he's telling you is that
2 structurally there hasn't been a change. But
3 doesn't he say his problems are not structural,
4 they're soft tissue, is that not what he says?
5    A. He does say this appears to be soft
6 tissue in origin with regards to the spinal
7 stenosis.
8    Q. So, soft tissue is not structural; is
9 that right? You don't see soft tissue on an
10 x-ray, do you?
11    A. I don't believe so. I'm not a
12 hundred percent positive.
13    Q. So whether there's a structural
14 change or not a change, should that have any
15 meaning? If your injury is soft tissue.
16    A. Could you rephrase the question?
17    Q. If your injury is soft tissue,
18 whether your structure changes or not is
19 irrelevant, is it not?
20    MR. HENEFER: Objection to the form.
21 You can answer.
22    A. Dr. Clarke states that, he doesn't
23 state about it being an injury. He just
24 indicates that something is soft tissue in

Page 133

1 origin. He doesn't indicate how that would
2 prevent him from performing the duties of his
3 occupation, or if it's limiting him at all.
4    Q. Let me just perhaps give you a for
5 instance.
6    A. Okay.
7    Q. If a nerve in your body is damaged,
8 you could take an x-ray and it wouldn't show it.
9 Is that right?
10    A. I believe so, correct.
11    Q. But, you still could be disabled from
12 that nerve being damaged; is that right?
13    A. Hypothetically speaking.
14    Q. And muscles can be damaged, and
15 ligaments can be damaged. Is that right?
16    A. Correct.
17    Q. And those muscles and ligaments and
18 nerves by being damaged, can disable you, can
19 they not?
20    A. They could.
21    Q. Even though the structure stays the
22 same; is that right?
23    A. Again, hypothetically speaking, it
24 could.

Page 134

1    Q. Where do you say, therefore, a basis
2 for you to deny his claim?
3    MR. HENEFER: Objection.
4    Q. In Dr. Clarke's report. In
5 Dr. Clarke's report.
6    MR. HENEFER: Note an objection to
7 the form of the question. But you can answer.
8    A. I believe that, again, based on the
9 duties of his occupation, and based on the
10 restrictions and limitations that Dr. Bower
11 placed on Mr. Mazzamuto, I believe that he could
12 perform the duties of his occupation perhaps
13 with accommodations, he could sit performing the
14 duties.
15    Q. If his job requires him to stand most
16 of the time, and the doctor says he's restricted
17 from any prolonged standing, more than 15 or 20
18 minutes at a time, is it not disabled?
19    MR. HENEFER: Note an objection to
20 the form of the question, but you can answer.
21    A. I don't recall the physician saying
22 that he couldn't stand for more than 15 or 20
23 minutes.
24    Q. Isn't that what Dr. Clarke talks

Page 135

1 about, 15 to 20 minutes? Last paragraph.
2    A. He doesn't indicate who says that.
3 He just says, "the degree to which he's required
4 to stand or walk for prolonged uninterrupted
5 periods of time over 15 to 20 minutes at a time
6 is not clear."
7    I believe that the insured may have
8 stated this, that after 15 to 20 minutes he
9 experiences pain. But I don't believe a
10 physician said that.
11    Q. Well, if you have to -- job requires
12 you to stand most of the time, that would make
13 you disabled if you start to get pain after
14 15 to 20 minutes, would it not?
15    A. Again, I don't believe that his job
16 required him to stand most of the time.
17    Q. You know what's so incredible, to me,
18 just as a lawyer, how do you know what his job
19 required?
20    MR. HENEFER: Objection to the form.
21 You can answer.
22    Q. Please answer that. How do you know
23 what his job required?
24    A. The insured indicated that, what his

Page 136

1 duties of his occupation are, and those duties,
2 I believe, could be performed sitting. I don't
3 believe that he does bookkeeping standing or
4 administrative duties standing.
5    Q. You don't believe him when he says he
6 has to stand most of the time, do you?
7    A. He may have stood most of the time,
8 but, again, I believe he could perform those
9 duties sitting. I don't see why he couldn't.
10    Q. What was told in Dr. Bower's
11 deposition is that whenever Dr. Bower has gone
12 to this pizza restaurant, he was able to observe
13 what Mr. Mazzamuto does. Supposedly, at his
14 restaurant, there is what I will almost call
15 like a counter where he sees Mr. Mazzamuto, or
16 had seen Mr. Mazzamuto most of the time. And
17 the height of that counter is such that you
18 can't sit. Did you know that is where he
19 generally worked?
20    A. No, I did not.
21    Q. So, that if you work at this counter
22 that is a high counter, and people come in, and
23 you have to stand at this counter, if you have
24 to have a register where you basically collect

Page 137

1 their money, if you have to stand at that
2 counter and greet the people, and say thank you
3 for coming, you can't sit. Do you understand
4 that?
5     MR. HENEFER: Objection to the form
6 of the question. You can answer if you're able.
7     Q. Do you understand that?
8     A. Again, I believe with accommodations
9 he could perform the duties of his occupation.
10     Q. How can you greet guests behind a
11 counter, take money from behind a counter,
12 observe what's happening and supervise employees
13 from behind a counter that is too high to sit?
14     MR. HENEFER: Objection to the form
15 of the question.
16     Q. Tell me how you could do that.
17     THE WITNESS: Do you want me to
18 answer?
19     MR. HENEFER: If you're able to
20 answer.
21     A. I don't -- first of all, I don't
22 believe that he took money. I don't recall that
23 being a duty of his occupation. But, I believe
24 that he could -- he could sit with

Page 138

1 accommodations. He wouldn't have to sit behind
2 a counter.
3     Q. Don't you realize that you made a
4 decision that he wasn't disabled without knowing
5 what this place looked like? That there was a
6 counter that he stood behind. Did you know that
7 up until this moment?
8     A. No, I did not.
9     Q. So you turned down this man, and he
10 has not been able to collect any disability
11 insurance, for which he paid, for almost two
12 years without you're even knowing where he had
13 to stand. Is that right?
14     MR. HENEFER: Objection to the form
15 of the question but you can answer.
16     Q. Is that not correct?
17     A. Correct.
18     MR. HENEFER: Off the record.
19     (Discussion off the record.)
20     Q. Take a few more minutes to go through
21 the field report, 15 minutes with Mr. Fogarty, 5
22 or 10 minutes with Dr. Clarke, and then he'll be
23 done.
24     A. Okay.

Page 139

1     Q. He described his back condition, is
2 that right? Second page.
3     A. Are you referring to the field
4 report?
5     Q. Field report. I think it's the third
6 page. Out of work for about a year. Do you see
7 that? First full paragraph?
8     A. Correct.
9     Q. Walks with a limp. Do you see that
10 again?
11     A. That the insured states, yes, I see
12 that.
13     Q. Do you think this man is a
14 malingerer, that he's putting this limp on for
15 benefit of your field representative?
16     A. I don't believe I can answer that
17 question.
18     Q. And when he sits, can't put pressure
19 on his right side. Do you see that?
20     A. Yes, I do.
21     Q. Pain starts in his back and runs down
22 to his right leg. Do you see that?
23     A. I see that the insured stated that
24 about his pain, yes.

Page 140

1     Q. Did you ever send him to some doctor
2 to have him examined?
3     A. No, we did not.
4     Q. So you don't have any doctor that's
5 ever examined this man. Is that right?
6     A. Correct.
7     Q. So you denied his claim without even
8 having him examined. Is that right?
9     A. Correct.
10     Q. Says he has numbness in his right
11 leg. Is that right?
12     A. Yes, correct.
13     Q. Can't bend. If he drops something on
14 the floor, needs to pick it up. Do you see
15 that?
16     A. I do.
17     Q. When he sleeps, he sleeps on his
18 stomach with pillows under his stomach, ankle,
19 and head. Do you see that?
20     A. Yes, I do.
21     Q. As far as sitting, standing or
22 walking, he stated he can only do these
23 activities for about 20 or 30 minutes before
24 changing positions. Do you see that?

Page 141

1   A.  Yes, I do.
2   Q.  Goes on to describe his activities.
3  Is that right?
4   A.  His current activities.
5   Q.  Do you see anything in here where the
6  man went to the restaurant and described that
7  there's a counter, the man would stand behind
8  the counter, what he would do behind the
9  counter, what his activities would be.  Do you
10 see any of that?
11  A.  Well, the part about him going to the
12 restaurant is actually cut off, so I don't --.
13      "After I met with the insured I went
14 to the business.  The business is pretty much a
15 pizza restaurant with some articles on the menu.
16 The restaurant has about 15 tables in the
17 establishment and when I went there during lunch
18 hour about half of the tables are taken.  There
19 were three young -- there were three workers at
20 the business.  One older female, who is probably
21 the insured's wife and two younger males,
22 probably the insured's son.  Shortly after, I
23 departed the area."
24  Q.  No mention of the counter, no mention

Page 142

1  of people standing behind the counter, how high
2  the counter was, where the register is, none of
3  that.  Is that right?
4   A.  Correct.
5      MR. ANGINO:  I have no further
6  questions.
7      MR. HENEFER:  I'm going to reserve my
8  questions until the time of trial with this
9  witness.
10 (At 11:54 a.m., the deposition then ended.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 143

1  COMMONWEALTH OF MASSACHUSETTS
2  WORCESTER, SS.
3      I, Dianne G. Rutan, a notary public in and
4  for the Commonwealth of Massachusetts, do
5  certify that pursuant to appropriate notice of
6  taking deposition, there came before me the
7  subject deponent, who was by me duly sworn; that
8  said witness was thereupon examined under oath
9  and said examination reduced to writing by me;
10 and that the deposition is a true record of the
11 testimony given by the witness.
12      I further certify that I am not a relative
13 or employee or counsel or attorney for any of
14 the parties, or a relative or employee of such
15 counsel or attorney, nor am I financially or
16 otherwise interested in the outcome of the
17 action.
18      Witness my hand and official seal at
19 Worcester, Massachusetts, this 23rd day of
20 April, 2002.
        My Commission Expires
21 June 5, 2003
22      _____
               Notary Public
        The foregoing certification of this
23 transcript does not apply to any reproduction of
24 the same in any respect unless under the direct

Page 144

        I have read the foregoing, and it is a
1  true transcript of the testimony given by me at
2  the taking of the subject deposition.
3
4
5
6
7      _____
8          MELISSA MULRY
9
10
11
12
13 _____
          DATE
14 DR-0423mm
15
16
17
18
19
20
21
22
23
24

Page 145

```
 1            ERRATA SHEET
 2       I WISH TO MAKE THE FOLLOWING CHANGES
 3  IN THE FOREGOING TRANSCRIPT OF MY DEPOSITION:
 4
 5  PAGE  LINE    CHANGE        REASON
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21  DATE: _____
          MELISSA MULRY
22  DR-0423mm
23
24
```

 
**-'-**

'01 [4]    47:1    53:4
83:2    102:19
'96 [4]    56:1    84:22
87:13    87:14

**-0-**

01608 [1]    2:13

**-1-**

1 [6]    1:5    4:1
11:12    21:17    34:1
50:17
10 [1]    138:22
10/04/2000 [1] 38:8
10/10 [1]    20:10
10/10/2000 [1] 20:7
10/11 [1]    20:10
10/19/2000 [1] 23:3
10th [4] 48:14    48:16
48:17    48:17
11 [2]    17:15    102:6
11/15 [1]    43:7
11/15/2000 [1] 36:13
111 [1]    2:8
11:54 [1]    142:10
11th [6]    19:19    20:11
21:6    72:12    80:3
80:4
13 [1]    42:17
13th [1]    56:1
15 [12]    42:17    113:4
122:6    122:7    134:17
134:22    135:1    135:5
135:8    135:14    138:21
141:16
15001 [2]    28:22
29:11
15th [29]36:6    44:8
49:10    49:13    49:21
54:8    54:13    54:16
63:15    63:20    65:8
70:4    71:8    72:2
72:3    72:4    72:11
74:10    75:20    75:23
75:24    77:5    77:15
78:20    100:10    101:2
103:12    123:3    123:4
16th [7]    77:1    77:6
77:10    77:20    77:21
120:23    121:8
17110-1708 [1]
2:5
18 [5]    2:12    4:19
83:2    102:19    106:14
18th [7]    78:8    78:15
78:23    80:16    80:20
85:1    104:24
19603-0679 [1]
2:9
197 [1]    128:3

**1996** [29]    16:19
61:15    62:17    62:24
73:19    82:7    84:1
94:1    96:2    96:7
113:24    119:13    127:17
127:7    127:11    127:15
127:17    127:24    127:24
128:3    128:11    128:24
129:1    129:2    129:10
129:17    129:21    130:3
131:14
**1997** [14] 87:13    96:7
114:1    130:3
**1998** [1] 5:5
19th [2]    80:2    99:21
1st [2]    21:21    50:20

**-2-**

20 [9]    113:4    125:1
134:17    134:22    135:1
135:5    135:8    135:14
140:23
2000 [22]    13:14
16:3    17:16    19:6
21:17    21:21    26:11
27:6    33:22    40:9
50:17    62:17    81:20
87:12    87:15    96:11
106:13    128:10    128:14
129:4    129:18    129:22
2001 [17]    13:5
48:2    56:15    56:18
71:9    71:11    82:12
89:16    89:17    102:11
106:15    106:16    128:1
128:7    128:10    129:4
130:6
2002 [2] 1:17    143:20
2003 [1] 143:21
20th [3]    64:12    64:17
64:18
22023 [1]    43:24
22nd [14]    42:24
43:20    44:10    44:13
46:4    49:11    71:11
77:8    80:20    80:21
85:5    88:16    89:16
92:11
23 [1]    1:17
233 [1]    55:21
236 [1]    55:5
23rd [1] 143:19
26 [1]    13:5
26th [1]    101:8
27 [1]    102:10
27th [1]    68:8
28 [2]    40:9    117:7
28th [4]    116:11    116:17
117:8    118:6
29 [1]    19:6
29th [1]    80:1
2nd [1]    89:17

**-3-**

3 [1]    27:6
3/28 [2]    114:17    118:10
3/7 [1]    59:19
3/7/97 [2]    59:15
59:19
30 [9]    1:13    64:21
76:12    100:18    121:18
121:20    122:1    122:7
140:23
31st [1]    88:13    106:16
344 [1]    83:6
345 [1]    83:6
371 [1]    120:18
376 [1]    121:2
377 [1]    114:19
380 [2]    99:7    99:18
381 [1]    97:13
3rd [14]    26:11    27:22
33:22    34:3    35:6
36:10    36:20    36:23
70:10    80:18    80:24
81:3    82:24    106:14

**-4-**

4 [2]    3:4    3:11
4/11 [1]    60:1
4/11/97 [1]    60:2
4/15/97 [1]    59:23
4/16/97 [1]    59:14
41 [1]    1:18
414.01 [1]    41:20
45-year-old [3] 92:14
92:18    102:14
4503 [1] 2:4
4th [10]    27:9    28:5
46:24    47:16    48:2
51:13    54:18    121:9
122:20    123:5

**-5-**

5 [2]    138:21    143:21
51 [1]    28:16
529 [1]    63:21
530 [1]    63:20
535 [1]    22:23
536 [1]    22:22
539 [2]    45:4    46:12
540 [1]    45:3    46:12
543 [1]    44:3
544 [1]    44:3
547 [1]    44:23
548 [1]    44:22
551 [3]    21:18    40:24
50:18
552 [1]    17:16
553 [2]    19:14    22:15
554 [1]    40:9
555 [1]    40:24
556 [1]    16:18
557 [1]    14:22

563 [1]    20:2

**-6-**

6 [1]    16:3
60 [2]    122:9    122:18
679 [1]    2:9
6th [3]    15:17    65:6
66:7

**-7-**

7/11/97 [1]    59:24
7/22 [2] 14:19    42:4
7/22/2000 [1]    38:5
75 [1]    122:22

**-8-**

8th [4]    53:4    54:19
66:8    115:12

**-9-**

9/27 [1] 17:2
9/6 [1]    17:1
9/6/2000 [4]    14:9
14:23    16:11    47:24
90-day [1]    64:6
9:00 [1] 1:17
9:15 [1] 55:5
9:16:23 [1]    23:5
9:28:08 [1]    23:5
9th [3]    47:15    55:4
66:8

**-A-**

a.m [4]    1:17    23:5
55:5    142:10
able [13] 17:6    34:22
35:3    42:18    43:11
80:12    114:1    124:11
130:6    136:12    137:6
137:19    138:10
abnormality [1]
106:3
above [2]    107:5
117:21
absence [1]    109:16
accept [2]    60:10
131:22
access [8]    56:18
56:24    57:4    57:5
57:11    57:13    57:19
58:2
Accident [1]    24:11
accommodations [3]
134:13    137:8    138:1
accompanied [1]
49:24
according [7]    72:16
96:14    96:15    106:17
116:5    124:15    124:16
account [1]    112:3

accurate [5]    16:3
16:19    16:20    18:7
20:4
acknowledgment [1]
77:19
action [14]    52:24
53:9    53:16    54:5
54:18    54:23    55:1
74:12    115:2    115:5
115:9    115:11    116:4
143:17
activities [4] 140:23
141:2    141:4    141:9
activity [1]    107:8
actual [3]    7:8
65:11    121:19
added [1]    127:12
addition [1]    80:17
additional [1]    76:3
address [5]    4:16
4:17    29:1    95:7
130:18
addressed [1]    19:6
addressing [1]    95:3
administering [3]
24:2    25:21    25:23
administration [2]
93:14    94:6
administrative [3]
62:20    111:7    136:4
admit [3]    74:10
80:23    91:20
advise [1]    116:22
116:24
affected [3]    95:19
96:19    96:24
afraid [1]    126:12
126:19
again [26]    7:16
13:11    21:4    21:21
22:13    32:22    39:6
46:8    63:15    71:18
89:10    93:2    97:20
97:24    101:11    104:21
106:11    119:10    120:16
122:13    133:23    134:8
135:15    136:8    137:8
139:10
agent [9]    7:2
7:5    7:11    7:23
57:15    119:8    119:22
120:9    123:23
agents [1]    31:20
aggravated [5] 31:16
83:24    90:4    93:24
103:1
agree [4]31:23    58:22
58:23    108:17
ahead [2]    53:13
74:12
air [1]    124:11
allow [1]    68:1
almost [3]    16:15
136:14    138:11
along [3]    23:23


52:3     52:6
**alternative** [1]   7:14
**always** [4]       83:18
90:1     93:21    102:21
**ambulance** [4]    106:12
113:21  126:23  130:11
**American** [1]      24:20
**among** [1]        40:10
**amount** [1]       34:19
**analgesics** [1]   31:19
**analysis** [1]     86:12
**Andrews** [1]      55:11
**angina** [1]      107:24
**ANGINO** [33]      2:3
2:4     3:4     4:5
4:12     6:7    6:15
7:9    12:13   18:5
18:16   19:1   19:4
19:22  22:12   34:4
34:8   34:14   40:7
40:12   41:5   44:24
46:11  50:11   59:18
60:2   63:17   78:1
83:4   92:16  102:5
102:8  142:5
**ankle** [1]        140:18
**Ann** [1]  4:15
**Anna** [1]          5:9
**answer** [18]      49:2
49:3   64:14   84:5
119:17 125:8  128:16
129:7  132:21  134:7
134:20 135:21 135:22
137:6  137:18 137:20
138:15 139:16
**answered** [1]     84:6
**anti-inflammatory** [1]
31:19
**anxiety** [24]      33:1
33:4   36:16   36:22
37:2   37:11   63:11
78:20  78:24   79:6
79:21  79:21   84:13
84:16  84:17   92:5
97:9   97:11   99:4
103:16 104:16  108:2
109:8  109:9
**app** [1]  118:23
**appear** [10]      42:3
87:14  94:15  107:13
107:21 112:23 122:17
131:1  131:10 131:13
**application** [19]
7:19   9:18   15:21
20:17  21:1   61:3
63:8  118:22  119:1
119:2  119:4  119:6
119:11 119:15 119:18
119:23 119:24 120:14
120:17
**applied** [1]      95:12
**apply** [1]       143:23
**appreciate** [1]   41:5
**appropriate** [5]  12:13
52:19  52:22  89:10

**approximate** [1]
123:19
**April** [7]         1:17
56:1  121:9  121:12
122:20 123:5  143:20
**area** [1]  141:23
**argue** [1]        130:16
**argument** [1]     52:17
**arithmetic** [1]   122:21
**arthritis** [1]    131:21
**articles** [1]     141:15
**asks** [1]  42:2
**aspect** [1]       120:7
**assign** [1]        20:3
**assigned** [13]    10:12
20:7  20:12   20:16
20:23  48:13   48:23
50:3   51:21   53:10
72:13  120:22  121:7
**assignment** [1]   20:10
**assignments** [1]
121:16
**assist** [1]        46:8
**assistant** [4]     5:16
55:12  71:3    71:8
**associated** [2]   131:2
131:11
**association** [1]  109:14
**assume** [1]        7:1
33:20  39:14   41:23
43:23  52:2    66:6
81:22  86:12  109:24
122:13
**assuming** [3]     34:11
54:16  128:22
**assumption** [6]   39:12
73:5   77:13   77:17
94:23  120:11
**attached** [3]     49:17
49:19  54:22
**attack** [1]       32:22
126:20 126:24
**attacks** [1]      129:9
**attempt** [1]       86:8
**attempted** [3]    32:18
32:18  60:23
**attempting** [2]   57:9
60:14
**attending** [6]    38:20
78:7   78:14   78:16
82:23  103:11
**attorney** [13]     11:5
11:9   11:16   21:11
27:17  29:13   35:8
58:10  72:20  118:8
118:11 143:13 143:15
**attorney's** [3]   13:1
26:20  27:16
**atypical** [1]      31:20
**authored** [1]     33:13
**authorization** [5]
68:1   68:8   68:18

**available** [1]    128:24
**Avenue** [1]        28:17
**await** [1]        116:9
**aware** [12]        8:11
8:13   8:16    8:17
9:6    9:13   13:13
26:17  33:11   52:14
112:6  116:15

**-B-**

**Bachini** [1]      23:3
**background** [2]   98:5
98:7
**bad** [9]  127:3   127:7
127:8  127:10  127:19
127:23 128:10  129:3
129:9
**Barbee** [1]       16:21
**based** [7]        42:22
57:10  82:11   95:10
130:14 134:8  134:9
**basis** [11]       57:20
57:24  59:10   59:11
60:22  60:23   61:22
76:11  107:2  107:5
134:1
**Bate** [19]         12:1
12:2   14:22   16:17
17:16  20:2   43:23
45:1   55:5    55:20
63:16  77:23   78:1
83:4   97:12  114:18
118:10 121:2  122:13
**Bate's** [1]       12:10
**Bates** [1]        19:14
21:17  40:9    44:2
44:2   44:22   50:17
**began** [2]         26:7
64:16
**beginning** [2]    24:6
64:18
**behind** [8]       137:10
137:11 137:13 138:1
138:6  141:7  141:8
142:1
**bend** [1]  140:13
**bending** [3]       35:1
104:20 111:4
**benefit** [1]       6:20
87:17  112:9  139:15
**benefits** [10]     7:19
64:15  64:16   82:16
96:6   96:7   108:20
127:16 128:6  130:15
**best** [1]  11:19
**better** [1]       35:22
**between** [7]      35:20
38:19  65:10   75:23
75:23  90:14   90:20
**beyond** [1]       122:18
**bit** [4]  34:7     58:7
79:5  121:22
**black** [1]        58:15

**blank** [3]                99:13
99:16  99:17
**block** [6]                23:15
23:22  25:5    25:7
25:14  25:22
**blocked** [1]      121:5
**blocks** [1]        26:9
**body** [1] 133:7
**bones** [1]        109:21
**bookkeeping** [3]
93:13  94:4  136:3
**books** [2]         6:3
91:4
**borrow** [1]       19:22
**bothering** [1]    106:6
**bottom** [5]        14:9
36:6   43:24   93:19
99:13
**Bower** [22]       34:12
35:5   35:11   36:13
38:11  38:11   62:2
69:22  70:22   71:10
81:1   81:4    82:22
104:1  104:5  104:14
104:21 104:23 128:13
129:12 134:10 136:11
**Bower's** [1]      34:2
136:10
**box** [8]  2:9      28:22
29:1   29:7    29:9
29:11  121:19  122:1
**break** [1]        102:6
**breath** [8]       83:22
90:3   93:23  102:24
124:10 125:24  126:1
126:5
**broad** [1]        96:5
**brought** [2]      26:15
88:23
**bump** [1]         106:12
113:20
**burdensome** [1]
76:19
**burning** [1]      105:22
**business** [20]    4:17
8:20   8:22   23:15
23:23  24:9   24:24
25:6   25:7   25:14
25:22  25:24   26:9
29:3   86:13  119:23
126:15 141:14 141:14
141:20
**buy** [1]  25:18

**-C-**

**C** [1]  2:1
**C.A** [1]  1:5
**CAD** [6] 78:23   79:5
79:11  105:3  105:7
106:23
**Cahill** [1]       114:23
**calls** [11]        7:15
9:1   65:16   66:9
66:14  66:18  67:11

**blank** ...

**cannot** [1]       34:24
37:24  46:13   80:8
**capacity** [2]      5:12
5:13
**cardiac** [18]      33:2
37:14  79:9   79:11
95:3   95:5    95:6
97:4   97:6   101:22
107:3  107:7  107:14
107:15 107:22 108:5
109:3  109:10
**Cardiovascular** [1]
109:11
**care** [2]  28:20  90:15
**Cariglia** [2]     88:19
116:13
**Carlisle** [2]     69:23
70:21
**carried** [1]       12:1
**carries** [2]      16:17
59:13
**carrying** [23]    12:24
14:8   14:22   17:15
20:2   22:22   23:2
23:3   26:11   27:5
36:5   43:23   44:9
44:13  49:9    53:3
55:20  87:11   87:12
87:21  88:13  102:10
114:18
**case** [10] 10:12   10:20
10:24  11:9    12:5
11:9   20:20   21:4   50:3
88:22  98:2
**cases** [2]         11:1
121:16
**Casualty** [1]     24:13
**catch** [1]        126:1
**cath** [1]  79:11
**catheter** [1]     37:15
**causes** [5]       83:21
84:12  90:1   93:22
102:22
**causing** [1]      107:16
**CCS** [1] 90:14
**center** [1]       28:20
**central** [2]      30:24
55:24
**centrally** [1]    105:23
**certain** [8]       6:3
6:11   8:17   17:21
30:8   41:24  119:17
123:4
**certainly** [2]    116:16
123:2
**certification** [1]
143:23
**certify** [2]      143:5
143:12
**cessation** [1]    34:20
**cetera** [1]       81:13
**chain** [1]        118:4


**chance** [1]        17:23
**change** [10]        67:23
  130:3    131:2    131:11
  131:14    131:21    133:2
  132:14    132:14    145:5
**changed** [2]        73:23
  117:9
**changes** [2]        132:18
  145:2
**changing** [1]        140:24
**Chattanooga** [2]
  55:6    55:7
**checked** [2]        24:21
  121:20
**chest** [10]        46:14
  83:21    83:22    90:2
  90:2    93:22    93:23
  97:5    102:22    102:23
**Chestnut** [2]        2:12
  4:19
**chronic** [14]        31:20
  34:21    78:24    79:6
  79:14    79:14    79:19
  79:20    82:4    84:17
  92:19    92:21    95:18
  98:21
**chronicity** [1]        82:4
**chronological** [4]
  11:18    17:20    18:21
  115:13
**chronologically** [1]
  11:17
**circle** [1]        42:19
**circumstances** [1]
  23:20
**Civil** [1] 1:14
**claim** [122]        5:15
  5:16    6:17    6:19
  6:22    7:3    7:8
  7:12    7:16    7:17
  7:18    8:1    9:17
  9:18    9:21    10:7
  10:10    10:18    13:7
  13:15    15:6    16:5
  16:17    16:18    19:9
  20:4    20:12    20:16
  20:24    21:2    21:8
  22:3    22:5    22:8
  22:10    22:17    22:18
  22:19    23:21    27:2
  27:4    27:19    28:4
  40:10    47:12    48:14
  48:19    48:21    48:23
  49:6    50:7    50:21
  50:23    52:15    52:18
  52:20    53:15    53:18
  53:22    53:24    54:4
  54:24    55:3    55:9
  55:12    55:15    55:19
  56:9    56:14    56:20
  56:21    56:22    57:10
  57:21    57:24    58:20
  59:6    59:13    60:16
  61:18    63:8    64:3
  64:21    65:8    65:11
  65:13    65:18    65:19
  67:20    68:14    69:1
  69:6    70:6    71:21

**companies** [5]        26:4
  29:3    45:6    45:15
  52:11
**company** [20]        1:7
  1:8    4:22    4:24
  24:3    25:16    27:7
  28:2    28:16    28:20
  29:15    32:3    33:12
  38:24    43:11    45:13
  49:14    54:11    54:12
  68:13
**compilation** [1] 18:13
**complaining** [1]
  101:11
**complete** [17]        34:8
  34:16    41:3    53:18
  70:14    70:16    70:17
  71:24    75:2    76:2
  82:20    83:1    101:6
  115:2    115:9    116:4
  121:5
**completed** [11]        17:23
  39:1    46:5    75:4
  114:21    115:8    115:11
  115:17    115:18    118:23
  119:4
**complicated** [1]
  32:8
**computer** [1]        10:8
**concerned** [1]    119:14
**concerns** [1]    126:6
**concluded** [1]    57:20
**conclusion** [1]    57:23
**conclusions** [1] 95:10
**condition** [5]        27:19
  27:20    32:8    34:17
  38:4    62:4    63:2
  63:10    87:6    92:3
  95:17    95:18    96:8
  96:15    96:24    101:23
  102:1    107:15    128:12
  129:1    129:2    129:3
  130:4    130:7    130:12
  130:19    131:2    131:11
  139:1
**conditions** [2]        33:5
  41:24
**conducted** [1]    124:18
**confer** [2]        18:3
  18:6
**confused** [4]        14:14
  34:10    47:21    112:11
**conscientious** [1]
  53:8
**consideration** [1]
  112:5
**considers** [1]    116:21
**consistent** [2]    42:6
  42:10
**consultant** [8]    85:23
  108:19    114:21    117:15
  117:16    117:17    117:20
  118:1
**consultants** [4] 82:14
  86:3    89:7    128:5
**contact** [1]        6:23

  15:20    26:20    48:20
  52:16

**contacted** [1]        15:15
**contend** [1]        63:1
**contended** [1]        63:4
**continue** [1]        19:1
**contra-distinction** [1]
  10:24
**contract** [2]        5:22
  5:23
**contracts** [1]        6:21
**contradict** [1]        18:1
**conversation** [8]
  27:15    35:21    48:7
  48:8    48:10    48:11
  90:14    90:20
**cooks** [1]        118:20
**cooperative** [1] 125:7
**copied** [1]        55:15
**copy** [3] 22:1    33:18
  121:5
**Corporation** [3]
  1:6    5:2    38:23
**correct** [198]        9:8
  10:13    11:3    15:23
  19:11    20:5    20:22
  22:20    23:6    23:7
  24:22    25:12    27:8
  28:8    28:11    28:21
  29:5    30:1    30:10
  30:14    30:21    32:1
  32:6    32:24    36:14
  36:21    37:7    37:13
  37:16    38:6    38:9
  38:13    38:16    39:5
  39:8    39:18    41:9
  41:13    42:1    42:5
  43:1    43:2    43:14
  43:18    44:11    44:16
  45:12    48:1    48:15
  49:22    51:2    51:8
  51:14    52:4    53:2
  53:5    53:23    54:3
  55:17    55:22    56:2
  56:9    56:10    60:17
  60:20    61:1    61:17
  61:20    61:23    62:18
  63:24    64:4    66:23
  67:2    67:5    67:9
  68:23    70:2    70:14
  72:9    72:18    73:2
  73:18    74:15    74:19
  75:18    76:24    77:11
  77:22    78:9    78:18
  78:22    79:2    79:23
  80:14    81:2    81:9
  81:12    81:16    82:2
  82:6    82:19    83:3
  84:24    85:4    86:15
  87:3    87:16    87:19
  88:6    88:20    91:8
  91:22    92:1    92:13
  93:1    93:6    95:2
  96:9    96:13    96:17
  96:20    97:1    97:2
  98:6    98:13    98:16
  98:22    99:1    99:19
  99:22    100:1    100:4

  100:7    100:11    100:15
  101:13    102:17    103:5
  103:14    103:18    104:2
  104:8    104:11    104:15
  104:22    105:5    106:5
  106:9    106:16    107:1
  109:1    110:18    112:15
  112:18    112:20    112:21
  113:1    113:10    113:13
  114:5    114:7    114:13
  114:16    116:19    117:24
  118:3    120:21    121:1
  121:10    122:3    122:23
  123:7    123:8    123:10
  123:17    123:21    124:2
  124:5    124:8    124:13
  124:17    125:19    125:22
  126:21    127:17    127:18
  128:8    129:23    133:10
  133:16    138:16    138:17
  139:8    140:6    140:9
  140:12    142:4
**correlated** [1]        41:23
**CORRIGAN** [2]
  2:11    87:24
**counsel** [9]        18:4
  18:6    19:5    21:17
  21:20    22:14    56:13
  143:13    143:15
**counsel's** [1]        51:7
**count** [2]        47:19
  47:21
**counter** [17]        136:15
  136:17    136:21    136:22
  136:23    137:2    137:11
  137:11    137:13    138:2
  138:6    141:7    141:8
  141:9    141:24    142:1
  142:2
**couple** [1]        54:16
**course** [2]        6:5
  36:11
**court** [2] 1:1        12:20
**coverage** [1]        120:1
**covered** [1]        100:19
**crossed** [1]        42:21
**CRS** [1]  99:7
**CT** [1]    105:20
**current** [1]        141:4
**customer** [3]        28:20
  90:15    122:24
**cut** [3]    12:11    46:18
  141:12
**CV-01-1157** [1]
  1:5

            -D-

**D** [1]        3:1
**damaged** [5]        133:7
  133:12    133:14    133:15
  133:18
**date** [34] 13:4        14:8
  14:14    14:17    14:17
  14:18    14:23    16:11
  17:15    23:3    26:11
  27:6    34:2    36:5

**chance** [1]        17:23
... (first column continued)
**claimant** [8]        7:1
  7:15    15:11    15:15
  15:22    16:2    49:11
  119:16
**claims** [15]        6:10
  9:23    9:24    19:8
  24:3    24:23    39:15
  43:17    71:3    71:8
  89:11    89:22    112:2
  115:23    127:3
**clarification** [1]
  75:10
**clarity** [1]        97:24
**Clarke** [14]        97:18
  99:6    101:18    107:17
  110:15    110:23    112:23
  130:18    130:21    130:23
  130:24    132:22    134:24
  138:22
**Clarke's** [6]        101:21
  102:9    130:13    130:17
  134:4    134:5
**clear** [7] 19:14        44:22
  56:13    113:5    116:8
  116:20    135:6
**clearly** [1]        87:4
**clinic** [1]        31:17
**clinical** [5]        97:15
  99:9    99:14    105:11
  116:14
**clip** [4]    58:15    58:16
  86:17    86:20
**Coar** [1] 124:16
**coherently** [1]        30:3
**collect** [2]        136:24
  138:10
**college** [5]        5:4
  5:5    5:6    5:8
  5:9
**combination** [1]
  104:4
**coming** [3]        19:7
  82:1    137:3
**command** [1]    118:5
**commencing** [1]
  1:17
**comment** [2]        85:18
  101:24
**Commission** [1]
  143:21
**Commonwealth** [3]
  1:16    143:1    143:4
**communicated** [1]
  57:16
**communicating** [1]
  32:2

71:22    73:20    76:3
76:10    82:13    85:9
89:5    89:6    89:20
96:11    99:5    100:9
100:13    100:16    100:20
101:2    101:3    101:6
102:18    108:11    108:24
110:5    111:1    115:14
118:7    119:13    134:2
140:7

MAZZAMUTO V. UNUMPROVIDENT     CondenseIt!™

38:3    38:7    44:9
44:13    49:13    50:20
53:3    59:14    64:17
64:18    80:16    85:2
89:16    92:11    100:13
101:3    102:10    114:8
144:14    145:21
**dated** [1]    36:13
38:11    40:8    75:19
77:1    77:20    78:15
83:2    99:21    102:19
117:6
**dates** [5] 49:9    71:6
87:12    87:13    114:3
**days** [16]    8:21
8:23    9:10    16:2
16:10    47:19    48:3
54:16    64:21    76:12
100:18    121:18    121:20
122:1    122:18    122:22
**deal** [1]  58:20
**dealing** [2]    8:3
11:22
**deals** [1] 31:23
**deceiving** [1]    69:18
**December** [19]    44:7
47:9    48:17    49:13
49:20    54:8    54:13
54:16    65:8    70:4
72:2    72:3    72:11
74:10    75:23    80:2
100:10    101:2    123:3
**decided** [1]    85:3
**decision** [8]    9:13
72:21    108:16    108:18
108:21    110:4    111:1
138:4
**decisions** [1]    86:6
**Defendants** [1] 1:8
2:6
**defense** [1]    56:12
**define** [1]    131:17
**definitely** [1]    123:3
**degree** [3]    109:15
113:2    135:3
**delay** [1]    67:10
**delayed** [4]    67:8
67:13    67:21    100:20
**delivery** [1]    36:11
**denial** [4]    59:11
60:23    108:11    108:20
**denied** [2]    108:24
140:7
**deny** [7] 60:3    60:6
60:14    60:15    110:5
111:1    134:2
**denying** [1]    57:21
57:24
**departed** [1]    141:23
**department** [13] 5:20
9:20    9:22    9:23
9:24    10:3    10:5
13:24    14:2    15:16
45:23    65:21    115:23
**deponent** [2]    3:2

143:7
**deposition** [17]  1:12
4:7    12:6    17:19
17:22    33:12    33:19
33:21    40:13    62:13
87:10    136:11    142:10
143:6    143:10    144:2
145:3
**describe** [3]    83:8
83:11    141:2
**described** [5]    30:18
93:13    105:22    139:1
141:6
**describing** [3]    30:17
123:18    123:22
**description** [4] 74:21
83:1    83:5    116:7
**descriptive** [1] 81:7
**designated** [1]    69:2
**determination** [2]
130:14    130:23
**determine** [2]    74:17
89:4
**determined** [2]  59:10
128:5
**Devereux** [1]    5:7
**diagnoses** [1]    41:19
**Diane** [2]    114:23
116:14
**Diann** [1]    14:23
**Dianne** [2]    1:15
143:3
**die** [1]    126:13
**difference** [2]    38:19
65:10    66:13
**different** [13]    23:4
23:17    24:24    35:18
45:6    45:15    66:17
68:14    70:8    70:11
79:5    79:12    116:1
**difficult** [1]    12:21
**difficulty** [3]    35:1
117:2    117:3
**direct** [1]    143:24
**directly** [1]    28:14
117:20
**director** [1]    117:22
**disability** [33]    14:18
19:7    19:10    20:16
20:24    24:3    35:12
43:15    55:19    58:1
59:12    60:19    61:19
61:22    64:12    64:22
72:23    73:17    82:9
83:8    84:7    88:22
98:2    100:13    100:18
101:4    108:4    108:11
119:13    120:11    128:6
130:15    138:10
**disable** [2]    63:2
133:18
**disabled** [20]    43:12
43:12    68:7    73:1
73:4    84:3    84:23

96:2    96:4    110:19
110:22    127:7    127:9
127:15    130:19    130:22
133:11    134:18    135:13
138:4
**disappointed** [1]
40:16
**discomfort** [4]    31:6
31:11    113:21    131:4
**discovery** [1]    4:7
**discuss** [1]    49:7
**discussed** [1]    11:8
**discusses** [3]    32:11
101:19    105:3
**discussing** [4]    102:9
102:13    106:23    109:9
**Discussion** [12] 6:8
6:16    18:24    19:3
41:6    42:14    56:5
63:18    80:7    88:1
92:17    138:19
**disease** [1]    31:12
**disorder** [1]    107:24
**dispute** [1]    119:19
**DISTRICT** [2]    1:1
1:1
**doctor** [24]    26:16
29:22    30:8    33:12
33:16    39:6    49:10
62:1    70:9    70:10
75:20    76:15    76:19
84:9    84:13    84:20
92:4    96:14    98:15
110:9    112:1    134:16
140:1    140:4
**doctor's** [2]    49:18
63:9
**doctors** [2]    76:6
86:3
**document** [55]    14:21
15:3    15:9    16:14
17:14    20:1    21:11
21:21    21:24    22:15
22:16    22:21    22:22
24:5    25:6    26:10
26:21    26:23    35:14
35:15    35:16    35:19
36:5    36:12    36:15
38:17    38:19    40:18
41:8    43:22    44:2
44:5    44:6    44:12
44:20    44:21    45:1
45:1    46:20    46:24
58:6    58:8    69:2
85:2    86:11    87:20
88:2    88:3    88:4
90:7    90:21    97:12
99:8    114:17    117:6
**documentation** [1]
48:10
**documented** [2]
27:14    54:8
**documents** [36] 3:11
15:20    16:1    16:7
16:24    17:2    17:6
17:22    17:24    18:12
22:24    35:17    41:1

43:8    47:6    47:14
49:12    53:18    53:19
58:2    58:3    58:11
58:15    58:19    58:19
62:1    62:9    62:10
62:11    62:12    63:1
63:4    67:17    68:3
71:14    87:14
**doesn't** [21]    16:16
46:19    69:5    93:20
94:17    97:11    99:2
99:3    99:9    99:5
109:5    116:10    120:8
120:9    126:4    127:9
131:13    132:3    132:22
133:1    135:2
**done** [6]  8:12    11:11
115:15    119:12    121:17
138:23
**Douglas** [2]    69:22
71:10
**down** [5]    14:9
29:13    105:23    138:9
139:21
**Dr** [44]    34:2    34:12
35:5    35:11    36:13
38:11    38:11    62:2
69:22    70:22    71:10
81:1    81:4    82:22
97:18    99:6    101:18
101:21    102:9    104:1
104:5    104:14    104:21
104:23    107:17    110:15
110:23    112:23    128:13
129:12    130:13    130:17
130:18    130:21    130:23
130:24    132:22    134:4
134:5    134:10    134:24
136:10    136:11    138:22
**DR-0423mm** [2]
144:14    145:22
**dressed** [1]    123:19
**drops** [1]    140:13
**duly** [1] 143:7
**during** [7]    6:4
51:3    106:12    113:20
124:9    124:21    141:17
**duties** [24]    46:10
46:13    93:12    93:13
93:14    93:15    94:5
94:7    95:12    95:19
96:19    96:24    111:7
111:12    129:15    133:2
134:9    134:12    134:14
136:1    136:1    136:4
136:9    137:9
**duty** [1] 137:23

-E-

**E** [4]    2:1    2:1
2:7    3:1
**e-mail** [1]    23:18
**early** [1] 15:16
**easier** [1]    12:19
**education** [1]    112:7
**EDWARD** [1]    2:11

**either** [3]    51:6
59:11    107:23
**eligible** [3]    64:15
82:16    130:15
**elimination** [1] 64:6
**Elm** [1]  1:18
**emotional** [3]    108:2
108:7    108:9
**emphasize** [1]    100:9
**employed** [3]    85:24
91:21    112:13
**employee** [5]    53:8
93:14    94:5    143:13
143:14
**employees** [1] 137:12
**employer** [3]    44:17
112:10    112:11
**employment** [1]
46:10
**employs** [1]    86:2
**enclosed** [1]    40:10
**end** [2]  18:15    102:4
**ended** [1]    142:10
**England** [1]    24:15
**English** [1]    30:7
**entire** [3]    56:9
84:21    99:5
**entirety** [1]    6:22
**entitled** [1]    39:3
**epidural** [1]    106:19
106:19
**episode** [2]    113:24
114:11
**episodes** [1]    113:19
**equal** [1]    120:20
**equation** [1]    88:24
**Equitable** [1]    24:16
**ERRATA** [1]    145:1
**escorts** [1]    123:23
123:23
**ESQ** [3] 2:3    2:7
2:11
**essentially** [1]  108:21
**establishment** [1]
141:17
**et** [1]    81:13
**evaluation** [7]    67:8
67:13    67:20    67:23
100:19    101:6    118:12
**evidence** [2]    114:14
115:19
**exacerbated** [1] 34:21
**exacerbation** [2]
130:9    131:12
**exacerbations** [1]
113:19
**exact** [2]    29:1
114:3    114:8    119:21
**exactly** [9]    5:23
8:2    23:13    46:2
46:6    58:6    102:4
107:20    131:17

MAZZAMUTO V. UNUMPROVIDENT     CondenseIt!™    exam - history
M. MULRY, 4/23/2002

**exam** [4]                 60:4
60:15    106:4    109:16
**examination** [3]
3:4      4:5      143:9
**examined** [4]          140:2
140:5    140:8    143:8
**example** [1]            18:14
**exasperated** [1] 130:11
**exasperation** [1]
131:3
**except** [1]             16:15
**excuse** [1]            130:23
**executive** [1]         62:19
**exhibit** [4]             4:1
11:12    34:1     40:23
**EXHIBITS** [1] 3:9
**existed** [1]            15:7
**experiences** [1] 135:9
**expiration** [1]        76:12
**Expires** [1]          143:21
**explain** [2]           64:2
64:5
**explaining** [1]       100:5
**expresses** [1]       101:21
**extending** [1]       105:23
**extends** [1]           31:2
**extensive** [1]       118:24
**extent** [1]            60:22

――――― -F- ―――――

**fact** [3]   30:22    57:5
66:4
**factual** [3]           23:19
89:19    89:21
**fancy** [1]             21:19
**far** [14]     25:18    29:10
49:21    58:1    60:18
61:14    62:15   62:20
79:24    82:4    122:15
123:6    130:19  140:21
**fashion** [3]           11:18
17:20    54:8
**father** [1]            126:8
**fault** [1] 100:22
**Favoring** [1]          124:3
**faxed** [1]             27:8
**fear** [1]  63:11
**fearful** [1]           46:15
**February** [4]          89:17
92:11    117:8   121:11
**Federal** [1]           1:14
**feels** [2] 90:24       118:13
**feet** [3]  91:6   93:3
93:8
**felt** [2]  77:15       91:10
**female** [1]           141:20
**few** [1] 138:20
**field** [11]            111:20
116:20   120:19  120:23
121:17   123:6   123:23
138:21   139:3   139:5

**file** [41]   11:2      11:4
14:5     14:14    15:6
15:24    16:5     18:19
22:22    23:12    26:15
40:24    41:10    45:6
51:10    51:21    51:23
53:10    53:18    56:9
56:14    56:22    66:18
69:16    69:16    70:18
70:24    72:13    82:13
85:9     85:16    85:18
85:18    89:5     89:6
89:20    89:22    90:6
99:6     115:14   115:22
**files** [6]  23:9       51:7
51:7     52:3     52:6
58:10
**filing** [1]            27:19
**filings** [1]           63:9
**fill** [7]   30:3       30:9
39:17    40:14    76:6
76:16    76:19
**filled** [7]            20:18
20:24    21:1     21:23
43:6     43:20    119:18
**filling** [1]           119:22
119:24
**fills** [1] 39:16
**financial** [1]         120:7
**financially** [1] 143:15
**finding** [2]           54:23
84:15
**findings** [3]          37:14
42:23    79:9
**fine** [4]   4:18       12:20
34:14    81:7
**first** [44] 6:20       7:4
7:21     7:24     12:9
12:24    13:6     14:17
30:13    30:18    38:4
42:3     42:20    45:9
47:15    47:23    48:8
48:11    54:21    62:10
62:11    64:5     69:13
73:20    75:12    79:8
81:5     85:8     86:8
88:9     88:10    88:16
95:8     98:7     101:9
101:9    105:6    114:4
117:5    123:1    125:23
128:21   137:21   139:7
**first-class** [1] 120:14
**five** [6]   47:19      59:5
100:13   101:3   102:6
102:6
**flip** [1] 72:19
**floor** [1] 140:14
**Fogarty** [11]          85:6
85:7     85:12    85:15
85:17    85:21    88:3
89:9     89:12    98:9
138:21
**Fogarty's** [2]         85:10
87:21
**follow** [8]            6:18

**follow-up** [1]         51:12
**follow-ups** [1] 72:12
**followed** [1]          54:17
**following** [2]        106:11
145:2
**foregoing** [1]        143:23
144:1    145:3
**foremost** [1]         125:23
**foreseeable** [1] 35:4
**forgot** [1]           128:20
**form** [96]             6:22
7:8      7:16     7:18
8:1      9:18     13:17
15:9     15:11    16:15
16:17    19:15    19:21
20:16    21:3     21:8
21:12    22:8     22:17
22:18    22:19    23:8
23:21    27:4     28:4
38:22    38:24    39:7
39:16    39:16    39:20
39:21    40:2     40:3
40:11    42:2     42:7
42:11    42:16    43:15
43:15    43:17    45:21
45:22    45:23    46:7
46:18    47:12    47:23
48:19    49:6     49:18
50:7     51:12    51:12
53:22    54:1     54:4
55:15    56:14    64:13
65:4     65:11    68:14
69:6     70:6     71:2
71:22    71:23    74:6
74:21    75:4     75:8
76:3     76:16    76:20
79:8     80:18    84:4
93:15    100:9    100:16
101:2    102:19   118:7
122:12   122:14   128:15
129:6    132:20   134:7
134:20   135:20   137:5
137:14   138:14
**former** [1]            54:24
**forms** [40]            7:12
7:17     9:21     10:10
10:18    16:13    21:23
22:10    22:11    24:8
30:3     30:9     39:1
41:11    45:6     45:14
45:19    45:20    48:21
49:9     50:21    50:23
52:15    52:18    52:20
53:15    65:21    68:14
68:15    68:19    68:21
68:22    71:21    72:7
74:11    75:19    76:6
79:7     80:16    80:17
**forth** [1] 68:2
**forward** [1]           89:6
124:6
**forwarded** [2]        23:16
82:13
**forwarding** [1] 128:4
**found** [1]            58:12

**Foundation** [1] 5:7
**four** [5]  4:23        43:13
47:10    47:20    48:3
**frame** [3]             67:7
67:20    100:17
**fraud** [6]             57:10
58:1     59:11    60:9
60:14    60:24
**frequently** [2]       124:10
126:1
**front** [2] 2:4        111:3
**full** [4]  4:14        74:21
75:2     139:7
**fully** [2] 115:17     125:8
**future** [1]           34:19
35:4

――――― -G- ―――――

**G** [3]      1:15       2:3
143:3
**gained** [1]           34:20
**gaps** [1] 40:22
**gasping** [1]          124:11
**gather** [1]           67:16
**gathering** [1]        53:7
**General** [1]          24:19
**generally** [2]        99:24
136:19
**given** [9]             19:5
27:1     31:5     45:24
64:21    68:19    68:21
143:11   144:1
**giving** [2]           82:22
89:12    121:4
**glad** [2]  56:12      121:4
**Gloria** [1]           59:16
**goes** [31] 7:2        30:2
32:7     32:14    32:17
38:3     38:10    42:9
42:15    42:22    43:3
72:15    74:13    81:24
88:5     88:9     88:10
88:14    88:15    92:23
97:3     105:9    106:10
106:23   109:12   112:22
116:5    125:11   126:8
130:19   141:2
**gone** [7]  11:4        15:24
18:19    47:10    62:13
128:23   136:11
**good** [1] 102:5
**gosh** [1] 77:4
**gradually** [3]        31:1
81:17    81:18
**graduated** [1]        5:5
**great** [4] 24:19      34:18
46:19    99:18
**greet** [2] 137:2      137:10
**guess** [1]            29:12
**guests** [1]           137:10
**guidance** [1]        108:22
**guidelines** [1]       9:4

――――― -H- ―――――

**H3236167** [1]  23:6
**habit** [1] 17:13
**half** [3]  121:12     122:20
141:18
**Hancock** [1]          24:16
**hand** [2] 48:21       143:18
**handed** [1]           21:20
**handing** [2]          21:16
22:14
**handle** [1]           8:20
**handled** [1]          76:10
**handles** [2]          9:20
10:14
**handling** [10]        6:19
25:4     25:5     25:8
25:9     26:3     26:6
26:7     66:18    115:22
**handwriting** [2]
119:8    119:15
**happening** [2]       115:13
137:12
**Harrisburg** [1]       2:5
**head** [2] 9:15        140:19
**hear** [1] 40:17
**heart** [10]           27:19
32:11    32:21    34:17
37:9     125:24   126:4
126:9    126:20   126:23
**heavy** [7]            31:15
35:2     37:18    95:14
104:19   111:3   112:24
**height** [2]           123:18
136:17
**held** [1] 54:1
**help** [1] 116:20
**HENEFER** [64] 2:7
4:10     4:13     7:7
7:10     12:9     14:16
16:9     18:3     18:10
18:22    19:2     19:13
19:24    21:16    22:14
28:9     28:12    33:6
33:24    34:6     34:10
39:2     40:4     40:8
40:16    44:1     44:21
45:3     46:9     46:12
49:1     50:9     50:12
50:15    50:21    52:7
56:3     56:6     59:17
60:1     63:19    64:13
69:19    78:3     80:5
83:6     84:4     93:17
95:23    120:18   128:15
129:6    132:20   134:3
134:6    134:19   135:20
137:5    137:14   137:19
138:14   138:18   142:7
**high** [3]  136:22     137:13
142:1
**highlighting** [1]
21:19
**hired** [1] 5:14
**history** [10]          30:12

 
30:19    81:8    87:5
92:18    92:20    98:18
105:8    109:14    123:6
**hitting** [1]          106:11
**holding** [1]          46:21
**home** [3]                4:16
123:9    123:17
**hopefully** [2]        34:18
40:14
**hospital** [5]         69:23
70:21    71:10    106:12
126:24
**hour** [2] 124:24    141:18
**hours** [1]            106:7
**hunched** [1]          124:6
**hundred** [3]           61:7
121:21    132:12
**husband** [1]          68:7
**hypothetically** [2]
133:13    133:23

- I -

**ice** [1]              113:20
**idea** [2] 45:18    61:8
**identical** [1]         16:15
**ignore** [2]           111:9
111:11
**impairment** [8]       107:3
107:7    107:14    107:22
108:6    109:4    109:8
109:10
**importance** [2] 46:19
99:18
**important** [3]        53:21
77:15    109:3
**in-house** [2]         82:14
86:9
**inaccurate** [1]       87:11
**include** [2]          94:24
95:14
**includes** [1]         103:7
**income** [1]           19:7
**incorrect** [1]        95:22
**increase** [1]         106:18
**increased** [4]        104:16
106:11    110:11    110:20
**incredible** [1]       135:17
**indicate** [6]         29:22
118:21    130:21    130:24
133:1    135:2
**indicated** [9]        20:10
27:2    27:15    27:17
91:3    91:13    111:15
131:4    135:24
**indicates** [6]        110:10
110:16    118:22    121:8
123:13    132:24
**indication** [1]       114:10
**individual** [4]       19:10
76:11    99:3    123:9
**individual's** [1]
98:7    120:22

**individuals** [2] 8:3
97:21
**induced** [1]          107:24
**ineligible** [1]       128:6
**infarction** [1]       98:24
**information** [24]
6:21    16:22    34:7
41:14    55:19    67:16
69:23    69:24    74:17
75:14    85:13    85:20
86:14    87:2    87:18
89:5    89:20    89:22
94:12    107:6    107:13
107:21    113:11    128:4
**initial** [3]          15:11
16:15    101:7
**injections** [3]       31:18
106:14    106:19
**injuries** [1]         30:17
**injury** [4]           30:18
132:15    132:17    132:23
**instance** [2]         131:19
133:5
**instead** [1]          68:6
**instructed** [1]       8:19
**instruction** [1]      34:11
**insurance** [18]        1:7
1:8    8:5    24:2
27:7    28:2    28:16
28:19    29:15    32:3
33:11    38:24    43:10
72:23    73:17    120:9
121:16    138:11
**insured** [27]         6:23
7:2    7:15    7:23
48:12    53:20    65:16
90:17    95:13    97:4
110:16    111:15    112:9
118:14    118:14    118:18
118:19    120:1    121:24
125:3    125:14    129:13
135:7    135:24    139:11
139:23    141:13
**insured's** [6]        46:9
95:17    118:15    124:21
141:21    141:22
**insureds** [3]         48:20
52:16    112:16
**intake** [6]           9:19
10:2    10:5    10:14
13:24    14:2    15:15
45:23    47:23    65:20
65:21
**intake's** [1]         19:15
**intended** [1]         64:10
**intending** [1]        21:18
**interested** [1]       143:16
**interfere** [1]        50:16
**interfered** [2]       83:8
84:7
**intermediate** [1]
118:2
**internal** [1]         71:7
**interrupting** [1] 44:23
**intervening** [1] 40:24

**interview** [6]        6:24
103:7    103:8    124:9
124:24    127:23
**Interview's** [1] 124:18
**interviewers** [1]
103:3
**interviewing** [2]
123:8    123:12
**investigating** [1]
57:14
**involve** [2]          61:12
112:24
**involved** [8]         6:11
10:11    10:15    6:18
25:15    54:23    60:19
60:21
**involvement** [1]
121:15
**involving** [1]        107:8
**irrelevant** [1]       132:19
**irritability** [2]     31:7
31:12
**issue** [1] 72:22
**issued** [1]           68:16
**itself** [1] 82:8

- J -

**J** [1]                13:1
**Jack** [4] 92:7    92:10
93:7    94:12
**Jack's** [1]           92:8
**January** [6]          26:22
27:9    27:12    28:5
29:17    36:2    46:24
47:10    47:16    48:2
48:17    51:13    52:24
53:4    54:18    54:19
55:4    56:14    56:18
62:1    62:15    63:7
63:15    63:20    66:4
71:8    71:11    72:4
75:24    77:1    77:5
77:6    77:10    77:15
77:20    77:21    78:8
78:15    78:23    79:20
79:22    80:3    80:4
80:16    80:21    80:23
82:12    82:21    83:2
85:1    85:5    88:13
88:16    89:16    91:10
93:4    102:19    104:24
106:14    106:16    106:20
115:5    115:12    120:23
121:8    123:4
**Jarvis** [1]           14:23
**Jill** [14] 88:18    92:10
92:11    92:14    93:7
93:12    94:12    95:24
97:16    97:24    98:2
98:17    98:22    116:13
**Jill's** [1] 116:15
**job** [21] 83:9    83:15
84:8    84:12    89:3
89:6    89:23    91:23
93:20    102:20    104:4
112:23    113:8    129:21

129:23    129:24    134:15
135:11    135:15    135:18
135:23
**John** [1] 24:16
**judge** [1]            72:21
**July** [1] 13:6    13:14
13:18    14:1    14:3
14:12    15:3    15:7
42:24    65:1    66:7
66:8    68:7    71:16
106:13    123:1
**June** [1] 143:21
**jury** [1] 12:21

- K -

**keep** [5] 12:3    17:11
24:7    50:4    78:5
**kept** [2] 55:7    68:22
**killed** [1]           126:9
**Kimberly** [1]         16:21
**kind** [6] 22:22    45:13
58:13    62:16    62:21
128:17
**kitchen** [1]          124:18
**knees** [1]            105:24
**knew** [5]             22:7
56:13    61:14    62:15
122:16
**knowing** [2]          30:7
56:17    138:4    138:12
**knowledge** [2]        16:6
29:6
**known** [3]            15:6
35:11    75:13

- L -

**L** [1]                61:10
**L2** [1]               31:2
**L3-L4** [1]            31:2
**L5** [1]               31:2
**label** [1] 19:14
**labeling** [1]         44:2
**language** [1]         30:7
**large** [1] 58:15
**last** [5]    34:11    38:7
44:21    100:8    135:1
**lateral** [1]          105:24
**law** [2]    8:5    52:5
**laws** [1] 52:9
**lawyer** [1]           127:22
135:18
**layman-like** [1]84:2
**lead** [1] 106:3
**least** [19]           15:16
48:8    48:9    50:24
51:10    54:7    60:21
65:1    74:10    77:18
80:16    84:22    85:14
93:9    114:6    127:15
128:13    129:3    131:5
**LEE** [1] 2:8
**left** [1] 125:5

**leg** [4]    106:3    124:3
139:22    140:11
**legalities** [1]       25:20
**length** [1]           124:11
**less** [1] 121:18
**letter** [45]          9:9
13:5    19:5    19:16
19:18    20:11    21:17
21:20    22:7    22:9
22:12    26:14    27:2
28:6    29:16    29:22
34:3    34:15    35:6
35:10    36:10    36:19
36:23    39:10    40:1
40:5    40:6    49:23
50:13    50:17    51:6
63:15    63:20    63:22
65:1    66:4    70:10
80:24    81:3    82:24
99:20    100:2    101:7
101:9    108:20
**letters** [4]          18:14
18:17    71:9    74:6
**letting** [1]          66:20
66:24    67:14
**liability** [2]        60:10
74:18
**life** [42]    1:7    1:7
23:14    23:15    24:2
24:11    24:13    24:20
24:20    25:10    25:11
25:14    25:18    25:24
26:3    26:7    26:7
27:7    27:12    27:24
28:2    28:16    28:19
28:20    29:15    32:3
35:9    38:24    39:3
39:11    39:22    40:2
40:5    41:8    46:15
47:5    57:6    57:9
57:16    61:21    62:24
127:16
**lifting** [7]          31:15
35:2    37:18    95:14
104:20    111:4    112:24
**ligaments** [2]        133:15
133:17
**light** [1] 107:8
**likewise** [1]         43:19
**limitation** [1]       34:18
**limitations** [8]      37:24
83:12    116:6    116:22
129:12    129:14    129:17
134:10
**limited** [1]          101:22
**limiting** [1]         133:3
**limp** [2] 139:9    139:14
**limping** [1]          123:24
**line** [4]    9:6    23:24
24:9    145:5
**lines** [6] 8:11    8:13
8:15    8:18    24:24
29:3
**literary** [1]         127:14
**local** [2] 31:17    31:18
**locate** [1]           12:11

MAZZAMUTO V. UNUMPROVIDENT     Condenselt!™      located - November
M. MULRY, 4/23/2002

**located** [1]          105:22
**location** [1]         23:17
**log** [4]   115:3      115:11
112:12  116:4
**logical** [1]          128:9
**longer** [3]           67:16
74:1   121:22
**look** [14] 14:4       14:13
16:4   17:24   21:10
36:1   46:2    46:6
69:15  89:15   90:12
119:5  122:11  129:19
**looked** [4]           85:9
119:1  119:2   138:5
**looking** [8]          15:10
17:15  17:21   26:10
87:11  87:12   87:20
98:4
**looks** [3]            58:9
80:3   118:7
**loses** [1] 126:16
**loss** [3] 76:8        76:13
100:19
**lost** [1] 22:22
**low** [13] 30:12       30:19
37:3   37:11   55:24
78:21  78:24   81:8
84:17  92:19   92:21
98:21  103:16
**lower** [7]            31:6
31:10  105:7   105:9
105:23 109:14  113:14
**lumbar** [1]           61:10
**lunch** [1]            141:17

**-M-**

**Madison** [1]          28:16
**mail** [3] 8:20        8:22
36:11
**majority** [3]         91:3
95:13  125:4
**male** [2] 92:15       92:18
**males** [1]            141:21
**malingerer** [1]       139:14
**man** [16] 43:1        68:24
71:15  72:16   79:13
98:20  106:17  111:23
123:15 123:18  124:14
138:9  139:13  140:5
141:6  141:7
**management** [1]
114:20
**manager** [3]          88:22
98:2   117:21
**managerial** [1]       111:6
**manifested** [1]       33:3
**March** [9]            13:5
99:21  100:18  102:10
116:11 116:17  117:7
118:6  121:11
**Maria** [1]            5:9
**mark** [2] 42:20       122:5
**marked** [1]           11:11

**Massachusetts** [10]
1:16   1:18    2:13
4:20   5:10    8:8
28:23  143:1   143:4
143:19
**material** [2]         6:4
86:16
**maximum** [1]          31:2
**may** [16] 14:14       19:22
22:12  67:8    67:13
67:16  67:21   86:23
100:20 101:5   102:5
121:22 126:19  129:10
135:7  136:7
**Mazzamuto** [44]
1:4    13:15   19:7
20:11  22:3    23:6
25:15  26:19   27:2
27:14  29:23   30:11
30:19  32:4    44:15
45:5   53:7    61:15
62:16  65:22   65:22
68:5   68:6    73:19
83:7   90:20   90:24
91:3   91:12   92:4
100:22 102:20  103:4
105:8  109:13  110:16
110:20 116:7   116:21
130:10 134:11  136:13
136:15 136:16
**Mazzamuto's** [4]
23:12  32:8    87:5
89:23
**McCarthy** [1] 59:16
**mean** [26]            5:13
7:7    13:19   31:8
41:20  41:21   47:21
51:6   52:19   53:24
65:14  65:16   72:7
72:10  72:19   79:17
91:9   91:20   93:19
94:2   96:1    96:5
98:10  109:7   114:14
118:17
**meaning** [1]          132:15
**meaningful** [3]       73:7
73:10  73:13
**means** [6]            31:11
79:15  109:19  113:16
118:14 131:16
**meant** [3]            67:15
81:18  81:22
**medical** [25]         30:4
38:18  38:21   39:3
41:17  41:24   42:23
56:18  56:24   57:2
68:2   69:8    69:12
69:14  69:22   70:5
70:6   70:7    70:11
70:12  70:14   70:16
70:17  71:4    71:7
71:19  72:4    74:13
82:14  82:20   86:21
87:5   89:3    89:7
92:23  95:11   99:10
101:14 101:17  102:14
110:8  116:9   116:11
116:13 116:17  117:12
118:12 125:11  128:4

128:12 129:8   130:13
**medications** [2]
31:21  105:15
**meet** [1] 121:24
**Melissa** [6]          1:12
3:2    4:3     4:15
144:8  145:21
**memo** [1]             59:23
118:7  120:18
**Memoranda** [1] 59:6
**memorandum** [1]
59:13
**mention** [9]          64:24
89:23  90:5    93:3
97:11  99:3    100:12
141:24 141:24
**mentioned** [4]        25:2
37:6   37:8    122:2
**mentioning** [2] 93:8
97:10
**mentions** [2]         94:13
125:17
**menu** [1]             141:15
**merger** [1]           23:22
**message** [1]          89:16
**met** [1] 141:13
**meticulously** [1]
18:19
**Michelle** [1]         23:2
**mid** [1]   13:8
**MIDDLE** [1]           1:1
**might** [4]            12:10
89:9   116:20  126:12
**mind** [1] 15:14
**mine** [1] 35:23
**minutes** [13]         102:6
113:4  125:1   134:18
134:23 135:1   135:5
135:8  135:14  138:20
138:21 138:22  140:23
**missing** [7]          18:12
23:9   23:12   40:14
40:17  40:21   40:21
**mix-up** [1]           45:13
**mixed** [1]            19:20
**moment** [1]           138:7
**money** [3]            73:3
137:1  137:11  137:22
**month** [7]            72:5
72:15  73:6    73:9
74:12  76:15   76:19
**monthly** [1]          76:22
77:19
**months** [20]          5:19
6:1    43:13   47:10
47:19  47:20   47:22
48:3   48:18   48:24
51:22  67:17   73:12
73:24  74:1    82:18
100:13 101:3   121:12
122:21
**most** [19]            5:24
83:16  89:24   93:3
93:8   93:21   94:14

102:21 104:4   106:13
111:10 111:23  113:8
134:15 135:12  135:16
136:6  136:7   136:16
**mostly** [1]           111:6
**move** [2]             52:3
52:5
**MPA** [1]              24:17
24:17  24:18
**MRI** [4] 30:24        81:14
105:20 109:15
**MRIs** [1]             81:13
**Mrs** [2] 65:22        68:6
**Mulry** [6]            1:12
3:2    4:3     4:15
144:8  145:21
**multiple** [1]         82:22
**muscles** [4]          109:22
109:24 133:14  133:17
**must** [3] 64:21       115:16
119:2
**Mutual** [1]           24:17
**myocardial** [1] 98:23

**-N-**

**N** [2]     2:1        3:1
**name** [9]             4:14
4:24   13:1    23:2
25:16  34:5    87:21
88:18  114:22
**nature** [2]           82:4
97:6
**necessary** [1]        7:12
**need** [10]            9:13
9:17   27:17   54:4
73:3   74:11   75:7
87:23  106:19  110:7
**needed** [5]           67:17
69:23  70:1    74:17
75:13
**needs** [1]            140:14
**neither** [1]          94:13
**nerve** [1]            133:7
133:12
**nerves** [3]           109:21
110:2  133:18
**nervous** [1]          126:16
**neurologic** [1]       106:4
**new** [59] 1:7         6:17
6:19   15:11   23:14
23:14  23:16   24:2
24:15  24:20   24:20
25:9   25:11   25:14
25:18  25:23   26:3
26:6   26:7    27:6
27:11  27:23   28:15
28:17  28:17   28:20
29:15  32:3    35:5
35:9   36:9    38:24
39:3   39:7    39:10
39:22  40:2    40:5
41:3   41:7    41:11
42:2   42:16   45:9
45:10  45:19   45:20
45:7   57:6    57:9

57:16  61:21   62:24
76:4   80:17   88:18
127:16 127:24  129:1
**next** [26] 17:5       17:14
19:18  20:9    22:21
24:4   26:10   35:14
36:5   38:17   43:15
44:12  46:18   46:20
55:20  76:22   77:10
86:11  87:20   88:2
90:12  97:12   99:8
99:20  114:17  118:6
**nods** [1] 9:11
**non** [1] 78:24
**none** [1] 142:2
**nonpayment** [1]
57:14
**nonsteroidal** [1]
31:19
**nor** [1]   143:15
**normal** [16]          15:8
15:19  17:3    17:4
36:11  51:16   51:17
51:18  51:20   51:24
52:1   53:6    53:7
97:20  116:1   116:3
**normally** [3]         20:15
20:19  115:22
**North** [2]            2:4
2:8
**Northwest** [1]        24:19
**notary** [1]           1:15
143:3  143:22
**note** [9] 34:12       35:9
59:20  68:7    69:8
69:21  91:11   134:6
134:19
**noted** [1]            113:14
**nothing** [1]          51:9
**notice** [33]          7:24
9:17   13:7    13:14
13:18  15:2    15:4
64:20  64:24   65:5
65:10  65:10   65:13
65:18  65:19   66:9
66:11  66:12   66:15
66:16  66:22   67:1
67:7   67:19   67:22
67:23  68:4    68:11
68:11  68:13   69:1
123:1  143:5
**notices** [1]          125:3
**noticing** [1]         18:10
**notification** [1] 65:8
**November** [40]        21:17
21:21  26:11   26:23
27:6   27:22   29:16
33:21  34:3    35:6
35:10  36:6    36:10
36:20  36:23   43:20
44:10  44:13   46:4
47:9   48:17   49:10
49:10  50:17   50:20
51:11  70:10   75:20
75:23  78:11   78:19
79:20  80:1    80:1
80:8   80:18   80:24


81:3    82:24    103:12
**now** [29] 15:24    20:15
33:21    47:15    52:24
54:21    60:18    64:19
69:7    74:9    74:20
75:16    80:15    80:23
82:3    82:22    88:18
89:21    91:2    91:5
92:10    93:7    97:16
98:14    101:14    123:5
127:3    127:8    127:10
**number** [18]    12:1
12:2    12:10    21:17
22:15    22:22    40:9
40:23    42:17    42:17
44:3    44:22    45:2
50:17    63:16    83:5
118:11    122:17
**numbered** [2]    40:20
40:21
**numbers** [8]    41:19
41:20    41:22    45:3
61:10    61:10    63:20
122:17
**numbness** [2]    106:3
140:10
**numerous** [3]    10:23
81:10
**nurse** [1]    98:3
**nurses** [1]    99:10
**nursing** [1]    98:5

-O-

**oath** [1] 143:8
**object** [1]    69:7
**objection** [19]    28:9
34:12    49:1    52:7
64:13    69:19    72:21
84:4    95:23    128:15
129:6    132:20    134:3
134:6    134:19    135:20
137:5    137:14    138:14
**objections** [1]    4:8
**objective** [3] 37:14
42:23    79:9
**observe** [2]    136:12
137:12
**observing** [1] 123:24
**obtain** [2]    68:4
75:9
**obviously** [4]    11:1
35:8    39:6    41:10
**OCC** [1] 118:13
**occasion** [1]    12:16
**occasionally** [1]
12:2
**occupation** [12] 94:8
95:14    111:2    111:13
118:15    129:15    133:3
134:9    134:12    136:1
137:9    137:23
**occupational** [16]
46:10    74:21    75:4
75:14    83:1    83:5
85:13    85:20    86:3

93:12    93:15    95:11
95:19    96:19    98:9
116:7
**occurring** [1]    64:12
**occurs** [1]    100:19
**October** [14]    17:15
19:19    20:11    21:6
47:9    48:14    48:16
50:3    64:12    64:17
64:18    72:12    106:14
106:19
**off** [31]    6:7    6:8
6:15    6:16    9:14
12:11    18:23    18:24
19:2    19:3    20:6
41:6    42:14    46:19
56:3    56:5    63:17
63:18    80:5    80:7
87:24    88:1    92:16
92:17    93:17    102:13
121:20    122:5    138:18
138:19    141:12
**office** [13]    25:4
26:20    27:1    27:16
28:3    28:4    28:10
40:19    79:24    93:13
94:5    106:8    106:9
**official** [1]    143:18
**often** [2] 76:5    76:9
**OGC** [1] 59:20
**older** [1] 141:20
**on-the-job** [3]    5:21
5:24    6:2
**once** [3] 10:17    15:20
89:4
**one** [34] 12:24    16:16
19:23    23:5    29:2
35:20    39:3    44:7
45:9    45:22    46:1
46:3    46:5    46:21
49:12    49:15    54:21
75:7    75:12    75:15
80:19    88:5    88:9
88:10    94:13    103:2
118:20    119:13    119:17
124:24    126:12    128:19
128:24    141:20
**one's** [2]    23:4
44:9    47:15
**ones** [2] 49:16    103:6
**opening** [1]    17:18
**operations** [1] 55:6
**opinion** [6]    42:18
42:23    89:12    89:18
101:21    102:3
**opportunity** [1] 85:17
**opposing** [1]    21:16
**oral** [5]    7:22    64:24
67:23    68:12    69:3
**order** [11]    12:4
12:5    20:3    35:18
35:22    36:2    58:8
78:6    86:24    88:12
115:13
**orders** [1]    91:4
**origin** [3]    109:18

132:6    133:1
**original** [1]    61:3
**otherwise** [2]    87:22
143:16
**outcome** [1]    143:16
**outset** [1]    64:1
**overnighted** [2] 77:11
77:14
**own** [4]    39:23    63:8
76:10    84:2
**owner** [1]    102:14

-P-

**P** [2]    2:1    2:1
**P-1** [1]    3:11
**P.C** [1]    2:4
**P.O** [6]    2:9    28:22
29:1    29:7    29:8
29:11
**packet** [7]    2:1
11:12    11:15    11:18
58:18    58:19    86:16
**page** [18]    3:3
3:10    12:9    14:6
14:7    34:2    34:15
36:7    42:16    55:20
81:5    81:6    93:20
101:9    101:9    139:2
139:6    145:5
**pages** [6]    40:17
40:20    40:21    56:8
59:5    83:6
**paid** [15] 60:16    61:21
64:16    72:24    96:5
96:7    120:5    120:6
120:9    127:15    127:16
127:24    129:1    129:2
138:11
**pain** [40] 30:12    30:20
31:17    31:20    55:24
78:21    78:24    79:6
79:19    79:20    81:8
83:22    84:1    84:17
90:2    92:19    92:21
93:23    94:1    97:9
98:21    102:23    103:16
105:8    105:9    105:22
106:10    106:18    109:13
109:14    110:11    110:20
113:15    113:23    114:12
126:4    135:9    135:13
139:21    139:24
**painful** [1]    46:15
**pains** [1]    97:5
**paper** [1]    12:24
**papers** [6]    11:12
11:18    11:22    11:24
128:23    128:23
**paragraph** [11] 13:8
13:9    32:15    69:17
95:8    95:10    100:8
105:11    107:6    135:1
139:7
**paragraphs** [1] 105:6
**part** [10] 13:8    54:22

55:1    86:18    94:3
94:21    108:10    114:4
128:21    141:11
**partially** [1]    115:17
**participated** [1] 108:13
**particular** [19]    4:22
5:17    10:24    13:5
14:7    14:21    20:1
20:20    22:16    27:22
38:4    43:22    44:4
44:6    58:8    58:11
72:22    85:2    122:24
**parties** [1]    143:14
**parts** [1] 121:6
**past** [4]    30:24    81:15
113:22    131:5
**pathology** [1]    31:11
**patient** [3]    32:18
42:18    42:24
**Paul** [19] 1:7    24:14
26:2    26:4    26:6
27:11    27:23    28:2
28:19    29:3    29:7
29:8    29:14    32:3
35:6    35:9    35:13
36:9    47:5
**Paxton** [1]    5:9
**pay** [8]    57:10    82:11
85:3    112:17    128:1
128:14    128:14    129:4
**payable** [1]    76:11
**paycheck** [4]    73:6
73:9    73:12    74:1
**payments** [1]    64:11
82:9
**PE** [3]    60:3    60:7
60:15
**Pennsylvania** [5]
1:1    2:5    2:9
8:6    8:19
**people** [8]    72:23
73:16    86:9    97:19
120:4    136:22    137:2
142:1
**percent** [3]    61:7
121:21    132:12
**perform** [6]    46:13
94:7    111:12    134:12
136:8    137:9
**performance** [2]
83:9    84:8
**performed** [2]    111:8
136:2
**performing** [3] 129:15
133:2    134:13
**perhaps** [2]    133:4
134:12
**period** [14]    9:12
9:16    34:24    50:24
51:4    51:11    52:13
60:11    64:6    73:21
84:21    96:6    122:8
127:16
**periodic** [1]    31:5
**periods** [4]    23:4

84:10    113:4    113:5
**person** [4]    108:13
108:23    118:7    120:8
**personally** [2]    54:13
54:14
**pertinent** [1]    89:4
**Peter** [2] 13:1    99:20
**Phelps** [1]    59:17
59:18
**Phillips** [1]    59:16
**phone** [12]    27:15
48:7    48:8    48:10
52:23    66:14    68:3
74:8    91:14    118:12
119:3    120:18
**physical** [14]    30:23
31:16    60:4    60:15
81:13    81:14    107:8
108:1    108:4    108:5
109:4    109:5    109:6
109:16
**physically** [1] 107:16
**physician** [7]    82:23
107:11    110:12    110:17
110:21    134:21    135:10
**physician's** [7] 38:20
58:24    70:11    78:7
78:14    78:17    103:12
**physicians** [1] 125:15
**pick** [1] 140:14
**picture** [1]    85:6
**pillows** [1]    140:18
**pizza** [3]    111:18
136:12    141:15
**PLA** [1] 24:9
**place** [1]    138:5
**placed** [3]    116:6
129:12    134:11
**plaintiff** [4]    1:4
1:13    2:2    11:12
**Plaintiff's** [2]    4:1
34:1
**plan** [11] 53:1    53:9
54:5    54:23    54:23
55:1    54:12    115:2
115:5    115:9    115:11
**play** [1] 108:10
**PLC** [1] 24:12
**Pleasant** [1]    125:7
**point** [11]    27:21
28:15    40:15    46:20
50:19    57:15    71:12
71:15    97:20    117:11
130:17
**pointing** [1]    14:16
**policies** [1]    76:11
120:5
**policy** [12]    19:10
48:22    49:4    57:16
64:20    66:21    67:4
68:17    76:4    76:7
96:10    100:18
**pose** [1] 34:18
**position**    85:10

MAZZAMUTO V. UNUMPROVIDENT  CondenseIt!™ 

positions - return
M. MULRY, 4/23/2002

85:11    117:13
positions [1]    140:24
positive [4]    25:20
    61:7    121:21    132:12
possession [2]    61:24
    116:15
potential [1]    4:7
potentially [3]    66:5
    66:6    123:1
practice [7]    39:15
    51:16    51:17    51:19
    51:20    51:24    52:1
practices [1]    8:5
preceded [1]    26:15
preclude [1]    107:7
premarked [1]    4:1
premium [1]    120:2
premiums [1]    112:17
prepare [2]    54:4
    91:4
prepared [1]    28:7
prescription [1]
    31:18
prescriptions [1]
    125:17
present [6]    8:10
    19:9    34:22    43:1
    84:23    107:22
presented [1]    102:15
pressure [1]    139:18
pretty [1]    141:14
prevent [2]    129:14
    133:2
prevented [3]    90:22
    91:1    130:4
previously [2]    40:5
    75:3
primary [1]    41:18
printed [1]    89:16
privilege [1]    21:18
problem [8]    32:4
    34:22    61:15    82:5
    82:7    83:23    93:24
    102:24
problem's [1]    90:3
problems [8]    30:4
    31:5    33:3    82:1
    82:12    96:2    105:1
    132:3
procedure [10]    1:14
    6:18    15:8    15:19
    17:3    17:4    48:22
    52:14    116:2    116:3
procedures [2]    6:11
    52:10
proceed [2]    7:13
    11:17
process [2]    56:12
    101:8
production [1]    40:18
progress [4]    75:16
    76:23    77:19    102:19
progressive [1]    34:21

prolonged [17]    31:15
    34:24    37:17    95:15
    103:19    103:21    104:6
    104:19    106:2    110:11
    110:13    110:20    111:3
    113:3    113:19    134:17
    135:4
proof [2]    76:8
    76:12
protocols [2]    6:11
    52:11
provided [6]    6:4
    13:7    28:12    28:14
    68:15    94:12
Provident [4]    1:6
    24:11    24:13    24:16
provider's [6]    38:15
    38:21    39:4    41:18
    70:7    70:12
providing [1]    98:17
provision [1]    60:9
provoked [1]    33:2
public [3]    1:15
    143:3    143:22
purpose [3]    23:18
    72:24    76:2
pursuant [2]    1:13
    143:5
pursue [1]    58:5
put [10]    17:6    18:20
    36:3    42:19    58:13
    85:15    91:11    104:3
    126:23    139:18
putting [1]    139:14

-Q-

QMI [1]    78:24
questioning [2]    27:22
    56:12
questionnaire [1]
    119:20
questions [11]    4:9
    11:22    89:9    101:18
    106:22    119:17    119:21
    125:8    128:17    142:6
    142:8
quite [4] 34:7    53:7
    124:10    126:1
quote [4]    102:20
    103:3    103:8    113:7
quotes [1]    103:11

-R-

R [1]    2:1
radiating [1]    31:11
radiculopathy [2]
    31:7    109:16
rather [4]    40:18
    67:11    69:2    69:3
re-injured [1]    127:1
read [9]    59:12    90:11
    107:18    107:19    107:20
    114:24    118:11    121:6

144:1
Reading [1]    2:9
readmission [1]
    32:14
realize [3]    58:4
    72:22    138:3
really [2]    10:11
    117:10
rear [1]    59:7
reason [5]    13:5
    54:22    70:15    128:10
    145:5
reasons [1]    125:20
receipt [1]    52:15
receive [15]    7:22
    10:9    22:1    22:10
    28:4    45:23    52:20
    55:18    69:6    72:1
    80:15    80:19    82:8
    100:9    101:1
received [31]    21:3
    22:18    29:15    29:16
    29:18    29:20    30:8
    35:13    36:10    39:7
    44:5    44:7    47:12
    49:14    50:22    50:24
    54:7    54:10    54:12
    54:15    56:7    62:10
    65:7    65:12    69:11
    70:3    75:19    80:20
    86:18    100:16    101:4
receiving [2]    45:14
    64:10
recent [5]    33:2
    90:13    106:13    131:3
    131:12
Recess [1]    102:7
recognize [2]    102:18
    103:3
recommending [1]
    60:10
record [39]    6:7
    6:8    6:9    6:15
    6:16    6:17    18:23
    18:24    19:2    19:3
    19:4    33:24    34:13
    39:2    41:6    42:14
    42:15    56:3    56:5
    56:6    56:7    57:14
    63:17    63:18    63:19
    80:5    80:7    87:24
    88:1    92:16    92:17
    102:8    115:1    119:7
    128:22    130:17    138:18
    138:19    143:10
record's [2]    19:13
    44:22
recorded [5]    14:23
    48:8    65:17    91:9
    91:12
records [44]    55:6
    55:7    56:18    56:24
    57:2    57:11    57:20
    68:2    69:9    69:13
    69:14    69:22    70:5
    70:7    70:13    70:14
    70:16    70:17    70:22

71:4    71:7    72:4
74:14    82:20    84:22
86:21    87:4    87:8
89:3    92:23    95:11
96:23    99:11    102:15
116:9    116:11    116:13
116:17    117:2    117:4
117:12    123:3    128:12
129:8
recovery [1]    32:21
reduced [1]    143:9
refer [2] 12:2    103:6
reference [2]    23:6
    61:10
referenced [1]    13:6
referral [5]    59:6
    59:13    59:20    114:20
    121:19
referred [4]    40:4
    50:13    50:16    99:6
referring [1]    69:1
    78:13    97:18    115:10
    139:3
reflect [2]    34:1
    39:2
regard [3]    6:9
    35:12    37:9
regarding [1]    27:18
regards [1]    132:6
register [2]    136:24
    142:2
rehabilitation [1]
    85:22
related [3]    104:18
    107:14    107:22
relation [1]    85:11
    117:13
relative [1]    143:12
    143:14
released [1]    5:20
remember [10]    37:2
    58:4    62:6    73:21
    119:11    119:16    119:20
    119:21    120:13    120:16
reminding [1]    17:12
rep [1]    39:15
rephrase [2]    128:18
    132:16
Reply [1]    59:23
report [29]    7:3
    7:5    7:8    7:9
    7:10    7:22    33:13
    75:17    76:23    77:20
    78:7    93:4    93:10
    94:3    101:21    102:2
    102:10    103:12    117:21
    120:19    120:23    121:6
    121:8    123:6    134:4
    134:5    138:21    139:4
    139:5
reported [1]    106:4
reportedly [1]    106:11
reports [4]    7:2
    82:23    106:7    121:17

representative [10]
    5:15    5:16    6:10
    24:23    89:11    111:21
    112:2    123:24    127:6
    139:15
reproduction [1]
    143:23
request [9]    1:13
    55:4    55:10    71:8
    74:13    86:13    86:19
    97:16    122:15
requested [5]    69:8
    69:12    69:13    69:21
    71:3
requesting [1]    97:16
requests [1]    71:4
require [1]    52:12
required [9]    34:23
    67:3    100:17    111:3
    113:2    135:3    135:16
    135:19    135:23
requirements [1]
    83:12
requires [11]    52:5
    64:20    76:7    83:15
    89:24    93:20    102:20
    104:4    113:8    134:11
    135:11
rescind [1]    60:9
research [1]    86:12
reserve [1]    142:7
resource [2]    86:7
    117:18
respect [6]    13:14
    105:6    105:7    106:23
    109:12    143:24
respond [2]    9:7
    9:10
responding [1]    9:1
response [8]    19:16
    26:16    59:4    59:15
    59:19    99:7    99:16
    106:22
responsibility [1]
    21:1
restaurant [13]    34:23
    102:14    111:17    111:21
    118:21    120:14    121:24
    136:12    136:14    141:6
    141:12    141:15    141:16
restaurants [1]    111:19
restricted [2]    35:2
    107:11    110:12    134:16
restriction [2]    103:23
    104:7
restrictions [10]
    37:17    43:3    103:21
    104:19    116:6    116:21
    129:11    129:13    134:10
    134:10
result [2]    66:17
    82:15
return [12]    32:19
    35:3    82:10    104:10
    104:18    104:24    114:6

MAZZAMUTO V. UNUMPROVIDENT    CondenseIt!™        returning - soone
M. MULRY, 4/23/2002

| 114:7 | 116:8 | 128:2 |
| 130:2 | 131:5 | |
| **returning** [1] | | 130:5 |
| **reveal** [1] | | 30:24 |
| **revealed** [1] | | 61:3 |
| **Revere** [19] | | 1:7 |
| 24:14 | 26:2 | 26:4 |
| 26:6 | 27:11 | 27:23 |
| 28:2 | 28:19 | 29:3 |
| 29:7 | 29:8 | 29:14 |
| 32:3 | 35:6 | 35:10 |
| 35:13 | 36:10 | 47:5 |
| **review** [34] | | 6:20 |
| 6:21 | 7:12 | 63:1 |
| 82:14 | 82:15 | 85:18 |
| 86:9 | 87:7 | 89:3 |
| 89:7 | 89:14 | 90:6 |
| 90:7 | 94:16 | 95:11 |
| 97:15 | 97:16 | 97:21 |
| 98:1 | 98:14 | 99:9 |
| 99:10 | 99:15 | 101:14 |
| 101:17 | 102:15 | 116:14 |
| 119:10 | 120:17 | 129:11 |
| 130:12 | 130:13 | 130:22 |
| **reviewed** [8] | | 11:1 |
| 21:14 | 53:19 | 75:15 |
| 85:12 | 90:19 | 90:21 |
| 99:15 | | |
| **reviewing** [1] | | 90:13 |
| **rhythm** [1] | | 107:24 |
| **Richard** [5] | | 2:3 |
| 12:10 | 18:11 | 21:19 |
| 40:18 | | |
| **ride** [3] | 106:12 | 113:21 |
| 130:11 | | |
| **right** [268] | | 5:4 |
| 10:17 | 10:19 | 11:9 |
| 11:24 | 14:6 | 15:12 |
| 15:17 | 15:18 | 15:22 |
| 16:22 | 17:3 | 17:11 |
| 17:14 | 20:6 | 20:7 |
| 20:13 | 20:14 | 20:18 |
| 24:21 | 29:4 | 29:24 |
| 30:9 | 31:24 | 32:5 |
| 32:9 | 32:12 | 32:15 |
| 35:12 | 36:13 | 36:17 |
| 36:20 | 36:24 | 37:6 |
| 37:12 | 37:15 | 38:5 |
| 38:8 | 38:12 | 38:15 |
| 39:7 | 41:12 | 41:15 |
| 41:24 | 42:4 | 42:7 |
| 42:12 | 43:4 | 43:8 |
| 43:13 | 43:17 | 43:20 |
| 44:10 | 44:14 | 44:18 |
| 45:7 | 45:11 | 46:11 |
| 47:7 | 47:11 | 47:16 |
| 47:20 | 51:1 | 51:13 |
| 52:3 | 53:1 | 53:4 |
| 53:11 | 53:22 | 54:2 |
| 54:19 | 54:20 | 54:24 |
| 55:9 | 55:16 | 55:21 |
| 56:1 | 56:15 | 56:16 |
| 56:19 | 57:1 | 57:17 |
| 60:7 | 60:16 | 60:24 |
| 61:4 | 61:16 | 61:19 |
| 61:22 | 62:2 | 62:5 |
| 62:8 | 62:17 | 62:22 |
| 63:3 | 63:12 | 63:23 |
| 64:3 | 64:7 | 65:2 |

| 65:3 | 65:6 | 70:1 |
| 72:8 | 72:17 | 73:4 |
| 73:17 | 74:14 | 74:18 |
| 74:22 | 75:3 | 75:5 |
| 75:17 | 75:20 | 76:16 |
| 76:23 | 77:2 | 77:3 |
| 77:16 | 77:20 | 78:5 |
| 78:8 | 78:17 | 78:21 |
| 79:1 | 79:4 | 79:22 |
| 80:2 | 80:9 | 80:10 |
| 80:13 | 80:18 | 81:1 |
| 81:8 | 81:11 | 81:14 |
| 81:21 | 82:1 | 82:5 |
| 82:9 | 82:18 | 83:2 |
| 83:9 | 84:10 | 84:13 |
| 84:23 | 85:3 | 85:16 |
| 85:19 | 86:6 | 86:14 |
| 86:19 | 87:6 | 87:15 |
| 87:18 | 89:13 | 90:18 |
| 90:23 | 91:7 | 91:11 |
| 91:21 | 91:24 | 92:12 |
| 92:21 | 92:24 | 93:5 |
| 93:10 | 93:19 | 94:22 |
| 95:4 | 96:8 | 96:12 |
| 97:10 | 98:21 | 99:4 |
| 99:21 | 100:3 | 100:6 |
| 100:10 | 100:14 | 101:15 |
| 102:12 | 102:16 | 103:4 |
| 103:9 | 103:13 | 103:17 |
| 103:20 | 103:24 | 104:7 |
| 104:10 | 104:13 | 104:20 |
| 105:1 | 105:2 | 105:4 |
| 105:16 | 105:20 | 106:4 |
| 106:7 | 106:15 | 106:20 |
| 106:21 | 106:24 | 107:3 |
| 108:2 | 109:4 | 112:14 |
| 112:17 | 112:24 | 113:9 |
| 113:12 | 114:2 | 114:12 |
| 116:18 | 117:4 | 119:23 |
| 120:2 | 120:10 | 120:15 |
| 120:20 | 120:24 | 121:9 |
| 122:2 | 122:22 | 123:9 |
| 123:16 | 123:20 | 124:1 |
| 124:3 | 124:4 | 124:7 |
| 124:12 | 124:14 | 124:19 |
| 124:22 | 125:1 | 125:5 |
| 125:12 | 125:15 | 125:18 |
| 125:21 | 126:10 | 126:11 |
| 126:13 | 126:14 | 126:17 |
| 126:18 | 126:20 | 127:1 |
| 127:8 | 127:13 | 127:16 |
| 132:9 | 133:9 | 133:12 |
| 133:15 | 133:22 | 138:13 |
| 139:2 | 139:19 | 139:22 |
| 140:5 | 140:8 | 140:10 |
| 140:11 | 141:3 | 142:3 |
| **Right-hand** [1] | | 14:9 |
| **RL** [1] | 95:12 | |
| **Robin** [2] | | 55:10 |
| 55:14 | | |
| **ROVNER** [1] | | 2:4 |
| **Rule** [1] | 1:13 | |
| **Rules** [1] | | 1:14 |
| **running** [1] | | 34:23 |
| **runs** [1] | 139:21 | |
| **Russo** [4] | | 13:1 |
| 28:13 | 99:21 | 100:3 |
| **Russo's** [1] | | 27:1 |
| 28:3 | 28:4 | 28:10 |

| 65:1 | | |
| **Rutan** [2] | | 1:15 |
| 143:3 | | |

| **-S-** | | |
| **S** [1] | | 2:1 |
| **S/P** [1] | 78:23 | |
| **sake** [1] | 52:17 | |
| **salary** [1] | | 120:12 |
| **saw** [1] | 21:14 | |
| **says** [64] 14:17 | | 16:18 |
| 20:6 | 30:11 | 30:13 |
| 30:15 | 32:17 | 32:23 |
| 34:16 | 37:20 | 40:9 |
| 42:3 | 42:16 | 46:13 |
| 46:16 | 55:10 | 78:23 |
| 80:8 | 83:15 | 84:9 |
| 84:14 | 84:18 | 84:19 |
| 91:5 | 91:6 | 92:14 |
| 93:10 | 93:12 | 93:16 |
| 94:11 | 95:15 | 96:18 |
| 98:22 | 99:24 | 103:15 |
| 104:9 | 104:24 | 107:2 |
| 108:8 | 109:6 | 110:14 |
| 110:20 | 110:21 | 111:23 |
| 111:24 | 112:1 | 113:5 |
| 118:11 | 119:8 | 120:14 |
| 124:16 | 125:9 | 125:14 |
| 125:20 | 126:2 | 126:6 |
| 127:4 | 131:9 | 132:4 |
| 134:16 | 135:2 | 135:3 |
| 136:5 | 140:10 | |
| **scan** [2] 87:13 | | 105:20 |
| **school** [1] | | 5:18 |
| **seal** [1] | 143:18 | |
| **seated** [2] | | 124:22 |
| 125:4 | | |
| **second** [24] | | 13:8 |
| 13:9 | 14:6 | 14:7 |
| 16:17 | 19:23 | 22:19 |
| 24:5 | 34:2 | 34:15 |
| 37:22 | 42:16 | 45:10 |
| 51:12 | 56:4 | 75:8 |
| 80:6 | 81:5 | 88:14 |
| 88:15 | 95:10 | 100:8 |
| 107:5 | 139:2 | |
| **secondary** [2] | | 37:21 |
| 80:12 | | |
| **Secondly** [1] | | 126:22 |
| **section** [3] | | 24:9 |
| 44:17 | 99:7 | |
| **sedentary** [1] | | 107:8 |
| **see** [81] 13:2 | | 13:8 |
| 13:12 | 14:8 | 14:10 |
| 14:19 | 14:24 | 16:1 |
| 17:5 | 17:16 | 22:7 |
| 22:12 | 22:23 | 25:2 |
| 26:12 | 30:5 | 30:6 |
| 31:3 | 31:12 | 31:21 |
| 32:16 | 32:18 | 33:5 |
| 33:8 | 35:15 | 36:6 |
| 36:8 | 37:3 | 37:4 |
| 37:18 | 37:20 | 38:1 |
| 44:12 | 49:12 | 58:14 |
| 59:5 | 59:15 | 59:19 |
| 60:11 | 63:4 | 65:20 |
| 65:24 | 71:1 | 71:22 |

| 76:22 | 79:9 | 83:13 |
| 83:16 | 83:18 | 90:10 |
| 93:2 | 95:12 | 95:20 |
| 97:13 | 102:11 | 105:14 |
| 105:24 | 107:9 | 108:8 |
| 109:7 | 118:6 | 118:8 |
| 122:14 | 130:3 | 130:6 |
| 130:9 | 130:10 | 131:22 |
| 132:9 | 136:9 | 139:6 |
| 139:9 | 139:11 | 139:19 |
| 139:22 | 139:23 | 140:14 |
| 140:19 | 140:24 | 141:5 |
| 141:10 | | |
| **seeing** [3] | | 40:23 |
| 67:16 | 125:14 | |
| **seem** [3] 29:22 | | 46:19 |
| 116:10 | | |
| **sees** [1] 136:15 | | |
| **selected** [1] | | 94:21 |
| **send** [29] | | 8:1 |
| 9:17 | 9:21 | 10:10 |
| 21:2 | 21:7 | 27:3 |
| 27:18 | 29:21 | 39:21 |
| 45:18 | 45:19 | 45:21 |
| 45:22 | 46:1 | 46:3 |
| 50:4 | 51:11 | 65:24 |
| 66:22 | 67:1 | 67:7 |
| 71:19 | 71:21 | 72:4 |
| 75:11 | 76:9 | 77:4 |
| 140:1 | | |
| **sending** [3] | | 40:2 |
| 40:3 | 74:20 | |
| **sends** [2] | | 70:9 |
| 70:10 | | |
| **sense** [2] | | 21:22 |
| 116:10 | | |
| **sent** [23] 15:21 | | 16:1 |
| 16:7 | 16:9 | 16:10 |
| 16:12 | 17:1 | 17:2 |
| 21:12 | 22:9 | 22:17 |
| 22:18 | 27:5 | 28:7 |
| 28:10 | 39:10 | 39:16 |
| 39:20 | 45:20 | 68:6 |
| 71:9 | 75:3 | 75:8 |
| **September** [14] | | 4:23 |
| 14:8 | 15:16 | 16:3 |
| 18:15 | 19:6 | 40:9 |
| 47:7 | 47:15 | 65:5 |
| 66:7 | 71:18 | 74:9 |
| 123:2 | | |
| **sequence** [2] | | 97:21 |
| 115:24 | | |
| **series** [3] | | 17:5 |
| 58:9 | 76:14 | |
| **servicing** [1] | | 29:2 |
| **set** [8] | 10:7 | 10:8 |
| 11:17 | 12:4 | 17:20 |
| 41:3 | 48:23 | 58:11 |
| **setup** [3] | | 15:11 |
| 16:15 | 24:8 | |
| **seven** [4] | | 8:20 |
| 8:22 | 9:10 | 16:10 |
| **several** [1] | | 30:4 |
| **SHEET** [1] | | 145:1 |
| **ship** [1] 41:3 | | |
| **short** [1] 48:3 | | |

| **Shortly** [1] | | 141:22 |
| **shortness** [6] | | 83:22 |
| 90:2 | 93:23 | 102:23 |
| 125:24 | 126:5 | |
| **show** [5] 21:12 | | 128:12 |
| 128:24 | 130:20 | 133:8 |
| **showed** [1] | | 22:9 |
| **showing** [1] | | 14:22 |
| 40:1 | 70:21 | |
| **shows** [1] | | 51:9 |
| **shy** [1] 47:19 | | |
| **sic** [2] | 130:11 | 131:3 |
| **side** [6] | 36:3 | 85:15 |
| 87:22 | 88:8 | 125:5 |
| 139:19 | | |
| **sideways** [1] | | 58:13 |
| **signature** [1] | | 22:2 |
| **signed** [8] | | 38:10 |
| 43:7 | 44:15 | 46:4 |
| 77:9 | 77:21 | 108:20 |
| 115:12 | | |
| **significant** [4] | | 33:4 |
| 107:23 | 131:1 | 131:10 |
| **simple** [1] | | 67:18 |
| **single-page** [1] | 35:16 | |
| **sit** [6] | 134:13 | 136:13 |
| 137:3 | 137:13 | 137:24 |
| 138:1 | | |
| **sits** [1] | 139:18 | |
| **sitting** [7] | | 62:20 |
| 83:11 | 111:8 | 111:13 |
| 136:2 | 136:9 | 140:21 |
| **situation** [5] | | 32:12 |
| 33:7 | 33:8 | 46:14 |
| 53:6 | 63:7 | 74:8 |
| 82:21 | 86:9 | |
| **situations** [4] | | 38:1 |
| 38:15 | 80:9 | 107:12 |
| **six** [2] | 50:24 | 73:24 |
| **six-month** [1] | | 73:20 |
| **six-week** [1] | | 51:4 |
| **Sixth** [1] | | 2:8 |
| **sleeps** [2] | | 140:17 |
| 140:17 | | |
| **slightly** [1] | | 124:6 |
| **slipping** [1] | | 113:20 |
| **small** [1] | | 111:16 |
| **smaller** [1] | | 58:16 |
| **smoking** [1] | | 34:20 |
| **soft** [12] 109:17 | | 109:19 |
| 109:23 | 110:5 | 110:8 |
| 132:4 | 132:5 | 132:8 |
| 132:9 | 132:15 | 132:17 |
| 132:24 | | |
| **someone** [4] | | 39:15 |
| 65:21 | 66:18 | 67:11 |
| **sometime** [1] | | 21:7 |
| 128:2 | 130:2 | |
| **sometimes** [3] | | 67:14 |
| 67:15 | 126:16 | |
| **somewhere** [1] | 43:23 | |
| **son** [1] 141:22 | | |
| **sooner** [1] | | 122:5 |

 
**sorry** [13]          13:12
17:10    17:13    27:16
42:17    44:23    47:4
51:18    59:18    64:17
71:13    78:2            107:4
**speak** [2]            7:11
25:15
**speaking** [3]        10:21
133:13   133:23
**specialist** [4]      90:16
99:9     99:15    116:14
**specific** [9]        8:14
8:18     9:3      9:6
52:9     69:2     75:9
75:12    75:14
**specifically** [2] 11:8
90:9
**spinal** [5]          31:1
55:24    105:18   109:15
132:6
**spoke** [1]           53:20
**SS** [1]      143:2
**stabilized** [1]      34:17
**stable** [1]          97:5
**stack** [1] 158:14
**stages** [1]          17:19
**stamp** [19]          12:1
12:2     14:22    16:18
17:16    20:2     43:23
49:13    55:5     55:20
63:16    77:23    78:1
83:5     97:13    114:18
118:10   121:2    122:14
**stand** [27]          34:24
83:15    84:9     89:24
92:5     93:21    94:7
94:14    102:21   103:24
104:4    104:5    110:21
111:10   111:23   113:3
113:8    134:15   134:22
135:4    135:12   135:16
136:6    136:23   137:1
138:13   141:7
**standing** [23]       31:15
37:18    62:20    83:11
83:23    90:3     93:24
95:15    102:24   103:19
103:22   104:19   106:2
106:7    110:11   110:13
110:21   111:3    134:17
136:3    136:4    140:21
142:1
**standpoint** [5]      95:4
95:5     95:7     97:4
101:19
**stands** [3]          60:15
90:15    94:11
**start** [1] 135:13
**started** [4]         64:11
101:8    106:6    115:20
**starts** [4]          64:22
100:18   102:13   139:21
**state** [4] 8:6       33:19
64:19    132:23
**statement** [19]      38:18
38:20    38:21    39:4

**suggest** [2]         59:3
87:9
**suggesting** [2]   47:18
58:18
**summarize** [2]    93:11
94:2
**summarized** [2]
85:13    94:21
**summarizing** [2]
89:19    89:21
**summary** [1]      105:12
**superior** [2]     117:19
117:23
**supervise** [1]    137:12
**supervisor** [1]   118:2
**supervisors** [1] 112:8
**support** [4]         107:3
107:6    107:13   107:22
**supported** [1]    129:9
**supposed** [2]        9:9
121:17
**Supposedly** [1] 136:13
**sworn** [2]            4:3
143:7
**symptom** [1]      37:8
**symptoms** [8]     31:6
36:16    37:5     37:10
37:11    42:3     78:20
103:15

**-T-**

**T** [1]       2:11
**table** [1] 124:19
**tables** [2]          141:16
141:18
**taking** [4]          4:6
99:24    100:5    125:18
143:6    144:2
**talks** [7] 36:15     36:16
36:22    105:15   105:18
109:8    134:24
**taped** [1]           91:14
**TD** [1]      60:11
**teachers** [1]        112:8
**telephone** [18]   6:23
6:24     9:1      9:5
9:7      10:9     13:20
13:22    14:1     14:3
19:16    26:19    35:21
90:13    90:19    91:10
103:7    103:8
**telling** [6]         37:23
43:10    55:23    79:3
79:13    80:11    127:6
132:1
**temper** [1]          126:16
**ten** [5]     8:20     8:22
9:10     16:2     16:10
**tendons** [1]         109:22
**tends** [1]           113:15
**term** [1] 96:5
**terms** [12]          8:5
8:8      18:7     21:23

23:8     30:17    41:17
43:16    95:9     107:23
112:19   119:12
**testimony** [2]    143:11
144:1
**thank** [1]           93:18
137:2
**themselves** [1]   33:3
**therapy** [4]         30:24
31:17    81:13    81:14
**therefore** [5]    55:19
56:17    94:20    130:8
134:1
**thereupon** [1]    143:8
**thighs** [1]          105:24
**third** [5] 32:15     45:10
46:7     105:11   139:5
**THOMAS** [1]       2:7
**thought** [3]
118:22   118:23   69:12
**three** [15]          5:19
6:1      43:12    48:18
48:24    56:8     66:5
73:12    73:24    74:1
103:2    106:6    126:9
141:19   141:19
**through** [25]        14:5
14:13    15:24    16:5
18:11    18:19    21:23
40:12    40:19    43:3
58:9     62:7     62:12
62:13    63:8     63:9
69:15    76:14    87:14
92:23    102:2    105:9
125:11   128:23   138:20
**throughout** [1]   84:21
**tightness** [4]    83:21
90:1     93:22    102:22
**times** [3]           66:5
116:1    122:4
**tissue** [12]         109:17
109:19   109:23   110:6
110:8    132:4    132:6
132:8    132:9    132:15
132:17   132:24
**TNE** [1] 24:14
**today** [1]           128:23
**together** [2]        17:7
18:20
**too** [2]  87:22    137:13
**took** [4] 13:18      33:12
70:17    137:22
**top** [3]  9:14     27:9
86:17
**total** [2] 128:6    10:15
**totally** [1]         95:22
**towards** [1]         102:3
**trained** [1]         98:12
**training** [11]       5:18
5:19     5:21     5:22
5:23     5:24     6:1
6:2      6:5      8:4
112:7

**transferred** [1]  23:23
**transmittal** [1]  49:23
**transported** [1] 126:24
**trauma** [1]          113:20
**treat** [1] 112:20
**treated** [3]         14:17
31:17    42:11
**treating** [2]        84:20
84:21
**treatment** [5]    42:10
81:11    83:24    94:1
112:19
**treatments** [1]   30:23
**trial** [3]  4:8      12:5
142:8
**tried** [2] 17:19    104:9
**true** [2]  143:10   144:1
**try** [2]  12:3     18:20
**trying** [1]          118:4
**turn** [3] 87:21    88:7
101:10
**turned** [1]          138:9
**twice** [1]           71:18
**two** [22] 22:23      23:4
45:14    48:3     51:22
70:11    80:1     80:16
82:3     82:18    88:7
97:19    104:3    105:6
117:9    118:20   121:12
122:20   125:14   125:20
138:11   141:21
**two-month** [2]    51:11
52:12
**type** [4] 40:7       40:8
63:2     98:1
**types** [3]           53:17
97:21    98:5
**typically** [4]    10:20
10:21    21:2     23:10

**-U-**

**unable** [2]          42:24
116:8
**under** [10]          19:10
46:14    67:3     79:10
83:24    94:1     108:21
140:18   143:8    143:24
**undergone** [1]    30:23
**understand** [10] 12:7
12:8     12:21    23:19
26:24    52:8     61:9
73:14    137:3    137:7
**unfair** [1]          8:5
**uninterrupted** [1]
113:3    135:4
**UNITED** [1]       1:1
**unless** [1]          143:24
**unlikely** [2]        35:2
80:11
**UNUM** [30]           1:6
5:11     23:8     25:14
25:4     25:5     25:14
25:24    26:1     25:15

**speaking** [3]        10:21

**speak** [2]            7:11

**statements** [5]   59:1
70:11    70:12    78:17
82:3
**states** [7]          1:1
8:4      8:17     19:8
110:10   132:22   139:11
**stating** [3]         22:3
104:1    110:15
**status** [1]          64:2
**stays** [1] 133:21
**stenosis** [3]        31:1
55:24    60:21    61:2
61:6     105:18   109:15
131:20   132:7
**step** [2]  7:4     7:21
**STEVENS** [1]      2:8
**still** [3] 17:18    19:2
133:11
**stipulations** [1] 4:11
**stomach** [2]         140:18
140:18
**stood** [2]           136:7
138:6
**Street** [5]          1:18
2:4      2:8     2:12
4:19
**stress** [6]          33:1
104:17   107:14   107:16
107:23   107:23
**stressed** [5]        83:18
90:1     93:21    94:18
102:22
**stressful** [6]       38:1
38:15    46:14    80:9
84:12    107:12
**Strike** [1]          101:20
**stroke** [1]          126:9
**structural** [8]      131:2
131:10   131:16   131:19
131:21   132:3    132:8
132:13
**structurally** [1] 132:2
**structure** [3]       131:22
132:18   133:21
**studies** [1]         109:17
**subject** [3]         76:12
143:7    144:2
**subjective** [2]      36:16
78:20
**submits** [1]         7:12
**submitted** [6]       22:4
22:6     22:8     67:19
68:11    75:15
**subsided** [5]        113:21
113:24   131:4    131:6
131:7
**such** [5] 8:6        59:1
93:4     136:17   143:14
**sufficient** [1]      82:8

MAZZAMUTO V. UNUMPROVIDENT     CondenseIt!™     UNUMProvident - younge
M. MULRY, 4/23/2002

| 36:12 | 39:20 | 40:2 |
| 40:6 | 41:11 | 42:6 |
| 42:11 | 45:10 | 45:21 |
| 45:22 | 47:5 | 68:17 |
| 76:5 | 78:15 | 80:16 |
| 85:24 | 86:2 | 91:21 |
| 91:23 | 112:13 | |

**UNUMProvident** [4]
2:12   5:2   25:17
38:23

**up** [21]   10:7   10:8
11:18   12:4   17:20
19:20   48:23   50:6
50:7   50:9   51:3
54:1   54:17   55:2
55:3   71:15   71:16
92:10   116:21   138:7
140:14

**urinary** [2]   31:7
31:12

**used** [6] 20:3   23:8
38:23   39:1   86:7
91:17

**usual** [1]   4:11
**utilized** [1]   86:5

### -V-

**verbal** [12]   7:8
7:9   7:10   13:7
13:13   13:20   15:2
15:4   65:15   66:15
68:3   123:1
**verification** [1] 65:5
**VINCENZO** [1]
1:4
**virtually** [1]   129:24
**visit** [6] 38:4   38:7
106:8   106:9   111:21
116:20
**visits** [2]   79:24
80:1
**vocational** [2] 85:22
98:9
**VS** [1]   1:5

### -W-

**wait** [3]   48:23   49:5
51:21
**waited** [1]   82:19
**waiting** [3]   48:19
50:5   73:20
**waived** [1]   53:17
**waiver** [1]   21:18
**walk** [2] 113:3   135:4
**walking** [3]   83:12
111:3   140:22
**Walks** [1]   139:9
**wane** [1] 113:15
**wax** [1]   113:15
**week** [1] 16:2
**weeks** [1]   50:24
**weight** [3]   34:19
123:19   125:4

**West** [1] 24:19
**whole** [5]   24:8
76:14   87:5   101:8
101:10
**wife** [2] 71:16   141:21
**wish** [2] 19:9   145:2
**within** [12]   8:20
8:22   9:10   16:2
16:10   52:11   54:15
64:21   67:7   67:19
100:17   121:18
**without** [9]   17:21
73:6   73:9   73:12
74:1   124:11   138:4
138:12   140:7
**witness** [11]   9:11
14:16   28:11   39:5
50:14   93:18   137:17
142:9   143:8   143:11
143:18
**wondering** [1]   99:23
**Worcester** [7]   1:18
2:13   4:19   25:4
28:23   143:2   143:19
**word** [7] 12:16   79:14
91:19   91:19   96:4
109:5   131:15
**words** [4]   31:8
81:18   91:17   112:1
**worked** [4]   4:21
5:3   5:6   136:19
**workers** [1]   141:19
**works** [2]   120:3
120:7
**worry** [6]   36:22
36:23   37:1   37:11
78:21   103:16
**worse** [4]   81:20
104:12   129:3   129:9
**worsen** [1]   81:17
**worsened** [6]   31:1
32:22   62:5   81:18
96:15   128:13
**worsening** [1] 131:21
**worst** [1]   72:10
**write** [2] 63:14   120:4
**writes** [4]   66:14
66:19   67:11   90:10
**writing** [6]   6:13
29:13   50:7   65:24
69:3   143:9
**written** [28]   6:4
7:24   10:18   15:20
16:1   16:7   22:2
57:15   64:20   65:4
65:7   65:9   65:13
65:18   65:19   66:12
66:16   66:22   67:1
67:7   67:19   67:22
67:24   68:10   68:11
68:13   69:1   99:16
**wrong** [2]   29:23
118:16
**wrote** [8]   65:22
70:21   70:22   102:20

| 104:14 | 118:16 | 118:18 |
| 118:19 | | |

### -X-

**X** [1]   3:1
**x-ray** [2]   132:10
133:8

### -Y-

**year** [4] 13:14   32:9
50:4   52:18   96:11
129:4   139:6
**years** [6]   4:23
30:22   62:5   81:10
95:18   138:12
**yellow** [1]   21:19
**yesterday** [1]   21:14
**yet** [2]   22:10   95:20
**York** [53]   1:7
23:14   23:15   23:16
24:2   24:20   24:20
25:10   25:11   25:14
25:18   25:24   26:3
26:7   26:7   27:7
27:12   27:23   28:16
28:17   28:17   28:20
29:15   32:3   35:5
35:9   36:9   38:24
39:3   39:7   39:10
39:22   40:2   40:5
41:7   41:11   42:2
42:16   45:9   45:10
45:19   45:20   47:5
57:6   57:9   57:16
61:21   62:24   76:4
80:17   127:16   127:24
129:2
**young** [1]   141:19
**younger** [1]   141:21

P.01    97%    10:26    MAR-31-2001

## *Peter J. Russo*
### ATTORNEY AT LAW



5010 East Trindle Road, Suite 200
Mechanicsburg, PA 17050

Offices in Carlisle, PA

PHONE: (717) 591-1755
FAX:    (717) 591-1756

### Monday, March 26, 2001

Melissa Magner
The New York Life Insurance Company
UNUMProvident Corporation
18 Chestnut Street
Worcester, Massachusetts  01608-1528

**VIA TELECOPIER & US MAIL**
508-751-7430

RE:    **VINCENZO MAZZAMUTO**
        **Claim# 13-H3236167-002**

Dear Ms. Manger:

My client has again asked me to take some action in attempting to obtain an answer from UNUM regarding his claim.  To that end, we were expecting that your medical staff would have the opportunity to review the claim information toward the end of last week.  As my client nor I have received a determination from UNUM, he asked that I inquire when your evaluation might be completed and how long thereafter would a determination follow.

My client and I do not mean to be difficult in this matter but several years ago he reduced the waiting period on the policy from 6 months to 3 months as being without income for the 6 months was deemed too detrimental.  Unfortunately, in July you were provided verbal notice of the claim and we continue to wait for a determination.  Even if you calculate from the time you received the paper claim in December, three months have already passed.  Please assist us in any way possible.

Very truly yours,

Peter J. Russo

PJR/mmm
cc:  Vincenzo Mazzamuto

*uaru*
*5·19-97*

# Initial Set-Up Form - New Claimant

Person Calling:  **Ms. Mazcamuto**

Relationship to Insured:  **Wife**

Telephone # of Person Calling:  **717-243-0383**

| | | | |
|---|---|---|---|
| Name of Insured: | **Vincenzo Mazcamuto** | Title | |
| Address (Street): | **501 Limestone Rd.** | Home Phone: | **717-243-0383** |
| City, State, ZIP | **Carlisle, PA 17013** | Business Phone: | |
| Date of Birth: | **5/25/55** | Policy No(s): | **H3236167-NYL** |
| Social Security Number: | **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** | Previous Claim? | **Unknow** |
| | | If so, when? | |

Nature of Disability: **heart attack**

If Pregnant, Due Date:

| Date of Disability **7/22/00** | First Date Treated **7/22/00** | Last Date Worked **?** |
|---|---|---|

Insured's Occupation: **Restaurant Owner**        Self-Employed? **Yes**

Employer of Claimant's Business Address: **Vinnys Rest Inc.?**

## Type of Claim/Coverage

- ☒ TD Sick
- ☐ RD Sick
- ☐ TD Acc
- ☐ RD Acc
- ☐ NDI
- ☐ RR

- ☐ VB
- ☐ Cancer
- ☐ Mammogram
- ☐ BOE/DI
- ☐ BOE only

## Line of Business

- ☐ PLA
- ☐ PLC
- ☐ Paul Revere
- ☐ TNE
- ☐ Equitable (to Springfield)
- ☐ John Hancock

- ☐ Provident Mutual
- ☐ MPA
- ☐ NorthWest
- ☐ Great West
- ☐ General American
- ☒ New York Life

Notes:

Recorded by: **Diann Jarvis**

Date: **09/06/2000 09:02:27 AM**

NYLCL00557

# Initial Set-Up Form - New Claimant

Person Calling:

Telephone # of
Person Calling:

Relationship to  **Wife**
Insured:

| Name of Insured: | **Vincenzo Mazzamuto** | Title | |
|---|---|---|---|
| Address (Street): | **501 Limestone Rd.** | Home Phone: | |
| City, State, ZIP | **Carlisle, PA  17013** | Business Phone: | |
| Date of Birth: | **5/25/55** | Policy No(s): | **13-H3236167** |
| Social Security Number: | **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** | Previous Claim? | **Yes** |
| | | If so, when? | **1996** |

Nature of Disability:  **General**

If Pregnant, Due Date:  **N/A**

| Date of Disability **Unknown** | First Date Treated **Unknown** | Last Date Worked **Unknown** |
|---|---|---|

Insured's Occupation:        Self-Employed?  **No**

Employer of Claimant's Business Address:

**Type of Claim/Coverage**

- ☒ TD Sick
- ☐ RD Sick
- ☐ TD Acc
- ☐ RD Acc
- ☐ NDI
- ☐ RR

- ☐ VB
- ☐ Cancer
- ☐ Mammogram
- ☐ BOE/DI
- ☐ BOE only

**Line of Business**

- ☐ PLA
- ☐ PLC
- ☐ Paul Revere
- ☐ TNE
- ☐ John Hancock
- ☐ Provident Mutual

- ☐ MPA
- ☐ NorthWest
- ☐ Great West
- ☐ General American
- ☒ New York Life

**Notes:**    New York Life

Recorded by: **Kimberly Barbee**

Date: **09/27/2000 01:09:07 PM**

NYLCL00556

MAZCAMUTO
13.4323.06.7.002

LAST NAME: MAZCAMUTO

FIRST NAME: VINCENZO

| TERRITORY | POL PLAN | ISSUE DATE | FICA |
| | 91328 | 8.8.48 | Yes ☐ No ☐ |

| D.O.B | COLL. PT. | AGENT # |
| 5.25.55 | 401 | 99999 |

DISABILITY DATE: 7/22/00.

CLAIMANT

HOME PHONE #               BUSINESS PHONE #

OTHER CLAIMS

| CLOSE DATE | REOPEN DATE | EP USED TO DATE | PREMIUM WAIVER DATES | | | EXAMINER ACTION LOG | |
| | | | PREMIUM MODE: _____ | | | ACTION | DATE |
| | | | TYPE | FROM | TO | assigned *illegible* | |
| | | | | | | | |

|  | REFERRED | OPEN | HANDLED |
| REHABILITATION | ☐ | ☐ | ☐ |
| SPECIAL SERVICES | ☐ | ☐ | ☐ |
| INQUIRIES | CIB | DIR | FICA |

LIFE # _____
REFER TO 799-99
AT 3 MOS
☐ NO LIFE WAIVER    ☐ HAS LIFE WAIVER REFER WHEN CLM ENDS

NYLCL00563

| NEW NOTICE CALL | 4 MOS. | 18 MOS. |
| 90 DAY CALL | 8 MOS. | |

| HEALTH CHANGE | APPROVED BY | CODED BY | HEALTH CHANGE | APPROVED BY | CODED BY |
| DEAD | | | AGE TERM. | | |
| RESCISSION | | | | | |
| LHOC/LHOS | | | | | |

FORM 6602 (Rev. 4/96)

13.4323.06.7.002

October 11, 2000

Vincenzo Mazcamuto
501 Limestone Road
Carlisle, PA 17013

Re: Claim # 13-h3236167-002

Dear Mr. Mazcamuto:

We are writing to confirm the receipt of your claim materials. The claim representative who will be handling your file is Melissa A. Magner. Please be assured that we are giving your file our attention and your representative will be in contact with you in the near future.

Should you have any questions or concerns, you can reach your representative at 1-888-226-7959, extension 6710.

Customer Care Center
The Paul Revere Life Insurance Company

NYLCL00552

Michelle Bachini

10/19/2000 09:16:23 AM

Sent by:  Michele Bachini

To:     Kristin Hyland/Provident Life/US, Nicole Hoyt/Provident Life/US, Linda Downing/Provident Life/US, Sue
        Williams/Provident Life/US, Melissa Magner/Provident Life/US, Diane Cahill/Provident Life/US, Diane
        Freeman/Provident Life/US, Tricia Moynihan/Provident Life/US, Janet Burns/Provident Life/US, Tracy
        McLaughlin/Provident Life/US, Melissa Depanian/Provident Life/US, Melissa Kirby/Provident Life/US,
cc:
Subject:  lost apps

THE FOLLOWING APPS COULD NOT BE FOUND DOWNSTAIRS IN THE APP VAULT. I WILL ASK
NYL IF THEY HAVE A SACN, BUT IF THEY DID THEY WOULD HAVE SENT IT TO US.....BUT I WILL
TRY ANYWAY:

Nomejko, H2285809
Huddleston, H3145667
Phipps, H2359286
Toig, h3042942 & H6000491
Prellwitz, H3173680
Gorman, H3250340
Mazcamuto, H3236167
Mondolo, H2358514
Wyly, H2734072
Stone, H3171150
Niles, H2190478
Rees, H3117334
Rutland, H2425513
Daniel, H3168381
Molinaros, h3262696
Flately, H2353580
Wolff, H3230077

I had app files do two misfiles on each of these and they could not be found. I will let you know what I hear
from NYL.

Michele.

NYLCL00536

---
Michelle Bachini
---
10/19/2000 09:28:08 AM
---

Sent by:  Michele Bachini

To:        Anetta_Ingram@newyorklife.com
cc:
Subject:  lost apps

The following list is more apps we cannot find and we are hoping you have scans available. These are all
supposed to be on our Image mainframe, but only the policy info has been entered, nothing else. Do you
have scans for these? Please let me know.
Thank you. Michele.

-------------------- Forwarded by Michele Bachini/Provident Life/US on 10/19/2000 09:16 AM --------------------

---
Michelle Bachini
---
10/19/2000 09:22:17 AM
---

Sent by:  Michele Bachini

To:        Kristin Hyland/Provident Life/US@Unum, Nicole Hoyt/Provident Life/US@Unum, Linda Downing/Provident
           Life/US@Unum, Sue Williams/Provident Life/US@Unum, Melissa Magner/Provident Life/US@Unum,
           Diane Cahill/Provident Life/US@Unum, Diane Freeman/Provident Life/US@Unum, Tricia
           Moynihan/Provident Life/US@Unum, Janet Burns/Provident Life/US@Unum, Tracy McLaughlin/Provident
           Life/US@Unum, Melissa Depanian/Provident Life/US@Unum, Melissa Kirby/Provident Life/US@Unum
cc:
Subject:  lost apps

THE FOLLOWING APPS COULD NOT BE FOUND DOWNSTAIRS IN THE APP VAULT. I WILL ASK
NYL IF THEY HAVE A SACN, BUT IF THEY DID THEY WOULD HAVE SENT IT TO US.....BUT I WILL
TRY ANYWAY:

Nomejko, H2285809
Huddleston, H3145667
Phipps, H2359286
Toig, h3042942 & H6000491
Prellwitz, H3173680
Gorman, H3250340
Mazcamuto, H3236167
Mondolo, H2358514
Wyly, H2734072
Stone, H3171150
Niles, H2190478
Rees, H3117334
Rutland, H2425513
Daniel, H3168381
Molinaros, h3262696
Flately, H2353580
Wolff, H3230077

I had app files do two misfiles on each of these and they could not be found. I will let you know what I hear

NYL CL 00535

01/04/01  16:16 FAX 717 731 7282        Chelsea Settlement                    ☎002

# MASLAND ASSOCIATES, INC.
## INTERNAL MEDICINE

MEDICAL ARTS BUILDING    220 WILSON STREET, CARLISLE, PA 17013    (717) 249-1929    Fax (717) 249-9332

| DAVID S. MASLAND, M.D. | LARRY S. RANKIN, M.D., F.A.C.C. | TERRY A. ROBISON, D.O. |
|---|---|---|
| RETIRED | CARDIOLOGY | INTERNAL MEDICINE |
| JOSEPH F. BRAZEL, M.D. | DEBRA D. TAYLOR, M.D. | PHILIP A. NEIDERER, D.O. |
| INTERNAL MEDICINE | INTERNAL MEDICINE | INTERNAL MEDICINE |
| FRANK P. CASTRINA, M.D. | LESTER L. HIMMELREICH, III, M.D., F.A.C.P. | DOUGLAS J. BOWER, M.D. |
| PULMONARY | INTERNAL MEDICINE | INTERNAL MEDICINE |

MICHELLE M. HALE, M.S.N., C.R.N.P.

November 3, 2000

Paul Revere Life Insurance Company
New York Life Customer Care Center
P.O. Box 15001
Worcester, MA 01615-0001

New York Life Insurance Company
51 Madison Avenue
New York, New York 10010

RE:  Vincenzo Mazzamuto
     DOB:  5/25/55

Dear Sir or Madam:

I am writing this letter to clarify the medical facts of my patient, Vincenzo
Mazzamuto, who apparently has policies with your companies. I find it difficult
to coherently fill out the forms as his medical problems are several, some
of which are long standing and do not easily fit into a category such as "when
did symptoms appear". Mr. Mazzamuto has had a long history of low back pain
and in fact for many years has undergone numerous treatments and physical therapy
and MRI in the past did reveal central spinal stenosis which gradually worsened
to a maximum at the L3-L4 level and extends from L2 to L5. This has given him
periodic problems with lower back discomfort, symptoms of radiculopathy and
urinary irritability. Prolonged standing and heavy lifting have aggravated it.
He has been seen in physical therapy, treated in a local Pain Clinic with local
injections as well as prescription analgesics, nonsteroidal anti-inflammatory
agents and other atypical chronic pain medications.

Mr. Mazzamuto's condition was complicated this year when he was admitted to
the hospital on July 22nd with new onset angina and a small subendocardial
myocardial infarction. He underwent cardiac catheterization and had a subsequent
PTCA of a distal LAD stenosis. He is currently involved in cardiac rehabilita-
tion.

The patient did subsequently have one re-admission to the hospital with chest
pain after his initial admission where this pain was subsequently felt to be
noncardiac in nature.

As the patient has attempted to return to work after his recovery from his
heart attack, his back has worsened again, also the stress and anxiety which
has been provoked because of his recent cardiac problems, and manifested
themselves with significant anxiety when he is back in a work situation.

Paul Rever Life Ins co
RE:  Vincenzo Mazzamuto
November 3, 2000
Page 2

While his heart condition has currently stabilized and should hopefully
not pose a great limitation on him in the future (assuming ongoing risk
factor modification is successful such as smoking cessation, cholesterol
lowering, etc), the amount of weight he has gained from his smoking
cessation has re-exacerbated his chronic and progressive back problem.
At the present time he is not able to do the work required in running his
restaurant because he cannot stand for a prolonged period of time, has
difficulty bending, and is restricted from heavy lifting.  It is unlikely
he will be able to return to work in the foreseeable future.

His prognosis for recovery is fair over the next 6 to 12-months.

At his last visit on October 4th he weighed 206 lbs., his blood pressure
was 112/80, his pulse 48 and regular.  He was proceeding with his cardiac
rehabilitation program and was to follow-up with the Pain Clinic for
further symptomatic treatment of his back.  At the present time the patient
has not achieved a medical plateau.  It is my hope that once his weight
stabilizes after his smoking cessation is consolidated and he completes his
cardiac rehabilitation he may be able to attempt weight loss and hopefully
improve his back situation in the future.

The final results of this may not be evident, however, for the next 6-months.

If further information is required in order to complete your evaluation,
please do not hesitate to call our office.  I hope that this narrative
summary provides you with the information you need and you can extract
those pertinent pieces which you find relevant to insert into your form.

Thank you for your consideration in this matter.

                                        Sincerely,

DJB/gav                                 Douglas J. Bower, M.D.
T:  11/7/00

FORM 1

**NEW YORK LIFE INSURANCE COMPANY** 51 Madison Avenue, New York, N.Y. 10010
**NEW YORK LIFE INSURANCE AND ANNUITY CORP.** (A Delaware Corporation)
**NYLIFE INSURANCE COMPANY OF ARIZONA** (Not Licensed in Every State)

### INSURED'S APPLICATION FOR DISABILITY BENEFITS          368799

**TO ENABLE US TO EXPEDITE CONSIDERATION OF YOUR CLAIM:** Please fully and completely answer each question, sign and date all forms and attachments and return the originals to us. Failure to complete all questions or to sign and date the claim form(s) or authorization will result in a delay in the consideration of your claim.

1. NAME: __VINCENZO MAZZAMUTO__                     POLICY#(s): __H3236167__

2. DATE OF BIRTH: __05__ / __25__ / __1955__          SOCIAL SECURITY NUMBER: __196__-__56__-__5744__
         (Month)  (Day)  (Year)

3. CURRENT ADDRESS: __501 LIMESTONE ROAD, CARLISLE, PA  17013__
     *(Provide complete street address)*      City      State      Zip Code

4. TELEPHONE NUMBERS: Home (__717__)-__243__-__0383__    Business (__717__)-__243-0383__

5. OCCUPATION: __PRESIDENT__                          MONTHLY SALARY: $ __3,035.00__
     *(Provide occupation title and also fully complete the enclosed Insured's Statement of Occupational Duties and Employment form)*

6. NAME AND ADDRESS OF EMPLOYER *(Provide the full name of the business or practice if you are self-employed)*:
   ~~VINNY, RESTAURANT, INC.  330 S. HANOVER STREET, CARLISLE, PA  17013~~

7. NATURE OF SICKNESS OR INJURY: __HEART CONDITION__
     *(Specify the medical cause of your disability)*

8. INDICATE THE DATE YOU FIRST EXPERIENCED SYMPTOMS OF YOUR SICKNESS OR THE INJURY OCCURRED:
   __07__ / __29__ / __2000__
     (Month)  (Day)  (Year)

9. IF INJURY, DESCRIBE WHERE AND HOW THE INJURY OCCURRED *(If a Police or Accident Report was made, attach a copy of the report as well)*: __AT HOME - SUFFERED A HEART ATTACK__

10. HAVE YOU EVER HAD THE SAME OR SIMILAR TYPE OF INJURY OR SICKNESS?   YES ☐   NO ☒
    *(If yes, give dates and details):* _____

11. DATE YOU FIRST CONSULTED WITH OR WERE TREATED BY A PHYSICIAN FOR THIS CONDITION: __07__ / __29__ / __2000__
          (Month)  (Day)  (Year)

12. PROVIDE THE NAMES AND ADDRESSES OF YOUR CURRENT DOCTOR, YOUR FAMILY PHYSICIAN, AND ALL OTHER PHYSICIANS OR MEDICAL PRACTITIONERS, HOSPITALS OR INSTITUTIONS, BY WHOM, OR IN WHICH, YOU WERE ATTENDED, TREATED OR EXAMINED DURING THE LAST 5 YEARS FOR THIS OR ANY OTHER MEDICAL CONDITION.

| NAME | ADDRESS | DATES OF ATTENDANCE | REASON |
|------|---------|---------------------|--------|
|      |         |                     |        |
|      |         |                     |        |
|      |         |                     |        |

13. WERE YOU UNABLE TO WORK OR DID YOU FILE A CLAIM FOR BENEFITS DUE TO A DISABILITY OF ANY TYPE WITHIN THE PAST 2 YEARS?   YES ☐   NO ☐   *(If "YES", provide the source of benefits and the dates benefits were received):*

14. INDICATE THE DATES THAT YOU ARE CLAIMING POLICY BENEFITS DUE TO:

    a.) TOTAL DISABILITY - FROM: __07__ / __29__ / __2000__ TO: __PRESENT__ / _____
                   (Month)  (Day)  (Year)    (Month)  (Day)  (Year)

    b.) PARTIAL OR RESIDUAL DISABILITY - FROM: _____/_____/_____ TO: _____/_____/_____
                            (Month)  (Day)  (Year)    (Month)  (Day)  (Year)

15. IF YOU HAVE NOT RETURNED TO WORK,          N/A
    WHEN DO YOU EXPECT TO RETURN TO WORK?          _____/_____/_____
                            (Month)  (Day)  (Year)

16. IF YOU HAVE RETURNED TO WORK, DATE THAT          N/A
    YOU FIRST RETURNED TO ANY PART OF YOUR WORK:          _____/_____/_____
                            (Month)  (Day)  (Year)

CONTINUED ON NEXT PAGE

17. THE FOLLOWING INFORMATION IS REQUIRED BY FEDERAL LAW:

    a.  Do you pay into SOCIAL SECURITY?  YES ☒    NO ☐

    b.  If you are considered an employee or if you are self-employed and your business is incorporated, does your employer pay any portion of your insurance premium?  YES ☐    NO ☒    NOT APPLICABLE ☐

    c.  If "YES", what percentage? _____% and is it reported as income to you?  YES ☐    NO ☐

18.  LIST ALL INSURANCE OR OTHER BENEFITS POTENTIALLY AVAILABLE TO YOU AS A RESULT OF YOUR CURRENT MEDICAL CONDITION BY ANSWERING WHETHER YOU HAVE APPLIED FOR ITEMS A-L BELOW AND PROVIDE THE ADDITIONAL RESPONSES REQUESTED FOR EACH BENEFIT APPLIED FOR.

| Source of Benefits | Applied for? Yes | Applied for? No | Receiving? Yes | Receiving? No | Monthly Benefit | Company Name and Policy Numbers (If applicable) |
|---|---|---|---|---|---|---|
| a. Other New York Life Policies | ☐ | ☒ | ☐ | ☒ | $_____ | _____ |
| b. Medical Insurance | ☐ | ☒ | ☐ | ☒ | $_____ | _____ |
| c. Social Security | ☐ | ☒ | ☐ | ☒ | $_____ | _____ |
| d. Worker's Compensation | ☐ | ☒ | ☐ | ☒ | $_____ | _____ |
| e. State Disability | ☐ | ☒ | ☐ | ☒ | $_____ | _____ |
| f. Retirement / Pension | ☐ | ☒ | ☐ | ☒ | $_____ | _____ |
| g. Short Term Disability | ☐ | ☒ | ☐ | ☒ | $_____ | _____ |
| h. Salary Continuation | ☐ | ☒ | ☐ | ☒ | $_____ | _____ |
| i. Unemployment | ☐ | ☒ | ☐ | ☒ | $_____ | _____ |
| j. Union | ☐ | ☒ | ☐ | ☒ | $_____ | _____ |
| k. Auto/No-Fault Auto | ☐ | ☒ | ☐ | ☒ | $_____ | _____ |

l. Other Policies: *(If none, indicate "None")*

| Name of Company | | | | | | Policy Number(s) |
|---|---|---|---|---|---|---|
| _____ | ☐ | ☐ | ☐ | ☐ | $_____ | _____ |
| _____ | ☐ | ☐ | ☐ | ☐ | $_____ | _____ |
| _____ | ☐ | ☐ | ☐ | ☐ | $_____ | _____ |

*IN FURNISHING THIS FORM, THE COMPANY DOES NOT ADMIT THE VALIDITY OF THIS CLAIM OR WAIVE ANY OF ITS RIGHTS OR DEFENSES.  YOUR ELIGIBILITY FOR BENEFITS WILL BE DETERMINED IN ACCORDANCE WITH THE TERMS OF YOUR SPECIFIC POLICY CONTRACT(S) WITH US.*

**ANY PERSON WHO KNOWINGLY AND WITH THE INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.**

## DECLARATION AND SIGNATURE

I declare that the answers provided on each page of this form and any attachments are complete and true to the best of my knowledge and belief.  I understand that the Company reserves the right to require further information in order to evaluate my claim.

11-22-00
**Date**

_Signature_
**Signature of Insured** (Insured or Insured's authorized representative)

_____
**Relationship if other than Insured**

22023  10/98

FORM 2

**NEW YORK LIFE INSURANCE COMPANY** 51 Madison Avenue, New York, N.Y. 10010
**NEW YORK LIFE INSURANCE AND ANNUITY CORP.** (A Delaware Corporation)
**NYLIFE INSURANCE COMPANY OF ARIZONA** (Not Licensed in Every State)

368799

## MEDICAL PROVIDER'S STATEMENT
*(The patient is responsible for the completion of this form without expense to the Company)*

**Notice to Provider:** Thank you in advance for your cooperation in completing this form on behalf of your patient identified below. We will consider this information in conjunction with other information gathered to determine the claimant's eligibility for benefits according to the terms of his or her specific contract(s) with us. We will periodically request that you provide updated information, records and chart notes to enable our evaluation of a continuing claim. In order for us to expedite our consideration of your patient's claim, please fully answer each question and sign and date the form where indicated.

1. PATIENT'S NAME: _Vincenzo_ _Mazzamuto_ DATE OF BIRTH: _5_ / _25_ / _55_
  (First)                (Middle)          (Last)          (Month)  (Day)  (Year)

2. CURRENT MEDICAL CONDITION(s):

  PRIMARY DIAGNOSIS: _414.01, V45.82, 410.70_ ICD-9-CM CODE: _____
  SECONDARY DIAGNOSIS: _729.1_ ICD-9-CM CODE: _____

3. DATE THAT SYMPTOMS FIRST APPEARED OR ACCIDENT HAPPENED: _7_ / _22_ / _00_
  (Month)  (Day)  (Year)

4. DATE THAT PATIENT FIRST CONSULTED YOU FOR THIS CONDITION: _7_ / _22_ / _00_
  (Month)  (Day)  (Year)

5. WAS PATIENT REFERRED TO YOU BY ANOTHER PRACTITIONER?  YES ☐  NO ☒
  *(If "YES", please provide the name and address of that practitioner):* _____

6. HAS THE PATIENT EVER HAD THE SAME OR SIMILAR INJURY OR SICKNESS?  YES ☐  NO ☒
  *(If "YES", please provide details and dates of treatment):* _____

7. HAVE YOU PREVIOUSLY TREATED THIS PATIENT?  YES ☒  NO ☐ *(If "YES", provide diagnosis(es) and dates of prior treatment):* _729.1  272.2 — Multiple dates since 1992_

8. OBJECTIVE FINDINGS *(Include x-ray, lab results and clinical findings. If pregnancy, also give LMP and EDC):* _⊕ MI by enzyme, ⊕ CAD by cath_

9. HAS PATIENT BEEN HOSPITALIZED?  YES ☒  NO ☐ *(If "YES", provide reason, hospital name and dates of confinement):* _Acute MI, Carlisle Hosp → Harrisburg Hospital for cath 7/22/00 → 7/25/00_

10. HAVE YOU COMPLETED CLAIM FORMS FOR OTHER INSURANCE CARRIERS?  YES ☒  NO ☐
  *(If "YES", provide name of other insurance carrier(s)):* _UNUM_

11. NATURE OF TREATMENT CURRENTLY BEING PROVIDED OR PLANNED *(Include surgery and medications prescribed if applicable):* _Complete cardiac rehab, follow up stress test, Rx of anxiety and ongoing Rx of chronic low back pain_

CONTINUED ON NEXT PAGE

2024 10/98

## MEDICAL PROVIDER'S STATEMENT
### (CONTINUED FROM PREVIOUS PAGE)

12. HAVE YOU REFERRED THE PATIENT TO ANOTHER PHYSICIAN OR PRACTITIONER?  YES ☒  NO ☐
    *(If "YES", please provide the name and address of all applicable physicians or practitioners):*
    Paul Piccini, MD,  Mt Pleas. & Clin Assoc

13. IN YOUR OPINION, IS THE PATIENT ABLE TO WORK AT THIS TIME?  YES ☒  NO ☒
    IF "NO", WHEN DO YOU EXPECT THAT THE
    PATIENT WILL BE ABLE TO PERFORM SOME WORK?     _____ / _____ / _____
    Unknown                                      (Month)  (Day)  (Year)

14. IS THERE ANY TYPE OF JOB MODIFICATION OR ACCOMMODATION THAT WOULD ENABLE THE
    PATIENT TO WORK AT THIS TIME?  YES ☐  NO ☐    *(If "YES", please describe):* _____
    _____

15. BASED ON OBJECTIVE FINDINGS AND YOUR MEDICAL OPINION:
    a.) THE PATIENT WAS UNABLE TO WORK FROM:  7 / 22 / 00  TO:  Present / _____ / _____
                                             (Month) (Day) (Year)      (Month) (Day) (Year)

    b.) THE PATIENT WAS ABLE TO PERFORM SOME WORK FROM:  _____ / _____ / _____  TO:  _____ / _____ / _____
                                                        (Month) (Day) (Year)      (Month) (Day) (Year)

16. LIST ALL CURRENT RESTRICTIONS AND LIMITATIONS YOU HAVE PLACED ON THE PATIENT'S WORK
    AND PERSONAL ACTIVITIES DUE TO THEIR MEDICAL CONDITION *(If none, indicate "NONE"):*
    Cannot be in stressful situation, no prolonged standing, No lifting
    _____
    _____
    _____

17. IS THE PATIENT COMPETENT TO ENDORSE CHECKS
    AND DIRECT THE USE OF THE PROCEEDS THEREOF?     YES ☒  NO ☐

18. HAS THE PATIENT BEEN RELEASED FROM YOUR CARE?  YES ☐  NO ☒

    IF "YES", DATE THEY WERE                      IF "NO", DATE OF NEXT SCHEDULED
    RELEASED FROM YOUR CARE: _____ / _____ / _____  TREATMENT OR EVALUATION: 01 / — / 01
                            (Month) (Day) (Year)                            (Month) (Day) (Year)

ANY PERSON WHO KNOWINGLY AND WITH THE INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION
FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF
MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME
AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

### MEDICAL PROVIDER'S DECLARATION AND SIGNATURE
I declare that the answers on this statement are complete and true to the best of my knowledge and belief. I understand that periodic updates
(including providing copies of medical records when requested) will be required in the event of a continuing claim.

Douglas J. Bauer MD                23-1929861              717 249 1525
**PHYSICIAN OR PROVIDER'S NAME (PLEASE PRINT)**    **TAX ID/SOCIAL SECURITY #**    **TELEPHONE NUMBER**

220 Wilson St. #105 Carlisle PA       [signature]           11/15/00
**STREET ADDRESS**        17013         **SIGNATURE OF PROVIDER**    **DATE SIGNED**

22024 10/98

**NEW YORK LIFE INSURANCE COMPANY** 51 Madison Avenue, New York, N.Y. 10010
**NEW YORK LIFE INSURANCE AND ANNUITY CORP.** (A Delaware Corporation)
**NYLIFE INSURANCE COMPANY OF ARIZONA** (Not Licensed in Every State) 36879

---

### INSURED'S STATEMENT OF OCCUPATIONAL DUTIES AND EMPLOYMENT

If you need additional space to answer any of the questions, please attach a sheet of paper with your additional answers.

1. NAME: __VINCENZO MAZZAMUTO__                POLICY#(s): __H3236167__

2. OCCUPATIONAL TITLE(s): __PRESIDENT__

3. NAME AND ADDRESS OF EMPLOYER: __VINNY'S RESTAURANT        S. HANOVER STREET, CARI__
   *(Provide full name of Business and a complete street address)*

4. NUMBER OF YEARS: IN OCCUPATION? __19__ YRS.; EMPLOYED BY CURRENT EMPLOYER? __19__ YRS.

5. HOW MANY HOURS DO YOU WORK DURING A NORMAL WORK WEEK? __40__

6. LIST THE DUTIES OF YOUR OCCUPATION(s) IN ORDER OF THEIR IMPORTANCE.  PROVIDE A DETAILED DESCRIPTION OF EACH.  SHOW THE NUMBER OF HOURS AND PERCENT OF TIME YOU SPENT ON EACH IN A NORMAL WORK WEEK IMMEDIATELY PRIOR TO THE ONSET OF YOUR CURRENT MEDICAL CONDITION:

- Duty: __SUPERVISE EMPLOYEES__                Hours: __20__ and % of time: __50__ spent each week
  Description: _____

- Duty: __BOOK KEEPING__                Hours: __10__ and % of time: __25__ spent each week
  Description: _____

- Duty: __OTHER OFFICE DUTIES__                Hours: __10__ and % of time: __25__ spent each week
  Description: _____

- Duty: _____                Hours: ____ and % of time: ____ spent each week
  Description: _____

Additional comments on Physical Requirements, Equipment/Tools Used: _____

INDICATE THE DATE YOU LAST WORKED IN THIS OCCUPATION: __07__ / __28__ / __2000__
                                                    *(Month)    (Day)    (Year)*

7. INDICATE YOUR HIGHEST LEVEL OF EDUCATION COMPLETED:
   COLLEGE ☐    HIGH SCHOOL ☐    PRIMARY SCHOOL ☒    NUMBER OF YEARS COMPLETED? _____

8. PLEASE SPECIFY DEGREE(s), DIPLOMA(s), OR CERTIFICATE(s) OBTAINED AND AREA OF CONCENTRATION:
   __n/a__

9. PREVIOUS EMPLOYMENT *(If None, state "NONE")*:
   OCCUPATION TITLE            NAME AND ADDRESS OF EMPLOYER            DATES EMPLOYED
   __n/a__

10. HOW HAS YOUR MEDICAL CONDITION INTERFERED WITH THE PERFORMANCE OF YOUR OCCUPATION?
    __CANNOT PERFORM MY DUTIES UNDER THE STRESSFULL SITUATION.  My chest is__
    __PAINFUL AND I AM FEARFUL FOR MY LIFE.__

CONTINUED ON NEXT PAGE

22027 10/98

11. ARE YOU PREDOMINANTLY RIGHT OR LEFT HANDED?    RIGHT HANDED ☒    LEFT HANDED ☐

12. IN TERMS OF AN 8 HOUR WORKDAY, YOUR OCCUPATION(s) REQUIRED THAT YOU:

| | Not at all | Occasionally (¼ - 1½ hrs) | Frequently (>1½ - 5½ hrs) | Continuously (>5½ - 8 hrs) |
|---|---|---|---|---|
| Bend/Stoop | ☐ | ☒ | ☐ | ☐ |
| Reach above Shoulder Level | ☐ | ☒ | ☐ | ☐ |
| Climb | ☐ | ☒ | ☐ | ☐ |
| Kneel | ☐ | ☒ | ☐ | ☐ |
| Balance | ☐ | ☒ | ☐ | ☐ |
| Lift: Usual number of pounds: __5__ lbs | ☐ | ☐ | ☐ | ☐ |
| Maximum number of pounds: _____ lbs | ☐ | ☒ | ☐ | ☐ |
| Carry: Usual number of pounds: __5__ lbs | ☐ | ☒ | ☐ | ☐ |
| Maximum number of pounds: _____ lbs | ☐ | ☐ | ☐ | ☐ |
| Other: _____ | | ☐ | ☐ | ☐ |
| _____ | | ☐ | ☐ | ☐ |

| | | | |
|---|---|---|---|
| Sit | _____ hour(s) at a time | _3.5_ | total hour(s) in a day |
| Stand | _____ hour(s) at a time | _3.5_ | total hour(s) in a day |
| Walk | _____ hour(s) at a time | _1_ | total hour(s) in a day |
| Drive | _____ hour(s) at a time | _____ | total hour(s) in a day |

3. IF YOU ARE SELF EMPLOYED OR OWN ANY PERCENT OF THE BUSINESS NAMED IN QUESTION 3, PLEASE COMPLETE THE FOLLOWING QUESTIONS:
   a.) WHAT PERCENTAGE OF THE BUSINESS DO YOU OWN?    __100_%

   b.) INDICATE THE FORM OF THE BUSINESS:   (check one)
   CORPORATION ☐    PARTNERSHIP ☐    "S" CORPORATION ☒    SOLE PROPRIETORSHIP ☐

   c.) NUMBER OF EMPLOYEES
   PRIOR TO THE ONSET OF YOUR CLAIMED DISABILITY:   FULL-TIME __7__    PART-TIME __6__
   CURRENTLY:   FULL-TIME __6__    PART-TIME __4__

   d.) WITHIN THE LAST 6 MONTHS, HAVE YOU HIRED
   ANY EMPLOYEES TO PERFORM ANY OF YOUR JOB DUTIES?   YES ☐    NO ☐

   e.) IS THE BUSINESS OPERATING AT THIS TIME?   YES ☒ , NO ☐

   f.) HAS THERE BEEN ANY CHANGE OF
   OWNERSHIP OF THE BUSINESS IN THE LAST 6 MONTHS?   YES ☐    NO ☒

   g.) DO YOU HAVE PLANS FOR, OR ARE YOU
   CONTEMPLATING THE SALE OF YOUR SHARE OF THIS BUSINESS?   YES ☒    NO ☐

NY PERSON WHO KNOWINGLY AND WITH THE INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN PPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR HE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE CT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

## DECLARATION AND SIGNATURE

declare that the answers provided on each page of this form and any attachments are complete and true to the best of my knowledge d belief. I understand that the Company reserves the right to require further information in order to evaluate my claim.

1-22-00
ate

_____
Signature of Insured (Insured or Insured's authorized representative)

_____
Relationship if other than Insured

027 10/98

## B. Attending Physician's Statement (PLEASE PRINT)

UNUM

Name of Patient: MAZZAMUTO-VINCENZO

Date of Birth: 5-125/1955

Social Security Number:

Mail To: The Paul Revere Life Insurance Comp
New York Life Customer Care Cen
P.O. Box 150
Worcester, MA 01615-0

Claim Questions: 800.633.7506
Fax To: 508.751.7041

### History

When did symptoms first appear or accident happen? **07/22/2000**

Date restrictions and limitations began. **07/22/2000**

Has patient ever had same or similar condition? If yes, state when and describe.
○ Yes ● No _ _ / _ _ / _ _ _ _

Names and addresses of other treating physicians

Doctor's Name: Paul Paccini MO

Address (street, city, state, zip): Moffit, Pease & Lim Assoc

Doctor's Name:

Address (street, city, state, zip):

### Diagnosis

Date of last examination: **10/04/2000**

Diagnosis (including any complications) Include ICD9 and/or DSM IV Multi Evaluation Nomenclature and Code Numbers: **414.01, V45.82, 410.70 272.2, 305.1, 300.0,**

Subjective symptoms: Anxiety, Worry, Low back pain

Objective findings (including current x-rays, EKGs, laboratory data and any clinical findings): Cardiac Cath 7/24

Is condition due to, or exacerbated by injury or sickness arising out of your patient's employment? ● Yes ○ No ○ Unknown

Information about the patient's ability to work - this information is critical to understanding your patient's condition
Fully describe restrictions and limitations.

RESTRICTIONS (What the patient should not do): No prolonged standg, no heavy lifting (2nd bench)

LIMITATIONS (What the patient cannot do): Cannot work in a stressful situation

What is the prognosis for recovery? Fair

Height / Weight: / 200 lbs    Blood pressure last visit: 112/80

If pregnancy, delivery type: ○ Normal ○ C-Section

If pregnancy, expected delivery date: _ _ / _ _ / _ _ _ _    If delivered, actual delivery date: _ _ / _ _ / _ _ _ _

### Treatment

Date of first visit for this illness or injury: **07/22/2000**    Date of next visit: **01/ — /0/ — —**

Date of last visit: **10/04/2000**    Frequency of visits: q 2-3 months

### Progress

Has patient achieved maximum medical improvement? ○ Yes ○ No If no, complete the following:

How soon do you expect fundamental changes in the patient's medical condition? ○ 1 - 2 months ● 3 - 4 months ○ 5 - 6 months ○ more than 6 months

Is patient: ● Ambulatory ○ Bed Confined ○ House Confined ○ Hospital Confined

Has patient been admitted to hospital? ● Yes ○ No
Confined:
From: 07/22/2000
To: 07/25/2000

If yes, give name and address of hospital: Carlisle Hospital, Harrisburg Hospital

## * REQUIRED ATTACHMENTS AND SIGNATURE

Please make sure that office notes, test results, and discharge summaries are attached! This will help reduce additional requests.

FRAUD NOTICE
Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties. This includes Employ
and Attending Physician portions of the claim form.

The above statements are true and complete to the best of my knowledge and belief.

Name (attending physician) Degree & Specialty: Douglas J. Brown MD

Street Address: 220 Wilson St #409

City or Town: Car lisle PA

State or Province: 1703

Telephone Number: 717 249 1929

Fax Number: 717 249 9332

Tax I.D. Number: 23-1929361

Signature of Attending Physician (no stamp) X

Date: 11/15/00

**Disability Claim**
**FOR EMPLOYER TO COMPLETE** (PLEASE PRINT)

UNUM

## C. Employer Section

| Employer Name | VINNY'S RESTAURANT INC. | Mail To: The Paul Revere Life Insurance Company New York Life Customer Care Center P.O. Box 15001 Worcester, MA 01615-0001 |
|---|---|---|
| Employer Address | 330 SOUTH HANOVER STREET | Claim Questions:  800.633.7506 Fax To:  508.751.7041 |
| | CARLISLE, PA    17013 | Employee's Name |
| Policy Number | H3 236 167 | Employee's Address |

Employee's Name: VINCENZO MAZZAMUTO

Employee's Address: 501 LIMESTONE ROAD, CARL

Division Number / Class Number
Division / Class Description

Date of Birth: 05 / 25 / 1955

Social Security Number: 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

Date of Hire: 01 / 01 / 1993

**Employee's Work Status:**
- (X) Full Time   ( ) Exempt
- ( ) Part Time   ( ) Non-exempt

**How was employee paid? (please check one)**
- ( ) Hourly        ( ) Salary and Bonus
- ( ) Commissions   ( ) Commissions Only
- ( ) Salaried      ( ) Salary and Commissions

Effective Date of Insurance: __ / __ / ____

Termination Date: __ / __ / ____

Occupation at last time worked: PRESIDENT

**For STD Claims Only**
Salary prior to date last worked: *(refer to earnings definition in your contract)*
Please attach appropriate documentation

Does the employee contribute toward the STD premium?
( ) Yes   (X) No     If Yes: ( ) Pre Tax   ( ) Post Tax
If Post Tax:

| | Weekly | Bi-Weekly | Semi-Monthly |
|---|---|---|---|
| W-2 Earnings | $ 700.00 | $ _____ | $ _____ |

_____ % paid by employer

_____ % paid by employee

| Overtime | $ _____ prior year |
|---|---|

Does the employee contribute toward the LTD premium?
( ) Yes   (X) No     If Yes: ( ) Pre Tax   ( ) Post Tax
If Post Tax:

| Commissions | $ _____ per week |
|---|---|

_____ % paid by employer

| | $ _____ per week |
|---|---|

_____ % paid by employee

| Bonuses | $ _____ per week |
|---|---|

Year to Date Earnings (For FICA % Deductions): $ 20,300.00

**For LTD Claims Only**
Reporting the employee's annual, monthly, or weekly earnings
What is the earnings figure you use to compute premium payments for this employee?     $ 36,400.00

Check the Definition of Earnings below that matches your contract for this employee and **attach the appropriate document(s).**

**Definitions of Earnings:** Please refer to your contract. (This Definition can be found in your contract.)

- ( ) **Salary Only / Current Earnings or Teacher's contract:**
  Attach copy of payroll record or last two paystubs just prior to disability. If Teacher, attach copy of contract.
- ( ) If you contract covers **bonus and/or commissions**, submit payroll records for the 12 months or the 24 months (refer to the contract for the correct number of months) immediately preceding the last day worked, or the period of employment if less.
- ( ) **Previous Year's W-2 Form:**
  Attach copy of the employee's W-2 form for the calendar year immediately preceding this disability.
- ( ) **Sole Proprietor:**
  Attach From 1040 Schedule C for the three calendar years immediately preceding the disability.
- ( ) **Previous Year's K-1 Form (Partners):**
  Attach a copy of the K-1 form of the year immediately preceding the disability. If your contract averages K-1 income over 3 years, attach prior 3 years K-1 forms.
- ( ) **All other definitions:**
  For definitions other than those above that are based on salary as expressed on a particular document, send us a copy of the document.

Date of last salary increase: 01 / 01 / 2000

Date last worked / number of hours worked that day: 07 / 28 / 2000     Hours per week 40

Employee's regular work schedule at time last worked:

| Days per week | Hours per day |
|---|---|

Has employee returned to work? If yes, date.
( ) Full Time
( ) Part Time

__ / __ / ____     Hours per week _____

Date paid through: For
( ) Salary continuation
( ) Vacation pay
( ) Accrued sick pay
( ) Other

__ / __ / ____

If this is a Flexible Benefits Plan, indicate which option of coverage this employee has chosen.

Previous Plan Year:                                    Current Plan Year:

## C. Employer Section (continued)

Prior LTD Carrier  Name [                    ]     Effective Date [ __ / __ / __ ]

Address [                    ]     Termination Date [ __ / __ / __ ]

| Is employee eligible for: | Yes | No | If yes, weekly or monthly amount | Weekly | Monthly | When do benefits begin? | When do benefits end? |
|---|---|---|---|---|---|---|---|
| Salary Continuation | ○ | ○ | $ _____ | ○ | ○ | __ / __ / __ | __ / __ / __ |
| Other Disability Benefits | ○ | ○ | $ _____ | ○ | ○ | __ / __ / __ | __ / __ / __ |
| State Disability | ○ | ○ | $ _____ | ○ | ○ | __ / __ / __ | __ / __ / __ |
| Social Security | ○ | ○ | $ _____ | ○ | ○ | __ / __ / __ | __ / __ / __ |
| Workers' Compensation | ○ | ○ | $ _____ | ○ | ○ | __ / __ / __ | __ / __ / __ |
| Has Workers' Compensation claim been filed? | ○ | ○ | If yes, Name and Address of Carrier | | | | |
| Health Insurance | ○ | ○ | If yes, Name and Address of Carrier | | | | |

## If Workers' Compensation claim has been denied, please submit a copy of denial with this claim.

**Information about your pension plan**  (Please send copy of Plan Summary) (do not complete for maternity claim)

Do you have a pension plan?        If yes, what type?
○ Yes   ⊗ No                        ○ Defined benefit      ○ 401(k)       ○ Other: (specify)
                                     ○ Defined contribution  ○ Profit sharing

Is employee eligible for your pension plan?  ○ Yes  ⊗ No       If eligible, does the employee participate?  ○ Yes  ○ No       What % does the employee contribute? [ _____ % ]       If the employee is participating, when is he or she eligible for benefits under the plan? [ __ / __ / __ ]

**General information about the employee's job**

Job Title [ PRESIDENT ]       Does the employee perform supervisory functions?  ⊗ Yes  ○ No

Minimum education or training required [ N/A ]       If yes, how many people are supervised? [ 12 ]

| Describe job duties (or attach copy of job description) | Duty | % of Time Spent at Duty |
|---|---|---|
| | EXECUTIVE DUTIES | 50% |
| | OFFICE DUTIES | 50% |

Name of Direct Supervisor [ VINCENZO MAZZAMUTO ]       Telephone Number of Direct Supervisor [ 717-243 0383 ]

Attachments and Signature - Please attach a copy of the employee's job description if employee expected to be out of work for more than six weeks.

FRAUD NOTICE
Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties. This includes Employer and Attending Physician portions of the claim form.

The above statements are true and complete to the best of my knowledge and belief.

Name of Person Completing Form [ VINCENZO MAZZAMUTO ]       Telephone Number [ 717-243-0383 ]

Title of Person Completing Form [ PRESIDENT ]       Fax Number [                    ]

Signature [ V. ___ Mazzamuto ]

Date Signed [ 11-22-00 ]       Telephone Number [                    ]

Not part of the Application                **AGENT'S STATEMENT**

| ANSWER QUESTION 1 FOR ALL CASES | | Yes | No |
|---|---|---|---|

1. A. If cash was collected with this application, did you give the receipt and explain that no coverage is provided under the receipt unless all conditions to coverage stated in it are met, and did you explain that such coverage is temporary and limited in the amount? If "No", cash must be refunded. (If Applicant did not give you the cash, give the name and address of the person who did in Question 7 below.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ☑ ☐

   B. Did you ask each question in the parts of the application for which you are responsible exactly as set forth, were the answers recorded exactly as made to you, and were all required signatures obtained in your presence? If "No", explain in Question 7 below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ☑ ☐

   C. (i)  Did the Proposed Insured communicate in English well enough to understand and answer each question in English including those on Non-Medical Part II, if applicable? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ☑ ☐
      (ii) If "No" to (i), who acted as interpreter? Agent ☐;  Other ☐
         If "Other", give name and relationship to Proposed Insured . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

   D. Are you aware of any information (including any prior rating or declination, physical condition, medical history, hazardous activities, alcoholic or drug habits, personal or financial reputation) which might affect the underwriting of the policy? If "Yes", explain fully in Question 7 below, even though this information may be disclosed in another part of the application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ☐ ☑

   E. By reason of this transaction, is replacement involved? If "Yes", give details in Question 7 below . . . . . . . . . . . .  ☐ ☑

   F. Annualized premium amount?  $. 1427.00. . .

   G. Estimated First Year Commission? $. 785.00. . .

   H. How well do you know the Proposed Insured?
      ☐ Well, for . . . . . years          ☑ Met on solicitation           ☐ Approached by Applicant
      ☐ Casually, for . . . . years        ☐ Relative (Relationship . . . . . . . . . . . .)

2. Source? (A) ☑ My Client          (B) ☐ Direct Mail          (C) ☐ Group Contract
   (D) ☐ Client Referral          (E) ☐ Canvass          (F) ☐ Customer List
   (G) ☐ Unassigned Policyowner          (H) ☐ Ad Response          (I) ☐ Other

3. A. Proposed Insured's Occupation Class: . 3A. . . .; Occ. Code. 941. . . . Client ID (if known). . . . . . . . . . .
   B. Status: ☑ Self-employed, ☐ Salaried, ☐ Commissioned, ☐ Other . . . . . . . . . . . .

4. If policy is to be added to an existing C-O-M, Nyl-A-Plan, List Bill Arrangement, give:
   A. Arrangement number (☐ C-O-M or ☐ Nyl-A or ☐ List Bill) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
   B. Type of Nyl-A-Plan Agreement: ☐ 8071, ☐ 8072    C. Name of Nyl-A-Plan . . . . . . . . . . . . . . . . . . . . . . .

5. Medical Specialty Letter Requested?  No ☑  Yes ☐   If "Yes", give Specialty . . . . . . . . . . . . . . . . .

6. (A) POP DI?  No ☑  Yes ☐ (Give Life policy # if known.) . . . . . . . . . . . . . . (B) Pro. Insd. County of Residence . . . . . . . . . . . . . . . .

7. Remarks, Additional Details . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

I DECLARE THAT: (a) the application was secured by me personally, and that I have no understanding or agreement with any other person, directly or indirectly, as to commissions or compensation on any policy applied for, except as may be specified below; and

(b) I have not paid or allowed, and I agree that I will not hereafter pay or allow, either directly or indirectly, any compensation or commission other than below, or any rebate of premium in any manner whatsoever to the Applicant or to any other person.

Name(s) of person(s) sharing commission . . . . . . NONE. . . .
                                        (If commission is not to be shared, enter "none".)

Share of commission . 100%. . . . . . . . . .

I HEREWITH SUBMIT the cash collected with this application. Date . 9/28, 1993.

Signature of Agent . . . . . . . . . . . . . . . . . . . . . . . .
Signature of any other
person(s) sharing commission . . . . . . . . . . . . . . . . . .

NYL-CB-DCP10

OFFICE "Date Received" Stamp Here
AUG 30
V.4.4 10:11 AM '93

13

H. 3-236167

## SUPPLEMENT TO APPLICATION PART 1 TO NEW YORK LIFE INSURANCE COMPANY

Proposed Insured _Vincenzo Mazzamuto_    Soc. Sec. No. _196-56-544_

**SECTION 1 - BUSINESS OWNER'S STATEMENT** - must be completed if Proposed Insured owns any portion of the business.
COMPLETE QUESTIONS 1 THROUGH 5 FOR ALL PLANS OF INSURANCE

1. Name of Business _Vinny's Restaurant, Inc_
2. Structure of Business:    Sole Proprietor ☐    Partnership ☐    S Corp. ☐    Corp. ☒
3. Date the business was formed (if Corp. or S Corp, give date of incorporation) _1990_
4. Percent of Business owned by Proposed Insured _100_ %
5. Is the Proposed Insured's spouse employed by the same employer?   Yes ☐   No ☒

COMPLETE QUESTIONS 6 THROUGH 10 WHEN APPLYING FOR OVERHEAD EXPENSE

6. How many partners or co-owners are there (including the Proposed Insured)? _____
7. Is the Proposed Insured actively employed full-time in the business?   Yes ☐   No ☐    If "No", explain _____
8. Number of full-time employees (including Proposed Insured) _____
9. Would the absence of the Proposed Insured result in a substantial loss of income to the firm?   Yes ☐   No ☐
10. Can the Proposed Insured's duties be performed by an individual presently employed by the firm?   Yes ☐   No ☐

COMPLETE QUESTIONS 11 THROUGH 15 ONLY WHEN APPLYING FOR DISABILITY BUY-OUT

11. How many partners or co-owners are there (including the Proposed Insured)? _____
12. Is the Proposed Insured actively employed full-time in the business?   Yes ☐   No ☐    If "No", explain _____
13. Number of full-time employees (including Proposed Insured) _____
14. Is there Disability Buy-Out coverage applied for (or already in force) on each partner or co-owner?   Yes ☐   No ☐
    If "No", explain reason _____
15. Is it understood that as a requirement for the payment of benefits, a Buy-Out Agreement must be in effect and a Buy-Out effected?   Yes ☐   No ☐

**NOTE: THE PROPOSED INSURED CANNOT BE THE OWNER OF A DISABILITY BUY-OUT POLICY. THE OWNER MUST BE NAMED IN QUESTION 6 OF PART I OF THE APPLICATION**

## SECTION 2 - FINANCIAL INFORMATION

EARNED INCOME — Complete the chart below if the Proposed Insured owns any portion of the business. Fill in amounts as reportable for Federal income tax purposes.

| | Current Annual Rate | Actual Last Year 19 _92_ | Actual 2 Years Ago 19 _91_ |
|---|---|---|---|
| (i) Proposed Insured's share of Gross Business Receipts | $_184,494_ | $_184,494_ | $_364,521_ |
| (ii) Proposed Insured's share of Business Expenses (include all salaries and contributions to deductible Pension or Profit Sharing Plans; do not include IRA or Keogh Plan contributions) | $_131,455_ | $_131,455_ | $_323,783_ |
| (iii) For a Corporation, Proposed Insured's salary, wages, commissions, bonuses from the business, that are in (ii) above | $_____ | $_____ | $_____ |
| (iv) Contributions to any Pension or Profit Sharing Plan on Proposed Insured's behalf included in (ii) above | $_____ | $_____ | $_____ |
| (v) Earned income from other sources, after deducting business expenses | $_____ | $_____ | $_____ |
| (vi) Total Income (i) − (ii) + (iii) + (iv) + (v) | $_53,039_ | $_53,039_ | $_40,738_ |

Is 30% or more of (i) above ever generated in a single month?   Yes ☐   No ☒

NYLCL 00310

916001

**HEALTH INSURANCE MEMORANDUM**

No. V44

H. I. Policy No.

*H3336167*

This Memo. must be attached OVER all the
papers of the Application to which it refers,
and must not be detached therefrom.

| DATE | NAME OF INSURED (PRINT) *Vincenzo Mazzamuto* |
|------|----------------------------------------------|
| 2/18/94 | *Typist M prepare clrd* |

DRUM DATES

HL.CL.00306

H-3 Cont. 5-68 Printed in U.S.A.

HEALTH INSURANCE MEMORANDUM

This Memo. must be attached OVER all the
papers of the Application to which it refers.
and must not be detached therefrom.

No. 144

H. I. Policy No.

H3 236167

| DATE | NAME OF INSURED (PRINT) | |
|---|---|---|
| | Vincenzo Mazzamuto | |

1/24  US44904932 (Add) _illegible_
Add - Please be advised that
the COO refer is not
available at _illegible_

1/26  US44904932

1/26  BPU _illegible_

1/27  BPU _illegible_ _illegible_ on file
PCC - OK to add
$1000 AM, change to 90 E1
and mode to Semi Annual

1/31/94  H14 96-209 +21Y per _illegible_

2/16  _illegible_

2/16  PCC  Please change to
non smoker rates effective
from start

H185174

NYCL00305

H-3-Cont. 3-68 Printed in U.S.A.

## INDIVIDUAL HEALTH CHANGE TRANSMITTAL FORM
### INDEX CHECK REQUIRED

☐ New Application Pending - Copy of Form 15015 Attached

To: Index Division Rm. 966 Check Insured or Other Member

Then To: Individual Health Change Unit Rm. 1053

Indicate in ☐ Office Originating Request

☒ Gen. Off. and Code: Constitution ☐ C.S.O.
    V44

Date ___1-12-94___

Agent and Code: S. Ferrigno  022054

Insured:  Vincenzo Mazzamuto

Policy #   H3 X 236 167

Amt. of Remittance Rec'd. $ _____

Date Cond. Temp. Cover Term. _____

Insured's Date of Birth    5-25-55

Applicant's Date of Birth

☒ Requirements

Type of Change ☒

| | Policy | I.R. Requested |
|---|---|---|
| x | 90X000 91-607 | 2274 |
| x | Non-Med. | |
| | Med. Exam. | |
| x | Para-Med HORL refer to 44904932 | |
| x | A.P.S. Requested | |

| | |
|---|---|
| Add Member | D.O.B. |
| Add Add'l. Ben. Rider | |
| Reinstatement | |
| Options | |
| Reconsider Rating  non-smoker | |
| Other | incr mon bene to $3000.00 waiting per 90 da 3 units ipo, 5% colb to age 65 w/residual & unrestricted own occ mode to semiannual |

| DATE | FOR H.O. USE ONLY | DRUM DATES |
|---|---|---|
| | | |

NYLCL 00297

H-116  2-84

CONSULTATION FORM

TO _____ Tim _____

FROM _____

RETURN TO UNIT _____

TYPE CONSULT: _____ MEDICAL

_____ OTHER

Poor Quality Original

M.I.B. CODES:

_____    _____
_____    _____

DESCRIPTION: Please note APR. - MED Hx OK
However - Please note # Date stopped
smoking indicates 10/92 - New note gtel
indicates 2/92.

RECOMMENDATION: Suggest we take Dr's word &
Issue as smoker!

DATE: 6/25.

SIG: A. M⁻ Cray

RESPONSE:

NYLCL 00295

DATE: _____    SIG: _____

JUN 24 '93  12:04PM NY LIFE CONST GEN OFFICE  P.2
NEW-YORK LIFE INSURANCE COMPANY
DISABILITY INCOME UNDERWRITING

ATTENDING PHYSICIAN'S STATEMENT
UNDERWRITING INFORMATION

| NAME OF PATIENT    3) INITIAL    4) LAST NAME | ADDRESS | GENERAL OFFICE CODE AND NAME |
|---|---|---|
| Vincenzo Mazzamuto | 501 Limestine Road Carlisle, PA 17011 | Constitution V44 |
| DATE OF BIRTH  05/25/55 | | AGENT Salvatore Perrigo |
| NAME OF APPLICANT AND RELATIONSHIP TO PATIENT | H.O. IDENTIFICATION H3 236 157 | NAME OF DOCTOR Dr. Terry Robinson | DATE 06/11/93 |

$40.00 Prepayment IF AGE OR YOUNGER, PLEASE COMPLETE REVERSE SIDE OF THIS FORM.

| (1) | Dates Attended | | Complaints & Abnormal Physical Findings | Duration of Illness | Diagnosis | Describe Treatment or Operation |
|---|---|---|---|---|---|---|
| | MONTH | YEAR | | | | |
| | 2/93 | | (R) knee pain ↓ torn menisus (R) | | | **Poor Quality Original** |
| | | | Phslm IMS lte of: Torness new Tevasstr obey | | | |

(2) Laboratory Findings (including x-ray, ECG, BMR and pathological reports, etc., with dates)

2/93 MRI - torn (R) medial menisus

(3) Present condition, if known? (include sequelae and complications of above reported illnesses)

(4) Have any other physicians or surgeons been consulted? If so, please give name, date and nature of disorder.

Dr MRI - ortho 2/93.

(5) Please record any other medical information which has a bearing on this person's health including cigarette smoking.

(+)Smoker 2-3 PPD Quit 10/92 obesity J cholestrolin

DATE  6 / 21 / 19  93    SIGNATURE  _____

220 Willow St.

STREET ADDRESS _____  CITY OR TOWN _____  STATE _____  ZIP CODE _____  17-15

This form was developed by the Health Insurance Council and
approved by the Council on Medical Services of the A.M.A. in 1965.

H-17674B 3-87

NYLCL 00292

JUN 24 '93 11:11

NYLCL00291

INFOLINK SERVICES          C O N F I D E N T I A L          For customer service,
Hooper Holmes, Inc.        ---- District / Agency ----       call: (509)428-3385
Order#: 371  32616         CONST V44
                           ------ Policy Number -------
Company: 00629-001         H3 236 167                        Date Requested:
                                                             Date Received: 06/05/93

   Name: VINCENZO      *. MAZZANUTO
Address: 501 LIMESTONE RD                                    Date of Birth: 05/25/55
                                                             Soc. Sec. #:
         CARLISLE          PA 17013                      Monthly Disability:              0

Beneficiary Name/Relationship:

SOURCES: [X] Applicant        [ ] Employer
         [ ] Spouse           [ ] Other adult family member

     Other adult family member name/relationship - Confirming sources/known

| IDENTIFICATION: | No/Yes | PROVIDE DETAILS OF Yes ANSWERS |
|---|---|---|
| 1. Name Incorrect? | [N]o | |
| 2. Date of Birth Incorrect? | [N]o | |
| 3. Residence address Incorrect?<br>a. Less than 1 yr. at Res.?<br>(If Yes, give prev. addr(s): | [N]o<br>[N]o | **Poor Quality Original** |
| 4. Beneficiary Incorrect? | [N]o | |
| 5. Applicant's marital status: | [M] | [M]d. [S]ing. [W]id. [D]iv. S[e]p. |

EMPLOYMENT: 1.Employer's Name: GENOVA'S

2.Job Title: OWNER                            3. Employed for: 7 YEARS

3a. Former employer, if less than 1 yr. at job:

4. Line of Business: PIZZA & ITALIAN RESTAURANT          5. # of Employees: 6

6. Duties: MANAGES THE RESTAURANT, DOES PURCHASING AND BOOKKEEPING 60% OF
           THE TIME AND MAKES PIZZAS 40% OF THE TIME.
           HE OWNS 100% OF THE BUSINESS.

INCOME/FINANCIAL: 1. Annual Earned Income:        $    110,000
                  2. Annual Unearned Income:      $     30,000

2a. Source: rent,dividends,etc..?
    RENTAL INCOME

3. Estimated Net Worth: $  1,000,000      4. Spouse's Income: $     10,000

| | No/Yes | PROVIDE DETAILS OF Yes ANSWERS |
|---|---|---|
| 5. Annual earned income figure<br>above exact? (If not, explain) | [Y]es | |
| 6. Any bonus or profit sharing? | [N]o | |
| 7. Covered by State Disability<br>Benefit Program? | [N]o | |
| 8. Any other Disability Income<br>in force or applied for? | [N]o | |
| 9. Any periods of absenteeism<br>from job or other potential<br>drains on income? | [N]o | |
| 10. Any financial problems, such<br>as bankruptcy,judgements,liens? | [N]o | |

NYLCL00288

JUN 16 9 37 AM '93

NYLCL00285

1. Based on occupational duties of _____ any policy issued will be, _____ at best, occupational class _____. Advise if acceptable. Information from IR.

2. Based on annual earned/unearned income of _____ any policy issued will be at best for _____ and SIS rider _____. We will consider if furnished with factual proofs of earned (net) income.

3. Based on annual earned/unearned income of _____ and other coverage in force with _____, any policy issued will be at best - _____ and SIS _____. Will reconsider if furnished with factual proofs of earned (net) income.

4. We have reason to believe that the proposed insured has a monthly income policy in force/pending with _____. Advise amount, BENEFIT PERIOD? status of policy.

(5.) Based on MIB information, we have reason to believe that the proposed insured may not have given us full details in answer to questions of Part II. Please secure a new non-medical Part II with special attention to such questions 3←_____

6. Based on history of _____, any policy issued will require a _____ Rider. We can consider on a standard basis with a _____ day waiting period. Advise if acceptable.

7. Based on history of _____, any policy issued will require a _____ special class extra premium. We can consider on a standard basis with a _____day waiting period. Advise if acceptable.

8. Based on history of _____, any policy issued will include a rider and/or a special class _____ extra premium on _____. As this is a replacement, advise if acceptable.

9. Based on occupational class of _____ we cannot offer Plan _____. Can consider for _____. Advise if acceptable.

10. Based on _____ history, any policy issued will require a _____ Rider with a _____ day waiting period. All other conditions will have _____ day waiting period.

11. We still have not received SRC documents. Please advise when they will be forwarded.

12. Because Nylic group disability benefits, which proposed will be eligible for integrate with Social Security, it is to proposed insured's benefit to apply for total amount in base policy. If desired, we can consider as applied for. Please advise.

13. Advise proposed insured's residency status, years in U.S. and does proposed insured intend to remain in the U.S. permanently.

14. It is difficult for us to accept an application on an individual at this age who has never seen a physician. Please advise name of Attending Physician, dates and reasons consulted.

NYLIC.L.00284

## ACKNOWLEDGEMENT

I have been given a copy of "Information Practices Related to Underwriting Your Application" which tells how New York Life Insurance Company and New York Life Insurance and Annuity Corporation obtain and use data about me. It includes the notice required by the state and federal Fair Credit Reporting Acts and a description of MIB, Inc. (Medical Information Bureau).

## AUTHORIZATION

(In this Authorization, "the Insurer" means New York Life Insurance Company or New York Life Insurance and Annuity Corporation, whichever applies.)

In order to see if (and on what basis) I qualify for insurance or for the benefits which that insurance may provide, I authorize the following:

**MEDICAL INFORMATION** Physicians or practitioners; hospitals; medical or medically related facilities; laboratories; insurance companies; or MIB may give to the Insurer (or any consumer reporting agency acting in its behalf) and to any of its reinsurers data and copies of records that they may have about my physical and mental health. The data and records may include important history, findings, diagnoses and treatment.

**OTHER UNDERWRITING INFORMATION** MIB and other insurance companies may give to the Insurer and to any of its reinsurers data about: my driving record; any criminal activity or association; hazardous sport or aviation activity; use of alcohol or drugs; any claim of eligibility for disability income benefits; and other applications for insurance.

**EXAMINATIONS AND TESTS** The Insurer may obtain physical examinations or medical tests deemed necessary to underwrite my application. These tests (where permitted by law) may include, but are not limited to, electrocardiograms, chest x-rays, and tests of blood and urine to determine, among other things, exposure to causative agents of disease (for example, exposure to the AIDS virus) and the presence of drugs. However, a separate notification/authorization form will be provided with respect to testing for the AIDS virus.

**INVESTIGATIVE CONSUMER REPORT** The Insurer may obtain an investigative consumer report and may give the consumer reporting agency information concerning the amount and type of my coverage and my use, if any, of tobacco. The report may add to or confirm the types of data mentioned above. It may also contain data about: my identity; age; residence; marital status; past and present jobs (including work duties); economic conditions; driving record; personal and business reputation in the community; and mode of living; but will not include any information relating directly or indirectly to sexual orientation.

**IDENTIFICATION** To obtain the data described above, the Insurer may give my name, address, and date, and place of birth to the above persons or organizations.

**RELEASE OF INFORMATION TO OTHERS** When necessary, the Insurer may give data about me that affects my insurability to: its subsidiaries; its affiliates; its parent company; its agents and their staffs; its reinsurers; and the Insurer and its reinsurers may give such data to MIB. However, this will not be done in connection with information relating to the AIDS virus.

I also authorize the release of these same types of data about any of my children who are to be insured.

This authorization shall be valid for 30 months from the date shown below. A photocopy of it shall be as valid as the original.

In giving this authorization, I release the above parties from all liability in the securing and use of the above underwriting data.

I know that a copy of this form is in the Insurer's statement on "Information Practices Related to Underwriting Your Application."

Date _____ 6/3 , 19 93

Witness _____ / Agent

Signature of Proposed Insured (Annuitant) _____

Signature of Spouse, if proposed for coverage; or
Signature of Parent or Guardian, if Proposed Insured (Annuitant)
is Under 14 years 6 months

NYLCL00283

Not part of the Application

**AGENT'S STATEMENT**

ANSWER QUESTION 1 FOR ALL CASES

|  |  | Yes | No |
|---|---|---|---|
| 1. | A. If cash was collected with this application, did you give the receipt and explain that no coverage is provided under the receipt unless all conditions to coverage stated in it are met, and did you explain that such coverage is temporary and limited in the amount? If "No", cash must be refunded. (If Applicant did not give you the cash, give the name and address of the person who did in Question 7 below.) | | |
| | B. Did you ask each question in the parts of the application for which you are responsible exactly as set forth, were the answers recorded exactly as made to you, and were all required signatures obtained in your presence? If "No", explain in Question 7 below | ☑ | ☐ |
| | C. (i)  Did the Proposed Insured communicate in English well enough to understand and answer each question in English including those on Non-Medical Part II, if applicable? | ☑ | ☐ |
| | (ii) If "No" to (i), who acted as interpreter? Agent ☐;  Other ☐ <br> If "Other", give name and relationship to Proposed Insured | ☑ | ☐ |
| | D. Are you aware of any information (including any prior rating or declination, physical condition, medical history, hazardous activities, alcoholic or drug habits, personal or financial reputation) which might affect the underwriting of the policy? If "Yes", explain fully in Question 7 below, even though this information may be disclosed in another part of the application | | |
| | E. By reason of this transaction, is replacement involved? If "Yes", give details in Question 7 below | ☐ | ☑ |
| | F. Annualized premium amount?   $ 187.00 | ☐ | ☑ |
| | G. Estimated First Year Commission? $ 185.00 | | |

H. How well do you know the Proposed Insured?

☐ Well, for ...... years  ☑ Met on solicitation
☐ Casually, for ...... years  ☐ Relative (Relationship ...........)  ☐ Approached by Applicant

2. Source? (A) ☑ My Client  (B) ☐ Direct Mail  (C) ☐ Group Contract
(D) ☐ Client Referral  (E) ☐ Canvass  (F) ☐ Customer List
(G) ☐ Unassigned Policyowner  (H) ☐ Ad Response  (I) ☐ Other

3. A. Proposed Insured's Occupation Class: 3A ....; Occ. Code 491 ...... Client ID (if known) ..........
B. Status: ☑ Self-employed, ☐ Salaried, ☐ Commissioned, ☐ Other ..........

4. If policy is to be added to an existing C-O-M, List-A-Plan, List Bill Arrangement, give:
A. Arrangement number (☐ C-O-M or ☐ Nyl-A or ☐ List Bill) ..........
B. Type of Nyl-A-Plan Agreement: ☐ 8071, ☐ 8072  C. Name of Nyl-A-Plan ..........

5. Medical Specialty Letter Requested?  No ☑  Yes ☐  If "Yes", give Specialty ..........

6. (A) POP DI?  No ☑  Yes ☐ (Give Life policy # if known.) ..........  (B) Pro. Insd. County of Residence Cumberland

7. Remarks, Additional Details ..........
..........
..........
..........

I DECLARE THAT: (a) the application was secured by me personally, and that I have no understanding or agreement with any other person, directly or indirectly, as to commissions or compensation on any policy applied for, except as may be specified below; and

(b) I have not paid or allowed, and I agree that I will not hereafter pay or allow, either directly or indirectly, any compensation or commission other than below, or any rebate of premium in any manner whatsoever to the Applicant or to any other person.

Name(s) of person(s) sharing commission ...... None
(If commission is not to be shared, enter "none")

Share of commission  100%  ..........

I HEREWITH SUBMIT the cash collected with this application. Date ... 6/3 ... 19 93

Signature of Agent  _Schooler Brown_

Signature of any other
person(s) sharing commission ..........

NYLCL00282

CONSTITUTION  Jun 3 - 1 19 PM '93  C.O. V44  "Date Received" Stamp Here  OFFICE

1063

PT 702765

## APPLICATION PART I TO NEW YORK LIFE INSURANCE COMPANY (Continued)

**THOSE WHO SIGN THIS PART I AGREE THAT:**

1. All of the statements in the application are correctly recorded, and are complete and true to the best of the knowledge and belief of those who made them.

2. No agent or medical examiner has any right to accept risks, make or change contracts, or give up any of the Company's rights or requirements.

3. "Cash Paid" with the application with respect to a new policy or additional benefit provides a limited amount of temporary coverage for up to 60 days, if the terms and conditions of the receipt are met. If an option to increase the amount of income protection is being exercised, it must be available in the policy indicated, and no coverage will be provided before the Option Date. Temporary coverage is not provided if reinstatement of a policy is applied for.

4. To put a policy or benefit issued in response to this application into effect, the policy or written evidence of the benefit

must be delivered to the Applicant and the full first pre... paid. If temporary coverage with respect to a policy or b... is not in effect at time of delivery, there must not have... any material change in the insurability of the Proposed In... as described by the application's written statements... means that these statements would still be complete an... if made at time of delivery.

5. If this application is in connection with a reinstatement... agreed that payment of the overdue premium to New... Life Insurance Company will be applied to a period bet... the date the policy lapsed and the date of reinstatem...

6. Under penalties of perjury, it is certified that: (a) The S... Security or tax numbers shown in this application are c... taxpayer identification numbers; and (b) the holders of ... numbers are not subject to any backup withholding of ... Federal income tax.

Dated at _Carlisle, PA_

on _____ 6/3 _____, 19 93

I certify I have truly and accurately recorded all answers given to me.

Witness _____

_____ Agent

Countersigned by Licensed Resident Agent (if required)

_____
Signature of Appli...

_____
Signature of Proposed Insured if other than Appli...

NYLCL00275

91-607

NEW YORK LIFE CONST GEN OFFICE

☐ NEW YORK LIFE INSURANCE COMPANY
☐ NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION (A Delaware Corp.)
51 Madison Avenue, New York, N.Y. 10010

| Policy Number (if known)? | |
|---|---|

Answers to the Paramedical Examiner, forming Part
Application for Insurance. Complete this form in pr

1. a. Name of Person Examined? **Vincenzo Mazzomato**  b. Date of Birth? Mo: 5  Day: 25  Yr.: 55  c. Soc. Sec. or Soc. Ins. No.? 196 36 574

2. Personal Physician  a. Name? Mosko Associates (Tony Robinson D.O.) Carlisle Pa. 17013
If none, or if not  b. Address and Phone No.? Same as above
consulted in last  c. Last consulted: Date? ≃ 1 month  Reason? Knee injury
5 yrs., so state.  d. Treatment: Type? Evaluation  Medication? N/a

Give the following information, so far as known, for the person being examined. If "Yes" to any question, give full details in Question 11.

3. In last 10 years, has such person consulted a physician or practitioner for, been treated for, had, or been informed that he or she had

|  | Yes | No |
|---|---|---|
| a. heart trouble, angina, stroke, murmur or irregular pulse? | ☐ | ☒ a |
| b. diabetes or elevated blood sugar? | ☐ | ☒ b |
| c. chronic bronchitis, emphysema, asthma or other lung disorder? | ☐ | ☒ c |
| d. cancer, tumor, lymphoma; lupus or collagen disorder; rheumatoid arthritis or muscular disease? | ☐ | ☒ d |
| e. pancreatitis; urine sugar; hepatitis, cirrhosis or liver trouble? | ☐ | ☒ e |
| f. AIDS, AIDS-related complex (ARC), or other immune deficiency? | ☐ | ☒ f |
| g. elevated blood pressure; thrombophlebitis, embolism or other circulatory disorder; kidney disease; albumin or blood in urine? | ☐ | ☒ g |
| h. ulcerative colitis, ileitis or other chronic intestinal disorder? | ☐ | ☒ h |
| i. seizures, dizziness or fainting; other nervous system disorder? | ☐ | ☒ i |
| j. anemia, thyroid or other blood or gland disorder? | ☐ | ☒ j |
| k. ulcer; hernia; varicose veins; gall bladder disorder; kidney stones? | ☒ | ☐ k |
| l. back, spine, joint or bone disorder; eye, ear or skin disorder? | ☐ | ☒ l |
| m. (if a male) disorder of prostate or reproductive organs? (if a female) disorder of pelvic organs, breasts, menses or pregnancy, or is she now pregnant? | ☐ | ☒ m |

4. Is any such person now taking prescription medication? ☐ ☒

5. In last 2 years, has any such person had any of the following:
a. unexplained weight loss or swollen glands; recurring diarrhea; fever or infection; persistent cough, pneumonia, or thrush? .....
b. chest discomfort, edema, transient visual loss, muscle weakness, shortness of breath, or internal bleeding? .......... Yes:

6. In last 10 years, has any such person been counselled, treated or hospitalized for any psychiatric, emotional or mental health condition, or for the use of alcohol or drugs? ..............

7. Other than as stated, has any such person during past 2 years had
a. treatment or surgery in a hospital or other facility? ..........
b. an electrocardiogram, x-ray or other diagnostic test, or an examination for checkup or other purpose? ..............
c. advice about any treatment, surgery or diagnostic testing which was not completed? ..............

8. Has any such person, for physical or mental health reasons, ever received disability benefits, compensation or pension; or been rejected for, or discharged from, military service? ..............

9. Any history of angina, heart trouble or stroke before age 60 among natural parents, brothers or sisters of any such person? If "Yes", give relationship, age at onset and subsequent history. ..... ☒

10. Has such person smoked any cigarettes in the past 12 months? ... ☐

## 11. GIVE FULL DETAILS FOR EACH "YES" ANSWER IN QUESTIONS 3-10

| a. Ques. No. | b. Reason — nature and severity of condition, (include frequency, treatment, medication, surgery and results.) | c. Onset? Mo. Yr. | d. Recovery? Mo. Yr. | e. Names and Addresses of Physicians Hospitals or Medical Facilities |
|---|---|---|---|---|
| 9 | Father: Stroke prior to age 60. | | | |

THE UNDERSIGNED DECLARE THAT, to the best of their knowledge and belief, all answers given in this Part II are correctly recorded, complete and true

Dated at Carlisle Pa.  on 5-19  19 93  x Vince Wy____
I certify I have truly and accurately recorded all answers given to me,  N/a  Signature of person examin
Witnessed by ____ REMC  Signature of Parent or Guardian, if person examined is under 14 years & month
Signature & title of person completing Questionnaire

JUN 9'93 16:06

NYL CL 00272

1 215 664 7270  PAGE.002
9885

| NON-MED. | | |
|---|---|---|
| ☐ NEW YORK LIFE INSURANCE COMPANY | Policy Number (if known)? | |
| ☐ NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION (A Delaware Corp.) 51 Madison Avenue, New York, N.Y. 10010 | Answers to Insurer forming Part II of Application for Insurance. (Please print or type.) | |

**Full information on all persons proposed for coverage in Question 1. (Use Question 11 for all details requested in Questions 2-11.)**

1. a. PROPOSED INSURED? _Vincenzo Mazzamuto_    Height? _5_ ft. _6_ in.; Weight? _195_ lbs.
   b. SPOUSE, if proposed for coverage?    Height? ___ ft. ___ in.; Weight? ___ lbs.
   c. CHILDREN, if proposed for coverage (give full names)?

2. Personal physicians (give consultation details in Ques. 11) Name?
   a. For Proposed Insured _Masland Medical Associates_  Address and Phone No.? _280 Wilson St Ste 109_  Date last consulted? _1 month ago_
   _(717) 249-1929  Carlisle, PA 17013_
   b. For Spouse named in Ques. 1

**Answer Questions 3-11, so far as known, for all persons in Ques. 1. (If "Yes" to Ques. 6, submit CPHQ Form 17480 for that person, and give name in Ques. 11.)**

| | | Yes | No | | | Yes | No |
|---|---|---|---|---|---|---|---|
| 3. In last 10 years, has such person consulted a physician or practitioner for, been treated for, had, or been informed that he or she had | | | | 5. In last 2 years, has any such person had any of the following: | | | |
| a. heart trouble, angina, stroke, murmur or irregular pulse? | | ☐ | ☒ a | a. unexplained weight loss or swollen glands; recurring diarrhea, fever or infection; persistent cough, pneumonia, or thrush? | | ☐ | ☒ a |
| b. diabetes or elevated blood sugar? | | ☐ | ☒ b | b. chest discomfort, edema, transient visual loss, muscle weakness, shortness of breath, or internal bleeding? | | ☐ | ☒ b |
| c. chronic bronchitis, emphysema, asthma or other lung disorder? | | ☐ | ☒ c | | | | |
| d. cancer, tumor, lymphoma; lupus or collagen disorder; rheumatoid arthritis or muscular disease? | | ☐ | ☒ d | 6. In last 10 years, has any such person been counselled, treated or hospitalized for any psychiatric, emotional or mental health condition, or for the use of alcohol or drugs? (if yes, submit CPHQ.) | | ☐ | ☒ |
| e. pancreatitis; urine sugar; hepatitis, cirrhosis or liver trouble? | | ☐ | ☒ e | | | | |
| f. AIDS, AIDS-related complex (ARC), or other immune deficiency? | | ☐ | ☒ f | 7. Other than as stated, has any such person during past 2 years had | | | |
| g. elevated blood pressure; thrombophlebitis, embolism or other circulatory disorder; kidney disease; albumin or blood in urine? | | ☐ | ☒ g | a. a treatment or surgery in a hospital or other facility? | | ☐ | ☒ a |
| h. ulcerative colitis, ileitis or other chronic intestinal disorder? | | ☐ | ☒ h | b. an electrocardiogram, x-ray or other diagnostic test, or an examination for checkup or other purpose? | | ☐ | ☒ b |
| i. seizures, dizziness or fainting; other nervous system disorder? | | ☐ | ☒ i | c. advice about any treatment, surgery or diagnostic testing which was not completed? | | ☐ | ☒ c |
| j. anemia, thyroid or other blood or gland disorder? | | ☐ | ☒ j | | | | |
| k. ulcer, hernia; varicose veins; gall bladder disorder; kidney stones? | | ☐ | ☒ k | 8. Has any such person, for physical or mental health reasons, ever received disability benefits, compensation or pension; or been rejected for, or discharged from, military service? | | ☐ | ☒ |
| l. back, spine, joint or bone disorder; eye, ear or skin disorder? | | ☐ | ☒ l | | | | |
| m. (if a male) disorder of prostate or reproductive organs? (if a female) disorder of pelvic organs, breasts, menses or pregnancy, or is she now pregnant? | | ☐ | ☒ m | 9. Any history of angina, heart trouble or stroke before age 60 among natural parents, brothers or sisters of any such person? If "Yes", give relationship, age at onset and subsequent history. | | ☒ | ☐ |
| 4. Is any such person now taking prescription medication? | | ☐ | ☒ | 10. Has Prop. Insured smoked any cigarettes in the past 12 months? | | ☐ | ☒ |

**11. GIVE FULL DETAILS FOR EACH "YES" ANSWER IN QUESTIONS 3-5, 7-9, AND LAST CONSULTATION WITH PERSONAL PHYSICIAN IN PAST 2 YEARS**

| a. Ques. No. | b. Name of Person to whom "Yes" applies | c. Reason -- nature and severity of condition? (include frequency, treatment, medication, surgery and results.) | d. Onset? Mo. Yr. | e. Recovery? Mo. Yr. | f. Names and Addresses of Physicians, Hospitals or Medical Facilities? |
|---|---|---|---|---|---|
| 9 | father | stroke prior to age 60 | | | |
| | | PI last consulted Dr Robinson injury -- fully recovered -- no further | 4/95 | | See knee treatment nec? |

THE UNDERSIGNED DECLARE THAT, to the best of their knowledge and belief, all answers given in this Part II are correctly recorded, complete and true.

Dated at _Carlisle, PA_ on _6/3_ , 19_95_    _Vincenzo Mazzamuto_
I certify I have truly and accurately recorded all answers given to me.    Signature of Proposed Insured

Witnessed by _Jennifer Brown_                    _____
                                      Agent

Signature of Spouse, if proposed for coverage:
Signature of Parent or Guardian, if Prop. Insured under 14 years 6 months

988510

NYLCL00277

NOT PART OF THE APPLICATION

### RULES AND INSTRUCTIONS FOR COMPLETION OF NON-MEDICAL APPLICATION PART II

If an Application Part II is required, it must be a Non-Medical Part II, unless a medical or paramedical examination is required because of age and amount or because the case is not suitable for non-medical (see Section 1 below). On all applications submitted on a non-medical basis (including simplified underwriting), the Agent must see the Proposed or Other Covered Insured and the spouse (if proposed for coverage) at the time they sign the application, and be satisfied that they appear to be normal, healthy and satisfactory risks for insurance coverage. (A separate Non-Medical Part II should be completed for the Other Covered Insured.)

**1. Caution: Proposed Insured, Spouse or Other Covered Insured Not Suitable for Non-Medical**

(a) Persons with a medical impairment for which a medical or paramedical examination is required regardless of age or amount. The Agents' Manual and the Health Insurance Rate Book list some significant impairments requiring a Medical or Paramedical Part II.

(b) Persons whose applications have been obtained by mail. The Agent should attach a letter explaining why it was necessary to do this.

(c) Citizens of foreign countries, unless they have resided continuously in the U.S. or Canada for at least one year (two years, if disability income).

(d) If the Agent is to be Applicant, Owner, Beneficiary or Assignee, any person who is not a member of the Agent's family or is not related by blood or marriage to the Agent. Prior approval for such cases must be obtained from the Home Office. A Paramedical or Full Medical Application Part II (whichever is applicable) will always be required.

**2. Signatures on Non-Medical and Authorization Forms**

(a) A spouse proposed for life or disability income coverage must also sign the Part II.

(b) If the Proposed Insured is a child under 14 years and 6 months old, a parent or guardian who is living with the child must answer the questions with respect to the child and must sign the Part II. The child, if age 9 or over and is able to write, should sign in the space provided.

(c) The Non-Medical Application Part II must be signed in the presence of the Agent.

(d) All persons (Proposed Insured, spouse, parent or guardian) who signed Application Part II must also sign the authorization form.

**3. New Business Transactions** (Note: The policy number will be entered by the Home Office.)

Question 1:   The height should be height in shoes, if normal heel size; and the weight should be the weight in indoor clothing.

Question 2:   Note that the name, address and phone number of the Proposed Insured's personal physician and the date last consulted are to be given in Question 2. If the Proposed Insured does not have a personal physician, enter "none" in Question 2, as applicable.

Question 3:   Circle each item to which a "Yes" answer applies, and give full details in Question 11.

Question 9:   This question pertains to the family history of the Proposed Insured only. If a natural parent, brother or sister developed angina, heart trouble or stroke before age 60, indicate condition and age at onset in Question 11. For subsequent history: if family member is deceased, give cause of death and age at death; if family member is living, give age and condition of health.

Question 11: Indicate, if possible, the month and year of onset of and recovery from any medical history. It is not necessary to repeat any physician's address given in Question 2. If more space is needed for details, use Question 11 of another Non-Medical Part II. All Part II forms must be signed by the same persons and attached together.

**4. After Issue Transactions:** Include Policy Number in the upper right corner of the Part II. The other instructions in item 3 above also apply to Questions 1, 2, 3, 9 and 11, when answered in connection with reinstatement, addition of benefits or other after issue transactions.

**5. Rules for Obtaining Additional Requirements on Non-Medical Cases.** Listed below are the additional requirements which must be obtained for Life policies, when the indicated portion of Question 3 on the reverse side is answered "Yes".

| If "Yes" to Question | Obtain Requirements | Obtain APS | | If "Yes" to Question | Obtain APS |
|---|---|---|---|---|---|
| 3a | M and E | 5 | | 3h | 5 |
| 3b | P and E | 5 | | 3i | 5 |
| 3c | P | 5 | | 3j | 2 |
| 3d | P | 5 | | 3m | 2 |
| 3e | P and B | 5 | | | |
| 3f | — | — | | | |
| 3g | P and E | 2 | | | |

M Medical Exam
P Paramedical Exam
B Blood — Urine kit

E ECG for amounts of $100,000 and over at issue ages 40 and older
2 or 5 Obtain APS, if physician seen within past 2 or 5 years, as applicable

NYLCLC00270

UNDERWRITING ACTION
(SHEET III)

POLICY NUMBER R 323667

| 1. | CHANGE THE FOLLOWING DATA: | REASON | AMEND | UIL | RECON YES |
|---|---|---|---|---|---|

Amend col PtII intended to be 'yes'

2. APP APPROVED _____    SMOKER __Y__    REINS __N__    RECALL ☐
   APP DECLINED _____    NO TEMP COVRG ☐    REASON _____
   FCRA: AGENCY,
   CITY, STATE _____    STATE OF: _____

3. PROPOSED INSURED:    OCC CODE 130  a 2A  (033?)
   BASIC RTG ___100___    RP: SYS ___    DIL ___    CHANGED BECAUSE OF ___cary dutes___    2A  O

| MIB | DEBIT | TOTAL RTG | SPECIAL CLASS | IMP CODE | ROR | Reason |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

SPOUSE: BASIC RTG _____    RP: SYS ___    DIL ___

**Poor Quality Original**

| MIB | DEBIT | TOTAL RTG | SPECIAL CLASS | IMP CODE | ROR | Reason |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

IF RATED OR DELETED
CHILD'S FIRST NAME-RELATIONSHIP

| | | TOTAL RTG | SPECIAL CLASS | IMP CODE | ROR | Reason |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

ISSUE AND DELIVERY INSTRUCTIONS

4. ATTACH TO EACH POL. COPIES OF:    REQUIREMENTS BEFORE DELIVERY
   ORIG. APP _____    ☐ OBA NEW PART I SIGNED BY _____    ☐ CK BACK
   PART I _____
   ORIG. APP _____    ☐ EM YRS
   PART II _____    ☐ SEE PART II    ☐ EM CON
   PAR & MED _____
   ADD'T _____    ☐ OBA UIL    ☐ VOL
   PART II _____
   ☐ RB _____    ☐ OBA AMENDMENT    ☐ SMOKER NOTICE
   DISCLOSURE _____    ☐ CHANGE PREVIOUS    ☐ LIST BILLING NOTICE
   STATEMENT _____    VISIT SENT
   ☐ MISC    ☐ DISCLOSURE STATEMENT

REMARKS _____

____6/28____    _____
DATE    UNDERWRITER

NYLCL-00269
-236-167

**INDIVIDUAL HEALTH CHANGE TRANSMITTAL FORM**
**INDEX CHECK REQUIRED**

☐ New Application Pending - Copy of Form 15015 Attached

To: Index Division Rm. 966 Check Insured or Other Member

Then To: Individual Health Change Unit Rm. 1053

Indicate in ☐ Office Originating Request

Date ___1-12-94___

☒ Gen. Off. and Code: Constitution ☐ C.S.O.
V44

Agent and Code:  S. Ferrigno  022054

| | |
|---|---|
| Insured:  Vincenzo Mazzamuto | Policy #   H3 ⅈ 236 167 |
| Amt. of Remittance Rec'd. $_____ | Date Cond. Temp. Cover Term. _____ |
| Insured's Date of Birth   5-25-55 | Applicant's Date of Birth |

☒ Requirements

| | Policy | I.R. Requested |
|---|---|---|
| x | 92-808 91-607 | 2274 |
| x | Non-Med. | |
| | Med. Exam. | |
| x | Para-Med. HORL refer to 44904932 | |
| | A.P.S. Requested | |

Type of Change ☒

| | D.O.B. |
|---|---|
| Add Member | |
| Add Add'l. Ben. Rider | |
| Reinstatement | |
| Options | |
| Reconsider Rating  non-smoker | |
| Other  incr mon bene to $3000.00 waiting per 90 da | |

3 units ipp, 5% colb to age 65 w/residual &
unrestricted own occ mode to semi-annual

| DATE | FOR H.Q. USE ONLY | DRUM DATES |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

H-118  2-84

NYLGL00266

# BENEFIT ADDITION RIDER

POLICY NUMBER H- *3236 167*                    INSURED *Vincenzo Mazzamuta*

This Benefit Addition Rider and any rider(s) named below are added to this policy. They are made part of the policy based on:

(1) The application for them.

(2) The payment of the amounts shown in (a) and (b) below:

    (a) $ _____ payable as of _2-28-94_ . This is the effective date of this Benefit Addition Rider and the rider(s) named below.

    (b) $ *1609.80* payable at _C.O.M_ intervals, beginning as of _2-28-94_ , subject to the terms of the policy.

ADDITIONAL BENEFIT                                    PREMIUM AMOUNT

*Additional Monthly Benefit of $ 1000 — added.*        *$ 453.30*

**Incontestability or Time Limit on Certain Defenses**   Any Incontestability or Time Limit on Certain Defenses provision of the policy does not apply to this Benefit Addition Rider and the rider(s) named above. Instead, the Incontestability of Rider provision in the rider(s) named above will apply.

**Effective Date of this Rider**   This Benefit Addition Rider and any rider(s) named above will not take effect as of the policy date. Instead, they will take effect on this rider's effective date, shown above. The additional benefits provided will not apply to any claim which results from an injury which occurs or a sickness which first manifests itself before the effective date of this rider.

**Change of Entire Contract Provision**   The Entire Contract provision of the policy is changed to include this statement.

    "The attached copy of any application for additional benefits is part of the entire contract."

NEW YORK LIFE INSURANCE COMPANY

_____
Secretary

_____
President

_____
Countersignature

Countersigned by _____
    Licensed Resident Agent if required by statute or regulation

86-212

NYLCL00256

PT702785

## APPLICATION PART I TO NEW YORK LIFE INSURANCE COMPANY (Continued)

6. Answer if APPLICANT ☐ and/or OWNER ☐ (check one or both, as appropriate) is not Proposed Insured.

  (a) Name _____ (b) Soc. Sec. No. or Emp. ID No. _____

  (c) Residence Address _____

  (d) Business Address _____ Zip _____

  (e) Mailing Address   Residence ☐   Business ☐   Other _____ Zip _____

  (f) Date of Birth (or date of incorporation, if a corporation) _____

7. (a) PLAN OF INSURANCE AND OPTIONAL BENEFITS

### DISABILITY INCOME

**PRIMARY PLAN**

Monthly Benefit $ 3000 ⁰⁰   SIS Rider $_____, COLB 5% ☑ 7½% ☐   IPO ____ (4) 3 UNI

Elim. Per. (days)  30 ☐  60 ☐  90 ☑  180 ☐  365 ☐  730 ☐;   Premiums Level ☑ or Step Rate ☐

Benefit Term   2 years ☐   5 years ☐   To Age 65 ☑   To Age 67 ☐   Lifetime ☐

**SECONDARY PLAN**

Monthly Benefit $_____   Elim Per (days)  30 ☐  60 ☐  90 ☐  180 ☐  365 ☐  730

Benefit Term   2 years ☐   5 years ☐   To Age 65 ☐   To Age 67 ☐   Lifetime ☐

**ARDI**

Monthly Benefit $_____   Elim Per (days)  30 ☐  60 ☐  90 ☐  180 ☐  365 ☐  730

Benefit Term   To Age 65 ☐   To Age 67 ☐   Lifetime ☐

RIDERS (Apply to Primary Plan, Secondary Plan, and ARDI)   Residual ☑   Unrestricted Own Occ ☑   Other _____

Exercise Automatic Benefit Increase options? (Applies only to Primary Plan and Secondary Plan)   Yes ☑   No ☐

**OVERHEAD EXPENSE**   12 x ☐   24 x ☐   IPO _____ Units

Max. Monthly Benefit $_____   Elim Per (days) 30 ☐   60 ☐   90 ☐

**DISABILITY BUY-OUT**   Elim Per (months)   12 ☐   24 ☐   36 ☐   IMB _____ Units

Buy-Out Benefit $_____

**KEY EMPLOYEE DISABILITY**   Elim Per (days)   30 ☐   60 ☐   90 ☐   IPO _____ Units

Monthly Benefit $_____

Complete (b) and (c) below if the Proposed Insured is a non-owner employee. If the Proposed Insured owns any portion of t business, complete (c) below and the Supplement to Application Part I.

(b) EARNED INCOME — Earned income consists of wages, commissions and other amounts received for personal services, reportable for personal federal income tax purposes, after deducting normal business expenses.

  (i) What is the Proposed Insured's earned income at the current annual rate? $_____

  (ii) What was the Proposed Insured's earned income for the prior calendar year? $_____

  (iii) Does the Proposed Insured ever receive more than 30% of his or her annual earned income in a single month?

    Yes ☐   No ☐   If "Yes", explain in question 12.

(c) UNEARNED INCOME AND NET WORTH

  (i) What is the Proposed Insured's annual unearned income (include interest, dividends, rent, etc.)?

    None ☑   Other $_____

  (ii) Is the Proposed Insured's net worth (assets minus liabilities) over $4,000,000?   No ☑   Yes ☐

    If "yes" complete section 2 of Supplement to Application Part I.

NYL CL 00254

● 91-607

91607



PL 702785

## APPLICATION PART I TO NEW YORK LIFE INSURANCE COMPANY (Continued)

(d) OTHER INCOME PROTECTION COVERAGE ON THE PROPOSED INSURED

(i) Will the employer continue salary in the event of an inability to work due to disability?  Yes ☐  No ☒

If "Yes", salary of $ _____ will be continued for _____ months.

(ii) List below other income coverage in force or pending on the Proposed Insured. Indicate type: (1) Individual (2) Association (3) Group (4) Employer Sick Pay (5) Overhead (6) Buy-Out.

| Company or Source | Type 1,2,3,4, 5 or 6 | Policy or Certificate # | Effective Date | Monthly Income | Elim. Per. | Ben. Term | Will this coverage be replaced? | Date coverage will be terminated? |
|---|---|---|---|---|---|---|---|---|
| none | | | | $ | | | Yes ☐ No ☐ | |
| | | | | $ | | | Yes ☐ No ☐ | |
| | | | | $ | | | Yes ☐ No ☐ | |
| | | | | $ | | | Yes ☐ No ☐ | |

(e) PREMIUM PAYER

(i) If employer is to pay all or part of the premium, indicate the percentage: _____ %

8. PREMIUM MODE  Annual ☐   Semiannual ☒   Quarterly ☐   C-O-M ☐   Nyl-A-Plan ☐
CHECK IF LIST BILLING APPLIES ☐

9. POLICY DATE_____, 19_____ if no date is specified, the policy date is: the later date of Parts I and II if cash is paid with this application; or the date of issue, if cash is not paid. If cash is not paid and the policy has not been issued by the date specified, the policy date will be the date of issue.

10. IF AMENDING APPLICATION PREVIOUSLY SUBMITTED: Since the date of the application for the policy (including any Part II), has the Proposed Insured:

(a) been admitted to a hospital, sanitarium or other medical facility?  Yes ☐ No ☒  If "Yes", submit a new application Part II.

(b) had any illness, injury, or consulted any physician or practitioner for any reason, including routine checkup examination?  Yes ☐  No ☒  If "Yes", give full details

11. (a) IF AMOUNT OF BENEFIT IS BEING INCREASED UNDER AN OPTION: (IPO, IMB)

Amount of increase $_____  (b) Option Date_____,19_____  (c) Scheduled ☐ or Alternate (Special) ☐

If Alternate (Special) Option Date, give: Date of marriage ☐, Birth ☐ or Adoption ☐  Mo._____ Day_____ Yr._____

(b) IF ARDI IS BEING CONVERTED
Amount of coverage being converted  $_____

12. ADDITIONAL DETAILS AND SPECIAL REQUESTS (incl. Question Number, where applicable).
Ques. No.

Please change policy # H3 236 167 as follows -
increase monthly benefit to $3000⁰⁰ waiting
period to be 90 days, 3 IPO units, 5% cola, to
age 65, residual rider w/ a unrestricted own occupation
premium mode to be semi-annual
Please refer to policy # 44904932 for blood requirements
Please issue policy NON-SMOKER rates

NYL-CL-00251

## ACKNOWLEDGEMENT

I have been given a copy of "Information Practices Related to Underwriting Your Application" which tells how New York Life Insurance Company and New York Life Insurance and Annuity Corporation obtain and use data about me. It includes the notice required



## DISABILITY INCOME INSURANCE APPLICATION PART I

### NEW YORK LIFE INSURANCE COMPANY 51 Madison Ave., New York, N.Y. 10010

I/We hereby apply for insurance based on the following representations:

If not an application for a New Policy check one:
- ☐ Add Rider to Policy No.
- ✓ Change in Policy No. *H3 236 767*
- ☐ Application to Reinstate Policy No.

- ☐ Converting ARDI in Policy No.
- ☐ Amend Application No.
- ☐ Exercising Option in Policy No.
- ☐ Upgrade Policy No.

1. (a) PROPOSED INSURED *Vincenzo Mazzarulto*  (b) Soc. Sec. No. *196-56-574*  (c) Sex M ☒ F ☐
   (d) Date of Birth Mo. *05* Day *25* Year *1955* (e) Place of Birth State _____ (f) Country *Italy*
   (g) ADDRESS (Complete street address including any apt. no. and Zip; do not only give P.O. Box)
      (i) Residence *501 Limestone Rd*   Zip *17013*  (iv) Time at Address *6* Yrs. _____ Mos.
         *Carlisle, PA*
      (ii) Telephone number(s) and best time to call Res. (*717*) *243-0383* A.M.☐ P.M.☐  (v) Mail Address Res. ☒ Bus.☐
      (iii) Bus. (*717*) *049-6417* A.M. _____ P.M. *30* If Proposed Insured cannot be reached by telephone, explain reason

   (h) Has the Proposed Insured smoked cigarettes in the last 12 months?   Yes ☐ No ☒

2. (a) OCCUPATION *President of EG First Class Restaurant*
      (i) Exact duties, including percentage of time spent performing any manual or supervisory duties and traveling
         *Executive, office duties only*

   (b) Does the proposed Insured have any other occupations? Yes ☐ No ☒ If "Yes", describe

   (c) EMPLOYER *Vinny's Restaurant Inc.*          Check if a Federal Govt. Employee ☐
      Address of Employer *330 South Hanover St*    Check if a Municipal Govt. Employee ☐
         *Carlisle, PA 17013*               (ii) Time with Employer *12* Yrs. _____ Mos.

   (d) Former Employer (within 2 years)
      (i) Address of Former Employer

   (e) Does the Proposed Insured own any portion of the business?  Yes ☒ No ☐ If "Yes", complete the Supplement to Application Part I.

| | | Yes | No |
|---|---|---|---|
| 3. (a) | Within the last 2 years, has the Proposed Insured engaged in: motorized racing, scuba or sky diving, ballooning, hang-gliding, ultra-light flying, stunt flying, mountain climbing, or rodeo riding, or does he or she intend to do so? If "Yes", complete Form 7663. | ☐ | ☒ |
| (b) | been convicted for 3 or more motor vehicle moving violations or been charged with driving under the influence of alcohol or drugs? If "Yes", complete CPHQ-Form 17480. | ☐ | ☒ |
| (c) | been declined for issue, renewal or reinstatement, rated or charged an extra premium for any type of Life or Health Insurance? If "Yes", give company and reasons, if known, in question 12. | ☐ | ☒ |
| 4. | If cash is to be paid with this application, has the Proposed Insured, within the last 2 years | | |
| (a) | been medically treated in, or been advised to seek medical treatment in a hospital, sanitarium or clinic other than for childbirth? | ☐ | ☒ |
| (b) | been medically diagnosed as having or received medical treatment for heart trouble, cancer (other than skin cancer), AIDS or AIDS-related complex (ARC), elevated blood pressure requiring medication, had any abnormal blood test results or had an electrocardiogram made for any cause other than a routine physical examination? | ☐ | ☒ |
| (c) | had an unexplained weight loss or swollen glands, recurring diarrhea, fever or infection, persistent cough, insomnia or thrush? | — | ☒ |
| | If "Yes" to either (a), (b) or (c) above, cash may not be paid. Also give details in question 12. | | |
| 5. | Is it agreed that cash will be received subject to the terms of the attached receipt, that no coverage will be provided under the receipt unless all conditions to coverage are met, and that any such coverage will be temporary and limited in amount? If "No", cash may not be paid | ☒ | ☐ |
| | CASH PAID $ *0* | | |

NYLSP00002

91-607                    916071

Accident and Sickness Department.

# NEW YORK LIFE INSURANCE COMPANY
## New York, New York 10010

### RIDER CHANGING POLICY DATE

Attached to and made a part of Policy Number_____ H3 236 167 _____

_____ Vincenzo Mazzamuto _____, the Insured.

In accordance with the applicant's written request, the policy date stated on the first page of this policy is hereby changed to August 28, _____ 19 93

NEW YORK LIFE INSURANCE COMPANY

*Edmund R. Harnedy*
Secretary

Countersigned by _____ *Mary C. Master* _____
(for Office Manager)          Office Manager

55-106    A.S.

NYLSP00012

P1702766

## APPLICATION PART I TO NEW YORK LIFE INSURANCE COMPANY (Continued)

6. Answer if APPLICANT ☐ and/or OWNER ☐ (check one or both, as appropriate) is not Proposed Insured.

(a) Name ................................................................ (b) Soc. Sec. No. or Emp. ID No. ........................

(c) Residence Address ................................................................ Zip ........................

(d) Business Address ................................................................ Zip ........................

(e) Mailing Address  Residence ☐  Business ☐  Other ☐

(f) Date of Birth (or date of incorporation, if a corporation) ................................................................

7. (a) PLAN OF INSURANCE AND OPTIONAL BENEFITS

DISABILITY INCOME

PRIMARY PLAN
Monthly Benefit $ 2,000  SIS Rider $ _____,  COLB 5% ☑  7½% ☐  IPO ___3___ UNITS
Elim. Per. (days)   30 ☐   60 ☐   90 ☐   180 ☑   365 ☐   730 ☐;   Premiums Level ☑ or Step Rate ☐
Benefit Term   2 years ☐   5 years ☐   To Age 65 ☑   To Age 67 ☐   Lifetime ☐

SECONDARY PLAN
Monthly Benefit $ _____  Elim Per (days)  30 ☐  60 ☐  90 ☐  180 ☐  365 ☐  730 ☐
Benefit Term  2 years ☐  5 years ☐  To Age 65 ☐  To Age 67 ☐  Lifetime ☐

ARDI
Monthly Benefit $ _____  Elim Per (days)  30 ☐  60 ☐  90 ☐  180 ☐  365 ☐  730 ☐
Benefit Term  To Age 65 ☐  To Age 67 ☐  Lifetime ☐

RIDERS (Apply to Primary Plan, Secondary Plan, and ARDI)  Residual ☑  Unrestricted Own Occ ☑  Other _____

Exercise Automatic Benefit Increase options? (Applies only to Primary Plan and Secondary Plan)  Yes ☑  No ☐

OVERHEAD EXPENSE   12 × ☐   24 × ☐   IPO _____ Units
Max. Monthly Benefit $ _____  Elim Per (days) 30 ☐  60 ☐  90 ☐

DISABILITY BUY-OUT   Elim Per (months)   12 ☐   24 ☐   36 ☐   IMB _____ Units
Buy-Out Benefit  $ _____

KEY EMPLOYEE DISABILITY   Elim Per (days)   30 ☐   60 ☐   90 ☐   IPO _____ Units
Monthly Benefit $ _____

Complete (b) and (c) below if the Proposed Insured is a non-owner employee. If the Proposed Insured owns any portion of the business, complete (c) below and the Supplement to Application Part I.

(b) EARNED INCOME — Earned income consists of wages, commissions and other amounts received for personal services, as reportable for personal federal income tax purposes, after deducting normal business expenses.

(i) What is the Proposed Insured's earned income at the current annual rate? $ _____

(ii) What was the Proposed Insured's earned income for the prior calendar year? $ _____

(iii) Does the Proposed Insured ever receive more than 30% of his or her annual earned income in a single month?
Yes ☐  No ☐  If "Yes", explain in question 12.

(c) UNEARNED INCOME AND NET WORTH

(i) What is the Proposed Insured's annual unearned income (include interest, dividends, rent. etc.)?
None ☐  Other $ _____

(ii) Is the Proposed Insured's net worth (assets minus liabilities) over $4,000,000?   No ☐  Yes ☐
If "yes" complete section 2 of Supplement to Application Part I.

NYLSP00013

916072

| NON-MED. | | Policy Number (if known) |
|---|---|---|
| ☒ NEW YORK LIFE INSURANCE COMPANY<br>☐ NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION (A Delaware Corp.)<br>51 Madison Avenue, New York, N.Y. 10010 | | Answers to Insurer forming Part II of Application for Insurance. (Please print or type.) |

Full information on all persons proposed for coverage in Question 1. (Use Question 11 for all details requested in Questions 2-11.)

1. a. PROPOSED INSURED? Vincenzo Mazzamuto    Height? 5 ft. 6 in.; Weight? 195 lbs.

b. SPOUSE, if proposed for coverage? _____ Height? ___ ft. ___ in.; Weight? ___ lbs.

c. CHILDREN, if proposed for coverage (give full names)? _____

2. Personal physicians (give consultation details in Ques. 11) Name?    Address and Phone No.?    Date last consulted?

a. For Proposed Insured Masland Medical Associates 220 Wilson St Ste 109   1 month ago
(717) 249-1929    Carlisle, PA 17013

b. For Spouse named in Ques. 1

Answer Questions 3-11, so far as known, for all persons in Ques. 1. (If "Yes" to Ques. 6, submit CPHQ Form 17480 for that person, and give name in Ques. 11.)

3. In last 10 years, has such person consulted a physician or practitioner for, been treated for, had, or been informed that he or she had

| | Yes | No |
|---|---|---|
| a. heart trouble, angina, stroke, murmur or irregular pulse? | ☐ | ☒ a |
| b. diabetes or elevated blood sugar? | ☐ | ☒ b |
| c. chronic bronchitis, emphysema, asthma or other lung disorder? | ☐ | ☒ c |
| d. cancer, tumor, lymphoma; lupus or collagen disorder; rheumatoid arthritis or muscular disease? | ☐ | ☒ d |
| e. pancreatitis; urine sugar; hepatitis; cirrhosis or liver trouble? | ☐ | ☒ e |
| f. AIDS, AIDS-related complex (ARC), or other immune deficiency? | ☐ | ☒ f |
| g. elevated blood pressure; thrombophlebitis, embolism or other circulatory disorder; kidney disease; albumin or blood in urine? | ☐ | ☒ g |
| h. ulcerative colitis, ileitis or other chronic intestinal disorder? | ☐ | ☒ h |
| i. seizures, dizziness or fainting; other nervous system disorder? | ☐ | ☒ i |
| j. anemia, thyroid or other blood or gland disorder? | ☐ | ☒ j |
| k. ulcer; hernia; varicose veins; gall bladder disorder; kidney stones? | ☐ | ☒ k |
| l. back, spine, joint or bone disorder; eye, ear or skin disorder? | ☐ | ☒ l |
| m. (if a male) disorder of prostate or reproductive organs? (if a female) disorder of pelvic organs, breasts, menses or pregnancy, or is she now pregnant? | ☐ | ☒ m |

4. Is any such person now taking prescription medication? ☐ ☒

5. In last 2 years, has any such person had any of the following:

| | Yes | No |
|---|---|---|
| a. unexplained weight loss or swollen glands; recurring diarrhea, fever or infection; persistent cough, pneumonia, or thrush? | ☐ | ☒ a |
| b. chest discomfort, edema, transient visual loss, muscle weakness, shortness of breath, or internal bleeding? | ☐ | ☒ b |

6. In last 10 years, has any such person been counselled, treated or hospitalized for any psychiatric, emotional or mental health condition, or for the use of alcohol or drugs? (If yes, submit CPHQ.)

☐ ☒

7. Other than as stated, has any such person during past 2 years had

| | Yes | No |
|---|---|---|
| a. treatment or surgery in a hospital or other facility? | ☐ | ☒ a |
| b. an electrocardiogram, x-ray or other diagnostic test, or an examination for checkup or other purpose? | ☐ | ☒ b |
| c. advice about any treatment, surgery or diagnostic testing which was not completed? | ☐ | ☒ c |

8. Has any such person, for physical or mental health reasons, ever received disability benefits, compensation or pension; or been rejected for, or discharged from, military service? ☐ ☒

9. Any history of angina, heart trouble or stroke before age 60 among natural parents, brothers or sisters of any such person? If "Yes", give relationship, age at onset and subsequent history. ☒ ☐

10. Has Prop. Insured smoked any cigarettes in the past 12 months? ☐ ☒

11. GIVE FULL DETAILS FOR EACH "YES" ANSWER IN QUESTIONS 3-5, 7-9, AND LAST CONSULTATION WITH PERSONAL PHYSICIAN IN PAST 2 YEARS

| a. Ques. No. | b. Name of Person to whom "Yes" applies | c. Reason – nature and severity of condition (Include frequency, treatment, medication, surgery and results.) | d. Onset? Mo. Yr. | e. Recovery? Mo. Yr. | f. Names and Addresses of Physicians, Hospitals or Medical Facilities? |
|---|---|---|---|---|---|
| 9 | father | stroke prior to age 60 | | | |
| | PI - last consulted Dr Robinson injury - fully recovered - no further treatment needed | | 4/95 | | for knee |

THE UNDERSIGNED DECLARE THAT, to the best of their knowledge and belief, all answers given in this Part II are correctly recorded, complete and true.

Dated at Carlisle, PA on 6/3 19 95    ___Vincenzo [signature]___
I certify I have truly and accurately recorded all answers given to me.    Signature of Proposed Insured

Witnessed by ___[signature]___    ___
Agent

Signature of Spouse, if proposed for coverage;
Signature of Parent or Guardian, if Prop. Insured under 14 years 6 months

NYLAP00008

No. 144    H. I. Policy No.

**HEALTH INSURANCE MEMORANDUM**

This Memo, must be attached OVER all the
papers of the Application to which it refers,
and must not be detached therefrom.

H323616

DRUM DATES

| DATE | NAME OF INSURED (PRINT) | Vincenzo Mazzamuto |
|------|-------------------------|---------------------|

1/24  WS44904932 (...

1/26  WS44904932

1/27 ...

1/31/94  H14 ...

2/16 ...
2/16  ...  H185174

PCC

WNAP00013

H-3 Cont. 3-68 Printed in U.S.A.

1. Based on occupational duties of _____ any policy
   issued will be, _____ at best, occupational class _____.
   Advise if acceptable.
   Information from IR.

2. Based on annual earned/unearned income of _____ any policy issued
   will be at best for _____ and SIS rider _____. We will
   consider if furnished with factual proofs of earned (net) income.

3. Based on annual earned/unearned income of _____ and other coverage
   in force with _____, any policy issued will be at best
   _____ and SIS _____. Will reconsider if furnished with
   factual proofs of earned (net) income.

4. We have reason to believe that the proposed insured has a monthly income
   policy in force/pending with _____. Advise amount, BENEFIT PERIOD ?
   status of policy.

5. Based on MIB information, we have reason to believe that the proposed
   insured may not have given us full details in answer to questions of Part
   II. Please secure a new non-medical Part II with special attention to such
   questions 3 ✓ _____.

6. Based on history of _____, any policy issued will require a
   _____ Rider. We can consider on a standard basis with a _____
   day waiting period. Advise if acceptable.

7. Based on history of _____, any policy issued will require a
   _____ special class extra premium. We can consider on a
   standard basis with a _____ day waiting period. Advise if acceptable.

8. Based on history of _____, any policy issued will include a
   rider and/or a special class _____ extra premium on _____.
   As this is a replacement, advise if acceptable.

9. Based on occupational class of _____ we cannot offer Plan _____.
   Can consider for _____. Advise if acceptable.

10. Based on _____ history, any policy issued will require a
    _____ Rider with a _____ day waiting period. All other
    conditions will have _____ day waiting period.

11. We still have not received SRC documents. Please advise when they will be
    forwarded.

12. Because Nylic group disability benefits, which proposed will be eligible
    for integrate with Social Security, it is to proposed insured's benefit to
    apply for total amount in base policy. If desired, we can consider as
    applied for. Please advise.

13. Advise proposed insured's residency status, years in U.S. and does proposed
    insured intend to remain in the U.S. permanently.

14. It is difficult for us to accept an application on an individual at this
    age who has never seen a physician. Please advise name of Attending
    Physician, dates and reasons consulted.

NYLAP00034

# AMENDMENT

**NAME:** MAZZAMUTO

**NUMBER:** H3 236 167    **NOTE:** This requirement must not be changed or modified in any way, but remain as made out by the Home Office

**APPLICATION DATED:** JUNE 3, 1993

The **NEW YORK LIFE INSURANCE COMPANY** will please accept the following answers in lieu of the answers to the corresponding questions in my application for insurance dated as indicated above.

| QUESTION | DISABILITY | |
|---|---|---|
| No. 7 (A) | INCOME | **PRIMARY PLAN**    Monthly Benefit $ **2000** <br> SIS Rider $ _____ , COLB 5% ☒   71/2% ☐   IPO \_\_\_ UNITS <br> Elim. Per. (days)   30 ☐    60 ☐    90 ☐   180 ☒    365 ☐    730 ☐ <br> Benefit Term:   2 years ☐   5 years ☐   To Age 65 ☒   To Age 67 ☐ <br>         Lifetime ☐ <br> Premiums:   Level ☒   or Step Rate ☐ |
| | | **SECONDARY PLAN**    Monthly Benefit $ _____ <br> Elim. Per. (days)   30 ☐    60 ☐    90 ☐   180 ☐    365 ☐    730 ☐ <br> Benefit Term: 2 years ☐ 5 years ☐   To Age 65 ☐   To Age 67 ☐   Lifetime ☐ |
| | | **ARDI**    Monthly Benefit $ _____ <br> Elim. Per. (days)   30 ☐    60 ☐    90 ☐   180 ☐    365 ☐    730 ☐ <br> Benefit Term:   To Age 65 ☐   To Age 67 ☐     Lifetime ☐ |
| | | **RIDERS:**   Residual ☒   Unrestricted Own Occ ☐    Other _____ |
| | | Exercise Automatic Benefit Increase options?    Yes ☒     No ☐ |
| | OVERHEAD EXPENSE | Max. Monthly Benefit $ _____    12 X ☐    24 X ☐ <br> IPO \_\_\_ UNITS   Elim Per (days)   30 ☐   60 ☐   90 ☐ |
| | DISABILITY BUY-OUT | Buy-Out Benefit $ _____     IMB \_\_\_ UNITS <br> Elim Per (months)   12 ☐   24 ☐   36 ☐ |
| | KEY EMPLOYEE | Monthly Benefit $ _____     IPO \_\_\_ UNITS <br> Elim Per (days)   30 ☐   60 ☒   90 ☐ |
| QUESTION No. 3L | | OF PART II SHOULD BE ANSWERED INTENDED TO BE YES. |

and I hereby agree that the above answers shall form a part of my said application for insurance, the agreement in which I hereby renew and confirm, and shall apply to any policy issued thereon.

Dated _____ 8/28 , 19 93       _(signature)_      Proposed Insured

Witness _(signature)_                 Applicant

Forwarded to the Central Records Division from CONSTITUTION     General Office

                                               8/30 , 19 93

256-B 1-89 Printed in U.S.A.

NYLAP00043

I have been given ___ of "Information Practices Related to Und___ ___ ___ Application" which tells how New Yo___ surance Company and New York Life Insurance and Annuity Corporation obtain and use data about me. It includes the notice ___ by the state and federal Fair Credit Reporting Acts and a description of MIB, Inc. (Medical Information Bureau).

## AUTHORIZATION

(In this Authorization, "the Insurer" means New York Life Insurance Company or New York Life Insurance and Annuity Corporatio whichever applies.)

In order to see if (and on what basis) I qualify for insurance or for the benefits which that insurance may provide, I authori the following:

**MEDICAL INFORMATION** Physicians or practitioners; hospitals; medical or medically related facilities; laboratories; insurance cor panies; or MIB may give to the Insurer (or any consumer reporting agency acting in its behalf) and to any of its reinsurers da and copies of records that they may have about my physical and mental health. The data and records may include important histor findings, diagnoses and treatment.

**OTHER UNDERWRITING INFORMATION** MIB and other insurance companies may give to the Insurer and to any of its reinsure data about: my driving record; any criminal activity or association; hazardous sport or aviation activity; use of alcohol or drugs; a claim of eligibility for disability income benefits; and other applications for insurance.

**EXAMINATIONS AND TESTS** The Insurer may obtain physical examinations or medical tests deemed necessary to underwrite n application. These tests (where permitted by law) may include, but are not limited to, electrocardiograms, chest x-rays, and tes of blood and urine to determine, among other things, exposure to causative agents of disease (for example, exposure to the AI( virus) and the presence of drugs. However, a separate notification/authorization form will be provided with respect to testing for tl AIDS virus.

**INVESTIGATIVE CONSUMER REPORT** The Insurer may obtain an investigative consumer report and may give the consumer reportin agency information concerning the amount and type of my coverage and my use, if any, of tobacco. The report may add to or confir the types of data mentioned above. It may also contain data about: my identity; age; residence; marital status; past and present jol (including work duties); economic conditions; driving record; personal and business reputation in the community; and mode of livin but will not include any information relating directly or indirectly to sexual orientation.

**IDENTIFICATION** To obtain the data described above, the Insurer may give my name, address, and date, and place of birth to t above persons or organizations.

**RELEASE OF INFORMATION TO OTHERS** When necessary, the Insurer may give data about me that affects my insurability to: i subsidiaries; its affiliates; its parent company; its agents and their staffs; its reinsurers; and the Insurer and its reinsurers may gi such data to MIB. However, this will not be done in connection with information relating to the AIDS virus.

I also authorize the release of these same types of data about any of my children who are to be insured.

This authorization shall be valid for 30 months from the date shown below. A photocopy of it shall be as valid as the origin:

In giving this authorization, I release the above parties from all liability in the securing and use of the above underwriting dat

I know that a copy of this form is in the Insurer's statement on "Information Practices Related to Underwriting Your Application

Date _____ 6/3 ___, 19 93    _Vinçe Wyy___

Witness _Johnson Brown___    Signature of Proposed Insured (Annuit:

_____/Agent    Signature of Spouse, if proposed for coverage; or
Signature of Parent or Guardian, if Proposed Insured (Annuitant)
is Under 14 years 6 months

NYL CL00355

17852 7-91

# POLICY RECEIPT

## ☑ NEW YORK LIFE INSURANCE COMPANY

## ☐ NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION
### (A Delaware Corporation)

### 51 MADISON AVENUE, NEW YORK, N.Y. 10010

*Devignio A.*

Insured/Annuitant **Vincenzo Mazzamato**     Policy Number **43 236 167**

I hereby acknowledge receipt of the above numbered policy, which includes a copy of my signed application.

Additional Information for Whole Life, Modified Premium Whole Life, and Survivorship Whole Life Policies

Dividends shown in the illustrations for this policy and the values based on those dividends reflect New York Life's current dividend scale, which is not guaranteed nor an estimate of future dividends that will be paid. Because of possible changes in the economy and the unpredictability of the future, dividends and the values based on dividends may be higher or lower than illustrated. If the illustration shows dividend values being used to pay premiums, or if it shows dividend values being withdrawn, a change in the dividend scale, additional withdrawals, or exercising a policy loan can cause the amount of cash premium payments or the amount available for withdrawal to vary.

I have been shown an alternate dividend illustration which shows values based on a reduction in dividends below the current dividend scale. That illustration does not reflect any planned actions by New York Life and is only an example of how lower dividends could affect policy values. Dividends actually paid may be higher or lower than shown in the illustrations.

I have reviewed the above information and the alternate illustration, along with Form 11939 (How to Read a Life Insurance Illustration), and understand that dividends are not guaranteed and illustrated dividends are not an estimate of future dividends that will be paid.

Signature of Owner **X Vega O. Mazz**     Date **8/28/93**

Signature of Agent **Salvatore W. Perry**

NOTE: Form 11939 must be given to the policyowner with the illustrations.

● 20673  12/92                    **GENERAL OFFICE COPY**                    206731

NYLCL00353

*Vincenzo Mazza*

OCCUPATION TITLE: *President*

OCCUPATION DUTIES: *Executive, office duties only*

BASIC OCCUPATIONAL CLASS *2A*                    FINAL OCCUPATIONAL CLASS *3A*

AGENT NAME: *Salvatore Feppiano*

GENERAL OFFICE: *Constitution G.O.*

POLICY NUMBER:

**AGENT'S USE**                                              **HOME OFFICE USE**

| | | |
|---|---|---|
| ANNUAL EARNED INCOME AFTER BUSINESS EXPENSES | $*53,039* | $_____ |
| BUSINESS ALLOWANCE | $*5043* | $_____ |
| CAR ALLOWANCE | $*6,000* | |
| OTHER (explain) _____ | | $_____ |
| TOTAL = | $*64,082* | $_____ |
| AGE | *38* | |
| YEARS OWNING PRESENT BUSINESS | *13* | |
| PERCENTAGE OF OWNERSHIP | *100%* | |

INITIAL CLASS _____
SCHEDULE CLASS _____

CIRCLE ONE
ISSUED
FILED
DECLINED

## BUSINESS OWNERS' FACTORS CHART
### (Appropriate Categories Should Be Circled)

| ADJUSTED INCOME | AGE 18 - 28 YEARS IN BUSINESS AS OWNER 1 | 2-8 | 9+ | AGE 29 - 33 YEARS IN BUSINESS AS OWNER 1 | 2-8 | 9+ | AGE 34 - 39 YEARS IN BUSINESS AS OWNER 1 | 2-4 | 5-8 | 9+ | AGE 40 - 54 YEARS IN BUSINESS AS OWNER 1 | 2-4 | 5-8 | 9+ | AGE 55+ YEARS IN BUSINESS AS OWNER 1 | 2-4 | 5-8 | 9+ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 16-K - 24,999 | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC |
| 25K - 34,999 | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | UP 1 | NC | NC | UP 1 | UP 1 |
| 35K - 49,999 | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | NC | UP 1 | NC | NC | UP 1 | UP 1 |
| 50K - 74,999 | NC | NC | NC | NC | NC | NC | NC | NC | NC | (UP 1) | NC | NC | NC | UP 1 | UP 1 | UP 1 | UP 1 | UP 2 |
| 75K - 119,999 | NC | NC | NC | NC | NC | NC | NC | NC | NC | UP 1 | UP 1 | UP 1 | UP 1 | UP 1 | UP 1 | NC | UP 1 | UP 2 |
| 120K + | NC | NC | NC | UP 1 | NC | NC | UP 1 | UP 1 | UP 1 | UP 1 | UP 1 | UP 1 | UP 1 | UP 1 | UP 1 | UP 1 | UP 2 | |

NC: NO CHANGE IN OCC CLASSIFICATION
UP: INDICATES OCC CLASSIFICATION UPGRADED ONE OR TWO CLASSES i.e., 2A may become 3A or 4A

NYLC 00356

H20140 (591)

If not an application for a N___ ___ check one:
- ☐ Add Rider to Policy No.
- ☐ Change in Policy No.
- ☐ Application to Reinstate Policy No.

- ☐ Converti___ "RP___" Policy No.
- ☐ Amend A___ No.
- ☐ Exercising Op___n in Policy No.
- ☐ Upgrade Policy No.

(c) Sex  M ☑  F ☐

1. (a) PROPOSED INSURED Vincenzo Mazzamuto   (b) Soc. Sec. No. 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
   (d) Date of Birth Mo. 05 Day 25 Year 1955  (e) Place of Birth State ___  (f) Country Italy
   (g) ADDRESS (Complete street address including any apt. no. and Zip; do not only give P.O. Box)  (iv) Time at Address
      (i) Residence 501 Limestone Rd       Zip 17013   6 Yrs.  M___
          Carlisle, PA                                 (v) Mail Address
      (ii) Telephone number(s) and best time to call Res. (717 )243-0383 A.M.9:00 P.M.___   Res. ☑ Bus.☐
      (iii) Bus. (717 )249-6417 A.M.___ P.M. 2:00 If Proposed Insured cannot be reached by telephone, explain reas___

   (h) Has the Proposed Insured smoked cigarettes in the last 12 months?   Yes ☐  No ☑

2. (a) OCCUPATION President of First Class Restaurant
      (i) Exact duties, including percentage of time spent performing any manual or supervisory duties and traveling
          Executive, office duties only

   (b) Does the proposed Insured have any other occupations?  Yes ☐  No ☑  If "Yes", describe
                                                              Check if a Federal Govt. Employee
   (c) EMPLOYER Vinny's Restaurant Inc.                       Check if a Municipal Govt. Employee
      (i) Address of Employer 330 South Hanover St         (ii) Time with Employ___
          Carlisle, PA 17013                                   13 Yrs.  M___

   (d) Former Employer (within 2 years)
      (i) Address of Former Employer

   (e) Does the Proposed Insured own any portion of the business?  Yes ☑  No ☐  If "Yes", complete the Supplement to Applica___
      Part I.

3. (a) Within the last 2 years, has the Proposed Insured engaged in: motorized racing, scuba or sky diving,   Yes  N___
       ballooning, hang-gliding, ultra-light flying, stunt flying, mountain climbing, or rodeo riding, or does he  ☐   ___
       or she intend to do so? If "Yes", complete Form 7663.
   (b) been convicted for 3 or more motor vehicle moving violations or been charged with driving under  ☐   ___
       the influence of alcohol or drugs? If "Yes", complete CPHQ Form 17480.
   (c) been declined for issue, renewal or reinstatement, rated or charged an extra premium for any type  ☐   ___
       of Life or Health Insurance? If "Yes", give company and reasons, if known, in question 12.

'. If cash is to be paid with this application, has the Proposed Insured, within the last 2 years
   (a) been medically treated in, or been advised to seek medical treatment in a hospital, sanitarium or clinic  ☐   ___
       other than for childbirth?
   'b) been medically diagnosed as having or received medical treatment for heart trouble, cancer (other than
       skin cancer), AIDS or AIDS-related complex (ARC), elevated blood pressure requiring medication, had any  ☐   ___
       abnormal blood test results or had an electrocardiogram made for any cause other than a routine physical
       examination?
       had an unexplained weight loss or swollen glands, recurring diarrhea, fever or infection, persistent cough,  ☐   ___
       insomnia or thrush?
       __s" to either (a), (b) or (c) above, cash may not be paid. Also give details in question 12.

   ___ ___reed that cash will be received subject to the terms of the attached receipt, that no coverage will be
   alt ___ ___'d under the receipt unless all conditions to coverage are met, and that any such coverage will be  ☑
       ___ry and limited in amount? If "No", cash may not be paid.
                                        CASH PAID $ 0

NYL CL 00357

O Tl
other
form
nd an
lease ___

9 9l___

91___

~~~~ ~~~~ ~~~~ (check one)
CORPORATION ☐      PARTNERSHIP ☐      "S" CORPORATION ☒      SOLE PROPRIETORSHIP ☐

c.) NUMBER OF EMPLOYEES
PRIOR TO THE ONSET OF YOUR CLAIMED DISABILITY:   FULL-TIME ___7___   PART-TIME ___6___
                                      CURRENTLY:   FULL-TIME ___6___   PART-TIME ___4___

d.) WITHIN THE LAST 6 MONTHS, HAVE YOU HIRED
ANY EMPLOYEES TO PERFORM ANY OF YOUR JOB DUTIES?   YES ☐      NO ☐

e.) IS THE BUSINESS OPERATING AT THIS TIME?   YES ☒  .  NO ☐

f.) HAS THERE BEEN ANY CHANGE OF
OWNERSHIP OF THE BUSINESS IN THE LAST 6 MONTHS?   YES ☐      NO ☒

g.) DO YOU HAVE PLANS FOR, OR ARE YOU
CONTEMPLATING THE SALE OF YOUR SHARE OF THIS BUSINESS?   YES ☒      NO ☐

.NY PERSON WHO KNOWINGLY AND WITH THE INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN
.PPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR
HE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE
.CT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

## DECLARATION AND SIGNATURE

declare that the answers provided on each page of this form and any attachments are complete and true to the best of my knowledge
nd belief. I understand that the Company reserves the right to require further information in order to evaluate my claim.

1-22-00
_____
ate

_____
Signature of Insured (Insured of Insured's authorized representative)


_____
Relationship if other than Insured

2027 10/98

# CLAIM DEPARTMENT
# PHONE MEMO

CLAIMANT: Vincenzo Mazzamuto

POLICY/CLAIM # 13-h3236167-002

PHONE NUMBER:

CALL IN                    CALL OUT

PERSON CALLING/CALLED

Insured

CONVERSATION: Called insured to go over claim form. Asked him to explain to me what happened. He had a heart attack in July and when they were putting him into the ambulance, his back snapped. He indicated that he has had back problems for years and this reinjured an injury that was already there. He gets injections for his back. He said that the back problems never went away but this just made him worse. I asked about his heart. Is that better. He said that it was. He attended cardiac rehab. He said that he thinks that that is a "rip off" because they barely let you move. He walks on the treadmill every day at home. He thinks that what is mostly keeping him off of work now is his back. His legs are numb. He said that he has a letter from his dr. about his back but his attorney's office advised him not to send that because he is claiming his heart problem. I told him that that letter would be beneficial for us to have because most of his symptoms and complaints are due to his back and not his heart. He asked me to call his attorney's office and speak with Melissa and she will send it to me. I told him that I would do that. I asked him about his job. What are your duties? His duties are mostly managerial. He does the books, orders food, writes the checks, etc. Had his workers do everything——cook, wait tables, etc. He would very rarely help out unless someone didn't come in to work then he would help cook or help with the tables. He said that that rarely happened though. What has happened to business now? He said that it is still open. His wife and son are running the business. His son quit school to help out. He is going to apply to a college closer to home. He said that he wanted to sell the restaurant but they have kids to take care of/support. I asked if he thought his job was stressful. He said that he thinks he is just a very nervous person. He thinks that maybe he has had too many years in the business. He said that he is from Italy and doesn't know English as well as other people and therefore, feels that he can't learn anymore. Gets frustrated. He is on medication for stress. He said that he doesn't know if he will ever return to work. I did indicate that we would obtain all of his medical records from all treating physicians to make a determination on his claim. I went over his benefits with him and told him that I would get a letter out to him explaining everything. He thanked me.

*Insured also indicated that he had an angioplasty.*

MAM 01-04-01

ACTION PLAN & LO~

Individual Disability Claims

INSURED: _Vincenzo Mazzamuto_    HOME TELEPHONE: _717 243 0383_

ADDRESS: _501 Limestone Rd_    WORK TELEPHONE: ____/____

CITY: _Carlisle_    STATE: _PA_    ZIP: _17013_

DOB: _5_/_25_/_55_ SSN: _190_/_56_/_5744_   DATE OF DISABILITY: _7_/_22_/_00_

☒ Sickness or ☐ Accident   Received by Claim Rep: _/_/_  DATE OF NOTICE: _/_/_

DIAGNOSIS: _Heart attack, anxiety, back pain_

OCCUPATION AT CLAIM: _Rest. owner / president_

Attorney Representation:  Name_____  Tel. _____/_____

### COVERAGE INFORMATION

| CLAIM # | ISSUE DATE | FORM # | ELIM PERIOD | MONTHLY BENEFIT | BENEFIT PERIOD | OWN OCC PERIOD | RESID LTD |
|---|---|---|---|---|---|---|---|
| H323 0167 | 8-28-93 | 9132 | 90 | 5000 | 65 | Yes | Yes |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**Exclusions/Riders/Waivers**

☐ Yes - Guarantee Issue   ☐ Yes - FICA   Expected RTW ___/___/___   RTW exceeded 6 Months? ☐ Yes

☐ Yes - Contestable   ☐ Yes - ERISA   ☒ Yes - Late Notice   New Notice Call _1_/_4_/_01_

### RECOMMENDED ACTION

☐ Employer Letter          ☒ APS _____          ☐ DEQY          ☐ SS Letter
☐ FICA Letter              ☒ AP Rec _____        ☐ SEQY          ☐ License Check
☒ Field Referral           ☒ Hosp Rec _____      ☐ Casualty Index Bureau   ☐ Waiver of Premium
☐ Reservation of Rights    ☐ W/C Rec _____       ☐ Data Base Search (super bureau etc)
☐ GENEX Referral           ☐ Other Carriers _____   ☐ Financial Review
☒ Verify occ.              ☐ HMO/PPO/Maj Med            ☐ Tax Returns/4506 _____
☐ Request occ. desc from EY   ☐ Third Party Action      ☐ Other recommendations (see below)

Recommendations: _get recs. write Mr to ① send to field (unannounced to_
_(restaurant) + back to 98_
_get occ._

CLAIM REPRESENTATIVE: _Melissa Magner_    DATE: _1/8/01_
CONSULTANT: _Diane Cahel_    DATE: _1/8/01_

NYL CL 00561

**ROBIN ANDREWS**
01/09/2001 09:15 AM

To:      Records Operations Chattanooga@Unum
cc:      Melissa Magner/Provident Life/US@Unum
Subject:  closed NYL File

Good Morning, could you please send me the following closed Individual NYL file on:

Mazzamuto, Vincenzo   Clm# 13-h3236167-001 Box# 79270/97-091 Cost Center 8175

Charge out to Melissa Magner   799-26

My route# is 775-52 or W200M, thanks

)4
11

5

3

NYLCL00236

# DISABILITY INCOME CLAIM INFORMATION

NEW YORK LIFE

NAME _Mammuto Vincenzo_   SS# _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_ D.O.B _5 25 55_

POLICY NO. _38369167_   CLAIM NO. _214 262_   POLICY FORM _9132 PA_

AGENT(S) NAME & CODE _Salvatore Terrys_   G.O. _V 44 Conslt._

_✓_ DISABILITY INCOME   ___ INCOME INSURANCE   ___ BOE

BENEFIT TERM _____   MONTHLY BENEFIT _____   COMMENCEMENT DATE _____

EFFECTIVE DATE _8 / 28 / 93_ DATE OF PART I _____   DATE OF PART II _____

RIDERS (with Effective Dates if after policy issue) _RD_

MONEY TAKEN (Yes or No) _____   PARAMEDICAL (Yes or No) _____

OCCUPATION & DUTIES ON APP _____

OCCUPATION & DUTIES AT CLAIM _____

UNDERWRITING OCC CODE _____   NET INCOME ON APP _____   NET INCOME ON IR _____

OTHER INSURANCE (Company, Amount, Policy #, Effective Date, Still In Force?) _____

PRIOR MEDICAL HISTORY _____

SUB-STANDARD: SPECIAL CLASS _____   EXCEPTION RIDER NO. _____
                        W/ REASON _____   W/ CONDITION _No_   LOSS INCURRED

NATURE OF THIS INJURY OR SICKNESS _Low back Periphinal Stenosis_   _4 13 96_

NUMBER OF CLAIMS UNDER THIS POLICY _____   MIB CODE: _____

PRIOR CLAIMS AND DIAGNOSES _____

DISPOSITION & DATE: PAID _____   REOPENED _____   CLOSED W/O PAYMENT _____

21143 6/94

NYLCG66233

NAME *Mazzamuti, Vintazo*
*N214-282.*

| DATE | CLAIM ACTION | S | TOTAL INSURANCE |
|------|-------------|---|-----------------|

DRUM DA

03/20/97  recd profs from kenneth l.stokum advising reveiw of complaints and
disciplinary actions revealed no reportable actions against agt ferrigno.
03/20/97  SENT REQUEST TO MANAGING PARTNER OF V44 FOR S/S FROM AGT.

3/24/97  *Tel Ackn frm RSB Notd*

3/2/97  *Notf Tax frm 60 w Statemt*
*Agts answers to que Views of*
*3/20(9) Memo Called 60.*
*Gtven frm Agt d. Not sgn*
*+ post date the statemt*

3/25/97  *Notd Frwd frm 60 w/agt's*
*Sgn't frm & date awtg*
*Respse frm Insd*

3/26/97  *Recd interim report frm RSB Inc*
*awtg final In. w/prescription info*
*from Carlisle Anthony & CVS pharmag*

NYLCLO0224

04/11/97  AGT'S ORIGINAL S/S, INSD'S REPLY & INTERIM REPORT W/INFO FROM CALISLE
PHARMARCY NOTED. REFERRED FILE TO ADAM WEINSTEIN IN OGC.

04/16/97  FILE RETURNED FROM OGC. REFERRED FILE TO AVP MCGRATH TO NOTE OGC'S
REPLY OF 4/15/97 WITH RECOMMENDATION THAT WE ACCEPT LIABILITY.     GPH

4/21/97  *Fle rchewed frm AVP mcgrath*
*Liab't accptd Bnes pd Afckby*
*frm 8/26/96 to 10/03/96 As Final*

5-39 12-62 Printed in U.S.A.



NEW YORK LIFE INSURANCE COMPANY
51 MADISON AVENUE
NEW YORK, NY  10010-1603
FERRIGNO,SALVATORE

VINCENZO MAZZAMUTO
501 LIMESTONE RD
CARLISLE, PA
17013-4348

EXPLANATION OF BENEFITS

APRIL 21, 1997

INSURED:  VINCENZO MAZZAMUTO
POLICY NUMBER:  H3236167
CLAIM NUMBER:  N  214282

PAYMENT HAS BEEN APPROVED BY:
GLORIA PHELPS
(212)576-7000

**************************** FILE COPY ****************************

    THE FOLLOWING CHECK REPRESENTS BENEFITS FROM JUL 02, 1996 THROUGH
OCT 23, 1996 UNDER YOUR DISABILITY INCOME POLICY AND APPLICABLE
RIDERS.

      BASE DISABILITY INCOME----------------------$7,466.67
      ADDITIONAL MONTHLY INCOME-------------------$3,733.33
      COST OF LIVING FOR ADDITIONAL MTHLY INC-------$373.33
      COST OF LIVING FOR ADDITIONAL MTHLY INC-------$373.33
      REFUND OF PREMIUM AMOUNT--------------------$1,502.67

      TOTAL PAYMENT------------------------------$13,449.33

    CONSISTENT WITH THE WAIVER OF PREMIUM BENEFIT INCLUDED IN YOUR
POLICY, WE ARE WAIVING/REFUNDING PAYMENT OF PREMIUM(S) BEGINNING
WITH THE ONE DUE 08/28/96 AND ENDING WITH THAT DUE 08/28/96.
PREMIUMS WERE AGAIN PAYABLE 02/28/97.  THE APPLICABLE REFUND
AMOUNT OF  $1,502.67 IS INCLUDED IN THE ATTACHED CHECK.
    PLEASE NOTE THAT CONSISTENT WITH YOUR POLICY, THE PREMIUMS
REFUNDED AND/OR WAIVED REPRESENT THOSE FALLING DUE UP TO 3 MONTHS
BEYOND THE DATE YOUR CLAIM TERMINATED.
    BASED ON THE INFORMATION WE HAVE RECEIVED WHICH INDICATES YOU
HAVE MADE A RECOVERY, THE ENCLOSED CHECK REPRESENTS OUR FINAL
PAYMENT FOR THIS LOSS.

                  CLAIMS DIVISION
                  DISABILITY INCOME DEPARTMENT

NYLCL00217



## UNUM.

*Protecting everything you work for*

January 15, 2001

Vincenzo Mazzamuto
501 Limestone Road
Carlisle, PA 17013

Claim # 13-H3236167-002

Dear Mr. Mazzamuto:

Thank you for the courtesies you extended me during our recent telephone conversation. I would like to take this opportunity to explain the status of your claim.

As we discussed, your policy was issued with a 90-day elimination period that must be satisfied before benefits can begin to accrue. Using a disability date of July 22, 2000, benefits would begin to accrue as of October 20, 2000.

Please note that your policy requires that written notice of claim must be given to us within 30-days after a disability starts or a covered loss occurs, or as soon thereafter as reasonably possible. As your written notice was not submitted within this time frame, our evaluation of your claim may be delayed.

Please note that we have requested your medical records from Dr. Douglas Bower and Carlisle Hospital. This information is needed before we can determine our liability on your claim. Your policy states that a claim will be payable when all information that is necessary for us to make a decision is received.

Also, for us to get a better understanding of your occupation, we ask that you please complete the enclosed Occupational Description Form, in full. Please complete this form indicating your specific duties that were performed prior to your disability and the amount of time spent in each duty.

Lastly, so that we may have continuing certification of your disability, we ask that you please complete the enclosed Progress Report, in full, with the help of your attending physician. Please be sure that he/she indicates all dates of recent treatment as well as to certify to your ongoing condition.

Thank you for your anticipated cooperation and if you should have any questions regarding the above, please do not hesitate to contact us.

Sincerely yours,


Melissa Magner, X6710
Claim Representative
The New York Life Insurance Company
UNUMProvident Corporation


Enc: pr, re

**NEW YORK LIFE**

NEW YORK LIFE INSURANCE COMPANY
NEW YORK LIFE INSURANCE COMPANY AND ANNUITY CORPORATION
(A DELAWARE CORPORATION)
NYLIFE INSURANCE COMPANY OF ARIZONA
(Not licensed in Every State)
PO BOX 6916, CLEVELAND OH  44101, (800) 695-9873
*The Company You Keep*

August 15, 2002


Vincenzo Mazzamuto
501 Limestone Rd
Carlisle PA  17013


Policy:  44 904 932
Claim:  368 799

Dear Mr.Mazzamuto:

Thank you for sending us the information we requested.  I am pleased to advise you that we have re-approved your claim for Waiver of Premium Disability Benefits beyond August 3, 2002.

A check for the refund of the August 2002 Annual premium has been sent under separate cover.  All future premiums will be waived while you are totally disabled, as defined in your policy.

Please let us know if you return to work or if your total disability ends.  If you have any questions regarding this claim, please let me know.


Sincerely,


Therese A. Sindelar
Ext 8724


cc: Salvatore Ferrigno V44
    Richard C Angino

NATIONAL UNDERWRITER
Life & Health/Financial Services Edition

July 29, 2002    **41**

**REGULATION**

# Public Criticism Of COLI Sales Spurs Regulators To Revamp Guidelines

By **Jim Connolly**

Public criticism over the sale of corporate-owned life insurance has regulators reexamining how the product is regulated.

As a starting point, a 10-year old guideline (*Model 602 of NAIC model laws*) developed by the National Association of Insurance Commissioners. Kansas City, Mo., will be reexamined and possibly revamped.

However, regulators who are part of the NAIC's COLI working group, have left open the possibility of developing a whole new model law that states can adopt to enforce how the product is sold and disclosed.

The working group's chairman, North Dakota Commissioner Jim Poolman, says the issue of affirmative consent, or an employee giving the employer the OK to purchase COLI on the employee's life, should be a top priority.

According to the NAIC, fewer than half of the states require the affirmative consent of an employee. Fifteen states do require it and five states have an opt-out provision in which an employee must say it is not all right for a

company to purchase COLI in order to prevent the firm from buying a life insurance contract on his life.

Other findings, according to the NAIC, are that most states require an insurable interest at the time coverage becomes effective; and laws in half of the states allow coverage to be maintained on non-management and retired employees.



Regulators say employee consent is important to COLI sales

The issue of affirmative consent being required for a Voluntary Employees' Beneficiary Association Trust contract which is being used as an irrevocable component of a 501c3 trust was raised by the industry; but regulators responded that even with the issue of irrevocability, at the very least, some sort of notification would seem appropriate.

Notice and consent should be part of the process, which is a stand that the National Association of Insurance and Financial Advisors has taken, according to Bill Anderson, vice president and associate general counsel with NAIFA, Falls Church, Va.

The "surprise factor" that occurs when a spouse finds out that a policy has been taken out on a deceased husband or wife, underscores the need for notification and consent, says John Pouliot, a regulator with the Ohio insurance department. **NU**

**LITIGATION**

# Doctor's Suit Asserts UnumProvident Had Policy Of Denying Claims

By **Marcella De Simone**

UnumProvident Corp. is accused in a lawsuit of denying disability claims whether they were valid or not.

The suit, filed June 28, was brought by Patrick Fergal McSharry, a doctor who once worked as a medical director for UnumProvident in Chattanooga, Tenn. He claims the company employed doctors "to provide language and conclusions supporting denial of claims."

The suit also claims that when he began writing his reports "accurately and without the foregone conclusion to deny the claim...(McSharry) began to suffer retaliation," including "verbal and written write-ups and warnings. He was subjected to constant criticism and ostracism."

The suit, which claims McSharry spoke with other medical personnel about "the illegality of (Unum's) practices," says McSharry was fired in January for "disruptive behavior."

Tom White, UnumProvident vice president, corporate relations, says the company "will definitely fight (the lawsuit); our company embraces very high ethical and professional standards, we deny all allegations against wrongdoing and will rigorously defend ourselves."

He says McSharry had been hired in 1999 as a consultant and worked as a medical director from Nov. 1, 2000 to Jan. 8, 2002 when he was fired "for performance."

"I think it's important to note that at no time did his

duties include making determination to benefits," White says. "His duty was to review medical records and answer questions about medical records, but not to decide whether a claim was valid."

McSharry is seeking back wages, reinstatement to his former position, compensation for mental suffering, humiliation and embarrassment, punitive damages and costs of attorney fees.

McSharry's lawyer, Anita Hardeman of Burnette, Dobson & Hardeman, Chattanooga, Tenn., did not respond to requests for comment. Her assistant says UnumProvident has 30 days from the time the lawsuit was filed to respond. It has not yet done so. **NU**

For high-quality article reprints (minimum of 100), including e-prints, contact Reprint Management Services at 717-399-1900 Ext. 166, or email nuco@reprintbuyer.com.



Confidential and Proprietary Information -- Authorized Use Only -- Do Not Print or Copy

# Introduction to the Claims Manual

This is the first Claims Manual created for UnumProvident Corporation's Customer Care Center. It is designed and intended to be a reference guide to claims professionals and others in the Customer Care Center on the handling of claims under the contracts that UnumProvident sells and administers. In effectuating that intent, the following key points apply to this Claims Manual:

1) Every claim submitted to UnumProvident is different and must be decided on its own unique and individual facts. Accordingly, this manual generally contains guidelines, rather than definitive, "hard and fast" rules on the handling, evaluation and determination of claims. These guidelines do not offer a prescribed answer to each claim situation. Rather, such answers must be arrived at based on the specific and particular facts of the claim, as noted above. This claims manual is not meant to replace independent thought and analysis by the Customer Care Representative. Depending on the unique facts of a claim, one or more of the guidelines contained in this Manual may or may not be applicable.

2) In the handling of each claim, the Customer Care Center will strive to comply with all applicable laws. In support of that goal, this Manual contains overviews of a variety of legal rules and guidelines that may apply to specific claims. The absence of any other applicable requirements from the Manual does not signify in any way noncompliance with such laws. In the event of any inadvertent conflict between any guidelines in this Manual and applicable law, the applicable law shall govern the situation.

3) In this first Manual, UnumProvident does not intend to cover every single claim practice and procedural topic. Rather, this Manual is and shall be a dynamic, interactive document to which procedural and practice guidelines on additional topics will be added over time, as appropriate.

4) This Manual will not include, at this point, guidelines with regard to the Colonial Life & Accident claims operation.

5) Once created, this Manual will be distributed to all Customer Care Centers and claim operations, as will additions and updates.

Confidential and Proprietary Information -- Authorized Use Only -- Do Not Print or Copy

## States: Pennsylvania

**Non-ERISA Claims**

Unfair Claims Settlement Practices Act and Other Claims Handling Laws:
Pa.Adm.Code 146.1 et seq.; Pa.St.Ann. 1171.5(10).

1. Adopted law similar to NAIC Model; for general provisions see NAIC Model Act and Regulations.
2. Specific Time Restrictions:
   Acknowledge receipt of notification of claim: 10 days
   Provide necessary claim forms: 10 days
   Respond to communications from claimant: 10 days
   Begin investigation of claim: None
   To complete investigation of claim: 30 days
   Notify claimant that more time is needed to review claim: 15 days after receipt of proofs of loss
   Send follow-up letters that investigation is incomplete: 30 days from the date of the initial notification requesting more time, and then 45 days thereafter.
   Accept or deny claim after receipt of proofs of loss: 15 days
   Pay claimant after acceptance of liability: None
   Pay after settlement of claim: None
   Respond to inquiry from Department of Insurance: 15 days

**ERISA & Non-ERISA Claims**

A. Pennsylvania does not tax sick pay.
B. Late Notice/Prejudice Rule: Insurer needs to demonstrate prejudice before a claim can be denied due to late filing. Perry v. Middle Atlantic Lumberman's Mutual, 542 A.2d 81 (Pa.1988); Brakeman v. Potomac Ins. Co., 371 A.2d 193 (Pa.1977); Weiner v. Metropolitan Life Ins. Co., 416 F.Supp.551 (E.D.Pa. 1976).

**ERISA Claims**

Located in the 3rd Circuit Federal Court of Appeals.



Confidential and Proprietary Information -- Authorized Use Only -- Do Not Print or Copy

# Guidelines for Evaluating an Occupation

Most UnumProvident policies condition eligibilty for benefits (at least for some period of time) on an individual's inability to perform some or all of the material and substantial duties of his "own occupation" due to sickness or injury. For some claimants, the degree of medical impairment is so severe that eligibility for benefits can be determined without an extensive analysis of the occupation. In other situations, an analysis of the claimants' pre-disability occupation is needed to evaluate their eligibility for benefits.

Questions may arise in interpreting "occupation" as defined in the policy. Some policies define 'occupation' in more detail than others. The following guidelines have been developed for identifying and evaluating the appropriate "occupation" for a claimant.

This guideline applies to all contracts that refer to the inability to perform one's own or regular occupation. If the contract includes a specialty definition or inability to perform a particular job with the employer, please keep that in mind during the evaluation. We may want to consider review of the Underwriting file for additional occupation information.

In determining the insured's occupation, we must develop a thorough understanding of the work the claimant was performing immediately prior to disability.

## Establishing Occupation
In determining what an insured's own occupation should be, consider the following:
- What were the material and substantial duties the claimant performed?
- How did the insured spend his time?
- From what activities was his income generated?

The insured's "own occupation" or "regular occupation" is the occupation which the insured was engaged in at the time of the disabling injury or sickness.

The following sources can be used to establish the insured's occupation:
- appointment books, calendars, schedules (including surgical schedules), or other evidence of how the insured spent his time prior to disability;
- billings;
- job description, personnel file, etc., if the insured is an employee of a firm that generates such materials;
- evidence of earned income W-2s, tax returns, etc.;
- authored works such as reports, memoranda, publications, etc.;
- timesheets; and
- vocational resources such as Dictionary of Occupational Titles, Occupational Outlook Handbook etc.

Occupation must be determined using fair and reasonable standards of review. If an occupation, broadly defined, includes a particular procedure, but the insured has not performed such procedures in the past to a material and substantial degree, the inability to perform that procedure should not result in a finding of disability.

Occupation does not include the particular physical environment in which the insured was performing his occupational duties prior to disability. For example, if an insured was a bookkeeper in an old building that, because of its unique structure, contained only a narrow flight of stairs that the insured cannot now climb, this does not render him unable to perform his occupational duties as a bookkeeper.


Certain state or federal courts have interpreted the term "occupation" in prior disabiliy cases. Each such holding is based on the unique facts of the case. Florida, however appears to have adopted a more narrow definition of "own occupation." Refer to the Legal Department if you have questions regarding the law of any state regarding "occupation."

## Job vs. Occupation Assessment
The essence of the job vs. occupation or own occupation assessment is a comparison of the specific duties performed prior to disability with the occupational duties as generally performed in the national economy.

The term "occupation" is often interpreted to be the same as a "job." This interpretation is incorrect as a job differs from an occupation in that a job is a set of specific duties performed at a particular employer whereas an occupation is a broader description of the type of work as is generally performed in the national economy.

Vocational resources are available to assist in determining a claimant's occupational duties as generally performed in the national economy.

## Analyzing Nurse Occupations
The Nursing profession has changed considerably over the years resulting in a variety of RN positions. When evaluating a claim involving a registered nurse, the restrictions and limitations may impact the claimant's ability to perform some if not all jobs within the Registered Nurse Occupation.

We do not offer a specialty definition of disability for nurse positions. However, we do recognize there are classes of nursing positions that require separate and distinct training and license to perform. Therefore the following positions are recognized as specialty occupations when administering claims:
- Nurse Anesthetist (CRNA)
- Nurse Midwife
- Nurse Practitioner

RN and LPN/LVN positions should be considered on a general basis vs. specific position with a particular employer. If we determine that an RN/LPN/LVN is reasonably capable of performing the occupation in another situation, the person is not disabled. In making this determination, careful review of the job demands as well as prior education, training (credentials, certifications, etc.) number of years in specific RN jobs and types of work experience is needed. Prior to referral to the Vocational Rehabilitation Consultant, we should obtain the Nurse Training, Education and Experience form.

## Labor Market Information/Geographical Proximity
During the management of a claim it may be necessary to obtain labor market information. The most frequent need for labor market information is for a Labor Market Survey (LMS) during an any occupation evaluation at change of definition to determine the existence and wages of alternate occupations.

Labor market information is a tool that can:
- provide wage information
- provide information about existence of occupations
- identify how an occupation is performed
- identify existence of occupations in local or national labor markets

Labor Market Surveys (LMS) are used when calls to employers are needed to obtain information regarding wages and/or existence of occupations within a given labor market. Calls to employers



Confidential and Proprietary Information -- Authorized Use Only -- Do Not Print or Copy

## Ongoing Claimant Certification of Disability

**Background**

During the active management of a claim we frequently ask for information supporting ongoing payment and calculation of benefits. One tool used to obtain data is the supplemental claim statement. This form requests information from the claimant and the attending physician.

To ensure that we are requesting the appropriate information at the right time and to establish a consistent approach to claims management, we should adhere to the following guidelines.

**Applicability**

Group LDU, IDI, Life
This does not apply to SDU claims due to limited duration.

**Attending Physician Statement**

We should request updated medical information as needed to support continued payment of a claim. This information can be obtained through various sources including office notes, attending physician statements, Independent Medical Examinations, etc.

When we are actively managing an LTD claim, we should be requesting a completed Attending Physician Statement at least quarterly. Some impairments may warrant more frequent attending physician statements. Actively managed IDI claims will usually require monthly attending physician statements.

**Claimant Statement**

When we are actively evaluating a claim, the fully completed claimant statement must be requested minimally on a quarterly basis. For IDI claims, we should consider monthly statements given the lack of a separate employer/employee relationship to assist with verification of information. While we may be using various tools to obtain updated medical data, we need to regularly get updated statements from the claimant.

**Rationale**

The claimant statement provides ongoing documentation, which will help direct the claim investigation. The claimant is submitting a written document that provides:
- written statement of the claimants activities (including any part-time work)
- updated authorization to release information
- current physical address and telephone number
- other insurance/income status

When we are determining what information is needed, the updated statement will help set our future investigative direction.

**Extended Duration Unit**

Extended Duration Unit (EDU) will obtain an updated claimant statement for claims every 12-36 months based on the criteria established by the EDU.

**Conclusion**

The claimant statement is an important tool that will assist in the ongoing management of a claim. The frequency guideline will help ensure that we are getting the updated information necessary to manage a claim.

**Reminder: Each claim is unique and should be evaluated on its own merits.**



Confidential and Proprietary Information -- Authorized Use Only -- Do Not Print or Copy

# Medical Information

All information obtained during the claim evaluation process must be considered when making decisions regarding liability. Key components of the evaluation process include but are not limited to consideration of:

- Contractual Provisions
- Claimant Activities
- Occupational Duties
- Financial Information
- Medical Information

As illness or injury is at the foundation of every claim, medical information is fundamental to an understanding of a claimant's restrictions and limitations, opportunity for recovery, and capacity for return to work.

The analysis of medical information drives the success of early intervention and medical case management where we partner with treatment providers to facilitate rehabilitation and return to work in appropriate cases.

During the claims evaluation process, medical information should be assessed for its credibility and relevance. There are a number of avenues, beyond the treating healthcare provider, available for obtaining an assessment of the medical information and/or the claimant's restrictions and limitations including:

- Independent Medical Examination (IME)
- Functional Capacity Evaluation (FCE)
- Internal Medical Personnel

## Independent Medical Examination (IME) and Functional Capacity Evaluation (FCE)

An IME and/or FCE is an examination of the claimant by an external healthcare provider performed at the request of the Company.

The IME and/or FCE are reserved as a claim management tool and will only be appropriate in certain situations. As each claim is unique, the specific facts of the claim will determine whether an IME and/or FCE is an appropriate step. If an IME and/or FCE is completed, it is generally appropriate to provide the treating healthcare provider with a copy of the report while proceeding with claims management activities.

Appropriate internal medical resources should be involved in the discussion of claims being considered for denial based on medical grounds.

## Customer Care Center Medical Department

Internal healthcare expertise is available to assist with the analysis of medical information. Our physicians, nurses and other allied healthcare professionals are available to:

- Assess medical information from the perspectives of adequacy, consistency and credibility
- Apply current medical knowledge to data regarding diagnosis, treatment, prognosis, and impairment;
- Offer advice regarding obtaining future medical information;
- Attempt to clarify a situation with a peer-to-peer call; and
- Evaluate restrictions and limitations and their expected impact on work capacity.

**Internal medical resources are expected to apply an appropriate level of critical scientific**

**analysis to the review of medical information; their analysis will be guided in part by the following principles:**

- Office notes, test results or other medical records which record findings of the patient's visits are generally more useful than a 'narrative summary' from the attending physician.
- More recent medical information is often more informative regarding current status than older data.
- An opinion from a healthcare provider with a higher level of expertise, specialization or training is generally more credible or persuasive than the opinion from a provider with a lesser level of expertise, specialization, or training.
- A medical opinion based on scientific evidence is frequently more compelling than a medical opinion without such a foundation.
- A medical conclusion/opinion founded on detailed specific facts or observations is generally more persuasive than a medical conclusion without such a foundation.
- When an attending healthcare provider is recommending restrictions and limitations, we need to consider the basis behind the recommendation and determine whether we have the same information/reports the attending healthcare provider used in making their determination.

**From the perspective of the claims adjudication professional:**

- A generic statement from an attending healthcare provider supporting disability, in most cases, is not sufficient to continue benefit payments. A factual basis behind the opinion should be evident. It may be relevant to evaluate whether the attending healthcare provider considered the claimant's work capacity relative to their occupation setting.
- The claim file should reflect the rationale used to reach conclusions when evaluating differing medical opinions.

**Conclusion**

Medical information is an important component of the claims investigation process. Our medical resources can provide assistance with the evaluation of the information including diagnosis, chart records/diagnostic test results, treatment protocols and prognosis.

Confidential and Proprietary Information -- Authorized Use Only -- Do Not Print or Copy

# File Documentation

Insurers are required by law to establish, maintain, and retain claim files. File documentation should be fact-based and professionally worded. All communications bearing on the claim should be documented and included in the file, including telephone conversation notes, e-mails, etc. All documents pertinent to the claim should be included in the claim file. All documents should be added in chronological order based on the date they were generated or the date of their receipt, whichever is later. All documents generated by UnumProvident should be legible, and include a date and the name or initials of the author. All documents should be complete.

UnumProvident employees handling claims should not maintain any files concerning a claim other than the claim file itself.

Attorney-client communications contained in the claim file should be designated "Attorney-Client Communication/Privileged and Confidential."

Material should not be removed from a claim file unless it was included by mistake; e.g., documents not related to the claim.

*E*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SYRACUSE EXPLORATION COMPANY,    :
     Plaintiff

                              :

     vs.             :   CIVIL ACTION NO. 1:CV-97-1405

NORTHBROOK PROPERTY &amp;        :
CASUALTY INSURANCE COMPANY,
     Defendant         :

**FILED**
HARRISBURG, PA

SEP 2 8 1999

M E M O R A N D U M

MARY E. D'ANDREA, CLERK
Per _____
                 Deputy Clerk

I.       <u>Introduction</u>

       Plaintiff, Syracuse Exploration Company ("Syracuse"),
has filed a motion for new trial. This was a bad faith claim in
which the jury exonerated Defendant's ("Northbrook") handling of
Plaintiff's insurance claim. <u>See</u> 42 Pa. Cons. Stat. Ann. § 8371
(West 1998). Plaintiff alleges that the court made errors in
ruling on motions in limine, admitting or excluding evidence at
trial, and in instructing the jury. As discussed below, we
conclude that these claims of error do not warrant the relief
sought.

       In addition, Defendant has filed a motion to strike
certain post-trial affidavits submitted by the Plaintiff
concerning several occurrences during the trial. We well deny
that motion because those filings are authorized by Fed. R. Civ.
P. 59.

AO 72A

II.        Background

Syracuse was insured by Northbrook for damage to its construction equipment.  On September 16, 1997, Syracuse commenced this action claiming that Northbrook acted in bad faith in handling a claim involving damage to a drill rig.  Syracuse alleged that Northbrook unreasonably delayed paying its claim for damage to the rig; canceled the policy following submission of the claim; took an improper deduction for depreciation; and that the handling of the claim caused Syracuse to sustain lost profits. The only question at trial was whether Syracuse proved by clear and convincing evidence that Northbrook's handling of Syracuse's claim was done in bad faith.  The jury returned a verdict in favor of the Defendant on June 9, 1999.

III.       Standard of Review

A motion for a new trial under Fed. R. Civ. P. 59 may be granted "if required to prevent injustice or to correct a verdict that was against the weight of the evidence." American Bearing Co., Inc. v. Litton Indus., 729 F.2d 943, 948 (3d Cir. 1984); Alexander v. Morning Pride Mfg., Inc., 913 F. Supp. 362, 372 (E.D. Pa. 1995).  A new trial may be necessary where the verdict is so contrary to the weight of the evidence that it represents "a miscarriage of justice" or "cries out to be overturned or shocks our conscience." Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1353 (3d Cir. 1991); Delli Santi v. CNA Ins. Co., 88 F.3d

2

192, 201 (3d Cir. 1996).  "Injustice" requiring a new trial may
include the improper exclusion of evidence, or a jury instruction
that misstates the law, so long as the error "appears to the court
inconsistent with substantial justice."  Fed. R. Civ. P. 61;
<u>Bailey v. Atlas Powder Co.</u>, 602 F.2d 585, 588 (3d Cir. 1979).

IV.      <u>Discussion</u>

   A.  *Evidentiary Rulings Before Trial*

         Prior to trial Defendant submitted several motions in
limine, all of which were granted.  Two of these motions stemmed
from a partial summary judgment that was granted to the Defendant.
The court determined that Plaintiff had failed to produce
evidence, first, that the depreciation calculation used by
Defendant was unreasonable or was reached in bad faith and,
second, that Plaintiff had sustained lost profits due to
Defendant's handling of its claim.  Accordingly, we granted
Defendant's motion in limine to exclude evidence as to lost
profits or the method it used to determine depreciation.

         Plaintiff argues that the jury should have been
permitted to consider evidence of lost profits and Defendant's
handling of the depreciation item.  However, because Plaintiff
failed to produce evidence, in response to Defendant's summary
judgment motion of any losses it sustained, or that Defendant's
calculation of depreciation was done in bad faith, Plaintiff

3

forfeited these claims.  Inasmuch as these allegations could no longer serve as a basis for Plaintiff's bad faith claim, we find no error in excluding this evidence at trial.

In response to a third motion in limine by Defendant, we excluded evidence of Defendant's decision not to renew Plaintiff's insurance policy based on Plaintiff's loss history.  Renewal of the policy was not relevant to the issue of the Defendant's handling of Plaintiff's claim.  Plaintiff now argues that the non-renewal was itself evidence of bad faith.

Plaintiff's argument is not supported by decisions interpreting the Pennsylvania bad faith statute.  See Perschau v. USF Ins. Co., 1999 WL 162969, at *4 n.6 (E.D. Pa. Mar. 22, 1999) (sending notice of non-renewal to insured not evidence of bad faith); Belmont Holdings Corp. v. Unicare Life & Health Ins. Co., 1999 WL 124389, at *3 (E.D. Pa. Feb. 5, 1999) (holding that bad faith statute applies to handling of insurance claims and not to contract disputes, including threats not to renew policy); Kurtz v. American Motorists Ins. Co., 1997 WL 117008, at *2-3 (E.D. Pa. Mar. 12, 1997) (reviewing case law and holding that bad faith statute does not apply to non-renewal of automobile policy); see also U.S. Metal & Coin Jewelry, Inc. v. Jewelers Mut. Ins. Co., 1996 WL 494149 (E.D. Pa. Aug. 26, 1996) (allowing claim of bad faith based on the non-renewal of a policy, but finding none where decision was legitimately based on insured's loss history).  The cases cited by Plaintiff are not persuasive because they do not

4

relate to the Pennsylvania bad faith statute or to non-renewal of insurance based on loss history.  Accordingly, we conclude there was no error, and certainly no prejudice, in excluding this evidence.

A final pre-trial ruling challenged by the Plaintiff is our order of December 31, 1998, sanctioning Plaintiff for submitting an expert report three and one-half months after the deadline for submitting such reports.  We ordered that the expert's report be stricken from the record.  Plaintiff correctly points out that before imposing the sanction of striking proposed testimony by a witness we must consider:

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified,
> (2) the ability of that party to cure the prejudice,
> (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and
> (4) bad faith or willfulness in failing to comply with the court's order.

Meyers v. Pennypack Woods Home Ownership Assn., 559 F.2d 894, 904-05 (3d Cir. 1977), overruled on other grounds, Goodman v. Lukens Steel, 777 F.2d 113 (3d Cir. 1985), aff'd, 482 U.S. 656, 107 S. Ct. 2617, 96 L. Ed. 2d 572 (1987); see also Elf Atochem N. Am., Inc. v. United States, 882 F. Supp. 1497, 1498 (E.D. Pa. 1995).  Although we did not require Defendant to establish that admitting the expert's proposed testimony would cause prejudice, nor whether such prejudice could be cured, we did determine that

5

Plaintiff's behavior was in disregard of the rules of civil procedure and the case management plan for this case. Furthermore, although Plaintiff characterized the expert as a "rebuttal expert," his report contained an analysis of Defendant's handling of Plaintiff's insurance claim.  There was no excuse for Plaintiff awaiting the report by Defendant's expert before presenting its own witness.  To allow the Plaintiff to introduce opinion evidence which could have (and should have) been produced initially would have affected the orderly prosecution of the case. Following the Plaintiff's disregard of the discovery deadline (through a request for production of documents), we conclude that the sanction imposed was a valid exercise of our authority under Fed. R. Civ. P. 37.

     B.    *Evidentiary Rulings During Trial*

     When the president of Syracuse began to testify about the company's debts we sustained Defendant's objection that this testimony was not relevant to the bad faith issue.  In arguing that this testimony was admissible to establish bad faith, Plaintiff cites two cases where the insurer's knowledge of its insured's difficult financial condition may have been a factor in proving bad faith.  See Polselli v. Nationwide Mut. Fire Ins. Co., 1995 WL 430571 (E.D. Pa. July 20, 1995) (holding that insurer acted in bad faith in delaying payment of living expenses when insurer knew that insured had no place to live after fire

destroyed home); <u>South Park Aggregates v. Northwestern Nat'l Ins.</u>
<u>Co. of Milwaukee</u>, 847 P.2d 218, 225 (Colo. App. 1992) (holding
that insurer's awareness of financial consequences to insured in
denying claim was evidence of bad faith).  However, Plaintiff
never offered to show that Defendant knew of the Plaintiff's
financial status.  Because an insured's financial condition,
standing alone, cannot establish bad faith on the part of the
insurer, there was no error in excluding this evidence.

Plaintiff contends that admitting testimony by the
Defendant's expert, a lawyer who handles insurance claims, was
error because the testimony included an opinion concerning the
question for the jury, i.e., whether Defendant acted in bad faith.
We find no error.  First, Federal Rule of Evidence 704 permits
testimony as to the ultimate issue.  Second, the expert testified
primarily about the facts of the case and whether particular
actions were acceptable practice within the insurance industry.
Defendant's expert did not testify regarding decisions or
interpretations of the law as did the attorney expert in <u>Nieves-</u>
<u>Villanueva v. Soto-Rivera</u>, 133 F.3d 92 (1st Cir. 1997), on which
the Plaintiff relies.  On those few occasions where the expert's
testimony appeared to veer in the direction of offering a legal
opinion, the court sustained Plaintiff's objections.  For example,
the expert was not permitted to testify as to the difference
between bad faith and a mistake.  (Tr. at 412.)  Accordingly, we
believe the expert's testimony was properly admitted.

7

During trial, Defendant called as a witness an independent appraiser, Charles Stanford, who adjusted the claim on its behalf.  Stanford testified from memory about his handling of the Plaintiff's claim, and on cross-examination Plaintiff's counsel asked to see Stanford's files.  Stanford stated that he did not have them because counsel for the Defendant told him it was not necessary to bring them to court.  (See Stanford Aff. ¶ 5; Zelle Aff. ¶ 8.)[1]  Plaintiff contends that defense counsel violated Rule 3.4 of the Rules of Professional Conduct[2] and that this behavior is grounds for granting a new trial.

This argument lacks merit.  In its initial disclosures in December 1997, the Defendant informed Plaintiff that Stanford was involved in handling the Plaintiff's claim.  (Zelle Aff. ¶ 3.) Defendant also indicated in its pre-trial memorandum that Stanford would testify at trial.  Because Stanford is not an employee of

---

[1] The court allowed Defendant additional time to submit affidavits in response to Plaintiff's arguments concerning Stanford's testimony.  Plaintiff argues that we lacked the authority to grant an extension.  Contrary to Plaintiff's position, the court did have discretion under Fed. R. Civ. P. 6(b) to extend Defendant's time for filing affidavits under Fed. R. Civ. P. 59(c).  Although Rule 6(b) lists specific rules for which the time periods may not be extended, Rule 59(c) does not appear in this list.

[2] Rule 3.4(a) provides that "[a] lawyer shall not:
     (a) unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value or assist another person to do any such act.
Pennsylvania Rules of Professional Conduct Rule 3.4(a).

8

AO 72A
(Rev 8/82)

the Defendant, his files were not in the possession or control of Defendant and they were not produced in response to a request for documents.  See Fed. R. Civ. P. 34.  However, Plaintiff had ample opportunity to subpoena Stanford's files.  The failure to do so cannot be blamed on the Defendant nor provide a basis for a new trial.  See Buchholz v. Rockwell Int'l Corp., 120 F.3d 146 (8th Cir. 1997) (denying motion for new trial for failure to produce documents where opposing party was aware of their existence one year before trial).  Furthermore, Plaintiff has not shown that the failure to produce Stanford's files was prejudicial.

C.   *Jury Charge*

        Plaintiff maintains that a new trial should be granted because the court did not hold a charge conference and because certain instructions he proposed were not given to the jury.  A jury charge conference is not required by the federal rules of civil procedure.  See Fed. R. Civ. P. 51.  Furthermore, a new trial will not be granted due to an incorrect jury instruction, "unless the moving party brought the erroneous instruction to the court's attention at trial."  Younis Bros. & Co. v. CIGNA Worldwide Ins. Co., 899 F.Supp. 1385, 1398 (E.D. Pa. 1995), aff'd, 91 F.3d 13 (3d Cir. 1996) (citing Fed. R. Civ. P. 51).  This can be accomplished either by seeking a ruling on the proposed instruction or by objecting after the jury is charged.  Smith v. Borough of Wilkinsburg, 147 F.3d 272, 275-77 (3d Cir. 1998).  In

9

either case, the party must clearly state what portion of the charge is objected to and why it is objectionable. Id at 277; Fed. R. Civ. P. 51. Despite being provided with an opportunity to object, Plaintiff did not do so, and thus failed to preserve this issue as a basis for obtaining a new trial.

Although we need not consider Plaintiff's arguments regarding the jury instructions, we will nonetheless explain our decision not to include Plaintiff's proposed charges concerning the Unfair Insurance Practices Act ("UIPA"). See Pa. Stat. Ann. tit. 40, §§ 1171.1-.15 (West 1997 & Supp. 1999). Plaintiff's proposed Points for Charge Numbers 5 and 6 listed specific provisions of the UIPA and the companion regulations. Plaintiff's suggested charge would allow a jury to conclude that committing any act prohibited by the UIPA establishes bad faith on the part of the insurer. We do recognize that establishing that an insurer committed acts mentioned in the UIPA may provide support for a bad faith claim. See Romano v. Nationwide Ins. Co., 435 Pa. Super. 545, 554, 646 A.2d 1228, 1233 (1994). Indeed, Plaintiff did introduce evidence that Defendant may not have complied with certain regulations, for example, in the timeliness of its response to Plaintiff's initial claim. We believe, however, that instructing a jury on these regulations is inappropriate. The UIPA is concerned with improper conduct that occurs so frequently as to rise to the level of a "business practice." Pa. Stat. Ann.

10

AO 72A
(Rev 8/82)

tit. 40, § 1171.5.   The bad faith statute, on the other hand, is

concerned only with an insurer's actions in a specific case.

See Hyde Athletic Indus. v. Continental Cas. Co., 969 F. Supp.

289, 307 (E.D. Pa. 1997) (observing that "[w]hat constitutes a

reasonable set of business practices for the investigation and

evaluation of claims is a question properly left to the

Pennsylvania Insurance Commissioner, not a judge or a jury").

Instructing the jury on the UIPA might lead to confusion.   We

believe the better approach is to permit the introduction of

evidence showing non-compliance with the UIPA, as the Plaintiff

did here, but to allow the jury to decide whether this is evidence

of bad faith as that term is defined in the law.

        Plaintiff's remaining two grounds center on questions

asked by the jury during the course of deliberations.   We

responded to those questions as we thought appropriate.   The

Plaintiff did not note any objections to the statements made to

the jury and thus failed to preserve these matters for review.

        We will issue an appropriate order denying Plaintiff's

motion for a new trial.

_William W. Caldwell_
William W. Caldwell
United States District Judge

Date: September 28, 1999

11

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SYRACUSE EXPLORATION COMPANY,    :
       Plaintiff

                         :

       vs.               :    CIVIL ACTION NO. 1:CV-97-1405

NORTHBROOK PROPERTY &    :
CASUALTY INSURANCE COMPANY,
       Defendant      :

**FILED**
HARRISBURG, PA

SEP 2 8 1999

MARY E. D'ANDREA, CLERK
Per _____
          Deputy Clerk

O R D E R

AND NOW, this 28th day of September, 1999, upon consideration of Plaintiff's motion for a new trial, filed June 11, 1999 (Doc. No. 113), and Defendant's motion to strike post-trial affidavits, filed June 22, 1999 (Doc. No. 117), it is Ordered that the motions are denied.

                                    _William W. Caldwell_
                                      William W. Caldwell
                                      United States District Judge

AO 72A
(Rev.8/82)

2a
*Appendix*

UNREPORTED – NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 99-3811

———————

SYRACUSE EXPLORATION COMPANY,
Appellant

v.

NORTHBROOK PROPERTY & CASUALTY
INSURANCE COMPANY

———————

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civ. No. 97-cv-01405)
District Judge: Honorable William W. Caldwell

———————

Submitted Under Third Circuit LAR 34.1(a)
May 23, 2000
Before: SLOVITER and MANSMANN,  Circuit Judges
and WARD, District Judge.

(Filed: May 26, 2000)

———————

MEMORANDUM OPINION OF THE COURT

———————

*Honorable Robert J. Ward, of the United States District Court for the Southern District
of New York, sitting by designation.

3a
*Appendix*

MANSMANN, <u>Circuit Judge</u>.

Syracuse Exploration Corporation, the plaintiff in a diversity action alleging bad faith on the part of its insurers under 42 Pa. Cons. Stat. Ann. § 8371, appeals from an order of the District Court granting partial summary judgment in favor of the insurer, Northbrook Property & Casualty Insurance Corporation. Syracuse also appeals from an order of the District Court denying Syracuse's motion for a new trial. Syracuse raises multiple allegations of error with respect to the grant of partial summary judgment, contending that the District Court erred in: (1) concluding that Syracuse failed to produce evidence in support of its bad faith claim based on Northbrook's depreciation and lost profits calculations; and (2) striking the report of Syracuse's expert as untimely. Syracuse raises additional allegations of error with respect to the District Court's denial of its motion for a new trial. Specifically, Syracuse contends that the District Court erred in: (1) precluding the introduction of evidence relating to Northbrook's failure to renew the insurance policy held by Syracuse; (2) permitting Northbrook's expert to express a legal opinion; (3) ruling that Syracuse's owner could not be questioned regarding the financial status of the company; (4) failing to hold a pre-charge conference and to deliver certain instructions requested by Syracuse; (5) formulating inadequate responses to questions posed by the jury during the course of deliberation; and (6) tolerating alleged misconduct on the part of counsel for Northbrook. We are convinced that each of the allegations of error lacks merit and will affirm the orders of the District Court.

4a

*Appendix*

I.

The parties are well familiar with the facts underlying this appeal and have referred to those facts in detail in the course of setting forth their respective positions. As a result, we refer to the facts only to provide context for our conclusions of law.

In September 1997 Syracuse filed a diversity action in the Middle District of Pennsylvania, alleging that Northbrook acted in bad faith in violation of Pennsylvania law when it processed an insurance claim for fire damage to a drilling rig owned by Syracuse. Syracuse sought lost profits, compensatory and punitive damages, and attorney's fees.

In January 1998 Northbrook filed a motion for partial summary judgment with respect to that portion of Syracuse's claim based on the deduction of depreciation from the amount owed. This motion was denied, as was Northbrook's motion for reconsideration.

At the close of discovery in August 1998, Northbrook filed a second motion for partial summary judgment on the depreciation and lost profits elements of Syracuse's bad faith claim. Following oral argument, the Magistrate Judge concluded that Syracuse failed to meet its burden of "point[ing] to some evidence of an unreasonable calculation of depreciation and of lost profits." Syracuse Exploration Corp. v. Northbrook Property & Casualty Ins. Co., Civ. No. 1:CV-97-14-5, report and recommendation at 5 (M.D. Pa. October 22, 1998). Accordingly, the Magistrate Judge recommended that Northbrook's

3

5a
*Appendix*

motion for partial summary judgment be granted.  In an order dated December 31, 1998,

the District Court adopted the report and recommendation of the Magistrate Judge,

granting partial summary judgment in favor of Northbrook.  In the same order the District

Court granted Northbrook's motion to strike a report prepared by Syracuse's expert

witness, finding that the report was untimely.

  In May 1999 Northbrook filed motions in limine seeking to exclude at trial

evidence relating to Syracuse's alleged lost profits and financial status, Northbrook's

failure to renew its insurance contract with Syracuse, and the method used by Northbrook

to calculate depreciation.  In an order dated June 3, 1999, these motions were granted.

Trial began on June 7, 1999, and concluded on June 8th with a jury verdict in favor of

Northbrook.

  On June 11, 1999, Syracuse filed a motion for a new trial alleging that the

District Court erred in admitting and excluding certain items of evidence at trial,

instructing the jury, and tolerating prejudicial misconduct on the part of Northbrook's

counsel.  The motion was denied on September 28, 1999.  A timely appeal followed.  We

have jurisdiction pursuant to 28 U.S.C. § 1291.


II.

  We address first Syracuse's appeal from the District Court order granting

partial summary judgment in favor of Northbrook.  Syracuse challenges first those

4

6a

*Appendix*

portions of the order directing that judgment be entered in favor of Northbrook on

Syracuse's claim that Northbrook exhibited bad faith in calculating a depreciation

deduction and on the claim for lost profits.[1]


A.

The deduction for depreciation and calculation of lost profits.

Pennsylvania law provides a statutory remedy for insurers' bad faith

conduct. 42 Pa. Cons. Stat. Ann. § 8371 reads:

> In an action arising under an insurance policy, if the court
> finds that the insurer has acted in bad faith toward the insured,
> a court may take all of the following actions:
> (1) Award interest on the amount of the claim from the date
> the claim was made by the insured, in an amount equal to the
> prime rate of interest plus 3%.
> (2) Award punitive damages against the insurer.
> (3) Assess court costs and attorney's fees against the insurer.

Although the statute does not define the term "bad faith," we have found that:

"in the insurance context the term . . . has acquired a peculiar and universally

acknowledged meaning." Polselli v. Nationwide Mutual First Insurance Co., 23 F.3d

747, 751 (3d Cri. 1994). "'Bad faith'" on [the] part of [an] insurer is any frivolous or

---

[1] In a parallel argument, Syracuse contends that the District Court erred in granting
Northbrook's motions in limine precluding the introduction at trial of evidence relating to
the method by which depreciation and lost profits were calculated. Our finding that the
District Court did not err in granting summary judgment with respect to these claims is
dispositive of Syracuse's challenge to the District Court's grant of the motions in limine.

7a
*Appendix*

unfounded refusal to pay proceeds of a policy . . . .   [S]uch conduct imports a dishonest

purpose and means a breach of a known duty . . . through some motive of self-interest or

ill-will; mere negligence or bad judgment is not bad faith." Id.  Based on this definition,

we concluded that reckless behavior may constitute bad faith and clarified that a plaintiff

bears the burden of proving bad faith by clear and convincing evidence. Id. at 750, 751.

In granting Northbrook's motion for partial summary judgment, the District

Court adopted the report and recommendation of the Magistrate Judge in which the

Magistrate Judge found, on the two relevant elements of its bad faith claim,  that Syracuse

failed to meet its burden of proof:

> Syracuse, who has the burden of proof, must point to some
> evidence of an unreasonable calculation of depreciation and
> of lost profits to avoid an entry of summary judgment in favor
> of defendant Northbrook as to these portions of [Syracuse's]
> claim.

Report and Recommendation at 5.  Addressing the calculation of depreciation, the District

Court noted that Syracuse conced[ed] in its brief that Northbrook may have had a

reasonable basis for its depreciation calculation." Id. at 6.  The District Court then stated:

> [A]fter the completion of discovery, Syracuse does not even
> present a single argument that the depreciation calculation of
> $4,288.16 as applied against a total claim of $51,718.67 was
> unreasonable.  In the absence of a colorable argument of
> unreasonableness in the calculation, evidence concerning the
> method of calculation of depreciation would not be relevant
> and admissible at trial to support an inference of a
> combination of factors that added together comprise bad faith.

8a
*Appendix*

Id. at 7.

The District Court's conclusion with respect to that portion of the bad faith claim based on lost profits was similar:

> [Syracuse] again does not present any factual interpretation or theory supporting a claim of bad faith or unreasonableness in connection with the handling of the lost profits portion . . . of the claim. . . .

Id. at 9.

We have reviewed the record in this matter and are convinced that the grant of partial summary judgment on the depreciation and lost profits elements of the bad faith claim was appropriate. We agree with the District Court that where Syracuse failed to establish even an inference of bad faith in calculating depreciation or lost profits, evidence relating to those calculations was irrelevant to the overall claim of bad faith.[2]

---

[2]On appeal, Syracuse's sole argument regarding the grant of summary judgment as to the calculation of depreciation is one never advanced in the District Court. Syracuse contends that under Pennsylvania law depreciation may not be deducted where there has been a partial loss that does not exceed the depreciated value of the whole property. Assuming, arguendo, that this is a correct statement of the law applicable to the facts of this case, Syracuse still has failed to meet its burden of proof on the depreciation element of its claim. Syracuse was required to show that Northbrook did not have a reasonable basis under the law for calculating deprecation and that Northbrook "knew or recklessly disregarded its lack of reasonable basis" in making that calculation. Terletsky v. Prudential Property and Casualty Ins. Co., 437 Pa. Super. 108, 649 A.2d 680, 688 (1994). Syracuse does not point to anything in the record that would support even an inference that Northbrook lacked a reasonable basis for its calculation. In fact, as we have noted, Syracuse, in its brief filed in opposition to Northbrook's motion for summary judgment, clarified that Northbrook was not guilty of bad faith or reckless conduct for asserting that it had a legal right to subtract depreciation.

7

9a
*Appendix*

B.

Sanctions imposed for untimely filing of expert's report.

Syracuse's remaining challenge to the grant of partial summary judgment in favor of Northbrook focuses on that portion of the order striking the report of Syracuse's expert as untimely and directing that Syracuse reimburse Northbrook for costs and attorney's fees associated with the motion to strike the report.

A District Court's ruling excluding evidence because of counsel's failure to adhere to a pretrial order will not be disturbed on appeal absent a clear abuse of discretion. DeLaval Turbine, Inc. v. West India Indus. Inc., 502 F.2d 259 (3d Cir. 1974). In determining whether there has been an abuse of discretion, we consider four factors: "(1) the prejudice or surprise in fact to the party against whom the excluded witness would have testified; (2) the ability of that party to cure the prejudice; (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court; and (4) bad faith or wilfulness in failing to comply with the court's order." Meyers v. Pennypack Woods Home Ownership Assn., 559 F.2d 894, 904-05 (3d Cir. 1977).

The record in this matter establishes that the District Court was aware of the Meyers factors and referenced them in its decision to exclude the testimony of Northbrook's expert:

8

10a
*Appendix*

> Although we did not require [Northbrook] to establish that
> admitting the expert's proposed testimony would cause
> prejudice, nor whether such prejudice could be cured, we did
> determine that [Syracuse's] behavior was in disregard of the
> rule of civil procedure and the case management plan for this
> case. . . . There was no excuse for Syracuse awaiting the
> report by Northbrook's expert before presenting its own
> witness. To allow [Syracuse] to introduce opinion evidence
> which could have (and should have) been produced initially
> would have affected the orderly prosecution of the case.
> Following [Syracuse's] disregard of the discovery deadline
> (through a request for production of documents) we conclude
> that the sanction imposed was a valid exercise of our authority
> under Fed. R. Civ. P. 37.

Syracuse Exploration Co. v. Northbrook Prop. & Cas. Ins., Co., No. 1:CV-97-1405,

memorandum at 5-6, (M.D. Pa. Sept. 28, 1999). We do not find reason in the record to

disagree with the District Court's finding that Syracuse was responsible for the position in

which it found itself with regard to its expert's report: The report was filed nearly four

months after the date established by the case management plan and "there was no excuse"

for this late filing. It is also clear that this late filing was not Syracuse's first infraction of

the case management plan and that consideration of the report at the time of its proffer

would have had a significant impact on "orderly prosecution of the case." In these

circumstances, the District Court did not require that Northbrook make a showing of

prejudice. As the District Court explained, the other Meyers factors so heavily weighed

in favor of striking the expert's report that the showing of prejudice "was not required."

On the facts of this case, we will not disturb the District Court's ruling. No one of the

9

11a
*Appendix*

Meyers factors is dispositive and we do not find that the Court's application of those

factors supports Syracuse's argument that the sanctions imposed were based on a clear

abuse of discretion.


III.

We address next Syracuse's contention that the District Court erred in

failing to grant its motion for a new trial.  Our decision in Bhaya v. Westinghouse Electric

Corp., 922 F.2d 184 (3d Cir. 1990) establishes that when we review a District Court's

decision to grant or deny a motion for a new trial, we must accord substantial deference to

the decision of the District Court which "saw and heard the witnesses and has the feel of

the case which no appellate transcript can impart."  Id. at 187 (quoting Cone v. West

Virginia Pulp & Paper Co., 330 U.S. 212, 216 (1947).  With this standard in mind, we

turn to the grounds supporting Syracuse's motion for a new trial.


A.

Allegations of error related to evidentiary issues.

Three of the allegations of error made by Syracuse in connection with the

District Court's denial of its motion for a new trial relate to the admission or exclusion of

evidence.  Our standard of review with respect to evidentiary issues is especially narrow.

A finding that a new trial is required "may not be predicated upon a ruling which admits

10

12a
*Appendix*

or excludes evidence unless a substantial right of the party is affected." <u>Glass v.</u>

<u>Philadelphia Elec. Co.</u>, 34 F.3d 188, 191 (3d Cir. 1994) (quoting <u>Linkstrom v. Golden T.</u>

<u>Farms</u>, 883 F.2d 269 (3d Cir. 1989)).  Nonconstitutional evidentiary error in a civil suit

warrants reversal only where it is highly probable that the error affected the outcome of

the case.  <u>Glass</u>, 34 F.3d at 91.

Syracuse alleges that it was entitled to a new trial based on the District

Court's: (1) admission of the testimony of Northbrook's expert witness; and (2) exclusion

of evidence relating to Northbrook's non-renewal of Syracuse's insurance policy and

testimony concerning Syracuse's financial status.  We address these allegations of

evidentiary error seriatim, considering first the testimony of Northbrook's expert witness.

Syracuse contends that this expert, an attorney, was permitted to testify, over objection,

"to legal issues which are reserved for the court."  Northbrook's expert was called to

testify in this bad faith action based on his familiarity with acceptable claims-handling

standards and practices in the insurance industry.  We have reviewed the transcript of the

expert testimony challenged by Northbrook and are convinced that the District Court was

careful to guard against allowing the expert to testify to matters reserved to the Court.

We agree with the substance of Northbrook's characterization of the expert testimony:

> Noticeably absent from [the expert] testimony is any
> discussion of (or even reference to) the Pennsylvania bad faith
> statute, the legal standards governing the determination of
> liability under the statute, a definition of "bad faith," or any
> other matter exclusively within the province of the district

11

13a
*Appendix*

court. Indeed, on the one occasion when questioning by
Northbrook's counsel arguably invited an opinion regarding
the law of bad faith, the district court sustained the objection
of Syracuse's counsel and appropriately limited the scope of
Northbrook's counsel's inquiry.

We do not find any abuse of discretion in the District Court's admission of this evidence.

Our conclusion is similar with respect to the other evidentiary rulings
challenged by Syracuse in its motion for a new trial. Syracuse contends that the District
Court erred in excluding evidence of Northbrook's failure to renew Syracuse's insurance
policy and in precluding Syracuse's owner from testifying about the financial status of the
company. We evaluate exclusion of these items of evidence in the context of what was at
issue. As the District Court observed, "The only question at trial was whether Syracuse
proved by clear and convincing evidence that Northbrook's handling of Syracuse's claim
was done in bad faith." Memorandum (September 28, 1999) at 2.

The District Court concluded first that the excluded evidence relating to
non-renewal of the insurance policy was not relevant in determining whether Syracuse
had operated in bad faith. The court also concluded that Syracuse's argument that the
non-renewal was itself evidence of bad faith was "not supported by decisions interpreting
the Pennsylvania bad faith statute." Id. at 4. We agree with both of these conclusions
and, accordingly, find that the District Court's exclusion of evidence relating to non-
renewal was consistent with the sound exercise of judicial discretion.

14a
*Appendix*

The District Court's decision to exclude evidence bearing on Syracuse's financial status was also consistent with the sound exercise of judicial discretion. We agree with the District Court's analysis of the evidence:

> [Syracuse] never offered to show that [Northbrook] knew of [Syracuse's] financial status. Because an insured's financial condition, standing alone, cannot establish bad faith on the part of the insurer, there was no error in excluding this evidence.

Id. at 7.

B.

The charge to and questions from the jury

Syracuse next argues that it is entitled to a new trial based on the District Court's: (1) decision not to hold a charge conference; (2) failure to rule on the parties' proposed jury instructions prior to closing argument; (3) failure to deliver certain instructions requested by Syracuse, particularly those relating to the Unfair Insurance Practices Act; and (4) formulation of answers to questions posed by the jury during the course of deliberation.

Syracuse failed to bring any of these alleged errors to the attention of the District Court. As a result, our review is limited by the plain error standard. "[W]e will reverse only if the trial court committed plain error that was fundamental and highly prejudicial . . . ." Alexander v. Riga, ___ F.3d ___, 2000 WL 295288 *4 (3d Cir. 2000).

13

*15a*
*Appendix*

Applying this standard to the allegations of error raised by Syracuse, we do not find any ground upon which to reverse. A charging conference is not required by the governing rule, Fed. R. Civ. P. 51. Syracuse did not object to the District Court's failure to rule on the parties' request for jury instructions and does not explain here how it was prejudiced by this failure. This would, indeed, be a difficult argument to make given that Syracuse failed to object to the instructions given at any point prior to the jury's retiring to deliberate, despite having been invited by the court to do so.

Likewise, we do not find error, plain or otherwise, in the District Court's charge to the jury. We agree with Northbrook that the instructions given fairly and adequately identified the issues in the case. The District Court thoroughly explained its decision not to instruct the jury regarding the Unfair Insurance Practices Act (UIPA):

> The UIPA is concerned with improper conduct that occurs so frequently as to rise to the level of a "business practice." The bad faith statute, on the other hand, is concerned only with an insurer's actions in a specific case. . . . Instructing the jury on the UIPA might lead to confusion. We believe the better approach is to permit the instruction of evidence showing non-compliance with the UIPA, as Syracuse did here, but to allow the jury to decide whether this is evidence of bad faith as that term is defined in the law.

Memorandum (September 28, 199) at 11.

We have reviewed, too, the District Court's answers to questions posed by the jury during the course of deliberation. The record establishes that the District Court discussed its proposed answers to these queries with counsel for both parties and that

14

16a
*Appendix*

Syracuse did not register any objection. We find nothing in the District Court's communication with the jury to suggest that Syracuse suffered any prejudice at all, let alone the degree of prejudice necessary to support a finding of plain error.

We are convinced that the allegations of error in the District Court's admission and exclusion of evidence lack merit and do not warrant the grant of a new trial.

## C.

### Alleged misconduct on the part of counsel for Northbrook

Syracuse contends that the District Court erred in denying its motion for a new trial where counsel for Northbrook engaged in unprofessional conduct by instructing a witness not to bring an allegedly relevant file to court. We have reviewed the record as it relates to this claim and are convinced that the District Court's refusal to grant a new trial based on the alleged misconduct was consistent with the sound exercise of judicial discretion. The District Court's analysis of this issue was sound and we adopt it here:

> In its initial disclosures in December 1997, [Northbrook] informed [Syracuse] that [the witness] was involved in handling [Syracuse's] claim. [Northbrook] also indicated in its pretrial memorandum that [the witness] would testify at trial. Because [the witness] is not an employee of [Northbrook], his files were not in possession or control of [Northbrook] and they were not produced in response to a request for documents. However, [Syracuse] had ample opportunity to subpoena the . . . files. The failure to do so

17a
*Appendix*

cannot be blamed on [Northbrook] nor provide a basis for a
new trial. . . .   Furthermore, [Syracuse] has not shown that the
failure to produce [the] . . . files was prejudicial.

Memorandum (September 28, 1999) at 9 (citations omitted).


IV.

Because Syracuse's allegations of error with respect to the grant of

Northbrook's motion for partial summary judgment and the denial of Syracuse's motion

for a new trial lack merit, we will affirm the orders of the District Court.


_____

TO THE CLERK:

Please file the foregoing opinion.


/s/ Carol L. Mansmann
Circuit Judge


16

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 99-3811

———————

SYRACUSE EXPLORATION COMPANY,
Appellant

v.

NORTHBROOK PROPERTY & CASUALTY
INSURANCE COMPANY

———————

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civ. No. 97-cv-01405)
District Judge: Honorable William W. Caldwell

———————

Before: SLOVITER and MANSMANN, Circuit Judges
and WARD,* District Judge.

———————

JUDGMENT

This cause came to be considered on the record from the United States

District Court for the Middle District of Pennsylvania and was submitted under Third

Circuit LAR 34.1(a) on May 23, 2000.

*Honorable Robert J. Ward, of the United States District Court for the Southern District
of New York, sitting by designation.

17

On consideration whereof, it is now here ordered and adjudged by this court that the judgments of the District Court entered on December 31, 1998 and September 29, 1999, be and the same are hereby affirmed.

Costs taxed against the appellant.

ATTEST:

Acting Clerk

Date: May 26, 2000

18

SUPREME COURT OF THE UNITED STATES
OFFICE OF THE CLERK
WASHINGTON, D. C. 20543

November 27, 2000

Mr. Richard C. Angino
4503 North Front Street
Harrisburg,  PA 17110

            Re:  Syracuse Exploration Company
                 v. Northbrook Property and Casualty Insurance
                 Company
                 No.  00-309

Dear Mr. Angino:

    The Court today entered the following order in the above

entitled case:

    The petition for a writ of certiorari is denied.

                          Sincerely,

                          William K Suter

                          William K. Suter, Clerk

FILED
HARRISBURG, PA

JUN 4 - 1999

MARY E. D'ANDREA, CLERK
Per _____
        Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SYRACUSE EXPLORATION COMPANY,        :    CIVIL ACTION LAW
                                     :
                Plaintiff            :    JUDGE CALDWELL
                                     :
        v.                           :    NO. 1:CV-97-1405
                                     :
NORTHBROOK PROPERTY & CASUALTY       :    MAGISTRATE JUDGE SMYSER
INSURANCE CO.,                       :
                                     :
                Defendant            :    JURY TRIAL DEMANDED

### PLAINTIFF'S POINTS FOR CHARGE

AND NOW comes the Plaintiffs, pursuant to Middle District Rule 51, and submits the enclosed Points for Charge.

Respectfully submitted,

ANGINO & ROVNER, P.C.

Richard C. Angino, Esquire
I.D. No. 07140
James DeCinti, Esquire
I.D. No. 77421
4503 North Front Street
Harrisburg, PA  17110
Counsel for Plaintiff

Dated: 6/4/99

151111/SC

## <u>Plaintiff's Point for Charge No. 1</u>

Under Pennsylvania law, an insurer has an obligation to exercise good faith in its handling of a claim with its insured. An insurer, such as Northbrook, can be held liable if it does not exercise good faith in its handling of a claim with its insured. <u>Cowden v. Aetna Casualty and Surety</u>, 389 Pa. 459, 468, 134 A.2d 223, 227 (1957).


_____    Affirmed          _____    Denied

### Plaintiff's Point for Charge No. 2

There is a fiduciary duty between the insurer, Northbrook, and the insured, Syracuse.  Northbrook must "accord the interest of its insured Syracuse the same faithful consideration it gives its own interest."  <u>Polselli v. Nationwide Mut. Fire Ins. Co.</u>, 23 F.3d 747, 752 (3d Cir. 1994), <u>quoting</u>, <u>Cowden v. Aetna Casualty. and Surety Co.</u>, 389 Pa. 459, 134 A.2d 223, 228 (1957).  Thus, Northbrook must act with the "utmost good faith" towards its insured.   <u>Fedas v. Insurance Company of Pa.</u>, 300 Pa. 555, 558, 151 A. 285, 286 (1930); <u>Romano v. Nationwide Mut. Fire Ins. Co.</u>, 435 Pa. Super. 545, 646 A.2d 1228, 1231 (1994); <u>see</u>, <u>also</u>, <u>Dercoli v. Pennsylvania National Mut. Ins. Co.</u>, 520 Pa. 471, 554 A.2d 906 (1989); <u>Cowden v. Aetna Casualty and Surety Co.</u>, 389 Pa. 459, 134 A.2d 223 (1957).


_____    Affirmed            _____    Denied

2

## <u>Plaintiff's Point for Charge No. 3</u>

Plaintiff Syracuse has alleged that the Defendant Northbrook acted in bad faith by failing to respond promptly to its claim, by failing to engage an experienced appraiser, by delaying in making a decision authorizing repairs, and by other actions that resulted in the delay in repairing Syracuse's drill rig.

To recover under a claim for bad faith, Syracuse must prove that Northbrook intentionally or recklessly disregarded its responsibility of good faith to its insured, Syracuse and/or intentionally or recklessly delayed in authorizing repairs to Syracuse's drill rig. <u>See</u>, <u>Polselli v. Nationwide Mut. Fire Ins. Co.</u>, 23 F.3d 747 (3d Cir. 1994); <u>Terletsky v. Prudential Property and Casualty Ins. Co.</u>, 437 Pa. Super. 108, 649 A.2d 680 (1994); <u>Klinger v. State Farm Mut. Auto. Ins. Co.</u>, 115 F.3d 230 (3d Cir. 1997).


_____    Affirmed            _____    Denied

3

### Plaintiff's Point for Charge No. 4

> Implicit in the duty of good faith and fair dealing is the insurer's obligation to be fair and honest with its insured and to give equal consideration to the insured's interests."

Appleman, *Insurance Law and Practice*, §8878 (1994 pocket part, at 12). Further,

> The duty of good faith and fair dealing that an insurer owes an insured obligates the insured to refrain from (1) engaging in unfounded refusals to pay policy proceeds, (2) causing unfounded delay in making payment, (3) deceiving the insured, and (4) exercising any unfair advantage to pressure an insured into settlement of the insurance claim.

Appleman, *Insurance Law and Practice*, §8878 (1994 pocket part, at 12).

_____    Affirmed          _____    Denied

4

## Plaintiff's Point for Charge No. 5

The Pennsylvania Unfair Insurance Practices Act defines unfair methods of competition and unfair or deceptive acts or practices in the insurance business. The Pennsylvania Unfair Insurance Practices Act provides guidance in defining bad faith. See, MacFarland v. United States Fidelity and Guarantee Co., 818 F.Supp. 108, 110 (E.D. Pa. 1993); Coyne v. Allstate Insurance Co., 771 F.Supp. 673, 678 (E.D. Pa. 1991); Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230 (3d Cir. 1997); Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 751 (3d Cir. 1994); and Romano v. Nationwide Mut. Fire Ins. Co., 435 Pa. Super. 545, 646 A.2d 1228-1332 (1994). The following insurance practices are prohibited:

> (i) Misrepresenting pertinent facts or policy or contract provisions relating to coverages at issue.

> (ii) Failing to acknowledge and/or fail to act promptly upon written or oral communications with respect to claims arising under insurance policies.

> (iii) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies.

> (iv) Refusing to pay claims without conducting a reasonable investigation based upon all available information.

> \* \* \*

> (vi) Failing to attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's liability under the policy has become reasonably clear.

(vii)    Compelling persons to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts due and ultimately recovered in actions brought by such persons.

40 P.S. §1171.5.  If you find that Northbrook intentionally or recklessly disregarded any of the prohibited provisions of the insurance law, you may find it liable for failing to fulfill its duty of good faith to its insured.


_____    Affirmed        _____    Denied

6

## <u>Plaintiff's Point for Charge No. 6</u>

Our Insurance Department publishes minimum standard regulations to control the insurance companies selling insurance coverage in Pennsylvania.  The regulations provide:

**§ 146.5.  Failure to acknowledge pertinent communications.**

(a) Every insurer, upon receiving notification of a claim, shall, within 10 working days, acknowledge the receipt of the notice unless payment is made within the period of time.  If an acknowledgement is made by means other than writing, an appropriate notation of the acknowledgement shall be made in the claim file of the insurer and dated.  Notification given to an agent of an insurer shall be notification to the insurer, dating from the time the insurer receives notice.

\* \* \*

**§ 146.6.  Standards for prompt investigation of claims.**

Every insurer shall complete investigation of a claim within 30 days after notification of claim, unless the investigation cannot reasonably be completed within the time.  If the investigation cannot be completed within 30 days, and every 45 days thereafter, the insurer shall provide the claimant with a reasonable written explanation for the delay and state when a decision on the claim may be expected.

**§ 146.7.  Standards for prompt, fair and equitable settlements applicable to insurers.**

(a) Acceptance or denial of a claim shall comply with the following:

(1) Within 15 working days after receipt by the insurer of properly executed proofs of loss, the first-party claimant shall be advised of the acceptance or denial of the claim by the insurer.  An insurer may not deny

7

a claim on the grounds of a specific policy provision, condition or exclusion unless reference to the provision, condition or exclusion is included in the denial. The denial shall be given to the claimant in writing and the claim file of the insurer shall contain a copy of the denial.

(b)  If a claim is denied for reasons other than those described in subsection (a) and is made by any other means than writing, an appropriate notation shall be made in the claim file of the insurer.

(c)  The following provisions govern acceptance or denial of a claim where additional time is needed to make a determination:

(1)  If the insurer needs more time to determine whether a first-party claim should be accepted or denied, it shall so notify the first-party claimant within 15 working days after receipt of the proofs of loss giving the reasons more time is needed. If the investigation remains incomplete, the insurer shall, 30 days from the date of the initial notification and every 45 days thereafter, send to the claimant a letter setting forth the reasons additional time is needed for investigation and state when a decision on the claim may be expected.

31 Pa. Code §§146, et seq. If you find that Defendant Northbrook violated any of the Insurance Department regulations, you may find it liable for failing in its responsibility of good faith to its insured.

_____    Affirmed          _____    Denied

8

## Plaintiff's Point for Charge No. 7

While "mere negligence on the part of the insurer is insufficient to constitute bad faith, recklessness can support a finding of bad faith." "[A]n insured [such as Syracuse], need not show <u>both</u> ill-will and recklessness.   Rather, the degree of recklessness required to succeed on such a claim in effect [can rise] to the level of 'improper purpose'." <u>Polselli v. Nationwide Mut. Fire Ins. Co.</u>, 23 F.3d 747, 751 (3d Cir. 1994); Judge Caldwell's August 21, 1994, Memorandum, at p. 14. in <u>Klinger v. State Farm</u>; and <u>Klinger v. State Farm Mut. Auto. Ins. Co.</u>, 115 F.3d 230 (3d Cir. 1997)


_____   Affirmed        _____   Denied

9

## Plaintiff's Point for Charge No. 8

Proof that Northbrook acted with sincerity is not the equivalent of proof of good faith. The good faith standard requires more than proof of sincerity. In fact, bad faith can be evidenced by reckless indifference to the rights of the insured and exists when an insurance company breaches its duty of good faith and fair dealing to the insureds. These duties of good faith and fair dealing require an insurance company, such as Northbrook, to promptly handle and pay insurance claims and not to unnecessarily delay in making decisions as to repair or replacement. Shearer v. Reed, 286 Pa. Super. 188, 193-194, 428 A.2d 635, 638 (1981); see, also, Bracciale v. Nationwide Mut. Fire Ins., 1993 LEXIS 11606 (E.D.Pa. 1993).


_____    Affirmed          _____    Denied

10

### Plaintiff's Point for Charge No. 9

Bad faith can be found where the insurer has found to have put its own interests before the insured's.   Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 752 (3d Cir. 1994); Puritan Ins. Co. v. Canadian Universal Ins. Co. Ltd., 775 F.2d 76, 79 (3d Cir. 1985), citing, U.S. Fire Ins. Co. v. Royal Ins. Co., 759 F.2d 306, 311 (3d Cir. 1985).

_____    Affirmed          _____    Denied

### Plaintiff's Point for Charge No. 10

Plaintiff Syracuse must prove Defendant Northbrook's "bad faith" by evidence that is "clear, direct, weighty, and convincing." <u>Polselli v. Nationwide Mut. Fire Ins. Co.</u>, 23 F.3d 747 (3d Cir. 1994) and 126 F.3d 524 (3d Cir. 1997).


_____    Affirmed          _____    Denied

## Plaintiff's Point for Charge No. 11

If you determine that Northbrook acted in bad faith, then you may award the Plaintiff punitive damages.  The purpose of punitive damages is to punish Northbrook for its outrageous conduct and to deter it and others from like conduct in the future.  <u>Kirkbride v. Lisbon Contractors, Inc.</u>, 521 Pa. 97, 555 A.2d 800, 803 (1989).


_____    Affirmed          _____    Denied

13

### Plaintiff's Point for Charge No. 12

If you decide that the Plaintiff is entitled to an award of punitive damages, the amount of such damages must be fixed by you. In doing so, you may consider any or all of the following factors:

1.  The character of Northbrook's conduct;

2.  The nature and extent of the harm to Syracuse caused by Northbrook and Northbrook's trouble and expense in seeking to protect their interest in legal proceedings and in the suit; and

3.  The wealth of Northbrook insofar as it is relevant in fixing an amount which will punish it, and deter it and others from like conduct in the future.

The amount of punitive damages awarded must not be the result of passion or prejudice against Northbrook. The sole purpose of punitive damages is to punish Northbrook's outrageous or reckless conduct, and to deter Northbrook and others from the commission of like acts. _Kirkbride v. Lisbon Contractors, Inc._, 521 Pa. 97, 555 A.2d 800 (1989); Restatement (Second) of Torts §908 (1979).

_____    Affirmed         _____    Denied

14

## CERTIFICATE OF SERVICE

I, Richard C. Angino, hereby certify that a true and correct copy of the foregoing **Plaintiff's Points for Charge** has been served in the following manner upon the following:

### VIA HAND DELIVERY ON JUNE 4, 1999

Robert E. Kelly, Jr., Esquire
Duane Morris & Heckscher LLP
305 North Front Street
P. O. Box 1003
Harrisburg, PA  17108-1003

### VIA HAND DELIVERY ON JUNE 7, 1999

Anthony R. Zelle, Esquire
Robinson & Cole
1 Boston Place
Boston, MA  02108

_____
Richard C. Angino

Dated: 6/4/99

15

## CERTIFICATE OF SERVICE

I, Richard C. Angino, Esquire, hereby certify that a true and correct copy of the foregoing

**PLAINTIFF'S BRIEF CONTRA DEFENDANTS' MOTION FOR SUMMARY**

**JUDGMENT** was served by United States first-class mail, postage prepaid, upon the following:

E. Thomas Henefer, Esquire
Stevens & Lee
111 North Sixth Street
P. O. Box 679
Reading, PA  19603-0679
        Counsel for Paul Revere Life Insurance Company and New York Life Insurance
        Company

_____
Richard C. Angino

Dated: 8/26/02