(71)
11-1-02
RW

# ORIGINAL

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

VINCENZO MAZZAMUTO,       :     CIVIL ACTION
            Plaintiff,       :     NO. 1:CV-01-1157
                 :
      v.           :
                 :
UNUMPROVIDENT CORPORATION, et   :     (JUDGE CONNER)
al.,       :
           Defendants       :

FILED
HARRISBURG, PA

OCT 31 2002

MARY E. D'ANDREA, CLE...
Per _____ Deput...

**EXHIBITS IN SUPPORT OF DEFENDANTS' MEMORANDUM
OF LAW IN SUPPORT OF THEIR REPLY TO
PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE**

Dated: October 31, 2002

STEVENS & LEE

By _____
E. Thomas Henefer
Attorney I.D. No. 55773
Kirk L. Wolgemuth
Attorney I.D. No. 45792
111 North Sixth Street
P.O. Box 679
Reading, Pennsylvania 19603
(610) 478-2000

Attorneys for Defendants UNUM Provident
Corporation, Paul Revere Insurance Company,
and New York Life Insurance Company

## TABLE OF CONTENTS

**Exhibit 1** – Defendants' Memorandum of Law in Support of Its Motion in Limine

**Exhibit 2** – Excerpts from Deposition of Patrick Fergal McSharry

**Exhibit 3** – Defendant's Deposition Exhibits Nos. 102, 110, and 124 (McSharry Dep.)



EXHIBIT
(1)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| VINCENZO MAZZAMUTO, | : | CIVIL ACTION |
| Plaintiff, | : | NO. 1:CV-01-1157 |
| | : | |
| v. | : | |
| | : | |
| UNUM PROVIDENT | : | JUDGE CONNER |
| CORPORATION, et al., | : | |
| Defendants | : | |

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION IN LIMINE

### I. INTRODUCTION

Defendants UNUMProvident Corporation, Paul Revere Insurance Company and New York Life Insurance Company ("Defendants") file this memorandum of law in support of their motion in limine to exclude certain evidence at trial consisting of the following: (1) Plaintiff's receipt of Social Security Disability benefits; (2) testimony of, or evidence regarding, Dr. McSharry; (3) testimony of, or evidence regarding, Dr. Schneider; (4) evidence of correspondence between counsel; and (5) the waiver of life insurance premiums by New York Life.

### II. PROCEDURAL HISTORY

Plaintiff is a restaurant owner who has asserted claims for bad faith, under 42 Pa. C.S.A. § 8371, and breach of contract arising from the denial of his claim for disability benefits under a disability policy based on alleged back and psychiatric conditions. After Defendants moved for summary judgment and after

the deadlines for designation of experts and discovery had passed, plaintiff

identified Dr. McSharry and Dr. Schneider as potential expert witnesses.

## III. FACTUAL HISTORY

Defendants incorporate herein in its entirety, the detailed factual history

contained in their summary judgment brief.

### Dr. McSharry

Detailed facts regarding Dr. McSharry, a former employee of

UNUMProvident Corporation, are set forth in Defendant's response in opposition

to plaintiff's motion to extend the expert report deadline, which is incorporated

herein in its entirety. In summary, however, Dr. McSharry is a former employee of

UNUMProvident who claims he was fired for complaining about how

UNUMProvident subsidiaries such as Paul Revere conduct internal medical

reviews. He has apparently made similar allegations in the past about other former

employers such as a the Tennessee Blue Cross and Blue Shield Plan.

There is no evidence that McSharry has any knowledge of this case or, for

that matter, has ever visited the Worcester, Massachusetts facility where plaintiff's

claim was reviewed. Although plaintiff has identified McSharry as an expert, he

has yet to produce any report or comply with Rule 26; instead, plaintiff seeks to

introduce McSharry's deposition transcript from a different case.

### Dr. Schneider

Plaintiff also seeks to use Dr. Schneider as an expert although plaintiff did

not designate him as an expert until well after the deadlines for discovery and

2

expert reports had passed. Further, plaintiff and has yet to comply with Rule 26's disclosure requirements regarding Dr. Schneider, a non-treating psychiatrist who examined plaintiff in connection with his claims for SSDI benefits.

## Correspondence Among Counsel

Although not listed in plaintiff's exhibit list, plaintiff's counsel threatened to offer into evidence copies of correspondence between counsel purportedly to support plaintiff's bad faith claim. While there is nothing in the correspondence (or anything else in this case) to suggest bad faith, the correspondence should be excluded because it is irrelevant and otherwise inadmissible under Rule 403.

## Award of SSDI Benefits

Plaintiff also seeks to offer into evidence a decision by the Social Security Administration awarding Social Security Disability Income ("SSDI") benefits. This decision is based on different legal standards and a vastly different factual record than is present here and should be excluded because it is irrelevant and will confuse the jury.

## NYL Waiver of Life Insurance Premiums

Finally, plaintiff seeks to introduce evidence concerning a decision by NYL to waive premiums under a separate and distinct life insurance policy. Exclusion is proper because different legal standards apply to the determination of the request for a waiver of life insurance premiums and a request for disability benefits.

10/24/02/SL1 295222v1/10305.060

## IV.  QUESTIONS PRESENTED

### A.  Whether Plaintiff's Untimely Experts Should Be Excluded.

[Suggested Answer:  Yes].

### B.  Whether Evidence Of The Award Of Social Security Benefits, The Waiver Of Life Insurance Premiums By New York Life, And Correspondence Between Counsel Should Be Excluded.

[Suggested Answer:  Yes].

## V.  ARGUMENT

### A.  The Untimely "Experts" Should Be Excluded

The Court has discretion to deny plaintiff's use of Dr. McSharry and

Dr. Schneider as experts.  Oliver v. Ingber, No. 96-4471, 1998 U.S. Dist. LEXIS

2799 at *3-4, (E.D. Pa. Mar. 9, 1998).  See also, Lanni v. State of New Jersey et

al., 177 FRD 295, 301 (DNY 1998).  Exclusion is proper because the proposed

testimony is inadmissible and the late disclosure is prejudicial.

#### (1)  Allowing the Late Designation of Experts is Unduly Prejudicial

Plaintiff's late identification of the experts is unfairly prejudicial, especially

because plaintiff apparently intends to use McSharry's frivolous accusations to

launch a new legal theory consisting of a broad-based "pattern and practice" attack

on defendants.  When plaintiff identified Dr. McSharry and Dr. Schneider,

discovery had closed and the deadline for expert reports had passed.  The pretrial

preparation for this case involved extensive discovery and the designation of expert

witnesses all within the confines of the deadlines established by the Court (with

one extension previously granted). These pretrial efforts culminated in the submission of detailed summary judgment papers.

Simply put, the defendants were entitled to make informed strategic choices in defending this action based on the pretrial preparation that took place within the deadlines. Discovery made it clear that this case has always been about plaintiff's individual claim. Plaintiff should not be allowed to undermine that preparation by using McSharry to present a new legal theory (i.e., a "pattern and practice" argument) well after the discovery and summary judgment deadlines.

The same can be said for Dr. Schneider. Again, discovery had long been concluded, and the deadline for expert reports had passed, before plaintiff ever sought to designate Dr. Schneider as an expert. Indeed, plaintiff's decision appears to be a knee-jerk response to defendants' designation of an expert psychiatrist.

There is no question that plaintiff's late designation of Dr. Schneider represents an eleventh-hour sift in strategy which is unfairly prejudicial. This is confirmed by the report of plaintiff's so-called expert on insurance practices expert, Gordon Rose, who opined that this case involves <u>no</u> psychological issues and that defendants acted in "bad faith" by designating a psychiatrist as an expert (even though plaintiff wants to do the same thing, albeit after the deadline has passed).

### (2) <u>The Proposed Testimony of McSharry Is Inadmissible</u>

When the Court considers the "importance" of McSharry's proposed testimony, the Court should grant Defendants' motion because the proposed

5

testimony would not be admissible.  <u>Scopia Mortgage Corp. v. Greentree Mortgage Corp.</u>, 194 F.R.D. 526, 529 (D.N.J. 1998) (in deciding whether to allow untimely designation of witness, Court should consider importance of proposed testimony).

### (a) <u>McSharry's Testimony Would Not Satisfy Rule 702</u>

Federal Rule of Evidence Rule 702 imposes three distinct substantive restrictions on the admission of expert testimony:  qualifications, reliability and fit. <u>In re Paoli Railroad Yard PCB Litig. v. Southeastern Pennsylvania Transp. Auth.</u>, 35 F.3d 717, 741-42 (3d Cir. 1994) (<u>citing</u> <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 at 587-591 (1993)).  McSharry's proposed testimony would not satisfy at least two of those requirements (fit and reliability).

The "fit" requirement under rule 702 is designed to ensure that the expert's testimony will assist the trier of fact (<u>i.e.</u>, it must "fit" the subject matter at issue). <u>Daubert</u>, 509 U.S. at 591.  That is, there must be a connection between the opinion and the facts of the case.  <u>Heller v. Shaw Industries, Inc.</u>, 167 F.3d 146, 159 (3d Cir. 1999).  In this way, Rule 702 contains a fundamental requirement that expert testimony must be helpful to the jury to be admissible.  Fed. R. of Evid. 702; <u>JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc.</u>, No. 97-CV-0652, 1998 U.S. Dist. LEXIS 5098 at *14 (E.D. Pa. Apr. 14, 1998), <u>aff'd</u>, 178 F.3d 1279 (3d Cir. 1999).

Here, plaintiff apparently intends to use McSharry to cobble together a "pattern and practice" type of argument to support his bad faith claim.  But such an approach would rely on irrelevant arguments and testimony because the question

of whether there was bad faith (which there was not) turns on whether plaintiff can prove, by clear and convincing evidence, that Paul Revere lacked a reasonable basis for its actions *based on the circumstances of this case*. Keefe v. Prudential Property and Cas. Ins. Co., 203 F.3d 218, 225 (3d Cir. 2000). Indeed, courts have routinely denied discovery seeking information on other claims because such information is irrelevant. E.g., Cantor v. Equitable Life, 1998 U.S. Dist. LEXIS 8435 at * 10-11 (E.D. Pa. 1998); North River Ins. Co. v. Greater New York Mutual Ins. Co., 872 F. Supp. 1411, 1412 (E.D. Pa. 1995).

Finally, Rule 702, like Daubert, requires reliability. Expert testimony is only reliable if the proponent establishes that the proposed expert bases his or her opinions and conclusions on "good grounds." Paoli Railroad, 35 F.3d at 748; see also Daubert, 509 U.S. at 590. A witness' "subjective belief or unsupported speculation" does not constitute "good grounds" for the proposed expert's conclusions or opinions. Daubert, 509 U.S. at 590.

Here, it is apparent that McSharry's testimony would be unreliable. Again, McSharry is pursing his own lawsuit against UNUMProvident for personal financial gain and his claim apparently depends in large measure on the success of his allegations. Thus, he has a financial incentive, quite unlike those typically found with expert witnesses, to advocate a position. McSharry is therefore not in a position to provide reliable testimony.

10/24/02/SL1 295222v1/10305.060

### (b) McSharry's Testimony Is Inadmissible Under Rule 403

Fed. R. of Evid. 403 prohibits admission of evidence (which would otherwise be admissible) if (1) its probative value is substantially outweighed by the danger of confusion of the issues, (2) it misleads the jury, or (3) it would result in "undue delay" or "waste of time." This applies to expert testimony. JMJ Enterprises, 1998 U.S. Dist. LEXIS 5098 at *14 (E.D. Pa. Apr. 14, 1998).

This is a classic example for use of Rule 403 because of the very real prospect that allowing McSharry to testify will result in a "mini-trial" over his allegations. This will require cross examination about specific claims in which he was involved, his total lack of knowledge of the facts of this case and the circumstances surrounding the termination of his former employment with BCBS (where he made similar allegations). Thus, allowing McSharry to testify will violate Rule 403's objectives of avoiding "undue delay" or "waste of time."

Allowing McSharry to testify will also violate Rule 403 by causing the jurors to become confused or mislead about the issues. Again, information about what happened on other claims is irrelevant. E.g., Cantor 1998 U.S. Dist. LEXIS 8435 at * 10-11 (E.D. Pa. 1998). Allowing a so-called "expert" to testify about irrelevant information will obviously confuse and mislead the jury who may believe he has knowledge of this case.

Further, Rule 403 is properly applied where the expert is "acting as an advocate, and not as an objective evaluator of evidence." JMJ Enterprises, 1998

U.S. Dist. LEXIS 5098 at * 27. McSharry has no option but to act as an advocate given his lawsuit and direct financial incentive to advocate a position consistent with the allegations of his lawsuit, regardless of the facts of this case.

### (c) **The Daubert Standard**

Without a report, defendants cannot assess whether McSharry could satisfy the Daubert standards. Defendants therefore reserve the right to assert additional objections to any actual proposed testimony.

### (d) **McSharry's Deposition Transcript**

It appears that plaintiff merely intends to offer into evidence the transcript of his deposition taken in a series of cases, of which this case was not one. The Court should exclude the transcript for the reasons outlined above pursuant to Rules 702 and 403 of the Federal Rules of Evidence. Exclusion of the transcript is also proper based on the prejudice that would arise by depriving defendants the chance to cross examine McSharry about the circumstances of this case. Defendants obviously did not have an opportunity to cross examine McSharry about the facts of this case because the Court in Tennessee allowed his deposition to go forward only a limited number of cases (which did not include this case).

Without such cross examination, the introduction of McSharry's testimony would be unfairly prejudicial because the jury would, at worst, be mislead into thinking that McSharry had personal knowledge of this case or, at least, never understand the minimal weight (if any) to assign to McSharry's testimony. Under

9

these circumstances, depriving defendants of the opportunity for cross examination would be unfairly prejudicial and improper under concepts of due process.

### (e) Newspaper Article and Complaint

Plaintiff also seeks to introduce a newspaper article regarding McSharry's case and McSharry's complaint. This "evidence" is inadmissible hearsay under Fed. R. of Evid. 801(c) and 802. E.g, Wright v. Montgomery County, No. 96-4597, 2002 U.S. Dist. LEXIS 9442, (E.D. Pa. May 20, 2002). This evidence should also be excluded for the same reasons (outline above) that McSharry should not be allowed to testify and his deposition transcript should not be admitted into evidence. E.g., Kelly v. United States, 924 F.2d 355, 357 (1st Cir. 1991) ("mere allegations in . . . an unverified complaint" are not "evidence which would be admissible at trial").

**B. The Social Security Decision, Evidence of the Waiver of Life Insurance Premiums by New York Life and Correspondence Between Counsel should be excluded.**

### The Social Security Award

Plaintiff seeks to offer into evidence his July 25, 2002 award of SSDI benefits to support his claim. But this award is based on different standards and a vastly different factual record and is therefore irrelevant to this case.

For example, the SSDI standards do not incorporate the Third Circuit standard in Russell v. Paul Revere Life Ins. Co., 288 F.3d 78 (3d Cir. 2002), under which no benefits are payable where (a) the policy provides residual disability benefits; (b) the claimant has a residual disability; and (c) the claimant does not

return to work. Here, the ALJ found plaintiff could, among other things, "sit 4 hours per 8-hour workday with a sit/stand option." (App., Exh. J at 14). Such restrictions would not preclude plaintiff from performing some of his occupational duties (like bookkeeping and office duties) and, therefore, the ALJ's decision undermines plaintiff's position under Russell.

Likewise, the Social Security award is based on a factual record far different from that presented to either Paul Revere or this Court. For example, it does not appear that Dr. Bower's deposition testimony was ever submitted to the ALJ. If it had been, the ALJ would have seen that Dr. Bower has opined that plaintiff's back condition alone does not prevent him from performing his occupational duties. (Exh. F at 54 –57 and 59 (where Dr. Bower opined: "Again, with the back, if that was his only issue, could he muddle through further, he probably could."). Instead, the ALJ had Dr. Bower's letter (written April 16, 2002, the day of his deposition, but not produced in discovery until August 8, 2002) which implies that the back condition alone is disabling. (App, Exh. J at 10 ("Despite this aggressive therapy, Mr. Mazzamuto is still severely limited in his ability to stand, bend or sit for prolonged periods of time and is unable to work.")).

For these reasons (different standards and different factual records) numerous courts have found that an award of SSDI is not germane to a disability insurance dispute. E.g., Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 186-87 n. 4 (1st Cir. 1998). Justice Ginsburg dealt with this issue while on the Court of

Appeals for the District of Columbia Circuit.  <u>Block v. Pitney Bowes, Inc.</u>, 952

F.2d 1450 (D.C. Cir. 1992).  Rejecting a plaintiff's argument that an SSDI award

rendered a denial of disability benefits arbitrary, Judge Ginsburg noted that the

evidentiary records may be different in the two proceedings and, therefore, the

Court would "accord no weight" to the SSDI award.  <u>Id.</u> at 1455-56.

Further, even if the evidence had some minimal relevance (which it does

not), it would be properly excluded under Rule 403 because it will confuse the

issues and mislead the jury which may be unable to understand that where different

legal standards are applied, and different factual records considered, a person can

quite logically be found disabled for one purpose but not for another.  <u>E.g.</u>,

<u>Cleveland v. Policy Management Systems Corp.</u>, 526 U.S. 795 (1999) (noting that

a finding of disability under Social Security Act is not necessarily inconsistent with

a claim that one can work with "reasonable accommodation" under Americans

with Disabilities Act).  This evidence should therefore be excluded.

### NYL Waiver of Life Insurance Premiums

Plaintiff also intends to offer evidence of NYL's waiver of premiums under

the separate Life Policy.  But a waiver of life insurance premiums based on

disability does not estop an insurer from denying benefits on a separate disability

policy.  <u>Bucks v. Reliance Standard Life Ins. Co.</u>, No. 99-3398, 2000 U.S. App.

LEXIS 11456 (6th Cir. May 12, 2000); <u>Gonyea v. John Hancock Life Ins. Co.</u>, 812

F. Supp. 445 (D. Vt. 1993).  Notably, these cases involved claim decisions by the

12

same company.  Here, plaintiff's argument is even weaker because the life insurance premium waiver was by NYL, a company separate and distinct from Paul Revere.  [See Hardin Affidavit attached to Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment].

But even more fundamentally, plaintiff's argument ignores his burden of proof under Russell.  Like the SSDI award, the decision to waiver premiums is not governed by the Russell standard under which the Court must consider the partial or "residual" disability provisions of the Disability Policy, and may not find in plaintiff's favor unless he can prove that he cannot perform any of his occupational duties.  NYL's decision to waive premiums under a separate life insurance policy is therefore irrelevant and inadmissible.  Fed. R. of Evid. 401 and 402.  In the alternative, it is properly excluded under Rule 403 because any minimal probative value is substantially outweighed by the danger of confusing the issues and misleading the jury especially given the different standards that apply.

## Correspondence Between Counsel

Plaintiff has threatened to introduce a letter drafted by defense counsel explaining that the waiver by NYL of life insurance premiums was not relevant to the issue of disability benefits.  This fact is not critical to plaintiff's case and, even if it was, the evidence can be obtained in other ways.  For example, Defendants could stipulate that they continued to deny disability benefits notwithstanding NYL's waiver of life insurance benefits.  This evidence is therefore inadmissible.

13

Cf., <u>Peerless Heater Company et al. v. Mestek, Inc. et al.</u>, 2000 U.S. Dist. LEXIS 1409 at *7, (Feb. 7, 2000 E.D. Pa.).

More importantly, the position expressed by counsel in defending this lawsuit is not evidence of bad faith.  <u>Slater v. Liberty Mutual Ins. Co.</u>, 1999 U.S. Dist. LEXIS 3753 at *5, (E.D. Pa. March 30, 1999) (Section 8371 provides a remedy for bad faith conduct by an insurer in its capacity as an insurer and not as a legal adversary in a lawsuit filed against it); <u>O'Donnell v. Allstate Ins. Co.</u>, 734 A.2d 901, 909 (Super. Ct. 1999) (discovery disputes are not evidence of bad faith).

In addition, the use of counsel's correspondence as evidence of bad faith would directly conflict with counsel's role as an advocate under the Rules of Professional Conduct.  Rule 1.3 requires that a lawyer shall act with reasonable diligence and the comment to the rule requires that an attorney represent a client with "zeal in advocacy."  <u>See</u> Comment to Rule 1.3.  If counsel's letters or actions could be used as evidence of bad faith it would greatly reduce or eliminate counsel's role as required by these Rules.

Such evidence should also be excluded under Rule 403 of the Rules of Evidence because counsel's letters to opposing counsel may cause unfair prejudice and confuse the jury.  It is not proper to have a jury comprised of laypersons evaluating correspondence of counsel in litigation.  This is especially so when the evidence can easily be obtained by other means (assuming it were otherwise

10/24/02/SL1 295222v1/10305.060

relevant and admissible which it is not).  Accordingly, Defendant's motion in limine must be granted.

## VI.  CONCLUSION

For the foregoing reasons, UNUM respectfully requests this Court to grant its Motion in Limine.

Dated:  October 2, 2002          STEVENS & LEE


By _____
          E. Thomas Henefer
          Attorney I.D. No. 55773
          Kirk L. Wolgemuth
          Attorney I.D. No. 45792
          111 North Sixth Street
          P.O. Box 679
          Reading, Pennsylvania  19603
          (610) 478-2000

          Attorneys for Defendants

10/24/02/SL1 295222v1/10305.060

## CERTIFICATE OF SERVICE

I, E. Thomas Henefer, Esquire, certify that on this date, I served a certified true and correct copy of the foregoing Response and Memorandum of Law upon the following counsel of record, by depositing the same in the United States mail, postage prepaid, addressed as follows:

> Richard C. Angino, Esquire
> 4503 North Front Street
> Harrisburg, PA 17110-1708

_____
E. Thomas Henefer

Date: October 2, 2002

# CERTIFICATE OF NON-CONCURRENCE

I, E. Thomas Henefer, Esquire certify pursuant to Local Rule 7.1 that plaintiff's counsel does not concur in the foregoing motion.

_____

E. Thomas Henefer

Dated: October 2, 2002



EXHIBIT 

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. I

CV00-08297
9/4/2002

Page 258

1 you've said that and that's what we're going to use in
2 our denial letter.
3     MR. SHEA: Motion to strike.
4     BY MR. DARRAS:
5     Q. In terms of mini round table reviews, did you
6 ever at any mini round table you attended see a claim
7 representative list for those in attendance all the
8 reasons that supported payment?
9     MR. SHEA: Object to the form.
10     THE WITNESS: Well, as I said earlier,
11 there were one or two claimants that felt sorry for the
12 individual, one or two claim representatives that felt
13 sorry for the individual and would to try to make the
14 case for payment. And in fact I would sometimes say,
15 well, I don't think you've made a full case for payment
16 actually because it's not thoroughly medically
17 investigated and I think we should put everybody
18 through this rigorous investigation, and I'm not, I'm
19 not convinced yet on the medical information. So
20 that's the only time I would seem to be, that I felt
21 that the person was trying to pay the claim and that I
22 was kind of saying, well, let's hold on, there's --
23     BY MR. DARRAS:
24     Q. From what you saw in the room as a person
25 would stand up to support payment, the reaction to the

Page 259

1 business partners was what?
2     MR. SHEA: Object to the form.
3     THE WITNESS: Yeah, depending if that
4 person was perceived as a softy or not. If they were a
5 softy, they make fun of her. In fact, that happened
6 once.
7     BY MR. DARRAS:
8     Q. And by softy, you meant --
9     MR. SHEA: Object to the form.
10     THE WITNESS: Somebody who always wanted
11 to pay the claim, and, you know, that wasn't, that
12 wasn't -- that was not the way to behave in these
13 meetings.
14     BY MR. DARRAS:
15     Q. How long did you go to mini round tables?
16     A. Oh, I think I was approved to go within a few
17 months of arriving there, so that would be -- I don't
18 know exactly.
19     Q. Did there come a time when you stopped going
20 to mini round tables?
21     A. Yes, I stopped going the minute that Dr.
22 Vatt told me not to go in his written , verbal warning.
23     Q. Let's get to that. I believe it will be
24 Exhibit 7.
25     MR. SHEA: Wait, are you done with 6? I

Page 260

1 would like to voir dire the witness on Exhibit 6.
2     MR. DARRAS: I'm sorry?
3     MR. SHEA: Voir dire the witness. We're
4 doing this at a trial. Before you tender an exhibit, I
5 get a chance to voir dire.
6     MR. DARRAS: We are not in trial, and
7 nice try, but you can put it down and when you come to
8 your side of the questions you can ask all you like on
9 it.
10     MR. SHEA: Fair enough.
11     BY MR. DARRAS:
12     Q. Dr. McSharry, at some time during your
13 second round of employment, you mentioned you received
14 a verbal warning.
15     A. Uh-huh.
16     Q. I would like you to take a look at what we've
17 marked as Exhibit 7.
18     A. This is not the written warning.
19     Q. I understand. We're going to move a week
20 ahead of time of your verbal warning and since we've
21 got this marked, can you tell us what Exhibit 7 is?
22     A. This is where I had, as I kind of talked
23 about before, questions and concerns about the way
24 things were done, and Dr. Vatt was supposed to be
25 working with me on how to do these things. And I

Page 261

1 really felt that my opinion was being compromised.
2 That's what I kept saying was, you know, really, Dr.
3 Vatt, if you feel strongly about this the way you seem
4 to do, you should be able to do the review. I cannot
5 change what I have said, you're a doctor also and you
6 should review, you should be reviewing these files.
7     And I said, I have no problem if you
8 want to review the file and give your stated opinion,
9 but I said the wrong way is for me to go back and
10 change what I said just because you told me so. And I
11 said, I know you're my supervisor and I know you're my
12 manager and you have great powers and authority in that
13 regard, however, you don't have any authority over what
14 I say in the review. I can certainly make things more
15 acceptable to business partners, but I cannot change my
16 opinion.
17     And he -- we had a number of meetings
18 and I just felt this was so much that I needed to talk
19 to Dr. Anfield, because I felt at that time Dr.
20 Anfield understood better and I was not -- Dr. Vatt
21 was not understanding what I was trying to say, he
22 didn't offer to do the reviews. In fact, one time I
23 had thought he did and I said, Dr. Vatt is willing to
24 do this review. And I sent it off and it came back,
25 Dr. Vatt invited me up and said, look, I never said

66 (Pages 258 to 261)

Randall Chapman, et al. vs. Unumprovident Corporation, et al.    CV00-08297
Patrick Fergal McSharry, Vol. II    9/5/2002

Page 379

1    the first draft. I can't remember, actually, if I --
2    we worked on it quite closely, actually, and I -- the
3    last draft was done by, I believe by Mr. Burnette's
4    office.
5        Q. Did you --
6        A. I don't know who did the first draft or how
7    we, you know --
8        Q. Did you make any changes to the draft?
9        A. Is that the whole page, or is there more?
10       Q. I believe this is the page, and this is the
11   page we have, so this is what I'm showing you.
12       A. Oh, okay.
13       Q. The question is did you make any changes to
14   any drafts of this document prior to its submission to
15   Provident?
16       A. I can't remember exactly, did I -- I think I
17   didn't -- yes, I think I wrote on the bottom of it as
18   well, didn't I?
19       Q. I'm asking with this typed document, I'm not
20   asking about any handwritten notes that you may have
21   added upon you handing it to Mr. Gault or leaving it
22   on his chair.
23       A. Okay.
24       Q. What I would like to know is how many prior
25   drafts were there of Plaintiff's Exhibit 1, if any?

Page 380

1        A. Actual drafts, myself and Mr. Burnette
2    talked about this and this is what we came up with.
3        Q. You talked about this with your attorney,
4    your attorney had it typed up in his office, and you
5    submitted it, is that a fair appraisal, or did
6    something else happen?
7        A. This particular document, I believe that we
8    worked closely together, that it was a joint -- it was
9    a joint effort, yes.
10       Q. I understand that you had input into it. I'm
11   asking for the physical way in which it was produced,
12   is that you discussed it orally, your lawyer prepared
13   it, and you submitted it, is that what happened?
14       A. That is -- yeah, I believe that is correct.
15   I cannot remember exactly because it's quite a while
16   ago, you know, it's eight months ago, but I believe
17   that's what we did.
18       Q. Now, on December 5, 2001, you were still
19   employed by UnumProvident, correct?
20       A. Yeah, for another month.
21       Q. Well, on that day you were an employee,
22   correct?
23       A. Yes.
24       Q. How long before December 5, 2001 had you
25   consulted with Mr. Burnette?

Page 381

1        A. I first went to Mr. Burnette when I first
2    felt that things were not right and I needed to talk to
3    an attorney about things that were going wrong, so
4    I --
5            MR. BURNETTE: He doesn't want you --
6    he's not even asking you what we discussed because he
7    knows that would be improper as privileged.
8            MR. MEAGHER: Of course. I just want to
9    know -- I want you to put a date for me on when you
10   first consulted with Mr. Burnette because you first
11   thought things were wrong.
12           THE WITNESS: It was -- again, I can't
13   remember exactly, but it was around three or four
14   months before this.
15   BY MR. MEAGHER:
16       Q. Was it around the time of your verbal warning
17   on August 13, 2000?
18       A. I believe it was before my verbal warning I
19   first went to Mr. Burnette.
20       Q. Was it in July of 2000?
21       A. Without any knowledge, if -- I went to Mr.
22   Burnette, he charged me, so there is, there is evidence
23   of what day I went to see him, but I can't say exactly.
24   July sounds right, but that could be June, July, or
25   August, I don't know.

Page 382

1        Q. Do you know what event precipitated your
2    going to see a lawyer and paying him for his services?
3        A. Yes. My -- basically the ERISA, we were
4    working on the ERISA regulations with Angela Beckers
5    Dennis, and, you know, I was not getting the support --
6    initially there was great support, and I thought there
7    was good support in what I was trying to do; and when
8    my support started disappearing as in Angela Beckles
9    Dennis left and said that she just couldn't handle it
10   anymore and when -- soon after, after this, Dr.
11   Beecher said she wasn't interested, it was around that
12   time that Dr. Beecher was not wishing to continue.
13   And there was a lot -- I had had a lot of concern
14   about what was happening, and I thought, you know,
15   there's -- what I'm saying is not being taken in the
16   way I intended, or is not a great understanding, or
17   doesn't seem to be a great willingness to listen to
18   what I'm saying. I said, I think I need to know,
19   because I'm not an expert in law or ERISA or state
20   law or anything like that, so I wanted to get an idea
21   as to what --
22       Q. Dr. McSharry, I'm just looking to try to find
23   a date. And was it after Dr. Angela Beckles Dennis
24   left UnumProvident that you first went to your lawyer?
25       A. I think it was -- I knew she was going to be

4 (Pages 379 to 382)

Page 383

1  leaving, so I think it was around that time, I believe.
2  I mean --
3      Q.  Do you believe it was before Dr. Angela
4  Beckles left UnumProvident?
5      A.  It might be. I'm just trying to remember
6  exactly when I went there, because she lived quite
7  close to me, so was she still there when I was
8  traveling down? When did she leave? I can't remember
9  the exact time that she left.
10     Q.  So you're not able to give us any better date
11 other than you believe it was sometime in July or
12 thereabouts, is that fair?
13     A.  Yeah, for what it's worth.
14     Q.  Taking a look at Plaintiff's Exhibit 1 --
15         MR. JACOBS:  Counsel, could I make a
16 suggestion, instead of having two 1s and two 2s, why
17 don't you start at another number, be it a hundred or a
18 thousand or whatever --
19         MR. MEAGHER:  Well, we could actually
20 use letters. How would that be?
21         MR. JACOBS:  Anything as long as we
22 don't have two duplicates so it isn't Defendant's 1 or
23 Plaintiff's 1, because it's going to complicate matters
24 down the road.
25         MR. BURNETTE:  Let me ask you just one

Page 384

1  other question, too. Obviously my office Bates stamped
2  these things, and on this particular document was
3  difficult to read the Bates stamp for me. And I
4  believe you said it was Bates stamp number 188, and it
5  sort of looked like 188 on my piece of paper, but it's
6  actually 186, and so --
7          MR. MEAGHER:  I don't think I referred
8  to the Bates stamp at all this morning .
9          MR. BURNETTE:  I thought you did,
10 because I -- but it's no big deal. If you did, and I
11 thought you did, in doing that document number.
12         MR. MEAGHER:  Okay. I'm going to accept
13 Mr. Jacob's suggestion, and we will remark this as
14 Plaintiff's, I'm sorry, Defendant's Exhibit 100, and we
15 will start running sequentially from that number.
16         THE WITNESS:  Thank you.
17 BY MR. MEAGHER:
18     Q.  In Defendant's Exhibit 100 that we have
19 marked, this is your December 5, 2001 memo, if you
20 could take a look at the fourth paragraph and tell me
21 when you're there.
22     A.  One, two, three, four, I'm there.
23     Q.  And you state there, quote, I, meaning you,
24 Dr. McSharry, have sought the high, legal, ethical and
25 moral ground in my work here. I will continue to seek

Page 385

1  the ethical and legal path, close quote. Did I read
2  that correctly?
3      A.  You did.
4      Q.  And that goes along with what we were saying
5  earlier about your character, and that is it's one of
6  high moral and ethical character, true?
7      A.  Well, you know, I would like to think so,
8  but, of course, nobody is perfect.
9      Q.  Nobody is perfect, that's true. We can all
10 agree on that.
11         Now, in your testimony yesterday Mr. Jacobs
12 was asking you some questions about your work history.
13 Do you recall that?
14     A.  Yes.
15     Q.  Now, Mr. Jacobs was one of the five
16 plaintiffs' attorneys who were present yesterday
17 representing their clients here that was not present at
18 that earlier meeting you had with the plaintiffs'
19 counsel about a month ago or thereabouts, is that
20 correct?
21     A.  Thereabouts, yes.
22     Q.  But you did have a chance to meet with Mr.
23 Jacobs before the deposition yesterday, correct?
24     A.  Correct.
25     Q.  When did you meet with Mr. Jacobs?

Page 386

1      A.  Last weekend.
2      Q.  What day?
3      A.  It was Friday night.
4      Q.  For how long?
5      A.  It was 6:00 to around, was it 9:00 or 10:00.
6      Q.  And was that at Mr. Burnette's office, your
7  lawyer?
8      A.  No. That was here in the Chattanoogan Hotel.
9      Q.  So you traveled to this hotel to meet with
10 Mr. Jacobs?
11     A.  Yes.
12     Q.  Where did you have the meeting? 'Was it in
13 his room or somewhere else?
14     A.  It was in a room, in one of the guest rooms
15 here.
16     Q.  Was it a room that he was staying in, or do
17 you mean it was like a conference room?
18     A.  No. It was a room. I don't know who was
19 staying there.
20     Q.  So there was a bed and a bathroom, it was a
21 guest room?
22     A.  It was a guest room, yes, and there was a
23 large -- it's kind of one of these suites, you know.
24     Q.  Did you see any luggage? I'm sorry.
25     A.  See any luggage in the room? Yeah, I saw

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (800) 342-5490

Page 495

1  Q.  Taking a look at this memorandum, it says,
2  quote, I, meaning --
3         MR. BURNETTE:  Objection to the
4  foundation.  You've not established whether he's ever
5  seen it before or not.  It would be improper cross.
6  BY MR. MEAGHER:
7  Q.  The document reads, quote, I am recommending
8  termination of employment for Patrick Fergal McSharry,
9  M.D. based on unacceptable and disruptive behavior in
10  the work environment.  Documentation which supports my
11  recommendation is attached.  Did I read that correctly?
12  A.  You did read it correctly.
13  Q.  And you knew that your termination at
14  BlueCross BlueShield was based on your unacceptable and
15  disruptive behavior, true?
16  A.  Say that again.
17  Q.  You knew, Dr. McSharry, that your termination
18  at BlueCross BlueShield was based on your unacceptable
19  and disruptive behavior in the work environment, true?
20  A.  No, I never received this document.  I didn't
21  know that.
22  Q.  You didn't know that fact, correct?  I'm not
23  asking you about the document.
24  A.  It's not a fact.  It's my understanding.  My
25  understanding at the time was that I was not terminated

Page 496

1  -- I knew -- yes, I knew that the -- Ms. Slagle was
2  -- had the job of rearranging the department, so I knew
3  my job was probably on the line and I knew that they
4  were building a case, because I got some -- something
5  from Sandy Bunting where it said Dr. McSharry did this
6  or that, and she sent it to me by mistake, so I knew
7  there was something going on.  But I, in my rose
8  colored glasses, which everybody accuses me of, thought
9  no, no, they wouldn't fire me for these silly little
10  things and that they are just building a big case, but
11  obviously they are.  I talked to my colleagues and I
12  said, no, this is the way corporations act, this is my
13  first corporation, you must remember, and this is the
14  way corporations are, they send these e-mails to and
15  from among themselves you didn't see them while they
16  are building a case, and I said, it looks like I'm the
17  one, and they said, yeah, you are, and you, you know,
18  you've got to be aware of that.  And I said, well, I
19  don't know, I think I can work.  And it's the same as
20  what I did at UnumProvident.  I said, I think I can
21  work with them, I think Judy is trying to understand
22  and help, and I'll work with them.  So I signed any of
23  the documents she asked me to sign.  And, no, my
24  understanding was a business need, and that's what Dr.
25  Coulter relayed to me on the day.  And when Judy Slagle

Page 497

1  tried to bring up all this stuff on the day, he just
2  said -- I said, all that stuff, I said, what's that
3  about?  And she just looked -- she was going to I
4  think pull out these things, I don't know, pull out
5  some documents, and Mr. Coulter said, no, let's just
6  not talk about that at all, let's talk to Dr. McSharry
7  about his options.  So he didn't want to get into the
8  discussion about firing, he wanted me to resign and--
9  take a severance, and that was my option.  And or else
10  -- he didn't give me any reasons why he would fire me.
11  It was only later on when we discussed, when I left to
12  come back, I was escorted by a security man, I had my
13  coat, it was raining, I asked could I get and see the
14  physician -- the other -- my physician colleagues,
15  they said, no, you can't go anywhere, we have your
16  badge, you must leave through that front door.  And I
17  pleaded with the security man, I said, hell, it's in
18  the rain and my car is a bit away, can I have my rain
19  coat, my coat, and he said okay.  So he went up, and I
20  did happen to say good-bye to the folks.  And they were
21  shocked.  I mean, everybody got upset.  So it was a
22  total surprise to all of us.  And yeah.  And then I
23  went with the security man.  You know, he opened the
24  doors in front of me, because they were locked doors
25  and I had given up my keys, and I didn't really

Page 498

1  have -- I didn't accept my -- I hadn't resigned at
2  that time, but they were walking me out.  So, you know,
3  that was my situation.  I was kind of shocked at, you
4  know, this kind of situation.  The security man said to
5  me, why are you joking through this?  And I said, you
6  either laugh or you cry through this kind of situation,
7  it's just a shock, I don't know how to react.
8  Q.  So your supervisor at BlueCross BlueShield,
9  Judy Slagle, was building a case against you, correct?
10  A.  Well, this is what people were telling me --
11  I learned.  This is what I learned from my colleagues,
12  they were saying, watch out.  They were saying, we're
13  all unhappy, we're all going to -- this area, associate
14  medical directors is no longer going to be, or at that
15  time UMD, this is not going to be any longer and we
16  should all be looking for alternative employment, so
17  they all did, except one guy who just resisted any
18  effort.  He used to put all his boxes of stuff outside
19  the door.  And he had nothing, nothing personal in
20  there, and it was just his reminder to Judy and Dr.
21  Coulter and Greg Preston and these folks that, you
22  know, you just have to come in, fire me, and I'm out of
23  here, you know.  So it was -- that was the atmosphere.
24  Everybody knew that we were on the line.  It closed --
25  they fired a ton of people from the area -- we were in

33 (Pages 495 to 498)

Randall Chapman, et al. vs. Unumprovident Corporation, et al.     CV00-08297
Patrick Fergal McSharry, Vol. II                                  9/5/2002

Page 583

1  there.
2      Q.  Were you a victim of politics within the
3  company?
4      A.  I see you're trying — I don't know.  I
5  don't know.  All I know is that when I went there, the
6  first few months it was great, I was doing what I said.
7  Maybe they actually intended this all along, I don't
8  know, that I would set up the systems, I would bring my
9  knowledge of American reimbursements, which isn't
10  advanced in other parts of the world, CPTs and ICTs,
11  codes, sorry to use those terms, but I can explain them
12  if you want.  And when I had done that, I probably
13  outlived my usefulness.  But I think what they didn't
14  understand was the Irish laws as regards permanent
15  employment are very — you know, Ireland is a
16  socialized system, so, you know, if you employee
17  somebody permanent, they are there, you know --
18      Q.  Dr. McSharry —
19      A.  — until you can prove that they are
20  whatever.
21      Q.  Dr. McSharry, looking back at BlueCross,
22  UnumProvident Corporation, and Alliance, do you see any
23  pattern with your job experiences?
24      A.  Yeah.
25      Q.  What patterns do you see?

Page 584

1      A.  Well, I see that I didn't last anywhere too
2  long.
3      Q.  You didn't fit in?
4      A.  I thought I fit in, but obviously others
5  didn't.
6      Q.  Who is Mr. Fink?  Do you know Mr. Fink --
7  Sink, I'm sorry.
8      A.  Oh, Mr. Sink.
9      Q.  Mr. Sink.  I was casting him aspersions.
10      A.  Mr. Sink, yes, is a — runs a recruitment
11  and locum tenens agency in Cleveland, Tennessee, just a
12  few miles away from here.
13      Q.  And where do you know Mr. Sink from?
14      A.  I was referred his name by somebody, and I
15  can't remember who, saying that he tended to need
16  people to work in walk-in clinics and in urgent care
17  centers local.
18      Q.  Did you contact Mr. Sink for a job?
19      A.  I did.
20      Q.  Was that after your termination from
21  UnumProvident?
22      A.  Yes.
23      Q.  How long after?
24      A.  I think within a week or two.
25      Q.  How did you find him, was it on the web or

Page 585

1  Yellow Pages or —
2      A.  No.  As I said, somebody, somebody told me,
3  this is somebody who recruits physicians.  Oh, I know
4  what it was.  It was one of my soccer buddies, she's a
5  goalkeeper.  And she said, you know — she was working
6  — she's an EMT, and she said, you know, you talk to
7  him, he employs a lot of people around the counties
8  around Hamilton County, where we are now, and why don't
9  you give him a call, so I got his number.
10      Q.  What was the name of the recruiting company
11  that you contacted?
12      A.  His recruiting company?
13      Q.  Yes.
14      A.  I think it's Physician Services of Cleveland,
15  is it?  I probably have it down here, maybe, maybe not.
16      Q.  If it is, that would be great.
17      A.  No, it's not on this one.
18      Q.  Something like that?
19      A.  Yes, something like that.
20      Q.  Did you provide Physician Service of
21  Cleveland with anything, any information, I'm sorry,
22  any written information, CVs, anything like that?
23      A.  Well, actually, the — not much directly to
24  him.  They wanted most stuff for the — for medical
25  malpractice insurance.

Page 586

1      Q.  Does a recruiting company -- I'm sorry?
2      A.  So they had asked me for those, I think maybe
3  a CV.  I don't know if it went directly to Physician
4  Services and they passed it on or if I passed it on, I
5  can't remember.
6      Q.  When you said malpractice, I take it
7  Physician Services doesn't do anything about your
8  malpractice, or did they?
9      A.  Yeah.
10      Q.  Oh, I see, they apply for you or help you
11  apply?
12      A.  Yes, they help you apply.
13      Q.  Did you fill out a malpractice application?
14      A.  I believe I did.
15      Q.  Was it for a specific company or just a
16  generic one?
17      A.  Oh, no.  It was for, what they are called,
18  Tennessee State Mutual.
19      Q.  That's the big carrier?
20      A.  That's the physician controlled company,
21  insurance carrier here.  I don't know if it's the
22  biggest or not.
23      Q.  As part of -- did you fill out any type of
24  application that you gave to the recruiting service?
25      A.  I don't think so.

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (800) 342-5490

Page 659

1    MR. MEAGHER: Let's do what Mr. Jacobs
2  wants. I'm going to read that question back, question
3  -- and listen, Dr. McSharry.
4    MR. JACOBS: I want the reporter to read
5  it back. I don't want you to read it back. I want it
6  read back from the official record.
7    MR. MEAGHER: Could you read that back,
8  Mr. Reporter. Maybe -- read it back, please.
9    (The record was read.)
10    THE WITNESS: This specific December 1,
11  I don't know what one was discussed, it could be the
12  November 1 that was discussed, but not this exact one,
13  I don't believe it was. It could have been this one,
14  but it might not have been this one.
15  BY MR. MEAGHER:
16    Q. When did you copy this document?
17    A. I would say in December.
18    Q. Right when you were getting ready to leave,
19  right?
20    A. No. I had no idea I was being -- as I told
21  you before, I have rose-colored glasses and I actually
22  believed I was going to work with folks and eventually
23  they were going to work with me, and I had absolutely
24  no idea I was going to be treated in that fashion.
25    Q. So you just hired a lawyer just for the heck

Page 660

1  of it, even though you were wearing those rose-colored
2  glasses, true?
3    MR. JACOBS: Wait a minute. Objection,
4  form.
5  BY MR. MEAGHER:
6    Q. Is that true?
7    MR. BURNETTE: Objection, form. Come
8  on.
9    THE WITNESS: Please ask the question.
10    MR. MEAGHER: Read it back from the
11  official record, Mr. Reporter, my question.
12    (The record was read.)
13    MR. JACOBS: Objection, form.
14    THE WITNESS: Even though I was wearing
15  those -- yes. No, I'm not totally naive, and I
16  had -- as I told you before, you know, people were
17  telling me, Angela Beckles Dennis was telling me, he's
18  out to get you and stuff like that, so I thought it was
19  prudent to have an attorney advise me on my situation.
20  But I really thought they wouldn't go and do it. And
21  after the written warning, I even kind of talked to Dr.
22  Vott and said, you know, this performance improvement
23  thing, let's work on it, I'll go to your meetings. But
24  then soon -- yeah, I suppose -- you know, he was --
25  as far as I was concerned, I knew he was -- in my mind

Page 661

1  -- everybody was telling me, he's -- he said you're
2  going to go, and I just -- I just presumed that this,
3  you know, that I should do something, think myself a
4  little bit about that.
5    MR. MEAGHER: Let's take a five-minute
6  break.
7    THE VIDEOGRAPHER: We're off the record
8  at 4:03.
9    (Brief recess).
10    THE VIDEOGRAPHER: We're on the record
11  at 4:31.
12  BY MR. MEAGHER:
13    Q. Dr. McSharry, before our last break, as part
14  of one of your answers you said that Dr. Angela
15  Beckles Dennis kept telling you that, quote, he was out
16  to get you, or he was after you. Who was he?
17    A. Dr. Vott.
18    Q. Your direct supervisor, correct?
19    A. My direct supervisor, yeah.
20    Q. Did she give you any specifics to back up her
21  claim that your boss was out to get you?
22    A. I asked her. I said, I mean, why, you know,
23  why? And she said, you just don't -- well, what she
24  said was because he's evil, like that. And I said,
25  well, you know, come on, Angela, that's not either here

Page 662

1  nor there, I don't believe in that theory. And then
2  she said, it's just that you, I'm telling you, I'm
3  friends, I mean, I know the people around here and he
4  is out after you. And I said, well, I'm going to my
5  meetings, I think it was at that stage, going to the
6  meetings and we were trying to construct a way of
7  looking at things and whatever. And she said, no, no,
8  he's -- you know, you know that he's going to -- you
9  know, as regards exact reasons, she just thought that I
10  was causing so much strife in my queries and questions
11  about all this stuff about this and that that he would
12  have no option but to fire me.
13    And that is what she said. And she said,
14  look, I'm leaving here and I'm leaving because I just
15  can't handle this, the same thing you're putting up
16  with. And I said, well, I'm really believing in what
17  I'm doing. I said, I'm not leaving anywhere. She
18  says, well, that won't matter, in the end he will make
19  sure you go. And I said, there's no way he can
20  intimidate me out of this position, I really believe in
21  this position and I believe in what I'm doing, or what
22  I'm trying to do here. And she just said, well, I'm up
23  to -- she wasn't at that ERISA committee at that time.
24  She said, I'm not on the committee, you can take over,
25  you seem to have an interest in this and you can take

74 (Pages 659 to 662)

Randall Chapman, et al. vs. Unumprovident Corporation, et al.    CV00-08297
Patrick Fergal McSharry, Vol. II    9/5/2002

Page 675

1  proceeds of my legal case and I was going to make
2  UnumProvident fire me. That's what he said.
3    Q. Isn't it a fact, Doctor, that you told Dr.
4  Vott that you had never spoken to anyone in the company
5  about suing the company back in August of 2001?
6    A. Not to my recollection. I told him that that
7  was a great idea, that whole thing was a great --
8  because he presented the whole thing to me, and I said
9  that was a great idea but totally unworkable. That's
10  what I said to him, I said, that's in the world of
11  fantasy.
12    Q. Let's turn to the second page of your
13  memorandum, dated August 17, 2001, Paragraph F. Tell
14  me when you're there, please, sir.
15    A. Paragraph F, yes.
16    Q. Do you see, one, two, three -- six sentences
17  down, the third word in is "I"?
18    A. It is.
19    Q. Quote, you wrote, quote, I had never spoken
20  to anyone in the company --
21    A. Sorry, I'm looking at the wrong thing. I had
22  found where the fourth line is. Is it the third line
23  in?
24    Q. Somewhere around there, right around there
25  (indicating) right there. I had.

Page 676

1    A. I had, oh, yeah.
2    Q. You state, quote, I had never spoken to
3  anyone in the company about suing the company, close
4  quote. I read that correctly, didn't I?
5    A. Yes.
6    Q. And that's what you put in this memo back to
7  Dr. Vott back in August of 2001, true?
8    A. Yes, true. But what I meant was I had spoken
9  to Angela outside of the company, I hadn't actually
10  spoken to anybody that I know of about -- at that
11  time, this is August, I hadn't talked to anybody.
12  Later on I did speak to people about the fact that I
13  talked -- and I wasn't paranoid, either, I thought
14  that there was, because I was told by other people that
15  my days were possibly numbered and I wouldn't accept
16  that.
17    Q. Who told you that?
18    A. Who told me what?
19    Q. That your days were numbered.
20    A. I told you, Dr. Angela Beckles Dennis.
21    Q. She wasn't there in August, correct?
22    A. Also Dr. Beecher said -- had said earlier
23  that, maybe, Fergal, you need to find another job.
24    Q. Let me go back to the question. You're
25  saying that's a correct statement because the only

Page 677

1  complaint Dr. Vott had was you talking about suing the
2  company to people within the company, is that your
3  recollection of what the concern was?
4    A. Would you repeat the question? I'm sorry.
5    Q. Yeah. I believe that you said that the
6  sentence I just read where you said, I have not spoken
7  with anybody about suing the company, or something to
8  that effect, I have never spoken to anyone in the
9  company about suing the company, was correct because
10  you had only spoken to people outside of the company
11  about suing the company?
12    A. No, no, no. Outside of the company.
13  It's -- you know, when you have discussions about it,
14  and, you know, I had discussions with Dr. Lance
15  Metheny about, you know, the problems we were having
16  with ERISA and my concerns, and, you know, and I said
17  to Dr. Hashaway, I said, you know, really, this is
18  big, this is the Federal Government who regulate these,
19  and this is -- I mean, if we're doing that, if you're
20  doing sign-offs and all these things, that's illegal,
21  Tom. And Tom said, I don't know. I said, well, it's
22  illegal, and, you know, I -- he said, are you going to
23  drop this? And I said, no, I said I'm not. And the
24  conversation may have gone on to discussion of what
25  would happen if I got fired. I can't recall exactly

Page 678

1  who I talked to about what would happen if I got fired.
2    Q. Doctor, the first time you raised alleged
3  ERISA violations was in a meeting with Dr. Vott on
4  November 19th of 2001, correct?
5    A. No. That's the only time that he passed --
6  11 --
7    Q. 11-19?
8    A. That's the only time I reacted to it.
9    Q. Well, are you saying that you made ERISA
10  violation allegations to Dr. Vott prior to 11-19-01?
11    A. I had talked to him in general terms. I'm
12  not a lawyer, so I didn't say what laws, but I did say
13  what was going on was very wrong. And I told him that,
14  you know, if he was changing my opinion, that was
15  wrong, and that -- you know, he didn't -- you know,
16  I'm not a lawyer and he's not a lawyer, so we didn't
17  talk in legal terms about that. Later, when I realized
18  that he didn't -- he maybe didn't understand what I
19  was saying, that was on November, then I -- he
20  said -- oh, no, he was prompted initially, he was
21  prompted initially by it, because I think I talked to
22  Jill Plumber, I think was the first person I said about
23  illegal.
24    Q. In November of 2001?
25    A. No, sometime before November. And so he knew

78 (Pages 675 to 678)

Randall Chapman, et al. vs. Unumprovident Corporation, et al.        CV00-08297
Patrick Fergal McSharry, Vol. II        9/5/2002

Page 679

1   --
2   Q.  When before November?  When did that
3   conversation take place?
4   A.  I don't know.  You probably have it in your
5   documents.
6   Q.  You have some notes, right?
7   A.  Yeah, yeah.  You should -- you know, they
8   should be somewhere.
9   Q.  You say you have notes of that meeting?
10  A.  Yeah.
11  Q.  Have you produced those notes?
12  A.  I think so.
13          MR. BURNETTE:  If I've got them, we've
14  produced them.
15          MR. MEAGHER:  Okay.
16  BY MR. MEAGHER:
17  Q.  Isn't it true that when you made the ERISA
18  violation allegations to Dr. Vott on November 19, 2001,
19  he immediately began to put in process an internal
20  investigation?
21  A.  His initial response was that he needed a
22  third-party, like a human resource person, that's who
23  he went to look for, that was his initial response,
24  that this was -- he hasn't -- you know, I thought I
25  made it pretty plain to him that this was a big deep

Page 680

1   concern of mine, but he hadn't passed the intention
2   level that day.
3   Q.  Well, you actually met the next day with Jim
4   Gault, the investigator?
5   A.  That same day, I believe.
6   Q.  The same day, they brought you there and had
7   a meeting, correct?
8   A.  Straight up, straight up, yeah.
9   Q.  Please tell me each and every allegation of
10  ERISA that you believe UnumProvident violated.
11  A.  I'm not an attorney and I can just go through
12  to --
13          MR. BURNETTE:  Objection to that.  The
14  bottom line is you're asking him for legal opinions.
15          MR. MEAGHER:  That's fine.  You object
16  to form or whatever.
17  BY MR. MEAGHER:
18  Q.  I want to know, since you made these
19  allegations, wow, this is the federal Government that
20  we're dealing with, we're messing with here, these are
21  the violations, what were the violations of ERISA?
22          MR. JACOBS:  Objection, form.
23          MR. BURNETTE:  Again, you're asking him
24  for legal matters.
25          THE WITNESS:  The overall matter to me

Page 681

1   was my understanding of a full and fair review.  That
2   was my basic understanding.  And, of course, there's
3   specifics in there that ERISA have defined every year
4   going forward, they define it more, the law, they
5   interpret the law and produce regulations.  And, of
6   course, there's specifics in there, but I'm not a
7   lawyer so I don't know exactly when the specifics are
8   broken or not.  But I know generally the ERISA is an
9   attempt by the federal government to protect the
10  employee, in this case, against the insurance company
11  not performing their fiduciary duty, which is they get
12  the money and they are supposed to do, pay, give back
13  the money when the person deserves to get it back, if
14  they deserve to get it back.  And, of course, we all
15  pay our disability insurance hoping we never get
16  disabled and we're quite happy if we never get disabled
17  and it goes to somebody else, and that's the whole
18  idea.  And ERISA was put in place to protect those
19  people because they gave some leeway to the insurance
20  company and the employer that these things didn't have
21  to go through, you know, there was retirement plan, and
22  then it kind of developed into being protection for
23  healthcare and other benefits, benefits plan,
24  protection for benefits plan.  So my understanding was
25  that the other -- what they gave up to the insurer,

Page 682

1   they also had to counter, a counter way to try to
2   protect the claimant against egregious behavior like,
3   you know, siphoning off their money to do something
4   like give, you know, yourself more stock options or
5   whatever.
6   BY MR. MEAGHER:
7   Q.  Other than full and fair review, what other
8   violations of ERISA, to your understanding, were
9   present at UnumProvident while you were there?
10  A.  Well, to me, that's the critical point.
11  Q.  I'm not asking you which is most critical.  I
12  want to know each and every one.  Is that the only one
13  you know?
14  A.  Well, I can break it down.
15  Q.  It's all under full and fair review?
16  A.  See, the thing is that you're an attorney and
17  you know verbatim what this law is, I don't.  All I
18  know is in my way the nurse does not deny the report
19  because she -- deny the claim because she doesn't know
20  all the details of the claim.  The --
21  Q.  Excuse me, I'm going to stop you after each
22  one.  I'll look at your transcript and we will go back,
23  all right.  Fine.  Go ahead, Doctor.
24  A.  Okay.  Secondarily is the independence of
25  the appeal area from the claims area, and I hadn't seen

79 (Pages 679 to 682)

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. II

CV00-08297
9/5/2002

Page 687

1  seen before?
2      A. Yeah.
3      Q. That is?
4      A. That is my writing.
5      Q. And when did you write that?
6      A. I spelled Plumber wrong. When did I write
7  that? I don't know. Sometime between probably --
8  sometime between my actual response and when I received
9  this.
10     Q. And with regard to your response, you wrote,
11 in part, quote, I have explained to Dr. Vott -- do
12 you see I'm reading about four lines down?
13     A. Yeah.
14     Q. I've explained to Dr. Vott and Dr. Anfield
15 on a number of occasions why and how the allegations A
16 through F are false, close quote. Do you see that?
17     A. Yes.
18     Q. And again, Exhibit, on the first page, 1-F,
19 is about your statements to other individuals that you
20 view your employee status with the company as being in
21 jeopardy and you were going to make certain that you
22 would take action against the company to receive money,
23 correct?
24     A. Say that again.
25     Q. I just read 1-F on the front page.

Page 688

1      A. Oh, 1-F. I thought we were reading -- can I
2  read this?
3      Q. Of course.
4      A. Thank you. That's not finished. I also
5  there --
6      Q. What else should be there?
7      A. I don't remember.
8      Q. It looks like the copying -- there's a copy
9  cut off at the bottom?
10     A. Yeah.
11         MR. BURNETTE: Did that come from us or
12 you?
13         MR. MEAGHER: I don't even know.
14 BY MR. MEAGHER:
15     Q. Did you keep a copy of this one? You
16 probably kept a copy of this one, didn't you?
17     A. Of this actual verbal, my own writing?
18     Q. Yes.
19     A. Possibly have, but --
20         MR. BURNETTE: I don't remember having
21 seen that.
22         THE WITNESS: It's probably in the pile
23 somewhere.
24         MR. JACOBS: 116.
25         THE WITNESS: So A through F are false,

Page 689

1  yes.
2  BY MR. MEAGHER:
3      Q. You had testified earlier on direct
4  examination about a concern you had in a particular
5  case regarding, and I believe the phrase you used was a
6  pre-walk-in. Have you ever heard that phrase,
7  pre-walk-in?
8      A. No. Pre-test or -- well, that may be the
9  term I used, but when people would come in before they
10 wanted the decision, just to see if I was going to be
11 compliant or not.
12         (Off the record discussion)
13 BY MR. MEAGHER:
14     Q. I'm handing you Defendant's Exhibit 117,
15 which is a redacted version of a document that you gave
16 us back last week, I believe. This is one of the
17 documents that you copied and kept after your
18 termination, correct?
19     A. This is correct.
20     Q. I'm going to do my best, Doctor, and I'm sure
21 you will also, not to use the actual name of the
22 claimant, although you may recall it, all right?
23     A. All right.
24     Q. Now, can we agree to call this particular
25 matter the case of Beverly D.

Page 690

1      A. Yes.
2      Q. Okay. With regard to this --
3      A. BD. The medical way is just to give the
4  initials.
5      Q. That's fine. Do you want to do BD?
6      A. I prefer if you did BD, that's what I'm used
7  to.
8      Q. Okay. That's fine. Do we use Ms. BD?
9      A. No, you don't -- oh, you do, you don't give
10 any title, you just give Ms. Or Mr.
11     Q. Let me ask you, Doctor --
12     A. It's important to know if they are male or
13 female --
14     Q. Sure.
15     A. -- for medical reasons.
16     Q. With regard to Exhibit 117, what does the
17 number 6 with a circle around it up here at the top
18 signify, if anything?
19     A. Nothing really. At one stage I was looking
20 through recently -- I was looking through the files to
21 try to remember what was in them and I started on --
22 just chronologically going through them, but I didn't
23 get very far. I think I got to ten or more.
24     Q. Now, was the case of Ms. BD one of the
25 examples of what you referred to as doctor shopping?

81 (Pages 687 to 690)

Randall Chapman, et al. vs. Unumprovident Corporation, et al.                    CV00-08297
Patrick Fergal McSharry, Vol. II                                  9/5/2002

Page 695

1    to -- some of the more experienced ones would have the
2    exact question there, somebody like Chris Foster would
3    have the exact question there, some would do it
4    broadly, some would not. It just depended.
5        Q.  Now, Ms. Ellington came into your office and
6    asked you to consider this case which involved Ms. BD
7    who was very ill at that time, correct?
8        A.  It appeared to me that she was very ill.
9        Q.  Well, her -- I'm sorry?
10       A.  Yeah, sorry.
11       Q.  Her AP statement diagnosis, as stated on this
12   document, is acute leukemia.
13       A.  That's correct.
14       Q.  Do you see that?
15       A.  Yes.
16       Q.  And you took a look at it and told her that
17   -- well, let me ask you this:  What did you tell her
18   when you took a look at the file on a walk-in?
19       A.  I told her that this preexisting didn't --
20   there was no preexisting, that aplastic anemia and
21   leukemia were not related directly.  There is, of
22   course, some aplastic anemias that do progress to a
23   leukemia, but it does not by any means all or by any
24   means even the majority, from what I'm aware of, that a
25   bone marrow transplant can result.  So that was my

Page 696

1    understanding of it at that time.  And that's what I
2    said, and she said, I really don't see it, I see that
3    there is a definite link looking in here.  And I said,
4    no, I don't.  Let's just put it this way, I said, one
5    is anemia and one is leukemia.  Do people who have
6    anemia develop leukemia?  No, she said.  I said, okay,
7    then do people with very severe anemia develop
8    leukemia, what's your understanding?  And she said, no,
9    they generally don't.  And I said, so where is the
10   existence, why are they both directly related, why are
11   they -- why is it preexisting, why is -- the reason
12   for preexisting is so that the claimant cannot calm the
13   insurance company by saying they don't have conditions
14   that they actually know about and that their doctor
15   knows about and -- or even that they had a condition
16   that they didn't really know about that was going to be
17   disabling and that they had a suspicion that it would
18   be disabling, or they didn't have a suspicion.  I mean,
19   that's going to be very difficult to prove in court, if
20   you had suspicion or you should have known or you would
21   have known.  That's where prudent layman language comes
22   into play, and some policies have that and some
23   policies don't.  So I was saying to her, medically, if
24   you saw a person -- well, she's a nurse, so she
25   wouldn't be seeing people then.  But from your

Page 697

1    understanding of the condition, aplastic anemia, you
2    know, severe anemia, would you think this person would
3    develop -- there was a high likelihood this person
4    would develop leukemia?  And she said, no.  And I said,
5    well, that's how I explain my answer.  And she said
6    fine.  But she said they really want to deny this.  I
7    said, well, I don't agree and you have to work with me
8    to convince me.  That's what I used to say to her.  I
9    would say, you have to go back and convince them of
10   what I'm saying.  I can do it, but they don't listen to
11   me.  You have a very gentle way, a nonabrasive way,
12   maybe I'm a little abrasive, talking down, might appear
13   because they are claims specialists and I'm a doctor,
14   that they feel that they are being criticized.  People
15   are very sensitive about that a lot of times, what the
16   doctor says, oh.  So they might appear -- so I asked,
17   please, for me, please go and talk to them.  And she
18   said, I will, I'll try, I'll talk to them and try to
19   explain why the doctor doesn't think it's leukemia, so
20   she went there, and subsequently she came back and
21   said, no, it's not going down well, they want me to go
22   to Deb Key and to try to sort it out with Deb Key.  And
23   I said, well, I don't think that's right, but -- and
24   then I went away, I think for a day, or maybe I wasn't
25   there, and when I came back, Judy had brought it on

Page 698

1    instructions of Deb Key to Nancy Beecher and Nancy
2    Beecher gave her opinion.  And I felt they should have
3    waited to come back to me and talked, Judy should have
4    come back before she did it.  She said, I know you're
5    going to be annoyed, but I had to bring this to
6    Beecher.  I said, why did you have to?  Because Deb Key
7    told me to.
8        Q.  Well, were you aware that --
9        A.  So then I went to Deb Key -- if you want to
10   hear the rest.
11       Q.  Are you aware that Ms. DB passed away on the
12   day the claims decision was made?
13       A.  Yes.
14       Q.  So you would agree that time was of the
15   essence in this claim?
16       A.  I would agree that -- I didn't know, I don't
17   know and I still don't know if a person dies while on
18   claim, if that's a good or bad thing for the company at
19   all, I still don't know.
20       Q.  Well, sir --
21       A.  If there's survivor benefits, I suppose it's
22   a bad thing for the company.  If they don't, then it's
23   a good thing for the company, I suppose.
24       Q.  Sir, isn't it true that when Ms. Ellington
25   went into your office, you told her in an agitated

83 (Pages 695 to 698)

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (800) 342-5490

Randall Chapman, et al. vs. Unumprovident Corporation, et al.          CV00-08297
Patrick Fergal McSharry, Vol. II                                       9/5/2002

Page 699

1  manner that how dare the company even consider denying
2  this claim because this person was very sick?
3      A. Yes. And that's what Dr. Anfield said to me,
4  accused me back. And I said at that time, no, that's
5  not what I said. I said that, in fact, that this
6  person was dying and to me, business decision wise, I
7  didn't understand why they weren't considering paying
8  it. I mean, it was not only for the preexisting, I
9  didn't even know why they had presented this. As far
10 as I was concerned, these are one of the ones that
11 should have been paid once the nurses said -- that she
12 should have approved, because that's entitlement
13 because this person is very sick. And there really was
14 no doubt that this was the humane thing to do.
15     And also, and I also was upset that there
16 wasn't a preexisting, so that was just an aside. My
17 opinion was at the time that this is not preexisting
18 and to decide -- on a human level, I said to her,
19 really, what do you think about denying somebody
20 payment when they are dying like this for a condition,
21 and I mean, the effect that would have on them and
22 their family and really the low amount of payment that
23 they are going to receive in any case. And I said, but
24 that's a business decision, that's the other, that's
25 the business people's decision, I don't make those

Page 700

1  decisions. As you pointed out earlier, I didn't work
2  in numbers. I just asked her about her nursing way of
3  looking at things and my medical way, and she kind of
4  went, yeah, it does seem a bit -- but, you know,
5  that's not the point. The point is is it preexisting
6  or not, and I don't think it is, and I was very
7  definite about that.
8      Q. In fact, what you write at the top of your
9  page is, I advised the nurse, Judy, in claims on why it
10 was not -- why it was unwise to consider these two
11 diseases contributing or related, and prognosis was
12 very poor, so much so that benefit would not have to be
13 paid. Do you see that?
14     A. That was just me surmising. I didn't know
15 that.
16     Q. Well, sir, do you believe the contractual
17 decisions should be made based on something other than
18 the contract, such as these moral reasons that the
19 person is very sick, even if they are not entitled to
20 benefits?
21     MR. JACOBS: Objection to form.
22     THE WITNESS: I think if you exclude
23 morality from the thing, it's pointless carrying on, if
24 you're going to exclude morality because it is not in
25 the contract.

Page 701

1  BY MR. MEAGHER:
2      Q. So should you look at a rich person --
3      A. The spirit of the contract is morality. The
4  spirit of the law is about morality. How can you say
5  that you should exclude at all and just look at the
6  contract? I'm no attorney, but I'm a doctor and I you
7  that you don't do that, and I would never do that, in
8  my practice or anywhere.
9      Q. So if a person is rich, you should scrutinize
10 their claim more carefully and perhaps deny this case?
11     A. Not at all.
12     Q. You should look at their pre --
13     A. You treat everybody equally.
14     Q. Exactly.
15     MR. JACOBS: One minute, move to strike
16 for the purposes of objecting to the question. You're
17 beginning to rapid fire and --
18     MR. BURNETTE: You have to let him
19 finish.
20     MR. JACOBS: -- you're not giving the
21 witness a chance.
22     MR. BURNETTE: Your blood is pumping,
23 but you're going to have to afford him an opportunity
24 to --
25     MR. JACOBS: One question at a time, one

Page 702

1  answer at a time, please.
2      MR. MEAGHER: Yeah. Well, he has to
3  afford me an opportunity to ask a question and not keep
4  rambling on. Again I'll state for the record that his
5  nonresponsive documents are increasing the length of
6  this deposition, the Magistrate has given us a limited
7  amount of time --
8      MR. BURNETTE: Did you say nonresponsive
9  documents on purpose?
10     MR. MEAGHER: I'm sorry, nonresponsive
11 answers, that was a mistake, Mr. Burnette.
12     MR. BURNETTE: Okay.
13     MR. MEAGHER: The nonresponsive answers
14 have wasted our time and we have a limited amount of
15 time with the Magistrate, and perhaps someone should
16 talk to Dr. McSharry, his counsel, and suggest to him
17 to try to listen to our questions and answer only the
18 question.
19     MR. JACOBS: Again, you've made another
20 speech that wasted more time.
21 BY MR. MEAGHER:
22     Q. Now, Dr. Beecher found that it was a
23 preexisting condition, correct?
24     A. She did.
25     Q. What division or impairment unit was Dr.

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (800) 342-5490

Randall Chapman, et al. vs. Unumprovident Corporation, et al.       CV00-08297
Patrick Fergal McSharry, Vol. II                                   9/5/2002

Page 751

1    Q. Did you ever see a situation where
2  UnumProvident selected a certain IME doctor for a
3  claimant and at the claimant's request they switched
4  doctors to the claimant's requested doctor?
5    A. I'm sorry, I leaned on my good ear there.
6    Q. Did you ever see a situation where
7  UnumProvident had selected an independent medical
8  examiner to perform an examination for a claimant then
9  there had been a request by the claimant to change the
10 IME doctor to one of their selection and Provident had
11 done that?
12     MS. RAFEL: Objection to the form.
13     THE WITNESS: I'm trying to remember.
14 Oh, a particular specialist? Yes. If the person had
15 said this specialist doesn't know anything, I want a
16 different specialist, they would pick a different
17 specialist off their panel, yes.
18 BY MR. MEAGHER:
19   Q. No, I'm saying that the claimant says, I
20 don't like Doctor A, I want Doctor B, same specialty,
21 have you ever seen a situation where Provident,
22 UnumProvident said, okay, Doctor B will do the IME?
23   A. Maybe it happened, but I didn't -- in my
24 experience, I didn't see it.
25   Q. And that would contradict somewhat what you

Page 752

1  said about UnumProvident with the IME, correct?
2      MS. RAFEL: Object to the form.
3      THE WITNESS: If it happened, it would
4  be -- a fairer way is when the person specifies that
5  they are happy with a particular opinion or they feel
6  they might be happier with a certain opinion, it would
7  be something that I would be impressed by, but
8  unfortunately I don't remember being impressed.
9  BY MR. MEAGHER:
10   Q. Then you would be impressed by the case of
11 Joyce Kakkis, which we're here on today, where the
12 selected IME, Dr. Jay Precaus, was changed to Dr.
13 Kenneth Kim at the request of the claimant.
14     MR. JACOBS: Objection, form.
15     MR. BURNETTE: Judge Carter very
16 explicitly told you don't ask him about things he
17 doesn't know anything about. He doesn't know anything
18 about those cases, so you're violating what the Judge
19 said.
20     THE WITNESS: I'm just taking your word
21 for it.
22     MR. JACOBS: Do you want to be put under
23 oath and do you want to testify to that fact? There's
24 no such fact. You're asking him to assume something
25 that's not in evidence.

Page 753

1      MR. MEAGHER: So that's an objection to
2  form, Mr. Jacobs?
3      MR. JACOBS: Well, it may well be an
4  objection to form, but the question is so out of line
5  and argumentative with your characterization of what
6  took place and you don't have any personal knowledge of
7  that whatsoever, you probably have hearsay on hearsay
8  on hearsay on that.
9      MR. BURNETTE: We would also like to
10 object to that under Rule 30D1, because it's to enforce
11 the limitation directed by the judge. The judge
12 directed that you not do those very kinds of questions
13 you just now asked.
14     MR. MEAGHER: Well, we disagree with
15 your interpretation of the Court's ruling.
16 BY MR. MEAGHER:
17   Q. Do you have any knowledge whatsoever of the
18 case of Robert Carr that you're here on today for
19 deposition?
20   A. If my name is in there as I've done a review,
21 I'm knowledgeable. If my name is not on there as
22 review, I haven't done a review, I'm not knowledgeable.
23   Q. Who is Mable Malek?
24   A. Who?
25   Q. Mable Malek.

Page 754

1    A. Malek?
2    Q. M-A-L-E-K.
3    A. M-A-L-L-E-K?
4    Q. M-A-L-E-K?
5    A. Oh, okay. Sounds like a doctor's name, but
6  no, I don't know who, you know, I don't know who that
7  is.
8    Q. How about Howard Taylor, do you know Howard
9  Taylor?
10   A. Howard Taylor?
11   Q. Yes.
12   A. I don't think I know anybody by that name.
13   Q. Do you know a Suzanne Williams?
14   A. Suzanne Williams? As I said, if these are
15 claimants, I have no -- you know, lots of people have
16 the same name, so, you know, if I knew somebody, it
17 might spark some remembrance, but those names don't
18 really remind me of anything.
19   Q. Do you know Tracy Talbot?
20   A. No. I know Talbots, but I don't think I know
21 a Tracy Talbot.
22   Q. How about Joanna Bialy, B-I-A-L-Y?
23   A. B-I -- what is it again? Sorry.
24   Q. B-I-A-L-Y.
25   A. Bialy?

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (800) 342-5490

Randall Chapman, et al. vs. Unumprovident Corporation, et al.                    CV00-08297
Patrick Fergal McSharry, Vol. II                                                 9/5/2002

Page 759

1   either in Worcester or Portland, I believe.
2       Q.  What's his specialty, if you know?
3       A.  He is a specialist, I don't think -- oh, he
4   might be an internist. I can't remember what his
5   specialty is.
6       Q.  How about Dr. Ursprung?
7       A.  Ursprung.
8       Q.  U-R-S-P-R-U-N-G.
9       A.  I don't believe so. I don't think I've
10  talked to him.
11      Q.  So you didn't know any of the internal claims
12  examiners or in-house medical who worked on the case of
13  Randall Chapman, one of the cases we're here on taking
14  your deposition today?
15          MS. RAFEL:  Object to the form.
16          THE WITNESS:  I did say I knew Dr.
17  Schwartz -- that I think that I know Dr. Schwartz. Is
18  he one of those people? I don't know.
19  BY MR. MEAGHER:
20      Q.  Aside from Dr. Schwartz and how you
21  described your knowledge of him, these other people you
22  have no knowledge of, correct?
23      A.  Yeah. I mean, it sounds like I know their
24  position, but I -- no, I don't think I've ever met
25  them or talked to them.

Page 760

1       Q.  Do you have any --
2           MR. BURNETTE:  Objection and move to
3   strike under Rule 30D1.
4   BY MR. MEAGHER:
5       Q.  Do you have any facts relating to the case of
6   Randall Chapman, any knowledge?
7       A.  Individual knowledge? Unless I saw the file,
8   I -- I don't know -- all I know is that it was dealt
9   with in the same way as it was probably dealt with in
10  Chattanooga. That's all I know. I don't know anything
11  about the individual file.
12      Q.  You stated that -- your last answer says,
13  unless I saw the file, I don't know -- all I know is
14  that it was dealt with the same way as it was probably
15  dealt with in Chattanooga.
16      A.  Uh-huh.
17      Q.  Is that correct?
18      A.  Well, that probably should be in a different
19  part of the sentence.
20      Q.  Why don't you correct that sentence and tell
21  me what you -- what your sworn testimony is?
22          MS. RAFEL:  Object to the form.
23          THE WITNESS:  What I meant was that --
24          MS. RAFEL:  What he said is what he
25  said.

Page 761

1           THE WITNESS:  What I said was what I
2   said --
3   BY MR. MEAGHER:
4       Q.  Tell us what you meant.
5       A.  What I meant is -- I mean, that's the way I
6   interpreted it. I can Americanize it, maybe, and make
7   it more easily understood, maybe, but I don't know if I
8   can.
9       Q.  Go ahead, Americanize it for us. That's
10  where these cases are pending. That's where these
11  cases are pending, sir.
12      A.  That would be embarrassing. Can you repeat
13  the question? Sorry.
14      Q.  Well, you stated that, when I read back your
15  answer, you wanted to correct it somehow or change it
16  somehow, and I want to know, what about the answer do
17  you want to change?
18          MS. RAFEL:  Objection. He didn't say he
19  was going to change it in any way. You're asking him
20  to --
21          MR. MEAGHER:  Excuse me, is that an
22  objection to form?
23          MS. RAFEL:  It's an objection as I'm
24  making it.
25          MR. MEAGHER:  Well, you know, again, we

Page 762

1   have rules that we all agreed to follow, objection to
2   form.
3           Question, do you know what -- I'm reading you
4   the question and answer.
5           THE WITNESS:  Thank you.
6   BY MR. MEAGHER:
7       Q.  Question, do you -- well, again, this is a
8   rough transcript, so it's a -- it hasn't been cleaned
9   up, and in all fairness to the reporter, that's
10  understandable. Do you have any facts relating to the
11  case of Randall Chapman, any knowledge? Answer, any
12  knowledge, unless I saw the file, I, I don't know. All
13  I know is that it was dealt with the same way as it was
14  probably dealt with in Chattanooga, that's all I know,
15  I don't know anything about the individual file.
16          MS. RAFEL:  And what's the question?
17  BY MR. MEAGHER:
18      Q.  The question was he said, the -- probably
19  should be, probably should be in a different place, and
20  I want to know where.
21      A.  To try to help you understand, it's that I
22  only knew how the system would deal with an individual
23  file. What those actual claim people actually did, I
24  presume they did what the company asked them to do, so
25  that's what I meant, that they do what the company had

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (800) 342-5490



Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. II

CV00-08297
9/5/2002

Page 763

1  asked them to do. The actual individual, what the
2  doctor's opinion was who looked at it or what the
3  claims person really felt about it, I wouldn't have any
4  idea.
5      Q.  Or what the claims person actually did, you
6  would have no idea, correct?
7      A.  Not -- only to the extent of what the
8  claimant usually did with those.
9      Q.  Based upon what you saw in the general
10  medical division that you worked in, correct?
11         MS. RAFEL:  Object to the form.
12         THE WITNESS:  Based on what I saw was
13  done in the general medical unit, the orthopedic unit,
14  the psychiatric unit, that I used to interact with.
15  BY MR. MEAGHER:
16     Q.  How long did you work in the psychiatric
17  unit?
18     A.  No, I -- we were encouraged to talk to the
19  psychiatrists and psychologists, so I would -- in the
20  process of referring, when they wanted neuropsychs to
21  be done, in psychiatry I would talk to Michelle, well,
22  the names fail me yet again, but Michelle, who was the
23  coordinator there who would refer them into the
24  psychologist, I would talk to her, I was supposed to
25  talk to her first before I could talk to the physician.

Page 764

1  So then I talked to her and then she said, yes, you can
2  talk to the physician. So then I would go talk to the
3  physician. Sometimes I would just go talk to the
4  physician anyway.
5      Q.  Which customer care specialist assigned to
6  that impairment unit did you deal with, specifically
7  psychiatric, if any?
8      A.  How do you mean, when I would want to
9  talk --
10     Q.  You said you went to talk to a doctor.
11     A.  Yes.
12     Q.  I'm not talking about doctors. The claims
13  people that were dealing with psychiatric cases, name
14  those for me in Chattanooga.
15        MS. RAFEL:  Objection to the form,
16  complex question. Could you simplify it?
17        MR. MEAGHER:  I'll repeat it.
18        MS. RAFEL:  You've got three things
19  going on there.
20        MR. MEAGHER:  I'll repeat it. I don't
21  know if it's any simpler.
22  BY MR. MEAGHER:
23     Q.  My question is, name for me, sir, when you
24  worked in general med the customer care specialists
25  assigned to the psychiatric impairment unit?

Page 765

1         MS. RAFEL:  Thank you.
2         THE WITNESS:  I met two guys once, and
3  their names escape me yet again. But I, again, I know
4  what they look like, and we -- on a few occasions I
5  spoke to them.
6  BY MR. MEAGHER:
7      Q.  Can you name me the customer care specialists
8  who were employed in Chattanooga where you were working
9  in the orthopedic section?
10     A.  All the clinical -- all the specialists in
11  the orthopedic section?
12     Q.  No, no. The customer care specialists, name
13  as many as you know in orthopedic while you were
14  working there.
15     A.  I know some of the nurses there.
16     Q.  Not the nurses. I'm asking for customer care
17  specialists, CCSs.
18     A.  Yes. Louise Ponds, I believe was.
19     Q.  Ponds. Any others?
20     A.  A lady who came to me once, but as I say, my
21  -- I don't have an exhaustive memory as regards
22  people's names and I can't remember this short lady's
23  name. And Louise --
24     Q.  How about -- sorry, are you done?
25     A.  Yes.

Page 766

1      Q.  How about the customer care specialists
2  related to the cancer impairment unit that was set up,
3  who were they? In Chattanooga only I'm asking you.
4      A.  Yes, I knew some of them because my team, gen
5  med, also did some cancer.
6      Q.  Who were the cancer CCSs when you worked
7  there?
8      A.  I knew the nurses.
9      Q.  No, no, no. I'm asking you about the CCSs,
10  sir. Who were the CCSs assigned to the cancer
11  impairment unit in Chattanooga, the physical location
12  where you worked?
13     A.  There was a guy called Jonathan Malek. I'm
14  not sure exactly where he was. We would see their
15  names very often, but, you know, it wouldn't connect a
16  name to a face.
17     Q.  And if I asked you the name of any customer
18  care specialist in the Worcester office, would you know
19  it?
20        MS. RAFEL:  At what point in time?
21  Object to the form.
22  BY MR. MEAGHER:
23     Q.  Let me ask him first, would you know it as
24  you sit here today?
25        MS. RAFEL:  Objection to the form.

100 (Pages 763 to 766)

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. II

CV00-08297
9/5/2002

Page 767

1    THE WITNESS:  Would I know the customer
2 service names as I sit heard today?
3 BY MR. MEAGHER:
4    Q.  Yes.
5    A.  No.  I never met any of them.  I don't think
6 I even -- I believe actually I spoke to one customer
7 care person once, I think, but again, no, I couldn't
8 remember their names.
9    Q.  How about if I asked you that same question
10 with regard to Portland customer care specialists,
11 could you identify any of them for me?
12    MS. RAFEL:  Objection to form.
13    THE WITNESS:  Probably not.
14 BY MR. MEAGHER:
15    Q.  Are there customer care specialists in
16 Glendale?
17    A.  Yes.  They are one of the four large customer
18 care centers.
19    Q.  Can you name any of them for me?
20    A.  No.
21    Q.  Can you tell me all you know about the
22 Catherine Kelly case that you're here being deposed on
23 today?
24    MS. RAFEL:  Objection to the form.  The
25 order prohibits that.

Page 768

1 BY MR. MEAGHER:
2    Q.  You can go ahead and answer the question.
3    A.  Could I tell you everything I know about
4 Catherine Kelly?
5    Q.  The Catherine Kelly case which you're being
6 deposed on as one of the six consolidated depositions.
7    A.  Again, I only know about the way these files
8 were dealt with, I don't know about the individual
9 claimants, only right I don't know, because I didn't
10 review the file.
11    Q.  What does DMS stand for?
12    A.  I think that was the older term for the
13 nurse, DMS.  Durable medical supplies it can be also.
14    Q.  Durable medical supplies?
15    A.  Yeah.  It can be that sometimes.
16    Q.  Does it mean anything else, that you know of?
17    A.  DMS?
18    Q.  DMS.
19    A.  DMS.  There's a computer terminology, too.
20 No, I don't know all the different meanings of DMS, no,
21 because there are probably quite a few.  I don't like
22 abbreviations, they don't really -- people just assume
23 that you know what the abbreviation means and a lot of
24 times you don't.  I prefer if people, you know,
25 dispense with the abbreviations and put down what it

Page 769

1 actually is.
2    Q.  Have you ever heard of a company called
3 Disability Management Services?
4    A.  Yes.
5    Q.  Where are they located?
6    A.  I did come across one of the reviews.  They
7 are located, I think -- they -- I think they did an
8 IME for the claimant, and that's why I remember them,
9 because I think that the claimant asked them to do it
10 and I thought this was kind of unique, because mostly
11 there was nobody for the claimants who could do an IME,
12 they were all off the panel, the IME panel for
13 UnumProvident or BlueCross, so it was an unusual idea,
14 so I looked through this file and I saw their review
15 and I thought it was quite a good review.
16    Q.  So Disability Management Services did an IME
17 at the request of a claimant in a file that you saw,
18 correct?
19    A.  I think that's -- wait --
20    Q.  It was an excellent review.
21    MS. RAFEL:  Objection to the form.
22    THE WITNESS:  Again, I can't say.  I
23 remember looking at it and thinking it was unusual, but
24 I don't remember whether it was excellent or not.  I
25 thought -- I think it was done by a physical therapist

Page 770

1 or -- I have no -- you know, that's what my memory is
2 of it.
3 BY MR. MEAGHER:
4    Q.  Tell me everything you know, if anything,
5 about the claim of Roberts Ligorsky, one of the six
6 depositions you're here on today.
7    MS. RAFEL:  Objection to the form.
8    MR. RUBIN:  Objection to the form.
9    THE WITNESS:  Sorry, could you repeat
10 the question?
11 BY MR. MEAGHER:
12    Q.  Yes.  Can you describe for me or state for me
13 all of your knowledge regarding the case of Robert
14 Ligorsky, one of the six depositions we're here on.
15    MR. RUBIN:  Objection to form.
16    THE WITNESS:  It's the same.  I don't
17 know the individual aspects of their case, who did the
18 IMEs, who did the review, any of that type of thing.
19 BY MR. MEAGHER:
20    Q.  At any time during the ten hours that you
21 described meeting with the plaintiffs' lawyers on these
22 various cases, were you ever made aware of any reason
23 why they were not telling you the facts of their case?
24    MS. RAFEL:  Objection to the form.
25    THE WITNESS:  No.

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (800) 342-5490

Case 1:01-cv-01157-CCC   Document 71   Filed 10/31/2002   Page 35 of 49

Randall Chapman, et al. vs. Unumprovident Corporation, et al.          CV00-08297
Patrick Fergal McSharry, Vol. III                                      9/6/2002

**Page 839**

1  back. And thank you, counsel, for recalling me.
2      BY MR. MEAGHER:
3      Q.  I had asked you specifically which of the
4  doctors that you worked with in general medical, that
5  is, Dr. Vott, Dr. Cruthers, Dr. Hill, Dr. Horn, Dr.
6  Jacobs, and Dr. Vergo, which of those doctors, if any,
7  changed their medical opinions in order to support the
8  denial of a claim?
9      MS. RAFEL:  Objection, asked and
10  answered.
11      THE WITNESS:  You've given me some time
12  for reflection so I can give you --
13      BY MR. MEAGHER:
14      Q.  I've given you time to talk to your lawyer.
15      A.  To talk to my lawyer so I can think about
16  what you meant by that question. I would see it break
17  into three categories, if you'll allow me to do that.
18      Q.  Answer the question, sir, however way you
19  want to answer it. I want names. You give me
20  categories with names.
21      A.  Okay. There were people who would just do
22  what the company wanted them to do. They would just
23  give the opinion that they were asked to do, you know,
24  after the pressure. Initially they may have started off
25  just giving their true opinions, and then they just gave

**Page 840**

1  up. And Nancy Beecher was definitely one of those. She
2  just said it to me, you know, she's not able to carry on
3  this fight. Nancy was one.
4      Angela may have done it towards the end
5  where --
6      Q.  This is Angela Beckles Dennis?
7      A.  Angela Beckles Dennis, yeah, where she just
8  gave up also. Dr. Hashaway also -- Hathaway, sorry --
9  Hashaway is -- Dr. Tom Hashaway also said to me that he
10  would just agree with the nurse.
11      Q.  Was he one of the names I gave you as a
12  person you worked with?
13      MR. BURNETTE:  You were asking him gen
14  med, and he's telling you the folks in gen med.
15      A.  No, no, this was one of the doctors in
16  cardiology who --
17      BY MR. MEAGHER:
18      Q.  Well, let's stick with gen med. And I'll go
19  to other areas. We have Nancy Beecher, you think maybe
20  Angela Beckles Dennis, and these are people who changed
21  their medical opinions in order to support a denial,
22  correct?
23      MR. BURNETTE:  Excuse me, counselor, he
24  broke it down into three categories, and you've
25  interrupted him. And he's begun giving you the first

**Page 841**

1  category of that. And those are the people that did
2  what the company wanted was his answer.
3      If you'll let him finish the categories,
4  perhaps he can then put the names with the categories.
5      BY MR. MEAGHER:
6      Q.  Finish your attorney's categories.
7      MR. BURNETTE:  Excuse me, that's what
8  you asked him to do if you'll read back your questions.
9  You said go ahead and give the categories and the names
10  that fit in the categories.
11      BY MR. MEAGHER:
12      Q.  Answer the question, please.
13      A.  Starting -- unfortunately I sometimes have
14  to go right back to the beginning. The people who
15  either eventually are -- from the get go want to do just
16  what the company asked them to do were Dr. Angela
17  Beckles Dennis, Dr. Nancy Beecher, Dr. Larry Cruthers
18  in gen medicine.
19      MR. BURNETTE:  What's the next
20  category?
21      THE WITNESS:  You didn't ask me about
22  contracted physicians, so I'm not --
23      BY MR. MEAGHER:
24      Q.  Go ahead with contracted physicians in gen
25  med.

**Page 842**

1      MS. RAFEL:  What's the question,
2  counsel?
3      MR. MEAGHER:  He knows what the
4  question is, it's clear on the record. He asked for
5  clarification, I gave it to him --
6      THE WITNESS:  I meant my category of
7  people who eventually initially even from the get go are
8  quite conducive to doing what the company wanted them to
9  do. And contracted physicians, Dr.  -- no, I will
10  say that -- I'll move on to my second category, which is
11  people who really didn't want to just give in to the
12  company.
13      BY MR. MEAGHER:
14      Q.  Is that because there are no consultants --
15  I want you to stay organized. Is that because there are
16  no consultants who fit into category one?
17      A.  I'm debating in my mind as to one of the
18  consultants, if they really said one thing and did
19  another thing; in other words, they just went along with
20  what the company wanted them to do, but were saying to
21  me that they were  -- oh, yes, they totally agreed with
22  what I was saying, which was that we shouldn't change
23  our opinions, we shouldn't be influenced so highly by
24  the claims people; so somebody who ostensibly said to me
25  that they were, but actually did really go by their

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (800) 342-5490

Randall Chapman, et al. vs. Unumprovident Corporation, et al.                    CV00-08297
Patrick Fergal McSharry, Vol. III                                                9/6/2002

**Page 843**

1  opinion. I'm just not sure about this person as to
2  which category they would fit into.
3      Q.   Okay. Who is this person?
4      A.   This is Carol Curtis.
5      Q.   Carol Curtis?
6      A.   Uh-huh.
7      Q.   I believe you were going to category two
8  now.
9      A.   Yes.
10     Q.   What is your category two?
11     A.   Category two is the people who tried to do
12 what the company wanted, but also tried to maintain
13 their dignity and their -- and get some of their
14 opinion across, try to a certain extent to tie the
15 claims professionals' hands in a subtle, very clever
16 medical way.
17     Q.   Who are they?
18     A.   They would be Dr. Steve Fagan, who's a
19 consultant, independent consultant, and Dr. Tanya Horn.
20 Now, this is all my opinion.
21     Q.   Oh, I understand that, Doctor.
22     A.   Yes, from talking with these folks and
23 working out the dilemmas we all faced. And Dr. --
24 could you remind me of the names again?
25     Q.   We had Vott, Cruthers, Hill, Horne, Jacobs,

**Page 844**

1  Vergo. And then the consultants were Bielawski, B I E L
2  A W S K I --
3      A.   No, he wasn't there.
4      Q.   -- Curtis Fagan and Sentef, S E N T E F.
5      A.   Mr. Sentef, yes. I forgot Dr. Sentef.
6  Bielawski I don't think was there when I was there. He
7  probably took my job, or I don't know what. But --
8  okay, so of course Dr. Vott as per my previous testimony
9  I believe is totally the company person.
10     Q.   What category is he in? Category two you're
11 on.
12     A.   He's in the most egregious. Not personally,
13 but he didn't do medical reviews s o -- but to me what he
14 did was worse in that he would just do totally the
15 company's bidding and not understand our dilemma at all.
16 It was like the difference between me and the practicing
17 physician, that he was telling me, the practicing -- the
18 person who was doing the reviews, how to do them, and he
19 had no conscience about the position I was in at all.
20     Q.   You were on category two. Have you finished
21 --
22     A.   I would put Dr. Vott in category one,
23 though.
24     Q.   Okay. And have you finished naming all the
25 doctors that you've put in what you've described as your

**Page 845**

1  category two?
2      A.   No.
3      Q.   Please continue.
4      A.   Please read out the names of the employees
5  employed.
6          MR. BURNETTE: Here, why don't you sort
7  of write them down as you go and that will help you,
8  because it's hard to remember those names as you go
9  down.
10         MR. MEAGHER: What are we doing?
11         MR. BURNETTE: He's writing down the
12 names so that he doesn't have to keep asking you each
13 time for their names to figure out which categories they
14 go in.
15 BY MR. MEAGHER:
16     Q.   Well, let me ask you this: Without me
17 telling the names, all right, what do you recall? I
18 mean, these are the doctors that were violating your
19 sense of honesty. Do you recall their names without me
20 telling them to you?
21         MS. RAFEL: Objection to the form.
22         THE WITNESS: Sorry, I told you I
23 remember things pictorially. People have called me a
24 paper person. I remember things written down. That's
25 how I succeed in passing examinations is I remember

**Page 846**

1  without seeing. So if you could give me the names --
2  BY MR. MEAGHER:
3      Q.   No, I want your recollection first and then
4  we'll try it with the names. I want to know what you
5  remember, Doctor. Tell me, Doctor, which of these
6  consultants that you worked with for 13 months were in
7  these categories.
8          MR. BURNETTE: Objection to the form.
9  Ask him just one little question.
10         THE WITNESS: The consultants, I
11 thought we were talking about employees and consultants.
12 BY MR. MEAGHER:
13     Q.   Name them. You're right. Name them,
14 please.
15         MS. RAFEL: Objection to the form.
16         MR. BURNETTE: Are you asking him to
17 name the consultants and the doctors?
18         MR. MEAGHER: My question is clear.
19 Don't --
20         MR. BURNETTE: No, it's not clear.
21         MR. MEAGHER: Let me repeat it then if it's
22 really not clear to you.
23 BY MR. MEAGHER:
24     Q.   My question is, I want to know the basis of
25 your allegation that medical doctors that you worked

16 (Pages 843 to 846)

Case 1:01-cv-01157-CCC    Document 71    Filed 10/31/2002    Page 37 of 49

Randy Chapman, et al. vs. Unumprovident Corporation, et al.                    CV00-08297
Patrick Fergal McSharry, Vol. III                                              9/6/2002

Page 847

1  with in Chattanooga for the 13 months or so that you
2  were employed there changed their medical opinions in
3  order to support the denial of a claim. You remember
4  that question, I've asked it three times, correct?
5        MS. RAFEL: Objection to the form.
6        THE WITNESS: I do remember that
7  question, and you have asked it three times.
8        BY MR. MEAGHER:
9     Q.  Please tell me your answer to that question,
10  Dr. McSharry.
11        MS. RAFEL: Objection to the form.
12        THE WITNESS: I was in the process of
13  doing that.
14        BY MR. MEAGHER:
15     Q.  Go ahead.
16     A.  Thank you. Number two category, which I was
17  hoping for some assistance, some reminders, but the
18  second category -- I'm trying to be inclusive and
19  that's why -- I'm trying not to leave anybody out. The
20  new doctor, Dr. Hill, very much was at the kind of
21  naive stage initially where he didn't understand what I
22  was -- what we were all talking about about the
23  relationship of the claims professionals and not and,
24  you know, looked at things in a military style.
25        So in talking with him, I think he felt his

Page 848

1  military training was very important just to obey
2  orders, and so I would put him in the first category,
3  that he would just do what his boss asked him to do.
4  But I don't know that because I didn't know him well
5  enough, I only met him for a month. I don't know what
6  way he turned out.
7     Q.  Anyone else in response to my question?
8     A.  I'm trying to remember who else I worked
9  with as a group, and I'm trying to remember who was
10  working in the gen med area with me because I also, as I
11  said, worked with doctors right across the Chattanooga
12  medical department.
13        You didn't include Dr. Anfield because --
14  yeah, because he's not in gen med, he's --
15     Q.  Are you done with gen med, because we'll
16  expand the question?
17     A.  No, I'm not. So then the people who really
18  -- did I put Dr. Steve Fagan in the second category?
19     Q.  Is he in the second category?
20     A.  He's in the second category.
21     Q.  All right. Anyone else?
22     A.  Well, we talked about Dr. Curtis being in
23  either. I'm just trying to remember. There's a --
24  yes, Dr. Susie Vergo would be in the second category,
25  where she struggled trying to keep Dr. Vott happy and

Page 849

1  the business partners and, yes, give a true opinion.
2  She struggled a lot with that, and he would give her a
3  fifth or sixth review. She felt that this wasn't
4  totally what insurance medicine was about, and so she
5  was still debating in her own mind and so, you know, I
6  said, just give your opinion, and she said, well, you
7  know, I don't want these people giving me the kind of
8  hassle that you get, or I don't want to be in the
9  situation that the person who was in this office before
10  me, Angela Beckles Dennis, was in, so I'm going to try
11  to wing it. So she would be in that second category.
12     Q.  Anyone else in your categories?
13     A.  And the third category then is the people
14  who just would not change their opinion.
15     Q.  Who were they?
16     A.  And we all did it at one time, but who
17  generally held the philosophy that we wouldn't change
18  their opinion, I am in that category. I did change one
19  or two of my opinions to please Dr. Vott. I feel very
20  bad about it still because I don't know what happened to
21  that person, but -- and the other person in that
22  category would be Dr. Jacob Martin. I really believe
23  he didn't -- he was as obstinate as me and wouldn't
24  change his opinion.
25     Q.  Anyone else in your category one?

Page 850

1     A.  Category one or category three? We're on
2  three now.
3     Q.  Whichever. This last category.
4        MS. RAFEL: Objection to the form.
5        BY MR. MEAGHER:
6     Q.  The last category you described.
7     A.  Do I have to repeat the question, sir?
8     Q.  You're on your category. What I'm asking
9  you is is there anyone else --
10     A.  I'm on category three.
11     Q.  It's you and Dr. Martin?
12     A.  In category three.
13     Q.  And what else?
14        MR. BURNETTE: Who wouldn't change
15  their minds.
16        THE WITNESS: People who wouldn't
17  change their minds, but may have once or twice given in.
18  You know, that's my opinion.
19        BY MR. MEAGHER:
20     Q.  Can you recall anyone else in that category?
21     A.  I can't recall who else was in my group, so
22  I don't know if I've left somebody out. And I think
23  most people would fit into one of those three
24  categories.
25     Q.  Let's expand the question to any other

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. III

Page 911

1          BY MR. MEAGHER:
2      Q.   Yes.
3      A.   No.
4      Q.   Are you aware that for those few claims
5   which received a ruling by a court last year, the courts
6   ruled in favor of UnumProvident's position more than 80
7   percent of the time?
8          MR. JACOBS: Objection to form.
9          MR. BURNETTE: Also objection. Judge
10   Carter asked you to ask the witness about things about
11   which he knew something.
12          MR. MEAGHER: I want to know if he
13   knows.
14          MR. BURNETTE: Then you might just ask
15   him do you know any percentages of so and so and such
16   and such, and that way you wouldn't have to be wasting
17   all your time.
18          MR. MEAGHER: I'm going to make up my
19   questions. Thank you, sir.
20          MR. JACOBS: He wants to get the
21   company propaganda into the record.
22          MR. MEAGHER: If you consider facts
23   propaganda, Mr. Jacobs, that's great. Words are cheap.
24          MR. BURNETTE: If the witness doesn't
25   know what they are, then it becomes propaganda.

Page 912

1          THE WITNESS: What you're recalling is --
2          MR. MEAGHER: Excuse me, there's no
3   question pending.
4          THE WITNESS: There was a question
5   pending.
6          BY MR. MEAGHER:
7      Q.   Is it part of UnumProvident's story -- let
8   me start again. This story that you've described, in
9   your opinion, is it part of UnumProvident's story that
10   judgments against UnumProvident represented seven
11   one-thousandths of 1 percent of new claim s?
12          MR. JACOBS: Objection to form.
13          THE WITNESS: Judgments against?
14          BY MR. MEAGHER:
15      Q.   Yes.
16          MR. BURNETTE: Do you know any
17   statistics like those?
18          BY MR. MEAGHER:
19      Q.   No, that's not my question. I asked you
20   that specific question, sir. Please answer it.
21          MR. BURNETTE: Do you know any
22   statistics like those to comply with Judge Carter's
23   thing? Do you know any statistics --
24          MR. MEAGHER: Counsel, I object to you
25   turning that to a new question.

Page 913

1          MR. JACOBS: You are violating the
2   order. He told you not to do that, specifically stated
3   it.
4          BY MR. MEAGHER:
5      Q.   Okay. Go ahead and answer my question,
6   please.
7      A.   This is I believe possibly a quote from
8   UnumProvident's marketing literature, and as such, I
9   believe that you are quoting directly from it. I'm
10   unaware of those numbers.
11      Q.   You were walked out from your job at
12   UnumProvident by security, correct?
13      A.   Yes.
14      Q.   Similar to the walk-out by security at Blue
15   Cross/Blue Shield, correct?
16      A.   That is the way that  -- the reason there
17   is, that companies always are concerned when they  --
18          MR. BURNETTE: Just answer whether it's
19   yes or no.
20          THE WITNESS: Yes.
21          BY MR. MEAGHER:
22      Q.   Were you unclear, as you stated you were,
23   about Blue Cross' situation, were you unclear as to
24   whether you resigned or were terminated from
25   UnumProvident?

Page 914

1          MR. JACOBS: Objection to form.
2          THE WITNESS: No, it was very clear.
3          MR. MEAGHER: Let's go off the record
4   and take a break.
5          THE VIDEOGRAPHER: We're off the record
6   at 11:09.
7          (Brief recess).
8          THE VIDEOGRAPHER: We're on the record
9   at 11:29.
10   BY MR. MEAGHER:
11      Q.   Dr. McSharry, I'm handing you what I've
12   marked as Defendants' Exhibit 123 to your deposition.
13   Can you identify this document?
14          MR. BURNETTE: Do you have an extra
15   one?
16          MR. MEAGHER: I do, I'm just trying
17   --
18          MR. BURNETTE: I understand.
19          BY MR. MEAGHER:
20      Q.   Can you identify this document as being one
21   of the documents that you copied and took from
22   UnumProvident, a clinical review request?
23      A.   This is a copy of a review that I did.
24      Q.   And up in your handwriting you write,
25   another where doctor shopping. Did I read that

33 (Pages 911 to 914)

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. III

CV00-08297
9/6/2002

Page 915

1  correctly?
2      A.  You did, and it's in quotation marks.
3      Q.  Why don't you read that handwriting for me,
4  please.
5      A.  Another where, start quotation mark, doctor
6  shopping, end quotation mark, though not official
7  company policy and leads to a certain outcome.
8      Q.  And then at the bottom there is some more
9  handwriting.  Could you read that for the record,
10  please?
11     A.  Yes.  Had walk-in with Nancy.  I was
12  available all week.  Walk-in not requested.
13     Q.  Do you recall this particular claim, and
14  we'll call it Mr. J's claim, J as in something that
15  begins with J, well, I'm afraid to use a name, so
16  Mr. J's claim, do you recall this coming up in a round
17  table situation?
18     A.  I believe this one came up in a mini round
19  table, yes.
20     Q.  And let me hand you what we've marked as
21  Defendants' Exhibit Number 124 to this deposition, which
22  is a supplemental statement of claim for Mr. J's case.
23  Do you recall --
24         MR. LEVINSON:  Can you hang on for just
25  a minute?  This is labeled Bates stamp DBJ 00071 at the

Page 916

1  bottom, is that right?
2          MR. MEAGHER:  Yes.
3          MR. LEVINSON:  I'm going object to the
4  use of any of these documents.  As you know, we have an
5  order to provide --
6          MR. MEAGHER:  Is this going to take a
7  long time because I want to get off the video record if
8  you're going to make some long objection.
9          MR. JACOBS:  We want to make it on the
10  record.
11         MR. MEAGHER:  Could you turn the video
12  off, please, it's not my time here.
13         THE VIDEOGRAPHER:  Sure.  Off the
14  record at 11:32.
15         MR. LEVINSON:  We have an order to
16  produce all of the documents relating to Mr. McSharry's
17  performance.  You advised us that you have 50 to 100
18  claim files that you say reflect this information.
19  We've been here now for almost three days, we've
20  received one claim file, and you are now apparently
21  seeking to ask the witness information regarding another
22  claim file and have produced apparently a document from
23  a claim file.
24         This appears to be a claimant's supplemental
25  statement, and I object to any questioning of this

Page 917

1  witness without previously producing the entire claim
2  file to us, as is required by the Court order.
3          And I will move to strike and preclude the
4  admission of any such evidence regarding any testimony
5  of this witness regarding any claim file that you had an
6  obligation to provide us and have not done so.
7          MR. JACOBS:  I join.
8          MR. MEAGHER:  Well, the order you refer
9  to, Mr. Levinson, is solely in the Chapman case,
10  correct?
11         MR. LEVINSON:  Yes, and I'm here on the
12  Chapman case.
13         MR. MEAGHER:  I understand.  I'm making
14  sure that when Mr. Jacobs and his case joins in here,
15  we don't really know what that means.
16         MR. JACOBS:  I'll tell you what it
17  means.  It means that I was relying upon the fact that
18  he had obtained that order and didn't seek to obtain any
19  order as a result.  And that was supposed to be produced
20  for the purposes of this deposition.
21         MR. LEVINSON:  And I would also like to
22  point out that on document MCS 0660, which I believe is
23  Exhibit 123, you have redacted the claim  -- the claim
24  file number, which is not confidential in any way, shape
25  or form, and in fact --

Page 918

1          MR. MEAGHER:  We'll be glad to provide
2  that.  We can work that out.  Certainly if we did an
3  overredaction of a claim file number that was
4  inadvertent, we'll be glad to provide that information.
5          MR. SHEA:  I think the issue there is
6  in certain cases the claim file number is identical to
7  the Social Security number.  But if you want us to tell
8  you the Social Security number --
9          THE WITNESS:  That's not true.
10  Sometimes it is and sometimes it's not.
11         MR. DARRAS:  All we care about --
12         THE WITNESS:  Sorry.
13         MR. BURNETTE:  Don't get involved.
14         THE WITNESS:  Sorry.  I'm just too
15  nosey.
16         MR. BURNETTE:  All right.  The one with
17  the DBJ is the 124 and the one that is the 660 is the
18  123?
19         MR. MEAGHER:  Now I'm confused.  You've
20  got them right there.  Let's take a look.
21         Defendants' Exhibit Number 124 is a
22  composite exhibit that is marked Bates Number DBJ 00071.
23         MR. BURNETTE:  Okay.
24         MR. MEAGHER:  And Defendants' Exhibit
25  123 is a composite exhibit marked Bates Number MCS 0660.

34 (Pages 915 to 918)

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. III

CV00-08297
9/6/2002

Page 919

1    MR. BURNETTE: That's what I had said.
2    MR. MEAGHER: Okay.
3    MR. LEVINSON: And what does the DBJ
4  stand for.
5    MR. MEAGHER: That's just the Bates
6  number.
7    MR. LEVINSON: What does the DBJ stand
8  for? --
9    MR. MEAGHER: I don't think I'm being
10  deposed here.
11    Let's go back on the record, please.
12    MR. LEVINSON: Well, I believe this
13  entire claim file is available, and I believe DBJ stands
14  for an identification of the claim file, and you've
15  refused to produce it pursuant to the Court order and
16  you're intentionally examining this witness without
17  producing the document as required by the Court order.
18    MR. MEAGHER: You have made your
19  motion. I would like to continue with the deposition,
20  please.
21    THE VIDEOGRAPHER: We're on the video
22  record at 11:35.
23    BY MR. MEAGHER:
24    Q. You recall -- well, taking a look at
25  Defendants' Exhibit 124, these are the types of

Page 920

1  documents that are available for review at round tables,
2  correct?
3    MR. BURNETTE: 124 you're asking about?
4    MR. MEAGHER: Yes, Defendants' Exhibit
5  124, which is the claimant's supplemental statement of
6  Mr. J dated June 16, 2001.
7    THE WITNESS: Well, I don't know if
8  they are available or not. Usually the claim
9  representative just quotes from the documents, whether
10  it be the claim file and what I said -- I mean, the
11  medical aspects of the claim file, or whether it be from
12  one of these claimant statements.
13    BY MR. MEAGHER:
14    Q. And at times you testified that surveillance
15  was shown at many round tables, correct?
16    A. Once or twice I remember surveillance being
17  shown.
18    Q. And in fact, surveillance was shown with
19  regard to this -- Mr. J's claim, and you strongly and
20  vehemently disagreed with the claims consultant's, the
21  customer care specialist's, thoughts on the tape, is
22  that correct?
23    A. Well, she was saying this person was
24  fraudulent, and I said, I don't think that's your
25  decision to make. And she said, well, we believe it's

Page 921

1  fraudulent. We believe we are going to send it to the
2  special fraud unit. I think this is the one. I mean,
3  as I said before, I discussed hundreds and hundreds of
4  cases.
5    MR. BURNETTE: Well, read them and see
6  if it's this one.
7    MR. LEVINSON: Well, I think we also
8  need to object again on the grounds that the entire
9  claim file has not been made available to us and is not
10  available to the witness to review everything in that
11  claim file that would permit him to determine whether
12  this refreshes his recollection or not. You are
13  intentionally providing him limited documents.
14    MR. MEAGHER: Well, that's what
15  redirect is for, and I also know that's a speaking
16  objection.
17    MR. LEVINSON: It's hard to redirect
18  him when you haven't produced the file to us.
19    MR. JACOBS: And you are talking about
20  surveillance, and you haven't produced the film.
21    MR. MEAGHER: Are you counsel done?
22    MR. BURNETTE: I have but one comment.
23  I do note that the documents that you have supplied are
24  obviously incomplete because, for example, they begin
25  with number three, and the last time I checked there was

Page 922

1  a one and a two that have to come before three, so you
2  can tell that --
3    MR. MEAGHER: Mr. Burnette --
4    MR. BURNETTE: -- it's not a full --
5  even the piece of paper you're giving is not correct.
6    MR. MEAGHER: You know, I hate to do
7  this to you on the record, but if you'll take a look at
8  question three, you'll see it's referenced, see
9  attached, and that is why page three begins with answer
10  three. Do you see that?
11    MR. BURNETTE: If you tell me that's
12  the case. If that's your testimony.
13    MR. MEAGHER: Are you going to withdraw
14  your comment now that you've had a chance to look at the
15  document and understand it better?
16    MR. BURNETTE: I would be glad to have
17  you explain it to me. You're most kind in that regard.
18    MR. MEAGHER: Now, if we're all done
19  with our objections -- could you just press that button,
20  please, the video monitor button right there.
21    THE WITNESS: (Witness complies).
22    BY MR. MEAGHER:
23    Q. Dr. McSharry, I am showing you a video of
24  surveillance performed in this case, and I wanted to ask
25  you after reviewing this video whether you believe it

35 (Pages 919 to 922)

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. III

CV00-08297
9/6/2002

Page 939

1    BY MR. MEAGHER:
2        Q.   Do you recall that, and I'm referencing a
3    portion of the supplemental claim form dated in June,
4    2001, that --
5            MR. BURNETTE:  Which number is that?
6            MR. MEAGHER:  DBJ 00 --
7            MR. BURNETTE:  Yeah, but that exhibit
8    number is?
9            MR. MEAGHER:  124.
10           MR. BURNETTE:  124, okay.  73 is the
11   Bates.
12       BY MR. MEAGHER:
13       Q.   That as part of the statement in there as of
14   June, 2001, and I'm referring to personal needs and
15   grooming, do you see --
16           MR. BURNETTE:  What page are you on?
17           MR. MEAGHER:  Page 73, at the last bottom
18   portion, personal needs and grooming, the claimant puts
19   in there, however, he often lies down during  -- I'm
20   sorry, the name, Mr. J, can care for his personal needs
21   without assistance if he has adequate time; however, he
22   often lies down during this, e.g., shaves, then lies
23   down, takes a shower, then lies down, gets dressed, then
24   lies down, close quote.
25           Did I read that correctly?

Page 940

1        A.   You did.
2        Q.   Would you agree that the videotape showed
3    him putting in a dock?
4            MR. LEVINSON:  Objection to form.
5            THE WITNESS:  Do you mean the --
6        BY MR. MEAGHER:
7        Q.   The video you just looked at.
8        A.   The video that I watched the whole portion
9    of it?
10       Q.   Yeah, did that show him putting in a dock?
11       A.   It showed him helping, he and his younger
12   friend or family member.
13           MR. LEVINSON:  As I understand it, you
14   are representing that the person on the videotape is the
15   same person that's identified in this document DBJ 0073,
16   is that right?
17           MR. MEAGHER:  Correct.
18           MR. LEVINSON:  We have no evidence of that
19   at this point except your representation.
20       BY MR. MEAGHER:
21       Q.   Can you answer my question, please?
22           MR. BURNETTE:  Do you remember the
23   question he asked you because I've already forgotten it?
24           MR. MEAGHER:  Since counsel forgot, let me
25   repeat it.

Page 941

1    BY MR. MEAGHER:
2        Q.   The videotape showed the claimant or an
3    individual that I represent as the claimant putting in a
4    dock in a lake, right?
5        A.   Assisting  -- there was two people
6    involved, and both were putting in the dock.
7        Q.   Was one person doing more than the other,
8    Doctor?
9        A.   Yeah, one person appeared to be the junior
10   and was just bringing to and fro things like I used to
11   do with my dad, and the other was doing a lot of the
12   nonmessenger type duties, putting in -- yeah.
13       Q.   Who was in the water, one person or two
14   people?
15       A.   The older person was in the water.
16       Q.   And with regard to you saw him --
17       A.   The older or the bigger person.
18       Q.   Right.  You saw him jumping up and down,
19   right?
20       A.   I saw him jumping up and down.
21       Q.   Let me ask you, you have an understanding
22   that there are different provisions of disability
23   policies regarding own occupation coverage and any
24   occupation coverage?
25       A.   I am aware of that.

Page 942

1        Q.   And were you aware back at the mini round
2    table on this case that this was a claim for total
3    disability in any occupation?
4            MR. LEVINSON:  Objection to form.
5            THE WITNESS:  I don't know if I was
6    totally aware of that, no.
7        BY MR. MEAGHER:
8        Q.   Well, were you free to ask that question to
9    the claims consultant?
10           MR. LEVINSON:  Objection to form.
11           THE WITNESS:  It depends on whether you're
12   allowed to answer a question.  If you raise your voice
13   louder and interrupt somebody, because usually this
14   flows through without the doctor being asked a question.
15   So I would try, yes, I would try to ask a question.
16       BY MR. MEAGHER:
17       Q.   But this is a case where you said there
18   needed to be more information yet still, correct?
19           MR. LEVINSON:  Objection to form.
20           THE WITNESS:  No, the point was, was
21   this person fraudulent?  And I was asked to support that
22   based on a segment of that video.  I didn't see all of
23   that what you showed me today.  I believe I saw a
24   portion of around three minutes where -- the portion
25   where he was starting off under the  -- where he was

40 (Pages 939 to 942)

ROUTING:

EXHIBIT 3

## Exit Interview

✚ ⚕ BlueCross BlueShield
of Tennessee

62560

1. _____ , _____
    Supervisor          Floor

2. ☐ _____ , _____

| Complete Prior to Interview | Name of Employee<br>Patrick McSharry | | Date Leaving<br>8/10/99 | Date of Interview<br>8/10/99 | |
|---|---|---|---|---|---|
| | Job Title<br>Medical Director | | Department<br>HealthCare Services | | Cost Center<br>305 |
| | Supervisor<br>Judy Slagle | | Length of Employment<br>1 yr. 4 ½ months | ☐ Resigned ☒ Other | |

| Complete After Interview | Reason for Leaving<br>Resigned vs Termination – Unacceptable Behavior | | | |
|---|---|---|---|---|
| | Recommended for Rehire<br>☐ Yes ☒ No | Insurance Extended<br>☐ Yes ☐ No *Possibly* | ID Card Turned In<br>☒ Yes ☐ No | Proper Notice Given<br>☒ Yes ☐ No |

Remarks

Dr. McSharry chose to resign rather than be terminated for Unacceptable Behavior. He chose not to give an Exit Interview as "it would not change anything."

*Kathy Lee*

DEFENDANT'S
EXHIBIT
NO. 102
PENGAD-Bayonne, N.J.





CONFIDENTIAL

**BlueCross BlueShield of Tennessee**
An Independent Licensee of the BlueCross BlueShield Association

To: ~~File~~ *H.R.*

From: Judy Slagle

Dept: Director of Operations

Floor/Phone: 1E - 7260

Date: August 9, 1999

Subject: Patrick Fergal McSharry

CC: Steve Coulter, M.D.

---

## memorandum

I am recommending termination of employment for Patrick Fergal McSharry, M.D., based on unacceptable and disruptive behavior in the work environment. Documentation which supports my recommendation is attached.

The documentation attached includes a copy of his 1998 performance evaluation where he received a rating of 1 (out of a possible 3 points), memos outlining an official disciplinary action which occurred on May 21, 1999 and was related to a specific incident/personality conflict with a clerical employee, an email complaint to me where Dr. McSharry refused to perform a specific type of medical necessity review upon request and an inappropriate email to a peer. In addition a memo, dated June 29, 1999, is attached which outlines a conversation that Steve Coulter, M.D., and I had with Dr. McSharry related to a complaint Dr. Coulter received from a participating provider regarding a threat issued in a telephone conversation by Dr. McSharry about the physician's continued participation with BCBST.

Dr. McSharry's behavior, specifically his attitude and interpersonal relationships with coworkers and peers, has not improved. I have continued to receive complaints from all levels of staff about his negative attitude and the difficulties in working personally with him. Consequently, due to concern about continued success of the Utilization Medical Director work unit and the division I am recommending termination.

Please note that a couple of other considerations have contributed to my recommendation. First, is his availability to perform the required functions and duties of the Utilization Medical Director position. Copies of Dr. McSharry's calendar for August, as communicated by him, to his clerical, are attached. Almost daily he has indicated that he is unavailable for either the entire morning or the entire afternoon. This pattern is consistent with the calendar for the previous 30 days which outlines the availability of all physicians to perform on-line medical necessity reviews. Please note he was on vacation for a two week period during the previous 30 days. However, BCBST has allowed Dr. McSharry to attend classes related to an MBA during the work day and his calendar and measures of productivity indicate that time away is not made up.

The second consideration is productivity. Tracking of the volume of cases reviewed on-line for the first six months of 1999 indicate that Dr. McSharry has the lowest productivity among the physician reviewers and the level of productivity cannot be explained by other required activity. He has a couple of committee responsibilities and has previously performed most of the paper predetermination reviews for BlueCare (average volume is 4-6 per day). However, the committee activity and predetermination reviews are similar to responsibilities and requirements for other reviewers.

Approved: _____
Steve Coulter, M.D.
Senior Vice-President, CMO

**DEFENDANT'S EXHIBIT NO. 110**
FENGAD-Bayonne, N.J.

OK
DLB
8-9-99

12/2/98

Name PATRICK McSHERRY, MD    Recommended Increase 3 %

## Annual Performance Management Evaluation

**Point System:**

| | |
|---|---|
| Does Not Meet Expectations - | No Points |
| Meets Expectations - | 1 Point |
| Exceeds Expectations - | 2 Points |
| Far Exceeds Expectations - | 3 Points |

**Point Score:**    Points

*TRANSITION*
*EGD/COLONOSCOPY*
*APPEAL PROCESS*

**I.    Leadership (0-3 Points)**
- How well did your area of responsibility develop?
- How much did you contribute leadership to the overall team?    1.5

*INA HIGH 70's*

**II.    Financial Management (0-3 Points)**
- Effective utilization of resources
- Demonstrates high level of accountability    1

*EGD/COLONOSCOPY*
*IRR.*

**III.    Attitude (0-3 Points)**
- Toward the Plan's goals and objectives
- Toward our team concept
Spirit that favorably influences others    1

*APPEALS*
*EGD/COLONOSCOPY*
*PICTURE REVIEW*
*GREEN SPRING*

**IV.    Results (0-6 Points)** *This area counts double*
- Outcomes under your influence, direction or scope of responsibility    4

7.5

**Point Total:**
*Maximum possible points = 15*

| Total Points | Guideline Salary Adjustment* |
|---|---|
| 0-4 | 0% |
| 5-9 | 3% |
| 10-13 | 5% |
| 14-15 | 6% |

*TRANSITION*
*REVIEWS -*
*RELATIONSHIPS*
*CONTINUING EDUCATION*
*DEVIL'S ADVOCATE*

*\*Adjustments can be made based on where salary falls in range.*
*\*Adjustments can be made based on less than full year in job.*

 *Melanie Newton Holmes RN*

 **UNUM.**

## CLAIMANT'S SUPPLEMENTAL STATEMENT
Mail to: Unum, Chattanooga Customer Care Center, P.O. Box 12030, Chattanooga, TN 37401-3030
Claim Questions: 800.633.7479   Fax To: 423.755.3009

For use with policies issued by the following UnumProvident Corporation subsidiaries:
Unum Life Insurance Company of America, First Unum Life Insurance Company,
Provident Life and Accident Insurance Company, Provident Life and Casualty Insurance Company
and The Paul Revere Life Insurance Company.

The Claimant is responsible for completion of all portions of this form without expense to the UnumProvident Corporation subsidiaries.

### CLAIMANT'S STATEMENT (PLEASE PRINT)

**Your reply to _____ is appreciated and enables us to provide timely consideration of your claim.    Mail Stop:**

1. Claimant's Name (last, first, middle)    ~ian    Social Security Number ~~xxx-xx-xxxx~~

Resi   *8633 Cedar Lake Drive, Jenison MI 49428*

Home Telephone Number ( 6l6 ) 457-3638    Business Telephone Number (          )

2. Policy Number(s):   ?

3. Have you been at any of your places of business, or engaged in any work activity for payment, profit, or other compensation during your claimed period of disability?  ☐ Yes  ☒ No   If yes, please give dates, hours worked, duties performed, and indicate how you were compensated.

Weekly or Monthly Earned Income Before Taxes $        0        (please provide documentation of earnings)

If you have not returned to work, when do you expect to return to work?    Part Time:  unknown    Full Time:  unknown

How does your injury or sickness continue to impede your ability to perform your occupational duties?

*See attached*

4. When was the last date you were treated by or consulted with a medical practitioner?   6-4-01

5. Describe your present activities:

*See attached*

Other than as described above, have there been any other changes in your daily activities or your condition since your last report? ☒ Yes  ☐ No If yes, describe.
*New additional medical problem - benign thyroid nodule, being treated with thyroid medication and may need surgery - physician for this is Dr. Keith Postma, 21 Michigan NE, Suite 520, Grand Rapids MI 49503 (title) 456-7758. This is unrelated to his disabling illnesses of CFS + FMS*

6. Does your current condition prevent you from caring for yourself?  ☐ Yes  ☒ No   Does someone provide assistance?  ☐ Yes  ☒ No
If yes to either question, please explain how.

7. Since the last report, have you applied for or begun to receive any other Disability, Workers' Compensation, Unemployment, Social Security, Retirement, or Pension benefits?  ☐ Yes  ☒ No   If yes, please provide us with detailed information for each benefit in the space provided below.  Please also report any changes to previously reported benefits.

| Source of Income: | Name of Insurance Carrier (if applicable) | Policy or ID No. | Benefit Amount Weekly/Monthly | Date claim was filed | Date payments began | Date payments ended |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

If you have been approved or denied for any of these benefits, please submit a copy of Award or Denial letter(s).

1332-99 (11/00)

DEFENDANT'S EXHIBIT NO. 124
FEDIGRI-Bayonne, N. J.

DBJ00071

 

 **UNUM.**

### CLAIMANT'S SUPPLEMENTAL STATEMENT
### CLAIMANT'S AUTHORIZATION

Mail to: Unum, Chattanooga Customer Care Center, P.O. Box 12030, Chattanooga, TN 37401-3030
Claim Questions: 800.633.7479   Fax To: 423.755.3009

---

**FOR CLAIMANT TO COMPLETE**

#### CLAIM FRAUD WARNING STATEMENTS

For your protection, the laws of several states, including Alaska, Arizona, Arkansas, Delaware, Idaho, Indiana, Kentucky, Louisiana, Minnesota, New Hampshire, Ohio and Oklahoma, and others require the following statement to appear:

**Fraud Warning**

## Any person who knowingly, and with intent to injure, defraud, or deceive an insurance company, files a statement of claim containing any false, incomplete, or misleading information is guilty of insurance fraud, which is a felony.

**Fraud Warning for California Residents**
For your protection, California law requires the following to appear:
Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**Fraud Warning for Colorado Residents**
It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**Fraud Warning for District of Columbia, Maine and Virginia Residents**
It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purposes of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**Fraud Warning for Florida Residents**
Any person who knowingly and with intent to injure, defraud or deceive any insurance company, files a statement of claim or an application containing false, incomplete or misleading information is guilty of a felony of the third degree.

**Fraud Statement for New Jersey, New Mexico and Pennsylvania Residents**
Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Fraud Statement for New York Residents**
Any person who knowingly and with the intent to defraud any insurance company or other person files an application for insurance or statement of claim containing materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**AUTHORIZATION**

I authorize any licensed physician, medical practitioner, hospital, clinic, pharmacy or other medically related facility, insurance company, third party administrator, government organization, employer and any of their agents performing services relating to any employee benefits or workers compensation, other organization, institution, or person that has any records or knowledge of me, my health (including any disorder of the immune system including HIV or AIDS, any information relating to the use of drugs and alcohol, and any information relating to mental and physical history, condition, advice or treatment), financial or credit information, earnings, employment history or other insurance benefits, to release this information to any of the UnumProvident Corporation subsidiaries or their duly authorized representatives. I also authorize the UnumProvident Corporation subsidiaries to request a report from the Medical Information Bureau (MIB), and the association of life insurance companies which operates the Health Claims Index (HCI) and the Disability Income Record System (DIRS). I understand that the dates of my past and present claims with any of the UnumProvident Corporation subsidiaries, excluding medical or personal information, may be reported to MIB and that an HCI or DIRS report may reflect this information including the identity of other insurance companies to which I have submitted claims. I further understand that in executing this authorization, information obtained by it will be used for evaluating and administering a claim for benefits.

This authorization is valid for the duration of my claim. I know that I or my authorized representative has a right to request a copy of this authorization. A copy of this authorization shall be as valid as the original.

I further authorize the UnumProvident Corporation subsidiaries or other authorized representatives to release all information (including information pertaining to HIV or AIDS, mental illness, and drug and alcohol abuse) related to this insurance claim to insurance companies, third party administrators, physicians, rehabilitation professionals, vocational evaluators, employers, my insurance agent, and any institution or person on a need to know basis for the purpose of verifying, evaluating, negotiating, or other pertinent uses with respect to my claim for benefits or service.

The statements made by me on this claim are true and complete.

I further authorize the UnumProvident Corporation subsidiaries or its authorized representatives or agents to request reports and information from the Social Security Administration regarding benefits, earnings and employer information, and any award, disallowance or termination relating to benefits.

I am the individual to whom this release/request applies or that person's legal Guardian, Power of Attorney, or Conservator. I know that if I make any representation which I know is false to obtain information from federal records, I could be punished by fine or imprisonment or both.

| | |
|---|---|
| Signature of Claimant   X | |
| Please Print Name   I | :on |
| Date Signed   6-16-01 | Social Security Number ▓▓▓▓▓▓▓▓ |

I signed on behalf of the claimant, as _____ (indicate relationship). If Power of Attorney, Guardian, or Conservator, please attach a copy of the document granting authority.
1332-99 (11/00)

DBJ00072

**Unum Claimant's Supplemental Statement**

June 2001



**3. How does your injury or sickness continue to impede your ability to perform your occupational activities?**

continues to be unable to work due to his profound fatigue and cognitive dysfunction (plus many other symptoms), which makes him unable to do any kind of sustained activity, physical or mental. He is unable to perform activities within a schedule or at a consistent pace. He would have trouble with regular attendance or punctuality due to needing to pace himself and take many rest breaks and having many worse days when too ill to do anything. He would have trouble remembering job instructions or procedures and would not be able to complete either a workday or a workweek without interruption from symptoms including pain, nausea, and dizziness as well as the exhaustion and cognitive problems. In addition, shakiness and poor coordination and spatial disorientation frequently impair fine manipulations. Also, even if he was able to push himself and function at a job for a short time, the added physical or mental work plus any additional stress would cause him to "crash" with a major increase in his symptoms afterwards for days or weeks. He has seen this regularly happen with increased activity or stress at home.

**5. Describe your present activities:**

<u>Personal mobility</u>

walks around our yard to stretch his legs and sometimes walks in our neighborhood. He has been encouraged by his doctors to get some exercise as able, to prevent further weakening of his body and disuse complications. However, he complains he is too tired to do this on a regular basis. So he goes for a short walk sometimes one or occasionally two days per week. He then must take pain medication ahead of time and rest afterwards. He has often experienced a relapse with many increased symptoms after he has done more than he is used to. Everything he does is extremely tiring for him, to the point of making him feel sick.

<u>Personal needs and grooming</u>

can care for his personal needs without assistance if he has adequate time. However, he often lies down during this, e.g. shaves, then lies down, takes a shower, then lies down, gets dressed, then lies down. He does better if he has no time pressure and can do these leisurely and after he's slept as long as possible. If he is awakened earlier than usual, he often complains he is feeling too sick (nausea and pain) to get up yet. This often happens when he is awakened to go to church or someplace else in the morning. We try to schedule his medical appointments or other necessary outings later in the morning or afternoon to help with this. Some days his extreme fatigue prevents him from shaving or

DBJ00073

getting cleaned up. He often takes two or three showers a day—initially warm for his pain, then cool to cool himself down, which helps his body temperature feel better, temporarily, but the effort of the showers is tiring. So he often tries to decrease these frequent showers by having a fan blow on him or setting the house temperature colder, but this is not practical when other household members want it a more normal room temperature.

Household care

████ does light household jobs such as preparing his breakfast and some lunches making simple meals (e.g. cereal, eggs, warming up leftovers in the microwave), light cleaning, mowing with a riding lawnmower, and other miscellaneous small tasks (e.g. replacing light bulbs) on days when he is feeling better. His energy level and overall degree of pain, nausea, and ability to think clearly vary from day to day and within a day, but he never returns to normal function. He can do some of the light jobs on some days for up to one or two hours, with breaks and with taking pain medication. Some days he is unable to do anything at all. He usually spaces his activities, resting in-between. He does not do the family shopping as he gets too dizzy with all the stimulation of the store merchandise, and often is forgetful. He has occasionally pushed himself to doing more than he feels up to, just to get a task done, but then he always is much sicker in the following days and sometimes weeks, with much more exhaustion, nausea, pain, dizziness, migraine headaches, and other symptoms. He cannot plan to do anything in advance, as how he feels is very unpredictable. He is consistently worse after mental or physical exertion. He has noted a correlation that on days of increased fatigue he also has increase in other symptoms such as cognitive, gastrointestinal, and pain.

Interests and hobbies

████ watches some TV most days, sometimes just listening to it. He has found watching TV sometimes overloads him and makes him feel dizzy and nauseous. He never reads a full newspaper or magazine and doesn't read any books, because he gets severe headaches after even a little reading. Some days he will glance at the headlines and other days says he doesn't feel well enough to look at the paper at all. Also, the smell of the newspaper ink bothers him. He has few hobbies or recreational activities. We do live on a lake and occasionally he will sit on our dock and fish for a little while. He doesn't like to go away from home very often in case he needs to lie down due to dizziness or fatigue. Also, he gets dizzy, complains of feeling "spacey" and lightheaded when in any environment with stimulation such as crowds of people, noise, or bright lights. He does get bored at home sometimes so I take him out occasionally to a small restaurant or to a nearby park if it is quiet and not too bright out. However, he gets more nausea and fatigue with car rides so these are limited.

Social contacts

████ social contacts are very limited. He gets together with a friend about every few months. He sometimes attends church services, but often misses them due to feeling ill. His main social contacts are with his sons and myself, his wife. He also visits with his parents occasionally. He would sometimes like to have more social contacts, but is hesitant to arrange them as it takes so much effort to concentrate on the conversations and

he needs the freedom to leave and lie down in another room when he starts feeling worse. Also, social situations are awkward when others don't understand his situation and when he looks OK but is feeling so ill. He has gotten more socially isolated the longer he has been ill.

Other
Once in awhile ▒▒▒▒ drives the car for short distances, usually just within a mile of our house. He always has someone else drive when available, as it takes extra energy to concentrate hard on this task. Some days or times of the day he totally avoids driving when he recognizes he feels too dizzy, spacey, or has much trouble concentrating. As a former professional driver, he used to enjoy driving, but now recognizes he must strongly curtail it for his and other's safety as well as how much it tires him. And he realizes that even if he thinks he feels OK to drive to a place, he may not feel well enough to drive back home, which has occurred.

Prepared by spouse ▒▒▒▒▒▒▒▒▒▒

RECEIVED - CCC
'01 JUN 25 PM 1 20

201596