2 to Ct.

73

11/4/02



**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FILED
HARRISBURG, PA

VINCENZO MAZZAMUTO,         :     CIVIL ACTION
          Plaintiff,            :     NO. 1:CV-01-1157

NOV 01 2002

      v.                      :

MARY E. D'ANDREA, CLERK
Per _____
              Deputy Clerk

UNUMPROVIDENT CORPORATION, et    :     (JUDGE CONNER)
al.,                                          :
          Defendants           :

**EXHIBITS IN SUPPORT OF DEFENDANTS' MEMORANDUM
OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION TO SUPPLEMENT EXPERT REPORT**

Dated: November 1, 2002        STEVENS & LEE

                          By _E. Thomas Henefer_
                             E. Thomas Henefer
                             Attorney I.D. No. 55773
                             Kirk L. Wolgemuth
                             Attorney I.D. No. 45792
                             111 North Sixth Street
                             P.O. Box 679
                             Reading, Pennsylvania 19603
                             (610) 478-2000

                             Attorneys for Defendants UNUM Provident
                             Corporation, Paul Revere Insurance Company,
                             and New York Life Insurance Company

## TABLE OF CONTENTS

**Exhibit 1** – Defendants' Memorandum of Law in Support of Response in Opposition to Plaintiff's Motion to Extend the Deadline for Expert Reports

**Exhibit 2** – Excerpts from Deposition of Patrick Fergal McSharry with Defendants' Deposition Exhibit 122

**Exhibit 3** – Defendant's Reply Brief in Support of Defendants' Motion in Limine

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VINCENZO MAZZAMUTO, | : | CIVIL ACTION |
| Plaintiff, | : | NO. 1:CV-01-1157 |
| | : | |
| v. | : | |
| | : | |
| UNUM PROVIDENT | : | JUDGE KANE |
| CORPORATION, et al., | : | |
| Defendants | : | |

*FILED*
HARRISBURG, PA
SEP 13 2002
MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF RESPONSE IN OPPOSITION TO PLAINTIFF'S
## MOTION TO EXTEND THE DEADLINE FOR EXPERT REPORTS

### I.    INTRODUCTION

Defendants UNUMProvident Corporation, Paul Revere Insurance Company and New York Life Insurance Company ("Defendants") file this memorandum of law in opposition to plaintiff's motion for an extension of the deadline for expert reports.  As explained below, Plaintiff's motion should be denied because (1) an extension of the deadline would be unduly prejudicial to the Defendants; and (2) the proposed expert testimony would be inadmissible.

### II.    PROCEDURAL HISTORY

Plaintiff alleges claims for bad faith, under 42 Pa. C.S.A. § 8371, and breach of contract arising from the denial of his claim for disability benefits based on back and psychiatric conditions.  Defendants UNUMProvident Corporation ("UNUMProvident"), The Paul Revere Life Insurance Company ("Paul Revere")

1

and New York Life Insurance Company ("NYL") have moved for summary judgment and plaintiff has filed a motion for partial summary judgment.

Discovery is closed and the deadline for expert reports was <u>June 28, 2002</u>. Although plaintiff claims to be medically disabled, he has not designated any medical expert. Now he seeks to extend the deadline for expert reports until September 30, 2002 (approximately one month before the case is scheduled for trial) to designate a new expert witness, Dr. Patrick Fergal McSharry ("McSharry") who, as explained below, is a former employee of UNUMProvident Corporation who has filed a lawsuit over the termination of his employment in which he has made spurious allegations about how disability claims are reviewed by UNUMProvident's subsidiaries such as Paul Revere. Defendants file this memorandum of law in opposition to plaintiff's motion.

## III.   FACTUAL HISTORY

This case involves breach of contract and bad faith claims by a restaurant owner arising out of his claim for disability benefits under a long-term disability policy issued by New York Life. A detailed description of the facts is contained in the brief in support of Defendants' motion for summary judgment which is incorporated herein in its entirety.

Defendant UNUMProvident Corporation, through its subsidiaries (including The Paul Revere Life Insurance Company), is the leading provider of income protection insurance, insuring over 25 million people. In 2001

SL1 289813v1/10305.060

UNUMProvident managed over 445,000 new claims for income protection benefits and paid over $4.6 billion in benefits.

While Defendants strive to provide thorough, fair, and objective evaluation of all claims received, and to pay claims promptly where legitimate, Defendants deny claims that are invalid. Accordingly, Defendants are required to litigate claims where their denial of benefits is contested.

On June 28, 2002 McSharry filed suit against UNUMProvident Corporation in Tennessee state court claiming he had been wrongfully terminated in violation of the Tennessee Public Protection Act, T.C.A. §50-1-304, and Tennessee public policy because he complained about Defendant's claims paying practices.[1] On July 16, 2002, UNUMProvident removed the state court action to federal court in Tennessee and filed its Answer, denying all claims of wrongdoing. In its Answer, UNUMProvident noted that McSharry "first made allegations about alleged inappropriate conduct by UNUMProvident only after he was placed on verbal warning for poor job performance and that he subsequently advised several colleagues that if UNUMProvident terminated his employment, he would assert a claim and collect a lot of money as he had with a prior employer" See Answer and Affirmative Defenses, ¶22, attached as Exhibit A.

---

[1] McSharry was one of approximately eighty physicians employed by UNUMProvident to enable it to make valid judgments regarding the disability status of various claimants. McSharry was terminated in January 2002 for performance related problems.

Dr. McSharry was employed for only a brief time (approximately 14 months) as one of 20 physician employees at UNUMProvident's Chattanooga site. UNUMProvident's medical review function is organized into six different impairment units that specialize in the review of particular types of disabilities. During his brief tenure with the Company, McSharry was assigned exclusively to the General Medical Unit in Chattanooga. For this reason, McSharry lacks any relevant knowledge with respect to the claims at issue in this case which were reviewed exclusively by Paul Revere in Worcester, Massachusetts, a location that McSharry never visited and as to which he has no knowledge.

Notably, while plaintiff seeks to extend the deadline until September 30, 2002, there is no indication that he has contacted McSharry directly or obtained his agreement to act as a so-called expert witness and there is good reason to believe that McSharry has not and will not agree to do so. Specifically, in a recent decision concerning limitations on depositions that can be taken of McSharry by the Court in Tennessee, which has jurisdiction over McSharry's employment action, the Court noted "McSharry avers that he began employment with a new employer on April 1, 2002, does not have leave time accumulated, and could be terminated if required to take off large amounts of time for many depositions." [Exhibit B at 8]. The Court has also restricted the number and timing of depositions that can be taken of McSharry and entered a protective order which provides that no further depositions can be taken of McSharry without prior

4

permission from the Court.  [Exhibit B at 10-11].  Thus, it appears speculative, at

best, that Plaintiff will be able to produce an expert report from McSharry even if

the deadline for expert reports is extended.

## IV.    QUESTIONS PRESENTED

Whether Plaintiff's motion should be denied where the late
designation of a new expert witness will be unduly prejudicial
and where the proposed testimony would be inadmissible.

[Suggested Answer: Yes].

## V.    ARGUMENT

### A.    The Court Has Discretion To Deny Plaintiff's Motion and Should Enforce the Existing Deadline For Expert Reports

The Court has discretion to deny plaintiff's request to extend the

deadline for expert reports.  Oliver v. Ingber, No. 96-4471, 1998 U.S. Dist. LEXIS

2799 at * 7, (E.D. Pa. Mar. 9, 1998).  Among the factors to be considered is the

importance or lack of importance of the proffered testimony.  Scopia Mortgage

Corp. v. Greentree Mortgage Co., 184 F.R.D. 526, 529 (D. N.J. 1998).  Also

relevant is the extent of any prejudice the late identification of an expert would

create.  Id.

### B.    Allowing the Late Designation of An Expert Would Be Unduly Prejudicial

Here, there is no question that the late identification of the expert

would be prejudicial, especially because plaintiff apparently intends to use

McSharry's misguided and specious accusations to launch a new legal theory that

5

expands the issues in the case from what happened on plaintiff's individual claim to a broad-based "pattern and practice" attack on defendants. Discovery has closed and the deadline for expert reports passed at the end of June 2002. The pretrial preparation for this case has involved extensive discovery and the designation of expert witnesses all within the confines of the deadlines established by the Court (with one extension previously granted). These pretrial efforts have culminated in the submission of detailed summary judgment papers.

Simply put, the defendants are (and were) entitled to make informed strategic choices in defending this action based on the pretrial preparation that took place within the deadlines. Discovery made it clear that this case has always been about plaintiff's individual claim (which, as outlined below, is the proper scope of relevance for the case). Plaintiff should not be allowed to undermine that preparation by identifying a new expert and a new legal theory (i.e., a "pattern and practice" argument) well after the discovery and summary judgment deadlines.

## C.    **The Proposed Testimony Is Inadmissible**

Perhaps more importantly, however, when the Court considers the "importance" of the proposed testimony, the Court should deny plaintiff's motion because the proposed testimony would not be admissible, much less important. Scopia Mortgage, 184 F.R.D. at 529. Indeed, McSharry's testimony would not satisfy Rule 702 and, even if otherwise admissible, would be properly excluded under Rule 403. For these reasons, the Court should deny plaintiff's motion.

6

### 1. **McSharry's Testimony Would Not Satisfy Rule 702**

Federal Rule of Evidence Rule 702 imposes three distinct substantive restrictions on the admission of expert testimony:  qualifications, reliability and fit:

(1)    whether the proposed witness is a qualified expert in the area in which he or she is being offered as an expert;

(2)    whether the proposed expert's testimony is based upon reliable evidence; and

(3)    whether the expert's testimony assists the trier of fact.

In re Paoli Railroad Yard PCB Litig. v. Southeastern Pennsylvania Transp. Auth., 35 F.3d 717, 741-42 (3d Cir. 1994) (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 at 587-591 (1993)); Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000).  McSharry's proposed testimony would not satisfy at least two of those requirements (fit and reliability).

The "fit" requirement under rule 702 is designed to ensure that the expert's testimony will assist the trier of fact (i.e., it must "fit" the subject matter at issue).  Daubert, 509 U.S. at 591.  That is, there must be a connection between the opinion and the facts of the case.  Heller v. Shaw Industries, Inc., 167 F.3d 146, 159 (3d Cir. 1999); Paoli Railroad, 35 F.3d at 742-43, 746.  In this way, Rule 702 contains a fundamental requirement that expert testimony must be helpful to the jury to be admissible.  Fed. R. of Evid. 702; JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc., No. 97-CV-0652, 1998 U.S. Dist. LEXIS 5098 at *14 (E.D. Pa. Apr. 14, 1998), aff'd, 178 F.3d 1279 (3d Cir. 1999).

Here, plaintiff apparently intends to use McSharry to cobble together a "pattern and practice" type of argument to support his bad faith claim. But such an approach would rely on irrelevant arguments and testimony because the question of whether there was bad faith (which there was not) turns on whether plaintiff can prove, by clear and convincing evidence, that Paul Revere lacked a reasonable basis for its actions *based on the circumstances of this case.* Keefe v. Prudential Property and Cas. Ins. Co., 203 F.3d 218, 225 (3d Cir. 2000); Hyde Athletic Indus., Inc. v. Continental Casualty Co., 969 F. Supp. 289, 307 (E.D. Pa. 1997)("[A]n insurer does not act in bad faith by investigating and litigating legitimate issues of coverage.").

Indeed, this conclusion is so apparent that courts have routinely denied discovery seeking information on other claims because such information is irrelevant. E.g., Cantor v. Equitable Life, 1998 U.S. Dist. LEXIS 8435 at * 10-11 (E.D. Pa. 1998); Kaufman v. Nationwide Mutual Ins. Co., 1997 U.S. Dist. LEXIS 18530 at * 6 (E.D. Pa. 1997); Shellenberger v. Chubb Life America, 1996 U.S. Dist. LEXIS 2375 (E.D. Pa. Feb. 22, 1996); Fidelity Deposit Co. v. McCulloch, 168 F.R.D. 516 (E.D. Pa. 1996). For example, in North River Ins. Co. v. Greater New York Mutual Ins. Co., 872 F. Supp. 1411 (E.D. Pa. 1995), the court held information on other "bad faith" cases was neither relevant nor reasonably calculated to lead to discovery of admissible evidence on whether the insurer had acted in bad faith in the lawsuit at issue. The court held: "any discovery of this

8

material would properly be characterized as a fishing expedition, causing needless expense and burden to all concerned." Id. at 1412.

That such information is so irrelevant that discovery on it would be denied underscores why it should not be presented to the jury here. Simply put, consideration of irrelevant information will not be "helpful."

Finally, Rule 702, like Daubert, requires reliability. Expert testimony is only reliable if the proponent establishes that the proposed expert bases his or her opinions and conclusions on "good grounds." Paoli Railroad, 35 F.3d at 748; see also Daubert, 509 U.S. at 590. A witness' "subjective belief or unsupported speculation" does not constitute "good grounds" for the proposed expert's conclusions or opinions. Daubert, 509 U.S. at 590. See Parkway Garage, Inc. v. City of Phila., 1994 U.S. Dist. LEXIS 10900, *31 (E.D. Pa. Aug. 3, 1994) (testimony based on "pure speculation" is unreliable).

Here, it is apparent that McSharry's testimony would be unreliable. Again, McSharry is pursing his own lawsuit against UNUMProvident for personal financial gain and his claim apparently depends in large measure on the success of his allegations. Thus, he has a financial incentive, quite unlike those typically found with expert witnesses, to advocate a position. McSharry is therefore not in a position to provide reliable testimony.

9

### 2. McSharry's Testimony Is Inadmissible Under Rule 403

Fed. R. of Evid. 403 prohibits admission of evidence (which would otherwise be admissible) if (1) its probative value is substantially outweighed by the danger of confusion of the issues, (2) it misleads the jury, or (3) it would result in "undue delay" or "waste of time." This applies to expert testimony. JMJ Enterprises, 1998 U.S. Dist. LEXIS 5098 at *14 (E.D. Pa. Apr. 14, 1998).

This is a classic example for use of Rule 403 because of the very real prospect that allowing McSharry to testify will result in a "mini-trial" over the truth or lack thereof in his allegations. Thus, allowing McSharry to testify will violate Rule 403's objectives of avoiding "undue delay" or "waste of time."

For instance, despite the fact that UNUMProvident paid more than $4.6 billion in claims last year, McSharry alleges it was "Defendant's primary practice and policy to deny disability claims. The medical advisors were only to be used to provide language and conclusions supporting denial of claims." See Complaint, ¶ 10, attached as Exhibit C. To defend against this claim, among other things, UNUMProvident must review the claims files McSharry worked on, estimated to be approximately 500-1,000 in number, interview employees who worked with him, and explore relevant background information and then cross examine him on the relevant details. This plainly cannot be accomplished within the context of this case.

10

As an example, among the many items of information necessary to cross examine McSharry are the records from McSharry's prior employer Blue Cross Blue Shield of Tennessee ("BCBS"). Various co-workers of McSharry have told Defendant that they heard McSharry state that if he was terminated for performance reasons, it would cost UNUMProvident a lot of money. He further has said that he got money from BCBS under similar circumstances. UNUMProvident subpoenaed McSharry's employment records from BCBS in another action, which records it believes are critical to its ability to thoroughly examine McSharry's credibility.

Unless defendants are given adequate opportunity to cross examine McSharry about his past work history (and apparent habit of making such accusations against former employers), his involvement in other claims and his lack of knowledge of the circumstances of this case, they will be severely prejudiced. Accordingly, allowing McSharry to testify will undoubtedly violate Rule 403 either (a) by causing "undue delay" or "waste of time" if defendants are allowed a full and proper cross examination; or (b) by causing undue prejudice to the defendants if their cross examination is limited to avoid undue delay.

Allowing McSharry to testify will also violate Rule 403 by causing the jurors to become confused or mislead about the issues. Again, information about what happened on other claims is irrelevant. E.g., Cantor v. Equitable Life, 1998 U.S. Dist. LEXIS 8435 at * 10-11 (E.D. Pa. 1998); Kaufman v. Nationwide

11

Mutual Ins. Co., 1997 U.S. Dist. LEXIS 18530 at * 6 (E.D. Pa. 1997).  Allowing a so-called "expert" to testify about irrelevant information will obviously confuse and mislead the jury.  This is even more problematic here where the proposed expert has no knowledge of, and played no role in, the facts of this case which will cause even greater confusion among the jurors who may believe that McSharry's unfounded allegations actually concern the review of plaintiff's claim.

Further, Rule 403 is properly applied where the expert is "acting as an advocate, and not as an objective evaluator of evidence."  JMJ Enterprises, 1998 U.S. Dist. LEXIS 5098 at * 27.  McSharry has no option but to act as an advocate.  Again, his lawsuit against UNUMProvident gives him a direct financial incentive to advocate a position consistent with the allegations of his lawsuit, regardless of the facts of this case.  McSharry is therefore not an objective evaluator of the evidence and his testimony should be precluded under Rule 403.  Id.

### 3.     The Daubert Standard

In their motion in limine, defendants carefully reviewed the case law on the standards for admissibility of expert testimony under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and its progeny.  At this juncture without having a report by McSharry it is impossible to tell whether plaintiff would be able to satisfy these standards (although it appears unlikely).  Accordingly, defendants reserve the right to assert additional objections to any actual proposed

12

testimony in the event that the Court grants plaintiff's motion for an extension of the deadline.

## VI.    CONCLUSION

For the foregoing reasons, UNUM respectfully requests this Court to deny plaintiff's motion to extend the deadline for expert reports.

Dated:  September 13, 2002            STEVENS & LEE

By _E. Thomas Henffer_____
E. Thomas Henffer
Attorney I.D. No. 55773
Kirk L. Wolgemuth
Attorney I.D. No. 45792
111 North Sixth Street
P.O. Box 679
Reading, Pennsylvania  19603
(610) 478-2000

Attorneys for Defendants

SL1 289813v1/10305.060



Randall Chapman, et al. vs. Unumprovident Corporation, et al.    CV00-08297
Patrick Fergal McSharry, Vol. I    9/4/2002

Page 102

1  question.
2      BY MR. DARRAS:
3    Q.  Sure.  When you joined the company as a
4  doctor, did you need to bring with the staff of people?
5    A.  No.
6    Q.  In terms of collections for your time for
7  your billing, did you have to do that while you were
8  here ?
9      MR. SHEA:  Object to the form.
10      THE WITNESS:  No .
11      BY MR. DARRAS:
12    Q.  In terms of your employment when you
13  returned, who was your supervisor?
14    A.  Dr. Vatt.
15    Q.  And your understanding of who Dr. Vatt
16  reported to?
17    A.  Dr. Anfield.
18    Q.  And Dr. Anfield reported to?
19    A.  Don Boutin.
20    Q.  And you worked in what unit when you
21  returned?
22    A.  I worked in the general medical unit of the
23  medical department.
24    Q.  And briefly, what did the general medical
25  unit look at in terms of type of claims?

Page 103

1    A.  All general medical claims that had been
2  assigned to the general medical unit in Chattanooga.
3    Q.  And your impairment unit, this gen med unit,
4  general medical unit, were there other units,
5  impairment units in the company here in Chattanooga?
6    A.  Yes.
7    Q.  Tell us about those.
8    A.  There's orthopedic, psychiatry, cardiology,
9  and then at that time I don't think there was a cancer
10  unit.
11    Q.  So four different impairment units, am I
12  accurate?
13      MR. SHEA:  Object to the form.
14      THE WITNESS:  Yes.
15      BY MR. DARRAS:
16    Q.  In terms of these four particular impairment
17  units, did you have an understanding who the impairment
18  unit directors reported to here at the Chattanooga site
19  ?
20      MR. SHEA:  Object to the form.
21      THE WITNESS:  Yes.
22      BY MR. DARRAS:
23    Q.  Who was that?
24    A.  They all reported to Ken Denton.
25    Q.  Did you have an understanding of who Ken

Page 104

1  Denton reported to?
2    A.  Yes.
3    Q.  Who was that?
4    A.  Ralph Mohney.
5    Q.  Does UnumProvident have other sites where
6  claims were being handled other than Chattanooga in
7  2000?
8    A.  Yes.
9    Q.  Where were those?
10    A.  Well, at that time I believe there was a lot
11  of different sites, and --
12    Q.  Besides Chattanooga?
13    A.  Oh, yeah, yeah.  Like there  -- I believe
14  they're still reviewing files in Chicago.  They are
15  definitely still reviewing files in Portland and
16  Worcester and Glendale.  I think there was a Tarrytown,
17  New York that people were reviewing files.  I'm not
18  sure exactly if customer care, as it was then called,
19  had centers in all of these places, but --
20    Q.  Let's talk about four of those sites.
21    A.  All right.
22    Q.  The Worcester site, Worcester, Massachusetts?
23    A.  Yes.
24    Q.  The Glendale site, Glendale, California?
25    A.  Yes.

Page 105

1    Q.  The Chattanooga site here in Tennessee?
2    A.  That's correct.
3    Q.  And Portland in Portland, Maine?
4    A.  Yeah.
5    Q.  In terms of files that you were seeing when
6  you returned, were the files that you saw strictly
7  limited to Chattanooga?
8      MR. SHEA:  Object to the form.
9      THE WITNESS:  No.
10      BY MR. DARRAS:
11    Q.  Share with us whether or not you saw files
12  from these other site locations.
13    A.  You know, I didn't know about what happened
14  after I left, but as far as I know, we were reviewing
15  files from Worcester and some from Portland.  You know,
16  the only way you would know what, where it was from is
17  if you saw the company that it originated from, like
18  Paul Revere, and I eventually learned that Paul Revere
19  were based in Worcester.  Now, I'm not sure about that,
20  but as far as I assumed, they were based in Worcester.
21  So that's the only way you would know where the claim
22  came from.
23    Q.  Is it  -- share with us whether you saw
24  policies from other companies besides, say, Provident.
25      MR. SHEA:  Object to the form.

27 (Pages 102 to 105)



Randall Chapman, et al. vs. Unumprovident Corporation, et al.    CV00-08297
Patrick Fergal McSharry, Vol. I    9/4/2002

Page 258

1  you've said that and that's what we're going to use in
2  our denial letter.
3      MR. SHEA:  Motion to strike.
4      BY MR. DARRAS:
5      Q.  In terms of mini round table reviews, did you
6  ever at any mini round table you attended see a claim
7  representative list for those in attendance all the
8  reasons that supported payment?
9      MR. SHEA:  Object to the form.
10      THE WITNESS:  Well, as I said earlier,
11  there were one or two claimants that felt sorry for the
12  individual, one or two claim representatives that felt
13  sorry for the individual and would to try to make the
14  case for payment.  And in fact I would sometimes say,
15  well, I don't think you've made a full case for payment
16  actually because it's not thoroughly medically
17  investigated and I think we should put everybody
18  through this rigorous investigation, and I'm not, I'm
19  not convinced yet on the medical information.  So
20  that's the only time I would seem to be, that I felt
21  that the person was trying to pay the claim and that I
22  was kind of saying, well, let's hold on, there's --
23      BY MR. DARRAS:
24      Q.  From what you saw in the room as a person
25  would stand up to support payment, the reaction to the

Page 259

1  business partners was what?
2      MR. SHEA:  Object to the form.
3      THE WITNESS:  Yeah, depending if that
4  person was perceived as a softy or not.  If they were a
5  softy, they make fun of her.  In fact, that happened
6  once.
7      BY MR. DARRAS:
8      Q.  And by softy, you meant --
9      MR. SHEA:  Object to the form.
10      THE WITNESS:  Somebody who always wanted
11  to pay the claim, and, you know, that wasn't, that
12  wasn't -- that was not the way to behave in these
13  meetings.
14      BY MR. DARRAS:
15      Q.  How long did you go to mini round tables?
16      A.  Oh, I think I was approved to go within a few
17  months of arriving there, so that would be  -- I don't
18  know exactly.
19      Q.  Did there come a time when you stopped going
20  to mini round tables?
21      A.  Yes, I stopped going the minute that Dr.
22  Vatt told me not to go in his written , verbal warning.
23      Q.  Let's get to that.  I believe it will be
24  Exhibit 7.
25      MR. SHEA:  Wait, are you done with 6?  I

Page 260

1  would like to voir dire the witness on Exhibit 6.
2      MR. DARRAS:  I'm sorry?
3      MR. SHEA:  Voir dire the witness.  We're
4  doing this at a trial.  Before you tender an exhibit, I
5  get a chance to voir dire.
6      MR. DARRAS:  We are not in trial, and
7  nice try, but you can put it down and when you come to
8  your side of the questions you can ask all you like on
9  it.
10      MR. SHEA:  Fair enough.
11      BY MR. DARRAS:
12      Q.  Dr. McSharry, at some time during your
13  second round of employment, you mentioned you received
14  a verbal warning.
15      A.  Uh-huh.
16      Q.  I would like you to take a look at what we've
17  marked as Exhibit 7.
18      A.  This is not the written warning.
19      Q.  I understand.  We're going to move a week
20  ahead of time of your verbal warning and since we've
21  got this marked, can you tell us what Exhibit 7 is?
22      A.  This is where I had, as I kind of talked
23  about before, questions and concerns about the way
24  things were done, and Dr. Vatt was supposed to be
25  working with me on how to do these things.  And I

Page 261

1  really felt that my opinion was being compromised.
2  That's what I kept saying was, you know, really, Dr.
3  Vatt, if you feel strongly about this the way you seem
4  to do, you should be able to do the review.  I cannot
5  change what I have said, you're a doctor also and you
6  should review, you should be reviewing these files.
7      And I said, I have no problem if you
8  want to review the file and give your stated opinion,
9  but I said the wrong way is for me to go back and
10  change what I said just because you told me so.  And I
11  said, I know you're my supervisor and I know you're my
12  manager and you have great powers and authority in that
13  regard, however, you don't have any authority over what
14  I say in the review.  I can certainly make things more
15  acceptable to business partners, but I cannot change my
16  opinion.
17      And he -- we had a number of meetings
18  and I just felt this was so much that I needed to talk
19  to Dr. Anfield, because I felt at that time Dr.
20  Anfield understood better and I was not -- Dr. Vatt
21  was not understanding what I was trying to say, he
22  didn't offer to do the reviews.  In fact, one time I
23  had thought he did and I said, Dr. Vatt is willing to
24  do this review.  And I sent it off and it came back,
25  Dr. Vatt invited me up and said, look, I never said

Page 751

1    Q.  Did you ever see a situation where
2  UnumProvident selected a certain IME doctor for a
3  claimant and at the claimant's request they switched
4  doctors to the claimant's requested doctor?
5    A.  I'm sorry, I leaned on my good ear there.
6    Q.  Did you ever see a situation where
7  UnumProvident had selected an independent medical
8  examiner to perform an examination for a claimant then
9  there had been a request by the claimant to change the
10  IME doctor to one of their selection and Provident had
11  done that?
12    MS. RAFEL:  Objection to the form.
13    THE WITNESS:  I'm trying to remember.
14  Oh, a particular specialist?  Yes.  If the person had
15  said this specialist doesn't know anything, I want a
16  different specialist, they would pick a different
17  specialist off their panel, yes.
18  BY MR. MEAGHER:
19    Q.  No, I'm saying that the claimant says, I
20  don't like Doctor A, I want Doctor B, same specialty,
21  have you ever seen a situation where Provident,
22  UnumProvident said, okay, Doctor B will do the IME?
23    A.  Maybe it happened, but I didn't -- in my
24  experience, I didn't see it.
25    Q.  And that would contradict somewhat what you

Page 752

1  said about UnumProvident with the IME, correct?
2    MS. RAFEL:  Object to the form.
3    THE WITNESS:  If it happened, it would
4  be -- a fairer way is when the person specifies that
5  they are happy with a particular opinion or they feel
6  they might be happier with a certain opinion, it would
7  be something that I would be impressed by, but
8  unfortunately I don't remember being impressed.
9  BY MR. MEAGHER:
10    Q.  Then you would be impressed by the case of
11  Joyce Kakkis, which we're here on today for, where the
12  selected IME, Dr. Jay Precaus, was changed to Dr.
13  Kenneth Kim at the request of the claimant.
14    MR. JACOBS:  Objection, form.
15    MR. BURNETTE:  Judge Carter very
16  explicitly told you don't ask him about things he
17  doesn't know anything about.  He doesn't know anything
18  about those cases, so you're violating what the Judge
19  said.
20    THE WITNESS:  I'm just taking your word
21  for it.
22    MR. JACOBS:  Do you want to be put under
23  oath and do you want to testify to that fact?  There's
24  no such fact.  You're asking him to assume something
25  that's not in evidence.

Page 753

1    MR. MEAGHER:  So that's an objection to
2  form, Mr. Jacobs?
3    MR. JACOBS:  Well, it may well be an
4  objection to form, but the question is so out of line
5  and argumentative with your characterization of what
6  took place and you don't have any personal knowledge of
7  that whatsoever, you probably have hearsay on hearsay
8  on hearsay on that.
9    MR. BURNETTE:  We would also like to
10  object to that under Rule 30D1, because it's to enforce
11  the limitation directed by the judge.  The judge
12  directed that you not do those very kinds of questions
13  you just now asked.
14    MR. MEAGHER:  Well, we disagree with
15  your interpretation of the Court's ruling.
16  BY MR. MEAGHER:
17    Q.  Do you have any knowledge whatsoever of the
18  case of Robert Carr that you're here on today for
19  deposition?
20    A.  If my name is in there as I've done a review,
21  I'm knowledgeable.  If my name is not on there as
22  review, I haven't done a review, I'm not knowledgeable.
23    Q.  Who is Mable Malek?
24    A.  Who?
25    Q.  Mable Malek.

Page 754

1    A.  Malek?
2    Q.  M-A-L-E-K.
3    A.  M-A-L-L-E-K?
4    Q.  M-A-L-E-K?
5    A.  Oh, okay.  Sounds like a doctor's name, but
6  no, I don't know who, you know, I don't know who that
7  is.
8    Q.  How about Howard Taylor, do you know Howard
9  Taylor?
10    A.  Howard Taylor?
11    Q.  Yes.
12    A.  I don't think I know anybody by that name.
13    Q.  Do you know a Suzanne Williams?
14    A.  Suzanne Williams?  As I said, if these are
15  claimants, I have no -- you know, lots of people have
16  the same name, so, you know, if I knew somebody, it
17  might spark some remembrance, but those names don't
18  really remind me of anything.
19    Q.  Do you know Tracy Talbot?
20    A.  No.  I know Talbots, but I don't think I know
21  a Tracy Talbot.
22    Q.  How about Joanna Bialy, B-I-A-L-Y?
23    A.  B-I -- what is it again?  Sorry.
24    Q.  B-I-A-L-Y.
25    A.  Bialy?

97 (Pages 751 to 754)

Randall Chapman, et al. vs. Unumprovident Corporation, et al.        CV00-08297
Patrick Fergal McSharry, Vol. II                                     9/5/2002

**Page 755**

1    Q. Do you know that person?
2    A. No, I don't think I've heard of that name
3 before.
4    Q. How about Deb Kozisek, K-O-Z-I-S-E-K?
5    A. Spell it again, sorry. It's just I have a
6 problem --
7    Q. Sure. K-O-Z-I-S-E-K.
8    A. I did look at folks -- the way I remember
9 names sometimes is their origin, because I'm interested
10 in that area, and that's a particular type of polish
11 Slavic name, I don't think I know that one. Again,
12 unless it's in the file that I had seen, seen it, then
13 I'll retract my statement and say I did know her, but
14 --
15    Q. So you don't recognize any of those six names
16 I just gave you as the in-house claims consultants and
17 medical people who were involved in the Carr case,
18 correct?
19    MS. RAFEL: Objection to the form.
20    THE WITNESS: Oh, are they claims
21 consultant people? As I said before, I didn't know all
22 the claims people's names. If you showed me their
23 face, I would recognize them straight away, because
24 once I recognize somebody, once I see somebody, I
25 remember their face, but I don't remember their name.

**Page 756**

1 BY MR. MEAGHER:
2    Q. These were in Worcester. Would you recognize
3 them even by their face?
4    MS. RAFEL: Object to the form.
5    THE WITNESS: No. If I never saw them,
6 I wouldn't recognize them by their face.
7 BY MR. MEAGHER:
8    Q. Did you ever go to the Worcester office?
9    A. No.
10    Q. How about Portland?
11    A. Well, oddly enough, I was in the Portland
12 office, but it was Unum.
13    Q. Back when you interviewed in what year?
14    MS. RAFEL: Objection to form.
15    THE WITNESS: That would be 1998, I
16 think.
17 BY MR. MEAGHER:
18    Q. 1998?
19    A. Or just before -- yes, 1998, I would say.
20    Q. Are you licensed in New York?
21    A. I -- I was.
22    Q. When did you get licensed in New York?
23    A. I applied around six months before I came, or
24 a few months before I came, and it took a year and a
25 bit to get the license. And I think I maintained that

**Page 757**

1 license for two years, until it was obvious I wasn't
2 going to be -- that I didn't want to work in New York.
3 And the reason I looked for that was because one of my
4 jobs that I had was in Buffalo, upstate New York.
5    Q. So you were thinking of practicing there at
6 some point in time?
7    A. Yes. They were the two options, was Buff --
8 I had already put my application in process and I --
9 you know, it's such a long process, I just left it
10 rather than continue to pay my fee. And but no, it was
11 because -- it was between Buffalo and Maine, New York
12 and Maine, as I said before in previous deposition, and
13 so I made applications to those two states.
14    Q. I asked you when did you get licensed in New
15 York. Can you give me a year rather than relating it
16 to the time six months before you came --
17    A. Yeah. It would have been probably 1994. No.
18 I got the license , you see, as I said, a year and a
19 bit, it could be '95 or '96, late '95 or early '96.
20    Q. How is -- do you know a Roger Shields?
21    A. Shields. That sounds familiar, but maybe --
22 I don't know.
23    Q. How about Elaine Neeser, N-E-E-S-E-R?
24    A. N-E-E-S-E-R. No, that isn't familiar at all.
25    Q. How about Chris Ryan?

**Page 758**

1    A. Ryan?
2    Q. R-Y-A-N.
3    A. Again, that's very familiar because it's an
4 Irish name. I think I know a Chris Ryan in Ireland.
5 But no, I don't think I know any Chris Ryans in the
6 United States.
7    Q. Steve Carlson?
8    A. Carlson, Steve, I don't think so.
9    Q. How about Steve Dattis, D-A-T-T-I-S?
10    A. D-A-T-T-I-S. That name I don't think I've
11 come across before.
12    Q. How about Jean Marie Merritt?
13    A. Merritt, M-E-R-R-I-T-T?
14    Q. Yes.
15    A. Like the elephant man? I don't think so.
16    Q. I'm sorry, I'm laughing again, because that
17 was --
18    A. He was married, wasn't he?
19    Q. Jean Marie Merritt?
20    A. I don't think I know that name. Jean Marie,
21 no.
22    Q. How about Dr. Schwartz?
23    A. Yes, I think -- I know Dr. Schwartz who's
24 up in one of the units in -- I can't remember exactly.
25 I think I might even have spoken to him once, but he's

98 (Pages 755 to 758)

Randall Chapman, et al. vs. Unumprovident Corporation, et al.    CV00-08297
Patrick Fergal McSharry, Vol. II                                  9/5/2002

Page 759

1    either in Worcester or Portland, I believe.
2        Q.  What's his specialty, if you know?
3        A.  He is a specialist, I don't think -- oh, he
4    might be an internist. I can't remember what his
5    specialty is.
6        Q.  How about Dr. Ursprung?
7        A.  Ursprung.
8        Q.  U-R-S-P-R-U-N-G.
9        A.  I don't believe so. I don't think I've
10   talked to him.
11       Q.  So you didn't know any of the internal claims
12   examiners or in-house medical who worked on the case of
13   Randall Chapman, one of the cases we're here on taking
14   your deposition today?
15           MS. RAFEL:  Object to the form.
16           THE WITNESS:  I did say I knew Dr.
17   Schwartz -- that I think that I know Dr. Schwartz. Is
18   he one of those people? I don't know.
19   BY MR. MEAGHER:
20       Q.  Aside from Dr. Schwartz and how you
21   described your knowledge of him, these other people you
22   have no knowledge of, correct?
23       A.  Yeah. I mean, it sounds like I know their
24   position, but I -- no, I don't think I've ever met
25   them or talked to them.

Page 760

1        Q.  Do you have any --
2            MR. BURNETTE:  Objection and move to
3    strike under Rule 30D1.
4    BY MR. MEAGHER:
5        Q.  Do you have any facts relating to the case of
6    Randall Chapman, any knowledge?
7        A.  Individual knowledge? Unless I saw the file,
8    I -- I don't know -- all I know is that it was dealt
9    with in the same way as it was probably dealt with in
10   Chattanooga. That's all I know. I don't know anything
11   about the individual file.
12       Q.  You stated that -- your last answer says,
13   unless I saw the file, I don't know -- all I know is
14   that it was dealt with the same way as it was probably
15   dealt with in Chattanooga?
16       A.  Uh-huh.
17       Q.  Is that correct?
18       A.  Well, that probably should be in a different
19   part of the sentence.
20       Q.  Why don't you correct that sentence and tell
21   me what you -- what your sworn testimony is?
22           MS. RAFEL:  Object to the form.
23           THE WITNESS:  What I meant was that --
24           MS. RAFEL:  What he said is what he
25   said.

Page 761

1            THE WITNESS:  What I said was what I
2    said --
3    BY MR. MEAGHER:
4        Q.  Tell us what you meant.
5        A.  What I meant is -- I mean, that's the way I
6    interpreted it. I can Americanize it, maybe, and make
7    it more easily understood, maybe, but I don't know if I
8    can.
9        Q.  Go ahead, Americanize it for us. That's
10   where these cases are pending. That's where these
11   cases are pending, sir.
12       A.  That would be embarrassing. Can you repeat
13   the question? Sorry.
14       Q.  Well, you stated that, when I read back your
15   answer, you wanted to correct it somehow or change it
16   somehow, and I want to know, what about the answer do
17   you want to change?
18           MS. RAFEL:  Objection. He didn't say he
19   was going to change it in any way. You're asking him
20   to --
21           MR. MEAGHER:  Excuse me, is that an
22   objection to form?
23           MS. RAFEL:  It's an objection as I'm
24   making it.
25           MR. MEAGHER:  Well, you know, again, we

Page 762

1    have rules that we all agreed to follow, objection to
2    form.
3            Question, do you know what -- I'm reading you
4    the question and answer.
5            THE WITNESS:  Thank you.
6    BY MR. MEAGHER:
7        Q.  Question, do you -- well, again, this is a
8    rough transcript, so it's a -- it hasn't been cleaned
9    up, and in all fairness to the reporter, that's
10   understandable. Do you have any facts relating to the
11   case of Randall Chapman, any knowledge? Answer, any
12   knowledge, unless I saw the file, I, I don't know. All
13   I know is that it was dealt with the same way as it was
14   probably dealt with in Chattanooga, that's all I know,
15   I don't know anything about the individual file.
16           MS. RAFEL:  And what's the question?
17   BY MR. MEAGHER:
18       Q.  The question was he said, the -- probably
19   should be, probably should be in a different place, and
20   I want to know where.
21       A.  To try to help you understand, it's that I
22   only knew how the system would deal with an individual
23   file. What those actual claim people actually did, I
24   presume they did what the company asked them to do, so
25   that's what I meant, that they do what the company had

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (800) 342-5490

Page 763

1  asked them to do. The actual individual, what the
2  doctor's opinion was who looked at it or what the
3  claims person really felt about it, I wouldn't have any
4  idea.
5      Q. Or what the claims person actually did, you
6  would have no idea, correct?
7      A. Not -- only to the extent of what the
8  claimant usually did with those.
9      Q. Based upon what you saw in the general
10 medical division that you worked in, correct?
11     MS. RAFEL: Object to the form.
12     THE WITNESS: Based on what I saw was
13 done in the general medical unit, the orthopedic unit,
14 the psychiatric unit, that I used to interact with.
15 BY MR. MEAGHER:
16     Q. How long did you work in the psychiatric
17 unit?
18     A. No, I -- we were encouraged to talk to the
19 psychiatrists and psychologists, so I would -- in the
20 process of referring, when they wanted neuropsychs to
21 be done, in psychiatry I would talk to Michelle, well,
22 the names fail me yet again, but Michelle, who was the
23 coordinator there who would refer them into the
24 psychologist, I would talk to her, I was supposed to
25 talk to her first before I could talk to the physician.

Page 764

1  So then I talked to her and then she said, yes, you can
2  talk to the physician. So then I would go talk to the
3  physician. Sometimes I would just go talk to the
4  physician anyway.
5      Q. Which customer care specialist assigned to
6  that impairment unit did you deal with, specifically
7  psychiatric, if any?
8      A. How do you mean, when I would want to
9  talk --
10     Q. You said you went to talk to a doctor.
11     A. Yes.
12     Q. I'm not talking about doctors. The claims
13 people that were dealing with psychiatric cases, name
14 those for me in Chattanooga.
15     MS. RAFEL: Objection to the form,
16 complex question. Could you simplify it?
17     MR. MEAGHER: I'll repeat it.
18     MS. RAFEL: You've got three things
19 going on there.
20     MR. MEAGHER: I'll repeat it. I don't
21 know if it's any simpler.
22 BY MR. MEAGHER:
23     Q. My question is, name for me, sir, when you
24 worked in general med the customer care specialists
25 assigned to the psychiatric impairment unit?

Page 765

1      MS. RAFEL: Thank you.
2      THE WITNESS: I met two guys once, and
3  their names escape me yet again. But I, again, I know
4  what they look like, and we -- on a few occasions I
5  spoke to them.
6  BY MR. MEAGHER:
7      Q. Can you name me the customer care specialists
8  who were employed in Chattanooga where you were working
9  in the orthopedic section?
10     A. All the clinical -- all the specialists in
11 the orthopedic section?
12     Q. No, no. The customer care specialists, name
13 as many as you know in orthopedic while you were
14 working there.
15     A. I know some of the nurses there.
16     Q. Not the nurses. I'm asking for customer care
17 specialists, CCSs.
18     A. Yes. Louise Ponds, I believe was.
19     Q. Ponds. Any others?
20     A. A lady who came to me once, but as I say, my
21 -- I don't have an exhaustive memory as regards
22 people's names and I can't remember this short lady's
23 name. And Louise --
24     Q. How about -- sorry, are you done?
25     A. Yes.

Page 766

1      Q. How about the customer care specialists
2  related to the cancer impairment unit that was set up,
3  who were they? In Chattanooga only I'm asking you.
4      A. Yes, I knew some of them because my team, gen
5  med, also did some cancer.
6      Q. Who were the cancer CCSs when you worked
7  there?
8      A. I knew the nurses.
9      Q. No, no, no. I'm asking you about the CCSs,
10 sir. Who were the CCSs assigned to the cancer
11 impairment unit in Chattanooga, the physical location
12 where you worked?
13     A. There was a guy called Jonathan Malek. I'm
14 not sure exactly where he was. We would see their
15 names very often, but, you know, it wouldn't connect a
16 name to a face.
17     Q. And if I asked you the name of any customer
18 care specialist in the Worcester office, would you know
19 it?
20     MS. RAFEL: At what point in time?
21 Object to the form.
22 BY MR. MEAGHER:
23     Q. Let me ask him first, would you know it as
24 you sit here today?
25     MS. RAFEL: Objection to the form.

100 (Pages 763 to 766)

Randall Chapman, et al. vs. Unumprovident Corporation, et al.                                      CV00-08297
Patrick Fergal McSharry, Vol. II                                                                    9/5/2002

Page 767

1    THE WITNESS: Would I know the customer
2  service names as I sit heard today?
3  BY MR. MEAGHER:
4    Q. Yes.
5    A. No. I never met any of them. I don't think
6  I even -- I believe actually I spoke to one customer
7  care person once, I think, but again, no, I couldn't
8  remember their names.
9    Q. How about if I asked you that same question
10  with regard to Portland customer care specialists,
11  could you identify any of them for me?
12    MS. RAFEL: Objection to form.
13    THE WITNESS: Probably not.
14  BY MR. MEAGHER:
15    Q. Are there customer care specialists in
16  Glendale?
17    A. Yes. They are one of the four large customer
18  care centers.
19    Q. Can you name any of them for me?
20    A. No.
21    Q. Can you tell me all you know about the
22  Catherine Kelly case that you're here being deposed on
23  today?
24    MS. RAFEL: Objection to the form. The
25  order prohibits that.

Page 768

1  BY MR. MEAGHER:
2    Q. You can go ahead and answer the question.
3    A. Could I tell you everything I know about
4  Catherine Kelly?
5    Q. The Catherine Kelly case which you're being
6  deposed on as one of the six consolidated depositions.
7    A. Again, I only know about the way these files
8  were dealt with, I don't know about the individual
9  claimants, only right I don't know, because I didn't
10  review the file.
11    Q. What does DMS stand for?
12    A. I think that was the older term for the
13  nurse, DMS. Durable medical supplies it can be also.
14    Q. Durable medical supplies?
15    A. Yeah. It can be that sometimes.
16    Q. Does it mean anything else, that you know of?
17    A. DMS?
18    Q. DMS.
19    A. DMS. There's a computer terminology, too.
20  No, I don't know all the different meanings of DMS, no,
21  because there are probably quite a few. I don't like
22  abbreviations, they don't really -- people just assume
23  that you know what the abbreviation means and a lot of
24  times you don't. I prefer if people, you know,
25  dispense with the abbreviations and put down what it

Page 769

1  actually is.
2    Q. Have you ever heard of a company called
3  Disability Management Services?
4    A. Yes.
5    Q. Where are they located?
6    A. I did come across one of the reviews. They
7  are located, I think -- they -- I think they did an
8  IME for the claimant, and that's why I remember them,
9  because I think that the claimant asked them to do it
10  and I thought this was kind of unique, because mostly
11  there was nobody for the claimants who could do an IME,
12  they were all off the panel, the IME panel for
13  UnumProvident or BlueCross, so it was an unusual idea,
14  so I looked through this file and I saw their review
15  and I thought it was quite a good review.
16    Q. So Disability Management Services did an IME
17  at the request of a claimant in a file that you saw,
18  correct?
19    A. I think that's -- wait --
20    Q. It was an excellent review?
21    MS. RAFEL: Objection to the form.
22    THE WITNESS: Again, I can't say. I
23  remember looking at it and thinking it was unusual, but
24  I don't remember whether it was excellent or not. I
25  thought -- I think it was done by a physical therapist

Page 770

1  or -- I have no -- you know, that's what my memory is
2  of it.
3  BY MR. MEAGHER:
4    Q. Tell me everything you know, if anything,
5  about the claim of Roberts Ligorsky, one of the six
6  depositions you're here on today.
7    MS. RAFEL: Objection to the form.
8    MR. RUBIN: Objection to the form.
9    THE WITNESS: Sorry, could you repeat
10  the question?
11  BY MR. MEAGHER:
12    Q. Yes. Can you describe for me or state for me
13  all of your knowledge regarding the case of Robert
14  Ligorsky, one of the six depositions we're here on.
15    MR. RUBIN: Objection to form.
16    THE WITNESS: It's the same. I don't
17  know the individual aspects of their case, who did the
18  IMEs, who did the review, any of that type of thing.
19  BY MR. MEAGHER:
20    Q. At any time during the ten hours that you
21  described meeting with the plaintiffs' lawyers on these
22  various cases, were you ever made aware of any reason
23  why they were not telling you the facts of their case?
24    MS. RAFEL: Objection to the form.
25    THE WITNESS: No.

101 (Pages 767 to 770)

Page 839

1  back. And thank you, counsel, for recalling me.
2      BY MR. MEAGHER:
3      Q.  I had asked you specifically which of the
4  doctors that you worked with in general medical, that
5  is, Dr. Vott, Dr. Cruthers, Dr. Hill, Dr. Horn, Dr.
6  Jacobs, and Dr. Vergo, which of those doctors, if any,
7  changed their medical opinions in order to support the
8  denial of a claim?
9      MS. RAFEL: Objection, asked and
10  answered.
11      THE WITNESS: You've given me some time
12  for reflection so I can give you --
13      BY MR. MEAGHER:
14      Q.  I've given you time to talk to your lawyer.
15      A.  To talk to my lawyer so I can think about
16  what you meant by that question. I would see it break
17  into three categories, if you'll allow me to do that.
18      Q.  Answer the question, sir, however way you
19  want to answer it. I want names. You give me
20  categories with names.
21      A.  Okay. There were people who would just do
22  what the company wanted them to do. They would just
23  give the opinion that they were asked to do, you know,
24  after the pressure. Initially they may have started off
25  just giving their true opinions, and then they just gave

Page 840

1  up. And Nancy Beecher was definitely one of those. She
2  just said it to me, you know, she's not able to carry on
3  this fight. Nancy was one.
4      Angela may have done it towards the end
5  where  --
6      Q.  This is Angela Beckles Dennis?
7      A.  Angela Beckles Dennis, yeah, where she just
8  gave up also. Dr. Hashaway also -- Hathaway, sorry --
9  Hashaway is -- Dr. Tom Hashaway also said to me that he
10  would just agree with the nurse.
11      Q.  Was he one of the names I gave you as a
12  person you worked with?
13      MR. BURNETTE: You were asking him gen
14  med, and he's telling you the folks in gen med.
15      A.  No, no, this was one of the doctors in
16  cardiology who --
17      BY MR. MEAGHER:
18      Q.  Well, let's stick with gen med. And I'll go
19  to other areas. We have Nancy Beecher, you think maybe
20  Angela Beckles Dennis, and these are people who changed
21  their medical opinions in order to support a denial,
22  correct?
23      MR. BURNETTE: Excuse me, counselor, he
24  broke it down into three categories, and you've
25  interrupted him. And he's begun giving you the first

Page 841

1  category of that. And those are the people that did
2  what the company wanted was his answer.
3      If you'll let him finish the categories,
4  perhaps he can then put the names with the categories.
5      BY MR. MEAGHER:
6      Q.  Finish your attorney's categories.
7      MR. BURNETTE: Excuse me, that's what
8  you asked him to do if you'll read back your questions.
9  You said go ahead and give the categories and the names
10  that fit in the categories.
11      BY MR. MEAGHER:
12      Q.  Answer the question, please.
13      A.  Starting -- unfortunately I sometimes have
14  to go right back to the beginning. The people who
15  either eventually are -- from the get go want to do just
16  what the company asked them to do were Dr. Angela
17  Beckles Dennis, Dr. Nancy Beecher, Dr. Larry Cruthers
18  in gen medicine.
19      MR. BURNETTE: What's the next
20  category?
21      THE WITNESS: You didn't ask me about
22  contracted physicians, so I'm not --
23      BY MR. MEAGHER:
24      Q.  Go ahead with contracted physicians in gen
25  med.

Page 842

1      MS. RAFEL: What's the question,
2  counsel?
3      MR. MEAGHER: He knows what the
4  question is, it's clear on the record. He asked for
5  clarification, I gave it to him --
6      THE WITNESS: I meant my category of
7  people who eventually initially even from the get go are
8  quite conducive to doing what the company wanted them to
9  do. And contracted physicians, Dr.  -- no, I will
10  say that -- I'll move on to my second category, which is
11  people who really didn't want to just give in to the
12  company.
13      BY MR. MEAGHER:
14      Q.  Is that because there are no consultants --
15  I want you to stay organized. Is that because there are
16  no consultants who fit into category one?
17      A.  I'm debating in my mind as to one of the
18  consultants, if they really said one thing and did
19  another thing; in other words, they just went a long with
20  what the company wanted them to do, but were saying to
21  me that they were  -- oh, yes, they totally agreed with
22  what I was saying, which was that we shouldn't change
23  our opinions, we shouldn't be influenced so highly by
24  the claims people; so somebody who ostensibly said to me
25  that they were, but actually did really go by their

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (800) 342-5490

Page 843

1  opinion. I'm just not sure about this person as to
2  which category they would fit into.
3      Q.  Okay. Who is this person?
4      A.  This is Carol Curtis.
5      Q.  Carol Curtis?
6      A.  Uh-huh.
7      Q.  I believe you were going to category two
8  now.
9      A.  Yes.
10     Q.  What is your category two?
11     A.  Category two is the people who tried to do
12  what the company wanted, but also tried to maintain
13  their dignity and their  -- and get some of their
14  opinion across, try to a certain extent to tie the
15  claims professionals' hands in a subtle, very clever
16  medical way.
17     Q.  Who are they?
18     A.  They would be Dr. Steve Fagan, who's a
19  consultant, independent consultant, and Dr. Tanya Horn.
20  Now, this is all my opinion.
21     Q.  Oh, I understand that, Doctor.
22     A.  Yes, from talking with these folks and
23  working out the dilemmas we all faced. And Dr.  --
24  could you remind me of the names again?
25     Q.  We had Vott, Cruthers, Hill, Horne, Jacobs,

Page 844

1  Vergo. And then the consultants were Bielawski, B I E L
2  A W S K I –
3      A.  No, he wasn't there.
4      Q.  -- Curtis Fagan and Sentef, S E N T E F.
5      A.  Mr. Sentef, yes. I forgot Dr. Sentef.
6  Bielawski I don't think was there when I was there. He
7  probably took my job, or I don't know what. But --
8  okay, so of course Dr. Vott as per my previous testimony
9  I believe is totally the company person.
10     Q.  What category is he in? Category two you're
11  on.
12     A.  He's in the most egregious. Not personally,
13  but he didn't do medical reviews so -- but to me what he
14  did was worse in that he would just do totally the
15  company's bidding and not understand our dilemma at all.
16  It was like the difference between me and the practicing
17  physician, that he was telling me, the practicing -- the
18  person who was doing the reviews, how to do them, and he
19  had no conscience about the position I was in at all.
20     Q.  You were on category two. Have you finished
21  --
22     A.  I would put Dr. Vott in category one,
23  though.
24     Q.  Okay. And have you finished naming all the
25  doctors that you've put in what you've described as your

Page 845

1  category two?
2      A.  No.
3      Q.  Please continue.
4      A.  Please read out the names of the employees
5  employed.
6          MR. BURNETTE: Here, why don't you sort
7  of write them down as you go and that will help you,
8  because it's hard to remember those names as you go
9  down.
10         MR. MEAGHER: What are we doing?
11         MR. BURNETTE: He's writing down the
12  names so that he doesn't have to keep asking you each
13  time for their names to figure out which categories they
14  go in.
15     BY MR. MEAGHER:
16     Q.  Well, let me ask you this: Without me
17  telling the names, all right, what do you recall? I
18  mean, these are the doctors that were violating your
19  sense of honesty. Do you recall their names without me
20  telling them to you?
21         MS. RAFEL: Objection to the form.
22         THE WITNESS: Sorry, I told you I
23  remember things pictorially. People have called me a
24  paper person. I remember things written down. That's
25  how I succeed in passing examinations is I remember

Page 846

1  without seeing. So if you could give me the names --
2      BY MR. MEAGHER:
3      Q.  No, I want your recollection first and then
4  we'll try it with the names. I want to know what you
5  remember, Doctor. Tell me, Doctor, which of these
6  consultants that you worked with for 13 months were in
7  these categories.
8          MR. BURNETTE: Objection to the form.
9  Ask him just one little question.
10         THE WITNESS: The consultants, I
11  thought we were talking about employees and consultants.
12     BY MR. MEAGHER:
13     Q.  Name them. You're right. Name them,
14  please.
15         MS. RAFEL: Objection to the form.
16         MR. BURNETTE: Are you asking him to
17  name the consultants and the doctors?
18         MR. MEAGHER: My question is clear.
19  Don't --
20         MR. BURNETTE: No, it's not clear.
21         MR. MEAGHER: Let me repeat it then if it's
22  really not clear to you.
23     BY MR. MEAGHER:
24     Q.  My question is, I want to know the basis of
25  your allegation that medical doctors that you worked

16 (Pages 843 to 846)

Rand[...]hapman, et al. vs. Unumprovident Corpor[...], et al.      CV00-08297
Patrick Fergal McSharry, Vol. III      9/6/2002

Page 847

1  with in Chattanooga for the 13 months or so that you
2  were employed there changed their medical opinions in
3  order to support the denial of a claim. You remember
4  that question, I've asked it three times, correct?
5        MS. RAFEL: Objection to the form.
6        THE WITNESS: I do remember that
7  question, and you have asked it three times.
8        BY MR. MEAGHER:
9    Q.  Please tell me your answer to that question,
10  Dr. McSharry.
11        MS. RAFEL: Objection to the form.
12        THE WITNESS: I was in the process of
13  doing that.
14        BY MR. MEAGHER:
15    Q.  Go ahead.
16    A.  Thank you. Number two category, which I was
17  hoping for some assistance, some reminders, but the
18  second category  -- I'm trying to be inclusive and
19  that's why -- I'm trying not to leave anybody out. The
20  new doctor, Dr. Hill, very much was at the kind of
21  naive stage initially where he didn't understand what I
22  was  -- what we were all talking about the
23  relationship of the claims professionals and not and,
24  you know, looked at things in a military style.
25        So in talking with him, I think he felt his

Page 848

1  military training was very important just to obey
2  orders, and so I would put him in the first category,
3  that he would just do what his boss asked him to do.
4  But I don't know that because I didn't know him well
5  enough, I only met him for a month. I don't know what
6  way he turned out.
7    Q.  Anyone else in response to my question?
8    A.  I'm trying to remember who else I worked
9  with as a group, and I'm trying to remember who was
10  working in the gen med area with me because I also, as I
11  said, worked with doctors right across the Chattanooga
12  medical department.
13        You didn't include Dr. Anfield because --
14  yeah, because he's not in gen med, he's --
15    Q.  Are you done with gen med, because we'll
16  expand the question?
17    A.  No, I'm not. So then the people who really
18  -- did I put Dr. Steve Fagan in the second category?
19    Q.  Is he in the second category?
20    A.  He's in the second category.
21    Q.  All right. Anyone else?
22    A.  Well, we talked about Dr. Curtis being in
23  either. I'm just trying to remember. There's a --
24  yes, Dr. Susie Vergo would be in the second category,
25  where she struggled trying to keep Dr. Vott happy and

Page 849

1  the business partners and, yes, give a true opinion.
2  She struggled a lot with that, and he would give her a
3  fifth or sixth review. She felt that this wasn't
4  totally what insurance medicine was about, and so she
5  was still debating in her own mind and so, you know, I
6  said, just give your opinion, and she said, well, you
7  know, I don't want these people giving me the kind of
8  hassle that you get, or I don't want to be in the
9  situation that the person who was in this office before
10  me, Angela Beckles Dennis, was in, so I'm going to try
11  to wing it. So she would be in that second category.
12    Q.  Anyone else in your categories?
13    A.  And the third category then is the people
14  who just would not change their opinion.
15    Q.  Who were they?
16    A.  And we all did it at one time, but who
17  generally held the philosophy that we wouldn't change
18  their opinion, I am in that category. I did change one
19  or two of my opinions to please Dr. Vott. I feel very
20  bad about it still because I don't know what happened to
21  that person, but -- and the other person in that
22  category would be Dr. Jacob Martin. I really believe
23  he didn't  -- he was as obstinate as me and wouldn't
24  change his opinion.
25    Q.  Anyone else in your category one?

Page 850

1    A.  Category one or category three? We're on
2  three now.
3    Q.  Whichever. This last category.
4        MS. RAFEL: Objection to the form.
5        BY MR. MEAGHER:
6    Q.  The last category you described.
7    A.  Do I have to repeat the question, sir?
8    Q.  You're on your category. What I'm asking
9  you is is there anyone else --
10    A.  I'm on category three.
11    Q.  It's you and Dr. Martin?
12    A.  In category three.
13    Q.  And what else?
14        MR. BURNETTE: Who wouldn't change
15  their minds.
16        THE WITNESS: People who wouldn't
17  change their minds, but may have once or twice given in.
18  You know, that's my opinion.
19        BY MR. MEAGHER:
20    Q.  Can you recall anyone else in that category?
21    A.  I can't recall who else was in my group, so
22  I don't know if I've left somebody out. And I think
23  most people would fit into one of those three
24  categories.
25    Q.  Let's expand the question to any other

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (800) 342-5490

**Page 887**

1 to me that I was enjoining people, I was going and
2 trying to enjoin people and bring people into this which
3 weren't relevant, so in an effort not to do that, I
4 decided not to enjoin Nancy Minor and Candice McGraw and
5 just work on the claims area.
6     Q. Doctor, was it a true statement as you set
7 forth in your e-mail that on October 24th, 2001, you had
8 no issues with appeals since you had your discussions
9 with them and indeed you held them up as good examples
10 of how medical and claims professionals can work well
11 together and make a fair and valid assessment of a
12 claim?
13     A. That's what I said.
14     Q. And is that true on that date?
15     A. That time those three people I believed were
16 trying to work with me.
17     Q. Is that a true statement on that date, yes,
18 no, or you don't know?
19     A. Of course it's a true statement.
20     Q. Because you wouldn't say anything that's not
21 true, right?
22         MR. JACOBS: Objection to the form.
23     BY MR. MEAGHER:
24     Q. Answer the question, please.
25         MR. JACOBS: Which question? Now you

**Page 888**

1 have three of them.
2     BY MR. MEAGHER:
3     Q. You wouldn't say anything that's not true,
4 correct?
5         MR. JACOBS: Objection to the form.
6     THE WITNESS: I always try to tell the
7 truth, always try to tell the absolute truth.
8     BY MR. MEAGHER:
9     Q. Going back to your meeting with Mrs. Dale,
10 did she tell you whether -- at any meeting did any of
11 the media representatives you spoke to tell you they had
12 any documents in their possession already?
13     A. Yes.
14     Q. Who?
15     A. Lynne Dale said she had documents.
16     Q. Did you ever see those documents?
17     A. No.
18     Q. Did she describe them to you?
19     A. No.
20     Q. Did she say whether she had met with --
21     A. I had asked her -- I had asked her, but she
22 wouldn't tell me what documents she had.
23     Q. Did any of these media representatives
24 inform you that they were meeting with any plaintiffs'
25 lawyers who had clients with cases against

**Page 889**

1 UnumProvident?
2     A. Implied that they were flying all over the
3 place talking to attorneys, yeah.
4     Q. Do you know whether they were talking with
5 any of UnumProvident's attorneys or was it clear to you
6 that they were talking to plaintiffs' attorneys?
7     A. Yes, it was clear to me that they were
8 talking to plaintiffs' attorneys. They didn't say if
9 they were talking to UnumProvident's attorneys.
10     Q. Did she say whether she had met with any of
11 the counsel who are present here today representing the
12 plaintiffs?
13     A. Lynne Dale?
14     Q. Yes.
15     A. No, she said she hadn't met -- I think she
16 said she hadn't met anybody.
17     Q. Did she say whether her organization, and
18 I'm including -- let me back up. I'm including any of
19 the media representatives, 60 Minutes or Dateline, did
20 any of those representatives ever tell you that they had
21 met with any of the counsel representing plaintiffs who
22 have been here at this deposition?
23     A. Yes.
24     Q. Which ones?
25     A. Or met, no. Talked to.

**Page 890**

1     Q. Talked to or met. Which ones?
2     A. Mr. Gelber had said that he was -- I think
3 he was going to talk to Mr. --
4     Q. Levinson?
5     A. The man at the end of the table.
6     Q. Oh, Mr. Rubin?
7     A. No, Mr. Darras.
8     Q. Oh, Mr. Darras?
9         MR. JACOBS: Excuse me, move to strike
10 the answer as nonresponsive.
11     BY MR. MEAGHER:
12     Q. Anyone else that any media representative
13 told you they were going to talk to or had talked to
14 with regard to the counsel at this -- on plaintiffs'
15 side of the table at this deposition?
16     A. Yes, Ms. Lynne Dale said she would like to
17 speak with Bonnie Rafel.
18     Q. Anyone else?
19         MR. JACOBS: Move to strike as
20 nonresponsive.
21     BY MR. MEAGHER:
22     Q. Anyone else?
23     A. I believe they may have -- either one, and I
24 don't remember who, said they wanted to try to track
25 down Mr. Rubins' --

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (800) 342-5490



**PATRICK MCSHARRY**
10/23/2001 04:17 PM

To:     Debbie Kee/Provident Life/US@Unum, Tom Lamar/Provident Life/US@Unum, Deanna Nunn/Provident
        Life/US@Unum, Uneva Shaw/Unum@Unum, Nancy Minor/Provident Life/US@Unum, John
        Kos/Provident Life/US@Unum

cc:
Subject: A Meeting of the Minds

Folks
I am very concerned   as to your  negitive comments on my ability to review files and answer
questions  from the group pace and occasionally the Appeals (QPS)area .I brought these concerns
to my boss's Dr. Vatt and Dr. Anfield as I know some of you have felt the need to do also .
Unfortunately they had received inaccurate information  as is often the case where there is a third
party who must judge between two opposing views.
My main concern is my ability to give an objective opinion if I know that giving this opinion will lead
to either  reprimand for me or  you avoiding sending files to me . I feel I have reached an
understanding with Dr. Vatt , Dr Anfield and previously with  Rob Hecker  (Impairment Head Gen
Med and Cancer) and they would like me to set up a meeting with you to go through a process
which will allow you to voice your concerns with me on a case by case  basis  and give me the
opportunity to explain the Medical Reasoning for my opinion . This is a service I have offered for
some time and not been availed of  sufficiently in my opinion. One of my suggestions is ( and
which is open to discussion) that  If you are still unhappy after this "courtesy meeting", I will offer
one of my colleagues as a peer reviewer and defer  my review to their expertise  and allow their
review to stand as the prevailing opinion  so as to avoid differing opinions. As you well understand
once I have given my opinion on pre-existing etc  I can-not change it.
   vill have this meeting Thursday at 9.00 in the conference room beside my office  and will draw
_p  an "action plan" for Dr. Anfield  based on these discussions . This is your opportunity to get it
all out  so grab it with both hands . Of course this is an ongoing process of communication and I
believe we have achieved a considerable amount already and have  cited our progress with 1)
priorities  and 2) improving relationship  between Appeals (QPS) and Group Pace and 3)  improved
handling of subjective claims as examples of this progress.
Perhaps this  progress can be shown  as a good model for other teams etc
Thank you.


Fergal

DEFENDANT'S
EXHIBIT
NO. 122

000 153

**PATRICK
MCSHARRY**
10/24/2001 09:38 AM

To:     John Kos/Provident Life/US@Unum
cc:     Nancy Minor/Provident Life/US@Unum, Candice McGrath/Provident Life/US@Unum
Subject: Re: A Meeting of the Minds

John
Sorry I misunderstood Bob Anfield's intention when we spoke yesterday . He sent me an E-mail this
morning confirming that a discussion with Appeals is not necessary . I certainly have had no
issues since we had our discussions and indeed hold you guys up as a good example of how
Medical (support/advice ) and Claims Professionals ( Decision Makers) can work well together and
make a fair and valid assessment of a claim.
Fergal
John Kos

        John Kos
        10/24/2001 08:40 AM

To:     Patrick McSharry/Provident Life/US@Unum
cc:     Nancy Minor/Provident Life/US@Unum, Candice McGrath/Provident Life/US@Unum
Subject: Re: A Meeting of the Minds

Fergal:

I do believe that we had worked out an understanding earlier about the differences between a claim
in active claim management and a claim that is being appealed. If there is a need for additional
clarity in this area, I would be pleased to meet with you. If you have some concern about your
current interactions with the Appeals Staff, please let me know and we will visit.

I will not be attending your 9:00 A.M. session as our understanding on process is in place and I
have a training class all morning on Thursday.

Please call me if you wish to discuss further.

John
x1991

PATRICK

**PATRICK
MCSHARRY**
10/23/2001 04:17 PM

To:     Debbie Kee/Provident Life/US@Unum, Tom Lamar/Provident Life/US@Unum, Deanna Nunn/Provident
        Life/US@Unum, Uneva Shaw/Unum@Unum, Nancy Minor/Provident Life/US@Unum, John
        Kos/Provident Life/US@Unum
cc:
Subject: A Meeting of the Minds

000 154

**PATRICK**
**MCSHARRY**
10/24/2001 09:40 AM

To:      Nancy Minor/Provident Life/US@Unum
cc:
Subject:  Re: A Meeting of the Minds 📄

Nancy
See E-Mail to John. I value your understanding of my position. Thank you.
Fergal
Nancy Minor



To:      Patrick McSharry/Provident Life/US@Unum
cc:
Subject:  Re: A Meeting of the Minds 📄

Fergal, I believe that I have nothing to offer for your meeting on Thursday as no issues have been brought to my attention since we last spoke several months ago.  Therefore, I will decline your invitation.  Thanks, Nancy
PATRICK

**PATRICK**
**MCSHARRY**
10/23/2001 04:17 PM

To:      Debbie Kee/Provident Life/US@Unum, Tom Lamar/Provident Life/US@Unum, Deanna Nunn/Provident
          Life/US@Unum, Uneva Shaw/Unum@Unum, Nancy Minor/Provident Life/US@Unum, John
          Kos/Provident Life/US@Unum
cc:
Subject:  A Meeting of the Minds

Folks
I am very concerned   as to your  negitive comments on my ability to review files and answer questions  from the group pace and occasionally the Appeals (QPS)area .I brought these concerns to my boss's Dr. Vatt and Dr. Anfield as I know some of you have felt the need to do also . Unfortunately they had received inaccurate information  as is often the case where there is a third party who must judge between two opposing views.
My main concern is my ability to give an objective opinion if I know that giving this opinion will lead to either  reprimand for me or  you avoiding sending files to me . I feel I have reached an understanding with Dr. Vatt , Dr Anfield and previously with  Rob Hecker  (Impairment Head- Gen Med and Cancer) and they would like me to set up a meeting with you to go through a process  which will allow you to voice your concerns with me on a case by case  basis  and give me the opportunity to explain the Medical Reasoning for my opinion . This is a service I have offered for some time and not been availed of  sufficiently in my opinion. One of my suggestions is ( and which is open to discussion) that  If you are still unhappy after this "courtesy meeting", I will offer  ne of my colleagues as a peer reviewer and defer  my review to their expertise  and allow their

PL0 158

review to stand as the prevailing opinion  so as to avoid differing opinions. As you well understand once I have given my opinion on pre-existing etc  I can-not change it.

I will have this meeting Thursday at 9.00 in the conference room beside my office  and will draw up  an "action plan" for Dr. Anfield  based on these discussions . This is your opportunity to get it all out  so grab it with both hands . Of course this is an ongoing process of communication and I believe we have achieved a considerable amount already and have  cited our progress with 1) priorities  and 2) improving relationship  between Appeals (QPS) and Group Pace  and 3)  improved handling of subjective claims  as examples of this progress.

Perhaps this  progress can be shown  as a good model for other teams etc

Thank you.


Fergal



**PATRICK
MCSHARRY**
10/24/2001 09:28 AM

To:      Bob Anfield/Provident Life/US@Unum
cc:
Subject:  Re: A Meeting of the Minds 📄

Bob
Sorry if I misunderstood . I did not hear   you say you would set up the meeting . I agree that  there
are no remaining issues with Appeals but again I misunderstood . As for the inclusion of the
additional folks ,this seems like a good idea . Sorry if I pre-empted you but I was only doing what I
thought you asked me to do .
Fergal
Bob Anfield

 **Bob Anfield**
10/23/2001 05:12 PM

To:      Patrick McSharry/Provident Life/US@Unum
cc:      Richard Vatt, Robert Hecker/Provident Life/US@Unum, Jill Plumer/Provident Life/US@Unum, Kimberly
         Mashburn, Debbie Kee/Provident Life/US@Unum, Uneva Shaw/Unum@Unum
Subject:  Re: A Meeting of the Minds 📄

¯ergal:

I was somewhat surprised to receive this memo as I thought I had indicated that I would set up the
meeting, irrespective, I can't fault you for your sense of urgency in this matter.

My vision for the team to work on improving our partnership with Gen Med and Cancer is
somewhat different from the team you have called together. First, my sense is that you have no
current issues with QPS those being resolved satisfactorily some months ago (which makes me
optimistic that we can resolve the current issues with our other partners) and thus there is no need
to include QPS in this dialog. There must be sponsorship from Rick, your manager, and Rob in the
development of a plan; I also want to be involved at least initially. I see Deb Kee, Uneva Shaw and
Jill Plumer as also being primary stakeholders and appropriate participants. I hope to be able to pull
you and the rest of the team together tomorrow afternoon if at all possible and will check with
each as to their availability.

Thanks,

Bob

PATRICK

**PATRICK
MCSHARRY**
10/23/2001 04:17 PM

**PATRICK
MCSHARRY**
10/24/2001 10:12 AM

To:      Patrick McSharry/Provident Life/US@Unum
cc:      Debbie Kee/Provident Life/US@Unum, Tom Lamar/Provident Life/US@Unum, Deanna Nunn/Provident
         Life/US@Unum, Uneva Shaw/Unum@Unum, Nancy Minor/Provident Life/US@Unum, John
         Kos/Provident Life/US@Unum
Subject: Re: A Meeting of the Minds 🖾

Folks
Dr Bob Anfield is going to help me address my concerns  and is setting up a meeting that he will
chair ,those you are invited will receive an invitation from him.  There have been  no issues with
Appeals for some time now . Please disregard my previous invitation .

Fergal
PATRICK


**PATRICK
MCSHARRY**
10/23/2001 04:17 PM

To:      Debbie Kee/Provident Life/US@Unum, Tom Lamar/Provident Life/US@Unum, Deanna Nunn/Provident
         Life/US@Unum, Uneva Shaw/Unum@Unum, Nancy Minor/Provident Life/US@Unum, John
         Kos/Provident Life/US@Unum
cc:
Subject: A Meeting of the Minds

Folks
I am very concerned  as to your  negitive comments on my ability to review files and answer
questions  from the group pace and occasionally the Appeals (QPS)area .I brought these concerns
to my boss's Dr. Vatt and Dr. Anfield as I know some of you have felt the need to do also .
Unfortunately they had received inaccurate information  as is often the case where there is a third
party who must judge between two opposing views.
My main concern is my ability to give an objective opinion if I know that giving this opinion will lead
to either  reprimand for me or  you avoiding sending files to me . I feel I have reached an
understanding with Dr. Vatt , Dr Anfield and previously with  Rob Hecker  (Impairment Head Gen
Med and Cancer) and they would like me to set up a meeting with you to go through a process
which will allow you to voice your concerns with me on a case by case  basis  and give me the
opportunity to explain the Medical Reasoning for my opinion . This is a service I have offered for
some time and not been availed of  sufficiently in my opinion . One of my suggestions is ( and
which is open to discussion) that  If you are still unhappy after this "courtesy meeting", I will offer
one of my colleagues as a peer reviewer and defer  my review to their expertise  and allow their
review to stand as the prevailing opinion  so as to avoid differing opinions. As you well understand
once I have given my opinion on pre-existing etc  I can-not change it.
I will have this meeting Thursday at 9.00 in the conference room beside my office  and will draw
up  an "action plan" for Dr. Anfield  based on these discussions . This is your opportunity to get it
all out  so grab it with both hands . Of course this is an ongoing process of communication and I
believe we have achieved a considerable amount already and have  cited our progress with 1)
priorities  and 2) improving relationship  between Appeals (QPS) and Group Face  and 3)  improved
handling of subjective claims  as examples of this progress.
Perhaps this  progress can be shown  as a good model for other teams etc
Thank you.

000 164

3

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VINCENZO MAZZAMUTO,<br>　　　　Plaintiff, | : | CIVIL ACTION<br>NO. 1:CV-01-1157 |
| | : | |
| v. | : | |
| | : | |
| UNUMPROVIDENT<br>CORPORATION, et al.,<br>　　　　Defendants | : | (JUDGE CONNER) |

FILED
HARRISBURG, PA

OCT 3 1 2002

ARY E. D'ANDREA, CLERK
Per _____
　　　　Deputy Clerk

## DEFENDANTS' REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE

Dated:  October 31 2002　　　　STEVENS & LEE

By _E. Thomas Hener̄_____

E. Thomas Henefer
Attorney I.D. No. 55773
Kirk L. Wolgemuth
Attorney I.D. No. 45792
111 North Sixth Street
P.O. Box 679
Reading, Pennsylvania  19603
(610) 478-2000

Attorneys for Defendants UNUM Provident
Corporation, Paul Revere Insurance Company,
and New York Life Insurance Company

## I. INTRODUCTION

Defendants UNUMProvident Corporation, Paul Revere Insurance Company and New York Life Insurance Company ("Defendants") file this reply brief in support of their Motion in Limine.

## II. ARGUMENT

### A. **The Untimely "Experts" Should Be Excluded**

The Court has discretion to deny plaintiff's use of McSharry and. Schneider as experts.  Oliver v. Ingber, No. 96-4471, 1998 U.S. Dist. LEXIS 2799 at *3-4, (E.D. Pa. Mar. 9, 1998).  Exclusion is proper because the proposed testimony is inadmissible and the late disclosure is prejudicial.  In fact, plaintiff's inconsistent arguments about whether these witnesses are fact or expert witnesses underscores how defendants would be prejudiced if plaintiff is allowed to ignore both the rules of evidence and the Court's scheduling order by presenting these witnesses.

There is no question that plaintiff failed to timely disclose McSharry and Schneider – despite plaintiff's disingenuous claim that he complied with Rule 26(a)(2)(A) "in accordance with Judge Kane's case management order."  [Plaintiff's Brief in Opposition, p. 4].  The amended case management order extended the deadline for expert reports to June 28, 2002.  Neither Schneider nor McSharry were designated as fact or expert witnesses until long after (a) discovery had closed and (b) the deadline for disclosure of experts had passed.

Plaintiff acknowledge that an expert report should be provided for McSharry by filing a motion (presumably with a good faith basis under Rule 11) to extend the

1

deadline for expert reports to September 30, 2002. As defendants predicted, September 30, 2002 came and went with no expert report from McSharry.

Having failed to secure a report from this so-called "expert," plaintiff now argues (for the first time in response to defendants' motion in limine) that <u>both</u> McSharry and Schneider are "fact" witnesses. But plaintiff offers only internally inconsistent and contradictory arguments that waffle between whether Schneider and McSharry are fact witnesses or experts.[1]

In short, any defendant in any case would be prejudiced by the untimely disclosure of two witnesses and the added uncertainty of whether they will offer testimony about "facts" "opinions" as experts. Plaintiff's default is particularly suspect in the case of Schneider because plaintiff knew of Schneider for roughly a year before the discovery deadline yet never disclosed him as a possible witness until after (a) the discovery deadline had passed, (b) plaintiff failed to designate any expert on psychiatric issues (and his bad faith expert opined there were no psychiatric issues in the case), and (c) defendants produced a report from an expert psychiatrist. Simply put, defendants are entitled to rely on the notion that this plaintiff would follow the rules and scheduling order (rather than attempting to sandbag defendants) in preparing their case. Allowing plaintiff to offer a new witness, who has not been deposed, to rebut a defense expert is plainly prejudicial.

---

[1]    While claiming they are "fact" witnesses, plaintiff cites to Rule 26(a)(2)(A) which, of course, deals with expert witnesses, claims McSharry is both a fact and expert witness and baldly claims McSharry qualifies as an expert. [Plaintiff's brief, p. 10-11.]

2



Allowing McSharry to testify (either live or through his deposition) would also be prejudicial. Apart from the fact that defendants have not been able to depose McSharry about this case (of which he has zero knowledge), plaintiff is offering McSharry to support a new theory based on the ludicrous notion that defendants have a pattern and practice of denying claims. While such allegations are spurious and should not be allowed, it suffices to say that defendants would have prepared for a different case, both in terms of fact and expert witnesses, had there been a timely disclosure of a pattern and practice claim.

### B. The Proposed Testimony of McSharry Is Inadmissible

#### 1. Rules 401 and 403

There is no evidence that McSharry has any knowledge of plaintiff s claim. Nevertheless, plaintiff seeks to introduce deposition testimony from McSharry concerning his review of <u>other</u> claims. His purpose is to prejudice and mislead the jury by asking them to speculate that what McSharry <u>claims to have witnessed</u> in the General Medical impairment unit in Chattanooga, Tennessee, has some bearing on what on what happened on plaintiff's claim in Worcester, Massachusetts.

#### The Proffered Testimony Is Irrelevant

Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Further, Rule 402 provides that "[e]vidence which is not relevant is not admissible."

At the outset, McSharry concedes he has a complete lack of any factual knowledge regarding any case where he did not do a review, which would include the claim that is the subject of this litigation. (Exh. 2, McSharry Tr. 753:17-22, 760:5-11; 762:7-763:8; 768:5-10; 770:12-18). Evidence about what might have happened in reaching claims determinations in 2000 in the General Medical impairment unit in Chattanooga where McSharry worked has no relevance to the facts at issue in this case. It has no tendency to prove that the denial of Plaintiff's claim was a breach of contract or done in bad faith. It is analogous to employment discrimination cases where courts often exclude as irrelevant evidence of other cases of alleged discrimination.[2]

In short, evidence of alleged wrongdoing unrelated to Plaintiff's claim is simply irrelevant and has no probative value with respect to what happened in this case, the only one before this Court.

### The Testimony Should Be Excluded Under Rule 403

As stated in Defendants' Memorandum of Law, McSharry's testimony a classic example for use of Rule 403 because of the very real prospect that allowing his deposition into evidence will confuse the jury and result in a "mini-trial" over his allegations. [Exhibit 1, p. 8.]  Indeed, for the jury to consider McSharry's allegations, even about the cases in which he was involved, we would need to try

---

[2]    See Goff v. Continental Oil Co., 678 F.2d 593, 597 (5th Cir. 1982); Seymore v. Shawyer & Sons, Inc., 111 F.3d 794, 801 (10th Cir. 1997); Haskell v. Kaman Corp., 743 F.2d 113, 122 (2d Cir. 1984); Schrand v. Federal Pac. Elec. Co., 851 F.2d 152, 156 (6th Cir. 1988).

each case. In fact, McSharry's deposition confirms that defendants would need to pursue many issues, unrelated to this case, to impeach McSharry such as:

McSharry's employment history. McSharry worked for three different insurance companies in three years. (McSharry Tr. 583:21-584:5). His 13 month stint at UNUMProvident was the longest of the three. While employed with Blue Cross he was slated to be terminated for poor performance and disruptive behavior, but after initially refusing the option of resigning to save face, he was escorted off the premises by security. (McSharry Tr. 495:24-498:7; Def. Ex. 102, 110).

McSharry's Employment at UNUMProvident. Defendants will have to introduce substantial evidence of McSharry's numerous performance problems while at UNUMProvident to enable the jury to assess his motivation to lie about the Company. For example, after he was given a performance warning in writing, he began consulting with a lawyer, and only thereafter did he begin to raise purported concerns about the Company's claims practices. (McSharry Tr. 381:8-19; 382:22-383:13; 659.16-660:2; 678:2-679:4).

Specific Instances of Alleged Improper Claims Handling. To rebut McSharry's claims of allegedly improper claims handling, UNUMProvident may be forced to introduce evidence concerning the specific cases on which McSharry relies (some of which is addressed below). This creates a risk of mini-trials on the merits of unrelated claims, greatly prolonging trial and distracting the jury.

5

The Accused Doctors in the Chattanooga General Medical Unit. McSharry has accused a certain number of his former colleagues in Chattanooga of changing medical opinions to support denial of claims. The individuals in question vehemently deny this very serious accusation and at a minimum would have the right to testify at trial to defend their professional reputation.

Each of these areas could become a sideshow to this trial. For all these reasons, McSharry's testimony, if admitted, will inevitably serve to mislead and/or confuse the jury and draw their attention away from the real issues in this case.

## 2. McSharry Is Not Competent To Testify

Despite plaintiff's arguments that McSharry is a fact witness, the limitations underlying Federal Rule of Evidence 602 preclude the use of his deposition. Rule 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Again, he has no personal knowledge of the plaintiff's claims, and thus is not competent to testify.

## 3. The Proffered Lay Opinion Testimony Of McSharry Is Inadmissible Under Rule 701

Plaintiff states that he proposes to use the McSharry deposition as evidence of "UNUM's practices in denying applications for disability" and specifically "as to the procedure followed in denying Mr. Mazzamuto's claim." [Plaintiff's Brief in Opposition, p. 7.] While plaintiff argues that McSharry's testimony "is probative," such a purpose can only be probative because it is, in effect, McSharry's <u>opinion</u>

6

regarding plaintiff's bad faith claims. If plaintiff is to be believed, and McSharry is really intended to be a "fact witness," then use of the testimony would result in McSharry rendering an improper opinion or inference in violation of Rule 701.

McSharry's testimony cannot be deemed to be <u>rationally based on the perception of the witness</u> as it relates to the facts of this case. Instead, the witness must have perceived with his senses the matters on which his opinion is based, and there must be a rational connection between the witness's opinions and his perceptions. Rule 701, like Rule 602, therefore requires personal knowledge (which McSharry lacks). Where lay opinion testimony is not based on personal knowledge or is considered to be speculative, such testimony is routinely excluded. <u>See</u> <u>e.g.</u> <u>SEC v. Infinity Group Co.</u>, 212 F.3d 180, 197 (3d Cir. 2000).

McSharry has no personal knowledge about the decision on plaintiff's claim, he never reviewed plaintiff's file, knows nothing about the basis for plaintiff's disability claim or the reasons for its denial, never worked in the impairment unit in Worcester, Massachusetts, and apparently does not even know Dr. Clarke who reviewed plaintiff's medical records.

The requirement that the opinion be "rationally based on the perception of the witness" demands more than that the witness perceived something firsthand. It also requires a logical connection between the perception and the opinion. Accordingly, the courts look to the validity of proposition that the witness used to

7

link perception to his opinion and reject opinions where there is little or no validity to the linkage.  See e.g., Hester v. Bic Corp., 225 F.3d 178, 184 (2d Cir. 2000).

Here, McSharry fails to offer any linkage -- let alone a reasonable one -- between the individual and hotly contested instances where he complains that claims were mishandled and his opinion that there purportedly existed a company-wide practice of denying valid claims.  In the absence of any such linkage, his inflammatory opinions are not evidence and should be excluded under Rule 701.

McSharry's testimony also must be helpful to the trier of fact to be admitted under Rule 701.  This requires the court to balance the benefits of the testimony against its costs.  When lay opinion testimony saves time or provides information not conveyed by testimony limited to the facts, it provides a benefit.  However, where the proffered testimony does little more than "tell the jury what result to reach," it is not helpful and will be excluded.  See U.S. v. Rea, 958 F.2d 1206, 1215 (2d Cir. 1992); See also Wright & Miller, 29 Fed. Prac. & Proc. Evid. § 6255. Where the proffered lay opinion testimony is offered without adequate supporting factual detail, it amounts to little more than "choosing up sides" and should be excluded, particularly where it concerns a crucial issue in the case.  See Connell v. Bank of Boston, 924 F.2d 1169, 1177-78 n. 7 (1st Cir.) cert. denied, 501 U.S. 1218 (1991).

Here, there is no evidence that McSharry has personal knowledge about the challenged claim denial and/or the decision-makers involved.  Further, he has not

testified about any uniform practice of improper claims handling, but instead testified that, in his experience, some doctors would compromise their opinions and others would not, some claims representatives pushed for denials that McSharry could not support and others wanted to pay claims that McSharry did not believe were valid. (McSharry Tr. 839: 3-24; 843:10-16; 849:12-14; 258:10-22).

McSharry could offer only limited specific concrete examples of the practices he claimed were designed to encourage claims denial, each of which is sharply disputed. For example, McSharry offered only two examples of "doctor shopping," where he contended that claims professionals had deliberately sought opinions from doctors other than him.

In one case, he pointed to a case of a woman with acute leukemia where he had done a preliminary review of whether there was a pre-existing condition that would preclude insurance coverage. In the course of his preliminary review, McSharry had told the nurse responsible for the claim that the Company should not even consider the pre-existing condition "because this person is very sick. And there really was no doubt that this [paying the claim] was the humane thing to do." (McSharry Tr. 699:13-14). This was consistent with his general view that benefits should be paid not in accordance with the insurance contract provisions, but according to principles of morality. (McSharry Tr. 700:16-701:8) ("The spirit of the contract is morality.") For understandable reasons, following this exchange, the claims reviewer doubted McSharry's ability to provide an objective opinion

9

about whether a pre-existing condition existed. Accordingly, another doctor was asked to review the full file and found a clearly documented pre-existing condition. (McSharry Tr. 690:24-691:1; 698:24-701:14; 702:22-705:2).

In the only other instance of alleged doctor shopping, McSharry pointed to the case of "Mr. J," who had been receiving disability benefits for five years and claimed to be totally disabled to the point where he required extended rest after performing such tasks as shaving, taking a shower, or getting dressed (Exh. 3, Def. Ex. 124; McSharry Tr. 939:17-940:1). McSharry ignored a surveillance video that revealed the claimant building a dock and engaging in prolonged, vigorous yard work over the course of several days, activities far more strenuous than his doctors indicated he was capable of doing. (McSharry Tr. 914:20-915:19; 920:18-921:4; 941:2-20). Under these circumstances, the specialist was amply justified in questioning McSharry's objectivity.

In any event, these opinions offer the jury no facts to assist it in reaching its own conclusion on the questions before it -- whether the claims denial <u>in this case</u> was a breach of contract and/or made in bad faith. Instead, McSharry simply takes sides by telling the jury that in his opinion, UNUMProvident is a bad company. This is precisely the kind of opinion testimony that is inadmissible under Rule 701.

Finally, Plaintiff argues persistently that McSharry's testimony is based on "<u>other specialized knowledge</u>." [Plaintiff's Brief in Opposition, p. 9]. But, again, if

10



McSharry is a "fact witness not an expert," [Plaintiff's response, ¶ 3], Rule 701 prohibits opinions or inferences <u>based on specialized knowledge</u>.

### 4.  McSharry's Testimony Would Not Satisfy Rule 702

As stated above, McSharry's testimony and/or deposition does not fit the facts of this case, and the concern over McSharry's personal financial interest renders it unreliable.  [Exhibit 1 pp. 6-7.]  Thus, regardless of whether plaintiff chooses to shroud McSharry in expert clothing, his testimony and deposition does not satisfy Rule 702.

### 5.  Plaintiff's Use Of McSharry's Deposition Pursuant To Rule 32 Is Improper.

Plaintiff stated that he intends to use McSharry's deposition at trial pursuant to Federal Rule of Civil Procedure 32.  However, plaintiff justified his use of Rule 32 by fast-forwarding to the end of subsection 32(a)[3] without first addressing the general provisions which allow for use of a deposition <u>so far as admissible under the rules of evidence</u>.  Fed. R. Evid. 32.  As noted above, McSharry's testimony is not admissible under the rules of evidence.

While Rule 32 appears largely inapplicable, defendants can only assume that Plaintiff intends to invoke subsection 32(a)(3) which roughly corresponds to the definition of unavailability for the hearsay exceptions provided under Federal Rule

---

[3]    Instead, Plaintiff quotes from a portion of Rule 32(a) that deals with the <u>substitution of parties</u> and the use of depositions in matters brought by the <u>same parties</u> or <u>their representatives</u>, or <u>successors in interest</u>.  Plaintiff was <u>not</u> a party to Dr. McSharry's suit, <u>nor</u> is he a substituted party, a representative or a successor in interest.

11

of Evidence 804. While plaintiff has not raised Rule 804, defendants note, out of an abundance of caution, that Rule 804 too is inapplicable.

Under Rule 804, assuming plaintiff can demonstrate that McSharry is unavailable, the only applicable use would fall under the subsection governing former testimony. Fed. R. Evid. 804(b)(1). But contrary to the requirements of the Rule, defendants did not have an opportunity and similar motive to examine McSharry during the deposition for his wrongful discharge case and certainly had no opportunity to inquire regarding about the facts of this case. Plaintiff cannot argue in good faith that the defendants had an opportunity or similar motive to develop testimony about Mr. Mazzamuto's disability claim during a deposition for another lawsuit about an employment matter.

## C. The Social Security Decision, Evidence Of The Waiver Of Life Insurance Premiums By New York Life And Correspondence Between Counsel Should Be Excluded.

### 1. The Social Security Award

As stated in Defendants' Memorandum, evidence of plaintiff's SSDI benefits should be excluded as irrelevant because the award is based on different standards and a vastly different factual record. [Exhibit 2, pp. 10-12.]

First, plaintiff argues that the Third Circuit standard from Russell v. Paul Revere Life Ins. Co., 288 F.3d 78 (3d Cir. 2002), is inapplicable because it was an ERISA case and as such "courts were required to affirm where the findings were reasonable." [Plaintiff's Brief in Opposition, p. 13.]

12

But the applicable part of Russell is not the ERISA arbitrary and capricious standard of review but the holding which involves plaintiff's contractual burden of proof and contract interpretation. Russell v. Paul Revere Life Ins. Co., 148 F. Supp. 2d 392, 404-05 (D. Del. 2001) (finding that "the policy language places upon the employee the initial burden to demonstrate that he or she can not perform any of the important duties of his position") aff'd, 288 F.3d 78 (3d Cir. 2002). Courts in other Circuits have applied the same rules of contract interpretation, McOsker v. Paul Revere Life Ins. Co., 279 F.3d 586, 588 (8th Cir. 2002), even when the policy in question was not subject to ERISA, Yahiro v. Northwestern Mutual Life Ins. Co., 168 F. Supp. 2d 511, 517-518 (D. Md. 2001) (looking to the language of the contract for the standard to apply for determining residual disability in non-ERISA policy). Plaintiff has offered no reason why these straightforward principles of contract interpretation should be different in an ERISA case than here.

Second, plaintiff does not dispute that the record available to the Social Security Administration ("SSA") was vastly different from that presented to Paul Revere of this Court. [Exhibit 2, p. 11.] Once again, plaintiff points out that the SSA relied upon Dr. Bowers's letter dated April 16, 2002. [Plaintiff's Brief in Opposition, p. 12.] Given his response, it is clear that the ALJ did not have Dr. Bower's deposition (from the same day), which contained contrary findings.

ST 1 303906v1/10305 060

## 2.  New York Life Waiver of Life Insurance Premiums

As stated in Defendant's Memorandum, New York Life's ("NYL") waiver of life insurance premiums is not relevant and likely to confuse and mislead the jury. [Exhibit 1, pp. 12-13.]  Nevertheless, plaintiff again merely sidesteps the argument and points blindly in the direction of ERISA.  [Plaintiff's Brief in Opposition, p. 13.]  For the same reasons as stated above, the <u>Russell</u> arbitrary and capricious standard does not apply to the contractual burden of proof required.  The salient point, completely overlooked by plaintiff, is that the standard applicable to waiving life insurance premiums for disability under the NYL policy is simply not the same as the standard required under the Paul Revere disability policy.  [Exhibit 1, p. 13.]

Moreover, plaintiff refuses to acknowledge that it is Paul Revere and not NYL, who administers the disability policy and pays benefits under valid disability claims.  NYL is responsible only for plaintiff's life insurance policy.  Paul Revere has a separate and distinct claims review policy, a separate and distinct claims review process, and a separate and distinct claims review staff.  Thus, a finding of disability under a NYL policy for the purpose of waiving a NYL life insurance premium does not mandate a finding of disability for the purpose of paying benefits under the disability policy.

Thus, evidence of NYL's waiver of life insurance premiums should be excluded because it is not relevant and likely to confuse and mislead the jury.

SL1 303906v1/10305 060

### 3.  Correspondence Between Counsel

Plaintiff's argument for the admissibility of counsel correspondence is without substance.  Boiled down to its basic premise, plaintiff's argument for the relevance of the correspondence says little more than "plaintiff demanded payment, but defendant said plaintiff is ineligible."  If all similar communication between counsel regarding demands for settlement were admissible as evidence of bad faith, very little in the way of productive dialogue could ever be expected.

## III.  CONCLUSION

For the foregoing reasons, defendants respectfully request this Court to grant their Motion in Limine.

Dated:  October **31**, 2002          STEVENS & LEE

By E. Thomas Henefer
E. Thomas Henefer
Attorney I.D. No. 55773
Kirk L. Wolgemuth
Attorney I.D. No. 45792
111 North Sixth Street
P.O. Box 679
Reading, Pennsylvania  19603
(610) 478-2000

Attorneys for Defendants

SL1 303906v1/10305.060

## CERTIFICATE OF SERVICE

I, E THOMAS HENEFER, ESQUIRE, certify that on this date, I

served a certified true and correct copy of the foregoing EXHIBITS upon the

following counsel of record, by hand delivery to the address as follows:

Richard C. Angino, Esquire
4503 North Front Street
Harrisburg, PA  17110-1708

E. Thomas Henefer

Date:  November 1, 2002