2 TO G
W/PROPO

(74)
11/20/02

ORIGINAL

FILED
HARRISBURG, PA

NOV 1 9 2002

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VINCENZO MAZZAMUTO,<br>    Plaintiff, | CIVIL ACTION – LAW |
| v. | NO. 1:CV-01-1157 |
| UNUM PROVIDENT CORPORATION;<br>PAUL REVERE LIFE INSURANCE<br>COMPANY; and NEW YORK LIFE<br>INSURANCE COMPANY<br>    Defendants | JUDGE CONNER<br><br>JURY TRIAL DEMANDED |

### PLAINTIFF'S MOTION TO REOPEN DISCOVERY, FILE AN AMENDED COMPLAINT, AND EXTEND DEADLINES

Richard C. Angino of Angino & Rovner, on behalf of Plaintiff Vincenzo Mazzamuto respectfully requests the Court's permission to reopen discovery, file and Amended Complaint, and extend deadlines based upon the following facts:

1.    Plaintiff filed a Complaint on June 26, 2001, alleging that Defendants wrongfully denied his disability claim and seeking payment of his disability claim plus "bad faith" damages under 42 Pa.C.S.A. §8371.

2.    The original Case Management Order dated October 25, 2001, provided for a close of fact discovery of March 15, 2002, and a proposed jury trial of August 5, 2002. The

Court later amended its Case Management Order to provide a close of fact discovery of June 14, 2002, and a jury selection and trial of November 4, 2002.

3.      On August 9, 2002, Defendants filed various motions and briefs, including a Motion in Limine and a Motion for Summary Judgment.

4.      On August 12, 2002, Plaintiff filed a Motion for Summary Judgment and Supporting Brief with Statement of Undisputed Facts.

5.      On August 26, 2002, Plaintiff learned that Defendant UNUMProvident was potentially guilty of unfair and fraudulent insurance practices and sought an extended deadline for filing an expert report dealing with the improper and potentially fraudulent insurance practices.

6.      On September 17, 2002, Judge Kane signed an order reassigning the instant case to Judge Conner.

7.      On October 21, 2002, Plaintiff filed a Motion and Supporting Brief to permit a supplemental expert report.  On October 24, 2002, Judge Conner entered a revised Order requiring that pre-trial memoranda be filed on or before Wednesday, February 5, 2003, and jury selection and trial commencing March 3, 2003.

8.      On October 16, 2002, John Larson, Dateline NBC correspondent, featured Defendant UNUMProvident under the by line "What if your disability benefits were suddenly cut off?"  See, **Exhibit A**.

9.      On November 17, 2002, CBS News did a similar segment on UNUMProvident: "Did Insurer Cheat Disabled Clients?"  **Exhibit B**.

10.     Referenced in the CBS segment is a District Court case out of the Northern District of California Hangarter v. The Paul Revere Life Insurance Company, et al., Case No.

C 99-5286 JL.  **Exhibit C**.  <u>Also see</u>, article on the <u>Hangarter</u> case published on May 17, 2002

(**Exhibit D**), the Reuters article:  "U.S. judge upholds verdict against UnumProvident (**Exhibit**

**E**), the docket entries as of November 15, 2002 (**Exhibit F**), and "Judge orders UnumProvident

to 'obey the law'" (**Exhibit G**).  <u>See also</u>, "Recent Lawsuits" (**Exhibit H**) and UnumProvident

information referencing Dr. William Feist mentioned in Dateline NBC investigation (**Exhibit I**)

11.     The <u>Hangarter</u> case has findings of fact and conclusions of law finding violations

of Cal. Bus. & Prof. Cod. §17200, and concluded:

<div align="center">CONCLUSION AND ORDER</div>

There was testimony at trial that Paul Revere adopted Provident's claims handling policies as part of the transition when it was acquired by Provident, including targeting certain categories of claims, and that Paul Revere employees admitted to such practices as destruction of the original medical reports from examining physicians, not knowing the California definition of total disability, and adopting a policy of failing to document claims processes in the file.  There was testimony from experts and others that Defendants used a biased medical examiner, failed to advise its insured of covered benefits, targeted claims like hers for termination, failed to settle a claim when liability was clear, and forced its insured to litigate to obtain benefits.  Based on the evidence presented at trial, this court concludes that Defendants have violated the Unfair Insurance Practices Act, Insurance Code §790.03, and that their bad faith in doing so, as found by the jury in this case, constitutes a violation of Cal. Bus. & Prof. Code §17200.

The court hereby adopts the factual finding of the jury that the Defendants acted in bad faith in denying Plaintiff's claim and further finds that the Defendants' multiple acts of bad faith constitute violations of the California Unfair Competition Act.

The court exercises its discretion in seeking to fashion an appropriate equitable remedy.

In bringing her cause of action under section 17200, Joan Hangarter asked this court to order Defendants to desist from unfair practices directed both at her and other policyholders, and to award her attorney fees and to provide other relief, including reopening investigations of other claims, refunding premiums and such other relief as the court found proper.  After the trial on Plaintiff's other causes of action, the jury awarded Plaintiff substantial damages for her past and future monthly benefits, her emotional distress, her attorney's fees and punitive damages.  In so doing the jury sent a significant message to the Defendants.  This court sees no need to supplement the jury's award.  The court also finds it

impracticable to fashion a consent decree or to *sua sponte* open an investigation into allegations by other policyholders. The court finds it more appropriate in this instance to order Defendants to obey the law, and hereby enjoins them from future violations, including but not limited, targeting categories of claims or claimants, employing biased medical examiners, destroying medical reports, and withholding from claimants information about their benefits.

IT IS SO ORDERED.

**Exhibit C**, pp. 61-62.

12. The Paul Revere Life Insurance Company and UNUMProvident are the same Defendants as the Defendants in the instant case, and the findings of fact and conclusions of law in Hangarter appear on the surface to be the same.

13. Pennsylvania has an Unfair Insurance Practices Act which facially appears to be similar to California's Unfair Competition Act.

14. Various individuals who may have relevant information have been identified in the NBC and CBS programs and the various articles, and it is highly likely that relevant information can be obtained as a result of the Hangarter lawsuit and other similar lawsuits throughout the country, as well as investigations being conducted by insurance commissioners in various states.

WHEREFORE, Plaintiff, by his attorney, Richard C. Angino, requests your Honorable Court to reopen discovery with a new discovery deadline of April 1, 2003, and the appropriate extension of other deadlines, including the filing of supplemental expert reports, an Amended Complaint, dispositive motions, pre-trial conference and trial dates.

Respectfully submitted,

ANGINO & ROVNER, P.C.

Richard C. Angino, Esquire
I.D. No. 07140
Joan L. Stehulak, Esquire
I.D. No. 29496
4503 N. Front Street
Harrisburg, PA  17110
(717) 238-6791
Attorney for Plaintiff

Date: 11/19/02

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VINCENZO MAZZAMUTO,<br>    Plaintiff, | CIVIL ACTION – LAW |
| v. | NO. 1:CV-01-1157 |
| UNUM PROVIDENT CORPORATION;<br>PAUL REVERE LIFE INSURANCE<br>COMPANY; and NEW YORK LIFE<br>INSURANCE COMPANY<br>    Defendants | JUDGE CONNER<br><br>JURY TRIAL DEMANDED |

## CERTIFICATE OF CONCURRENCE/NON-CONCURRENCE

I, Richard C. Angino, hereby certify that on November 18, 2002, I faxed a letter to

Thomas Henefer, counsel for Defendants, seeking concurrence/non-concurrence in Plaintiff's

Motion to Reopen Discovery, File an Amended Complaint, and Extend Deadlines. I have not

received a response from Mr. Henefer.

Richard C. Angino

# What if your disability benefits were suddenly cut off?

**A Dateline NBC Investigation**

NBC News

Oct. 16— Insurance — we buy it for peace of mind to cover our homes, our health, our lives. Millions of Americans have disability insurance to help replace lost income in case of a serious illness or injury. If you can't work, those benefits may be crucial for you and your family. But what if, suddenly, unexpectedly, your benefits were cut off? That's what happened to the people in this story. We found some startling charges against the biggest disability insurance provider in the country. Correspondent John Larson reports in this Dateline Investigation.



**John Larson**
DATELINE NBC
CORRESPONDENT

IT BEGAN ON a stretch of Interstate 40 in Albuquerque, New Mexico in February of 1998 — a car salesman swerves to avoid some rocks, and the world suddenly turns upside down.

"The nurses and all the physicians they were saying, 'Do you have any feeling? Can you move your legs?'" says John Montano. "And I kept telling them, 'I can't feel anything from the chest down.'"

The accident had severed John Montano's spinal cord. Although he was spared some limited use of his arms, he's considered a quadriplegic — paralyzed for life.

And what lay ahead could hardly have looked worse. Unable to work or support his family, Montano faced losing everything. But like millions of Americans, he had prepared for just such a disaster. He had paid $59 a month for disability insurance, which promised if he was ever too sick or too injured to keep working, it would help replace his lost income. The checks began arriving as promised, but after two years he got a shocking letter. His disability benefits were being cut off.

"I was scared," says Montano. "I was frightened. I go, 'Well, there's got to be a mistake.'"

But there was no mistake. Montano's insurance company had decided that despite his paralysis he no longer deserved benefits. So what was going on? Sources tell Dateline that what happened to john Montano may have been part of something much larger. a dateline investigation into whether the largest disability carrier in the United States — Unum provident — launched a company-wide effort to cut costs aggressively, and in the process, unfairly denied benefits, selling out people it promised to protect.

"They just basically cut me off and that was it," says Montano.

In Montano's case, UnumProvident claimed to have good reason. It said it had "surveillance tape", that Montano had "improved immensely" and he should go back to work selling cars.

Was there any way that Montano was faking his quadriplegia?

Absolutely not. There's no way," says Dr. Jonathan Burg, Montano's doctor.
He says the records are clear, Montano is a quadriplegic.

**John Larson**: "Did you tell the company, look I'll take any test you want me to take?"
**John Montano**: "Yes."
**John Larson**: "And so did they do that? Did they evaluate you?"
**John Montano**: "No, I didn't hear back from them."

The disability and life insurance industry says it faces $1.5 billion in fraudulent claims every year. So you can understand why it might investigate Montano's claim. But when UnumProvident finally shared its surveillance tape Dr. Burg says it showed nothing new — just John Montano driving his specially-equipped van, demonstrating what everyone already knew: Montano had a limited use of his upper arms. In a letter to UnumProvident, Dr. Burg stated "by all standards this man is completely and totally disabled."
Meanwhile, his benefits cut off, Montano spiraled towards bankruptcy. His wife had divorced him after the accident. Now faced with losing his home and his children, he says he became suicidal.

**John Larson**: "It sounds like it was pretty close."
**John Montano**: "Yes, yes."

So how could something like this happen? Some people say they know.
These three former UnumProvident employees tell a disturbing story of a company obsessed with finding excuses to cut off benefits.
"They have to literally fight to get their benefits," says one.
**John Larson**: "Did you feel pressure to close claims?"
**Former employee**: "Absolutely."

They asked Dateline to conceal their identities because they're afraid of reprisals.

**Former employee**: "Find ways to close claims. Just look so very carefully to find anything that will disqualify them from the claim."
**Former employee:** "They even gave incentives."
**John Larson**: "Incentives how?"
**Former employee**: "Incentives for closing claims. If we projected that we were going to close 30, if we get to 30 we'll have a pizza party or we'll have an ice cream party."

Would the company pressure employees to terminate claims? Financial reports show that in 1993, the company was losing millions. Then came new management and a complete reversal. It began making millions. How did they do it? UnumProvident says by restructuring and making smart business decisions.
But internal documents suggest the company had a new game plan to help it deny as many claims as it could.
Dr. William Feist, was one of Provident's two staff physicians when new management took over in 1993. He left the company two years later. Here in a deposition, he describes under oath how the company changed.
Dr. Feist said: "There was no concern for the individual. It was just bottom line. If we can terminate this file, we're going to do it."
Dr. Feist says the company first began targeting the policyholders who were costing the company the most money at meetings called 'roundtables.'
"The object of the roundtable was to cut off the high dollar claims," says Feist.
UnumProvident urged Dateline not to believe Dr. Feist, saying his knowledge of the company is outdated, and that he has twice signed affidavits which included false information. Dr. Feist says they were simple mistakes. And remember, Dr. Feist isn't the only one speaking out.
"It became a witch hunt," says one.
These people say they encountered similar roundtables years later.

**Former employee**: "It was all looking for loopholes to close the claim."

**John Larson:** "And if you can't do it, we have a team of experts here to figure out how you can."
**Former employee**: "It was mandatory. Even if you didn't have a claim, you'd better find one."

They say most vulnerable were policyholders with so-called subjective illnesses — illnesses that don't show up on x-rays or MRI's, like mental illness, chronic pain, migraines or even Parkinsons.

**Former employee**: "So they're fatigued. Prove it. So they've got achy joints. Prove it. Why can't they work?"
**John Larson:** "And if they can't prove it?
**Former employee:** "They're out of there.
**John Larson**: "Denied."
**Former employee**: "Denied."

And they are not the only ones saying this. In all, ten Unumprovident employees agreed to speak with Dateline, but only if we promised not to reveal their names. We can tell you this about them — their jobs range from claim representatives all the way up to vice presidents. Some left the company on their own, some were fired, and some still work at Unum provident. But all have described the same atmosphere — one of intense pressure coming from management down to employees — pressure to cut off benefits to policyholders.
Dateline also searched thousands of pages of internal corporate documents and court records and found evidence that appears to back up what they say.
This is a series of internal monthly reports that show company savings seem to be growing — the result of cutting claims — "terminated claims have reached a record level."
And we found evidence that suggests the company set goals for cutting claims, deciding ahead of time how many claims should be denied. Like this 1995 top-level memo. It spells out a company-wide goal to terminate $132 million in claims.
An internal e-mail from last year alerted a group of adjusters they have one week to close "18 more" claims to meet "our projections". These people say if they didn't meet their projections, they'd have what they called 'fire drills' — intensive efforts to find claims to close.

**John Larson:** "The image is of a fire drill. A bell goes off. Everybody rallies to a cause. What was the cause?"
**Former employee:** "The cause was looking for opportunities to close a file."
**John Larson:** "Deny claims."
**Former employee**: "Deny claims."

Unum Provident would not agree to an on-camera interview, but vehemently denies that it sets goals to terminate claims. In a letter to Dateline, it says it does "estimate claim results" to "project a business plan into the future" — which may have been "mischaracterized or misinterpreted by others." Also, it says that it will pay "3.6 billion in benefits...this year." And that of all the people who filed claims with UnumProvident last year, only 2% were found to be not disabled. And, it says it has "a consistent record in paying claims."
UnumProvident is more than just claims people and managers, it's also doctors — over 100 of them — doctors sworn to do no harm. Wouldn't a Unum Provident doctor stop the company from cutting off disabled people? Not according to this policy holder.
"If I could have every wish in the world, I'd wish that I could teach again and see my kids get older. Two wishes," says Rosemary Wright.
Once a healthy, vibrant school teacher from Illinois, Rosemary Wright began suffering from a progressive, fatal form of emphysema. Even the smallest activity can leave her gasping for breath.
Her doctors say the kind of emphysema Wright has is genetic, it's not from smoking. The same disease had already killed her younger brother and now it's killing her.
When Wright became too sick to teach, Unum Provident began paying her disability benefits. But two years later, just as in John Montano's case, the company cut her off.
"I opened that letter and I couldn't believe it," says Wright. "I thought, "Why?" I mean this must be a mistake."
Unum Provident based its decision on the opinion of a UnumProvident staff doctor who not only never

examined Wright in person, but disregarded the opinions of Wright's two doctors — both lung specialists who had examined her and found her "totally and completely disabled".

So how could a UnumProvident doctor help cut her off? Dr. Fergal McSharry, who doesn't know Rosemary Wright, worked for Unum Provident for a year and a half. He says it is more about the system than the doctor.

**John Larson**: "Doctor, were they interested in your honest, objective medical opinion?"
**Dr. McSharry**: "No."

McSharry says doctors at UnumProvident were pressured to write narrow medical reports to help the company deny benefits.

**Dr. McSharry**: "We were a means to an end."
**John Larson**: "And the end was?"
**Dr. McSharry**: "The end was denial."

And if too many of their opinions favored the claimants, McSharry says doctors would be reprimanded — in his case, by his boss.

**Dr. McSharry**: "I was told I had fallen off the career path."
**John Larson**: "What did you feel you had to do to get back on their career path?"
**Dr. McSharry:** "You know I was just going to have to do more of what the claims people wanted me to do."
**John Larson:** "And what was that?"
**Dr. McSharry:** "That was to make it easy for them to deny the claim."

Dr. McSharry says like other doctors who work at UnumProvident, he succumbed to the pressure.

**John Larson**: "Did you ever change a medical opinion because you were being pressured?"
**Dr. McSharry:** "Yes. I did."
**John Larson:** "These were cases where in your best medical opinion, you thought these people were either sick or impaired, or disabled. You reversed your own best judgment?"
**Dr. McSharry:** "I did that. I didn't want to lose my job. I didn't want to upset everybody around me and I tried to play within the rules."

McSharry says he did it only a couple of times and vowed never to do it again. Even so, if what he's saying is true, they got his medical soul.

"Yes. I'm only human," he says. "I you know, I gave in. Once or twice. I just hope I didn't hurt somebody too badly."

UnumProvident says it doesn't pressure doctors to terminate claims. So what happened to Dr. McSharry? He was fired from Unum Provident for what the company calls "poor performance." It also says Dr. McSharry was forced to resign from other jobs for similar reasons.

But McSharry says that losing those other jobs had nothing to do with his performance, and the real reason he was fired from UnumProvident was that he began standing up to the company, refusing to play along.

In fact, five of Dateline's sources back up Dr. McSharry's story — specifically that doctors were pressured to help cut off benefits. Dr. McSharry is now suing UnumProvident.

**Dr. McSharry**: "I don't have a problem with people setting targets as long as those targets are reasonable and don't hurt people."
**John Larson**: "Were these targets reasonable?"
**Dr. McSharry**: "No, not at all."
**John Larson**: "Did they hurt people?"
**Dr. McSharry**: "They hurt people every day."

"They didn't just take the money away from me," says Rosemary Wright. "But they took a sense of dignity away from me."

After Unum Provident ended her disability payments, Rosemary Wright says she was forced to begin spending money she had saved for a lung transplant just to cover living expenses. Wright sued the Unum Provident, which suddenly reversed itself, reimbursed her back benefits and began paying her again. But Wright has not dropped her lawsuit, and says the stress took its toll.

"I wasn't sleeping," says Wright. You know I was a wreck and yes, last year was the sickest year I've ever had. I believe they robbed me of a whole year of my life.

As for John Montano, the quadriplegic, he also filed suit against Unum Provident and the company settled with him for an undisclosed amount of money.

**John Larson:** "In the end what was this company's promise worth?"

**John Montano:** "To me, nothing. Their word, the way they operated, they're totally unethical. "

UnumProvident says it regrets how it handled the cases of Wright and Montano, but says they are exceptions. It also says it handles 400,000 new claims a year and it does "on occasion, make a mistake".

Yet, in the eyes of at least one insurance commissioner, it may be more than an occasional mistake.

"There are some substantial problem areas," says the Georgia Insurance Commissioner John Oxendine.

He told Dateline that he began investigating UnumProvident's disability practices more than a year ago. He says his investigation should be complete by the end of the year.

"Unless something radical changes, there probably will be some disciplinary action based on what we have already found," he says.

Unum Provident says any problems in Georgia represent a small percentage of their overall claims, and it will do what is necessary to correct these issues.

In the end, both Montano and Wright say no one should be treated the way they were treated — cut off, abandoned by a company that had promised if the worst ever happened, it would be there for them.

"It's like stealing," says John Montano. "They should be held accountable for that."

## ●CBSNEWS.com 

# Did Insurer Cheat Disabled Clients?

Nov. 17, 2002

If you're one of the 50 million Americans who has money deducted from his or her paycheck to pay for disability insurance, or if you've purchased a disability policy on your own, you may think you're covered if you're injured or too sick to work. But don't be too sure. **Ed Bradley** reports.

A number of people who worked at UnumProvident, the giant of the disability insurance business, whose clients include CBS, told us that the cmpany's management puts tremendous pressure on claims handlers to deny new claims and shut down existing ones. And that many UnumProvident policy holders- who are obviously disabled – are left out in the cold.

UnumProvident is the largest disability insurance company by far, providing disability insurance to 17 million Americans. One of them was Dr. John Tedesco. Today, Dr. Tedesco does part-time diagnostic work, but he used to be a successful eye surgeon. Then, four years ago, he developed a tremor in his right hand:

"I knew that if I tried to operate on somebody, I might hurt them. I might blind them," Tedesco says. So he stopped operating.

For six years, Dr. Tedesco had paid for an insurance policy that guaranteed him a decent income if he could no longer do surgery. He filed a claim with UnumProvident, and the company paid his claim for four months. Then a claims handler sent Dr. Tedesco a letter.

"Basically, the letter said 'We're cutting off your benefits. We don't think you're disabled. And you're not entitled to any benefits,'" says Tedesco. As far as he knows, the company did not talk to his doctors. Nor did they come to see him.

UnumProvident had a cameraman secretly follow Dr. Tedesco for six days and shoot videotape. The company said it showed Dr. Tedesco playing football in his backyard looking anything but disabled. However, there was just one problem. It actually showed his 23-year-old son.

Three years ago, Dr. Tedesco was diagnosed with Parkinson's Disease. He found he couldn't keep his hands steady enough to do routine eye exams, let alone surgery. Three physicians said he was too disabled to operate. The company still didn't start paying him.

"It almost sounds ridiculous an insurance company refusing a disability from an eye surgeon who has a hand tremor and Parkinson's Disease. How do you explain that?" Bradley asks Tedesco.

"I can't explain that. There's not a person on this earth who would say that a person with Parkinson's Disease could do eye surgery," Tedesco says.

What happened to Dr. Tedesco came as no surprise to the UnumProvident employees we spoke to. Diane McGinnis started working at UnumProvident three years ago. When Bradley interviewed her she was working as a claims handler at the company's headquarters in Chattanooga. She says that the company told its workers they had to shut down enough claims to meet monthly targets in the millions of dollars.

"At the beginning of each month the projections would come down from the directors or above, who would give a number as to the amount of money we would have to come up with at the end of the month in closures," she says.

**Bradley:** These were like targets you had to meet?
**McGinnis:** Right
**Bradley:** And did the people who set the targets know that there were a certain number of claims that deserved to be terminated before they set the target?
**McGinnis:** I don't think it was about whether they deserved to be closed. They had to be closed. They needed to make those projections.
**Bradley:** So you would go into these meetings once a month with a target, a dollar figure, which you had to save the company and that dollar figure had nothing to do with the validity of the claims that were out there. It had nothing to do with the legitimacy of the claims that were out there?
**McGinnis:** Right. The claim reps would go looking for claims that they could shut down and the consultants would be right behind them helping them go through files to look for those numbers that they needed.

**Bradley:** And did the claims handlers ever shut down claims that they knew were legitimate in order to meet a monthly target?
**McGinnis:** Yes, many times that's happened, many times.
**Bradley:** You say that without any hesitation.
**McGinnis:** Because I've seen it for three years.

UnumProvident declined to talk to **60 Minutes** on camera, but top executives repeatedly denied that the company sets any targets whatsoever for saving money by closing claims. The executives also told us the company processes 400,000 claims a year and occasionally makes a mistake, which, they say, UnumProvident is quick to remedy once the company is aware of it.

As for Diane McGinnis, she resigned eight weeks ago. UnumProvident questions her integrity, citing several instances of dishonesty in her personal life. But more than a dozen current and former UnumProvident employees, including former vice presidents of the company, confirmed some or all of McGinnis' allegations.

Angelique Brackett was a claims handler in the company's headquarters in Chattanooga.

"About the middle of the month, they'd let us know if we were on track to meet our dollar amount for the month, and if we wouldn't, they'd really start pushing us to find more or to get the ones we thought we could get closed," she said.

Gina Hartley worked for five years as a claims handler in the company's headquarters. She resigned a month ago.

**Bradley:** And if they would say to us that there were no targets, no money targets that we were aiming for each month, you would say…
**Hartley:** It was well known to each individual, each one of us and to every department. It was standard, I mean day in day out there were targets. There were goals.
**Bradley:** So you're saying the company is lying?
**Hartley:** That's what I'm saying.
**Bradley:** and were these targets just suggestions or guidelines?
**Hartley:** oh no it was set. I mean this is the amount. We were given the exact dollar amount that we were targeting, and toward the end of the month, if we were far behind, we would what's called a blitz in the orthopedic area where everybody would come in on Saturday and we'd go through our claim files. If they'd been gone through 20 times and reviewed 20 times by managers, consultants, we would still go through our claims, other department's claims, trying to find something that might just – even if was a technicality – something we could close that claim on. And the pressure on the claims representatives was so intense that we felt we had to go in to close that claim.
**Bradley:** You knew of people who were really disabled and their claims were terminated because in terminating those claims UnumProvident would save money.
**Hartley:** Oh yes, oh yes
**Bradley:** No doubt about it?
**Hartley:** No doubt about it.
**Bradley:** And did your supervisors know that you were terminating legitimate claims?
**Hartley:** They had to give the approval to, before we could. As a claims handler, we did not have the power or the authority to close the claim ourselves. It had to be signed off on by our consultant and our manager.
**Bradley:** And how much money are we talking about. What were they looking to shut down every month?
**Hartley:** Anywhere from 7 to 14 million. If another department needed help, they would bump it up to 14 million a month.

UnumProvident told us the claims handlers had no financial incentive to terminate the claims of disabled policyholders. Michelle Payne, a former administrative assistant, says that's not true:

**Michelle:** The ones that knew how to do what was asked of them, they're the ones that got the bonuses.
**Bradley:** And what was asked of them?
**Michelle:** Close the claims.
**Bradley:** You say that without any hesitation.
**Michelle:** I saw it on a daily basis.
**Hartley:** there were staff meetings that we sat in and the manager would say so and so just closed 2 million claim today and everybody would give them a hand and 2 or 3 weeks later, low and behold, that person would end up being presented with a bonus, a check, money.

It wasn't just claims handlers who were under pressure to deny claims:

"I saw the same thing," says Dr. Fergal McSharry worked for UnumProvident for nearly two years as an in-house physician reviewing disability claims. Dr. McSharry says the company pressured him and other doctors to go along with the claims' handlers decisions to terminate claims:



**McSharry:** The decision was nearly always made and we were to not upset the apple cart and give this opinion which was contrary to everybody else's.
**Bradley** Didn't the company give you the option to request more tests, more medical information about the claimant?
**McSharry:** Yes, the option was there, but whenever I did it I got into trouble.
**Bradley:** why would that get you in trouble?
**McSharry:** It would blow the target way back, and the team were very dependent on me as the physician to support their achieving the goal.
**Bradley** Of meeting that target, the dollar figure?
**McSharry:** Yeah, so I was getting a lot of upset people coming into my office saying: "You're not helping us, doc!"

At first, Dr. McSharry says he did change his medical opinion once or twice to please his supervisor. Then, he decided he could no longer do that. Six months ago, UnumProvident fired Dr. McSharry. He is now suing the company for 'wrongful termination."

**Bradley:** Unum Provident says that the issue with you was productivity; that you were slow to sign off on your claims.
**McSharry:** I wouldn't sign off, yes. I wouldn't. I refused.
**Bradley:** Were other doctors in the claims department pressured to sign off on terminations?
**McSharry:** We all were. And some doctors did and some doctors didn't.
**Hartley:** We knew what doctors to send it to and what not to. If we wanted that claims closed, we'd send it such and such doctor.

Closing those existing claims – or denying new ones - has led to nearly 3,000 lawsuits against UnumProvident in the past five years. Gina Hartley says the company's lawyers warned claims handlers to be extra careful about denying claims in certain states:

**Hartley:** We would get guidance as far as what state you might be able to close this claim in. That may not give us trouble in the courts. What state would be, okay this is a tougher state, they've strong insurance commissioners, they've got strong courts, they've got courts that favor the insured. Better not mess with this one too much.
**Bradley:** Tell me what you think the philosophy of this company is:
**Hartley:** Their philosophy was close it if you can close it. If there was any way possible to close it. That was the bottom line.
**Garamendi:** Every insurance department in this nation ought to be taking a hard look at this situation

Last week, John Garamendi was re-elected to head the California Department of Insurance.

**Bradley:** How can an insurance company decide in advance the percentage of claims that should be terminated?
**Garamendi:** How can they? Well, they can if they want to break the law, if they want to go against the normal practice, and if they want to get big lawsuits. It is not the thing to do.
**Bradley:** Provident's adjusters appear to be under pressure to increase terminations.
**Garamendi:** Exactly.
**Bradley:** On the face of it, what's wrong with that.
**Garamendi:** This kind of thing will lead to problems. It'll lead to fraud by the insurance company against the consumer, against the policy-holder.
**Bradley:** Do you see a pattern here? What does it say about this company?
**Garamendi:** There's been successful lawsuits against this company in which federal courts by unanimous verdicts have issued punitive damages for this kind of activity. That's another, not a warning sign, that's a clear siren out in the streets saying 'What is going on here.

Tedesco, the eye surgeon with Parkinson's Disease, sued the company, and a jury awarded him 36 million dollars. To avoid a lengthy appeal, Dr. Tedesco settled with UnumProvident for an undisclosed sum.

**Bradley:** If this company knows that they're going to be hit with these lawsuits and they're going to lose some of them, that there's going to be bad publicity, why would they do this?

**Garamendi:** It's an equation, an economic equation. How many will we lose? How much business will we lose? Versus how much will we gain by denying these claims. So they're doing that economic equation and they're saying, "We'll run the risk of the lawsuits. We'll run the risk of the bad publicity, and probably the departments of insurance are asleep anyway. So let's go!"

While the great majority of lawsuits against UnumProvident are settled out of court, and the company says it wins most of those that do go to trial - this week it lost a big one. A federal court in San Francisco upheld a $7.5 million judgment against UnumProvident saying it showed bad faith in targeting a claim for closure, and that it employed biased medical examiners and improperly destroyed medical and other reports. The court issued an injunction ordering the company to stop those practices.

© MMII, CBS Worldwide Inc. All Rights Reserved.

• Feedback  • Terms of Service  • Privacy Statement

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JOAN HANGARTER, | ) | Case No. C 99-5286 JL |
| Plaintiff, | ) | ORDER DENYING JUDGMENT AS A MATTER OF LAW OR NEW TRIAL |
| v. | ) | |
| THE PAUL REVERE LIFE INSURANCE COMPANY, et al., | ) | FINDINGS OF FACT AND CONCLUSIONS OF LAW FINDING VIOLATION OF CAL. BUS. & PROF. CODE §17200 |
| Defendants. | ) | |

INTRODUCTION

Defendants' Motion for Judgment as a Matter of Law or for a New Trial came on for hearing on June 5, 2002. Appearing for Plaintiff were Ray Bourhis, Alice Wolfson, David Lilienstein, and Daniel U. Smith.  Appearing for Defendants was Horace Greene and  Evan Tager, who participated by telephone from Washington, D.C. After reviewing the parties' extensive briefs and the record in this case and hearing oral argument, the court concludes that Defendants' motion should be denied. The jury's verdict was based on substantial admissible evidence of Defendants' bad faith breach of the insurance contract with Plaintiff, including evidence that Plaintiff was totally disabled under California law, that Defendants conducted a biased investigation of her claim and that her benefits

1  were wrongfully terminated. The court committed no prejudicial error by admitting or

2  excluding either evidence or witness testimony or in the jury instructions. The verdict

3  reflected the weight of the evidence. The awards for compensatory and punitive damages

4  were legally sound and not excessive. The jury awarded attorney fees after proper

5  instruction by the court according to the California Supreme Court's holding in *Brandt*.

6      The court also hereby issues its findings of fact and conclusions of law with respect

7  to Plaintiff's cause of action under Cal. Bus.&Prof. Code §17200, the Unfair Competition

8  Act. The court finds that the same actions which led to the jury verdict in this case

9  constitute violations of §790.03 of the California Insurance Code, the Unfair Insurance

10  Practices Act. Further, the jury found, and this court agrees, that Defendants acted in bad

11  faith. Consequently, Defendants have also violated §17200 and the court enjoins

12  Defendants from committing any further violations.

13                          BACKGROUND

14      After eleven days of trial, on February 4, 2002, a jury of six men and one woman

15  returned a unanimous verdict for plaintiff Joan Hangarter against Defendants Paul Revere

16  Life Insurance Company and UnumProvident Co. The total awarded was $7.67 million,

17  including $5 million for punitive damages, $1,520,849 for past and future unpaid benefits,

18  $400,000 for emotional distress and $750,000 for attorneys' fees. Defendants filed a

19  motion to overturn this verdict, for judgment as a matter of law ("JMOL") or for new trial.

20      The jury made the following findings in the Special Verdict:

21      1. After May 21, 1999, the date her benefits were terminated by Defendant,

22      Plaintiff was unable to perform the substantial and material duties of her own

23      occupation in the usual and customary way with reasonable continuity;

24      2. Plaintiff is entitled to recover her past benefits, up to the present day, as a result

25      of Defendant's breach of contract;

26      3. The present value of Plaintiff's past disability benefits is $320,849;

27      4. Defendant breached the duty of good faith and fair dealing to Plaintiff;

28      5. Plaintiff is entitled to recover the present value of her future policy benefits as a

C-99-5286  ORDER & FINDINGS                                    Page 2 of 62

1    result of Defendant's breach;

2    6. The present value of Plaintiff's future disability benefits is $1,200,000;

3    7. Plaintiff suffered mental and emotional damages as a result of Defendant's

4    unreasonable conduct;

5    8. The amount of damages that will fairly compensate Plaintiff for her mental and

6    emotional distress is $400,000;

7    9. Plaintiff is entitled to recover her reasonable attorneys' fees and costs incurred

8    in obtaining the benefits due under her policy;

9    10. The amount the jury wishes to award in attorneys' fees and costs is $750,000;

10   11. Defendant acted with oppression, fraud or malice in handling Plaintiff's claim

11   and denying her benefits;

12   12. The amount the jury wishes to award in punitive damages is $5,000,000.

13   The Special Verdict was signed by the foreperson and the jury was polled in open

14   court and its members affirmed that their verdict was unanimous.

15

16                                   <u>JURY INSTRUCTIONS</u>

17   The jury received the following instructions prior to their deliberations:

18   **INDEX OF INSTRUCTIONS**

19   1.   Duties of Jury to Find Facts and Follow Law

20   2.   Instructions to be Considered as a Whole

21   3.   Jury Not to Take Cue from Judge

22   4.   Juror Forbidden to Make Any Independent Investigation

23   5.   Corporations and Partnership - Fair Treatment

24   6.   What Is Evidence

25   7.   What Is Not Evidence

26   8.   Statements of Counsel - Evidence Stricken Out -

27        Insinuations of Questions

28   9.   Direct and Circumstantial Evidence

1    10.    Direct and Circumstantial Evidence - Inferences

2    11.    Weighing Conflicting Testimony

3    12.    Credibility of Witnesses

4    13.    Deposition Testimony

5    14.    Interrogatories

6    15.    Requests for Admissions

7    16.    Charts and Summaries Not Received In Evidence

8    17.    Charts and Summaries In Evidence

9    18.    Stipulated Testimony

10    19.    Discrepancies In Testimony

11    20.    Witness Willfully False

12    21.    Impeachment - - Inconsistent Statements or Conduct - -

13           Falsus In Uno Falsus In Omnibus

14    22.    Extrajudicial Admissions - - Cautionary Instruction

15    23.    Opinion Evidence (Expert Witnesses)

16    24.    Expert Testimony - - Qualifications of Expert

17    25.    Weighing Conflicting Expert Testimony

18    26.    Hypothetical Questions

19    27.    Statements Made By Patient To Physician

20    28.    Failure to Deny or Explain Adverse Evidence

21    29.    Burden of Proof and Preponderance of Evidence

22    30.    Contract - - A Definition

23    31.    Insurance Policy Defined

24    32.    Insurance - Policy Provisions

25    33.    Insurance - Ambiguity in Policy

26    34.    Plaintiff's Burden to Prove Coverage

27    35.    Breach - - Essential Elements

28    36.    Total Disability

C-99-5286  ORDER & FINDINGS

| | | |
|---|---|---|
| 1 | 37. | Transitional Instruction |
| 2 | 38. | Covenant of Good Faith - Standard |
| 3 | 39. | Insurance Company's Obligations - Implied Obligation of Good Faith |
| 4 | 40. | Insurance Company's Obligations |
| 5 | 41. | Good Faith/Proper Cause |
| 6 | 42. | Duty to Investigate |
| 7 | 43. | Ongoing Nature of the Duty of Good Faith and Fair Dealing |
| 8 | 44. | Good Faith - Equal Consideration |
| 9 | 45. | **Not Given** |
| 10 | 46. | Good Faith - Conduct Before Denial |
| 11 | 47. | Good Faith - Genuine Dispute |
| 12 | 48. | Good Faith - Policy Coverage |
| 13 | 49. | Liability of Corporations - Scope of Authority Not In Issue |
| 14 | 50. | Act of Agent is Act of Principal - Scope of Authority Not In Issue |
| 15 | 51. | Effect of Instructions As To Damages |
| 16 | 52. | Damages/Proof |
| 17 | 53. | Pleadings or Argument - Not Evidence of Damages |
| 18 | 54. | Damages - Reasonable - Not Speculative |
| 19 | 55. | Legal Causation |
| 20 | 56. | Economic and Non-Economic Damages - Defined |
| 21 | 57. | General Damages/Breach of Contract |
| 22 | 58. | Damages/Breach of the Covenant of Good Faith and Fair Dealing |
| 23 | 59. | Emotional Distress |
| 24 | 60. | Emotional Distress - Defined |
| 25 | 61. | Susceptibility of Plaintiff |
| 26 | 62. | Damages Arising in the Future - Discount to Present Cash Value |
| 27 | 63. | Damages - Attorney's Fees |
| 28 | 64. | Future Disability Benefits |

C-99-5286  ORDER & FINDINGS

| 1 | 65. | Residual Disability |
| 2 | 66. | Punitive Damages - Burden of Proof |
| 3 | 67. | Punitive Damages - Conduct |
| 4 | 68. | Clear and Convincing Evidence |
| 5 | 69. | Punitive Damages - Standard |
| 6 | 70. | Amount of Punitive Damages |
| 7 | 71. | Punitive Damages - Interest |
| 8 | 72. | Chance or Quotient Verdict Prohibited |
| 9 | 73. | Duty to Deliberate |
| 10 | 74. | Communication with Court |
| 11 | 75. | Return of Verdict |

12

13                                        **PLAINTIFF'S COMPLAINT**

14       Plaintiff's Amended Complaint, filed August 13, 2001, sought the following relief:

15       [First Cause of Action for violation of Cal.Bus & Prof. Code §17200, is discussed

16 hereafter].

17       The Second Cause of Action  for Breach of Contract against Paul Revere,

18 UnumProvident and Doe Defendants.  Plaintiff sought damages of $8100 per month in

19 unpaid benefits.

20       The Third Cause of Action for Breach of the Covenant of Good Faith and Fair

21 Dealing against Paul Revere, UnumProvident and Doe Defendants.  Plaintiff sought

22 damages of $8100 per month in unpaid benefits and punitive damages.

23       The Fourth Cause of Action for Intentional Misrepresentation against Paul Revere,

24 UnumProvident and Doe Defendants.  Plaintiff sought damages of $8100 per month in

25 unpaid benefits and punitive damages.

26                          **GENERAL STATEMENT OF THE LAW**

27       Judgment as a matter of law is only appropriate when the evidence permits only

28 one reasonable conclusion, contrary to the jury's verdict. *Gilbrook v City of Westminster*,

1   177 F.3d 839, 864 (9th Cir. 1999), cert denied, 528 U.S. 1061. If conflicting inferences

2   may be drawn from the facts, then the case must go to the jury. *Pierce v. Multnomah*

3   *County*, Or., 76 F.3d 1032, 1037 (9th Cir. 1996). In ruling on a motion for JMOL, the court

4   is not to make credibility determinations or weigh the evidence and should view all

5   inferences in the light most favorable to the non-moving party. *Winarto v. Toshiba*

6   *America Electronics Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001). As this

7   court said in denying summary judgment in this case, whether an insurer's denial of a

8   claim is unreasonable is a question of fact, unless only one inference may be drawn from

9   the evidence, citing *Carlton v. St. Paul Mercury Ins. Co.*, 30 Cal.App.4th 1450, 1456

10  (1994).

11          A new trial is proper only if the verdict is contrary to the clear weight of the

12  evidence or is based upon evidence which is false, or to prevent, in the sound discretion

13  of the trial court, a miscarriage of justice. *Silver Sage Partners, Ltd. v. City of Desert Hot*

14  *Springs,* 251 F.3d 814, 818-819 (9th Cir. 2001).  A district court may not grant a new trial

15  simply because it would have arrived at a different verdict.

16

17                              **Defendants' Motion**

18          **Paul Revere claims that the evidence at trial was insufficient to support**

19  **Plaintiff's claims.**

20          Plaintiff Joan Hangarter is a trim woman in her forties with two children, a boy of

21  nine and a girl of eleven. (Tr. 381:17-20, 24) When she was thirteen she was diagnosed

22  with scoliosis and as an alternative to surgery, her father took her to a chiropractor, who

23  treated her for two years. That experience inspired her to think about becoming a

24  chiropractor herself. (Tr.382:3-11)  Plaintiff testified as to the scientific and diagnostic

25  training she received as part of the degree program at Los Angeles College of

26  Chiropractic, where she obtained her Doctor of Chiropractic degree in 1979. She was

27  licensed in California in 1980, after taking national board exams. (Tr. 382:12-383:25) She

28  then opened her practice in Berkeley, Solano Chiropractic. (Tr. 384:3-7) The practice

1  grew rapidly and she loved her patients, many of whom she treated for years, and who in
2  turn brought their children to her for treatment. (Tr. 384:25-385:3)
3       She testified about the types of adjustments she performed on patients and
4  demonstrated on one of her counsel some typical manipulations of the neck and spine.
5  These manipulations involved her standing over a patient who would be either seated or
6  lying down. To perform the manipulation or adjustment, she would bend over her patient,
7  then pull the patient's arm, neck, spine or rib cage, and perform other maneuvers such as
8  twisting, or pressing, to align the patient's spine. (Tr.386:24-391:17) She described a
9  myofascial release, a procedure to release muscle spasm, which required her to press
10  and pull the contracted muscle and massage it to release the spasm. (Tr. 393:2-22) She
11  also described deep tissue work, a procedure in which she applied pressure with her
12  hands, rubbing deeply, to release painful areas on the spine, (Tr. 393:24-394:10) To
13  obtain the leverage to exert the proper traction, she usually placed her patients on a low
14  table and leaned over them. None of the manipulations were easy to perform. (Tr.395:1-
15  396:5) On a typical day, prior to her becoming disabled, she would treat between 30 and
16  50 patients. (396:6-10)
17       In 1989, after almost ten years in practice and when her daughter was two years
18  old and she was pregnant with her son, Plaintiff purchased an individual disability
19  insurance policy from the Paul Revere Life Insurance Company, a defendant in this case.
20  The purpose of this policy, as the insurance agent explained it to her, was to protect her
21  should she not be able to work as a chiropractor. (Tr. 396:14-400:23, Ex. 1) The agent
22  explained to her that even if she could still do paperwork or other work, if she could not
23  work as a chiropractor, the policy would cover her. (Tr. 406:4-9) The policy also provided
24  that after she had been disabled for 90 days, future premiums would be waived while she
25  remained disabled. After Paul Revere terminated Plaintiff's benefits in this case, the
26  company attached her bank account for the insurance premiums, until the account was
27  drained, at which point the company cancelled her policy. Plaintiff presently has no
28  disability insurance at all. (Tr.417:18-24; 418:1-419:4)

C-99-5286  ORDER & FINDINGS                                    Page 8 of 62

1    In 1993 Plaintiff began to experience severe recurrent shoulder pain. She sought

2    treatment from a chiropractor in her office, Dr. England, who adjusted her daily. In 1995

3    and 1996 she saw an orthopedist, Dr. Isono and sometimes wore a shoulder brace. (Tr.

4    419:5-25) She did not file any claims for disability coverage and focused on getting better

5    and continuing to work. (Tr. 420:1-9) In 1997 she went to Dr. Linda Berry,[1]  a chiropractor,

6    because she was having severe pain in her shoulder, arm and neck. (Tr. 420:15-421:6)

7    She also went for physical therapy. Although she continued this treatment for six to eight

8    weeks, it was not helpful. (Tr. 421:19-424:1) She filed a claim for benefits under her

9    disability insurance policy in May 1997, and started receiving payments. (Tr. 424:230-23)

10   She was in an auto accident in October 1997, which aggravated her pain. (Tr. 237:25-

11   238:8; 424:2-5; 556:12-557:1, 562:15-20, Ex. 3)

12   Dr. Berry treated Plaintiff from April 1997 to December 4, 2001, and eventually told

13   her that she would probably not ever be able to work again as a chiropractor. (Tr. 563:9-

14   17; 650:5-10) As stated above, Plaintiff had previously been making adjustments on 30-

15   50 patients a day. Each adjustment was physically demanding. Between 1996 and 2000

16   Plaintiff had 3 Magnetic Resonance Imaging studies ("MRI's") with abnormal findings. The

17   third MRI in May 2000 showed her condition to be growing worse, despite treatment by

18   Dr. Berry and Dr. Isono. Dr. Berry diagnosed her with epicondylitis, cervical intervertebral

19   disk syndrome, and tendinitis. (Tr. 631:22 - 632:1) Her medical records documented the

20   development of severe pain in her right arm, elbow and neck.  Dr. Isono offered only

21   surgery to correct the problem, which Plaintiff rejected based on her past negative

22   experience with post-surgery pain medication. (Tr. 434:1-11, 565:9-21). Plaintiff was also

23   leery of cortisone injections, after experiencing heart palpitations and becoming ill from

24   them. (Tr. 564:20-565:7)  Plaintiff stopped seeing Dr. Isono and was treated by Dr. Berry,

25

26       [1] Dr. Berry testified that she received a B.A. degree from the State University of
New York at Binghamton and her Doctor of Chiropractic degree and was licensed to
27   practice in the State of California. At the time of trial she had been practicing for 20 years
and had performed approximately 60,000 chiropractic adjustments. (Tr. 625-17-25;
28   626:17-18; 627:9-10, 19-20) Her practice was located in the same neighborhood as
Plaintiff's. (Tr. 420:16-17)

1   whose chiropractic manipulations gave her some pain relief and enabled her to get

2   around. (Tr. 584:9-15).

3       Dr. Berry treated Plaintiff's epicondylitis with what she described as the "RICE

4   formula:" This involved rest, ice, compression and exercise-and-elevation. Plaintiff

5   followed this regimen and obtained temporary relief but no permanent relief. (Tr. 645:1-

6   23) Dr. Berry testified that she treated Plaintiff for her tendinitis as well and that Plaintiff

7   had physical therapy. None of these treatments afforded Plaintiff permanent relief. (Tr.

8   646:23-648:17) Dr. Berry saw Plaintiff a total of 88 times, most often for no fee, as a

9   professional courtesy. She was paid only for the treatments following Plaintiff's auto

10  accident, but not for the work-related injury. (Tr. 646:6-22; 690:14-18) Dr. Berry, Dr. Katz [2]

11  and the Kaiser and Novato Hospital records all concurred that Plaintiff was severely

12  impaired.

13      At Plaintiff counsel's request, Dr. Katz reviewed Plaintiff's medical records,

14  including those of Dr. Isono, the reports of the MRI scans of the Plaintiff's right shoulder

15  taken in 1997, and of the MRI of her cervical spine taken in 1997, (Ex. 8) the records and

16  deposition of Dr. Linda Berry, the electromyogram ("EMG") studies on March 6th and

17  March 30th, 1998, the report of Dr. Aubrey Swartz, the IME in 1999, the MRI report of May

18  12th, 2000 (Ex. 19) and the report from Dr. Palatucci retained by the insurance company.

19  (Tr. 227:2-11).

20      Dr. Katz testified that Plaintiff suffered from lateral epicondylitis, more commonly

21  called tennis elbow, cervical disk disease and rotator cuff tendinitis. (Tr. 227:18-228:17)

22  He examined Plaintiff in July 2001, more than two years after Dr. Swartz saw her in March

23  1999 (Tr. 263:8-14) and found 75% range of motion in her neck, spasm and tenderness

24  in the right trapezius muscle, and reduced grip strength in her arm. (Tr.230:1-231:21) The

25

26  _____

27      [2] Edward Katz, M.D., is an orthopedic surgeon, with experience as a team
    physician for several high school football teams, in addition to his surgical practice. At the

28  time of trial he was performing approximately ten surgeries each week and seeing about
    175 patients. Less than five percent of his patients were seen for medical/legal purposes.
    He testified for Plaintiff as an expert witness. (Tr. 224:23-226:6)

1   grip test result was consistent with her report of pain. (Tr. 231:22-23) He also employed a

2   Spurling test, an objective test for cervical disk disease. This was positive for pain, in the

3   right trapezius and scapular, indicating cervical disk disease at C-5 and C-6. (Tr. 232:7-

4   23, 233:19-22) Dr. Katz also found a depressed biceps reflex on the right side, (Tr.233:1-

5   5), a test which Dr. Swartz did not perform (Tr. 264:15-18), and numbness and tingling of

6   the middle finger of her right hand, when given a pin test, an indicator of nerve root

7   compression affecting the sensory portion of the nerve going down the arm. (Tr. 233:7-

8   18). He did not see any biceps wasting.  (Tr. 262:18-20) Dr. Katz attributed the spasm in

9   Plaintiff's right trapezius muscle to spasm from the degenerative disk disease at C-5 and

10  C-6. (Tr. 233:25-234:8). Dr. Berry testified that surgery for her neck would be particularly

11  dangerous for Plaintiff due to her stenosis (Tr. 642:22-643:14)

12      Dr. Katz also reviewed the reports of the MRI films of Plaintiff's cervical spine taken

13  May 30th 1997, ordered by Dr. Isono and read by Dr. Cardoza, finding mild to minimal

14  central canal stenosis at 5-6, a narrowing of the spinal canal, which causes some

15  compression on the spinal canal or the nerve roots (Tr. 234:9-23)

16      The radiologist's finding of "mild" did not mean that Plaintiff's pain would be mild;

17  this varied from patient to patient. (Tr. 234:24-235:6).

18      When Dr. Katz reviewed the report of the MRI of the same area taken May 12,

19  2000, (Ex. 19) he found more changes, including a bulging disk at C-5-6, more than in

20  1997, spurring into the spinal canal, narrowing and mild canal stenosis. He also found

21  right lateral protrusion into an uncinate process [3] at C3-4, spurring and mild right neural

22  foraminal narrowing. [4] At 4-5 he also found a broad-based disk bulge with uncinate

23  spurring at C-6 and a minimal broad-based disk bulge. (Tr. 235:7-236:4). He concluded

24  that Plaintiff's condition was worsening. (Tr. 237:9-11) Her symptoms corresponded to the

25  findings on the MRI. (Tr. 237:14-23) There is surgery for cervical disk disease, but it

26

27      [3] A curved process on bone which can cause spurring which in turn can contact the
28  nerve root and cause pain. (Tr. 237:5-7)

        [4] Narrowing of the canal where the nerve roots are inserted. (Tr. 236:22-24)

C-99-5286  ORDER & FINDINGS                                      Page 11 of 62

1 carries risks, from the anesthesia and other complications. (Tr. 241:6-20) When Dr. Berry

2 reviewed Plaintiff's MRI reports, she too concluded that Plaintiff's condition grew worse

3 between 1997 and 2000. (Tr. 639:5-15)

4       Dr. Katz reviewed the report of the MRI of Plaintiff's shoulder, taken in 1996, and

5 found evidence of tendinitis [5] or an inflammatory process. This could account for the

6 shoulder pain she experienced. (Tr. 238:9-20) He examined her elbow and found good

7 range of motion, no redness or swelling but lateral tenderness. In light of her subjective

8 complaints he concluded she had epicondylitis or tennis elbow. This condition might

9 improve with rest alone, but could require 30 days' immobilization in a cast or sling,

10 physical therapy, the use of ice and heat, steroid injections or anti-inflammatory

11 medications. When all else fails surgery is necessary. Even with surgery, someone like

12 Plaintiff, whose work involved strenuous use of her arms, hands and shoulder, would run

13 the risk of reinjury. (Tr. 239:3-241:5, 275:4-19). He would not recommend that she return

14 to the practice of chiropractics. ( Tr. 276:16-25)

15       Plaintiff herself described the pain in her elbow as feeling like the muscle was

16 ripping from the bone, and the pain in her shoulder and neck as burning or stabbing. After

17 a day of adjusting patients she would go home in agony. (Tr. 605:25-606:11) Dr. Berry

18 confirmed Plaintiff's description of the pain as burning or stabbing. (Tr. 653:2-6) Dr. Berry

19 also confirmed an objective basis for Plaintiff's pain when she examined Plaintiff and

20 obtained a flinch response (Tr. 653:7-14)

21       In October 1997, Paul Revere approved her claim for total disability benefits;

22 thereafter her condition did not improve. While she was receiving benefits from her policy,

23 Plaintiff attempted to continue adjusting patients, but was forced to hire Dr. Parissa

24 Peymani to adjust patients while she ran the rest of the practice. (Tr. 440:23-442:1) Dr.

25 Peymani testified that after she started working, Plaintiff stopped seeing all but five to

26 seven of her patients. Peymani testified that during the year-and-a-half she worked for her,

27 Plaintiff performed adjustments for only 5 out of over 9,000 patient visits. Plaintiff had to

28 _____

[5] Inflammation of the tendon around a joint.

C-99-5286  ORDER & FINDINGS                                    Page 12 of 62

1  terminate Dr. Peymani in May 1999, because she could no longer afford to pay her. (Tr.

2  1087:9-13, 19-22;1088:17-21;1090:3-8; 1105:17-18; 1114:22-1115:23) Finally she

3  decided to sell her practice to Dr. Sugarman, another chiropractor whom she had brought

4  in to replace Dr. Peymani. (Tr. 447:7-23)

5      The practice had not been profitable with Dr. Peymani, and it remained

6  unprofitable when Plaintiff was paying Dr. Sugarman, because the patient volume had

7  dropped since she had stopped treating patients herself. (Tr. 447:24-448:5) Some

8  patients were so loyal to her that she had to gradually "wean" them by continuing to treat

9  them with certain procedures until the patients were comfortable with another doctor or left

10  the practice. (Tr. 511:1-18, 512:8-25)  When she sold the practice she did so without

11  obtaining any legal advice and now believes she did "a stupid thing."

12      On cross-examination, Defendants asked Plaintiff about her deposition in this

13  case, in which she had testified that her practice had not been doing as well in the years

14  before she became disabled, due to managed care. She responded that after her

15  deposition she reviewed her financial records and discovered that in fact the practice had

16  continued to do well, despite the increased paperwork. (Tr. 600:11-25, 601:16-602:13)

17      At the time Plaintiff sold her practice she believed she would still be receiving her

18  disability benefits. In fact, they were terminated the day after she signed the contract with

19  Dr. Sugarman. (Tr. 449:4-25) Before she became disabled she had been earning a net

20  income from her practice of almost $100,000 per year. (Tr. 488: 20-23, 532:17-19, Ex. C,

21  533:15-19, 536:14-16) After she became disabled, most of her draw from the business

22  came from the business overhead insurance policy benefits paid by Defendants. For the

23  entire time she was receiving benefits, she was unable to perform chiropractic

24  adjustments on patients, by far the most important duty of her occupation. None of her

25  attempts to start another business produced a profit.

26      Defendants' contention that Plaintiff merely wanted to change careers was

27  rebutted by Plaintiff's own testimony that she loved her patients, it was very hard for her to

28  give up being a chiropractor, that she would return to working as a chiropractor today if

1   she could,  that she had repeatedly tried to continue treating patients even after she

2   became disabled, and that it was always her intention to return to work. (Tr. 440:7-9;

3   446:1-21, 561:4, 603:10-604:19)

4         Dr. Berry also testified that Plaintiff loved being a chiropractor and that Dr. Berry

5   had encouraged her to continue to try to adjust patients, even while she was being treated

6   herself. However, the pain, especially in her elbow and arm, was too much, and they

7   concluded that Plaintiff could not return to work adjusting patients. (Tr. 651:22-652:10)

8         <u>Conclusion regarding sufficiency of the evidence</u> - - The jury heard more than

9   enough evidence to conclude that Plaintiff was totally disabled and that Defendants in bad

10  faith terminated her benefits and caused her damages.

11

12       **1) Defendant contends that Paul Revere did not breach its contract with**

13  **Plaintiff.**

14        Plaintiff bought a policy in which Defendants promised to pay her benefits if she

15  became totally disabled from working at her own occupation or gainfully employed at

16  another occupation. Despite conclusive evidence that Plaintiff was unable to work as a

17  chiropractor and that her other attempts to work had failed, after one and one-half years of

18  paying benefits, Defendants subjected her to a biased medical examination, then re-

19  characterized her occupation as a business owner, rather than a chiropractor, and

20  claimed she was not totally disabled because she could perform bookkeeping or teach a

21  class or see two patients per hour. (Tr. 403:10-23, 404:1-23; 405:11-19; Ex. 20)

22  Defendants breached their contract with Plaintiff to provide an objective evaluation of her

23  ability to perform her own occupation and to pay her benefits if she were to become totally

24  disabled from her own occupation. Although Dr. Isono found plaintiff had no objective

25  signs of impairment, this was contradicted by Dr. Katz, Dr. Berry, the Kaiser records and

26  the Novato Hospital records.[6]

27

28  ─────────────────

     [6] This was the Emergency Room visit where her arm hurt so much she thought she
had broken it.

C-99-5286 ORDER & FINDINGS

1    Dr. Katz, the orthopedic surgeon who examined Plaintiff at counsel's request,

2    testified that she had lateral epicondylitis, cervical disk disease, rotator cuff tendinitis and

3    mild central canal stenosis. He also testified that a mild stenosis did not mean that she

4    would only experience mild pain from it. He also testified that her pain from the other

5    conditions was at a level of 8.5 on a scale of 10 and that she was also depressed as a

6    result of the chronic pain. (Tr. 245:2-246:2)  He agreed with Dr. Berry that Plaintiff would

7    no longer be able to practice chiropractics even with surgery to her neck and elbow. (Tr.

8    246:12-247:4, 271:20-25) He reversed the Independent Medical Examiner ("IME") reports

9    of Dr. Swartz (Ex. 17) and concluded that all the objective findings were abnormal. He

10   disagreed with Dr. Swartz's conclusion that Plaintiff would be able to see two chiropractic

11   patients per hour. (Tr. 241:24-244:22, Ex. 20) Plaintiff would have been eligible for

12   benefits even with no objective findings if her pain rendered her totally disabled or eligible

13   for residual benefits. (Tr. 767:1-768:2)

14   <u>Conclusion re breach of contract</u> - - Defendants breached their contract with

15   Plaintiff to continue to pay her benefits as long as she remained disabled from working at

16   her own occupation.

17

18   **2) Defendant contends that Plaintiff failed to present sufficient evidence**

19   **that Paul Revere denied her claim in bad faith.**

20   Frank Caliri, Plaintiff's expert, testified that Paul Revere had a time line for

21   terminating claims and that by the end of 18 months of benefits, a targeted claim would be

22   due for termination (Tr. 287:11-289:11). The kinds of resolutions on the claims time line

23   included: "return to work, pay enclosed, denial, termination, rescission, settlement,

24   litigation, ongoing claim approval or other referrals." Five out of eight specific goals were

25   negative for claimants. (Tr. 289:16-290:2)

26   The jury heard testimony that Defendants' claims handling personnel evaluated

27   Plaintiff  with the intent to deny her claim, that they deliberately employed a biased

28   examiner in Dr. Swartz, and that they terminated her benefits despite the fact that she was

C-99-5286  ORDER & FINDINGS

1   totally disabled from performing her own occupation, her attempts to make a living by

2   other means had failed, and she was entitled to benefits under the terms of her policy. (Tr.

3   213:12-214:19)

4        <u>Conclusion re bad faith</u> - - The jury heard ample evidence from multiple sources

5   that Defendants set out to target claims such as Plaintiff's with termination the goal, and

6   that Defendants evaluated her claim with the purpose of terminating her benefits.

7

8        **3) Defendant contends that There was a genuine dispute as to Paul**

9   **Revere's liability for coverage.**

10        If an insurer's investigation of a claim was biased, it bars a finding that the insurer

11   was engaged in a genuine dispute. *Chateau Chamberay Homeowners Ass'n v.*

12   *Associated Intern. Ins. Co.,* 90 Cal. App. 4th 335, 348 fn. 7, 350 (2001). (When an

13   insurer's investigation or reliance on experts does not reflect a genuine dispute, the bad

14   faith claim should go to the jury.) The following factors may indicate an insurer's bias:

15        1. The insurer may have misrepresented the nature of the investigatory

16   proceedings;

17        2. The insurer's employees lied in depositions or to the insured;

18        3. The insurer dishonestly selected its experts;

19        4. The insurer's experts were unreasonable; or

20        5. The insurer failed to conduct a thorough investigation; *Id.*

21        Plaintiff's expert, Frank Caliri, testified that Defendants did all of the above, as

22   follows:

23        1. Paul Revere misrepresented the benefits available to Plaintiff, by not informing

24

25

26

27

28

C-99-5286  ORDER & FINDINGS

1  her about recovery benefits,[7] residual benefits [8] or rehabilitation benefits [9] and telling her

2  in their denial letter that her policy was subject to ERISA, when it wasn't. (Tr. 82:23-83:6,

3  84:25-85:1, 138:3-140:9, 140:21-141:19, 194:3-196:9, 198:7-199:22, *see* Order Denying

4  Partial Summary Judgment, issued January 3, 2001)

5          2. Paul Revere exhibited bias against Plaintiff in its selection of an IME doctor with

6  the purpose of challenging the claimant's disability and in not providing Plaintiff's in job

7  description in the IME letter.[10] The examiner made his evaluation without having the

8  claimant's description of her work.  (Tr. 85:8-89:1, 128:2-132:17, 133:12-22)

9          3. Paul Revere compelled the insured to litigate to obtain continued benefits.

10          4. Paul Revere did not settle in good faith when its liability was clear.

11          5. Paul Revere failed to pay as it was obligated to under the policy.

12  (Tr. 74:2-75:17, 79:14-80:11)

13          Defendants had a bias against claims like Dr. Hangarter's. They planned to save

14

---

15          [7] A recovery benefit is provided in the policy if, prior to age 65, an insured is

16  engaged in any occupation immediately after a period of disability for which benefits were

17  paid and incurs a loss of earnings equal to at least 20% of prior earnings. This does not
require disability or being under the care of a physician (Tr. 33:4-13) (Plaintiff Ex. 1).

18          [8] Residual disability benefits are provided in the policy if the insured is unable to

19  perform one or more of the important duties of her occupation; is unable to perform the
important duties of her occupation for more than 80% of the time normally required to

20  perform them; or her loss of earnings is equal to at least 20% of her former earnings while
engaged in her occupation or another occupation; and she is under the regular and

21  personal care of a physician. (Tr. 32:3-13);(Plaintiff Ex. 1). Mr. Caliri testified that

22  Defendants' termination letter to Plaintiff wrongly advised her that she was not eligible for
this benefit. (Tr. 82:2-22) Plaintiff also testified that Defendants' representative Mr.

23  Seaman told her she was not eligible for residual benefits. (Tr. 550:17-22)

24          [9] While an insured is receiving total disability benefits, she may choose to join a

25  vocational rehabilitation program, during which she may receive benefits for 36 months
without being under the care of a physician, in order to be retrained in another occupation.

26  (Tr. 34:18-34:7) There was nothing in the claim file to indicate that Plaintiff was offered this
covered benefit. Mr. Caliri testified that failing to inform an insured of a covered benefit fell

27  below industry standards. (Tr. 80:20-81:17)

28          [10] Plaintiff had given Defendants an Occupational Description Form describing her
work at the time she filed her claim for benefits. (Tr. 501:21-502:14, Ex. 63)

1   money by terminating claims like hers. They sent her to be examined by Dr. Swartz, who

2   was biased - - 13 of 13 claimants whose records Plaintiff obtained were found by Dr.

3   Swartz not to be totally disabled. (Tr. 135:12-16;136:8-24) Dr. Swartz himself was further

4   influenced by Defendants' employee Dr. Bianchi, who in the referral letter expressed to

5   Dr. Swartz his opinion regarding the results of the medical diagnostic tests and advised

6   him that Plaintiff would probably improve with conservative treatment.  (Tr.90:15-91:18,

7   294:12-295:13, Ex. 28). Dr. Bianchi had never met Plaintiff at the time he expressed this

8   opinion. (Tr. 474:4-12)

9        Defendants rely on the *Phelps* case to bolster their claim that there was a genuine

10  dispute over coverage. However, *Phelps* involved no company-wide scheme to terminate

11  expensive disability claims to increase profits. *Phelps* also did not involve a challenge to

12  the IME doctor or to the accuracy and reliability of the IME. In fact, the insurer in *Phelps*

13  relied on three separate IME's before terminating benefits. *Phelps v. Provident Life &*

14  *Acc. Ins. Co.*, 60 F. Supp.2d 1014, 1021-22 (C.D.Cal. 1999).

15       In addition, Defendants in the case at bar developed, with the expertise of Ralph

16  Mohney,[11] a comprehensive system for targeting and terminating expensive claims like

17  Plaintiff's. She was a professional in California with an "own-occupation" policy. Under

18  Defendants' risk analysis her claim fit the profile as one with a potentially adverse

19  financial impact on Defendants. (Tr. 98:4-16). This targeting scheme was described by

20  Dr. Feist, [12] who testified about the changes Ralph Mohney introduced at Provident and

21

22       [11] Former Vice President of Claims for Provident starting in 1994, assuming

23  responsibility for group disability claims with the acquisition of Paul Revere in 1997, then
    with the merger with Unum in 1999. Mr. Mohney was  Senior Vice President, Customer

24  Care, for UnumProvident (the combined companies) at the time of Plaintiff's claim. (Tr.
    118:6-22, 764:18, 768:22-769:1, 771:3-24)

25

26       [12] William Feist, M.D., was formerly a Vice-President and Medical Director of

27  Provident Life & Accident Insurance Co., from 1982 to 1996 and is currently Medical
    Director of another insurance company and a board certified specialist in Insurance

28  Medicine. Excerpts from his deposition testimony taken August 23, 2001 in Birmingham,
    Alabama, in the case of *United Policy Holders, et al. v Provident Life & Accident Ins. Co.*,
    were admitted in evidence in this case. (Tr. 59:19-21, 62:25-63:1, 111:5-12, 111:22-

1  brought with him to Paul Revere, such as round table claims reviews and the goal of

2  achieving a  "net termination ratio" (the ratio of the value of terminated claims compared

3  with new claims). [13]

4       Mohney's goal was to increase this ratio to 84% (Ex. 35). By 1996 Provident

5  increased the net termination ratio goal to 90% (Ex. 37). By 1997, the ratio was increased

6  to 104% (Ex. 38). These goals provided an incentive for Provident to terminate claims

7  with high reserves, such as Plaintiff's. (Ex. 23, 34, 36, 41, 47, 116(A))

8       One of the claims handling processes introduced by Ralph Mohney when he came

9  to Paul Revere from Provident was the round table. The round tables were meetings of

10  Paul Revere personnel, at which each adjustor brought one or more of a "Top Ten List" of

11  claims to be targeted for intensive efforts to achieve "successful resolution." (Ex. 47, 48)

12  The round tables were usually held after hours, (Tr. 809:18-21) and the discussion would

13  begin with the dollar amount of the claim (Tr. 829:24).

14       Frank Caliri testified that the round table process fell below insurance industry

15  standards for several reasons: the purpose was to target claims in order to meet net

16  termination ratio targets, and the proceedings were not documented in the claims files.

17  (Tr. 60:18-61:2) Plaintiff's notice of claim was July 8, 1997; Paul Revere received the

18  claim form on August 12, 1997; and her case was taken to a round table on September 9,

19  1997. The round tables focused on claims with a high reserve - - one to two million dollars,

20  where the insured was a disabled professional who had been receiving benefits for

21  months or years. (Tr. 829:16-24; Ex. 48). Plaintiff fit this profile.

22       Dr. Feist also testified that Ralph Mohney told him that company policy was that

23  after his taking over the claims area,  doctors were no longer permitted to express their

24  opinions regarding disability in the claims file and that such decisions were reserved for

25  _____

26  112:6, 801:20-835:14)

27      [13] Defendants conceded at trial that UnumProvident benefitted financially from the
acquisition of Paul Revere Life Insurance Co. and that the increase in income in 1999 was
28  primarily due to "the acquisition of Paul Revere and improved results in the company's
*individual disability income* line of business." (Tr. 121:3-16) (Emphasis added).

1   the claims handling personnel only. (Tr. 822:1-13; 824:2-6). This changed the prior

2   procedure which had been that doctors determined whether claimants were disabled.

3   (Tr.822:17-19). Preventing doctors such as Dr. Feist from expressing an opinion of

4   disability in the claims file left more latitude for claims personnel to make their own

5   decisions. (Tr. 831:15-19; 833:20-24).

6           Dr. Feist described other new tactics as well, such as the following:

7           (1) searching for the "right physician to do the IME because we want to get the

8   answer we want; we don't want to get the answer that's detrimental to our cause;"

9           (2) questioning financial qualifications for the initial policy;

10          (3) questioning the attending physician's integrity; [14]

11          (4) using surveillance inappropriately, and

12          (5) accusing the insured of fraud. (Tr. 824:25-825:3; 827:17-24.)

13          Dr. Feist concluded that the goal of the round table discussions to terminate claims

14  was unethical. (Tr. 820:14-20).

15          The practice of conducting round table meetings was adopted by Paul Revere

16  from Provident after its acquisition by the parent company. (Ex. 46, 5). This is

17  documented in the 1996 "Provident/Paul Revere Transition Plan."

18          Conclusion regarding existence of a genuine dispute - - The evidence is

19  overwhelming that Paul Revere intended to terminate claims such as Plaintiff's, that her

20  claim had been taken to a round table  on more than one occasion, and that the purpose

21  of the round table reviews was to find a way to terminate benefits.  (Tr. 65:14-67:10,

22  94:21-24, 807:13-18; 810:2)

23

24          **4) Defendant contends that Paul Revere conducted a thorough and**

25  **unbiased investigation of Plaintiff's claim.**

26

27          _____

        [14] Defendants' counsel at trial repeatedly addressed and referred to Plaintiff's

28  treating chiropractor as "Linda Berry" or "Ms. Berry," rather than "Dr. Berry." (Tr. 250:1-2,
    557:5, 559:12, 20, 25, 562:25, 592:1) Counsel referred to Defendants' witness,
    Chiropractor  Parissa Peymani as "Dr. Peymani." (Tr. 1097:3-4)

1    The court has already analyzed how the Defendants did not have a genuine

2 dispute over their duty to provide benefits to Plaintiff, but instead deliberately set out to

3 terminate her claim. In addition, Defendants' employees testified repeatedly that they

4 neither knew nor used the California definition of total disability. They attempted to apply

5 an artificial standard to avoid the requirements of California law in their efforts to find

6 plaintiff not disabled. They chose an examiner, Dr. Swartz,  with a record of finding

7 claimants not disabled and instructed him through Dr. Bianchi in how he should find that

8 Plaintiff's condition with conservative treatment would improve over time.

9    Conclusion re Paul Revere's thorough and unbiased investigation - - Most of the

10 company's efforts on Plaintiff's claim were directed toward the goal of terminating her

11 benefits.

12    ( See also No. 3 above. )

13

14    **5) Defendant contends that the Jury should not have awarded punitive**

15 **damages.**

16    To award punitive damages, the jury had to find clear and convincing evidence that

17 Defendants acted with malice, oppression or fraud. A defendant may only succeed in a

18 claim that an award of punitive damages violates its due process rights if it can show it

19 had no notice that what it was doing was wrong. A conscious disregard of the rights of

20 insureds to know about company policies which would potentially affect a decision

21 whether to purchase a policy creates a presumption that the insurer knew that its policies

22 were deceptive. *Notrica v. State Compensation Ins. Fund* 70 Cal.App.4th 911, 949

23 (1999) (Where senior management personnel knew that company policy would lead to

24 increased premiums for insureds, conscious disregard of rights of policyholders was fair

25 notice that company's conduct could subject it to punitive damages.)

26    In the case at bar, Defendants should have been on notice that targeting certain

27 categories of claims, using biased examiners, ignoring the California definition of total

28 disability, misinforming or failing to inform insureds regarding all of their potential benefits,

1   and other practices which fell below industry standards could put them at risk for punitive

2   damages. [15]

3          The jury was properly instructed on the elements of malice, oppression and fraud

4   and the distinctive burden of proof imposed upon Plaintiff as follows:

5                 "Clear and convincing" evidence means evidence of such convincing force
                  that it demonstrates, in contrast to the opposing evidence, a high probability that
6                 the facts of which it is proof are true. (Jury Instruction Number 68)

7          In evaluating the reasonableness of an award of punitive damages, the entire

8   record must be viewed in the light most favorable to the judgment, and reversal is

9   appropriate only when "the award as a matter of law appears excessive, or where the

10  recovery is so grossly disproportionate as to raise a presumption that it is the result of

11  passion or prejudice." *Neal v. Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 928 (1992)

12  (internal quotation marks omitted.)  If the conduct upon which the award is premised was

13  fraud perpetrated by an insurer upon an insured, such conduct clearly supports an award

14  of punitive damages. (*Pistorius v. Prudential Insurance Co., supra,* 123 Cal.App.3d 541,

15  556 (1981)) *Cited in Notrica v. State Compensation Ins. Fund* 70 Cal.App.4th 911, 951

16  (1999).

17         With respect to requirement of a finding of malice, oppression or fraud, it is not

18  necessary that the compensatory damages be based on a finding of fraud, only that the

19  plaintiff meets the evidentiary burden to prove bad faith:

20                [Defendant's] error is in urging that the "fraud" within Civil Code section
                  3294 be conjoint with a finding of compensatory damages based upon a legal
21                theory of fraud. That position is incorrect. All that is required is that the fraud must
                  equate to the conduct which gives rise to liability--in this case bad faith.
22
                  *Pistorius v. Prudential Insurance Co.* (1981) 123 Cal.App.3d 541, 555-556, cited
23                in *Notrica.*)

24         Due process prohibits only a "grossly excessive" award, leaving to the states

25  "considerable flexibility to find whether "the damages awarded [were] reasonably

26  necessary to vindicate the State's legitimate interest in punishment and deterrence."

27  _____

28         [15] Plaintiff testified that, once her total disability benefits were terminated, no one
    from Paul Revere informed her about any other benefits. (Tr. 410:8-412:9; 414:20-419:4)

1    *BMW of North America, Inc. v. Gore*, 517 U.S.559, 568 (1996). No "simple mathematical

2    formula" shows what is grossly excessive because a "particularly egregious act" will

3    support a higher award for punitive damages. *Id.* At 582.

4         <u>Conclusion re jury award of punitive damages</u> - - The jury heard ample evidence

5    regarding Defendants' conduct, constituting the type of malice, oppression or fraud

6    sufficient to justify punitive damages:  the round tables, the use of a biased medical

7    examiner, failing to advise plaintiff of benefits to which she was entitled, and then

8    terminating her benefits when she remained totally disabled. In the case at bar, the jury

9    found sufficient egregious acts by Defendants to justify its award of punitive damages.

10

11       **6) Defendant contends that the Jury should not have awarded future**

12    **benefits.**

13         In a motion in limine in this case, Defendants attempted to exclude evidence of

14    Plaintiff's eligibility for future benefits. This court denied the motion. Defendants argue

15    again that plaintiff may not recover future disability benefits if the insurance policy

16    provides for periodic payments and conditions payment of benefits upon continuing proof

17    of disability.  They cite the decision in *Erreca*  to support their contention that an insurer's

18    refusal to pay future benefits according to a policy does not entitle the insured to treat the

19    entire contract as repudiated and ask for future disability payments on a theory of

20    anticipatory repudiation. *Erreca v. Western States Life Ins. Co.*, 19 Cal. 2d 388 (1942).

21    / / /

22    / / /

23         However, Defendants erroneously applied the holding in *Erreca* to the case at bar.

24    In *Erreca*,  the court held that the insured had no cause of action for benefits which had not

25    accrued.  The court found that the disability benefits stopped accruing when the insured

26    refused to submit to a physical exam as required by the insurer's policy.  However, the

27    benefits continued to accrue for the insured up until the time he refused to submit to an

28    exam as required by the policy, even though the insurer had  stopped making payments.

1    In contrast, in the case at bar, Defendants cannot contend that Plaintiff did not comply with

2    the requirements of the policy.  A court applying the holding in *Erreca* to this case would

3    find that the Plaintiff's benefits have accrued and therefore any claim for future benefits is

4    valid, the opposite of Defendants' position.

5           Defendants concede that the California Court of Appeal for the Third District has

6    construed the court's decision in the *Egan* case to allow for an award of future benefits

7    following a finding of bad faith. *See Pistorius v. Prudential Ins. Co. of Am.*, 123

8    Cal.App.3d 541, 551 (1981), *citing Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809

9    (1979). However, they believe that the California court erred and rely on the decision in

10   *U.S. v. Ramos*, 39 F.3d 219, 222 (9th Cir. 1994) ("since we are convinced the Arizona

11   Supreme Court would interpret [Ariz. Rev. Stat. § 13-3883(B)] differently than the [Arizona

12   Court of Appeals], we reach our conclusion as to the subsection's meaning despite the

13   interpretation given it by the [Arizona Court of Appeals]". 123 Cal.App.3d at 551. This

14   court sees no reason to look to a federal court's interpretation of Arizona law in order to

15   decide the proper damages for a tortious breach of contract in California, when there is

16   good California law available.

17          In the case at bar the court gave the following instruction to the jury on damages for

18   bad faith:

19

20   DAMAGES/BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

21          If you find that the defendant breached its duty of good faith and fair dealing, then
     you may award plaintiff an amount that will compensate her for all damages legally
22   caused by that breach, including:

23                 1.     *An amount of future contract benefits that you reasonably
            conclude after examination of the policy and other evidence that plaintiff
24          would receive had the contract been honored by the insured;*

25                 2.     An amount that will compensate for plaintiff's emotional
            distress and injury;
26
                   3.     An amount that will compensate for plaintiff's economical
27          losses, including loss of the value of time, interest expense, attorneys' fees
            and any other losses you determine she sustained as a result of the breach
28          of covenant of good faith and fair dealing.

1   (Emphasis added). (Jury Instruction Number 58)

2         This court finds that the jury was properly instructed and that future benefits are an

3   appropriate form of damages for an insurance company's breach of the covenant of good

4   faith and fair dealing.

5         <u>Conclusion on future benefits:</u>   What other courts have held and what this court

6   holds here, is that if Plaintiff has at all times complied with the terms of the policy and

7   Defendants in bad faith breached their obligation under those terms, then Plaintiff is

8   entitled to all benefits which have accrued, including future benefits. Why should Dr.

9   Hangarter have to submit to future physical examinations to prove her continued disability

10  when the jury has already found that the insurance company cannot be trusted to deal fairly

11  with her? It would be illogical for the court to find as a matter of law that a prevailing

12  plaintiff in a bad faith case should have to continue to submit to the same treatment in

13  order to receive the future benefits of a contract where she has complied with its terms

14  and the insurance company has not.

15

16        **DEFENDANTS ALLEGE COURT MADE EVIDENTIARY ERRORS**

17        **7) Defendants assert that the court should not have admitted the testimony**

18  **of Frank Caliri, that he lacked qualifications to testify about insurance industry**

19  **claims adjustment standards, that he testified to factual matters which should**

20  **have been left to jury, legal matters which should have been left to court, and that**

21  **his testimony was unreliable.**

22

23        The court decided this issue for the first time before trial in a motion in limine and

24  again in a detailed ruling during trial:

25        The Ninth Circuit has held that an expert's testimony and qualifications need not be
          evaluated according to *Daubert* if the expert is both qualified and testifying based

26        on his own experience. *Thomas v. Newton Intern. Enterprises*, 42 F.3d 1266 (9th
          Cir. 1994) (longshore worker with 29 years experience in numerous job categories

27        and for different stevedoring companies qualified to testify as expert on working
          conditions of experienced longshore personnel) *Id.* at 1269-1270). *Daubert* only

28        applies to an expert testifying based on hard science and specifically on the
          application to the evidence of a particular methodology.

1        Other courts have held specifically that an insurance expert's testimony and qualifications are not subject to the requirements of *Daubert*. *U.S. Fidelity & Guar.*

2    *Co. v. Sulco, Inc.*, 171 F.R.D. 305 (D.Kan., 1997). *Id.* at 308 (citations omitted)

3        Furthermore, an expert in insurance bad faith may reasonably rely on the

4    application of statutes in determining the reasonableness of a company's actions.

5    *Kraeger v. Nationwide Mut. Ins. Company,* 1997 WL 109582 (E.D.Pa. 1997). It would be

6    reasonable for experts in bad faith insurance practices to look to the relevant statutory and

7    regulatory requirements in examining the reasonableness of an insurer's actions. *Id.* at *2.

8        The California Supreme Court has allowed expert testimony on "the conduct and

9    motives of an insurance company in denying coverage":

10        We can conceive of many ways in which a lay jury, in assessing the conduct and motives of an insurance company in denying coverage under its policy, could

11        benefit from the opinion of one who by profession and experience, was peculiarly equipped to evaluate such matters in the context of similar disputes.

12

13    *Neal v. Farmers Ins. Exch.*, 21 Cal.3d 910, 924 (1978)

14        Mr. Caliri has twenty-five years' experience working for insurance companies and

15    as an independent consultant. His experience includes marketing insurance products,

16    evaluating them, evaluating insurance claims and assisting insureds in dealing with

17    insurance companies to obtain payment of their claims. (Tr. 3:13-19, 6:2-17, 13:1-6). He

18    worked for both Unum and Provident as a representative at the time many of the own-

19    occupation disability policies like Plaintiff's were sold (Tr. 5:14-19, 10:5-14). He became

20    familiar with the important features of the insurance contracts (Tr. 5:20-25). He has

21    received training from the insurance companies and has educated himself on how

22    insurance companies in general, and the Defendants in this case in particular, operate.

23    (Tr. 13:15-15:15, 16:18-17:20).

24        He is qualified as an expert on the basis of his experience in dealing with insurers

25    and insureds. In arriving at his opinion whether Defendants' handling of Plaintiff's claim

26    comported with the standards in the insurance industry, he relied on his education, his

27    experience and his understanding of the requirements of state law, specifically Unfair

28

1    Settlement Claims Practice § 2695. [16] In his opinion, the standards of the industry impose

2    an obligation on insurance companies such as Defendants to be fair, objective and

3    thorough in their evaluation and analysis of a claim; not to put their financial interests

4    above those of their insureds, not to search for ways to deny a claim, not to misrepresent

5    provisions of the insurance policy including coverage benefits, not to pay less on a policy

6    than the insured is rightfully owed, and not to compel insureds to sue in order to receive

7    benefits. He testified as well that it is standard in the industry that written records of the

8    claim process be kept in the claim file. (Tr. 26:16-19, 26:19-20, 26:23-25, 27:1-10, 27:11-

9    16, 27:17-23, 27:24-28:13).

10          He testified that it was improper to set a goal to terminate a certain percentage of

11   claims. (Tr. 50:1-13) He testified to his interpretation of internal Provident documents

12   which in his opinion set goals for terminating whole blocks of claims without reference to

13   the merits of individual claims for benefits, for example, a directive that each adjuster will

14   maintain a list of ten claimants "where intensive effort will lead to successful resolution of

15   the claim. As one drops off another name will be added." (The "Top Ten Lists") He

16   referred to testimony by Ralph Mohney and Sandra Fryc [17] that "resolution" meant

17   "termination." In his opinion this practice fell below industry standards because it violated

18   _____

19        [16]  Title 10 California Code of Regulations Sections 2695.1-2695.17 are
20   regulations concerning, as their heading states, "Fair Claims Settlement Practices
     Regulations." These regulations interpret Insurance Code section 790.03, subdivision (h),
21   which prohibits unfair claims settlement practices by those conducting the "business of
     insurance" (id., § 790.03). *Cates Construction, Inc. v. Talbot Partners,*  21 Cal.4th 28, 62
22   (1999). Review Granted and Opinion Superseded by *Cates Const., Inc. v. Talbot*
23   *Partners*, 941 P.2d 56 , 66 Cal.Rptr.2d 423 (Cal. Jul 23, 1997) (NO. S061215), Reversed
     in Part by *Cates Construction, Inc. v. Talbot Partners*,  21 Cal.4th 28 (1999).
24

25        [17]  Sandra Fryc at time of trial was employed by UnumProvident as Litigation
26   Manager. She handles disability claims for all types of impairments throughout the United
     States. She was currently responsible for 100-125 claims in litigation.  She began working
27   for Paul Revere in 1987. She was promoted to Claims Manager in 1992, handling at first
     the Mid-Atlantic states, supervising five claims representatives and four or five field
28   representatives, until 1996 when she was made a director overseeing California and
     Hawaii. Tr. 930-932)

1    the principle of looking at each policy claim objectively, fairly and on a case-by-case
2    basis. (Tr. 55:8-56:1).
3        <u>Conclusion re Frank Caliri</u>: This court found him qualified by training and
4    experience to testify as an expert on insurance industry practices and standards and
5    whether Defendants' policies and practices complied with those standards, but not to
6    render an opinion on the ultimate issues in the case (Tr. 25:2-7, 40:2-8, 40:20-41:4,
7    41:18-22, 42:3-43:1, 43:22-44:11, 49:3-9, 102:9-16). This court finds that he was
8    qualified, and that his testimony fell well within the parameters of his expertise without
9    impinging on the province of either the court or the jury.
10
11        **8) Defendant contends that the court should not have admitted the**
12    **deposition testimony of Dr. Feist. He was improperly permitted to testify as an**
13    **expert. His deposition was inadmissible hearsay. It was more prejudicial than**
14    **probative and should have been excluded under FRE 403.**
15        This was also dealt with in a motion in limine in which the Defendants objected that
16    the witness was not genuinely unavailable as required by FRCP Rule 32(a)(3), that they
17    had no opportunity to cross-examine  pursuant to 804(b)(1), that Dr. Feist had never
18    worked for Paul Revere itself and that he left Provident prior to the merger of Paul Revere
19    and the Provident Companies. Defendants also objected to Dr. Feist's testimony as
20    prejudicial to Defendants.
21        Fed.R.Evid. 804(b)(1) permits introduction of former testimony which was given
22    under oath and subject to cross-examination by the party against whom the testimony is
23    offered:
24        "Former testimony . . . in a deposition [where] the party against whom the testimony
25    is now offered, or, in a civil action or proceeding, a predecessor in interest, had an
26    opportunity and similar motive to develop the testimony by direct, cross, or redirect
27    examination." Fed.R.Evid. 804(b)(1).
28        The court denied Defendants' motion to exclude Dr. Feist's deposition from

C-99-5286  ORDER & FINDINGS                                          Page 28 of 62

1   evidence at trial. The court held that his deposition in the case of *United Policyholders, et*

2   *al., v. Provident Life and Accident Insurance Co., UnumProvident Corp., and Bay Brook*

3   *Medical Group* (Alameda County Super. Ct. No. 815688-2) was relevant to the case at

4   bar. Dr. Feist had participated as Medical Director of Provident in roundtables where

5   termination of own-occupation policies was discussed. He testified at his deposition

6   about  Defendant's business practices which resulted in the termination of claims which

7   were targeted as Plaintiff's was.

8         The *United Policyholders* case was also a suit for wrongful termination of disability

9   benefits for an own-occupation policy.  (Tr. 110) Dr. Feist lives in Alabama, outside the

10  court's subpoena power under FRCP Rule 45, and was thus unavailable pursuant to Rule

11  32(a)(3). The court also held that the Defendants in the case at bar have had an

12  opportunity to cross examine him with similar motive. (FRE 804(b)(1)) Defendants'

13  counsel was notified that Dr. Feist's deposition was being taken in the *United*

14  *Policyholders'* case, the witness was on the witness list in this case (Tr. 116:1-5), and

15  counsel's partner, representing Provident Life & Accident Insurance Co. and

16  UnumProvident, participated energetically in the deposition, objecting to virtually every

17  one of Plaintiff's questions. (Tr. 110:9-24) In fact, UnumProvident was a co-defendant in

18  the *United Policyholders* case, just as it is in this case, and therefore the same defendant

19  was represented at the deposition in the *United Policyholders* case. (Tr. 741:1-21,

20  742:14-743:25).

21

22        The court had previously ordered that deposition testimony from other cases could

23  not be introduced at trial. The court distinguished Dr. Feist's deposition from the

24  depositions excluded by its prior ruling. The other depositions were offered with respect

25  to the final determination of whether or not the individual was disabled and whether

26  benefits would be continued. Dr. Feist's testimony, by contrast, deals with claims handling

27  procedures which a jury could reasonably infer were carried over from Provident to Paul

28  Revere as a subsidiary of UnumProvident after Unum and Provident combined under the

1   name of UnumProvident. (Tr. 745:2-17).  *See Murray v. Toyota Motors Distributors, Inc.,*

2   664 F.2d 1377, 1379-1380 (9th Cir.  1982) (deposition testimony of unavailable former

3   employee of affiliated company admissible against affiliate with similar motive where both

4   controlled by same parent company ).

5           Conclusion regarding deposition of Dr. Feist: This deposition was subject to the

6   hearsay exception since the witness was unavailable and had been subject to cross-

7   examination by the Defendants' counsel in another action. He was not offered as an

8   expert so much as a percipient witness to Defendants' claims handling practices.

9   Defendants had notice that Dr. Feist was a potential witness. His name was on Plaintiff's

10  amended witness list filed with this court on September 6, 2001 (Decl. of Alice Wolfson in

11  Support of Motion to Amend at Ex. 2) The court finds once again that the admission of Dr.

12  Feist's deposition was proper. He was unavailable, he was offered as a percipient

13  witness and he was examined by counsel for co-defendant UnumProvident with the same

14  motive as in this case.

15

16          **9) Defendants contend that the court erred in admitting the documents**

17  **produced by Provident in another lawsuit.**

18          In its December 13, 2001 Pre-Trial Order, the court ruled:" With regard to Plaintiff's

19  Exhibit Nos. 115-155, the so-called 'Provident Documents,' Defendants' motion to

20  exclude these documents from evidence is granted, without prejudice. If, in the course of

21  trial, a nexus is established between these documents and Plaintiff's claim, the court will

22  re-consider the issue."

23          At trial, Defendants admitted that the documents were business records of

24  Provident. (Tr. 48:8-12). Many of the documents were read to the jury by Ralph Mohney.

25  (Tr. 837-863). The documents confirmed that Provident claims handling practices were

26  adopted by Paul Revere.[18]  Exhibit 153, 155 - "Bring Wooster (Paul Revere) reporting

27  _____

28          [18] Provident Life & Accident Insurance Company merged with Unum Insurance
    Company in 1999 to form UnumProvident. Paul Revere is a wholly owned subsidiary of
    UnumProvident. (Tr. 118:24-119:10, 122:24-123:6) Employees who handled Plaintiff's

1  into conformance with Chattanooga (Provident) standards." [19] (Ex. 81 - Provident to Paul

2  Revere Transition Plan). Frank Caliri also testified that he read depositions of Provident

3  employees which led him to conclude that employees of Provident and Paul Revere

4  together worked out the transition of Provident claims handling practices to Paul Revere.

5  (Tr. 51:16-52:2, 145:1-152:2, 152:14-154:3) The plan was to take an aggressive

6  approach to claims handling, and using round tables, independent medical examiners,

7  and surveillance to achieve the desired net termination ratios.[20] (Tr. 52:18-23)

8      This court reviewed the documents and the deposition of Mr. Parks, the Provident

9  employee who authenticated the documents. The court observed that the documents were

10  created before Plaintiff filed her claim for benefits but after she bought her policy from

11  Defendants. At that time Paul Revere had not yet been acquired by Provident. (Tr. 528:7-

12  11) The court at trial listed a number of ways in which the documents could be

13  authenticated:

14      1) They were admitted by Judge Conti in a similar case, *Schneider v. Provident*

15  *Life & Accident Ins. Co.* (C-97-4646 SC, N.D.Cal.);  (Tr. 748:15-16, 19-21, 750:4-11,22-

16  751:21).

17      2) They were produced by defense counsel for companies which ultimately

18  became UnumProvident; (Tr. 750:25-751:3)

19      3) Frank Caliri was familiar with the documents and could attest to their

20  genuineness;

21      4) UnumProvident is a successor in interest to Paul Revere and Provident; (Tr.

22  _____

23  claim at Paul Revere were paid by UnumProvident (Tr. 120:1-3)

24      [19] Paul Revere's headquarters is in Wooster, Massachusetts, Provident's in

25  Chattanooga, Tennessee.

26      [20] The net termination ratio was the proportion of terminated claims to new claims.

27  For example, Frank Caliri testified based on Provident documents that in 1996 the goal
   was to terminate ninety dollars in existing claims for disability coverage for every hundred
   dollars of new claims, a net termination ratio of 90 percent. (Tr. 53:4-12) By the second

28  quarter of 1997 the ratio had been raised to 124 percent, to terminate 124 dollars in
   existing claims for every 100 dollars in new claims. (Tr. 282:17-23)

1    741: 1-15)

2        5) Ralph Mohney was present throughout the time the documents were being

3    created; (Tr.751:8-11)

4        6) The documents were authenticated by Mr. Parks in his deposition. (Tr.751:11-

5    14)

6        The court permitted Frank Caliri  testify about the implications of many of the

7    documents in determining the reasonableness of Defendants' claims handling policies.

8    (Tr.102:9-16). An expert may rely on hearsay in forming an opinion. Evid.Code, §801,

9    subd. (b), 802; *Mosesian v. Pennwalt Corp.*, 191 Cal.App.3d 851, 860, (1987); *Notrica v.*

10   *State Compensation Ins. Fund* 70 Cal.App.4th 911, 933 (1999)

11       Conclusion re Provident documents:  The documents were relevant to the claims

12   handling policies introduced by Ralph Mohney at Provident and taken with him to Paul

13   Revere and applied to the handling of Plaintiff's claim. The documents were properly

14   authenticated as business records and were in fact used at trial by Defendants.

15

16       **10) Defendants contend that the court improperly excluded evidence:**

17   **testimony of Stephen Rutledge, Andrew O'Brien.**

18       Defendants offered Stephen Rutledge to testify that both the percentage of monthly

19   individual disability claims that Paul Revere paid and Paul Revere's pay-outs for the

20   individual disability line of business increased during the relevant time period. The court

21   rejected his testimony on the grounds that it was too general, because statistics were for

22   all individual disability claims, not just own-occupation individual disability claims. (Tr.

23   1584.)

24       Andrew O'Brien is a rehabilitation counselor and life care planner who would have

25   testified regarding Plaintiff's ability to continue to work as a chiropractor with

26   modifications to her practice. Plaintiff testified at trial that she primarily used

27   manipulations, deep tissue massage and traction to treat her patients. Mr. O'Brien would

28

C-99-5286  ORDER & FINDINGS                                      Page 32 of 62

1   have testified that Plaintiff could use a device called an activator [21] to treat her patients

2   instead. The court excluded his testimony on the basis that he was not qualified to offer an

3   expert opinion based on conversations with three chiropractors, and that his testimony

4   was not relevant in light of the evidence in the record as to the usual and customary

5   manner in which Plaintiff conducted her practice and that his testimony was more

6   prejudicial than probative. (Tr. 1568-70).

7

8   **11) Defendant's contend that the court's jury instruction and Plaintiff's**

9   **argument and evidence for the definition of total disability were improper under**

10   **California law.**

11   Total disability - Defendants claim that this court erred in instructing that a claimant

12   must be unable to perform the important duties of her occupation in the usual and

13   customary way with reasonable continuity. Defendants claim the court further erred in

14   declining to instruct the jury that, to be totally disabled, an insured must be unable to

15   perform all the important duties of her occupation.

16   The instruction given to the jury in the case at bar was:

17

18   **TOTAL DISABILITY**

19   Plaintiff's policy defines "total disability" as follows:

20   "Total Disability" means that because of Injury or Sickness:

21   a.      you are unable to perform the important duties of your Occupation;

22           and

23

24

25   _____

26   [21] Plaintiff testified that she formerly used the activator only in conjunction with other
     procedures, such as manual traction or myofascial release. In fact, using the activator
27   aggravated her own symptoms (Tr. 480:11-16 ;481:10-17) She also testified that using the
     activator requires two hands, that she could not use it with her right hand without pain and
28   that she could not use it at all with her left hand, because she wasn't left-handed and the
     position was wrong. (Tr. 505:11-506:2)

1          b.     you are not engaged in any other gainful [22] occupation; and

2          c.     you are under the regular and personal care of a physician.

3                    This means, according to the law in California, that plaintiff is eligible

4                    for benefits if she is unable to perform the substantial and material

5                    duties of her own occupation in the usual and customary way with

6                    reasonable continuity.

7    (Jury Instruction Number 36)

8        Plaintiff contends that the instruction correctly stated California law, which governs

9    the policy. Furthermore, Defendants agreed to the instruction. Defendants' witness,

10   Sandra Fryc, the UnumProvident nationwide Litigation Manager, testified that California's

11   definition of total disability is being unable to perform the substantial and material duties

12   of your own occupation in the usual and customary manner and with reasonable continuity,

13   and that this definition of disability governs the policy's definition of disability, under the

14   language of section 10.3, and that the policy is amended to meet the minimum

15   requirements of state law. (Tr. 761:10-21). She also admitted that adjustors handling

16   California claims should know the definition of disability for those policies, including the

17   California Supreme Court rulings that could change the literal meaning of the disability

18   definition in Paul Revere's policies. (Tr. 762:15-19; 764:2-9).

19       <u>Conclusion on definition of total disability</u>: Defendants are bound by the definition

20   of total disability under California law, regardless of their own interpretation of the policy

21   language.

22

23       **12) Defendants contend that Court's decision not to bifurcate punitive**

24

_____

25       [22] Gainful - profitable, lucrative ( Webster's Unabridged Dictionary, 1996). Plaintiff

26   testified that her chiropractic office failed after she became disabled and that her other
     business efforts were not successful. These included teaching and helping other

27   chiropractors set up web sites. (Tr. 598:7-11) She could not put up the model web site due
     to conflicts with the web designer, who was also her fiancé, Mr. Decker. (Tr. 459:18-

28   463:19) She couldn't hire someone else to complete the site because she had no more
     money and Mr. Decker claimed the rights to the web design. (Tr. 598:16-22)

1   **damages violated Defendants' right to due process**.

2       The court considered this issue in deciding Defendants' pretrial motion to bifurcate

3   the issues of liability and punitive damages, which was denied.

4       Rule 42(b), Federal Rules of Civil Procedure, provides that the court, in furtherance

5   of convenience or to avoid prejudice, or when separate trials will be conducive to

6   expedition and economy, may order a separate trial of any claim, cross-claim,

7   counterclaim or third-party claim, or of any separate issue or of any number of claims,

8   cross-claims, counterclaims, third-party claims or issues, always preserving inviolate the

9   right of trial by jury as declared by the Seventh Amendment to the Constitution or as given

10  by a statute of the United States.

11      The statute is intended to "further the parties' convenience, avoid delay and

12  prejudice and serve the ends of justice." *9 Wright and Miller, Federal Practice and*

13  *Procedure: Civil 2d*, §2388 (1995). However, the court should cautiously apply the rule.

14  "The piecemeal trial of separate issues in a single suit is not to be the usual course.  It

15  should be resorted to only in the exercise of informed discretion when the court believes

16  that separation will achieve the purposes of the rule." *Id.*

17      The advisory note to § 2388 further explains that Rule 42(b) does not allow for

18  bifurcation if the issues will be based on substantially the same facts. *Id.*

19      In the case at bar, Defendants' financial condition and claims handling practices

20  were relevant to their motive for terminating claims like Plaintiff's. The purpose of

21  precluding evidence of a defendant's financial condition is to minimize prejudice prior to

22  the jury's determination of a prima facie case of liability for punitive damages. However,

23  such evidence is not to be excluded on the basis of prejudice when the information is

24  relevant to liability. *Notrica v. State Compensation Ins. Fund*, 70 Cal.App.4th 911, 937-

25  938 (1999). (In an action for bad faith and unfair business practices against State Fund

26  Insurance Company, insured was permitted by court to bring before the jury evidence of

27  defendant's financial condition to place defendant's evidence in perspective.)

28      In the case at bar, Defendants have not shown how the evidence of their financial

1  condition would prejudice the jury. To the contrary, the financial condition of the

2  Defendants was relevant to liability. Plaintiff's claim for breach of contract was interwoven

3  with her claim for bad faith. Evidence of the Defendants' profits, financial condition and

4  financial statements helped establish Defendants' business strategies, incentives and

5  practices, which were relevant to Plaintiff's claim for breach of contract.

6    <u>Conclusion re decision not to bifurcate punitive damages</u>: the basis for the award

7  of punitive damages was inextricably linked with the evidence for liability. The Defendants'

8  bad faith termination of Plaintiff's benefits was motivated by the desire of Defendants'

9  managers to improve the companies' financial bottom line. In a trial for insurance bad faith

10  it is reasonable and in fact necessary to try the issues of liability for contract damages and

11  liability for punitive damages for tortious breach of that contract together before the same

12  jury. It would have been a waste of time and resources to have separate trials on contract

13  damages and punitive damages.

14

15    **13) Defendants contend that the Damages awards are excessive.**

16  **Emotional distress is grossly excessive, on its face and in comparison to prior**

17  **awards in similar cases, both California and federal.**

18    The jury awarded Plaintiff $320,849 as the present value of Plaintiff's past

19  disability benefits; and $1,200,000 as the present value of Plaintiff's future disability

20  benefits.

21  ///

22  ///

23    With respect to the awards for past and future unpaid benefits Plaintiff's expert,

24  Christine Davis,[23] was qualified without objection (Tr. 785:8-14) and testified to the

25  _____

26    [23] Christine Davis is a Certified Public Accountant ("CPA") and has been since
    1995. At the time of trial she was employed at Hemming Morse in San Francisco.
27  Hemming Morse is a CPA firm with 60 employees, with additional offices in Fresno and
    Los Angeles. She is the Litigation Manager, which she described as a notch below
28  director or partner. She studied accounting and graduated from Golden Gate University,
    and has worked for Burr, Pilger & Mayer, Coopers & Lybrand and as the subsidiary

1  present value of Plaintiff's past and future unpaid policy benefits. She calculated Plaintiff's

2  past benefits by using the monthly benefit in the insurance policy, $8150 per month,

3  multiplied by the number of months of unpaid benefits, plus 10% interest as provided by

4  Cal. Civ. Code section 3289. (Tr.788:17-789:24) The total value of Plaintiff's unpaid past

5  policy benefits plus 10 percent interest would be $320,849. (Tr. 794:1-2)

6       She calculated the present value of Plaintiff's unpaid future policy benefits using a

7  four-part system: the amount of the future benefit, the present value amount, the time

8  frame between those two amounts and the growth rate required for the initial amount to

9  increase to the future level. (Tr. 787:10-18). She set the future to commence in February

10  2002 and the end date at the year Plaintiff reaches the age of 82, which is her life

11  expectancy, as derived from tables of the Department of Health and Human Services. (Tr.

12  790:3-11) She utilized an investment vehicle which was low risk and provided tax benefits,

13  California municipal bonds, with a Triple A rating, with an interest rate of 3.5 percent. (Tr.

14  791:11-792:10) She calculated that the total future benefit payments would be

15  $2,463,105. The present value of those payments, that is, the amount which would be

16  invested in a low-risk, tax-advantaged investment such as California municipal bonds, to

17  yield that amount would be $1,500,575. This is the present value of Plaintiff's future policy

18  benefits. (Tr. 793:16-22).

19       If Plaintiff were owed benefits only to age 65, the amount of past unpaid benefits

20  would remain the same, but the present value of future policy benefits would be reduced to

21  $960,000. The total for past and future lifetime benefits would be $1,280,849 (Tr. 794:9-

22  795:2).

23       The court finds that Plaintiff through her expert presented ample credible evidence

24  of the present value of her past and future benefits.

25

26  _____

27  controller for a publicly held corporation. She is a member of the American Institute of
Certified Public Accountants, and the California Society of Certified Public Accountants.

28  She has worked on cases which involved analysis of the financial statements of insurance
companies and to calculate those companies' net worth. She has also attended a course
in life insurance accounting and financial reporting.

1  The jury awarded Plaintiff $400,000 as damages for emotional distress. Plaintiff

2  testified at trial about her humiliation at being forced along with her children onto

3  welfare,[24] after having been a professional with her own practice. (Tr. 487:24 - 489:4,

4  492:3-25, 497:17-21). She also testified that she was concerned about her life and so

5  anxious that her doctor prescribed anti-anxiety medication. One night she went to the

6  hospital thinking she was having a heart attack, which turned out to be an anxiety attack.

7  (Tr. 489:10-491:2. She attributed her anxiety to Defendants' having terminated her

8  benefits. (Tr. 489:10) She was evicted from her house for nonpayment of rent and began

9  to feel like a "bag lady." (Tr. 493:10-15) She testified that she wouldn't have had to go on

10  welfare, declare bankruptcy, or be evicted if she had still been receiving her disability

11  benefits from Defendants. (Tr. 494:10-18)

12  The damage awards for emotional distress in other California and federal cases

13  are comparable to Plaintiff's. Larger awards for emotional distress have been upheld -

14  $400,000 and more. *Clayton v. United Services Auto Assn.* (1997) 54 Cal. App. 4th

15  1158 (upholding emotional distress award of $400,000 for insurance bad faith);

16  (*Tomaselli v. Transamerica Ins. Co.,* 25 Cal.App.4th 1269, 1286 (1994); (upholding

17  emotional distress award of $500,000).

18  Defendants claim they are being penalized for Plaintiff's financial losses due to

19  bad investments.[25] Defendants cannot in fairness shift the blame for their wrongful actions

20  to Plaintiff by citing her unwise investments as the cause of her damages.

---

[24] Plaintiff testified that she receives $600 in cash aid per month, plus food stamps and Medi-Cal. Some months she receives less, if she has worked and earned money. She has sold some of her books and done consulting, and worked for a printer. She and her children live on $800-$1200 per month. (Tr. 495: 2-10) She applied for Social Security and State disability but is not totally disabled from any occupation and therefore does not qualify for those benefits. (Tr. 432:8-19)

[25] Plaintiff invested a total of $250,000 to $300,000, her retirement savings, in a dot-com company headed by her former fiancé, at the same time that she was purchasing a house, where her fiancé built a recording studio as part of his "Napster" style business. Plaintiff ultimately lost all her money and her house when the business failed. Plaintiff and her two children went to stay with her sister in Southern California (Tr. 451:7-456:3)

1    Under California law, Defendants are responsible for injuries where their conduct

2    was a substantial factor. Defendants seek to use a comparative fault analysis, but are

3    barred from asserting comparative bad faith or any modification of their fault based on

4    Plaintiff's conduct. *Kransco v. American Empire Surplus Lines Ins. Co.,* 23 Cal. 4th 390

5    (2000). Defendants did not seek a jury instruction on ordinary comparative fault. The jury

6    impliedly found that Plaintiff could have weathered her own financial mismanagement but

7    for Defendants' termination of her benefits.

8    Conclusion on damage awards:  Plaintiff presented substantial evidence of her

9    damages, both contractual and extra-contractual, including the loss of her income, and her

10    emotional distress. The jury's awards were reasonable, under both California and federal

11    law.

12

13    **14) Defendants contend that Punitive damages award of $5 million is**

14    **grossly excessive - - unconstitutional under the due process clause, and grossly**

15    **excessive under California law.**

16    The jury awarded Plaintiff $5 million as punitive damages. This amount represents

17    0.1% of UnumProvident's net worth of $5 billion and 6.25% of Paul Revere's net worth of

18    $800 million. The percentages are well within California's 10% of net worth standard for

19    punitive damages. *Sierra Club Foundation v. Graham,* 72 Cal.App.4th 1135, 1163

20    (1999); *Weeks v. Baker & McKenzie,* 63 Cal.App.4th 1128, 1166 (1998). Some

21    California courts have approved punitive damages awards representing 10-23% of

22    defendants' net worth. *Valbona v. Springer,* 43 Cal.App.4th 1525, 1539 n. 15 (1996)

23    (23.1%); *Sommer v. Gabor,* 40 Cal.App.4th 1455, 1464 (1995) (7.25%); *Devlin v.*

24    *Kearny Mesa AMC/Jeep/Renault, Inc.,* 155 Cal.App.3d, 381, 391 (1984) (17.5%);

25    *Wollersheim v. Church of Scientology,* 212 Cal.App.3d 872 (1989) (12.5%); *Schomer v.*

26    *Smidt,* 113 Cal.App.3d 828 (1980) (10%).

27    The goal is to award an amount of punitive damages that is sufficient to deter the
      conduct but is not excessive. [1/10 of 1 percent of defendant's gross assets and
28    less than a week's worth of its net income in 1974; held not excessive].)   *Notrica v.*
      *State Compensation Ins. Fund* 70 Cal.App.4th 911, *952 (1999). (citation

1   omitted)

2        The ratio between compensatory and punitive damages is not overly significant.

3   "The rule that the exemplary should bear a reasonable relation to the actual damages is

4   only for the purpose of guarding against excess. [Citations.] But these cases also state

5   that there is no fixed ratio by which to determine the proper proportion between the two

6   classes of damages." (*Finney v. Lockhart* (1950) 35 Cal.2d 161, 164 [in defamation

7   case, $2,000 in punitives, $1 award]; see also *Neal v. Farmers Ins. Exchange, supra,* 21

8   Cal.3d at &. 928-929 [$740,000 punitive damages award and about $10,000 in

9   compensatory damages, a 74 to 1 ratio]; 952 *Downey Savings & Loan Assn. v. Ohio*

10  *Casualty Ins. Co.* (1987) 189 Cal.App.3d 1072, 1097-1098 [$5 million in punitive

11  damages and $152,983.43 in compensatory damages, a ratio of 32.7 to 1]; *Chodos v.*

12  *Insurance Co. of North America* (1981) 126 Cal.App.3d 86, 90, 103-104, [$200,000 in

13  punitive damages and $5,146.71 in compensatory damages, a ratio of about 40 to 1];

14  *Wetherbee v. United Ins. Co. of America* (1971) 18 Cal.App.3d 266, 270-271 [$200,000

15  in punitive damages and $1,050 in compensatory damages, a ratio of about 190 to 1].)

16  *Notrica v. State Compensation Ins. Fund* 70 Cal.App.4th 911, 951-952 (Cal.App. 2

17  Dist.,1999)

18        In the case at bar the ratio of punitive damages ($5 million) to compensatory

19  damages ($2.67 million) is less than 2:1, well under the ratios approved by California

20  courts, *Neal*, supra, 21 Cal.3d at 928 (affirming 74:1 ratio for insurer's bad faith); *Weeks*,

21  supra, 63 Cal.App.4th at 1166 (70:1); *Steven v. Owens-Corning Fiberglas Corp.*, 49

22  Cal.App.4th 1645, 1651 (1996) (80:1); *Leonardini v. Shell Oil Co.*, 216 Cal.App.3d 547,

23  555 (1989) ($1 million punitives - 25:1); *Ballou v. Master Properties No. 6*, 189

24  Cal.App.3d 65, 71 (1987) ($2 million punitives - 13:1).

25        <u>Conclusion regarding punitive damages:</u> The jury awarded $5 million as punitive

26  damages. The jury had evidence of Defendants' net worth (over $5 billion for

27  UnumProvident and $800 million for Paul Revere) and of the egregiousness of their

28  conduct. (Targeting a particular category of claims for termination, subjecting their own

1   insured to biased claims handling and withdrawing benefits rightfully due her, driving her

2   into poverty).[26] A reasonable person could well conclude that the award of punitive

3   damages was not excessive.

4

5   **15) Defendants assert that Plaintiff failed to establish entitlement to any**

6   **award of attorney's fees.**

7   The jury awarded Plaintiff $750,000 for attorneys' fees. Defendants rely on the

8   California Supreme Court decision in *Brandt v. Superior Court*, in which the court held

9   that a successful plaintiff in an action against an insurance company may only receive an

10  award of attorney's fees incurred to obtain the amount due under the policy. (Normally,

11  each party to a civil action must bear his or her own legal fees (Ca Civ Pro §1021).

12  However, fees reasonably incurred by an insured to enforce payment of benefits due

13  under an insurance policy--as distinguished from fees attributable to proving the insurer's

14  "bad faith"--are recoverable damages in a "bad faith" action against the insurer.  *Brandt*

15  *v. Sup.Ct. (Standard Ins. Co.)* (1985) 37 Cal.3d 813, 817. The court in the case at bar will

16  look first at which benefits are due under Plaintiff's policy.

17

18                                    Benefits Due

19

20  This court finds as a matter of law that in addition to past and future unpaid

21  benefits, Plaintiff may recover under a theory of insurance bad faith for both emotional

22  distress and future benefits as benefits recoverable under the policy. Furthermore, the

23  court also finds as a matter of law that the jury may award attorney fees without an hourly

24  itemization, but according to the reasonable value of the work performed to obtain

25  Plaintiff's benefits due under the policy. The court reaches this conclusion based on the

26  _____

27     [26] Plaintiff filed bankruptcy October 3, 2000. (Tr. 469:20-22) Her two children were
    eligible for the free lunch program at school by September 2000. (Tr. 485:6-11, Ex. 93)

28  The family has been receiving food stamps from June 2000 to July 2001 and from
    September 2001 until the time of trial. Plaintiff lost this benefit briefly by working and
    earning money. (Tr. 487:9-20)

C-99-5286  ORDER & FINDINGS                                    Page 41 of 62

1    following decisions by other courts, both state and federal.

2    In *Crisci v. Security Ins. Co. of New Haven, Conn.*, 66 Cal.2d 425, 434 (1967), the

3    California Supreme Court unanimously upheld an award of emotional distress damages

4    for breach of a liability insurance contract sounding in both contract and tort:

5
6    "(P)laintiff did not seek by the contract involved here to obtain a commercial
     advantage but to protect herself against the risks of accidental losses, including
     the mental distress which might follow from the losses. Among the considerations
7    in purchasing liability insurance, as insurers are well aware, is the peace of mind
     and security it will provide in the event of an accidental loss, and recovery of
8    damages for mental suffering has been permitted for breach of contracts which
     directly concern the comfort, happiness or personal esteem of one of the parties.
9    (*Chelini v. Nieri*, 32 Cal.2d 480, 482 (1948).)"

10   *See Westervelt v. McCullough*, 68 Cal.App. 198 (1924).

11
     Likewise, in *Fletcher v. Western National Life Ins. Co.*, 10 Cal.App.3d 376, 404
12
     (1970), the above statement from *Crisci* was quoted with approval in the context of a
13
     disability insurance contract. The court elaborated as follows:
14

15   "These considerations (the insured's peace of mind and security) are particularly
     cogent in disability insurance. The very risks insured against presuppose that if
16   and when a claim is made, the insured will be disabled and in strait financial
     circumstances and, therefore, particularly vulnerable to oppressive tactics on the
17   part of an economically powerful entity." *Kewin v. Massachusetts Mut. Life Ins.
     Co.* 409 Mich. 401, 442, 295 N.W.2d 50, 65 (Mich., 1980)
18

19   Accordingly, in the case at bar, this court finds that Plaintiff's peace of mind was a

20   policy benefit, and that any efforts by her attorneys to obtain damages for her emotional

21   distress caused by Defendants' bad faith termination of her policy benefits are

22   compensable as incurred to obtain benefits due her under the policy.

23   With respect to Plaintiff's claim for future benefits, the court finds that these too are

24   policy benefits, as stated previously in the section on Defendants' motion to exclude

25   evidence on future benefits.  Plaintiff complied with all the terms of her policy and

26   Defendants did not; therefore, Plaintiff is entitled to all accrued benefits, including future

27   benefits. Defendants would have the court find that Plaintiff must continue to reapply, year

28   after year, in order to receive benefits. It would be unreasonable to require a claimant,

1   whose insurance company has been proven to have acted in bad faith in the processing

2   of her claim, to continue to subject herself to the same illegitimate process in order to

3   continue to receive benefits.

4                                    Amount of Fee Award

5            The primary authority the court looks to for allocation of an award of attorney fees in

6   an insurance bad faith case is the decision of the California Supreme Court in *Brandt.*

7

8            When an insurer's tortious conduct reasonably compels the insured to retain an
             attorney to obtain the benefits due under a policy, it follows that the insurer should

9            be liable in a tort action for that expense. The attorney's fees are an economic
             loss--damages--proximately caused by the tort. These fees must be distinguished

10           from recovery of attorney's fees *qua* attorney's fees, such as those attributable to
             the bringing of the bad faith action itself. What we consider here is attorney's fees

11           that are recoverable as damages resulting from a tort in the same way that medical
             fees would be part of the damages in a personal injury action.

12

13           Code of Civil Procedure section 1021 does not preclude an award of attorney's
             fees under these circumstances. "Section 1021 leaves to the agreement of the

14           parties 'the measure and mode of compensation of attorneys.' However, here, as
             in the third party tort situation, 'we are not dealing with "the measure and mode of

15           compensation of attorneys" but with damages wrongfully caused by defendant's
             improper actions.' In such cases there is no recovery of attorney's fees *qua*

16           attorney's fees. This is also true in actions for false arrest and malicious
             prosecution, where damages may include attorney's fees incurred to obtain

17           release from confinement or dismissal of the unjustified charges.

18

19           When the insurer's conduct is unreasonable, a plaintiff is allowed to recover for all
             detriment proximately resulting from the insurer's bad faith, which detriment

20           *Mustachio* has correctly held includes those attorney's fees that were incurred to
             obtain the policy benefits and that would not have been incurred but for the

21           insurer's tortious conduct." The fees recoverable, however, may not exceed the
             amount attributable to the attorney's efforts to obtain the rejected payment due on

22           the insurance contract. Fees attributable to obtaining any portion of the plaintiff's
             award which exceeds the amount due under the policy are not recoverable.

23

24   *Brandt v. Superior Court* 37 Cal.3d 813, 817, 819 (1985) (internal citations and

25   footnotes omitted)

26           **Defendants contends that Plaintiff's attorneys must provide an hourly**

27   **breakdown of their work on her case.**

28           In their memo re Plaintiff's claim for attorneys' fees, filed September 14, 2001,

1    Defendants cited the unpublished decision by the district court in *Reed v. Scottsdale Ins.*

2    *Co.*, 1998 U.S.Dist. Lexis 4254 at *4 (N.D.Cal. 1998). In that case, the court denied

3    attorney's fees because the plaintiff could not segregate *Brandt* fees hour by hour.  The

4    court required counsel to submit a list of itemized hours worked on the particular issues

5    involved. Defendants in the case at bar seek to nullify the jury's award of attorney fees

6    because there is no hourly itemization.

7        This court disagrees with Defendants' interpretation of the holding in *Brandt*. A

8    more recent case has dealt with this same question: whether there need be an hourly

9    itemization of the attorney fees for an award to be upheld. Although in this case the court

10   rather than the jury awarded the fees, there is no reason its decision should not apply to a

11   jury verdict as well:

12

13       Trial court could allocate attorney fees in a bad faith suit based on its
         determination of the reasonable value of services expended by loss payee's

14       attorneys to obtain benefits due under property insurance policy; the court could
         thus limit payee's award to $80,000 out of $143,458 allegedly expended to compel

15       payment of policy benefits, although it could not segregate the billing between
         recoverable amounts for enforcing the contract and unrecoverable amounts for

16       proving bad faith. *Track Mortg. Group, Inc. v. Crusader Ins. Co.*, 98 Cal.App.4th
         857 (2002)

17

18   / / /

19

20

21       In the case at bar, this court carefully considered the instruction to be given to the

22   jury, which as the fact-finder, was charged with allocating any award of attorney's fees,

23   since fees would be awarded as part of Plaintiff's damages and the parties did not

24   stipulate otherwise. The court followed the recommendation of the California Supreme

25   Court in the *Brandt* case to the letter:

26

27       If, however, the matter is to be presented to the jury, the court should instruct along
         the following lines: "If you find (1) that the plaintiff is entitled to recover on his cause

28       of action for breach of the implied covenant of good faith and fair dealing, and (2)
         that because of such breach it was reasonably necessary for the plaintiff to employ
         the services of an attorney to collect the benefits due under the policy, then and

1    only then is the plaintiff entitled to an award for attorney's fees incurred to obtain the
     policy benefits, which award must not include attorney's fees incurred to recover
2    any other portion of the verdict." *Brandt v. Superior Court* 37 Cal.3d 813, 819
     (1985)
3

4    In the case at bar, the jury was instructed as follows on attorneys' fees:

5                                      **No. 63**

6                        **DAMAGES - ATTORNEYS' FEES**
7

8         If you find (1) that plaintiff is entitled to recover on her cause of action for breach of

9    the implied covenant of good faith and fair dealing, and (2) that because of such breach, it

10   was reasonably necessary for the plaintiff to employ the services of her attorney to collect

11   the benefits due under the policy, then and only then is the plaintiff entitled to an award of

12   reasonable attorney's fees incurred to obtain the past and current policy benefits.  This

13   award must not include attorney's fees incurred to recover other portions of the verdict.

14        This is the precise language recommended by the California Supreme Court in the

15   *Brandt* case.  Accordingly, the court finds that the jury was properly instructed, and it infers

16   that the jury awarded attorney's fees solely for the recovery of the benefits due plaintiff

17   under the policy, including fees incurred for counsels' efforts to obtain both future benefits

18   and damages for emotional distress. Plaintiff's total damages for past

19

20
     and future benefits and emotional distress were $1,920,849, of which 40%, representing
21
     the contingent fee agreed to by Plaintiff and her counsel, is $768,339.60. (Ex.101). The
22
     jury's award of $750,000 is slightly less than this. Therefore, the fee should not be
23
     reduced.
24

25        Conclusion regarding attorney's fees: The jury awarded Plaintiff $750,000 as

26   damages for attorney's fees. The jury was properly instructed to award fees only for efforts

27   to obtain benefits due to plaintiff under her policy. The award should be upheld.

28                        SUMMARY OF CONCLUSIONS

C-99-5286  ORDER & FINDINGS                                      Page 45 of 62

1   <u>Conclusion re breach of contract</u> - - Defendants breached their contract with

2   plaintiff to pay her benefits if she became disabled from working at her own occupation.

3

4   <u>Conclusion regarding existence of a genuine dispute</u> - - The evidence is

5   overwhelming that Paul Revere intended to terminate claims such as Plaintiff's and that in

6   fact her claim had been taken to a round table on more than one occasion with the intent

7   to find a way to terminate her benefits.

8   <u>Conclusion re Paul Revere's thorough and unbiased investigation</u> - - All of the

9

10  company's efforts, including the surveillance, begun even before anyone had reviewed

11  plaintiff's medical records, were undertaken with the goal of terminating her benefits.

12  <u>Conclusion re jury award of punitive damages</u> - - The jury heard ample evidence in

13  support of this award - - the round tables, the use of a biased medical examiner, failing to

14  advise plaintiff of benefits to which she was entitled, and terminating her benefits when

15

16  she was totally disabled.

17  <u>Conclusion on future benefits</u> - - If Plaintiff has at all times complied with the terms

18  of the policy and Defendants in bad faith breached their obligation under those terms,

19  then Plaintiff is entitled to all benefits which have accrued, including future benefits.

20

21  <u>Conclusion re Frank Caliri</u> - - This court found him qualified by training and

22  experience to testify as an expert on insurance industry practices and standards, but not

23  to render an opinion on the ultimate issues in the case.

24  <u>Conclusion regarding deposition of Dr. Feist</u> - - This deposition came under  the

25  hearsay exception since the witness was unavailable and had been subject to cross-

26  examination by the co-defendant in the previous action also a Defendant in the case at

27  bar. He was not offered as an expert but as a percipient witness to Defendants' claims

28

C-99-5286  ORDER & FINDINGS                                    Page 46 of 62

1   handling practices and general policies. Defendants had notice that Dr. Feist was a

2   potential witness.

3

4        Conclusions re excluded defense witnesses - - Stephen Rutledge was offered  to

5   testify that the percentage of monthly individual disability claims that Paul Revere paid and

6   that Paul Revere's pay-outs for the individual disability line of business increased during

7   the relevant time period. The court rejected his testimony on the grounds that it was too

8   general, perhaps because statistics were for all individual disability claims, not just own

9   occupation individual disability claims.  Andrew O'Brien was not qualified to offer an

10  expert opinion based on conversations with three chiropractors, and his testimony was

11  not relevant in light of the evidence in the record as to the usual and customary manner in

12

13  which Plaintiff conducted her practice and that his testimony was more prejudicial than

14  probative.

15

16       Conclusion on definition of total disability - - Defendants are bound by the definition

17  of total disability under California law, regardless of their own interpretation of the policy

18  language.

19

20

21       Conclusion re decision not to bifurcate punitive damages - - the basis for a finding

22  of punitive damages was inextricably linked to the evidence as to liability - - bad faith

23  motivated by the desire of Defendants' managers to improve the companies' financial

24  bottom line. It would have been a waste of time and resources to have separate trials on

25  liability, damages and punitive damages.

26

27       Conclusion on damage awards - - Plaintiff presented ample evidence of her

28  damages, both contractual and extra-contractual, including the loss of her income, and her

C-99-5286  ORDER & FINDINGS                                    Page 47 of 62

emotional distress. Other California and federal cases are comparable.

Conclusion regarding punitive damages - - The jury had evidence of Defendants' net worth (over $5 billion and over $800 million respectively) and of the egregiousness of their conduct. (Targeting a particular category of claims for termination, subjecting their own insured to biased claims handling and withdrawing benefits rightfully due her, driving her into poverty). Put those together and a reasonable person could conclude the award of punitive damages was not excessive.

Conclusion regarding attorney's fees - - The jury was properly instructed and the award should be upheld.

For all the above reasons, Defendants' motion for judgment as a matter of law or for new trial is denied.

CLAIM FOR VIOLATION OF UNFAIR COMPETITION ACT

Plaintiff moves for findings of fact, conclusions of law and an equitable remedy for Defendants' alleged violation of California Business and Professions Code §17200, the Unfair Business Practices Act or Unfair Competition Act ("UCA") or Unfair Competition Law ("UCL"). Earlier in this case, on a motion for leave to amend which was granted, Plaintiff proposed to add this cause of action and seek the following remedy:

On behalf of the general public, and of law-abiding insurance companies who have suffered unfair competition, seeking no damages on her own behalf, Plaintiff asked the court to order:

1) injunctive relief, in the form of an injunction against defendants' continuing to engage in the unlawful conduct;

2) that defendants be ordered to re-open claims filed by its insureds with "own

occupation" disability policies where the complained-of practices were employed, with notice to the insureds and review, reprocessing and reevaluation of their claims;

    3) restoration of all monies illegally obtained in the form of premiums for these policies;

    4) any equitable relief deemed appropriate by the court;

    5) reasonable attorneys' fees.


### Defendants' Earlier Opposition to §17200 Claim

    Plaintiff previously moved for leave to amend her complaint in the case at bar to add a cause of action for unfair business practices in light of deposition testimony taken in July 2001 in a state court case, *United Policyholders, et. al. v Provident et al.*, Alameda County Superior Court, Case No. 815688-2. (See Memorandum of Points and Authorities and Declaration of Alice Wolfson in Support of Plaintiff's Motion to Amend.) These exhibits tend to show that when Provident acquired Paul Revere, as part of the transition, Paul Revere employees implemented Provident's policies for handling claims, as complained of in this lawsuit; such as targeting certain types of claims for termination. (See Ex. Q to Confidential Declaration of Alice Wolfson in Support of Motion to File Amended Complaint - Transition Plan).

    Defendants developed risk profiles of targeted claims and claimants based on the following factors:

    1) Higher amounts of income of insured;

    2) Existence of residual or COLA riders;

    3) Longer benefit period;

1    4) Shorter elimination period;

2    5) 1983 to 1989 issue;

3
     6) California and Florida;
4
     7) Certain occupations.
5

6    (Ex. H to Memorandum of Points and Authorities in support of motion to file amended

7    complaint).

8         Defendants opposed amendment of the complaint on grounds that it would be
9
     futile, since they contend there is no private right of action under the Unfair Insurance
10
     Practice Act ("UIPA"), Insurance Code, §790 *et seq.*, and Plaintiff is attempting to use a
11
     claim under the Unfair Business Practices Act, (Business and Professions Code
12
     §17200), to make an end run around this prohibition. Defendants also claim that Plaintiff's
13
14   allegations in support of this cause of action are untrue, and that the injunctive relief

15   sought by Plaintiff is not available as a matter of law.
16
17        However, Defendants' own documents show that it did indeed target certain

18   categories of claims for closer scrutiny, for instance doctors in Florida and California.
19
     (See Exs. E, F, G and H to Plaintiff's Memorandum of Points and Authorities in Support of
20
     Motion to Amend). Paragraphs 26 through 28 of the amended complaint allege that
21
22   Provident's Senior Vice President of Claims, Ralph Mohney, on behalf of Provident itself,

23   implemented various initiatives in order to deny unfairly the claims of its insureds.

24   Plaintiffs alleged such practices as keeping information out of the written reports if it could
25
     prove damaging to Defendants in the event of legal action (See *Id.*, Exs. I, J and K).
26
27   Defendants assert that these allegations are untrue.

28        Plaintiff contends that UnumProvident's wholly owned subsidiary GenEx (Ex. 59)

1  sent out the IME referral letter referring Plaintiff in the case at bar to Dr. Swartz. This letter,

2  by stating an opinion by Dr. Bianchi regarding Plaintiff's medical condition, violated

3
4  Defendants' own standards. (Tr. 294:14-295:17, Ex. 28).  Defendants chose physicians

5  who would find claimants to be not disabled, failed to instruct physicians regarding the

6  appropriate definitions of disability, and destroyed medical records. (See Plaintiff's

7  Memo of Points & Authorities in Support of Motion to Amend, Ex. M). Plaintiff in the case

8
9  at bar alleged that these, among other policies and practices, constitute bad faith, and the

10 jury agreed with her.

11        Defendants cite the California case of *Safeco Ins. Co. v. Superior Court*, 216

12 Cal.App.3d 1491, 1494 (1990) and its interpretation of *Moradi-Shalal v. Fireman's Fund*

13
14 *Ins. Companies*, 46 Cal. 3d 287, 304 (1988), to foreclose a cause of action under

15 §17200 as a sham substitute for a private right of action for violations of Insurance Code

16 §790 *et seq.* Defendants contend that there is an absolute bar against private

17 enforcement of this section.  In *Safeco* the court held that a motorcyclist who settled with

18
19 an insured driver after an accident could not bring a private cause of action against the

20 insurance company for failure to pay premiums. The *Safeco* opinion, however, is

21 extremely brief, conclusory and involves a third-party lawsuit by an injured person against

22 the insurer of the person who injured him. These factors distinguish it from the case at bar,

23
24 which involves a suit by the insured against her own insurance company.

25        In *Moradi-Shalal,* both the facts and the applicable law are distinguishable. That

26 case involved a third-party action brought by an injured person, who first settled her case

27 against the driver and then sued the insurance company. The court decided only that

28 §790.09 of the UIPA did not provide a private right of action against the insurer for

1  violation of the UIPA. The court did permit common law causes of action in tort but did not

2  consider the availability of an action under §17200 of the Bus. & Prof. Code.

3

4        Defendants also cite the case of *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*,

5  17 Cal.4th 553, 556 (1998), for the proposition that there is no cause of action available

6  under §17200 if the underlying statute does not authorize a private right of action.

7  However, in a lengthy and well-reasoned opinion, the court directly contradicts

8  Defendant's position.  In that case, a nonprofit corporation sued retailers for selling

9
10  cigarettes to minors in violation of California Penal Code §308, which does not authorize

11  a private cause of action. The trial court sustained the retailer's demurrer, the court of

12  appeal reversed and the California Supreme Court affirmed the decision of the Court of

13  Appeal.

14
15        The court, reasoned as follows: (1) the nonprofit corporation had standing under

16  the Unfair Competition Law ("UCL") to bring a private action, although Penal Code

17  section 308 provision which was a predicate for the UCL action did not provide a private

18  right of action; (2) private-party standing under the UCL was not impliedly repealed by the

19
20  Penal Code provision prohibiting tobacco sales to minors or by the Stop Tobacco

21  Access to Kids Enforcement (STAKE) Act; and (3) a private action did not violate public

22  policy by putting prosecutorial discretion within the control of an interested party or by

23  diminishing the enforcement responsibilities of the Department of Health Services (DHS)

24  under the STAKE Act.)

25
26        Thus, in a much more detailed and thoughtful decision, the California Supreme

27  Court has allowed a private right of action under §17200, even if the underlying statute

28  does not expressly authorize it, as long as the statute does not explicitly bar it.

The Unfair Insurance Practices Act ("UIPA"), lists a number of prohibited acts at § 790.03 and the remedies at § 790.09. Plaintiff in the case at bar accuses Defendants of many of them.

Contrary to the assertions of Defendants, the remedies for violating any of the provisions of §790.03 are not limited to administrative action, as stated in the plain language of §790.09 itself:

> No order to cease and desist issued under this article directed to any person or subsequent administrative or judicial proceeding to enforce the same shall in any way relieve or absolve such person from any administrative action against the license or certificate of such person, civil liability or criminal penalty under the laws of this State arising out of the methods, acts or practices found unfair or deceptive.

Cal. Insurance Code §790.09

Consequently, in accordance with the court's reasoning in *Stop Youth Addiction*, civil liability is expressly reserved in the insurance statute which Plaintiff claims Defendants have violated, and a private cause of action is available to her under §17200 for any alleged unfair business practices by Defendants.

The holding of the California Supreme Court in *Stop Youth Addiction* has also been adopted by the U.S. Court of Appeals for the Ninth Circuit, which held that a private right of action for violation of an insurance regulation is available in federal court under Cal. Business and Professions Code §17200.  In *Chabner v United of Omaha Life Ins. Co.*, 225 F.3d 1042 (9th Cir. 2000), plaintiff sued for violation of both the Americans with Disabilities Act and California Insurance Code § 10144, after an insurance company charged him nearly double the usual life insurance premium on the basis of a medical condition which would actuarially shorten his life by four years.

1      The court held that he could also bring a cause of action for violation of Business &

2  Professions Code §17200:

3

4        Chabner, however, also claimed violations of California Business and Professions
        Code section 17200. Section 17200 is part of the Unfair

5        Competition Law, Cal. Bus. & Prof.Code    17200--17209, and provides, in
        relevant part, that "unfair competition shall mean and include any unlawful,

6        unfair or fraudulent business act or practice."

7
        Private causes of action for violations of Business and Professions Code

8        section 17200 are authorized by Business and Professions Code section 17204.
        The district court held that Insurance Code section 10144 may be used to define

9        the contours of a private cause of action under Business and Professions Code
        section 17200. We agree.

10

11       The California Supreme Court has held that section 17200 "defines
        'unfair competition' very broadly, to include 'anything that can properly be

12       called a business practice and that at the same time is forbidden by law.' "
        "By proscribing 'any unlawful' business practice, section 17200 'borrows' violations

13       of other laws and treats them as unlawful practices that the unfair competition law
        makes independently actionable." It does not matter whether the underlying statute

14       also provides for a private cause of action; section 17200 can form the basis for a

15       private cause of action even if the predicate statute does not.

16
        There are limits on the causes of action that can be maintained under section

17       17200. A court may not allow a plaintiff to "plead around an absolute bar to relief
        simply by recasting the cause of action as one for unfair competition." The limit is

18       rather narrow, however. "To forestall an action under [section 17200], another
        provision must actually 'bar' the action or clearly permit the conduct."

19

20   *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042 (9th Cir. 2000)(internal

21  citations omitted)

22

23      In light of the decisions of the California Supreme Court in *Stop Youth Addiction*

24  and the Ninth Circuit in *Chabner,* a cause of action for violations of  §790.09 of the UIPA

25  may be asserted under §17200 of the Unfair Competition Law by plaintiff in the case at

26  bar. Section 790.09 expressly provides that an administrative action does not

27  immunize a defendant from either civil or criminal liability. Consequently, the court in the

28  case at bar ruled that this amendment to plaintiff's complaint to add a cause of action

1  under the UCL was not improper.

2        Parenthetically, in response to Defendants' assertion that injunctive relief is not
3
4  available to plaintiff in this case pursuant to §17200, this court reiterates its previous ruling
5  in another case: as a matter of law, California's Bus. & Prof. Code §17200 provides for
6  both disgorgement of profits and injunctive relief. *Irwin v. Mascott,* 112 F.Supp.2d 937
7
   (N.D.Cal.2000).
8
                              APPLICABLE LAW
9
10       Under the Unfair Competition Act (UCA) definition of "competition," to mean and
11 include "*any* unlawful, unfair or fraudulent business *act or* practice," liability can be based
12 on a single transaction and does not require a showing of ongoing wrongful business
13
   conduct. West's Ann.Cal.Bus. & Prof.Code §§ 17200. *Klein v. Earth Elements, Inc.,* 59
14
15 Cal.App.4th 965 (1997).
16       Prior to the 1992 amendment to the UCA, which added the emphasized words,
17 section 17200 was construed as directed at ongoing wrongful business conduct,
18 something beyond a single transaction. *State of California ex rel. Van de Kamp v.*
19 *Texaco, Inc.,* 46 Cal.3d 1147, 1169-1170 (1988).
20       According to recent authority, all that changed when two three-letter words--"any"
21 and "act" were added. (*Podolsky v. First Healthcare Corp.* 50 Cal.App.4th 632, 653-654
22
   (1996); Antitrust and Trade Regulation Law Section of the State Bar of California, Cal.
23
24 Antitrust Law (Supp.1994). (*Cited in Klein v. Earth Elements, Inc.* 59 Cal.App.4th 965,
25 969 (1997).
26
27       In proving an Unfair Business Practice violation, claimants are entitled to introduce
28 evidence not only of practices which affect them individually, but also similar practices

C-99-5286  ORDER & FINDINGS                                          Page 55 of 62

involving other members of the public who are not parties to the action. (*Perdue v. Crocker National Bank* 38 Cal.3d 913, 929 (1985); *Consumers Union of United States, Inc. v. Fisher Development, Inc.*, 208 Cal.App.3d 1433, 1441-1442 (1989); *Hernandez v. Atlantic Finance Co.*, 105 Cal.App.3d 65, 72, (1980) (Without the unfair business practices claim, the trial court restricted the scope of the evidence introduced at trial to that directly relevant to each individual plaintiff. Consequently, the case must be remanded for retrial of this claim.) *Cisneros v. U.D. Registry, Inc.* 39 Cal.App.4th 548,  564 (1995).

The Unfair Insurance Practices Act ("UIPA"), lists a number of prohibited acts at § 790.03 and the remedies at § 790.09.

A partial list of prohibited acts which have been complained of in the case at bar includes the following:

"(h) Knowingly committing or performing with such frequency as to indicate a general business practice any of the following unfair claims settlement practices:

(1) Misrepresenting to claimants pertinent facts or insurance policy provisions relating to any coverages at issue.

(2) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.

(3) Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies.

(4) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss requirements have been completed and submitted by the insured.

(5) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.

C-99-5286  ORDER & FINDINGS    Page 56 of 62

(13) Failing to provide promptly a reasonable explanation of the basis relied on in the insurance policy, in relation to the facts or applicable law, for the denial of a claim or for the offer of a compromise settlement.

Cal. Insurance Code §790.03

In the case at bar, the evidence was substantial that Defendants engaged in several violations of provisions (1), (3), and (5).

With respect to provision (1):

Plaintiff's expert, Frank Caliri, testified that Paul Revere misrepresented the benefits available to plaintiff, by not informing her about recovery benefits, residual benefits or rehabilitation benefits and telling her in their denial letter that her policy was subject to ERISA, when it wasn't.

A recovery benefit is provided in the policy if, prior to age 65, an insured is engaged in any occupation immediately after a period of disability for which benefits were paid and incurs a loss of earnings equal to at least 20% of prior earnings. This does not require disability or being under the care of a physician.

Residual disability benefits are provided in the policy if the insured is unable to perform one or more of the important duties of her occupation; is unable to perform the important duties of her occupation for more than 80% of the time normally required to perform them; or her loss of earnings is equal to at least 20% of her former earnings while engaged in her occupation or another occupation; and she is under the regular

and personal care of a physician. Mr. Caliri testified that Defendants' termination letter to

1    Plaintiff wrongly advised her that she was not eligible for this benefit.

2          While an insured is receiving total disability benefits, she may choose to join a

3    vocational rehabilitation program, during which she may receive benefits for 36 months

4

5    without being under the care of a physician, in order to be retrained in another occupation.

6    There was nothing in the claim file to indicate that Plaintiff was offered this covered

7    benefit. Mr. Caliri testified that failing to inform an insured of a covered benefit fell below

8

9    industry standards.

10          With respect to provision (3), there was testimony from Frank Caliri and Dr. Feist

11   that Defendants targeted claims for termination when they fit a certain profile and that

12   Plaintiff's claim fit that profile: she was a professional, with an own occupation policy,

13

14   receiving a high benefit amount, who received benefits for a number of months.

15   Defendants' claims personnel took "problem claims" to the round table process, where

16   they were examined for ways to terminate them. Defendants' claims personnel took

17   Plaintiff's claim to a round table soon after she began receiving benefits, and several

18   times thereafter until her benefits were terminated.

19

20          Defendants also sent Plaintiff to a biased medical examiner, Dr. Swartz, after

21   sending a referral letter to him from Dr. Bianchi, which expressed the opinion that

22   Plaintiff's condition would improve with conservative treatment over time, in effect

23   directing Dr. Swartz to the conclusion he should reach before he ever saw Plaintiff.

24

25          With respect to provision (5), Defendants engaged in practices designed to

26   conceal their decision-making process and make it more difficult for an insured to obtain

27   information to help resolve a claim.

28

At trial, Mr. Caliri testified that the practice described in Exhibit 45 fell below

1   insurance industry standards. That document is a directive from the Law Department of

2   Provident Life & Accident Insurance Co. instructing claims adjusters to "shred all sensitive

3
4   papers that will not be needed for business purposes." (Tr. 69:11-24, Ex. 45) The

5   document also instructed claims adjusters to communicate in person rather than on paper

6   regarding sensitive matters.  In his opinion this was also below the industry standard

7   which is to document the status of a claims file. (Tr. 70:21-71:6) Mr. Caliri also testified

8
9   that in an internal Provident memorandum dated February 21, 1996, field managers were

10  directed not to include recommendations or conclusions regarding claims in their written

11  reports. Instead they were instructed to communicate them verbally or in a separate

12  memo. He testified that this practice was below the standard of care in the insurance

13  industry, which requires that decisions be documented in the claims file. (Tr. 71:15-72:8,

14
15  215:13-24, 216:6-12)

16      There was some discussion during cross-examination of Mr. Caliri of which

17  documents needed to be retained in the claim file, either by insurance regulations or

18  company policy. Defendants' counsel read a passage from a Provident Document

19  (Exhibit 45). This stated "Retain only those documents needed for operations, legal

20  compliance, and official archives." Mr. Caliri referred to an additional passage which

21
22  admonished Provident employees as follows: "Shred all sensitive papers that will not be

23  needed for business purposes. Generally when copies of certain legal-type

24  documents are sent to you for informational purposes, these documents should be

25  shredded after you've read them. These may be documents prepared for lawsuits and

26
27  reports of investigations or legal audits, memos, responses, or reports from the Law

28

1    Department involving actual facts about the company businesses or legal situations." (Tr.

2    220:1-8)

3

4         Mr. Caliri testified that it was below the insurance industry standards to shred

5    documents which had been prepared for reports and investigations and lawsuits. (Tr.

6    219:12- 220:14) This section governed which documents the company wanted to be

7    shredded or otherwise destroyed, a separate issue from that of the policy to avoid

8    creating documents in the first place. Mr. Caliri conceded that it was reasonable for

9    Provident to instruct its employees to retain those documents needed for legal

10   compliance. (Tr. 221:6-9).

11

12        Dr. Feist testified as well, based on his years as a medical director in the

13   insurance industry, including many years at Provident, prior to Ralph Mohney's advent,

14   that if an insurance company is fairly adjudicating claims, all documentation of data and

15   decisions should be in the claims file and not be purged. If data which does not support

16   the insurance company's decision regarding the claim was purged, that would be

17   dishonest.  (Tr. 813:8-814:3) In his opinion the practices described in the document

18   entitled "Outline for Information Management" presented by the Law Department of

19

20   Provident Life & Accident Insurance Co. were wrong. These included avoiding written

21   communications about sensitive subjects and shredding sensitive papers. (Tr. 816:2-10)

22   Dr. Feist testified that before Chandler and Mohney came to Provident, claims were

23   handled in a fair and aboveboard way, but that after their arrival, standards slid to

24   those which were not ethical for an insurance company. (Tr. 817:14-23)

25

26

27        Mr. Caliri also expressed the opinion that Defendants violated industry standards

28   when they initiated surveillance of Plaintiff prior to receiving all of her

C-99-5286  ORDER & FINDINGS                                        Page 60 of 62

1  medical records. He testified that the purpose of surveillance was to determine whether

2  there was a discrepancy between a claimant's activities and something in the file. (Tr.

3
4  72:20-73:14) Defendants initiated surveillance before there was much of anything to

5  document in the file.

6                              CONCLUSION AND ORDER

7
8       There was testimony at trial that Paul Revere adopted Provident's claims handling

9  policies as part of the transition when it was acquired by Provident, including targeting

10 certain categories of claims, and that Paul Revere employees admitted to such practices

11
12 as destruction of the original medical reports from examining physicians, not knowing the

13 California definition of total disability, and adopting a policy of failing to document claims

14 processes in the file. There was testimony from experts and others that Defendants used

15 a biased medical examiner, failed to advise its insured of covered benefits, targeted

16 claims like hers for termination, failed to settle a claim when liability was clear, and forced

17
18 its insured to litigate to obtain benefits. Based on the evidence presented at trial, this

19 court concludes that Defendants have violated the Unfair Insurance Practices Act,

20 Insurance Code §790.03,  and that their bad faith in doing so, as found by the jury in this

21 case, constitutes a violation of Cal. Bus. & Prof. Code §17200.

22
23      The court hereby adopts the factual finding of the jury that the Defendants acted in

24 bad faith in denying Plaintiff's claim and further finds that the Defendants' multiple acts of

25 bad faith constitute violations of the California Unfair Competition Act.

26      The court  exercises its discretion in seeking to fashion an appropriate equitable

27
28 remedy.

C-99-5286  ORDER & FINDINGS                                    Page 61 of 62

1    In bringing her cause of action under section 17200, Joan Hangarter asked

2   this court to order Defendants to desist from unfair practices directed both at her and

3
4   other policyholders, and to award her attorney fees and to provide other relief, including

5   reopening investigations of other claims, refunding premiums and such other relief as the

6   court found proper. After the trial on Plaintiff's other causes of action, the jury awarded

7   Plaintiff substantial damages for her past and future monthly benefits, her emotional

8
9   distress, her attorney's fees and punitive damages. In so doing the jury sent a significant

10  message to the Defendants. This court sees no need to supplement the jury's award. The

11  court also finds it impracticable to fashion a consent decree or to *sua sponte* open an

12  investigation into allegations by other policyholders. The court finds it more appropriate in

13
14  this instance to order Defendants to obey the law, and hereby enjoins them from future

15  violations, including but not limited to, targeting categories of claims or claimants,

16  employing biased medical examiners, destroying medical reports, and withholding from

17  claimants information about their benefits.

18      IT IS SO ORDERED.

19
20  DATED:

21
                                        _____
22                                      James Larson
                                        United States Magistrate Judge
23

24

25

26

27

28



**BOURHIS & WOLFSON**

insurance law and policyholders represen

ASK ANY QUESTION

FAQs

ABOUT OUR FIRM

CONSUMER
SURVIVAL GUIDE

USEFUL LINKS
AND RESOURCES

RESOURCES FOR
LAWYERS

CONTACT US

HOME

**Hangarter v. Paul Revere, UnumProvident**

*The following article on the Hangarter case was published on May 17, 2002 on the Verdicts Section of the Los Angeles Daily Journal - a publication for California lawyers. This may be of interest to individuals with disability claims.*

Joan Hangarter was left bankrupt and on welfare when Paul Revere Life Insurance Co. canceled her disability benefits. She sued and won a $7.6million verdict from a unanimous jury.

**Adjusted Income**
**by Christina Landers**
**Los Angeles Daily Journal**

Former business owner Joan Hangarter ran a successful chiropractor practice in Albany for nearly 20 years, but when an injury left her unable to work and her insurance company stopped paying her disability benefits, her life fell to ruin.

When Paul Revere Life Insurance Co. stopped paying Hangarter disability benefits for which she had paid a monthly premium, she lost the majority of her income and was reduced first to filing for bankruptcy, then to living off welfare checks and food stamps.

But Hangarter's life turned around again when she read an article n The Wall Street Journal about two attorneys who had filed a case against Paul revere and its parent company, Unum Provident Corp. - San Francisco partners Ray Bourhis and Alice J. Wolfson of Bourhis & Wolfson.

"When Paul Revere terminated my benefits, I didn't really think I had any options," Hangarter says, "I read about Ray Bourhis representing a dentist in a case against Unum Provident and called him. It turns out I couldn't have picked better attorneys.

After hearing the details of Hangarter's story, the team took her case to federal court, where after a three-week trial a unanimous jury agreed that Hangarter had been wrongfully denied payments the insurance company owed her.

The jury awarded her a $7.6 million verdict, including $5 million in punitive damages, $1.2 million in future disability benefits, $320,849 in past disability benefits, $400,000 in emotional distress damage and $760,000 in attorney fees and costs. Joan Hangarter . The Paul Revere Life Insurance Co. C-99-5286 (N.D. Cal. verdict Feb. 2, 2002)

"The day I was awarded millions in the verdict I still wen to the market that night and paid for my food with food stamps." Hangarter says. "It was truly a surreal experience."

Counsel for the defense, Horace W. Green and Lori K. Bernard with San Francisco's Barger and Wolen, said that Hangarter had healed sufficiently to continue working and that her insurance company was justified in terminating her benefits.

"The doctor whom the company hired to perform an independent evaluation testified that he found Joan had significant subjective complaints but that there was no objective basis for them. "Green says, "I honestly believe that this organization tries to pay every single valid claim."
The trial was bifurcated to consider separately charges of unfair of unfair business practices under the Business and Professions Code Section 17200. Those matters are still under consideration by the court.

The defense has filed post-trial motions of a request for a new trial and a request for judgment notwithstanding a

verdict.

"Personally, I don't think they have a chance." Wolfson says." My guess is they'll appeal, or do anything, rather than settle.

Hangarter, who lives in Navajo, became a chiropractor because she "liked helping people," and because she never forgot the gentle assistance of a chiropractor who treated her for scoliosis when she was a child and helped ease her condition.

In 1989, a pregnant Hangarter purchased an insurance policy from Paul Revere Life Insurance Co. The policy was sold to her as an "own occupation" policy that would provide total disability benefits if she became unable to perform her duties as a chiropractor. Those benefits included residual disability benefits, rehabilitation benefits, and recovery benefits.

The lady who sold it to me was adamant that the day may come when the sky falls down and that this policy would protect me from that." Hangarter says.

In 1993 Hangarter was diagnosed with cervical disc disease and lateral epicondylyitis. She treated the back and neck injuries and physical therapy and even wore various braces, but the pain increased.

When she was involved in an auto accident in 1997 that may have aggravated the injuries, she filed a claim for disability with the Chattanooga, Tenn-based Unum Providence Corp, which by the time had taken over Paul Revere Life Insurance.

Unum Provident asked that Hangarter visit Dr. Aub Swartz, who worked for GENEX Services, Inc. wholly-owned subsidiary of UnumProvident - for a medical evaluation.

Swartz examined Hangarter.

"He did no movement tests whatsoever," she recalls. The insurance company had asked her to print out a description of her normal work duties on a day-to-day

basis before her accident and said it would give that description to the doctor.

"Swartz was not even provided with a copy of that description when he made his evaluation." Bourhis says. Swartz determined that Hangarter was capable of seeing two patients per hour.

"Just off the top of his silly head, he came up with a number of two patients per hour," Bourhis says.

Before her injuries, Hangarter had seen eight eight to 10 patients per hour, she says.

At the time she filed the claim, Hangarter hired another chiropractor to perform her duties, to keep her business running. But her condition continued to deteriorate. In April 1999, she sold her practice.

UnumProvident paid her disability benefits of more than $8,100 per month for 18 months, until a month after she sold her practice when the company sent a letter saying they were terminating her benefits.

"They started looking for ways to deny my policy from the day I filed my claim," Hangarter says, "I freaked out because I had lost my business, and all of a sudden I had no money."

She tried opening an internet-based service for chiropractors but made less than 80 percent of what she had been making as a chiropractor. Eventually Hangarter filed for bankruptcy and was forced to go on welfare to raise her two grammar school-aged sons.

"My life went down the toilet," she says.

But when Hangarter happened upon the newspaper article about a pair of San Francisco Attorneys who took on a lawsuit against. UnumProvident, she called their office and told them her story.

"Joan called me," Wolfson recalls,"I saw her in my office on a Saturday. I heard her story, and I signed her up

and started litigating her case."

**They Kicked Her When She Was Down**

Under Bourhis and Wolfson's counsel, Hangarter filed suit against UnumProvident in November 1999.

"The question was whether or not the insurance company violated its obligations to her," Bourhis says. "They kicked her when she was down."

After several unsuccessful mediations, the suit went to trial in February.

"I begged the company before Christmas to settle the case," Bourhis says. "Joan became suicidal, she was so depressed. They offered $500,000, which after all fees would have been less than what she was owed for her benefits."

The case was filed originally in state court, but it was removed to federal court on the basis of diversity of citizenship-the company is an out-of-state company, and the plaintiff is from California. This provided UnumProvident with a distinct advantage." says Bourhis. "there's always a concern when you have to have a unanimous jury in federal court, " he says. "The standard of proof is so high. You have to show malice, fraud or oppression. Add those things up, and you have damn good evidence.

But Bourhis and Wolfson felt confident that they did, and in the form of internal insurance company memos outlining what they described as less-than-ethical business practices, and in the testimony of former Paul Revere Life Insurance Co. employees who said they witnessed some of those practices.

The attorneys had, from other cases they had tried against Unum Provident, memos that they included as evidence in this case, on how to calculate a "net terminations ratio."
"They take all new claims and compare those to the claims they're able to terminate, and turn that into a

dollar formula, translated to a percentage. " Bourhis says. "They got to a point where they were at more than 100 percent on the ratio - they were terminating more policies than they were bringing in."

The plaintiff's counsel obtained the deposition of former Provident Insurance employee Dr. William Feist, who testified about meetings in which these rations were discussed.

Feist was the medical director and vice president of Provident Insurance from 1980 to 1996. He testified in a deposition that when Ralph Mohney, a new head of claims, and Harold Chandler, the company's new president, were brought in 1993 and 1994 receptively "the things they were doing were so unethical that he quit," Bourhis says.

In his deposition, Feist discussed the "round table" meetings where Mohney and Changler reviewed cases that had been on claim for several months or years and tried to determine in which, if any, of those cases the benefits could be terminated.

"These were cases where people were already being paid benefits and weren't getting any better physically, and the company wanted to terminate the claims," Feist says. "It's probably fair to say that Provident and Paul Revere wrote some very expensive benefit policies back in the 1970s and 1980s, which were not priced or underwritten correctly and then in the late 1990s it came back to haunt them.

The round-table meetings were held late in the afternoon and into the evening," Feist says, " and on record was made of what transpired there."

Defense counsel argued that policies at UnumProvident had changed by the time Feist left and that he has "no idea what the current policy is," Green says.

Green, who has worked as counsel for the company since 1986 also argued that the insurance company believed Hangarter had stopped treating patients and that she had time to recover fully when it stopped paying

her benefits.

"She did have an injury, and she healed, and she was back to her prior level of performance, " Green says."As I sit here, my back hurts a bit, my knees are aching, so maybe I overdid it a bit this weekend. But that doesn't mean we are precluded from our job duties."

**Rags to Riches**

But in the end, the jury felt it had enough evidence that UnumProvident had terminated Hangarter's claims without sufficient evidence that she was healed and enough evidence that the company had concealed from her benefits to which she was entitled.

"UnumProvident tried to do all sorts of things to get out of the litigation, including asserting that Joan's case was pre-empted by the Employment Retirement Income Security Act," Wolfson says. "As a sole business owner, her case was not pre-empted, but they tried to claim that it was when they sent her termination letter."

After a three week trial and five hours of deliberations, the jury awarded a unanimous verdict of $7.6million. Hangarter was amazed by the results.

"I'm happy I won because it sends a message to the insurance company that they're not going to get away with this any longer," she says.

Bourhis and Wolfson, who have several other cases pending against UnumProvident, similarly were pleased with the message the large verdict sent.

"This jury verdict, being unanimous and being a federal jury, fires a shot across the bow of this company that has not yet been heard, but will be very soon throughout the country," Bourhis says."I really thing that this had to happen and that it's only the beginning."

**Articles of Interest**

**Pumping Victories**
by Christina Landers
published in Litagators Profile 2002

Ray Bourhis went from wanting to work in a gas station to taking on insurers as a plaintiff's lawyer and winning multimillion-dollar cases.

If he had stuck with his high-school career plans, San Francisco attorney Ray Bourhis might be pumping gas and looking under the hoods of cars at his own gas station.

"At one point, I wanted to work in a gas station," Bourhis, 59 says. "Why not? That's what I did in high school and I liked tinkering with cars.

But a high school teacher of his recognized talent in Bourhis for writing and suggested he go off to college instead of pursuing work as a grease monkey.

"She got me interested, so I went to Ohio State University and studied political science." he recalls. After graduating, Bourhis headed for the mountains of Appalachia, where he taught rural children for a year. The kid's long, lazy summer vacations gave him an idea.

He wrote to Robert Kennedy, who was in the Senate at that point, and said, "Why don't we send some of these kids out to Indian Reservation for the summer, and have some Native Americans spend the summer here to give them some different experiences?"

Much to the young college graduates surprise, Kennedy read the letter and loved the idea. The senator even convinced American Airlines to fly the students back and forth across the country for free.

During the planning stages Bourhis lost his position with the Appalachian school district...

He mentioned to the Kennedy clan that he was out of a job, and they offered him a job as a campaign advisor on Kennedy's presidential campaign.

" The next thing I knew, I was running all over the



country with Robert Kennedy, " he says.

In 1968, Bourhis came out to California and decided to go to law school in Berkeley. He started a public interest law firm while in school, but he went into private practice shortly after graduating in 1974.

Ever since, he has done insurance bad faith work, inspired by a "horrible experience" his mother had with her insurance company, an experience that had "very dire consequences."

Bourhis preferred not to elaborate.

His practice grew quickly as he worked on ever-larger cases against insurance companies and pulled in bigger and bigger verdicts for his clients.

In one case, Bourhis represented a chiropractor whose disability benefits were terminated by Unum Provident Corp. , resulting in a verdict of more than $7.6million. Hangarter v. The Paul Revere Life Insurance Co. C-99-5286 (N.D. Cal. verdict Feb. 2002).

I've had a lot of cases against this company- I don't even want to say how many." he says. " We've represented doctors, dentists, chiropractors and court reporters who've had unbelievable things done to them by this company. This case is just the tip of the iceberg.

His peers were not surprised to hear about his latest win, which came on the heels of a $1.3million verdict against Paul Revere Life Insurance Co. for a court reporter whose benefits were canceled (McGregor v. Paul Revere Life Ins. Co. C972938 (N.D. Cal., verdict April 9,2001.)

"Ray is a very tenacious litigator, and he had them in his sights." says Robert Scott, a sole practitioner who call himself a 'professional acquaintance of Bourhis. "He mixes aggression with compassion and strategic analysis," Scott says.

These days, when he's not working on prosecuting insurance companies, Bourhis is working on a book he's

written about the Hangarter case.

It's taking a hell of a lot of time, but it's worth it," he says." Thank goodness I have my patient, gorgeous, redhead wife. She is my inspiration in all of this."

As for adversaries in the field, Bourhis says he admires most of them.

"Most of the defense lawyers who represent insurance companies are great people, " he says. "I have a lot of respect for them."

But he certainly doesn't mind beating them in the courtroom.

### Medicine Woman
by Christian Landers
Litigator Profile/Verdicts and Settlements 2002

Alice J. Wolfson didn't plan on becoming an attorney - her public interest work drew out the litigators' spirit within her.

Her first career was as an audiologist, testing people for hearing problems. She moved from that into a second career running a community-based women's health organization, the Coalition for the medical Rights of Women, for nearly a decade in San Francisco.

"My husband was a doctor, that made me an honorary doctor," Wolfson quips.

She founded a similar organization, called the National Women's Health Network and served on its board of directors for several years.

The mission of the group, which is based on Washington, D.C., is to advocate for national policies that protect and promote all women's health and to provide evidence-based, independent information to empower women to make fully informed health decisions.

"I was involved in alot of reproductive-rights work in that organization and was constantly debating...it was something about my style; everyone thought I was a lawyer.

Eventually she decided to go to law school at the Hastings College of Law.

But while pursuing her law degree, Wolfson's pre-law interests in medicine became heightened when her oldest son was diagnosed with leukemia.

He was ill when I went to law school, which could have been one of my incentives. I missed a semester when he relapsed.

Her son eventually died from the disease.

Wolfson got her law degree in 1989 and answered an advertisement by San Francisco attorney Ray Bourhis for litigators to join his team.

It's very difficult in San Francisco to find a job as a public-interest attorney, she says, "I needed to get paid, so I answered his ad."

Bourhis hired Wolfson, who seemed a natural for his insurance bad faith practice.

:" She is a smart, determined, straightforward litigator who never gives in, " Bourhis says.

Today, Wolfson is a partner in the firm.

"I love representing insured against their insurance company when the company had denied them their benefits," she says. "We really believe in the cases, and we litigate them fully."

Wolfson practiced what she preaches in a recent case in which she and Bourhis represented a chiropractor whose disability benefits were terminated by UnumProvident Corp. The case resulted in a verdict of more than $7.6 million. Hangarter v. The Paul Revere Life Insurance Co. C99-5286 (ND Cal. verdict Feb 2,

2002).

I was fully confident we were going to win this case, she says.

And she and her partner are ready to begin trial in several other cases against the same insurance company. When she discusses these cases, Wolfson sounds more like a doctor than a lawyer.

"We have a case right now of a doctor who has AIDS and documented AIDS dementia." she explains. "He had a three-valve heart failure and is at high risk for grafting because of the co-morbidity. They terminated his benefits and started to pay them again the minute we filed the lawsuit.

When she has spare time, Wolfson likes to spend time reading, exercising and visiting with friends. She also relishes time spent with her other son, a 26 -year-old actor and producer who lives in Los Angeles.

---

## ASK ANY QUESTION
Send a question to BW through our online form.

For additional Information and Resources please visit
**InsuranceConsumers.com**

---

## Bourhis & Wolfson
**Insurance Law and Policyholder Representation**

1050 Battery Street
San Francisco, California 94111

Telephone: 415.392.4660
Fax: 415.421.0259
**Toll Free: 1 800 264 2082**
info@bourhis-wolfson.com

---

 

Search - Finance Home - Yahoo! - Help

**Welcome** [Sign In]

**Financial News**

To track stocks & more, Reg

Enter symbol(s) [_____] [Basic ▾] [Get]   Symbol Lookup

  

**Reuters**

# U.S. judge upholds verdict against UnumProvident

Friday November 15, 8:50 pm ET

SAN FRANCISCO, Nov 15 (Reuters) - A federal judge has ordered UnumProvident Corp. (NYSE:UNM - News) to stop using biased medical examiners and to quit withholding benefits information after concluding the nation's No.1 disability insurer used such tactics to deny benefits to boost profits.



ADVERTISEMENT

In upholding a $7.67 million verdict against the company for wrongly cutting off the long-term benefits to one of its policyholders, U.S. Magistrate James Larson found that UnumProvident violated California's unfair insurance practices and unfair competition acts.

He issued an injunction that also ordered the company to stop destroying medical reports or else possibly face civil sanctions.

"The court...enjoins them from future violations, including but not limited to, targeting categories of claims or claimants, employing biased medical examiners, destroying medical reports, and withholding from claimants information about their benefits," said the strongly worded 62-page injunction issued earlier this week.

The Tennessee-based company said in a statement that it strongly disagreed with the court's finding and would aggressively appeal the decision.

The company noted that it has paid out $3.6 billion in disability-related benefits this year and that courts have ruled in favor of the company three out of every four times.

"The court opinion suggests that we set specific goals for the inappropriate ending of benefits to our customers," the statement said. "That is patently wrong. We do not and would not under any circumstance tolerate such conduct by an employee of our

## Related Quote



UNM          18.55          N

**View Detailed Quote**
Delayed 20 mins
Quote data provided by Reuters

### Related News Stories

UnumProvident Launches Integrated Disability Management Website With Interactive Tools for Employers - PR Newswire (Wed Nov 13)

[external] Long-term-care premiums soar amid slump sales - at CBS MarketWatch (Mon Nov 11)

UNUM Corp downgraded b SunTrust Rbsn Humphrey Briefing.com (Thu Nov 7)

Zurich Financial Names Ne Head Of UK, International L - Dow Jones Business News (Thu Nov 7)

Mo

By industry: Banking, Healt care, Insurance, Law

### Top Stories

Stocks Set to Rise After Do Up Six Weeks - Reuters (8:06

Wal-Mart Sees Sales at Lo End of Range - Reuters (8:07 a

Lowe's Earnings Rise 35 Percent - Reuters (7:54 am)

AMD Sees Up to $600 Mln Pretax Charges - Reuters (7:5 am)

Mo

More Reuters

Most-emailed articles

Most-viewed articles

company."

The California decision, however, could add fuel to similar lawsuits across the country that also accuse the insurer of denying insurance to people too sick or too injured to work.

Earlier this month the insurer and its subsidiaries were sued in New York by a group of clients alleging they were wrongfully denied claims as part of a strategy to save money and rack up profits.

PUNITIVE DAMAGES TOTAL $5 MILLION

The California case stemmed from a lawsuit brought by Joan Hangarter, a Berkeley chiropractor who alleged that the insurer used tactics involving biased examiners in a drawn-out effort to avoid paying her long-term claim.

A jury agreed and awarded $7.67 million, including $5 million in punitive damages, to the single mother who had to go on welfare after losing her benefits.

The judge concluded that the company failed to advise the former chiropractor on benefits to which she was entitled and then terminated them when she was totally disabled.

The judge also said that despite conclusive evidence that Hangarter was unable to work as a chiropractor, the company reclassified her occupation as business owner and claimed she was not totally disabled because she could perform bookkeeping duties or teach a class.

"Defendants had a bias against claims like Dr. Hangarter's," the ruling said. "They planned to save money by terminating claims like hers."

Email this story – Set a News Alert

ADVERTISEMENT

**Special Offers**

**Find Old Friends at Classmates.com**

**AT&T Wireless. Get a FREE Nokia 3360 and plans from $19.99!!**

**Hide Your Tracks Download internetwasher.com only $79.95!**

**Make Your PC Faster in Just Five Minutes!**

**$8.95 Domain Name Registrations & $7.75 Transfers at GoDaddy.com**

**Web hosting. Best quality, 24/7 toll free support. Lowest prices.**

**Compare REALTORS® and View Homes!**

**$7.95 Domain Name Registrations & Transfers at Aplus.Net!**

**Make Your PC Faster in Just Five Minutes!**

Search News

Docket as of November 15, 2002 9:13 pm                    Web PACER (v2.3)

# U.S. District Court

# U.S. District for the Northern District of California (S.F.)

# CIVIL DOCKET FOR CASE #: 99-CV-5286

# Hangarter v. Provident Life & Acc, et al

Filed: 12/15/99
Assigned to: Magistrate Judge James Larson
Jury demand: Both
Referred to: Mag. Judge Maria-Elena James
Demand: $0,000
Nature of Suit: 110
Lead Docket: None
Jurisdiction: Diversity
Cause: 28:1332 Diversity-Insurance Contract

| | |
|---|---|
| JOAN HANGARTER<br>    Plaintiff | Ray Bourhis<br>[COR LD NTC]<br>Jill K. Schlichtmann<br>[COR LD NTC]<br>Alice J. Wolfson<br>[COR LD NTC]<br>Bourhis Wolfson & Schlichtmann<br>1050 Battery St<br>San Francisco, CA 94111<br>(415) 392-4660<br>Daniel U. Smith<br>[COR LD NTC]<br>Daniel U. Smith Law Offices<br>P.O. Box 278<br>Kentfield, CA 94914<br>415-461-5630 |
|    v.<br>PROVIDENT LIFE & ACCIDENT<br>INSURANCE CO<br>    defendant<br>[term  04/06/00] | Horace W. Green<br> [term  04/06/00]<br>[COR LD NTC]<br>Peter E. Romo, Jr.<br> [term  04/06/00]<br>[COR LD NTC]<br>Eric R McDonough<br> [term  04/06/00]<br>[COR LD NTC]<br>Seyfarth Shaw<br>101 California St<br>Ste 2900<br>San Francisco, CA 94111-5858<br>(415) 397-2823 |

```
PAUL REVERE LIFE INSURANCE CO.        Horace W. Green
     defendant                         [term  07/09/01]
                                       (See above)
                                       [COR LD NTC]
                                       Peter E. Romo, Jr.
                                        [term  07/09/01]
                                       (See above)
                                       [COR LD NTC]
                                       Eric R McDonough
                                        [term  07/09/01]
                                       (See above)
                                       [COR LD NTC]
                                       Horace W. Green
                                       [COR LD NTC]
                                       Lori K. Bernard
                                       [COR LD NTC]
                                       Barger & Wolen LLP
                                       650 California St
                                       9th Flr
                                       San Francisco, CA 94108
                                       415-434-2800
                                       Evan M. Tager
                                       [COR LD NTC]
                                       Mayer Brown Rowe & Maw
                                       1909 K. Street NW
                                       Washington, DC 20006
                                       202-263-3000
UNUMPROVIDENT CORP                     Horace W. Green
     defendant                          [term  07/09/01]
                                       (See above)
                                       [COR LD NTC]
                                       Peter E. Romo, Jr.
                                        [term  07/09/01]
                                       (See above)
                                       [COR LD NTC]
                                       Eric R McDonough
                                        [term  07/09/01]
                                       (See above)
                                       [COR LD NTC]
                                       Horace W. Green
                                       (See above)
                                       [COR LD NTC]
                                       Lori K. Bernard
                                       (See above)
                                       [COR LD NTC]
                                       Evan M. Tager
                                       (See above)
                                       [COR LD NTC]
PATRICIA MEYER                         Horace W. Green
     defendant                          [term  01/21/00]
     [term  01/21/00]                  (See above)
                                       [COR LD NTC]
                                       Peter E. Romo, Jr.
                                        [term  01/21/00]
                                       (See above)
                                       [COR LD NTC]
                                       Eric R McDonough
                                        [term  01/21/00]
                                       (See above)
                                       [COR LD NTC]
```

# DOCKET    PROCEEDINGS

DATE    #        DOCKET    ENTRY

3/27/92  350     DECLARATION by Alice J. Wolfson on behalf of Plaintiff Joan
                 Hangarter re response [349-1]  [3:99-cv-05286] (ga)
                 [Entry date 03/28/02]

12/15/99 1       NOTICE OF REMOVAL (no process) by defendant from Alameda
                 Superior Court,  Case Number: 819411-0 ; Summons,
                 Complaint, Fee status pd entered on 12/15/99  in the amount
                 of $ 150.00 ( Receipt No. 4400932)   [3:99-cv-05286] (ab)
                 [Entry date 12/20/99]

12/15/99 2       MEMORANDUM by defendant in support of removal complaint
                 [1-1] [3:99-cv-05286] (ab) [Entry date 12/20/99]

12/15/99 3       ORDER RE COURT PROCEDURE and SCHEDULE (ADR Multi-Option)
                 by Magistrate Judge James Larson : Proof of service to be
                 filed by 1/31/00 ; counsels' case management statement to
                 be filed by 4/10/00 ; initial case management conference
                 will be held 10:30 4/19/00 .  (cc: all counsel)
                 [3:99-cv-05286] (ab) [Entry date 12/20/99]

12/20/99 4       PROOF OF SERVICE by defendant of notice of assignment of
                 case to US Magistrate and other related documents
                 [3:99-cv-05286] (ab) [Entry date 12/21/99]

12/20/99 5       CONSENT to proceed before magistrate judge by Plaintiff
                 [3:99-cv-05286] (ab) [Entry date 12/22/99]

12/20/99 6       DEMAND for jury trial by Plaintiff [3:99-cv-05286] (ab)
                 [Entry date 12/22/99]

12/21/99 7       MOTION with memorandum in support  before Magistrate Judge
                 James Larson by defendant to dismiss complaint  with
                 Notice set for 2/2/00 9:30 a.m.  [3:99-cv-05286] (ab)
                 [Entry date 12/22/99]

12/22/99 8       NOTICE OF MOTION AND MOTION  before Magistrate Judge James
                 Larson by Plaintiff to remand to State Court  with Notice
                 set for 2/2/00 9:30 a.m. [3:99-cv-05286] (ab)
                 [Entry date 12/23/99] [Edit date 09/14/00]

12/22/99 9       MEMORANDUM by Plaintiff in support of motion to remand to
                 State Court [8-1] [3:99-cv-05286] (ab) [Entry date 12/23/99]

12/22/99 10      DECLARATION by Alice Wolfson on behalf of Plaintiff re
                 motion to remand to State Court [8-1]  [3:99-cv-05286] (ab)
                 [Entry date 12/23/99]

12/22/99 11      PROOF OF SERVICE by Plaintiff of motion to remand to State
                 Court [8-1] and related documents [3:99-cv-05286] (ab)
                 [Entry date 12/23/99]

12/23/99 12      EX-PARTE APPLICATION  before Magistrate Judge James Larson
                 by Plaintiff to continue hearing date for defendant's

|          |    | motion  dismiss complaint [3:99-cv-05286] (ab) [Entry date 12/29/99] |
|----------|----|----------------------------------------------------------------------|
| 12/23/99 | 13 | DECLARATION by Alice Wolfson on behalf of Plaintiff re motion to continue hearing date for defendant's motion dismiss complaint [12-1] [3:99-cv-05286] (ab) [Entry date 12/29/99] |
| 12/23/99 | 14 | PROOF OF SERVICE by Plaintiff of dockets no. 12-13 [3:99-cv-05286] (ab) [Entry date 12/29/99] |
| 12/27/99 | 15 | OPPOSITION by defendant to motion to continue hearing date for defendant's motion  dismiss complaint [12-1] [3:99-cv-05286] (ab) [Entry date 12/29/99] |
| 12/27/99 | 16 | DECLARATION by Eric McDonough on behalf of defendant re declaration [10-1] in support of opposition to plaintiff's exparte motion to continue hearing  [3:99-cv-05286] (ab) [Entry date 12/29/99] |
| 12/29/99 | 17 | CONSENT to proceed before magistrate judge by defendant [3:99-cv-05286] (ab) [Entry date 12/30/99] |
| 12/29/99 | 18 | ORDER  by Magistrate Judge James Larson  denying motion to continue hearing date for defendant's motion  dismiss complaint [12-1] ( Date Entered: 12/30/99) (cc: all counsel)  [3:99-cv-05286] (ab) [Entry date 12/30/99] |
| 1/11/00  | 19 | LETTER to Clerk dated 1/10/00 from Alice J. Wolfson confirming removal of motion to remand from Mag. Larson's calendar [3:99-cv-05286] (ab) [Entry date 01/12/00] |
| 1/12/00  | 20 | LETTER to Mag Judge JL  dated 1/11/00  from Eric R McDonough confirming motion to remand taken off calendar [3:99-cv-05286] (ab) [Entry date 01/14/00] |
| 1/12/00  | 21 | OPPOSITION by Plaintiff to motion to dismiss complaint [7-1] [3:99-cv-05286] (ab) [Entry date 01/14/00] |
| 1/12/00  | 22 | DECLARATION by Alice Wolfson on behalf of Plaintiff re opposition [21-1] to motion to dismiss  [3:99-cv-05286] (ab) [Entry date 01/14/00] |
| 1/12/00  | 23 | PROOF OF SERVICE by Plaintiff of opposition [21-1] to motion to dismiss and related documents [3:99-cv-05286] (ab) [Entry date 01/14/00] |
| 1/13/00  | -- | SUMMONS issued as to defendant Paul Revere Life Ins, defendant Unumprovident Corp, defendant Provident Life & Acc [3:99-cv-05286] (ab) [Entry date 01/13/00] |
| 1/19/00  | 24 | REPLY by defendant re opposition [21-1] to motion to dismiss complaint [3:99-cv-05286] (ab) [Entry date 01/21/00] |
| 1/19/00  | 25 | OBJECTIONS by defendant to declaration of Alice Wolfson [22-1] in support of plaintiff's opposition to defendants'motioin to dismiss complaint [3:99-cv-05286] (ab) [Entry date 01/21/00] |
| 1/21/00  | 26 | STIPULATION and ORDER  by Magistrate Judge James Larson : dismissing party Patricia Meyer with prejudice (cc: all counsel) [3:99-cv-05286] (ab) [Entry date 01/24/00] |
| 1/26/00  | 27 | PROOF OF SERVICE by defendant of stipulation and order of |

dismissal of Patricia Meyer [3:99-cv-05286] (ab)
[Entry date 01/27/00]

| | | |
|---|---|---|
| 1/28/00 | 28 | NOTICE by Plaintiff of filing of proof of service [3:99-cv-05286] (ab) [Entry date 02/01/00] |
| 1/28/00 | 29 | ACCEPTANCE/ACKNOWLEDGEMENT OF SERVICE by defendant of summons and complaint on 1/14/00 [3:99-cv-05286] (ab) [Entry date 02/01/00] |
| 2/2/00 | 30 | MINUTES: ( C/R Tape 00-5) ( Hearing Date: 2/2/00) granting motion to dismiss complaint [7-1] [3:99-cv-05286] (ab) [Entry date 02/03/00] |
| 2/11/00 | 31 | ORDER by Magistrate Judge James Larson granting motion to dismiss complaint [7-1] with leave to amend ( Date Entered: 2/15/00) (cc: all counsel) [3:99-cv-05286] (ab) [Entry date 02/15/00] |
| 3/7/00 | 32 | STIPULATION and ORDER by Magistrate Judge James Larson : amending complaint to 4/11/00 (cc: all counsel) [3:99-cv-05286] (ab) [Entry date 03/09/00] |
| 3/20/00 | 33 | STIPULATION and ORDER by Magistrate Judge James Larson : Case Management Conference set for 6/7/00 ; Case Management Statement is due 5/30/00 ; (cc: all counsel) [3:99-cv-05286] (ab) [Entry date 03/21/00] |
| 3/22/00 | 34 | OBJECTIONS to subpoena in a civil case by Aubrey Swartz MD [3:99-cv-05286] (ab) [Entry date 03/23/00] |
| 3/27/00 | 35 | NOTICE by Plaintiff of unavailability of counsel [3:99-cv-05286] (ab) [Entry date 03/29/00] |
| 3/31/00 | 36 | NOTICE by Plaintiff of unavailability of counsel [3:99-cv-05286] (ab) [Entry date 04/06/00] |
| 4/4/00 | 37 | MOTION before Magistrate Judge James Larson to quash subpoena on behalf of Aubrey Swartz with Notice set for 5/10/00 9:30 a.m. [3:99-cv-05286] (ab) [Entry date 04/17/00] |
| 4/4/00 | 38 | NOTICE of hearing setting motion to quash subpoena on behalf of Aubrey Swartz [37-1] ; hearing set for 9:30 5/10/00 [3:99-cv-05286] (ab) [Entry date 04/17/00] |
| 4/4/00 | 39 | MEMORANDUM in support of motion to quash subpoena on behalf of Aubrey Swartz [37-1] [3:99-cv-05286] (ab) [Entry date 04/17/00] |
| 4/4/00 | 40 | AFFIDAVIT of Aubrey Swartz regarding motion to quash subpoena on behalf of Aubrey Swartz [37-1] [3:99-cv-05286] (ab) [Entry date 04/17/00] |
| 4/6/00 | 41 | FIRST AMENDED COMPLAINT by Plaintiff; jury demand terminating defendant Provident Life & Acc [3:99-cv-05286] (ab) [Entry date 04/17/00] |
| 4/6/00 | -- | FIRST AMENDED COMPLAINT SUMMONS issued as to defendant Paul Revere Life Ins, defendant Unumprovident Corp [3:99-cv-05286] (ab) [Entry date 04/17/00] |
| 4/17/00 | 42 | MEMORANDUM by Plaintiff in opposition to motion to quash subpoena on behalf of Aubrey Swartz [37-1] [3:99-cv-05286] (ab) [Entry date 04/25/00] |

4/17/00   43       DECLARATION by Alice Wolfson on behalf of Plaintiff re
                   opposition memorandum [42-1] to motion to quash
                   [3:99-cv-05286] (ab) [Entry date 04/25/00]

4/19/00   44       RETURN OF SERVICE of summons and first amended complaint
                   executed upon defendant Unumprovident Corp on 4/14/00  on
                   4/14/00   [3:99-cv-05286] (ab) [Entry date 04/25/00]

4/19/00   45       RETURN OF SERVICE of summons and first amended complaint
                   executed upon defendant Paul Revere Life Ins  on 4/14/00
                   [3:99-cv-05286] (ab) [Entry date 04/25/00]

4/25/00   46       STIPULATION and ORDER  by Magistrate Judge James Larson :
                   extending time to answer first amended complaint to 5/2/00
                   (cc: all counsel) [3:99-cv-05286] (ab)
                   [Entry date 05/01/00]

5/2/00    47       ANSWER by defendant Paul Revere Life Ins, defendant
                   Unumprovident Corp to first amended  complaint [41-1]
                   [3:99-cv-05286] (ab) [Entry date 05/08/00]

5/8/00    48       NOTICE by Plaintiff of unavailability of counsel
                   [3:99-cv-05286] (ab) [Entry date 05/10/00]

5/10/00   49       MINUTES: ( C/R Tape 00-28) ( Hearing Date: 5/10/00)
                   setting hearing on motion to quash subpoena on behalf of
                   Aubrey Swartz [37-1] 9:30 6/7/00 [3:99-cv-05286] (ab)
                   [Entry date 05/19/00]

5/23/00   50       REPLY by defendant re opposition memorandum [42-1] to
                   motion to quash subpoena [3:99-cv-05286] (ab)
                   [Entry date 05/24/00]

5/26/00   51       JOINT CASE MANAGEMENT STATEMENT and PROPOSED ORDER filed.
                   [3:99-cv-05286] (ab) [Entry date 05/31/00]

6/5/00    52       AMENDED JOINT CASE MANAGEMENT STATEMENT and PROPOSED ORDER
                   filed.   [3:99-cv-05286] (ab) [Entry date 06/06/00]

6/7/00    53       MINUTES: ( C/R tape 00-32 & 33) ( Hearing Date: 6/7/00)
                   that the motion to quash subpoena on behalf of Aubrey
                   Swartz [37-1] is submitted; referring case for settlement
                   to anoather magistrate judge [3:99-cv-05286] (ab)
                   [Entry date 06/14/00]

6/13/00   54       ORDER  by Mag. Judge Bernard Zimmerman Settlement conf.
                   (Mag) at 11:00 6/29/00  ( Date Entered: 6/16/00) (cc:  all
                   counsel)  [3:99-cv-05286] (ab) [Entry date 06/16/00]

6/19/00   55       ORDER  by Magistrate Judge James Larson  denying motion to
                   quash subpoena on behalf of Aubrey Swartz [37-1] ( Date
                   Entered: 6/21/00) (cc:  all counsel)  [3:99-cv-05286] (ab)
                   [Entry date 06/21/00]

6/26/00   56       NOTICE by defendant Paul Revere Life Ins  of change of
                   address [3:99-cv-05286] (ab) [Entry date 06/29/00]

6/29/00   57       SETTLEMENT CONFERENCE MINUTES: BZ ( C/R none) ( Hearing
                   Date: 6/29/00)  Settlement conference held, Status
                   conference set for 9/18/00   [3:99-cv-05286] (ab)
                   [Entry date 07/05/00]

6/29/00   58       ORDER  by Mag. Judge Bernard Zimmerman Settlement conf.

|          |    |  |
|----------|----|--|
|          |    | (Mag) at 9:00 10/11/00 ; ( Date Entered: 7/5/00) (cc:  all counsel)  [3:99-cv-05286] (ab) [Entry date 07/05/00] |
| 9/18/00  | 59 | MINUTES: BZ ( C/R none) ( Hearing Date: 9/18/00) settlement conference vacated [3:99-cv-05286] (ab) [Entry date 09/21/00] |
| 9/19/00  | 60 | ORDER  by Mag. Judge Bernard Zimmerman vacating 10/11/00 settlement conference ( Date Entered: 9/21/00) (cc: all counsel)  [3:99-cv-05286] (ab) [Entry date 09/21/00] |
| 9/22/00  | 61 | MOTION with memorandum in support  before Magistrate Judge James Larson by defendant Paul Revere Life Ins, defendant Unumprovident Corp for partial summary judgment  with Notice set for 11/1/00 9:30 a.m.  [3:99-cv-05286] (ab) [Entry date 09/25/00] |
| 9/22/00  | 62 | DECLARATION by Horace W. Green on behalf of defendant re motion for partial summary judgment [61-1]  [3:99-cv-05286] (ab) [Entry date 09/25/00] |
| 9/22/00  | 63 | STATEMENT of facts by defendant in support of motion for partial summary judgment [61-1]   [3:99-cv-05286] (ab) [Entry date 09/25/00] |
| 10/10/00 | 64 | NOTICE of hearing by defendant Paul Revere Life Ins setting motion for partial summary judgment [61-1] ; hearing set for 9:30 11/8/00 [3:99-cv-05286] (ga) [Entry date 10/13/00] |
| 10/16/00 | 65 | LETTER to Mag Judge JL  dated 10/13/00  from Eric R McDonough enclosing a decision from the USDC Central District of CA which supports defendants' recently filed motion for summary judgment [3:99-cv-05286] (ab) [Entry date 10/18/00] |
| 10/18/00 | 66 | MEMORANDUM by Plaintiff in opposition to motion for partial summary judgment [61-1] [3:99-cv-05286] (ab) [Entry date 10/18/00] |
| 10/18/00 | 67 | DECLARATION by Ray Bourhis on behalf of Plaintiff re opposition memorandum [66-1] to motion for partial summary judgment [3:99-cv-05286] (ab) [Entry date 10/18/00] |
| 10/18/00 | 68 | DECLARATION by Alice Wolfson on behalf of Plaintiff re opposition memorandum [66-1] re motion for partial summary judgment [3:99-cv-05286] (ab) [Entry date 10/18/00] |
| 10/18/00 | 69 | DECLARATION by Dr. Joan Hangarter on behalf of Plaintiff re opposition memorandum [66-1] to motion for partial summary judgment  [3:99-cv-05286] (ab) [Entry date 10/18/00] |
| 10/18/00 | 70 | Material facts and response to separate STATEMENT of facts by Plaintiff in support of opposition memorandum [66-1] to motion for partial summary judgment   [3:99-cv-05286] (ab) [Entry date 10/18/00] |
| 10/18/00 | 71 | PROOF OF SERVICE by Plaintiff of dockets no. 66-70 [3:99-cv-05286] (ab) [Entry date 10/18/00] |
| 10/25/00 | 72 | REPLY by defendant re opposition memorandum [66-1] to motion for partial summary judgment [3:99-cv-05286] (ab) [Entry date 10/27/00] |

| | | |
|---|---|---|
| 10/25/00 | 73 | RESPONSE by defendant re statement [70-1] of disputed material facts in support of opposition to defendants' motion for partial summary judgment [3:99-cv-05286] (ab) [Entry date 10/27/00] [Edit date 10/27/00] |
| 11/9/00 | 74 | CLERK'S NOTICE setting hearing on motion for partial summary judgment [61-1] 9:30 12/13/00 [3:99-cv-05286] (ab) [Entry date 11/09/00] |
| 12/13/00 | 75 | MINUTES: ( C/R Kathy Wyatt ) ( Hearing Date: 12/13/00) that the motion for partial summary judgment [61-1] is submitted Status conference set for 10:30 2/7/01 ; [3:99-cv-05286] (ga) [Entry date 12/19/00] |
| 1/3/01 | 76 | ORDER by Magistrate Judge James Larson denying motion for partial summary judgment [61-1] ( Date Entered: 1/19/01) (cc: all counsel) [3:99-cv-05286] (ab) [Entry date 01/19/01] |
| 1/30/01 | 77 | CASE MANAGEMENT STATEMENT and PROPOSED ORDER filed. [3:99-cv-05286] (ga) [Entry date 01/31/01] |
| 2/7/01 | 79 | STIPULATION and ORDER by Magistrate Judge James Larson : Status conference set for 10:30 2/14/01 ; (cc: all counsel) [3:99-cv-05286] (ga) [Entry date 02/14/01] |
| 2/9/01 | 78 | FURTHER CASE MANAGEMENT STATEMENT filed by defendants. [3:99-cv-05286] (mcl) [Entry date 02/14/01] |
| 2/9/01 | 80 | SUPPLEMENTAL CASE MANAGEMENT STATEMENT and PROPOSED ORDER filed. [3:99-cv-05286] (ab) [Entry date 02/14/01] |
| 2/14/01 | 81 | MINUTES: ( C/R tape no. 1-11) ( Hearing Date: 2/14/01) Discovery cutoff set for 7/24/01 ; Trial will be held 9:00 9/24/01 ; cutoff date for expert discovery is 8/24/01 ; [3:99-cv-05286] (ab) [Entry date 02/23/01] |
| 2/14/01 | 82 | CASE MANAGEMENT AND PRETRIAL ORDER by Magistrate Judge James Larson: Jury Trial set for 9:00 9/24/01 ; deadline for discovery from experts is 8/24/01 ; Discovery cutoff 7/24/01 ; Pre-trial conference will be held 11:00 9/11/01; Est.trial days: 10 days (cc: all counsel) [3:99-cv-05286] (slh) [Entry date 03/01/01] |
| 3/5/01 | -- | RECEIVED Stipulation and Proposed Protective Order (submitted by defendant) [3:99-cv-05286] (slh) [Entry date 03/06/01] |
| 3/6/01 | 83 | STIPULATION and ORDER by Magistrate Judge James Larson: for protective order (cc: all counsel) [3:99-cv-05286] (slh) [Entry date 03/07/01] |
| 3/8/01 | 84 | PROOF OF SERVICE by defendant of stipulation and protective order [83-1] [3:99-cv-05286] (slh) [Entry date 03/09/01] |
| 4/16/01 | 85 | NOTICE OF MOTION AND MOTION before Magistrate Judge James Larson by defendant for partial summary judgment on plaintiff's claims for bad faith, fraud, and punitive damages with Notice set for 6/13/01 at 9:30 [3:99-cv-05286] (slh) [Entry date 04/18/01] |
| 4/16/01 | 86 | MEMORANDUM OF POINTS AND AUTHORITIES by defendant in support of motion for partial summary judgment [85-1] [3:99-cv-05286] (slh) [Entry date 04/18/01] |

| 4/16/01 | 87 | DECLARATION by Joseph L. Sillivan on behalf of defendant in support of motion for partial summary judgment [85-1] [3:99-cv-05286] (slh) [Entry date 04/18/01] |
| 4/16/01 | 88 | DECLARATION by John L. Bianchi on behalf of defendant in support of motion for partial summary judgment [85-1] [3:99-cv-05286] (slh) [Entry date 04/18/01] |
| 4/16/01 | -- | RECEIVED Proposed Order (submitted by defendant) re: motion for partial summary judgment [85-1] [3:99-cv-05286] (slh) [Entry date 04/18/01] |
| 4/16/01 | 89 | PROOF OF SERVICE by defendant of motion for partial summary judgment [85-1], memorandum [86-1], declaration [87-1], declaration [88-1], order received [0-0] [3:99-cv-05286] (slh) [Entry date 04/18/01] |
| 4/18/01 | 90 | ORDER RE DEPOSITIONS by Magistrate Judge James Larson that the depositions shall proceed as noticed; see Order for specifics. (Date Entered: 4/18/01) (cc: all counsel) [3:99-cv-05286] (slh) [Entry date 04/18/01] |
| 4/23/01 | 91 | EXPEDITED MOTION before Magistrate Judge James Larson by defendant for reconsideration of order re depositions [3:99-cv-05286] (slh) [Entry date 04/26/01] |
| 4/23/01 | 92 | DECLARATION by Horace W. Green on behalf of defendant in support of motion for reconsideration of order re depositions [91-1] [3:99-cv-05286] (slh) [Entry date 04/26/01] |
| 4/23/01 | 93 | PROOF OF SERVICE by defendant of motion for reconsideration of order re depositions [91-1], declaration [92-1] [3:99-cv-05286] (slh) [Entry date 04/26/01] |
| 4/23/01 | 94 | RESPONSE by Plaintiff to defendant's motion for reconsideration of order re depositions [91-1] [3:99-cv-05286] (slh) [Entry date 04/26/01] |
| 4/23/01 | 95 | DECLARATION by Margot E. Barg on behalf of Plaintiff in opposition to motion for reconsideration of order re depositions [91-1] [3:99-cv-05286] (slh) [Entry date 04/26/01] |
| 4/23/01 | 96 | ORDER by Magistrate Judge James Larson DENYING defendant's motion for reconsideration of order re depositions [91-1] (Date Entered: 4/26/01) (cc: all counsel) [3:99-cv-05286] (slh) [Entry date 04/26/01] |
| 5/11/01 | -- | RECEIVED Stipulation and Proposed Order (submitted by defendant) to continue hearing on defenants' motion for summary judgment [3:99-cv-05286] (slh) [Entry date 05/11/01] |
| 5/15/01 | 97 | STIPULATION and ORDER by Magistrate Judge James Larson : continuing hearing on defendant's motion for summary judgment [85-1] 9:30 7/11/01 (cc: all counsel) [3:99-cv-05286] (slh) [Entry date 05/16/01] |
| 5/18/01 | 98 | PROOF OF SERVICE by defendant of stipulation and order [97-1] [3:99-cv-05286] (slh) [Entry date 05/22/01] |
| 6/4/01 | 99 | AMENDED CASE MANAGMENT AND PRETRIAL ORDER by Magistrate Judge James Larson: Pretrial conference reset for 11:00 |

⬤                                    ⬤

```
                    9/12/01 (Date Entered: 6/5/01) (cc: all counsel)
                    [3:99-cv-05286] (slh) [Entry date 06/05/01]

6/20/01    100      OPPOSITION by Plaintiff to defendant's motion for partial
                    summary judgment [85-1] [3:99-cv-05286] (slh)
                    [Entry date 06/21/01]

6/20/01    101      DECLARATION by Plaintiff Joan Hangarter in opposition to
                    motion for partial summary judgment [85-1] [3:99-cv-05286]
                    (slh) [Entry date 06/21/01]

6/20/01    102      DECLARATION by Alice J. Wolfson on behalf of Plaintiff in
                    opposition to motion for partial summary judgment [85-1]
                    [3:99-cv-05286] (slh) [Entry date 06/21/01]
                    [Edit date 06/21/01]

6/21/01    103      ORIGINAL SIGNATURE PAGE by Plaintiff to declaration [101-1]
                    [3:99-cv-05286] (slh) [Entry date 06/21/01]
                    [Edit date 06/21/01]

6/27/01    104      REPLY BRIEF by defendant Paul Revere Life Ins in support of
                    motion for partial summary judgment [85-1] [3:99-cv-05286]
                    (slh) [Entry date 07/02/01]

6/27/01    105      DECLARATION by Horace W. Green on behalf of defendant Paul
                    Revere Life Ins in support of motion for partial summary
                    judgment [85-1] [3:99-cv-05286] (slh) [Entry date 07/02/01]

6/27/01    106      OBJECTIONS by defendant Paul Revere Life Ins to exhibits to
                    declaration of Alice J. Wlfson [102-1] [3:99-cv-05286] (slh)
                    [Entry date 07/02/01]

6/27/01    107      PROOF OF SERVICE by defendant Paul Revere Life Ins of reply
                    [104-1], declaration [105-1], objection [106-1]
                    [3:99-cv-05286] (slh) [Entry date 07/02/01]

7/3/01     108      PLAINTIFF'S AMENDMENT TO JOINT CASE MANAGEMENT STATEMENT
                    and supplemental initial disclosure filed.
                    [3:99-cv-05286] (slh) [Entry date 07/05/01]

7/3/01     109      DECLARATION by Linda Berry on behalf of Plaintiff in
                    opposition to motion for partial summary judgment [85-1]
                    [3:99-cv-05286] (slh) [Entry date 07/05/01]

7/3/01     110      SUPPLEMENTAL DECLARATION by Alice J. Wolfson on behalf of
                    Plaintiff in opposition to motion for partial summary
                    judgment [85-1] [3:99-cv-05286] (slh) [Entry date 07/05/01]

7/3/01     111      RESPONSE by Plaintiff to defendant's objections to exhibits
                    in opposition to defendant's motion for partial summary
                    judgment [85-1] [3:99-cv-05286] (slh) [Entry date 07/05/01]

7/9/01     --       RECEIVED Substitution of Attorneys submitted by defendants
                    Paul Revere Life Ins, Unumprovident Corp [3:99-cv-05286]
                    (slh) [Entry date 07/13/01]

7/9/01     112      OBJECTIONS by defendant to plaintiff's submission of
                    documents subsequent to the filing of the reply.
                    [3:99-cv-05286] (slh) [Entry date 07/13/01]

7/9/01     114      ORDER by Magistrate Judge James Larson withdrawing
                    attorney Eric R McDonoug, Peter E. Romo as counsel for
                    defendants Unumprovident Corp and Paul Revere Life Ins and
                    substituting attorney Horace W. Green, Lori K. Bernard
```

| | | |
|---|---|---|
| | | (cc: all counsel) [3:99-cv-05286] (slh) [Entry date 07/17/01] |
| 7/11/01 | 113 | MINUTES: (C/R Sahar Demos) (Hearing Date: 7/11/01) Further case management conference held; Discovery cutoff set for 7/24/01 ; cutoff date for expert discovery is 8/24/01 ; Pretrial conference set for 11:00 9/12/01 ; Jury trial will be held 9:00 9/24/01 [3:99-cv-05286] (slh) [Entry date 07/13/01] |
| 7/18/01 | 115 | REPORTER'S TRANSCRIPT; Date of proceedings: 07/11/01 ( C/R: Sahar Demos) [3:99-cv-05286] (bae) [Entry date 07/20/01] |
| 7/20/01 | 116 | STATEMENT of recent decision by defendant relating to motion for partial summary judgment [85-1] [3:99-cv-05286] (slh) [Entry date 07/23/01] |
| 8/2/01 | 117 | BRIEFING ORDER by Magistrate Judge James Larson re defendant's motion for summary judgment [85-1]; plaintiff may submit a brief of no more than 10 pages responding to the Statement of Decision [116-1] and defendant may submit a brief of no more than 5 pages in response. (Date Entered: 8/3/01) (cc: all counsel) [3:99-cv-05286] (slh) [Entry date 08/03/01] |
| 8/9/01 | 118 | STATEMENT of recent decision by defendant relating to motion for partial summary judgment [85-1] [3:99-cv-05286] (slh) [Entry date 08/13/01] |
| 8/13/01 | 119 | NOTICE OF MOTION AND MOTION before Magistrate Judge James Larson by Plaintiff to amend first amended complaint Notice set for 9/17/01 at 9:30 [3:99-cv-05286] (slh) [Entry date 08/22/01] |
| 8/13/01 | 120 | MEMORANDUM OF POINTS AND AUTHORITIES by Plaintiff in support of motion to amend first amended complaint [119-1] [3:99-cv-05286] (slh) [Entry date 08/22/01] |
| 8/13/01 | 121 | DECLARATION by Alice J. Wolfson on behalf of Plaintiff in support of motion to amend first amended complaint [119-1] [3:99-cv-05286] (slh) [Entry date 08/22/01] |
| 8/13/01 | 122 | PROOF OF SERVICE by Plaintiff of motion to amend first amended complaint [119-1], memorandum [120-1], declaration [121-1] [3:99-cv-05286] (slh) [Entry date 08/22/01] |
| 8/13/01 | 123 | RESPONSE by Plaintiff to defendants' statement of recent decision relating to defendant's motion for partial summary judgment [85-1] [3:99-cv-05286] (slh) [Entry date 08/22/01] |
| 8/13/01 | 124 | DECLARATION by Alice J. Wolfson on behalf of Plaintiff in support of response to defendants' statement of recent decision relating to motion for partial summary judgment [85-1] [3:99-cv-05286] (slh) [Entry date 08/22/01] |
| 8/13/01 | 125 | PROOF OF SERVICE by Plaintiff of response [123-1], declaration [124-1] [3:99-cv-05286] (slh) [Entry date 08/22/01] |
| 8/20/01 | 126 | STIPULATION and ORDER by Magistrate Judge James Larson : to shorten time on motion to amend first amended complaint [119-1]; setting hearing on motion to amend [119-1] 9:30 9/5/01 (cc: all counsel) [3:99-cv-05286] (slh) |



```
                    [Entry date 08/22/01]

8/21/01  127    REPLY by defendant to plaintiff's response re: defendant's
                motion for partial summary judgment [85-1] [3:99-cv-05286]
                (slh) [Entry date 08/22/01]

8/22/01  128    STIPULATION and ORDER by Magistrate Judge James Larson
                extending time to 8/31/01 to file Daubert motions (cc:
                all counsel) [3:99-cv-05286] (slh) [Entry date 08/22/01]

8/22/01  129    MOTION before Magistrate Judge James Larson by defendant
                in limine No. 1 for an order excluding any alleged defect
                in the insurance policy and excluding plaintif's irrelevant
                interpretaion of the policy language [3:99-cv-05286] (slh)
                [Entry date 08/23/01]

8/22/01  130    MOTION before Magistrate Judge James Larson by defendant
                in limine No. 2 for an order excluding any evidence of
                plaintiff's bad faith claims beyond her discovery responses
                and deposition answers [3:99-cv-05286] (slh)
                [Entry date 08/23/01]

8/22/01  131    MOTION before Magistrate Judge James Larson by defendant
                in limine No. 3 to exclude evidence of future disability
                benefits [3:99-cv-05286] (slh) [Entry date 08/23/01]

8/22/01  132    MOTION before Magistrate Judge James Larson by defendant
                in limine No. 4 for an order preventing plaintiff from
                recovering any damages for emotional distress
                [3:99-cv-05286] (slh) [Entry date 08/23/01]

8/22/01  133    MOTION before Magistrate Judge James Larson by defendant
                in limine No. 5 to prevent Linda Berry from offering any
                opinions or testimony beyond her role as a treater
                [3:99-cv-05286] (slh) [Entry date 08/23/01]

8/22/01  134    MOTION before Magistrate Judge James Larson by defendant
                in limine No. 6 to bifurcate plaintiff's breach of
                contract and badfaith/punitive damage claim
                [3:99-cv-05286] (slh) [Entry date 08/23/01]

8/22/01  135    MOTION before Magistrate Judge James Larson by defendant
                in limine No. 7 to exclude testimony regarding plaintiff's
                children or her receipt of welfare benefits
                [3:99-cv-05286] (slh) [Entry date 08/23/01]

8/22/01  136    MOTION before Magistrate Judge James Larson by defendant
                in limine No. 8 to exclude any evidence regarding Unum
                Provident [3:99-cv-05286] (slh) [Entry date 08/23/01]

8/22/01  137    MOTION before Magistrate Judge James Larson by defendant
                in limine No. 9 for an order excluding evidence pertaining
                to Provident Life & Accident Insurance Company, or
                Provident Companies Inc. [3:99-cv-05286] (slh)
                [Entry date 08/23/01]

8/22/01  138    MOTION before Magistrate Judge James Larson by defendant
                in limine No. 10 to exclude any evidence regarding medical
                reports prepared by Aubrey Swartz, M.D. for companies other
                than Paul Revere [3:99-cv-05286] (slh) [Entry date 08/23/01]

8/22/01  139    MOTION before Magistrate Judge James Larson by defendant
                in limine No. 11 to exclude any evidence of Provident
                documents [3:99-cv-05286] (slh) [Entry date 08/23/01]
```

8/22/01   140      STATEMENT by defendants Paul Revere Life Ins, Unumprovident
                   Corp designating excerts from discovery to be offered in
                   their Case in Chief.   [3:99-cv-05286] (slh)
                   [Entry date 08/23/01]

8/22/01   141      EXHIBIT LIST by defendant [3:99-cv-05286] (slh)
                   [Entry date 08/23/01]

8/22/01   142      DEFENDANT'S EXHIBITS setting forth qualifications and
                   experience of expert witnesses [3:99-cv-05286] (slh)
                   [Entry date 08/23/01]

8/22/01   143      REQUEST FOR JUDICIAL NOTICE by defendants [3:99-cv-05286]
                   (slh) [Entry date 08/23/01]

8/22/01   144      PROOF OF SERVICE by defendant of proposed Special Verdict
                   Form [3:99-cv-05286] (slh) [Entry date 08/23/01]

8/22/01   145      PROOF OF SERVICE by defendant of trial exhibits
                   [3:99-cv-05286] (slh) [Entry date 08/23/01]

8/23/01   146      TRIAL BRIEF submitted by Plaintiff [3:99-cv-05286] (slh)
                   [Entry date 08/24/01]

8/23/01   147      JOINT PROPOSED STATEMENT and VOIR DIRE submitted by
                   Plaintiff [3:99-cv-05286] (slh) [Entry date 08/24/01]

8/23/01   148      PLAINTIFF'S EXHIBIT setting forth qualifications and
                   experience of expert witnesses. [3:99-cv-05286] (slh)
                   [Entry date 08/24/01]

8/23/01   149      JOINT JURY INSTRUCTIONS submitted by Plaintiff
                   [3:99-cv-05286] (slh) [Entry date 08/24/01]

8/23/01   150      JOINT JURY INSTRUCTIONS (without sources) submitted by
                   Plaintiff [3:99-cv-05286] (slh) [Entry date 08/24/01]

8/23/01   151      DISPUTEDC JURY INSTRUCTIONS submitted by Plaintiff
                   [3:99-cv-05286] (slh) [Entry date 08/24/01]

8/23/01   152      DISPUTED JURY INSTRUCTIONS (without sources) submitted by
                   Plaintiff [3:99-cv-05286] (slh) [Entry date 08/24/01]

8/23/01   153      MOTION before Magistrate Judge James Larson by Plaintiff
                   in limine No. 1 to exclude witnesses from listening to
                   trial testimony; in limine No. 2 to exclude evidence and
                   witnesses not produced by defendant during discovery; in
                   limine No. 3 to exclude defendants from arguing that
                   plaintiff's disability policy is governed by ERISA; in
                   limine No. 4 to exclude evidence that defendants'
                   termination of plaintiff's disability was reasonable
                   because plaintiff's ability to perform adminstrative
                   functions created a genuine issue of coverage; in limine
                   No. 5 to exclude evidence that plaintiff may be able to
                   work in other occupations; in limine No. 6 to exclude
                   evidence or argument that plaintiff's claims are barred by
                   the doctrine of comparative bad faith; in limine No. 7 to
                   exclude evidence that the terms "important" and
                   "substantial and material" provide different standards of
                   total disability; and in limine No. 8 to exclude evidence
                   or argument that plaintiff can only be disabled if there is
                   objective proof of her disability [3:99-cv-05286] (slh)
                   [Entry date 08/24/01]

8/23/01   154   DECLARATION by Margot E. Barg on behalf of Plaintiff in
                support of motions in limine [153-1] throught [153-8]
                [3:99-cv-05286] (slh) [Entry date 08/24/01]

8/23/01   155   SEPARATE PROPOSED STATEMENT and VOIR DIRE submitted by
                Plaintiff [3:99-cv-05286] (slh) [Entry date 08/24/01]

8/23/01   156   EXHIBIT LIST by Plaintiff [3:99-cv-05286] (slh)
                [Entry date 08/24/01]

8/23/01   157   STATEMENT by Plaintiff designating excertps from discovery
                to be offered in her case in chief   [3:99-cv-05286] (slh)
                [Entry date 08/24/01]

8/23/01   158   JOINT PRE-TRIAL CONFERENCE STATEMENT by plaintiff and
                defendants Paul Revere Life Ins, Unumprovident Corp
                [3:99-cv-05286] (slh) [Entry date 08/24/01]

8/23/01   159   TRIAL BRIEF submitted by defendants [3:99-cv-05286] (slh)
                [Entry date 08/24/01]

8/23/01   160   SEPARATE JURY INSTRUCTIONS submitted by defendants
                [3:99-cv-05286] (slh) [Entry date 08/24/01]

8/23/01   161   PROOF OF SERVICE by defendant of jury instructions [160-1]
                [3:99-cv-05286] (slh) [Entry date 08/24/01]

8/24/01   162   CLERK'S NOTICE that motions in limine [153] [139-1] [138-1]
                [137-1] [136-1] [135-1] [134-1] [133-1] [132-1] [131-1]
                [130-1] [129-1] will be heard at the Pretrial conference
                set for 10:30 9/12/01; oppositions to the motions are due
                9/5/01. [3:99-cv-05286] (slh) [Entry date 08/24/01]

8/29/01   163   OPPOSITION by defendant to plaintiff's motion to amend
                first amended complaint [119-1] [3:99-cv-05286] (slh)
                [Entry date 09/07/01]

8/29/01   164   PROOF OF SERVICE by defendant of opposition [163-1]
                [3:99-cv-05286] (slh) [Entry date 09/07/01]

8/31/01   165   MOTION before Magistrate Judge James Larson by Plaintiff
                to exclude the testimony of defendants' expert witnesses
                [3:99-cv-05286] (slh) [Entry date 09/07/01]

8/31/01   166   DECLARATION by Margot E. Barg on behalf of Plaintiff in
                support of motion to exclude the testimony of defendants'
                expert witnesses [165-1]   [3:99-cv-05286] (slh)
                [Entry date 09/07/01]

8/31/01   167   EXPEDITED APPLICATION by defendant for leave to file motion
                in limine for order excluding references to other lawsuits
                [3:99-cv-05286] (slh) [Entry date 09/07/01]

8/31/01   168   DECLARATION by Lori K. Bernard on behalf of defendant in
                support of expedited application [167-1]   [3:99-cv-05286]
                (slh) [Entry date 09/07/01]

8/31/01   169   MOTION with memorandum of points and authorities in support
                before Magistrate Judge James Larson by defendant to
                exclude the testimony of plaintiff's expert witnesses
                [3:99-cv-05286] (slh) [Entry date 09/07/01]

8/31/01   170   SUPPLEMENTAL MEMORANDUM by defendant in support of Daubert

|         |     | Motion to exclude the testimony of plaintiff's expert witness Linda Berry D.C. [169-1] [3:99-cv-05286] (slh) [Entry date 09/07/01] |
|---------|-----|---|

8/31/01  171  SUPPLEMENTAL MEMORANDUM by defendant in support of Daubert Motion to exclude the testimony of plaintiff's expert witness Frank Caliri, III [169-1] [3:99-cv-05286] (slh) [Entry date 09/07/01]

8/31/01  172  SUPPLEMENTAL MEMORANDUM by defendant in support of Daubert Motion to exclude the testimony of plaintiff's expert witness A. Christine Davis [169-1] [3:99-cv-05286] (slh) [Entry date 09/07/01]

8/31/01  173  SUPPLEMENTAL MEMORANDUM by defendant in support of Daubert Motion to exclude the testimony of plaintiff's expert witness Edward Katz M.D. [169-1] [3:99-cv-05286] (slh) [Entry date 09/07/01]

8/31/01  174  DECLARATION by Lori K. Bernard on behalf of defendant in support of Daubert Motion to exclude the testimony of plaintiff's expert witnesses [169-1] [3:99-cv-05286] (slh) [Entry date 09/07/01]

8/31/01  175  OBJECTIONS by defendant to plaintiff's designated trial witnesses. [3:99-cv-05286] (slh) [Entry date 09/07/01]

8/31/01  176  OBJECTIONS by defendant to plaintiff's trial exhibits [156-1] [3:99-cv-05286] (slh) [Entry date 09/07/01]

8/31/01  177  MOTION before Magistrate Judge James Larson by defendant in limine No. 12 for order excluding references to other lawsuits [3:99-cv-05286] (slh) [Entry date 09/07/01]

8/31/01  178  DECLARATION by Horace W. Green on behalf of defendant in support of motion in limine No. 12 for order excluding references to other lawsuits [177-1] [3:99-cv-05286] (slh) [Entry date 09/07/01]

9/4/01  179  AMENDED JOINT PRE-TRIAL CONFERENCE STATEMENT [3:99-cv-05286] (slh) [Entry date 09/07/01]

9/5/01  180  OPPOSITION by defendant to plaintiff's motion in limine No. 2 to exclude evidence and witnesses not produced by defendant during discovery [153-2] [3:99-cv-05286] (slh) [Entry date 09/07/01]

9/5/01  181  OPPOSITION by defendant to plaintiff's motion in limine No. 3 to exclude defendants from arguing that plaintiff's disability policy is governed by ERISA [153-3] [3:99-cv-05286] (slh) [Entry date 09/07/01]

9/5/01  182  OPPOSITION by defendant to plaintiff's motion in limine No. 4 to exclude evidence that defendants' termination of plaintiff's disability was reasonable because plaintiff's ability to perform adminstrative functions created a genuine issue of coverage [153-4] [3:99-cv-05286] (slh) [Entry date 09/07/01]

9/5/01  183  OPPOSITION by defendant to plaintiff's motion in limine No. 5 to exclude evidence that plaintiff may be able to work in other occupations [153-5] [3:99-cv-05286] (slh) [Entry date 09/07/01]

| 9/5/01 | 184 | OPPOSITION by defendant to plaintiff's motion in limine No. 6 to exclude evidence or argument that plaintiff's claims are barred by the doctrine of comparative bad faith [153-6] [3:99-cv-05286] (slh) [Entry date 09/07/01] |
|--------|-----|---|
| 9/5/01 | 185 | OPPOSITION by defendant to plaintiff's motion in limine No. 7 to exclude evidence that the terms "important" and "substantial and material" provide different standards of total disability [153-7] [3:99-cv-05286] (slh) [Entry date 09/07/01] |
| 9/5/01 | 186 | OPPOSITION by defendant to plaintiff's motion in limine No. 8 to exclude evidence or argument that plaintiff can only be disabled if there is objective proof of her disability [153-8] [3:99-cv-05286] (slh) [Entry date 09/07/01] |
| 9/5/01 | 187 | MINUTES: (C/R Tape 01-48) (Hearing Date: 9/5/01) granting plaintiff's motion to amend first amended complaint [119-1]; Jury trial to be continued 1 to 3 months. [3:99-cv-05286] (slh) [Entry date 09/07/01] |
| 9/6/01 | 188 | OPPOSITION by Plaintiff to defendants' motions in limine [129-1] through [139-1], and [177-1] [3:99-cv-05286] (slh) [Entry date 09/07/01] |
| 9/6/01 | 189 | DECLARATION by Margot E. Barg on behalf of defendant in opposition to defendants' motions in limine [129-1] through [139-1], and [177-1] [3:99-cv-05286] (slh) [Entry date 09/07/01] |
| 9/6/01 | 190 | DECLARATION by Margot E. Berg on behalf of Plaintiff in opposition to defendants' motions in limine [129-1] through [139-], and [177-1] [3:99-cv-05286] (slh) [Entry date 09/07/01] |
| 9/6/01 | 191 | AMENDED WITNESS LIST submitted by Plaintiff [3:99-cv-05286] (slh) [Entry date 09/07/01] |
| 9/6/01 | 192 | AMENDED EXHIBIT LIST by Plaintiff [3:99-cv-05286] (slh) [Entry date 09/07/01] |
| 9/14/01 | 193 | OBJECTIONS by defendant to plaintiff's amended witness list [191-1] [3:99-cv-05286] (slh) [Entry date 09/19/01] |
| 9/14/01 | 194 | OBJECTIONS by defendant to plaintiff's exhibit list [192-1] [3:99-cv-05286] (slh) [Entry date 09/19/01] |
| 9/14/01 | 195 | BRIEF filed by defendant re: viability of attorneys' fees as an element of damages. [3:99-cv-05286] (slh) [Entry date 09/19/01] |
| 9/17/01 | 196 | LETTER dated 9/7/01 from defendant's counsel Horace W. Green re: parties inability to reach agreement on a discovery schedule and a trial dates. [3:99-cv-05286] (slh) [Entry date 09/19/01] |
| 9/17/01 | 197 | LETTER dated 9/7/01 from plaintiff's counsel Ray Bourhis and Alice J. Wolfson re: discovery schedule and trial date. [3:99-cv-05286] (slh) [Entry date 09/19/01] |
| 9/19/01 | 198 | ORDER by Magistrate Judge James Larson: Jury trial continued to 9:30 1/14/02; Pretrial conference set for 11:00 12/12/01 (Date Entered: 9/20/01) (cc: all counsel) [3:99-cv-05286] (slh) [Entry date 09/20/01] |

9/21/01  199    EXPEDITED MOTION before Magistrate Judge James Larson by
                defendant to compel further responses to requests for
                production, set two [3:99-cv-05286] (slh)
                [Entry date 09/26/01]

9/21/01  200    NOTICE by defendant of expedited motion to compel further
                responses to requests for production, set two [199-1]
                [3:99-cv-05286] (slh) [Entry date 09/26/01]

9/21/01  201    DECLARATION by Lori K. Bernard on behalf of defendant in
                support of motion to compel further responses to requests
                for production, set two [199-1]  [3:99-cv-05286] (slh)
                [Entry date 09/26/01]

9/21/01  202    STATEMENT of requests and responses in dispute by defendant
                in support of motion to compel further responses to
                requests for production, set two [199-1]    [3:99-cv-05286]
                (slh) [Entry date 09/26/01]

9/21/01  203    PROOF OF SERVICE by defendant of motion to compel further
                responses to requests for production, set two [199-1],
                notice [200-1], declaration [201-1], statement [202-1]
                [3:99-cv-05286] (slh) [Entry date 09/26/01]

9/21/01  204    ORDER by Magistrate Judge James Larson GRANTING plaintiff's
                motion to amend first amended complaint [119-1] (Date
                Entered: 9/26/01) (cc: all counsel)  [3:99-cv-05286] (slh)
                [Entry date 09/26/01]

9/26/01  205    OPPOSITION by Plaintiff to Defendant's motion to compel
                further responses to requests for production, set two
                [199-1] [3:99-cv-05286] (slh) [Entry date 09/27/01]

9/26/01  206    DECLARATION by Margot E. Barg on behalf of Plaintiff in
                opposition to motion to compel further responses to
                requests for production, set two [199-1]  [3:99-cv-05286]
                (slh) [Entry date 09/27/01]

9/26/01  207    DECLARATION by Susanne Globig on behalf of Plaintiff in
                opposition to motion to compel further responses to
                requests for production, set two [199-1]  [3:99-cv-05286]
                (slh) [Entry date 09/27/01]

9/26/01  208    PROOF OF SERVICE by Plaintiff of opposition [205-1],
                declaration [206-1], declaration [207-1] [3:99-cv-05286]
                (slh) [Entry date 09/27/01]

9/26/01  209    CLERK'S NOTICE setting hearing on defendant's motion to
                compel further responses to requests for production, set
                two [199-1] 9:30 10/31/01 [3:99-cv-05286] (slh)
                [Entry date 09/27/01]

9/26/01  210    NOTICE by defendant withdrawing motion to compel further
                responses to requests for production, set two [199-1]
                [3:99-cv-05286] (slh) [Entry date 10/05/01]

9/27/01  211    OBJECTIONS by Plaintiff to defendant's Notice of withdrawal
                of its' motion to compel further responses to requests for
                production, set two [199-1] [3:99-cv-05286] (slh)
                [Entry date 10/05/01]

9/28/01  212    MOTION before Magistrate Judge James Larson by Plaintiff
                to quash defendants' subpoena with Notice set for

●                                      ●

11/14/01 at 9:30 [3:99-cv-05286] (slh) [Entry date 10/05/01]

9/28/01  213   MEMORANDUM OF POINTS AND AUTHORITIES by Plaintiff in
               support of motion to quash defendants' subpoena [212-1]
               [3:99-cv-05286] (slh) [Entry date 10/05/01]

9/28/01  214   DECLARATION by Margot E. Barg on behalf of Plaintiff in
               support of motion to quash defendants' subpoena [212-1]
               [3:99-cv-05286] (slh) [Entry date 10/05/01]

9/28/01  215   DECLARATION by Plaintiff Joan Hangarter in support of
               motion to quash defendants' subpoena [212-1]
               [3:99-cv-05286] (slh) [Entry date 10/05/01]

9/28/01  216   PROOF OF SERVICE by Plaintiff of motion to quash
               defendants' subpoena [212-1], memorandum [213-1],
               declaration [214-1], declaration [215-1] [3:99-cv-05286]
               (slh) [Entry date 10/05/01]

10/1/01  217   MOTION before Magistrate Judge James Larson by defendant
               to compel further responses to requests for production,
               set two with Notice set for 10/31/01 at 9:30
               [3:99-cv-05286] (slh) [Entry date 10/05/01]

10/1/01  218   NOTICE of hearing by defendant setting motion to compel
               further responses to requests for production, set two
               [217-1] ; hearing set for 9:30 10/31/01 [3:99-cv-05286] (slh)
               [Entry date 10/05/01]

10/1/01  219   STATEMENT of requests and responses in dispute by defendant
               in support of motion to compel further responses to
               requests for production, set two [217-1]   [3:99-cv-05286]
               (slh) [Entry date 10/05/01]

10/1/01  220   DECLARATION by Lori K. Bernard on behalf of defendant in
               support of motion to compel further responses to requests
               for production, set two [217-1]   [3:99-cv-05286] (slh)
               [Entry date 10/05/01]

10/1/01  221   PROOF OF SERVICE by defendant of motion to compel further
               responses to requests for production, set two [217-1],
               motion notice [218-1], statement [219-1], declaration
               [220-1] [3:99-cv-05286] (slh) [Entry date 10/05/01]

10/3/01  222   AMENDED NOTICE of hearing by defendant setting motion to
               compel further responses to requests for production, set
               two [217-1]; hearing set for 9:30 11/14/01 [3:99-cv-05286]
               (slh) [Entry date 10/05/01]

10/9/01  223   MEMORANDUM OF POINTS AND AUTHORITIES by Plaintiff in
               support of motion to quash defendants' subpoena [212-1]
               [3:99-cv-05286] (slh) [Entry date 10/17/01]

10/9/01  --    RECEIVED Proposed Order (submitted by Plaintiff) re: motion
               to quash defendants' subpoena [212-1] [3:99-cv-05286] (slh)
               [Entry date 10/17/01]

10/9/01  224   DECLARATION by Margot E. Barg on behalf of Plaintiff in
               support of motion to quash defendants' subpoena [212-1]
               [3:99-cv-05286] (slh) [Entry date 10/17/01]
               [Edit date 10/17/01]

10/11/01 225   ANSWER by defendants to amended complaint [41-1]
               [3:99-cv-05286] (slh) [Entry date 10/17/01]



[Edit date 10/17/01]

10/24/01 226    OPPOSITION by defendant to plaintiff's motion to quash
                defendants' subpoena [212-1] [3:99-cv-05286] (slh)
                [Entry date 10/25/01]

10/24/01 227    DECLARATION by Heidi Messerli on behalf of defendant in
                opposition to motion to quash defendants' subpoena [212-1]
                [3:99-cv-05286] (slh) [Entry date 10/25/01]

10/24/01 228    DECLARATION by Lori K. Bernard on behalf of defendant in
                opposition to motion to quash defendants' subpoena [212-1]
                [3:99-cv-05286] (slh) [Entry date 10/25/01]

10/24/01 229    OPPOSITION by Plaintiff to defendant's motion to compel
                further responses to requests for production, set two
                [217-1] [3:99-cv-05286] (slh) [Entry date 10/25/01]

10/24/01 230    DECLARATION by Alice J. Wolfson on behalf of Plaintiff in
                oppsotion to motion to compel further responses to requests
                for production, set two [217-1]  [3:99-cv-05286] (slh)
                [Entry date 10/25/01]

10/31/01 231    REPLY by Plaintiff to defendant's opposition to motion to
                quash defendants' subpoena [212-1] [3:99-cv-05286] (slh)
                [Entry date 10/31/01]

10/31/01 232    SUPPLEMENTAL DECLARATION by Margot E. Barg on behalf of
                Plaintiff in support of motion to quash defendants'
                subpoena [212-1]  [3:99-cv-05286] (slh)
                [Entry date 10/31/01]

10/31/01 233    REPLY by defendant to plaintiff's opposition to motion to
                compel further responses to requests for production, set
                two [217-1] [3:99-cv-05286] (slh) [Entry date 10/31/01]

10/31/01 234    DECLARATION by Lori K. Bernard on behalf of defendant in
                support of motion to compel further responses to requests
                for production, set two [217-1]  [3:99-cv-05286] (slh)
                [Entry date 10/31/01]

11/2/01  235    MOTION before Magistrate Judge James Larson by defendant
                for leave to file motion for reconsideration
                [3:99-cv-05286] (slh) [Entry date 11/05/01]

11/2/01  236    MOTION with memorandum of points and authorities in support
                before Magistrate Judge James Larson by defendant for
                reconsideration of Order granting leave to file second
                amended complaint  [3:99-cv-05286] (slh)
                [Entry date 11/05/01]

11/2/01  237    DECLARATION by Horace W. Green on behalf of defendant in
                support of motion for reconsideration of Order granting
                leave to file second amended complaint [236-1]
                [3:99-cv-05286] (slh) [Entry date 11/05/01]

11/2/01  238    PROOF OF SERVICE by defendant of motion for leave to file
                motion for reconsideration [235-1], motion for
                reconsideration of Order granting leave to file second
                amended complaint [236-1], declaration [237-1]
                [3:99-cv-05286] (slh) [Entry date 11/05/01]

11/14/01 239    MINUTES: ( C/R tape 01-58) ( Hearing Date: 11/14/01)
                granting in part  motion to compel further responses to

requests for production, set two [217-1], granting without
prejudice motion to quash defendants' subpoena [212-1] both
parties request for sanctions denied; first page of tax
return and Schedule C (for 1995 to present) to be produced
within 10 days; [3:99-cv-05286] (ga) [Entry date 11/16/01]

11/19/01 240    DESIGNATION OF WITNESS(ES) submitted by defendant Paul
Revere Life Ins, defendant Unumprovident Corp
[3:99-cv-05286] (ga) [Entry date 11/21/01]

11/30/01 241    BRIEFING ORDER  by Magistrate Judge James Larson () (cc:
all counsel) [3:99-cv-05286] (ga) [Entry date 12/04/01]

12/3/01  242    OPPOSITION by Plaintiff Joan Hangarter  to objection
[194-1] [3:99-cv-05286] (ga) [Entry date 12/05/01]

12/3/01  243    OPPOSITION by Plaintiff Joan Hangarter  to objection
[193-1] [3:99-cv-05286] (ga) [Entry date 12/05/01]

12/3/01  244    OPPOSITION by Plaintiff Joan Hangarter  to motions re Dr.
Linda, Dr. Edward Katz,  Frank Caliri and Christine Davis
[3:99-cv-05286] (ga) [Entry date 12/05/01]

12/3/01  245    OPPOSITION by Plaintiff Joan Hangarter  to Defendants brief
re Viability of Attorneys Fees [3:99-cv-05286] (ga)
[Entry date 12/05/01]

12/3/01  246    SUPPLEMENT by Plaintiff Joan Hangarter re list [240-1]
[3:99-cv-05286] (ga) [Entry date 12/05/01]

12/3/01  247    PROOF OF SERVICE by Plaintiff Joan Hangarter of [246-1],
opposition [245-1], opposition [244-1], opposition [243-1],
opposition [242-1] [3:99-cv-05286] (ga)
[Entry date 12/05/01]

12/7/01  248    OPPOSITION by defendant Paul Revere Life Ins, defendant
Unumprovident Corp  to motion to exclude the testimony of
defendants' expert witnesses [165-1] [3:99-cv-05286] (ga)
[Entry date 12/10/01]

12/7/01  249    DECLARATION by Lori K. Bernard on behalf of defendant Paul
Revere Life Ins, defendant Unumprovident Corp re opposition
[248-1]  [3:99-cv-05286] (ga) [Entry date 12/10/01]

12/7/01  250    PROOF OF SERVICE by defendant Paul Revere Life Ins,
defendant Unumprovident Corp of declaration [249-1],
opposition [248-1] [3:99-cv-05286] (ga)
[Entry date 12/10/01]

12/11/01 251    BRIEF FILED by defendant Paul Revere Life Ins regarding
order [241-1] [3:99-cv-05286] (ga) [Entry date 12/13/01]

12/12/01 253    MINUTES: ( C/R Jeanne Bishop) ( Hearing Date: 12/12/01)
Pretrial Conference Held [3:99-cv-05286] (ga)
[Entry date 01/02/02]

12/13/01 254    ORDER  by Magistrate Judge James Larson  granting  motion
in limine No. 12 for order excluding references to other
lawsuits [177-1], denying motion to exclude the testimony
of plaintiff's expert witnesses [169-1], granting in part
and denying in part motion to exclude the testimony of
defendants' expert witnesses [165-1], granting in part and
denying in part motion in limine No. 1 to exclude witnesses
from listening to trial testimony [153-1], granting in part

MaineToday.com

Portland Press Herald | KENNEBEC JOURNAL | Morning Sentinel | NEWS 8 WMTW

WOLFE NEWS WIRE

**Dr. Steven Hess Named Chief Medical Officer at Martin's Point Health Care**
Click here for news release

HOME
CLASSIFIEDS
▸ Careers
▸ Homes
▸ Wheels
▸ Marketplace
▸ Place an ad
▸ WebPix
NEWS
  Local and state
  Midday/4PM Reports
  In Depth
  Election Results
  Week in Photos
WEATHER
  4-day forecast
  Tides
SPORTS
  High schools
  Pirates
  Sea Dogs
  Running
BUSINESS
  News
  Resources
  Classifieds
  Business Services
ENTERTAINMENT
  Movies
  Dining
  Music
  Theater
  Art
CALENDAR
  Southern Maine
  Central Maine
TV LISTINGS
  Search your area
TRAVEL
  Visiting Maine
  Trip Talk
  Vacation Rentals
  Lodging guide
OUTDOORS
  Hiking
  Fishing
  Biking
  More activities
20 BELOW
  Teen writing
  Views and reviews
CAREERS
  Classifieds
  Advice and info
  Featured employers
HOMES
  Classifieds
  Advice and info
  Featured agents
  Moving to Maine

**BUSINESS** *Maine's complete business resource*

News | Calendar | Resources | Small Business | Classifieds

## News

Saturday, November 16, 2002

E-mail this story
to a friend

### Judge orders UnumProvident to 'obey the law'

By MICHAEL LIEDTKE, Associated Press

©Copyright 2002 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Also on this
page:
AT A GLANCE

SAN FRANCISCO - A federal judge has ordered the nation's largest disability insurer to clean up its business practices after concluding it abused policyholders in a scheme to boost its profits.

U.S. Magistrate Judge James Larson ordered Chattanooga, Tenn.-based UnumProvident Corp. to "obey the law" in a scathing 62-page injunction that found the company in violation of California's unfair insurance practices and unfair competition acts.

The injunction, issued late Wednesday, may intensify policyholder attacks on



ADVERTISEMENT

FirstPark
MAINE'S PREMIER TECHNOLOGY CENTER

NEW BUSINESS AND TECHNOLOGY SUPER PARK.

EXCITING OPPORTUNITIES FOR YOU AND YOUR COMPANY, CLICK HERE.





Retiring in Maine
WHEELS
  Classifieds
  Resources and info
  Featured dealers
MILESTONES
  Weddings
MARKETPLACE
  Classifieds
  Newspaper ads
DIRECTORIES
  Professional Svcs.
  Education Guide
  and more
ADVERTISING
  Advertising products
  Request a quote
About Us
  Help/site guide

UnumProvident, which is facing similar allegations of misconduct in dozens of civil lawsuits filed across the country.

In the California ruling, Larson concluded UnumProvident shredded medical records and used the demographic profiles of policyholders to target claims for possible rejection.

Larson also found UnumProvident didn't assure its employees understood California's legal definition of total disability.



**AT A GLANCE**

UnumProvident Corp., the nation's largest disability insurer, is headquartered in Chattanooga, Tenn.

About 3,600 people work for the company in Portland.

**See related story**
'60 Minutes' to air report on insurer this Sunday

To top of story



CLICK HE

UnumProvident "strongly disagreed" with Larson's ruling and will appeal, said Thomas White, the company's vice president of corporate relations.

Larson's order also upheld a $7.67 million jury verdict against UnumProvident for mistreating one of its policyholders, former Berkeley chiropractor Joan Harngarter.

The jury award includes $5 million in punitive damages for Harngarter, a single mother who wound up on welfare after losing her disability benefits for joint pain that prevented her from returning to her chiropractic practice.

California's newly elected insurance commissioner, John Garamendi, said the allegations against UnumProvident are pervasive enough to warrant an intensive investigation after he takes office in January.

"There isn't just smoke here. There is clearly a fire here," Garamendi said Friday. "This has become a matter of serious concern to me."

Most of the policyholder complaints involve expensive, non-cancelable disability policies that UnumProvident aggressively sold during the late 1980s and early 1990s to mostly affluent self-employed professionals.

Faced with mounting losses, UnumProvident's predecessor company, Provident, brought in a former banker, J. Harold Chandler, as its chief executive in 1993.

Attorneys representing policyholders allege that Chandler imposed a system to deny a greater number of disability claims to boost profits.

As an incentive, UnumProvident began to hand out a "Hungry Vulture" award to recognize top-performing employees. A UnumProvident executive said the award was discontinued when it became clear that people outside the company were misconstruing what was meant as a lighthearted effort to boost morale.

UnumProvident believes the re- cent wave of lawsuits isn't surprising, given that it provides about 30 percent of the nation's disability insurance, covering about 17 million people.

The company says it processes 400,000 disability claims annually, distributing $3.6 billion in the process. UnumProvident says the vast majority of policyholders are pleased with their treatment.

But the lawsuits filed by unhappy policyholders paint a sordid picture of UnumProvident. The complaints depict a cutthroat company that spied on the disabled and refused to make payments to injured and ill policyholders, including terminal cancer patients.

UnumProvident believes most of the lawsuits are baseless. The company prevailed in three-fourths of the cases that went to trial last year, White said.

To top of page

**The E-brief**: Sign up here to receive daily business headlines by e-mail.
Your e-mail: [_____] [Signup now]
...or visit our signup page for more information.



Copyright © Blethen Maine Newspapers Inc.

Recent Federal Litigation from CourtLink (By Company)



**EDGAR ONLINE**
https://www.edgar-online.com

**Work Faster, Smarter with EDGARpro — EDGARpro™**
The newest desktop subscription service from EDGAR Online, Inc.

Quick Search: [Ticker Symbol]  [   ]  GO

**FLY CAR ONLINE** — Recent Litigation

RECENT LAWSUITS

**UNUMPROVIDENT**

Quote | Chart | Resources | News | Annual | SEC
Sector: Financial Industry: Insurance (Accident & Health)
All companies with recent federal litigation Covering the period from 11/5/2002 to 11/18/2002

| Date Filed | Case Caption | Nature of Suit |
|---|---|---|
| 11/13/2002 | Palmer v. UNUM Life Insurance Company of America | Other Statutory Actions |
| 11/15/2002 | Radcliff v. Precision Components Group et al | Other Statutory Actions |
| 11/13/2002 | Detrick v. Fleet National Bank, et al | ERISA |
| 11/8/2002 | Zgutowicz v. Unumprovident Corp, et al | ERISA |
| 11/15/2002 | Rachel v. UNUM Life Insurance | ERISA |
| 11/12/2002 | Sampson v. Unumprovident | ERISA |
| 11/14/2002 | Sadowsky v. UNUM Corporation, et al | Other Statutory Actions |
| 11/7/2002 | Guerin v. Unumprovident Corporation et al | ERISA |
| 11/7/2002 | Quick v. Unumprovident | Insurance |
| 11/4/2002 | Keir, et al v. Unumprovident Corp, et al | Insurance |
| 11/7/2002 | Killian v. UNUM Life Insurance | ERISA |
| 11/5/2002 | Jaffee v. UNUM Life Ins Co, et al | Insurance |
| 11/7/2002 | Czech v. UNUM Life Insurance | ERISA |
| 11/7/2002 | Barrios v. UNUM Life Insurance, et al | Insurance |
| 11/5/2002 | Emil v. UNUM Life Insurance | Insurance |
| 11/5/2002 | Scott v. UNUM Life Ins Co | Insurance |
| 11/5/2002 | Brereton v. Unumprovident Co, et al | Insurance |
| 11/5/2002 | Premeaux v. Unumprovident Corp, et al | Other Contract |
| 11/1/2002 | Patricia Wohlgemuth v. Zebra Technology, et al | ERISA |
| 10/31/2002 | Gramling v. UNUM Life Insurance | ERISA |
| 11/4/2002 | Lail v. America Online Inc, et al | Other Statutory Actions |
| 10/31/2002 | Debroff v. Unumprovident Corpor, et al | Insurance |
| 11/5/2002 | McCann v. UNUM Life Insurance | ERISA |

**Home**

**SEC Filings**
- Today's Filings
- This Week's Filings
- Full Search
- Full Text Search
- People

**IPO Express**
- IPO Headlines
- Latest Pricings
- Upcoming Pricings
- Latest Filings

**InsiderTrader**

**Compensation**

**FD-Express**

**Alerts**
- Personal

**Decision Maker Directory**

**News**
- SECrets Newsletter
- SEC News
- VC News
- IPO News
- M&A News
- Executive News
- Real Time News
- Litigation

**Register**
- Join Now
- Benefits
- Upgrade Account

Recent Federal Litigation from CourtLink (By Company)

- Upgrade Account
- Update Info

**Help**
- Form Definitions
- FAQs
- Customer Support

| | | |
|---|---|---|
| 11/1/2002 | Wilson v. UNUM Life Ins Co | ERISA |
| 11/1/2002 | McNaughton v. UNUM Life Insurance | ERISA |
| 11/1/2002 | Unumprovident v. Greggs-McQuilkin | Insurance |
| 11/1/2002 | Moyers v. UNUM Life Insurance | ERISA |
| 11/1/2002 | Nickens v. Palm Harbor Homes, in., et al | Insurance |

Recent Federal Litigation Home

**About EOL**
- Contact Us
- IR Services
- Advertise
- Partnership
- Corporate Sales
- Investor Info
- Press Releases
- Jobs

Copyright © 2000 CourtLink, Inc. All rights reserved. Please read our Disclaimer and Terms of Use.

**UnumProvident Information** 

UnumProvident Corporation is based in Chattanooga, TN and has operations in the United States, Canada, the U.K., Japan, and elsewhere around the world. They have significant U.S. operations in Portland, Maine; Worcester, Mass.; and Glendale, Calif. Along with **Unum Life Insurance Company of America**, **Provident Life and Accident Insurance Company**, **Provident Life**, **Casualty Insurance Company** other subsidiaries of UnumProvident Corporation include:

| | | |
|---|---|---|
| Metropolitan Life Insurance Company | Paul Revere Life Insurance Company | New England Life Insurance Company |
| John Hancock Insurance Company | Equitable Life Insurance Company | Colonial Life Insurance Company |

A law firm says they have uncovered evidence that suggests that the **same corporate policy of denying benefits** has been implemented by other insurance companies UnumProvident handles claims for.

IWA will try to keep you up-to-date with new developments here. Visit Corporate Crimefighters for much more information about UNUM. You can also use the search engine here and insert UnumProvident to view numerous articles from UNUM's home town newspaper.

| | | |
|---|---|---|
| 11/15/02 | Associated Press | Entitled "Insurer Ordered to Change Practices." Among other things, a federal judge concludes that *UnumProvident shredded medical records* and used the demographic profiles of policyholders to target claims for possible rejection. |
| 11/14/02 | Two Feist Depositions | Dr. William Feist was one of Provident's two staff physicians in its headquarders. He was mentioned in the Dateline NBC investigation. |
| 11/5/02 | Dow Jones Business News | "Ailing Workers Sue UnumProvident Over Denial Of Claims" discusses a class-action suit that claims *UnumProvident gives bonuses and promotions to its employees based upon the numbers of claims they can deny*. It also has related news stories. |
| 10/6/02 | San Francisco Chronicle | Entitled "Disability insurer is under fire – Legitimate claims denied, suits say." The article says, "The nation's largest disability insurance company has been accused of systematically denying legitimate claims from seriously ill customers, a corporate strategy allegedly concocted for one purpose: boosting profits." |
| 9/25/02 | Press Herald Online | "Doctor: Unum denies claims" discusses Dr. Patrick F. McSharry who claims he was fired as a medical director at the company's headquarters in Chattanooga, Tenn. after he refused to go along with UNUM's policy of denying disability claims and using its medical staff to back up the denial. |
| 1998 to Present | Claimant Information Bureau | A UNUMProvident Discussion Forum with hundreds of postings. Visit their main page at http://www.us-cib.com. It provides additional news including contact info. |
| | Twist.com | An interview with J. Harold Chandler, Chairman, President and CEO of UnumProvident Corporation where he outlines specific goals that UnumProvident intends to live up to. |
| Updated Regularly | UnumProvident Fraud | A law firm runs this site. They have a few links and offer a free case assesment. |
| Updated Regularly | Recent Lawsuits | Provided by EDGAR® Online®, Inc., a provider of business, financial and competitive information derived from U.S. Securities and Exchange Commission data. |

Visit our Fraud Section                    Make a Donation or Volunteer

UnumProvident Information

www.injuredworker.org/UNUM

## CERTIFICATE OF SERVICE

I, Richard C. Angino, Esquire, hereby certify that a true and correct copy of the foregoing **PLAINTIFF'S MOTION TO REOPEN DISCOVERY, FILE AN AMENDED COMPLAINT, AND EXTEND DEADLINES** was served by United States first-class mail, postage prepaid, upon the following:

E. Thomas Henefer, Esquire
Stevens & Lee
111 North Sixth Street
P. O. Box 679
Reading, PA  19603-0679
        Counsel for Paul Revere Life Insurance Company and New York Life Insurance Company

                                               Richard C. Angino

Dated:  11/19/02