FILED
HARRISBURG, PA

NOV 2 5 2002

MARY E. D'ANDREA, C
Por _____
Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VINCENZO MAZZAMUTO,<br>　　　Plaintiff, | CIVIL ACTION – LAW |
| v. | NO. 1:CV-01-1157 |
| UNUM PROVIDENT CORPORATION;<br>PAUL REVERE LIFE INSURANCE<br>COMPANY; and NEW YORK LIFE<br>INSURANCE COMPANY<br>　　　Defendants | JUDGE CONNER<br><br>JURY TRIAL DEMANDED |

## PLAINTIFF'S MOTION TO SUPPLEMENT RECORD

Richard C. Angino, Esquire, of Angino & Rovner, on behalf of Plaintiff Vincenzo Mazzamuto, moves Your Honorable Court to permit the supplementation of the present record to add an additional report dated November 19, 2002, from Plaintiff's expert Gordon K. Rose (**Exhibit A**), as well as two depositions of Dr. William Feist, a prior employee of Defendant UNUMProvident (**Exhibits B and C**). It should be noted that the <u>Laucks</u> deposition involved a case originating in the Middle District of Pennsylvania and Judge Richard Caputo was the assigned judge. Plaintiff's counsel has been advised that there are numerous additional

A

**●ordon K. Rose, CLU, ChFC ●**
**735 Virginia Rail**
**Kiawah Island**
**SC 29455**
**Ph 843 768 6669**
**Fax 843 768 0344**
**E-Mail GKROSECLU@aol.com**

Richard C. Angino                                     Nov. 19, 2002
Angino & Rovner, P.C.
4503 N. Front St.
Harrisburg, PA 17110-1708

      Re: Vincenzo Mazzamuto

Dear Mr. Angino:

On Sunday evening, Nov. 17, the CBS network show "60 Minutes" included a segment on UNUM Provident's disability insurance claims procedures. As I watched this segment, I realized a direct relationship existed between the company's practices, as being reported by several former employees of UNUM Provident, and Mr. Mazzamuto's claim.

UNUM's practice of providing incentives to claims people for "closing" a given $ amount of claims each month is outrageous, and is contrary to public policy. (closing is a nice word for denial)

Claims departments of insurance companies are charged with the responsibility of paying claims that are justified and denying those that are not justified. UNUM Provident's claims department was charged with the responsibility of denying claims, so the total claims pay out would meet predetermined goals. Whether the claim was justified was irrelevant.

UNUM Provident used a lengthy delaying process in many claims, including Mr. Mazzamuto's claim. (See my June 13, 2002 report Pages 4 and 5.)

As reported on 60 minutes the claims people also knew which Medical Doctors on staff would cooperate on denying claims. If they needed to close a given claim, they knew which Doctor should review the claim. Dr. McSharry was interviewed by CBS. He had refused to cooperate and his employment was terminated. (See my supplemental report of Oct 14, 2002)

UNUM Provident's claims procedures casts a cloud over the entire insurance business. How can the public trust insurance companies when they learn that a claim will be denied, simply because the company's total pay out this month is running too high? Insurance companies sell policies that promise certain benefits in the event of a defined disability. They collect the premiums, as insureds are willing to pay those premiums, so they will be protected in the case of unforeseen events. Then after paying premiums for a number of years, the insured learns that their claim is denied, because there are too many claims this month.

Page 2.

In my 50 plus years in insurance and insurance education, I have not seen a situation as blatant as UNUM Provident's claims procedures. I trust the courts will correct this situation.

Please advise if you have any questions.

Sincerely

Gordon K. Rose

**Page 0001**

[01]    IN THE UNITED STATES DISTRICT COURT
[02]    FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
[03]
[04]    STEPHEN O LAUCKS, M D ,
[05]                    )
[06]        PLAINTIFF    )
[07]                    )
[08]    VS            CASE NUMBER
[09]                1 Cv-1507
[10]    PROVIDENT COMPANIES, INC
[11]    d/b/a PROVIDENT LIFE and
[12]    ACCIDENT INSURANCE COMPANY,
[13]    and ANESTHESIA ASSOCIATES
[14]    OF YORK PHYSICIAN EMPLOYEE
[15]    BENEFIT PLAN,        )
[16]                    )
[17]        DEFENDANTS    )JUDGE RICHARD CAPUTO
[18]
[19]        DEPOSITION OF
[20]        DR WILLIAM FEIST
[21]
[22]    S T I P U L A T I O N
[23]    IT IS STIPULATED AND AGREED by and

**Page 0002**

[01]    between the parties through their
[02]    respective counsel, that the deposition of
[03]    DR WILLIAM FEIST may be taken before Donna
[04]    L Miller, Commissioner and Notary Public,
[05]    State of Alabama at Large, at the offices
[06]    of Foshee & Turner, 220 Park Place Tower,
[07]    2001 Park Place North, Birmingham, Alabama
[08]    35203, on the 8th day of March 1998
[09]    commencing at 10 00 a m
[10]    DEPOSITION OF DR WILLIAM FEIST
[11]
[12]        IT IS FURTHER STIPULATED AND AGREED
[13]    that the signature to and the reading of
[14]    the deposition by the witness is waived,
[15]    the deposition to have the same force and
[16]    effect as if full compliance had been had
[17]    with all laws and rules of Court relating
[18]    to the taking of depositions
[19]        IT IS FURTHER STIPULATED AND AGREED
[20]    that it shall not be necessary for any
[21]    objections to be made by counsel as to any
[22]    questions, except as to form or leading
[23]    questions, and that counsel for the parties

**Page 0003**

[01]    may make objections and assign grounds at
[02]    the time of the trial, or at the time said
[03]    deposition is offered in evidence or prior
[04]    thereto
[05]        IT IS FURTHER STIPULATED AND AGREED
[06]    that notice of filing of this deposition by
[07]    the Commissioner is waived
[08]
[09]        E X H I B I T S
[10]    EXHIBIT PG DESCRIPTION
[11]    PX-1   53 10-12-95 handwritten response to
[12]    Tim Peace
[13]
[14]
[15]
[16]
[17]        I N D E X
[18]    EXAMINATION BY    PAGE NUMBER
[19]    Mr Schefter        5 - 71
[20]                193 - 197
[21]                202 - 204
[22]    Mr McMonigle      71 - 193
[23]                197 - 202

**Page 0004**

[01]    A P P E A R A N C E S
[02]    BARLEY, SNYDER, SENFT & COHEN, by
[03]    Mr Robert J Schefter 100 East Market
[04]    Street, P O Box 15012 York, Pennsylvania
[05]    17405-7012, appearing for the Plaintiff
[06]    POST & SCHELL, by Mr Richard
[07]    McMonigle, 1800 John F Kennedy Boulevard,
[08]    Philadelphia, Pennsylvania 19103, appearing
[09]    for the Defendants
[10]
[11]
[12]
[13]        I, Donna L Miller, a Court
[14]    Reporter of Tuscaloosa, Alabama, acting as
[15]    Commissioner, and a Notary Public for the
[16]    State of Alabama at Large, certify that on
[17]    this date, as provided by Rule 30 of the
[18]    Alabama Rules of Civil Procedure and the
[19]    foregoing stipulation of counsel, there
[20]    came before me, DR WILLIAM FEIST, witness
[21]    in the above cause, for oral examination,
[22]    whereupon the following proceedings were
[23]    had

**Page 0005**

[01]        DR WILLIAM FEIST,
[02]    having been first duly sworn, was examined
[03]    and testified as follows
[04]
[05]    EXAMINATION BY MR SCHEFTER
[06]    Q    This is the case of Stephen Laucks
[07]    versus the Provident Companies  Dr Feist,
[08]    we met earlier today  My name is Bobby
[09]    Schefter  The law firm I am with
[10]    represents Dr Laucks in this litigation
[11]    We are here today to take your deposition
[12]    I'm going to be asking you a series of
[13]    questions about your involvement with
[14]    Provident, and specifically with this case
[15]    I would like to start just by asking you
[16]    your full name for the record, please
[17]    A    My full name is William Edgar Feist,
[18]    F-e-i-s-t
[19]    Q    Dr Feist, if you would, briefly
[20]    describe for me your educational
[21]    background
[22]    A    I have a bachelor s degree from the
[23]    University of Kansas in 1962. medical

**Page 0006**

[01]    school, M D  degree University of Kansas
[02]    1966; internship and residency at the St
[03]    Luke's Hospital in Kansas City, Missouri,
[04]    internship from 1966 to '67 and residency
[05]    from 69 to '72
[06]    Q    What specialty, if any, did you have
[07]    during your internship?
[08]    A    I took an internal medicine
[09]    residency  I am board eligible in internal
[10]    medicine
[11]    Q    What did you do after obtaining your
[12]    medical degree in 1967, was it?
[13]    A    1967  I had two years of military
[14]    service with the U S  Air Force in Mexico
[15]    as a medical officer
[16]    Q    What were your duties as a medical
[17]    officer in the Air Force?
[18]    A    General medicine  I worked in
[19]    various clinics, pediatrics, general
[20]    medicine, flight surgeon's office,
[21]    emergency room  General medical officer
[22]    goes wherever the hospital commander
[23]    instructs him to go

## DR WILLIAM FEIST   [3-8-99]

### Page 0007

[01]  Q    What was your rank in the Air Force?
[02]  A    Captain
[03]  Q    what did you do after getting out of
[04] the Air Force in 1969?
[05]  A    In 69, I went back to St Luke's
[06] Hospital in Kansas City and did my internal
[07] medicine residency
[08]  Q    What did you do after finishing your
[09] residency?
[10]  A    Practiced internal medicine in
[11] Kansas City, Missouri, from July of 72 to
[12] October of '77, five years
[13]  Q    What did your private practice
[14] consist of?
[15]  A    It was a general medical, general
[16] internal medicine practice, just treating
[17] adults of all illnesses, staff privileges
[18] at a couple of hospitals in the area, and
[19] so on
[20]  Q    What did you do after 1977?
[21]  A    I started working for the
[22] Businessmen s Assurance in Kansas City,
[23] Missouri  in January of 1978

### Page 0008

[01]  Q    What was your position there?
[02]  A    I was assistant medical director
[03]  Q    And what were your duties as
[04] assistant medical director?
[05]  A    Primarily were involved in life
[06] insurance underwriting, a small amount of
[07] claims work  life claims and some work in
[08] the company infirmary, industrial medicine
[09] type situation
[10]  Q    What were your duties specifically
[11] as an underwriter?
[12]  A    Well, primarily, it would be to
[13] review the medical history on a life
[14] insurance file, read electrocardiograms,
[15] interpret x-rays, interpret medical data,
[16] medical history in terms of adjudicating
[17] the risk of the particular file
[18]  Q    Can you define for me, Doctor, just
[19] generally what underwriting is?
[20]  A    Underwriting basically is the
[21] selection of risk for individuals applying
[22] for insurance  That is a general term  It
[23] applies to life insurance, disability

### Page 0009

[01] income, health insurance, property and
[02] casualty  Basically, you just take an
[03] applicant and assess his or her risk for
[04] that particular type of insurance
[05]  Q    When you say "risk," can you define
[06] that term in its context here?
[07]  A    Well, I think the easiest way to
[08] understand it would be in the life
[09] insurance arena, if somebody is a standard
[10] risk, he gets the standard rate  If he's a
[11] 200 percent mortality risk, he gets a rate
[12] up  In the disability lines, you do
[13] similarly rate impairments  In disability,
[14] you can put on a waiver for a pre-existing
[15] condition  Similarly for health insurance,
[16] you assess the risk and so forth  I have
[17] never done property and casualty, so I
[18] can't speak to that
[19]  Q    When you use the term "risk," whose
[20] risk are you referring?
[21]  A    Well, ultimately, it s the insurer s
[22] risk of that individual dying early or
[23] becoming disabled or having a medical

### Page 0010

[01] illness or something  The insurance
[02] company is insuring the risk of that
[03] individual for whatever type insurance that
[04] is at issue
[05]  Q    How long were you with the
[06] Businessmen's Assurance company?
[07]  A    I was there from January of 78, I
[08] said 98, excuse me  Time flies  I was
[09] there from January of  78 to June of 82
[10]  Q    What did you do after June of 1982?
[11]  A    I took a position with the Provident
[12] Life and Accident of Chattanooga July 1st
[13] of 1982
[14]  Q    What was your position when you
[15] joined Provident in 1982?
[16]  A    I was the assistant medical director
[17] initially
[18]  Q    What were your duties as assistant
[19] medical director?
[20]  A    At that time, I did life insurance
[21] underwriting, disability insurance
[22] underwriting, a smattering of claims work,
[23] and, also, I was responsible for the

### Page 0011

[01] company infirmary
[02]  Q    How long were you assistant medical
[03] director?
[04]  A    I was assistant medical director
[05] from '82 to '85, when I became associate
[06] medical director
[07]  Q    Did your duties change as associate
[08] medical director?
[09]  A    No, none whatsoever  I didn't even
[10] get a salary increase
[11]  Q    Just purely a change in title?
[12]  A    Just a title, yes, no perks
[13]  Q    How long were you an associate
[14] medical director?
[15]  A    Until July of 1990, when I became
[16] vice president and medical director
[17]  Q    What were your duties as vice president of?
[18]  A    Vice president of the medical
[19] department, which at that time consisted of
[20] a total of three positions, plus the
[21] company infirmary, and we would serve as
[22] consultants to the Life Department, the
[23] Accident Department, and to the Group

### Page 0012

[01] Department for individual underwriting
[02] Virtually anything to do with individual
[03] underwriting came through our department as
[04] far as medical referrals
[05]  Q    When you say "medical director,"
[06] were you medical director of Provident, or
[07] a specific unit within Provident?
[08]  A    Well, my title was corporate medical
[09] director, vice president and corporate
[10] medical director of Provident
[11]  Q    Were there any medical directors
[12] senior to you?
[13]  A    No
[14]  Q    When you took over as medical
[15] director, was there an assistant or an
[16] associate medical director?
[17]  A    Yes  We can reconstruct all of
[18] that  In the usual situation  there would
[19] have been a medical director, maybe one
[20] associate medical director, and one
[21] assistant  Somewhat in flux, but that was
[22] the usual structure
[23]  Q    How long were you corporate medical

## DR  WILLIAM FEIST    [3-8-99]

### Page 0013

[01] director of Provident?
[02] A      From July 1st of 1990 to February
[03] 26th of 1996
[04] Q      What were your duties as corporate
[05] medical director?
[06] A      Primarily being over the physicians
[07] in the Medical Department  We had a
[08] full-time nurse and a full-time assistant,
[09] nursing assistant, in the company
[10] infirmary, one full-time and one part-time
[11] secretary, and, of course, I had
[12] responsibility of budgeting for the
[13] department, as well as performance
[14] appraisals and salary adjustments and so
[15] forth on a regular basis, of all these
[16] people that reported to me
[17] Q      As medical director, did you have
[18] any involvement with claims handling at
[19] Provident?
[20] A      Are you saying my entire career at
[21] Provident, or specifically as medical
[22] director?
[23] Q      Specifically as medical director

### Page 0014

[01] and then I'll followup with throughout your
[02] employment with Provident
[03] A      Well  from 1990 until the spring of
[04] 1995, I had no direct involvement with the
[05] claims operation  But then in the spring
[06] of 1995, I was asked to step back in the
[07] disability income claims arena to help out
[08] Q      Now go back further throughout your
[09] employment with Provident, from 1982 up
[10] until 1990, when you became the medical
[11] director  What involvement, if any, did
[12] you have with the claims handling process?
[13] A      Well, from the time I came on to
[14] Provident in 1982 until 1990, there were
[15] three positions, and we basically did
[16] claims and underwriting, the whole mix kind
[17] of on an as-needed basis  The secretary
[18] would just virtually distribute the various
[19] claims cases  underwriting cases, sort of
[20] on a next available type basis
[21]      MR  McMONIGLE  Excuse me, Doctor
[22] What were those years again?  I missed it
[23]      THE WITNESS  1982 to 1990

### Page 0015

[01] A      So I had from 1982 to  90, I had
[02] some claims review responsibility  Claims
[03] was probably a fourth of what I was doing
[04] Most of it was underwriting, but probably a
[05] fourth of my duties were involving claims
[06] Q      What was your last date of
[07] employment with Provident?
[08] A      February 29, 1996
[09] Q      What did you do after leaving the
[10] employment of Provident?
[11] A.      I became medical director of
[12] Protective Life here in Birmingham
[13] Q      Is this generally where your duties
[14] are there?
[15] A      Duties now are primarily life
[16] insurance underwriting, a smattering of
[17] early life death claims, attestable life
[18] death claims, and also backup for the
[19] company nurse in the infirmary
[20] Q      Are you presently licensed as a
[21] physician?
[22] A      Yes, sir
[23] Q      In what states do you hold a

### Page 0016

[01] physician's license?
[02] A      Alabama, Tennessee, Missouri, and
[03] Kansas
[04] Q      Are each of those licenses current?
[05] A      Yes  sir
[06] Q      Do you hold any certifications in
[07] the insurance industry?
[08] A      I m board certified in insurance
[09] medicine as of 1985
[10] Q      What is required to become board
[11] certified in insurance medicine?
[12] A      The board requires some insurance
[13] industry courses called LOMA courses, which
[14] are like basic life, basic insurance,
[15] legal  There is a LOMA course on the law
[16] of insurance  I had to take a statistics
[17] course, take an oral and written
[18] examination, and also one has to be
[19] actively engaged in working for an
[20] insurance company for four years before one
[21] can sit for the oral  Well, actually
[22] written is before the oral  You have to be
[23] in the practice of insurance for four years

### Page 0017

[01] before you sit for examination in the
[02] oral exams
[03] Q      Is your board certification in
[04] insurance medicine current?
[05] A      Yes, sir
[06] Q      Are there any ongoing educational
[07] requirements to maintain that
[08] certification?
[09] A      Not specifically with that, but
[10] several of the states in which I am
[11] licensed require continuing medical
[12] education credits, and also I maintain the
[13] American Medical Association s M  D
[14] certification, continuing education
[15] certificate, which is renewed every three
[16] years
[17] Q      Doctor, are you a member of any
[18] other organizations either within the
[19] medical field or insurance field?
[20] A      Yes  I m a member of the American
[21] Medical Association  the Alabama Medical
[22] Association, the Jefferson County Medical
[23] Association, Christian Medical and Dental

### Page 0018

[01] Society; American College of Physicians,
[02] and the American Academy of Insurance
[03] Medicine
[04] Q      I would like to focus now, Doctor,
[05] on your employment with Provident  You had
[06] mentioned previously that, I believe
[07] sometime in the spring of 1995, you became
[08] more involved in the claims review process,
[09] is that correct?
[10] A      That's correct, sir, yes
[11] Q      Can you describe for me how you came
[12] to be more involved in claims reviews?
[13] A      Well, in the spring of '95, Ralph
[14] Mohney asked me to assist the claims
[15] operation of the Accident Department by
[16] basically spending fifteen to twenty hours
[17] a week on sort of a consulting basis, sort
[18] of a walk-around basis to look at cases and
[19] advise the claims adjusters  At that time,
[20] there were like, they hadn t consolidated
[21] their claims operation from across the
[22] country into Chattanooga, and there were
[23] literally five different sections of

## DR. WILLIAM FEIST    [3-8-99]

### Page 0019

[01] building complex where there were claims
[02] adjusters located   I went on a rotating
[03] basis, Monday through Friday, go to each of
[04] those five sections and be available for
[05] any review of cases or consultations that
[06] the adjusters had   In addition, I was
[07] asked to be a part of the evening
[08] round-table discussions on a once weekly
[09] basis
[10] Q    Who was Ralph Mohney, specifically
[11] what was his title in spring of 1995?
[12] A    My recollection was that he was the
[13] vice president in charge of the Accident
[14] Department claims operation
[15] Q    Can you spell his last name, or give
[16] your best approximation for the court
[17] reporter?
[18] A    M-o-h-n-e-y  I believe, first name
[19] Ralph
[20] Q    Did Mr Mohney explain to you why he
[21] was requesting that you become involved in
[22] those claims reviews?
[23] A    Well  the discussion we had at that

### Page 0020

[01] point, as I recall, was that he felt that
[02] the claims operation needed more medical
[03] expertise, and they were bringing in
[04] seasoned claims personnel to beef up their
[05] claims operation, and he wanted me to help
[06] out in that area   He mentioned something
[07] to the effect that he felt like the new
[08] application count was going to be down in
[09] the next six months, so, therefore, [quote]
[10] [unquote], "I would have more time to spend
[11] with claims,   and beef up that section
[12] Dr  Fred O'Connell was the medical director
[13] dedicated to the claims process, and I
[14] think Ralph Mohney felt that he needed
[15] help, so I was asked to do that   So I was
[16] spending fifteen to twenty hours a week in
[17] claims adjudication from the spring of '95
[18] forward than I had been prior to that
[19] point
[20] Q    You had mentioned that Mr  Mohney
[21] made reference to applications being down
[22] What does that refer to?
[23] A    Well --

### Page 0021

[01] MR  McMONIGLE   I just object  You
[02] can answer, Doctor
[03] A    Well, I mean, the whole idea of
[04] insurance is to sell policies   He didn t
[05] explain why he thought the new application
[06] count was going to be down in the next six
[07] months   I suppose he had some projections
[08] that I wasn t privy to   I think the
[09] indication was what I would have a little
[10] extra time I could dedicate to the claims
[11] process   I think he was realizing that he
[12] needed more medical expertise in the
[13] operation, and probably didn't feel like he
[14] could hire a second position doctor
[15] full-time, so he asked me to do it
[16] part-time
[17] MR  McMONIGLE   Objection and move
[18] to strike as nonresponsive
[19] Q    You had mentioned a Dr  O'Connell
[20] Were you aware of his position with
[21] Provident in the spring of 1995?
[22] A    Oh, absolutely   I had worked with
[23] Fred in the Medical Department from the

### Page 0022

[01] fall of '89 when Fred came on board, and
[02] Fred was working in the combined medical
[03] departments before he was asked to go into
[04] the disability claims  so I knew Fred very
[05] well   And we occasionally talked back and
[06] forth   Occasionally, he would ask me about
[07] a case or something of that sort   During
[08] most of my tenure as medical director   he
[09] was not reporting directly to me, but we
[10] did have professional contact from time to
[11] time
[12] Q    Did the physicians or physician
[13] within the disability unit report to you as
[14] medical director?
[15] A    No   He reported to the vice
[16] president of claims
[17] Q    Was there a time prior to 1995 when
[18] the physicians reported to the medical
[19] director, as opposed to the vice president
[20] of claims?
[21] A    Well, in the late 1980's and going
[22] into 1990, all the physicians in the whole
[23] company reported to the medical director

### Page 0023

[01] After my predecessor retired, the positions
[02] were split out  if you will, to the Group
[03] Department  Accident Department  and to the
[04] Underwriting Department, if you will
[05] Q    You had mentioned that in the spring
[06] of 1995 when you began spending fifteen to
[07] twenty hours per week reviewing claims, can
[08] you describe what your role was in
[09] reviewing the claims?
[10] A    Well, primarily, my role was a
[11] medical consultant   It could take several
[12] forms   Some of the claims adjusters wanted
[13] to actually sit down with the case and
[14] review it one-on-one   Others preferred to
[15] just hand me the case and say, "This is
[16] what I would like you to do   Please review
[17] the file and answer in writing   So it
[18] varied   But the ultimate goal was to
[19] provide medical expertise to them in their
[20] reviewing of claim files
[21] Q    You had mentioned that besides the
[22] one-on-one meetings with claims
[23] representatives, there were also what you

### Page 0024

[01] termed round-table meetings or discussions
[02] A    Yes
[03] Q    What are they?
[04] A    Well, the round-tables, as they were
[05] sort of known in the company, were twice
[06] weekly evening meetings   Usually, they
[07] would start at like 6 00 in the evening
[08] after normal working hours, and maybe go
[09] two to three hours, and the participants
[10] would be generally Ralph Mohney or one of
[11] his reports who had ran the meeting,
[12] usually had some attorneys there who
[13] usually -- well, they were company
[14] attorneys  usually two  sometimes three of
[15] them, would be there, a medical director,
[16] either myself or Dr  O'Connell on a
[17] Thursday meeting   Then you would have the
[18] claims adjusters who are actually working
[19] the case to be presented, and they would
[20] present   Then generally they would have
[21] the supervisors and the administrative
[22] personnel of the Group Department, I mean
[23] the Accident Department, there in the

## DR  WILLIAM FEIST    [3-8-99]

### Page 0025

[01] meeting as well
[02] Q    Were the round-table meetings held
[03] twice every week?
[04] A    Very regularly  yes  sir
[05] Q    When did Provident begin to hold
[06] these round-table meetings, as you have
[07] termed them?
[08] A    My recollection was March or April
[09] of 1995  I can't give you the specific
[10] date, but it was in the spring of 1995
[11] Q    Do you know who within Provident
[12] ordered that these round-table meetings be
[13] held beginning in early 1995?
[14]        MR McMONIGLE    Objection to form
[15]  You can answer
[16]        MR SCHEFTER    What is the
[17] objection, so I can try to clear it up?
[18]        MR McMONIGLE  Who said anybody
[19] ordered it?  There is no predicate for that
[20] question
[21]    Q    Let me rephrase then, Doctor  You
[22] had testified that these meetings began to
[23] be held sometime in the spring of 1995, is

### Page 0026

[01] that correct?
[02] A    That's correct, yes  sir
[03] Q    Do you know how it was that these
[04] meetings came about?
[05] A    Well, my recollection was that there
[06] was a memo from Ralph Monnay that said -- I
[07] can't say the exact words, but there is a
[08] concern about claims  "We need to have
[09] these meetings to try to adjudicate some of
[10] the claims "  He listed on his memo who the
[11] participants were going to be  That's how
[12] they got started
[13] Q    How often did you attend round-table
[14] meetings?
[15] A    I went once a week from spring of
[16] 1995 until February of '96  About two
[17] weeks before I left Provident, I attended
[18] very faithfully once a week, unless I was
[19] out of town  Occasionally, they might not
[20] have had one
[21] Q    Do you know, Doctor, or can you
[22] approximate how many of these round-table
[23] meetings you personally attended?

### Page 0027

[01] A    Well, I'm guessing I went to
[02] probably three or four a month, roughly
[03] eight or nine months  so I m thinking
[04] around thirty  twenty-seven to thirty
[05] maybe, if my math is correct
[06] Q    Do you know, Doctor, whether
[07] official minutes were taken of these
[08] meetings?
[09] A    I wouldn't call them "official
[10] minutes," but generally the claims adjuster
[11] and his or her supervisor would take, when
[12] a case is presented by a claims adjuster,
[13] discussion was made what action to take,
[14] and the claims adjuster and/or his
[15] supervisor would notate what the plan of
[16] action was and then they would carry it
[17] out  As far as any specific recorded
[18] minutes or recorded minutes, I guess, I
[19] don't believe there were
[20] Q    How long did each meeting last,
[21] typically?
[22] A    Generally about three hours  maybe
[23] sometimes a little longer  On average

### Page 0028

[01] about three hours
[02] Q    Can you approximate how many files
[03] would be discussed at these meetings?
[04] A    My recollection was it might have
[05] been four to six cases presented in a given
[06] session  That's an average, obviously
[07] Sometimes they might have only done two or
[08] three cases  But on average, four to six
[09] cases a session.
[10] Q    Who would present the cases to be
[11] discussed at the meetings?
[12] A    For lack of a better word, I call it
[13] the "in-the-trenches" claims adjuster
[14] Usually the entry level, if you will,
[15] claims adjuster would have the file in his
[16] or her staple of files  The first line
[17] claims adjuster would present the case  and
[18] then discussion would ensue from there
[19]        MR McMONIGLE  Bobby, could you
[20] clarify, "first line" and "entry level " is
[21] that synonymous?
[22]        THE WITNESS    Yes  I say that as,
[23] you know, obviously, a file has to come

### Page 0029

[01] into the system, and, generally, it's the
[02] lowest ranking claims adjuster sees it
[03] first  Then there's a hierarchy of
[04] supervisors, assistant vice president, and
[05] so on up the organizational chart
[06] Q    Do you know, Dr  Feist, now the
[07] claims representatives would select which
[08] cases to present at the round-table
[09] meetings?
[10] A    Well, my impression was, is that
[11] they were looking for cases that had high
[12] dollar reserves and also, perhaps, those
[13] that might be gray areas  There might be
[14] some dispute or a difference of opinion how
[15] it was or should be handled
[16]        MR McMONIGLE  Could you read back
[17] that question and answer, please?
[18]        (Whereupon, the last question and
[19] answer were read back by the court reporter
[20] at the request of counsel )
[21]        MR McMONIGLE  I just move to
[22] strike as nonresponsive  You can proceed,
[23] Doctor

### Page 0030

[01] Q    When you state that it was your
[02] impression, and then you continued to give
[03] an answer, what was your impression based
[04] upon?
[05] A    Well, my impression of high dollar
[06] amounts was that when the case was
[07] presented, they would have a presentation,
[08] if you will, of what the company liability
[09] was for that applicant or that claimant,
[10] I'm sorry  Generally, you had reserves,
[11] you know, in the millions  And also,
[12] generally, the cases were those where there
[13] might have been some legal problem or
[14] licensing problem or drug and alcohol abuse
[15] problem or psychiatric problem or chronic
[16] fatigue problem, some concern that the
[17] attending physician was falsifying the
[18] record  Just most anything that might be
[19] latched onto  If you will in determining
[20] the claim
[21] Q    As part of your prior answer, you
[22] used the term --
[23]        MR McMONIGLE  Excuse me, Bobby  I

---

## DR. WILLIAM FEIST    [3-8-99]

**Page 0031**

[01] move to strike the last half of that as
[02] nonresponsive
[03] Q       As part of your prior answer, you
[04] had indicated, number one, the high dollar
[05] amount, number two, gray areas  Was the
[06] letter part of your last answer, was that
[07] what you meant by gray areas?
[08]          MR McMONIGLE   Objection  You can
[09] answer
[10] A       Yes  I think it s fairly apparent
[11] that there are some medical impairments
[12] that are difficult to adjudicate in claims
[13] review, particularly the disability income
[14] scenario  These cases are ideal for this
[15] type of thing
[16] Q       Do you know, Dr Feist, whether the
[17] claims adjusters were required to present
[18] cases at the round-table meetings?
[19] A       My impression was that they were not
[20] required, that they were encouraged to
[21] present cases
[22] Q       When you say that was your
[23] impression, again, what was your impression

**Page 0032**

[01] based upon?
[02] A       Well, it seemed like the youngsters,
[03] I call them youngsters  these were usually
[04] young people who were on their first job or
[05] the best job they had ever had at that
[06] point, and they were eager to please  It
[07] seemed like the same front line claim
[08] adjusters were at each of the weekly
[09] meetings presenting cases, i e , the ones
[10] that wanted to get ahead presented cases.
[11] and the ones that were not that interested
[12] didn't present cases  That was the
[13] impression I got
[14] Q       Dr Feist, do you have any personal
[15] knowledge of whether the claims adjuster's
[16] participation in the round-table meetings,
[17] meaning bringing cases to the round-table
[18] meetings, was tied to their salary or bonus
[19] or compensation in any way?
[20]          MR McMONIGLE   Objection,
[21] speculative  You can answer
[22] A       I have no knowledge of that specific
[23] question

**Page 0033**

[01] Q       Were the amount of benefits that an
[02] individual claimant was receiving discussed
[03] at the meeting?
[04] A       Yes
[05] Q       Were the durations of payments,
[06] meaning how long the claimant had been
[07] receiving benefits, was that raised at the
[08] round-table meetings?
[09]          MR McMONIGLE   Objection, leading
[10] A       Well, in the course of a
[11] presentation, the claims adjuster that is
[12] presenting the case would generally say,
[13] "This is Dr so-and-so, case so-and-so  He
[14] has been on disability payments for 'x'
[15] number of years '  It was usually brought
[16] up in the context of presenting the
[17] specifics of the case
[18] Q       Files that were presented at the
[19] round-table meetings  were they cases where
[20] Provident was paying benefits or, as
[21] opposed to that, were there cases presented
[22] that Provident had not made a decision yet
[23] as to whether to honor or pay the claim?

**Page 0034**

[01] A       My recollection was that all the
[02] cases that were presented were established
[03] cases that were, at the time that the case
[04] was presented, the individual was being
[05] paid disability  I don t recall any de
[06] novo cases coming to the round-table  It
[07] would not seem to be appropriate  probably
[08] to bring a case that was in the process of
[09] being adjudicated from the beginning
[10]          MR McMONIGLE   Objection, move to
[11] strike
[12]          MR SCHEFTER   Is the objection
[13] nonresponsive?
[14]          MR McMONIGLE   Yes, beyond the
[15] scope of your question  There was no
[16] basis
[17] Q       Doctor, there was an earlier
[18] question that I believe was objected to as
[19] leading  So I want to ask you, what
[20] information was presented by the claims
[21] adjuster when presenting the case?
[22] A       Well, my recollection would be,
[23] would be that the claims adjuster would

**Page 0035**

[01] have the individual s file he or she was
[02] discussing in front of them  They would
[03] usually give the age  the gender
[04] occupation, the company liability, and sort
[05] of the track record, if you will, of what
[06] had been paid or not been paid after the
[07] point of the presentation.  I would have to
[08] say that the claims adjuster pretty well
[09] gave a broad picture of what was going on
[10] with that particular case
[11] Q       Dr Feist, what was the purpose of
[12] the round-table meetings, as you understood
[13] them?
[14] A       My impression was that there was an
[15] attempt to look at established claim files
[16] to see if there was any way to terminate
[17] those files, to basically enhance the
[18] bottom line apropos to the tremendous
[19] claims losses that Provident had in the
[20] eighteen months prior to that point
[21] Q       When you say that was your
[22] impression, again, what was your impression
[23] based upon?

**Page 0036**

[01] A       Well, my impression was that they
[02] had to take a 275 to 300 million dollar
[03] write-off in the fall of 1993 for the
[04] claims liability  I think there was a
[05] corporate decision made to try to look at
[06] all of the established claims, as much as
[07] possible, to see if they could stop paying
[08] some of these cases
[09]          MR McMONIGLE   I object, move to
[10] strike, nonresponsive, speculative
[11] Q       You had indicated in that answer
[12] Doctor, that Provident had taken a
[13] write-off, I believe the amount you said
[14] were 275 to 300 million dollars
[15] A       It depends on how you account it
[16] One way is 275, another way is 300, and I
[17] can t tell you the difference
[18] Q       How was it that you became aware of
[19] this write-off by Provident?
[20] A       It was common knowledge
[21] Particularly, the thing that struck me was.
[22] when the write-off was announced by the
[23] then chief financial officer, he made a

## Page 0037

[01] specific point of saying that even though
[02] Provident had to take a loss for that
[03] particular quarter that the executive
[04] bonus payouts for that year would not be
[05] affected, because of that write-off and the
[06] claims had been long-standing, and it was
[07] not related to that particular year a bonus
[08] criteria or whatever It was a
[09] company-wide bulletin Not only was it
[10] company-wide, I think it was reported in
[11] the local newspaper
[12] Q In one of your prior answers, when
[13] asked about the purpose of the round-table
[14] meetings, you had used the phrase "to
[15] enhance the bottom line " What did you
[16] mean by that?
[17] MR McMONIGLE Same objection You
[18] can answer
[19] A Well, admittedly, I m not an
[20] actuary The way the insurance business
[21] works the company has to set aside a cash
[22] liability to cover claims, and that if they
[23] can write off a million dollar claim, they

## Page 0038

[01] can put that right to the bottom line
[02] That is probably over-simplified, but I
[03] think that is basically how it works
[04] Q When you say write off a million
[05] dollar claim," what do you mean by the term
[06] "write off"?
[07] A Terminate the claim and quit paying
[08] the -- if Provident could terminate a claim
[09] and eliminate a liability for that claim,
[10] then they could drop the reserve by
[11] whatever was reserved for that claim
[12] Q What was the role that the attorneys
[13] played at the round-table meetings, if you
[14] know?
[15] A Well, my impression was that they
[16] usually tried to get attorneys, they
[17] probably had a number of attorneys; but
[18] they usually tried to get the attorneys
[19] that were most familiar with, most
[20] up-to-date on the laws of a particular
[21] state in which the claimant was residing,
[22] i e , if it was a California case, they
[23] would have a company lawyer that was most

## Page 0039

[01] versed in California law The attorneys, I
[02] think, basically were there to interpret
[03] the situation, claims situation being
[04] presented, in light of the laws of a
[05] particular jurisdiction
[06] Q What was the role, as you understood
[07] it of Ralph Mohney, or whoever was at the
[08] meeting in his place? What was that
[09] person's role at the meeting?
[10] A Well, I think primarily to keep the
[11] discussion on track Mohney had a rule
[12] that only one person at a time could speak,
[13] and if more than one person spoke, he would
[14] throw a rubber ball at you, tell you to be
[15] quiet But I think mostly to explore all
[16] the avenues that might be available to
[17] terminate a given case, medical legal
[18] income, occupational, whatever might be
[19] involved
[20] MR McMONIGLE Could you read that
[21] back?
[22] (Whereupon, the last answer was read
[23] back by the court reporter at the request

## Page 0040

[01] of counsel )
[02] Q Dr Feist, what was your role or any
[03] other physician's role who attended the
[04] meetings?
[05] A Generally I was sort of a
[06] consulting basis, and there is a
[07] consultant If there was a medical
[08] impairment that the claims adjuster didn't
[09] understand or some sort of a medical
[10] terminology situation or situation I would
[11] ask to explain that, I guess, for lack of a
[12] better word
[13] Q Procedurally at the meetings what
[14] happened after the claims adjuster would
[15] present the case?
[16] A Procedurally, normally after the
[17] claims adjuster presented the case there
[18] would be discussion on whatever avenue they
[19] felt could be used to determine the claim
[20] You know, if the person wasn't making
[21] enough income to justify having that much
[22] monthly income, or maybe he had gotten in
[23] trouble with the licensing bureau or maybe

## Page 0041

[01] the attending physician that was sending in
[02] the disability reports was falsifying them
[03] Any number of ways to try to terminate the
[04] claim
[05] Q Were there decisions made on the
[06] claims at the round-table meetings? And by
[07] "decision," I mean decision to terminate
[08] benefits or not terminate benefits
[09] A My recollection is that generally
[10] there was not a specific decision made at
[11] the round-table more of an investigatory
[12] approach The claims adjuster was
[13] reassigned, if you will, additional duties
[14] get more information, get the income
[15] report, get this get that I just don't
[16] recall it has been three years, three
[17] years plus, that actually a specific
[18] decision was made at that particular
[19] meeting
[20] Q You had used the term
[21] "investigatory" in your last answer Were
[22] the claims being presented at the
[23] round-table meetings than currently under a

## Page 0042

[01] reservation of rights by Provident?
[02] A I m a little unclear, but I think --
[03] Q I don't mean to interrupt Are you
[04] unclear about my question, or is that part
[05] of your answer?
[06] A Well, I know what you mean by
[07] reservation of rights My answer would
[08] be, I'm not specifically sure, but my
[09] recollection would be that some of them may
[10] have been reservation of rights, but
[11] probably the majority of them were not
[12] reservation of rights
[13] Q What does the term "reservation of
[14] rights" mean?
[15] A My understanding of that would be
[16] that the insurance company would say after
[17] a claim has been received, there seems to
[18] be some reasonable expectation that this
[19] person is disabled, perhaps they re not
[20] working, we ll go ahead and start the
[21] payments, but we are still investigating
[22] We need to get some additional information
[23] to make our final determination of

DR. WILLIAM FEIST    [3-8-99]

### Page 0043

[01] disability or not  My understanding, it s
[02] a mechanism of the insurance company to pay
[03] the person to maybe get them over an acute
[04] period, but they haven t really made the
[05] final decision about disability or not
[06] Q    Typically, Dr Feist, how long would
[07] it take to investigate a claim?
[08]       MR McMONIGLE  Any claim?  I object
[09] to the form
[10] Q    Let me rephrase  Is there a general
[11] time period within which an insurance
[12] company would take to investigate a claim
[13] and the individual disability income
[14] segment of business?
[15] A    I would say, typically  it would
[16] take maybe three to six months  The
[17] procedure would be that somebody sends in a
[18] file, sends in a request for disability,
[19] and then he or she would list the reason
[20] for the disability, and then list the
[21] attending physicians who have attended him
[22] in regard to this disability  And then the
[23] process would be for the claims adjuster to

### Page 0044

[01] obtain the records from those physicians
[02] for the claimant to put on his or her file,
[03] claim form  Then a request would go out to
[04] get that information, and, obviously, the
[05] unknown is how long it is going to take for
[06] the physician s office to respond to the
[07] request  Some physicians are very prompt,
[08] and some are not very prompt  But within
[09] three to six months, these insurance
[10] companies should have all the necessary
[11] data to make the decision
[12] Q    Once the investigation has been
[13] completed and Provident waives its
[14] reservation of rights — well, let me ask
[15] you, what does it mean if Provident has
[16] waived its reservation of rights?  What
[17] does that mean?
[18]       MR McMONIGLE  Objection to form
[19] You can answer
[20] A    If I understand your question, it
[21] would seem to me that if Provident has
[22] waived its right to pay the claim, then
[23] they are obligated to pay the claim  They

### Page 0045

[01] have decided that this is a valid claim,
[02] we re going to pay it  I'm not sure that s
[03] what you asked, but I think that s what you
[04] asked
[05] Q    It is  If that is the case, my next
[06] question is, why would claims that are no
[07] longer under reservation of rights be
[08] presented at round-table meetings?
[09]       MR McMONIGLE  Objection
[10]       MR SCHEFTER  What is the
[11] objection?
[12]       MR McMONIGLE  I'm actually a
[13] little bit lost, as to where you are going
[14] here, to be honest with you  I know he's a
[15] medical doctor, and he has given his
[16] credentials  I am just noting my
[17] objection  that was a form objection
[18] because I think it was a leading question
[19] But I'm also just a little bit bewildered
[20] here as to the subject matter  I assume I
[21] reserve these objections for later, but
[22] sometimes I can't help myself
[23] Q    You can answer

### Page 0046

[01] A    If I can remember what the question
[02] was
[03]       (Whereupon, the last question was
[04] read back by the court reporter at the
[05] request of counsel )
[06]       MR McMONIGLE  It calls for
[07] speculation too
[08] A    It would seem to me that if a
[09] claimant was judged to be disabled and
[10] there was no change in his or her medical
[11] condition or impairment, there would be no
[12] reason to investigate a claim  I mean, it
[13] seems to me that philosophically  a company
[14] should decide within that three to
[15] six-month window If a person is or is not
[16] disabled, and then barring any dramatic
[17] improvement or new technology or new
[18] treatment, there would be no reason to
[19] investigate the claim  There would be no
[20] reason to consider it
[21]       MR McMONIGLE  I move to strike,
[22] nonresponsive  Please keep your voice up a
[23] little, Doctor  I definitely can't hear

### Page 0047

[01] you
[02]       THE WITNESS  I'm sorry
[03] Q    What mechanisms, if any, are in
[04] place for Provident to continue to monitor
[05] claims that are past the stage of a
[06] reservation of rights?
[07]       MR McMONIGLE  Objection to form
[08] A    That a pretty standard in disability
[09] income  If one is claiming disability, one
[10] has to file typically every thirty days a
[11] statement by one s attending physician that
[12] that medical impairment is continuing, has
[13] not improved where the person can go back
[14] to work  I guess that s basically just a
[15] certificate of continuing disability  That
[16] is the intent of a continuation of
[17] disability  Whether it is called that or
[18] not, I m not sure
[19] Q    When you say that is the "intent" of
[20] it, I'm not quite sure what you are
[21] referring to  Can you clarify?
[22]       MR McMONIGLE  Objection, you can
[23] answer

### Page 0048

[01] A    Well, I think the insurance company
[02] has the right to have ongoing certification
[03] that this person has continued to be
[04] disabled  i e  some new technology comes
[05] in, and the person is dramatically cured
[06] from an impairment that was disabling him,
[07] the company would have the right to say,
[08] 'You have the magic procedure, and now you
[09] are okay  Go back to work  That s their
[10] legitimate right
[11] Q    Were psychiatric claims presented at
[12] the round-table meetings?
[13] A    Quite common  yes, sir
[14] Q    Were the round-table meetings
[15] specific to the disability unit?
[16] A    To my knowledge, yes
[17] Q    With the attending physician
[18] statements, if there was a question about
[19] something that the attending physician had
[20] indicated on the statement, what would be
[21] the normal procedure to investigate that?
[22]       MR McMONIGLE  Objection  You can
[23] answer

DR. WILLIAM FEIST    [3-8-99]

**Page 0049**

[01] A    Well, fairly commonly an
[02] independent medical examiner's report was
[03] requested    Some physician skilled in that
[04] particular specialty would be asked, as an
[05] independent medical examiner, to examine
[06] this person and make his or her
[07] determination of disability
[08] Q    To the best of your knowledge, were
[09] Provident representatives able, under the
[10] terms of an individual disability income
[11] policy, to contact the claimant's attending
[12] physician?
[13] A    Certainly    Surely    It was part of
[14] the application process or claim process --
[15] I'm sorry -- that the claimant allowed
[16] Provident to investigate any physician or
[17] hospital, or whatever medical records that
[18] might be pertinent to the case, to obtain
[19] and contact the physician if there was some
[20] clarification point or ambiguity sort of
[21] thing
[22] Q    And is that something that you
[23] personally were ever involved in

**Page 0050**

[01] contacting an attending physician?
[02] A    I did on a few occasions    Granted,
[03] my career wasn't specifically in claims,
[04] but, occasionally, I would call a physician
[05] to get clarification, sure.
[06] Q    Dr Feist, are you familiar with the
[07] term "own-occupation policies" as it
[08] relates to the individual disability income
[09] line of business of Provident?
[10] A    Yes
[11] Q    Can you tell us when, to the best of
[12] your knowledge, Provident began offering
[13] own-occupation policies?
[14] A    Well, it was certainly a long
[15] tradition at Provident    When I came there
[16] in 82    Provident was one of the leaders in
[17] the industry of own-occupational disability
[18] policies    My sense would be that they were
[19] started in the 1970's, maybe sixties, but
[20] I'm not real sure on that
[21] Q    Generally what does the term
[22] "own-occupation policy" mean?
[23] A    It generally means that one is

**Page 0051**

[01] disabled if one cannot perform the
[02] substantial and material duties of that
[03] occupation
[04]    MR McMONIGLE    I'm sorry    I should
[05] have objected to the form of that question
[06] Q    Were claims under own-occupation
[07] policies ever presented at the round-table
[08] meetings?
[09] A    Well    I would say probably a hundred
[10] percent of the time    Simply because of the
[11] fact that so many of them were sold and so
[12] many of them on claims, I would have to say
[13] that maybe not a hundred percent, but I
[14] would say probably pretty close to a
[15] hundred percent would be own-oc    Many
[16] times that was the bone of contention,
[17] whether a person was disabled for his or
[18] her own oc as opposed to any occupation
[19] Q    Dr Feist, while you were employed
[20] by Provident, did you have the opportunity
[21] to review the claims file of Stephen
[22] Laucks, M D ?
[23] A    Yes sir I did

**Page 0052**

[01] Q    Do you recall approximately when you
[02] would have reviewed Dr Laucks' file?
[03] A    My recollection was it was in the
[04] fall of 1995
[05] Q    Do you recall how it was that you
[06] became involved with the Laucks file?
[07] A    One of the claims adjusters, Tim.
[08] Peace, P-e-a-c-e, presented the file to me
[09] and asked me to review it and give an
[10] impression -- an opinion, I'm sorry --
[11] about Dr. Laucks situation.
[12] Q    Do you recall whether Mr Peace
[13] presented the file to you by way of oral
[14] request or written request?
[15] A    My recollection was that it was one
[16] of those Thursday morning psyche unit
[17] visits, and he just gave me the file and
[18] asked me to look at it    I think the
[19] specific question, as I recall, was whether
[20] an IME from an addictionologist would be
[21] helpful in the case    And my answer to that
[22] was, Yes, I think an evaluation by an
[23] addictionologist may prove very useful

**Page 0053**

[01]    MR McMONIGLE    Objection, move to
[02] strike, nonresponsive
[03] Q    Did you respond to Mr Peace's
[04] request?
[05] A    Yes    In the file, there is a
[06] handwritten note that I did, that you have
[07] in your file, that I did to his request
[08]    (Whereupon, at this time a short
[09] break was taken )
[10]    (Whereupon, Plaintiff's Exhibit
[11] Number One was marked for identification, a
[12] copy of which is attached to the original
[13] of the transcript )
[14] Q    Let me show you what has been marked
[15] as Dr Feist Exhibit Number One    What is
[16] that document?
[17] A    This document is a response that I
[18] made on October 12, 1995 to Mr Tim Peace
[19] regarding Dr Stephen O Laucks
[20] Q    Is that your handwriting?
[21] A    Yes sir
[22] Q    Is that your signature at the
[23] bottom?

**Page 0054**

[01] A.    Yes, sir
[02] Q    Do you recall whether the entire
[03] claims file, as it existed at that time,
[04] would have been given to you along with the
[05] request from Mr Peace?
[06] A    My recollection was that the entire
[07] claims file then existing was given to me
[08] to review
[09] Q    Did you review the entire claims
[10] file as it existed at that time, prior to
[11] preparing your written response, that is
[12] Exhibit Number One?
[13] A    That's correct, I did review the
[14] entire file
[15] Q    If I could ask you, Dr Feist, to
[16] please read into the record the first
[17] sentence of your response "
[18] A    It says,  I think we need an IME
[19] from an addictionologist "
[20] Q    Why did you write that sentence?
[21] A    Well, my recollection is that Mr
[22] Peace asked me whether an IME from a
[23] specialist in addiction, i e .

## DR. WILLIAM FEIST    [3-8-99]

### Page 0055

[01] addictionologist, would be appropriate in
[02] reviewing Dr Laucks' case  And my
[03] response was, Yes, I think so
[04] Q    Are you aware of whether there is a
[05] board certification in addictionology?
[06] A    To my knowledge, there is, yes  an
[07] Q    In your written response, why do you
[08] refer to an addictionologist as opposed to
[09] a doctor with any other specialty?
[10] A    Well, my impression and my intent
[11] was that since Dr Laucks' problem was
[12] addiction to alcohol and other medications,
[13] that this would be an appropriate specialty
[14] by training and experience to most
[15] accurately evaluate Dr Laucks' situation
[16] Q    Are you aware that as of October of
[17] 1995, Provident had taken the Laucks claim
[18] off of its reservation of rights?
[19]    MR McMONIGLE  Objection  You can
[20] answer
[21] A    I had no knowledge of that
[22] Q    From your review of the file in
[23] October of 1995, do you recall whether you

### Page 0056

[01] had made any determination as to whether
[02] Dr Laucks was complying with the
[03] submission of the monthly supplementary
[04] statement of claim and attending physician
[05] statement?
[06] A    Yes  In the record, there were
[07] regular statements by his attending
[08] physician that he was disabled  It is well
[09] documented, yes, sir
[10] Q    If you could, Dr Feist, please read
[11] into the record the second paragraph of
[12] your written response, which is Exhibit
[13] Number One
[14] A    Are you referring to the query?
[15] Q    Yes
[16] A    Query, "Can Dr Laucks work safely
[17] with medications generally used in the
[18] current accepted practice of
[19] anesthesiology?"
[20] Q    That question, where it says,
[21] although you just read it into the record,
[22] did you use an abbreviation for
[23] anesthesiology?

### Page 0057

[01] A    Yes, I did  I'm sorry  It's "AN,"
[02] which is an accepted abbreviation for
[03] anesthesiology or anesthesiologist
[04] Q    Why did you pose that question?
[05] A    Well, I think that is the crux of
[06] the issue for Dr. Laucks, is whether he can
[07] safely and prudently use the narcotics and
[08] the other medications that are used in the
[09] general anesthetic practice
[10] Q    Are you aware, Dr Feist, of the
[11] policy language in these own-occupation
[12] individual disability income policies,
[13] which defines disability as the inability
[14] to perform the material and substantial
[15] duties of one's own occupation,
[16] acknowledging that that is a paraphrase of
[17] the policy language?
[18] A    Yes, sir, I am aware of that
[19] Q    Does the question that you posed in
[20] your written response, which is Exhibit
[21] Number One, relate to the determination of
[22] whether Dr Laucks was able to perform the
[23] material and substantial duties of his

### Page 0058

[01] occupation?
[02]    MR McMONIGLE  Objection, leading
[03] A    Yes, I think it is very appropriate
[04] Anesthesiologists use a specific type of
[05] medications  and Dr Laucks had been
[06] demonstratively abusing these medications
[07] As I said earlier, that is the crux of the
[08] issue, whether it was safe for him to be
[09] around and use these medications
[10] Q    When you used the terminology,
[11] [quote], "work safely " [end of quote],
[12] what are you referring to specifically?
[13] A    Well, I think it's a two-fold  The
[14] primary thing would be safely in terms of
[15] using it appropriately on patients that
[16] were anesthetized  The side issue might be
[17] if he were to use it himself, if his
[18] judgment in the practice of anesthesiology
[19] would be impaired  I think my basic
[20] concern was for the safety of the patients
[21]    MR McMONIGLE  Would you read that
[22] back again?
[23]    (Whereupon  at this time the last

### Page 0059

[01] answer was read back by the court reporter
[02] at the request of counsel )
[03] Q    Dr  Feist, are you generally
[04] familiar with the duties of an
[05] anesthesiologist?
[06] A    I would say generally, yes
[07] Q    What are the duties of an
[08] anesthesiologist generally?
[09] A    Generally an anesthesiologist
[10] provides anesthesia or lack of pain
[11] sensation to a patient, so a surgeon can do
[12] the appropriate operation  Of course,
[13] there are various levels of anesthesiology
[14] but most anesthesiologists practice in the
[15] hospital setting and are going to be
[16] anesthetizing patients down to an
[17] anesthetic level that they can have a major
[18] operation without feeling pain, whatever
[19] modality is needed and whatever procedure
[20] is being done, the ability to stop the
[21] agents and revive the patient and allow him
[22] or her to recover, having had the
[23] operation

### Page 0060

[01] Q    Do you know who Sharon Haas is?
[02] A    Sharon Haas is a lady that works in
[03] the psychiatric claims unit at -- well  she
[04] did work at the psychiatric claims unit
[05] when I was there at Provident
[06] Q    I will represent to you that Sharon
[07] Haas of Provident is the claims personnel
[08] credited with the decision/action to
[09] terminate Dr Laucks' benefits  In her
[10] deposition in this case, she was asked the
[11] following question, and Counsel, I'm
[12] referring to page 196 of her deposition,
[13] which I have if you need to look at it
[14] She was asked the following question on
[15] page 196 beginning with line three  I'm
[16] going to read this to you and ask you
[17] whether you agree or disagree with her
[18] response  [Quote], "And my question was,
[19] would you agree that in determining whether
[20] Dr Laucks was disabled within that policy
[21] language, the key issue was whether or not
[22] he could safely use those drugs which are
[23] typically administered by

---

## DR. WILLIAM FEIST    [3-8-99]

### Page 0061

[01] anesthesiologists?" Answer, is, [quote],
[02] "The policy provision does not refer to
[03] safety as part of the standard  It talks
[04] about not being able to  And it was my
[05] determination that Dr Laucks was capable  "
[06] [End of quote]  My question is whether you
[07] agree or disagree with the answer that the
[08] policy provision does not refer to safety
[09] as part of the standard
[10]      MR McMONIGLE  Objection  You can
[11] answer
[12] A    Well, I think in the strict sense,
[13] it doesn t specifically say that, but from
[14] a common sense approach, if the man is
[15] impaired in using these medications, he
[16] can t safely practice anesthesiology  and,
[17] therefore, he can t fulfill the material
[18] and substantial duties of his occupation
[19] So to me, the safety is very important,
[20] very important to the practice of
[21] anesthesiologists  If he can t safely use
[22] the medications, he shouldn t be
[23] practicing

### Page 0062

[01] Q    Did you forward your written
[02] response, which we have identified as
[03] Exhibit Number One, did you forward that
[04] response to Mr Peace?
[05] A    Yes  My recollection was I just
[06] reviewed the file on that Thursday morning
[07] wrote this, and handed the entire file with
[08] this response back to Mr Peace
[09] Q    Do you recall whether you had any
[10] discussions with Mr Peace contemporaneous
[11] to providing him your written response?
[12] A    I can t specifically say about that
[13] particular incident, but, generally, when I
[14] reviewed a case like this on a one-on-one
[15] basis, I would take the case back to the
[16] claims adjuster and say  "This is what I
[17] think about the case ; and he or she could
[18] ask questions  My sense would be that we
[19] discussed it on October 12, 1995
[20] Q    Do you have any specific
[21] recollection of a conversation, if one was
[22] held?
[23] A    I'm not real clear, but I think I

### Page 0063

[01] probably did have a discussion with Mr
[02] Peace
[03] Q    You don't recall the specifics of
[04] that discussion?
[05] A    No, I don't, no more than what is
[06] included in this response
[07] Q    Do you recall, Dr Feist, whether
[08] you had any involvement with the Laucks'
[09] file subsequent to your written response of
[10] October 12, 1995?
[11] A    No, I have no recollection of any
[12] additional action on that file
[13] Q    Do you have any recollection of
[14] whether Dr Laucks' file was presented at a
[15] round-table meeting at which you were
[16] present?
[17] A    I have no recollection of that
[18] Q    Are you aware of the amount of
[19] monthly benefits which Dr Laucks was
[20] receiving?
[21] A    I think I saw that number, but I
[22] don t recall at this moment  I m thinking
[23] it was in the range of $4,000 to $5,000 a

### Page 0064

[01] month  Maybe around $10,000 or $11,000 a
[02] month, I think  I can t recall
[03] specifically but it was substantial
[04] Q    I'll represent to you, Dr Feist,
[05] that Dr Laucks' policy indicates his
[06] initial amount of benefits was $11,230 per
[07] month  Taking that to be true, is that
[08] amounts of monthly benefits on the higher
[09] end or lower end or middle of the range as
[10] far as files you reviewed?
[11]      MR McMONIGLE  Objection  You can
[12] answer
[13] A    My recollection is it was probably
[14] about mid range  Some of the files had
[15] $15,000 to $20,000 per month payouts
[16] Q    Dr Feist, what does the term "claim
[17] resolution" mean to you?
[18] A    Well, I think, "claim resolution"
[19] means that some final decision has been
[20] made  I think, generally, in the context
[21] of what we re speaking of, it would mean
[22] that the claim has been terminated or a
[23] decision was made to terminate the file  or

### Page 0065

[01] I suppose it could be there has been an out
[02] of court settlement  I suppose you could,
[03] in sort of a tenucy way, say it was
[04] decided he was disabled and continue paying
[05] indefinitely  I think in the context we
[06] are speaking of  it was some sort of
[07] resolution to get off the risk, so to
[08] speak
[09]      MR McMONIGLE  Could you read that
[10] back?
[11]      (Whereupon, at this time the last
[12] answer was read back by the court reporter
[13] at the request of counsel )
[14]      MR McMONIGLE  I would just move to
[15] strike that last answer as being
[16] nonresponsive
[17] Q    Dr Feist, once a decision has been
[18] made by Provident to terminate benefits,
[19] are you aware of Provident's policy, either
[20] written or unwritten, as to whether that
[21] decision and the reasons therefor should be
[22] documented in the claims file?
[23]      MR McMONIGLE  Objection  You can

### Page 0066

[01] answer
[02] A    I don't know specifically, but I
[03] think just from my training and experience
[04] and background in insurance, I think any
[05] decision has to be documented, take a case
[06] standard, take a case rated, decline a
[07] case, issue a case, it would have to be
[08] documented
[09]      MR McMONIGLE  Objection, move to
[10] strike, nonresponsive
[11] Q    Are you aware, Dr Feist, that
[12] Provident stopped issuing the
[13] own-occupation policies of the type which
[14] Dr Laucks had, providing for lifetime
[15] benefits and noncancelable, that Provident
[16] ceased offering those policies in November
[17] 1994?
[18]      MR McMONIGLE  Objection
[19] A    Yes, sir, I am
[20] Q    How did you become aware of that?
[21] A    Well, that was publicized by
[22] company-wide bulletins, that because of the
[23] liability of the own-oc noncancelable

### Page 0067

[01] disability policies, that Provident was
[02] going to stop selling those, and to go to a
[03] more limited income protection type policy
[04]   Q     When you say the "liability of these
[05] policies " what do you mean by that, and
[06] how did you become aware of that fact?
[07]   A    Well, I think the basic thing was
[08] the fall of '93 substantial write-off  It
[09] was pretty common knowledge that Provident
[10] had written many noncan policies for the
[11] prior twenty years, fifteen or twenty years
[12] prior to the time of question  And that
[13] was touted as the reason that they were
[14] having the substantial reserve problem,
[15] because of all of these policies, noncan
[16] policies were written
[17]   Q     I'm sorry, right at the end, you
[18] said what?
[19]   A    All of the noncan policies were
[20] written, made the liability  Basically,
[21] the decision was made to stop selling those
[22] policies, and go to an alternative form of
[23] disability insurance

### Page 0068

[01]   Q     What does "noncan" mean?
[02]   A    It means as long as the individual
[03] pays his or her premium, the insurance
[04] company cannot cancel that policy
[05]   Q     Were you aware of any directives
[06] from Provident management that existing
[07] claims under the own-occupation policies
[08] needed to be closed or resolved?
[09]       MR McMONIGLE  Objection, leading
[10]   A    Well, the memo that Ralph Mohney put
[11] out in the spring of '95 didn't
[12] specifically state that, but that was the
[13] implication  because of claims liability to
[14] enhance the personnel in the Claims
[15] Department and enhance the effort to put
[16] into that claims adjudication process
[17]   Q     when did Mr Chandler take over as
[18] president or CEO, whatever his title is, of
[19] Provident?
[20]   A    November 15, 1993
[21]   Q     Was there any change in your role at
[22] Provident when Mr Chandler took over?
[23]   A    No

### Page 0069

[01]   Q     Was there any change in claims
[02] handling procedures after November 15,
[03] 1993?
[04]   A    I think there were a number  I
[05] think the initial effort was -- the time
[06] frame escapes me -- but, probably, in  94,
[07] the decision was made to bring all the
[08] accident and property claims personnel and
[09] activities into the home office in
[10] Chattanooga, that prior to that time, were
[11] in the branch offices over the country, and
[12] the claims were evaluated and adjudicated
[13] in the geographical area in which they were
[14] made  So that effort was made to bring on
[15] these personnel into Chattanooga  That
[16] would have been probably mostly the year of
[17]  94  In the early part of '95, that was
[18] all accomplished, and then the round-table
[19] started out in the spring of  95  So I
[20] think bringing the claims activities into
[21] the home office in '94, and the
[22] round-tables in  95 would be the major
[23] changes that I saw

### Page 0070

[01]   Q     Dr Feist, what were the
[02] circumstances of your departure from
[03] Provident?
[04]   A    I retired from Provident in February
[05]  96, after being there for almost fourteen
[06] years  It was a multi-factorial reason for
[07] leaving  One, I was 55 and able to take
[08] retirement  Two  I felt like Ralph Mohney
[09] was dumping on me, for asking me to do the
[10] claims work with all my other duties, and
[11] three, I don t like the way Harold
[12] Chandler was running the company
[13]   Q     When you say you "didn t like the
[14] way Mr Chandler was running the company,"
[15] what do you mean?
[16]   A    Basically, he had taken a company
[17] that had tradition for treating the
[18] customer fairly, paying the claims when
[19] appropriate, a company that had executives
[20] that did not take salaries during the
[21] depression years so they wouldn't have to
[22] lay off employees, totally bottom line,
[23] whatever it took to make a buck, not the

### Page 0071

[01] least of which is seeing a number of top
[02] level executives been RIF'd out in the
[03] '93-'94 time frame, and with family
[04] support, I felt like I needed to make a
[05] move
[06]       MR SCHEFTER  I have no further
[07] questions at this time  Thank you, Dr
[08] Feist
[09]
[10] EXAMINATION BY MR  McMONIGLE
[11]   Q     Good afternoon, Dr  Feist
[12]   A    Hello
[13]   Q     We have not had the pleasure of
[14] meeting until today, I don't believe
[15]   A    That's correct
[16]   Q     Although you did meet a colleague of
[17] mine, Jason Gosselin, several months ago, I
[18] think
[19]   A    Right in this room, yes
[20]   Q     Right here
[21]   A    I hope his health is better today
[22] than it was that day
[23]   Q     He was fighting something

### Page 0072

[01]   A    He was sick
[02]   Q     And that case you testified in was
[03] in the case of Dr  Norman Knee versus
[04] Provident?
[05]   A    Yes, sir
[06]   Q     As I question you here today, I will
[07] ask you to wait until my question is done
[08] before you answer, and I'll try to wait
[09] until your answer is done before I followup
[10] with another question  That way,
[11] everything will read nice and clear, okay?
[12]   A    Okay
[13]   Q     I would ask you to verbalize, say
[14] "yes," say "no " rather than make a
[15] gesture, because that also makes for a
[16] better record, okay?
[17]   A    Okay
[18]   Q     You have testified at some length
[19] with respect to these round-tables or
[20] round-table discussions held at Provident
[21] from the spring of 1995 until you left in
[22] February 1996  is that correct?
[23]   A    That s correct, sir

DR. WILLIAM FEIST    [3-8-99]

## Page 0073

[01]    Q    Is it accurate to say that you have
[02]  absolutely no knowledge that Dr. Laucks'
[03]  claim ever submitted to one of these
[04]  round-table discussions, is that right?
[05]    A    That's my understanding
[06]    Q    And not every claim went to the
[07]  round-table, is that correct?
[08]    A    That's correct
[09]    Q    In terms of the percentages of
[10]  claims, only a small percentage of the
[11]  number of claims actually went to these
[12]  round-table discussions, is that right?
[13]        MR SCHEFTER  Objection, leading
[14]        MR McMONIGLE  Let me just note for
[15]  the record here, Bobby, because I recently
[16]  made the same objections  I will give you
[17]  a standing objection to a leading question,
[18]  because I believe, since you have named Dr
[19]  Feist as your witness, I am entitled to
[20]  lead because I am entitled to
[21]  cross-examine  So you can have a standing
[22]  objection for leading grounds  Although,
[23]  any other form type objections, I would ask

## Page 0074

[01]  you to make
[02]        MR SCHEFTER  Okay
[03]    Q    Maybe you remember what my question
[04]  was, but I forgot
[05]    A    The question was the number of
[06]  cases, as I understood it, the number of
[07]  cases presented at the round-table was
[08]  small in the panoply of cases
[09]    Q    Is that correct?
[10]    A    To my understanding, that's correct
[11]    Q    The entire discussion that you had
[12]  earlier this morning concerning the
[13]  round-tables at Provident may, in fact,
[14]  have nothing to do with Dr Laucks' claim,
[15]  is that correct?
[16]    A    Yes, sir
[17]    Q    You had indicated that you became
[18]  involved in claims for a significant
[19]  portion of your time after the spring of
[20]  1995, is that right?
[21]    A    That's correct
[22]    Q    Before that your chief duties were
[23]  underwriting duties, is that correct?

## Page 0075

[01]    A    Underwriting duties, administrative
[02]  duties, and some employee health duties,
[03]  yes, sir
[04]    Q    In the infirmary, is that correct?
[05]    A    That's correct
[06]    Q    And underwriting is different than
[07]  claims, is that correct?
[08]    A    In a strict sense, yes, sir
[09]    Q    In the context of the organization
[10]  of Provident?
[11]    A    Well, underwriting is up front, and
[12]  claims is on the back end  I mean, it's
[13]  the same case that is being looked at
[14]    Q    Well, let me follow up there  The
[15]  underwriting usually focuses on the
[16]  person's health prior to a policy being
[17]  issued, is that correct?
[18]    A    That's correct
[19]    Q    And that could be a totally
[20]  different thing than looking at a claim
[21]  filed by a person, many years after the
[22]  policy is issued, correct?
[23]    A    Well, again, it's in the spectrum of

## Page 0076

[01]  insurance medicine training and experience
[02]  and evaluation  In underwriting  you are
[03]  evaluating the medical impairment for risk
[04]  to the company  In claims, you are
[05]  evaluating the risk to the company in terms
[06]  of current disability, in the disability
[07]  mode
[08]    Q    When you were, I think, the
[09]  corporate medical director of Provident,
[10]  there was another medical director with
[11]  respect to the claims side, is that right?
[12]    A.   That's correct
[13]    Q    And that was not you?
[14]    A    That is correct
[15]    Q    Who was that?  Was that Dr
[16]  O'Connell?
[17]    A    Dr Fred O Connell, O-C-o-n-n-e-l-l,
[18]  Fred H
[19]    Q    Let me ask you this  I thought you
[20]  said that from 1982 to 1990, about
[21]  one-fourth of your time was spent doing
[22]  claims work  Is that what you testified to
[23]  earlier today?

## Page 0077

[01]    A    Well, we're talking different
[02]  structures, sir  In the 1982 to 1990
[03]  frame, there were three physicians for the
[04]  entire Provident corporation nationwide
[05]  The three of us all did, pretty much, the
[06]  same thing  We did underwriting, we did
[07]  claims, we did, you know, everything  And
[08]  it was sort of like the secretary would
[09]  come in with a stack of underwriting files,
[10]  she would go one, two, three, one, two,
[11]  three, claims the same way  So it was sort
[12]  of potpourri, I guess, luck of the draw
[13]  what you got
[14]    Q    Notwithstanding that luck of the
[15]  draw, would you agree with me, sir, that
[16]  only a minimal amount of your time was
[17]  spent handling claims in that period?
[18]    A    Well, I'm not sure what you mean by
[19]  minimal  But I would say it probably would
[20]  have been a third of my time during that
[21]  time frame  Three physicians were all
[22]  doing the same thing  so a hundred divided
[23]  by three is a third

## Page 0078

[01]    Q    So it's your testimony that during
[02]  that time period, a third of your time was
[03]  spent handling claims?
[04]    A    Roughly  It has been almost fifteen
[05]  years ago, but that's my recollection at
[06]  this moment
[07]    Q    But if you said earlier today that a
[08]  fourth, or twenty-five percent of your time
[09]  was spent doing claims, are you now upping
[10]  that percentage somewhat?
[11]    A    Well, I would say it's in the same
[12]  ballpark  Make your own conclusion, but,
[13]  to me, a third and a fourth is a pretty
[14]  good recollection for fifteen years ago,
[15]  upwards of fifteen years ago
[16]    Q    Do you remember testifying that
[17]  prior to the spring of 1995, you had,
[18]  [quote], "very minimal," [end quote],
[19]  contact with claims?
[20]    A    That's correct  There was a hiatus
[21]  between 1990 and 1995, where I had very
[22]  little contact other than professionally
[23]  with Dr League who preceded Dr  O'Connell

## Page 0079

[01] in that role
[02] Q    So for about what?
[03] A    Five years
[04] Q    For about five years from 1990 to
[05] 1995, you handled almost no claims at all
[06] is that true?
[07] A    That would be my recollection, yes,
[08] sir
[09] Q    You had gotten a letter from Mr
[10] Schefter dated February 11, 1999, thanking
[11] you for the opportunity to speak with him
[12] and introducing you to this case, is that
[13] right?
[14] A    That s correct; yes, sir
[15] Q    I take it, you had spoken with
[16] either Mr Schefter or Mr Griffiths prior
[17] to your getting this letter?
[18] A    My recollection is that Mr. Schefter
[19] called me maybe a week or two or three, I'm
[20] not sure, about the Dr Laucks case, asking
[21] me if I would be willing to testify in the
[22] situation  And my recollection is this
[23] letter is a followup to that phone

## Page 0080

[01] conversation  I have not talked with Mr.
[02] Griffiths about any of this
[03] Q    Ever?
[04] A    No  I have not talked with Mr
[05] Griffiths about it at all
[06] Q    So all of your conversations have
[07] been with Mr Schefter?
[08] A    Yes, sir
[09] Q    Have you had any conversations with
[10] Dr Laucks?
[11] A    No  I have never talked with Dr
[12] Laucks
[13] Q    How long was that initial
[14] conversation with Mr Schefter?
[15] A    Five or ten minutes, I suppose  He
[16] just briefly outlined the case and asked me
[17] if I would be willing to testify in it, and
[18] I said I would be willing to testify
[19] Q    And Mr Schefter also indicated to
[20] you what he and Mr Griffiths thought about
[21] the case, did they not?
[22] A    I m not sure what you mean about
[23] 'what they thought about it'; but, I mean,

## Page 0081

[01] he explained the situation, and there was
[02] litigation going on between Provident and
[03] Dr Laucks
[04] Q    Specifically, down at the bottom of
[05] page one, he writes, I'll read it, and then
[06] I will turn it around to you  I apologize
[07] I don't have an extra copy  "We believe
[08] that the decision to terminate the benefits
[09] of Dr Laucks was a business decision
[10] rather than one on the merits  Based upon
[11] the financial losses Provident was
[12] suffering due to these own-occupation
[13] disability income policies "  That is what
[14] Mr Schefter wrote to you, correct?
[15] A    This is correct, yes, sir
[16] Q    And he used the word "we" meaning
[17] either he or Mr Griffiths or, perhaps, he
[18] and Dr Laucks?  You don't necessarily know
[19] who the "we" is?
[20] A    I haven't any clue who the 'we' is
[21] in that
[22] Q    But he told you, before he had
[23] actually sent all of these materials down

## Page 0082

[01] to you for your review, what his thoughts
[02] were concerning this particular claim,
[03] isn't that right?
[04] A    I think that is true, yes, sir
[05] Q    And then he also indicated that any
[06] particulars that you might recall
[07] concerning these practices, in general or
[08] specifically relating to Dr Laucks, would
[09] be helpful, correct?
[10] A    Yes  That s what the letter states
[11] Q    So before you even had a chance to
[12] review this file, you were aware that, at
[13] least that Mr Schefter felt that Provident
[14] had made an inappropriate decision based on
[15] business, rather than the merits of the
[16] claim, is that right?
[17] A    Yes, sir, that's correct
[18] Q    Had you expressed any views to him
[19] over the telephone before the materials
[20] were even submitted to you, that you might
[21] agree with that scenario?
[22] A    My recollection was I said I would
[23] be happy to review the files that you send

## Page 0083

[01] to me, and then we ll get back in touch and
[02] talk about it
[03] Q    Now, Mr Schefter also indicated on
[04] page two of his letter, that Provident's
[05] counsel may very well attempt to contact
[06] you in the near future concerning your
[07] deposition, and he also suggested that you,
[08] Dr. Feist, would have no obligation to
[09] speak to counsel for Provident, and "We
[10] would simply request that you do not meet
[11] or discuss this case with them without us
[12] being present", is that correct?
[13] A    That is correct, sir
[14] Q    So he was basically, telling you
[15] that you would not have to speak to counsel
[16] for Provident, should counsel call, is that
[17] correct?
[18] A    Well, that s true  The implication
[19] is that since I no longer work for
[20] Provident, I had no obligation to discuss
[21] the case before this deposition with any
[22] Provident attorney or representative
[23] thereof

## Page 0084

[01] Q    And you haven't talked about this
[02] case with any Provident attorney or any
[03] representative thereof, is that right?
[04] A    No, sir, I have not
[05] Q    What plaintiff's counsel was saying
[06] to you was that if you were thinking about
[07] doing that, please call them first, so they
[08] could be there, is that right?
[09] A    Say that again  I'm sorry
[10] Q    What he was saying was that, "We
[11] would simply request that you do not meet
[12] or discuss this case with Provident's
[13] counsel without us being present "  That
[14] was a request that they made?
[15] A    Well, I think that was just a legal
[16] request, so that he knows what Provident s
[17] attorneys or representatives said  I think
[18] that is a fairly straightforward request,
[19] as far as my interpretation
[20] Q    And was that request acceptable to
[21] you?
[22] A    Yes, sir
[23] Q    You don't have any physician-patient

Case 1:01-cv-01137-CCC    Document 76    Filed 11/25/2002    Page 17 of 98

## DR. WILLIAM FEIST    [3-8-99]

### Page 0085

[01] relationship with Dr Laucks, do you?
[02] A    No I have never met the man nor
[03] talked with him
[04] Q    Do you have any idea why it is that
[05] plaintiff's counsel would want to be here
[06] the need, but it Mr Gosselin felt so, I
[06] if you were to talk with somebody from
[07] Provident?
[08]    MR SCHEFTER  Objection, calls for
[09] speculation
[10] A    Well, I think any good attorney
[11] would want to know what his witness, or his
[12] person he is going to depose is going to
[13] say
[14] Q    The fact of the matter, you used the
[15] expression "his witness " Is it fair to
[16] say that you actually view yourself as Dr
[17] Laucks' witness in this case, isn't that
[18] right?
[19] A    I think you would have to say that
[20] yes, sir
[21] Q    Did you, in fact, meet with Mr
[22] Schefter prior to your testimony?
[23] A    Yes, I did, this morning

### Page 0086

[01] Q    About how long was that?
[02] A    I got here about a quarter until
[03] 9 00  We talked probably for I guess,
[04] forty, forty-five minutes, something like
[05] that
[06] Q    Did you have any other phone
[07] conversations with Mr Schefter between
[08] today and that first conversation that you
[09] had with him?
[10] A    He called me last Friday  The
[11] deposition was scheduled for 10 00, and ne
[12] asked to meet with me prior to the
[13] deposition  That was last Friday  and I
[14] agreed to do that
[15] Q    Now, you had indicated that you had
[16] also testified on behalf of a claimant in
[17] the Norman Knee versus Provident case, is
[18] that right?
[19] A    That s correct  yes  sir
[20] Q    And before that case, you had spoken
[21] with Dr  Knee's counsel, Andrew Miller, on
[22] several occasions  is that right?
[23] A    That s correct

### Page 0087

[01] Q    Plus, you met with him before his
[02] deposition, is that correct?
[03] A    I m not sure about that  I don't
[04] recall, at this date, whether I met with
[05] Mr Miller before  My recollection is that
[06] we didn t  but it has been almost eighteen
[07] months ago since that happened
[08] Q    Do you remember that Jason Gosselin,
[09] the attorney for Provident  had wanted to
[10] meet with you before Dr  Knee's deposition?
[11] A    Yes
[12]    MR SCHEFTER  Objection, relavancy
[13] A    And I agreed to, sir, and he got
[14] sick and couldn't make it
[15] Q    Well, is it fact, Doctor, that you
[16] actually indicated that you were actually
[17] quite uncomfortable with meeting with Jason
[18] Gosselin?
[19] A    I was uncomfortable  but I agreed to
[20] do it  We were going to meet at the
[21] Tutwiler Hotel before the deposition, and
[22] then he became ill, and literally got off
[23] of his bed to come here, and that didn't

### Page 0088

[01] come off
[02] Q    And you really didn't think a
[03] meeting with Provident's counsel was
[04] necessary in that case, is that correct?
[05] A    That s correct  I didn t see
[06] the need, but it Mr Gosselin felt so, I
[07] was willing to do it
[08] Q    Are you getting paid in connection
[09] with your review of the Dr Laucks file
[10] materials in this case?
[11] A    No, sir, I m not
[12] Q    Are you getting paid in connection
[13] with the time you have spent testifying
[14] today?
[15] A    No, sir, I m not
[16] Q    As a courtesy, I just ask you to
[17] wait until my question is done  Even
[18] though you may know what I'm asking, and I
[19] only do that because the record is easier
[20] to read
[21] A    I understand  She has to record all
[22] of this
[23] Q    Basically, the service that you are

### Page 0089

[01] rendering here, you are rendering free of
[02] charge to Dr Laucks, is that right?
[03] A    That is correct  sir  I would view
[04] it as a professional courtesy, hoping that
[05] if I were in a similar situation, that
[06] another physician would do the same for me
[07] Q    Are you presently working full-time
[08] at Protective?
[09] A    Yes, sir
[10] Q    How do they define full-time there,
[11] thirty, forty, fifty?
[12] A    About fifty-five to sixty hours a
[13] week
[14] Q    I guess that's typical full time
[15] hours in America today?
[16] A    Yes, sir, that's about where they
[17] are.
[18] Q    Do you have family in the area,
[19] other things that you do outside of working
[20] for Protective?
[21] A    I have three children  My daughter
[22] lives in Birmingham, a son in Montana, and
[23] a son and daughter-in-law in Atlanta  yes,

### Page 0090

[01] sir
[02] Q    Would it be fair to say you consider
[03] yourself a pretty busy person?
[04] A    I would say so  yes
[05] Q    But despite the busy schedule that
[06] you have, both work-wise and family-wise,
[07] you are willing to spend the better portion
[08] of a day here on behalf of Dr  Laucks
[09] testifying against Provident, is that
[10] right?
[11] A    That s correct, sir
[12] Q    Now, you have become involved in
[13] other cases where a physician has a pending
[14] claim against Provident  is that correct?
[15]    MR SCHEFTER  Objection
[16] A    This is correct
[17]    MR SCHEFTER  If you are going to
[18] ask specifically about other cases that are
[19] pending  we're going to need to discuss
[20] that  I would probably instruct the
[21] witness not to answer without other counsel
[22] being present
[23]    MR McMONIGLE  Why don't we see

**Page 0091**

[01] where it goes? I don't know whether you
[02] really can instruct him not to answer, to
[03] be honest with you, unless you represent
[04] him, which perhaps you do Why don't we
[05] see where we go here, and if there comes
[06] into any confidentiality issues or
[07] something, we can put this deposition in
[08] such a way as to not compromise any
[09] particular claimants, if that's what you
[10] are thinking of
[11]      MR SCHEFTER  Yes  I would
[12] respectfully disagree with your position
[13] that I can't instruct the witness not to
[14] answer  And if you ask him about specific
[15] other claims that are pending, we'll see
[16] where it goes, but I anticipate that I
[17] would instruct him not to answer, just as a
[18] matter of you noticed the deposition for
[19] the Dr Laucks case and the Laucks case
[20] only  So it's fairly simple and standard
[21]  Q     I think you had already indicated
[22] that you had become involved and testified
[23] on behalf of Dr Norman Knee  is that

**Page 0092**

[01] correct?
[02]  A     That's correct, yes, sir
[03]  Q     There was also a Dr Thompson, is
[04] that correct?
[05]  A     Dr Lynn Thompson  yes, sir
[06]  Q     There was also a Dr Wallace, is
[07] that correct?
[08]  A     Joe Wallace, yes, sir
[09]  Q     There was also a Dr Walker?
[10]  A     It's actually, I think it's Philip
[11] Walker, but he's not a physician
[12]  Q     What is Mr Walker?
[13]  A     It's a psychiatric claim
[14]  Q     Do you know what he does by way of
[15] occupation?
[16]  A     He was a business person when he was
[17] working
[18]  Q     Then, of course, there's Dr Laucks
[19] Are there any other physicians where you
[20] have made contact with the physician's
[21] attorneys and agreed to testify against
[22] Provident on behalf of the physician?
[23]      MR SCHEFTER  Objection

**Page 0093**

[01]  Q     You can answer
[02]      MR SCHEFTER  No, I don't think so
[03] I'm going to instruct him not to answer, if
[04] you are asking for specific names or just
[05] if he is involved with other cases pending
[06]      MR McMONIGLE  I just gave him some
[07] names, but there may be some that I don't
[08] know, and that is why I'm asking here  I
[09] just don't understand the basis of your
[10] instructing the doctor not to answer, only
[11] because I don't think you are his lawyer
[12]  I think you are Dr Laucks' lawyer
[13]  A     No other physician cases going
[14]  Q     Dr Wallace and Dr Thompson, they
[15] were in Austin, Texas, is that correct?
[16]  A     I think one is actually in Austin
[17] and one is in Dallas, but in Texas
[18]  Q     Lone Star Republic and all that?
[19]  A     Oh, yes, that sort of thing
[20]  Q     Dr Knee, of course  was
[21] Philadelphia, PA  I was involved in that
[22] case, so I'm familiar with that one  Mr
[23] Walker, where was his case?

**Page 0094**

[01]  A     He is in California
[02]  Q     You actually did an affidavit in
[03] that case, did you not, and submitted it to
[04] the plaintiff's counsel?
[05]  A     Yes, I did
[06]  Q     By the way, your services that you
[07] have rendered to Dr Knee, Dr Thompson,
[08] and Dr Wallace, and Mr Walker, were they
[09] also rendered free of charge?
[10]  A     Yes  sir
[11]  Q     Would it be fair to say that you
[12] believe that Provident has given some
[13] doctors a, [quote], "raw deal," [end
[14] quote], in connection with the handling of
[15] their claims?
[16]  A     I don't know that I would use that
[17] exact terminology, but I would say yes,
[18] sir
[19]  Q     Do you recall using that terminology
[20] in the transcript of your deposition in the
[21] case of Joe Wallace and Lynn Thompson?
[22]      MR SCHEFTER  I'm going to object
[23] to Counsel's use of the deposition from

**Page 0095**

[01] that case  Specifically, we had requested
[02] copies of that transcript in that case, and
[03] we were denied receiving copies of that
[04] transcript due to a court order
[05] confidentiality order, and, thus, we are
[06] not able to obtain it  Therefore, I object
[07] to you referring to that deposition in this
[08] case, due to that confidentiality order
[09] in that court  And if you persist in using
[10] it, obviously I can't stop you, but I
[11] should inform you that we may let that
[12] court know that you have that transcript,
[13] when we were not able to obtain it
[14]      MR McMONIGLE  On the record here
[15] was I aware that you tried to get that in
[16] that case, or is that something that just
[17] you and Rees did?
[18]      MR SCHEFTER  We didn't request it
[19] through you, so I would say you were not
[20] aware that we requested it
[21]      MR McMONIGLE  I'm just trying to
[22] understand  Did you go through counsel
[23] and counsel said he couldn't give it to

**Page 0096**

[01] you?
[02]      MR SCHEFTER  Yes  I'm just
[03] putting that on the record
[04]      MR McMONIGLE  Okay
[05]  Q     Doctor, let me just refresh your
[06] memory, and I'll show Mr Schefter, as
[07] well, to page 167 of your deposition in the
[08] Thompson and Wallace case  You will just
[09] see where I highlighted and where I am
[10] pointing
[11]  A     This is my testimony  But let me
[12] add that the attorney whose name --
[13]  Q     Davenport
[14]  A     Davenport  He used that
[15] terminology, and I said, "If you are going
[16] to use that terminology, I agree with it "
[17]  Q     So give me one second here
[18]  A     I have to, obviously, concur with my
[19] testimony in that case, as you have it
[20] printed there in front of you
[21]      MR SCHEFTER  Counsel, will you
[22] specifically identify for the record what
[23] you are referring to? Are you going to

## DR. WILLIAM FEIST    [3-8-99]

### Page 0097

[01] make that part of an exhibit in this case?
[02]     MR McMONIGLE  The whole
[03] deposition?
[04]     MR SCHEFTER  Yes
[05]     MR McMONIGLE  I probably will not
[06]     MR SCHEFTER  Are you going to make
[07] the excerpts that you are referring to?
[08]     MR McMONIGLE  I think the doctor
[09] is going to give us the excerpt right now
[10]  Q    I just want to followup here  What
[11] you were looking at, Doctor, was your
[12] testimony where you indicated essentially
[13] that the medical professionals Dr  Knee,
[14] Dr  Thompson, and Dr  Wallace were getting
[15] a raw deal  The words "raw deal" was used,
[16] is that right?
[17]  A    That's correct
[18]  Q    And I know the print is a little
[19] small, but that is in the answer section
[20] So that is your testimony, as opposed to
[21] Mr  Davenport's question, correct?
[22]  A    This is correct, yes
[23]  Q    I just might have missed something,

### Page 0098

[01] but did you say Mr  Davenport used those
[02] words, "raw deal"?
[03]  A    Yes  he did  For the record, I told
[04] him, it is in there someplace,  Mr
[05] Davenport, you used that term  I didn t use
[06] it  But I agree with it "
[07]  Q    Okay  That's probably all that is
[08] important
[09]     MR SCHEFTER  Counsel, can you
[10] identify for the record, as I asked
[11] previously, specifically what that document
[12] is that you are referring to?
[13]     MR McMONIGLE  Fair enough  This
[14] is the deposition of Dr  William Feist
[15] taken on the 25th day of January, 1999 in a
[16] case in the United States District Court
[17] for the Western District of Texas, Austin
[18] Division, Dr  Lynn E  Thompson versus
[19] Provident Life and Accident Insurance
[20] Company and Joe L  Wallace versus
[21] Provident Life and Accident Insurance
[22] Company
[23]     MR SCHEFTER  Thank you

### Page 0099

[01]  Q    Would it be accurate to say, Doctor,
[02] that any time an attorney representing a
[03] doctor were to ask you to be a witness for
[04] that doctor in a lawsuit against Provident,
[05] you would agree to testify?
[06]  A    I would, yes, sir
[07]  Q    Would you describe yourself as
[08] something of a crusader on behalf of
[09] doctors who go into litigation against
[10] Provident?
[11]     MR SCHEFTER  Objection to the
[12] form  You can answer
[13]  A    I suppose it depends upon one's
[14] definition of "crusader", but my motivation
[15] is to help healthcare professionals in
[16] general, and folks in particular, who
[17] perhaps have not had a fair shake from
[18] Provident
[19]  Q    If I could turn to Dr  Laucks' claim
[20] momentarily and specifically Feist Exhibit
[21] One, which is your notation to Tim Peace,
[22] do you have that in front of you, sir?
[23]  A    I do now; yes, sir

### Page 0100

[01]  Q    Now, you indicated here that,
[02] [quote], "I think we need an independent
[03] medical exam from an addictionologist,"
[04] [end quote], is that correct?
[05]  A    That s correct
[06]  Q    And this was authored by you on
[07] October 12, 1995?
[08]  A    That s correct
[09]  Q    And the "we" that you are talking
[10] about there is Provident  is that correct?
[11]  A    Yes, sir
[12]  Q    But this is your recommendation to
[13] Tim Peace, is that right?
[14]  A    Yes, sir
[15]  Q    And you made that recommendation
[16] because you really believed it, is that
[17] right?
[18]  A    Yes, of course
[19]  Q    I mean, you didn't make this
[20] recommendation because Ralph Mohney or
[21] somebody else from Provident told you to do
[22] it, correct?
[23]  A    That s correct  My role as a

### Page 0101

[01] medical consultant was to evaluate the
[02] information, and make my best guess on what
[03] we should do in light of the case and the
[04] question asked by the claims adjuster
[05] That was my best guess of what we should do
[06] for Dr  Laucks at that moment in time
[07]  Q    Would it be fair to say that at this
[08] moment in time, October 1995, you, Dr
[09] Feist, felt that it was appropriate for
[10] Provident to seek the opinion of an
[11] independent third party with some
[12] qualifications in the addiction field?
[13]     MR SCHEFTER  Objection to the
[14] form
[15]  A    Yes, sir
[16]  Q    If Provident submitted the file
[17] materials to a Ph D  in psychiatry, a
[18] director of dual disorder and chemical
[19] dependency program, and a former member of
[20] the Department of Psychiatry Addiction
[21] Services, would that be the kind of person
[22] that you had in mind when you recommended
[23] an addictionologist?

### Page 0102

[01]     MR SCHEFTER  Objection to the
[02] form  You can answer
[03]  A.   Yes  sir, I think they would be
[04] qualified to do so  yes
[05]  Q    If Provident submitted the file
[06] materials to a board certified M D ,
[07] someone who was the head of the Center for
[08] Chemical Dependency at Johns Hopkins
[09] Medical Center in Baltimore, would that be
[10] the kind of person that you think this
[11] claim could rightly be submitted to?
[12]     MR SCHEFTER  Objection to the
[13] form
[14]  A.   Certainly
[15]  Q    Now, you testified on direct
[16] examination, at least I thought you did,
[17] that in your view, in evaluating a claim,
[18] Provident has a three to six-month window
[19] to make a final determination regarding
[20] that claim, is that right?
[21]  A    That s correct
[22]  Q    Would you agree with me, sir, that
[23] there is nothing in the Provident policy

## Page 0103

[01] that sets forth this three to six-month
[02] window to make a final decision?
[03] A    Well, obviously, it is not stated,
[04] but from a practical matter, a three to
[05] six-month time frame, to me, is enough time
[06] to gather the necessary information and to
[07] make that decision
[08] Q    Is it your belief that once a
[09] decision is made by Provident  then it's a
[10] final decision?
[11] A    I think once a decision is made
[12] based on the best available information,
[13] that should be the decision, prior to any
[14] change in medical condition of that
[15] claimant
[16] Q    And you believe that in almost every
[17] case, that decision can be made in three to
[18] six months, is that right?
[19] A    Yes, sir, I do
[20] Q    But you will agree that that is
[21] something that you conclude, as a practical
[22] matter, because that is not written in the
[23] policy  isn't that correct?

## Page 0104

[01] A    No, it's a very practical matter,
[02] and some states even mandate that this is
[03] adjudicated in that time frame
[04] Q    Do you view Provident's policies
[05] such as the one Dr Laucks had, as a
[06] monthly indemnity policy?
[07] A    Define what you mean by a  monthly
[08] indemnity policy
[09] Q    Fair question  Do you view it as
[10] one where it is the burden on the claimant
[11] to submit to Provident, on a monthly basis,
[12] the proofs of his or her disability and the
[13] fact that he or she is seeing the
[14] appropriate physician?
[15] A    Yes, I think that is fine
[16] Q    Is it your view that after three to
[17] six months, the policy is no longer a
[18] monthly type of policy?
[19] A    No  I didn't say that  I think the
[20] proof of disability needs to be an ongoing
[21] thing  Whether it's thirty days or sixty
[22] days or six months is not that important
[23] But as long as the disability remains

## Page 0105

[01] permanent and unchanged, there should be no
[02] change in the decision on that disability
[03] In other words, if an individual is
[04] adjudicated as disabled after that initial
[05] time frame, and there is no demonstrable
[06] change in that person's medical disability,
[07] he or she should be disabled indefinitely
[08] Q    And that's how you believe the
[09] Provident policy should be applied, is that
[10] correct?
[11] A    Yes, sir, I do, very strongly
[12] Q    And that is not something that you
[13] have arrived at since you have left
[14] Provident  but this is something you felt
[15] at that time, correct?
[16] A    That's the way the policies were
[17] sold, as  Back in the 1980's, that's the
[18] way policies were sold to professional
[19] people  physicians, lawyers, executive
[20] business persons  This is a policy that
[21] will pay for your disability if you become
[22] disabled  Your own oc,  If you can't do
[23] the material and substantial duties of your

## Page 0106

[01] occupation, Provident will pay you
[02] That's the way they were sold all over the
[03] country
[04] Q    I understand that, Doctor
[05]     MR SCHEFTER  Please let the
[06] witness answer
[07] A    They were sold that way, I mean that
[08] was the way they were sold  Dr Laucks or
[09] anybody else who bought that policy in that
[10] time frame, to me, should be expected to
[11] receive his disability payments if he
[12] becomes disabled
[13] Q    Are you finished?
[14] A    I'm finished  Thank you
[15] Q    I'll object, and move to strike as
[16] nonresponsive  My question was, sir, is it
[17] your testimony that these policies were
[18] sold with the representation to the
[19] policyholder that Provident would make a
[20] decision within three to six months
[21] concerning the permanency of the
[22] disability?
[23] A    That wasn't in the contract

## Page 0107

[01] language, that is seems to me that in the
[02] concept of disability income policies, that
[03] decision has got to be made within a
[04] certain time frame  You know, I'm not
[05] saying it has got to be three to six
[06] months  It could be a year  But once that
[07] initial decision is made, that should be
[08] firm until there is some demonstrable
[09] change in that person's condition
[10] Q    Respectfully, Doctor, you did say it
[11] was three to six months, so are you saying
[12] it's not three to six months?
[13] A    Well, I'm just saying three to six
[14] months is a reasonable average  My point
[15] is, whether it's three to six months or
[16] nine months or twelve months  whatever it
[17] takes to make that initial determination
[18] once that determination is made of
[19] disability or not disability  to me  there
[20] should be no going back and looking at it,
[21] unless there has been -- granted, there are
[22] people who have new operations, they get
[23] well from conditions that they previously

## Page 0108

[01] didn't get well  Unless something like
[02] that happens, to me, once that decision has
[03] been made, it should be made and fixed
[04] Q    Would you agree with me, Doctor,
[05] that there is nothing you can point to in
[06] the Provident policy that says there is
[07] this three to six-month window that you
[08] have testified about?
[09]     MR SCHEFTER  Objection  asked and
[10] answered
[11] A    That's correct  No insurance policy
[12] says that, I mean, not any policy  Your
[13] life insurance policy, your property and
[14] casualty, they don't say that
[15] Q    Would you agree with me that there
[16] is no written specimen policy or handout,
[17] or something in the Provident Claims
[18] Department that sets forth this three to
[19] six-month window that Dr Feist is setting
[20] forth?
[21] A    Well, I think in any efficiently run
[22] disability claims operation, a three to
[23] six-month window is kind of the standard

DR. WILLIAM FEIST   (3-8-99)

**Page 0109**

[01] You have got to get these things out and
[02] settled
[03] Q    Here is my question to you, sir
[04] Are you saying there is, that you remember,
[05] or there is not, that you remember, a
[06] written document in the Provident Claim
[07] Department setting forth this three to
[08] six-month window that you discussed?
[09] A    There is no written document,
[10] obviously
[11] Q    I know you spent specific time in
[12] underwriting   Is there any written
[13] document in underwriting that sets forth
[14] this three to six-month window?
[15] A    Well, in underwriting, you get the
[16] case out as quickly as possible   Once you
[17] have got all the data together, you get it
[18] out.
[19] Q    My question to you, was there
[20] anything in underwriting that you saw by
[21] way of writing that talked about the claims
[22] process, and that there was this three to
[23] six-month window?

**Page 0110**

[01] A    No, obviously not
[02] Q    This particular exhibit here, Feist
[03] Exhibit One, you authored this on October
[04] 12, 1995, is that correct?
[05] A    That's correct, yes, sir
[06] Q    Would you accept my word on this,
[07] Doctor, that Dr Laucks submitted his claim
[08] to Provident in June of 1994?
[09] MR SCHEFTER   Objection to the
[10] form
[11] A    Well, you, obviously, have the claim
[12] form in front of you, and that, from my
[13] review of the file, would be about the
[14] right time frame   So my answer is yes,
[15] obviously
[16] Q    Let me show you the original notice
[17] of claim form, which is page C19 of the
[18] claim file in this case
[19] A    It is dated May 5, 1994, it looks
[20] like
[21] Q    It looks to me like it was received
[22] June 2, 1994
[23] A    That's correct

**Page 0111**

[01] Q    My point is that is
[02] approximately sixteen months before your
[03] recommendation that an independent medical
[04] exam with an addictionologist be done   is
[05] that correct?
[06] A    It would probably add up to fourteen
[07] months
[08] Q    You may be better than me   I went
[09] June to June as being twelve months, and
[10] then July, August, September, October as
[11] being another four
[12] A    Okay
[13] Q    Will you accept sixteen months?
[14] A    I will accept sixteen months
[15] Q    Now   during the period of time after
[16] the elimination period, Dr Laucks was
[17] being paid by Provident his monthly
[18] benefits, isn't that correct?
[19] A    My understanding was it was under
[20] reservation of rights   but the answer is
[21] correct, yes
[22] Q    Do you really know how long that
[23] reservation of rights lasted?

**Page 0112**

[01] A    No, I don't
[02] Q    If I told you the reservation of
[03] rights was no longer placed on the benefit
[04] checks after three or four months, would
[05] you accept that?
[06] A    You obviously have the data
[07] Surely
[08] Q    As a general rule, from an insurance
[09] claims perspective, there is nothing wrong
[10] with an insurance company, in general
[11] requesting an independent medical exam, is
[12] that right?
[13] A    Oh, that is a time honored tradition
[14] in the industry
[15] Q    In fact, the policy expressly gives
[16] Provident the right to have an IME as often
[17] as reasonably required, is that right?
[18] A    That's correct
[19] Q    You felt it was appropriate for
[20] Provident to secure this independent third
[21] party opinion, even though it was sixteen
[22] months after Dr Laucks submitted his
[23] claim, isn't that correct?

**Page 0113**

[01] A    Well that's correct   But I think
[02] there was some concern at that point   I m
[03] not speaking from a clear recollection
[04] But I think the concern in October of '95
[05] was that Provident was going to try to
[06] rescind this man s claim   terminate his
[07] claim, therefore, they wanted to get some
[08] more information   I think my point was
[09] "Okay, if you want to try to discontinue
[10] this claim, at least give Dr Laucks the
[11] credit or the opportunity to have an
[12] addictionologist evaluate him, to see if he
[13] is or not able to work "
[14] Q    But you were free, were you not, in
[15] October 1995 to reject any suggestion for
[16] an independent medical exam, correct?
[17] A    I'm not sure that 'reject ' is the
[18] word, but I could have said, "No, I don t
[19] think one is needed "  Again, it's up to
[20] the claims administration people to make
[21] that call
[22] Q    Well, I just want to be clear here
[23] You made this recommendation on Feist One

**Page 0114**

[01] to Tim Peace, correct?
[02] A    That s correct
[03] Q    This wasn't Ralph Mohney twisting
[04] your arm to say this, correct?
[05] A    Well, that s true, obviously
[06] Q    So it's Dr William Feist who is
[07] deciding sixteen months after Dr Laucks
[08] submitted his claim to have him looked at
[09] by an independent third party, correct?
[10] A    That's correct
[11] Q    And I just point that out to you to
[12] see if you will reconsider your testimony
[13] about this window of three to six months,
[14] which you believe applies to claims,
[15] including Dr Laucks' claims
[16] A    I think you misunderstood me   I
[17] think the initial three to six months is
[18] the initial evaluation   Subsequent to
[19] that, if there has been a change in the
[20] individual s medical condition, then you go
[21] back and look at it   My sense is,
[22] obviously, three years after the fact   is
[23] that there was some thought by some of the

DR  WILLIAM FEIST    [3-8-99]

## Page 0115

[01] claims personnel working the file, I m not
[02] sure about Tim Peace, is that Dr  Laucks
[03] has recovered  He can go back to
[04] anesthesiology  I said, "Okay  Well, it's
[05] going to be tough to get him back in
[06] anesthesiology  so let s have an
[07] addictionologist look at him and go from
[08] there "
[09] Q      Do you have the claim file with you,
[10] or the materials that were submitted?
[11] A      I ve got them right back here
[12] Q      Does yours have the little numbers
[13] down in the lower right-hand corner?  I,
[14] sort of, assume they do
[15] A      It looks like they do  yes
[16] Q      If you would take a look at page C69
[17] and C70, I guess
[18] A      I m not sure that I have that  My
[19] numbers go from C60 to C63  So unless they
[20] are here and are not numbered --
[21] Q      If you take a look at page C70, I
[22] would suggest to you that Dr Phillip
[23] Wilson of Talbott Marsh opined that

## Page 0116

[01] "Stephen Laucks will never be able to
[02] return to work in anesthesia "
[03] A      August 17, 1994, yes  Okay
[04] Q      And if you turn to page C87,
[05] actually C88
[06] A      I ve got 88 but not 87  I'm sorry
[07] Q      It looks like Dr Thomas Hobbs, in
[08] September 1994, said "The patient will not
[09] be able to return to employment as an
[10] anesthesiologist", is that right?
[11] A      That s correct
[12] Q      Take a look at page C105  Dr
[13] Hobbs, in October 1994, says the same
[14] thing
[15] A      Yes, sir, that's correct
[16] Q      Take a look at the letter at page
[17] 135 and 136
[18] A      December 6, 1994
[19] Q      In that letter, again, Dr Hobbs,
[20] indicates that Dr Laucks cannot go back
[21] and be an anesthesiologist, is that right?
[22] A      That s correct, yes, sir
[23] Q      Take a look at page 151  I'm sorry,

## Page 0117

[01] 182  That's interesting  It's actually a
[02] record of these PMS people, where they
[03] indicate that they contacted Dr Hobbs in
[04] or around March of '95  and he continues to
[05] believe that Dr Laucks will not return to
[06] anesthesiology, is that right?
[07] A      Yes  It says he is recovering, is
[08] attending alcoholics anonymous  However,
[09] he probably will never be able to return to
[10] anesthesiology
[11] Q      And at C183, at around the same time
[12] period, March 1995, Penelope Zglar, also
[13] indicates her view that Dr Hobbs can't go
[14] back, is that right?
[15] A      Dr Laucks
[16] Q      I'm sorry  Thank you
[17] A      Yes  In fact, she highlights in her
[18] letter, [quote],  permanently disabled from
[19] the practice of anesthesiology " [end
[20] quote], in bold print
[21] Q      If you take a look at page 248, that
[22] is a letter from Dr Hobbs dated September
[23] 1, 1995, is that correct?

## Page 0118

[01] A      Yes, sir
[02] Q      And in the third paragraph, he
[03] indicates, again, it's his professional
[04] opinion, that Dr Laucks should never
[05] return to work as an anesthesiologist, is
[06] that correct?
[07] A      Yes, this is correct
[08] Q      Now, a little over a month after
[09] this letter, you, Dr Feist, plaintiff's
[10] witness in this case, had recommended that
[11] Provident get the opinion of an independent
[12] third party, is that right?
[13]          MR SCHEFTER  Objection, asked and
[14] answered
[15] A      It s written right there on that
[16] paper  Apparently so
[17] Q      Would you agree with me, sir, that
[18] in this period of time, this sixteen
[19] months, there was no new technological
[20] advances or new medical device invented
[21] that impacted on your decision to recommend
[22] the IME?
[23] A      None to my knowledge

## Page 0119

[01] Q      Isn t it a fact that despite the
[02] rather consistent opinions of Dr Laucks'
[03] physicians we just went through, you
[04] still felt that it was appropriate for
[05] Provident to seek this independent third
[06] party opinion?
[07]          MR SCHEFTER  Objection asked and
[08] answered a number of times  I hope this is
[09] the last time that it is
[10] A      Well, I m somewhat at a
[11] disadvantage, not knowing exactly what Tim
[12] Peace asked me  That seems to be missing,
[13] and I don't know whether it was verbal or
[14] written and not in the record  But my
[15] practice was to answer the question of the
[16] claim adjuster that was presented to me
[17] I m conjecturing now, but Tim may have been
[18] under some direction by one of his
[19] superiors to look into this case more
[20] carefully, and I  obviously, don't know the
[21] question that was asked  My perspective,
[22] based on the fact that all of these
[23] physicians have said he can't go back to

## Page 0120

[01] practice, okay, if you are not convinced by
[02] that, go out and get an independent medical
[03] examiner
[04] Q      I'll object and move to strike as
[05] being broader and not responsive  Tim
[06] Peace coming to you for your assistance on
[07] this claim, that is something that he would
[08] do in the ordinary course of claims
[09] business?
[10] A      Well, this is in the scenario of me
[11] going to the psychiatric unit every
[12] Thursday morning from 8 00 to noon, just
[13] being available for these people in the
[14] psychiatric -- that was one of my stops on
[15] my circuit  Every Thursday, I would go to
[16] the psyche unit, and they would bring me
[17] these cases, and we would sit down and talk
[18] about it
[19] Q      And you considered that a good
[20] thing, for a young claim representative
[21] like Tim Peace to come to a medical person
[22] like you, to seek your input, is that right?
[23] A      That s part of the normal process of

## DR. WILLIAM FEIST    [3-8-99]

Page 0121

[01] evaluating the claims, sure
[02] Q    You are in the insurance business
[03] Let's be honest  Don't you think that's a
[04] good idea for a young claim rep to go to a
[05] senior medical person like yourself?
[06] A    Obviously, that's how he learns and
[07] how he gets medical knowledge and expertise
[08] that he needs to work his claim
[09] Q    Would you agree that you were one of
[10] the resources that Provident made available
[11] to Tim Peace and other claim
[12] representatives in the handling of
[13] disability claims?
[14] A    Well, sure
[15] Q    There was nothing in your claim
[16] file, and I'll tell you, there is nothing
[17] in mine, that suggests that Tim Peace gave
[18] you a written request  You have seen
[19] nothing in writing, have you?
[20] A    There is nothing in writing, and my
[21] recollection -- I can recall going to his
[22] desk that day and sitting down and
[23] reviewing this file  My recollection that

Page 0122

[01] he asked me a verbal question, which
[02] obviously escapes me now  Whether he wrote
[03] anything I don't know
[04] Q    But you know that you wrote
[05] something?
[06] A    I wrote this down, and I am very
[07] compulsive about writing things down
[08] Q    Is it fair to say that sometimes the
[09] claim reps would give you something in
[10] writing, other times, they would just make
[11] an oral request of you?
[12] A    Yes, that's true
[13] Q    And both of those were acceptable,
[14] is that right?
[15] A    Well, that's part of the scenario,
[16] is that some cases let themselves better to
[17] written requests, others, to more sit down
[18] and go through the file with the claims
[19] adjuster, and it was flexible
[20] Q    That's what I'm saying
[21] A    Some of the claims adjusters
[22] preferred send a case, review, send back,
[23] others wanted to come and talk  So it was

Page 0123

[01] somewhat based on the nature of the case
[02] and also the personality, if you will, of
[03] the claims adjuster
[04] Q    Either one of those alternatives was
[05] acceptable to you, Dr Feist, correct?
[06] A    Yes, of course  Absolutely
[07] Q    The other thing that I think you
[08] mentioned is that Mr Peace would have made
[09] everything in your claim file available to
[10] you up to that date, and you would have
[11] reviewed everything in the claims file?
[12] A    That's generally the way it worked,
[13] yes, sir
[14] Q    There has been some testimony about
[15] what was the process of presenting of
[16] materials to someone like yourself, and to
[17] that extent, you are vacillating that
[18] testimony when you say that you reviewed
[19] the whole file up to that date  So you are
[20] comfortable with that testimony, is that
[21] right?
[22] A    That was the procedure, and that's
[23] my practice, review the entire file that is

Page 0124

[01] given to me
[02] Q    This process of you going around for
[03] three or four hours each day to a different
[04] department in Provident, that is different
[05] than your role in the round-table, is that
[06] right?  That's a different aspect of your
[07] role?
[08] A    I would say the consultant in
[09] the various sections was more one-on-one, a
[10] particular case, a particular claims
[11] adjuster, whereas, the round-table was more
[12] of a medical question  You know, in the
[13] process of the round-table  If there is a
[14] medical question, definition, description
[15] of an impairment or going over an
[16] impairment to see how it affects people,
[17] that was more my role  That was my role
[18] there
[19] Q    Before I go to the round-table, I
[20] just want to finish up on this other
[21] system  Do you have a name for that
[22] system, your going around for three or four
[23] hours to departments?

Page 0125

[01] A    I felt like I was an old Methodist
[02] circuit riding preacher  As I said
[03] earlier, if I carried a Bible and had a
[04] horse, I would be ready to go
[05] Q    Well, we'll call it, then, "riding
[06] the circuit "
[07] A    "Riding the circuit, I like that
[08] That's good
[09] Q    In general  would it be fair to say
[10] that you, Dr Feist, considered this riding
[11] of the circuit to be a good procedure for
[12] Provident to embark upon?
[13] A    Well, I would say good in the fact
[14] that it was needed to have more medical
[15] expertise  I would have to say, frankly,
[16] that I wasn't real happy that I had to add
[17] those fifteen to twenty hours a week in
[18] addition to my other duties without
[19] additional compensation, or even thanks
[20] from Ralph Mohney, but that's an aside
[21] issue
[22] Q    Apart from that issue, the
[23] compensation issue or the economic issue,

Page 0126

[01] the procedure was a good procedure?
[02] A    Well, basically, Fred O'Connell Dr
[03] O'Connell wasn't able to keep up with the
[04] work and they really needed to put on
[05] another physician  For whatever reason,
[06] obviously, administrative decision, they
[07] weren't ready to do that  So I was sort of
[08] a stop gap until they could get another
[09] physician and they put out a job
[10] description for a position just as I was
[11] leaving, that was filled about a year after
[12] I left, to do that  So I was sort of a
[13] stop gap, interim measure, if you will
[14] Q    But even that stop gap, you
[15] considered to be a laudatory purpose,
[16] providing guidance to these younger
[17] claimants?
[18] MR SCHEFTER  Objection to the
[19] form
[20] A    In that sense, it was good, yes
[21] That was good  I got to train and help
[22] these people  many of whom were just really
[23] very new to the business

## DR WILLIAM FEIST    [3-8-99]

### Page 0127

[01] Q    And Tim Peace wasn't the only one
[02] that you would make recommendations for
[03] You would make recommendations to anybody
[04] that asked you for a recommendation?
[05] A    Every case that came to my
[06] attention, I made whatever recommendation
[07] was appropriate
[08] Q    And it's fair to say that you can't
[09] recall a single instance where a claims
[10] representative rejected or disregarded your
[11] recommendation, true?
[12] A    Well, I would have to say that in my
[13] role, I gave my medical opinion    The claim
[14] decision was up to the administrative
[15] people, and Ralph Mohney made that very
[16] clear, that it wasn't just the medical
[17] part, it was the whole kit and kaboodle, if
[18] you will    All he wanted was the medical
[19] part from me
[20] Q    Because you are a doctor?
[21] A.    Absolutely.
[22] Q    He didn't want you making the claim
[23] decision?

### Page 0128

[01] A    That's exactly right
[02] Q    But as a medical doctor, you would
[03] make a medical recommendation, is that
[04] correct?
[05] A    I would make a medical
[06] recommendation, and unless I saw the same
[07] case later, I wouldn't have any idea what
[08] they did
[09] Q    So the fact is, as you sit here
[10] today, you can't give a specific instance
[11] where some claims representative either
[12] rejected your medical advice or disregarded
[13] your medical advice, true?
[14] A    I can't give you a specific example
[15] Obviously, from the trend of things, it
[16] obviously happened, but I can't cite you
[17] name and case
[18] Q    You say something obviously
[19] happened    I guess it isn't so obvious
[20] This is a court of law that we are working
[21] in, and we want some evidence    Can you
[22] give us some evidence where someone
[23] disregarded your advice or rejected your

### Page 0129

[01] advice?
[02] A    My specific advice?
[03] Q    Yes, sir
[04] A    I can't give any example, no
[05] Q    Now, with respect to the
[06] round-tables, let's turn to that topic    As
[07] we sit here today, for several hours
[08] between Mr  Schalter and I, are you getting
[09] any recollection refreshed that Dr  Laucks'
[10] case was discussed at a round-table?
[11] A    No  You know, as I said earlier, I
[12] saw a number of cases  I didn't keep
[13] records of any  I took notes when I was in
[14] the round-table, but I destroyed all of
[15] those notes when I left Provident in
[16] February of '96 · Obviously, I don't
[17] remember Dr  Laucks' case being at a
[18] round-table
[19] Q    Did you go to the round-table on a
[20] particular night?
[21] A    Thursday night, every Thursday night
[22] from the spring of '95 until February of
[23] '96

### Page 0130

[01] Q    Were these things held in a
[02] conference room or someplace like that?
[03] A    Yes  They were about like this,
[04] same size table, same size room  We would
[05] have twelve to fifteen people altogether in
[06] a meeting
[07] Q    These people would be from different
[08] disciplines, is that right?
[09] A    That is correct
[10] Q    Would Mr  Mohney generally attend
[11] or somebody from his unit?
[12] A    Mr  Mohney usually presided  Or if
[13] he was out of town or unavailable, he would
[14] have one of his vice presidents preside
[15] Q    Mr  Mohney was the head claims
[16] person at Provident at the time?
[17] A    Yes, sir, that's correct, vice
[18] president of claims
[19] Q    There would be some attorneys from
[20] the Law Department who would handle some of
[21] the legal questions that would be asked?
[22] A    That's correct
[23] Q    And I think you said that if there

### Page 0131

[01] was going to be some California cases on
[02] the agenda, then there might be one of the
[03] attorneys who was familiar with the
[04] California law, is that right?
[05] A    He even made an effort to, depending
[06] on the cases, get an attorney that had some
[07] working knowledge of that particular
[08] jurisdiction
[09] Q    Would you agree with me that if
[10] there is going to be a legal issue raised,
[11] it's probably good to have a lawyer there?
[12] A    Oh, indeed
[13] Q    And if there is going to be a legal
[14] issue raised in a particular jurisdiction,
[15] it might be helpful to have a lawyer
[16] familiar with the law of that jurisdiction?
[17] A    Well, granted
[18] Q    There were also some claims
[19] professionals there, is that right?
[20] A    Yes, sir
[21] Q    But would it be fair to say that the
[22] claims professionals were of a more senior
[23] status than, say, somebody like Tim Peace?

### Page 0132

[01] A    Well, there was a range  You had
[02] the folks of Tim Peace's rank presenting
[03] the cases out of their stable of cases, and
[04] usually you would have supervisory people,
[05] assistant vice presidents, vice presidents,
[06] that rank, there as well  So there was a
[07] variety of people
[08] Q    Would you agree that in a forum like
[09] that, it is preferable to have some senior
[10] claims persons there  rather than having a
[11] bunch of youngsters, to use your word?
[12] A.    Obviously, the more experience one
[13] has, the more expertise one can lend to the
[14] discussion
[15] Q    And then there would be somebody
[16] like yourself  Would there only be one
[17] doctor at a time, or would, sometimes, the
[18] doctors overlap?
[19] A    We just had one at a time  This is
[20] like 6 00 in the evening when we are
[21] starting  How many times can you do that a
[22] week?  Usually Dr  O'Connell had the
[23] Tuesday slot, and I had the Thursday slot

## DR. WILLIAM FEIST    [3-8-99]

### Page 0133

[01] Q    Was Dr O'Connell as grumbling as
[02] you  with respect to the evening hours that
[03] Mr  Mohney was asking you to put in?
[04]     MR  SCHEFTER  I object to the form
[05] A    I can't speak to Dr  O'Connell  He
[06] is his own man
[07] Q    Apart from the evening hour aspect
[08] that you have already testified to you were
[09] not particularly happy with, did you think
[10] it was a good idea to have someone like
[11] yourself at a meeting such as this to
[12] discuss medical issues?
[13] A    Well, it had some rationale,
[14] particularly if there was a very unusual or
[15] very complex medical impairment being
[16] discussed
[17] Q    Would it be accurate to say that
[18] there was a free flow of discussion?
[19] A    Oh, indeed, one at a time though
[20] Mohney would only allow one at a time  He
[21] would throw this thing at you if two people
[22] talked at once
[23] Q    You said something about a ball or

### Page 0134

[01] something  I didn't know whether you were
[02] serious
[03] A    Yes  You have seen these little
[04] rubber balls with the little fuzzies
[05] Q    Nerf things or sponge?
[06] A    Well, it's not like a Nerf  It is
[07] like a soft rubber ball, and it has little
[08] protrusions coming out of it  I mean, it
[09] won't hurt you if you get hit by it  But
[10] he literally, if two people started
[11] talking, he would throw these things at
[12] them to tell them  one at a time
[13] Q    It sounds like that is a somewhat
[14] innovative use of Robert's Rules of Order
[15] A    It gets your point  that is right
[16] Q    I guess the point is, apart from the
[17] style, would you agree it's probably a good
[18] thing, in any group setting, to try to have
[19] one person talking at a time?
[20] A    Obviously.  We have demonstrated
[21] that here today  yes
[22] Q    At these round-tables, you, Dr
[23] Feist, felt free to give your opinion?

### Page 0135

[01] A    Yes, I did, although, I was not
[02] often asked  Most of the time, the
[03] discussion was outside of medical, legal,
[04] financial, et cetera  I would have to say
[05] I didn't contribute much of anything
[06] outside of medical
[07] Q    To the extent that medical was an
[08] issue, though, you felt free to give your
[09] opinion?
[10] A    Oh, surely, yes
[11] Q    I think you indicated that the
[12] younger claim representatives would
[13] actually present their case?
[14] A    Yes  as  that's correct
[15] Q    Do you think there is any analogy, I
[16] know you were in internal medicine for a
[17] while, and you went through an internship
[18] or residency
[19] A    Yes
[20] Q    Was there any analogy that could be
[21] made between what young residents and
[22] interns, go through and what Tim Peace and
[23] some of the younger claim reps were going

### Page 0136

[01] through in this forum?
[02] A    It's very similar  They learn to
[03] know the facts of the case very well and be
[04] able to present it  Then, of course, the
[05] more seasoned people, claims adjusters or
[06] whomever, would ask questions of these
[07] people  They would be expected to know
[08] from the file what the answer was to that
[09] particular question
[10] Q    Would it be fair to say that this
[11] multi-disciplinary group would try to
[12] arrive at a consensus as to how the claim
[13] should be handled?
[14] A    In a general way, in terms of maybe
[15] deciding to get surveillance or maybe get a
[16] financial review or maybe suggesting an
[17] independent medical examiner  It could go
[18] a number of ways  The whole idea was to
[19] get input into the situation from various
[20] sources and disciplines
[21] Q    You mentioned doing surveillance and
[22] getting an IME, is that right?
[23] A    Yes

### Page 0137

[01] Q    Both of those can be appropriate
[02] tools in investigating insurance claims,
[03] isn't that right?
[04] A    That's correct  It can also be
[05] misused, as well
[06] Q    Sometimes there might be a
[07] recommendation at a round-table to get a
[08] face-to-face interview using one of the
[09] field reps?
[10] A    That would happen on occasion  yes,
[11] sir
[12] Q    If it was a financial issue,
[13] somebody might say, "Go get some tax
[14] returns or financial documents , is that
[15] right?
[16] A    That's correct  yes
[17] Q    Would it be fair to say that as you
[18] look back into your months involved in the
[19] round-table process, you can't recall
[20] specific decisions rendered to terminate
[21] benefits, is that right?
[22] A    Specifically at the round-table
[23] meeting?

### Page 0138

[01] Q    Yes
[02] A    That's correct
[03] Q    What you recall is a recommendation
[04] that an investigatory step or steps be
[05] taken?
[06] A.    Yes
[07] Q    On the claim, is that right?
[08] A    That's correct
[09] Q    I'll ask you the same question that
[10] I asked you with respect to the circuit
[11] riding  Would it be fair to say that you
[12] have no recollection of a single instance
[13] where you made a medical recommendation,
[14] where that was rejected by the round-table
[15] is that right?
[16] A    I have no recollection of that, as I
[17] sit here today, yes, sir
[18] Q    Would it be fair to say that you
[19] have no recollection of a single instance
[20] where you suggested that a claim be paid,
[21] but a decision was made by the round-table
[22] to deny the claim?
[23]     MR  SCHEFTER  Objection to the

## DR. WILLIAM FEIST    [3-8-99]

### Page 0139

[01] form
[02] A    Well, I think that's correct  But,
[03] again, I was just there for the medical
[04] input  Mr Mohney made the call on the
[05] claim termination or not, or one of his
[06] subordinates, maybe not him himself
[07] Q    Would it be fair to say that you,
[08] Dr Feist, do not think that there was
[09] something inherently wrong with the
[10] round-table process?
[11]     MR SCHEFTER  Objection to the
[12] form  You can answer
[13] A    I think the form of it was okay, but
[14] the basic underlying reason for it is what
[15] I object to
[16] Q    Thus idea of having young attorneys
[17] come in, present a case to a
[18] multi-disciplinary group including law,
[19] medical, and senior claim representatives,
[20] you don't see anything inherently wrong
[21] with that process, is that correct?
[22]     MR SCHEFTER  I object to the form
[23] You said "young attorneys "  Did you mean

### Page 0140

[01] young claims adjusters?
[02] Q    It is good to rephrase  This
[03] process of having young claims
[04] representatives come and present a claim to
[05] a doctor, management, attorneys, and senior
[06] claims personnel, would you agree that
[07] there is nothing inherently wrong about
[08] that process in the insurance business?
[09]     MR SCHEFTER  Objection to the
[10] form, asked and answered
[11] A    The process is fine, but the
[12] rationale may be the problem  The rational
[13] for having the round-table is what I object
[14] to
[15] Q    And is it fair to say that nobody
[16] ever articulated that rationale to you?
[17]     MR SCHEFTER  Objection to the
[18] form
[19] A    Not in so many words, but the memo
[20] in the spring of 95 from Ralph Mohney to
[21] those persons involved in the round-table
[22] basically said, you know, "We've got to
[23] beef up our claim processes, because of

### Page 0141

[01] these great losses we are having "  So I
[02] don t think you can specifically say that
[03] To me, that was the implication  "We ve
[04] got to do everything we can to try to look
[05] at some of these cases, and see if we can t
[06] terminate them
[07] Q    What you are saying, it's an
[08] inference that you, Dr Feist, drew, is
[09] that correct?
[10] A    I think so  But I think it also was
[11] fairly well-known to the company that that
[12] was what was happening
[13] Q    My question is, this is not
[14] something that was expressly stated  "Let's
[15] have these round-tables, so that we can
[16] deny more claims", correct?
[17] A    I would have to say that is correct,
[18] yes, sir
[19] Q    Tell me whether you would agree with
[20] this  I think we just deposed Mr Parker a
[21] little while ago, and I think he testified
[22] there was --
[23] A    Ed Parker?

### Page 0142

[01] Q    Yes
[02] A    I know him well
[03] Q    Yes  I think he testified there was
[04] some 12,000 claims or so
[05] A    12,000 claims  it s a big company
[06] it may well be true  He would know better
[07] than I
[08] Q    You would agree with me that at
[09] three to six cases per round-table, only a
[10] very tiny percent of those thousands of
[11] claims can actually be submitted to the
[12] round-table, correct?
[13]     MR SCHEFTER  Objection to the
[14] form
[15] A    Granted, but I think there was a
[16] selective process  i e  the high dollar
[17] amount, high claims reserve cases that were
[18] brought to the round-table  Obviously, you
[19] can't bring every one of those 12,000 cases
[20] to the round-table  But that one percent
[21] that you have got a problem with  you could
[22] bring those to the round-table very
[23] effectively

### Page 0143

[01] Q    Is it your testimony that there were
[02] no cases ever brought to the round-table
[03] that had a small monthly benefit amount or
[04] a small reserve  Is that what you are
[05] saying?
[06] A    Well, my recollection is that the
[07] majority of the cases were high reserves
[08] Not to say that there weren't some lower
[09] reserves  I think the great majority of
[10] them were higher reserve
[11] Q    So what you seem to be saying is the
[12] amount of the claim does not seem to be the
[13] consistent factor that would apply to each
[14] and every case submitted to the
[15] round-table, is that correct?
[16]     MR SCHEFTER  Objection to the
[17] form
[18] A    Well, obviously, there are other
[19] parameters that brought a case to the
[20] round-table
[21] Q    Would it be fair to say that the
[22] consistent factor that applied to all the
[23] claims brought to the round-table was that

### Page 0144

[01] there were complex issues involved?
[02]     MR SCHEFTER  Objection to the
[03] form
[04] A    I think that is probably true, yes
[05] Q    I'm thinking back to your direct
[06] examination and some things you said, and I
[07] don't think Mr  Schefter followed up on it,
[08] but I will here  You mentioned there might
[09] be a claimant who has a legal problem, and
[10] by that, I took it to mean like some sort
[11] of, perhaps, a criminal problem
[12] A    Well, it could be some sort of a problem
[13] thinking about was some sort of a problem
[14] with maybe licensure or where a healthcare
[15] professional in particular, for whatever
[16] reason, had lost his or her license and
[17] cousin t practice
[18] Q    I actually wrote down legal problem
[19] and license problem  I know they could be
[20] a little different, although, they might be
[21] related
[22] A    Yes  But, again, it becomes a very
[23] difficult issue, because the policies are

## DR WILLIAM FEIST  [3-8-99]

### Page 0145

[01] written for medical disabilities  Granted,
[02] if somebody is a felon, that's one thing,
[03] but they pushed the envelope on this pretty
[04] tight in the round-table discussions
[05] Q    The fact of the matter is  somebody
[06] could get arrested, for example, for
[07] embezzlement?
[08] A    Sure
[09] Q    And then that person might lose
[10] their job, is that right?
[11] A    Of course  But I don t recall
[12] anybody in the round-table ever having that
[13] problem
[14] Q    That would be known, that I just
[15] gave you, that would be a type of legal
[16] disability, correct?
[17] A    Disciplinary  Somebody with drug or
[18] alcohol abuses gets in trouble with their
[19] licensing in their state, loses their
[20] license, he is medically disabled  If you
[21] say it is a legal disability and don t pay
[22] him the claim, I don t think that is right
[23] Q    Well, the licensing issue only

### Page 0146

[01] applies to those professionals who actually
[02] have licenses, correct?
[03] A    Which is virtually every healthcare
[04] professional that practices in the United
[05] States of America and any jurisdictions
[06] Q    And lawyers, as well?
[07] A    Lawyers  sure
[08] Q    And I suppose there could be some
[09] law enforcement types that could lose their
[10] license, correct?
[11] A    Of course, sure
[12] Q    And then what you are saying is you
[13] get into issues as to what is causing the
[14] person not to be working, is it a medical
[15] disability, or is it the fact that this
[16] person lost their license  correct?
[17] A    Exactly
[18] Q    Would it be fair to say that that is
[19] an example of a more complex disability, as
[20] opposed to somebody just breaking their arm
[21] and being out of work three weeks?
[22] A    Of course, yes
[23] Q    And I think you said there is some

### Page 0147

[01] overlap between all of these categories,
[02] but drugs and alcohol addiction cases by
[03] themselves are somewhat complex  Would you
[04] agree?
[05] A    Indeed
[06] Q    Then I think you mentioned the
[07] chronic fatigue syndrome cases?
[08] A    Syndrome, yes
[09] Q    And they are a little complex from
[10] the claims perspective?
[11] A    They are very tough  They are very
[12] tough
[13] Q    You mentioned, I think I wrote down,
[14] falsification of records  I didn't know
[15] exactly what you meant by that, but you
[16] said that
[17] A    Well, that s a scenario where an
[18] attending physician for a little kickback,
[19] little or much will falsify a disability
[20] statement for a claimant
[21] Q    Did you encounter something like
[22] that over your years at Provident?
[23] A    I never encountered it, but on more

### Page 0148

[01] then one occasion, it was discussed in the
[02] round-table  "This attending doctor is
[03] falsifying these things  Go back and check
[04] on him "  They really pushed the envelope
[05] on all of this stuff  Everything you say
[06] is legitimate, but it's the way they did it
[07] was the problem for me
[08] Q    Well, is it fair to say that all of
[09] these inquiries could be legitimate,
[10] correct?
[11]      MR SCHEFTER  Objection to the
[12] form
[13] A    Of course, sure
[14] Q    These complex cases, such as we have
[15] talked about here, could they also be
[16] called grey area kind of claims?
[17] A    In many cases, yes, sir
[18] Q    And would you agree with me that as
[19] a general rule, these gray area kind of
[20] claims can be the most difficult ones for a
[21] claims department to deal with?
[22] A    Well, of course  Sure
[23] Q    And would you agree with me that

### Page 0149

[01] these type of difficult to handle claims
[02] are the kind of claims that cry out for the
[03] multi-disciplinary approach, such as that
[04] designed by Mr Mohney and the round-table?
[05]      MR SCHEFTER  Objection to the
[06] form
[07] A    I would have to say that most of
[08] them didn t require that level of
[09] expertise  The front line claims adjusters
[10] and their supervisors, medical input could
[11] handle most of them, apropos to that three
[12] to six-month adjudication  I just think
[13] that the round-table was set up basically
[14] just to try to terminate claims
[15] Q    You almost said it was a good idea,
[16] isn't that correct?
[17]      MR SCHEFTER  Objection to the
[18] form
[19] A    Well, it is a good idea to
[20] investigate claims to see what they can
[21] terminate  I think the concept of a
[22] multi-disciplinary thing would be good
[23] apropos to a very difficult case early on

### Page 0150

[01] in the evaluation of a claim  But coming
[02] back years later, I think it sort of went
[03] awry
[04] Q    Would you agree that people who are
[05] disabled can get better as time goes by?
[06] A    Of course  We hope they do  That
[07] is the medical profession's duty and charge
[08] to help people get well and recover
[09] Q    Can you agree that in many claims,
[10] simply the passage of time since the date
[11] of disability can warrant a refreshed look
[12] at the circumstances of the claimant, and
[13] whether he or she is then entitled to go
[14] back to work?
[15]      MR SCHEFTER  Objection to the
[16] form
[17] A    I would say that passage of time is
[18] really irrelevant  I think the stability
[19] of the disability is what is the important
[20] thing  I mean, if somebody is disabled
[21] from a condition that never gets better, it
[22] goes indefinitely  If he is disabled from
[23] a myocardial infarction, has a bypass, and

## Page 0151

[01] gets back to work within a year, that's an
[02] entirely different matter.
[03] Q    Would you agree that sometimes good
[04] medical doctors can disagree as to, you
[05] know, whether a particular person, after a
[06] certain period of time, is medically able
[07] to go back to work?
[08]     MR. SCHEFTER   Objection to the
[09] form.
[10] A    That is the art of medicine.  People
[11] have different styles, different opinions.
[12] Q    You agree that good medical doctors
[13] applying the practice of medicine in
[14] accordance with the standard of care could
[15] disagree as to whether a particular person
[16] should or should not return to work?
[17]     MR. SCHEFTER   Objection to the
[18] form.
[19] A    I think the answer is  yes.
[20] Q    Would you agree that it is
[21] appropriate for a claims representative to
[22] bring a legitimate claims question to the
[23] round-table?

## Page 0152

[01] A    Of course.  I don't have any problem
[02] with that.
[03] Q    Would you agree that in the majority
[04] of these round-table discussions that you
[05] attended, in your view, the company acted
[06] appropriately?
[07]     MR. SCHEFTER   Objection to the
[08] form.
[09] A    My impression was that they were
[10] looking at every possible way to terminate
[11] the claim.  You know, surveillance, check
[12] the financials, check the legal, check the
[13] laws of the state to see how far you could
[14] push it.  I think the procedures were
[15] legitimate, but the ultimate aim was pretty
[16] close to the line.
[17] Q    Let me read to you your testimony at
[18] page 242 of your deposition in the Lynn
[19] Thompson matter.  This is a question by Mr.
[20] Davenport.  Question, "Would it be a fair
[21] statement that with regard to a majority of
[22] the round-table reviews, you did not think
[23] the company did anything improper?"

## Page 0153

[01] Answer, "That's probably a fair statement,
[02] yes."  Do you stand by that testimony?
[03]     MR. SCHEFTER   I object to the form
[04] and ask if you are referring to something
[05] specific.  If the deponent wishes  to let
[06] him review the testimony that you are
[07] citing but not showing to him.
[08] Q    Let me show  you page 242 of your
[09] deposition testimony, sir, and ask whether
[10] you stand by that question and answer that
[11] I just read?
[12] A    I stand by it.
[13]     MR. SCHEFTER   Just so the record is
[14] clear, Counsel, is this the same deposition
[15] you were referring to earlier?
[16]     MR. McMONIGLE   Yes.
[17] Q    Did you ever criticize the concept
[18] of the round-table while you were at the
[19] round-table meetings?
[20] A    Not verbally, but I think my
[21] demeanor at the meetings was pretty clear
[22] that I was not happy being there.
[23] Q    Did that have more to do with the

## Page 0154

[01] fact that it was 6:00 p.m., and you weren't
[02] happy to be working the night shift without
[03] pay?
[04] A    Obviously, that's one factor.  But I
[05] think the rationale of the process is what
[06] upset me more than the lateness of the hour
[07] and the non-compensation issue.
[08] Q    You are, obviously, somebody who has
[09] done well and has a number of professional
[10] degrees, is that right?
[11] A    I would have to say so.
[12] Q    You are not a person who considers
[13] yourself to be unduly shy about expressing
[14] your opinions, are you?
[15] A    Generally not.
[16] Q    You are not the type of person to be
[17] cowed for expressing your opinions, are
[18] you?
[19] A    Well, I would have to say there is
[20] some issue there.  The round-tables were
[21] endorsed by Harold Chandler and his people,
[22] and they made cameo appearances.  The
[23] implication was you didn't criticize the

## Page 0155

[01] round-tables if you wanted to continue to
[02] work at Provident.  Having a family to
[03] support, I felt that until I had another
[04] job lined up, I didn't want to criticize
[05] the round-tables, at least verbally.
[06] Q    Well, isn't it a fact, sir, that you
[07] had actually been looking for a job before
[08] you ever went to your first round-table?
[09] A    Well, that is in the Lynn
[10] Thompson/Wallace deposition.
[11] Q    I'm just looking for an answer.
[12] Isn't it a fact, sir, that you were already
[13] looking for a job before you attended the
[14] very first round-table session you went to?
[15] A    I would say  yes.  But that one in
[16] November of '94 was just a  "I haven't done
[17] this for fifteen years," or maybe twelve
[18] I needed to get out there in the arena and
[19] see what it was like.  I didn't get serious
[20] about it until the round-tables started
[21] And I made no fewer than five interviews in
[22] that year before I got the job I have now.
[23] Q    Let me see if I can understand your

## Page 0156

[01] answer.  You used the word "one," you were
[02] referring to one job interview, correct?
[03] A    In November of '94, I went to a job
[04] interview, basically just to get back into
[05] the swing of things.  I had been out of it
[06] since 82 to '85, '94, twelve years.  I
[07] needed to get my resume up, I needed to get
[08] out there and see what was out there.
[09] Apropos to the changes that were being made
[10] at Provident from '93 to  94, I felt like I
[11] had better get my resume out and start the
[12] process.
[13] Q    But the fact is, you were thinking
[14] of leaving the company before the
[15] round-table was ever implemented, correct?
[16] A    I was thinking of the possibility
[17] I would say the round-table solidified my
[18] thought that I had to leave.
[19] Q    You were thinking of leaving the
[20] company before the round-table ever
[21] started, correct?
[22] A    Sure.  When the chief financial
[23] officer comes in, when Harold Chandler

## Page 0157

[01] comes in to Tom Hardy, the chief financial
[02] officer, at 10.00 in the morning and says,
[03] "You are out of here by noon," this was a
[04] number two man in the company   What am I
[05] going to do as medical director if he
[06] decides that I'm out?   What am I going to
[07] do?   I've got a licensure to think of   I
[08] had to take a written exam to get this
[09] licensure in Alabama   You know, I've got
[10] to protect my family
[11] Q      Let me just object and move to
[12] strike as nonresponsive   I'm just going to
[13] ask you to listen to my question and answer
[14] it simply, if you can, sir
[15] A      I will
[16] Q      Isn't it true that you were looking
[17] for a job before you ever went to a
[18] round-table?
[19]        MR SCHEFTER   Objection, asked and
[20] answered
[21]        MR McMONIGLE   It's not asked and
[22] answered
[23]        MR SCHEFTER   Yes, it was asked and

## Page 0158

[01] answered
[02]        MR McMONIGLE   I moved to strike
[03] the nonresponsive speech, and now I'm
[04] asking the question
[05]        MR SCHEFTER   You can definitely
[06] answer   My objection is it has been asked
[07] and answered   It's noted for the record
[08] Proceed
[08] A      I went on a job interview in
[10] November 1994   I would have to say I was
[11] not serious about it until the spring of
[12] 1995   Take it for whatever you will
[13] Q      Would you agree with me that
[14] somebody who goes to a job interview is at
[15] least thinking, perhaps in a deep recess of
[16] his or her mind, of leaving the company,
[17] correct?
[18] A      Absolutely   That is undeniable
[19] Q      And you would agree with me that the
[20] round-table had nothing to do with that
[21] decision, because the round-table hasn't
[22] started yet, right?
[23] A      I said the round-table solidified

## Page 0159

[01] my -- I was thinking about it in '94  and
[02] in the spring of '95, the round-table and
[03] all that business solidified my resolve
[04] that I had to leave
[05] Q      Is it fair to say that you never
[06] lodged any written complaints about the
[07] round-table, correct?
[08] A      Obviously not   Again  had I done
[09] that, I would have been out on my ear
[10] minutes after sending the letter
[11] Q      Is it fair to say that on your last
[12] day at Provident, before you embarked upon
[13] a bold new adventure at Protective, you
[14] didn't send a letter to Mr  Mohney or Mr
[15] Chandler or anyone else--
[16] A      No
[17] Q      --to express your --
[18] A      I'm not a vindictive person, sir   I
[19] was not happy with what Mohney and Chandler
[20] were doing   I didn't want to criticize
[21] them   I just wanted to get out of that
[22] situation
[23] Q      You would agree with me, sir, that

## Page 0160

[01] you do not like Howard Chandler very much,
[02] correct?
[03]        MR SCHEFTER   I object to the form
[04] A      I think Howard Chandler is a fine
[05] man   He has done well what he has been
[06] paid to do, but I don't have to be a part
[07] of it, and that a why I left
[08] Q      He's a fine man, but you don't like
[09] him, correct?
[10]        MR SCHEFTER   Objection to the
[11] form
[12] A      I didn't say that   I said he is a
[13] fine man personally   He s a very
[14] handsome-looking man, but I don t like his
[15] business practices, and he was specifically
[16] brought to Provident to do that   It has
[17] been obvious   Again  either you stay with
[18] Harold Chandler lock, stock, and berrel  or
[19] you leave   There is no alternative  You
[20] have to admire the man for doing what he
[21] has done   He s great at what he is doing,
[22] but it's not my style
[23] Q      Would you agree that you don't like

## Page 0161

[01] Ralph Mohney, although, he may be a fine
[02] man?
[03]        MR SCHEFTER   Objection to the
[04] form
[05] A      Ralph Mohney is a great man, but I
[06] think he was instructed by Harold Chandler
[07] to enhance the bottom line on claims,
[08] however he could do it  and he has done his
[09] job well   But, again, I don't have to be a
[10] part of it   I can leave and do something
[11] else that is not a part of that
[12] Q      Would you agree that there is
[13] nothing wrong with an insurance company
[14] auditing claims on a regular basis?
[15] A      Of course   They all do it   They
[16] have to do it
[17] Q      Would you agree that it's
[18] appropriate for Provident to pay all valid
[19] claims, but defend against those claims the
[20] company believes are invalid?
[21] A      I strongly agree with that   I think
[22] when they push the envelope to cut those
[23] gray area claims, they have overstepped the

## Page 0162

[01] line
[02] Q      Would you agree that Provident has a
[03] duty to investigate claims at the outset,
[04] and a continuing duty to investigate as the
[05] claim continues?
[06] A      Of course
[07] Q      You do not hold yourself out as an
[08] expert on claims handling, is that right?
[09] A      Well, I would have to say that I
[10] have done a fair amount of it, and Ralph
[11] Mohney must have had some competence in my
[12] expertise to ask me to do what he did
[13] Q      You have indicated that Mr  Mohney
[14] had confidence in your medical expertise
[15] A      i e , disability claims evaluations
[16] I mean, he wouldn t ask me to go you know
[17] help him train all these inexperienced
[18] people, if he didn t have some confidence
[19] in my ability
[20] Q      Do you consider yourself an expert
[21] in claims handling?
[22] A      I would say  yes --
[23]        (Whereupon, at this time a short

## DR. WILLIAM FEIST    [3-8-99]

### Page 0163

[01] break was taken I

[02] Q    Do you consider yourself an expert
[03] in determining whether or not a particular
[04] alleged disability is covered under the
[05] terms and conditions of a Provident policy?
[06] A    I'm not sure that I understand your
[07] question
[08] Q    Well, would you agree with me that
[09] ultimately when any claim is presented to
[10] Provident. Provident has to make a decision
[11] as to whether the person with the alleged
[12] disability is entitled to benefits under
[13] the terms and conditions of the Provident
[14] policy?
[15] A    That's correct
[16] Q    Do you consider yourself an expert
[17] in deciding whether or not a particular
[18] person who presents with an alleged
[19] disability is entitled to benefits under
[20] the applicable disability insurance policy?
[21] A    If it's a medical impairment, I
[22] would say "yes", and that's the way I
[23] would say all the own-oc policies were

### Page 0164

[01] written, medical impairments
[02] Q    Would it be fair to say that
[03] Provident handles thousands of claims in a
[04] given year, the vast majority of which you
[05] were not involved in?
[06] A    Of course  A medical director just
[07] serves as a consultant to the people
[08] Q    With respect to claims that you saw
[09] in your years handling claims at Provident,
[10] would it be fair to say that you have seen
[11] fraudulent claims?
[12] A    I can't recall ever seeing a
[13] fraudulent claim, sir  The claims that I
[14] saw were legitimate claims or an impairment
[15] where there might be, as you say, a
[16] difference in opinion on how they were
[17] adjudicated  But I cannot say that I have
[18] ever seen a fraudulent claim
[19] Q    Would you agree that if there was a
[20] fraudulent claim, Provident shouldn't have
[21] to pay it?
[22] A    Of course  In that discovery
[23] process of that three to six-months window

### Page 0165

[01] that I talked about earlier  that's when
[02] that should come out
[03] Q    You have seen some claims that were
[04] not medically supported over the course of
[05] your claims history at Provident?
[06] A    Not medically supported in terms of
[07] attending physician s statement or actual
[08] medical data, et cetera?
[09] Q    Yes
[10] A    I can't say that I have  Any claims
[11] that I would have reviewed would have been
[12] related to a medical impairment
[13] Q    Have you seen claims where a person
[14] claimed they were medically disabled, but,
[15] in fact, you believed they were not?
[16] A    I can't say that in my experience I
[17] have seen that
[18] Q    Have you seen claims that were
[19] legitimate at the outset  but where the
[20] claimant ultimately got well?
[21] A    Of course  People do recover from
[22] illnesses and injuries and so forth
[23] Q    I think you had already indicated

### Page 0166

[01] that doctors could disagree over a
[02] particular --
[03] A    Impairment or issue?
[04] Q    Yes
[05] A    Of course  Like lawyers disagree on
[06] things
[07] Q    Let me ask you this  Can medical
[08] directors within the company disagree as to
[09] whether or not a person is disabled under
[10] the terms or conditions of the policy?
[11] A    I m sure it could happen, sure
[12] Q    And I guess you would agree that
[13] lawyers, too, could disagree on one of
[14] those legal aspects, such as whether
[15] something is or is not a legal disability?
[16] A    Sure  That s why we have courts and
[17] judges
[18] Q    Have you seen cases, in your history
[19] at Provident, where the policyholders have
[20] exaggerated their claims?
[21]    MR SCHEFTER  I object to the form
[22] A    I'm not sure what you mean by
[23] exaggerated

### Page 0167

[01] Q    Well, like, perhaps, they have an
[02] injury, but they have exaggerated the
[03] extent of the injury  or the extent of the
[04] disability
[05] A    I can't specifically recall, but it
[06] seems to me that if a claimant claims a
[07] certain disability, then there would not be
[08] the data to support it by the attending
[09] physician
[10] Q    Have you ever known an insured to
[11] exaggerate subjective claims in the
[12] disability process?
[13]    MR SCHEFTER  Objection to the
[14] form
[15] A    Subjective claims like emotional
[16] impairments or depression?
[17] Q    Yes
[18] A    I can't say that I have  That s
[19] part of the process to discover those
[20] things
[21] Q    Let me show you page 274 of your
[22] deposition in the Thompson case, just to
[23] refresh your memory, where you were asked,

### Page 0168

[01] Question. "Have you ever known an insured
[02] to exaggerate subjective claims in the
[03] disability process?"  Answer, "Of course "
[04] Question, "Because it is in their interest
[05] to do so, isn't it?"  Answer, "Sometimes it
[06] is, yes "
[07]    MR SCHEFTER  While the deponent is
[08] reviewing that, Mr McMonigle, we have
[09] talked about this deposition, now, a couple
[10] of times, and you have certainly asked Dr
[11] Feist to review portions of it  In
[12] referring to it, you have not made those
[13] excerpts part of the record, other than I
[14] guess, having them read in either by
[15] yourself or Dr Feist  My objection, if it
[16] is an objection or probably more of it
[17] request, that if you are going to use these
[18] questions and answers at trial, I certainly
[19] believe that plaintiff's counsel has the
[20] right to have that deposition in its
[21] possession to review  as you do  So I'm
[22] going to make the request of you to give us
[23] a copy of that deposition, and, obviously,

## DR. WILLIAM FEIST    [3-8-99]

### Page 0169

[01] if you reject that request, somehow we're
[02] going to get the request before the court
[03] in Texas or wherever it is, to get that
[04] deposition transcript
[05]     MR McMONIGLE  I certainly won't
[06] stand in the way of any request that you
[07] should make either to the Texas court or to
[08] anyone else  As to my use of these
[09] depositions, I am quoting the excerpt here,
[10] I am giving it to the doctor  Frankly, I
[11] expect him to stand by his testimony, so it
[12] will all be recorded right in our
[13] transcript that we're getting here and now
[14] I guess I haven't really gotten an answer
[15] I note your objection
[16]     MR SCHEFTER  Sure  I guess your
[17] answer to my request is "no," you are not
[18] going to give me -- you said you won't
[19] stand in the way of it, but I can't leave
[20] here today with a copy of the transcript
[21] that you have  is that correct?
[22]     MR McMONIGLE  Right now, I'm in
[23] Birmingham, Alabama, as you know, thanks to

### Page 0170

[01] your invite, so I'm not in my office
[02] Secondly, I always prefer document
[03] requests, if they are done pursuant to the
[04] rules, to be in writing, et cetera  I
[05] don't think it's proper, at a deposition,
[06] to say "Give me that, give me that, give me
[07] that "  It gets very sloppy, and then you
[08] get into other issues  and I would have to
[09] say we're about four days to trial in this
[10] case, although, we are still doing
[11] depositions
[12]     MR SCHEFTER  That is understood
[13] We have made the request for the
[14] transcript  We couldn't get it  You have
[15] it, and if we knew it existed prior to last
[16] week, and that you had it, we certainly
[17] would have requested it from you
[18] Certainly, we are under the understanding
[19] that since we couldn't get it, we didn't
[20] think you would have it  So the objection
[21] is noted, the request is, if my verbal
[22] request is not sufficient, certainly the
[23] request will be made in writing, and we can

### Page 0171

[01] continue
[02]     MR McMONIGLE  I just want to state
[03] that this is news to me too  You have had
[04] much more access to Dr Feist than I have
[05] As you know in your letter, you basically
[06] suggested he not talk to us unless you and
[07] Rees were there  So this is news to me
[08] When you say you don't have it, I frankly
[09] sort of thought you did have it
[10]     MR SCHEFTER  Right  I never asked
[11] Dr Feist  I don't think he has a copy of
[12] the transcript  You can continue
[13] Q   Doctor, I showed you page 274 of
[14] that deposition in the Thompson case, which
[15] I quoted  Do you stand by that testimony?
[16] A   I do, yes, sir
[17] Q   And does that refresh your memory
[18] that sometime over the course of your
[19] several years  you may have run into an
[20] insured who exaggerated a subjective claim?
[21] A   Well, it would happen from time to
[22] time  But I think that's a part of the
[23] discovery process that the insurance

### Page 0172

[01] company goes through, to adjudicate whether
[02] that is legitimate or not  It would happen
[03] occasionally, but not all that often
[04] Q    Did you ever run into a case where
[05] an insured actually was injured  and then
[06] as time went by, the insured, according to
[07] the medical records, was or should have
[08] been better, and the insured exaggerated
[09] his or her symptoms thereafter?
[10] A   Well, I run into that happens  But,
[11] again, the thirty-day certification process
[12] would pick that up  Say, this person has
[13] recovered, he is able to work  Terminate
[14] the claim payment
[15] Q    Have you ever experienced situations
[16] where you felt that the attending physician
[17] was in, perhaps, too cozy a relationship
[18] with the claimant, so that the attending
[19] physician was certifying disability when it
[20] may have been in the patient's best
[21] interest to say, "This patient is fine "?
[22]     MR SCHEFTER  Objection to the
[23] form

### Page 0173

[01] A   I don't think I have ever personally
[02] seen that  I think you have, as a claims
[03] evaluator  you have to assume that that
[04] physician is looking at that claimant and
[05] giving you the best evaluation of that
[06] claimant  One of my former bosses said
[07] that that physician looking at that man
[08] across the examining table has got the best
[09] shot of telling you what that man's
[10] abilities or disabilities are  I can't say
[11] that is a hundred percent, but it's pretty
[12] close  There is an honor in the
[13] profession  Granted, there are bad apples
[14] in the medical profession  All professions
[15] have bad apples, but they are usually found
[16] out pretty quickly  They don't last long
[17] Q   Even if a doctor is not a bad apple,
[18] do you believe that it could happen where a
[19] doctor chooses to be an advocate for the
[20] patient in the disability process?
[21]     MR SCHEFTER  Objection to the
[22] form
[23] A   I think all physicians are advocates

### Page 0174

[01] for their patients, like all lawyers are
[02] advocates for their clients  But I think
[03] there has to be a basic trust from the
[04] claimant to his physician to the insurance
[05] company, that the information is correct
[06] Q    You had described what you believe
[07] was your impression of Mr Chandler's
[08] intent to enhance the bottom line  And I
[09] know you mentioned a memo that was sent to
[10] the vice presidents
[11] A   In terms of?
[12] Q    That's what I'm trying to identify
[13] I thought you had identified an impression
[14] that you said went to a memo that you said went
[15] to the vice presidents, so I'm trying to
[16] identify that memorandum
[17] A   I think we discussed earlier that in
[18] the interim between Harold Chandler's
[19] coming and his predecessor leaving, there
[20] was a major write-off -- actually, the
[21] corporation put money into the disability
[22] claim reserves to cover that  The comment
[23] was that, you know, the company showed a

## DR. WILLIAM FEIST    [3-8-99]

### Page 0175

[01] corporate loss for that quarter, but the
[02] comment was that the vice presidents that
[03] were responsible for the incentive bonus
[04] that year would not be detrimentally
[05] affected by that reserve write-down,
[06] because, [quote], "none of the persons had
[07] any responsibility." But you were talking,
[08] that's really before Harold Chandler came
[09] Q    I'm just looking for where -- I
[10] thought you said you got this impression of
[11] the enhancing the bottom line and stressing
[12] the bottom line from documents that were in
[13] writing
[14] A    Well, I refer to the Ralph Mohney
[15] memo of spring of '95, that had the large
[16] claims losses, and they were trying to
[17] enhance the claims process to improve the
[18] bottom line
[19] Q    So that is the memo that you are
[20] talking about, the Ralph Mohney memo?
[21] A    I think so
[22] Q    Did that have something to do with
[23] the round-table, or something different?

### Page 0176

[01] A    The Ralph Mohney memo of spring of
[02] '95, the backdrop of the losses was the
[03] lead-in to the necessity to have the
[04] round-tables, or the concept of the
[05] round-tables
[06] Q    Was this the memo that introduced
[07] the concept of the round-tables to someone
[08] such as yourself?
[09] A    Yes, sir
[10] Q    And had there been any round-tables,
[11] or anything like a round-table before that?
[12] A    Well, the disability claim section
[13] had had a weekly meeting where claims
[14] adjusters and Dr. O'Connell and an attorney
[15] would sit in and, sort of, on the initial
[16] adjudication of claims, have sort of a
[17] round-table discussion group I guess it
[18] wasn't quite as formal as the evening
[19] round-tables. Also, it was usually more of
[20] a process of evaluating an initial claim,
[21] up-front window type thing
[22] Q    How long did that around-the-table
[23] discussion take place?

### Page 0177

[01] A    I have no idea I was never
[02] involved in that, more than once or twice
[03] when Dr. O'Connell was out for disability
[04] for six weeks for his rotator cuff surgery,
[05] I had to step in My impression was it
[06] had been an ongoing thing for some time,
[07] but I don't know how long
[08] Q    When you stepped in, you sat around
[09] a table, and you discussed some claims?
[10] A    Yes Basically, these were new
[11] claims These were claims that were
[12] difficult, and the claims adjuster wanted
[13] some input from the Legal Medical
[14] Department, how to investigate the initial
[15] claim, how to make the adjudication, if you
[16] will
[17] Q    You mentioned the fact that you were
[18] unhappy with the fact that Ralph Mohney
[19] basically had you go to these nighttime
[20] meetings without any extra pay, is that
[21] right?
[22] A    Well, that would have to be true,
[23] surely, any extra pay or any extra

### Page 0178

[01] accommodation He never said "thanks" the
[02] whole nine months It was like, you know
[03] they expected you to do this
[04] Q    When Mr Chandler came in, you
[05] thought that one of the things that he did
[06] that you didn't like was the downsizing, is
[07] that right?
[08] A    Specifically downsizing all vice
[09] presidents and persons with any experience,
[10] anybody over fifty with twenty-five years
[11] of experience was gone
[12] Q    Is that because they are the folks
[13] with the biggest salaries?
[14]    MR SCHEFTER    Objection to the
[15] form
[16] A    I would assume so, yes
[17] Q    Did you think you were going to be
[18] one of those persons that was downsized?
[19] A    I felt it was a definite
[20] possibility, yes, sir
[21] Q    And that's why you went looking?
[22] A    That's why I am where I am today,
[23] yes, sir

### Page 0179

[01] Q    I looked at a previous deposition
[02] that you had given in 1991, when you were
[03] still a Provident employee
[04] A    1991
[05] Q    And one of the things that you said
[06] there was, "My job is to provide the best
[07] medical advice to the Life Department that
[08] I can " Does that sound like something you
[09] might have said?
[10] A    Repeat that again
[11] Q    "My job is to provide the best
[12] medical advice to the Life Department that
[13] I can "
[14]    MR SCHEFTER    Objection to the
[15] form Counsel, do you have a copy of that
[16] he can refer to?
[17]    MR McMONIGLE    Sure
[18] Q    Does that sound like something you
[19] would have said?
[20] A    Well, obviously, I don't know the
[21] context of the deposition, but that was the
[22] Medical Department's role, is to -- I
[23] assume that was in the life insurance

### Page 0180

[01] underwriting, with the best guess of the
[02] risks I did do some claims work, what is
[03] called contestable claims somebody takes a
[04] life insurance policy and dies within the
[05] contestable period Those are routinely
[06] investigated Occasionally, I would review
[07] those
[08] Q    My question here is, and that's why
[09] it may not be all that important that
[10] particular testimony When you turn to
[11] your claims role, would you use the same
[12] phraseology and say that part of your job
[13] was to provide the best medical advice to
[14] the Claims Department that you could?
[15] A    Well, certainly That is the role
[16] of the medical director in the insurance
[17] company to do that That is his expertise
[18] and experience, knowledge
[19] Q    To your belief, is that what
[20] Provident asked you to do with respect to
[21] your claims role, to provide the best
[22] medical advice to the Claims Department
[23] that you could?

## DR. WILLIAM FEIST    [3-8-99]

### Page 0181

[01] A    Certainly  Sure
[02] Q    And did you try to do that when you
[03] would do those circuit meetings with the
[04] Claims Department?
[05] A    I always try to do the best I can in
[06] every case I look at
[07] Q    Same would go for the meetings that
[08] you attended on behalf of the round-table?
[09] A    I would say that when asked to give
[10] a medical opinion, I gave my best medical
[11] opinion  I was rarely asked about anything
[12] else, I have to say that, nor did I make
[13] any comment outside the medical arena,
[14] because I didn't have the expertise
[15] Q    But you didn't shade your medical
[16] comments, based upon what you thought of
[17] either Harold Chandler or Ralph Mohney, is
[18] that correct?
[19] A    No, sir  I stand on the quality of
[20] my referrals throughout the entire tenure
[21] at Provident
[22] Q    So for as long as you were there,
[23] you believe you gave appropriate and

### Page 0182

[01] excellent medical advice to the Claims
[02] Department?
[03] A    Certainly  I worked until 6:00 my
[04] last day on the job, if you want to know
[05] it probably doesn't surprise you
[06] Q    It does not
[07] A    Yes
[08] Q    On the subject of reserves, you had
[09] mentioned reserves in your direct
[10] testimony
[11] A.    Yes
[12] Q    Do you have any knowledge as to the
[13] criteria that goes into the setting of
[14] statutory reserves?
[15] A    Well, I think that is a question for
[16] Mr Davenport, and then he  obviously, was
[17] trying to bag me on that because he got
[18] into the statutory and the GAAP reserves
[19] I'm not an actuary or a financial expert,
[20] but I think the answer to the question is,
[21] is that if there is a claim  the company
[22] has to set up a reserve and cover the
[23] claim  Now, whether it's statutory or

### Page 0183

[01] GAAP, that's beyond me  I can't even
[02] balance my checkbook  But the point is, is
[03] that the company -- my wife does that,
[04] fortunately  The company has to set aside
[05] a monetary reserve to cover the claim
[06] It's just that simple
[07] Q    Do you know what the formula is for
[08] setting up a statutory reserve?
[09] A    Well, my concept would be, and it's
[10] probably over-simplified, is that you have
[11] to take the amount of liability of a given
[12] claimant and project that out over the
[13] projected life span or the time frame, and
[14] that's basically your reserve  That may be
[15] somewhat over-simplified, but, to me  that
[16] works
[17] Q    Now, you mentioned GAAP  That's
[18] generally accepted accounting principles?
[19] A    Yes
[20] Q    Because there is such a thing as
[21] GAAP reserves, correct?
[22] A    Yes  There's GAAP reserves and
[23] statutory reserves  and for the life of me

### Page 0184

[01] I don't understand it  nor do I wish to
[02] understand it
[03] Q    You don't know how either one of
[04] those reserves are specifically set, is
[05] that correct?
[06] A    That's correct
[07] Q    And you don't know how the company
[08] changes its reserves on a day-to-day basis,
[09] is that correct?
[10] A    Obviously  But I think the point
[11] is, is that if they terminate a claim, it
[12] drops off the reserve, and that can go
[13] right to the bottom line  I think that is
[14] a fact that is certain
[15] Q    The fact of the matter is, when it
[16] comes to your testimony about reserves, you
[17] are making a lot of very basic assumptions
[18] Would you agree with me?
[19] MR SCHEFTER  Objection to the
[20] form
[21] A    Well, granted  But when a company
[22] memo comes out and says.  We've got to take
[23] a 275 million dollar infusion into our

### Page 0185

[01] disability reserve to keep it
[02] financially solvent." that's pretty
[03] significant  That gets your attention
[04] MR McMONIGLE  Could you read back
[05] my question?
[06] (Whereupon, the last question was
[07] read back by the court reporter at the
[08] request of counsel )
[09] Q    Would you mind answering the
[10] question that I asked?
[11] A    Yes  Obviously, yes  Again, I'm
[12] not an actuary. I'm not an accountant.
[13] Those numbers don't mean anything to me
[14] But, again, the basic line is you have got
[15] to have reserve to cover a claim  If you
[16] eliminate the claim  the old saying in
[17] underwriting on the disability side, "We
[18] don't care if the person dies  We just
[19] don't want him to be disabled '  The life
[20] people say  "We don't care if he gets
[21] disabled  We just don't want him to die "
[22] It's how you look at things
[23] MR McMONIGLE  Could you read back

### Page 0186

[01] that previous question and previous answer,
[02] where I put the little tab?  You may have
[03] to put in what you read  I want to hear
[04] what it says first
[05] THE COURT REPORTER  Question, When
[06] you use the terminology, [quote], "work
[07] safely," [end quote], what are you
[08] referring to specifically?  Answer, Well, I
[09] think it's a two-fold  The primary thing
[10] would be safely in terms of using
[11] appropriately on patients that were
[12] anesthetized  The side issue might be if
[13] he were to use a patient if his equipment
[14] in the practice of anesthesiology would be
[15] impaired  I think my basic concern was for
[16] the safety of the patient
[17] MR McMONIGLE  Could you mark
[18] that, because I would like your text to
[19] read that you read that question and that
[20] answer
[21] Q    Doctor, we just had a previous
[22] question on direct examination read to you
[23] in conjunction with your answer to it  Did

## DR. WILLIAM FEIST   [3-8-99]

### Page 0187

[01] you hear that?
[02] A    Yes, sir
[03] Q    And one of the things or one of the
[04] phrases that you said, you mentioned that
[05] there was a "side issue," and you said "if
[06] he were to use it himself " Do you
[07] remember that part of your answer?
[08] A    Certainly
[09] Q    When you were talking about "if he
[10] were to use it himself " what you were
[11] saying was, if Dr Laucks were to use the
[12] drugs or were to ingest the drugs, that's
[13] what you meant, correct?
[14] A    Well, I would say use the drugs in
[15] terms of ingestion and/or injection  Some
[16] of these anesthesiologists actually inject
[17] themselves with some of the narcotics that
[18] they are supposed to be giving to the
[19] patient  They give a half-a-vial to the
[20] patients and give a half-a-vial to
[21] themselves
[22] Q    I was probably using "ingestion" a
[23] little sloppily there, because I was

### Page 0188

[01] including "ingestion" and "injection " Let
[02] me see if I can clarify  What you were
[03] referring to there was the fact that if Dr
[04] Laucks were to take the drugs himself,
[05] either by ingestion or injection, correct?
[06] A    Yes, sir
[07] Q    And what you believe, if Dr Laucks
[08] were to take the drugs himself  that could
[09] have an adverse impact on his safely
[10] performing his occupation, correct?
[11] A    Absolutely, yes  Indeed  I think
[12] that is the crux of the thing
[13] Q    The crux of the thing, being
[14] whether, in fact, he takes the drugs
[15] himself, correct?
[16] A    Certainly
[17] Q    Now, there was a section of this
[18] Exhibit One that I will also have you read,
[19] because I don't think it was today here
[20] It begins with the word "also " Could you
[21] just read that into the record?
[22] A    Okay  I'm reading from my note of
[23] December 12, 1995  Also  I don t see how

### Page 0189

[01] benzodiazepines."
[02] b-e-n-z-o-d-i-a-z-e-p-i-n-e-s, with an  s"
[03] and an apostrophe  benzodiazepines  can be
[04] aerosoloyzed " a-e-r-o-s-o-l-o-y-z-e-d, I
[05] think, if I spelled it right, " as it is
[06] liquid only used intravenously  Abe
[07] Eyelan, a registered pharmacist, Abe,
[08] A-b-e, Eyelan, E-y-e-l-a-n, " at Fountain
[09] Square Pharmacy,  ' fountain ' like fountain
[10] and "square" like the square, pharmacy,
[11] concurs with this opinion '
[12] Q    And in that particular paragraph,
[13] you were addressing the potential of this
[14] liquid narcotic becoming airborne, is that
[15] right?
[16] A    Yes
[17] Q    And there was at least a question in
[18] your mind, before you talked to the
[19] pharmacy person, that there was an issue as
[20] to whether this liquid narcotic could, in
[21] fact, become airborne and somehow affect
[22] Dr Laucks, isn't that right?
[23]         MR SCHEFTER  Objection to the

### Page 0190

[01] form
[02] A    Benzodiazepine is an anxiety agent
[03] I think that was kind of a relevant issue
[04] There was some concern that -- I can t
[05] remember the current now  That this
[06] particular agent could be aerosolyzed, and
[07] that could cause a problem  but it can t be
[08] aerosolyzed, so I don't see that that is
[09] relevant to this case  It s an intravenous
[10] thing that has to be injected
[11] intravenously
[12] Q    You resolved that in your mind,
[13] correct, by the end of that note?
[14] A    Well, yes  I resolved that
[15] question  I think  in retrospect  Tim
[16] Peace might have asked that question, and I
[17] said, I don t think so  And I got a
[18] recognized authority in pharmacology, a man
[19] who has a lot of experience in
[20] pharmacology, and he said, "You can t
[21] aerosolyze that medication," or that class
[22] of medication  It s actually a class
[23] Q    And if Tim Peace were to go to the

### Page 0191

[01] IME doctor, was that something the IME
[02] doctor was supposed to address, as well,
[03] isn't that right?
[04] A    I can t speak to that  I think what
[05] I wanted the IME doctor to question was the
[06] oral and intravenous medications  I don t
[07] think we were going to ask him about the
[08] aerosolization of the benzodiazepines
[09] Q    By oral intravenous medications, you
[10] mean what would happen if Dr Laucks were
[11] to take the medications orally or
[12] intravenously, is that what you mean?
[13] A    Yes
[14] Q    Take a look at page 259, if you
[15] would  259 is a memo to Tim Peace from the
[16] field representative Don Lefevre,
[17] L-e-f-e-v-r-e, is that right?
[18] A    That s correct
[19] Q    The only reason I bring this up, is
[20] the idea of the aerosolyzing drugs seems,
[21] but I'm not sure, to have been introduced
[22] to this file on this page, at page 259
[23] Take a look at paragraph four in Mr

### Page 0192

[01] Lefevre's memo  You will see he makes
[02] reference to speaking with the attorney for
[03] Dr Laucks  Do you see that?
[04] A    Yes
[05] Q    And he writes, "The attorney
[06] indicated that it is not only a matter of
[07] being exposed to a high level of stress in
[08] a workplace where the abused drug is
[09] readily available," but he said, "the drug
[10] itself becomes airborne in the OR, making
[11] dependency to benzodiazepine " Do you see
[12] that?
[13] A    I see that  yes  sir
[14] Q    Feel free to look anywhere else in
[15] the file materials that have been provided
[16] to you  But would you agree with me that
[17] that seems to be the introduction of this
[18] topic, which led to your including the
[19] topic on your handwritten notation, Exhibit
[20] Feist One?
[21] A    One would assume so, yes  If I
[22] might add, the last paragraph in this memo
[23] from Lefevre says,  Confirm that airborne

# DR. WILLIAM FEIST    [3-8-99]

## Page 0193

[01] benzodiazepine creates an unreasonable risk
[02] which could set up a relapse
[03] Q    So Don Lefevre was asking Tim Peace
[04] to try to confirm with a medical person
[05] about the authorization, for want of a
[06] better word, of this drug, is that right?
[07] A    That appears to be so, yes
[08] Q    And for that reason that particular
[09] subject was included in your memo?
[10] A    Apparently so  yes  sir
[11]        MR McMONIGLE  I have no further
[12] questions  Thank you, Doctor
[13]
[14] RE-EXAMINATION BY MR SCHEFTER
[15] Q    On questioning by Mr  McMonigle, Dr
[16] Feist, I believe you were asked whether you
[17] could name any specific instances where a
[18] claims adjuster rejected your medical
[19] advice, and I believe your answer was "no "
[20] My question is, after you were asked about
[21] your medical opinion on a file, did you
[22] have any further role with the file,
[23] barring another request for medical advice?

## Page 0194

[01] A    No, I did not
[02] Q    My next question is how you would
[03] know whether a claims adjuster accepted or
[04] rejected your medical advice on any given
[05] file?
[06] A    The only way I would know would be
[07] if that file were to come back to me with
[08] additional information or another question
[09] Normally, I just gave my opinion and did
[10] not see the file again
[11] Q    Prior to reviewing the Laucks claims
[12] file in preparation for this deposition,
[13] prior to that, were you aware whether Tim
[14] Peace followed your statement that, "I
[15] think we need an IME from an
[16] addictionologist"?
[17] A    To my knowledge, I did not
[18] Q    If there was not an IME conducted by
[19] an addictionologist, would that be a
[20] rejection of your advice?
[21]        MR McMONIGLE  Objection
[22] A    In a broad sense, I would say  yes "
[23] Q    You were questioned about whether

## Page 0195

[01] Exhibit One, which is your handwritten
[02] memorandum, concerning an IME, whether you
[03] were advising that an IME be conducted  My
[04] question is on C2 -- referring to  the
[05] claims file -- C259 through C262, the memo
[06] from Lefevre to Peace that you were just
[07] asked to refer to, number one under
[08] "recommendations" says "set up IME "
[09] Having a chance to look at that, can you
[10] state whether it was on your own initiative
[11] whether you recommended that an IME be
[12] conducted in this case?
[13]        MR McMONIGLE  Objection
[14] A    I would have to say that  I think it
[15] was probably on my own evaluation of the
[16] file that I suggested it
[17] Q    You were asked, through questioning
[18] from Mr  McMonigle, whether it was
[19] appropriate for Provident to have the file
[20] reviewed by an individual, and he
[21] referenced certain qualifications  Do you
[22] know whether the individuals referenced are
[23] addictionologists?  Do you have any

## Page 0196

[01] reference?
[02] A    The physicians in this file are
[03] addictionologists?
[04] Q    Do you have any knowledge of the
[05] qualifications of the individual which Mr
[06] McMonigle cited, whether that physician is
[07] an addictionologist?
[08]        MR McMONIGLE  Objection
[09] A    No, I do not
[10] Q    Do you have, in your possession, a
[11] copy of the spring of 1995 Ralph Mohney
[12] memo that you have discussed today?
[13] A    No, I do not
[14] Q    With regard to this issue of the
[15] drugs becoming aerosolyzed, other than the
[16] Lefevre memo that we have referred to that
[17] starts at C259, other than Mr  Lefevre's
[18] statement that that consideration was
[19] raised by Stephen Laucks' attorney, other
[20] than that reference, do you have any
[21] personal knowledge of, indeed, whether
[22] Stephen Laucks' attorney raised that issue?
[23]        MR McMONIGLE  Objection

## Page 0197

[01] A    I do not know
[02] Q    Are you aware that Mr  Lefevre was
[03] deposed in this case, and admitted that he
[04] could have misunderstood the attorney with
[05] regard to that issue?
[06] A    I have no knowledge of that, sir
[07] Q    Do you have in your possession a
[08] copy of the deposition transcript of your
[09] deposition in the Thompson and Wallace
[10] case?
[11] A    I do have, sir
[12] Q    You have a copy of that in your
[13] possession?
[14] A    Yes, I do
[15]        MR SCHEFTER  I have no further
[16] questions
[17]
[18] RE-EXAMINATION BY MR McMONIGLE
[19] Q    Just very briefly, you seem to
[20] suggest that you didn't necessarily get an
[21] opportunity to follow up with Tim Peace  or
[22] somebody like that, after you made your
[23] recommendation  That seems to be the gist

## Page 0198

[01] of the questions that you just answered,
[02] correct?
[03]        MR SCHEFTER  I object to the form
[04] A    That's correct
[05] Q    Let me ask you this, though
[06] Particularly somebody of your senior
[07] status, you probably would have a good
[08] sense when you would sit down with one of
[09] these rookies, such as Tim Peace or one of
[10] the other folks, as to whether they were
[11] listening to you and respecting your views
[12] or whether they were paying absolutely no
[13] attention to you, and you got a sense of
[14] doubt or cynicism or skepticism  And I
[15] guess my question to you is, let's take Tim
[16] Peace  When you sat down with a person
[17] like Tim Peace, did you think he was giving
[18] your medical opinions the attention and
[19] respect they deserved?
[20]        MR SCHEFTER  Objection
[21] A    Well, I think so  But I think one
[22] issue that we have alluded to that probably
[23] ought to be brought up at this point is

# DR. WILLIAM FEIST   [3-8-99]

## Page 0199

[01] that Ralph Mohney, during the time I was
[02] working with him, made it very clear that
[03] the medical decision was not the only thing
[04] that was important  He was very specific
[05] to say that I should only give a medical
[06] opinion, and I was not to write "This
[07] person is totally and permanently
[08] disabled    In fact, I got called on the
[09] carpet one time when I wrote on the file,
[10] the gentleman who had intractable
[11] endomeplectoms  He had all the operations
[12] He couldn't walk across the room without
[13] getting a chest pain  I said  This man is
[14] permanently and totally disabled '  Ralph
[15] Mohney said, "You can t make that call
[16] Only the claims people can make the call of
[17] disability", i e  "We want your medical
[18] input, but we want to make the call " I
[19] think apropos to this case, Tim Peace
[20] listened to me  he respected me  I knew
[21] him from the day he started working at
[22] Provident, very nice young man  I m sure
[23] he respected my opinion, but the ultimate

## Page 0200

[01] decision was not made by me  It was made
[02] by somebody else in the Claims Department
[03] Q     Are you finished?
[04] A     I m finished
[05] Q     I object and move to strike as
[06] nonresponsive  Let me ask you this, sir
[07] When you would sit down with Tim Peace and
[08] you would make a medical recommendation  do
[09] you think Tim Peace accorded you the
[10] attention and respect that you felt you
[11] deserved?
[12] A     Oh, absolutely  Tim was a babe in
[13] the woods when he came to Provident  He
[14] didn't know a claim from a credit card
[15] ticket  I say that in an unkind way, but
[16] he didn t know a thing about it  I think I
[17] helped him, in the time I was working with
[18] him, to raise his expertise  I know he
[19] respected me
[20] Q     What about the other claim
[21] representatives who you spoke to, even some
[22] of the senior types would talk to you, as
[23] well, true?

## Page 0201

[01] A     Sure  They all respected my medical
[02] opinion, but it was pretty clear that my
[03] opinion was not the ultimate decision  It
[04] was the claims administration staff that
[05] made the call, and all I was asked to do
[06] was give a medical opinion, no more and no
[07] less  I would not write "This person is
[08] disabled" or "This person is not disabled "
[09] I was to write my opinion of it
[10] Q     And when you made your medical
[11] opinion, did it receive the accord and
[12] respect that you felt it should have?
[13]           MR SCHEFTER  Objection to the
[14] form
[15] A     I had no way of knowing  As Bobby
[16] has suggested, make the opinion, write it
[17] on the chart, and unless some additional
[18] information came in or an IME or something
[19] else  I would not see the file  I would
[20] not know what the final decision was
[21] Q     Let me ask you this  On those rare
[22] occasions when you did see a file again,
[23] did you ever, in the history of your

## Page 0202

[01] experience at Provident, find a file where
[02] your opinion had been rejected?
[03] A     I can't say that I did
[04] Q     And although I recognize from your
[05] answer, that with respect to the senior
[06] management, you might not see what they did
[07] on the file, you already testified to that
[08] But when you dealt face-to-face with senior
[09] management and you made recommendations,
[10] did they accord you the respect that you
[11] thought you deserved?
[12] A     Certainly  Sure
[13]           MR McMONIGLE   Thanks
[14]
[15] RE-EXAMINATION BY MR  SCHEFTER
[16] Q     Real brief followup  You had stated
[17] on questioning by Mr  McMonigle that
[18] immediately preceded this, that you
[19] believed it was your role to give medical
[20] opinions, but the claims decision was not
[21] yours?
[22] A     That's correct, yes, sir
[23]           MR McMONIGLE  I object to the

## Page 0203

[01] form, by the way
[02] Q     And I believe you also answered this
[03] question, but it was — it was asked to be
[04] stricken as nonresponsive, so I'm going to
[05] ask you if there was ever a specific
[06] instance where you were directed not to
[07] reach a conclusion on disability?
[08]           MR McMONIGLE  Objection
[09] A     Yes, indeed  I alluded to that
[10] earlier
[11] Q     And who gave you that order?
[12] A     Ralph Mohney
[13] Q     When and under what circumstances
[14] did he tell you that?
[15]           MR McMONIGLE  Same objection to
[16] this line of questioning
[17] A     I had reviewed a file, and it was an
[18] individual who was a fairly young man who
[19] had just hopeless untreatable coronary
[20] disease  I just wrote on the file "This
[21] man is permanently and totally disabled
[22] Mohney actually called me in his office and
[23] said, You can t write that on a file  All

## Page 0204

[01] we want to know is level of disability  We
[02] will make the call for whether he s
[03] disabled by the policy language   And
[04] basically says it s a claims and
[05] administration call whether someone is paid
[06] a claim or not  Medical input, of course
[07] is important, but not the ultimate
[08] decision
[09]           MR SCHEFTER  I have no further
[10] questions
[11]           MR McMONIGLE  Just note the
[12] objection and move to strike as
[13] nonresponsive
[14]           MR McMONIGLE  No questions
[15]           FURTHER DEPONENT SAITH NOT
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]

**DR WILLIAM FEIST    |3-8-99|**

Page 0205

```
[01]         CERTIFICATE
[02]
[03]  STATE OF ALABAMA)
[04]  JEFFERSON COUNTY)
[05]
[06]       I hereby certify that the above and
[07]  foregoing deposition was taken down by me
[08]  in stenotype and the questions and answers
[09]  thereto were reduced to typewriting under
[10]  my supervision and that the foregoing
[11]  represents a true and correct transcript of
[12]  the deposition given by said witness upon
[13]  said hearing.
[14]       I further certify that I am neither
[15]  of counsel nor of kin to the parties to the
[16]  action, nor am I in anywise interested in
[17]  the results of said cause.
[18]
[19]
[20]
[21]
[22]  Donna L. Miller, Commissioner
[23]
```

Page 0206

```
[01]
[02]
[03]
[04]
[05]
[06]
[07]
[08]
[09]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
```

## DR. WILLIAM E. FEIST   [1-25-99]

**Page 0001**

[01] IN THE UNITED STATES DISTRICT COURT
[02] FOR THE WESTERN DISTRICT OF TEXAS
[03] AUSTIN DIVISION
[04]
[05] CASE NUMBER: C.A. NO. A:98-CA-407-SS
[06] DR. LYNNE E. THOMPSON
[07] Plaintiff,
[08]
[09] vs.
[10] PROVIDENT LIFE AND ACCIDENT
[11] INSURANCE COMPANY,
[12] Defendant.
[13]
[14] CASE NUMBER: C.A. NO. A: 98-CA-425-JN
[15] JOE L. WALLACE,
[16] Plaintiff,
[17] vs
[18] PROVIDENT LIFE AND ACCIDENT
[19] INSURANCE COMPANY,
[20] Defendant.
[21]
[22] DEPOSITION OF DR. WILLIAM E. FEIST
[23] In accordance with The Federal
    Rules of Civil Procedure, I, MICKEY TURNER,

**Page 0002**

[01] am hereby delivering to Mr. David C. Kent,
[02] the original transcript of the oral
[03] testimony taken on the 25th day of January,
[04] 1999, along with exhibits.
[05] Please be advised that this is
[06] the same and not retained by the Court Reporter,
[07] nor filed with the Court.
[08]
[09]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]

**Page 0003**

[01] IN THE UNITED STATES DISTRICT COURT
[02] FOR THE WESTERN DISTRICT OF TEXAS
[03] AUSTIN DIVISION
[04] CASE NUMBER: C.A. NO. A:98-CA-407-SS
[05] DR. LYNNE E. THOMPSON
[06] Plaintiff,
[07] vs.
[08] PROVIDENT LIFE AND ACCIDENT
[09] INSURANCE COMPANY,
[10] Defendant.
[11]
[12] CASE NUMBER: C.A. NO. A: 98-CA-425-JN
[13] JOE L. WALLACE,
[14] Plaintiff,
[15] vs.
[16] PROVIDENT LIFE AND ACCIDENT
[17] INSURANCE COMPANY,
[18] Defendant.
[19]
[20] S T I P U L A T I O N
[21] IT IS STIPULATED AND AGREED by and
[22] between the parties through their respective
[23] counsel, that the video deposition of DR.

**Page 0004**

[01] WILLIAM E. FEIST may be taken before MICKEY
[02] TURNER, Commissioner, at the offices of Foshee &
[03] Turner at 220 Park Place Tower, Birmingham,
[04] Alabama 35203, on the 25th day of January, 1999.
[05] IT IS FURTHER STIPULATED AND AGREED
[06] that it shall not be necessary for any
[07] objections to be made by counsel to any
[08] questions except as to form or leading
[09] questions, and that counsel for the parties may
[10] make objections and assign grounds at the time
[11] of the trial, or at the time said deposition is
[12] offered in evidence, or prior thereto.
[13] IT IS FURTHER STIPULATED AND AGREED
[14] that the notice of filing of the deposition by
[15] the Commissioner is waived.
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]

**Page 0005**

[01] INDEX
[02] EXAMINATION BY: PAGE NUMBER:
[03] Mr. Kent 11
[04] Mr. Ehlinger 113
[05] Mr. Davenport 162
[06] Mr. Kent 292
[07] Mr. Echerd 337
[08] Mr. Kent 340
[09]
[10] PLAINTIFF'S EXHIBITS:
[11] 1 - 4-24-95 Internal Memo 85
[12] 2 - 1997 Annual Report 157
[13] 4 - Securities And Exchange
[14] Commission, Form 10-K - 332
[15] 5 - Packet of Documents re:
[16] Dr. Lynn Thompson's
[17] Disability Claim 346
[18]
[19] DEFENDANT'S EXHIBITS:
[20] 3 - Provident Vision Statement 223
[21]
[22]
[23]

**Page 0006**

[01] IN THE UNITED STATES DISTRICT COURT
[02] FOR THE WESTERN DISTRICT OF TEXAS
[03] AUSTIN DIVISION
[04] CASE NUMBER: C.A. NO. A:98-CA-407-SS
[05] DR. LYNNE E. THOMPSON
[06] Plaintiff,
[07] vs.
[08] PROVIDENT LIFE AND ACCIDENT
[09] INSURANCE COMPANY,
[10] Defendant.
[11]
[12] CASE NUMBER: C.A. NO. A: 98-CA-425-JN
[13] JOE L. WALLACE,
[14] Plaintiff,
[15] vs.
[16] PROVIDENT LIFE AND ACCIDENT
[17] INSURANCE COMPANY,
[18] Defendant.
[19] BEFORE:
[20] MICKEY TURNER, Commissioner
[21] APPEARANCES:
[22] HUGHES & LUCE, LLP, by Mr. David C.
[23] Kent, 1717 Main Street, Suite 2800, Dallas,

## DR. WILLIAM E. FEIST    [1-25-99]

### Page 0007

[01] Texas 75201, appearing on behalf of the
[02] Plaintiff, Lynn E. Thompson.
[03]      GROVE & EHLINGER, by Mr. Ross H.
[04] Ehlinger, 508 West Twelfth Street, Austin, Texas
[05] 78701, appearing on behalf of the Plaintiff, Joe
[06] L. Wallace.
[07]      FIGARI & DAVENPORT, L.L.P., by Mr.
[08] Mark T. Davenport, 901 Main Street, Suite 4800,
[09] Dallas, Texas 75202, appearing on behalf of the
[10] Defendant.
[11]      MR. J. HARTLY ECHERD, Vice President
[12] & Counsel, Provident Companies, Inc., 1 Fountain
[13] Square, Chattanooga, Tennessee 37402, appearing
[14] on behalf of the Defendant.
[15] ALSO PRESENT: Video Technician
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]

### Page 0008

[01]      I, MICKEY TURNER, a Court Reporter of
[02] Birmingham, Alabama, acting as Commissioner,
[03] certify that on this date, as provided by
[04] the Federal Rules of Civil Procedure and the
[05] foregoing stipulation of counsel, there came
[06] before me at the offices of Foshee & Turner, 220
[07] Park Place Tower, Birmingham, Alabama 35203,
[08] beginning at 12:30 p.m., DR. WILLIAM E. FEIST,
[09] witness in the above cause, for oral
[10] examination, whereupon the following proceedings
[11] were had:
[12]      MR. KENT: We are taking this
[13] deposition in two cases that are separately
[14] filed, separately being pursued in Federal
[15] District Court in Austin. And our agreement is
[16] that to make it economical and efficient, we
[17] will agree that the single deposition transcript
[18] can be used in both cases. That way we don't
[19] have to have a repetition of questioning by Mr.
[20] and then the same questions again by Mr.
[21] Ehlinger. So it won't matter who asked the
[22] questions, whatever is done here can be used in
[23] either case. Correct?

### Page 0009

[01]      MR. DAVENPORT: Right.
[02]      MR. EHLINGER: That's right.
[03]      VIDEO TECHNICIAN: This is the video
[04] deposition of Dr. William Feist. Today's date
[05] is January 25, 1999. The time is approximately
[06] 12:35 P.M. The first case is being held in the
[07] United States District Court for the Western
[08] District of Texas, Austin Division, Civil Action
[09] Number A:98-CA-407-SS. Dr. Lynn E. Thompson for
[10] the Plaintiff versus Provident Life and Accident
[11] Insurance Company for the Defendant.
[12]      The second case is being held in the
[13] United States District Court for the Western
[14] District of Texas, Austin Division, Civil Action
[15] Number, A: 98-CA-425-JN, Joe L. Wallace, for the
[16] Plaintiff versus Provident Life and Accident
[17] Insurance Company for the Defendant.
[18]      Will counsel please state who they
[19] are and who they represent?
[20]      MR. KENT: David Kent for the firm of
[21] Hughes & Luce from Dallas and Austin and we
[22] represent Dr. Lynn Thompson in his case.
[23]      MR. EHLINGER: I'm Ross Ehlinger of

### Page 0010

[01] Grove & Ehlinger of Austin, Texas. I represent
[02] Joe Wallace.
[03]      MR. DAVENPORT: I'm Mark Davenport
[04] from Dallas, and I represent Provident in both
[05] cases.
[06]      VIDEO TECHNICIAN: Will the Court
[07] Reporter please swear in the witness?
[08]
[09]      DR. WILLIAM E. FEIST,
[10] being first duly sworn, was examined and
[11] testified as follows:
[12]
[13]      COURT REPORTER: Usual stipulations?
[14]      MR. DAVENPORT: Preserve objections
[15] until time of trial except to the form of the
[16] question, the responsiveness of the answer.
[17] The witness -- do you want to sign this
[18] deposition, read it and sign it? Read it?
[19]      THE WITNESS: I would like to, yes,
[20] sir.
[21]      MR. DAVENPORT: The witness will,
[22] then, read it and sign it before any notary. If
[23] for any reason he doesn't, we can use a

### Page 0011

[01] certified copy in the trial or the hearing. Is
[02] that okay?
[03]      MR. KENT: That's fine.
[04]
[05] EXAMINATION BY MR. KENT:
[06]      Q. Dr. Feist would, you tell us your
[07] name, please?
[08]      A. My name is William E. Feist, M.D.
[09]      Q. Where do you live, sir?
[10]      A. I live in Birmingham, Alabama.
[11]      Q. We are here in Birmingham, Alabama,
[12] today taking your deposition, are we not?
[13]      A. Yes, sir.
[14]      Q. How old are you, sir?
[15]      A. Fifty-eight years old.
[16]      Q. You said that you are an M.D. What
[17] is your profession?
[18]      A. My training is internal medicine,
[19] Board eligible in internal medicine. I have
[20] been practicing insurance medicine for
[21] twenty-one years. I am Board Certified in
[22] insurance medicine.
[23]      Q. What is insurance medicine?

### Page 0012

[01]      A. Insurance medicine is the evaluation
[02] of underwriting cases for life insurance and
[03] various other types of insurance. Also some
[04] claims work for other types of insurance, and
[05] some employee health responsibilities as well.
[06]      Q. Do you practice medicine in a private
[07] practice capacity today?
[08]      A. No, I am fully -- a full-time
[09] employee of the insurance company.
[10]      Q. Which insurance company is that?
[11]      A. Protective Life Insurance Company in
[12] Birmingham.
[13]      Q. What is your position with Protective
[14] Life Insurance Company?
[15]      A. Medical Director.
[16]      Q. As Medical Director, what are your
[17] responsibilities?
[18]      A. Primary responsibility is for
[19] underwriting life insurance applications. I do
[20] some early death claim evaluations, contestable
[21] death claim evaluations and some employee
[22] health.
[23]      Q. Prior to the time that -- well, let

## DR. WILLIAM E. FEIST   [1-25-99]

**Page 0013**

[01] me ask you, how long have you worked for
[02] Protective Life?
[03]    A.   It will be three years next month.
[04]    Q.   So back in 1996 is when you joined
[05] them?
[06]    A.   March 1, 1996, yes, sir.
[07]    Q.   Prior to working for Protective,
[08] where did you work?
[09]    A.   Provident Life and Accident in
[10] Chattanooga.
[11]    Q.   That is the defendant in this
[12] lawsuit?
[13]    A.   Yes, sir.
[14]    Q.   How long did you work for Provident
[15] Life?
[16]    A.   Fourteen years, from July of 1982 to
[17] February of 1996.
[18]    Q.   Can you briefly trace for us your job
[19] positions and responsibilities at Provident over
[20] that fourteen-year period from July of 1982
[21] through February of 1996?
[22]    A.   I was hired in July of 1982 as
[23] Assistant Medical Director with two other

**Page 0014**

[01] physicians in the department reporting to the
[02] Medical Director. I was promoted to Associate
[03] Medical Director in 1985 and to Vice President
[04] and Medical Director in July of 1990 when the
[05] Medical Director who hired me retired.
[06]    Q.   So, from 1990 through the time of
[07] your retirement from the company in February of
[08] 1996, you were a Vice President and Medical
[09] Director?
[10]    A.   Yes, sir.
[11]    Q.   What were your job responsibilities
[12] as Vice President and Medical Director?
[13]    A.   Primarily overseeing a group of two
[14] other physicians in the underwriting of life,
[15] disability, medical insurance and long-term care
[16] insurance from separate departments. We're a
[17] free-standing department. And also the employee
[18] health care, the employee infirmary, if you
[19] will.
[20]    Q.   You may have to speak up a little bit
[21] to make sure we get good sound here on tape.
[22]       What do you mean the medical
[23] infirmary, medical clinic? What was that?

**Page 0015**

[01]    A.   Well, we had an employee clinic where
[02] employees -- we had a full-time nurse and a
[03] nursing assistant who saw employees in the
[04] infirmary for routine medical analysis or for
[05] immunizations, minor illnesses, basically
[06] designed to keep an employee in the building on
[07] the job, rather than having to go out to his or
[08] her own physician.
[09]    Q.   Prior to the time that you worked for
[10] Provident, beginning in July of 1982, can you
[11] give us a thumbnail sketch of your professional
[12] background, employment background prior to then?
[13]    A.   Backwards or forwards?
[14]    Q.   Either way that you prefer.
[15]    A.   Okay. From January of 1998 --
[16] pardon me, January of 1978, January of '78 to
[17] July of '82, I worked for the Businessmen's
[18] Insurance Company of Kansas City as a Assistant
[19] Medical Director.
[20]       From roughly July of 1972 to the end
[21] of 1977, I was in practice in internal medicine
[22] in Kansas City, Missouri. Prior to that, I was
[23] an internal medicine resident in St. Luke's

**Page 0016**

[01] Hospital, Kansas City, Missouri. Internship,
[02] two years with Uncle Sam --
[03]       COURT REPORTER: I'm sorry,
[04] internship?
[05]       THE WITNESS: I'm sorry. I'm going
[06] too fast. Internship and medical residency St.
[07] Luke's Hospital in Kansas City. I finished that
[08] in 1972. Medical school, graduated in 1966,
[09] University of Kansas, Kansas City, Kansas.
[10]    Q.   So for a little bit more than twenty
[11] years, now, you have worked in some capacity as
[12] a Medical Director for insurance companies?
[13]    A.   That's correct, sir. Yes, sir.
[14]    Q.   Is that correct?
[15]    A.   And I was Board Certified in
[16] insurance medicine in 1985.
[17]    Q.   1985 you were Board Certified?
[18]    A.   Yes, sir.
[19]    Q.   All right. Now, during your time --
[20] well, before we get to that, tell us something
[21] about Provident Life insurance. Where is that
[22] located?
[23]    A.   Located in Chattanooga, Tennessee.

**Page 0017**

[01]    Q.   And when you were there, from 1982
[02] up until the time you became Medical Director in
[03] 1990, how big a company was that for those who
[04] have no sense of insurance companies?
[05]    A.   Well, from about 1982 up until 1990,
[06] perhaps even in the early nineties, there were
[07] as many as four hundred -- pardon me, four
[08] thousand employees nationwide, about two
[09] thousand in Chattanooga and maybe two thousand
[10] countrywide.
[11]    Q.   Okay. And what happened after the
[12] early 1990s? You said it went up. You took us
[13] up to the early 1990s in your answer there.
[14]    A.   Well, in roughly 1995, the group
[15] department was sold off to Healthsource, so the
[16] company basically went from four thousand
[17] employees to two thousand.
[18]    Q.   What type of insurance products did
[19] Provident sell? Was there a particular type or
[20] part of the market that it was known for while
[21] you were working there?
[22]    A.   Well, I think most of my tenure:
[23] there, they were known for the disability income

**Page 0018**

[01] insurance, primarily individual disability.
[02] There was some life insurance. Up until the
[03] group department split out in, say, '94 or 5, or
[04] 6, whenever that was, they had had health
[05] insurance as well.
[06]    Q.   When you say individual disability
[07] income insurance what are you referring to?
[08] Can you give us a description of what that
[09] insurance product is?
[10]    A.   Basically it's a product where an
[11] individual of whatever profession buys a policy
[12] that protects him or her from disabilities. Of
[13] course, there's several varieties of such
[14] policies. One can get an own occ policy or an
[15] any occ policy or an income replacement policy?
[16] During the time I was at Provident, it was
[17] primarily -- well, there were several varieties,
[18] but the own occ, top of the line, top dollar
[19] professional person insurance was really the
[20] main stay and what they were known for
[21] throughout the industry.
[22]    Q.   What do you mean own occ? Is that
[23] own occupation?

## DR. WILLIAM E. FEIST   [1-25-99]

### Page 0019

[01]  A.  Own occupation, yes, sir.

[02]  Q.  And what does that mean?  Put that in

[03] terms that a lay person can understand.

[04]  A.  Basically if an individual is unable

[05] to perform the material and substantial duties

[06] of his or her occupation, he or she is disabled

[07] in that policy.

[08]  Q.  And how is that contrasted with an

[09] any occupation policy?

[10]  A.  An any occupation policy, basically

[11] means that a disability is paid if one cannot

[12] perform any occupation for which he has

[13] appropriate education or training.

[14]  Q.  So to the insured individual, which

[15] one is generally sold as a more preferable one

[16] or more, I shouldn't say more preferable, but

[17] one that has greater benefits?

[18]  A.  Well, obviously --

[19]  MR. DAVENPORT:  Excuse me, object.

[20] Calls for speculation, outside of the

[21] qualifications of this witness.

[22]  Q.  Is that something you feel that you

[23] understand that?

### Page 0020

[01]  A.  I can answer it.  Yes, sir, I do.

[02]  Q.  Okay.  Go ahead and --

[03]  A.  Rephrase the question or repeat the

[04] question.

[05]  Q.  In the way that insurance policies

[06] between own occupation and any occupation

[07] policies were sold, which one is sold or

[08] marketed as having greater benefits for the

[09] individual?

[10]  A.  Obviously, the own occ policy has a

[11] greater benefit, as in greater coverage, greater

[12] options, if you were to become disabled.

[13]  Q.  You also mentioned there is an income

[14] replacement-type policy.  What's the distinction

[15] there between that and an any occupation and own

[16] occupation policy?

[17]  A.  My understanding of a income

[18] replacement policy would be one if somebody

[19] were, say, making ten thousand a month and they

[20] became disabled and couldn't do that occupation,

[21] then took another occupation where they made

[22] five thousand a month, the insurance company

[23] would pay the difference between what he was

### Page 0021

[01] making and what he is now currently making.

[02]  MR. DAVENPORT:  Object to the

[03] responsiveness of the answer.  It calls for

[04] speculation.  Also improperly describes the

[05] policy.

[06]  Q.  Dr. Feist, with regard to Provident,

[07] the company that you worked for, of those three

[08] types of policies you have described, what was

[09] the primary focus of Provident while you were

[10] there?

[11]  A.  During my tenure from '82 to '96, the

[12] main policy that was sold and publicized and

[13] pushed was the own occ policy.

[14]  Q.  And I think you also mentioned that

[15] it was aimed at the professional market.  What

[16] did you mean by that?

[17]  A.  Physicians, dentists, lawyers,

[18] executives.  Generally those who were making six

[19] figure incomes, put it that way.

[20]  Q.  And I presume that the benefit level

[21] available under the policy was equally high or

[22] was also a high figure?

[23]  MR. DAVENPORT:  Again, that calls for

### Page 0022

[01] speculation of this witness.  He wasn't in

[02] marketing.  He's not familiar with the policies.

[03]  MR. DAVENPORT:  Dr. Feist --

[04]  A.  I can tell you what I saw come across

[05] my desk.  I saw ten, fifteen, twenty thousand

[06] dollar a month policies come across.  And my

[07] understanding was that the individual, the limit

[08] of the coverage that one could have was six

[09] percent of one's net income.

[10]  Q.  Okay.

[11]  A.  In other words, to get a

[12] ten-thousand-dollar-a-month-policy you had make

[13] forty percent more than that.

[14]  MR. DAVENPORT:  Object.

[15] Nonresponsive, move to strike.

[16]  Q.  So, Dr. Feist, you understand, if you

[17] have given a deposition before, sometimes

[18] lawyers will make objections?

[19]  A.  I understand.

[20]  Q.  And the result is that we may ask a

[21] question again to try to cure --

[22]  A.  Sure.

[23]  Q.  -- overcome --

### Page 0023

[01]  A.  I've been here before.

[02]  Q.  Okay.  Great.  Thank you.  So my

[03] question is, when you were -- Provident was

[04] selling an own occupation income disability

[05] policy to professionals with high income,

[06] earnings, were the benefits also high monthly

[07] benefits?

[08]  A.  Sure, yeah.

[09]  MR. DAVENPORT:  Excuse me, object.

[10] Excuse me, Doctor.  When I need to make an

[11] objection, let me make my objection for the

[12] record and stop talking, so the court reporter

[13] can --

[14]  THE WITNESS:  All right.

[15]  MR. DAVENPORT:  And when I finish, I

[16] won't talk over you, too.  Is that okay?

[17]  THE WITNESS:  All right.  That's

[18] fine.

[19]  MR. DAVENPORT:  I object to the last

[20] question.  It was leading and it calls for

[21] speculation.  Thank you.

[22]  Q.  Dr. Feist, among your job

[23] responsibilities at Provident, while you were

### Page 0024

[01] there, did you have any responsibilities for

[02] claims handling?

[03]  A.  Intermittently.  When I first came

[04] there in 1982, there were three physicians in

[05] the department.  And we were just sort of, as a

[06] case-by-case basis would look at cases.  And,

[07] then, in about 1990, there was a reorganization

[08] of the company and the disability claims

[09] operation was set up, at least for the physician

[10] role, as a designated physician for the claims

[11] review.  And from about 1990 until about 1995, I

[12] had virtually no responsibility for claims

[13] review.

[14]  Q.  Okay.  What happened in 1995?

[15]  A.  In the spring of 1995, I was asked to

[16] step back into that role.  It was presented to

[17] me that they had needs to increase their

[18] physician staffing in the disability income

[19] arena by virtually putting fifteen or twenty

[20] hours of my week, fifteen to twenty hours a

[21] week, being available to the claims adjustors.

[22]  And at that time, they had brought in

[23] the disability income claims from around the

# DR. WILLIAM E. FEIST   [1-25-99]

Page 0025

[01] country into the home office and virtually had
[02] five different offices in two different
[03] buildings. So I would go on successive days of
[04] the week to a given section, be available for
[05] two or three hours to just address questions and
[06] so forth.
[07]    Q.   Now, you say that they asked you to
[08] do that?   Who asked you to do that?
[09]    A.   Ralph Mohney in particular.
[10]    Q.   Who is Ralph Mohney?
[11]    A.   Ralph Mohney, at that time, was the
[12] Vice President in charge of disability claims.
[13] I don't know what his title is now, but that's
[14] what it was at that time.
[15]    Q.   Was this responsibility of doing the
[16] fifteen to twenty hours a week consulting with
[17] the claims handlers, was that to replace what
[18] you were already doing or how did that fit with
[19] your job assignment?
[20]    A.   It just was an additional fifteen to
[21] twenty hours a week, more work for me. No
[22] remuneration, by the way, either, increase in
[23] salary.

Page 0026

[01]    Q.   You say that started in the spring of
[02] 1995?
[03]    A.   I am thinking, March/April.
[04] Somewhere in the spring of 1995, yes, sir.
[05]    Q.   Did you have any other involvement in
[06] the claims review process beginning in 1995?
[07]    A.   I had the responsibility to take
[08] one of the evening round-table groups. There
[09] were --
[10]    Q.   Excuse me.   What do you mean
[11] round-table groups?
[12]    A.   Round table?   Beginning in the fall,
[13] pardon me, the spring of 1996, there were
[14] evening round-table meetings, usually held on
[15] Tuesday, Thursday evenings where a group of
[16] people would gather after hours and review
[17] cases. I was assigned to one of those, one of
[18] those a week. And cases were brought to that
[19] round table. The round table consisted of
[20] claims adjusters, one physician, a couple of
[21] attorneys or more and some administrative
[22] personnel, and cases were brought to that round
[23] table to discuss.

Page 0027

[01]    Q.   Was the round-table process something
[02] new or had it been going on for a while?
[03]    A.   In that formal setting, it was new
[04] to my experience.
[05]    Q.   Okay.
[06]    MR. DAVENPORT:   Object.
[07] Nonresponsive.
[08]    Q.   How long did that round-table review
[09] process continue from the time it started in the
[10] spring of 1995 up until the time you left in
[11] February of '96?
[12]    A.   It was ongoing when I left in
[13] February of '96. I -- well, from the spring of
[14] '95 to when I left in February of '96, it was an
[15] ongoing routine process.
[16]    Q.   And how long did you participate in
[17] the round-table process from spring of '95 up
[18] until the time you left in February of '96?
[19]    A.   I continued up to the middle of
[20] February of '96. After I submitted my
[21] resignation, retirement. I quit attending the
[22] round tables.
[23]    Q.   Was were there any other ways in

Page 0028

[01] which you participated in the claims handling
[02] process beginning there in 1995?   You have
[03] identified the round-table reviews.   You have
[04] identified the fifteen to twenty hours a week of
[05] talking with --
[06]    A.   Claims adjusters.
[07]    Q.   -- claims adjusters.  Any other ways?
[08]    A.   I believe those are the primary
[09] responsibilities.
[10]    Q.   Had anything happened within the
[11] company to your knowledge that prompted this new
[12] process, this round-table review process?
[13]    MR. DAVENPORT:   Object to the form of
[14] the question.  Calls for speculation.
[15]    Q.   If you know.
[16]    A.   Well, as counsel has indicated, I
[17] will have to speculate, that the claims review
[18] or the claims liability was so high they had
[19] taken a three hundred million dollar pay-in to
[20] the reserves for the disability claims in the
[21] fall of 1993. I think that --
[22]    Q.   Go ahead.  You can finish your
[23] answer.

Page 0029

[01]    MR. DAVENPORT:   Go ahead.
[02]    A.   I think there was just some effort to
[03] control the claims. Three hundred million
[04] dollars is a pretty good hit for any insurance
[05] company.
[06]    MR. DAVENPORT:   Object. The answer
[07] was speculation. Move to strike.
[08]    Q.   At the time that your involvement in
[09] claims began in the way you described in the
[10] spring of 1995, who was the CEO of Provident?
[11]    A.   Terry L. Chandler.
[12]    Q.   Mr. Chandler?
[13]    A.   Mr. Chandler, yes, sir.
[14]    Q.   When did he come to the company?
[15]    A.   November 15, 1993.
[16]    Q.   In 1993, did Provident have any
[17] financial losses or take any financial losses
[18] related to their disability insurance products?
[19]    A.   Oh, gee.
[20]    MR. DAVENPORT:   Object to the form of
[21] the question.  Calls for speculation. Clearly
[22] outside of this witness's area of expertise.
[23]    A.   Well, it was common knowledge in the

Page 0030

[01] company. In fact, at one of our Vice
[02] President's meetings, they discussed the
[03] problem.
[04]    Q.   And what was it that they discussed
[05] at the Vice President's meeting?
[06]    A.   Basically that it was a serious
[07] problem and we were going to have to deal with
[08] it.
[09]    Q.   What was the nature of the problem?
[10]    A.   A large financial reserve, debt, if
[11] you will, or liability is perhaps a better word,
[12] for the disability claims.
[13]    Q.   How much was it?
[14]    A.   My understanding is about three
[15] hundred million dollars that they had to dump
[16] in. I don't know what the total liability for
[17] the disability claims. I don't have any
[18] knowledge of that number. They had to shore up
[19] three hundred million dollars to satisfy the
[20] State Insurance Commissioner to cover their
[21] reserves.
[22]    MR. DAVENPORT:   Excuse me. Object to
[23] the responsiveness of the answer. It's clearly

## DR. WILLIAM E. FEIST    [1-25-99]

[01] based on speculation from this witness.

[02]  Q.  When you said that they had to dump

[03] in this money, what did you mean, dump in the

[04] money?

[05]  A.  Well, my understanding, again, I will

[06] have to defer to counsel. If one has a financial

[07] liability in one area, one line of insurance,

[08] the umbrella corporation has to shift funds, if

[09] you will, to cover that, to maintain their good

[10] standing with the insurance regulatory

[11] regulations.

[12]  MR. DAVENPORT:  Excuse me. Object to

[13] the responsiveness. This is speculation from

[14] this witness.

[15]  Q.  What was explained to the Vice

[16] Presidents by Provident as to what was

[17] happening, why the company was having to take

[18] this three hundred million dollar charge.

[19]  A.  Basically --

[20]  MR. DAVENPORT:  Excuse me. Object to

[21] the form of the question. It's vague and

[22] ambiguous as to time, place, speaker and

[23] location.

[01]  Q.  You can answer that question.  We are

[02] talking there in the fall of 1993 as the time

[03] period that you have described.

[04]  A.  Yeah. Well, basically, it was made

[05] known to the Vice Presidents in the company that

[06] there was a liability in the disability claims

[07] that had to be met one way or the other.  And I

[08] don't recall the specific procedures that were

[09] to correct that, but it was well known that that

[10] was happening.  I mean, that that was present, I

[11] am sorry.

[12]  MR. DAVENPORT:  Excuse me. Object to

[13] the responsiveness of the answer.  It's a

[14] summary or an understanding, apparently, of

[15] alleged statements that may or may not have been

[16] made. It's therefore speculative. Go ahead.

[17]  Q.  Was that three hundred million dollar

[18] charge that you have described, was that done

[19] before or after Mr. Chandler came in as CEO?

[20]  A.  My recollection is it was made after he

[21] took the reins as the CEO.

[22]  Q.  Were there any changes made in the

[23] corporate structure or the company that were

[01] expressed to the employees of the company as a

[02] response to this three hundred million dollar

[03] charge?

[04]  MR. DAVENPORT:  Object to the form of

[05] the question as vague and ambiguous as to time,

[06] place, identity and so forth of the alleged

[07] statement.

[08]  A.  Well, my opinion is that the claims

[09] people felt like at that point, in the fall of

[10] 1993, there were claims offices scattered

[11] throughout North America in association with

[12] their sales office. In other words, a branch

[13] manager in Seattle would not only sell Provident

[14] disability income, he would have people on his

[15] staff that would pay the claims for his

[16] jurisdiction. And virtually all of the

[17] claims-paying operation and the claims adjustors

[18] were brought into the home office during that

[19] time frame, say, roughly probably late '93 to

[20] maybe early '94.

[21]  In other words, an effort to bring

[22] the claims adjustors in-house, basically, to

[23] have more control of what they were doing.

[01] better training, et cetera, et cetera.  There

[02] was some thought that these claims adjustors out

[03] in the field didn't have the training or the

[04] expertise, maybe, or the time to really

[05] adjudicate claims, so that was one of their

[06] things, to bring everything in-house.

[07]  MR. DAVENPORT:  Object to the answer

[08] as being nonresponsive.  The answer was prefaced

[09] with the statement that it was his opinion.

[10] It's, therefore, based on nothing more than

[11] speculation. I move to strike.

[12]  Q.  Dr. Feist, as you can gather from the

[13] comments sometimes, to the extent that you can,

[14] answer based on what you knew, saw, heard, and

[15] clarify that, that will make it a little clearer

[16] for all of us sometimes.

[17]  A.  Well, when one has to make -- you

[18] know.

[19]  Q.  All I am saying is that when you are

[20] giving your answers, if you can specify that to

[21] help clarify your answer, that may help us some,

[22] okay?

[23]  A.  Uh-huh (indicating affirmatively).

[01]  Q.  Now, with the advent of Mr. Chandler

[02] as CEO, did you see any change in the culture of

[03] the company of Provident after he arrived in

[04] 1993, in the fall of 1993?

[05]  MR. DAVENPORT:  Excuse me. Object to

[06] the form of the question. It is vague and

[07] ambiguous.

[08]  A.  I think it all became bottom line.  I

[09] mean --

[10]  Q.  What do you mean by that?

[11]  A.  Well, I think everything, personnel,

[12] policies, et cetera, type of insurance sold.

[13] everything became bottom line.  Provident, for

[14] the first hundred years, was more of a

[15] internalistic family-run company to do what's

[16] right for the customer, do what's right for the

[17] employee and that changed dramatically after

[18] Chandler came.

[19]  MR. DAVENPORT:  Object to the form

[20] of the answer as speculative, nonresponsive,

[21] containing conclusions and opinion.

[22]  Q.  What do you mean that it changed

[23] completely after that?  That was your closing

[01] comment, that it changed completely.

[02]  A.  Well, I think, the CEO sets the

[03] culture of a company.  I think that's an

[04] undeniable fact

[05]  Q.  And what was the culture --

[06]  MR. DAVENPORT:  Excuse me. Object to

[07] the responsiveness of the answer.  It is

[08] speculation of this witness as to what the CEO

[09] did. Move to strike.

[10]  Q.  In what way, if any, did you see any

[11] direction of the corporate culture coming from

[12] the CEO, Mr. Chandler?

[13]  MR. DAVENPORT:  Let me interject --

[14]  A.  Let me make sure I understand your

[15] question.

[16]  MR. DAVENPORT:  Excuse me, Doctor.

[17] Object on the grounds of vagueness and

[18] ambiguous.

[19]  Q.  In your comment a moment ago, you

[20] said that the CEO sets the culture --

[21]  A.  Yes, sir.

[22]  Q.  -- of the company?

[23]  A.  I believe so.

Page 0037

[01]    Q.   In what way did you see that
[02]  manifested, if at all, with Mr. Chandler in his
[03]  tenure at Provident?
[04]    A.   Again, becoming more concerned about
[05]  the bottom line and, uh, profits than virtually
[06]  anything else.
[07]    MR. DAVENPORT:  Object.  Excuse me.
[08]  Object.  These are opinions and speculations and
[09]  conclusions of the witness.  These are not
[10]  facts.  They are not based on what the witness
[11]  knows.  Move to strike.
[12]    Q.   What is the basis for your comment
[13]  that it became a view towards, an interest in
[14]  profits at the company?  Can you give us
[15]  examples of the way that would manifest?
[16]    A.   If you take, one of the things was
[17]  that he split off the group department.  Half
[18]  the company he sold off, because they weren't
[19]  making enough profits.
[20]    Q.   Any other ways?
[21]    MR. DAVENPORT:  Excuse me.  Object,
[22]  nonresponsive.  This man was not in management.
[23]  He has no way to know the reasons that that

Page 0038

[01]  company was sold and why it was sold.
[02]  Speculation.  Move to strike.
[03]    Q.   Do you feel that's a speculative
[04]  comment on your part?
[05]    A.   It's a fact.  The group department
[06]  was sold in, I don't remember the date.  It was
[07]  probably ninety -- about, sometime in '96, I
[08]  think.  And Chandler said in a Vice President
[09]  meeting that the group department was top heavy
[10]  and they weren't -- they were taking a lot of
[11]  the expenses of the company and not producing
[12]  the revenue, the turn on investment, if you
[13]  will.  It was stated in a Vice President's
[14]  meeting.  These were quarterly meetings that
[15]  were held pretty regularly.
[16]    Q.   Is that something that you heard?
[17]    A.   Yes, sir, I did.
[18]    Q.   We talked about the Vice President
[19]  meetings.  How often did those happen?
[20]    A.   Were held quarterly.
[21]    Q.   What was the purpose of the Vice
[22]  President's meeting?
[23]    A.   I think primarily to keep the Vice

Page 0039

[01]  Presidents abreast of what was happening in the
[02]  company.
[03]    Q.   Who attended that from a higher level
[04]  management for the company?
[05]    A.   It would usually be, during my tenure
[06]  there, it would have been Vice Presidents and
[07]  Senior Vice Presidents and then Executive
[08]  Officers.  Earl Chandler and others.
[09]    Q.   I am sorry, who else?
[10]    A.   Earl Chandler and Bob Watjen and
[11]  Mohney, et cetera, all the way down to the Vice
[12]  Presidents.
[13]    Q.   Who is Bob Watjen?
[14]    A.   The Chief Financial Officer.
[15]    Q.   Did you regularly attend those
[16]  meetings?
[17]    A.   Yes, sir, I did.
[18]    Q.   Were they held more often than
[19]  quarterly?
[20]    A.   Not to my recollection.
[21]    Q.   On the basis of attending those
[22]  meetings, did you feel that you had an
[23]  understanding of the direction of the company?

Page 0040

[01]    A.   Yes, sir.
[02]    MR. DAVENPORT:  Excuse me.  Object.
[03]  Leading and calls for speculation.
[04]    Q.   Let me rephrase that.  From attending
[05]  those meetings, how would you characterize your
[06]  understanding of the financial operations of the
[07]  company?
[08]    A.   I think Earl Chandler and Mr. Watjen
[09]  made effort to explain the financial situation
[10]  of the company and pointed out many mistakes
[11]  that had been made before they came on board and
[12]  their determination to turn the company around,
[13]  so to speak.
[14]    Q.   What about your level of knowledge
[15]  about the corporate strategy that the company
[16]  was going to follow?  Do you -- how well did you
[17]  feel you understood that as a result of
[18]  attending these meetings?
[19]    A.   Well, I would have to say it in a
[20]  general way.  I think I would not propose to
[21]  know what, you know, specific items and so
[22]  forth, but I think that the general consensus
[23]  was, you know, we had to, from Chandler's

Page 0041

[01]  people, we had to correct these deficiencies and
[02]  make the company profitable.
[03]    MR. DAVENPORT:  Object to the non-
[04]  responsiveness of the answer based on
[05]  speculation.
[06]    Q.   Did Mr. Chandler or any of the other
[07]  executive level officers, Mr. Watjen and Mohney,
[08]  whose names you mentioned, express any views at
[09]  these meetings that you attended regarding the
[10]  overall direction that the company needed to
[11]  take?
[12]    A.   I think, you know, toward sort of the
[13]  end of my tenure there, I think the concept from
[14]  Mr. Chandler was that they needed to move out of
[15]  the own occ policies into an income protection
[16]  or income -- income protection or income
[17]  covering type policy.
[18]    Q.   What do you mean by that, move out of
[19]  the own occupation policy?
[20]    A.   Simply put, just to quit selling
[21]  them, I think that's what they have done since
[22]  I left.
[23]    Q.   During the time that you were with

Page 0042

[01]  the company, did Provident make any
[02]  announcements as to its intention to discontinue
[03]  the own occupation policies?
[04]    A.   In more than one companywide
[05]  bulletin, printed bulletin, I think they
[06]  mentioned that that was their intention.
[07]    Q.   By the time you left the company in
[08]  February of '96, do you know whether or not
[09]  Provident had in fact discontinued the own
[10]  occupation disability income policy?
[11]    A.   I would have to -- I don't know.  I
[12]  think the intent was to do that.  Whether they
[13]  actually accomplished that I cannot say.
[14]    Q.   Let's talk for a moment -- well,
[15]  before we leave that subject, from your position
[16]  within the company attending these meetings or
[17]  from information you obtained from the company
[18]  newsletters, did you have an understanding of
[19]  why Provident intended to discontinue the own
[20]  occupation policy?
[21]    MR. DAVENPORT:  Again, object to the
[22]  form of the question.  Calls for speculation,
[23]  vague and ambiguous.

## DR. WILLIAM E. FEIST   [1-25-99]

### Page 0043

[01]   A.  I think the intent was to decrease
[02] the liability.  If you've got an own occ policy,
[03] you have a certain level of liability.  If you
[04] have income protection policy, you have a lesser
[05] amount of liability for that policyholder.
[06]   MR. DAVENPORT:  Excuse me.  Object to
[07] the competence of the answer.  This is
[08] speculation of this witness.  He's a doctor,
[09] he's not in the business or economics of the
[10] company.
[11]   Q.  When you answered that way, was that
[12] based on your understanding or was that based
[13] upon information from the company that you
[14] acquired either at these meetings, quarterly
[15] meetings or the company newsletter or whatever?
[16]   A.  It was pretty well spelled out in the
[17] company newsletters, company bulletins.  They
[18] had a system, when I was there, of having
[19] literally printed bulletins that would come out
[20] from the resources department that would outline
[21] these things.  And they would outline these
[22] things that they were trying to do --
[23]   Q.  Let's talk for a moment, how about

### Page 0044

[01] the spring of 1996 round-table review process
[02] that you discussed a moment before.  When you
[03] began your involvement in that, did that --
[04] what was your understanding as to whether that
[05] was a new process or an ongoing process?
[06]   A.  I understand it was a new process,
[07] was a new way to handle the claim situation.
[08]   Q.  And about how much hours -- let me
[09] rephrase that.  How long did each meeting last
[10] that you attended?
[11]   A.  My recollection of the meeting was
[12] started around six in the evening and would
[13] maybe run two-and-a-half to three hours.
[14]   Q.  How many claims would typically be
[15] reviewed in one of those meetings?
[16]   A.  I would have to estimate maybe three
[17] to five cases were discussed in a given evening.
[18]   Q.  And who were the people or the types
[19] of people present at the round-table meetings?
[20]   A.  Well, you would have a number of
[21] folks.  You would have the, in the trenches,
[22] claims adjustors if you will, those persons who
[23] would usually present the claim or question.

### Page 0045

[01] You usually have the line managers there in the
[02] claims department.  You usually have
[03] representation from the medical department and
[04] also some legal representation, and usually a
[05] member of the management of the disability
[06] claims section, Ralph Mohney or one of his
[07] designees.  If you will.  Mohney usually attended
[08] when I was there.  When he was out of town or
[09] something, he would send somebody else in his
[10] place.
[11]   Q.  And what was the process that would
[12] take place when a claim was presented for review
[13] at the round table?
[14]   A.  Generally, the line underwriter would
[15] present the case, parameters of it, and,
[16] usually, somewhere during the discussion they
[17] would have the indication what the reserve was
[18] for that individual's case.
[19]   Q.  What do you mean, what the reserve
[20] was for that individual case?
[21]   A.  Basically, how much the company had
[22] to set aside to cover the disability claim of
[23] that particular individual.

### Page 0046

[01]   Q.  Okay.  What else would happen?
[02]   A.  And, then, there would be a
[03] discussion in terms of the legal ramifications
[04] and so forth and, basically, tried to see if
[05] there's some way to not pay the claims, is my
[06] impression of it.
[07]   Q.  Why --
[08]   MR. DAVENPORT:  Excuse me.  Object,
[09] nonresponsive.  Move to strike the last part of
[10] his answer as calling for speculation and
[11] opinion.
[12]   Q.  Why do you say that you felt that
[13] they were looking for some way not to pay the
[14] claim?
[15]   A.  Well, in most cases, they were cases
[16] that had quite high financial reserve.  And many
[17] times, they were cases that were, perhaps, a
[18] little gray.  They weren't quite black and
[19] white, as I recall.  It has been sometime since
[20] I was there, but that's my recollection of it.
[21]   MR. DAVENPORT:  Same objection.
[22] That was part of the prior answer, which I moved
[23] to be stricken as nonresponsive and based on

### Page 0047

[01] speculation.
[02]   Q.  What type of comments would be made
[03] at the round-table review while someone was
[04] looking through these or reviewing these claims
[05] that would give you -- gave you any belief that
[06] the purpose was to find a way not to pay the
[07] claim?
[08]   MR. DAVENPORT:  Object to the form of
[09] the question.  These are vague questions as to
[10] time and place, identity of speaker and so
[11] forth.
[12]   MR. KENT:  You can answer the
[13] question.
[14]   A.  Well, I mean, personally, anything
[15] they could think of in terms of one saying, this
[16] doctor that's certifying disability for this
[17] person has signed several other disabilities and
[18] we wonder about the ability of this doctor.  We
[19] have got do a surveillance and see if this guy
[20] is really disabled.  My impression was to find
[21] any way they could to terminate the claim.
[22]   MR. DAVENPORT:  Same objection to his
[23] answer as being speculative and nonresponsive.

### Page 0048

[01]   Q.  How were the claims selected for
[02] presentation to the round-table review?
[03]   A.  My impression was that the, in the
[04] trenches, and that's the work level of the
[05] claims review, individuals were encouraged to,
[06] by their managers, to review their stable of
[07] cases, if you will, to find ones that could
[08] potentially be brought to the round table for
[09] review.
[10]   MR. DAVENPORT:  Excuse me.  I hate to
[11] keep objecting.
[12]   MR. KENT:  That's all right.
[13]   MR. DAVENPORT:  But in the context of
[14] this witness specifying, he continues to not
[15] answer specific questions of what was said to
[16] him or what he did.  He says, "my impression" or
[17] "my" this or "my" that, like ha did in the last
[18] answer.  As such, I object to the testimony as
[19] being nonresponsive.
[20]   Q.  On what do you base that statement of
[21] what your impression was about how claims were
[22] selected for review?
[23]   A.  I think the bottom level claims

## DR. WILLIAM E. FEIST    (1-25-99)

### Page 0049

[01] adjusters were encouraged to find cases in their
[02] stable of cases to bring to the table.
[03]     Q.    That's not the question.
[04]     MR. DAVENPORT: Object as
[05] nonresponsive.   Move to strike that answer.
[06]     Q.    My question is, on what do you base
[07] that impression?  Why do you think they were
[08] encouraged?
[09]     A.    They were thought more highly by
[10] their superiors for being able to bring cases
[11] and present them to the round table.
[12]     MR. DAVENPORT: Object.
[13] nonresponsive. He's giving impressions, not
[14] specific answers what he did or what he said.
[15] Move to strike his answer.
[16]     Q.    We are trying to satisfy the
[17] objection there.
[18]     A.    Okay.
[19]     Q.    And I am trying to figure out if you
[20] can give us any more specifics as to what --
[21]     A.    Well, I mean, if I am making my
[22] weekly circuit of cases and one of the claims
[23] adjusters brings a case and we talk it and I

### Page 0050

[01] give my impression, and they say, "Well, that's
[02] a good case to take to the round table."   I'd
[03] say, "If you want to take it there, it's fine."
[04]     Q.    When you were spending your time,
[05] fifteen to twenty hours a week going and talking
[06] to the claims representatives --
[07]     A.    Claims adjustors.
[08]     Q.    Claims adjustors?
[09]     A.    Probably better said, yeah.
[10]     Q.    Okay, claims adjustors?
[11]     A.    Yeah.
[12]     Q.    And clarify, that's different from
[13] the round-table meetings once a week?
[14]     A.    Yeah, oh, yeah.  These are separate
[15] areas where these people work the files and I
[16] would go to their area and make myself available
[17] to them for discussion, review, whatever.
[18]     Q.    What were you discussing and
[19] reviewing with them in those types of meetings?
[20]     A.    Well, basically, reviewing claims for
[21] disability and so forth on the specific cases
[22] they had concerning their problems.
[23]     Q.    And on the -- from those meetings,

### Page 0051

[01] did you have discussions with claims
[02] representatives, or claims adjustors, dealing
[03] with the round-table review process?
[04]     A.    Generally, I didn't discuss that with
[05] the individual claims adjustors on any specific
[06] basis.   That was really not in my area, prime
[07] area of responsibility.
[08]     Q.    From those meetings with the
[09] individual claims adjustors, did you get any
[10] impression as to their participation in the
[11] round-table review, the way they selected cases
[12] for the round-table review?
[13]     MR. DAVENPORT: Object to the
[14] question as vague and ambiguous.
[15]     A.    Well, my thought was that they saw
[16] cases that were not cut and dried and perhaps
[17] they could see some way to bring them up for
[18] discussion to terminate the case.
[19]     MR. DAVENPORT: Object,
[20] nonresponsive. He didn't answer the question
[21] that you asked. He's giving us his
[22] impressions.
[23]     Q.    At the round-table review where you

### Page 0052

[01] would have these cases, did you see any pattern
[02] emerging as to the size of claim that was
[03] presented?
[04]     A.    My impression is that they were the
[05] upper end of the claims.  They rarely would be
[06] -- well, I mean if you have got a reserve of
[07] two-and-a-half million dollars, it's a pretty
[08] sizable claim.  And I don't recall reserves of
[09] anything less than five hundred thousand up.
[10] So, basically, it would have to be the higher
[11] end cases.
[12]     MR. DAVENPORT: Object.
[13] nonresponsive. Move to strike.
[14]     Q.    To clarify that objection, from your
[15] involvement in those round-table reviews, did
[16] you see a -- could you describe the type of
[17] claims in terms of size that were typically
[18] presented?
[19]     A.    Well, I would have to say that I am
[20] not sure the -- you are talking about reserves
[21] or the actual monthly dollar amount?
[22]     Q.    Well, in any way that gives us an
[23] idea of how these claims were -- how big these

### Page 0053

[01] claims were.  Were they big collar claims, small
[02] dollar claims?  Something that gives us an idea
[03] of --
[04]     MR. DAVENPORT: Excuse me.
[05]     A.    Generally they were big dollar
[06] claims.
[07]     MR. DAVENPORT: Excuse me, Doctor.  I
[08] object to the form of the question for the
[09] reasons just articulated by the doctor and his
[10] inability to understand the question.
[11]     Q.    Now that I have clarified for you, do
[12] you understand?
[13]     A.    I understand your question perfectly.
[14]     Q.    With that understanding, then, can
[15] you answer?
[16]     A.    I would say it was the higher end
[17] cases.  I would say a million dollars and up
[18] reserve, which, depending on the age of the
[19] individual, is going to be roughly three to five
[20] thousand dollars a month.   You calculate the
[21] reserve by the monthly indemnity times the
[22] expected life the person could live.
[23]     Q.    At these round-table review meetings,

### Page 0054

[01] when a claim was presented, what information
[02] concerning the amount of the monthly benefit and
[03] the size of the reserve was presented, if any?
[04]     A.    Generally, it would present the --
[05] they would have a tally sheet, if you will,
[06] inventory, if you will, of the financial reserve
[07] for every claimant.  So as they presented the
[08] case, they could look on their computer printout
[09] and see how much reserve they had at the moment
[10] that the case was being presented.
[11]     Q.    And would that information be
[12] presented?
[13]     A.    Yes, sir, indeed.
[14]     Q.    Let me ask you this about the nature
[15] of the claims that were presented.  Was there
[16] any pattern that emerged as to how old the claim
[17] was, by which I mean, was it a new claim, one
[18] that had been on claim for several months or
[19] years or was there any pattern?
[20]     A.    Well, again based on my recollection,
[21] it was generally those cases that had been on
[22] claim, at least in-house for a number of years.
[23] And the typical case would have been somebody

## DR. WILLIAM E. FEIST    [1-25-99]

### Page 0055

[01] that would have been paid for several years as
[02] being disabled and then the review was brought
[03] up as if they were going back and, if you will,
[04] second guessing the original claims review
[05] process.
[06]     MR. DAVENPORT: Move to strike the
[07] answer, beginning with "as if," as being
[08] nonresponsive and speculative and stating a
[09] conclusion.
[10]     Q. What was your reaction to the way the
[11] round-table review process -- well, let me
[12] rephrase that. What was your reaction to the
[13] round-table review process in which you
[14] participated?
[15]     MR. DAVENPORT: Excuse me. Object to
[16] the form of the question. It's vague and
[17] ambiguous and calls for nothing more than an
[18] opinion.
[19]     A. My opinion was, is that, was and is,
[20] is that it was an attempt to get a handle on
[21] this large block of claims that were causing
[22] such a financial burden on the company.
[23]     MR. DAVENPORT: Object to the form of

### Page 0056

[01] the answer. Move to strike it as being succinct
[02] with lay opinion statements.
[03]     Q. Were you trouble by this?
[04]     A. Yes, sir, I was.
[05]     Q. Why?
[06]     A. I felt it was such a complete turn
[07] around from the philosophy of the Company that I
[08] had hired on with in 1982.
[09]     Q. What do you mean you felt it was such
[10] a complete turn around?
[11]     A. When I came to work with Provident in
[12] 1982, I felt like the company made an effort to
[13] pay the claims. If there was a question about,
[14] you know, a gray area or whatnot, the company
[15] usually paid the claim. Here you have a round
[16] table situation where, in my mind, the only
[17] intent was to find some way, if possible, to
[18] terminate these claims. And that troubled me
[19] deeply.
[20]     Q. And --
[21]     MR. DAVENPORT: Excuse me. I object
[22] to the answer as being speculation and
[23] conclusions and opinions rather than a statement

### Page 0057

[01] of fact.
[02]     Q. Did you share your feelings and
[03] opinions with anyone within the company?
[04]     A. Not specifically, but I felt like
[05] either I had to leave the company on my own or
[06] risk being terminated myself if I spoke out
[07] against this procedure.
[08]     MR. DAVENPORT: Object to the
[09] remainder of the answer after the word, "not
[10] specifically," as being nonresponsive.
[11]     Q. Why didn't you speak out to anyone
[12] about your feelings about the round-table
[13] process?
[14]     A. I had a wife and a mortgage and --
[15]     COURT REPORTER: I'm sorry. I can't
[16] hear you.
[17]     A. I had a wife and a mortgage and three
[18] children to educate. I needed a job.
[19]     Q. Well, what do you mean by that, you
[20] needed a job. What was your concern?
[21]     A. Well, generally speaking, those who
[22] spoke out against Harold Chandler were quietly
[23] eased out one way or another.

### Page 0058

[01]     Q. Is that your impressions from what
[02] you observed at the time?
[03]     A. Yes, sir, it is.
[04]     Q. How do you feel, what would happen to
[05] you if you spoke out about your concerns?
[06]     A. I would have had my pink slip on my
[07] desk, probably by night fall.
[08]     Q. From those round-table review
[09] meetings where Ralph Mohney was present, did you
[10] feel, or did you -- did Mr. Mohney give any
[11] direction to the process, the purpose for the
[12] round-table review?
[13]     A. His entire purpose was to find cases
[14] that could be terminated and he encouraged and
[15] rewarded people that found such cases.
[16]     MR. DAVENPORT: Excuse me. Object,
[17] nonresponsive, move to strike.
[18]     Q. On what do you base that belief?
[19]     A. Well, I think those who found cases
[20] and went with Mohney's program, so to speak,
[21] were promoted and those claims adjustors who
[22] didn't deal with this program were either, you
[23] know, not promoted, or -- especially the cases

### Page 0059

[01] where they left the company. I know several
[02] cases where some experienced people were passed
[03] over because they didn't go with the program.
[04] And those who did, perhaps less experienced, got
[05] promoted.
[06]     MR. DAVENPORT: Again, object to
[07] these answers. They are not factual statements.
[08] They are not responsive and they are setting
[09] forth nothing but vague opinions and
[10] conclusions.
[11]     Q. When you used the phrase go with Mr.
[12] Mohney's program, what do you mean? What are
[13] you referring to, go with the program?
[14]     A. Well, I think Mohney's process of
[15] trying to manage claims, you know, the idea of
[16] paying every legitimate claim, the idea of
[17] trying to deny every claim that they possibly
[18] could. And, again, those who went with the
[19] program were rewarded.
[20]     MR. DAVENPORT: Same objection to the
[21] form of the question, to the form of the
[22] response setting forth conclusions and opinions.
[23] Go ahead.

### Page 0060

[01]     Q. To what extent -- let me rephrase
[02] that. When this process of looking at claims
[03] was going on, how did they -- in the round-table
[04] review, how did people try to find reasons, I
[05] mean, on what basis were claims being terminated
[06] or sought to be terminated?
[07]     A. To be terminated? Well, if they
[08] could find anyway to prove that the individual
[09] was not disabled, surveillance or getting
[10] another IME to get the impression they want,
[11] that would be a method they would use.
[12]     Q. If your opinion were the bases for
[13] obtaining -- for finding a reason to terminate
[14] claims, loopholes or were they part of the
[15] contract or -- let me rephrase that. How would
[16] you characterize the basis?
[17]     MR. DAVENPORT: Excuse me, let me --
[18]     A. I think your word loopholes is
[19] appropriate.
[20]     MR. DAVENPORT: Excuse me, let me
[21] object to the form of the question. The lawyer
[22] has suggested the answer in his wording. It's
[23] leading. The question is also objectionable

## DR. WILLIAM E. FEIST    [1-25-99]

### Page 0061

[01] because it's calling for nothing more than
[02] speculation, opinions conclusions of this
[03] witness.
[04]    Q.    Based on your participation in these
[05] weekly round-table reviews from the spring of
[06] 1995 up through February of 1996, how would you
[07] characterize the basis on which reasons for
[08] terminating payments were made?
[09]    MR. DAVENPORT:   Same objection as to
[10] the prior question.
[11]    A.    Many times it would be nothing more
[12] complicated than getting an IME that wanted, i.e.,
[13] corroborate the answer that they wanted, i.e.,
[14] somebody might've been determined disabled and
[15] being paid as disabled for a number of years
[16] and, then, without any change in the basic,
[17] underlying medical impairment, another physician
[18] or IME would be presented that would refute the
[19] original disability determination and on that
[20] basis the individual would be terminated, the
[21] claim would be terminated.
[22]    Q.    Whenever -- prior to the time that
[23] these round-table review processes were

### Page 0062

[01] instituted in which you participated, from your
[02] involvement in the company, how did the company
[03] resolve doubts or gray areas, as a general
[04] policy, either in favor of the claimant, against
[05] the claimant, ask more questions.   Was there
[06] any general policy that the company had?
[07]    MR. DAVENPORT:   Excuse me.
[08]    A.    I am not sure of the time frame.
[09]    MR. DAVENPORT:   Excuse me, object.
[10]    Q.    Prior to?
[11]    A.    Prior to 1993?
[12]    Q.    1995 when you started doing the
[13] round-table reviews.
[14]    MR. DAVENPORT:   Same objection to the
[15] form of the question and calling for speculation
[16] and conjecture from this witness.   He was not in
[17] claims.   He was a Medical Director giving
[18] medical input and advice on claims.   It was
[19] outside of his area.
[20]    A.    Well, my impression up until, say,
[21] the spring of 1995, or may '94, is that
[22] generally Provident tried to, if there was a
[23] question where it could have gone either way

### Page 0063

[01] they would usually have gone in favor of the
[02] claimant, and pay the claim.
[03]    Q.    And after that time that you talked
[04] about?
[05]    A.    They kind of switched around the
[06] other way, tried to find any way not to pay the
[07] claim.
[08]    MR. DAVENPORT:   Same objection.
[09] Calling for speculation and opinion.
[10]    Q.    Have you ever heard the term the
[11] scrub process?
[12]    A.    Uh-huh, yeah, I'm familiar with that.
[13]    Q.    What does the scrub process mean --
[14]    A.    Well, my --
[15]    Q.    Let me finish the question.
[16]    A.    I'm sorry.
[17]    Q.    What does the term the scrub process
[18] mean within your experience at Provident?
[19]    A.    Well, my experience at Provident
[20] would be that if there was a, the claims
[21] adjustors were encouraged to review files, maybe
[22] find a file that if there's some area that was
[23] gray that they could scrub it and try to clean

### Page 0064

[01] it up, i.e., try to find some way to deny or
[02] terminate the claim.
[03]    MR. DAVENPORT:   Object.
[04] Nonresponsive.   That sets forth a conclusion and
[05] opinion of the witness that's not based on fact.
[06]    Q.    And how did you come to know or hear
[07] of the term scrub process within Provident?
[08]    A.    I think that was primarily used in
[09] the psychiatric claims unit, i.e., psychiatric
[10] claims, emotional claims tend to be quite
[11] subjective.   And, obviously, if you can find
[12] some way to, quote, unquote, prove this person
[13] is not disabled for emotional disorder, that was
[14] an intent.
[15]    COURT REPORTER:   That was what?
[16]    A.    That was an intent to do that.
[17]    MR. DAVENPORT:   Object,
[18] nonresponsive.
[19]    Q.    Was the term scrub process one that
[20] was commonly used within Provident?
[21]    A.    I don't know if that term was used,
[22] but I think the process was often involved.
[23]    Q.    And had you heard the term scrub

### Page 0065

[01] process or scrubbing?
[02]    A.    Scrubbing.   I think it's kind of like
[03] if you go wash your hands real good, you scrub
[04] off the dirt and find some cases that have got a
[05] little dirt in them and try to clean them up.
[06]    Q.    How did that scrub process -- let me
[07] rephrase that.   Was there a time period within
[08] your tenure of Provident when that scrub process
[09] that you have described originated or took
[10] place?
[11]    A.    I would have to estimate.   It
[12] probably took place from, probably, '94 through
[13] early '96, until I left.
[14]    Q.    And when you say early '94, was there
[15] anything that precipitated or began the scrub
[16] process that you can identify?
[17]    A.    Well, I think the only thing I can
[18] rephrase that was the establishment of a psychiatric
[19] claim unit within the disability income section
[20] where they had dedicated claims people with some
[21] expertise in psychiatric training, masters in
[22] psychology, persons who actually had counseling
[23] background, came into the, a dedicated unit for

### Page 0066

[01] psychiatric claims.
[02]    Q.    Have you heard of the special
[03] handling unit?
[04]    A.    Yes, sir.
[05]    Q.    What was the special handling unit at
[06] Provident?
[07]    A.    Well, my understanding of the special
[08] handling unit was a special unit, was generally
[09] highly trained individuals who would look at
[10] cases that had some concern about validity or
[11] black and white, that sort of thing.   And
[12] basically if the case had some area that was not
[13] clear, it would go into the special handling
[14] unit.   That also implied that they were
[15] carefully watched and monitored and the whole
[16] thing.   It wasn't just pay the claim and keep
[17] going.
[18]    Q.    I am sorry?
[19]    A.    They didn't just pay the claim and
[20] not look at the file.   They kept an ongoing
[21] basis to review them.
[22]    MR. DAVENPORT:   I move to strike the
[23] portion of his response beginning with his

[01] conclusion, "I think the process," or something
[02] to that effect. I move to strike the remainder
[03] of the answer.
[04] Q. Did Provident, at the time that you
[05] worked there, have any procedure for, or a
[06] special unit that handled claims where someone
[07] had been on disability for a long time where it
[08] would be almost like a presumptive disability?
[09] They would reduce the amount of paperwork or
[10] claim handling associated with that?
[11] A. Well, I think there was a process
[12] where if somebody had a disability that was not
[13] expected to improve, instead of having monthly
[14] certification for disability by their attending
[15] physician, they could go to quarterly or maybe a
[16] semiannually, or sometimes they would even go to
[17] an annual review.
[18] The implication would be that this
[19] disability is fixed, not likely to get better,
[20] therefore let's don't put the burden on the
[21] claimant to get so many reviews by his
[22] physician, because generally these folks had to
[23] pay their physician the office visit or whatever

[01] to fill out the form. So, somebody that has got
[02] an impairment that's ongoing and not likely to
[03] improve, why trouble yourself to review every
[04] thirty days. Why not go every six months or
[05] maybe -- I don't think they ever went any longer
[06] than a year, but extend the review process.
[07] Q. To your knowledge, was that type of
[08] claim that you described assigned to any
[09] particular unit or division within the
[10] claims-handling area?
[11] A. Not to my knowledge.
[12] Q. From your participation in the weekly
[13] round-table reviews did you see any pattern
[14] emerge as to whether or not those types of
[15] claims that you have described appeared at the
[16] round-table review?
[17] A. I would say generally those that
[18] appeared at the round-table reviews had been
[19] persons, workers who had been on claim for some
[20] period of time, some of them, you know, one or
[21] two years, maybe up to several years.
[22] Q. And from your participation in the
[23] round-table review process, were those claims

[01] that you have just described where people had
[02] been on claims for some period of time, did they
[03] fall into that category where they had reduced
[04] the number of -- the frequency of attending
[05] physician statements?
[06] A. I am a little vague on that, but I
[07] think generally so, yeah. The specific cases
[08] that I have reviewed, that is the case, yes.
[09] Q. And if that's the type of claim that
[10] was present, why would that, then, be
[11] appropriate for the -- why would that have,
[12] then, been appropriate for the round-table
[13] review?
[14] A. I can't answer that. I have no
[15] knowledge of that.
[16] Q. At the time that you -- well, first
[17] of all, when you left Provident, did you retire?
[18] A. Yes, sir.
[19] Q. And at the time that you retired from
[20] Provident, how would you describe the corporate
[21] culture or the company culture compared to what
[22] it had been before Harold Chandler arrived?
[23] MR. DAVENPORT: Object. That calls

[01] for speculation. The question is vague and
[02] ambiguous.
[03] A. I think we've answered -- discussed
[04] that earlier. I think we came on bottom line
[05] and individuals were expendable as opposed to
[06] doing what is right for the customer. The
[07] concept that if you come to work at Provident,
[08] you can retire there, if you don't sexually
[09] harass somebody or embezzle funds.
[10] COURT REPORTER: If you don't -- I'm
[11] sorry?
[12] A. If you don't sexually harass anybody
[13] or embezzle funds, you are going to be able to
[14] retire there. That all changed after Chandler
[15] came.
[16] Q. What was Mr. Chandler's background?
[17] A. In banking.
[18] Q. Did he have any insurance background
[19] that you knew of?
[20] A. To my knowledge, he sat on the Board
[21] of Colonial Life and Accident Insurance Company
[22] in Columbia, South Carolina. He might have had
[23] some exposure to Blue Cross and Blue Shield

[01] Boards in Washington, D.C., where he lived --
[02] where he resided before he came to Chattanooga,
[03] but other than that, no.
[04] Q. Prior to Mr. Chandler coming on, who
[05] had been the CEO of the company?
[06] A. Mr. Winston Walker, Winston W.
[07] Walker, III.
[08] Q. Had there been a family, a particular
[09] family involved in the management of the company
[10] for years?
[11] A. The McClelland family founded the
[12] company in 1887 and was involved in it in direct
[13] management of the company up until about late
[14] '70s, I think, maybe early '70s. But the
[15] McClellands held the majority stock holdings of
[16] the company.
[17] Q. Did that continue up to the time that
[18] Mr. Chandler arrived or do you know?
[19] A. It's my understanding the McClelland
[20] and their foundation had fifty-one percent of
[21] the stock up until recently and then this
[22] reorganization --
[23] MR. DAVENPORT: I can't hear you.

[01] MR. KENT: You are going to have to
[02] speak up a bit.
[03] A. The McClellands had the majority
[04] holding until the recent merger with Unum and I
[05] think it has dropped down below a third, and
[06] they don't have control.
[07] Q. So even at the time that Chandler
[08] came on board, the McClellands still had an
[09] ownership interest?
[10] A. Yeah, yeah, stock ownership and
[11] non-active management role.
[12] Q. Now, prior to today's deposition, you
[13] and I have had an opportunity to talk by
[14] telephone a couple of times, correct?
[15] A. That's correct, yes, sir.
[16] Q. And I sent you some materials
[17] relating to Dr. Thompson's claim, correct?
[18] A. Yes, sir, I have received that and I
[19] have reviewed that.
[20] Q. At whose request, or whose idea was
[21] it for you to have those file materials relating
[22] to Dr. Thompson?
[23] A. It was my request.

## DR. WILLIAM E. FEIST    [1-25-99]

### Page 0073

[01]    Q.   Not my suggestion?
[02]    A.   No, I requested it.
[03]    Q.   Again, you may have to speak up a bit
[04] for the microphone.
[05]    A.   I am sorry.
[06]    Q.   Briefly describe the type of
[07] information you received and were able to review
[08] regarding Dr. Thompson's claim file.
[09]    A.   Well, basically Dr. Thompson is a
[10] periodontist --
[11]    Q.   No, let me stop you right there.
[12] What type of documentation did you get, not the
[13] a description of his claim.
[14]    A.   Okay.  Well, basically, you sent me a
[15] packet of materials which outlined his original
[16] claims adjudication, the process of being on
[17] claim, the process of being terminated from
[18] claim and the supporting documents related to
[19] that.
[20]    Q.   And what were the supporting
[21] documents?
[22]    A.   Various attending physician
[23] statements over the years, a number of

### Page 0074

[01] ophthalmologists, optometrists, some of Dr.
[02] Thompson's own statements about his situation,
[03] some of the correspondence between Dr. Thompson
[04] and Provident.  If you are looking for general,
[05] I think that covers it fairly well.
[06]    Q.   Some of the internal Provident
[07] memorandum regarding his claim?
[08]    A.   Yeah.
[09]    Q.   Independent medical examinations?
[10]    A.   Yes, sir.
[11]    Q.   Okay.  Based on the information that
[12] you gave, can you briefly, just give a thumbnail
[13] sketch of your understanding of the nature of
[14] the claim?
[15]    A.   My understanding is that Dr. Thompson
[16] is a periodontist, who has a rather unusual
[17] combination of visual problems.  He has a
[18] congenital abnormality of his lens, actually his
[19] cornea, I'm sorry, his cornea.  He has severe
[20] myopia or nearsightedness and he has presbyopia
[21] or old vision before his time.  And that
[22] basically led to a difficulty of accommodation
[23] and he basically became unable to practice

### Page 0075

[01] periodontics despite extensive lenses and
[02] accommodations and et cetera.  And I think he
[03] realized when he severed the -- a nerve in an
[04] artery of one of his patients that he could no
[05] longer operate and removed himself from
[06] periodontic surgery.
[07]         He was then evaluated by one or more
[08] physicians who felt that --
[09]         COURT REPORTER:  By what physicians?
[10]    A.   One or more physicians who felt that
[11] he had a very unusual combination of problems,
[12] that had deemed him impaired, visually impaired
[13] for his profession as a periodontal surgeon.
[14]         MR. DAVENPORT:  Object.
[15] Nonrespansive.  That is nothing more that a
[16] recital of portions of a claim file.
[17]         THE WITNESS:  That's what he asked
[18] me to do, so that's what I did.
[19]    Q.   And what is your understanding of
[20] what happened to his claim in the recent couple
[21] of years with Provident?
[22]    A.   Well, the last couple of years, I
[23] think he ended up, if I am recalling correctly,

### Page 0076

[01] he ended up in the special handling unit and
[02] then was sent to a physician who basically said,
[03] he has no -- he's not visually impaired enough
[04] to be unable to practice periodontal surgery.
[05]         And despite Dr. Thompson's careful
[06] writing to this physician explaining the
[07] situation that was pretty much glossed --
[08]         COURT REPORTER:  I can't hear you.
[09]    A.   That was glossed over and Dr.
[10] Thompson was considered not disabled by that
[11] physician
[12]    Q.   And is it your --
[13]         MR. DAVENPORT:  Excuse me.  Object to
[14] the answer as being a conclusion and an improper
[15] one of that of the action Provident took in this
[16] case.
[17]         THE WITNESS:  It's right in the
[18] record.
[19]    Q.   (BY MR. KENT:)  Is it your
[20] understanding that Provident ultimately
[21] terminated --
[22]    A.   That's correct.
[23]    Q.   -- Dr. Thompson's benefits after he

### Page 0077

[01] had been on claim for many years?
[02]    A.   Yes, sir, that's correct.
[03]    Q.   Now, based on your review of the
[04] information provided to you, do you feel you
[05] have an adequate understanding of the nature of
[06] his claim?
[07]    A.   I do, yes, sir.
[08]    Q.   What I want to ask you is, how do you
[09] compare the treatment of his claim with what
[10] happened in the round-table review process that
[11] you participated in in the spring of '95 through
[12] '96?
[13]         MR. DAVENPORT:  Object to the form of
[14] the question.  It's calling for conclusions,
[15] speculation, and a comparison based on improper
[16] and incomplete predicate questions.
[17]    Q.   You can answer.
[18]    A.   Well, I think that the similarity is
[19] Dr. Thompson was on claim, had been on claim,
[20] determined to be disabled for a number of years
[21] and then arrives in the special handling  unit
[22] and, basically, somewhat of an
[23] oversimplification, a physician was found that

### Page 0078

[01] declared him not disabled and payments were
[02] terminated.  And I think that's fairly
[03] characteristic of the round table, and it may
[04] not have been an IME, but whatever possible to
[05] terminate claims.
[06]    Q.   And from your review of the
[07] materials, do you feel that termination of Dr.
[08] Thompson's claim, years after he had been
[09] initially approved, was a correct decision?
[10]         MR. DAVENPORT:  Object to the form.
[11]    A.   No, I do not.
[12]         MR. DAVENPORT:  Calls for --
[13] excuse me, Doctor.  Calls for conclusion and
[14] speculations and opinion of this doctor as to
[15] whether what Provident did was, quote, correct,
[16] close quote, under what standard.  It also calls
[17] for a comparison based on incomplete predicate
[18] hypothetical questions.
[19]    A.   I think the termination was
[20] incorrect.  I think Dr. Thompson was disabled in
[21] 1992.  I think he's disabled for periodontics in
[22] January of 1999.
[23]    Q.   Do you feel that the treatment by

## DR. WILLIAM E. FEIST   [1-25-99]

### Page 0079

[01] Provident was fair?
[02]     A.  No, I do not.
[03]     MR. DAVENPORT: Excuse me.  Same
[04] objection as to the prior question.
[05]     Q.  He has stated his objection.  And
[06] with that objection, do you feel that it was
[07] fair to Dr. Thompson?
[08]     A.  I feel it was not fair to Dr.
[09] Thompson.
[10]     Q.  Do you see anything in the medical
[11] records to indicate any change in his medical
[12] condition from the time he originally went on
[13] claim in 1989 until the time that he was
[14] terminated in 1997?
[15]     A.  No.  He stayed basically stable
[16] during that time frame.
[17]     Q.  From your involvement with the
[18] round-table reviews from the spring of '95
[19] through February of '96, how often would you say
[20] you would find a fact pattern where there would
[21] be no change in the claimant's medical
[22] condition and yet, Provident would then
[23] terminate the claim?

### Page 0080

[01]     MR. DAVENPORT: Again, object to the
[02] form of these questions as calling for broad
[03] speculation.  If he wants to recite the specific
[04] cases that he's familiar with so we can cross
[05] examine him, that's fine.  Otherwise, he's
[06] giving nothing more than conclusions.
[07]     A.  I think most of the cases that were
[08] brought to the round table were persons who had
[09] been on claim for a number of years.  And the
[10] implication was that, you know, the initial
[11] disability decision was incorrect.  It's our job
[12] to go back and correct that improper decision.
[13] I think you see that in Dr. Thompson's case.  I
[14] think --
[15]     MR. KENT: Let him state his
[16] objection.
[17]     MR. DAVENPORT: When you finish your
[18] answer, Doctor.
[19]     MR. KENT: I'm sorry.
[20]     A.  Dr. Thompson's case, he had been
[21] adjudicated as disabled by at least two
[22] physicians in 1992.  We are coming up to 1997
[23] and his condition has not changed in the least,

### Page 0081

[01] yet another physician was found to have said he
[02] was not disabled and he was terminated.  I
[03] think that is a pattern that you see over and
[04] over.
[05]     MR. DAVENPORT: Object,
[06] nonresponsive.  The doctor is giving his opinion
[07] based on speculation and his conclusions.  I
[08] move to strike.
[09]     MR. KENT: I am going to try to cure
[10] some of those objections, so if it seems
[11] repetitive, that is the nature of it.
[12]     A.  Take as long as you want to.
[13]     Q.  My question is, how often did you
[14] see the pattern within the round-table review
[15] process in which you participated from spring of
[16] '95 to February of '96 where the medical
[17] condition of the claimant did not change and,
[18] yet, the decision by Provident changed from one
[19] of initially granting disability to then
[20] terminating disability.
[21]     MR. DAVENPORT: Object to the form of
[22] the pattern -- I mean, form of the question.
[23] It calls for a conclusion.  If the Doctor wants

### Page 0082

[01] to give us specific facts, specific instances,
[02] specific claims that he's talking about, so we
[03] can cross examine, I don't have any objection.
[04] But for him to give broad conclusions in a
[05] summary based on facts that we don't know what
[06] he's giving is improper.
[07]     MR. KENT: You can still answer.
[08]     A.  It would have to be the great
[09] majority of cases.  I don't know see any other
[10] reason why they would have been brought to that
[11] process.
[12]     Q.  Is there any way for you to estimate
[13] the number of claims that you actually reviewed
[14] during the round-table review process in which
[15] you participated?
[16]     A.  I would have to make a calculation.
[17] We met weekly from, say, April to February.
[18] Eight months.  How many weeks is that?  Say
[19] thirty weeks.
[20]     Q.  Okay.
[21]     A.  Three cases.  That sounds like ninety
[22] cases.  That seems excessive.
[23]     Q.  You have to speak up a little bit.

### Page 0083

[01]     A.  It seems like ninety cases is too
[02] many, but I would say seventy-five cases might
[03] be a reasonable estimate.  I don't recall
[04] specifically.  If we did two or three cases per
[05] week for eight months, in the range of
[06] seventy-five cases.
[07]     Q.  Okay.  And how about in terms of
[08] fifteen to twenty hours a week that you would
[09] spend talking with the claims adjustors?  Any
[10] way to estimate the number of claims you
[11] reviewed during that process?
[12]     A.  Well, I would generally see, maybe,
[13] three to five cases, each of those five days
[14] during that time.  So that's about the same
[15] number.  I'm not sure.  Sometimes it would be
[16] just, just be there and they would just talk
[17] about one or two cases.  Sometimes maybe five
[18] cases.  It would vary considerably, depending on
[19] what they were doing and so forth.
[20]     Q.  So that would be several hundred
[21] cases over the period of eight months or so?
[22]     A.  Probably.  Probably two hundred --
[23]     COURT REPORTER: I can't hear you.

### Page 0084

[01] Probably?
[02]     A.  Probably two hundred cases.  I
[03] obviously don't, at this point, remember.  If
[04] you had asked me that at the end of February of
[05] '96, I could probably have given you the
[06] specific numbers, because one of the things we
[07] did was actually tally the cases we reviewed.
[08]     Q.  Okay.
[09]     A.  For budgetary purposes, but I can't
[10] give you a number.
[11]     Q.  All right.  Were you aware of whether
[12] or not there was any other formalized review
[13] process under way at Provident prior to the time
[14] you left for reviewing any claims or auditing
[15] disability claims besides the round-table review
[16] that you have described?
[17]     A.  I am not sure about the specific
[18] details of it, but I'm sure there were ongoing
[19] internal audits.  They have individuals, usually
[20] experienced claims adjustors who would review
[21] files of the entry level, if you will, or less
[22] experienced claims adjustors, so I think it was
[23] an ongoing process.

## DR. WILLIAM E. FEIST   [1-25-99]

### Page 0085

[01]        MR. KENT: Let me take a break,
[02]  please, if I may?
[03]        VIDEO TECHNICIAN: We are now off the
[04]  record at 1:51 P.M.
[05]
[06]        (Whereupon, a brief recess was taken.)
[07]
[08]        (Whereupon, Plaintiff's Exhibit 1
[09]  was marked for identification and
[10]  same is attached hereto.)
[11]
[12]        VIDEO TECHNICIAN: We are on the
[13]  record, 2:05 P.M.
[14]        Q.  (BY MR. KENT:) Okay. Dr. Feist, we
[15]  took a brief break now there and we are starting
[16]  back now. I gave you, prior to starting up
[17]  just a few minutes ago, a copy of an exhibit
[18]  that we have labeled as Feist Number 1.  This
[19]  is a Provident internal memorandum dated April
[20]  24, 1995 from Ralph Mohney regarding the special
[21]  review process, submitted to a variety of
[22]  people.
[23]        Back on the third page, you are shown

### Page 0086

[01]  us a carbon copy and the document itself is four
[02]  pages long.  Have you had a chance to review
[03]  that?
[04]        A.  I have reviewed that.
[05]        Q.  Do you have a memory of having seen
[06]  this before?
[07]        A.  I do not recall seeing this before.
[08]        Q.  Does that mean in your estimation
[09]  you probably did not receive it or simply that
[10]  you just don't recall?
[11]        A.  I would say I do not recall.  If I
[12]  am copied, obviously I did, but I don't recall.
[13]        Q.  Having had a chance to review this
[14]  memorandum, does it refresh your recollection at
[15]  all as to some of the specifics on the special
[16]  review process, the round-table review process?
[17]        A.  Yeah.  Yes, sir, it does.
[18]        Q.  I would like to direct your attention
[19]  to some of the comments in the memorandum and
[20]  see if you can put them in context for us,
[21]  having had it refresh your memory.  The first
[22]  paragraph starts, "I thought our meeting last
[23]  week represented a positive first step toward a

### Page 0087

[01]  stronger and more effective working relationship
[02]  between claims and the law department.  In order
[03]  to meet the continuing challenges of our
[04]  individual disability business, it is critical
[05]  that we all work together effectively and that
[06]  we practically seek new and different solutions
[07]  to our problems."
[08]        My question, sir, first of all, does
[09]  this refresh your recollection as to what the,
[10]  quote, unquote, problems were that the company
[11]  was facing, or to use another phrase, the quote,
[12]  continuing challenges of our individual
[13]  disability business, close quote?
[14]        MR. DAVENPORT: Well, in the first
[15]  place, I would object to the question as calling
[16]  for speculation as to what was in the writer's
[17]  mind when he said that.  Especially on the fact
[18]  that this witness has never seen the document or
[19]  doesn't recall ever having seen it, it would be
[20]  calling for speculation.
[21]        A.  Well, it seems to me that a
[22]  reasonable interpretation is there's some crisis
[23]  involved in terms of claims risks or claims

### Page 0088

[01]  problems or there's a problem we have to get a
[02]  handle on, you know, get a handle on.
[03]        Q.  And, from your having read this, does
[04]  it refresh your recollection as to whether or
[05]  not that was the sentiment at the time that you
[06]  entered the round-table review process in the
[07]  spring of 1995, your description of the, your
[08]  understanding of the problem or continuing
[09]  challenge?
[10]        A.  Yes, I think that was the intent of
[11]  the round-table format.
[12]        Q.  All right.  And it talks about more
[13]  effective working relationship between claims
[14]  and the law department.  What is your
[15]  recollection today, as we look back there to
[16]  this round-table review process, as to what the
[17]  working relationship between claims and the law
[18]  department was?
[19]        A.  My recollection is, is that the law
[20]  department was in one part of the building and
[21]  they would review cases for the disability
[22]  claims section, that there was not an in-house,
[23]  if you will, relationship.  And —

### Page 0089

[01]        Q.  And how did —
[02]        MR. DAVENPORT: Excuse me.
[03]        MR. KENT: I am sorry.
[04]        MR. DAVENPORT: I don't understand the
[05]  answer.
[06]        A.  Well —
[07]        MR. DAVENPORT: Objection. Let me
[08]  just object to the answer of the Doctor. He
[09]  doesn't know how the legal department is set up
[10]  or what the legal department does. He's talking
[11]  speculation. Move to strike.
[12]        A.  Before this memo, there were not any
[13]  dedicated lawyers to the claims section.
[14]  Subsequent to this memo, Ed Nanney, I think is
[15]  mentioned here, was actually removed from the
[16]  law department quarters and housed in the
[17]  accident department quarters and basically was
[18]  in-house, or in-department, if you will, to
[19]  review cases for the accident department.
[20]        I don't know if it specifically
[21]  mentions that. Oh, yeah, it does down in the
[22]  first paragraph here. It says Glenn Felton, who
[23]  I think was chief counsel at that point, advised

### Page 0090

[01]  that Ed Nanney would be focusing solely on
[02]  individual disability claim matters. In other
[03]  words, he was — Ed Nanney, an attorney, was
[04]  dedicated to disability claims, specifically
[05]  full-time as opposed to any other corporate
[06]  responsibilities he might have had at that
[07]  point.
[08]        Q.  And that brings to mind a question.
[09]  Do you recall ever receiving any special
[10]  training while at Provident on how to give
[11]  depositions or testify at trial or deal with
[12]  legal cases?
[13]        A.  I did not have any special training.
[14]  I was involved with some cases with the
[15]  Provident Corporation.
[16]        Q.  Do you recall whether or not
[17]  Provident instituted any such training sessions
[18]  for its employees, just on a general basis, not
[19]  case specific, just general basis?
[20]        A.  Not to my knowledge, no, sir.
[21]        Q.  And look on the second paragraph.
[22]  It says, "A primary conclusion from our meeting
[23]  was a decision to implement a more intensive

---

## DR. WILLIAM E. FEIST   [1-25-99]

### Page 0091

[01] joint claims/legal special review process. The
[02] process will begin on Tuesday, April 26th and is
[03] expected to continue," and it goes on to
[04] describe some of that.
[05]   A.  To the second quarter, yes.
[06]   Q.  And is this more intensive joint
[07] claims/legal special review process one that you
[08] discussed the round-table process?
[09]   A.  Yes, sir. It is.
[10]   Q.  If you will look down towards the
[11] bottom of the page where it says, "On an interim
[12] basis, we have arranged for Dr. Feist to be
[13] available for individual disability claims on a
[14] half-day basis beginning Monday, April 24th."
[15]   A.  Uh-huh, yes, I see that.
[16]   Q.  And in addition, Dr. Feist will be
[17] participating in one of the two special review
[18] process meetings each week?
[19]   A.  Yes, sir.
[20]   Q.  So would this give us the time frame
[21] in which this process started?
[22]   A.  Yes, I believe so.
[23]   Q.  Look on the second page. It

### Page 0092

[01] identifies the participants for the meetings,
[02] two claims representatives from each claim unit
[03] present, two to three attorneys, physician, Dr.
[04] O'Connell on Thursday -- excuse me, Dr.
[05] O'Connell on Tuesday, Dr. Feist on Thursdays,
[06] senior management representative?
[07]   A.  Yes, sir, I see that.
[08]   Q.  Is that generally the way these
[09] meetings were staffed?
[10]   A.  Yes.
[11]   Q.  Then it has another heading,
[12] "Relationship to Current Legal Review Meetings."
[13] The first bullet point:  "It is intended that
[14] the review of those 120 files be incremental or
[15] in addition to files currently being brought
[16] before the legal review process."
[17]   What is your understanding as you
[18] look back on it now what the legal review
[19] process was that that is referring to?
[20]   A.  Well, this document refreshed my
[21] memory that there was a weekly, I guess weekly
[22] conference where Dr. O'Connell would sit down
[23] with some of the claims adjustors and discuss

### Page 0093

[01] some of the cases. I was not personally
[02] involved in that, except during the time Dr.
[03] O'Connell was out at the end of '95 with his --
[04] he was out for six weeks for an operation, I
[05] think I sat in on that, but I frankly had
[06] forgotten about that. I think that was an
[07] ongoing process, but, again, I was not directly
[08] involved in that.
[09]   Q.  And from -- as you look back on it,
[10] the six weeks or so that you substituted for Dr.
[11] O'Connell in that process, what is your
[12] understanding as to whether that had been a
[13] process long in place or was that part --
[14] something new like the weekly review,
[15] round-table review?
[16]   A.  It's my impression that what we are
[17] referring to here had been in place for
[18] sometime, not a new thing. Again, I don't know
[19] the time frame, but it was not new.
[20]   Q.  And what was the nature of that legal
[21] review process that you substituted for Dr.
[22] O'Connell in for the six weeks or so in 1995?
[23]   A.  Well, it's very -- it's not real

### Page 0094

[01] clear, but I think it was a very -- perhaps more
[02] of an ongoing claims review, in other words,
[03] cases that were currently being evaluated for
[04] disability and not, were brought to that meeting
[05] for the claims people to get some input from
[06] medical and legal in terms of what issues they
[07] might have.
[08]   Q.  Was that part of the scrub process or
[09] was it different from the scrub process you
[10] described?
[11]   A.  I would say it's different from the
[12] scrub process. It was just -- if memory serves
[13] me correctly that was more of an ongoing initial
[14] evaluation mode. In other words, the claim had
[15] come in and they were still working whether the
[16] person was disabled or not and needed some
[17] input. It was not, to my knowledge, any more
[18] than that.
[19]   Q.  Okay. And, so, this point here about
[20] the relationship to the current legal review
[21] meetings is where the claims to be selected for
[22] the round-table review are different from those
[23] that you describe as part of the ongoing legal

### Page 0095

[01] review process?
[02]   A.  That would be my understanding, yes,
[03] sir.
[04]   Q.  Okay.  Look back on the fourth page,
[05] which is the attachment to this memo, describing
[06] the special review process. It describes the
[07] review process in four bullets. First, "The
[08] executive consultant/claims consultant will
[09] present each claim by reviewing the specifics of
[10] the claim, summarizing the conclusions of the
[11] investigation, highlighting the issues to be
[12] resolved and making a recommendation for how to
[13] resolve the claim," correct?
[14]   A.  Yes, sir.
[15]   Q.  And is that basically the way that it
[16] started for each one, each claim that would be
[17] reviewed?
[18]   A.  Yes, sir, I believe so.
[19]   Q.  Okay.  Then it says this
[20] presentation will be followed by group
[21] discussion and consensus on how to produce?
[22]   A.  Yes, sir, that's correct.
[23]   Q.  And is that the way that the process

### Page 0096

[01] worked?  You would have a group discussion?
[02]   A.  A group discussion, yes, sir.
[03]   Q.  And it says a consensus on how to
[04] proceed.  What does that mean?  What did y'all
[05] do?
[06]   A.  We basically would discuss a case and
[07] I think the legal and medical ramifications were
[08] discussed and, then, if there was some plan of
[09] attack for more information or whatever needed
[10] to be done, was sort of gathered together and
[11] one of the claims persons was assigned to follow
[12] through on maybe surveillance or more financial
[13] information. Or maybe one of the attorneys
[14] would look at the legal aspect, and oftentimes,
[15] it was not concluded in a given session. You
[16] might have to get more information and come
[17] back -- a given case might come back at a later
[18] round table if there was more information that
[19] was needed.
[20]   Q.  And what input did you typically have
[21] into those types of administrative decisions on
[22] how to process the claim or deal with it?
[23]   A.  My role was primarily to evaluate,

## DR. WILLIAM E. FEIST   [1-25-99]

**Page 0097**

[01] maybe not evaluate, but maybe elucidate on the
[02] medical impairment. Sometimes it would be a
[03] medical impairment that the claims adjustors
[04] might not have been really familiar with. I
[05] could then give some medical output, input.
[06] The administrative part, really, was out of my
[07] hands. I really didn't have any administrative
[08] role in that.
[09]     Q. The next line says, "Jeff McCall has
[10] agreed to develop a recommended system for
[11] tracking decisions and monitoring their
[12] implementation." Do you recall whether or not
[13] during the eight months, roughly, that you
[14] participated in the round-table review, such a
[15] system was ever developed and implemented for
[16] tracking decisions and monitoring their
[17] implementation?
[18]     A. I am a little vague on that, but I
[19] think there was -- at least McCall, Jeff McCall
[20] had some kind of a system where he would track
[21] cases and often would report back as to the
[22] status of a given case.
[23]     Q. Was there any policy or practice

**Page 0098**

[01] followed by the members of the round-table
[02] review as to the subject of keeping notes of
[03] what was discussed in -- on each case?
[04]     A. I think many of the individuals, the
[05] claim adjustors, the lawyers, the physicians
[06] would make notes, but, to my knowledge, those
[07] notes were not part of the record. They might
[08] have been part of the decision process, but not
[09] formally written down, so to speak.
[10]     Q. Not formalized into the claim file
[11] itself?
[12]     A. That's my understanding.
[13]     Q. Was there any reason expressed that
[14] you recall as to why or why not such notes would
[15] or would not be included in the claim file?
[16]     A. I don't recall any discussion of
[17] that.
[18]     Q. The final point there is, "A key to
[19] the success of this process is a commitment by
[20] all participants to focus on how to resolve the
[21] claim currently versus finding fault with
[22] previous handling." Is that correct? That's
[23] what it says?

**Page 0099**

[01]     A. That's what it says, yes, sir.
[02]     Q. Can you give us some insight into the
[03] meaning of that, as you saw it from these
[04] round-table review processes, resolving the
[05] claim currently versus finding fault with
[06] previous handling?
[07]     MR. DAVENPORT: Object, calls for
[08] speculation.
[09]     Q. I just want what you saw, not
[10] speculating about what the writer may or may not
[11] have meant.
[12]     A. Well, I think -- I think there was a
[13] perception that during the time frame when the
[14] claims adjudication was being handled in the
[15] field offices that the quality of claims
[16] adjudication was not what it should have been.
[17] And, then, once the files are all brought into
[18] one central location, then it might be
[19] appropriate in a given case to revisit that case
[20] to see if there were mistakes made or whether
[21] the person really was or wasn't disabled. I
[22] think that's how I would perceive that.
[23]     Q. Okay. Now, the next heading is File

**Page 0100**

[01] Selection, and it has three bullet points.
[02] "Each claim unit will present two claims per
[03] week for review. At this rate one hundred
[04] twenty claims will be reviewed over the
[05] remaining ten weeks in the quarter."
[06]     And, if I understand that right,
[07] each claim unit presenting two cases per, two
[08] claims per week, there was more than one claim
[09] unit that would attend the meeting, is that
[10] correct?
[11]     A. That's correct, yes, sir.
[12]     Q. So, what would that be, how many
[13] claim units would typically attend or were
[14] scheduled to attend these meetings?
[15]     A. Well, my recollection would be that
[16] those units that had cases to present would
[17] attend and primarily the first line claims
[18] adjustor would present it. I guess these
[19] enumerated units are apparently the ones that
[20] were primarily involved. But I suppose it's
[21] possible that if one of these units didn't
[22] handle a case on a given night, they wouldn't
[23] present. On the other hand, they might have

**Page 0101**

[01] many cases to present. It would vary somewhat.
[02]     Q. I guess what I'm headed -- where I'm
[03] headed on this, it says, "At this rate one
[04] hundred twenty claims will be reviewed over the
[05] remaining ten weeks in the quarter." That would
[06] be twelve, twelve claims per week?
[07]     A. Yes.
[08]     Q. Divided by two different meetings, so
[09] six claims per meeting?
[10]     A. That's a good estimate, yeah. Yeah.
[11]     Q. And from your recollection, how close
[12] did the round-table review process come to
[13] meeting that type of rate of as many as six
[14] claims per week per meeting?
[15]     A. Per meeting?
[16]     Q. Yes.
[17]     A. Six per meeting? It probably came
[18] close to it. Again, I don't recall,
[19] specifically.
[20]     Q. All I am doing here is trying to
[21] figure out if this is -- if this is closer to
[22] the rate that was followed or the estimate you
[23] gave us earlier this afternoon about maybe

**Page 0102**

[01] seventy-five claims over the eight months that
[02] you were there?
[03]     A. Well, yeah. This was written in the
[04] spring of '96 and --
[05]     Q. Looking forward?
[06]     A. Looking forward and I'm sure maybe
[07] this forecast wasn't, perhaps, as accurate as it
[08] ended up being, but --
[09]     Q. The second bullet point about file
[10] selections was, "For the first several week,
[11] claims will be selected based on the
[12] manager/consultant's knowledge of high impact
[13] problematic claims, particularly those with
[14] significant legal issues." Did I read that
[15] correctly?
[16]     A. Yes, sir.
[17]     Q. Now, can you -- from your experience
[18] of participating in these round-table review
[19] process, give us some understanding of what this
[20] meant, high impact problem --
[21]     A. High impact problematic claims?
[22]     Q. Yes.
[23]     MR. DAVENPORT: Again, objection.

**Page 0103**

[01] Calls for speculation as to what was in the mind
[02] of the writer at the time he wrote that.
[03]     Q. And I'm looking for your experience
[04] how you relate this memo says as it's projecting
[05] forward.
[06]     A. I would define high impact as a case
[07] that had high financial reserve. Problematic
[08] claims as those which may have areas of
[09] disagreement or potential disagreement about the
[10] proper adjudication of the initial claim, claim
[11] process.
[12]     Q. And from your experience on the high
[13] impact, which you said was high dollar, was that
[14] the type of case you wound up seeing?
[15]     A. Yes, sir, I believe so.
[16]     Q. And by the way, it refers to the
[17] manager/consultant. What is the consultant as
[18] manager/consultant being referred to there?
[19] Do you know?
[20]     A. My recollection is that it was a
[21] position, in other words, entry level claims
[22] adjustor was one level. The manager, quote,
[23] consultant, these underlings consultant to this

**Page 0104**

[01] manager, quote, consultant, just a way of
[02] addressing the fact that, you know, X number of
[03] bottom line claims adjustors report to a manager
[04] who is a consultant, quote, unquote, because he
[05] or she has had more experience and tenure and so
[06] forth.
[07]     Q. Yes. So it's not an outside
[08] consulting company?
[09]     A. Not to my knowledge.
[10]     Q. All right. Then it says,
[11] "Subsequently claims will be selected based on
[12] criteria currently under development in the
[13] clinic -- in the claims department"?
[14]     A. Yes.
[15]     Q. Do you recall from your tenure on the
[16] round-table review process whether any criteria
[17] were ever developed by the claims department for
[18] selection of cases to be presented at the
[19] round-table review?
[20]     A. I have no knowledge of that.
[21]     Q. Okay. Then it shows meeting dates of
[22] Tuesdays, the three units were the high
[23] litigation risk unit, the north unit, the south

**Page 0105**

[01] unit, and on Thursdays the psyche unit, the
[02] residual unit and the special handling units?
[03]     A. Uh-huh (indicating affirmatively).
[04]     Q. And if I go back to the first page,
[05] on one of these pages, it said, the second page,
[06] it said Dr. O'Connell will be there on Tuesdays
[07] and Dr. Feist on Thursdays?
[08]     A. (Witness nods head.)
[09]     Q. Putting that together, did you
[10] typically attend on Thursdays?
[11]     A. Yes, sir, I did.
[12]     Q. And are these units the psych unit,
[13] the residual unit and the special handling units
[14] the ones that typically presented on the
[15] Thursdays that you were there?
[16]     A. To the best of my recollection, yes,
[17] sir.
[18]     Q. There's the reference on Tuesday, the
[19] Tuesday meetings to the high litigation risk
[20] unit. What was that? Do you know?
[21]     A. My understanding was that it would
[22] be cases that had some significant legal risk,
[23] but I have no -- I have no specific knowledge of

**Page 0106**

[01] that.
[02]     Q. Okay. When -- you say that Ralph
[03] Mohney attended many of these meetings?
[04]     A. Yes, he did.
[05]     Q. From your recollection, how often did
[06] he attend the meetings?
[07]     A. My recollection is that he was there
[08] most of the times that I was there on Thursday.
[09] I think he was there most of the time on Tuesday
[10] evenings, unless he was out of town or unable to
[11] attend and he would have a vice president,
[12] usually, sit in for him at that meeting.
[13]     Q. What role did he play in the meetings
[14] that you attended?
[15]     A. He generally was the facilitator,
[16] kept the discussion going, kept it on track,
[17] kept people from getting -- going on tangents
[18] and so forth.
[19]     Q. In terms of making suggestions or
[20] recommendations for action, what role did he
[21] play, if any?
[22]     A. My recollection was that he was more
[23] facilitator, trying to encourage discussion and

**Page 0107**

[01] maybe bringing to conclusion. I don't recall
[02] that he actually made a specific recommendation
[03] on cases.
[04]     Q. Did he set a tone or tenor for the
[05] meeting?
[06]     A. I would say he did. I think he
[07] basically felt like these cases were suspect
[08] cases and we needed try to see what we could do
[09] to terminate them.
[10]     Q. I am sorry, do what?
[11]     A. Do what we can to terminate them.
[12]     MR. DAVENPORT: Object, calling for
[13] conclusions. I don't object to him saying what
[14] was said at the meeting. I object to his
[15] concluding, giving conclusions or opinions.
[16]     Q. In that regard, do you recall Mr.
[17] Mohney coming out and saying, "We need to
[18] terminate"? I mean, how -- let me rephrase it.
[19]     For your conclusion, your statement
[20] that the tenor of the meeting was, let's find a
[21] way to terminate paying, what do you base that
[22] on? Was it specific words that you can recall
[23] for Mr. Davenport's benefit, for his objection?

**Page 0108**

[01] Or is it some other way that you come to that
[02] description of the tenor of the meeting?
[03]     A. I don't know if there's any specific
[04] examples I can give, but I think just the
[05] impression of the entire intent of the meeting
[06] would bring that up.
[07]     MR. DAVENPORT: I renew my objection.
[08] I move to strike the prior answer. I also would
[09] move to strike that answer.
[10]     Q. From -- at the time you left the
[11] company in February of '96, what was the
[12] turnover rate at the company at -- there in
[13] Chattanooga?
[14]     MR. DAVENPORT: Objection, calling
[15] for speculation.
[16]     A. I don't know the exact turnover rate,
[17] but I know that the number of vice presidents
[18] that were present at the company when Chandler
[19] came on board and the number when I left was
[20] about fifty percent less from beginning to end.
[21] Many of those were -- many of them were
[22] terminated.
[23]     MR. DAVENPORT: Object.

## DR. WILLIAM E. FEIST   [1-25-99]

### Page 0109

[01] MR. KENT: Let me interrupt before you
[02] get there.
[03]    Q.   Did you see any pattern developing in
[04] the nature of people who were leaving the
[05] company, whether voluntarily or by termination
[06] as compared to people brought in to replace
[07] them?
[08]    MR. DAVENPORT: Object, calls for
[09] speculation, calls for comparison. There's no
[10] proper predicate to get the comparison. And
[11] the answer calls for speculation outside of this
[12] witness's area of expertise.
[13]    A.   Well, my impression was that he was
[14] replacing seasoned veterans with young people
[15] with little or no experience in their job, with
[16] masters of business administration degrees.
[17]    MR. DAVENPORT: Again, object and
[18] move to strike his, quote, impressions, close
[19] quote, as they are not admissible.
[20]    Q.   What do you base that impression on,
[21] sir?
[22]    A.   Look at the claims department under
[23] Ralph Mohney. He promoted young people with

### Page 0110

[01] masters of business administration degrees over
[02] seasoned claims adjustors without those degree,
[03] because they want along with his program.
[04]    Q.   From your experience --
[05]    MR. DAVENPORT: Excuse me. "Because
[06] they went along with his program," object, that
[07] calls for conclusions. Again, he's giving
[08] conclusions, opinions and speculations, his
[09] impression.
[10]    Q.   From your personal observation there,
[11] did you see this apparent pattern that you've
[12] described of bringing in inexperienced people or
[13] promoting inexperienced people over experienced
[14] people?
[15]    A.   Yes.
[16]    MR. DAVENPORT: Excuse me. Object to
[17] leading to the question.
[18]    A.   Yes, I did. Some of their names are
[19] on here (indicating). --
[20]    Q.   Give me an example, then, from
[21] this --
[22]    A.   Tim Arnold.
[23]    Q.   Let's back up.

### Page 0111

[01]    COURT REPORTER: I didn't hear you.
[02]    Q.   You're going to have to speak a
[03] little louder --
[04]    A.   Tim Arnold.
[05]    Q.   And tell me what you are giving an
[06] example of.
[07]    A.   Okay. I'm giving an example of
[08] individuals who were promoted on the basis of
[09] MBA degrees and not experienced over more
[10] experienced persons.
[11]    Tim Arnold, Ken Denton, perhaps
[12] Brian Klapman. I'm not sure, but, certainly, Tim
[13] Arnold and Ken Denton.
[14]    Q.   And from your personal observation at
[15] the time you were there at Provident, these
[16] examples you give here of Tim Arnold and Ken
[17] Denton, how representative, if at all, were
[18] those of the way that promotions and personnel
[19] were handled?
[20]    MR. DAVENPORT: Object, calls for
[21] conclusions, speculation.
[22]    A.   Are we talking companywide or
[23] disability income department specifically?

### Page 0112

[01]    Q.   We'll go to disability income
[02] department.
[03]    A.   I mentioned those two. I think also
[04] in the company there were other individuals who
[05] were promoted similarly in that type of
[06] situation.
[07]    Q.   Okay. Have you given deposition
[08] testimony before in any other lawsuits being
[09] brought against Provident?
[10]    A.   Yes, sir, I have.
[11]    Q.   And how many occasions?
[12]    A.   Two.
[13]    Q.   What cases were those?
[14]    A.   The case of Norman Knee versus
[15] Provident a year ago. And another one last
[16] summer, the case I can't recall off the top of
[17] my head.
[18]    Q.   And in those depositions did you
[19] describe the same -- give the same description
[20] of the company and the round-table review
[21] process that you gave here?
[22]    A.   Yes, sir.
[23]    Q.   Have you expressed your view of the

### Page 0113

[01] company's use of the round-table review process
[02] to other people at Provident since leaving the
[03] company?
[04]    A.   No, I have not.
[05]    Q.   And while there at Provident, did you
[06] -- do you recall anybody that you spoke with and
[07] shared your feelings about the use of the
[08] round-table review process or the change in the
[09] company culture that you have described for us
[10] today?
[11]    A.   Well, I don't know if I specifically
[12] expressed it to anybody, but I think my demeanor
[13] at the Thursday round-table meetings was pretty
[14] obvious that I was not comfortable with that
[15] setting.
[16]    MR. DAVENPORT: Object.
[17] Nonresponsive, move to strike.
[18]    MR. KENT: Thank you. That's all I
[19] have. Thank you very much.
[20]    THE WITNESS: You're welcome, sir.
[21]
[22] EXAMINATION BY MR. EHLINGER:
[23]    Q.   Doctor, my name is Ross Ehlinger, I

### Page 0114

[01] represent Joe Wallace, who has a separate
[02] lawsuit pending in Federal Court in Austin.
[03]    A.   Yes, sir.
[04]    Q.   The good news is that the lawyers
[05] have agreed that the questions that Mr. Kent has
[06] asked you can be direct examination in my case.
[07] That's --
[08]    A.   I appreciate that.
[09]    Q.   -- the good news.
[10]    A.   I appreciate that.
[11]    Q.   So my examination won't take as long.
[12] In fact, I probably have about ten or fifteen
[13] minutes with you. The problem is, I'm going to
[14] have to jump around a little bit. If you ever
[15] get confused about what area I'm talking about,
[16] please ask me to restate my question. Would
[17] you do that?
[18]    A.   Certainly.
[19]    Q.   Okay. Let's talk about your
[20] educational background. What college did you
[21] attend what medical school did you go to?
[22]    A.   I attended the University of Kansas
[23] in Lawrence, receiving a bachelor of science

## DR. WILLIAM E. FEIST    [1-25-99]

**Page 0115**

[01] degree there in 1962. I went to the University
[02] of Kansas Medical School in Kansas City, Kansas,
[03] receiving an M.D. degree in 1966.
[04]    Q.    I see. And you spoke earlier of
[05] being Board Certified in insurance medicine, is
[06] that right?
[07]    A.    That's correct.
[08]    Q.    Would you explain to the jury what
[09] that means?
[10]    A.    Board certification in insurance
[11] medicine is prescribed by the American Board of
[12] Insurance Medicine. It requires some training
[13] in basic insurance terminology and in products
[14] and procedures, a statistics course, a written
[15] and oral examinations before the Board. It's
[16] quite an extensive procedure to go through.
[17]          And also, as a prerequisite or
[18] criterion to sit for the oral and written exams,
[19] one has to practice insurance medicine for a
[20] minimum of four years. So not only is it taking
[21] the examination, but it's four years of a
[22] minimum, four years minimum before you can sit
[23] for the exams of actually doing insurance

**Page 0116**

[01] medicine.
[02]    Q.    Did you pass that exam the first time
[03] you sat for it?
[04]    A.    Yes, sir.
[05]    Q.    Have you ever had your certification
[06] ever revoked or challenged?
[07]    A.    No, sir.
[08]    Q.    Are you currently licensed here in
[09] Alabama?
[10]    A.    Yes, sir.
[11]    Q.    What other license -- what states are
[12] you licensed in?
[13]    A.    Tennessee. Missouri and Kansas.
[14]    Q.    Are you familiar with the term
[15] underwriting?
[16]    A.    Yes, sir.
[17]    Q.    Okay. There was some objections to
[18] some earlier questions, and I think you have
[19] some broad experience in the area?
[20]    A.    Twenty-one years. I think I know
[21] what I'm doing.
[22]    Q.    Can you explain just briefly in a
[23] nutshell what underwriting means?

**Page 0117**

[01]    A.    Underwriting basically is reviewing a
[02] case, whatever type of insurance one is looking
[03] at, life, disability, medical, long-term, to
[04] assess the risk of that individual, and to
[05] either assign, to use the example of life
[06] insurance, either give them a standard rating or
[07] if there's a medical impairment that needs to be
[08] rated up, to rate them up.
[09]    Q.    Would it be incorporating medical
[10] terminology into a insurance contract or at
[11] least incorporating the theories of medicine and
[12] insurance together?
[13]    A.    Absolutely. That's the whole heart
[14] of the thing.
[15]    Q.    And that's nothing new to you?
[16]    A.    Twenty-one years last month.
[17] Actually, this month.
[18]    Q.    Let me ask you about the quarterly
[19] vice president meetings that you attended.
[20] What was discussed at those meetings?
[21]    A.    Those were generally items of
[22] interest to the vice presidents. Could be
[23] anywhere from new products to where the company

**Page 0118**

[01] is, where they are going, that sort of thing.
[02] Mr. Chandler's predecessor, Skip Walker, or
[03] Winston Walker, started those when he was CEO.
[04] And during my tenure at Provident they were
[05] carried on by Mr. Chandler.
[06]    Q.    When you said he started those
[07] meetings, what year are you talking about that
[08] they were started?
[09]    A.    Well, I became vice president in
[10] 1990, and that was one's ticket to be invited,
[11] so --
[12]          COURT REPORTER:  That was what?
[13] I didn't hear you.
[14]    A.    It was one's ticket to be invited to
[15] the vice president meetings. Walker was in that
[16] office from '87 to '93. So, actually -- I
[17] can't recall when they started, but somewhere in
[18] the early nineties those meetings were started.
[19]    Q.    And did you attend those meetings
[20] religiously?
[21]    A.    Religiously. Attendance was taken.
[22]    Q.    Were things such as the financial
[23] condition of the company discussed at those

**Page 0119**

[01] meetings?
[02]    A.    Often. If appropriate, it was, yes,
[03] sir.
[04]    Q.    In fact, was the financial
[05] information in terms of written materials passed
[06] out at those meetings?
[07]    A.    I don't recall. Usually it was like
[08] a presentation of a officer on a video type
[09] thing. I don't recall that handouts were given.
[10]    Q.    You discussed or you stated that new
[11] products were discussed. Can you elaborate on
[12] what you meant by new products?
[13]    A.    Well, many -- on occasion, I guess I
[14] shouldn't say many times, on occasion, maybe a
[15] department is going to bring out a new product,
[16] a new line of insurance or something, they might
[17] have one of their marketing people or whatever
[18] explain the product, what it's supposed to do
[19] and that sort of thing.
[20]    Q.    That's my point. The point is that
[21] marketing people were involved in these vice
[22] president meetings as well?
[23]    A.    Oh, any vice president of the company

**Page 0120**

[01] was expected to attend.
[02]    Q.    Therefore, you had experience in the
[03] marketing area based upon these quarterly
[04] meetings, is that right?
[05]          MR. DAVENPORT:  Excuse me. Object to
[06] that question as leading.
[07]    Q.    Did you have any experience with the
[08] marketing department?
[09]    A.    I would have to say I did not have
[10] any direct experience. Again, part of my job as
[11] a medical underwriter is to know what the
[12] products are and pretty much, you know, what
[13] they, what they purport to do or what the
[14] benefits are, so to speak. So I would have a
[15] working knowledge of the products. I wouldn't,
[16] obviously, know anything more than just a
[17] general working knowledge.
[18]    Q.    Are you saying there was requirement
[19] that you be familiar with these types of
[20] policies?
[21]    A.    I think as part of the underwriting
[22] process, you have to know what -- for example,
[23] in a disability policy, you have to know what



## DR. WILLIAM E. FEIST   (1-25-99)

### Page 0121

[01] the elimination period is. That has to do with
[02] underwriting. You have to know what the
[03] benefits are. Yes, that's part of the process.
[04]    Q.   Let's discuss the bulletins. You
[05] said -- earlier today, you discussed bulletins
[06] that were circulated. How often were these
[07] bulletins circulated to you?
[08]    A.   They were circulated on an as-needed
[09] basis. Whenever there was some major promotion
[10] of some officer or new hire, or something of
[11] this sort, or new employee benefit program, or
[12] whatever, they would have general bulletins.
[13]    Q.   Approximately what year did you start
[14] receiving those bulletins?
[15]    A.   My recollection was that they were,
[16] they were an ongoing thing from 1982 until I
[17] left. Now, this was pre-era of e-mail, so this
[18] was sort of the e-mail of the day, if you will.
[19]    Q.   I understand. I am sorry to
[20] interrupt you. From 1982 until the time that
[21] you left, were you receiving these bulletins on
[22] a regular basis?
[23]    A.   Oh, yes. Yes, sir.

### Page 0122

[01]    Q.   And just on an average month, how
[02] often would you have received these bulletins?
[03]    A.   It would vary considerably. Some
[04] months we would have none and some months we
[05] would have several.
[06]    Q.   In these bulletins, was the financial
[07] condition of the company discussed on occasion?
[08]    A.   On occasion, yes, sir.
[09]    Q.   Were marketing issues discussed in
[10] these bulletins?
[11]    A.   Many times, yes, sir.
[12]    Q.   Were things such as specific policy
[13] language discussed in these bulletins?
[14]    A.   I don't recall if they were, except
[15] when the situation came up about own occ and
[16] income replacement type insurance. That was
[17] probably the only time that I can recall.
[18]    Q.   Do you recall specific bulletins
[19] regarding the own occupation policies?
[20]    A.   Yes, sir.
[21]    Q.   When did that start?
[22]    A.   It would have been somewhere in '95,
[23] mid -- late '94, early '95, I would guess.

### Page 0123

[01]    Q.   Let me ask you this before I forget.
[02] You are currently on retirement from Provident,
[03] is that correct?
[04]    A.   That's correct, sir.
[05]    Q.   Are you receiving retirement benefits
[06] from Provident?
[07]    A.   Yes, sir.
[08]    Q.   How long have you been receiving
[09] retirement benefits from Provident?
[10]    A.   Since March 1, 1996.
[11]    Q.   Now, did you ever see a restructuring
[12] of the claims department in the nineties?
[13]    A.   A restructuring of the claims
[14] department?
[15]    Q.   Yes, sir.
[16]    A.   Yes, of course.
[17]    Q.   Okay. Now, can you -- I don't think
[18] we have covered that, but in terms of the
[19] hierarchy of the claims department, did you see
[20] that restructured in the nineties?
[21]    A.   Well, yeah, when Ralph Mohney was
[22] elevated to Vice President of Claims, he
[23] basically restructured the whole department in

### Page 0124

[01] terms of, I alluded to this earlier, bringing
[02] claims adjustors from the field office, which
[03] had been done for, I don't know how many years,
[04] into the home office and setting up some of
[05] these various units that are noted in this memo
[06] (indicating). It was a very definite
[07] restructuring.
[08]    Q.   Okay. And I would like to be -- I
[09] would like for you to be as specific as you can
[10] about the restructuring. What I heard you say
[11] is there was different types of units set up
[12] that we already discussed about and I am
[13] assuming you are referring to the psychiatric
[14] claims unit, is that right?
[15]    A.   Among others, yes.
[16]    Q.   Okay.
[17]    A.   The special handling unit and the
[18] various ones that specialize in certain areas.
[19]    Q.   Prior to the entrance of Ralph
[20] Mahoney on the scene, was there -- I'm sorry,
[21] it's Ralph Mohney.
[22]    A.   Mohney, Mohney, yes, sir.
[23]    Q.   Prior to the time was there a

### Page 0125

[01] psychiatric claims unit?
[02]    A.   Not a specific one, not a dedicated
[03] one to my knowledge.
[04]    Q.   What was your understanding of what
[05] types of cases would go to the psychiatric
[06] claims unit?
[07]    A.   It would be those that obviously had
[08] a psychiatric problem. And I am not sure
[09] whether that was all psychiatric claims or just
[10] ones that were a particular problem, but it may
[11] well have been all psychiatric claims.
[12]    Q.   With regard to the restructuring,
[13] were there more claims adjustors hired on when
[14] this restructuring occurred under the auspices
[15] of Ralph Mohney?
[16]    A.   Yes, sir.
[17]    Q.   And in terms of how many people were
[18] added, do you have any estimation?
[19]    A.   Well, you know, entire units were set
[20] up and generally they would have, maybe, an
[21] experienced person leave the unit, maybe have
[22] eight or ten newly hired claims adjustors or new
[23] to Provident.

### Page 0126

[01]    Q.   How many of these units were set up,
[02] do you think?
[03]    A.   Probably six or eight. If there
[04] were --
[05]       MR. EHLINGER:  We need to take a
[06] break for the videographer.
[07]       THE WITNESS:  Okay.
[08]       VIDEO TECHNICIAN:  We are now off
[09] the record. This ends video tape number 1, 2:47
[10] P.M.
[11]
[12]       (Whereupon, a brief recess was
[13]       taken.)
[14]
[15]       VIDEO TECHNICIAN:  This begins video
[16] tape number 2.  We are on the record at 2:48
[17] P.M.
[18]    Q.   Before the break, or the change of
[19] tape, anyway, we were discussing the change in
[20] the hierarchy of the claims department and you
[21] had mentioned that there was more units set up,
[22] or additional units that hadn't existed that
[23] were set up and there were more adjustors

## DR. WILLIAM E. FEIST    [1-25-99]

### Page 0127

[01] brought in. Were there more vice presidents
[02] added as well?
[03]    A.  I can't recall if there were.
[04]    Q.  Were more consultants brought in,
[05] medical consultants?
[06]    A.  Medical consultants?
[07]    Q.  Yes.
[08]    A.  During my tenure, there was not.
[09] When I left in March of '96, Dr. O'Connell and
[10] myself were the only physicians.
[11]    Q.  Were there other consultants, not
[12] necessarily medical consultants that were added.
[13] I thought you were going to answer yes until I
[14] put the word medical in there. That's why I am
[15] asking.
[16]    A.  I am not sure what you mean
[17] consultants.
[18]    Q.  Okay.
[19]    A.  I don't -- well, other than the
[20] in-house people that might specialize in
[21] psychiatry or special problems or other types of
[22] things, there were no outside consultants that I
[23] know of.

### Page 0128

[01]    Q.  We'll get that to that in a minute,
[02] but when this restructuring occurred, was this
[03] the first time after the restructuring that the
[04] lawyers had actually been involved in the claims
[05] process to your knowledge?
[06]    A.  I think lawyers have been involved
[07] from time immemorial as far as reviewing cases.
[08] The way Provident was structured when I first
[09] went there, we had like a separate medical
[10] department and separate legal department and
[11] claims people would send cases for our review
[12] and we would send them back. I think that, my
[13] understanding, was a similar process or setup
[14] for the legal department. They were consulting
[15] to the claims people, but they weren't actually
[16] physically sitting in the department.
[17]    Q.  Now, you are familiar with the own
[18] occupation non-cancellable policies, correct?
[19]    A.  Yes, sir.
[20]    Q.  Now, does the term 334 series mean
[21] anything to you?
[22]    A.  My understanding is that's the own
[23] occ non-cancellable policy, the disability

### Page 0129

[01] policy that Provident sold during the 1980s.
[02]    Q.  Do you know if Provident still sells
[03] those policies?
[04]    A.  I can't speak to that.
[05]    Q.  Do you know if these 334 series, or
[06] these own occupation policies that were
[07] non-cancellable became unprofitable in 1995?
[08]    MR. DAVENPORT:  Object, calls for
[09] speculation.
[10]    A.  I think they became unprofitable
[11] several years before that, but they were
[12] unprofitable in that time frame, yes.
[13]    Q.  Is your understanding of that based
[14] upon the meetings that you attended and the
[15] bulletins that you read?
[16]    A.  Yes, sir.
[17]    MR. DAVENPORT:  Excuse me. Object to
[18] leading. Also object to the use of the term
[19] unprofitable as being vague and ambiguous. Also
[20] object to the response of the answer -- of the
[21] witness as being outside his area of expertise.
[22]    Q.  What is your understanding about why
[23] these policies became -- not why, but that these

### Page 0130

[01] policies became unprofitable in 1995? What is
[02] that based upon?
[03]    MR. DAVENPORT:  Object to the opinion
[04] of what it's based on.
[05]    MR. EHLINGER:  I've already got his
[06] opinion. I am asking what it's based upon,
[07] because you objected to leading.
[08]    A.  I think the basic line was, basic
[09] situation was that there were a lot of claims on
[10] the own occ policies that just all of all came
[11] together at one point in time.
[12]    Q.  Okay. And I'm not --
[13]    A.  Or many of them came together, not
[14] all.
[15]    Q.  I'm not communicating well with you.
[16] I'm trying to get your understanding as to how
[17] you came to this understanding. In other words,
[18] did you review any documents? Was something
[19] placed in front of you, something to that
[20] effect?
[21]    A.  Well, I think when I went to a vice
[22] presidents meeting and the vice president in the
[23] actual department says, we have got to take a

### Page 0131

[01] three hundred million dollar dump in to the
[02] claims unit, claims reserve to make ourselves
[03] solvent.
[04]    Q.  When you were testifying earlier
[05] about the three hundred million dollar charge,
[06] however you described it, that is something that
[07] you are basing upon -- well, what are you basing
[08] that upon, a meeting, a document?
[09]    A.  A meeting that it was discussed very
[10] openly that there was a claims crisis, if you
[11] will, and that there was a three hundred dollar
[12] dump-in from other reserves of the corporation
[13] to cover that.
[14]    Q.  Not three hundred dollars?
[15]    A.  No, three hundred million, I am
[16] sorry.
[17]    Q.  Okay. The -- earlier, I think you
[18] testified briefly about the term scrubbing.
[19] Did you see either a larger amount or a lesser
[20] amount or the same amount of scrubbing going on
[21] in the psychiatric claims unit than any other
[22] unit?
[23]    A.  I would say so, simply because

### Page 0132

[01] psychiatry is such a subjective area and
[02] emotional problems are such subjective things.
[03] It's not as easily verifiable as some other
[04] impairments.
[05]    Q.  And, again, I asked a poor question.
[06] I was asking if you saw more scrubbing going on
[07] in that unit, less scrubbing going on in that
[08] unit?
[09]    A.  I would say more scrubbing.
[10]    MR. DAVENPORT:  Let me object to the
[11] form of the question as being vague, use of the
[12] term scrubbing.
[13]    Q.  When I am referring to the term
[14] scrubbing, I am referring to the way you
[15] described it earlier when Mr. Kent was asking
[16] the questions.
[17]    A.  Yes, sir, I would say so.
[18]    Q.  When did this scrubbing -- let me ask
[19] you this: Did this scrubbing seem to increase
[20] with the claims department went under the
[21] restructuring under Ralph Mohney?
[22]    A.  Yes, sir, I would say so.
[23]    MR. DAVENPORT:  Excuse me. I object



DR. WILLIAM E. FEIST    [1-25-99]

### Page 0133

[01] to the form of the question as being leading and
[02] object to the answer as giving an opinion based
[03] on speculation.
[04]     Q.    Was there any relationship between
[05] the frequency of scrubbing and the restructuring
[06] frequency of claims department?
[07]         MR. DAVENPORT:  Same objection.
[08]         MR. EHLINGER:  I'm asking the same
[09] question.
[10]     A.    I would say so, yeah.
[11]     Q.    When did that occur?
[12]     A.    Well, again, late '94 or early '95,
[13] is the best that I can recall.
[14]     Q.    Based upon your seventy-five or so
[15] times that you sat through a round table, would
[16] you have any estimation of the percentage of
[17] those types of claims that address psychiatric
[18] claims unit claims?
[19]     A.    I would have to -- I would probably
[20] say --
[21]         MR. DAVENPORT:  Excuse me.  He asked
[22] you if you had an opinion, didn't you?
[23]         MR. EHLINGER:  Right.

### Page 0134

[01]         MR. DAVENPORT:  That is a yes or a
[02] no.
[03]     A.    Do I have an opinion?
[04]     Q.    Yes, sir.
[05]     A.    I would say yes.
[06]     Q.    What is your opinion?
[07]         MR. DAVENPORT:  Object to the answer
[08] as giving an opinion, and number two, calling
[09] for speculation, I mean, in giving an answer
[10] based on speculation.
[11]     A.    I would say twenty-five percent.
[12]     Q.    Twenty-five?  Okay.  Explain your
[13] answer.
[14]     A.    Well, again, it's subjective, but I
[15] mean just from my recollection, many of the case
[16] were emotionally-related psychiatric claims.
[17]     Q.    Okay.  Just to clarify, are you
[18] saying twenty-five percent of the claims you saw
[19] at round table were from the psychiatric claims
[20] unit?  Is that what you are saying?
[21]     A.    I would say so, yes, sir.
[22]     Q.    Did that seem to be a large
[23] percentage to you, average percentage?

### Page 0135

[01]     A.    Well, again, I think the nature of
[02] the, of the impairment, one might expect to see
[03] more intense scrutiny of psychiatric claims.
[04]     Q.    Let me ask you this:  Did you ever
[05] have any outside consultants at any of these
[06] round-table meetings?
[07]     A.    Outside consultants?
[08]     Q.    Yes, sir, somebody that wasn't a
[09] Provident employee?
[10]     A.    Not to my recollection.
[11]     Q.    Do you have any understanding why
[12] they were called round-table discussions?
[13] Was the table round?  What is your
[14] understanding of why it was called a round
[15] table?
[16]     A.    I have no idea.  The table was shaped
[17] about like this one we are sitting around today.
[18]     Q.    Was it more to signify the types of
[19] people that were going to be at the meeting, in
[20] your opinion?
[21]     A.    I have no opinion.
[22]         MR. DAVENPORT:  Object.  He said he
[23] didn't know.

### Page 0136

[01]     A.    I don't know.
[02]     Q.    When you were at one of these --
[03] are you familiar with the concept that an
[04] insured should get the benefit of the doubt from
[05] an insurance company?  Are you familiar with
[06] that concept?
[07]         MR. DAVENPORT:  Excuse me.  Object,
[08] calling for a question of law here.
[09]     A.    I have heard of that.  I assume that
[10] refers to a specific state or states that has
[11] that distinction or law, however you want to say
[12] that.
[13]     Q.    And based upon your board
[14] certification in insurance medicine, are you
[15] familiar with the term that ambiguities are
[16] supposed to be resolved in favor of the
[17] policyholder.
[18]         MR. DAVENPORT:  Again, I object,
[19] calling for conclusions of law from a doctor.
[20]     A.    I would say that's -- I am not
[21] familiar with that concept.
[22]     Q.    Did you ever see -- in any of these
[23] round tables, did you ever see the insured get

### Page 0137

[01] the benefit of the doubt?
[02]         MR. DAVENPORT:  Object, calling for a
[03] conclusion based on speculation.  The question
[04] is vague.
[05]     A.    I cannot recall such a case.
[06]     Q.    You testified earlier that you gave
[07] -- well, let me back up.  What was the role of
[08] these lawyers at the round table that you
[09] recall?
[10]     A.    My recollection was they were there
[11] to advise the claims people in terms of the
[12] specific laws of the specific states in which
[13] the jurisdiction was involved.  And, generally,
[14] they would have lawyers who were, say, if it was
[15] a California case, they would have a corporate
[16] lawyer that was versed in California law or a
[17] specific state, that sort of thing, in terms of
[18] clarifying the legal aspects of the case.
[19]     Q.    Now, do you recall giving your
[20] deposition in the Knee case?
[21]     A.    Yes, sir.
[22]     Q.    And, in the Knee case, I am reading
[23] from page 29, you described that the lawyers

### Page 0138

[01] there in response to the question, "Well, I
[02] guess my question is, when you say appropriate,
[03] what do you mean?"
[04]         Answer:  "Well, I think that they
[05] would look at a case and they might ask a
[06] lawyer, you know, is there some way that we
[07] could, you know, in the state of jurisdiction,
[08] is there some loophole we could look into."
[09]         Is that your recollection, that these
[10] lawyers were looking for loopholes?
[11]         MR. DAVENPORT:  Object to leading.
[12]     A.    It may be an over simplification, but
[13] I think that was their basic role, yes, sir.
[14]     Q.    And just so I clear the record up --
[15]         MR. DAVENPORT:  Excuse me.  Also let
[16] me object and move to strike the answer as being
[17] an opinion based on speculation.
[18]     Q.    Just so I can clear up the record,
[19] and based upon the objection, was there a
[20] consistent theme that you saw these lawyers --
[21] or strike that.  What was the role -- what do
[22] you believe the role as far as having a lawyer
[23] familiar with the laws of the jurisdiction in

## DR. WILLIAM E. FEIST   [1-25-99]

### Page 0139

[01] which the claim is pending, what was your
[02] understanding or at least your interpretation,
[03] sitting through these meetings, of having them
[04] there?
[05]    A.   Well, I think, my recollection was
[06] that they would have knowledge of the specific
[07] laws of that state, so they would know how far
[08] to push the case.
[09]    Q.   And based upon pushing the case, do
[10] you believe they were looking for loopholes?
[11]    A.   Yes, sir, I do.
[12]       MR. DAVENPORT:  Excuse me.  Object to
[13] leading.  Also the question calls for
[14] speculation.  And I move to strike the answer as
[15] being objectionable as giving nothing but
[16] speculation and opinion.
[17]    Q.   Now, based upon your sitting through
[18] these seventy-five or so round tables, what do
[19] you believe the driving force of these meetings
[20] were, the welfare of the insured or the bottom
[21] line?
[22]    A.   The bottom line.
[23]       MR. DAVENPORT:  Excuse me.  Excuse

### Page 0140

[01] me, Doctor.  Must make my objection.  First he
[02] didn't say he sat through seventy-five round
[03] tables.  He said he looked at maybe seventy-five
[04] claims.  Number two, I object to the form of
[05] the question as calling for opinion and
[06] speculation and now I object to the answer you
[07] gave as giving just that.  Pardon me.
[08]    Q.   Did you say you had sat through
[09] approximately seventy-five -- yes, okay.  There
[10] were seventy-five different claims at the
[11] different round tables?
[12]    A.   I think it would be eight months at
[13] three or four per month, so maybe thirty-two.
[14]    Q.   Let me restate my question so we can
[15] clear up a little bit of the objection.  Based
[16] upon your sitting through the round tables
[17] during your tenure at Provident, did you come to
[18] an opinion about whether or not the welfare of
[19] the insured was taken as a priority or whether
[20] the bottom line was the priority.
[21]       MR. DAVENPORT:  Excuse me.
[22]    A.   I would say the bottom line was the
[23] priority.

### Page 0141

[01]       MR. DAVENPORT:  Excuse me.  Object to
[02] the form of the question.  It is leading as to
[03] form.  It is calling for a lay opinion.  Move to
[04] strike the answer.
[05]    Q.   Were ambiguities, in your opinion,
[06] exploited at the round tables?
[07]    A.   Yes, they were.
[08]       MR. DAVENPORT:  Excuse me.  Object to
[09] the form of the question.  It's leading.  And
[10] also object to the question as calling for a
[11] conclusion and an opinion.  The question is also
[12] vague.
[13]    Q.   In your -- you understood and had
[14] seen the policy language of these own occupation
[15] policies, hadn't you?
[16]    A.   Yes, sir.
[17]    Q.   Now, have you ever seen the term
[18] present disability in any of these
[19] policies?
[20]    A.   Present disability?
[21]    Q.   Yes, sir.
[22]    A.   Define the term for me, if you will.
[23] I don't recall seeing that term and if I

### Page 0142

[01] understand what you mean, I don't think it was
[02] there.
[03]    Q.   All right.
[04]    A.   Define the term for me, please.
[05]    Q.   Well, it's not my term and I don't
[06] think it exists.  That's why I am asking you.
[07]    A.   Okay.
[08]    Q.   So I can't define it.  Would adding a
[09] word or changing the interpretation of a policy
[10] be something that would be consistent with what
[11] you saw occurring at these round tables?
[12]       MR. DAVENPORT:  Object to the
[13] question as vague and misleading.  I am sorry,
[14] vague and ambiguous.
[15]    A.   I don't think they changed the policy
[16] wording.  I think they just tried to change the
[17] interpretation.
[18]    Q.   And do you believe that they were
[19] attempting to change the interpretation or at
[20] least give a different interpretation that was
[21] more favorable to the bottom line in these round
[22] tables?
[23]    A.   I would have to say so, yes, sir.

### Page 0143

[01]       MR. DAVENPORT:  Excuse me.  Object.
[02] The question is leading and calling for opinion
[03] and based on speculation.  I also move to strike
[04] the answer on the same grounds.
[05]    Q.   Now, do you know Steven Greenberg?
[06]    A.   No, I do not.
[07]    Q.   Do you know of Provident claims
[08] adjustors ever releasing their file to somebody
[09] who was independent of the company?
[10]    A.   Releasing files independent of the
[11] company?
[12]    Q.   An entire file, containing not only
[13] the medical or the file, but also maybe the
[14] claims adjustor's notes and the log notes and
[15] those types of thing?
[16]    A.   I don't recall that.  Many times, if
[17] there was going to be an independent medical
[18] review, they would send the medical data they
[19] had, but not the entire file.
[20]    Q.   At your stay at Provident, did you
[21] ever see where they ever released their entire
[22] file, including all the notes we discussed --
[23]    A.   No.

### Page 0144

[01]    Q.   Let me finish my question.  -- to
[02] somebody that wasn't involved with Provident or
[03] failing to be independent of Provident?
[04]    A.   I don't recall, no, sir.
[05]    Q.   Now, you said something earlier, I
[06] believe you mentioned the term lying
[07] underwriter, did you say that?
[08]    A.   Refresh my memory.
[09]    Q.   Lying underwriting?
[10]    A.   Lying underwriter or --
[11]    Q.   I think --
[12]    A.   I am not sure of the context.
[13]    Q.   What I would like to do is clarify.
[14] Generally at these round tables, who would
[15] present that case to the round table?
[16]    A.   You are talking about claims
[17] adjustors.
[18]    Q.   I thought you said
[19] underwriter.  I want to make sure we're
[20] talking --
[21]    A.   No, no, I'm sorry, I --
[22]       MR. KENT:  I think he said line
[23] underwriter.

## DR. WILLIAM E. FEIST    [1-25-99]

### Page 0145

[01]       MR. EHLINGER: He said line
[02] underwriter?
[03]       MR. DAVENPORT: I heard that, he
[04] did.
[05]       Q.    When you're talking, when you said
[06] line underwriter --
[07]       A.    I meant to say the claims adjustors
[08] working the files. The underwriters would not
[09] have been involved in the claims process.
[10]       Q.    How would the meeting start? In
[11] other words, what was the first data that was
[12] presented by the claims adjustor at these round
[13] tables?
[14]       A.    My recollection would be that the
[15] claims adjustors presented the case, would go
[16] through the case and give the age, gender,
[17] situation, occupation, go through the medical
[18] history, generally go through the claims history
[19] in terms of what had been done and so forth.
[20] And, then, somewhere in the process they would
[21] usually give the financial reserve they had on
[22] that case.
[23]       Q.    Who would give the financial reserve

### Page 0146

[01] information?
[02]       A.    Usually the individual running the
[03] meeting, either Ralph Mohney, if he was running
[04] it or maybe Ken Denton, if he had the pad that
[05] had the data. There was a computer printout
[06] that had the data on all of the cash reserves
[07] for all of these case.
[08]       Q.    Would you be privy to that?
[09]       A.    Indeed. I mean, I would that
[10] information. I wouldn't have privy to the
[11] computer printout of what the reserves were.
[12]       Q.    I guess my point is, when you came to
[13] these meetings, did they have the reserve
[14] information, Xerox copies so everybody could see
[15] it at the table?
[16]       A.    Oh, no, it was in a computer printout
[17] and one could look on the computer printout and
[18] see, Dr. Joe Smith has three policies, the
[19] reserve is such and such.
[20]       Q.    Do you know who would bring this
[21] printout to the meetings?
[22]       A.    It would usually be Ken Denton or
[23] somebody in Mohney's office. I am not sure.

### Page 0147

[01]       Q.    And would these reserves be stated in
[02] front of the claims adjustor?
[03]       A.    Yes, of course.
[04]       Q.    Do you know if the claims adjustor
[05] had access to these reserves?
[06]       A.    I assume so. It would be part of the
[07] process for him to know, on an ongoing working
[08] of the files to know what the cash reserve would
[09] be.
[10]       MR. DAVENPORT: Excuse me. Object,
[11] nonresponsive. Move to strike. Answer is based
[12] on speculation.
[13]       Q.    Had you ever discussed reserves with
[14] a claim adjustors ever when you were at
[15] Provident?
[16]       A.    I don't recall that I did.
[17]       Q.    Did a claims adjustor ever tell you
[18] or did you ever hear a claims adjustor, speak
[19] about reserves while you were working at
[20] Provident?
[21]       A.    No, I think my role would be to
[22] evaluate the medical aspect, and, to me, the
[23] cash reserve was not relevant.

### Page 0148

[01]       Q.    Do you know, at these meetings,
[02] whether or not the claims adjustor had authority
[03] to look at these documents that had --
[04]       A.    I assume so. I think all he or she
[05] would have to do is just pull up in the computer
[06] if he didn't have the printout.
[07]       MR. DAVENPORT: Object.
[08] Nonresponsive.
[09]       Q.    Well, based upon --
[10]       A.    It was available to these
[11] underwriters -- I mean, these claims
[12] adjustors.
[13]       Q.    While you were at these round tables,
[14] you were considered part of that team, weren't
[15] you?
[16]       A.    Yes, sir.
[17]       Q.    Now, as part of that round-table
[18] team, can you tell the ladies and gentlemen of
[19] the jury what relevance reserves has to whether
[20] or not somebody is disabled or not?
[21]       MR. DAVENPORT: I object. Calling
[22] for conclusion outside this witness's
[23]       A.    To me --

### Page 0149

[01]       MR. DAVENPORT: Excuse me, Doctor.
[02]       THE WITNESS: I'm sorry.
[03]       MR. DAVENPORT: I object to the
[04] question as calling for opinion and speculation
[05] from this witness.
[06]       MR. EHLINGER: You may answer.
[07]       A.    To me, the reserve has nothing to do
[08] with the validity of the claim. I mean, that's
[09] just a number that's there that is obviously
[10] important, but not to the adjudication of the
[11] claim.
[12]       Q.    Now, in addition to the total
[13] reserves that were mentioned at these meetings,
[14] was the monthly benefit also stated?
[15]       A.    Generally, yeah. Many times these
[16] individuals would have several claims, I mean,
[17] several policies. They would usually list the
[18] dollar amount and the specific income policy and
[19] total amount reserved on all applicable
[20] policies.
[21]       Q.    Based upon your Board certification
[22] in insurance medicine, do you have an opinion
[23] about whether or not insurance companies insure

### Page 0150

[01] risks?
[02]       A.    Of course. That's what they are in
[03] business to do.
[04]       Q.    Would you agree or disagree with the
[05] statement that Provident does not insure the
[06] risk of relapse?
[07]       MR. DAVENPORT: Object, calling for a
[08] legal conclusion.
[09]       A.    Uh -- can you restate that, I mean,
[10] repeat it, I guess.
[11]       Q.    Sure. The term risk, is that
[12] something that is, that is common to the
[13] insurance company?
[14]       A.    That's what they do, they take risks.
[15]       Q.    What is -- in fact, isn't that the
[16] basic premises of insurance is to insure risks?
[17]       A.    Insure risks of all kinds, yes, sir.
[18]       MR. DAVENPORT: Excuse me, object.
[19] I object to the form of the question, asking
[20] this witness legal conclusions, contract
[21] interpretation well outside his area of
[22] expertise. Also calling for speculation.
[23]       Q.    When you were in underwriting, did

## DR. WILLIAM E. FEIST   [1-25-99]

Page 0151

[01] you have the ability to be familiar with the
[02] term risk?
[03]     A.  Yes, sir, that's my training and
[04] background and experience.
[05]     Q.  Just so we have it clear for the
[06] record, what exactly is a reserve?
[07]     A.  A reserve basically is a cash reserve
[08] -- cash amount that an insurance company has to
[09] carry to cover any loss that might be incurred
[10] by that policy.  If a person dies, they have to
[11] pay out the face amount of the policy.  If the
[12] person becomes disabled, they have to have
[13] enough money in the cash reserve, so to speak,
[14] to cover that claim.
[15]     Q.  And when a claim is terminated, what
[16] happens to the reserves?
[17]     MR. DAVENPORT:  Object.  Calls for a
[18] conclusion from this witness, outside his area
[19] of expertise.
[20]     A.  My impression would be if a claim is
[21] terminated that the company is no longer
[22] required to hold those cash reserves.  In other
[23] words, the cash reserve would go down by

Page 0152

[01] whatever that liability is.
[02]     Q.  Your impression that you stated, is
[03] that based upon your experience with Provident
[04] and your being Board certified in insurance
[05] medicine and your work in underwriting?
[06]     MR. DAVENPORT:  Object.  Leading.  A
[07] Board certification in insurance doesn't qualify
[08] him about statutory or GAAP reserves.  He
[09] didn't work in that area.
[10]     A.  It's basic insurance 101, LOMA course
[11] 1.  They talk about it.  You have got to know
[12] that to work in the industry.  LOMA is a
[13] insurance industry organization that provides
[14] information.  They have courses that one takes
[15] to learn about these things.
[16]     Q.  Now, in your opinion, or just based
[17] upon your experience, is alcohol abuse or
[18] alcohol dependency something that is recognized
[19] as a disability?
[20]     MR. DAVENPORT:  Excuse me.
[21]     A.  Yes, sir.
[22]     MR. DAVENPORT:  Excuse me.  Object to
[23] the form of the question as vague and ambiguous.

Page 0153

[01]     Q.  Are you familiar with alcohol
[02] dependency and alcohol --
[03]     A.  Yes, sir, I deal with it on an
[04] ongoing basis in underwriting cases.  It's a
[05] real issue.
[06]     Q.  Explain how you are familiar with it
[07] with regard to underwriting.
[08]     A.  If we have an individual who has,
[09] in his attending physician's statement, that the
[10] physician cautions him against drinking or we do
[11] our -- I deal primarily with life insurance now,
[12] but if we see some elevations of liver
[13] functions, we get concerned about alcohol.  If we
[14] see that individual has had motor vehicle
[15] citations for DWIs or reckless driving, we are
[16] very concerned about that.
[17]     Q.  I also sent you some, or actually my
[18] partner sent you some information regarding Joe
[19] Wallace, is that right?
[20]     A.  That's correct, sir.
[21]     Q.  And can you briefly just describe
[22] what information you received?
[23]     A.  Well, briefly I received the file on

Page 0154

[01] Dr. Wallace in terms of his difficulty with
[02] alcohol problems and, several years, ago,
[03] actually, his going through alcohol
[04] rehabilitation in a recognized facility and,
[05] then, coming back to an anesthesiology practice
[06] and unable to carry that on.
[07]     Q.  And were you able to review or did I
[08] send you copies of independent medical
[09] examinations?
[10]     A.  Yes, sir.
[11]     Q.  Did you also review the reports
[12] written by Providence in-house Dr. Greenberg?
[13]     A.  I read that report, yes, sir.
[14]     Q.  And did you see the -- that wasn't
[15] favorable to Mr. Wallace, Dr. Wallace, was it?
[16]     A.  That is correct.
[17]     Q.  And you also were able to review Dr.
[18] Liptak, the psychologist in Boston?
[19]     A.  Yes, sir
[20]     Q.  I sent that to you as well?
[21]     A.  Yes, sir.
[22]     Q.  I sent you the documents with medical
[23] records that were not necessarily good for Dr.

Page 0155

[01] Wallace's claim, as well as the IMEs and the
[02] ones that supported his disability, is that
[03] right?
[04]     A.  I would concur with that statement,
[05] yes, sir.
[06]     Q.  Did you see any similarities between
[07] the handling -- and I also sent you the
[08] termination letters written by Arlene Davidson?
[09]     A.  Yes, sir.
[10]     Q.  And I send you some other claim
[11] information in that regard?
[12]     A.  You did, indeed.
[13]     Q.  And did you see any change in Dr.
[14] Wallace's condition from the time that the claim
[15] was accepted until the time it was denied?
[16]     A.  I did not.
[17]     Q.  Because that of that, because there
[18] was no change in his condition, did that strike
[19] any similarities between the trend that you
[20] discussed earlier?
[21]     MR. DAVENPORT:  Same objection, vague
[22] and ambiguous.
[23]     A.  I think Dr. Wallace's case shows a

Page 0156

[01] trend of someone being on disability for a
[02] number of years, what was initially judged to be
[03] a true disability, and later on, an IME
[04] determined that he was not disabled and he was
[05] terminated.
[06]     MR. DAVENPORT:  Object,
[07] nonresponsive.  Move to strike.
[08]     MR. EHLINGER:  An I'll object to that
[09] as mischaracterizes the actual medical
[10] documents.
[11]     Q.  Doctor, there was -- and the reason I
[12] object is because there was no IME.  There was
[13] no independent medical exam ever done.
[14]     A.  I was thinking of Dr. Greenberg's
[15] review.
[16]     Q.  Right.  Dr. Greenberg never saw him.
[17] He was up in Boston.
[18]     A.  I stand corrected.
[19]     Q.  Okay.
[20]     A.  My point was a physician who reviewed
[21] the file made the determination that he was not
[22] disabled.
[23]     Q.  And, again, was --



## DR. WILLIAM E. FEIST   (1-25-99)

### Page 0157

[01] MR. DAVENPORT: Object to the
[02] response on the same basis.
[03]    Q.   Again, was this consistent with the
[04] pattern of terminating claims on a preordained
[05] basis that you have testified to earlier?
[06] MR. DAVENPORT: Object to leading.
[07]    A.   I would say so, yes, sir.
[08] MR. EHLINGER: Let's take a short
[09] break.  Is that okay with everybody? Two
[10] minutes.
[11] MR. DAVENPORT: Yes, but we need to
[12] keep moving
[13] MR. EHLINGER: I understand.
[14]    VIDEO TECHNICIAN: We are off the
[15] record. 3:16 P.M.
[16]
[17] (Whereupon, a brief recess was taken.)
[18]
[19] (Whereupon, Plaintiff's Exhibit 2
[20] was marked for identification and
[21] same is attached hereto.)
[22]
[23]    VIDEO TECHNICIAN: On the record, 3:23

### Page 0158

[01] P.M.
[02]    Q.   (BY MR. EHLINGER:) Dr. Feist, two
[03] more questions and I am finished.  I have
[04] marked and handed you what has now been marked
[05] as Deposition Exhibit 2, I believe
[06]    A.   Uh-huh.
[07]    Q.   Would you open it up to the second
[08] page? First of all, can you identify what you
[09] are looking at?
[10]    A.   I am looking at the 1997 annual
[11] report of Provident Companies, Incorporated.
[12]    Q.   Do you receive these as someone who
[13] is now retired from Provident? Do you receive
[14] any reports?
[15]    A.   I think I received this one as a
[16] stockholder.
[17]    Q.   Are you currently a stockholder?
[18]    A.   Not any more.
[19]    Q.   But you believe you received this
[20] 1997 annual report?
[21]    A.   I think I have seen this, yes, sir.
[22]    Q.   If you will turn to page 5, the page
[23] immediately behind the picture of Harold

### Page 0159

[01] Chandler, and I am going to read just the top
[02] text there.  It says, "Looking back, 1997 was a
[03] successful year for Provident. This success was
[04] clearly rooted in the strategic, organizational
[05] and cultural changes that have occurred over the
[06] past four years."  First of all, did I read
[07] that correctly?
[08]    A.   Yes, sir.
[09]    Q.   And these organizational,
[10] organizational and cultural changes began,
[11] according to this, in 1993. Wouldn't you agree?
[12]    A.   I would agree, yes, sir.
[13]    Q.   And are those the strategic and
[14] organizational changes that you saw that you
[15] believe that became profitable to Provident as
[16] far as the restructuring of the claims
[17] department and the round-table meetings?
[18] MR. DAVENPORT: Object to leading.
[19] Vague and ambiguous?
[20]    A.   And I on the right page?
[21]    Q.   Yes, sir.  I'm just looking up here.
[22] Does that correspond with your understanding of
[23] what was happening at Provident?

### Page 0160

[01]    A.   Yes, sir.
[02]    Q.   If you would, on the second full
[03] paragraph there on the same page, about halfway
[04] down?
[05]    A.   Uh-huh.
[06]    Q.   I am sorry, the second column.
[07]    A.   "Four fundamental business
[08] principles"?
[09]    Q.   That's correct.
[10]    A.   Okay.
[11]    Q.   It says. "At the foundation of the
[12] success we are enjoying in 1997 is our ongoing
[13] commitment to the four fundamental business
[14] principles we established in 1994." Did I read
[15] that correctly?
[16]    A.   That's correct.
[17]    Q.   Okay. If you go down, the fourth one
[18] on there says -- will you read that to the jury?
[19] What does it say?
[20]    A.   It says. "Align the interests of all
[21] Provident constituents with our shareholders."
[22]    Q.   And is that what you saw going on
[23] there when you were there?

### Page 0161

[01] MR. DAVENPORT: Object to leading.
[02] This is outside of this witness's area of
[03] expertise, if any.
[04]    Q.   Aligning the interests of all
[05] Provident constituents with our shareholders, is
[06] that what you saw?
[07]    A.   The sentence is pretty vague, but I
[08] think that speaks to the bottom line, do
[09] whatever it needs to do to get to the bottom
[10] line.
[11]    Q.   And that's what my question --
[12] MR. DAVENPORT: Object to strike, an opinion.  You
[13] response and move to strike, an opinion.  You
[14] are having him read the annual report and give
[15] his opinion on it.
[16] MR. EHLINGER: Okay.
[17]    Q.   Align the interests.  It says
[18] interests there?
[19]    A.   Yes, sir.
[20]    Q.   Do you know of anything interests
[21] could stand for other than profits?
[22] MR. DAVENPORT: Object, leading.
[23]    Q.   Does it seem like that that is

### Page 0162

[01] referring to profits?
[02]    A.   To me, the shareholders want profits.
[03] That's the only reason they invest in the
[04] company is to get profits.
[05] MR. DAVENPORT: Object, an opinion.
[06]    Q.   This is stating here that this is
[07] ongoing and has been ongoing even since your
[08] departure.  Would you agree or disagree with
[09] that?
[10]    A.   I would agree with that, yes, sir.
[11] MR. EHLINGER: Pass the witness.
[12]
[13] EXAMINATION BY MR. DAVENPORT:
[14]    Q.   Dr. Feist, I am Mark Davenport. I
[15] represent Provident. I guess, unlike the other
[16] lawyers in this room, I haven't talked to you
[17] before today, have I?
[18]    A.   That's correct, sir.
[19]    Q.   When did you first talk with anyone
[20] about either of these cases? Mr. Ehlinger, for
[21] example, when did you ever talk with him or his
[22] office?
[23]    A.   Last week.

## DR. WILLIAM E. FEIST    [1-25-99]

### Page 0163

[01]    Q.    When did you get the documents that
[02] he sent you?
[03]    A.    The end of last week, Friday, I
[04] think.
[05]    Q.    Did you bring the documents with you
[06] today?
[07]    A.    No, sir, I did not.
[08]    Q.    Did you get a letter of transmittal
[09] with -- when he sent you his documents, did he
[10] sent you send you a letter?
[11]    A.    He sent a covering letter.  I'm not
[12] sure what you mean by letter of transmittal.
[13]    Q.    Well, you first talked to -- was it
[14] Mr. Ehlinger you talked to?
[15]    A.    Yes, sir, I believe so.
[16]    Q.    And did he just call you out of the
[17] blue?
[18]    A.    No, it was in relationship to having
[19] this deposition today and wanting to have
[20] representation for his firm for both cases.
[21]    Q.    My question, though, when did you
[22] first talk to either Mr. Kent, or his office, or
[23] Mr. Ehlinger, or his office, about in any way

### Page 0164

[01] testifying in either one of these cases?
[02]    A.    I talked to Mr. Kent roughly two
[03] weeks ago.  My memory is a little unclear as to
[04] exact date, but he just called me up and asked
[05] me to be available for this deposition,
[06] basically.
[07]    Q.    Is that the first time you had ever
[08] heard of the case?
[09]    A.    Yes, sir.
[10]    Q.    You just got a call out of the blue
[11] at your office at Protective Life?
[12]    A.    Well, I mean, I am sure the reason I
[13] was called is because of my deposition in the
[14] Knee case, but that was the first I knew about
[15] when Mr. Kent called me.
[16]    Q.    You just got a call, though, out of
[17] the blue.  Mr. Kent said, "Hi, I'm David Kent"?
[18]    A.    Yes, sir.
[19]    Q.    "And let me tell you about a case I'v
[20] got"?
[21]    A.    I guess that's a fair
[22] characterization, yes, sir.
[23]    Q.    What did he say on the phone when you

### Page 0165

[01] first talked to him?  Did you ask him why he was
[02] calling you?
[03]    A.    Well, I mean, he explained why he
[04] called me, yes, sir.  He wanted my expertise in
[05] this deposition.
[06]    Q.    I listened to your direct testimony
[07] fairly carefully and I didn't hear you testify
[08] that you ever played any role in making any
[09] decisions on the Thompson case while you were at
[10] Provident.  Is that accurate?
[11]    A.    That's correct, sir.
[12]    Q.    And I listened to your direct
[13] testimony and I didn't hear you testify that you
[14] had ever played any role whatsoever in the Joe
[15] Wallace claim, is that correct?
[16]    A.    That's correct.
[17]    Q.    So it's your testimony to the jury
[18] that you never reviewed those claims, you never
[19] reviewed the medical on those claims and you had
[20] no input regarding the handling of those claims
[21] while you were at Provident, is that correct?
[22]    A.    That's correct, sir.
[23]    Q.    Do you even know whether either of

### Page 0166

[01] these claims was presented at round-table
[02] review, ever?
[03]    A.    I am not sure that they were
[04] presented at round table.
[05]    Q.    That was my question.  Do you even
[06] know whether either the --
[07]    A.    No, I do not.
[08]    Q.    -- Thompson claim or the Wallace
[09] claim was ever submitted for round-table
[10] review?
[11]    A.    No, I do not, sir.
[12]    Q.    All right.  Now, since you, while you
[13] were at Provident, didn't work on either one of
[14] these claims, didn't look at the medical, didn't
[15] go to any round-table reviews, were you somewhat
[16] surprised that two lawyers from Texas would call
[17] you here in Birmingham and start asking you
[18] about claims that you didn't even handle?
[19]    A.    I think the reason they called me was
[20] because of my testimony in the Dr. Norman Knee
[21] case.
[22]    Q.    Did they say that?
[23]    A.    Not specifically, but I think that

### Page 0167

[01] was part of the implication that that's how they
[02] got my name.
[03]    Q.    Well, when they called you, since you
[04] hadn't looked at the claim, you were willing to
[05] come testify in this case.  Why?
[06]    A.    Well, many reasons, but the basic
[07] reason is, I feel like as a medical
[08] professional, when I see medical professionals,
[09] Dr. Knee, Dr. Thompson and Dr. -- whatever the
[10] other name is -- Wallace getting a raw deal, if
[11] you will, I feel my obligation as a medical
[12] professional to do what I can.  I receive no
[13] remuneration for any of these cases and I don't
[14] intend to.
[15]    Q.    Well, are you going to testify every
[16] time a doctor, and believe me there are a lot of
[17] doctors that have filed disability claims these
[18] days.  Are you aware of that?
[19]    A.    I am fully aware of that, sir.
[20]    Q.    Is it your position, sir, that every
[21] time Provident denies a doctor's claim that you
[22] are going to come testify on behalf of that
[23] doctor against the company?

### Page 0168

[01]    A.    I don't intend to, sir, no.
[02]    Q.    Well, how do you make a determination
[03] of when you are going to testify and when you
[04] are not?
[05]    A.    If an attorney asks me to testify,
[06] I'll do it.
[07]    Q.    So, any time an attorney represents a
[08] doctor from now on in the future, you are going
[09] to be willing to come into court, whether you
[10] know anything at all about the claim, and
[11] testify against Provident?
[12]    A.    I will be willing to do so, if asked.
[13]    Q.    What about for just regular people
[14] whose claims were denied, not a doctor, are you
[15] going to go testify for them, too?
[16]    A.    If asked, I will be happy to.
[17]    Q.    So, any time any case is denied and
[18] goes into litigation against Provident, are you
[19] saying that you will be a fact, a witness in
[20] that case against the company, is that right?
[21]    A.    If asked, I will do so.
[22]    Q.    Now, do you have any problem with
[23] spending that much time away from Protective

## DR. WILLIAM E. FEIST    (1-25-99)

### Page 0169

[01] Life?

[02]    A.    If it becomes a problem, I will deal

[03] with it.

[04]    Q.    Do you have any agreements with

[05] Protective Life --

[06]    A.    None.

[07]    Q.    -- as to your remuneration while you

[08] are going around the country testifying against

[09] Provident?

[10]    A.    I have none whatsoever.

[11]        MR. KENT:    Objection. Assumes a

[12] fact not in evidence, that he has gone anywhere.

[13]    A.    The only place I've gone is this

[14] room.

[15]    Q.    You have given testimony against the

[16] company in a California case, haven't you?

[17]    A.    Well, yes, I have.

[18]    Q.    Are you licensed in California?

[19]    A.    No, sir.

[20]    Q.    You've given -- you are trying to

[21] give testimony in this case against two doctors

[22] in Texas. Are you licensed in Texas?

[23]    A.    No, sir.

### Page 0170

[01]    Q.    And you are not getting paid for this

[02] at all?

[03]    A.    That's correct.

[04]    Q.    Okay. Now, what if just a person,

[05] say, in Seattle, Washington has a claim denied

[06] and is unhappy. Would you be willing to testify

[07] in that case?

[08]    A.    I would be willing to testify. I

[09] would probably ask that the attorney come to

[10] this room. It's much more convenient for me to

[11] come here than, obviously, go to Seattle, but if

[12] asked, I will do so.

[13]    Q.    So you will testify in any case,

[14] wherein a claim has been denied; you will give

[15] testimony against Provident? Is that what

[16] you're saying?

[17]    A.    If asked, I will do so.

[18]    Q.    In this case, you have looked at

[19] certain records. You have talked to Mr. Kent on

[20] the phone?

[21]    A.    Yes, sir.

[22]    Q.    What did Mr. Kent tell you about the

[23] case when you first talked to him?

### Page 0171

[01]    A.    My recollection was that we talked

[02] about the general situation. I asked him to

[03] send me the particulars of the case and I agreed

[04] to come here today.

[05]    Q.    Did Mr. Kent tell you he was a lawyer

[06] representing Dr. Thompson?

[07]    A.    Yes, sir.

[08]    Q.    Did he tell you that he felt Dr.

[09] Thompson had gotten a raw deal, that his claim

[10] shouldn't have been denied?

[11]    A.    That was the implication. I don't

[12] know why they would have a lawsuit if they

[13] didn't feel that way.

[14]    Q.    Did he tell you he had read your

[15] deposition that you had given in the Knee case?

[16]    A.    Yes, sir.

[17]    Q.    And did he tell you that he wanted

[18] you to come in and testify in this case that

[19] Provident was not behaving itself right when it

[20] denied Thompson's claim?

[21]    A.    That's probably a fair

[22] characterization, yes, sir.

[23]    Q.    Did you think that a lawyer

### Page 0172

[01] describing his case would be a fair and

[02] objective and impartial person, or do you think

[03] he might have a different slant on things?

[04]    A.    Well, I would only speak to Mr.

[05] Kent's intention.

[06]    Q.    When you talked to him, though, he

[07] gave you the clear impression at the outset that

[08] he thought Thompson was right and Provident was

[09] wrong, is that fair?

[10]    A.    That's the whole point of the

[11] litigation, obviously.

[12]    Q.    How many times did you talk to Mr.

[13] Kent?

[14]    A.    I think I talked to him initially.

[15] He said he would send me the information. I

[16] reviewed the information. I left a voice mail

[17] with him that I had received the information.

[18] I think we talked perhaps the end of last week

[19] just to confirm the date. To my recollection,

[20] that's all.

[21]    Q.    Well, when you look at the -- how

[22] much material. Are we talking about a foot of

[23] materials?

### Page 0173

[01]    A.    Which -- we're talking --

[02]    Q.    Thompson, now.

[03]    A.    Mr. Kent's case.

[04]    Q.    Yes.

[05]    A.    Thirty-five pages, maybe.

[06]    Q.    Thirty-five pages?

[07]    A.    Yeah.

[08]    Q.    How much time did you spend looking

[09] at these thirty-five pages and talking with

[10] David Kent?

[11]    A.    I just looked at the information and

[12] I honestly don't know how much time I spent on

[13] the review, but I reviewed it carefully and then

[14] I called him and told him I had received the

[15] information. I didn't actually talk to him. I

[16] left a voice mail that I had received the

[17] information and I would be here for this

[18] deposition today.

[19]    Q.    Well, did you, did you -- is there

[20] some reason that you didn't bring the materials

[21] with you today so you could show the jury what

[22] you looked at?

[23]    A.    Other than the fact that I didn't --

### Page 0174

[01] I wasn't asked to. If it's an issue to you, I

[02] can submit it to the court, but generally when I

[03] depose a case like this, I prefer to have the

[04] information not with me.

[05]    Q.    Why?

[06]    A.    If I'm knowledgeable about the

[07] information, I don't need to bring it.

[08]    Q.    And you can't be cross examined on

[09] the inconsistencies in the documents and your

[10] testimony if the documents aren't before you,

[11] can you, Dr. Feist?

[12]    A.    That's a legal term. I don't know.

[13]    Q.    How long did you talk to Mr.

[14] Ehlinger? When did you first talk to him?

[15]    A.    Well, I don't -- after Mr. Kent said

[16] there would be two cases, Mr. Ehlin -- what's

[17] his name?

[18]    Q.    Ehlinger.

[19]        MR. EHLINGER:    Ehlinger.

[20]    Q.    Ehlinger, I am sorry.

[21]    A.    Ehlinger, yeah. Mr. Ehlinger called

[22] me and said that he would be sending me the

[23] information on his case and I talked with him --

## DR. WILLIAM E. FEIST   [1-25-99]

### Page 0175

[01] actually he left me a voice mail at the end of
[02] last week just to make sure I got the
[03] information.
[04]    Q.   Did you ever talk to Mr. Ehlinger
[05] about what Dr. Wallace's case was about?
[06]    A.   Not specifically, no, sir.
[07]    Q.   And, so, when you reviewed that
[08] information, did you call Mr. Ehlinger back and
[09] tell him what your opinions were?
[10]    A.   No, I did not.  I got it on Saturday.
[11] I reviewed it -- I mean I got it on Friday and
[12] reviewed it Saturday and I really did not have
[13] an opportunity to discuss it with him.
[14]    Q.   Do you keep your time or make any
[15] notes when you review these matters?
[16]    A.   No, sir, I don't.
[17]    Q.   Between talking to Mr. Kent and Mr.
[18] Ehlinger and reviewing those records, what would
[19] you have spent on time on both cases, how many
[20] hours before today, before you got here today?
[21]    A.   I probably spent an hour and a half,
[22] maybe two hours on each of the two cases.
[23]    Q.   Two hours on each.  And you talked to

### Page 0176

[01] both attorneys on at least, what, two occasions?
[02]    A.   Mr. Kent twice.  Mr. Ehlinger once
[03] and -- yeah, that's correct.
[04]    Q.   All right.  Now, did you have a
[05] chance to look at the video depositions I took
[06] of Dr. Thompson?
[07]    A.   No, sir.
[08]    Q.   Did you have a chance to review the
[09] video deposition I took of Dr. Wallace?
[10]    A.   No, sir.
[11]    Q.   Or look at those transcripts?
[12]    A.   I did not.
[13]    Q.   Would it have been helpful to you in
[14] forming any opinions you give today to have the
[15] opportunity to have heard what both people said
[16] about their claims?
[17]    A.   It might have been interesting, but I
[18] don't know that it's really that necessary for
[19] my testimony.
[20]    Q.   Now, with respect to these cases, do
[21] you know that people at Provident had been
[22] deposed as to the basis of the actions they
[23] took?  Do you know that claims people at

### Page 0177

[01] Provident have been deposed on these Cases?
[02]    A.   Yes, I understood that.  I don't know
[03] specifically whom, but that was my understanding
[04] that these attorneys have been to Chattanooga
[05] for the purpose of deposing those individuals.
[06]    Q.   All right.  How long did you take
[07] reviewing those deposition transcripts?
[08]    MR. KENT:  Objection.  There's no
[09] predicate that he ever got the deposition
[10] transcript.
[11]    A.   I don't have them.  I didn't review
[12] those transcripts.
[13]    Q.   The attorneys didn't send you the
[14] depositions of Provident --
[15]    A.   No, sir.
[16]    Q.   -- which would have explained the
[17] reasons they took the actions they did?
[18]    A.   No, I don't have those.
[19]    MR. KENT:  Objection.  That assumes a
[20] fact not in evidence, that there would be such
[21] an explanation.
[22]    Q.   Did you request copies of the
[23] depositions when you found out they had been

### Page 0178

[01] taken?
[02]    A.   No, sir.
[03]    Q.   You wouldn't want to have read the
[04] sworn testimony when they were examined as to
[05] what they looked at and how they value things
[06] and how they reached decisions they reached?
[07]    A.   I thought the information I had in my
[08] files -- the files that were sent to me were
[09] adequate.
[10]    Q.   Because, Doctor, you had already made
[11] up your mind as a preconceived notion that no
[12] matter what Provident did, you were going to
[13] testify that it was wrong?
[14]    A.   I would not say that, sir.  My
[15] intention was to review the case and make my own
[16] impression.  And I have enough integrity to say
[17] that if, you know, there's not evidence that the
[18] person was wronged, I would be the first to say
[19] so.
[20]    Q.   Well, Doctor, if you are telling the
[21] jury that you are fair, objective and impartial,
[22] why wouldn't your first area of inquiry have
[23] been, let me see what the company said, let me

### Page 0179

[01] see what their position is, let me see what
[02] their testimony is, so I can understand what
[03] they were doing?
[04]    A.   Sir, I beg to differ.  I am not an
[05] attorney.  We spoke to that earlier.  I'm a
[06] physician.  I look at the medical information.
[07] The legal testimony, et cetera, I leave to you.
[08] That's your profession.  My profession is
[09] evaluating medical risks, either as a
[10] underwriting mode or a claims mode.  Obviously,
[11] I have not had any legal training.
[12]    Q.   Well, I guess I am trying to say,
[13] there's a number of factors that go into a
[14] whether a claim is payable or not?
[15]    A.   I understand that.
[16]    Q.   I thought I heard you testifying on
[17] direct that you thought Provident was unfair and
[18] was -- in denying these claims.  Are you
[19] limiting that testimony to just your review of
[20] the medical aspects of the claim?
[21]    A.   Well, I would have to say that's my
[22] expertise.  Now, again, if there are legal
[23] factors, I have no knowledge nor any expertise

### Page 0180

[01] in that area.
[02]    Q.   Let me approach it a different way.
[03] When you got this -- you talked to these lawyers
[04] and you got this information, and you knew there
[05] were depositions taken, you told me you did not
[06] request the transcripts of the Provident people,
[07] correct?
[08]    A.   That's correct, sir.
[09]    Q.   Now, did you pick up the phone and
[10] call the people at Provident, the people that
[11] you had worked with for a number of years to ask
[12] questions, at least on an informal basis?
[13]    A.   No sir, I don't know who works at
[14] Provident any more.
[15]    MR. KENT:  I am going to object to
[16] the form of the question.  That's assuming that
[17] any of those people still work there.
[18]    A.   Exactly.  I have been gone three
[19] years, sir.  I don't know who works at Provident
[20] any more --
[21]    Q.   Did you --
[22]    A.   -- other than Hartly Echerd.
[23]    Q.   Well, you know Hartly Echerd.  You



## DR. WILLIAM E. FEIST   [1-25-99]

Page 0181

[01] know Hartly Echerd, don't you?
[02]   A.  Yes, I worked with him for several
[03] years at Provident.
[04]   Q.  Didn't Hartly call you and ask to
[05] meet with you before this deposition?
[06]   A.  I was here at 11:45 and you were not
[07] here.
[08]   Q.  We have been sitting in this room,
[09] because I have been sitting with you, at 11:30,
[10] sitting right in this conference room and you
[11] never showed up.
[12]   A.  Well, I'm sorry we missed
[13] connections.  I was tardy getting here.  I left
[14] a message I was coming late and I didn't think
[15] you were here.
[16]   Q.  Didn't you agree to meet with Hartly
[17] at 11:30 --
[18]   A.  Yes, sir.
[19]   Q.  -- when he wanted to know why you
[20] were being asked to testify and just wanted to
[21] find out what you were testifying about?
[22]   A.  Yeah.  Yeah, that's true.
[23]   Q.  But you were uncomfortable meeting

Page 0182

[01] with him?
[02]   A.  No, we just missed connections.  I
[03] was tardy leaving my office.  It was 11:30
[04] before I got away.  I phoned the secretary.  I
[05] said, "I'm going to be tardy, I'm leaving my
[06] office."  I got here at 11:45.  I didn't see
[07] you.  I didn't know who you were.  How was I
[08] supposed to make the connection?
[09]   Q.  Did you talk with Joe Wallace?
[10]   A.  No, I have never talked with Joe
[11] Wallace.
[12]   Q.  Did you speak with Dr. Thompson?
[13]   A.  No, sir, I did not speak with either
[14] one of those gentlemen.
[15]   Q.  Now -- well, are you purporting to
[16] offer an opinion that Provident did do anything
[17] wrong one way or another in connection with the
[18] handling of Thompson's claim?
[19]   A.  Well, I think the man is disabled.
[20] He's been on -- he was on claim for a number of
[21] years, and his condition was construed that he
[22] was not disabled.
[23]   Q.  So you think the fact that the

Page 0183

[01] company made a determination that Dr Thompson
[02] did not qualify for disability benefits, you
[03] think that's wrong?
[04]   A.  Yes, sir, I do.
[05]   Q.  Now, do you know that the company had
[06] paid Dr. Thompson benefits for a number of
[07] years?
[08]   A.  From about 1992 to 1997, I believe,
[09] if memory serves.
[10]   Q.  And you know that he was a
[11] periodontist?
[12]   A.  Yes, sir.
[13]   Q.  And when he went on claim, do you
[14] know what he did for a living after that?
[15]   A.  No, sir, I don't know what he did
[16] after that.
[17]   Q.  Well, did you --
[18]   A.  I don't think that's relevant to his
[19] medical situation what he does after he goes on
[20] claim.
[21]   Q.  I tell you what, Dr. Feist, why don't
[22] we let a judge determine what's relevant?
[23]   A.  That's fine.  That's fine.

Page 0184

[01]   Q.  You just give me your answers?
[02]   A.  I will be happy to, sir.
[03]       MR. KENT:  I object to the
[04] argumentative nature of the question.
[05]   Q.  With respect to the condition of Dr.
[06] Thompson, he had a condition called presbyopia,
[07] am I right?
[08]   A.  Among others.  He had several
[09] conditions, sir.
[10]   Q.  My question is, did he have
[11] presbyopia?
[12]   A.  Yes, sir.
[13]   Q.  Well, do you consider the other
[14] conditions that he claims he had, myopia --
[15]   A.  Myopia, severe myopia.  He also had
[16] an abnormality of his cornea.  He had several
[17] impairments.
[18]   Q.  Did you see any of the medical
[19] records disputing some of that?
[20]   A.  I did see some of those records, yes,
[21] sir.
[22]   Q.  Are you a specialist in optometry or
[23] ophthalmology?

Page 0185

[01]   A.  No, sir.  No, I've never had any
[02] training in ophthalmology.  I have done a lot of
[03] evaluation of underwriting of ophthalmology
[04] impairments.  In fact, my predecessor at
[05] Provident would give me the cases that had any
[06] eye problems to evaluate for underwriting.  He
[07] would take three of my routine cases so I could
[08] do one of the ophthalmology cases.  So I have
[09] some expertise in that, not by formal clinical
[10] training, but by some underwriting training.
[11]   Q.  Presbyopia is a condition which is a
[12] normal part of the aging process, is it not?
[13]   A.  This is correct, sir.  Yes, sir, we
[14] all have it.  That's why we wear bifocals.
[15]   Q.  And you saw that Dr. Thompson's
[16] vision, according to the doctors, was
[17] correctable to 20/20 at any given focal length
[18] by either the use of bifocals or trifocals, did
[19] you not?
[20]   A.  I saw that.
[21]   Q.  Yet, Dr. Thompson's claim was that,
[22] when he was doing this dental surgery, he was
[23] having trouble accommodating, changing visual

Page 0186

[01] fields?
[02]   A.  This is correct.  He has several
[03] impairments which makes it difficult for him to
[04] accommodate different focal lengths during an
[05] operative procedure.
[06]   Q.  And the accommodation, that went to
[07] the core of his problem, why he said he couldn't
[08] do surgery?
[09]   A.  That is correct.
[10]   Q.  Now, we know that under -- from the
[11] optometrist and the ophthalmologist and so forth
[12] that the accommodation issue is a subjective
[13] issue, it can't be demonstrated objectively?
[14]   A.  I would agree.  I would agree.
[15]   Q.  All right.
[16]   A.  But I think the point is that the man
[17] realized at one point that he couldn't operate
[18] successfully.  When he cut an artery and severed
[19] a nerve, it's time for him to quit operating.
[20]       MR. DAVENPORT:  Object,
[21] nonresponsive.  Move to strike the last half of
[22] your answer.
[23]   Q.  Now, with respect to this eye

## DR. WILLIAM E. FEIST    [1-25-99]

### Page 0187

[01] condition that he had, after he was paid for a
[02] number of years, do you know whether there were
[03] any change of events in this doctor when his
[04] claim was reexamined and what he was doing for a
[05] living?
[06]    A.  Well, I'm not sure about the time
[07] frame exactly, but he went into -- went back for
[08] specialty training in dental anesthesia training
[09] and I think is currently practicing as a dental
[10] anesthesia -- anesthesiologist, if I can say
[11] that.
[12]    Q.  Now, when the doctor was out -- this
[13] dentist was out for a number of years and he
[14] retrained in dental anesthesiology.
[15]    A.  Uh-huh (indicating affirmatively).
[16]    Q.  Did you then make any efforts to see
[17] what the visual requirements were for an
[18] anesthesiologist as opposed to a periodontist?
[19]    A.  There's a very careful evaluation in
[20] the record that indicates that -- and Dr.
[21] Thompson himself indicates that the setting of
[22] anesthesiology is a more controlled setting,
[23] more fixed setting.  He doesn't have the fine

### Page 0188

[01] precision.  He doesn't have the distances, the
[02] lighting, et cetera, et cetera, that he had with
[03] periodontic work, and, apparently, is
[04] successfully practicing dental anesthesia.
[05]    Q.  Have you seen the government
[06] comparisons of the visual requirements of an
[07] anesthesiologist that were in the file?
[08]    A.  Yes, sir.
[09]    Q.  And that of a periodontist?
[10]    A.  Yes, sir.
[11]    Q.  And in looking at that, did you see,
[12] when they examined the visual requirements for
[13] accommodation, do you recall what the
[14] classification was for a periodontist?
[15]    A.  You will have to refresh my memory.
[16] It has been a few days since I looked at it.
[17]    Q.  Would frequent sound right with
[18] respect to the requirements for accommodation,
[19] for visually -- doing the anesthesiology --
[20]    A.  Anesthesiology, frequent?
[21]    Q.  It would be frequent?
[22]    A.  Well --
[23]    Q.  Would that surprise you?

### Page 0189

[01]    A.  Well, it depends on how you define
[02] frequent.  I mean, if he has got a patient that
[03] he's providing anesthesia for, it's more
[04] controlled than it is in periodontal.
[05]    Q.  I am just asking you if you agree
[06] with the report?
[07]    A.  I would agree, yes, sir.
[08]        MR. KENT:  Object.  You haven't
[09] given him the report to look at.
[10]        MR. DAVENPORT:  Well, he didn't bring
[11] his reports.
[12]        MR. KENT:  Well, you have one.
[13]        MR. DAVENPORT:  I can show him the
[14] report, if you want.  Is that what your issue
[15] is?  You take issue with what I said?
[16]        MR. KENT:  Yeah, you were getting him
[17] to agree or disagree with a report he just said
[18] that he would like to look at.
[19]    Q.  Anesthesiologist's report, do you
[20] want to see that?
[21]    A.  Yeah, let me see.
[22]    Q.  I have highlighted in yellow the
[23] anesthesiology and I have highlighted in yellow

### Page 0190

[01] on the second pages of the report the visual
[02] requirements of a periodontist.
[03]    A.  Okay.  You are showing me the
[04] anesthesiology -- okay, I see that.
[05]    Q.  That's a document that you had, that
[06] you looked --
[07]    A.  Yes, sir, same document, yes, sir.
[08]    Q.  And under the accommodation
[09] requirements, would you read to the jury what an
[10] anesthesiologist is classified as?
[11]    A.  It says, "Accommodation, frequent."
[12]    Q.  Now, would you turn over to the
[13] periodontist and read to the jury what the
[14] accommodation is?
[15]    A.  It's the same, frequent
[16] accommodation.
[17]    Q.  Hand me my exhibit back, please.
[18]        Now, when the claims examiner is
[19] looking at this and they see that the doctor has
[20] retrained to anesthesiology and they look at
[21] reports that say, well, the guy's problem, this
[22] accommodation, it looks like the requirements
[23] are the same, maybe we ought to have him looked

### Page 0191

[01] at by a doctor to see what's going on, do you
[02] think that's unreasonable?
[03]    A.  I think that's appropriate.
[04]    Q.  And did you know that when he was
[05] examined by a doctor in Travis County, he was
[06] sent to an ophthalmologist, a specialist in
[07] medical and surgical diseases of the eye, did
[08] you read Dr. Hendrix's report?
[09]    A.  I did.
[10]    Q.  When Dr. Hendrix said that he
[11] examined it and he said he was corrected to
[12] 20/20 in both eyes.  He said, "His eye exam, in
[13] my opinion, is a normal eye exam for a 55-year
[14] old men."  Did you see that?
[15]    A.  I saw that, yes, sir.
[16]    Q.  He said, "His complaint of
[17] accommodation is subjective.  Every 55 year old
[18] has this occur.  There is no disease of
[19] accommodation."  Do you agree with that?
[20]    A.  That's Dr. Hendrix said, yes,
[21] sir.
[22]    Q.  He says, "He has no limitations than
[23] any 55 year old man has.  I don't understand how

### Page 0192

[01] he got disability in the first place.  Glasses
[02] are the appropriate treatment."
[03]        Did you see that?
[04]    A.  I did.
[05]    Q.  Well, do you think that Provident
[06] somehow paid this doctor off for a bad opinion?
[07]    A.  I think that's Dr. Hendrix's opinion.
[08] I have no knowledge about any payoffs.
[09]    Q.  All right.  Well, do you think that
[10] those questions like that, seeing what I just
[11] pointed out in Dr. Thompson's claim, might give
[12] the claims adjustor a reason to question the
[13] claim?
[14]    A.  Possibly, yeah.
[15]    Q.  Nothing unreasonable about
[16] questioning the claim when those questions
[17] arose, was there?
[18]    A.  That's probably true, yes.
[19]    Q.  Well, let's talk a minute about Dr.
[20] Wallace's claim.
[21]    A.  Uh-huh.
[22]    Q.  Dr. Wallace was a man that used
[23] alcohol in 1992?

## DR. WILLIAM E. FEIST    [1-25-99]

### Page 0193

[01]  A.  That's correct.
[02]  Q.  And then he went out and he went out
[03]  to Talbot Marsh --
[04]  A.  A recognized rehabilitation center.
[05]  Q.  And he underwent successful
[06]  treatment, he dried out?
[07]  A.  That's correct.
[08]  Q.  And he never had another drink until
[09]  today we sit here.  Are you aware of that?
[10]  A.  That's probably true.  That's
[11]  characteristic of most successful recovering
[12]  alcoholics.
[13]  Q.  Do you know he was, in the Talbot
[14]  Marsh records, initially released by Dr. Talbot
[15]  himself to go back to anesthesiology?  Did you
[16]  see that?
[17]  A.  I did not see that, no, sir.
[18]  Q.  Did you see that he, in fact, advised
[19]  him to go back in the medical records to get
[20]  himself firmly established in his practice.
[21]  That was Dr. Marsh's recommendation.  Did you
[22]  see that?
[23]  A.  I did not see that.  I'm not sure

### Page 0194

[01]  that I have that report from Dr. Talbot.
[02]  Q.  Did you see that he actually did go
[03]  back to his practice group?
[04]  A.  Yes, sir.
[05]  Q.  All right.  Now, did you see that
[06]  after he had been practicing back in his
[07]  practice group for several months that he
[08]  completed a questionnaire to his monitoring
[09]  physician in which he said that he was enjoying
[10]  the practice of anesthesiology more than he had
[11]  in the last eight years.  Did you see that?
[12]  A.  I did not see that, sir.
[13]  Q.  Well, did they forward you the copy
[14]  of this big lawsuit that he filed?
[15]  A.  Yes, I saw that.
[16]  Q.  Wherein he sued all of the doctors
[17]  and he sued the clinic and he sued the Travis
[18]  County Group for wrongfully forcing him out of
[19]  the practice.  Did you see that?
[20]  A.  I saw that.
[21]  Q.  Now, do you think that -- did you
[22]  know that when he was submitting proofs of
[23]  claims after he had been paid for a number of

### Page 0195

[01]  years that the doctors who were signing the
[02]  proofs of claim were doctors that he was working
[03]  with, associates?  Did they tell you that?
[04]  MR. EHLINGER: Objection.
[05]  MR. KENT: Objection.
[06]  A.  If a man is disabled, it shouldn't
[07]  make any difference.
[08]  Q.  Well, this doctor was successfully
[09]  practicing internal medicine or family practice.
[10]  A.  Family practice.
[11]  Q.  Yes, sir.
[12]  A.  Yes.
[13]  Q.  Are you holding yourself out as a
[14]  specialist in addictionology?
[15]  A.  No, I never said that.
[16]  Q.  Well, the fact that the guy wasn't
[17]  drinking on the guy, never drank on the job,
[18]  according to his testimony, and successfully
[19]  practiced in another specialty, did that give
[20]  you any --
[21]  A.  Well --
[22]  Q.  Let me finish my question.
[23]  A.  Yeah.

### Page 0196

[01]  Q.  Given those facts, just in and of
[02]  themselves, do you think that a claims person
[03]  looking at that could have questions about
[04]  whether --
[05]  A.  Possibly so, but I think you have to
[06]  deal with the stresses of anesthesiology
[07]  practice versus a doc-in-the-box family practice
[08]  of less than, you know, only thirty hours a
[09]  week.  The stress level is considerably less in
[10]  a free-standing walk-in clinic as opposed to
[11]  life and death of anesthesiology practice.
[12]  Q.  Do you think that -- well, to turn
[13]  that back and ask you on Dr. Thompson's claim,
[14]  do you think that a man that has trouble seeing,
[15]  and accordingly, is totally disability from
[16]  doing dental surgery, do you find it strange
[17]  that he can put people to sleep, life and death
[18]  matters, while he monitors and looks around?
[19]  A.  You are not talking -- you are
[20]  talking dental procedures.  I don't think the
[21]  level of anesthesiology in dentistry rises to
[22]  the level of anesthesiology in general surgery,
[23]  for example, or neurosurgery.

### Page 0197

[01]  Q.  So you can't kill someone when you
[02]  put them to sleep in dentistry?
[03]  A.  Obviously, you have got to know what
[04]  you are doing, but I am saying the level of
[05]  complexity.  I know of no dental procedure that
[06]  is complex as a brain operation or a heart
[07]  transplant, or a cardiac by-pass, for that
[08]  matter.
[09]  Q.  Well, you don't -- you're not a
[10]  psychiatrist, are you?
[11]  A.  No.
[12]  Q.  You're not an addictionologist?
[13]  A.  No, sir, I'm not.
[14]  Q.  Let me just close there, then, Dr.
[15]  Wallace (sic).  You saw that the Provident
[16]  claims examiner sent Dr. Wallace's medical
[17]  records and so forth to a consulting
[18]  psychiatrist, did you not?
[19]  A.  I did.
[20]  Q.  And you saw Dr. Greenberg's report?
[21]  A.  Yes, sir.
[22]  Q.  That said in no uncertain terms is
[23]  this man disabled?

### Page 0198

[01]  A.  That's what Dr. Greenberg said, yes,
[02]  sir.
[03]  Q.  Now, the claims consultants, they are
[04]  not doctors, either, are they?
[05]  A.  No, there's only, as far as I know,
[06]  currently, one physician on full-time staff at
[07]  Provident.
[08]  Q.  All right.  So, don't you think a
[09]  claims consultant has the right to rely on
[10]  medical specialists?
[11]  A.  Well, of course.  Of course, but --
[12]  Q.  Let me see if I can understand your
[13]  background just a second, Doctor.  You were only
[14]  in private practice about, what, five years?
[15]  A.  Five years.
[16]  Q.  And then you went to Businessman's
[17]  Assurance where you stayed from '78 to '82?
[18]  A.  That's correct.
[19]  Q.  You were giving medical advice to
[20]  underwriters, you were not in claims?
[21]  A.  A little bit of claims, mostly
[22]  underwriting but a smattering of claims.
[23]  Q.  That was your main responsibility,

## DR. WILLIAM E. FEIST    [1-25-99]

### Page 0199

[01] advising people when -- advising your company.
[02] When they got an application, in you would
[03] examine the medical and the reviews to see if
[04] they were insurable and, if so, at what level?
[05]    A. At what level, I am not sure.
[06]    Q. At what risk they would be rated?
[07]    A. Yeah, assessing the risk, yes, sir.
[08]    Q. But you didn't actually make the
[09] underwriting decisions? The underwriters did
[10] that?
[11]    A. They relied heavily on my decision.
[12] If I said to decline a case, they usually did,
[13] or if said take standard, they usually did.
[14]    Q. The ultimate responsibility, though,
[15] was left with the underwriter?
[16]    A. In a real sense, yes, sir.
[17]    Q. Then, in '82, you went to work with
[18] Provident from '82 to '96, is that right?
[19]    A. That's correct, sir.
[20]    Q. When you became Medical Director in
[21] 1990 -- let me stop there. During that period
[22] of time, let's just go from '82 through -- was
[23] it February/March of '95, when you got asked by

### Page 0200

[01] Mr. Mohney to work on the round-table review?
[02]    A. It was April of '95, according to
[03] this memo.
[04]    Q. So basically, from 1982 through April
[05] of '95, your primary responsibility was
[06] underwriting medical advice for underwriters?
[07]    A. Let's go back from 1982 to 1990.
[08]    Q. When you became Medical Director.
[09]    A. From 1982 to 1990, there were three
[10] physicians in Provident. We did all the
[11] underwriting, all the claims work and it was
[12] sort of like a -- you know, the secretary
[13] brought the cases in and she just spread them
[14] around, according to who was available.
[15]    So I did, from '82 to '90, I did both
[16] underwriting and claims work. And, then, from
[17] '90 to '95, it was hiatus, and in '95, April of
[18] '95, I was asked by Ralph Mohney to step back in
[19] as per this memo.
[20]    Q. Let me just read your answer that you
[21] gave at page 21 of your prior deposition when
[22] you were asked: "Did you have any contact with
[23] claims prior to the April '95 time period?" You

### Page 0201

[01] testified: "Very minimal. Sometime, somewhere
[02] about '89 to '90, the disability income section
[03] hired sort of a dedicated physician to work in
[04] their area. And additionally position reported
[05] to the Medical Director, but somewhere between
[06] '89 and '95, the actual date escapes me, the
[07] physician in the accident department or
[08] disability income department reported to the
[09] Vice President of Claims and was not reporting
[10] to the Medical Director, the corporate Medical
[11] Director. So at that point I was really out of
[12] the loop. But, then, when I was asked to step
[13] back in in the spring of '95, I was sort of
[14] assisting that position. He had his own
[15] responsibility and I was sort of helping him
[16] with some of the other cases that he couldn't
[17] get to."
[18]    Do you stand on that testify? Is
[19] that correct?
[20]    A. Yes, sir.
[21]    Q. Now, in 1993, there were some changes
[22] in management when Harold Chandler was brought
[23] in?

### Page 0202

[01]    A. Yes, sir.
[02]    Q. You don't like Harold Chandler, do
[03] you?
[04]    A. He's a very fine man, but I'm not
[05] real happy with what he has done with the
[06] company.
[07]    Q. Have you ever made any statements to
[08] anyone that you do not like Harold Chandler or
[09] his philosophy?
[10]    A. Other than the testimony that you
[11] have in front of you. I have --
[12]    Q. You have never told anybody at
[13] Provident?
[14]    A. No, sir.
[15]    Q. Have you never told anybody outside
[16] of Provident?
[17]    A. No, sir.
[18]    Q. Words to the effect that you don't
[19] like Harold Chandler, you don't approve of his
[20] philosophy in running the company?
[21]    A. I like him -- personally I think he's
[22] a great man, but what he's done with the
[23] company, I have umbrage with.

### Page 0203

[01]    Q. I thought he was one of the reasons
[02] you say you left the company on February 29?
[03]    A. Well, if you see a situation you are
[04] not comfortable with, many times it's better
[05] to leave.
[06]    Q. Well, did you leave the company
[07] because you thought that you were uncomfortable
[08] with him because you saw people your own age
[09] going out the door? Did you ever make that
[10] statement?
[11]    A. You have probably got it right there
[12] in the deposition. Yeah, it happened all the
[13] time during that time period.
[14]    Q. What did you think, that he was going
[15] to fire a man of your age?
[16]    A. I thought it was a great poss -- good
[17] possibility, yes, sir.
[18]    Q. Why was that? Why would he fire a
[19] man of your age? Just because you were older?
[20]    A. Either didn't fit into his program or
[21] didn't go along with his plans, sure.
[22]    Q. In what way didn't you fit into the
[23] program?

### Page 0204

[01]    A. I didn't like the way he was handling
[02] the claims, the way he was running the company.
[03]    Q. Were you a hard worker?
[04]    A. Ask my wife. She thinks I'm a
[05] workaholic.
[06]    Q. I would rather ask the people at
[07] Provident. I want to know if you think you were
[08] a hard worker?
[09]    A. I think if you asked anybody that was
[10] at Provident during my tenure, you'd say I was
[11] probably the hardest working individual employed
[12] by that company.
[13]    Q. Well, did you like Ralph Mohney?
[14]    A. I didn't like what he was doing to
[15] the company, but he was a fine man.
[16]    Q. When you say you didn't like what he
[17] was doing to the company, what was that?
[18]    A. Well, the reorganizations we alluded
[19] to earlier about the claims and all of that.
[20]    Q. Well, let me ask you about in '93.
[21] The way the old Provident used to handle claims,
[22] they were done out in the field, weren't they?
[23]    A. That's correct.

## DR. WILLIAM E. FEIST   [1-25-99]

### Page 0205

[01]   Q.   Do you think that's a very good way
[02] to handle claims?
[03]   A.   Well, it's a philosophical thing, I
[04] think.
[05]   Q.   Did you take -- did you have a
[06] difference of opinion when the company brought
[07] in their claims in 1993?
[08]   A.   It was a change of philosophy, sir.
[09] When the claims setup was set up in the branch
[10] offices, the idea was that the claims
[11] adjudication could be done in that branch office
[12] for that geographical region.   And the idea of
[13] bringing the people into Chattanooga was not a
[14] problem.   I didn't have any problem with that.
[15] It did allow better training, better monitoring
[16] of their work and you could see the rationale
[17] for that.   I had no problem with that.
[18]   Q.   There were some good sound business
[19] reasons for bringing the claims back into the
[20] home office?
[21]   A.   Well, obviously.   I mean, they had
[22] better control.   They had dedicated people.
[23] They could train them.   They could supervise

### Page 0206

[01] them.   They virtually had claims people in
[02] fifty branch offices across North America and
[03] there's no way you can effectively monitor that
[04] many people in that wide a distribution.
[05]   Q.   So, to some -- in many ways bringing
[06] the claims back in and centralizing claims
[07] handling in the early nineties was positive, it
[08] was good development?
[09]   A.   I would say so, yeah.
[10]   Q.   Now, the psych unit was formed back
[11] then?
[12]   A.   That's my understanding, somewhere in
[13] that time.   I can't give you the specific date.
[14] but somewhere in that time frame, yes.
[15]   Q.   Did they bring in doctors to work in
[16] the psych unit?
[17]   A.   My recollection is that there was a
[18] part-time local psychiatrist, whose name I can't
[19] recall, who came in or reviewed cases, maybe,
[20] you know, two half days a week and worked with
[21] Dr. O'Connell.   But, other than that, there
[22] were no consulting physicians that I'm aware of.
[23]   Q.   Before Dr. O'Connell, was there

### Page 0207

[01] another doctor there?
[02]   A.   Dr. Charles Leagus, now deceased.
[03]   Q.   Did Dr. Leagus work in claims?
[04]   A.   Yes, sir.
[05]   Q.   Now, after Dr. Leagus left or died,
[06] he was replaced by Dr. O'Connell?
[07]   A.   Yes, sir.
[08]   Q.   And then, Dr. O'Connell worked in
[09] claims until his retirement?
[10]   A.   Yes, sir.
[11]   Q.   Did Dr. O'Connell report to you or to
[12] Ralph Mohney?
[13]   A.   Most of his tenure he reported to
[14] Ralph Mohney or Ralph Mohney's predecessor, Dr.
[15] Freetag.   When I took over Medical Director in
[16] the middle of 1990, all positions reported to
[17] the Medical Director.   And, then, after that
[18] time frame, we basically split the department up
[19] into those physicians who worked in the group
[20] department.   One physician, Dr. Leagus then, in
[21] the accident department, and then later Dr.
[22] O'Connell moved over to that department.
[23]   Q.   Okay.   So, Doctor, in 1990, then,

### Page 0208

[01] your primary responsibility, you had
[02] administrative duties you picked up as a
[03] corporate Medical Director?
[04]   A.   Yes, sir.   Yes, sir.
[05]   Q.   But your primary responsibilities
[06] were in the area of giving medical advice to
[07] underwriting?
[08]   A.   This is correct.
[09]   Q.   The primary doctor in charge of
[10] giving medical input, if you will, on claims was
[11] Dr. O'Connell?
[12]   A.   Yes, sir.
[13]   Q.   And he wasn't in your reporting link?
[14]   A.   That's correct.
[15]   Q.   He reported to Doctor, I mean to Mr.
[16] Mohney?
[17]   A.   Mohney, yes, that's correct.
[18]   Q.   Now, by 1995, the health care, the
[19] group health care had been sold off?
[20]   A.   Yes, that's correct.
[21]   Q.   All right.   Now, you were asked in.
[22] as I thought you said, that Mr. Mohney asked you
[23] to start looking at some of the complex claims

### Page 0209

[01] in April of '95?
[02]   A.   That's correct.
[03]   Q.   By April of '95, Harold Chandler had
[04] been there, what, a couple of years?
[05]   A.   A year and a half, eighteen months.
[06]   Q.   Were you happy with the company in
[07] April of '95, or had you already started having
[08] some problems?
[09]   A.   I was having problems with the way
[10] the company was being run.
[11]   Q.   Well, let's take it up through 1982
[12] through the time you became Medical Director.
[13] Were you happy at the company?
[14]   A.   Yes, sir.
[15]   Q.   And from '90 to '93, were you happy
[16] at the company?
[17]   A.   Yes, sir.
[18]   Q.   All right.   Now, in '93, Chandler
[19] comes in --
[20]   A.   November.
[21]   Q.   -- and he starts downsizing?
[22]   A.   Yes, sir.
[23]   Q.   He starts doing efforts to make the

### Page 0210

[01] company more efficient because it has been
[02] losing money?
[03]   A.   That's a fair summary, yes, sir.
[04]   Q.   You mention there had been payments,
[05] there had been a big take down from -- of the
[06] money increasing reserves?
[07]   A.   Yes, sir.
[08]   Q.   So they started trying to make the
[09] claims handling process more efficient?
[10]   A.   That's correct.
[11]   Q.   You don't have any problem with that,
[12] do you?
[13]   A.   No, I do not.
[14]   Q.   Now, some time in '93, though, it's a
[15] new world, they are running the company
[16] different than they had in the past?
[17]   A.   Oh, undoubtedly.
[18]   Q.   Do you find, is there any problem
[19] conceptually with trying to keep a company in
[20] business?   Do you find -- take objection to
[21] that?
[22]   A.   Oh, no, I have no problem with that.
[23]   Q.   Now, with respect to the changes, you

## DR. WILLIAM E. FEIST   [1-25-99]

**Page 0211**

[01] mentioned that you were asked to start sitting
[02] on the round-table reviews in April of '95 that
[03] increased your work, but it didn't increase your
[04] money?
[05]  A.  That's correct.
[06]  Q.  Did you resent that?
[07]  A.  Yes, indeed.
[08]  Q.  Did you ask somebody if you were
[09] going to have to start working nights you
[10] thought you ought to be paid for it?
[11]  A.  It wouldn't have done any good.
[12] They wouldn't have done it anyway.
[13]  Q.  Well, why didn't you go talk to
[14] somebody?  Why didn't you ask Ralph Mohney?
[15]  A.  Ralph Mohney said, it's okay,
[16] something to the effect that the new application
[17] count is down, so you won't have so much
[18] underwriting, so you have more time to do the
[19] claims work, which, to me, is not a valid
[20] reason, but that was what he offered.
[21]  Q.  His perception was that you had a
[22] little extra time on your hands -- would you
[23] like a drink of water?

**Page 0212**

[01]  A.  Yeah.
[02]  Q.  I saw you looking around.
[03]  A.  Yeah, I would.
[04]  Q.  David, would you get him a glass and
[05] let me keep going here?  So your perception was
[06] that Ralph thought you had some extra time on
[07] your hands?
[08]  A.  Right.
[09]  Q.  And he wanted you to start helping
[10] with some of those complex claims?
[11]  A.  I would guess that's probably a fair
[12] summary.
[13]  Q.  As I hear you, though, you say, well,
[14] I was pretty busy and I don't mind working
[15] extra, but I think I ought to be paid for it?
[16]  A.  Or at least recognized.  Ralph never
[17] recognized my efforts.  He never said, "You are
[18] going a good job.  We really appreciate it."  It
[19] was, like, you know, he expected me to do it.
[20]  Q.  Do you think that that is one of the
[21] bases that you started becoming a little unhappy
[22] with this job you had had for so long?
[23]  A.  I would have to say so, yeah.

**Page 0213**

[01]  Q.  Were there any other ways that you
[02] think you weren't appreciated?
[03]  A.  I can't think of any.  I'm not sure
[04] what your --
[05]  Q.  Well, are there any other job
[06] dissatisfaction?  Forget about these issues
[07] about round-table review.  Did you have, other
[08] than maybe a disagreement with Chandler about
[09] his business practices, or --
[10]  A.  I never discussed Chandler's business
[11] practice with him.
[12]  Q.  I am trying to get at if you had
[13] other areas of discontent.
[14]  A.  No.  No, I was -- no, I did not.
[15]  Q.  What was your salary level at that
[16] time in --
[17]  A.  At that time?
[18]  Q.  In '95?
[19]  A.  In '95?
[20]  Q.  Yes, sir.
[21]  A.  It was around ninety-five thousand,
[22] I think.
[23]  Q.  Ninety-five thousand?

**Page 0214**

[01]  A.  Ninety-five thousand annually, yes,
[02] sir.
[03]  Q.  You mentioned on your direct that
[04] you're getting retirement benefits.  You were
[05] able to take early retirement?
[06]  A.  At age 55, yes, sir.
[07]  Q.  When did you become 55?
[08]  A.  September 25, 1995.
[09]  A.  '95 and you retired in February of
[10] '95?
[11]  A.  That's correct.
[12]  Q.  Was the fact that you wanted to take
[13] early retirement, was that one of the reasons
[14] you did it?
[15]  A.  I thought it was a blessing I could
[16] do it, yeah.
[17]  Q.  What does that mean?  By taking early
[18] retirement, what does that mean?
[19]  A.  It means that I get a retirement from
[20] Provident and I could move to another job.  I
[21] just moved -- finished my job on one week and
[22] started my new job the next week.
[23]  Q.  So the benefits that you were getting

**Page 0215**

[01] from Provident by this early retirement, that
[02] was good?
[03]  A.  I wouldn't say it's good.  It's
[04] whatever you get from age 55 and working
[05] for a company for fourteen years.
[06]  Q.  And how much was that?  How much is
[07] your early retirement?
[08]  A.  It's roughly twelve hundred dollars a
[09] month.
[10]  Q.  So you get twelve hundred dollars a
[11] month and you just went to work for somebody
[12] else?
[13]  A.  That's correct.
[14]  Q.  Are you making more money now than
[15] you did while you were at Provident?
[16]  A.  Oh, yeah, but it has been three years
[17] since I worked there.  Just the natural
[18] acceleration of benefits, I mean, of
[19] cost-of-living increases.
[20]  Q.  I heard you testify that in April of
[21] '95, in addition to those round-table reviews
[22] you also started going around and talking and
[23] consulting with other claims departments.  I

**Page 0216**

[01] mean, other people in the claims department,
[02] different sections?
[03]  A.  These units that you see here.
[04]  Q.  Right.
[05]  A.  The psych unit, the -- I never went
[06] to high litigation risks, you know, but there
[07] was about five different units that I would
[08] make, you know, weekly visits to.
[09]  Q.  Okay.  So, if a claims examiner had a
[10] question about the medical in a file, he was
[11] free to consult with you, starting in about
[12] April of '95?
[13]  A.  Yes, sir.
[14]  Q.  And you did, in fact, that part of
[15] your job was to answer questions that a claims
[16] examiner would have about the medical?
[17]  A.  That's correct.
[18]  Q.  Nothing is wrong with that, is there?
[19] You don't find any -- you don't take any issue
[20] with the right of a claims examiner to visit
[21] with you about medical?
[22]  A.  That's what I am there for.  I mean,
[23] that's why Ralph asked me to do that.

## DR. WILLIAM E. FEIST    [1-25-99]

### Page 0217

[01]   Q.   When you were doing this, you don't
[02]   think that every time a Medical Examiner had --
[03]   I mean, every time a claims examiner had a
[04]   question about a claim and visited with you
[05]   about it that he was trying to find some
[06]   loophole to get rid of the claim?
[07]   A.   No, I don't think so.
[08]   Q.   In fact, Doctor, you know of no
[09]   situation where a claims examiner failed to
[10]   follow your recommendation?
[11]   A.   Say that again.
[12]   Q.   You know of no situation where a
[13]   claims examiner failed to follow your
[14]   recommendation?
[15]   A.   I can't speak to that, because
[16]   normally I would see a case and make my
[17]   recommendation, and most of the times I would
[18]   not see the case again unless there was some new
[19]   information or new situation.
[20]   Q.   Well, I am looking at your other
[21]   deposition on page 67.  You were asked the
[22]   question, "Are you aware of at any time when you
[23]   made a recommendation that a claims adjustor

### Page 0218

[01]   disregarded?"
[02]         And your answer was, "I have no
[03]   recollection of that.  I would have had no way
[04]   of knowing, because basically I was a
[05]   consultant.  I would make my opinion and what
[06]   happened after that, I rarely would find out."
[07]         Question: "So the answer would be
[08]   no?"
[09]         Answer: "That's correct."
[10]         Do you stand on that testimony?
[11]   A.   Yes, sir, I do.
[12]   Q.   All right.  Now, in addition, you
[13]   said that Mr. Mohney had asked you to attend
[14]   some of these evening sessions, which you told
[15]   us about in your direct?
[16]   A.   Yes, sir.
[17]   Q.   And these sessions lasted in the
[18]   evening from six to, what, eight or nine?
[19]   A.   Eight or nine, depending on how long
[20]   it went.
[21]   Q.   And, generally, you all -- there
[22]   would be a questionable claim that would be
[23]   brought up to the attention of the committee.

### Page 0219

[01]   you said, two or three in an evening?
[02]   A.   I have lost my voice.
[03]   Q.   Do you want another drink of water?
[04]   A.   Let me have one of the candles.
[05]   Q.   Repeat the question, if you would.
[06]   A.   I am just trying to -- you basically
[07]   were working one night a week, Thursday night?
[08]   A.   That's correct.
[09]   Q.   Now, in attendance at the meetings
[10]   there was different disciplines that had to work
[11]   on claims.  There was the medical people, you.
[12]   A.   Uh-huh (indicating affirmatively).
[13]   Q.   There was the legal people to answer
[14]   legal questions about the contract?
[15]   A.   Uh-huh (indicating affirmatively).
[16]   Q.   There would have been the claims
[17]   examiner that would have done -- you might've
[18]   had a rehab specialist in there?
[19]   A.   That's correct.
[20]   Q.   You brought together a number of
[21]   expertise to answer questions that were raised
[22]   by the baseline claims examiner about a claim?
[23]   A.   That's correct.

### Page 0220

[01]   Q.   Now, there's nothing inherently wrong
[02]   with that process, is there?
[03]   A.   No, sir.
[04]   Q.   The claims examiner would come in
[05]   and may say, "Okay, here are the issues we've
[06]   got on our claims.  Here's the facts, here's the
[07]   medicine, here's this, here's that, and I have
[08]   some questions."  These presentations were made
[09]   because there was some question in the claim
[10]   file in the examiner's mind that caused him to
[11]   question the validity of the claim, is that
[12]   fair?
[13]   A.   That's a fair statement, yes, sir.
[14]   Q.   And he wanted the input of the
[15]   doctors and the lawyers and his supervisor and
[16]   other specialists to him answer the question,
[17]   would that be fair?
[18]   A.   Yes, sir.
[19]   Q.   Provident's inside counsel in
[20]   attendance at the meeting would provide legal
[21]   advice in connection issues that had arisen,
[22]   perhaps, in connection with the construction of
[23]   the insurance policies?

### Page 0221

[01]   A.   That's correct.
[02]   Q.   Now, not all claims went to round
[03]   table, did they?
[04]   A.   No.
[05]   Q.   It was only the claims that there was
[06]   a question or there was a suspicion about it or
[07]   there was something about it that caused the
[08]   examiner to question?
[09]   A.   That's correct.
[10]   Q.   Now, you told me earlier, I think you
[11]   agreed with me that there are a lot of factors
[12]   that can go into the mix as to whether a claim
[13]   is payable under a disability policy?
[14]   A.   This is true.
[15]   Q.   Your area, if I understood you, was
[16]   not to make the claim's decision, but to answer
[17]   medical questions and to give medical advice?
[18]   A.   That's correct.
[19]   Q.   Is that accurate?
[20]   A.   I would say so.
[21]   Q.   Now, at some times in some of these
[22]   claims that you participated in at round table
[23]   there would be numerous complexities, either as

### Page 0222

[01]   to medical opinions that might differ, legal
[02]   questions that made it very difficult to
[03]   determine whether this insured was, in fact,
[04]   entitled to benefits.  Would that be a fair
[05]   statement?
[06]   A.   I think so, yes, sir.
[07]   Q.   And it wasn't always a bright line
[08]   test, was it?
[09]   A.   That's true.
[10]   Q.   Many times it was a very gray area?
[11]   A.   I think that's why those cases were
[12]   brought.
[13]   Q.   In fact, a gray area as you have
[14]   mentioned earlier, in the psych unit, a
[15]   psychological claim, is inherently, quote, gray?
[16]   A.   I think that's a given.
[17]   Q.   And that's because it is based in
[18]   large part on subjective complaints that cannot
[19]   be confirmed medically?
[20]   A.   That is a fair statement.
[21]   Q.   In fact, a treating psychiatrist, if
[22]   you will, following his oath, has an initial
[23]   duty to believe what his person is telling him,

## DR. WILLIAM E. FEIST   [1-25-99]

### Page 0223

[01]  doesn't he?
[02]      A.  I think that's correct.
[03]      Q.  Dr. Feist, are you familiar with the
[04]  Vision Statement of Provident?
[05]      A.  I am not sure that I am.  When was
[06]  that constructed?
[07]          MR. DAVENPORT:  What is your exhibit
[08]  number?  Are we doing these consecutively?
[09]          MR. KENT:  Yes.
[10]          MR. DAVENPORT:  I will put
[11]  Defendant's Exhibit 3.  How is that?
[12]
[13]          (Whereupon, Defendant's Exhibit 3
[14]          was marked for identification and
[15]          same is attached hereto.)
[16]
[17]      Q.  Let me hand you the Vision
[18]  Statement, Exhibit Number 3.  Now, are you
[19]  familiar with this Vision Statement and when it
[20]  was promulgated by the claim department and when
[21]  it was distributed throughout the company?
[22]      A.  Let me think a minute.  I don't
[23]  believe I have seen this in this form

### Page 0224

[01]  heretofore.
[02]      Q.  Have you ever seen one similar to it?
[03]      A.  Oh, I am sure I have.  It has been
[04]  three years since I worked there.
[05]      Q.  This was promulgated while you were
[06]  still an employee of Provident, was it not, or
[07]  one very similar to it?
[08]      A.  I have no recollection.  I cannot
[09]  speak to that.
[10]      Q.  You don't know whether this was
[11]  distributed to people?  Have you ever heard
[12]  Ralph Mohney testify about it or talk about it?
[13]      A.  Not to my recollection.
[14]      Q.  So you know nothing about the
[15]  Provident Vision Statement?
[16]      A.  I mean, I am not sure how the
[17]  Provident Vision Statement relates to this
[18]  claim.
[19]      Q.  Well, you told me that you were at
[20]  round-table review.  Is it your testimony that
[21]  prior to the time you left, you were not
[22]  familiar with the Provident Vision Statement of
[23]  the claim department?

### Page 0225

[01]      A.  I guess I apparently wasn't, in a
[02]  form that I remember.
[03]      Q.  In this Vision Statement, the
[04]  statement is made about Individual Disability
[05]  Claims Vision Statement, "To become the best
[06]  claims management organization in the industry
[07]  in all phases of operation."  Do you see that?
[08]      A.  Uh-huh (indicating affirmatively).
[09]      Q.  And then they said, "We will define
[10]  the best in the industry to mean that we will
[11]  administer claims in a courteous manner, prompt
[12]  and courteous manner."  Do you see that?
[13]      A.  Yes, sir.
[14]      Q.  You will "Administer claims
[15]  consistent with good faith claim practices,
[16]  policy provisions and legal requirements."  Do
[17]  you see that?
[18]      A.  Uh-huh (indicating affirmatively).
[19]      Q.  Dropping down here, let me just go to
[20]  one I wanted to question you on.  It says, "Pay
[21]  all valid claims and aggressively defend the
[22]  company against invalid and fraudulent claims"?
[23]      A.  I see that.

### Page 0226

[01]      Q.  Do you take any issues with the fact
[02]  that Provident has a duty to pay claims that it
[03]  owes under the contract and defend against
[04]  claims that are not owed?
[05]      A.  I would agree with that statement.
[06]      Q.  All right.  Now, did you ever tell
[07]  anybody that you didn't agree with this
[08]  obligation of Provident to pay valid claims or
[09]  that you didn't agree with Provident's
[10]  obligation to defend against invalid claims?
[11]  That's what it's all about, isn't it?
[12]      A.  I think so.  I think this is a great
[13]  mission statement, but I think the thing that I
[14]  took umbrage with was the fact that we had
[15]  claimants on claim for a number of years who had
[16]  been considered valid — considered to have a
[17]  valid disability and then many years later, it's
[18]  revisited.
[19]          And my philosophy was that a claim
[20]  should be evaluated carefully on the initial
[21]  filing of that claim and a person should be
[22]  judged disabled or not at that point.  And
[23]  unless there was some major change in that

### Page 0227

[01]  individual's condition, there's no reason to
[02]  look at it.  And I think that that's where
[03]  Provident stepped over the line.
[04]          These gentlemen had been, both of
[05]  these doctors had been considered disabled for a
[06]  number of years and then somewhere in the
[07]  process somebody picked it up and said, you
[08]  know, maybe we didn't do it right.  Let's go
[09]  back and revisit it.  And I think that's what I
[10]  have a problem with.
[11]      Q.  Have you completed your response?
[12]      A.  Yes, sir.
[13]          MR. DAVENPORT:  Object.
[14]  Nonresponsive, move to strike.
[15]      Q.  Dr. Feist, you don't hold yourself
[16]  out as being a lawyer?
[17]      A.  No, I never said that.  I have never
[18]  been to law school.
[19]      Q.  And you don't hold yourself out as
[20]  being an expert on contract interpretation?
[21]      A.  I would have to say I don't have any
[22]  expertise in contract interpretation; but I have
[23]  some expertise in disability income contractual

### Page 0228

[01]  obligations with the company that wrote the
[02]  policy.
[03]          MR. DAVENPORT:  I move to strike the
[04]  balance of your answer beginning with "but I" as
[05]  being nonresponsive.
[06]      Q.  Now, with respect to the claims
[07]  decision itself, if I have understood you
[08]  correctly, you don't make that decision?
[09]      A.  I would say in the bottom line, in
[10]  the way Provident was structured, when I was
[11]  working, when I was working there, I would make
[12]  my recommendation and, again, I don't know what
[13]  happened to it.
[14]      Q.  That's not my question.
[15]      A.  Unless something else came up later.
[16]      Q.  My question is:  You don't hold
[17]  yourself out as an expert in claims handling?
[18]  That means making a determination of whether a
[19]  specific set of facts entitle a claimant to
[20]  receive benefits under an insurance contract.
[21]  Is that fair?
[22]      A.  I think that's a fair statement, but
[23]  I think in many cases the medical aspect of it

## DR. WILLIAM E. FEIST   [1-25-99]

### Page 0229

[01] is the crux of it. And you can talk legal and
[02] contractual and all of that other peripheral
[03] issues and the medical part of it is really
[04] where it is.
[05]        MR. DAVENPORT: I object to the
[06] portion of your response beginning with, "but I
[07] think." I think the following, the balance of
[08] your answer is being nonresponsive.
[09]        Q. Even when you participated in
[10] round-table reviews, your sole responsibility
[11] was giving medical input and answers to
[12] questions that the claims adjustor raised?
[13]        A. That's correct.
[14]        Q. And as I understand your testimony,
[15] Dr. O'Connell and I guess Dr. Leagus probably
[16] had had a good deal more exposure to claims than
[17] you did?
[18]        A. Well, the only difference between Dr.
[19] Leagus and Dr. O'Connell and myself was that
[20] they were successfully dedicated to disability
[21] claim. I suspect in overall experience, I was
[22] probably comparable with Dr. Leagus.
[23]        Q. I am not talking about experience.

### Page 0230

[01] I'm talking about the percentage of time devoted
[02] to claims, would you agree in '95, for example,
[03] O'Connell was spending more time on claims than
[04] your fifteen hours a week?
[05]        A. That was his full-time job, yes, sir.
[06]        Q. And the answer to my question is
[07] what?
[08]        A. Yes.
[09]        Q. Now, did you testify that you did not
[10] think round-table reviews existed before April
[11] of 1995?
[12]        A. Not in that format, no, sir.
[13]        Q. What format?
[14]        A. Where you had the, as the memo of
[15] April 24, '95 structures it, I don't recall that
[16] there was. Now, obviously, I wasn't directly
[17] involved in that --
[18]        Q. That's my point.
[19]        A. -- issue from 1990 to 1995.
[20]        Q. That's my point of my question. You
[21] are reading my mail. Did you ever attend a
[22] round-table review session from 1990 to '95?
[23]        A. No, sir.

### Page 0231

[01]        Q. Not one single session?
[02]        A. Not to my -- not to the best of my
[03] knowledge, no.
[04]        Q. And you are coming in and telling the
[05] jury that, well, in February of '95, it was
[06] different from the old round-table reviews? Is
[07] that what you just said?
[08]        A. In my experience it was, because I
[09] was asked to come to these round tables. I was
[10] not involved in any prior round tables.
[11]        Q. Then, how can you purport to make a
[12] comparison of what happened in round-table
[13] reviews that you participated in to round-table
[14] reviews that you did not participate in? How
[15] could you know what went on?
[16]        A. Well, I don't think that's an issue.
[17] I'm saying that I had round-table experience
[18] from '95 to '96, and I don't know what happened,
[19] what transpired in that interim.
[20]        Q. You don't, I understand you don't
[21] know what the round-table reviews, how they were
[22] handled prior to the time you started
[23] participating in them in March of '95?

### Page 0232

[01]        A. That is correct.
[02]        Q. In your direct testimony, as I
[03] understand it, you think that in this period
[04] between the spring of '95 and February of '96
[05] when you left the company that you maybe looked
[06] at some, roughly, seventy-five questionable
[07] claims. Is that what you said?
[08]        A. I think we were talking about the
[09] round table.
[10]        Q. At the round table, that's right?
[11]        A. To the best of my recollection. I
[12] obviously don't, at this point, recall.
[13]        Q. And then you also talked to other
[14] people and the claims examiners, kind of
[15] one-on-one about medical questions?
[16]        A. Yeah, it was my job to go to the
[17] section and one-on-one discuss cases.
[18]        Q. Let's talk about just the one-on-one
[19] cases. You are not here to testify that in
[20] those situations involving those claims that the
[21] Medical Examiner was doing something improper in
[22] talking to you about medical questions?
[23]        MR. KENT: Claims people?

### Page 0233

[01]        A. Claim people?
[02]        Q. I am sorry, I missed it. What I am
[03] trying to say is, you are not saying --
[04]        A. No, no, they were --
[05]        Q. Let me restate my question, so when I
[06] read it to the jury it will make some sense.
[07] You are not saying that when you talked to the
[08] claims persons on a one-on-one basis in the
[09] '95-'96 time period and giving them information
[10] that those claims people were doing something
[11] improper in consulting with you?
[12]        A. That was their job to get medical
[13] input, to get medical consultations about a
[14] case.
[15]        Q. Because, as it says in the Vision
[16] Statement, the company has a duty to continue
[17] the investigation of a disability claim, doesn't
[18] it, to investigate it and continue an
[19] investigation?
[20]        A. Well, indeed, but, to me, if there's
[21] no change in an individual that is adjudicated
[22] to be disabled, it's not valid.
[23]        MR. DAVENPORT: Object to the balance

### Page 0234

[01] of your response as being nonresponsive.
[02]        Q. Do you know how many claims
[03] processed, for example, in '95?
[04]        A. How many claims processed in '95?
[05]        Q. Yes.
[06]        A. I have, really, no idea. I'm sure
[07] it's tens or maybe hundreds of thousands.
[08]        Q. So you are not going to come in and
[09] tell the jury that you know anything about the
[10] tens or hundreds of thousands of claims that
[11] were being handled that you didn't have any
[12] input in?
[13]        A. I obviously have no knowledge of
[14] that. I was uninvolved in that.
[15]        Q. So, then, you would have had no
[16] contact whatsoever with the great majority of
[17] claims that Provident was handling, is that
[18] fair?
[19]        A. Yes, indeed.
[20]        Q. So, then, in a given week, then, if I
[21] am listening to you, in a given week of your
[22] week, you might see two to three to four claims
[23] at your weekly round-table review that were --

## DR. WILLIAM E. FEIST   [1-25-99]

### Page 0235

[01] that the validity was questioned on?
[02]   A.  That's probably a fair statement,
[03] yes, sir.
[04]   Q.  All right.  Let's talk just a second
[05] about the issue of questioning the validity of a
[06] claim.  Not every claim that is submitted to
[07] Provident is a legitimate payable claim, is it?
[08]   A.  Obviously not.  I mean, there would
[09] be no point in even evaluating claims, if that
[10] were the case.
[11]   Q.  In fact, some claims which are
[12] submitted to Provident are fraudulent?
[13]   A.  Indeed.
[14]   Q.  And you, yourself, Dr. Feist, have
[15] seen claims for disability that were not
[16] medically supported?
[17]   A.  Indeed.
[18]   Q.  And you yourself, Dr. Feist, have
[19] made recommendations that claims not be paid
[20] because the medical evidence did not support
[21] disability?
[22]   A.  This is correct.
[23]   Q.  Dr. Feist, you have seen claims that

### Page 0236

[01] may be legitimate and medically supported at the
[02] outset, but not involve a condition that is
[03] permanent?
[04]   A.  Oh, indeed, indeed.  Sure.
[05]   Q.  In fact, many medical conditions
[06] which can disable a person are treatable and are
[07] not permanently disabling?
[08]   A.  Oh, absolutely.  That's a given.
[09]   Q.  People get well, don't they?
[10]   A.  Some people get well, but some people
[11] have impairments that don't get well.
[12]   Q.  People do get well, things change?
[13]   A.  Well --
[14]   Q.  Is that right or wrong?
[15]   A.  That's correct and that's why you
[16] have an ongoing review of these people.
[17]   Q.  There are medical advances, advances
[18] in medical technology.  Things are being
[19] discovered every day in the world of medicine,
[20] aren't they?
[21]   A.  Indeed.
[22]   Q.  Diseases and problems can be cured
[23] today that weren't even treatable in the past?

### Page 0237

[01]   A.  Indeed.
[02]   Q.  In fact, Doctor, based on your
[03] experience, a very high percentage of people who
[04] become disabled and go on claim eventually
[05] return to their own occupation?
[06]   A.  Oh, indeed.
[07]   Q.  That's the goal, isn't it, to return
[08] to work?
[09]   A.  That's the whole goal is to get to
[10] work.  People want to work.
[11]   Q.  Well, then, you don't take the
[12] position that just because Provident approves a
[13] claim, starts making payments, that those facts
[14] can never change?
[15]   A.  No.  My point was that when that
[16] initial claim comes in, the adjudication should
[17] be made if this person was medically impaired.
[18] Once that decision is made, that should hold
[19] until some, at some point or some point in time,
[20] when there is a change.  If there's no change,
[21] there should not be a termination of claims
[22] payment.
[23]   Q.  You don't think, though, that just

### Page 0238

[01] because Provident makes a claim, approves a
[02] claim, rather, and starts making payments that
[03] those facts can never change or that Provident
[04] is automatically obligated to continue making
[05] payments --
[06]   A.  Oh, certainly not.  That's why you
[07] have a periodic review.  Most situations they
[08] have got to submit a thirty day, ninety day, six
[09] months verification that they have remained
[10] disabled and have not recovered.
[11]   Q.  Because the way the policy is
[12] structured, like you just said, the insureds
[13] have to submit a proof of claim each month,
[14] signed by a doctor --
[15]   A.  Yes, sir.
[16]   Q.  -- supporting, and proving that they
[17] continue to remain disabled?
[18]   A.  This is correct, yes.
[19]   Q.  Well, what about a situation where a
[20] company makes a mistake and initially starts
[21] paying a claim that really was not payable.  It
[22] was really not medically supported and the
[23] claims examiner made a mistake.  If that

### Page 0239

[01] situation happened, do you think Provident would
[02] have the right to correct the error?
[03]   A.  Oh, indeed.  I think that's the
[04] failsafe, if you will, of the periodic review.
[05] If somebody is mistakenly put on claim and the
[06] review process indicates that he was not, he or
[07] she was not disabled, then, of course, you have
[08] the right to go back.
[09]   Q.  Okay.  So --
[10]   A.  But, you know, it seems to me that
[11] has got to be done pretty close up to the
[12] initial start of the thing, not years down the
[13] line, like in the cases we are talking about
[14] today.
[15]   MR. DAVENPORT:  I'm going to object
[16] to the responsiveness of your answer beginning
[17] with the words, "you know."
[18]   Q.  My question is:  Do you think that if
[19] Provident learns it makes a mistake and was
[20] paying a claim it shouldn't have been paying,
[21] that it has a right to correct it?
[22]   A.  Oh, absolutely.  Under the contract,
[23] they do, indeed.

### Page 0240

[01]   Q.  So you agree with the statement,
[02] then, that Provident has a duty to investigate
[03] the claim at the outset and then continue its
[04] investigation as the claim continues?
[05]   A.  If there's some question as to the
[06] proof of ongoing disability, they have the right
[07] to do it.
[08]   Q.  And the obligation?
[09]   A.  And the obligation, of course,
[10] indeed.
[11]   Q.  As an abstract proposition, Dr.
[12] Feist, do you believe it is, in fact, a good
[13] development if an insured gets well and returns
[14] to work?
[15]   A.  Oh, absolutely.  That's what
[16] everybody wants.  Everybody wants to go to work.
[17] Nobody wants to be disabled.
[18]   Q.  Have you ever heard --
[19]   A.  Very few people do.
[20]   Q.  -- of the concept of secondary gain
[21] in the context of a psychiatric claim?
[22]   A.  Oh, absolutely.  Psychiatrists talk
[23] about it all the time.



## DR. WILLIAM E. FEIST    [1-25-99]

### Page 0241

[01]    Q.  Where if someone is, say, disabled
[02]  because they claim they are depressed, the fact
[03]  that they are getting disability benefits
[04]  presents with the secondary gain and prohibits
[05]  them from getting better?
[06]    A.  I am fully aware of that concept,
[07]  yes, sir.
[08]    Q.  Also, Dr. Feist, you are aware,
[09]  generally, that under the Provident policies, an
[10]  insured has an obligation to be under the
[11]  regular care and attendance of a duly qualified
[12]  physician for any period of time they are on
[13]  claim?
[14]    A.  Oh, absolutely.  That's a given.
[15]    Q.  And the purpose of that clause in the
[16]  policy is to make sure that the insured gets
[17]  treatment and hopefully gets well?
[18]    A.  Sure.  That's the whole point of it.
[19]    Q.  You don't take any issue with that?
[20]    A.  I do not.
[21]    Q.  Let's talk about the claims that were
[22]  submitted to the round-table review while you
[23]  were there.  And, again, this is the

### Page 0242

[01]  period between April of '95 and February of '96.
[02]  Would it be a fair statement that not every
[03]  claim involves a reserve of in excess of a
[04]  million dollars?
[05]    A.  I'm sure that's true.  I can't recall
[06]  specifically, but, obviously, you've researched
[07]  that and that's probably true.
[08]    Q.  Would it be a fair statement that not
[09]  every claim involved a situation where an
[10]  insured had been on claim for a long period of
[11]  time?
[12]    A.  I'm sure that has happened, but it
[13]  seems that would not be common.
[14]    Q.  Would it be a fair statement that
[15]  with regard to a majority of the round-table
[16]  reviews, you did not think the company did
[17]  anything improper?
[18]    A.  That's probably a fair statement,
[19]  yeah.
[20]    Q.  As I understand it, you don't have a
[21]  problem with the fact that a claims
[22]  representative could have a legitimate question
[23]  and bring the case to a round-table review?

### Page 0243

[01]  You don't find anything --
[02]    A.  No, not at all.
[03]    Q.  In your prior deposition, I believe
[04]  you told us that the claim representatives have
[05]  a duty to actually do that if they don't feel a
[06]  claim is payable pursuant to a policy.  They
[07]  have a duty to seek help.
[08]    A.  That's what they are hired by the
[09]  company to do.  That's their job.
[10]    Q.  In every claim that you saw during
[11]  the round-table review, the claims
[12]  representative had raised a question as to
[13]  whether the claim was payable for some reason or
[14]  another?
[15]    A.  Indeed, yes.
[16]    Q.  And the issue as to why the claim,
[17]  the questions that the claims representative
[18]  had, were they then discussed at the meeting?
[19]    A.  Yes, that was the point of the
[20]  meeting.
[21]    Q.  All right.  Now, do you have any
[22]  specific recollection, as you sit here today, of
[23]  the details of any claim that was discussed?

### Page 0244

[01]    A.  I do not.
[02]    Q.  Well, you are not purporting to tell
[03]  this jury that Ralph Mahney came in and said,
[04]  "Guys, we have got this claim reserved at X
[05]  dollars.  I don't care what the facts show.  I
[06]  don't care what the medicine shows.  We just
[07]  want to cut this claimant off."  Did he ever say
[08]  that?
[09]    A.  Not in so many words, but --
[10]    Q.  Did he ever say that or words to that
[11]  effect?
[12]    A.  No.  No, he did not.
[13]    Q.  After the questions were discussed
[14]  as I listened to you, you said that a number of
[15]  things could happen.  The first thing that could
[16]  happen is the decision could go in favor of the
[17]  insured.  The question could be answered and the
[18]  claim in the insured's favor, the decision would
[19]  be reached to continue payment of the claim,
[20]  look at it another day?
[21]    A.  Yeah.
[22]    Q.  That happened, in fact, on
[23]  situations, did it not?

### Page 0245

[01]    A.  Oh, I'm sure it did, yes, of course.
[02]    Q.  And again, whether the claim was
[03]  payable or not, that's not solely a medical
[04]  question; there may be legal issues involved?
[05]    A.  Many issues, yes, sir.
[06]    Q.  For example, somebody could be
[07]  medically disabled, in other words, have a
[08]  condition that shows they are medically
[09]  disabled, but the claim could not be legally
[10]  payable for some reason under the contract?
[11]    A.  Indeed.
[12]    Q.  For example, the illness could have
[13]  manifested itself before the contract was
[14]  issued?
[15]    A.  Oh, yeah, preexisting.  Of course.
[16]    Q.  Okay.  So there could be legal
[17]  reasons why a claim wouldn't be payable even if
[18]  it was medically justified?
[19]    A.  Oh, indeed.
[20]    Q.  All right.  Now, or the company after
[21]  they heard everything could say, we are just
[22]  going to deny the claim; the claim needs to be
[23]  denied and should not have been paid?

### Page 0246

[01]    A.  If they had valid reason to do so,
[02]  that's within their prerogative.
[03]    Q.  On some occasions, did that, in fact,
[04]  happen, after round-table review a decision was
[05]  reached to deny the claim?
[06]    A.  It apparently was.  I don't have
[07]  statistics on the number, but I'm sure that
[08]  happened.
[09]    Q.  But you don't remember the
[10]  statistics, though?
[11]    A.  No, sir, I do not.
[12]    Q.  But isn't it a fact, Doctor, that in
[13]  the great bulk of the questionable claims that
[14]  were presented for round-table review when you
[15]  were there, the decision was made to go get some
[16]  additional information?
[17]    A.  I think that's a fair statement.  The
[18]  great majority of them were, yes.
[19]    Q.  So at the end of the day, the people
[20]  gave input and they said, "Okay, here's what you
[21]  need do, we need more information"?
[22]    A.  Uh-huh (indicating affirmatively).
[23]    Q.  For example, send a questionnaire to

## DR. WILLIAM E. FEIST   [1-25-99]

### Page 0247

[01] the treating doctor, let's get some specific
[02] answers to these questions?
[03]   A. Uh-huh (Indicating affirmatively).
[04]   Q. That was done, wasn't it?
[05]   A. Yes, sir.
[06]   Q. Or, let's get the tax returns. Maybe
[07] there was a question in a, in a residual claim
[08] of the predictability earnings, we need to get
[09] confirmation of what those earnings were?
[10]   A. That sometimes is a factor.
[11]   Q. Or maybe there was a decision made,
[12] well, we need the field rep to go out and
[13] conduct a face-to-face interview and get more
[14] information from the insured?
[15]   A. Indeed.
[16]   Q. Then, as I understand it, too,
[17] another tool to get additional information was
[18] for the insured to undergo an independent
[19] medical examination?
[20]   A. That's correct.
[21]   Q. In fact, the company had the right to
[22] do that in its insurance contract, is that
[23] right?

### Page 0248

[01]   A. That's correct.
[02]   Q. You don't take any issue with the
[03] company's right to conduct an independent
[04] medical examination?
[05]   A. No, I do not.
[06]   Q. And, also, as I understood you, the
[07] decision could be reached to put an insured
[08] under surveillance?
[09]   A. Oh, indeed.
[10]   Q. You don't question that the company
[11] has the right to conduct surveillance?
[12]   A. Certainly not, if they feel it's
[13] indicated.
[14]   Q. Now, surveillance has many times
[15] validated a claim, has it not?
[16]   A. In many cases, it will, yes.
[17]   Q. Because a camera can't lie, can it?
[18]   A. Probably not.
[19]   Q. Okay. An independent medical
[20] examination can, in fact, confirm a disability,
[21] validate a disability?
[22]   A. Well, yeah, indeed.
[23]   Q. And that happened on occasion, did it

### Page 0249

[01] not?
[02]   A. I'm sure it did.
[03]   Q. Now, at the time, Dr. Feist, when the
[04] company decided to get more information, most of
[05] the time they continued to pay the claim while
[06] they continued the investigation, didn't they?
[07]   A. That's my understanding, yes, sir.
[08]   Q. So, they would be giving the benefit
[09] of the doubt to the insured in that situation,
[10] even though they were questioning --
[11]   A. At least through the duration of
[12] their investigation, I am sure, yes.
[13]   Q. Now, on most occasions, if I
[14] understood you correctly on your direct
[15] testimony, the only time you saw a particular
[16] claim would be at the round-table review?
[17]   A. Say that -- I am not understanding
[18] the question.
[19]   Q. Most of the time when you saw a
[20] particular claim --
[21]   A. At the round table.
[22]   Q. -- at the round-table review --
[23]   A. Yeah.

### Page 0250

[01]   Q. -- that would be your only connection
[02] with the claim?
[03]   A. Generally so, unless a given case
[04] would come back to the round table on a
[05] subsequent meeting for maybe additional
[06] discussion or whatever, but, in essence, that's
[07] true.
[08]   Q. All right. And so you weren't, you
[09] weren't, like, in a reporting loop that after
[10] the surveillance is completed, send it back to
[11] Dr. Feist?
[12]   A. No, I was not.
[13]   Q. So, many times, you don't know what
[14] the subsequent investigation showed or what the
[15] subsequent information showed?
[16]   A. This is true, yes.
[17]   Q. And you don't know what these
[18] round-table claims where they got additional
[19] information, which claims ultimately stayed on
[20] the books and kept getting paid?
[21]   A. I had no record of that, no.
[22]   Q. You just don't know what the company
[23] ultimately did on most of the round-table review

### Page 0251

[01] claims in which you participated, is that fair?
[02]   A. That is true.
[03]   Q. All right.
[04]   MR. EHLINGER: Are you at a spot
[05] where we can talk about scheduling? I have a
[06] flight to catch. I don't know how long you
[07] have.
[08]   MR. DAVENPORT: I have got about
[09] another, probably pretty close to about another
[10] ten minutes. What time do you need to leave?
[11]   MR. EHLINGER: Well, I have got to be
[12] at the airport around 5:15.
[13]   MR. DAVENPORT: I am close to being
[14] through. Do you want to break now and talk
[15] about scheduling what?
[16]   MR. EHLINGER: That's it. I just
[17] wanted to know where you thought you were going
[18] to be. I'm sure he has a long redirect. Can we
[19] do this off the record? All we're talking about
[20] is scheduling.
[21]   VIDEO TECHNICIAN: We are off the
[22] record at 4:43 P.M.
[23]

### Page 0252

[01]   (Whereupon, a discussion was held
[02] off the record.)
[03]
[04]   (Whereupon, Mr. Ross Ehlinger is no
[05] longer present at deposition.)
[06]
[07]   VIDEO TECHNICIAN: On the record at
[08] 4:45 P.M. Going back off the record. This
[09] ends video tape number 2 of this deposition.
[10]
[11]   (Whereupon, a brief recess was taken.)
[12]
[13]   VIDEO TECHNICIAN: We are on the
[14] record at 4:52 P.M. This begins video tape
[15] number 3.
[16]   Q. Dr. Feist, continuing your
[17] deposition, prior to 1996, did you play a role
[18] in selecting doctors to perform independent
[19] medical examinations?
[20]   A. No, I did not.
[21]   Q. Prior to 1995, do you know how
[22] medical providers to do that service were
[23] selected?

DR. WILLIAM E. FEIST   [1-25-99]



Page 0253

[01]   A.   My recollection was that the claims
[02] adjustor who needed an independent medical
[03] examiner would call a national company that
[04] provided independent medical examiners in a
[05] locale that was needed and have them do it.
[06]   Q.   In other words, there would be
[07] certain vendors who would assist claims
[08] representatives --
[09]   A.   Yeah.
[10]   Q.   -- in obtaining the names of outside
[11] doctors?
[12]   A.   Yes, sir.
[13]   Q.   Do you know how the process occurs
[14] after you left?
[15]   A.   I have no idea.
[16]   Q.   You don't contend that there's
[17] anything improper in having a vendor select an
[18] outside medical consultant, do you?
[19]   A.   No, I have no problem with that.
[20]   Q.   You don't claim that Provident would
[21] go out and try to hire only independent medical
[22] examiners who would parrot their deposition, or
[23] parrot its position to try to deny disability?

Page 0254

[01]   A.   I would hope not. I have no
[02] indication that they have.
[03]   Q.   When they find doctors, these
[04] generally would be Board certified doctors in
[05] their specialty?
[06]   A.   Generally a Board certified, yes,
[07] sir.
[08]   Q.   And then the company would send to
[09] the doctor the medical information and the past
[10] medical information, is that right?
[11]   A.   That's correct, and sometimes x-rays
[12] and other records. You know, basically the
[13] medical history and records.
[14]   Q.   Okay. You don't find -- when you
[15] were at Provident, there was nothing inherently
[16] bad about the process of using IMEs, is that
[17] fair?
[18]   A.   No, I think that's a given in the
[19] process.
[20]   Q.   All right. Now, let's talk about the
[21] reasons as to why you would want an independent
[22] medical examination on a claim. What about a
[23] situation where a condition appears treatable

Page 0255

[01] but for some reason it doesn't seem to be
[02] getting better? In other words, the insured
[03] should be getting well, but he's not. That
[04] might warrant an IME, mightn't it?
[05]   A.   Yeah.
[06]   Q.   Or let's say the condition is one
[07] which would not normally disable an individual
[08] from his occupation?
[09]   A.   There are gray areas where that could
[10] be helpful, yes, sir.
[11]   Q.   Or what if there would be activities,
[12] like the insured becomes aware of activities of
[13] the insured which are inconsistent with the
[14] claimed medical condition?
[15]   A.   I think that's a valid reason.
[16]   Q.   Or activities that are inconsistent
[17] with the claim disability?
[18]   A.   Indeed.
[19]   Q.   All right. Did you testify that as
[20] far as you know, Provident has always used IMEs?
[21]   A.   During the time that I was working
[22] at Provident, my understanding is that they did
[23] use IMEs.

Page 0256

[01]   Q.   Okay. Now, what about a situation
[02] where the claims representative is receiving
[03] inconsistent information from more than one
[04] treating physician? Would an IME help in that
[05] situation?
[06]   A.   IME is often helpful, yes, sir.
[07]   Q.   And you know of situations where the
[08] company has used IMEs in these kinds of
[09] situations I am describing?
[10]   A.   Oh, certainly, yeah.
[11]   Q.   You don't know, or have any way to
[12] know how often the IMEs were utilized by claims
[13] representatives, do you?
[14]   A.   Not specifically, but many times they
[15] would ask me when I was reviewing a case, should
[16] we get an IME, and not only should we get one,
[17] which specialty should we request. In other
[18] words, is it an internist or orthopedist or
[19] whatever the situation might be.
[20]   Q.   Okay. Let me -- with respect to the
[21] selection of IMEs, would that -- by outside
[22] vendors, would that also apply to the
[23] psychiatric IMEs as well?

Page 0257

[01]   A.   To my knowledge, it would, yes.
[02]   Q.   With respect to these round-table
[03] reviews, I went to visit with another question I
[04] had. Were the participants free to express
[05] opinions? I mean, was it kind of an open panel
[06] discussion?
[07]   A.   It was open discussion, sure. I
[08] mean, everybody had an opportunity to speak
[09] their mind, so to speak.
[10]   Q.   And did you know the people that
[11] participated most of the time?
[12]   A.   Well, surely. I know them and worked
[13] with most of them. With all of them, basically.
[14]   Q.   Were you friends with them, for the
[15] most part?
[16]   A.   For the most part. I don't know that
[17] anybody disliked me or vice versa.
[18]   Q.   Do you think the people tried to do a
[19] good job for the company, for the most part?
[20]   A.   I think so, sure.
[21]   Q.   Did you frequently express your
[22] opinions?
[23]   A.   I expressed the medical aspect of it

Page 0258

[01] and, many times. If there was a medical
[02] impairment that it was apparent that the claims
[03] adjustors or any of the other individuals
[04] present at the meeting didn't understand, I
[05] would get up and give a brief description of the
[06] impairment and what it was all about.
[07]   Q.   And, then, did you give a medical
[08] opinion from time to time?
[09]   A.   Oh, surely. I mean, that was my role
[10] to be there.
[11]   Q.   In your prior deposition, you
[12] testified there was never a time that you
[13] expressed an opinion that the medical evidence
[14] justified disability when the claims adjustor
[15] denied the claim and refused to follow your
[16] advice. Do you stand on that?
[17]   A.   Read that again, please.
[18]   Q.   I think it's what I read to you
[19] earlier. It's on page 73. In fact, you
[20] already answered the question. I went over it
[21] with you in your prior deposition. Here's my
[22] point. My point is simply that when you -- you
[23] never gave advice and then the claims adjustor

## DR. WILLIAM E. FEIST   [1-25-99]

### Page 0268

[01] said, "I am sorry, you are right, the guy is
[02] disabled medically, but I'm going to deny the
[03] claim anyway; I'm going to disregard your
[04] advice"?
[05]   A.  I don't recall that, no.
[06]   Q.  You can't think of a single instance
[07] where you recommended that a claim be paid at a
[08] round-table review when they said they weren't
[09] going to follow your advice?
[10]   A.  I cannot remember.
[11]   Q.  You never criticized in writing the
[12] round-table review sessions to anyone while you
[13] were at Provident?
[14]   A.  This is correct.
[15]   Q.  You never voiced an opinion during
[16] any round-table review session that you thought
[17] someone was doing something improper there?
[18]   A.  I did not, but it would not have been
[19] the appropriate place to do that.
[20]   MR. DAVENPORT:  Now, when you said,
[21] "but I did not," I move to strike that portion
[22] of your answer as being nonresponsive.
[23]   Q.  If -- if I have listened to your

### Page 0260

[01] direct testimony, as I heard what you said, and
[02] especially now in light of your cross-
[03] examination, you seem to say that while so many
[04] things that were being conducted at round-table
[05] review were proper -- have I heard you say that
[06] right?
[07]   A.  That's correct.
[08]   Q.  You think that by conducting the
[09] review, you could put another spin on it, that
[10] we are doing something to try to find a loophole
[11] or something to try to deny the claim?
[12]   A.  Oh, I think even just the fact of
[13] bringing a given case to the round table is
[14] looking to see if there can be some way to get
[15] out of paying the claim.
[16]   Q.  But as my examination, I hope, has
[17] demonstrated, even according to you, there are a
[18] number of completely proper things, proper
[19] motives, proper procedures --
[20]   A.  Oh, surely.  Surely.
[21]   Q.  -- that were performed at the
[22] round-table review?
[23]   A.  Exactly, but --

### Page 0281

[01]   MR. KENT:  Let me object to the
[02] argumentative and side bar nature of the
[03] question, predicate of the question.
[04]   MR. DAVENPORT:  What was that?  I'll
[05] restate the question.  I haven't been trying to
[06] argue with him.  I will restate the question.
[07]   Q.  If I heard your testimony correctly,
[08] you have agreed with me that there were a number
[09] of things about the round-table review process
[10] that were entirely proper?
[11]   A.  Yeah.
[12]   Q.  Is that right?
[13]   A.  I think, I think the processes are
[14] proper, but the application of those processes,
[15] in many cases, was not what I felt was proper.
[16]   Q.  Let me follow up on that, because you
[17] know, you can sit here and look at this and on
[18] one side, I can say, here are all of the
[19] legitimate reasons for raising this claim, to
[20] examine it, to answer questions.  And I can say,
[21] Dr. Feist, you know, I hear what you have
[22] testified, but you don't even know what happened
[23] on a bulk of these claims down the road.  You

### Page 0282

[01] don't know whether they were denied or whatever.
[02] Is that fair?
[03]   A.  I think we are seeing some of the
[04] evidence of these claims as we sit here.
[05]   Q.  You are seeing two claims right now
[06] that are in dispute.  Okay?
[07]   A.  Dr. Knee a year ago, Norman Knee.
[08]   Q.  I don't know Dr. Knee?  That's not my
[09] case.
[10]   A.  That's the same situation.
[11]   Q.  Well, it's not the same situation.  I
[12] read the deposition.  These are entirely
[13] different types of disabilities and disability
[14] claims.
[15]   MR. KENT:  I would object to the
[16] argumentative.
[17]   A.  I would submit that the process is
[18] the same.
[19]   Q.  You don't even know if on these
[20] claims here today, they were presented for
[21] round-table review, do you?
[22]   A.  No, I don't, but I think there's a
[23] process going on in the company that led us to

### Page 0263

[01] being here today.
[02]   MR. DAVENPORT:  I move to strike
[03] your answer after the words, "no, I don't," as
[04] being nonresponsive.
[05]   Q.  Did you ever -- who did you report to
[06] when you were at Provident in 1995?
[07]   A.  Whom did I report to in 1995?  At
[08] the time, at 1995, I reported to Bob Nash, the
[09] Vice President of Underwriting.
[10]   Q.  Did you ever, at any time, voice any
[11] complaints or concerns to Bob Nash about
[12] anything relating to the round-table review
[13] process?
[14]   A.  Well, no, I didn't, but obviously he
[15] was in the life department and he had, really,
[16] nothing to do with the claims situation.
[17]   Q.  Do you know of anyone ever being
[18] fired for expressing an opinion at round-table
[19] review?
[20]   A.  Not to my knowledge, no.  They might
[21] not have been promoted to the next level, but
[22] never fired as far as I know.
[23]   Q.  Well, you never heard Ralph Mohney

### Page 0264

[01] say anything specifically that the round-table
[02] review was to deny the claim because of the
[03] reserve, forget about the facts?  He never made
[04] statements like that?
[05]   A.  He never made that statement, but the
[06] implication was there that this is a case that
[07] we've got to really work hard on, because
[08] there's a high reserve.
[09]   Q.  When you say the implication, you are
[10] interpreting words that were said, is that fair?
[11]   A.  That's correct, but I think the
[12] implication was there.
[13]   Q.  Well, you said that you thought that
[14] some of the claims that came to round-table
[15] review were high impact claims, meaning big
[16] dollars?
[17]   A.  Big dollars, yes, sir.
[18]   Q.  And you said some of the claims had
[19] been on claim for a long period of time?
[20]   A.  There were those many times, yes,
[21] sir.
[22]   Q.  Many of the claims that were at
[23] round-table review were, in fact, put on claim

DR. WILLIAM E. FEIST   (1-25-99)

### Page 0265

[01] back in the old days of the examinations out in
[02] the field?
[03]   A.   That's probably true.  That's
[04] probably true.
[05]   Q.   And there's nothing wrong with an
[06] insurance company auditing claims on a regular
[07] basis, is there?
[08]   A.   No, certainly not.
[09]   Q.   To make sure that the claim is being
[10] properly handled, that it's being paid if it
[11] should be paid and it's being denied if it
[12] should be denied?
[13]   A.   I would agree with that.
[14]   Q.   All right.  And you, uh, you never
[15] expressed an opinion or an objection orally or
[16] in writing to anyone at Provident about the
[17] round-table review process, is that correct?
[18]   A.   Not specifically in writing nor in
[19] verbalization, but, my demeanor, it would be
[20] obvious that I was not happy there --
[21]   Q.   Well, I mean --
[22]   A.   -- attending those meetings.
[23]   Q.   -- if you're not saying why you are

### Page 0266

[01] not happy, your demeanor might be because you
[02] are having to work at night until 9:00 and not
[03] getting paid for it.  Do you think the people at
[04] Provident are somehow mind readers and could
[05] know why you were unhappy if you refused to tell
[06] them why?
[07]   MR. KENT:  Objection to argumentative
[08] counsel narrative.
[09]   A.   That's a speculative question.
[10] Obviously, if one has been asked to work fifteen
[11] to twenty hours a week extra, with no additional
[12] remuneration, you're not going to be happy.  And
[13] if you are not happy with what you had to spend
[14] the extra time on, you tend to be unhappy.
[15]   Q.   I guess when I'm trying to get at is,
[16] you had been at Provident for a number of years.
[17] You were an officer in the company?
[18]   A.   Yes, sir.
[19]   Q.   You were well compensated?
[20]   A.   Yes, sir.
[21]   Q.   You had been treated fairly by
[22] Provident, by your own testimony, at least
[23] through, what, '93 or '95?

### Page 0267

[01]   A.   I would say probably up until the
[02] early part of '95.
[03]   Q.   Okay.  So up through the early part
[04] of '95, you really didn't have any complaints
[05] with the company?
[06]   A.   Oh, I was very happy there.
[07]   Q.   All right.  Now, sometime in the
[08] spring of '95, you are going to, you are
[09] participating in claims very actively for really
[10] the first time, is that fair?
[11]   A.   I would not say the first time.  There
[12] was a hiatus.  I did claims from 1982 to 1990
[13] on a fairly regular basis, as I indicated.  Not
[14] a big percentage, but I had my finger in the
[15] pie.  And, then, from 1990 until 1995 there was
[16] a hiatus, but Dr. O'Connell and Dr. League came
[17] through our department periodically to research
[18] cases, to discuss cases.  I -- you know, I
[19] wasn't supervising Dr. O'Connell or Dr. League,
[20] but I knew what they were doing on a day-to-day
[21] basis.
[22]   Q.   Well, here's my point.  If you
[23] thought, and you really did think while you were

### Page 0268

[01] seeing a relatively small number of claims,
[02] given the large number of claims that were being
[03] processed --
[04]   A.   Oh, indeed.
[05]   Q.   -- that there was something improper,
[06] why didn't you say something to somebody before
[07] you left?
[08]   A.   As I alluded to earlier in my earlier
[09] testimony, I needed a job.  Until I had a
[10] position ready to move to, I didn't feel like I
[11] could or should say anything.  It's just as
[12] simple as that.  I mean, I've got a family to
[13] support.
[14]   Q.   You didn't think by placing a
[15] constructive criticism, if you had a valid one,
[16] it could be addressed or answered?
[17]   A.   I think the process was going on and
[18] whatever I said would not have any input on it
[19] or any impact on it.
[20]   Q.   Well, if you didn't ask anybody, how
[21] do you know that?  You didn't talk to Ralph, you
[22] didn't talk to your supervisor.  You didn't talk
[23] to anybody to express any objection to a process

### Page 0269

[01] in which you were participating.
[02]   MR. KENT:  Objection, argumentative.
[03]   A.   Absolutely.  I mean, it's a practical
[04] matter, sir.  I have to work for a living.  I've
[05] got a family to support.  And until I have --
[06] you know, I was actively looking for another
[07] job, if you want to know, since November of '94.
[08] And throughout the year of 1995, I may have had
[09] six interviews over the country.  Until I had
[10] this job at Protective in Birmingham, I didn't
[11] feel I could say anything, and I didn't have
[12] this job until two weeks before I put in my
[13] resignation.
[14]   Q.   Is it your testimony you started
[15] looking for a job before you started the
[16] round-table review sessions in March of '95?
[17] Did I hear you right?
[18]   A.   Well, I had one interview in November
[19] of 1994, but the subsequent interviews would
[20] have been after April of '95.
[21]   Q.   So you were looking for a job before
[22] you ever sat on a round-table review session?
[23]   A.   I had one interview.  That was just

### Page 0270

[01] sort of -- you know, but once the round table
[02] came in April of '95, I became very serious
[03] about it.
[04]   MR. DAVENPORT:  Object, move to --
[05]   A.   And one of the things about changing
[06] jobs in the insurance industry is there's
[07] licensing and all sorts of things.  I had to
[08] take an examination to get licensed in Alabama
[09] so I could take this job and you don't do that
[10] lightly.  And you don't go around, you know,
[11] saying bad things about people at your one
[12] company until you have got a job in another
[13] company in hand.
[14]   MR. DAVENPORT:  Object.  Move to
[15] strike your answer as being nonresponsive,
[16] beginning with the words, " but once the round
[17] table."
[18]   Q.   Doctor, you will admit to the jury,
[19] then, that before you ever sat on one single
[20] round-table review session beginning March of
[21] '95 that you had already --
[22]   A.   April of '95.
[23]   Q.   April of '95, that you had already

## DR. WILLIAM E. FEIST   [1-25-99]

### Page 0271

[01] had an interview?

[02] A.  One interview, but I became serious

[03] about getting another job --

[04] Q.  Let me finish my question.

[05] A.  -- after that April of '95.

[06] Q.  That you had already interviewed

[07] another employer for prospective employment for

[08] somewhere other than Provident; is that

[09] accurate?

[10] A.  That is accurate, yes, sir.

[11] Q.  Now, that doesn't seem very

[12] consistent with some of the testimony you gave

[13] on your direct examination that the reason you

[14] were leaving Provident is because of all of

[15] these bad things that were happening on

[16] round-table review, does it?

[17] A.  I think it's consistent, absolutely.

[18] Q.  Why would you look for another job in

[19] November of '94?

[20] A.  It was preliminary.

[21] Q.  Why?

[22] A.  Well, if you really want to know, I

[23] was -- Harold Chandler had come in a year before

### Page 0272

[01] in November of '93 and I basically saw the

[02] handwriting on the wall, I am either going to

[03] have to leave this company or get another job.

[04] Q.  Why, because they were making people

[05] work and do their jobs well?

[06] A.  They were firing people that had

[07] experience and bringing in younger people.

[08] Q.  Was that the reason you started

[09] looking around?

[10] A.  Basically if you want to know, yes.

[11] Q.  Because they were looking for younger

[12] people?

[13] A.  Yes.

[14] Q.  And you figured that your number was

[15] going do come up?

[16] A.  Were it under a court of law, I would

[17] say, yes, sir.

[18] Q.  Well, you are in a court of law right

[19] now?

[20] A.  I understand that.

[21] Q.  Do you understand that the testimony

[22] you have given here today is sworn, under oath

[23] testimony?

### Page 0273

[01] A.  Yes, sir, I know that full well.

[02] Q.  Do you understand that you would be

[03] subject to the same penalties for untruthfulness

[04] in this proceeding as you would be in open

[05] court?

[06] A.  Absolutely, I am fully aware of that.

[07] Q.  Dr. Feist, talking about these

[08] disability claims, is it a fair statement that

[09] there can be legitimate disputes over a

[10] disability claim?

[11] A.  Oh, absolutely.  That's the whole

[12] point of the thing.

[13] Q.  You know that there can be disputes

[14] among lawyers over the law?

[15] A.  I know that well.

[16] Q.  You know that there can be disputes

[17] among good doctors that simply have different

[18] medical opinions?

[19] A.  Oh, indeed.

[20] Q.  A great deal of determining whether

[21] an insured is disabled is in this gray area, is

[22] it not?

[23] A.  Oh, absolutely, yeah.

### Page 0274

[01] Q.  And sometimes insureds aren't

[02] entirely candid with you in the claims process,

[03] are they?

[04] A.  I think the great majority are very

[05] candid and honest.  Granted, there are some who

[06] are not.  There are systems and procedures in

[07] the process to weed out those that are

[08] fraudulent and to verify those who are

[09] legitimate.

[10] Q.  All right.  Have you ever known an

[11] insured to exaggerate subjective claims in the

[12] disability process?

[13] A.  Of course.

[14] Q.  Because it's in their interest to do

[15] so, isn't it?

[16] A.  Sometimes it is, yes.

[17] Q.  Now, where there are disputes over

[18] claims, do you think that Provident, just as

[19] much as a claimant, has a right to have a

[20] legitimate dispute determined by a jury in a

[21] court of law?

[22] A.  Absolutely, that's our system.  I

[23] mean, that's why we are here.  Absolutely.

### Page 0275

[01] Q.  Do you think Provident has ever

[02] correctly denied a claim?

[03] A.  Has ever correctly denied a claim?

[04] Q.  Yes.

[05] A.  Oh, I'm sure they have.

[06] Q.  Do you believe that great majority of

[07] claims that Provident denied should have in fact

[08] been denied under the contract or the applicable

[09] facts.

[10] MR. KENT: I object to the question,

[11] because it calls for speculation as to claims he

[12] has not any knowledge of.

[13] Q.  Do you believe that the company

[14] basically -- do you think Provident is basically

[15] a good company?

[16] A.  Oh, I think they basically are a good

[17] company.  I think there are some cases where

[18] they shade the -- walk the line.

[19] Q.  Given the number of claims that are

[20] processed and handled, the number of claims that

[21] are paid, the number of claims that are denied,

[22] is it inevitable that some of those claims are

[23] going to wind up in the courthouse?

### Page 0276

[01] A.  Obviously.

[02] Q.  Do you think that every time a claim

[03] is denied a suit is filed?

[04] A.  Oh, I'm sure there isn't.

[05] Q.  Would you be surprised, Doctor, that

[06] in virtually every single claim that Provident

[07] denies where a claimant hires a lawyer, at least

[08] in Texas, that the insured always claims that

[09] Provident committed bad faith in some form or

[10] another in denying a claim?

[11] A.  Absolutely, I'm sure that's true.

[12] MR. KENT: Objection as to

[13] speculation on things he knows nothing about.

[14] Q.  Do you think that Provident life has

[15] ever denied a claim relying on a contract where

[16] it does not act in bad faith?

[17] A.  Where it does not act in bad faith?

[18] Q.  Yes.  Do you think it can deny a

[19] claim and just say there's a dispute over this,

[20] we don't think it's payable, without doing

[21] something sinister or doing something bad?

[22] A.  That's purely speculation, but I'm

[23] sure that's true.



## DR. WILLIAM E. FEIST    [1-25-99]

### Page 0277

[01]    Q.   My question, though, in listening to
[02] your testimony, do you believe that every time
[03] Provident denies a claim or every time there's a
[04] dispute over a claim that Provident is acting in
[05] bad faith if it denies benefits?
[06]    A.   No, I don't think it's necessarily
[07] acting in bad faith. I think sometimes they may
[08] take the claim to their advantage other than
[09] giving the benefit of the doubt to the claimant.
[10]    Q.   Let me ask you a quick question here.
[11] I saw that declaration you filed in the Walker
[12] case in California, the declaration and the
[13] little affidavit.
[14]    A.   The Walker case, yes.
[15]    Q.   Did you type that up yourself or did
[16] the lawyers out there type it up?
[17]    A.   The lawyer's office typed it up.
[18]    Q.   So, when the initial document was
[19] typed up, it was mailed to you?
[20]    A.   Actually it was faxed to me.
[21]    Q.   Faxed to you. Did you make any
[22] changes to it, to the fax you got, or did you
[23] just sign it and send it back?

### Page 0278

[01]    A.   I don't recall that I made any
[02] changes, but I read it carefully and signed it.
[03]    Q.   But the wording and the way the
[04] sentences were phrased and everything, that was
[05] put in there by the lawyer that sent it to you,
[06] that wasn't your words?
[07]    A.   That's my words, but he wrote it
[08] down. I mean, I'm not a, I'm not a -- again, as
[09] you said earlier, I'm not an attorney, and that
[10] information was placed in that affidavit based
[11] on what I told the attorney.
[12]    Q.   Okay. But what I'm saying is, you
[13] didn't sit down and dictate it or write it or
[14] write a draft and send it to the lawyer?
[15]    A.   No, I'm not an attorney. I'm not
[16] licensed to practice in California. How could I
[17] do that?
[18]    Q.   Well --
[19]    A.   I mean, that presupposes that I'm an
[20] attorney, filing a brief for the court in the
[21] jurisdiction of California, and I can't do that.
[22]    Q.   So the lawyer, it was the lawyer's
[23] sentence structure and the paragraphs, he put

### Page 0279

[01] together the statement, mailed it to you, you
[02] signed it and adopted it and sent it back?
[03]    A.   That's correct.
[04]    Q.   Were you paid to do that?
[05]    A.   No, sir. I got a free lunch out of
[06] it. That's all.
[07]    Q.   We are seeing your name routinely
[08] showing up in litigation across the United
[09] States.
[10]    A.   I'm not surprised. You get a case
[11] like Dr. Knees, it's going to be out there on
[12] the internet.
[13]    Q.   And, in fact, we just saw your name
[14] on another case in Texas, Dr. Redmond. What did
[15] they do wrong in that case?
[16]    A.   I have no idea who Dr. Redmond is. I
[17] have no knowledge of that case.
[18]    Q.   You don't have any knowledge that you
[19] have been designated as a witness in that case?
[20]    A.   I have no knowledge of that, sir.
[21]    Q.   You've never heard the name Dr.
[22] Redmond?
[23]    A.   Dr. Redmond?

### Page 0280

[01]    Q.   Yes.
[02]    A.   No, sir. I don't recall that I have.
[03] Where is Dr. Redmond located? I might remember
[04] it by location rather than --
[05]    Q.   He's in Texas.
[06]    A.   Obviously. No, I have no knowledge
[07] of that case.
[08]    Q.   Assuming he's in Austin?
[09]    A.   I have no knowledge of that case,
[10] sir.
[11]    Q.   So if I were to ask you in the
[12] Redmond case, do you claim Provident did
[13] something wrong --
[14]    A.   I have no knowledge of the Redmond
[15] case. I told you, sir, I don't know about that
[16] case.
[17]    Q.   And you don't know why you would be
[18] designated?
[19]    A.   Probably because my name is on Dr.
[20] Norman Knee's case a year ago. That's the only
[21] thing I would know.
[22]    Q.   What other cases, as we sit here
[23] today, have you been hired to testify against

### Page 0281

[01] Provident on --
[02]    A.   I would object to that question.
[03]       MR. KENT:  Object to the form. He
[04] has not been hired.
[05]    A.   I have not been hired by anyone. I'm
[06] doing it for altruistic reasons.
[07]    Q.   I apologize, you did say you hadn't
[08] been paid. You are doing it for doctors, right?
[09]    A.   I did it for Dr. Knee. I did it for
[10] Dr. -- the one in California is not a physician,
[11] but it was a medical problem.
[12]    Q.   This one I just read you?
[13]    A.   Yeah, he's not a physician, but he
[14] has a psychiatric problem.
[15]    Q.   Philip Walker. Why did you agree to
[16] do it for him?
[17]    A.   I felt like he -- after presenting
[18] the case for Mr. Teal, I felt like he had been
[19] wronged by Provident.
[20]    Q.   After you -- I'm sorry, I didn't
[21] under -- is that the lawyer?
[22]    A.   Yes. Steven Teal is the lawyer.
[23]    Q.   So the lawyer calls you up and says,

### Page 0282

[01] "Here are all of these facts that I think they
[02] did wrong," you seem to automatically agree with
[03] them that Provident did something wrong in that
[04] case?
[05]    A.   I think in that case that there was
[06] some problems, yes. The other two cases are the
[07] two we speak of today.
[08]    Q.   Let me ask you one other thing. In
[09] the Walker case, did you review --
[10]    A.   The Walker case?
[11]    Q.   The Walker case, the one you gave
[12] this declaration in.
[13]    A.   Okay.
[14]    Q.   Did you review any of his files?
[15]    A.   No, I did not.
[16]    Q.   What did you base this affidavit on,
[17] just what the lawyer told you?
[18]    A.   No, I based it on my experience at
[19] Provident. The record is clear. We have
[20] discussed that throughout this deposition.
[21]    Q.   I see. So you didn't review any of
[22] Walker's medical records --
[23]    A.   No.

## DR. WILLIAM E. FEIST    [1-25-99]

**Page 0283**

[01]    Q.    -- or anything at all?

[02]    A.    No, I did not. Mr. Teal, the

[03]    attorney, described the case very completely and

[04]    told me the situation.

[05]    Q.    Did he describe the case in as good a

[06]    detail as David Kent did?

[07]    A.    No, he did not.

[08]    Q.    Did David Kent describe the case even

[09]    better than the guy in California did?

[10]    A.    David Kent sent me the records. It's

[11]    much better.

[12]    Q.    Okay. Now, in agreeing to testify,

[13]    and especially since you are not charging them

[14]    for it, you said you were doing it for

[15]    altruistic reasons?

[16]    A.    Altruistic reasons.

[17]    Q.    What is that? What altruistic reason

[18]    do you have to testify?

[19]    A.    Well, if you really want to know, Dr.

[20]    Knee is a colleague at another insurance

[21]    company. And several years ago in a meeting he

[22]    indicated that he was having problems with his

[23]    policy with Provident. The reason it all got

**Page 0284**

[01]    started, Dr. Knee was on disability for a number

[02]    of years, and he asked me at a meeting -- the

[03]    time frame is getting away from me. In February

[04]    of '96, "I am disabled, I am having to put in

[05]    monthly statements of disability. Can you see

[06]    about getting me put on more lengthy or more

[07]    long term, six months?"

[08]        So I got his file. I wrote on there,

[09]    I think, "Dr. Knee is disabled. He's not going

[10]    to get any better. He should go to every six

[11]    months review rather than every thirty days

[12]    review." And the next thing I know I'm getting

[13]    called by an attorney in Philadelphia, which is

[14]    in a year ago, December of '97, actually.

[15]    Q.    Doctor, you have answered my

[16]    question. I am running late for a plane.

[17]    Unless there's something else you want to say --

[18]    A.    That how I got started in this thing,

[19]    and, you know, I did it for a colleague, a

[20]    friend. I would ask him to do the same thing

[21]    for me, and that's where we are today.

[22]    Q.    All right. Why are you doing it for

[23]    Dr. Thompson and Dr. Wallace? Because they are

**Page 0285**

[01]    doctors?

[02]    A.    Because they are physicians. One is

[03]    actually a dentist. Health care professionals.

[04]    Q.    You mean just because they are

[05]    professionals, you tend to believe them more

[06]    than you would, say, just a lay claimant?

[07]    A.    I don't think occupation has anything

[08]    to do with honesty and integrity. I think the

[09]    connection is that they are health care

[10]    professionals and as brother, a colleague,

[11]    although I've never met those two individuals, I

[12]    feel obligated to help them if I can.

[13]    Q.    And I understand what you are saying.

[14]    What I don't understand, though, is you had a

[15]    former employer that you say treated you well

[16]    for a number of years and I don't hear you

[17]    making any effort to find out the other side of

[18]    the story, what Provident says or what

[19]    Provident --

[20]    A.    I beg to differ, sir, on the Knee

[21]    case.

[22]    Q.    May I finish my question?

[23]    A.    Surely.

**Page 0286**

[01]    Q.    I don't hear you making any effort to

[02]    hear what's on the other side of the coin before

[03]    you come out here in Birmingham and give

[04]    testimony against Provident. Why?

[05]        MR. KENT: I object to the

[06]    argumentative nature of the question.

[07]    A.    I think in the Dr. Knee case, I

[08]    reviewed all of Provident's file. In these

[09]    particular cases, I have reviewed all of the

[10]    medical information.

[11]    Q.    In Dr. Knee's case, didn't you work

[12]    on the claim when you were at Provident?

[13]    A.    I just made one recommendation. And

[14]    I don't have that in front of me, obviously.

[15]    My recommendation was that Dr. Knee is

[16]    permanently disabled. He should be on every six

[17]    month review. And the thing about Dr. Knee was

[18]    that he had been retired as an osteopath,

[19]    couldn't do osteopathy treatments, but was

[20]    working actively as a medical director for an

[21]    insurance company. I think that was the reason

[22]    he was picked up.

[23]    Q.    But you had looked at his claim in

**Page 0287**

[01]    some capacity while you were an employee?

[02]    A.    That's correct.

[03]    Q.    Which is unlike the situation in Dr.

[04]    Thompson and Dr. Wallace?

[05]    A.    This is correct.

[06]    Q.    Is it a fair statement that you would

[07]    agree to give testimony against Provident in a

[08]    case whether you know anything about the claim

[09]    at all, the underlying claim?

[10]        MR. KENT: Let me object to the form

[11]    of the question in saying testimony against

[12]    Provident.

[13]        THE WITNESS: Any case.

[14]        MR. KENT: As to suggest that the

[15]    doctor is taking sides.

[16]        MR. DAVENPORT: What do you think the

[17]    testimony is today that he's trying to offer.

[18]        MR. KENT: The truth. How about the

[19]    truth?

[20]        MR. DAVENPORT: Well, that's what we

[21]    are trying to find out.

[22]        MR. KENT: How about the truth?

[23]    A.    If I may answer the question, my role

**Page 0288**

[01]    -- I see my role as a Board certified insurance

[02]    medicine physician, obviously having more

[03]    experience in underwriting than in claims, but I

[04]    think I can evaluate a case and see where the

[05]    health care professional, a colleague, if you

[06]    will, has been wronged by the company and I want

[07]    to do what I can to help him.

[08]        MR. DAVENPORT: Object.

[09]    Nonresponsive, move to strike.

[10]    Q.    Doctor, did you finish telling me

[11]    every case you have been talked to, every case

[12]    you are going to testify in so far?

[13]    A.    Yes, sir.

[14]    Q.    Have you talked to anybody else other

[15]    than what you have told me?

[16]    A.    No, sir, I have not.

[17]    Q.    But your testimony today is you

[18]    haven't talked to anybody about the Redmond

[19]    case?

[20]    A.    I know nothing about the Redmond

[21]    case. That's a name I have no knowledge of.

[22]    Q.    You mentioned something in your

[23]    earlier testimony about reserves. You don't

Page 0289

[01] know how Provident sets its, either its claims
[02] reserves or its litigation reserves, do you?
[03]     A.  Not specifically, but in general.
[04] It's -- the liability reserve is mandated by the
[05] insurance regulatory commission.
[06]     Q.  Are you talking about statutory
[07] reserves or GAAP reserves?
[08]     A.  Well, I assume it's statutory, but I
[09] am obviously not knowledgeable about that.
[10]     Q.  Tell me, then, if you purport to have
[11] knowledge of reserves, explain what criteria go
[12] in to set statutory reserves?
[13]     A.  I haven't a clue.
[14]     Q.  What about in setting reserves for --
[15]     A.  You just take the amount of liability
[16] and factor it out the number of years of
[17] liability and that's the number.
[18]     Q.  That's the way it's done?
[19]     A.  That's my understanding.
[20]     Q.  Would you defer to anybody at
[21] Provident on that?
[22]     A.  I would defer to anybody.  I am not
[23] knowledgeable about it.  I would be the first to

Page 0290

[01] admit it.
[02]     Q.  Do you know anything about Generally
[03] Accepted Accounting Principles?
[04]     A.  Generally.
[05]     Q.  Do you know how reserves are set
[06] under these principles?
[07]     A.  I have no idea.
[08]     Q.  Do you know how the company changes
[09] its reserves on a day-to-day basis?
[10]     A.  I have no idea.
[11]     Q.  But you do know this, Doctor, you
[12] know Provident pays a lot of claims, don't they?
[13]     A.  I understand that, and they've got a
[14] lot of reserves in reserve to pay those claims.
[15]     Q.  Do you plan on attending this trial
[16] live as you sit here today?
[17]     A.  I have no idea.
[18]     Q.  As you sit here today, do you plan to
[19] come to Travis County and testify?
[20]     A.  I have no plans.  If you subpoena me,
[21] I'll come.  If you don't, I won't.
[22]     Q.  Well, you're outside subpoena range,
[23] Doctor.  That's why I asked you if you have an

Page 0291

[01] intention of coming.
[02]     A.  I -- It's never been asked.  I would
[03] prefer not to, but if you -- you can't subpoena
[04] me.
[05]     Q.  Doctor, have you understood all of my
[06] questions?
[07]     A.  Yes, sir.
[08]     Q.  Have your answers been true and
[09] correct?
[10]     A.  To the best of my knowledge, yes,
[11] sir.
[12]     Q.  Do you desire to change any of the
[13] answers you have given me here today?
[14]     A.  No, sir.
[15]     Q.  If you testify live at trial, do you
[16] realize that I will use this testimony?
[17]     A.  I understand that fully.
[18]     Q.  And if you testify different on the
[19] witness stand than you've told me--
[20]     A.  That I will perjure myself.
[21]     Q.  -- here today --
[22]     A.  I understand that, yes, sir.
[23]     Q.  That said, do you want to change

Page 0292

[01] anything you have told me here today?
[02]     A.  I don't want to change anything, no,
[03] sir.
[04]     Q.  Have your answers been true and
[05] correct?
[06]     A.  To the best of my knowledge.
[07]         MR. DAVENPORT:  Thank you, Doctor.
[08] It was nice visiting with you.
[09]         THE WITNESS:  My pleasure.
[10]
[11] RE-EXAMINATION BY MR. KENT:
[12]     Q.  Dr. Feist, let me follow up on a few
[13] things.
[14]     A.  Okay.
[15]     Q.  Regarding your willingness to provide
[16] testimony.
[17]     A.  Uh-huh.
[18]     Q.  Do you have any agenda involved in
[19] what you are testifying about or why you are
[20] willing to cooperate with people who ask you?
[21]     A.  I just want to see the proper -- the
[22] appropriate thing done for individuals who I
[23] feel in these cases have been wronged, if you

Page 0293

[01] will, by Provident.
[02]     Q.  Have you testified as to anything
[03] other than the truth in any of those cases?
[04]     A.  No, I have not.
[05]     Q.  And as to your description of the
[06] round-table review process in which you
[07] participated and the overall corporate culture,
[08] is that based on anything other than your
[09] personal experience at Provident?
[10]     A.  That's my personal experience.
[11]     Q.  You were asked about where you were
[12] at 11:45 and where they were and why you didn't
[13] meet with Provident and its lawyers.
[14]     A.  Uh-huh.
[15]     Q.  Did you see me before this deposition
[16] start?
[17]     A.  No, you did not.  No, I did not.
[18] You did not either.
[19]     Q.  Did we go down and have lunch
[20] downstairs?
[21]     A.  Yes, sir.
[22]     Q.  And how was it that I ran into you
[23] before this deposition started?

Page 0294

[01]     A.  I went back to the coffee pot and you
[02] were there.
[03]     Q.  You went back to the coffee pot and I
[04] was there getting a cup of coffee?
[05]     A.  Yes, right.
[06]     Q.  Was there anybody else in this room
[07] that you saw?
[08]     A.  I think the court reporter and this
[09] gentleman, perhaps, were here.
[10]     Q.  Did you see the attorney or the
[11] gentleman from Provident?
[12]     A.  I don't recall that I did.  I don't
[13] recall that we did.
[14]         MR. DAVENPORT:  Kent, do we need to
[15] swear you in?
[16]         MR. KENT:  No, I'm asking him.  You
[17] started that.
[18]     Q.  So as far as you knew, was there
[19] anybody around?  Were you trying to avoid
[20] meeting with them?
[21]     A.  No, I was not trying to avoid them.
[22] I made an effort, when I knew I was going to be
[23] tardy, to call the office and say, "It's 11:30,

## Page 0295

[01] I'm leaving my office. I will be there in
[02] fifteen minutes." And I was here in fifteen
[03] minutes.
[04]    Q.  Now, the question was asked to you
[05] about whether Dr. Thompson's claim was a
[06] subjective claim, vision condition that was a
[07] subjective claim, is that true?
[08]    A.  That's correct.
[09]    Q.  Now, does the fact that a claim is
[10] based on subjective complaints render it any
[11] less true than one based on objective
[12] complaints?
[13]    A.  In my mind, it does not.
[14]    Q.  Does the fact that a claim may be
[15] based on subjective complaints make it any
[16] better candidate for a round-table review
[17] process?
[18]    A.  Perhaps so, in terms of the
[19] subjective nature and interpretation of that
[20] suggestive data, yeah.
[21]    Q.  And is the fact that a complaint is
[22] based on a -- a disability claim is based on a
[23] subjective claim, does that make it any less

## Page 0296

[01] appropriate to pay disability, simply because
[02] it's subjective?
[03]    A.  Oh, no, certainly not.
[04]    Q.  How important are subjective
[05] complaints and claims to a doctor in determining
[06] a person's condition, the treatment of it or its
[07] affect on that person?
[08]    A.  It's very important. It's very
[09] valid.
[10]    Q.  You were asked questions about the
[11] review, the department of -- the occupational
[12] report, I guess it is.
[13]    A.  Yeah.
[14]    Q.  Something called an EZDOT report?
[15]    A.  Uh-huh (indicating affirmatively).
[16]    Q.  And that was among the documents that
[17] you were given ahead of time that I sent to you
[18] at your request, correct?
[19]    A.  This is correct, yes, sir.
[20]    Q.  One was on periodontist and one was
[21] on anesthesiologist, correct?
[22]    A.  This is correct, yes, sir.
[23]    Q.  And I put before you the one on

## Page 0297

[01] periodontist, is that correct?
[02]    A.  That's correct.
[03]    Q.  The -- Mr. Davenport, in asking you
[04] questions, asked you about what the requirements
[05] for accommodation are as to that report,
[06] correct?
[07]    A.  That's correct.
[08]    Q.  What about visual acuity? What does
[09] it say about the needs for visual acuity?
[10]    A.  I'm not sure where you're -- of your
[11] reference.
[12]    Q.  Where it has near acuity.
[13]    A.  Oh, near acuity, okay. Near acuity,
[14] under twenty inches, over twenty
[15] feet.
[16]    Q.  And how often -- what are the demands
[17] for near acuity under twenty inches, according
[18] to the Department of Transportation report on
[19] periodontistry?
[20]    A.  Constant.
[21]    Q.  Constant?
[22]    A.  Constant.
[23]    Q.  Constant. Now, is that true as well

## Page 0298

[01] for anesthesiologists?
[02]    MR. DAVENPORT:  David, I'm going to
[03] order a cab.  Are you going to be -- my cab --
[04] my plane is at 6:20.  And I've got to -- I'll
[05] leave Hartly here to defend it.  Are you going
[06] to be going a long time?
[07]    MR. KENT:  I hope not, but it will be
[08] probably longer than 6:20.  I mean, leaving here
[09] 6:20.
[10]    A.  Yeah, it says constant, near acuity
[11] under twenty inches.
[12]    Q.  And is it your understanding that
[13] that that differs from the demands for
[14] anesthesiologist?
[15]    MR. DAVENPORT:  Can I interrupt you
[16] again?
[17]
[18]    (Whereupon, a discussion was held
[19] off the record.)
[20]
[21]    A.  I am sorry, repeat the question.
[22]    Q.  Is it your understanding that that
[23] differs for the demands for an anesthesiologist?

## Page 0299

[01] I believe this is still a periodontistry report.
[02]    A.  Okay.  Anesthesiologist.
[03]    Q.  No, I think these are both
[04] anesthesiologists -- I mean, periodontist?
[05]    A.  Oh, okay.  I'm sorry.
[06]    Q.  I just had a few copies of the same
[07] report.
[08]    A.  Yeah, I'm --
[09]    Q.  From your recollection, is the
[10] demands for visual acuity at a near level for a
[11] periodontist the same as for an
[12] anesthesiologist?
[13]    A.  I don't know.  I don't recall what
[14] they are.
[15]    Q.  The question was asked, quite a few
[16] questions were asked about the fact that Dr.
[17] Thompson did move to a new occupation, that
[18] being dental anesthesiologist, is that correct?
[19]    A.  That's correct.
[20]    Q.  Now, what is your understanding of
[21] the way that the own occupation policy was
[22] marketed by Provident as to the significance of
[23] a claimant being able to engage in some other

## Page 0300

[01] occupation?
[02]    MR. ECHERD:  Objection. Lack of
[03] foundation, asking for speculation. That's
[04] entirely outside his field.
[05]    A.  Well, I think the own policy
[06] would be basically that one has to be able to
[07] perform the duties of his or her occupation,
[08] the material duties of that occupation as
[09] opposed to any occupation.
[10]    Q.  All right. And, so, in the way that
[11] you were familiar with Provident marketing its
[12] policies, what relevance was it that a person
[13] who was totally disoccupied -- totally disabled
[14] in his own occupation might be able to engage in
[15] another occupation?
[16]    A.  There's no restriction. The language
[17] said his or her own occupation. There's no
[18] stipulation about another occupation or in the
[19] same, in the same medical field, or same medical
[20] area.
[21]    Q.  So, insofar as Dr. Thompson's ability
[22] to engage in a different occupation, that of
[23] dental anesthesiologist is concerned, of what

## DR. WILLIAM E. FEIST [1-25-99]

[01] particular relevance is that to a determination
[02] as to whether he was totally disabled as a
[03] periodontist, an oral surgeon?
[04]     MR. DAVENPORT: Object to leading.
[05]     A.   I think that has no relevance at all.
[06] If he's disabled as a periodontist, he can do
[07] anesthesiology.
[08]     MR. DAVENPORT: Object,
[09] nonresponsive.
[10]     Q.   Questions were asked of you as to
[11] whether there was anything wrong with making
[12] changes in a company to make it more profitable
[13] and keep it in business.  Do you remember that
[14] series of questions?
[15]     A.   I remember that, that's correct.
[16] Yes, sir.
[17]     Q.   From your experience there at
[18] Provident, did you think that that's all that
[19] Provident was doing, just making changes to stay
[20] in business?
[21]     MR. DAVENPORT: Object. Calls for
[22] speculations and conclusions and opinions.
[23]     A.   Well, I think the major emphasis of

[01] the accident department was to control the
[02] credible claims reserve that they were indebted
[03] for, so I think they made efforts to control
[04] that.
[05]     Q.   And does -- even if it's appropriate,
[06] in try to make a profit and stay in business, as
[07] the question was put, does that in your mind --
[08]     MR. DAVENPORT: Come in. Excuse me.
[09] Go ahead. I'm sorry, David.
[10]     MR. KENT: That's all right.
[11]     MR. DAVENPORT: I'm tired. I want to
[12] go home.
[13]     MR. KENT: I understand.
[14]
[15]     (Whereupon, a discussion was held
[16]     off the record.)
[17]
[18]     MR. DAVENPORT: Go ahead. I'm
[19] sorry.
[20]     Q.   My question, Dr. Thompson is, even if
[21] there's nothing wrong with trying to make
[22] profits in a business and keep it in business,
[23] let it stay in business, does that, in your

[01] mind, justify mistreating claimants?
[02]     A.   No, I think not.
[03]     MR. DAVENPORT: Excuse me. Object,
[04] leading, calls for conclusions, argumentative
[05] and is otherwise generally a bad, unacceptable
[06] question.  Other than that, it's fine.  You
[07] may answer.
[08]     THE WITNESS: Did I answer it okay
[09] or --
[10]     MR. KENT: You answered it fine.
[11]     THE WITNESS: Okay.
[12]     Q.   From your experience there at
[13] Provident, how did you see Provident balancing
[14] that line between simply trying to make a profit
[15] and stay in business and treating claimants
[16] fairly on their claims?
[17]     MR. DAVENPORT: Excuse me.
[18] Objection, calls for an opinion.
[19]     A.   Well, I think that they pushed it to
[20] a limit to try to, you know, get the reserves
[21] down any way they could.
[22]     Q.   You were given -- asked a lot of
[23] questions about this Exhibit 3, the Provident

[01] Vision Statement. Do you remember that?
[02]     A.   I remember that well, yes.
[03]     Q.   And the tenor of the questions was
[04] that this was in effect back at the time you
[05] were on the round table, right?
[06]     A.   That was the implication, but I
[07] honestly would have to say I don't recall when
[08] that was published.
[09]     Q.   That's fine. Let me ask you this:
[10] Do you have any problem with this vision
[11] statement of, "Will pay all of the valid claims
[12] and aggressively defend the company against
[13] invalid and fraudulent claims"?
[14]     A.   I think that's a great statement.
[15]     Q.   Now, do you think, that from your
[16] experience, Provident fulfilled that statement
[17] of paying all valid claims?
[18]     A.   That's the question. Sometimes I
[19] think that they --
[20]     Q.   And aggressively defending the
[21] company against invalid and fraudulent claims.
[22] Let me ask you about that. If that's part of
[23] the company's vision statement, from your

[01] experience and your firsthand observation of the
[02] company there in that last year you were there,
[03] did you see any evidence that that was affecting
[04] people's view of how to handle claims?
[05]     MR. DAVENPORT: Object. The question
[06] is vague and ambiguous, calls for an opinion.
[07]     A.   I think that they were again looking
[08] for any way they could possibly do, medical or
[09] otherwise, to deny claims.
[10]     Q.   Was it apparent to you that that idea
[11] of aggressively defending the company had become
[12] the justification for going over the edge as you
[13] described?
[14]     A.   I think so, yes.
[15]     MR. DAVENPORT: Object,
[16] nonresponsive. Hey, David, can Hartly make my
[17] objections?
[18]     MR. KENT: Yes.
[19]     MR. DAVENPORT: Are you going to go
[20] much longer?
[21]     MR. KENT: No.
[22]     MR. DAVENPORT: I would love for you
[23] to be here with me. It's been a blast. You are

[01] a lot of fun.
[02]     MR. DAVENPORT: Can I disrupt you a
[03] minute. Thank you all. Hartly, I told Hartly,
[04] I said, "Hartly, I've got you down to the one
[05] yard line.  I'm going to hand you the ball,
[06] just fall forward."
[07]     THE WITNESS: He wouldn't have an
[08] idea what that means.
[09]     MR. DAVENPORT: Dr. Feist.
[10]     THE WITNESS: My pleasure.
[11]     MR. DAVENPORT: Good to see you.
[12]     THE WITNESS: Yes, sir. Have a good
[13] trip back.
[14]     MR. DAVENPORT: Y'all have a nice
[15] week.
[16]     THE WITNESS: Yes, sir.
[17]
[18]     (Whereupon, Mr. Mark Davenport leaves the
[19]     deposition.)
[20]
[21]     Q.   (BY MR. KENT:) Assuming that the
[22] company was using this vision statement that
[23] they were going to administer claims consistent

## DR. WILLIAM E. FEIST    [1-25-99]

### Page 0307

[01] with good faith claims practices, policy
[02] provisions and legal requirements back during
[03] that last year you were with the company,
[04] assuming this was the company's goal, did you
[05] feel that the round-table review process was
[06] fulfilling that goal of using good faith
[07] practices?
[08]    MR. ECHERD: Objection. Calls for an
[09] opinion that he has not been qualified to give.
[10]    A.  I think the round table was used to
[11] depress the claims.
[12]    COURT REPORTER: I didn't hear you.
[13]    A.  I think the round table was used to
[14] depress the claims.
[15]    Q.  Do you feel that it was being used in
[16] furtherance of good faith practices, assuming
[17] that was in fact the vision statement
[18] adopted by the company at that time?
[19]    MR. ECHERD: Objection. Calls for an
[20] opinion?
[21]    A.  I don't think it was good faith in
[22] many cases.
[23]    Q.  You were also asked the question of

### Page 0308

[01] whether people's medical conditions can change
[02] over time, correct?
[03]    A.  Oh, indeed, indeed.
[04]    Q.  And that people sometimes can get
[05] better?
[06]    A.  Indeed they can.
[07]    Q.  And the assumption of the question
[08] put to you was that that can be a reason for a
[09] change in the way a claim is administered?
[10]    A.  Oh, absolutely.  That's the ongoing
[11] process.
[12]    Q.  But from what you saw in Dr.
[13] Thompson's claim file, did you see any
[14] indication that there had been a change in his
[15] condition for the better?
[16]    A.  There had been none.
[17]    Q.  And, so, all of those questions about
[18] that's a reason to maybe change the way you
[19] change payment of a claim, do you see that as
[20] having any relevance to Dr. Thompson's file?
[21]    A.  No, I think his condition remained
[22] stable throughout the entire time frame.
[23]    Q.  The same thing was asked about is it

### Page 0309

[01] all right for you to go back, or for a company
[02] to go back and correct a mistake, right?
[03]    A.  Indeed.
[04]    Q.  And you were giving your answer that
[05] it was all -- it was okay to correct a mistake?
[06]    A.  If there was a legitimate mistake,
[07] that's correct.
[08]    Q.  And you also tried to express some
[09] comment about how soon the company ought to
[10] correct its mistake?
[11]    A.  Uh-huh (indicating affirmatively).
[12]    Q.  But I think Mr. Davenport objected,
[13] because he didn't want to hear your comment
[14] about that?
[15]    A.  Well --
[16]    Q.  Let me ask my question.
[17]    A.  I'm sorry.  I'm sorry.
[18]    Q.  What is your view about whether there
[19] is an appropriate time to so-called correct the
[20] mistake on the record?
[21]    A.  Well, I think my concept of
[22] adjudicating claims is that when the initial
[23] claim comes in, there has been a thirty to sixty

### Page 0310

[01] day window when the claim should be adjudicated
[02] and the person should be on disability or not.
[03] Now, if it goes out beyond six months to a year,
[04] then, you know, it's basically an ongoing thing.
[05] So, if it goes beyond a year, it seems to me
[06] that the company, really, has no right to go
[07] back and change that.
[08]    Q.  Well, let's take Dr. Thompson's
[09] situation where he was put on claim and approved
[10] on claim in 1989.
[11]    A.  Uh-huh (indicating affirmatively).
[12]    Q.  And, then, eight and a half years
[13] later in 1997, the company decides to terminate
[14] his claim?
[15]    A.  Uh-huh (indicating affirmatively).
[16]    Q.  Now, assuming that they want to say,
[17] well, gee, that was just a mistake in 1989, we
[18] never should have done it, do you think that
[19] that's fair?  Do you think that's showing good
[20] faith according to this vision statement to come
[21] back in and say, "We're just correcting a
[22] mistake"?
[23]    MR. ECHERD: Objection. Calls for

### Page 0311

[01] speculation and calls for an opinion.
[02]    A.  Well, I think without demonstrable
[03] improvement in Dr. Thompson's situation, i.e.,
[04] his vision, that it's not appropriate that long
[05] interval to come back and say, "Oh, we made a
[06] mistake."  It seems -- you know, it seems to me
[07] there's some finite time.  I picked the term six
[08] months -- I mean, twelve months, to adjudicate
[09] the -- make the initial evaluation in three to
[10] six months and maybe it would take a year to
[11] make sure you didn't make a mistake.  If it gets
[12] out beyond a year, unless there's demonstrable
[13] improvement, I think the company should continue
[14] do pay the claim.
[15]    Q.  The questions were asked you whether
[16] in the round-table review process, Ralph Mohney
[17] ever came out and said these words or words to
[18] this effect of, "Don't bother me with the facts,
[19] this claim is too large, we need to cut it off,
[20] we need to save money."  Do you remember that
[21] series of questions?
[22]    A.  Uh-huh, oh, yeah.
[23]    Q.  And I believe you said that he never

### Page 0312

[01] said those words directly?
[02]    A.  That's correct.
[03]    Q.  Okay.  Did he have to say those words
[04] in order for that message to come across?
[05]    MR. ECHERD: Objection. Calls for
[06] speculation.
[07]    A.  Well, I think that he didn't have to
[08] say the words.  I think the implication of the
[09] whole process, the evening round table or
[10] whatever you want to call it was to do that.  I
[11] see no other reason to have them.  We are
[12] talking about a lot of time involved by a lot of
[13] people.
[14]    Q.  Was there -- and was there any
[15] question in your mind at the time you were going
[16] through this process in 1995 and early 1996, of
[17] that being the motivation for the round-table
[18] review?
[19]    A.  I see no other reason for it.
[20]    MR. ECHERD: Objection. Calls for
[21] speculation. Excuse me.
[22]    Q.  You can answer the question.
[23]    A.  I see no other reason for it.



### DR. WILLIAM E. FEIST  [1-25-99]

**Page 0313**

[01] Q. And at the time, did you see any
[02] other reason for it?
[03] A. I did not.
[04] Q. You were asked, also, questions about
[05] the type of records that -- concerning Dr.
[06] Thompson's claim that were submitted to you.
[07] Remember?
[08] A. Yes, sir.
[09] Q. And you were trying to list off what
[10] some of those documents were, is that right?
[11] A. That's correct.
[12] Q. Among the documents that were given
[13] to you, that I mailed to you, did that include
[14] the April 11, 1989 letter from Dr. Vodvarka, To
[15] Whom It May Concern, describing Dr. Thompson's
[16] condition?
[17] A. Yes, sir, it was.
[18] Q. And all of these documents have been
[19] produced and are part of the record. This one
[20] is from Provident's files, PLA document 129.
[21]        COURT REPORTER: Spell his last name.
[22]        MR. KENT: I'm sorry?  Oh, Vodvarka.
[23] V-O-D-V-A-R-K-A.

**Page 0314**

[01] Q. And this is the one where Dr.
[02] Vodvarka wrote in April of 1989 that the
[03] presbyopia has increased at a faster rate than
[04] normal and that the occupation of a periodontist
[05] for Dr. Thompson required visual, uh, visual
[06] demands at multiple working distances, correct?
[07] A. This is correct, yes, sir.
[08] Q. And at the conclusion he said, "I
[09] have not found a satisfactory optical correction
[10] for Dr. Thompson," correct?
[11] A. This is correct and they worked for
[12] several months trying to find that, actually.
[13] Q. And among the documents that were
[14] sent to you was a Provident internal memorandum
[15] to the file from 1989 from their Austin office,
[16] correct?
[17] A. This is correct, yes, sir.
[18] Q. And this is from Henry Dowdle,
[19] D-O-W-D-L-E, CLU and CHFC, certifications that
[20] he held in the Austin office, correct?
[21] A. This is correct.
[22] Q. And didn't he say in his report in
[23] 1989: "Without a doubt, because of his

**Page 0315**

[01] limitations, he knew continuing to practice as
[02] he had was not a possibility"?
[03] A. This is correct?
[04] Q. And among the documents that were
[05] sent to you were the attending physician
[06] statements from Dr. Wesley Herman, an
[07] ophthalmologist in 1989, correct?
[08] A. That's correct.
[09] Q. And those show that according to his
[10] records and his recommendations, Dr. Thompson
[11] was disabled, is that correct?
[12]        MR. ECHERD: Object to leading.
[13] A. This is correct.
[14] Q. And among the documents that you were
[15] given was an October 18, 1989 report from Dr.
[16] Thomas Henderson of Austin, an independent
[17] medical examination, correct?
[18] A. That's correct, yes, sir.
[19] Q. And this one shows that it has got
[20] Provident's "Received" stamp on it, correct
[21] (indicating)?
[22] A. This is correct.
[23] Q. And in this report, among the things

**Page 0316**

[01] that you were able to read was a statement from
[02] Dr. Henderson regarding Dr. Thompson.  "He is,
[03] in my opinion, effectively disabled from his
[04] chosen profession as a periodontist at this
[05] time."  Correct?
[06] A. This is correct, yes.
[07] Q. And back on the back, he concluded
[08] his report to Provident, saying, "I found this
[09] this claim to be true and valid," correct?
[10] A. This is correct.
[11] Q. And other documents that you were
[12] given was another internal Provident memorandum
[13] from Gini Terpening, T-E-R-P-E-N-I-N-G, of the
[14] Austin branch office, dated February 13, 1992,
[15] saying, "Dr. Thompson has no treatment options
[16] and can never go back to dental practice, so is
[17] there any need for him to see a doctor on a
[18] continuing basis?"
[19] A. Yes.
[20] Q. That's among the documents you were
[21] given to review, correct?
[22] A. That's correct.
[23] Q. And there is another one that you

**Page 0317**

[01] were given.  This is another internal document
[02] from Provident, dated February 19, 1992,
[03] correct?
[04] A. That's correct.
[05] Q. And this is the request to Dr.
[06] O'Connell?
[07] A. This is correct.
[08] Q. Following up on Gini Terpening's
[09] question, "Do we need to send Dr. Thompson off
[10] for continuing medical reviews," correct?
[11] A. This is correct, uh-huh.
[12] Q. And Dr. O'Connell, upon reviewing the
[13] file, wrote in his handwriting that he
[14] recommended maybe an annual physical or an
[15] annual statement from an attending physician,
[16] correct?
[17] A. Yes, it says every year.  Basically
[18] annually, yes.
[19] Q. And there's absolutely no indication
[20] on that report, is there, from Dr. O'Connell,
[21] in-house at Provident at Chattanooga, of any
[22] question about the validity of Dr. Thompson's
[23] disabled claim, correct?

**Page 0318**

[01] A. I see none, that's correct.
[02] Q. And among the other documents you
[03] were given was a letter from May 12, 1992 from
[04] Dr. Vodvarka to Provident.  It bears Provident's
[05] "Received" stamp, correct (indicating)?
[06] A. That's correct, uh-huh.
[07] Q. And his conclusion regarding Dr.
[08] Thompson is, "These are conditions that
[09] generally do not improve"?
[10] A. This's correct.
[11] Q. And among the other documents you
[12] received was a Provident in-house field report
[13] from Antoinetta Page dated November 2, 1994,
[14] correct?
[15] A. This is correct.
[16] Q. Excuse me.  It's to Antoinette Page
[17] from David Pavias, a field claims
[18] representative, correct?
[19] A. Yes. P-A-V-L-A-S.
[20] Q. And his recommendation was, "An IME
[21] was previously done that verified the insured's
[22] disability.  Please continue benefits, as I see
[23] nothing further that can be done at this time"?

## DR. WILLIAM E. FEIST   [1-25-99]

### Page 0319

[01]   A. This is correct.

[02]   Q. And another document that you

[03] received was an in-house internal Provident

[04] document dated sometime in 1996 from a Melissa

[05] Davez. Does that name mean anything to you

[06] Melissa Davez?

[07]   A. No, I'm not familiar with that

[08] person.

[09]   Q. Okay. And the question was, "Do you

[10] agree that the medical condition totally

[11] prevents the insured from working in his

[12] occupation?" And the answer, circled on that

[13] document is "yes" with the word "currently,"

[14] correct?

[15]   A. Currently, yes, uh-huh.

[16]   Q. And among the other documents you

[17] received was another Provident memorandum dated

[18] April 2nd, 1997, regarding Genex audits of SHU

[19] files, correct?

[20]   A. This is correct, uh-huh.

[21]   Q. And attached to that was, or along

[22] with that was a handwritten note concerning the

[23] Genex review, dated 4-30-97, correct?

### Page 0320

[01]   A. That's correct.

[02]   Q. Then, you were also given an "Eye

[03] Medical Advisor's Evaluation of Disability form

[04] dated June 27, 1997, correct?

[05]   A. Actually it's June 10, 1997.

[06]   Q. Or it's signed down at the bottom by

[07] Steve Anderson, M.D.

[08]   A. Oh, I'm sorry. I'm sorry. Yeah,

[09] yeah, you're right.

[10]   Q. Signed at the bottom by Steve

[11] Anderson, M.D. July 10, 1997, correct?

[12]   A. Yeah, okay, correct.

[13]   Q. Do you know Dr. Anderson or who he

[14] is?

[15]   A. I know of him. He's an

[16] ophthalmologist in Chattanooga.

[17]   Q. Even at that time, was there anything

[18] on this report in-house to Provident that said

[19] that anyone had concluded Dr. Thompson was not

[20] disabled?

[21]   A. It does not say he is not disabled.

[22] He did recommend another physician to be seen.

[23] But I think the comment might be made here that

### Page 0321

[01] this is an unusual situation, that this very

[02] esteemed ophthalmologist said this is an unusual

[03] situation. I have never seen one quite like

[04] this and he needs to see a specialist in

[05] Houston. The records don't indicate that he

[06] ever did. And this is a very unique case. I

[07] have never seen one quite like it.

[08]   Q. And one of the other things you were

[09] given — well, before I leave that, the point,

[10] though, is that even Dr. Anderson, an

[11] ophthalmologist, was not saying in his opinion

[12] Dr. Thompson was not disabled?

[13]   A. That is correct, yes.

[14]   Q. And, then, among the other documents

[15] you were given was a report from Dr. Hendrix in

[16] Round Rock to Provident, dated September 25,

[17] 1997, along with his eye examination chart?

[18]   A. That's correct.

[19]   Q. And that's the one that Mr. Davenport

[20] asked you about, in which Dr. Hendrix said,

[21] "Well, it's just a subjective complaint," is

[22] that right?

[23]   A. That's correct, it's presbyopia.

### Page 0322

[01]   Q. And among the other documents that

[02] you did receive were letters that Lynn Thompson

[03] himself wrote back in 1989 to Dr. Herman?

[04]   A. Uh-huh (indicating affirmatively).

[05]   Q. His ophthalmologist, is that correct?

[06]   A. That's correct.

[07]   Q. And you also received a copy of his

[08] letter that he wrote in 1997 to Dr. Hendrix,

[09] correct?

[10]   A. That's correct. That's correct.

[11]   Q. And those letters described the

[12] nature of his complaint.

[13]   A. I think Dr. Thompson made a good

[14] faith effort to explain the situation to these

[15] ophthalmologists to get an adequate review.

[16]   Q. Okay. Looking at Dr. Hendrix's

[17] report of September 25, 1997, which by the way,

[18] does bear a Provident "Received" stamp, does it

[19] not?

[20]   A. Yes, sir, it does.

[21]   Q. And that is also, for your

[22] information, a deposition exhibit in several

[23] other depositions. From your review of that, is

### Page 0323

[01] there any indication that Dr. Hendrix made any

[02] investigation or evaluation of the occupational

[03] demands of a periodontist?

[04]   MR. ECHERD: Objection, speculation

[05]   A. I see no —

[06]   MR. ECHERD: Calls for speculation.

[07]   A. I see no indication that he made any

[08] evaluation of his occupational demands. This is

[09] just a straight eye exam, refraction, as he

[10] might do in any routine patients coming into his

[11] office.

[12]   Q. In fact, if you go back and compare

[13] Dr. Henderson's report from 1989, he has a

[14] specific measurement in here, does he not, that

[15] says, regarding Dr. Thompson, "He is unusually

[16] susceptible to blur with a plus 0.50 over this

[17] and a negative 0.75 over and has approximately a

[18] three centimeter range of clear vision centered

[19] at eighteen inches with this add." Do you see

[20] that?

[21]   A. Yes.

[22]   Q. It appears that Dr. Henderson

[23] actually made a measurement of his range of

### Page 0324

[01] vision?

[02]   A. That's correct.

[03]   Q. Is there any indication in Dr.

[04] Hendrix's report in 1997 that he made any

[05] measurement of this range of vision?

[06]   A. I see none.

[07]   Q. And among the other documents we gave

[08] you was a report, a letter from Provident life,

[09] October 15, 1997 to Lynn Thompson telling him

[10] they were terminating his benefits, correct?

[11]   A. That's correct.

[12]   Q. You also received a copy of the

[13] December 10, 1997 report from Dr. Wes Herman,

[14] the treating ophthalmologist, to Provident

[15] reconfirming Dr. Thompson's disability, correct?

[16]   A. This is correct, uh-huh.

[17]   Q. You also received a January 16, 1998

[18] internal memorandum from Dan Christner of

[19] Provident discussing the claim, correct?

[20]   A. This is correct, uh-huh.

[21]   Q. You also received the January 16,

[22] 1998 letter from Provident to Dr. Hendrix in

[23] Round Rock with his handwritten note in reply,

## Page 0325

[01] correct?
[02]    A.  This is correct, uh-huh.
[03]    Q.  Followed by a January 29, 1998 letter
[04] from Provident to Dr. Thompson saying, "We stand
[05] by our termination decision," correct?
[06]    A.  This is correct.
[07]    Q.  And, then, there is a letter that you
[08] were given, a vocational rehabilitation log,
[09] February 13, 1998 from Provident by Susan
[10] Hunter.  That was among the documents I sent to
[11] you, isn't it?
[12]    A.  That's correct, uh-huh.
[13]    Q.  And did you notice down here at the
[14] bottom, where they are discussing what Dr.
[15] Hendrix did and did not do.  It says, "Regarding
[16] testing for depth perception, I did not see note
[17] in the IME report from Doctor Hendrix"?
[18]    A.  That's correct, uh-huh.
[19]    Q.  So Provident itself seemed to
[20] recognize in its own reports that Dr. Hendrix
[21] had not measured the very thing that Dr.
[22] Henderson did?
[23]    MR. ECHERD:  Objection.  Calls for

## Page 0326

[01] speculation and conclusion.
[02]    A.  I would agree.  If I may add on the
[03] record, Susan Hunter is a specialist in visual
[04] impairment.  That's her training and expertise.
[05]    Q.  And there's also a report that we
[06] gave to you from Allan Ey, E-Y, from California,
[07] March 3, 1998, an occupational report that he
[08] mailed to Susan Hunter, or provided for Susan
[09] Hunter at Provident.  And that was among the
[10] documents we gave you as well?
[11]    A.  I don't believe this was included.
[12] If I may have a moment to read it.
[13]    Q.  Certainly.
[14]    A.  It's quoting from some of --
[15]    COURT REPORTER:  I didn't hear you.
[16] I'm sorry.
[17]    A.  I'm sorry.  This article is quoting
[18] from some other data.  Okay.  Yeah.
[19]    Q.  But do you notice that one of the
[20] items in his report, when he is trying to
[21] evaluate the visual demands of a periodontist,
[22] this is on page two of his report, and then over
[23] on page three, he says, "Accommodation."  What

## Page 0327

[01] does he say about accommodation?
[02]    A.  "Accommodation:  Necessary when
[03] performing examinations and when cutting soft or
[04] bony tissue."
[05]    Q.  So, according to this Allen Ey,
[06] accommodation, visual accommodation for a
[07] periodontist is necessary when performing exams
[08] and when cutting soft and bony tissue, correct?
[09]    A.  Exactly, yes, sir.
[10]    Q.  But over here about dental
[11] anesthesiologist, what did he say under dental
[12] anesthesiologist was the demand for
[13] accommodation, visual accommodation?
[14]    A.  "Not applicable."
[15]    Q.  That it's not even applicable --
[16]    A.  Not even applicable.
[17]    Q.  -- to the job requirements of being a
[18] dental anesthesiologist?
[19]    A.  That is correct.
[20]    Q.  And that's a document that was mailed
[21] to Provident in March of 1998?
[22]    A.  Uh-huh (indicating affirmatively).
[23]    Q.  Months after they had already denied

## Page 0328

[01] the -- Dr. Thompson's claim?
[02]    A.  This is correct.
[03]    Q.  And we haven't even gone over all of
[04] the documents that I provided to you, have we?
[05]    A.  That's correct.
[06]    Q.  You also had several other attending
[07] physician statements and some medical records,
[08] correct?
[09]    A.  Indeed.
[10]    Q.  Based on your review of the documents
[11] and our review of these, was it -- did you see
[12] any indication that the medical condition of Dr.
[13] Thompson had changed from 1989 through 1997 or
[14] even to this day?
[15]    A.  I see no indication that it had
[16] changed during that time frame.
[17]    Q.  Or any indication that he was any
[18] more capable of being a periodontist now than he
[19] was in 1989?
[20]    A.  Certainly not.
[21]    Q.  The question was asked to you whether
[22] you had any knowledge if these particular claims
[23] went to the round table?

## Page 0329

[01]    A.  That's correct.
[02]    Q.  And you did not know?
[03]    A.  I did not know.
[04]    Q.  But you also offered the comment that
[05] Mr. Davenport objected to, about how you
[06] compared these particular claims, the one of Dr.
[07] Thompson and the other doctor, other claimant,
[08] to what you saw happening in the round-table
[09] process?
[10]    A.  Uh-huh (indicating affirmatively).
[11]    Q.  And I am -- that's a question I went
[12] to ask you, sir.  What similarities did you see
[13] in reviewing these claim files of what has
[14] happened to these doctor, Dr. Thompson and the
[15] other claimant --
[16]    A.  -- Dr. Wallace.
[17]    Q.  Dr. Wallace, to what you saw and
[18] experienced in the round-table review process in
[19] 1995, if any?
[20]    MR. ECHERD:  I'm going to object on
[21] the basis that Dr. Feist has already testified
[22] that he did not review the entire claim file.
[23] He only reviewed the portions of the claim file

## Page 0330

[01] that was sent to him.  I object on that basis
[02] and, also, that it calls for speculation and
[03] opinion.
[04]    MR. KENT:  You can answer the
[05] question.
[06]    A.  Well, I think the two cases we
[07] reviewed today, Dr. Thompson and Dr. Wallace are
[08] individuals who have been on claim for a number
[09] of years and no, to my mind, my review, no
[10] demonstrable change in their medical conditions.
[11]    If Dr. Thompson had some
[12] operation or something that corrected his
[13] problem, that's one thing.  There's no
[14] indication that he had such treatment.  And
[15] similarly with Dr. Wallace, there's no change.
[16] And I think that's the process that I object to.
[17]    Q.  And did, in your mind, the change in
[18] corporate culture that Provident references in
[19] its 1997 annual report was -- how did that
[20] change in corporate culture relate to what was
[21] going on with the round-table review, what you
[22] saw and experienced?
[23]    MR. ECHERD:  Objection.  Calls for

## DR. WILLIAM E. FEIST   [1-25-99]

### Page 0331

[01] speculation and calls for opinion.
[02]   A.  I think the round table is designed
[03] to bring up the files that had been on – the
[04] individual had been on claim for a number of
[05] years and trying to find some way to evaluate
[06] and/or terminate them.
[07]   Q.  From your review of these files and
[08] compared with your experience inside the company
[09] in 1995 and 1996, is Dr. Thompson's claim and
[10] Dr. Wallace's claim an outgrowth of the process
[11] you saw in place back then?
[12]   MR. ECHERD:  Objection. Calls for
[13] speculation and calls for opinion.
[14]   MR. KENT:  Go ahead.
[15]   A.  Yes, I think so.  Yes, indeed.
[16]   Q.  You were also asked some questions
[17] about what you knew and didn't know about the
[18] events going on within the company with regard
[19] to its products that it was selling.
[20]   I will show you what we've marked,
[21] what I'm marking for identification purposes as
[22] Exhibit 4, which is just a printout of the 10-K
[23] report filed by Provident with the Securities

### Page 0332

[01] and Exchange Commission for the year ending
[02] December 31, 1996.
[03]
[04]   (Whereupon, Plaintiff's Exhibit 4
[05]   was marked for identification
[06]   and same is attached hereto.)
[07]
[08]   A.  That's correct.
[09]   Q.  If you will turn over to the third
[10] page of the document, which is just an excerpted
[11] page, I have highlighted a section in there.
[12] Take a moment to read it to yourself.
[13]   A.  (Witness reading document.) Indeed.
[14]   Q.  And the quotation that I highlighted
[15] is: "The management of the company initiated a
[16] comprehensive analysis of its overall corporate
[17] strategy in 1994. An important conclusion
[18] related to the individual disability income line
[19] was that the combination of noncancellable
[20] pricing guarantees and long-term non-occupation
[21] coverage is a risk which is very difficult to
[22] manage in today's environment.  Therefore, in
[23] 1995, Provident discontinued selling individual

### Page 0333

[01] noncancellable contracts with the long-term
[02] own-occupation provision other than conversion
[03] policies available under existing contractual
[04] arrangements.  Additionally, after January 1,
[05] 1995, lifetime benefits were not available on
[06] any basis and maximum issue and participation
[07] limits of $10,000 were applied to all physicians
[08] and dentists." I read that correctly?
[09]   A.  You did indeed.
[10]   Q.  And when you were there at the
[11] company, were you aware of those types of
[12] changes being made?
[13]   A.  Yes, sir, I was.
[14]   Q.  And were you aware from your time at
[15] the company from these administrative meetings
[16] going on as to the reason needed for these types
[17] of changes?
[18]   A.  Well, again, basically the large
[19] liability claims area.
[20]   Q.  And, in fact, on the previous page of
[21] this document, it tells us that the – in the
[22] right – or the change to reserves that you
[23] talked about, the study resulted in a 423

### Page 0334

[01] million dollar pretax or 275 million dollar
[02] after-tax charge to operating earnings.  Was
[03] that about the number you remember?
[04]   A.  That's about the number I remember.
[05] Yes, indeed.  Yeah.
[06]   Q.  And that's after tax charged to
[07] operating earnings of 275 million dollars?
[08]   A.  That was my 300 million dollar
[09] figure.
[10]   Q.  Did that put pressure on the
[11] company, from what you heard and saw and lived
[12] and experienced or within the company?
[13]   A.  Indeed.  Indeed.  I think they were
[14] very concerned about that.
[15]   Q.  And these changes we are talking
[16] about, the 275 million dollar after-tax charge
[17] to operating earnings, the change in the
[18] policies taking place in 1995 and the
[19] institution of the round-table review process,
[20] was that all part of this response to the
[21] losses?
[22]   MR. ECHERD:  Objection, Doctor.
[23] That calls for speculation.

### Page 0335

[01]   A.  That would be my impression that
[02] these activities were related to the round table
[03] and all of that was related to the large
[04] liability.
[05]   Q.  When you say that's your impression,
[06] is that just some – I want to make sure we
[07] don't have an argument about where that
[08] impression comes from.  Is that based on your
[09] knowledge of what went on in the company or are
[10] you just speculating?
[11]   A.  Well, I would have to say my
[12] knowledge, since I was there at the time.
[13]   Q.  Okay.  Thank you.
[14]   A.  This pretty well documents it right
[15] there (indicating), the statement made for
[16] federal regulatory agencies.
[17]   Q.  And is all of this part of what you
[18] described as the change in culture from the
[19] company from a family-run-and-operated business
[20] to one chasing profits?
[21]   A.  Yes, I would say so.
[22]   Q.  Is that why you left the company?
[23]   A.  Basically, yes, sir.

### Page 0336

[01]   Q.  We have been here now for five and a
[02] half hours, I believe.  Is that right?
[03]   A.  Yeah.
[04]   Q.  I appreciate all of your time.  I
[05] believe one of the things Mr. Davenport asked
[06] you was, the very words he used were that you
[07] felt that Dr. Thompson and Dr. Wallace had –
[08]   A.  Wallace.
[09]   Q.  – received a raw deal from
[10] Provident?
[11]   A.  Yes, he used those words, yes, sir.
[12]   Q.  And that was Provident's lawyer's
[13] choice of words, a raw deal?
[14]   A.  As I recall, that's correct.
[15]   Q.  Do you agree with his choice of words
[16] as to how they had been treated?
[17]   MR. ECHERD:  Objection.  Objection.
[18] Let me state my objection, Doctor.  As I recall,
[19] Mr. Davenport was paraphrasing some earlier
[20] testimony.  And I object to the question on the
[21] basis that it calls for opinion.
[22]   Q.  Let's clarify that.  Mr. Davenport
[23] certainly wasn't agreeing with you, but those

## DR. WILLIAM E. FEIST    [1-25-99]

**Page 0337**

[01] were the words he used to paraphrase the
[02] testimony earlier in the day, correct?
[03]    A.  I would say so, yes, sir.
[04]    Q.  Having said that, and recognizing and
[05] accepting the objection as to -- of the opinion
[06] being expressed, do you feel that's a fair
[07] characterization of how Dr. Thompson and Dr.
[08] Wallace have been treated by Provident?
[09]    A.  I do.
[10]       MR. KENT:  Thank you.
[11]
[12] EXAMINATION BY MR. ECHERD:
[13]    Q.  Doctor, you mentioned the fact that
[14] this special charge, I believe, was taken in the
[15] fall of 1993.  Do you recall that being the time
[16] of the special charge?
[17]    A.  That's my recollection, yes, sir,
[18] that's correct.
[19]    Q.  And the round-table review was not
[20] begun until some year and a half after that
[21] special charge was taken, is that correct?
[22]    A.  That's correct.
[23]    Q.  You mentioned that Dr. -- that you

**Page 0338**

[01] could see nothing in the medical records which
[02] would indicate that there had been a change in
[03] Dr. Thompson's medical condition since the
[04] inception of his claim?
[05]    A.  That's correct, sir.
[06]    Q.  One other reason for questioning a
[07] claim, an ongoing claim might be a change in an
[08] insured's activities, is that correct?  Do you
[09] agree with that?
[10]    A.  Only so much as it relates to the own
[11] occ definition of that individual's activities.
[12]    Q.  Well, if an insured was -- his
[13] activity level had changed during the time that
[14] he was on a claim that might be a reason to
[15] question that claim?
[16]    A.  Yes, of course.
[17]    Q.  As a general proposition?
[18]    A.  Sure, as a general statement, yeah.
[19]    Q.  And, in fact, Dr. Thompson, when his
[20] claim was initially approved, he was unemployed
[21] at that time, is that correct?
[22]    A.  I can't speak to that.  I think it
[23] -- I guess if you mean that he had left his

**Page 0339**

[01] practice, I guess he was unemployed.  But I
[02] think the reason he left his practice, because
[03] he couldn't practice periodontics.
[04]    Q.  And during the time he was on claim,
[05] there was a change in that -- in his activities?
[06] Do you recall seeing an indication of that in
[07] the records?
[08]    A.  Well, there was a time when he left
[09] periodontics practice and entered dental
[10] anesthesia.  And I don't know what he did in the
[11] interim.  I have no knowledge of that.
[12]    Q.  Well, at some point in time, he
[13] entered a new practice of anesthesia, dental
[14] anesthesia?
[15]    A.  That's correct, yes, sir.
[16]    Q.  So, although there was not a change
[17] in his medical condition during the time he was
[18] being paid benefits by Provident, there was
[19] certainly a change in his activities?
[20]    A.  Oh, indeed.  Indeed.
[21]    Q.  Which can be another reason to
[22] question or reexamine?
[23]    A.  Reexamine.  I think you have the

**Page 0340**

[01] right to reexamine, but unless there's some
[02] change in his basic medical impairment that
[03] prevents him from practicing periodontics, it's
[04] a moot point.
[05]       MR. ECHERD:  That's all I have.
[06]
[07]    Q.  Let me follow up on that.  Now, if
[08] the policy was in effect in 1989 when Dr.
[09] Thompson went on benefit, then it obviously must
[10] have been sold sometime prior to that, correct?
[11]
[12]    A.  Oh, indeed.  Indeed.
[13]    Q.  You don't know, nor would I expect
[14] you to know when the policy was issued, do you?
[15]    A.  I don't recall.  It may be, it may
[16] have been in some of the material you sent me,
[17] but I don't recall at this moment.
[18]    Q.  That's fine.  I will show you what
[19] was used as Exhibit 2 in Robert Moore's
[20] deposition, which is a specimen policy for the
[21] 334 policy.
[22]    A.  Uh-huh.
[23]    Q.  And it has on the page, page four,

**Page 0341**

[01] the definition of total disability and it says,
[02] "Total disability means that due to injuries or
[03] sickness you are not able to perform the
[04] substantial and material duties of your
[05] occupation."  That's what you have quoted to us
[06] before, correct?
[07]    A.  Indeed.  Indeed.
[08]    Q.  And out to the left, it has a typed
[09] explanation or comment about this definition of
[10] total disability, correct?
[11]    A.  Yes.
[12]    Q.  This is a marketing brochure, isn't
[13] it, for salesmen to use to explain what the
[14] policy provisions are?
[15]    A.  Indeed.  Indeed.
[16]    Q.  And what Provident says in its
[17] marketing brochure is that this definition of
[18] total disability, I am going to quote, is the
[19] best definition available.  You are totally
[20] disable -- you are totally disabled even if you
[21] can work in another occupation?
[22]    A.  That's what it says and that's the
[23] way the policies are sold.

**Page 0342**

[01]    Q.  And that was one of the benefits, one
[02] of the distinctive characteristics?
[03]    A.  One of the distinction of Provident
[04] policies in that time frame.
[05]    Q.  That was one thing that helped
[06] Provident achieve its position of superiority in
[07] the marketplace?
[08]    A.  Exactly.
[09]       MR. ECHERD:  Objection.  Calls for
[10] speculation.
[11]    A.  Exactly.
[12]    Q.  From your tenure of fourteen years
[13] with the company and eight years as a Vice
[14] President, do you feel that you have enough
[15] knowledge of the way that Provident marketed
[16] itself and positioned itself within the industry
[17] to know this answer?
[18]    A.  That's correct.  That's the way these
[19] policies were sold and that was their forte, if
[20] you will.
[21]    Q.  Okay.  Now, let's compare that, the
[22] way that this policy was sold and the way
[23] Provident achieved its position in the

## DR. WILLIAM E. FEIST    [1-25-99]

### Page 0343

[01] marketplace, with what we see in Exhibit 4, the
[02] 1986 10-K. The quotation that I read to you
[03] that they have decided to discontinue
[04] own-occupation policies, right?
[05]    A. That's correct.
[06]    Q. And from your experience there at the
[07] company, did you see this reflected that people
[08] did not like the own-occupation policy because
[09] of its expensive definition?
[10]    MR. ECHERD: Objection. Calls for
[11] speculation.
[12]    A. I think the impression was that in
[13] this time frame that those policies, as sold in
[14] the eighties and early nineties, had a great
[15] degree -- was, in a great degree, the problem.
[16] I mean, they sold so many of these policies and
[17] now these folks are coming on claim and that was
[18] the big claim reserve and that we ought to --
[19] Provident ought to quit selling these policies
[20] because they have been too much liability. We
[21] ought to cut back as is indicated here
[22] indicating.
[23]    Q. That's based on your involvement with

### Page 0344

[01] the company and your direct firsthand knowledge?
[02]    A. Yes, sir.
[03]    Q. Now, let's follow that up now, here
[04] we are in 1997, 1998 and 1999, where someone
[05] like Dr. Thompson with an own-occupation policy.
[06] What conclusion do you draw about the great
[07] emphasis that Provident now seems to be placing
[08] on the fact that Dr. Thompson was able to go
[09] into another profession, dental
[10] anesthesiology?
[11]    MR. ECHERD: Objection. Calls for a
[12] conclusion. Calls for speculation. And for the
[13] doctor to testify about what happened in 1988,
[14] or 1987 when he wasn't there, it calls for
[15] speculation on his part.
[16]    Q. Do you have any opinion about that?
[17]    A. Well, I think if an individual buys
[18] an own occ policy in good faith in 1987 or
[19] whenever this was issued, that as long as he
[20] pays his premiums he has a right to expect pay
[21] out of his own occ, irrespective of what he does
[22] after he goes on disability, whether it's in the
[23] same general field of medical endeavor or not.

### Page 0345

[01]    Q. Would it suggest to you that Dr.
[02] Provident's great interest in the fact that Dr.
[03] Thompson has gone into another profession
[04] indicate · is consistent with their retreatment
[05] from the own-occupation policy that you
[06] experienced in 1996 and 1996?
[07]    MR. ECHERD: Objection. Calls for a
[08] conclusion, calls for speculation.
[09]    A. Obviously, that's a reasonable
[10] explanation.
[11]    MR. KENT: Thank you. I have
[12] nothing further. Thank you.
[13]    MR. ECHERD: Nothing further.
[14]    VIDEO TECHNICIAN: This concludes the
[15] deposition of Dr. William Feist on January 25,
[16] 1999 at 6:18 P.M. This also ends tape 3.
[17]
[18]    (Whereupon, a discussion was held
[19]    off the record.)
[20]
[21]    MR. KENT: Let me add one other
[22] thing for this record. That we will mark as a
[23] collective exhibit, which will be Exhibit 5, the

### Page 0346

[01] various records that I asked him about that we
[02] had supplied to him and which I identified
[03] fairly well on the deposition.
[04]    MR. ECHERD: No objection.
[05]    MR. KENT: That's so we can have a
[06] copy just in the file.
[07]
[08]    (Whereupon, Plaintiff's Exhibit 5
[09]    was marked for identification and
[10]    same is attached hereto.)
[11]
[12]
[13]    FURTHER DEPONENT SAITH NOT
[14]
[15]
[16]
[17]    DR. WILLIAM E. FEIST.
[18]
[19]
[20]
[21]
[22]
[23]

### Page 0347

CERTIFICATE

[01]
[02]
[03] STATE OF ALABAMA
[04] JEFFERSON COUNTY
[05]
[06]    I hereby certify that the above and
[07] foregoing deposition was taken down by me in
[08] stenotype and the questions and answers thereto
[09] were transcribed by means of computer-aided
[10] transcription, and that the foregoing represents
[11] a true and correct transcript of the testimony
[12] given by said witness upon said hearing.
[13]    I further certify that I am neither of
[14] counsel, nor of kin to the parties to the
[15] action, nor am I in anywise interested in the
[16] result of said cause.
[17]
[18]
[19]    MICKEY TURNER
[20]
[21]
[22]
[23]

### Page 0348

DR. WILLIAM E. FEIST

[01]
[02]
[03] INSTRUCTIONS TO THE WITNESS
[04]
[05]    PLEASE READ YOUR DEPOSITION OVER
[06] CAREFULLY BEFORE YOU SIGN IT. YOU SHOULD MAKE
[07] ALL YOUR CHANGES ON THE ATTACHED ERRATA SHEET.
[08] PLEASE DO NOT MARK ON THE ORIGINAL DEPOSITION.
[09]    AFTER MAKING ANY CHANGES WHICH YOU
[10] HAVE NOTED ON THE ATTACHED ERRATA SHEET, SIGN
[11] YOUR NAME ON THE ERRATA SHEET AND DATE IT
[12] THEN SIGN YOUR DEPOSITION AT THE END OF YOUR
[13] TESTIMONY IN THE SPACE PROVIDED. YOU ARE
[14] SIGNING IT SUBJECT TO THE CHANGES YOU HAVE MADE
[15] ON THE ERRATA SHEET, WHICH WILL BE ATTACHED TO
[16] THE DEPOSITION.
[17]    RETURN THE ORIGINAL ERRATA SHEET AND
[18] TRANSCRIPT TO FOSHEE & TURNER, SUITE 220 PARK
[19] PLACE TOWER, 2001 PARK PLACE NORTH, BIRMINGHAM,
[20] ALABAMA 35203.
[21]    ACCORDING TO RULES OF CIVIL
[22] PROCEDURE, YOU WILL HAVE THIRTY (30) DAYS FROM
[23] THE DATE YOU RECEIVE THIS DEPOSITION IN WHICH TO

## DR. WILLIAM E. FEIST    [1-25-99]

Page 0349

[01] READ, SIGN AND RETURN YOUR DEPOSITION TO THE
[02] ABOVE OFFICE. IF YOU FAIL TO DO SO, YOU
[03] AUTOMATICALLY WAIVE YOUR RIGHT TO MAKE ANY
[04] CORRECTIONS TO YOUR DEPOSITION.
[05]
[06]
[07]
[08]
[09]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]

Page 0350

[01] PAGE        LINE        EXPLANATION
[02] ----------------------------------------
[03] ----------------------------------------
[04] ----------------------------------------
[05] ----------------------------------------
[06] ----------------------------------------
[07] ----------------------------------------
[08] ----------------------------------------
[09] ----------------------------------------
[10] ----------------------------------------
[11] ----------------------------------------
[12] ----------------------------------------
[13] ----------------------------------------
[14] ----------------------------------------
[15] ----------------------------------------
[16] ----------------------------------------
[17] ----------------------------------------
[18]
[19] ----------------------------------------
[20]        DEPONENT'S SIGNATURE
[21]
[22] ----------------------------------------
[23]        DATE

Page 0351

[01]        SIGNATURE PAGE
[02]             OF
[03]        DR. WILLIAM E. FEIST
[04]
[05]
[06]        I HEREBY ACKNOWLEDGE THAT I HAVE READ
[07] THE FOREGOING DEPOSITION AND THAT THE SAME IS A
[08] TRUE AND CORRECT TRANSCRIPTION OF THE ANSWERS
[09] GIVEN BY ME TO THE QUESTIONS PROPOUNDED, EXCEPT
[10] FOR THE CHANGES, IF ANY, NOTED ON THE ATTACHED
[11] ERRATA SHEET.
[12]
[13]
[14]
[15]
[16]
[17] SIGNATURE: _____
[18]
[19]
[20] DATE: _____
[21]
[22]
[23]

## CERTIFICATE OF SERVICE

I, Richard C. Angino, Esquire, hereby certify that a true and correct copy of the foregoing

PLAINTIFF'S MOTION TO SUPPLEMENT RECORD was served by United States first-class

mail, postage prepaid, upon the following:

E. Thomas Henefer, Esquire
Stevens & Lee
111 North Sixth Street
P. O. Box 679
Reading, PA 19603-0679
     Counsel for Paul Revere Life Insurance Company and New York Life Insurance
Company

Dated: 11/25/02

Richard C. Angino

253718.1\RCA\SC