ORIGINAL

FILED
HARRISBURG, PA

NOV 2 5 2002

MARY E. D'ANDREA, CLER
Per _____ Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VINCENZO MAZZAMUTO,<br>Plaintiff, | CIVIL ACTION – LAW |
| v. | NO. 1:CV-01-1157 |
| UNUM PROVIDENT CORPORATION;<br>PAUL REVERE LIFE INSURANCE<br>COMPANY; and NEW YORK LIFE<br>INSURANCE COMPANY<br>Defendants | JUDGE CONNER<br><br>JURY TRIAL DEMANDED |

### PLAINTIFF'S MOTION TO ADD ADDITIONAL AUTHORITY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT AND AS OPPOSITION AUTHORITY TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

As a result of recent publicity concerning UNUMProvident's practices, Plaintiff's counsel has obtained specific cases dealing with UNUMProvident where summary judgment has been granted to plaintiffs, summary judgment has been denied to UNUMProvident, and/or deposition testimony concerning UNUMProvident's practices has been permitted. Plaintiff's counsel, on behalf of Plaintiff, requests that Your Court consider the following cases:

James v. Provident Life Insurance Co. and UNUM Life Insurance Co., 1999 U.S. Dist. LEXIS 4179 (District of Columbia, March 30, 1999) (**Exhibit A**)

Stender v. Provident Life and Accident Insurance Company, 2001 U.S. Dist. Lexis 10052 (E.D. Ill., July 12, 2001) (**Exhibit B**)

Brennan v. The Paul Revere Life Insurance Company, Provident Companies, Inc. and Provident Life and Accident Insurance Company, 2002 U.S. Dist. LEXIS 10505 (E.D. Ill. June 10, 2002) (**Exhibit C**)

Cerni v. Provident Life and Accident Insurance Company, et al., 2002 U.S. Dist. LEXIS 6053 (C.D. Cal., April 3, 2002) (**Exhibit D**)

Soll v. Provident Life & Accident Insurance Company and UNUM Provident Corporation, 2002 U.S. Dist. LEXIS 12568 (E.D. LA, July 3, 2002) (**Exhibit E**)

Walker v. UnumProvident Corporation, 2002 U.S. Dist. LEXIS 21647 (Dist. of Minnesota, October 25, 2002) (**Exhibit F**)

Brosnan v. Provident Life and Accident Insurance Company, 31 F. Supp.2d 460; 1998 U.S. Dist. LEXIS 20259 (E.D. Pa., December 17, 1998) (**Exhibit G**)

Cake v. Provident Life and Accident Insurance Company, 1999 U.S. Dist. LEXIS 371 (E.D. Pa., January 15, 1999) (**Exhibit H**)

Lain v. Unum Life Insurance Company of America, 279 F.3d 337; 2002 U.S. App. LEXIS 1208; 27 E.B.C. 1570 (**Exhibit I**)

Dishman v. Unum Life Insurance Company of America, 269 F.3d 974; 2001 U.S. App. LEXIS 22599 (9th Cir. October 17, 2001) (**Exhibit J**)

Respectfully submitted,

ANGINO & ROVNER, P.C.

Richard C. Angino, Esquire
I.D. No. 07140
4503 N. Front Street
Harrisburg, PA  17110
(717) 238-6791
Attorney for Plaintiff

Date:  11/25/02

**A. EVERETTE JAMES, Plaintiff, v. PROVIDENT LIFE INSURANCE CO. and UNUM LIFE INSURANCE CO., Defendants.**

**Cv. No. 96-2000 (TFH)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*1999 U.S. Dist. LEXIS 4179*

**March 30, 1999, Decided**

**March 29, 1999, Filed**

**DISPOSITION:**
[*1] Plaintiff's Motion for Partial Summary Judgment [34-1] GRANTED.

**COUNSEL:**
For Plaintiff(s): Fred Saul Summer, Esq., Rockville, MD.

For Defendant(s): James Lee Marketos, Esq., Berliner, Corcoran & Rowe, Washington, D.C.

**JUDGES:**
Thomas F. Hogan, United States District Judge.

**OPINIONBY:**
Thomas F. Hogan

**OPINION:**

### MEMORANDUM OPINION

This is an insurance coverage case. The plaintiff, A. Everette James, is suing the defendants, Provident Life Insurance Co. and UNUM Life Insurance Co., over the defendants' failure to pay disability benefits pursuant to James's insurance policies for occupational disability. James seeks relief from the defendants' alleged breach of contract and alleged bad faith in refusing to pay disability benefits. James moves for summary judgment on the breach of contract claims only (Counts I and IV). The Court heard oral argument on this motion on January 21, 1999. After considering the arguments of the parties and carefully reviewing the pleadings, the Court grants James' motion.

I.

James trained in radiology at Harvard Medical School from 1966-1969, and at the John Hopkins Hospital from 1969-1975. He became Radiologist-in-Chief and Chairman of the Department of Radiology [*2] at the Vanderbilt University Medical Center in 1975. James remained in this position until his resignation as Chairman in July 1991. Although James continued as a Professor of Radiology, he took a six-month leave of absence beginning September 1, 1991. During his leave James lived in Washington, D.C., where he was a visiting scholar at the Institute of Medicine and the National Cancer Institute of the National Institute of Health.

Following the completion of his leave in March 1992, James returned to Vanderbilt as a Professor of Radiology. At that time his duties and responsibilities were essentially the same as all other Professors of Radiology at Vanderbilt. A letter prepared by Dr. C. Leon Partain, James' replacement as Chairman of the Radiology Department at Vanderbilt, described those responsibilities as follows:

1. Clinical Radiology: 50%

2. Education in Radiology and Radiological Sciences: 20%

3. Research in Radiological Sciences: 30%.

See Letter from Dr. Partain to Dan Fordyce of 8/30/93 at 1, Defendants' Attachment 15. James was also placed on the regular clinical schedule of radiology assignments. James claims that he performed clinical assignments [*3] in April and May 1992, although those assignments

appear to have been very limited in number. See Letter from Dr. Partain to Jean Johnson of 6/18/93 at 1, Defendants' Attachment 15 ("Partain Letter") ("except for a few days in April of 1992, Dr. James has not worked in radiology for a period extending over at least two years."). In addition to his clinical assignments, James taught and performed administrative work.

Beginning in 1990, James began to suffer neck pain, muscle weakness and other neurological symptoms caused by cervical spine disease. These symptoms eventually required cervical spine surgery in February 1991. In late May 1992, James's acute cervical spine symptoms returned. Over the next several months James received physical therapy, various medications and other treatment. His symptoms did not improve with treatment and after various tests, James' doctors advised him that a second cervical spine operation was necessary. On September 28, 1992, James underwent the second operation.

Around the time of James' second surgery, Vanderbilt informed James that his salary was substantially reduced until he was able to return to a significant level of clinical activity. Shortly [*4] thereafter, James filed claims for disability benefits under disability policies with Provident Life Insurance Company ("Provident") and UNUM Life Insurance Company ("UNUM"). He sought benefits from June 1992, the date James claimed he was last able to work. On the Provident and UNUM claim forms, James described his occupation as "Professor, Staff Radiologist" and "Physician-Radiologist," respectively. See Provident Claim Form at 1, Plaintiff's Attachment A; UNUM Claim Form at 1, Plaintiff's Attachment B. Both UNUM and Provident granted James' claim and began paying him total disability benefits dating back to June 1992. The Provident Policy pays a monthly benefit of $ 2,830 for total disability. The UNUM policy provides for a $ 3,307 monthly benefit for total disability.

Following his second surgery, James claims that he continued to suffer acute neck and shoulder pain as well as muscle weakness. This pain continued through the spring of 1993 and James remained unable to perform clinical duties. By that time, however, Vanderbilt had informed James that his compensation would be based on his clinical activities and/or other revenue generating activities. After discussions between [*5] Vanderbilt and James, they agreed that effective July 1, 1993, James would attempt to return to his clinical duties on a part-time basis. In this capacity, his salary would be based on a .3 FTE (full time equivalent) status. James attempted to perform his reduced clinical duties, but found himself unable to do so. On August 10, 1993, James resigned from his position at Vanderbilt. He has not worked as a radiologist since that time.

Defendants cite the deposition testimony of Dr. James' psychiatrist, Dr. David A. Barton, that James had considered retiring from Vanderbilt as early as 1990. James' sessions with Dr. Barton focused on how James dealt with his transition away from the chairmanship, including James' awareness of perceptions within the hospital community that his interests were "not relevant to radiology or ... to the direction of the department." Deposition of Dr. David A. Barton at 88/14 - 89/7. Dr. Barton testified that James "began to look toward other directions towards what he might do or not do," and recalled James as considering such options as higher level administrative positions, deanships, research interests, and administrative positions in foundations. See [*6] id. at 89/12 - 90/15. In August and September 1991, Dr. Barton perceived James to be "grieving life transactions and sense of loss [about his] job situation" and recalled that James "was reporting some sense of his life situation being less than in control." Id. at 100/13 - 101/12.

On August 1, 1993, Provident ceased paying benefits to James. UNUM's benefit payments ceased on December 8, 1993. n1 Both companies claim that James was not working as a radiologist for more than a year prior to May 28, 1992, and that he therefore is not covered under the Provident or UNUM policies. Defendants cite a letter from Dr. Partain, dated June 18, 1993, which states, "except for a few days in April of 1992, Dr. James has not worked in radiology for a period extending over at least two years." Partain Letter at 1.

n1 At the time Defendants ceased paying benefits under the policies, Plaintiff was a resident of the District of Columbia. Thus, venue is properly laid in this District. See 28 U.S.C. § 1391(a).

[*7]

James filed this action against Provident and UNUM for breach of contract on July 25, 1996 in Superior Court. On August 28, 1996, Defendants removed the case to this Court. James filed a Motion for Partial Summary Judgment on April 6, 1998. James' motion presents two issues for consideration by the Court. First, whether radiology was James' "occupation" at the time of his disability within the meaning of that policy term. Second, whether James has a genuine medical condition that constitutes a "total disability." These issues are considered in turn.

II.

**A. Standard for Judgment**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A material fact is one that "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* Additionally, in considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are [*8] to be drawn in his favor." *Id. at 255.*

### B. James' "Occupation"

Under District of Columbia law, "clear and unambiguous policy language [in an insurance policy] should be construed according to its everyday meaning." *Continental Cas. Co. v. Cole, 258 U.S. App. D.C. 50, 809 F.2d 891, 896 (D.C. Cir. 1987).* n2 If the language of the policy is ambiguous, however, then it must be "construed in favor of the insured wherever reasonable." *Id.* at 895; see also *Meade v. Prudential Ins. Co., 477 A.2d 726, 728 (D.C. 1984).*

> n2 The District of Columbia follows a modified "interest analysis" approach to choice of law. See *GEICO v. Fetisoff, 294 U.S. App. D.C. 279, 958 F.2d 1137, 1141 (D.C. Cir. 1992).* In this case, the interested jurisdictions are the District of Columbia (where Plaintiff resided at the time of the alleged breach of contract), Tennessee (UNUM), and Maine (Provident). Because the plain meaning of the policy controls in all three jurisdictions, there is no conflict of law and the Court applies District of Columbia law by default. See *id.*; see also *Fowler v. A&A Co., 262 A.2d 344, 348 (D.C. 1970).*

[*9]

There are two policies at issue in this case. Under the Provident Policy, Provident is obligated to pay benefits for "total disability" if, *inter alia*, "you are not able to perform the substantial and material duties of your occupation." Provident Policy at 4. The Provident Policy defines "your occupation" as follows:

The occupation (or occupations, if more than one) in which you are regularly engaged at the time you became disabled. If your occupation is limited to a recognized specialty within the scope of your degree or license, we will deem your specialty to be your occupation.

*Id.* On the Application for the Provident Policy James entered his occupation as "Radiologist, Author, Lecturer, Administrator." Provident Application at 1.

The UNUM Policy pays benefits to an insured for "total disability" if, *inter alia*, "injury or sickness restricts the insured's ability to perform the material and substantial duties of his regular occupation to an extent that prevents him from engaging in his regular occupation." UNUM Policy at 6, 7. The UNUM Policy defines "regular occupation" as follows:

"Regular occupation" means the Insured's occupation at the time [*10] the Elimination Period begins. If the Insured engages primarily in a professionally recognized specialty at that time, his occupation is that specialty.

*Id.* at 7. On the UNUM application, which was entered into in 1990, James entered his specialty as "Radiology." UNUM Application at 1.

In this case, the disputed policy language is the definition of the term "occupation" in the above policies. n3 Defendants contend that the term occupation should include only those activities in which the insured is actively engaging in at the time of his disability. Because James was performing very few, if any, of his radiology duties at the time of his disability, defendants argue that radiology was not James' occupation within the meaning of the policies' language. James, on the other hand, argues that the term occupation should be defined as "what one was employed to do." Because James was employed by Vanderbilt as a Professor of Radiology, James argues that he should be covered as such under the Provident and UNUM policies.

> n3 The Court notes that Defendants have not attempted to distinguish the two policies based on their differing definitions of the relevant policy terms.

[*11]

The only case cited by either side with similar facts to this one is *Brumer v. National Life, 874 F. Supp. 60 (E.D.N.Y. 1995).* In Brumer, the District Court for the Eastern District of New York held that the plaintiff was not entitled to disability insurance as a podiatric surgeon where he had not performed podiatric surgery for 13 months before the date of his disability. The court found that for the previous 13 months, 11 of which the plaintiff's surgical license was suspended, the plaintiff had engaged only in the management of his podiatric clinics, and had not worked as a surgeon. Thus, Brumer failed "to establish that the practice of podiatric surgery constituted a material and substantial part of the role he

performed at the time of the onset of his ... impairment." *Id. at 64.* The court therefore granted summary judgment for the insurers.

Brumer is distinguishable from the instant case on the ground that the plaintiff in *Brumer* was self-employed. *Brumer* was not a hired podiatric surgeon who neglected his duties. Rather, *Brumer* chose to pursue another occupation, namely his job managing podiatric clinics. The court therefore found that *Brumer* had changed [*12] jobs and that this change removed him form the scope of coverage for a podiatric surgeon. See *id. at 65.*

In contrast to *Brumer*, this case involves an employment relationship between two parties, Vanderbilt and James. While Defendants offer ample evidence that James tendered a seriously deficient performance in his job with Vanderbilt, this does not translate to a finding that radiology was not James's "occupation." The better rule is that one's occupation is defined by the job one is employed to perform and is performing, however inadequately, at the time of the disability. This interpretation is consistent with the plain and ordinary meaning of the policy language and provides a clear rule for employers, employees and insurers with respect to their rights and responsibilities under the policy. n4

> n4 Defendants offer an interpretation of occupation that focuses on the degree of an employee's engagement in his work. Such a reading leads to numerous other questions regarding the details of the employment. For instance, Defendants contend (as they must to disqualify James) that an individual must have worked in the occupation for a period of time before the onset of the disability in order to receive disability benefits. However, Defendants have not set forth what that time period should be, nor whether that period should vary by occupation, years of experience in the occupation or other factors.

[*13]

In accordance with the above, the Court examines the employment relationship between James and Vanderbilt. As it is undisputed that James was working for Vanderbilt as a radiologist at the time of his disability (albeit inadequately), the Court finds that radiology was James' "occupation" under the UNUM and Provident policies.

**C. James' "Disability"**

The second issue is whether James has a "total disability" within the meaning of that policy term. Although there is no dispute as to the meaning of "total disability," Defendants challenge James' disability claim as a factual matter. Specifically, Defendants argue that after May 28, 1992, there is a genuine issue of material fact whether James' cervical spine condition totally disabled him from performing his occupation. James counters with the expert opinions of two physicians, Dr. Don M. Long, Director of the Department of Neurosurgery and Professor of Neurosurgery at John Hopkins University Medical Institution, and Dr. Ira M. Hardy, Clinical Professor of Surgery at East Carolina University School of Medicine. Both doctors provided letters to Defendants confirming James' total disability. See Plaintiff's Attachments [*14] 21-22. Doctors Long and Hardy have also submitted expert reports in this case which summarize their prior findings. See id. at 23-24. Dr. Long concludes that "I consider Dr. James incapacitated for his previous occupation as a practicing radiologist." Id. at 23. Dr. Hardy similarly concludes that "Dr. James is permanently disabled from practicing radiology..." Id. at 24.

Defendants present no medical evidence whatever to rebut James' claim. While Defendants offer the pre-surgery prediction of James' surgeon, Dr. Everette Howell, that James would be able to perform the functions of a radiologist after James's second surgery, defendants did not depose Dr. Howell or obtain an affidavit. Furthermore, although Defendants could have required James to submit to a medical examination by another physician, see Provident Policy at 16; UNUM Policy at 9, they did not do so. As a consequence, Defendants' evidence on this issue consists only of non-medical testimony that is not necessarily inconsistent with James' disability claim. n5 Such evidence is insufficient to overcome the professional opinions of two examining neurologists and therefore to create a genuine question of fact [*15] for trial.

> n5 For instance, James' secretary, Gail Lackey, testified at her deposition that James actively pursued other interests (particularly his art collection) since the onset of his disability. Lackey testified that she typed 40-60 letters per day for James, most of which related to his art collection. See Deposition of Gail Lackey at 30-31. Similarly, Defendants cite a letter from Dr. Partain stating that James maintained an extensive travel schedule after his second surgery. See Letter from Dr. C. Leon Partain to John Chapman of 8/10/92 at 1, Defendants' Attachment 29. While such evidence is instructive regarding James' job performance for

1999 U.S. Dist. LEXIS 4179, *

Vanderbilt, it is not necessarily inconsistent with James' disability claim.

III.

For the above-mentioned reasons, Plaintiff's Motion for Partial Summary Judgment is GRANTED. An Order consistent with this Memorandum Opinion will issue this same day.

March 30th 1999

    Thomas F. Hogan

United States District Judge

**ORDER**

For the reasons **[\*16]** stated in the accompanying Memorandum Opinion, Plaintiff's Motion for Partial Summary Judgment [34-1] is **GRANTED**.

March 30Th, 1999

    Thomas F. Hogan

    United States District Judge

*found was faith*

**JOEL M. STENDER, Plaintiff, PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, Defendant.**

**No. 98 C 1056**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2001 U.S. Dist. LEXIS 10052*

**July 12, 2001, Decided**

**July 17, 2001, Docketed**

**DISPOSITION:**
[*1] Summary judgment granted. Summary judgment entered in favor of plaintiff and against defendant in the amount of $ 25,000.00 for attorney fees pursuant to 215 ILCS 5/155.

**COUNSEL:**
For JOEL M STENDER, plaintiff: Penny T. Brown, Joanne Arden Sarasin, Much, Shelist, Freed, Denenberg, Ament & Rubenstein, P.C., Chicago, IL.

For PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, defendant: Steven R. McMannon, Christopher John Robison, Michael J. Smith & Associates, Michael J. Smith, Attorney at Law, Chicago, IL.

**JUDGES:**
HON. RONALD A. GUZMAN, United States Judge.

**OPINIONBY:**
RONALD A. GUZMAN

**OPINION:**

### MEMORANDUM OPINION AND ORDER

The facts of this case were previously discussed in this Court's Memorandum Opinion of June 28, 2000. In that opinion we found that there existed no legitimate dispute as to the fact that the plaintiff, Joel M. Stender ("Stender") is totally disabled relative to the duties he was regularly engaged in as a Pit-Scalper. Subsequently, in March 2001, we ruled on still another motion for summary judgment, this time granting Stender's motion for summary judgment with regard to damages and interest, but denying the same as to Stender's Request for Section 155 damages. We found that [*2] Provident has sufficiently raised a material issue of fact as to whether it acted "vexatiously and unreasonably" in handling Stender's claim. Before us now for determination is this final issue. 215 Ill. Comp. Stat. 5/155 provides:

§ 155. Attorney fees. (1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts: (a) 25% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs; (b) $ 25,000; (c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

(2) Where there are several policies insuring the same insured against the same loss whether [*3] issued by the same or by different companies, the court may fix the amount of the allowance so that the total attorney fees on account of one loss shall not be increased by reason of the fact that the insured brings separate suits on such policies.

2001 U.S. Dist. LEXIS 10052, *

The parties are at odds as to whether or not the analysis of vexatious and unreasonable conduct requires the court to take into consideration the subjective intent and good faith of the insurer, or merely whether or not the conduct was objectively reasonable. There appears to be some conflict in the caselaw. In, *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co., 200 F.3d 1102 (7th Cir. 2000)* the court held:

Attorney fees may not be awarded against an insurer, under Illinois law, simply because the insurer took an unsuccessful position in litigation, but, rather, only where the evidence shows that the insurer's behavior was willful and without reasonable cause; this means that an insurer's conduct is not "vexatious and unreasonable" if: (1) there is a bona fide dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents [*4] a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law.

The requirement that the dispute be "bona fide" implies that there be a good faith belief as to the application of insurance coverage. Thus, a subjective component is part of the evaluation of the insurance company's actions. This conclusion appears to be supported by a number of courts which have found that in making this determination we should consider the totality of the circumstances, including the insurer's attitude. *Marcheschi v. Illinois Farmers Ins. Co., 298 Ill. App. 3d 306, 698 N.E.2d 683, 232 Ill. Dec. 592,* (Ill.App.1.Dist.,1998). ( Court deciding whether an insurer is liable for attorney fees and other amounts for vexatiously and unreasonably delaying settlement of a claim should consider the totality of the circumstances, including the insurer's attitude.) *Buais v. Safeway Ins. Co., 275 Ill. App. 3d 587, 656 N.E.2d 61,* (Ill.App. 1 Dist.,1995, *211 Ill. Dec. 869).* (In deciding whether an insurer is liable, a trial court should consider the totality of the circumstances, including the [*5] insurer's attitude.) *Ragan v. Columbia Mut. Ins. Co., 291 Ill. App. 3d 1088, 684 N.E.2d 1108,* (Ill.App. 5 Dist.,1997, *226 Ill. Dec. 112).* (In determining whether a defendant's conduct is vexatiousand or unreasonable, the trier of fact must examine the totality of the circumstances.) *Garcia v. Lovellette, 265 Ill. App. 3d 724, 639 N.E.2d 935, 203 Ill. Dec. 376* (Ill.App. 2 Dist.,1994). (Section 155 of the Code provides that a court may award attorney fees and specified penalties in an action against an insurer when the court determines, in its discretion, that the insurer's delay in settling a claim was unreasonable and vexatious considering the totality of the circumstances.) *Spearman Industries, Inc. v. St. Paul Fire and Marine Ins. Co., 138 F. Supp. 2d 1088,* (N.D.Ill.,2001).(There is no evidence of bad faith, vexatious behavior, or unreasonableness on the part of St. Paul concerning its investigation, litigation, and denial of this claim.) Thus, we look at the totality of the evidence in determining whether or not the dispute set forth as to coverage by Provident was both reasonable, and bona fide in the [*6] sense that it was made in good faith.

At the heart of this issue is the definition of Stender's occupation. If his occupation is deemed to be that of a Commodities Pit-Scalper, then Provident was clearly without justification for denying total disability benefits for it has never been doubted that Stender is no longer able to work or perform as a Commodities Pit-Scalper. On the other hand, if Stender's occupation is defined as merely a Commodities Trader, then Provident was justified in denying the benefits. We have already determined by our prior opinions that Stender's occupation was that of a Commodities Pit-Scalper. What remains to be determined is whether or not Provident's attempt to define his occupation as merely that of a Commodities Trader was unreasonable and vexatious.

Stender described his duties as a Commodities Pit-Scalper, as first of all, requiring a membership on a commodities exchange in order to have access to a commodities pit. In the pit his duties consisted of trading many times a day for small increments in value based upon the many tiny changes and fluctuations in price during the course of any trading day. In order to be able to effectuate trades it is necessary [*7] to stand in the pit and to be able to shout sufficiently loud enough to make you voice heard over the loud noise of the many other scalpers who also are at the same time attempting to do the same thing. The ability to be able to hear and distinguish offers and acceptances being shouted in the same raucous environment and the ability to attract attention and make yourself heard and understood at precisely the right time so as to effectuate a trade that would take advantage of the constant price fluctuations is crucial. Pit Scalping is a very physical occupation.

Trading commodities off of the floor or pit is entirely different. First, there is no need for access to the pit and therefore membership on a commodities exchange is not necessary. Second, the entire strategy of trading is different. Because trades cannot be made quickly at a precise moment in time it is not possible to take advantage of the hundreds of small fluctuations in changes in price during the course of any given day. Rather, the off the floor trader uses fewer and much slower transactions in an attempt to take advantage of the longer-term direction of the market during a particular time span. Mr. Stender, while a [*8] very successful Pit-Scalper, was never able to make a profit as an off the floor commodities trader.

Provident Life and Accident Insurance Company ("Provident") issued plaintiff an occupational disability insurance policy in June of 1980. Stender applied for an additional policy, with the birth of his second child, on October 14, 1982, and the policy was issued on January 14, 1983. Stender testified that his motivation for purchasing these policies was advice given by the president of his clearing firm to all of the younger pit-scalpers at the firm. Apparently, the president was sufficiently experienced to know that a loss of hearing and voice was a common occupational hazard and counseled the younger pit-scalper's to protect themselves against this hazard by purchasing occupational disability insurance. According to Stender all of the pit-scalpers at the firm acted together on this advice to protect themselves from the potential loss of hearing and voice. It is clear that, that the protection sought was protection from the inability to continue performing the very physical work of a Commodities Pit-Scalper. The intent was not to obtain protection from the inability to continue working [*9] as an off the floor commodities trader. Off the floor traders are not exposed to the same dangers of loss of hearing and voice as are pit-scalpers because off the floor traders do not need to utilize their voices and hearing capacities in the same way as pit-scalpers. Logically, if the essential duties and skills of pit-scalping and off the floor trading were the same, there would be no need for pit-scalpers to insure themselves against loss of hearing and voice. Should they encounter such difficulties they could simply continue on as off the floor traders should they ever encounter difficulties with their hearing or voice capacities.

Over time Stender himself also became aware of the stress and effects of the duties of his occupation on his voice and hearing. On March 14, 1983, Stender wrote his insurance agent a letter describing his understanding of the terms of the policy in an effort to confirm that the policy he was purchasing would cover him if he should ever become unable to trade on the floor. In the letter he stated that his occupation was that of a Commodities Pit-Scalper, and that scalping entails standing in the trading pit and buying and selling commodities for his own [*10] account. Stender further stated it was his understanding that if his hearing or voice deteriorated, for any medical reason, to the point where a physician advised him to discontinue Pit-scalping, he would be entitled to full benefits under the polices. Stender further went on to state that if he were to become disabled, he would still trade, albeit outside of the pit. This, he informed Provident, is "entirely different from what I do for the purpose of the disability insurance," and must therefore be considered a different occupation. Stender made the attachment of this letter to his policy a precondition to Provident accepting his premium check. The intent

behind this letter was to confirm that the policy insured his occupation as a Commodities Pit-Scalper. Stender could not have made his intent more clear. From this point on Provident must be deemed to have known precisely what Stender believed his occupation was and that he considered the occupation of Commodities Pit-Scalper different from that of an off the floor trader. His intent at the time of entering into the contract with Provident is therefore clearly established.

Provident responded to Stender in two separate letters. [*11] In its first letter, dated April 15, 1983, Provident informed Stender that "in the event of suffering total loss of speech, hearing, sight or use of two limbs, regardless of your ability to engage in any occupation, you will be paid your monthly benefits for lifetime. In the event of a residual disability, where you are unable to perform one or more of your usual important business duties, or cannot devote as much time as normal, and suffer an earnings loss of 25% or more, we would pay a proportionate benefit. This applies only if you return to your normal occupation." In its second letter, dated June 10, 1983, Provident acknowledged Stender's statement that his occupation was that of a Commodity Pit-Scalper, but noted that "the policy does not dictate how you must perform the duties of your occupation." Provident informed Stender that in determining disability, the relevant issue would be whether or not his is able to perform the duties of his occupation. Provident informed Stender that although the letter would be kept in his file, the letter did not have any effect on the disability policy. The terms of these policies also provided that, should Stender become totally disabled, his [*12] premium payments would be waived during the time Provident would pay his total disability benefits.

Several years after obtaining these policies, Stender's fears came true and he became totally disabled in that he could no longer hear or speak sufficiently to work as a Commodities Pit-Scalper, and has since been under the care of a physician. In July of 1993, Stender filed a claim for total disability with Provident under both policies, and payment of benefits by Provident commenced soon thereafter. At this point, then, Provident must be deemed to have accepted Stender's occupation as that of a Commodities Pit-Scalper. There would be no other reason to pay on the policy. By December of 1993, Stender informed Provident that he was in the process of learning how to be an off the floor commodities trader. In January of 1994, a Provident Field Agent named Warren Diegel met with Stender to discuss Stender's off the floor trading. The payments continued. Again, it Provident must be deemed to have accepted Stender's occupation as that of a Commodities Pit-Scalper. Otherwise, there would be no basis to

Case 1:01-cv-01157-CCC    Document 77    Filed 11/25/2002    Page 11 of 68

2001 U.S. Dist. LEXIS 10052, *                                    Page 4

continue the payments after learning that Stender was now engaged in trading off the floor. [*13] Stender's claim file was then assigned to Clayton Smith, another Provident adjuster in 1995. It was then that Mr. Stender's problems with Provident began.

The gist of Provident's position is found in a field request dated 3/23/95 (Plaintiff's Exhibit 18) in which Mr. Smith writes:

... claim form and file indicates this former "pit trader" is "working on becoming off floor trader." If he is doing so -- I think he should be considered as working at his occupation. A trader is a trader. Please interview and advise.

Mr. Smith has given no satisfactory explanation for the sudden change in Provident's position with respect to the definition of Stender's occupation. It is clear that as of the date of this request and before any other information came in, Mr. Smith, at least, had determined to effectively, if not officially, alter Stender's occupational definition from "pit trader" to "trader". As far as we can discern, the sole basis for this change in Provident's position, was Mr. Smith's attitude that "a trader is a trader". Clearly there was no rational basis for this redetermination at this point in time. There was no new information upon which such a change in policy [*14] could rationally be based. Smith had not interviewed Stender. Nor was he in possession of *any* new information. In fact, his memo of 3/23/95 was first involvement with the file. All he would have done prior to the memo would have been to review what was already in the file.

Predictably enough, having received his marching orders from the adjuster, Clayton Smith, Warren Deigel, proceeded to re-interview Stender on 6/7/95 and this time concludes that consideration should be given to changing Stender's claim from total disability to residual disability based on his description of the current work he is performing. The problem with this determination is that Stender on 6/7/95 was performing precisely the same work that he was performing in January of 1994 when Deigel interviewed him for the first time. There is no change in the description of what Stender was doing, nor is there any new material information as to what he did prior to the claim. Insofar as we can glean from the testimony and exhibits the only thing that has changed from the time that Stender's claim was honored to this recommendation that the claim be denied is Clayton Smith's decision that Provident should now [*15] take the position that "a trader is a trader". Indeed, Stender testified that he informed Deigel that he had not been successful in learning off the floor trading and had been unable to make a net profit at this new occupation for

any year. This is in great contrast to his prior substantial success as a Pit Scalper. He also informed Mr. Diegel that buying and selling commodities is merely a generic term for what he does; that although he could buy and sell the same commodities in and out of the commodities pit, he could not scalp them as he did in the commodities pit. It's interesting to note that even Mr. Smith, in his internal memo of June 15, 1995 to Richard Leiderman, describes Stender's occupation as a "Floor Trader". One wonders why, if indeed it is true that "a trader is a trader" Mr. Smith does not simply describes Stender's occupation is that of "Trader". Clearly, if Provident had nothing more upon which to base its sudden turnabout its action would be unreasonable and vexatious because it would be lacking in any factual basis for rejecting the definition of occupation contained in the application for the policy and which it had previously accepted. Provident is not entitled [*16] merely to change its mind for no good reason.

Provident, however, places great emphasis on a "Vocational Analysis" which it commissioned from Pembroke Consultants. The report, apparently one of many such reports, was compiled in three and a half hours at a cost of $ 275.10 and is dated June 13, 1997. It was commissioned after Smith's determination to challenge Stender's claim. The importance of this report, according to Provident's witnesses, is not so much that it contains new information, for they admit it does not, but that it is an independent source providing clarification. Clarification of what, we're not quite sure. As best we can discern from the testimony this report serves as Provident's reasonable, good faith basis for changing its mind. But, in truth, the report really does state nothing new. In the first sentence of the report it defines its objective as "to clarify the duties required in the occupation of Futures & Options Trader, and to determine if a self-employed Commodities Trader who has a Bilateral Hearing Loss, Dysphonia/Hoarsness (with Deterioration of his vocal cords/chronic scarring) and Chronic Laryngitis would be able to do the essential duties of this occupation. [*17] " Thus, the report, unfortunately, assumes the crucial question in it's very first sentence when it describes Mr. Stender as a "Futures & Options Trader". Mr. Stender contends that his occupation is that of a Commodities Pit's-Scalper. To be of any great help the report would have to describe its mission as to determine whether and/or to what extent a Commodities Pit-Scalper is a different occupation from that of a Futures & Options Trader. This in turn would depend upon the essential duties and functions of each. As one would expect from such a misguided analysis the report concludes, in essence, that pit-scalping is just one of many ways of trading commodities. It states:

Case 1:01-cv-01157-CCC    Document 77    Filed 11/25/2002    Page 12 of 68

2001 U.S. Dist. LEXIS 10052, *                                        Page 5

Terms such as Futures/Commodities Trader and Market Maker are very broad, and cover various positions within the industry. Thus if Mr. Stender was insured under any one of these occupational titles he would not be totally disabled from his own occupation, if on the other hand he had a specialty definition restricted to trading on the floor of the exchange then he should be classified his totally disabled from his own occupation.

In other words, if you define his occupation to be that of a trader, [*18] then he is not totally disabled. But if you define his occupation as being that of a Pit-Scalper, then he is totally disabled. This conclusion is not surprising when one considers that the original premise of the report assumed the critical issue to be resolved. More surprising is the use of the term "specialty definition" in the report itself. We find this use puzzling because the term has nothing to do with the definition of the occupation or the vocation, but rather is a term used by Provident to define coverage parameters. Why a truly independent vocational expert would use such a term is puzzling. Moreover, the use of this term, "specialty definition", is nothing more than a red herring. The real question is not whether one labels the essential duties and functions of Stender's occupation as a "specialty definition". Once that is done, the determination has already been made that the policy never intended to cover the precise activities his employment necessarily entailed. The true issue before us is whether or not the policy did, in fact, so intend. But, as we have previously held, it is clear that the policy language gave Mr. Stender the right to expect that his occupation, [*19] for purposes of the policy, would be defined by his essential duties. His essential duties were, at the time the policies were initiated, and at all times since then the same. They involved the very physical activity of scalping commodities on the floor of the pit. That fact that Provident agreed to accept his premiums for years and to honor his claim initially and did so for a substantial period of time is proof certain that it accepted this definition for purposes of the policy.

This determination was no doubt made on the basis of all of the information and documentation which Provident possessed at the time of the claim. That information included plaintiff's exhibit 4, the Application for Disability Insurance dated October 11, 1982. In this application, part 3 thereof, Mr. Stender describes his occupation as "commodity floor scalper". His exact duties as "remaining in trading pit most of trading session continuously buying and selling for own account". He describes the "Nature of business" as "commodity futures trading". He clearly differentiates here between what Provident now chooses to call his occupation, i.e., commodities trader, which he describes in the application as the [*20] business he is in, and his actual occupation for purposes of the policy, i.e., commodity floor-scalper. The application itself (Exhibit 3), makes this distinction between plaintiff's "business" and his "occupation" when it requires him to describe both. While the policy states that it is issued in consideration of the payment of premiums and of "your statements and representations in the application. A copy of your application is attached and made a part of the policy." Provident itself agreed to and accepted this definitional difference as witnessed not only by the policy and application, but also by the many references to Mr. Stender as a "commodity pit scalper" during the processing of his claim. See plaintiff's exhibits 10, 12, 13, 14, & 15. It is clear from the evidence that at the time the contract was entered into it was the intent of the parties that Mr. Stender's occupational definition for purposes of the policy was that of a commodity pit-scalper. This was true at the time the policy was purchased; it was true when Provident agreed to honor his claim; it was true when Mr. Smith first determined for no reason whatsoever to dishonor that same claim; as it was before, during, [*21] and after the expert report commissioned by Provident. Nothing has changed - except, of course, Provident's position. But a change in position without any factual basis is a paradigm example of a vexatious and unreasonable act. All Provident has done is attempt to erase a distinction which it agreed to at the inception of the contract with Stender. In so doing Provident claims this is a new consideration brought to light for the first time by the "Vocational Analysis". We are not convinced. Plaintiff's evidence establishes clearly that the distinction between the business of purchasing commodities and Stender's occupation of pit-scalping was present and considered by Provident both at the time the contract was entered into and at the time his initial claim was granted. Since then, nothing has changed. We find Provident's refusal to honor this claim vexatious and unreasonable under 215 Ill. Comp. Stat. 5/155.

Stender's motion for summary judgment was previously granted with respect to the following:

1) Benefits accrued but not yet paid under the insurance policies;

2) Prejudgment interest on the delinquent benefits at 5 percent; and

3) Reimbursement for all premiums [*22] paid by Stender since the date his first disability claim was honored.

Summary Judgment is now granted as to an award of $ 25,000 under 215 ILCS 5/155, and reasonable attorneys fees.

Stender is to submit a statement for final judgment containing a separate statement of the amount of damages requested for each of categories above and the sum total for the same within 14 days. With respect to attorneys fees, plaintiff is directed to file his petition for fees pursuant to LR 54.3 (Attorney's Fees and Related Non-taxable Expenses forthwith.)

SO ORDERED

ENTERED: 7/12/01

HON. RONALD A. GUZMAN

United States Judge

15 of 65 DOCUMENTS

**TIMOTHY J. BRENNAN, Plaintiff, vs. THE PAUL REVERE LIFE INSURANCE COMPANY, PROVIDENT COMPANIES, INC., and PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, Defendants.**

**Case No. 00 C 0725**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2002 U.S. Dist. LEXIS 10505*

**June 10, 2002, Decided**

**June 12, 2002, Docketed**

**DISPOSITION:**
[*1]  Plaintiff's first motion in limine denied, second motion in limine granted in part and denied in part, and third motion in limine granted. Defendants' motion in limine granted in part and denied in part.

**COUNSEL:**
For TIMOTHY J BRENNAN, plaintiff: James Prendergast, Richard J. Prendergast, Michael Thomas Layden, Matthew S. Miller, Deirdre Ann Close, Richard J. Prendergast, Ltd., Chicago, IL.

For PAUL REVERE LIFE INSURANCE COMPANY, THE, PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, defendants: Steven R. McMannon, Christopher John Robison, Michael J. Smith & Associates, Michael J. Smith, Attorney at Law, Chicago, IL.

**JUDGES:**
MATTHEW F. KENNELLY, United States District Judge.

**OPINIONBY:**
MATTHEW F. KENNELLY

**OPINION:**

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Plaintiff Timothy Brennan was a floor trader at a local commodity exchange; he had a disability insurance policy issued by defendant Paul Revere Life Insurance Company that provided benefits if Brennan was unable to perform that occupation. Brennan has two claims remaining for trial: a breach of contract claim concerning defendants' termination of his insurance [*2] benefits, and a claim under 215 ILCS 5/155 for recovery of a statutory penalty and attorney's fees based on his allegation that the termination was "unreasonable and vexatious." The purpose of this Memorandum Opinion and Order is to rule on the parties' motions *in limine* and various other pretrial matters.

**A. Plaintiff's Motions *in Limine***

**1. Plaintiff's earlier trading losses**

Brennan first moves *in limine* to exclude evidence of his motivation to return to work. This consists of evidence that he sustained a $ 1.3 million loss on the trading floor, which resulted in his cutting a deal that required him to pay most or all of his earnings to his creditors. This, according to defendants, gave Brennan a motive not to return to work and thus to shade his claim of physical impairment to support his contention that he cannot return to work. The fact that Brennan's disability is premised on evidence that is partly subjective -- regarding the extent to which the impairment of his peripheral vision prevents him from doing his former job -- puts his credibility in that regard squarely in issue. The evidence is relevant, and its probative value is not outweighed by any potential [*3] for unfair prejudice.

The Court therefore denies Brennan's motion to exclude this evidence. We will carefully circumscribe, however, the nature and extent of defendants' inquiry in this regard; they will not, for example, be permitted to introduce the reasons for the underlying liability unless Brennan brings up that issue. But it will be up to Brennan to object at the time of trial, as the Court cannot completely anticipate at this time all possible avenues of questioning on this topic.

### 2. Evidence regarding plaintiff's ability to perform other jobs

Brennan next seeks to exclude evidence concerning his ability to do other jobs. In this regard, defendants propose to introduce evidence in three areas. First, they contend that Brennan's floor trader job also involved work as a "clerk," which they maintain he can still do despite his impaired vision. The Court agrees with defendants that this evidence is relevant to the issue of Brennan's alleged inability to perform his former occupation.

Next, defendants want to introduce evidence regarding Brennan's current work in a sales job and his ability to perform day-to-day tasks such as driving a car. Again, the Court agrees with defendants [*4] that this evidence may be relevant regarding the degree of impairment of Brennan's vision and thus may bear, to some extent, on his ability to perform his former job. It is important to keep in mind, however, that the issue is not Brennan's ability to perform work generally, but rather his ability to perform his former job as a floor trader. The Court will leave it to plaintiff to object at trial if defendants' inquiry in this regard goes too far afield.

Finally, defendants want to introduce evidence that Brennan was able to trade commodities in an office using a computer screen; they say that they should be permitted to argue that this is the same occupation that Brennan performed on the floor of the exchange. The Court rejects this argument; the evidence is irrelevant and even if somehow marginally probative would be enormously and unfairly prejudicial. Brennan's insurance policy provided benefits if he was unable to perform his own occupation; it is undisputed that his occupation involved trading on the floor of the exchange, not in an office sitting at a desk. That is a different occupation, and one that defendants have failed to show bears in any way on the issue of Brennan's [*5] ability to work as a floor trader. *See* *Stender v. Provident Life and Accident Insurance Co., 2000 U.S. Dist. LEXIS 11478, 2000 WL 875919*, at *7-8 (N.D. Ill. June 29, 2000).

### 3. Evidence regarding plaintiff's medical malpractice suit

Brennan's third motion *in limine* seeks to exclude evidence relating to his medical malpractice suit against the doctors who performed his eye surgery. The defendants oppose the motion, arguing first that they are entitled to introduce the lawsuit to show that Brennan has a financial motive to shade his testimony because a win in this case would help him in the malpractice case. The Court rejects this argument. The fact that Brennan has another case pending does not give him any materially increased motive to testify falsely beyond that which may result from the fact that he hopes to win the present case. And even if evidence about the other case had some limited probative value, it would be far outweighed by the unfair prejudice, confusion of the issues, and waste of time that would result from injecting the malpractice case into this one.

Defendants also want to introduce the malpractice case to undermine Brennan's argument that Dr. Deutsch, [*6] the companies' medical examiner, was a hired gun; evidently Brennan turned down another proposed medical examiner on the grounds that he was the partner of the physician Brennan is suing. But for defendants' purpose, it will suffice to allow them to elicit from Brennan the fact that he turned down the other doctor; his reason for doing that does not truly help defendants. Brennan, despite his request to exclude the malpractice case, will have to decide whether he wants to explain his reason for the turn-down; if so, he may open the door to admission of at least some evidence concerning the malpractice case.

### B. Defendants' Motions *in Limine*

The defendants have filed eighteen motions *in limine*, which we address in turn.

### 1. Evidence of future damages

First, defendants seek to bar any evidence about Brennan's future damages; they argue that the evidence must be limited to the damages that have accrued under the contract to date. The motion is denied. Even the cases on which defendants rely recognize that a plaintiff may recover a judgment regarding future benefits in some instances -- specifically, where he can show that the insurer completely repudiated the [*7] insurance contract. *E.g.,* *New York Life Insurance Co. v. Viglas, 297 U.S. 672, 680, 682, 80 L. Ed. 971, 56 S. Ct. 615 (1936); Scherer v. The Equitable Life Assurance Society of the United States, 190 F. Supp. 2d 629, 633 (S.D.N.Y. 2002).* Under Illinois law, that happens when a contracting party "unequivocally and without justification renounces its duty to perform the contract," *see* *Draper v. Frontier Insurance Co., 265 Ill. App. 3d 739, 745, 638 N.E.2d 1176, 1181, 203 Ill. Dec. 50 (1994),* which is precisely what Brennan has alleged

defendants did. Based on the current record, the issue of recovery of future benefits is properly presented to the jury.

## 2. Evidence relating to defendants' practices generally and in other cases specifically; testimony of Dr. William Fiest

Defendants' second motion asks the Court to bar evidence of claims handling, alleged bad faith, and vexatious conduct with respect to insureds other than Brennan; their eighth motion asks for an order precluding evidence regarding the manner and method by which they generally conducted business during period before Brennan presented his disability claim; and [*8] their fourteenth motion requests an order barring admission of any investigations, administrative proceedings, lawsuits, market conduct studies, reports, and other inquiries into their claims handling practices. Their third motion *in limine* seeks to exclude the testimony of Dr. William Fiest, a former Provident medical director, concerning that company's policies. Defendants argue that Brennan's claims concern defendants' handling of his particular insurance claim, and not how they may have handled other claims made by other people at other times.

Though we agree with defendants that determination of their liability on the § 155 claim is premised on their handling of Brennan's claim, that does not render irrelevant all evidence concerning their claims handling practices generally or other claims specifically, and none of the cases cited by defendant so hold. Under Federal Rule of Evidence 406, "evidence of the habit of a person or of the routine practice of an organization ... is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." A good deal of the evidence Brennan seeks to offer in [*9] this regard falls neatly within the scope of Rule 406; he contends that the evidence shows that defendants had a standard practice of targeting for denial or termination certain types of high-value claims (including the type Brennan made) and then coming up with evidence to support a denial.

Defendants note, and the Court agrees, that the admissibility of evidence offered under Rule 406 must be determined with great caution to ensure that what is denominated as "routine practice" evidence is not actually evidence of other acts offered to prove a party's propensity to act in conformity with its general character, which Rule 404(b) renders inadmissible. *See    Simplex, Inc. v. Diversified Energy Systems, Inc.,* 847 F.2d 1290, 1293 (7th Cir. 1988). But that admonition cannot be read in a way that writes Rule 406 out of the Rules of Evidence. *Simplex* concerned an attempt to use specific instances of conduct to establish the existence of a

general practice -- evidence which directly implicates the concerns that motivated the general prohibition in Rule 404(b) and which therefore presents the risk that the court addressed. But the case did not concern evidence that tends [*10] to establish the existence of a routine practice more directly, such as by showing an entity had a general policy, procedure, or rule which covered the specific scenario involved in the litigation. Evidence of that type does not implicate Rule 404(b)'s concern with the misuse of evidence of specific instances of conduct. And in any event, *Simplex* did not impose a bar to "specific instance" evidence altogether n1; rather it limited the use of such evidence to situations in which it shows a degree of repetition sufficient to reasonably give rise to "an inference of systemic conduct" that constituted the party's regular response to a given situation. *Id. at 1293, 1294* (quoting *Wilson v. Volkswagen of America, Inc., 561 F.2d 494, 511 (4th Cir. 1977)).* Indeed, just a little over a year after *Simplex* was decided, the Seventh Circuit, by a panel that included *Simplex's* author, upheld a trial court's admission, in an insurance breach-of-contract case, of evidence of the insurer's conduct in other similar situations for the purpose of showing the company's habit and routine practice. *Rosenburg v. Lincoln American Life Insurance Co., 883 F.2d 1328, 1336 (7th Cir. 1989).* [*11]

> n1 Indeed, the Advisory Committee Notes to Rule 406 appear to specifically contemplate the use of evidence of particular instances of a party's conduct to establish the existence of a habit or routine practice. *See* Fed. R. Evid. 406, 1972 Advisory Committee Notes.

Some of the evidence offered by Brennan tends to show the existence of a regularly-followed policy or practice that is sufficiently routine and "automatic" to permit its admission under Rule 406 as construed in *Simplex* and *Rosenburg*. Specifically, plaintiff has direct evidence consisting of the testimony of Dr. William Fiest, a former Vice President and Medical Director of Paul Revere, that that company had a policy of targeting for termination certain types of high-level disability insurance claims (including those of the type made by Brennan) and then marshaling evidence to support the termination, rather than dealing with the claims fairly. Though, as defendants point out, Fiest left Paul Revere before the time period when Brennan's benefits [*12] were terminated, plaintiff has sufficient evidence of the continuation of this policy or practice into the relevant time period, including the period after Paul Revere was acquired by Provident, to provide an adequate foundation

for a reasonable inference that it did in fact continue. Plaintiff likewise has sufficient circumstantial evidence to permit a reasonable inference that the policy was followed in his particular case. Though defendants dispute this evidence and the inferences to be drawn from it, those are matters for the jury; Brennan has laid an adequate foundation for admission of this evidence. Though there may, in some cases, be a fine line between "routine practice" evidence admissible under Rule 406 and "other act" evidence generally rendered inadmissible under Rule 404(b), Brennan's policy evidence does not come close to that line.

Further, this evidence is admissible on both of Brennan's claims: it bears circumstantially on the validity of defendants' reason for terminating Brennan's benefits as well as on the question whether they acted vexatiously and unreasonably. For these reasons, the Court holds that the evidence relating to defendants' alleged practices regarding [*13] "round tabling" and "scrubbing" of claims is relevant and not unfairly prejudicial, and we therefore deny defendants' second, third, and eighth motions *in limine* to the extent they are aimed at such evidence.

As noted above, defendants' fourteenth motion *in limine* seeks to exclude any investigations, administrative proceedings, lawsuits, market conduct studies, reports or other inquiries into defendants' claims handling practices to the extent they involve claims other than Brennan's. The Court will preclude Brennan from introducing jury verdicts and court decisions from other cases. Even if such evidence is relevant -- which the Court seriously doubts -- the probative value of using a handful of specific instances that resulted in litigation to prove or illustrate defendants' methods of operation and alleged bad faith claims handling practices is slight. That marginal probative value is far outweighed by the unfair prejudice that would result to the defendants from the bare admission of the results of other lawsuits, or the extraordinary confusion of the issues and waste of time that would result if the particulars of those cases had to be aired before the jury, as likely [*14] would be the case if we decided to admit the verdicts and decisions.

With regard to decisions and actions by administrative agencies, the Court advised the parties at the initial session of the final pretrial conference that it could not determine, sight-unseen, whether such matters might be admissible to show some relevant aspect of defendants' business practices or for some other purpose. The Court directed plaintiff to submit any such materials that he proposed to offer in evidence so that the Court could review them prior to the second session of the final pretrial conference. At that session, plaintiff's counsel advised the Court that plaintiff was withdrawing his request to introduce evidence of this type.

### 3. Arthur Andersen report to Maine Department of Insurance

Defendants' thirteenth motion *in limine* seeks to exclude a June 1999 report by the accounting firm Arthur Andersen relating to the merger between Provident Companies and Unum Life Insurance Company of America. Andersen was retained by the Maine Department of Insurance to report on various aspects of the merger, which that Department was required to approve. At the final pretrial conference, Brennan's counsel [*15] said that he wants to offer the Andersen report for a single reason -- for its summary of a "market conduct" report prepared by the Illinois Department of Insurance concerning defendants' claim handling practices. This is not a proper basis to introduce the Arthur Andersen report in evidence. Even if the Illinois market conduct report were itself admissible, plaintiff has shown no proper basis under Rule 1006 to introduce Arthur Andersen's summary of it, which in any event would be inadmissible hearsay.

### 4. Undisclosed opinions of plaintiff's expert

In their fourth motion, the defendants seek to bar any undisclosed opinions by James Schultze, an experienced bond trader at the Chicago Board of Trade. Plaintiff's Rule 26(a)(2) disclosure regarding Schultze evidently stated only that he would "testify as to matters and opinions expressed and stated in his deposition." Though this disclosure plainly did not comply with Rule 26(a)(2)(B), defendants did not object to it and did not seek to strike the disclosure; instead they took Schultze's deposition and now seek to confine him to what he said in the deposition. The Court agrees with defendants that under the circumstances, Schultze [*16] will be limited to the opinions he expressed in his deposition, though he need not deliver them verbatim. But until we hear the questions that will be asked of Schultze at trial, we will be unable to determine the particular contours of this ruling. Defendants will be required to make their objections, if they have any, during the course of Schultze's testimony; if plaintiff improperly attempts to take advantage of the Court's inability to predetermine the matter, we will take appropriate steps to avoid unfair prejudice to defendants.

### 5. Defendant's alleged tactics in this case

Defendants next ask the Court to bar evidence of certain litigation tactics that Brennan contends are indicative of defendants' bad faith. As explained by Brennan's counsel at the hearing on the motion, the evidence focuses on three episodes: the alleged misidentification of persons who purportedly had knowledge of relevant facts but turned out at their deposition to know nothing; the alleged failure to identify documents until a late stage of the litigation; and

the submission of the affidavit of Gloria Langevin, which the Court previously found was untrue. The Court grants defendants' motion to exclude [*17] this evidence. The facts concerning the first two matters are equivocal and have not been shown to indicate an intent to conceal evidence. And though the Court sanctioned defendants for the submission of Langevin's false affidavit, we did so not because we believed that the defendant corporations had engaged in a deliberate effort to mislead, but primarily because they failed to exercise sufficient oversight concerning the veracity of the affidavit submitted by their employee. None of this evidence has any bearing on Brennan's breach of contract claim or his claim under § 155.

### 6. Testimony of agent/broker who sold plaintiff the insurance policy

In their sixth motion *in limine,* defendants seek to bar the testimony of Michael Corrigan, the insurance agent or broker who sold Brennan the policy. Brennan says that he wants to call Corrigan to testify about the purpose of the policy and one of its riders, as well as the circumstances leading up to Brennan's purchase of the policy, including the fact that Brennan was given a flyer, purportedly prepared by Paul Revere, that compared its policy to another one he was considering. None of this evidence is relevant. There is no claim [*18] that the policy or the rider is ambiguous and thus no need for testimony from Corrigan regarding its purpose. And the circumstances leading up to Brennan's purchase of the policy likewise have no bearing on any contested issue in the case. The comparison sheet is similarly irrelevant; we have granted defendant summary judgment on Brennan's claim that he fraudulently induced to purchase the policy, thus taking out of the case any claims that might make the circumstances of the purchase relevant and material.

### 7. Destruction of claim handler's handwritten notes

In their seventh motion *in limine,* defendants seek to bar evidence that Steve Page, who handled Brennan's claim for defendants, destroyed certain notes he made in relation to Brennan's claim. Defendants say that Page did this only after preparing a typed memorandum that included the contents of the notes. The motion to exclude this evidence is denied. This episode is relevant as part of the circumstantial evidence that, according to Brennan, shows that defendants had no basis for denying his claim and sanitized their files to remove evidence that might undermine their decision. We agree with defendants that this [*19] evidence may be characterized in a way that is innocuous and consistent with proper practice, but that is a matter properly left for argument by counsel and consideration by the jury.

### 8. Testimony of certain of defendants' executives

Defendants next seek to bar the testimony of J. Harold Chandler (UnumProvident's chairman, president and chief executive officer) and Ralph Mohney (UnumProvident's senior vice president). Brennan has suggested that he intends to call Mohney to testify concerning defendants' claims handling practices and procedures generally, as well as the specific procedures employed in Brennan's case; he apparently intends to call Chandler to testify concerning the "round tables" and other processes allegedly geared toward promoting the claims-denying philosophy Brennan alleges defendants had and to discuss their procedure for resolving a difference of opinion between an insured's doctor and the insurer's medical examiner. Because both witnesses are outside the Court's subpoena power, Brennan will be required to offer their deposition testimony. Brennan has now submitted the portions of the depositions that he intends to offer, and defendants have elaborated [*20] on their objections. A separate order will be entered identifying which parts of the depositions will be admitted.

### 9. Evidence of plaintiff's payments of premiums

Defendants' tenth motion *in limine* seeks to exclude evidence of past, current or future premium payments Brennan has made or will make. The motion is denied; at a minimum, such evidence is relevant to show that Brennan performed his obligations under the insurance contract that he claims the defendants breached.

### 10. Evidence regarding plaintiff's claim for statutory interest

Defendants next seek to exclude evidence regarding Brennan's claim for statutory interest. The motion is granted without objection; the matter is one for the Court to determine after trial in the event Brennan prevails.

### 11. Argument concerning defendants' prior payment of benefits

In their twelfth motion *in limine,* defendants seek to preclude Brennan from arguing that their payment of benefits under the policy constitutes an admission of liability or an acknowledgment that he is totally disabled. The motion is denied; the evidence is what it is, and the meaning to be attached to it is a point for the attorneys to argue [*21] to the jury, not for the Court to determine in advance of trial.

### 12. Characterization of payment to defendants' consulting physician

In their fifteenth motion *in limine,* defendants seek to preclude Brennan from characterizing Paul Revere's payment to Dr. Deutsch as a "rush" payment. Evidently after Dr. Deutsch submitted a bill to Paul Revere for his

examination of Brennan, some unknown staff person at Paul Revere put through a payment request, marking it "ASAP." Brennan wants to be able to argue that this was a "rush" payment, which he says somehow bears on Dr. Deutsch's status as a hired gun or somehow supports Brennan's claim that the process that led to the termination of his benefits was a set-up. The Court does not see the connection. Plaintiff has done nothing to illuminate the actual significance of the "ASAP" designation, such as showing that this was not the standard practice, and thus his argument that this was out of the ordinary or indicative of sinister intentions is speculative. The document itself is admissible (defendant has not objected to its admission), but the proposed characterization is improper and will not be permitted.

### 13. Evidence regarding [*22] timing of defendants' retention of vocational consultant

Defendants next seek to preclude Brennan from arguing that Jacqueline Pickering, a vocational consultant who opined that Brennan was able to perform his job, was retained only after defendants learned that Brennan had hired counsel. Brennan is primarily interested in the timing of Pickering's retention because it did not occur until after his benefits were terminated, but he also wants to introduce the fact that defendants had also learned by that time that he had retained counsel. He contends that the timing of these events is relevant as to whether Pickering was retained in a *bona fide* effort to evaluate his claim or rather to support a preconceived determination that he was not disabled. Though the Court agrees with defendants that the timing of Pickering's retention can likewise be explained as completely appropriate, the choice between these competing interpretations is properly made by the jury. The evidence is relevant and not unfairly prejudicial. Defendants contend that if plaintiff is permitted to introduce this "timing" evidence, they should be able to call as a witness the attorney plaintiff retained -- his [*23] lead counsel at the upcoming trial -- to explore the nature and content of his communications with the insurers' representatives. But defendants have not shown any real need to call counsel to elucidate these matters, assuming they are relevant (a question we do not now decide): most of the communications were in writing, and those that were not were memorialized by defendants' representatives, who are prepared to testify at trial. Defendants' request to call plaintiff's attorney is therefore denied.

### 14. Evidence concerning defendants' finances

Defendants' seventeenth motion *in limine* seeks to bar evidence concerning defendants' corporate size and assets. At the final pretrial conference, plaintiff's counsel advised that plaintiff proposed to introduce evidence that

in 1993, Paul Revere posted a $ 423 million reserve for losses relating to disability insurance policies of the type issued to Brennan, which supposedly was the result of liberalized underwriting practices in the late 1980's. Plaintiff maintains that the practice of targeting such claims for termination resulted from this loss. He also proposes to introduce a series of Paul Revere monthly reports covering the [*24] period from mid-1995 through mid-1997 which reported on the amounts saved by the company by the strategies it developed to deal with these types of claims. According to plaintiff, this evidence is part and parcel of the "habit and practice" evidence which the Court has previously found admissible. The Court disagrees. What we have found is pertinent to Brennan's claims are the practices that defendants used during the period of time in which his claim was denied -- the early part of 1999. We have permitted Brennan to offer evidence regarding defendants' earlier use of the "round tabling" and "scrubbing" procedures not because what happened in earlier years is directly relevant, but rather because it is part of the circumstantial evidence that tends to show that such practices continued during the relevant period (a point on which plaintiff has little or no direct evidence). That does not mean that *everything* surrounding the use of round tabling and scrubbing at those earlier dates is admissible. Without evidence that defendants continued to report on the dollar effects of these practices during the relevant time period -- evidence that plaintiff concedes he does not have -- the [*25] earlier memoranda are at most marginally relevant. The same is true of evidence of the apparent motivation for the original institution of these practices many years before the relevant time period. The unfair prejudice and diversion of the trial onto a side-track that would result from admission of this evidence far outweighs that limited probative value. The Court therefore excludes evidence of the $ 423 million reserve and the 1995-97 reports pursuant to Federal Rule of Evidence 403. We will, however, permit plaintiff to attempt to elicit succinctly, in testimonial form, that the practices of round tabling and scrubbing had a positive effect on defendants' finances.

### 15. Argument regarding "alter ego" issue

Lastly, defendants seek to preclude Brennan from "obfuscating the corporate separateness" of Paul Revere, Provident Life and UnumProvident. The motion is denied. As the Court held in ruling on defendants' motions for summary judgment, there is some question as to which defendant was responsible for handling -- and rejecting -- Brennan's claim and which company the relevant employees actually worked for at any given time. *See* [*26] *Brennan v. Paul Revere*, 2002 U.S. Dist. LEXIS 446, 2002 WL 54558, at *3 (N.D. Ill. Jan.

15, 2002). And we will not preclude Brennan from pursuing an alter ego theory at trial. Defendants' argument in this regard is really that the evidence supporting an alter ego theory would be insufficient to support a jury verdict. The Court cannot assess the sufficiency of the evidence until we hear it. Defendants should renew their request, if appropriate, in a Rule 50 motion at the close of plaintiff's case and/or at the close of the evidence.

### C. Defendants' Motion to Bar Testimony & Opinions of Susan Scanlan

Defendants have moved to exclude the testimony of Susan Scanlan, a board certified occupational therapist, under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).* After hearing argument at the second session of the final pretrial conference, the Court stated that it was denying defendants' motion. However, after giving the matter further thought, the Court has reconsidered this ruling on its own motion, and wishes to hear additional argument from counsel prior to jury selection at 9:45 a.m. on June 17, 2002.

### [*27] D. Jury vs. Bench Trial

Brennan made a jury demand, but defendants argued that he was not entitled to a jury on the section 155 claim as a matter of Illinois law. When the Court asked the parties to brief the issue of Brennan's right to a jury trial on the section 155 claim, Brennan essentially conceded the point, withdrawing his jury demand so that both claims would be determined by the same finder of fact. Defendants, however, did not consent to the withdrawal of the jury demand, *see* Fed. R. Civ. P. 38(d), so we are required to address the issue briefly. We agree with defendants that as a matter of Illinois law -- the only basis on which the parties argued the issue -- Brennan is not entitled to a jury trial on the section 155 claim. *See, e.g., Horning Wire Corp. v. Home Indemnity Co., 8 F.3d 587, 590 (7th Cir. 1993)* (deciding the issue as a matter of Illinois law). n2

> n2 Brennan has not argued that the Seventh Amendment entitles him to a jury trial on the § 155 claim and is therefore deemed to have waived the point. *See generally A. Kush & Associates, Ltd. v. American States Insurance Co., 927 F.2d 929, 940 (7th Cir. 1991)* (rejecting a Seventh Amendment argument in this context, but on the basis of harmless error).

[*28]
### Conclusion

For the reasons explained in this Memorandum Opinion, the Court denies plaintiff's first motion *in limine;* grants in part and denies in part his second motion *in limine;* and grants his third motion *in limine* [docket items 109-1, 110-1 & 111-1]. In addition, the Court grants in part and denies in part defendants' motion *in limine* [112-1] as stated in this Opinion, and defers ruling on defendant's motion to bar the testimony and opinions of Susan Scanlan [113-1]

Dated: June 10, 2002

MATTHEW F. KENNELLY

United States District Judge

18 of 65 DOCUMENTS

**JOSEPH CERNI, Plaintiff, v. PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, a Tennessee Corporation; NEW ENGLAND VARIABLE LIFE INSURANCE COMPANY, a Delaware Corporation; NEW ENGLAND LIFE INSURANCE COMPANY; METROPOLITAN LIFE INSURANCE COMPANY, a New York Corporation; DAVID KOSSAK, an Individual; and DOES 1 through 50, Defendants.**

**Case No. CV 00-12898 - GAF (CTx)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

*2002 U.S. Dist. LEXIS 6053*

**April 3, 2002, Decided**

**April 3, 2002, Filed; April 4, 2002, Entered**

**DISPOSITION:**
 [*1] Defendant's Motion for Partial Summary Judgment DENIED.

**COUNSEL:**
For JOSEPH CERNI, plaintiff: Rhonda R Harris, Schindler & Harris, Laguna Beach, CA.

For PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, defendant: Robert J McKennon, Jenny H. Wang, Barger & Wolen, Irvine, CA.

**JUDGES:**
Judge Gary Allen Feess, United States District Court.

**OPINIONBY:**
Gary Feess

**OPINION:**

**ORDER DENYING DEFENDANT PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

 **I.**

 **INTRODUCTION**

Plaintiff Joseph Cerni ("Dr. Cerni"), an osteopath, purchased an occupation disability insurance policy from Defendant Provident Life and Accident Insurance Company ("Provident"). Dr. Cerni filed a disability claim with Provident in 1998, reporting a back condition forced him to stop working in 1997 and later left him totally disabled from his occupation. Provident conducted an investigation and then denied the disability claim in September 1998. In January 2000, Dr. Cerni filed a second disability claim with Provident. According to Dr. Cerni, he attempted to return to work in 1999, but his back condition forced him to stop after one [*2] month. Provident conducted another investigation, and in May 2000, again denied Dr. Cerni's disability claim.

In response, Dr. Cerni submitted additional materials to Provident in support of his disability claim. He also filed this action in state court against Provident and others alleging breach of contract, insurance bad faith, and negligence in connection with Provident's denial of his two disability claims. Defendants removed the action to this Court. Provident claims to have suspended its review of Dr. Cerni's claim appeal when the company was served with the summons and complaint in this pending litigation.

Provident now brings this motion for partial summary judgment, asserting this Court should: (1) determine as a matter of law that Provident acted reasonably in denying Dr. Cerni's disability claims because legitimate questions regarding coverage existed

at the time of Provident's denial; and, therefore, (2) grant summary judgment in Provident's favor on both the bad faith insurance and punitive damages claims. Dr. Cerni counters that he has presented evidence sufficient to raise triable issues of fact regarding the reasonableness of Provident's investigations and claim [*3] denials and that the matter should therefore be left for trial on the merits.

After reviewing the moving and opposition papers, along with the voluminous evidence submitted on behalf of both parties, the Court holds that genuine issues of material fact remain for trial regarding whether there was a "genuine dispute" between Provident and Dr. Cerni regarding coverage, and thus, whether Provident acted unreasonably in denying Dr. Cerni's occupation disability claims. Moreover, in light of the factual disputes that remain, the Court declines to decide the punitive damages issue at the summary judgment stage. Accordingly, the Court hereby **DENIES** Provident's Motion for Partial Summary Judgment in its entirety.

## II.

### FACTUAL BACKGROUND

The Court finds the following facts are undisputed or are without substantial controversy, and are deemed established for the remainder of this case.

### A. THE PARTIES AND PLAINTIFF'S POLICY

On May 28, 1990, Defendant Provident issued a disability income policy ("Policy") to Plaintiff, which provides for disability benefits in the amount of $ 7,310 per month in the event of the insured's total disability. (SUF P 2). Under the Policy, [*4]

**Total disability or totally disabled** means that due to Injuries or Sickness:

1. you are not able to perform the substantial and material duties of your occupation; and 2, you are receiving care by a Physician which is appropriate for the condition causing the disability. We will waive this requirement when continued care would be of no benefit to you.

(SUF P 2). The Policy defines occupation as follows:

**your occupation** means the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled. If your occupation is limited to a recognized specialty within the scope of your degree or license, we will deem your specialty to be your occupation.

(SUF P 3).

### B. DR. CERNI'S FIRST CLAIM UNDER PROVIDENT'S DISABILITY POLICY

#### 1. Dr. Cerni's 1998 Claim

Dr. Cerni telephoned Provident in early April 1998, and spoke with Jane Kennemore about a possible claim arising from a back condition. (SUF P 4). Plaintiff subsequently submitted a claim form to Defendant in May 1998, in which he represented his last date of work as July 17, 1997; the first date of treatment as August 4, 1997; and the dates [*5] of total and complete inability to work as November 17, 1997 to present. (SUF P 5). n1

> n1 Plaintiff objects to the admission of many documents that make up Provident's Cerni claim file, asserting the documents are hearsay and lack foundation because the information memorialized in many of the records was not personally known to Mr. Neil Smoot, the declarant who purports to authenticate them, and who did not become the claim file custodian until August 1998. (See Plaintiff Objections at 2). The Court disagrees. The documents in Cerni's claim file fall within the business records exception which can be authenticated by a custodian who has no personal knowledge of the events recorded in such records. Here, because Smoot lays a proper foundation for the exception, the Court will consider them. (Declaration of Neil Smoot ("Smoot Decl.") PP 1-2). Moreover, the Court notes many of the statements within the claim file documents are nonhearsay admissions by Dr. Cerni. Finally, the Court notes that the reasonableness of defendant's conduct turns at least in part on its knowledge, and evidence in the claim file bears on what defendant knew and when it knew it. Therefore, the Court overrules Plaintiff's evidentiary objection, and concludes Provident's claim file exhibits are admissible.

[*6]

In response to a claim form question about the occupation engaged in at the time he became disabled, Dr. Cerni listed physician. (SUF P 6). He also provided a list of occupation duties, which included seeing patients on hospital rounds and in the office, taking care of administrative and phone tasks, and performing surgery. (Id.) Dr. Cerni also submitted a Physician Questionnaire, in which he represented that he specialized in family practice and internal medicine. (SUF P 7).

In addition to the claim form and Physician Questionnaire, Dr. Cerni submitted an Attending

Physician's Statement ("APS") completed in early May 1998 by Plaintiff's chiropractor, Dr. Gary Gautier. (SUF P 8). Gautier opined that Plaintiff's then diagnosis and condition was acute spondyloiysis in the lumbar spine, disc degeneration in the lumbar and cervical spine and osteoarthritis in the cervical and lumbar spine. (SUF P 8). Gautier also indicated that Plaintiff was restricted from performing occupational duties in the following ways: no continuous standing or sitting for more than 15 minutes; no continuous walking for more than 30 minutes; no picking up or lifting of more than ten pounds; and no twisting, **[*7]** bending or stooping. (SUF P 9; Provident Ex. 3).

## 2. Provident's Initial Investigation of Dr. Cerni's 1998 Claim And Approval of Benefits

On June 3, 1998, after reviewing the claim form and accompanying documents, Provident representative Deborah Hart phoned Dr. Cerni regarding his claim. (SUF P 10). According to Hart's Disability Case Management Message Report ("Hart Report") outlining the details of this call, Dr. Cerni described his job duties prior to disability as hospital rounds, office practice, surgery and administrative work relating to the medical practice. (SUF P 11).

On June 19, 1998, Provident representative Jerry Lyles also spoke with Dr. Cerni over the telephone. (SUF P 14). The two discussed a number of matters relating to Plaintiff's claim, including the back condition symptoms arising in July 1997, his corresponding treatment dating back to August 1997, and his occupation as an osteopath with its related duties prior to disability. (Id.) Dr. Cerni informed Lyles that he was treating with his brother, Michel Cerni (also an osteopath) and Dr. Gautier. (SUF P 16). Lyles' Interview also indicates that Dr. Cerni's then existing symptoms apparently prevented **[*8]** job duty performance, or at least caused a loss of work time, because even though he could walk without much trouble, Dr. Cerni could not stand for long periods, or bend or lift. (SUF P 16; Provident Ex. 6). Lyles questioned Dr. Cerni regarding the availability of records as daily appointment logs and hours billable to clients. (SUF P 18). According to Lyles' Interview, Caremore (and maybe Plaintiff's brother) would have some billing records, although it was uncertain whether a log book or other appointment materials were available. (Id.; Provident Ex. 6).

At about the same time, Provident sent a letter to Dr. Gautier requesting all records relating to his treatment of Dr. Cerni. (SUF P 47). Shortly thereafter, Provident received Gautier's records dated January 12, 1998 to June 16, 1998. (SUF PP 48-49). n2

n2 Provident never sent a letter to Michael Cerni requesting treatment records or other information that would confirm Plaintiff worked with him prior to June 1996. (SUF PP 117-118).

Dr. Gautier submitted **[*9]** a second APS, dated June 19, 1998, certifying the diagnosis underlying Dr. Cerni's disability as spondylolisthesis in the lumbar spine. (SUF P 19). Dr. Cerni also submitted an "Insured's Supplementary Statement of Claim," dated June 17, 1998, which confirmed he was still unable to perform his occupational duties. (SUF P 20; Provident Ex. 8).

On June 29, 1998, Provident approved payment of benefits to Dr. Cerni under the Policy. (SUF P 21).

## 3. Provident's Follow-Up Investigation

After approving benefit payments to Dr. Cerni, Provident conducted further investigation into the claim. On August 3, 1998, Provident's Christopher DeLuca conducted a one hour field visit with Dr. Cerni at his home, during which time Plaintiff voiced no complaint of pain or stiffness. (SUF PP 27-28). During the visit, Dr. Cerni informed DeLuca he was a doctor of osteopathic medicine, and was involved in a practice as an internist and family practitioner. (SUF P 29). According to DeLuca's field visit report ("DeLuca Report"), Dr. Cerni informed DeLuca that he "ceased to practice in February 1997, having sold the practice to some internists whom he had brought into the practice." (SUF P 31; Provident **[*10]** Ex. 11). Dr. Cerni provided reasons for why he ceased practicing medicine at that time, including that he was looking for a practice closer to his residence, had grown tired of the long distance drive to work, and had become dissatisfied with being involved in a large managed care practice. (Id.) The DeLuca Report also indicates Dr. Cerni stated that since February 1997, he had been "doing some consulting, evaluating practices and practice management, and looking for a practice to purchase." (SUF P 32; Provident Ex. 11).

In early August 1998, Dr. Robert Coddington reviewed Gautier's records and an attached 1998 x-ray report. (SUF P 52). Dr. Coddington, an orthopedist and medical consultant for Provident, opined that the records did not support Dr. Cerni's impairment from occupational duties relating to the acquisition of practices. (Id.)

## 4. Provident Receives Knowledge of Claims Under Other Disability Policies

In July 1998, First Allmerica Life Insurance Company ("Allmerica") contacted Provident regarding Dr. Cerni's disability claim. (SUF P 36). Allmerica requested information about Dr. Cerni's claim because he had a disability policy with Allmerica, under which **[*11]**

he also submitted a claim for the same back condition. (Id.) When a representative of Allmerica phoned Smoot in August 1998 to follow up on this information request, the representative informed Smoot that Allmerica was going to attempt to rescind Dr. Cerni's disability policy obtained in 1997 because he had provided false information regarding his employment. (SUF P 37).

Smoot also received a telephone call from Massachusetts Casualty Insurance Company ("Mass Casualty") regarding Dr. Cerni in August 1998. (SUF P 22). The Mass Casualty representative informed Smoot that one of its field representatives met with Dr. Cerni at his home in June 1998. (SUF P 23). According to Mass Casualty, Dr. Cerni told the representative that at the time his disability arose, he was working with his brother as a consultant identifying businesses and practices for purchase and sale; work which involved review of financial information, and could be characterized as brokering businesses. (SUF PP 23-24). Mass Casualty informed Provident that Dr. Cerni's occupational duties as described at the field visit contradicted his initial representations to Mass Casualty of his occupation as a medical doctor. **[*12]** (SUF P 24).

### 5. Provident Conducts Video Surveillance of Dr. Cerni

On August 3, 1998, as part of Provident's continued investigation of Dr. Cerni's disability claim, Smoot authorized surveillance of Dr. Cerni. (SUF PP 64 and 125). And on August 6, 1998, Smoot made several research requests regarding the insured. (SUF P 125). The confidential video surveillance of Dr. Cerni ensued for six days between August 10 and 29, 1998. (SUF P 64). According to Smoot, he requested the surveillance to "validate the extent of [Cerni's] claimed restrictions and limitations" as reported in DeLuca's Report. (Id.) The video surveillance conducted on August 10 - 12, 1998 showed no activity by Dr. Cerni. (SUF P 128).

The video footage submitted to the Court covers surveillance on August 27 and 28, 1998. (SUF P 65). The August 27, 1998 footage shows the Plaintiff pumping gas, walking around his yard for an extended period of time in which he walked up steps and inclines and bent or stooped over occasionally. (Id.) Although the video footage is not in real time, this extended time period in which Plaintiff is shown walking around his yard apparently covers at least two hours. (Id. **[*13]** ) The footage for both August 27 and 28 shows Dr. Cerni driving around as a passenger in a car, getting in and out of that car, and walking in and out of various shops with the driving companion. (Id.)

Nonetheless, Provident did not receive the report or video footage for the August 27 - 29, 1998 surveillance prior to denying Dr. Cerni's claim. (SUF P 127). And

Provident did not rely on any of the 1998 video surveillance as a basis for denying Dr. Cerni's first disability claim. (SUF P 126). Moreover, Provident never had Dr. Coddington review the report or actual footage to determine whether the activity shown on the tape was inconsistent with Dr. Cerni's disability claim. (SUF P 124).

### 6. Provident's Ultimate Denial of Dr. Cerni's 1998 Disability Claim

As of September 1998, Provident had not sought an Independent Medical Examination ("IME") of Dr. Cerni (SUF P123), and as noted above, had not sought any medical records from Michael Cerni who had allegedly treated plaintiff's medical condition. (SUF P 119). Moreover, Provident never advised Plaintiff that his claim was being decided on the premise that the insured's occupation was that of "acquisitioner" rather than **[*14]** an osteopath. (SUF P 120).

Nevertheless, on September 1, 1998, Provident conducted a "roundtable review" of Dr. Cerni's disability claim, attended by Smoot, his supervisor, an attorney and medical personnel. (SUF P 68). Those in attendance discussed what decision should be made regarding Dr. Cerni's claim based on Provident's investigation, and ultimately concluded the claim should be denied. (Id.) Provident then wrote to Dr. Cerni on September 17, 1998, advising him that further benefits under his policy were discontinued because the company had concluded that he was ineligible for total disability benefits. (SUF P 69). The letter stated that "according to the terms and provisions of your policy, [Provident] can not evaluate your claim based on the occupation of a physician, since this is not the occupation in which you were engaged at the time of claim." (SUF P 69; Provident Ex. 22). And the letter further explained that the records made available to Provident did not support Dr. Cerni's total disability claim, as "it is the presence of objective data in support of an impairment of disabling proportions which allows [Provident] to provide benefits on a claim." (Id.)

### **[*15]** C. DR. CERNI'S SECOND CLAIM UNDER THE PROVIDENT DISABILITY POLICY

### 1. Dr. Cerni's 2000 Disability Claim

In December 1999, Dr. Cerni notified Provident that he would be submitting a second claim. (SUF P 71). Thereafter, in January 2000, Plaintiff submitted a disability claim based on the same back condition, claiming he tried working as a physician for one month in October 1999, but had to stop due to pain. (SUF P 72). Dr. Cerni also submitted a January 11, 2000 APS from Dr. Gautier, which certified Dr. Cerni as disabled from spondylolisthesis and disc generation. (SUF P 73). The

APS stated Dr. Cerni should not spend longer than ten to fifteen minutes on his feet, and could not engage in prolonged sitting, standing, bending, lifting or stooping. (SUF P 74; Provident Ex. 24).

## 2. Provident's Investigation of Dr. Cerni's Second Claim

Following an exchange of phone calls and messages, Smoot spoke with Dr. Cerni on April 3, 2000. (SUF P 77). During this call, Smoot learned that the Plaintiff, worked with Dr. Gautier for approximately one month in October 1999, but was unable to continue because of his back condition. (Id.) Dr. Cerni informed Smoot he had trouble [*16] walking, bending and twisting without severe pain. (Id.) According to Smoot's telephone memorandum of this conversation, Dr. Cerni informed Smoot that in addition to treatment by Dr. Gautier, he had also been seeing an orthopedist, Dr. Don Bittner, M.D., since 1998. (Id.)

Immediately following this phone conversation, Provident requested and obtained Dr. Cerni's medical records from Drs. Bittner and Gautier. (SUF PP 78-79). Provident also asked Dr. Cerni to provide his personal and business tax returns for the years 1997 through 1999, in order to evaluate the amount and sources of Plaintiff's earned income during the period of alleged disability. (SUF P 80).

In May 2000, Provident forwarded records of Dr. Cerni's claimed disability to physical therapist consultant, Chris Duggan, for review. (SUF P 81). Within two hours of receiving the records, Duggan concluded that the physical findings documented by Dr. Bittner did not support impairment, and opined that the medical basis for Dr. Gautier's prognosis was unclear. (SUF P 82). Duggan then referred Dr. Cerni's file to Dr. Lance Matheny, Provident's in-house orthopedist, for additional input. (Id.)

Dr. Matheny reviewed [*17] Plaintiff's medical records, and included the following medical opinion in his Physician Response form submitted to Provident:

It is unclear from the information in the record at the time of this review what, if any, functional impairment might be attributable to the x-ray findings described [by Duggan] above. The symptomatic treatment received is one means of treating neck and back complaints. The current plans for further evaluation and treatment is [sic] unclear. Further medical and functional information may be needed to clarify his current status.

(SUF P 83; Provident Ex. 31). Dr. Matheny did not review the actual video footage of Dr. Cerni's August 1998 surveillance to determine whether the "activity"

shown on that video was inconsistent with Dr. Cerni's January 2000 disability claim. (SUF P 133).

## 3. Provident's Second Field Visit with Dr. Cerni

Also during this period, Provident decided a second field visit with Dr. Cerni was needed to further investigate his disability claim. (SUF P 84). Beginning in April 2000, Provident field representative Dan Pooler began attempting to speak with Dr. Cerni about his claim, and on May 18, 2000, Pooler was [*18] able to conduct a field visit at Dr. Cerni's home. (SUF PP 85, 87).

During this field visit, Dr. Cerni Informed Pooler that he tried working in October 1999 in the Santa Ana offices of Dr. Gautier, but was forced to stop working after one month because of his severe back pain. (Id.) When Pooler noted the long daily commute from Dr. Cerni's home in Malibu to Dr. Gautier's practice in Santa Ana, Dr. Cerni responded that he often stayed overnight at his parent's house in Orange County, and went directly to work from there. (SUF P 88). Dr. Cerni also informed Pooler of his limitations and restrictions, namely that he could not bend, lift or squat; he had to rest frequently; he had weakness in both legs and burning in his left leg; he had stabbing back pains; and his activities were restricted because of pain, which had resulted in weight gain of 20 pounds. (SUF P 89).

Following Pooler's field visit, Provident asked Dr. Cerni to provide documents, including billing records, to prove he had actually treated patients in October 1999. (SUF P 90).

## 4. Provident Conducts Additional Surveillance of Dr. Cerni

In order to evaluate the validity of Dr. Cerni's allegedly severe level [*19] of impairment, Provident conducted additional video surveillance of the Plaintiff from May 18 through 21, 2000. (SUF P 92). The video footage for May 19, 2000 covered a period from 8 a.m. to 6 p.m., and shows the Plaintiff for less than one minute when he walked down his driveway to speak with a man. (SUF P 93). The video footage for May 19 and 21, however, shows Dr. Cerni pumping gas, driving for extended periods of time (including at least one consecutive hour on May 19), riding around as the passenger in a companion's car for extended periods, getting in and out of both his car and his companion's car, and sitting for approximately forty minutes while dining. (SUF P 93).

## 5. Provident's Denial of Dr. Cerni's 2000 Disability Claim

On May 23, 2000, following another roundtable review process, Provident denied Dr. Cerni's second

disability claim. (SUF P 94). According to Smoot, "the determination that Cerni did not qualify for benefits under the Policy was based, in part, on the numerous inconsistencies and misstatements about Cerni's alleged restrictions and limitations." (SUF P 94; Smoot Decl. P 50). The denial letter, also dated May 23, 2000, informed Dr. Cerni that Provident's **[*20]** in-house orthopedist reviewed the Plaintiff's medical records, and concluded that the physical findings documented did not support the claimed impairment, and that documentation of Dr. Cerni's prior activities contradicted his "self-described claimed restrictions and limitations." (SUF P 94; Provident Ex. 37). Furthermore, the letter informed Dr. Cerni that the claim denial was based on the information presently available in Provident's claim file. (SUF P 96). Provident explained that Dr. Cerni should submit additional relevant information not known to the insurer in writing so that it may be considered. (SUF P 96).

Prior to reaching the decision to deny Dr. Cerni's claim, Provident did not send Dr. Cerni to an IME. (SUF P 131). And at the time of the denial, Provident had not yet received the results of Pooler's field visit, or the 2000 surveillance reports or footage. (SUF PP 129, 132).

### 6. Provident's Post-Denial Receipt of Additional Information

After Provident sent Plaintiff the claim denial letter, Smoot did receive the May 2000 surveillance video footage and Pooler's May 2000 field visit report. (SUF P 98). Dr. Matheny was never asked to review the May 2000 surveillance **[*21]** of Dr. Cerni after it was received by Provident in June 2000. (SUF P 133).

On August 2, 2000, Provident received the requested personal and business tax returns from Dr. Cerni for the years 1997 to 1999. (SUF P 99). Dr. Cerni's 1999 personal tax returns identified Cerni as an "investor" rather than a physician, and indicated no wages or salaries earned. (SUF PP 102-03). His 1997 personal tax returns also identified Cerni as an "investor," indicated wages and salaries earned in the amount of $ 2,500, gross income from business as $ 13, 635.00, and net long term capital gain as $ 56,396.00. (SUF P 102; Provident Ex. 38).

Thereafter, with respect to the documentation Pooler requested from Plaintiff confirming he actually worked for one month in 1999, Dr. Cerni submitted an Independent Contractor Agreement signed by him and Dr. Gautier in September 1999, and copies of three checks totaling $ 5,000 from Newport Bristol Medical Group and made payable to Dr. Cerni. (SUF P 104). Dr. Cerni also informed Provident that he did not carry malpractice insurance, so he could not provide a copy of that requested item. (SUF P 105). Moreover, Plaintiff did not provide any patient billing records, **[*22]**

appointment books or other documentation showing he treated patients in October 1999. (SUF P 106).

Provident's representative Diane Henley responded to Plaintiff in a letter dated August 17, 2000, advising him the additional materials had been received, and were receiving Provident's consideration. (SUF P 100). The letter further informed Dr. Cerni that "as soon as the review process has been completed, you will be notified in writing of the results of the additional review." (SUF P 101). And in a letter dated September 1, 2000, Provident's Senior Complaint Specialist Kandy Jones wrote to Dr. Cerni confirming the receipt of additional information, and advising him that his file would be forwarded back to the Customer Care Specialist for an additional review and determination on his claim. (SUF P 107).

### D. DR. CERNI'S SUIT AGAINST PROVIDENT AND EVENTS LEADING TO THE PRESENT MOTION

On September 15, 2000, Plaintiff filed suit in state court against Provident, alleging breach of contract, breach of implied covenant of good faith and fair dealing, and professional negligence in connection with the denial of his disability claims.

On October 25, 2000, Dr. Cerni called Provident **[*23]** and advised Jones that he was sending additional material to support his claim. (SUF P 108). Dr. Cerni also stated that he had filed a lawsuit, but would hold it until Provident made a final decision on his newly submitted materials. (SUF P 108; Provident Ex. 41). Jones apparently responded by telling Dr. Cerni that the additional materials would be reviewed, and he would be contacted in the future regarding the review. (SUF P 109). Around this same time, Provident's quality review (or appeals) department received the following additional materials from Plaintiff via two facsimiles: a Curriculum Vitae of Dr. Bittner; an August 29, 2000 MRI report; an October 7, 2000 report from Dr. Bittner; a Curriculum Vitae of Dr. Michael Kropf; an October 17, 2000 report by Dr. Kropf, and a copy of the complaint filed in the instant action. (SUF P 110; Plaintiff Exs. 32 and 34).

In November 2000, Plaintiff and Provident communicated regarding the status of Provident's review of these additional materials. (SUF PP 111-12). Nonetheless, before Provident completed its review, Plaintiff served Provident with a summons and copy of the complaint in the pending lawsuit on November 9, 2000. (SUF P 113). **[*24]** Pursuant to Defendant's custom and practice, Plaintiff's claim file was then sent to Provident's legal department for further handling. (SUF P 113).

Following the service of process, the action was removed to this Court on December 8, 2000. Provident subsequently filed the present Motion for Partial Summary Judgment on December 28, 2001, asserting it is entitled to relief as a matter of law on Plaintiff's bad faith insurance and punitive damages claims. The motion stands opposed.

## III.

### ANALYSIS

### A. THE LEGAL STANDARD UNDER RULE 56

The Federal Rules of Civil Procedure provide that summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* If the moving party satisfies the burden, the party opposing the motion must [*25] set forth specific facts showing that a genuine issue remains for trial. Id; see also Fed. R. Civ. P. 56(e).

### B. INSURANCE BAD FAITH CLAIMS

Under California law, all insurance contracts contain an implied covenant of good faith and fair dealing. *Egan v. Mutual of Omaha Ins. Co., 24 Cal. 3d 809, 818, 169 Cal. Rptr. 691, 620 P.2d 141 (1979).* A cause of action for breach of the implied covenant is characterized as insurance bad faith, for which a plaintiff may recover tort damages. Success under the claim requires a showing that the insurer erroneously failed to pay benefits under an insurance policy, and the failure to do so was without proper cause. In short, the "ultimate test of bad faith liability in the first party cases is whether the refusal to pay policy benefits ... was unreasonable," and not as a result of mere negligence or bad judgment. *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co., 90 Cal. App. 4th 335, 346 (2001)(citing Opsal v. United Servs. Auto Ass'n, 2 Cal. App. 4th 1197, 1205 (1991)); see also Guebara v. Allstate Ins. Co., 237 F.3d 987, 992 (9th Cir. 2001).* When [*26] evaluating the reasonableness of an insurer's claim denial, the company's actions and decisions are to be considered at the time they were made, not with the benefit of hindsight. *Chateau, 90 Cal. App. 4th at 347 (citation omitted); see also Rigas v. Allstate Ins. Co., 1998 U.S. Dist. LEXIS 6192, No. CV-97-31919, 1998 WL 422671, at * 2 (C.D. Cal. April 16, 1998)(citing Austero v.*

*National Cas. Co., 84 Cal. App. 3d 1, 32, 148 Cal. Rptr. 653 (1978)).*

While the question of whether an insurer has acted in bad faith is generally one of fact, a court can conclude that an insurer's actions in denying the claim were not unreasonable as a matter of law where the undisputed facts establish a legitimate question of an insurer's liability under a policy. *Chateau, 90 Cal. App. 4th at 347.* Thus, "under California law, a bad faith claim can be dismissed on summary judgment if the defendant can show that there was a genuine dispute as to coverage." *Guebara, 237 F.3d at 992.*

### C. THE "GENUINE DISPUTE" DOCTRINE

The "genuine dispute" doctrine is well settled and often used in insurance bad faith actions brought under California law. [*27] The Ninth Circuit has frequently affirmed summary judgment orders in bad faith claims where the trial court's ruling was based on a genuine dispute over insurance coverage. *Guebara, 237 F.3d at 993-94.* While the California Supreme Court has yet to define the limits of this doctrine, it continues to be applied, on a case-by-case basis, to cases involving both factual and legal coverage disputes. See id. (citing as instructive the California appellate court decision *Fraley v. Allstate Ins. Co., 81 Cal. App. 4th 1282, 1292 (2000)); see also Chateau, 90 Cal. App. 4th at 348.*

In Guebara, where the insured and insurer became embroiled in a dispute over whether certain items were in fact destroyed in a fire, the insurance company ultimately denied coverage on the ground that the claimant had submitted a fraudulent claim, and that her dwelling had been destroyed in an arson fire. After the insurer denied the claim, the insured brought suit for breach of contract and insurance bad faith. *Guebara, 237 F.3d at 990.* The court concluded the content claim dispute was a genuine one because when denying the claim, the insurer [*28] relied on the opinions of independent experts and the inconsistent explanations offered by the insured relating to property allegedly damaged by the fire. *Id. at 995.* Affirming the trial court's entry of summary judgment in the insurer's favor on the bad faith claim, the Ninth Circuit noted that the existence of a "genuine dispute" must be determined case-by-case, and the reliance on "expert testimony does not automatically insulate insurers from bad faith claims based on biased investigations." *Id. at 996.* Thus, a trial court should consider whether:

(1) the insurer is guilty of misrepresenting the nature of the investigatory proceedings, ... (2) the insurer's employees lie during the depositions or to the insured; (3) the insurer dishonestly selected its experts; (4) the

insurer's experts were unreasonable; and (5) the insurer failed to conduct a thorough investigation.

Id. (internal citations omitted).

Similarly, in Chateau, the court agreed with a lower court's application of the "genuine dispute" doctrine where the coverage dispute between the insured and insurer related to an adjustment of benefits paid under a policy. [*29] 90 Cal. App. 4th at 349. The court upheld the lower court's grant of the insurer's motion for partial summary judgment on the insured's claim of bad faith, concluding the insured failed to raise a triable issue of fact regarding alleged bad faith actions by the insurer in adjusting the property damage claim. Id.; see also Benton v. Allstate Ins. Co., 2001 U.S. Dist. LEXIS 9448, No. CV-00-00499, 2001 WL 210685, at *7 (C.D. Cal. Feb. 26, 2001)(concluding the insured failed to raise a triable issue of fact as to the insurer's alleged bad faith claim denial); Phelps v. Provident Life & Accident Ins. Co., 60 F. Supp. 2d 1014, 1024 (C.D. Cal. 1999)(same); Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 382 (C.D. Cal. 1995)(same).

## D. DR. CERNI'S BAD FAITH INSURANCE CLAIM AGAINST PROVIDENT

### 1. Applicability of the "Genuine Dispute" Doctrine

Plaintiff argues the "genuine dispute" doctrine is not even applicable in the present case because the doctrine applies in the context of factual coverage disputes only where the insurer uncovers information inconsistent with the insured's claim by way of independent experts. But no case has ever so [*30] held. The California appellate courts have never articulated a hard and fast rule that the "genuine dispute" doctrine cannot apply unless and until an independent expert evaluates the claim. Rather, in deciding whether an insurer had proper cause to deny an insured's claim for coverage, the Court is to consider the record as a whole, and based on the information known to the insurer at the time the claim was denied. Chateau, 90 Cal. App. 4th at 347.

### 2. A "Genuine Dispute" Regarding Coverage

Provident argues the uncontroverted facts establish numerous reasons existing at the time of the two claim denials that support Defendant's genuine dispute of coverage liability. Plaintiff responds by pointing out factual disputes that remain in the record, and asserting such disputes preclude application of the "genuine dispute" doctrine. The Court concludes that material facts exist which must be resolved before the genuine dispute issue can be decided. By way of example, the

Court concludes that a jury should decide the following factual disputes:

#### a. Dr. Cerni's credibility

The existence of a legitimate question relating to Dr. Cerni's credibility remains [*31] in dispute. The parties dispute whether Plaintiff provided inconsistent information when reporting the circumstances surrounding his two disability claims, and in responding to Provident's investigation of the claims. The proper characterization of Dr. Cerni's statements, the meaning to be attributed to them, and the alleged inconsistency of those statements are the kinds of facts that should not be decided on summary judgment.

#### b. Material dates

The jury should decide any factual disputes that remain relating to the following material dates: the date Dr. Cerni identified as the onset of his alleged back condition; the date Dr. Cerni represented he was no longer able to work due to his alleged back condition; and the date Dr. Cerni claimed he considered himself totally disabled.

#### c. Dr. Cerni's actions following the 1998 claim denial

Whether Dr. Cerni challenged the 1998 claim denial, and if so, what actions he took to bring the challenge to Provident's attention, are both factual questions for the jury.

#### d. Provident's record requests

The parties dispute whether Dr. Cerni and Jerry Lyles merely discussed the existence of relevant financial and occupational records [*32] during Provident's investigation of Dr. Cerni's 1998 claim, or whether Lyles actually requested Dr. Cerni provide Provident with copies of such documents. Provident offers the Declaration of Neil Smoot in support of its contention that during a 1998 telephone conversation between Lyles and Dr. Cerni, Lyles asked Plaintiff to submit certain documents for Provident's review. However, Smoot's statement about the content of Lyles' telephone conversation with Dr. Cerni is inadmissible hearsay. And the Court concludes the record request at issue is not documented in the record now before it. Moreover, the parties also dispute whether Provident ever requested medical records from Michael Cerni relating to his treatment of Dr. Cerni. There is evidence in the record that no such request was made.

In short, the Court cannot say, as a matter of law, that a genuine dispute so clearly existed that the matter can be decided on summary judgment.

Moreover, because the Court concludes that material issues of fact exist regarding the existence of a genuine dispute as to coverage at the time of both claim denials, the Court cannot resolve the "bad faith" claim as a matter of law. A jury might find [*33] that Provident did not have sufficient information to believe that a good faith dispute existed, and that it refused to obtain an IME for fear that the IME would undermine the company's position. Thus, a jury might conclude that Provident's articulated reasons for denial were pretextual and that the failure to obtain an IME supports such a conclusion. Whether a jury would make such a finding is, of course, anyone's guess. But the possibility is enough at this stage of the proceedings to warrant denial of the defense motion for summary judgment.

For these reasons, the Court **DENIES** Defendant's summary judgment motion with respect to Plaintiff's bad faith claim.

### E. PUNITIVE DAMAGES IN INSURANCE ACTIONS

Defendant argues that regardless of this Court's resolution of Plaintiff's claim for bad faith insurance, Provident is entitled to summary judgment on Plaintiff's punitive damages claim. Dr. Cerni counters the issue is one better left for the jury, and the Court agrees. The California Civil Code provides, in pertinent part:

In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant [*34] has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.

Cal. Civ. Code § 3294(a); see also *Phelps v. Provident Life and Accident Ins. Co., 60 F. Supp. 2d 1014, 1026*

*(C.D. Cal. 1999)*(citing Cal. Civ. Code § § 3294(a) and 3294(c)).

Before a plaintiff may ever recover under a claim for punitive damages, he or she must first establish by clear and convincing evidence that the defendant acted with malice, oppression or fraud. *Lunsford v. American Guarantee & Liability Ins. Co., 18 F.3d 653, 656 (9th Cir. 1994)*(citation omitted); see also *Tomaselli v. Transamerica Ins. Co., 25 Cal. App. 4th 1269, 1288 (1994).* This higher clear and convincing evidentiary standard applies at every stage of the litigation process, including summary adjudication. See *Basich v. Allstate Ins. Co., 87 Cal. App. 4th 1112, 1121 (2001).* Thus, a plaintiff who is not able to survive summary judgment on an insurance bad faith claim, is also unable to survive summary judgment on a related claim for punitive damages. [*35] *Lunsford, 18 F.3d at 656; Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 382 (C.D. Cal. 1995).*

In light of the number of material factual questions that remain in dispute in this action, the Court declines to decide the issue of punitive damages at this time. Accordingly, the Court **DENIES** Defendant's summary judgment motion with respect to Plaintiff's claim for punitive damages.

### IV.

### CONCLUSION

For the reasons as set forth above, the Court **DENIES** Defendant's Motion for Partial Summary Judgment with respect to Plaintiff's bad faith and punitive damages claims.

IT IS SO ORDERED.

DATED: April 3, 2002

Judge Gary Allen Feess

United States District Court

14 of 65 DOCUMENTS

**EDWARD L. SOLL, M. D. VERSUS PROVIDENT LIFE & ACCIDENT
INSURANCE COMPANY and UNUM PROVIDENT CORPORATION**

**CIVIL ACTION No. 00-3670 SECTION "N" (4)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
LOUISIANA**

*2002 U.S. Dist. LEXIS 12568*

**July 3, 2002, Decided**

**July 5, 2002, Filed, Entered**

**DISPOSITION:**
  [*1]  Defendant's motions in limine granted in part and
denied in part.

**COUNSEL:**
For EDWARD L SOLL, plaintiff: Maury A. Herman,
Brian David Katz, Joseph A. Kott, Herman, Herman,
Katz & Cotlar, LLP, New Orleans, LA.

For PROVIDENT LIFE & ACCIDENT INSURANCE
COMPANY, UNUMPROVIDENT CORPORATION,
defendants: Lauren A. Welch, McGlinchey Stafford,
PLLC, New Orleans, LA.

**JUDGES:**
Kurt D. Engelhardt, UNITED STATES DISTRICT
JUDGE.

**OPINIONBY:**
Kurt D. Engelhardt

**OPINION:**

    Before the Court are Motions in Limine filed on
behalf of defendants, Provident Life & Accident
Insurance Company and UNUM Provident Corporation
("Provident"), to wit: (1) Defendants' Motion in Limine
to Exclude or Limit the Testimony of Ben Frank roc.
Doc. # 79]; (2) Defendants'  [*2]  Motion in Limine to
Limit the Testimony of the Plaintiff's Treating
Cardiologist Dr. Ben Jacobs roc. Doc. # 80]; (3)
Defendants' Motion in Limine to Prohibit Evidence or
Reference to the Total Disability Policy Premium

Payments made to Provident by Dr. Soll roc. Doc. # 81];
and (4) Defendants' Motion in Limine to Preclude
Testimonial and Documentary Evidence Relative to the
Reliance Disability Policy and Reliance Insurance
Company's Payment of Dr. Soll's March 2000 "Total
Disability" Claim pursuant to its Policy roc. Doc. # 82].
Plaintiff filed a formal response memorandum roc. Doc.
# 84], opposing the aforesaid motions *in limine.*
Regarding Provident's Motion in Limine seeking to
Exclude the Expert Testimony of Louis F. Munro, Jr.
roc. Doc. # 75], counsel for the plaintiff informed the
Court that it does not intend to call Mr. Munro to testify
at trial. Provident's Motion *in Limine* to Exclude Expert
Testimony by Louis F. Munro, Jr. shall be DISMISSED
AS MOOT, the Court having been advised pursuant to
the pre-trial conference that the plaintiff does not intend
to call Mr. Munro to testify at trial. The Court addresses
those motions which remain pending herein [*3]  below.

    I. Testimony of Ben Frank

    Provident submits that, in addition to being the
independent sales agent who sold Dr. Soll the total
disability policy at issue in the case at bar, "Mr. Frank is
a co-worker of Louis Munro, plaintiff's purported 'bad
faith' expert." See Provident's Memorandum in support
of Motion in Limine to Exclude and/or Limit the
Testimony of Ben Frank, at p. 1 roc. Doc. # 79].
Specifically, Provident contends that Mr. Frank's
testimony is deficient in a number of respects, to wit: (1)
it is not relevant to any issue in this litigation, and thus
will not assist the trier of fact; (2) it constitutes opinion
testimony beyond the permissible scope of a fact
witness; and (3) his testimony involves interpretation of
the policy provisions, for which he is not a qualified

witness. Thus, Provident submits that the Court should exclude the following specific testimony by Mr. Frank, to wit: (1) any and all testimony regarding his interpretation of the policy, and his interpretation of marketing materials provided by the plaintiff; (2) any and all testimony regarding his representation to Dr. Soll that the policy would provide coverage in the event that Dr. Soll could [*4] no longer practice radiology; (3) his opinion as to whether Dr. Soll's occupation was that of a radiologist; and (4) his factual testimony regarding Dr. Soll's attempt to obtain increased coverage with Provident subsequent to his 1988 heart attack, which applications for coverage were denied in 1991 and 1993, due to Dr. Soll's medical history.

For his part, plaintiff submits that Ben Frank is Provident's agent, who sold him the total disability policy at issue. In this vein, plaintiff contends that representations made to him by Mr. Frank are highly relevant and while potentially prejudicial to the defense, such evidence is not unfairly so. Plaintiff highlights the importance of "the reasonable expectations doctrine," in a case such as this involving an insurance policy which is lacking a definition, which might add some degree of clarity to the terms of "total disability" coverage. Citing this Court's prior Order and Reasons, plaintiff notes the law applicable to this case, to wit:

"Ambiguity is also resolved by ascertaining how a reasonable policy purchaser would construe the clause at the time the insurance contract was entered. See *Breland v. Shilling, 550 So.2d 609, 610-611 (La. 1989).* [*5] The court should construe the policy to fulfill the reasonable expectations of the parties in light of the customs and usage of the industry - *i.e.,* in insurance parlance, the reasonable expectations doctrine. See *Louisiana Insurance Guaranty Association, 630 So.2d at 764* (citing La. Civ. Code Arts. 2045, 2050, 2053 and 2054; W. Freedman, 2 *Richards on the Law of Insurance* § 11:2(g)). Nevertheless, if the policy wording clearly and unambiguously expresses the intent of the parties, the insurance contract must be enforced as written. La. Civ. Code Art. 2046; *Shroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342, 345 (La. 1991).*"

Order and Reasons dated June 26, 2002, at p. 9 roc. Doc. # 66].

This Court also noted that the intention of the parties is a paramount consideration in the construction and interpretation of contracts of insurance under Louisiana law and that the intention of the parties is properly discerned from the plain, ordinary and popular meaning of language set forth in the policy, with consideration being given to the practical and reasonable construction

of the instrument as a whole. [*6] *Id.* (citing *Kottle v. Provident Life and Accident Insurance Company, 775 So.2d 64, 75 (La. App. 2nd Cir. 2000), cert. denied, 790 So.2d 635 (La. 2001)).* The Louisiana Second Circuit's decision *Kottle,* construing the terms of "total disability" coverage in a Provident policy, noted that its definition of "total disability" is in harmony Louisiana's unwavering jurisprudential view that "the insured who is unable to perform the 'substantial and material duties of his occupation' is entitled to policy benefits." *Id.* Recognizing that jurisprudential maxim that "the insured's intent for economic protection from loss of employment should not be thwarted," the *Kottle* court considered letters authored in 1975 and 1980 by Provident confirming and/or admitting the view that "'should disability cause a physician, for example, whose practice is limited to nephrology to be unable to perform the duties of a nephrologist, then we would consider him to be unable to perform the duties of his occupation and eligible for monthly benefits.'" *Id.* Unlike the case at bar, the particular policy considered by the court in *Kottle* involved a "recognized [*7] specialty" type of coverage (*i.e.,* the occupation covered was defined in terms of the professional's particular specialty). Nevertheless, the court looked beyond the terms of the policy to letters written at the inception of coverage, to determine the parties' intent regarding economic protection from loss of employment.

Notwithstanding the foregoing, regarding Ben Frank's proposed testimony in the nature of expert opinions which were not discussed with the plaintiff at the point of purchase of the policy, the Court is mindful that compliance with Federal Rule of Civil Procedure 26(a)(2)(A) requires disclosure of the identity of any expert witness. To eliminate *unfair* surprise, the drafters saw fit to require the parties also to disclose the substance of the expert opinion testimony and the basis of such opinion, *inter alia.* See Fed. R. Civ. P.26(a)(2)(B) (requiring a party to accompany the disclosure of an expert witness with a *complete,* written report prepared and signed by the witness).

Rule 26(a)(2)(B) specifically provides that:

(2) Disclosure of Expert Testimony.

***(B) Except as otherwise stipulated or directed by the court, this disclosure [*8] [ *i.e.,* identity of witness] shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by a witness. The report shall contain *a complete statement of all opinions to be expressed* and *the basis and reasons*

*therefor;* the *data or other information considered by the witness* in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the *qualifications of the witness,* including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study or testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

*Id.* (emphasis added).

Rule 701 of the Federal Rules of Evidence addresses opinion testimony of the lay witness, and only applies if the witness is not testifying as an expert. It provides that a non-expert witness may testify in the form of opinions or inferences which are (1) rationally [*9] based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact issue. See Fed. R. Evid. 701. Pursuant to Rule 701, a lay witness is limited to opinions or inferences (1) based on personal perception; (2) that an ordinary average person would form from those perceptions; and (3) are helpful to the jury. n1

> n1 See *Rushing v. Kansas City So. Railway Co., 185 F.3d 496, 512 (5th Cir. 1999)*(quoting *United States v. Riddle, 103 F.3d 423, 428 (5th Cir. 1997); Doddy v. Oxy USA, Inc., 101 F.3d 448, 460 (5th Cir. 1996)*(a person may testify as a lay witness if his opinions or inferences do not require any specialized knowledge and could be reached by an ordinary person); and *Lambeth v. Edison Chouest Offshore, L.L.C., 1999 U.S. Dist. LEXIS 19662, 1999 WL 1204843 (E. D. La. 1999)*(Vance, J.)(lay witness lacked specialized knowledge required to assess the quality of medical care he received; lay testimony limited to topics within the witness' personal knowledge, which required neither specialized nor scientific knowledge).

[*10]

This Court has serious reservations regarding Mr. Frank's "opinion" testimony which addresses the ultimate issue (*i.e.,* the meaning of the coverage terms of the policy). This is particularly true in light of the fact that Mr. Frank has represented that he and the plaintiff did not converse on that issue. It is far from clear in this case that Mr. Frank's undisclosed opinion as a lay witness rests, for its validity, on a factual predicate entirely within his own perception and does not require any specialized knowledge. Suffice it to say, it remains to be

determined whether or not his opinions and inferences supporting his lay testimony regarding policy interpretation require specialized knowledge and could be reached by any ordinary person. Accordingly and for the reasons discussed above,

The Court DENIES Provident's Motion *in Limine* Regarding the Testimony of Ben Frank to the extent it seeks to preclude (1) testimony regarding his actual use of marketing materials supplied by Provident to him, including the subject policy specimen in connection with negotiating the subject contract of "total disability" insurance with Dr. Soll; (2) testimony regarding the representations [*11] he actually made to Dr. Soll in negotiating the purchase and any renewals of the subject contract providing "total disability" coverage; (3) his understanding based on his first hand actual knowledge as to what occupation the plaintiff was actually engaged in; and (4) testimony detailing the facts regarding Dr. Soll's attempt to obtain increased coverage with Provident subsequent to his 1988 heart attack, and his handling of the such applications, if any, and their ultimate disposition. Such factual testimony is relevant to number of issues in this case, including but not limited to (1) whether the terms "total disability" coverage under the policy at issue apply in this case, (2) whether Dr. Soll's medical condition (coronary disease) degenerated after his 1988 heart attack to the point of "total disability" by March of 2000, and (3) whether or not it was reasonable for Provident's claims specialist to conclude otherwise.

As to testimony by Mr. Frank in the nature of an "expert opinion" going to the ultimate issue of coverage under the policy, the Court DEFERS ruling on Provident's Motion *in Limine* until the Court has had the opportunity to hear such testimony *in limine.* [*12] At such time, the Court will determine whether any such proffered testimony is admissible pursuant to Federal Rule of Evidence 701. The Court will not otherwise permit "expert testimony" by this lay witness, as no expert report was authored and timely exchanged in accordance with the Federal Rules discussed herein above.

II. Testimony of Plaintiff's Treating Cardiologist Dr. Ben Jacobs

Provident objects to "expert opinion" testimony by the plaintiff's treating cardiologist Dr. Ben Jacobs, arguing that plaintiff failed to exchange any expert report as required by the Federal Rules of Civil Procedure. Provident contends that it was surprised by the fact plaintiff also intends to offer testimonial evidence at trial in the form of Dr. Jacobs' expert opinion expressing disagreement with the opinion of the Provident's expert Dr. Lawrence O'Meallie, whose expert report was timely

exchanged in accordance with the applicable rules. Essentially, Provident objects to any opinion testimony being offered by Dr. Jacobs beyond that of his own observation conducted during his treatment of the plaintiff.

In considering whether to exclude evidence as a means of enforcing a pretrial scheduling [*13] order, the Court evaluates the explanation for the failure to comply, any prejudice to the opposing party, the possibility of a curing such prejudice, if any, and the importance of the evidence. See *Barrett v. Atlantic Richfield Co., 95 F.3d 375, 380 (5th Cir. 1996);* and *Geiserman v. MacDonald, 893 F.2d 787, 791 (5th Cir. 1990)*(observing that the trial court has "broad discretion to preserve the integrity and purpose of the pretrial order").

First, the defendants have had medical records or reports of plaintiff's treating cardiologist Dr. Jacobs for some time. There can be no claim of surprise, and there is no such claim regarding Dr. Jacobs' opinions concerning his care and treatment of the plaintiff.

It is noteworthy that, to the extent that the treating physician testifies as to the care and treatment of his patient, the physician is not to be considered a specially retained expert, notwithstanding that the witness may offer opinion testimony under Fed.R.Evid. 702, 703, and 705. However, when the physician's proposed opinion testimony extends beyond the facts made known to him during the course of the care and treatment of the patient and the [*14] witness is specially retained to develop specific opinion testimony, he becomes subject to the provisions of Fed.R.Civ.P. 26(a)(2)(B).

Accordingly, Dr. Jacobs shall be permitted to testify as to his current and past care and treatment of the plaintiff without limitation. As to any comments or opinions that Dr. Jacobs may have or have not expressed in his deposition regarding the opinions set forth in the report of the Dr. O'Meallie, Provident's Motion in Limine is GRANTED. The Court believes the foregoing rulings permitting the testimony of Dr. Jacobs regarding his care and treatment, but excluding other expert opinion testimony which was not memorialized in writing and timely exchanged, preserves the purpose and integrity of the pretrial orders issued in this case and comports with the applicable Federal Rules of Civil Procedure.

III. Evidence of the Amount of the Premium Paid

Since approximately 1985, Dr. Soll has paid over $ 94,000.00 in insurance premiums to Provident for coverage insuring against the his loss of capacity to work in his occupation. Provident seeks to exclude evidence of Dr. Soll's premium payments dating back to 1985. Plaintiff correctly points out that this [*15] is a contract case, pursuant to which he claims entitlement to benefits

under a policy of "total disability" insurance. In order to be entitled to benefits, plaintiff is entitled to demonstrate that he held up his end of the bargain by timely paying premiums for the coverage plaintiff has continued to renew for over a decade.

Provident suggests that the parties enter a stipulation as to premium payments for the stated reason that a stipulation would be less prejudicial, perhaps presenting Provident in a better light. Since the defendants opted for trial rather than payment of the total disability benefits allegedly owed, plaintiff has chosen to carry his own burden of proof without the stipulation.

Plaintiff candidly admits that he hopes that the facts of this case which he intends to prove, including the evidence of his timely payments of insurance premiums which have exceeded $ 94,000.00, will cast Provident in a bad light in the eyes of the jury, and that it will find in plaintiff's favor on the "bad faith" issue. See Plaintiff's Responses to Defendant's Motions in Limine at p. 11. Whether or not the plaintiff himself or his employer actually paid the premium in some of the past [*16] years is proper grist for cross-examination.

The issue posed by Provident's motion is whether the facts regarding Dr. Soll's payment of the policy's premiums, which consideration/premiums the plaintiff continues to pay, notwithstanding the denial of his "total disability" claim, constitutes evidence which can be categorized as *unfairly* prejudicial. See Federal Rules of Evidence 403. Considering that the issues in this lawsuit include whether there is coverage under a *contract* of insurance, as well as whether Provident's denial of the plaintiff's "total disability" claim constitutes a "bad faith" refusal, this Court finds no unfair prejudice. Suffice it to say, evidence of premium payments is part of the *res gestae.* The fact of the payments and their total value have a probative value that is not outweighed by any potential for *unfair* prejudice. Relevant evidence is inherently prejudicial. See *United States v. Abrego, 141 F.3d 142, 175 (5th Cir. 1998)*(noting that because application of Rule 403 operates to exclude relevant evidence, application of the rule must be cautious and sparing, and in any event, Rule 403 only excludes evidence that would be [*17] unfairly prejudicial).

Direct proof of a claim does not create the *unfair* prejudice that Rule 403 intended to avoid. The touchstone for excluding evidence under Rule 403 is not prejudice, but *unfair* prejudice, which must substantially outweigh the probative value of the evidence. This Court does not view Rule 403 as a tool designed to permit the trial court to "even out" the weight of the evidence. Instead, there is a place in the courtroom where the skill and acumen of professional trial lawyers should be brought to bear. Indeed, the motion practice presaging

the subject jury trial admits that the trial lawyers in this case are keenly aware of the points of contest, and quite capable of fairly evening-out the score at trial on the merits and paring down any inaccuracy or exaggeration, such that it more closely comports with the truth.

The Fifth Circuit in *United States v. Pace, 10 F.3d 1106 (5th Cir. 1993), cert. denied, 114 S. Ct. 2180 (1994)* observed that:

The exclusion of evidence under Rule 403 should occur only sparingly:

"Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing **[*18]** probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in the heels for the sake of its prejudicial effect. As to such, Rule 403 is meant to relax the iron rule of relevance. It is not designed to permit the court to 'even out' the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none."

*Id. at 1115-16 (quoting United States v. McRae, 593 F.2d 700, 707 (5th Cir.), cert. denied, 444 U.S. 862, 100 S. Ct. 128, 62 L. Ed. 2d 83 (1979)).* Accordingly, Provident's Motion *in Limine* to exclude payment of premiums is DENIED.

IV. Evidence Regarding Reliance Insurance Company's Adjustment of Plaintiff's Claim

While this is not the usual case of a party plaintiff, or party defendant for that matter, seeking to have the Court try another case, involving an incident which occurred at a different point in time and **[*19]** under a different set of circumstances, admission of evidence of the Reliance payment of Dr. Soll's claim would require a trial within a trial. As the Court previously indicated in the pre-trial conference, it is not so inclined to protract this matter, or to do so unfairly.

Plaintiff argues that the jury should be privy to this evidence of another "total disability" claim to demonstrate that Provident's denial of the very same claim at the very same time under the very same circumstances regarding the same insured was arbitrary and capricious. Plaintiff points out that this "other claim" not only involves the same claim, it involves a total disability policy with substantially similar *own* occupation "total disability" coverage terms, and the determination of coverage was made on the basis of the

same medical history in the light of such substantially similar coverage terms.

However, without the appropriate witnesses (*i.e.,* Reliance's claims specialist) testifying as to why Reliance opted to pay the claim against it and forgo litigation and/or trial, the evidence of Reliance's payment harbors a grave potential for jury confusion. There can be no effective cross-examination **[*20]** of the silent Reliance claims file relative to Dr. Soll's claim, nor the sales and marketing employed to entice the plaintiff to procure the Reliance coverage.

Under the circumstances, evidence relating to Reliance's payment of the plaintiff's claim may well be perceived by the jury as the rule in this case. Absent testimony by a Reliance claims representative, and there is not one such witness listed to testify in this case, the Court can only conclude that the evidence is *not* admissible. Because the great potential for *unfair* prejudice substantially outweighs any probative value the evidence may have with respect to any issue in the case, the Court GRANTS Provident's Motion *in Limine*.

Accordingly, and for all the foregoing reasons, the Court enters the following orders, to wit:

IT IS ORDERED that Provident's Motion *in Limine* regarding the Payment of Dr. Soll's Total Disability Claim by Reliance Insurance Company is GRANTED. roc. Doc. # 82].

IT IS FURTHER ORDERED that Provident's Motion *in Limine* regarding the Testimony of Ben Frank is DENIED IN PART and to the extent that defendant seeks to preclude (1) testimony regarding his actual use of marketing materials **[*21]** supplied by Provident to him, including the subject policy specimen in connection with negotiating the subject contract of "total disability" insurance with Dr. Soll; (2) testimony regarding the representations he actually made to Dr. Soll in negotiating the purchase of the subject contract providing "total disability" coverage; (3) his understanding based on his first hand actual knowledge as to what occupation the plaintiff was actually engaged in; and (4) testimony detailing the facts regarding Dr. Soll's attempt to obtain increased coverage with Provident subsequent to his 1988 heart attack, and his handling of the such applications, if any, and their ultimate disposition. roc. Doc. # 79].

IT IS FURTHER ORDERED that to the extent that Provident seeks an order excluding "opinion testimony" of Mr. Frank going to the ultimate issue of coverage under the policy, the Court DEFERS RULING on Provident's Motion *in Limine,* which will permit the Court the opportunity to hear such testimony *in limine,* so as to determine whether the evidence is admissible

pursuant to Federal Rule of Evidence 701. roc. Doc. # 79].

IT IS FURTHER ORDERED that Provident's Motion *in Limine* to [*22] Exclude Dr. Jacobs' expert testimony is GRANTED IN PART, but only to the extent that it seeks to exclude Dr. Jacobs' comments or opinion testimony regarding the report of Dr. O'Meallie. Otherwise, Dr. Jacobs may freely testify regarding his care and treatment of the plaintiff in this case. roc. Doc. # 80].

IT IS FURTHER ORDERED that Provident's Motion *in Limine* to Exclude Evidence of Premium Payments is DENIED. roc. Doc. # 81].

IT IS FURTHER ORDERED that Provident's Motion *in Limine* to Exclude the Testimony of Louis F. Munro, Jr., is DISMISSED AS MOOT. roc. Doc. # 75].

Kurt D. Engelhardt

UNITED STATES DISTRICT JUDGE

13 of 65 DOCUMENTS

**James R. Walker, Plaintiff, v. UnumProvident Corporation, f/k/a Provident Life & Accident Insurance Company, Defendant.**

**Civil No. 01-1795 (DWF/RLE)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

*2002 U.S. Dist. LEXIS 21647*

**October 25, 2002, Decided**

**DISPOSITION:**
[*1] Defendant's motion granted in part and denied in part.

**COUNSEL:**
Stephen W. Cooper, Esq., and Stacey R. Everson, Esq., Cooper Law Office, Minneapolis, Minnesota, counsel for Plaintiff.

John Harper III, Esq., and Terrance J. Wagener, Esq., Krass Monroe, Bloomington, Minnesota, counsel for Defendant.

**JUDGES:**
DONOVAN W. FRANK, Judge of United States District Court.

**OPINIONBY:**
DONOVAN W. FRANK

**OPINION:**

### MEMORANDUM OPINION AND ORDER

### INTRODUCTION

The above-entitled matter came on for hearing before the undersigned United States District Judge on Friday, September 27, 2002, pursuant to Defendant UnumProvident Corporation's Motion for Summary Judgment. n1 In its Complaint, Plaintiff alleges a breach of contract claim against Defendant, asserting that Defendant failed to pay Plaintiff benefits due under Plaintiff's disability policy when Plaintiff became totally disabled on January 1, 1993. For the reasons stated below, Defendant's motion is granted in part and denied in part.

n1 Defendant's motion papers also included a motion to dismiss Plaintiff's claim of bad faith breach of contract pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Court need not address this issue because Plaintiff has since withdrawn this bad faith claim.

[*2]

### BACKGROUND

Plaintiff is a medical doctor diagnosed with serious sexual disorders that leave him unable to control his impulse to expose himself to females. Terminated from his long-standing job as a family practice doctor because of this inability to control himself and diagnosed with Sexual Disorder-N.O.S. and Paraphilia-N.O.S., Plaintiff petitioned his occupational disability insurer, Defendant UnumProvident Corporation, for benefits. After UnumProvident denied his request, Plaintiff brought an action for breach of contract against the company. The specific facts that lead to this suit follow.

**1. Plaintiff's Employment History and Allegations of Misconduct**

Plaintiff, Dr. James R. Walker, began his practice in family medicine at the Mork Clinic in Anoka, Minnesota, in 1973. Plaintiff apparently had a successful practice until 1991, when Mork Clinic discovered that Plaintiff had been performing unnecessary and inappropriate pelvic and breast exams on female patients. Many of the allegations leveled against Plaintiff during his time at the clinic form a similar pattern: without bona fide medical indications for a breast or pelvic exam, Plaintiff would inappropriately [*3] assist in undressing

the female patient, examine her without a gown, stare at her breasts, handle her breasts, and, many times, perform a pelvic exam that involved lingering and inappropriate touching. Plaintiff did not chart these "exams."

To deal with this misconduct, Mork Clinic initially required that Plaintiff have a chaperone present in the examining room when he examined female patients. This chaperone system ended in approximately July 1992, but was reinstated in September 1992 after allegations of another inappropriate examination by Plaintiff on a female patient.

Apparently due to this continued misconduct, Mork Clinic terminated Plaintiff, effective December 31, 1992. The clinic also reported his misconduct to the Anoka County authorities and the Minnesota Board of Medical Practice. In April 1993, the Anoka County authorities charged Plaintiff with seven counts of criminal sexual conduct in the third degree and nineteen counts of criminal sexual conduct in the fourth degree. Plaintiff pleaded guilty to three counts of third degree criminal sexual conduct, for which he was sentenced to 15 years probation, community service, sexual offender treatment, and one year in the [*4] Anoka County jail with work release.

On January 28, 1994, the Complaint Review Committee of the Minnesota Board of Medical Practice commenced a disciplinary proceeding against Plaintiff. The Committee alleged that Plaintiff had abused 21 female patients during 1991 and 1992. By its January 21, 1995, Findings of Fact, Conclusions and Order, the Board of Medical Practice suspended Plaintiff's license, but stayed a suspension against him provided that he comply with certain conditions: he was to practice in a group setting, he was to complete a program for sexual offenders at the University of Minnesota, and, most notably, he was not allowed to treat female patients. Plaintiff completed the sex offender program at the University of Minnesota between 1993-1995.

Between 1993 and 1999, Plaintiff was employed sporadically. His jobs included moving and cleaning vehicles for an automobile leasing business, reviewing medical records for medical malpractice and personal injury cases, and performing physicals for male truck drivers. During this time, Plaintiff petitioned the Minnesota Board of Medical Practice for reinstatement of his ability to treat female patients. His request was denied. [*5] Because Plaintiff continued to struggle with his inappropriate sexual impulses, Plaintiff was unable to return to a position in medicine where he could treat female patients.

Throughout Plaintiff's treatment for these sexual disorders and with sentencing looming overhead for the crimes that he committed, Plaintiff was also exposing himself to women, despite the obvious negative consequences that would inevitably result from such behavior, and even in settings where he was not treating patients. Plaintiff exposed himself to the mother of a fellow patient at Alpha House, the inpatient sexual treatment facility where Plaintiff was living between January 1999 and January 2000, resulting in his discharge from the facility. Plaintiff exposed himself to a librarian during his community service work at the Sherburne County Historical Society. Plaintiff exposed himself to his office secretary. By Plaintiff's own admissions, he exposed himself to up to hundreds of women over approximately the past 30 years.

In March 2000, Plaintiff was charged with additional counts of indecent exposure, criminal sexual conduct, and probation violations, and was sentenced to 82 months in prison. On March 28, 2000, Plaintiff's [*6] license to practice medicine was revoked.

Plaintiff is currently incarcerated at the Moose Lake Correctional Facility in Moose Lake, Minnesota.

## 2. Plaintiff's Medical History

Plaintiff began receiving medical treatment for his psychological issues from a variety of doctors, beginning in 1991. This treatment began even before Plaintiff was terminated from his position and continued at least until he was incarcerated. n2 The initial diagnoses of Plaintiff include that he suffered from boundary issues, depression, and anxiety. Notably, Plaintiff began treatment with Dr. Thomas Gratzer in 1998, who finally diagnosed Plaintiff as suffering from generalized anxiety disorder, major depressive disorder, Sexual Disorder-- Not Otherwise Specified, and Paraphiliac Disorder--Not Otherwise Specified. Sexual Disorder N.O.S. and Paraphiliac Disorder N.O.S. are Plaintiff's primary disabling conditions, according to Dr. Gratzer. Furthermore, according to Dr. Gratzer, Plaintiff's symptoms of Sexual Disorder N.O.S. include "intense, sexually arousing fantasies, urges, and associated sexual behaviors that cause significant distress or impairment." Dr. Gratzer testified in his deposition that [*7] Plaintiff's sexual-related disorders began as early as 1992 or 1995.

n2 While it is unclear to the Court what treatment Plaintiff currently is receiving in prison, Defendant's expert witness Dr. Rauenhorst stated in his deposition that Plaintiff is "participating in what treatments are available."

## 3. The Policy

Plaintiff purchased consecutive occupational disability policies from Defendant or its predecessor organizations beginning in 1973 (collectively, the "Policy"). He kept the Policy up-to-date through the year 2000. Under the Policy, Plaintiff was entitled to monthly benefits if he became totally disabled. The Policy Definitions read as follows:

**Sickness** means sickness or disease which is first manifested while your policy is in force.

**Total Disability or totally disabled** means that due to Injuries or Sickness:

1. you are not able to perform the substantial and material duties of your occupation; and

2. you are receiving care by a Physician which is appropriate [*8] for the condition causing the disability. We will waive this requirement when continued care would be of no benefit to you.

**your occupation** means the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled. If your occupation is limited to a recognized specialty within the scope of your degree or license, we will deem your specialty to be your occupation.

**period of disability** means a period of disability starting while this policy is in force (emphasis added). Notably, the Policy had no exclusion for injury or sickness that resulted in criminal acts. Furthermore, the Policy only exempted pre-existing conditions for which the policyholder had received treatment within the five-year period prior to the effective date of the Policy.

The Policy also provided instructions for filing a claim:

NOTICE OF CLAIM
Written notice of claim must be given within 20 days after a covered loss starts or as soon as reasonably possible. The notice can be given to us at our home office, Chattanooga, Tennessee, or to our agent. Notice should include your name and the policy number.

PROOF OF LOSS
If the Policy provides [*9] for periodic payment for a continuing loss, you must give us written proof of loss within 90 days after the end of each period for which we are liable. For any other loss, written proof must be given within 90 days after such loss.

If it was not reasonably possible for you to give written proof in the time required, we will not reduce or deny the claim for this reason if the proof is filed as soon as reasonably possible. In any event, the proof required must be furnished no later than one year after the 90 days unless you are legally unable to do so.

Plaintiff submitted his claim for disability benefits on March 17, 2000, alleging that he became totally disabled on January 1, 1993.

**Discussion**

**1. Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri, 92 F.3d 743, 747 (8th Cir. 1996).* However, as the Supreme Court has stated, [*10] "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Fed. R. Civ. P. 1; *Celotex Corp. v. Catrett, 477 U.S. 317, 327, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).*

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank, 92 F.3d at 747.* The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th Cir. 1995).* A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Krenik, 47 F.3d at 957.*

**2. Plaintiff's Legal Disability Versus Factual Disability**

"'It is a general rule that disability insurance policies, such as those at [*11] issue in the instant case, provide coverage for factual disabilities (i.e., disabilities due to sickness or injury) and not for legal disabilities.'" *BLH ex rel. GEH v. Northwestern Mutual Life Ins. Co., 92 F. Supp. 2d 910, 915 (D. Minn. 2000), quoting Goomar v. Centennial Life Ins. Co., 855 F. Supp. 319, 325 (S.D. Cal. 1994), aff'd, 76 F.3d 1059 (9th Cir. 1996); see also 10 Couch on Insurance § 146:9 (3d ed. 1998).* Courts

have held that where a legal disability such as a license suspension precedes the alleged factual disability, an insured is not entitled to disability payments. *See, e.g., Massachusetts Mut. Life Ins. Co. v. Millstein, 129 F.3d 688 (2d Cir. 1997)* (summary judgment upheld when lawyer's license suspension, not chemical dependency and other alleged disorders, resulted in his inability to work). Defendant alleges that Plaintiff's inability to practice medicine is not a result of sickness, but rather is a result of the restrictions placed upon Plaintiff's work as a doctor and his subsequent incarceration. Defendant claims that Plaintiff is disabled by virtue of a legal, not factual disability, **[*12]** and therefore is not disabled within the terms of the Policy.

The Court finds the reasoning from this District's *BLH* case persuasive on this issue. In *BLH*, assignees of RKH, the insured (who were also minor children abused by RKH), sued RKH's insurance company for payment of benefits under a disability insurance policy that RKH had obtained while working as an anaesthesiologist. *BLH, 92 F. Supp. 2d at 911-13.* The relevant provisions of RKH's disability policy, as stated by the court, were nearly identical to those at issue in the present case. *Id. at 914.*

After being caught sexually abusing his daughter in 1994, RKH pleaded guilty to one count of criminal sexual conduct. *Id. at 911.* Following this guilty plea, RKH further admitted to having had sexual contact with approximately 26 female patients while they were under anesthesia and to sexually abusing several other small children. *Id. at 912.* Nearly two years later, the Minnesota Board of Medical Practice revoked RKH's license to practice medicine due to his misconduct. *Id.* Initially, RKH was diagnosed with depression, but approximately four years later, **[*13]** RKH was diagnosed with multiple paraphilic disorders, including voyeurism, pedophilia, paraphilic disorder .N.O.S., and sexual disorder N.O.S. *Id. at 913.*

The insurance company moved for summary judgment, asserting that RKH was unable to work not because of his sickness, but rather due to the legal and professional consequences of his criminal behavior. *Id. at 915.* Finding that a genuine issue of fact existed as to whether RKH's depression and paraphilic disorders rendered him disabled under the policy and thus preceded his legal disability, the *BLH* court denied summary judgment. *Id. at 916-17.* The court stated:

RKH's secret molestation of patients shows that he was unable to ensure the health and safety of his patients. A reasonable jury could find, as a result, that RKH was unable to perform the principal duties of his occupation, despite his ability to administer anesthetics competently.

There is a maxim in medical ethics, often proclaimed as a fundamental principle of the ancient Hippocratic Oath, which suggests as much: 'Above all[,] do no harm.'

*Id. at 916, quoting* Tom L. Beauchamp & **[*14]** James F. Childress, *Principles of Biomedical Ethics* 189 (4th ed. 1994).

Here, as in *BLH*, a reasonable jury could conclude that Plaintiff was unable to perform the substantial and material duties of his occupation and thus that he became disabled long before his medical license was revoked. It appears to the Court that Plaintiff suffered from a sickness that rendered him unable to ensure the health and safety of his patients, much less that of his female co-workers. While a clear, formal diagnosis of Plaintiff's disorder did not occur until many years after this sickness manifested itself, Plaintiff admittedly had been performing acts consistent with the diagnosis long before he was caught, long before his medical license was revoked, and long before he was incarcerated for his misconduct. Thus, the Court finds that there is a genuine issue of fact as to the time at which Plaintiff became disabled under the Policy and thus as to whether Plaintiff's factual disability, under the terms of the Policy, preceded his legal disability. Thus, summary judgment is inappropriate on this issue.

### 3. Plaintiff's Change of Occupations

Defendant alleges that even if a sickness precluded **[*15]** Plaintiff from employment as a family practice physician, Plaintiff is not entitled to disability benefits under the Policy because he had changed occupations when the disability was uncovered. Because the Court finds that the time at which Plaintiff became disabled is a question of fact, the Court need not address this issue.

### 4. Care of a Physician and Timely Notice of Plaintiff's Claim

Defendant asserts that it is entitled to at least partial summary judgment because, under the terms of the Policy, Plaintiff failed to obtain consistent "care by a physician which is appropriate for the condition causing the disability" and because Plaintiff failed to provide timely notice of his claim.

Viewing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff did indeed receive consistent, appropriate care beginning in 1991 and thereafter.

However, the Court finds that under a strict reading of the Policy and as a matter of law, Plaintiff is not entitled to benefits prior to one year and 90 days before he filed his notice of claim. The Policy clearly states:

If the Policy provides for periodic payment for a continuing loss, you must give us written [*16] proof of loss within 90 days after the end of each period for which we are liable. For any other loss, written proof must be given within 90 days after such loss.

If it was not reasonably possible for you to give written proof in the time required, we will not reduce or deny the claim for this reason if the proof is filed as soon as reasonably possible. **In any event, the proof required must be furnished no later than one year after the 90 days unless you are legally unable to do so.**

(emphasis added). Plaintiff first filed notice of his claim on March 17, 2000. Plaintiff has not alleged that he was legally unable to provide proof of his claim until that time. Under the terms of the Policy, Plaintiff is entitled to receive benefits only within the preceding one year and 90 days prior to his notice of claim. Thus, Plaintiff's claim for disability benefits may be considered only as of December 18, 1998.

### CONCLUSION

The parties entered into a contract that stated that Plaintiff would receive a substantial amount of benefits if he became totally disabled from his occupation at the time of the disability. As offensive to notions of decency and fairness as Plaintiff's [*17] conduct may seem, public policy cannot dictate that this Court rewrite the terms of this valid contract. Both parties are bound by the terms of the policies for which they contracted. The Court cannot undo this contract, no matter how repulsive Plaintiff's conduct may seem.

For the reasons stated, **IT IS HEREBY ORDERED:**

1. Defendant's Motion for Summary Judgment (Doc. No. 29) is **DENIED IN PART** and **GRANTED IN PART** as follows:

a. Defendant's Motion for Summary Judgment is **DENIED** with respect to Defendant's claim that Plaintiff is not disabled within the terms of the Policy.

b. Defendant's Motion for Summary Judgment is **GRANTED** with respect to Defendant's claim that Plaintiff failed to provide timely notice of his claim. Plaintiff's claim may be considered only as of December 18, 1998.

Dated: October 25, 2002

DONOVAN W. FRANK

Judge of United States District Court

*denied Provident's msj;*
*disability definition*

G

**WILLIAM J. BROSNAN, M.D., Plaintiff, v. PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, Defendant.**

**CIVIL ACTION NO. 96-4605**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*31 F. Supp. 2d 460; 1998 U.S. Dist. LEXIS 20259*

**December 17, 1998, Decided**

**December 17, 1998, Filed; December 18, 1998, Entered**

**DISPOSITION:**
[**1]   Defendant's motion for summary judgment DENIED.

**COUNSEL:**
For WILLIAM J. BROSNAN, M.D., PLAINTIFF: JOHN ROGERS CARROLL, M. PATRICIA CARROLL, CARROLL & CARROLL, PHILA, PA USA.

For PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, DEFENDANT: PETER J. HOFFMAN, AMY L. CURRIER, MC KISSOCK & HOFFMAN, P.C., PHILA, PA USA.

**JUDGES:**
LOWELL A. REED, JR., J.

**OPINIONBY:**
LOWELL A. REED, JR.

**OPINION:**

[*461] **MEMORANDUM**

**Reed, J.**

December 17, 1998

Presently before the Court is the motion of Provident Life and Accident Insurance Company ("Provident") for summary judgment (Document No. 15) and the response of plaintiff William J. Brosnan, M.D. ("Brosnan") thereto. At issue is whether Brosnan is totally disabled as

defined in two disability income protection policies issued by Provident and, therefore, entitled to receive disability benefits. For the reasons stated below, the motion will be denied. n1

n1 The Court notes that jurisdiction is proper pursuant to *28 U.S.C. § 1332* as the parties are diverse and the amount in controversy exceeds $ 75,000.00, exclusive interest and costs. Also, it is undisputed that Pennsylvania law applies.

[**2]

**I. BACKGROUND**

The following facts are based on the evidence of record viewed in the light most favorable to plaintiff William Brosnan, the nonmoving party, as required when considering a motion for summary judgment. See *Carnegie Mellon Univ. v. Schwartz, 105 F.3d 863, 865 (3d Cir. 1997).*

Brosnan was a practicing anesthesiologist until August of 1992, when he was terminated by Darby Anesthesia Associates, a practice group with which he was associated, after alcohol was detected on his breath. Reportedly, he had been warned previously that someone had smelled alcohol on his breath. Shortly thereafter Brosnan was admitted to the Strecker Program for treatment of addictions at the Institute of Pennsylvania Hospital. At Strecker, Brosnan was treated, and continues to be treated, by Richard F. Limoges, M.D., a psychiatrist whose discharge diagnosis from the hospitalization included: alcoholism, chronic dysthymia,

31 F. Supp. 2d 460, *; 1998 U.S. Dist. LEXIS 20259, **

Page 2

acute depressive episodes, and mild organic brain syndrome. Following his discharge from the hospital, Brosnan withdrew from the practice of anesthesiology and made a claim under two disability income policies and Provident began to pay benefits to Brosnan. n2 [**3]

> n2 The disability income protection coverage policies are identified by number. Policy No. 6-334-697727 was issued on February 5, 1986 (Memorandum of Law in Support of the Motion for Summary Judgment of Defendant ("Def. Mem."), Exh. A), and Policy No. 6-335-749086 was issued on October 25, 1986 (Def. Mem., Exh. B).

In September of 1993, Dr. Limoges, responding to questions posed by a Provident claims manager, declared that he considered Brosnan to be disabled from his specialty of anesthesiology because of the discomfort and distress which Brosnan experienced when he thought about reentering the operating room to administer anesthesia. (Plaintiff's Answer to Defendant's Motion for Summary Judgment ("Plt. Ans."), Exh. A). Dr. Limoges described Brosnan as experiencing "panic" and suffering from a "severe anxiety reaction." (Id.). Dr. Limoges also noted a degree of performance diminution and deterioration of abilities. (Id.)

Approximately two years later, in mid-1995, Brosnan was examined by Robert M. Toborowsky, [**4] M.D., a psychiatrist retained by Provident to evaluate Brosnan's claim of disability. In his report, Dr. Toborowsky opined that Brosnan's "decision not to return to the practice of anesthesiology should be deemed a voluntary one and not based on any underlying psychiatric disability." (Def. Mem., Exh. C). In a letter dated September 25, 1995, Provident notified Brosnan that he was no longer eligible for disability benefits under the Provident policies. (Def. Mem., Exh. D).

[*462] In response, Dr. Limoges submitted a report to Provident disputing Dr. Toborowsky's characterization of Brosnan's attitude about the operating room as a voluntary choice and not based on any underlying psychiatric disability. (Plt. Ans., Exh B). Dr. Limoges based his rebuttal upon his records, upon Dr. Toborowsky's letter, upon his continued clinical observations of Brosnan and upon weekly group therapy sessions and monthly individual therapy sessions. Dr. Limoges opined that Brosnan was at risk if he reentered the operating room for the following reasons: "a relapse of alcoholism if the anxiety of entering the operating room is too great; resumption of Benzodiazepines or other anti-anxiety agents in an abusive [**5] fashion; or

the use of psychoactive chemicals which are plentiful and abundant in the operating room and which are often associated with chemical dependency in their own right." (Plt. Ans., Exh. B). Dr. Limoges concluded that "Dr. Brosnan is disabled by virtue of his conditions of alcoholism, anxiety and depression, and is at this time unable to reenter the operating room to perform his duties as an anesthesiologist." (Plt. Ans. Exh. B). In a 1997 supplementary report, Dr. Limoges summarized his diagnosis and conclusions as follows: "Dr. Brosnan continues to suffer from Chronic Depression and Dysthymia along with persistent Anxiety. ... He suffers from Anxiety, Chronic Alcoholism in Remission and testing shows Chronic Brain Dysfunction especially with regard to performance abilities which are critical in a fast moving operating room. My further conclusion, also to a reasonable degree of medical certainty, is that Dr. Brosnan should not return to the operating room as an Anesthesiologist .... This is due to both his persistent chronic anxiety as well as his decreased performance functioning independently." (Plt. Ans., Exh. F).

Brosnan was also evaluated in March of 1997 by Victor [**6] J. Malatesta, Ph.D., a clinical psychologist. Dr. Malatesta conducted a battery of tests calculated to evaluate Brosnan's cognitive and neuropsychological functioning. In his report, Dr. Malatesta found consistent and reliable evidence of chronic brain dysfunction. (Plt. Ans., Exh. D). Dr. Malatesta notes a 23-point difference between the verbal and nonverbal scores and that this "is consistent with some disruption in cortical brain functioning." (Id.). Dr. Malatesta also observed "significant deficits in the area of perceptual organization and visuospatial processing." (Id.). With regard to perceptual motor functioning, Dr. Malatesta found that "tests of visuospatial speed, visual scanning and rapid visual motor coding revealed mild to moderate impairment." (Id.). Dr. Malatesta also found that "on a complex nonvisual task requiring tactile and kinesthetic senses, memory, and upper extremity coordination and speed, Dr. Brosnan performed overall in the moderate impairment range." (Id.). Dr. Malatesta noted further that "his performance on the second and third trials was moderately to severely impaired." (Id.). Overall, Dr. Malatesta found that the pattern of deficits [**7] was consistent with the chronic effects of long-term alcohol dependence but found no evidence to suggest that the deficits are part of a progressive disorder. (Id.). Dr. Malatesta also found "no evidence of symptom exaggeration of malingering. In fact, his tendency is to minimize, deny and avoid his difficulties." (Id.) Based upon the neuropsychological test findings, Dr. Malatesta concluded that "there is no reasonable way that Dr. Brosnan could return to his previous work as an anesthesiologist. In fact, without the use of compensatory

31 F. Supp. 2d 460, *; 1998 U.S. Dist. LEXIS 20259, **

strategies, he may be expected to experience difficulty in his current family practice work." (Id.).

Brosnan was examined in May of 1997 by Peter C. Badgio, Ph.D, a neuropsychologist. Although Dr. Badgio found Brosnan "demonstrates relative weakness on perceptual motor tasks, particularly speeded perceptual motor tasks," he ruled out any progressively deteriorating condition and opined that Brosnan's "current neuropsychological functioning remains as strong or better than it was at the time that he ended his work as an anesthesiologist." (Def. Mem., Exh. I). Dr. Badgio concluded that there is no neuropsychological evidence that Brosnan [**8] could not perform his professional activities at the same level as he did prior to 1992. (Id.).

Dr. Badgio's conclusions were, in turn, disputed by Dr. Malatesta. Among other things, [*463] Dr. Malatesta notes that Dr. Badgio downplayed Brosnan's impaired performance across a range of "speeded perceptual motor tasks." (Plt. Ans., Exh. E). Although noting that Brosnan's peers could best evaluate his ability to function as an anesthesiologist, Dr. Malatesta notes that "time and speed of response are life and death issues in the operating room." (Id.). In addition, Dr. Malatesta opined that Dr. Badgio "sidestepped the issue of neuropsychological impairment and chronic brain dysfunction in his interpretation of Dr. Brosnan's test performance." (Id.) Dr. Malatesta, as an expert in behavioral therapies, also disputed that Brosnan was a suitable candidate for the type of symptom focused treatment suggested by Drs. Toborowsky and Badgio. (Id.). Finally, Dr. Malatesta took issue with Dr. Badgio's conclusion that Brosnan is no more disabled now than at the time he stopped working as an anesthesiologist. (Id.). Dr. Malatesta first notes that there is no way to determine what Brosnan's [**9] mental abilities were at the time he ceased working as an anesthesiologist. (Id.). Despite a documented tendency of Brosnan to minimize his difficulties, Drs. Badgio and Toborowsky relied on Brosnan's recollection that his performance as an anesthesiologist was unimpaired. (Id.). Dr. Malatesta then points out that testing "clearly showed that moderate diffuse brain impairment was present in 1992, and continues to be present in 1997. This level of impairment is typically associated with disability. ..." (Id.). Thus, Dr. Malatesta concluded: "The point, however, is that Dr. Brosnan was disabled in 1992, and current data continue to reflect this disability. Whether or not it is 'relative to his mental abilities at the time he stopped working as an anesthesiologist," as noted by Dr. Badgio, is immaterial." (Id.).

## II. LEGAL STANDARD

Defendants have moved pursuant to Federal Rule of Civil Procedure 56 for summary judgment. Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted when, "after considering the record evidence in the light most favorable to the nonmoving party, no genuine issue of material fact exists and the moving party is [**10] entitled to judgment as a matter of law." *Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990).* For a dispute to be "genuine," the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* If the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* The non-moving party may not rely merely upon bare assertions, conclusory allegations, or suspicions. *Fireman's Ins. Co. of Newark v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982).*

## III. DISCUSSION

The present controversy centers whether Brosnan is totally disabled as defined in each of the two disability income insurance policies Brosnan purchased from Provident in 1986. (Def. Mem., Exhs. A & B). Under policy 3-334-697727:

total disability is defined to mean that due to injuries or sickness:
(1) you are [**11] not able to perform the substantial and material duties of your occupation; and

(2) you are under the care and attendance of a Physician

(Def. Mem., Exh. A). Under policy 6-335-749086:

total disability or totally disabled means that due to Injuries or Sickness:

(1) you are not able to perform the substantial and material duties of your occupation; and

(2) you are receiving care by a Physician which is appropriate for the condition causing the disability

(Def. Mem., Exh. B).

Provident first argues that Brosnan's occupation under the policies is that of a medical doctor, as opposed to an anesthesiologist, and, therefore, Brosnan is not totally disabled because he can and is presently working

Case 1:01-cv-01137-CCC   Document 77   Filed 11/25/2002   Page 44 of 68

31 F. Supp. 2d 460, *; 1998 U.S. Dist. LEXIS 20259, **

Page 4

as general practitioner. Provident's **[\*464]** argument is disingenuous at best. Occupation, as defined by the policies, is the occupation regularly engaged in at the time the claimant becomes disabled. On his application for both policies, Brosnan made clear that his occupation was the "practice of anesthesiology." The uncontradicted evidence also shows that anesthesiology was the sole professional activity in which Brosnan was regularly engaged at the time he became **[\*\*12]** disabled. See *DiTommaso v. Union Central Life Ins. Co., 1991 U.S. Dist. LEXIS 9159, 1991 WL 124601 \*3* (1991) (plaintiff was not disabled because he was still earning his primary living as osteopathic physician even though disability prevented him from performing surgery where surgery was "at most 15% of his practice"). n3

       n3 Provident also argues that Brosnan does not meet the definition of totally disabled under one of the policies because he is not receiving appropriate care. Policy No. 6-335-749086 requires that the "claimant must be receiving care by a physician which is appropriate for the condition causing the disability." Provident asserts that Brosnan is not receiving appropriate care because he is not undergoing symptom focused therapy or taking medicine to control his anxiety. (Def. Mem., Exh. M). However, both Drs. Limoges and Malatesta refute this assertion. (Plt. Ans., Exhs. B, E & G). Thus, a reasonable juror could find that such treatment is inappropriate for Brosnan and that he is receiving appropriate treatment from Dr. Limoges.

**[\*\*13]**

Next, Provident argues that Brosnan is not disabled because he suffers only from a speculative fear of relapse if he were to return to the operating room as opposed to a presently existing disability. n4 In support of its argument, Provident points out that Brosnan's condition has been diagnosed as "chronic," reasoning that there is no reason why Brosnan cannot perform at the same level as he did before he was fired. Provident also notes that Brosnan's recovery, by all accounts, has been successful. The gravamen of Provident's argument is that Brosnan has made a voluntary choice not to return to the practice of anesthesiology. Accordingly, Provident asserts that "plaintiff is not able to sustain his burden of proving that he is totally disabled as defined by the policies at issue." (Def. Mem. at 7-8).

       n4 Provident has also argued that Brosnan's fear of relapse if he returns to the operating room

is simply a fear of a potential harm and, therefore, is not a compensable injury. See *Simmons v. Pacor, Inc., 543 Pa. 664, 674 A.2d 232 (Pa. 1996)* (asymptomatic pleural thickening, i.e., unaccompanied by disabling consequences of physical impairment, is not a compensable injury). This case is distinguishable from Simmons because, at least in the minds of some experts, Brosnan suffers from some physiological impairments as well as emotional impairments. (Plt. Ans., Exhs. D & F). Thus, although the fear of relapse is one of the reasons for Brosnan's alleged disability, it is not the only one.

**[\*\*14]**

It is, however, Provident that has failed to meets its burden of establishing the absence of any issue of material fact for purposes of its motion for summary judgment. *Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992)* ("To raise a genuine issue of material fact, however, the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. It thus remains the province of the fact finder to ascertain the believability and weight of the evidence."). The record contains sufficient evidence that a reasonable jury could find that Brosnan is totally disabled as defined in the policies. Brosnan has been diagnosed as suffering from chronic depression and dysthymia along with persistent anxiety. (Plt. Ans., Exh. F). In addition, Brosnan's treating physician concluded that he "suffers from Anxiety, Chronic Alcoholism in Remission and testing **[\*\*15]** shows Chronic Brain Dysfunction especially with regard to performance abilities which are critical in a fast moving operating room." (Id.). Dr. Limoges further concluded that Brosnan is unable to return to the operating room "due to both his persistent chronic anxiety as well as his decreased performance functioning independently." (Id.). Thus, a reasonable juror could find that Brosnan's condition prevents him from performing substantial and material duties of an anaesthesiologist.

The fact that Brosnan suffers from the effects of chronic mental and brain dysfunction **[\*465]** impairments is not itself dispositive because it is not a requirement under the policy that the claimant's condition deteriorate over time. Indeed, as opined by Dr. Malatesta, it may be that in 1992, the effect of chronic alcohol abuse and anxiety became disabling such that Brosnan is entitle to benefits and that his condition

31 F. Supp. 2d 460, *; 1998 U.S. Dist. LEXIS 20259, **

Page 5

persists such that he is "totally disabled" as defined by the policy. n5 (Plt. Ans., Exh. E). That, however, is a question to be determined by the finder of fact. n6

n5 Admittedly, the argument that Brosnan's anxieties and limitations are no different than they were prior to his being terminated in 1992 and, therefore, he is no less able to perform the duties of an anesthesiologist than he was prior to being terminated may be persuasive to a jury. The point is, however, that the extent to which the chronic nature of his mental and physical deficits effects his present condition is a factual determination. [**16]

n6 It is the presence of a genuine issue of material fact precludes the granting of defendant's motion for summary judgment on the issue of total disability, not the merits of the case. The Court is not sanguine that the plaintiff will recover before a jury. But the Court's views in that regard are irrelevant because the Court may not determine the believability or weight of the evidence.

Provident also argues that it is entitled to summary judgment on the issue of recision. Provident asserts that Brosnan made at least one, if not several, material misrepresentation on his applications for these policies in 1986. Each policy application form asked specific questions about Brosnan's past medical history. The application for Policy No. 6-334-697727 asked:

6. Have you ever been treated for or had any know indication of:

(a) High blood pressure, diabetes, cancer, arthritis, asthma, emphysema, or emotional, nervous or mental disorder, or disease or disorder of the eyes, ears or speech?

(Id., Exh. A). The application for Policy No. 6-335-749086 asked:

2. Have ever been treated [**17] for or had any known indication of:

b. Dizziness, fainting, convulsions, headache; speech defect, paralysis or stroke; mental or nervous disorder?

c. Shortness of breath, persistent hoarseness or cough, blood spitting; bronchitis, pleurisy, asthma, emphysema, tuberculosis or chronic respiratory disorder?

d. Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disorder of the heart of blood vessels?

(Id., Exh. B.)

Brosnan answered "no" to each of these questions. His answer did not reflect the following: (1) Brosnan had been treated for mild hypertension since sometime in the early 1980's and was taking a prescribed medication for this condition at the time of the application; (2) Brosnan had an episode of shortness of breath in the late 1970s for which he was briefly hospitalized; (3) Brosnan stutters; and (4) in the early 1980s, after alcohol was detected on his breath at work, he was visited by people from the Medical Society who tried to interest him in attending a group for physicians with alcohol problems. Although Brosnan attended meetings on a few occasions, he did not think he had an alcohol related [**18] problem and did not attend further meetings. (Def. Mem. Exh. H at 31).

Under Pennsylvania law, an insurer must establish three elements to void an insurance policy on the grounds of false and fraudulent representations: (1) the declaration must be false; (2) its subject matter must be material to the risk; and (3) the applicant must have known it to be false or must have made the statement in bad faith. *Van Riper v. The Equitable Life Assurance Society of the United States, 561 F. Supp. 26, 30 (E.D. Pa. 1982)*. First, with respect to his alcoholism, Provident has provided no evidence that Brosnan made the statement in bad faith or knew it to be false. n7

n7 It is well documented that denial is a common symptom of alcoholism. There is no evidence that Brosnan was aware, prior to 1992, that he had a drinking problem. On the contrary, the record supports a conclusion that he did not believe he had a drinking problem. (Def. Mem., Exh. H at 31).

Second, and more importantly, both policies contain incontestability [**19] clauses which state:

[*466]  1. After this policy has been in force for two years during your lifetime, we cannot contest the statements in the application.

2. No claim for loss incurred or disability that starts after two years from the Effective Date of this policy will be reduced or denied on the ground that a sickness or physical condition not excluded by name or specific



Case 1:01-cv-01157-CCC   Document 77   Filed 11/25/2002   Page 46 of 68

31 F. Supp. 2d 460, *; 1998 U.S. Dist. LEXIS 20259, **

Page 6

description had existed before the Effective Date of this policy.

(Def. Mem., Exhs. A & B). There is no contention that Brosnan's disability was caused by any condition excluded by name or specific description or in the policy schedule. Moreover, at the time of Brosnan's disability, the policy was in effect for many years; long enough to trigger the incontestability clause.

Pennsylvania courts have long interpreted the meaning of the incontestability clause to be absolute. *Unity Mutual L.I.C. v. Moses, 621 F. Supp. 13, 16 (E.D. Pa. 1985)*. As far back as 1924, the Pennsylvania Supreme Court stated that "the clause means precisely what its language states: the policy will not be challenged, opposed or litigated, and is indisputable after two years." *Feierman v. Eureka Life Ins. Co., 279 Pa.* [**20] *507, 124 A. 171, 171 (1924)*. The effect of an incontestability clause is to provide a two year period in which the insurance company may ascertain whether the insured has perpetrated any type of fraud in obtaining the coverage, after which it is obliged to make no further inquires nor challenge the validity of the policy. *Moses, 621 F. Supp. at 16.*

Provident nevertheless argues that the clause should not apply. See *Moses, 621 F. Supp. 13, 16 (E.D. Pa. 1985)*. Provident tries to draw support from Moses in which the applicant not only lied about having skin cancer but also fraudulently posed as his own doctor in making the medical certification. *Id. at 17*. The Moses Court, however, analogized the fraud perpetrated by the defendant in the one recognized exception to the incontestability defense, and that is where the insurance company can prove that an imposter was used to deceive the insurance company into issuing the policy. Id. ("Dr. Mosses committed more than simple fraud, he also undertook a criminal act of intercepting mail which was earmarked for another person. This fraudulent act was a cold calculation to circumvent a system that contained reasonable [**21] and workable safeguards to verify his health condition."). There are no such facts here. To the extent that Brosnan knowingly made any material misrepresentations, the incontestability clause serves bar Provident from challenging the validity of the policy. *Groll v. Safeco Life Ins. Co., 388 Pa. Super. 556, 566 A.2d 269, 270 (Pa. Super. 1989)* (incontestability clause barred insurer from asserting insured's status as an ineligible employee as defense to nonpayment of death proceeds).

### IV. Conclusion

Based upon the foregoing analysis, I will deny the motion. An appropriate Order follows.

### ORDER

**AND NOW** this 17th day of December, 1998, upon consideration of the motion of defendant Provident Life and Accident Insurance Company for summary judgment (Document No. 15) and the response of plaintiff William J. Brosnan thereto, and the supporting memoranda, pleadings, exhibits and affidavits submitted by the parties, having found that there are genuine issues of material fact and that the defendant is not entitled to judgment as a matter of law, and for the reasons set forth in the foregoing memorandum, it is hereby **ORDERED** that the motion is **DENIED.** [**22]

**IT IS FURTHER ORDERED** that the parties shall submit a joint report to the Court no later than **January 18, 1998** as to the status of settlement. If the parties need the assistance of the Court in facilitating settlement negotiations, the report shall so indicate. By said date, plaintiff shall contact the Deputy Clerk to arrange a date for a final scheduling conference.

**LOWELL A. REED, JR., J.**

*motion to dismiss bad faith claim denied*

**B. JAMES CAKE v. PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY**

**CIVIL ACTION NO. 98-4945**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1999 U.S. Dist. LEXIS 371*

**January 15, 1999, Filed; January 19, 1999, Entered**

**DISPOSITION:**

[*1] Motion GRANTED IN PART in that the claims for infliction of emotional harm and for a constructive trust DISMISSED, and Motion otherwise DENIED.

**COUNSEL:**

For B. JAMES CAKE, PLAINTIFF: RONALD H. SURKIN, RICHARD, DI SANTI, GALLAGHER, SCHOENFELD & SURKIN, MEDIA, PA USA.

For PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, DEFENDANT: RICHARD L. MC MONIGLE, JR., POST & SCHELL, P.C., PHILA, PA USA.

**JUDGES:**

JAY C. WALDMAN, J.

**OPINIONBY:**

JAY C. WALDMAN

**OPINION:**

### MEMORANDUM ORDER

Plaintiff claims that defendant has wrongfully withheld disability insurance benefits to which plaintiff was entitled and that defendant has wrongfully required plaintiff to continue paying premiums to maintain the insurance policies in force despite his disability. Plaintiff has asserted claims for breach of contract, for imposition of a constructive trust, for bad faith pursuant to 42 Pa. C.S.A. § 8371, for violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 et seq., and for infliction of emotional harm. Presently before the court is defendant's motion to

dismiss plaintiff's constructive trust, unfair trade practice and emotional harm claims pursuant to Fed. R. Civ. [*2] P. 12(b)(6).

The pertinent factual allegations are as follow. Plaintiff was the insured under two disability policies issued by defendant. In the event plaintiff became "totally disabled," defendant was obligated to pay combined benefits of $ 7,000 per month, starting 181 days after the onset of disability and continuing to the end of the disability or plaintiff's sixty-fifth birthday. The term "totally disabled" is defined in the policies as an inability to perform the "substantial and material duties of [his] occupation."

Plaintiff was the chief financial officer and acting president of John A. Robbins Companies, a real estate company specializing in the management of shopping centers. Suffering from depression, he resigned on April 25, 1999. His depression grew worse after the resignation. In late September 1997, plaintiff became chief financial officer of Drexel Realty Co. His condition deteriorated. He was suffering from "anxiety, stress and an inability to concentrate." He resigned from Robbins on October 6, 1997, after eight days on the job. From that time, "plaintiff's mental illness has rendered him unable to perform the substantial and material duties of his occupation." [*3] Defendant did not reasonably investigate plaintiff's claim and has declined to pay him benefits.

Plaintiff does not oppose defendant's motion to dismiss the emotional harm claim and, in any event he has not remotely set forth a cognizable claim for intentional or negligent infliction of emotional distress.

A constructive trust is an equitable remedy and not a cause of action. See, e.g., *Kaiser v. Stewart, 1997 U.S.*

*Dist. LEXIS 12788, 1997 WL 476455,* at *19 (E.D. Pa. Aug. 19, 1997); *Lerario v. Provident Life and Accident Ins. Co., 1996 U.S. Dist. LEXIS 13671, 1996 WL 532491,* at *4 (E.D. Pa. Sept. 20, 1996). It would appear that plaintiff clearly has a fully adequate legal remedy for the wrongs he has alleged. Plaintiff concedes as much, but argues that he only intended this count serve as an alternative prayer for relief. A court may grant any relief which is shown to be appropriate. See, e.g., *Old Republic Ins. Co. v. Employers Reinsurance Corp., 144 F.3d 1077, 1081 (7th Cir. 1998)* (court should grant all appropriate relief even if not specifically requested by parties); *Schumann v. Levi, 728 F.2d 1141, 1143 (8th Cir. 1984); Hamlin v. Warren, 664 F.2d 29, 30 (4th Cir. 1981),* cert. denied, *455 U.S.* **[*4]** *911, 71 L. Ed. 2d 451, 102 S. Ct. 1261 (1982); Sapp v. Renfroe, 511 F.2d 172, 176 n.3 (5th Cir. 1975); Riggs, Ferris & Geer v. Lillibridge, 316 F.2d 60, 62-63 (2d Cir. 1963).* Nevertheless, if he wishes, plaintiff may amend his complaint to add a prayer for equitable relief in the form of a constructive trust.

Malfeasance or misfeasance is actionable under the Consumer Protection Law. Nonfeasance is not. See *Horowitz v. Federal Kemper Life Ins. Co., 57 F.3d 300, 307 (3d Cir. 1995).* An insurer's failure to pay the proceeds of an insurance policy is nonfeasance and accordingly is not actionable. Id.

In the course of denying a claim for coverage, however, an insurer may engage in conduct that constitutes malfeasance or misfeasance and which thus could be actionable under the Consumer Protection Law.

See *Smith v. Nationwide Mut. Fire Ins. Co., 935 F. Supp. 616, 620-21 (W.D. Pa. 1996)* (allegation that post-loss investigation was performed improperly states claim); *Parasco v. Pacific Indem. Co., 870 F. Supp. 644, 648 (E.D. Pa. 1994)* (allegations that post-loss investigation was conducted in unfair manner and that insurer made misrepresentations regarding nature **[*5]** of its contractual obligations stated claim). Plaintiff's allegation that defendant "conducted an unreasonable investigation of plaintiff's claim" suggests more than a failure to investigate. Rather, it suggests that defendant undertook an investigation and performed it improperly. As such, the court cannot conscientiously conclude beyond doubt at this juncture that plaintiff will be unable to prove any set of facts on which he could prevail on his Consumer Protection Law claim. See *Robb v. Philadelphia, 733 F.2d 286, 290 (3d Cir. 1984).*

**ACCORDINGLY,** this 15th day of January, 1999, upon consideration of defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) (Doc. # 3) and plaintiff's response thereto, **IT IS HEREBY ORDERED** that said Motion is **GRANTED IN PART** in that the claims for infliction of emotional harm and for a constructive trust are **DISMISSED** and said Motion is otherwise **DENIED.**

**BY THE COURT:**

**JAY C. WALDMAN, J.**

**ENTERED: 1-19-99**

*ERISA case — UNUM manipulation*
*atty's fees awarded*

LEXSEE 279 f3d 337

**ELLEN LAIN, Plaintiff-Appellee, versus UNUM LIFE INSURANCE COMPANY OF AMERICA, Defendant-Appellant.**

**No. 00-20889**

**UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

*279 F.3d 337; 2002 U.S. App. LEXIS 1208; 27 E.B.C. 1570*

**January 29, 2002, Decided**

**PRIOR HISTORY:**
[**1] Appeal from the United States District Court for the Southern District of Texas. H-97-CV-3560. Ewing Werlein, Jr, US District Judge.

**DISPOSITION:**
Affirmed.

**COUNSEL:**
For ELLEN LAIN, Plaintiff - Appellee: Paul D Clote, Houston, TX.

For UNUM LIFE INSURANCE COMPANY OF AMERICA, Defendant - Appellant: Douglas Kent Butler, Figari, Davenport & Graves, Dallas, TX.

**JUDGES:**
Before BARKSDALE and STEWART, Circuit Judges, and ROSENTHAL, District Judge. *

   * District Judge of the Southern District of Texas, sitting by designation.

**OPINIONBY:**
CARL E. STEWART

**OPINION:**

[*340] CARL E. STEWART, Circuit Judge:

UNUM Life Insurance Company of America ("UNUM") appeals the district court's award of disability benefits and attorneys' fees to Ellen Lain ("Lain"). For the reasons stated below, we affirm.

FACTUAL AND PROCEDURAL HISTORY

Lain is a former partner in the law firm of Schlanger, Mills, Macer & Grossberg ("Schlanger") in Houston, Texas. She specialized in real estate, banking, and finance law. In late 1993, Lain began to suffer severe chest pains and on November 19, 1993, she sought treatment from Dr. John M. Bergland ("Bergland"), an internist. In January of 1994, Bergland, noting that Lain was having chest problems day and night, prescribed Inderol, which Lain contends did not alleviate her chest pains. The following month, Lain consulted Dr. Patrick Cook ("Cook"), a cardiologist. Cook reported that Lain's chest pains had progressed and could last from seconds to [**2] hours. Shortly thereafter, on March 3, 1994, Lain consulted Dr. Philip Bentlif ("Bentlif"), a gastroenterologist, who administered an endoscopy of Lain's esophagus. The test revealed that Lain's esophagus had normal epithelium (i.e., the lining of her esophagus appeared normal and not damaged by stomach acid), but her esophagus had disordered motility. n2 Thus, Bentlif recommend a esophageal motility study.

   n2 Esophageal motility are the muscular contractions of the esophagus and the study of these contractions. Esophageal motility disorder is a condition that produces symptoms and discomfort to patients sometimes caused by the partial or total failure of synchronous esophageal muscular contractions. This disorder is rare and there is no known cure.

On March 15, 1994, Dr. F. J. Garcia-Tores ("Garcia-Tores") conducted a esophageal motility study on Lain at St. Luke's Episcopal Hospital in Houston. Garcia-Tores reported that the motility study was normal, but that Lain's peristaltic contractions were "top normal" [**3]


with an amplitude of 175 mm Hg and several of the contractions were greater than 220 mm HG. n3

> n3 Peristalsis is a contractual wave that moves food from the upstream part of the esophagus to the downstream part of the esophagus. A peristaltic wave of 150 to 180 mm HG is normal, anything greater than 180 mm Hg is considered abnormal.

In April of 1994, Lain visited Dr. Ira Klein ("Klein"), another specialist in gastroenology interology. Klein, finding that Lain suffered from severe chest pains, prescribed Procardia and Tofranil. Subsequently, Klein discontinued the use of Procardia, because Lain believed it was making her symptoms worse, and increased her dosage of Tofranil. On August 16, 1994, Lain returned to Bentlif, who, after reviewing the results of the esophageal motility test, diagnosed her condition as esophageal motor dysfunction, a form of esophageal motility disorder, and prescribed Valium and Nitrostat.

By November 10, 1994, Lain's condition had progressed and she complained that the medication prescribed [**4] was not effective. As a result, Lain visited the Mayo Clinic in Rochester, Minnesota where she was examined by Dr. Michael D. O'Brien ("O'Brien") and Dr. R. W. Hughes ("Hughes"). They discovered that Lain also suffered from hiatal hernia and prescribed Prilosec. On April 26, 1995, Bentlif diagnosed Lain with Zenker's diverticulum n4 and gastroesophageal reflux disease ("GERD"). He then started Lain on an anti-reflux program, including a prescription for Axid. The following month, Lain [*341] contacted Bentlif and reported that the Axid was not effective.

> n4 Zenker's diverticulum is a weakness in the back wall of the pharynx.

In July of 1995, Lain visited Dr. A. David Axelrad ("Axelrad"), a psychiatrist, who diagnosed her with "pain disorder associated with psychological factors and general medical condition," and "Major Depressive Disorder secondary to Chronic Pain Syndrome." Axelrad prescribed Zoloft and Desyrel.

Sometime in 1988 or 1989, Schlanger selected UNUM as the firm's long-term disability insurance carrier. [**5] UNUM issued Legal Services Group Insurance Trust Policy 37700 (the "Policy") for the employees of Schlanger, effective January 1, 1989. On April 3, 1995, Lain stopped working with Schlanger due to her deteriorating condition, and on July 12, 1995, she filed a disability claim under the Policy. Lain alleged that she was unable to work due to severe chest pains, esophagus motility disorder, and esophagal spasms.

Along with her claim, Lain submitted a physician statement written by Bentlif, which stated: (1) Lain's symptoms were substernal pain; (2) his objective findings were esophageal motility disorder and G-E Reflux; (3) the symptoms first appeared in late 1993; (4) Bentlif had first seen Lain on March 3, 1994; (5) he believed that Lain was first unable to work on April 3, 1995; (6) Lain saw him every two to three months; (7) Lain's medical condition was such that she could not do normal legal professional work; and (8) his prognosis for recovery was "hopeful after a period of time." Lain also submitted a statement from Schlanger stating that Lain stopped work on April 3, 1995 due to illness. n5

> n5 Schlanger also reported to UNUM that Lain's job could not have been modified to accommodate her disability.

[**6]
Steven Feagon ("Feagon"), one of UNUM's staff physicians, reviewed Lain's file. Feagon reported that "given what [UNUM had], [he could] neither validate nor refute the claimant's subjective pain complaints though the consistency across multiple providers and the presentation of pyschological evaluations suggest a real ongoing problem." Feagon also stated that he did not believe UNUM would be able to refute, with an independent examination, the findings of Bentlif and Axelrad regarding Lain's impairment. Id.

Nonetheless, on November 30, 1995, UNUM denied Lain's claim. It gave four reasons for the denial: (1) the doctors' description of her restrictions and limitations was insufficient to support a finding of disability; (2) Lain was able to retain bodily nourishment, and she had not produced any evidence of persistent anemia; (3) she had not been receiving regular ongoing treatment for her condition; and (4) there was no evidence of a severe mental condition that would have prevented her from performing her job duties at the time she stopped working.

On December 7, 1996, Lain received notice of the denial of her claim. Because UNUM acted as both the insurer and the [**7] Employee Retirement Income Security Act ("ERISA") administrator of the Policy, Lain sent a letter to UNUM appealing the decision. Thereafter, Carolyn Jackson ("Jackson"), another one of UNUM's staff physicians, reviewed Lain's file and

determined that Lain's "intermittent symptoms" were not frequent or severe enough to prevent her from working. On February 14, 1996, the day after Jackson made her recommendation, UNUM sent a letter to Lain rejecting her appeal. However, UNUM stated that it would submit Lain's file to UNUM's home office for further review. After Lain's file was reviewed for **[*342]** the third time, UNUM finally denied her appeal for the following reasons: (1) the medical restrictions assigned to her did not support disability; (2) the objective test results performed by Bentlif and the Mayo Clinic were normal; and (3) Lain was not under psychiatric care when she ceased active employment.

Lain filed suit against UNUM in state court and UNUM removed the action to federal district court asserting that ERISA preempted Lain's state law claims. It also filed a counterclaim for attorneys' fees. Thereafter, Lain filed an amended complaint asserting seven causes of action: (1) breach of contract, **[**8]** (2) equitable or promissory estoppel, (3) common-law fraud and intentional misrepresentation, (4) violation of the Texas Deceptive Trade Practices Act, (5) violation of article 21.21 of the Texas Insurance Code, (6) breach of fiduciary duty and duty of good faith and fair dealing, and (7) in the event that her claims are preempted, she asserted denial of benefits and breach of fiduciary duty under ERISA.

Subsequently, Lain filed a motion for partial summary judgment asking the district court to declare that ERISA did not preempt her state-law claims against UNUM and UNUM filed a motion to strike Lain's jury demand. The district court found that Lain's state law claims related to an ERISA-regulated plan and were therefore preempted. It also denied Lain's demand for trial by jury. At the conclusion of trial, the district court held that Lain was disabled within the meaning of the Policy and awarded benefits from April 3, 1995 to the date of final judgment. The district court also awarded Lain attorneys' fees. n6 This appeal followed.

> n6 The district court ordered the parties to provide a calculation of benefits and Lain's claim for attorneys' fees.

**[**9]**

STANDARD OF REVIEW

An administrator's denial of benefits under an ERISA plan is "reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101,*

*115, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989)* (citation omitted). Because the language in the Policy does not give UNUM such discretion, we apply the de novo standard of review. However, UNUM's factual determinations during the course of Lain's benefit proceeding are reviewed for abuse of discretion. *Estate of Bratton v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 215 F.3d 516, 522 (5th Cir. 2000).* When applying the abuse of discretion standard, "we analyze whether the plan administrator acted arbitrarily or capriciously." *Sweatman v. Commercial Union Ins. Co., 39 F.3d 594, 601 (5th Cir. 1994)* (quoting *Salley v. E.I. DuPont de Nemours & Co., 966 F.2d 1011, 1014 (5th Cir. 1992)).* A decision is arbitrary when made "without a rational connection between the known facts and the decision or **[**10]** between the found facts and the evidence." *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich., 97 F.3d 822, 828 (5th Cir. 1996).* An administrator's decision to deny benefits must be "based on evidence, even if disputable, that clearly supports the basis for its denial." *Vega v. Nat'l Life Ins. Servs., Inc., 188 F.3d 287, 299 (5th Cir. 1999).* We must find that "without some *concrete evidence* in the administrative record that supports the denial of the claim, ... the administrator abused its discretion." *Id. at 302* (emphasis added).

**[*343]** A "sliding scale" is applied to the abuse of discretion standard where it is determined that the administrator has acted under a conflict of interest. *Id. at 296.* "The greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard will be." *Id. at 297.* When a minimal basis for a conflict is established, we review the decision with "only a *modicum less* deference than we otherwise would." *Id. at 301* (emphasis added).

In the instant case, the district court held that UNUM had an "inherent **[**11]** conflict of interest" because it was both the insurer and the plan administrator, which determined whether to pay claims under the Policy. Accordingly, the district court found that UNUM's decision to deny Lain's claim was subject to a "modicum less deference." n7 Id. UNUM argues that the district court erred in allowing UNUM only "a moderate or medium amount of deference on the sliding scale." We are not required to apply the Vega "sliding scale" analysis to this case because we agree with the district court that "given the overwhelming evidence of ... Lain's disability ... and the absence of any 'concrete' evidence to the contrary, the decision in this case would not be different even if UNUM's factual determinations were entitled to all but 'a modicum' of deference."

> n7 The district court also stated, in support of sliding the scale, that UNUM infused its inherent,

279 F.3d 337, *; 2002 U.S. App. LEXIS 1208, **;
27 E.B.C. 1570

institutional conflict of interest into its employees by providing substantial financial bonus incentives based partially on UNUM's financial achievement and its net earnings per share. UNUM argues that the fact that employee benefits are "tied indirectly and only in part to the overall performance of the company does not warrant heightened review."

[**12]

A district court's determination of whether an administrator abused its discretion in denying a claim for benefits is reviewed de novo. *Bellaire Gen. Hosp., 97 F.3d at 829.* However, this Court "will set aside the district court's factual findings underlying its review of the [policy] administrator's determination only if clearly erroneous." Id. (citation omitted). The district court has discretion to allow reasonable attorneys' fees and court costs to either party under *29 U.S.C. § 1132*(g)(1). "Such an award [of attorneys' fees and costs] is purely discretionary, and we review the district court's decision only for an abuse of discretion." *Salley v. E.I. DuPont de Nemours & Co., 966 F.2d 1011, 1016-17 (5th Cir. 1992)* (citing *Donovan v. Cunningham, 716 F.2d 1455, 1475 (5th Cir. 1983)).*

DISCUSSION

I. Disability

In assessing whether to grant or deny benefits, an administrator must make two determinations. First, he must determine the facts underlying the claim presented and then he must determine whether the facts establish a claim to be honored under the terms of the policy. *Schadler v. Anthem Life Ins. Co., 147 F.3d 388, 394 (5th Cir. 1998).* [**13] In the instant case, UNUM argues that, based on the established facts, Lain is not disabled as defined under the Policy. The Policy provides

"Disability" and "disabled" mean that because of injury or sickness:

1. [the insured] cannot perform *each* of the material duties of [her] regular occupation; or

2. [the insured], while unable to perform all of the material duties of [her] regular occupation on a full-time basis, [is]:

a. performing at least one of the material duties of [her] regular [*344] occupation or another occupation on a part-time or full-time basis; and

b. earning currently at least 20% less per month than [her] indexed pre-disability earnings due to that same sickness or injury.

Note: For attorneys, "regular occupation" means the speciality in the practice of law which [the insured was] practicing just prior to the date the disability started. (emphasis added).

UNUM asserts that Lain is not disabled under the first-prong of the definition of disability because she has failed to present any evidence that she was unable to perform *all* of her material duties as an attorney. n8 There is no dispute that Lain attempted [**14] to practice law while she sought treatment. Lain initially began seeking treatment in November of 1993, but did not completely stop working until April 4, 1995. UNUM avers that there is no better evidence that Lain was able to perform at least one or more of her material duties than the fact that she worked while undergoing treatment for chest pains.

n8 Lain does not assert nor did the district court find that Lain was disabled under the second-prong of the definition. Although the district court did not specifically state that she was disabled under the first-prong, the language used in its finding of facts lend to this interpretation. Specifically the district court found that "Lain as of April 3, 1995, and continuously since that date, could not perform *each of the material duties* of her regular occupation as an attorney specializing in transactional matters involving real estate, banking, and financial law, and therefore, she was disabled." (emphasis added).

Further, UNUM maintains that there is a complete [**15] absence in the record of any objective medical evidence of an illness rendering Lain unable to practice law in her specialized field. It notes that Lain was tested extensively, but all of the tests were essentially normal. Accordingly, UNUM concludes that Lain is not disabled under the definition set forth in the Policy and the district court erred in awarding her benefits.

This Circuit applies a two-prong test when reviewing an administrator's denial of benefits. First, we determine the "legally correct interpretation of the [policy]." *Tolson v. Avondale Industr., Inc., 141 F.3d 604, 608 (5th Cir. 1998).* If it is found that the administrator failed to give the plan "the legally correct interpretation, [this Court must] then determine whether

279 F.3d 337, *; 2002 U.S. App. LEXIS 1208, **;
27 E.B.C. 1570

the administrator's decision was an abuse of discretion." Id.

A. The Legally Correct Interpretation

In ascertaining the legally correct interpretation of the policy, we must consider (1) whether a uniform construction of the policy has been given by the administrator, (2) whether the interpretation is fair and reasonable, and (3) whether unanticipated costs will result from a different interpretation of the policy. [**16] *Gosselink v. Am. Tel. & Tel. Inc.*, 272 F.3d 722, 726 (5th Cir. 2001) (citing *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 637-638 (5th Cir. 1992)).

In the instant case, there has been no allegation or evidence as to whether UNUM gave the Policy a uniform construction. The only potential unanticipated cost resulting from a different interpretation of the Policy would be that UNUM will have to pay benefits to Lain and possibly other employees or former employees eligible prior to early 1996. n9 The crucial issue in this case is whether UNUM's interpretation of the Policy is fair and reasonable. Under the Policy, an [*345] employee is eligible for long-term disability benefits if that employee meets the definition of "disability," which in this case means that "because of injury or sickness [the insured] cannot perform *each* of the material duties of [her] regular occupation." (emphasis added).

n9 In January of 1996, Schlanger terminated its long-term disability policy with UNUM.

[**17]

In a seven page letter of appeal, Lain explained that her regular occupation requires the ability to concentrate mentally for long periods of time on complex and detailed factual and legal matters involving significant real estate transactions for clients. Lain maintained that her chest pains were so severe that she was unable to concentrate, think, and act in a manner necessary to perform each of the material duties of her regular occupation. As a result of her severe chest pains, Bentlif reported that Lain's ability to work was limited and she was unable to perform normal legal work, and thus, could not practice law. Also, Axelrad documented that Lain was unable to work because of Chronic Pain Sydrome, which interfered with her cognitive activity.

In denying Lain's appeal, Bruce Dominick ("Dominick"), a senior benefit analyst at UNUM, testified that he interpreted the first-prong of the definition of "disability" as requiring Lain to be unable to perform all of her material duties before she would be considered disabled. This is contrary to the plain language of the Policy and to UNUM's interpretation of the same definition in other cases.

A fair reading of the Policy supports [**18] the view that in order to be considered disabled, an insured must be unable to perform only a single material duty of her occupation. In fact, one of UNUM's own disability benefits specialist, Gayle Harrison Bledsoe ("Bledsoe"), who reviewed Lain's claim on the first level, admitted that this is the way that the Policy is interpreted. n10 Further, UNUM has previously interpreted the policy in other cases containing a similar definition of "disability" as requiring a person to be unable to perform only a single material duty of her regular occupation before she is disabled and entitled to benefits. See also *Dishman v. UNUM Life Ins. Co. of Am.*, 1997 U.S. Dist. LEXIS 22676, No. 96-0015 JSL, 1997 WL 906146, at *6 (C.D. Cal. May 9, 1997) (When interpreting an UNUM policy containing language similar to the language of the policy in this case, the court held that "the disability and partial disability provisions of the [policy], read together, evidence the fact that an ... employee is disabled if there is a single material duty of [her] occupation which [she] cannot perform.").

n10 During Bledsoe's deposition, counsel for Lain, Paul D. Clote ("Clote"), had the following exchanges with Bledsoe: With regard to the subject of the definition of "disabled" under the policy:

CLOTE: Now, when the ... [policy] says the insured cannot perform each of the material duties of his or her regular occupation, what that means is, if the insured can do some, but not all of the material duties, then you're disabled. Isn't that what that means?

BLEDSOE: Yes, it is. Bledsoe's Deposition at 224, lines 1-7.

CLOTE: You would agree with me wouldn't you, Ms. Bledsoe, that if there was a single duty of Ellen Lain's own occupation which she could not perform, then under the terms of the policy, she should have been declared disabled; true?

BLEDSOE: Yes. Bledsoe's Deposition at 280, lines 3-10.

[**19]

Furthermore, even assuming the definition is ambiguous, under Texas law it is well-settled that ambiguities in insurance policies are construed against

279 F.3d 337, *; 2002 U.S. App. LEXIS 1208, **;
27 E.B.C. 1570

the insurer. *Jarvis Christian Coll. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 197 F.3d 742, 746 (5th Cir. 1999).* Accordingly, **[*346]** Dominick incorrectly interpreted the terms of the Policy and held Lain to a higher standard by requiring her to prove that she was unable to perform all of the material duties of her regular occupation. Accordingly, we find that UNUM's interpretation is inconsistent with a fair reading of the policy.

### B. Abuse of Discretion

We must now determine whether UNUM's interpretation of the Policy, although legally incorrect, constitutes an abuse of discretion. An administrator's incorrect interpretation of a policy does not in itself demonstrate an abuse of discretion, however, "when [his] interpretation ... is in direct conflict with the express language [of] a [policy], this action is a very strong indication of arbitrary and capricious behavior." *Wildbur, 974 F.2d at 638* (citation omitted).

When considering whether there has been an abuse of discretion, we have **[**20]** identified three important factors in this analysis: (1) the plan's internal consistency under the administrator's interpretation, (2) any relevant regulations, (3) the factual background underlying the decision, and (4) any indication of lack of good faith. Id. In regard to the first and second factors, neither party has presented any evidence that the language of the Policy conflicts with other provisions of the Policy and no relevant regulations have been presented to this Court. With respect to the third factor, "to find an absence of abuse of discretion, [this] court must scour the record and the pleadings for any legal basis upon which the administrator could have based [its] interpretation[]." *Kennedy v. Electricians Pension Plan, 954 F.2d 1116, 1124 (5th Cir. 1992).*

UNUM afforded the following reasons in finally denying Lain's claim: (1) the medical restrictions assigned to her did not support disability; (2) the objective test results performed by Bentlif and the Mayo Clinic were normal; and (3) Lain was not under psychiatric care when she ceased active employment.

Bentlif was the only physician to file a statement with UNUM. In his report, Bentlif **[**21]** stated that he believed Lain was unable to perform "normal legal professional work" after April 3, 1995. Three months after receiving the report, UNUM, evidently not satisfied with this clear statement of Lain's restrictions, faxed Bentlif a document containing three questions. It is Bentlif's answers to these questions that UNUM heavily relied on in denying Lain's claim. To the first question, which concerned Lain's specific restrictions and limitations, Bentlif responded that Lain's physical limitations were caused by "6 to 8 chest pains [a] day,"

which Lain asserted prevented her from practicing law. The second question stated "please provide us with specific restrictions and limitations in relation to ... Lain's speech, driving, and eating." To this question Bentlif answered, "scared to drive on freeways." UNUM maintains that a "fear of driving" is insufficient to support a finding of disability under the terms of the Policy. Viewing the administrative record in its entirety, it is clear that Lain's fear of driving on the freeway was a product of the unpredictability of her severe heart attack-like chest pains. Thus, UNUM unreasonably relied on this statement in denying Lain's **[**22]** claim without considering it in the context of all the relevant facts and evidence presented.

The last question stated "Lain has indicated that she spends quite a bit of time at home doing research pertaining to her diagnosis. If she is able to do this research, what is it that is preventing her from performing the duties of her regular occupation?" Bentlif simply replied, "I do not **[*347]** know" without an explanation. It is reasonable to infer that Bentlif just did not know how to respond to such an odd question. This question unfairly equates amateur research conducted by a severely ill individual trying to find answers about her painful and incurable sickness with the kind of daily performance required of an attorney specializing in major sophisticated real estate and financial transactions. Equating these disparate activities reflects plain lack of objectivity and an abuse of discretion by UNUM.

The second and third reasons set forth by UNUM in finally denying Lain's claim also demonstrated an abuse of discretion. The second reason given by UNUM was that the objective test results performed by Bentlif and the Mayo Clinic were essentially normal. Although some of the test results were **[**23]** normal, Lain's peristaltic contractions tests revealed abnormal and at times "top normal" contractions. UNUM's own staff physician, Feagon, stated that the tests performed on Lain by Garcia-Tores, at St. Luke's Hospital, and O'Brien and Hughes, at the Mayo Clinic, revealed "greater than normal amplitude contractions." Feagon also determined that he "[could] neither validate nor refute the claimant's subjective pain complaints though the consistency across multiple providers and the presentations of psychological evaluations suggest a real ongoing problem." In addition, the tests were administered at times when Lain was not experiencing a painful episode of spasms and not in distress, a factor ignored by UNUM. It also failed to take into account that Lain's chest pains cannot be clinically measured by tests. To focus on the tests, rather than the pain and its effect, further indicates UNUM's abuse of discretion.

The third reason given by UNUM in denying Lain benefits was that she did not seek psychiatric care prior

to ceasing active employment. Although this fact is true, it has no bearing on Lain's claim because her disability was physical and not mental. Understandably, as a result [**24] of Lain's deteriorating condition, she suffered from major depressive disorder secondary to chronic pain syndrome; however, severe chest pains were the cause of her disability. Accordingly, UNUM's denial on this ground further reflects an abuse of discretion rather than a fair and objective determination.

As stated previously, the policy at issue only requires "proof" that Lain is unable to perform each of the material duties of her occupation. The record contains an overwhelming amount of medical evidence supporting Lain's claim of disability. Further, there is no evidence in the administrative record and UNUM has not presented any evidence to this Court which establishes that Lain was capable of working after April 3, 1995. Thus, because there is a complete absence in the record of any "concrete evidence" supporting UNUM's determination that Lain is not disabled, the district court properly held that UNUM abused its discretion.

## II. Attorneys' Fees

When determining whether to award attorneys' fees and costs, the district court should consider the following factors: "(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to [**25] satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits [*348] of the parties' position." *Iron Workers Local No. 272 v. Bowen, 624 F.2d 1255, 1266 (5th Cir. 1980).* Once it is determined that the plaintiff is entitled to attorneys' fees, it is incumbent upon the district court to "utilize the lodestar method to determine the amount to be awarded." *Wegner v. Standard Ins. Co., 129 F.3d 814, 822 (5th Cir. 1997).* This requires the

district court to assess the "reasonable number of hours expended on the litigation and the reasonable hourly rates for the participating attorneys, and then multiply the two figures together to arrive at the 'lodestar.' " Id. (internal footnote and citation omitted). After applying the Bowen factors, the district court determined that Lain is entitled to attorneys' fees.

The district court then reviewed [**26] the affidavit supplied by Lain's lead counsel, Clote, detailing Lain's claim for attorneys' fees and summarizing, month by month, his legal services provided over a period of approximately three years. n11 The affidavit was supported by an exhibit in which Clote's itemized bills to Lain were evidenced, including entries specifically stating the work performed, the day each service was rendered, and the amount of time spent. Utilizing the lodestar method, the district court determined that Lain was entitled to $ 122, 264.02 in attorneys' fees, plus expenses and court costs in the amount of $ 20,040.02.

n11 Lain's claim for attorneys' fees also consisted of reasonable and necessary legal services rendered by co-counsel, Marc Grossberg, and several other lawyers and legal assistants.

This Court has held that a district court may award attorneys' fees upon finding an abuse of discretion on the part of an administrator in denying benefits. *Vega, 188 F.3d at 302.* Because we have already concluded that [**27] the district court properly found that UNUM abused its discretion by holding Lain to a higher standard of proof, we affirm the district court's award of attorneys' fees.

## CONCLUSION

For the reasons stated herein, we affirm the district court's award of benefits and attorneys' fees to Lain.

AFFIRMED.

*ERISA case – UNUM improperly investigated claim, see attifier dis assion*

LEXSEE 269 f3d 974

**JOHN W. DISHMAN, Plaintiff-Appellee-Cross-Appellant, v. UNUM LIFE INSURANCE COMPANY OF AMERICA; THE ADAMS, DUQUE & HAZELTINE LONG TERM DISABILITY INCOME PLAN, Defendants-Appellants-Cross-Appellees.**

**Nos. 99-55963, 99-56077**

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

*269 F.3d 974; 2001 U.S. App. LEXIS 22599*

**October 17, 2001, Filed**

**SUBSEQUENT HISTORY:**
 [**1] Reported at: *269 F.3d 974 at 977.*

**PRIOR HISTORY:**
Appeal from the United States District Court for the Central District of California. D.C. No. CV-96-00015-JSL. J. Spencer Letts, District Judge, Presiding.

 *Dishman v. UNUM Life Ins. Co. of Am., 250 F.3d 1272, 2001 U.S. App. LEXIS 8529 (9th Cir. Cal. 2001)*

This Opinion Substituted on Denial of Rehearing and Rehearing En Banc for Withdrawn Opinion of May 8, 2001, Previously Reported at: *2001 U.S. App. LEXIS 8529.*

**DISPOSITION:**
Affirmed in part, reversed in part and remanded.

**COUNSEL:**
Lesley C. Green and Russell G. Petti, Bannan, Green & Frank, Los Angeles, California, for defendants/appellants UNUM Life Insurance Company of America and The Adams, Duque & Hazeltine Long Term Disability Income Plan.

Thomas E. Shardlow and Patricia G. Vick, Law Offices of Shardlow & Vick, Pasadena, California, for appellee/cross-appellant John Dishman.

Henry Solano, Marc I. Machiz, and Marcia Bove, Department of Labor, Washington, D.C., for amicus curiae United States.

**JUDGES:**
Before: Robert R. Beezer, Thomas G. Nelson, and Marsha S. Berzon, Circuit Judges. Opinion by Judge T.G. Nelson.

**OPINIONBY:**
T.G. Nelson.

**OPINION:**

 [*977] T.G. NELSON, Circuit Judge:

UNUM Life Insurance Company of America ("UNUM") appeals a bench trial judgment and consequent attorneys' fee award in favor of John Dishman, an ERISA plan participant and benefits [**2] claimant. On cross-appeal, Dishman asserts that the district court erroneously dismissed as preempted his state law tort claim. We affirm in part and reverse in part.

I. FACTS AND PROCEEDINGS BELOW

John Dishman was Executive Director of the Adams, Duque & Hazeltine law firm ("AD&H") from 1986 until July 1993, when he resigned complaining of debilitating migraine headaches. He successfully [*978] applied for long-term disability benefits from UNUM, the insurance company from which AD&H had purchased a long-term disability insurance policy. UNUM began paying Dishman $ 11,500 monthly in November 1993.

After granting Dishman's claim for disability benefits, UNUM sought and obtained two reports from Dishman's neurologist confirming the severity of Dishman's condition, which had afflicted him since childhood. Moreover, the vocational expert UNUM

269 F.3d 974, *; 2001 U.S. App. LEXIS 22599, **

retained to evaluate Dishman recommended settlement because (1) Dishman's medical record "strongly established" the presence and duration of his condition; (2) Dishman had gone to great lengths to remedy it; (3) Dishman had made "numerous attempts to overcome his disability and improve his work capacity" without avail; and (4) "further medical information [**3] was unlikely to render information useful to his claim." Despite this recommendation, in April 1995 UNUM assigned Dishman's claim to its" Complex Claim Unit" because the claim's reserve was $ 497,154, and it had exhausted risk management tools at the time.

Within the Complex Claim Unit, UNUM assigned Dishman's claim to Frankie Puthoff, who initiated an investigation. Puthoff hired several private investigative agencies to do a "work and sports check" on Dishman, and asked him to submit to two "Independent Medical Evaluations" ("IMEs"), one with a neurologist and another with a forensic psychiatrist.

Neither of those IMEs ever came to pass. One of the "work and sports checks" Puthoff ordered returned ambiguous information suggesting that Dishman might be employed by Semiotix, Inc., a Denver, Colorado, company. The report, which allegedly resulted from an investigator's impersonation of a bank lender, did not indicate the amount Dishman was being paid, or whether any payments were the result of Dishman's ownership of a minority interest in the business. Nonetheless, on the strength of that report and another indicating that Dishman had traveled to Denver three times and was Chairman [**4] of the Board of Semiotix, Puthoff telephoned Dishman on July 18, 1995, and informed him that she was terminating his benefits and cancelling the appointments with the neurologist n1 and psychiatrist. Prior to this call, Dishman had no knowledge that UNUM was investigating his claim or giving any thought to stopping benefits payments to him.

n1 The appointment with the neurologist was scheduled for that day.

Dishman informed Puthoff that he was not employed by Semiotix and that her information was incorrect. Upon learning this, Puthoff told Dishman she was going to "suspend" his benefits rather than deny his claim and that he was to provide her with a statement explaining his relationship with Semiotix, his travel to Colorado, and his investment in any other business, as well as copies of his and Semiotix' 1993 and 1994 tax returns. Notably, the AD&H policy contains no provision for "suspension" of benefits.

UNUM suspended Dishman's benefits without receiving any medical opinion that Dishman was no longer disabled, [**5] or that the activities it thought he might be engaged in indicated that he was capable of performing his "own occupation," as his policy required. UNUM made no effort to ascertain whether any money Dishman might have received from Semiotix was sufficient to require a reduction in benefits payment under the terms of the contract. UNUM, moreover, received two additional investigative reports after July 18, 1995, stating that Dishman was not an employee [*979] of Semiotix. Nevertheless, UNUM did not reinstate Dishman's benefits.

After Dishman retained an attorney, a series of correspondence ensued. Highlights of this correspondence include the following facts: (1) Dishman proposed that he be examined by a neutral neurologist, but UNUM declined; (2) UNUM ultimately abandoned its request for Dishman's tax returns and replaced it with a demand for Dishman to arrange for a "forensic certified public accounting firm" to visit Semiotix and "review any documents they deem necessary;" (3) UNUM told Dishman that if he was "unwilling or unable" to cooperate with this unrestricted audit, his file would be "closed"; (4) despite the fact that AD&H's policy contained no mental disability exclusion applicable [**6] to Dishman, UNUM insisted that Dishman be evaluated by a "forensic psychiatrist" and proffered several conflicting justifications for this requirement; and (5) Dishman's first request for a copy of UNUM's claim procedure was ignored, and his second request was met with the unequivocal response from UNUM, "UNUM does not have a Claims Procedure with regard to the suspension or termination of benefits."

Upon being told that he had no administrative recourse, Dishman filed the instant suit. In addition to his claims relating to nonpayment of disability benefits, Dishman's complaint alleged that UNUM was vicariously liable for the tortious invasion of privacy perpetrated by the several investigative firms it hired. In February 1996, the district court dismissed this state law claim without a hearing, presumably because it thought the claim was preempted by ERISA. A bench trial on UNUM's "suspension" of benefits ensued, with the result that Dishman prevailed on all his claims.

UNUM appealed the bench trial judgment and fee award, and Dishman cross-appealed the dismissal of his state law cause of action. In a previous memorandum disposition, we held that neither order was an appealable [**7] final order because the district court included a line in each to the effect that it might amend or amplify the orders at a later date. On Dishman's motion, the district court issued a "Modified Judgment and Order" on April 20, 1999, that removed that line from the judgment

269 F.3d 974, *; 2001 U.S. App. LEXIS 22599, **

resulting from the trial. On January 29, 2001, pursuant to our suggestion, the court excised the same line from the order dismissing Dishman's invasion of privacy claim. Now that both orders are final, we have jurisdiction to consider the parties' claims on appeal.

## II. ERISA PREEMPTION OF STATE LAW CLAIM

In addition to a host of claims under ERISA, Dishman alleged that under California law UNUM was vicariously liable for the tortious invasion of privacy committed by the investigative firms it hired. n2 Dishman alleged, inter alia, that an investigator retained by UNUM elicited information about his employment status by falsely claiming to be a bank loan officer endeavoring to verify information he had supplied; that investigators elicited personal information about him from neighbors and acquaintances by representing that he had volunteered to coach a basketball team; that investigators sought and obtained [**8] personal credit card information and travel itineraries by impersonating him; that investigators falsely identified [*980] themselves when caught photographing his residence; and that investigators repeatedly called his residence and either hung up or else dunned the person answering for information about him. UNUM did not contest the fact that Dishman stated a claim against it under California law. Rather, it argued that, regardless, Dishman's state law claim was preempted by ERISA. The district court apparently agreed, as it granted UNUM's motion to dismiss this claim. n3

n2 Throughout the briefing on appeal and below, the parties refer to his claim as Dishman's fourth claim for relief. This appears to be an erroneous transposition of Roman numerals. The original complaint reveals that the state law tort claim was Dishman's sixth claim for relief.

n3 The order granting UNUM's motion to dismiss provides no reason for the dismissal.

$

It is with great trepidation that we tread into the field of ERISA preemption. [**9] As we noted in Rutledge v. Seyfarth, Shaw, Fairweather & Geraldson, n4 "developing a rule to identify whether ERISA preempts a given state law ... has bedeviled the Supreme Court." n5 In 1997, Justice Scalia frankly observed that the fourteen ERISA preemption cases the Supreme Court had taken to that point "had not succeeded in bringing clarity to the law." n6 Regrettably, neither have the three preemption cases that the Court has taken since. n7 However,

because a majority of the Court remains unwilling to embrace the solution advocated by the minority, n8 the amorphous contours of the preemption doctrine present a problem with which we must deal head-on.

n4 201 F.3d 1212, 1216 (9th Cir. 2000), as amended by 208 F.3d 1170 (9th Cir. 2000).

n5 Id.

n6 California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc., 519 U.S. 316, 335, 136 L. Ed. 2d 791, 117 S. Ct. 832 (1997) (Scalia, J., with whom Justice Ginsburg joined, concurring).

n7 See, e.g., DeBuono v. NYSA-ILA Med. and Clinical Servs. Fund, 520 U.S. 806, 138 L. Ed. 2d 21, 117 S. Ct. 1747 (1997); Boggs v. Boggs, 520 U.S. 833, 138 L. Ed. 2d 45, 117 S. Ct. 1754 (1997); Egelhoff v. Egelhoff, 532 U.S. 141, 121 S. Ct. 1322, 1330-31, 149 L. Ed. 2d 264 (2001) (Scalia, J. with whom Justice Ginsburg joined, concurring) ("I remain unsure (as I think the lower courts and everyone else will be) as to what else triggers the 'relate to' provision .... I persist in the view that we can bring some coherence to this area ...."). [**10]

n8 In Egelhoff, Justices Scalia, Ginsburg, Breyer and Stevens indicated a willingness to bring coherence to preemption jurisprudence by clarifying that normal conflict preemption and field preemption principles apply. 121 S. Ct. at 1330-31.

The problem is this: 29 U.S.C. § 1144(a) states that ERISA "shall supersede any and all state laws insofar as they ... relate to any employee benefit plan." The question thus becomes, what does "relate to" mean? In 1983, the Court announced that "[a] law 'relates to' an employee benefit plan ... if it has a connection with or reference to such a plan." n9 Twelve years' experience with that standard, however, convinced the Court that it created as many problems as it solved. In New York Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co., the Court announced that "for the same reasons that infinite relations cannot be the measure of pre-emption, neither can infinite connections." n10 "Uncritical literalism" n11 is not the answer; rather, "to determine whether a state law has the forbidden [**11] connection [to an ERISA plan], we look to 'the objectives of the ERISA statute [*981] as a guide to the scope of the state law that Congress

269 F.3d 974, *; 2001 U.S. App. LEXIS 22599, **

understood would survive,' as well as to the nature of the effect of the state law on ERISA plans." n12

> n9 *Shaw v. Delta Airlines, Inc., 463 U.S. 85, 96-97, 77 L. Ed. 2d 490, 103 S. Ct. 2890 (1983).*

> n10 *514 U.S. 645, 656, 115 S. Ct. 1671, 131 L. Ed. 2d 695 (1995);* see also *Egelhoff, 121 S. Ct. at 1327* ("The term 'relate to' cannot be taken to extend to the furthest stretch of its indeterminacy, or else for all practical purposes pre-emption would never run its course.") (internal quotation marks and citation omitted).

> n11 *Travelers, 514 U.S. at 656.*

> n12 *Egelhoff, 121 S. Ct. at 1327* (quoting *Dillingham, 519 U.S. at 325).*

Congress crafted ERISA's preemption provision

to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative [**12] and financial burden of complying with conflicting directives among States or between States and the Federal Government ...[and to prevent] the potential for conflict in substantive law ... requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction. n13

> n13 *Ingersoll-Rand Co. v. McClendon ,498 U.S. 133, 142, 112 L. Ed. 2d 474, 111 S. Ct. 478 (1990).*

As the Supreme Court explained in Travelers, "the basic thrust of the pre-emption clause ... was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans." n14 For this reason, the Court explained that it has had no trouble holding that ERISA preempts "state laws that mandate[] employee benefit structures or their administration, "or that" provide alternative enforcement mechanisms." n15

> n14 *Travelers, 514 U.S. at 657.* [**13]

> n15 *Id. at 658.* As we noted in Rutledge, "since the Supreme Court decided Travelers, we have formulated several different, though compatible, tests in an effort to follow the Supreme Court in fulfilling the statutory mandate of broad preemption without intruding upon state

laws beyond the intention of Congress and the objectives of ERISA." *Rutledge, 201 F.3d at 1217.* We decline to apply any of those tests here, however, for two reasons. First, we note that the Supreme Court's recent cases have eschewed such multi-factor tests in favor of a more holistic analysis guided by congressional intent. See, e.g., *Egelhoff, 532 U.S. 141, 121 S. Ct. 1322, 149 L. Ed. 2d 264 (2001).* Second, though perhaps useful tools in other contexts, these tests are of marginal utility, where, as here, the question boils down to whether state tort law "relates to" an ERISA plan. Our efforts, like the Supreme Court's, have not succeeded in making this inquiry a precise one.

In Travelers, the Court cited New York's Human Rights Law as a classic example of the [**14] former. n16 That comprehensive anti-discrimination law, which the Court found preempted in Shaw v. Delta Air Lines, Inc., n17 required ERISA plan administrators in New York to extend the same benefits to persons disabled by pregnancy as to those disabled by other causes during a period of time when federal law did not so require. n18 As the Travelers Court explained, New York's mandates affecting coverage "could have been honored only by varying the subjects of a plan's benefits whenever New York law might have applied, or by requiring every plan to provide all beneficiaries with a benefit demanded by New York law." n19 As further examples of laws preempted under this same rationale, the Travelers Court cited the Pennsylvania law at issue in FMC [*982] Corp. v. Holliday, n20 which required plan providers to calculate benefit levels in Pennsylvania differently than elsewhere, and the New Jersey law at issue in Alessi v. Raybestos-Manhattan, Inc., n21 which, by prohibiting plans from setting workers' compensation payments off against employees' retirement benefits or pensions, effectively precluded them from using a method of calculating benefits permitted by federal law. [**15] n22 The fatal flaw in both laws was that they required deviation from the norm; to comply with them, plans necessarily had to vary their administration of benefits state by state.

> n16 *Travelers, 514 U.S. at 657.*

> n17 *463 U.S. 85, 103 S. Ct. 2890, 77 L. Ed. 2d 490 (1983).*

> n18 Congress subsequently enacted the Pregnancy Discrimination Act of 1978, 92 Stat. 2076, *42 U.S.C. § 2000e*(k) (1976 ed., Supp. V),

269 F.3d 974, *; 2001 U.S. App. LEXIS 22599, **

which eradicated the theretofore lawful practice of discrimination based on pregnancy by making it clear that discrimination based on pregnancy was discrimination based on sex. *Shaw, 463 U.S. at 89.*

n19 *Travelers, 514 U.S. at 657.*

n20 *FMC Corp. v. Holliday, 498 U.S. 52, 111 S. Ct. 403, 112 L. Ed. 2d 356 (1990).*

n21 *Alessi v. Raybestos-Manhattan, Inc. 451 U.S. 504, 101 S. Ct. 1895, 68 L. Ed. 2d 402 (1981).*

n22 *Travelers, 514 U.S. at 657-58.*

More recently, the Supreme Court found that a Washington statute that provided for automatic revocation, upon divorce, of any designation of a spouse as a beneficiary of a non-probate [**16] asset posed the same problem. n23 The revocation statute, the Court explained, "binds ERISA plan administrators to a particular choice of rules for determining beneficiary status." n24 "Plan administrators cannot make payments simply by identifying the beneficiary specified by the plan documents. Instead they must familiarize themselves with state statutes so that they can determine whether the named beneficiary's status has been 'revoked' by operation of law." n25 Because the statute "governs the payment of benefits, a central matter of plan administration," and thereby "interferes with nationally uniform plan administration," n26 the Court found the Washington law preempted.

n23 *Egelhoff, 121 S. Ct. at 1327.*

n24 Id.

n25 Id. at *5.

n26 Id. at *4.

California's common law tort remedy for an "unreasonably intrusive" investigation that amounts to an invasion of privacy n27 bears scant resemblance to the laws the Supreme Court has found violative of this first principle. [**17] By no stretch of the imagination can it be said to "mandate employee benefit structures or their administration" as the laws at issue in Shaw and Egelhoff did. This tort remedy, moreover, is entirely unlike the Pennsylvania law in Holliday or the New Jersey law found preempted in Alessi. Making ERISA administrators liable for investigations perpetrated by their agents "'which would be objectionable or offensive

to the reasonable man'" n28 simply cannot be said to interfere with nationally uniform plan administration in the manner or to the extent these laws did.

n27 *Comeaux v. Brown & Williamson Tobacco Co., 915 F.2d 1264, 1275 (9th Cir. 1990)* ("California recognizes the tort of 'unreasonably intrusive' investigation as an invasion of privacy."); *Noble v. Sears, Roebuck and Co., 33 Cal. App. 3d 654, 109 Cal. Rptr. 269, 272 (Ct. App. 1973); Cain v. State Farm Mut. Auto. Ins. Co., 62 Cal. App. 3d 310, 132 Cal. Rptr. 860, 862 (Ct. App. 1976).*

n28 *Noble, 109 Cal. Rptr. at 272* (quoting William L. Prosser, Privacy, 48 Cal. L. Rev. 383, 390-91 (1960)).

[**18]

Travelers also pointed out, however, that state laws may be preempted for another reason: they may provide "alternative enforcement mechanisms" that relate to ERISA plans. n29 By "alternative enforcement mechanisms," the Supreme Court was alluding specifically to cases [*983] like Ingersoll-Rand Co. v. McClendon, n30 in which a former employee brought a wrongful discharge cause of action alleging that his employer discharged him to avoid vesting of ERISA benefits. n31 It is clear, however, that ERISA "supplants a variety of state law causes of action for the wrongful denial of benefits." n32 As the Supreme Court held in Pilot Life Insurance Co. v. Dedeaux, n33 these include claims for tortious breach of contract, breach of fiduciary duty, and fraud in the inducement. n34 Claimants simply cannot obtain relief by dressing up an ERISA benefits claim in the garb of a state law tort.

n29 *Travelers, 514 U.S. at 658.*

n30 *498 U.S. 133, 111 S. Ct. 478, 112 L. Ed. 2d 474 (1990).*

n31 *Travelers, 514 U.S. at 658.*

n32 James F. Jordan, et al., Handbook on ERISA Litigation § 2.06[A] (2000 Supplement). [**19]

n33 *Pilot Life Ins. Co. v. Dedeaux 481 U.S. 41, 107 S. Ct. 1549, 95 L. Ed. 2d 39 (1987).*

n34 Id. at 47-48.

269 F.3d 974, *; 2001 U.S. App. LEXIS 22599, **

Consistent with Pilot Life's teaching, in Bast v. Prudential Insurance Co. of America, n35 we held that the husband and son of a woman who allegedly died from cancer as a result of an ERISA plan administrator's failure to timely authorize life-saving treatment could not maintain state law causes of action for, inter alia, breach of contract, loss of consortium, and emotional distress because these claims were preempted by ERISA. In so doing, we characterized these torts as causes of action "asserting improper processing of a claim for benefits under an insured employee benefit plan." n36 But for the denial of the Basts' claim, there would have been no grounds for their state law actions. If Prudential had authorized the requested treatment, there would have been no loss of consortium, no breach of contract, and presumably no emotional distress. The Basts, every bit as much as the discharged plaintiff in Ingersoll-Rand, were seeking an "alternative enforcement mechanism."

n35 Bast v. Prudential Ins. Co. of Am., 150 F.3d 1003 (9th Cir. 1998). [**20]

n36 Id. at 1007.

UNUM oversimplifies this case by likening it to Bast and Pilot Life. The Basts' intentional infliction of emotional distress claim was preempted because the emotional distress they allegedly suffered arose from Prudential's failure to timely pay them benefits. The harm they suffered was inextricably intertwined with the plan's decision not to pay. Thus, to find Prudential liable for intentional infliction of emotional distress for not paying benefits would be tantamount to compelling benefits, which assuredly "encroaches on the relationships regulated by ERISA." n37

n37 Geweke Ford v. St. Joseph's Omni Preferred Care Inc., 130 F.3d 1355, 1358 (9th Cir. 1997) (quotations omitted).

Unlike the Basts, Dishman is not seeking to obtain through a tort remedy that which he could not obtain through ERISA. As he notes, his damages for invasion of privacy remain whether or [**21] not UNUM ultimately pays his claim. His tort claim does not depend on or derive from his claim for benefits in any meaningful way.

UNUM argues that Dishman's claim must "relate to" the plan, because but for the plan's relationship of insurer and insured, UNUM would have had no need to investigate Dishman's claim of disability. n38 Dishman, UNUM contends, "cannot reasonably dispute that UNUM [*984] performed these alleged actions in the course of its administration of the plan under which [he] was seeking benefits." This argument smacks of the "uncritical literalism" the Supreme Court has admonished us to eschew. Obviously, at some level Dishman's tort claim relates to the plan. That cannot be denied. But that cannot be the end of the analysis, either, for as we know, "pre-emption does not occur ... if the state law has only a tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability." n39

n38 We assume, for the sake of argument, that the information UNUM endeavored to collect in fact had some relevance to Dishman's eligibility for disability benefits, though whether and to what extent that is true is debatable. [**22]

n39 Travelers, 514 U.S. at 661 (internal quotation marks and alteration omitted).

The fact that the conduct at issue allegedly occurred "in the course of UNUM's administration of the plan" does not create a relationship sufficient to warrant preemption. If that were the case, a plan administrator could "investigate" a claim in all manner of tortious ways with impunity. What if one of UNUM's investigators had accidentally rear-ended Dishman's car while surveilling him? Would the fact that the surveillance was intended to shed light on his claim shield UNUM and the investigator from liability? What if UNUM had tapped Dishman's phone, put a tracer on his car, or trained a video camera into his bedroom in an effort to obtain information? Must that be tolerated simply because it is done purportedly in furtherance of plan administration? To ask the question is to answer it. Though there is clearly some relationship between the conduct alleged and the administration of the plan, it is not enough of a relationship to warrant preemption. We are certain that the objective of Congress [**23] in crafting Section 1144(a) was not to provide ERISA administrators with blanket immunity from garden variety torts which only peripherally impact daily plan administration. Accordingly, the district court's dismissal is reversed, and the state law claim is remanded for further proceedings.

III.    EXHAUSTION    OF    ADMINISTRATIVE REMEDIES

Federal courts have authority to enforce the exhaustion requirement in ERISA actions, "and []as a

269 F.3d 974, *; 2001 U.S. App. LEXIS 22599, **

matter of sound policy they should usually do so." n40 That said, we have made it clear that there are exceptions to the general rule, n41 and that when a district court determines that one of these exceptions applies, we review that determination for an abuse of discretion. n42 We find no abuse of discretion here.

n40 *Amato v. Bernard, 618 F.2d 559, 568 (9th Cir. 1980).*

n41 See id. ("Despite the usual applicability of the exhaustion requirement, there are occasions when a court is obliged to exercise its jurisdiction and is guilty of an abuse of discretion if it does not, the most familiar examples perhaps being when resort to the administrative route is futile or the remedy inadequate." (citation omitted)). [**24]

n42 *Diaz v. United Agric. Employee Welfare Benefit Plan and Trust, 50 F.3d 1478, 1483 (9th Cir. 1995).*

The district court excused Dishman's failure to exhaust his administrative remedies because it found that UNUM gave him inadequate notice of both the denial of his claim and the available appeals procedure. The district court's findings of fact amply support this determination. For example, the court found that on July 18, 1995, Puthoff called Dishman and told him she was denying his claim. She later retreated somewhat and said she was merely "suspending" his benefits until he provided certain tax and employment information. Because neither AD&H's [*985] policy nor ERISA's claim procedures contemplate "suspension" of payments, as opposed to termination, Dishman subsequently requested a copy of the procedures UNUM invoked. UNUM ignored this first request for information, prompting Dishman to repeat it. In response to the inquiry, "Does UNUM have any procedures applicable to the suspension and threatened termination of Mr. Dishman's benefits? If so, is UNUM willing to provide me with [**25] a copy?" UNUM's unequivocal response was, "UNUM does not have a Claims Procedure with regard to the suspension and termination of benefits." The district court found, moreover, that UNUM did not provide Dishman or his counsel with a copy of the claims procedure. We find nothing in the record to suggest that these facts are clearly erroneous.

The district court's decision to excuse Dishman's failure to exhaust his administrative remedies is further supported by the fact that the district court offered, earnestly and in good faith, to allow UNUM thirty days to undertake its administrative process, and UNUM rejected that offer. When the court first offered to give UNUM thirty days, UNUM's counsel replied that she was not the one who makes that decision. When the court repeated and clarified its offer, UNUM's counsel denigrated the proposition, thinking aloud about the repercussions on the administrative record and any subsequent standard of review. Under these circumstances, it was not an abuse of discretion for the court to excuse Dishman's failure to exhaust his administrative remedies. The court properly upheld Dishman's decision to proceed directly to suit.

IV. SCOPE OF THE DISTRICT [**26] COURT'S REVIEW

Although there was no administrative review, UNUM con-tends that the district court should have limited its de novo review of UNUM's decision to deny Dishman benefits to the contents of the administrative record. This argument lacks merit.

It is true that in Kearney v. Standard Insurance Co. n43 we held that "[when] a court reviews [an ERISA] administrator's decision, whether de novo ... or for abuse of discretion, the record that was before the administrator furnishes the primary basis for review." n44 However, in Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan, n45 we recognized that the administrative record need not serve as the exclusive basis for review. A district court may, in its discretion, allow evidence that was not before the plan administrator" when circumstances clearly establish that additional evidence is necessary to conduct an adequate de novo review of the benefit decision." n46 When a district court deems those circumstances met, we review its decision for an abuse of discretion. n47

n43 Kearney v. Standard Ins. Co. *175 F.3d 1084, 1090 (9th Cir. 1999)* (en banc). [**27]

n44 Id.

n45 *Mongeluzo v. Long Term Disability Benefit Plan 46 F.3d 938 (9th Cir. 1995).*

n46 *Mongeluzo, 46 F.3d at 944* (quotation marks and citation omitted); accord *Kearney, 175 F.3d at 1090.* The Mongeluzo court juxtaposed "necessity" to situations in which "someone at a later time comes up with new evidence that was not presented to the plan administrator." *46 F.3d at 944.*

n47 *Kearney, 175 F.3d at 1091.*

269 F.3d 974, *; 2001 U.S. App. LEXIS 22599, **

We find no abuse of discretion here, either. No administrative review preceded UNUM's decision to "suspend" Dishman's benefits. Thus, Dishman, unlike the plaintiff in Kearney, could not have "easily ... **[*986]** submitted [the belatedly-proffered] material to [his plan administrator]" before the initial termination decision was made. n48 Dishman could have submitted the materials clarifying his relationship with Semiotix after UNUM suspended his benefits, but in light of the fact that UNUM told him no appeals process applied to him, one can hardly fault him for not doing so. In this case, there was no administrative process to speak of, and **[**28]** hence there is no administrative record. Thus, the need to introduce evidence from outside the record to facilitate de novo review is stronger here than in Mongeluzo, where the administrative record found wanting was present but flawed. n49

n48 Id.

n49 46 F.3d at 944.

UNUM's argument to the contrary is not persuasive. It concedes that where necessary, a district court may look outside the record to evaluate a plan administrator's decision, but relies on a version of the facts the district court clearly rejected to argue that such recourse was unnecessary here. UNUM continues to press the idea that Dishman was in the wrong. That is not the conclusion the district court came to, and because there is no showing that the court's factual conclusions are clearly erroneous, there is no basis for disregarding them and crediting UNUM's alternative version of events. If UNUM did not want Dishman to be able to impress the judge with his personal, credible testimony, or for Semiotix's president **[**29]** to be able to testify to the nature of Dishman's relationship to that company, then UNUM should have followed the proper procedures and allowed Dishman to present that information to it in the first instance (before terminating his benefits, or, at the least, in a subsequent administrative appeal). The district court did not err.

## V. SUFFICIENCY AND TIMELINESS OF DISHMAN'S "PROOF OF CLAIM"

UNUM argues that it had the right to suspend Dishman's benefits because Dishman "refused to provide the information reasonably requested by UNUM." This argument is foreclosed by the district court's decision. UNUM's contention that due to "(1) [its] right to continue to evaluate Dishman's claim, (2) [its] reasonable request for clarifying information, and (3) Dishman's flat refusal to provide any of the requested information," it was" well within its rights as Plan administrator to suspend and/or deny further benefits," inverts the

sequence of events. Puthoff did not "suspend" Dishman's benefits after Dishman refused to provide information. Rather, she terminated his benefits first and then indicated a willingness to consider any clarifications. Dishman cooperated up to July 18, 1995, the **[**30]** day Puthoff called to deliver the bad news; indeed, it was she, not he, who cancelled the IME that UNUM had scheduled and which Dishman had agreed to attend, on that day. The picture UNUM strives to paint of an intransigent claimant who stonewalled it for information until it had no choice but to discontinue benefits in order to prompt information flow could not be more contrary to the facts the district court found.

These facts preclude UNUM from prevailing on this eleventh hour theory. Assuming, for the sake of argument only, that the "proof of loss" language contained in the AD&H policy requires Dishman to proffer, monthly and without any request therefor, proof of his continued disability and sources of income, and he failed to do so, reversal of the district court's decision **[*987]** would not be warranted. The trial judge found that UNUM was not motivated by a legitimate purpose in "suspending" Dishman's benefits and demanding information from Dishman. Indeed, the court opined that the" suspension" may well have been intended to place pressure on Dishman to settle his claim on favorable terms to UNUM. In light of these findings, the fact that UNUM may be able, post-hoc, to offer a legally **[**31]** plausible justification for its termination of Dishman's benefits is irrelevant.

## VI. ATTORNEYS' FEE AWARD

UNUM contends that the district court's award of attorneys' fees is flawed in two ways: (1) it compensates counsel for a tangential, frivolous state law claim; and (2) it compensates counsel for "pre-litigation" expenses.

As explained above, we do not agree that Dishman's invasion of privacy claim is frivolous. On the contrary, we hold that the district court's dismissal was erroneous because the claim is not preempted. Because we reverse the dismissal, however, we must also remand the attorneys' fee award so that fees related to this claim can be excised, as it is currently premature to consider eligibility for fees for this claim.

UNUM next argues that by awarding Dishman attorneys' fees for work done prior to the filing of his complaint, the district court exceeded its authority and contravened our decision in Cann v. Carpenters' Pension Trust Fund for Northern California. n50 Contrary to UNUM's assertion, Cann does not stand for the proposition that ERISA plaintiffs may not recover attorneys' fees for any work done prior to the date they file their complaint. n51 **[**32]** Rather, Cann simply holds that ERISA's attorneys' fee provision, 29 U.S.C. §

*1132*(g)(1), was not meant to reimburse claimants for legal expenses "incurred during administrative proceedings prior to suit," n52 even though such proceedings are "necessary and valuable." n53 Put simply, ERISA does not "allow[]for attorneys' fees for the administrative phase of the claims process." n54

n50 *989 F.2d 313 (9th Cir. 1993).*

n51 See *Williams v. UNUM Life Ins. Co. of Am., 1996 U.S. Dist. LEXIS 4809, 1996 WL 162972,* at *3 n. 1 (N. D. Cal. 1996):

> Defendants also argue that the attorneys' fees requested by [the plaintiff] are excessive because attorneys' fees for pre-litigation work are not recoverable. Cann held that ERISA's attorneys' fees provision does not allow for the administrative phase of the claims process. However, attorneys' fees for work done on the lawsuit prior to the filing of the lawsuit are recoverable.

n52 *Cann, 989 F.2d at 315.*

n53 *Id.* at 316.

n54 *Id.* at 314.

[**33]

The Cann court put this principle into practice by upholding the district court's award of attorneys' fees which "pared off the administrative work from the work on the lawsuit" n55 and compensated the claimant's attorney for the latter work only. n56 The district court here understood Cann's practice perfectly. The court did not mistakenly compensate Dishman's counsel for work done in furtherance of an administrative action; it deliberately included all the work done in the fee award because there was nothing to pare off. It found that none of the claimed hours were expended in connection with the exhaustion of administrative procedures, [*988] inasmuch as UNUM did not make any administrative remedy available to the plaintiff. In addition, the court made a factual finding that "the hours claimed for work performed before the filing of the complaint were for conferences with clients, drafting the complaint and other reasonable efforts directed toward the filing of the litigation." These are exactly the kind of expenses Cann sanctioned. n57 They do not have to be excised. Because other costs do, however, we reverse and remand the award of attorneys' fees. n58

n55 *Id. at 315.* [**34]

n56 Id. This work was done up to fifty-one days before the complaint was filed. Id.

n57 Id.

n58 We direct the district court to award Dishman interest on his attorneys' fee award beginning January 29, 2001, the date the district court entered the Order which made final the orders appealed from. See Part VII, infra.

VII. PREJUDGMENT INTEREST The district court's award of prejudgment interest must also be reversed. The court awarded Dishman prejudgment interest at the rate of 16%, a rate Dishman had requested based on a trial exhibit tending to show that UNUM anticipated this rate of return on the reserve it maintained for his claim. The district court, however, did not justify its selection of the prejudgment interest rate based on what it thought UNUM earned. Rather, the court made it clear that it wanted UNUM to pay more than it could have earned to make amends for its bad faith conduct:

> The court finds that the equities of this case, namely the defendants' bad faith termination of the plaintiff's benefits, require this higher interest rate to disgorge [**35] the defendants of more than the amount of return that they obtained by retaining the money that the plaintiff was due. The court accepts the plaintiff's proposed rate of 16%. However, the court will vacate this paragraph of the judgment and set the rate at twice the actual rate of the return of the defendants' investment portfolio if, by May 22, 1997, the defendants show with sufficient evidence that the actual rate of the return on their investment portfolio was less than 8%.

Awarding 16% prejudgment interest on this rationale was an abuse of discretion. Prejudgment interest is an element of compensation, not a penalty. n59 Although a defendant's bad faith conduct may influence whether a court awards prejudgment interest, it should not influence the rate of the interest. Thus, we remand this case to allow the district court to choose a prejudgment interest rate that compensates Dishman for the losses he incurred as a result of UNUM's nonpayment of benefits, rather than a rate that doubles UNUM's portfolio return in order to punish it. It is entirely possible, of course, that such a rate may meet or exceed the 16% the district court assigned initially.

n59 *Western Pac. Fisheries, Inc. v. SS President Grant, 730 F.2d 1280, 1288 (9th Cir. 1984).*

[**36]

## VIII. THE OPERATIVE JUDGMENT

UNUM contends that, even though this court held that the district court's April 1997 judgment was not a final appealable order, post-judgment interest on the underlying judgment should accrue from that date. Dishman takes the opposite position, asserting that post-judgment interest should accrue from April 20, 1999, when the district court entered its "Modified Judgment and Order," and that the higher rate of prejudgment interest should apply prior to that date. Although we reverse and remand the district court's award of prejudgment interest, we must still decide when its applicability ceases and post-judgment interest begins to accrue, because [*989] the same issue will assuredly arise after the district court reestablishes an appropriate rate. Unfortunately, the law provides no clear guidance on this point.

Title *28 U.S.C. § 1961*(a) provides that post-judgment interest "shall be calculated from the date of the entry of the judgment." The statute itself does not specify whether the judgment must be a final, appealable one. Dishman argues, however, that Federal Rule of Civil Procedure 54 compels that conclusion. We disagree. Rule 54, which is [**37] entitled "Judgments; Costs," provides that "'Judgment' as used in these rules includes a decree and any order from which an appeal lies." Fed. R. Civ. P. 54(a). This language is ambiguous; it is simply not clear whether a "decree" and an "order from which an appeal lies" are the only two things that comprise a judgment, or whether these things are but two examples of a larger class. n60 We note that, generally, to say A includes B does not exclude the possibility that A also includes C and D. More concretely, Rule 54's statement that a judgment "includes ... any order from which an appeal lies" "does not require the conclusion that any order that is not a final, appealable judgment is not a 'judgment.'" n61 We agree with the Sixth Circuit that "Rule 54 ... does not definitively answer the question of whether post-judgment interest begins to accrue when the district court enters a partial [or non-final] judgment." n62

n60 See Webster's Third New International Dictionary 1143 (1986) (defining the word "include" as "1: to shut up: confine, enclose, bound [the nut-shell tilde s the kernel] ... 2a: to place, list, or rate as a part or component of a whole or of a larger group, class or aggregate,"

but also noting that the word "may call more attention to the single item or smaller class by stressing the fact of its existence or the fact of its not having been over-looked"). [**38]

n61 *Skalka v. Fernald Envtl. Restoration Mgmt. Corp., 178 F.3d 414, 428 (6th Cir. 1999).*

n62 Id.

Having found no answer in the rule's plain language, we turn our attention to precedent. Again, however, we find scant guidance. Although the Supreme Court dealt with the topic of post-judgment interest in Kaiser Aluminum & Chemical Corp. v. Bonjorno, n63 that case is plainly distinguishable on the facts. In Kaiser, the district court concluded that two successive jury verdicts awarding damages to the plaintiffs were unsupported by the evidence. After the first jury verdict, the district court vacated the judgment entered on that new verdict and granted the defendant's motion for a new trial. However, the second jury awarded the plaintiffs a higher damage award than the first jury. Upon defendant's motion, the court granted judgment notwithstanding the verdict as to part of the damages awarded, vacated the judgment entered on the second jury verdict, and entered a third judgment on a reduced damages amount. The Third Circuit vacated the third judgment entered [**39] by the district court and reinstated the judgment entered by the second jury's damage award. The Supreme Court granted certiorari to consider the calculation of post-judgment interest and held that, under § 1961, post-judgment interest should run from the date of the second vacated judgment. The Court reasoned that "the purpose of post-judgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant." n64 It rejected the [*990] contention that interest should run from the date of the first judgment because "where the judgment on damages was not supported by the evidence, the damages have not been 'ascertained' in any meaningful way." n65

n63 *Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 110 S. Ct. 1570, 108 L. Ed. 2d 842 (1990).*

n64 *Id. at 835-36* (citation omitted).

n65 Id.

Kaiser assisted us in deciding cases like Tinsley v. Sea-land Corp., n66 where the question presented was "whether the damages were [**40] sufficiently

269 F.3d 974, *; 2001 U.S. App. LEXIS 22599, **

ascertained as of the date of the original judgment where on appeal this court ordered the district court to reduce the damage award in proportion to the plaintiff's comparative negligence." n67 There we had little difficulty deciding that damages were meaningfully ascertained the first time around and, thus, that post-judgment interest would run from the date of the initial judgment. n68 The difference between that case and this case, however, is that Tinsley involved two final, appealable judgments, whereas this case only involves one. Kaiser simply does not address whether this distinction is meaningful.

> n66 *Tinsley v. Sea-Land Corp., 979 F.2d 1382 (9th Cir. 1992).*
>
> n67 *Id. at 1383.*
>
> n68 Id.

The District of Columbia Circuit has held that it is, and although the facts and equities of this case are quite different, we agree. Mergentime Corp. v. Washington Metropolitan Area Transit Authority n69 was a sad and unique case. After pre-siding over a 45-day bench trial in a [**41] multimillion dollar case, the district judge developed a terminal illness. As the illness worsened, the judge continued to work heroically, issuing a 251-page opinion containing partial findings of fact and conclusions of law just two days before he died. The case was reassigned to a successor judge, who four years later issued his own findings of fact and conclusions with respect to remaining issues. The successor judge ordered post-judgment interest to run from the date of his final judgment, not from the original judge's partial judgment. n70 On cross-appeal, the Washington Metropolitan Area Transit Authority (WMATA) claimed that post-judgment interest should run from the date of the original judge's partial order.

> n69 *Mergentime Corp. v. Washington Metro. Area Transit Auth., 334 U.S. App. D.C. 294, 166 F.3d 1257 (D. C. Cir. 1999).*
>
> n70 *166 F.3d at 1261.*

The D.C. Circuit disagreed. It held that finality principles dictated that interest should run from the second, final judgment. Admittedly, equitable principles drove its analysis. The court reasoned that it [**42] would be unfair to allow WMATA to collect prejudgment interest dating back to the first partial judgment, because its existence was simply fortuitous: had the district judge not been diagnosed with terminal cancer, he would have had no reason to enter judgment until he ruled on all of the parties' claims. n71 The same cannot be said here because the April 1997 judgment was not a fortuitous event. On the contrary, it was meant to conclusively embody Dishman's triumph and put an end to the litigation. Neither party lucked into the judgment; rather, it came in due course and had all the hallmarks of a final judgment except for the inclusion of one improper line.

> n71 Id. at 1267.

By holding that post-judgment interest runs only from a final, appealable judgment, we make Dishman the beneficiary of the district court's misstep. This is a fortuitous event, for unlike WMATA, no fairness considerations compel this result. n72 [*991] However, practical considerations do. A final, appealable judgment is a [**43] clear dividing line: either one exists, or one does not. n73 This clarity will create salutary incentives. If plaintiffs want post-judgment interest to start, or defendants want prejudgment interest to stop, they will likely take action to ensure that the judgment is final. A clear rule invites vigilance, while an unclear rule like that which the Sixth Circuit has adopted n74 invites confusion and further litigation. Thus, we hold that "judgment" within the meaning of 28 U.S.C. § 1961 means "final, appealable order" and therefore, post-judgment interest in this case runs from January 29, 2001.

> n72 We note, however, that although the district court's prejudgment interest rate was much higher than the post-judgment interest rate, it was Dish-man, not UNUM, who finally moved the district court to remove from its judgment the line that prevented it from becoming final and appealable.
>
> n73 We express no view as to whether, if a situation akin to this were to arise again, a district court could avoid any unfairness by issuing the second judgment nunc pro tunc to the date of the original, but defective, judgment. [**44]
>
> n74 See *Skalka, 178 F.3d at 429* ("We believe that the better rule is for plaintiffs to be entitled to post-judgment interest from the date of entry of the initial, partial judgment ... even though that judgment was not yet appealable.").

269 F.3d 974, *; 2001 U.S. App. LEXIS 22599, **

AFFIRMED IN PART, REVERSED IN PART AND REMANDED. Costs awarded to Appellee/Cross-

Appellant Dishman. Pursuant to the parties' motion and Ninth Circuit Rule 39-1, we transfer consideration of attorneys' fees on appeal to the district court from which this action was taken.

## CERTIFICATE OF SERVICE

I, Joan L. Stehulak, Esquire, hereby certify that a true and correct copy of the foregoing **PLAINTIFF'S MOTION TO ADD ADDITIONAL AUTHORITY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT AND AS OPPOSITION AUTHORITY TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** was served by United States first-class mail, postage prepaid, upon the following:

E. Thomas Henefer, Esquire
Stevens & Lee
111 North Sixth Street
P. O. Box 679
Reading, PA  19603-0679
  Counsel for Paul Revere Life Insurance Company and New York Life Insurance
  Company

               _Joan L. Stehulak_
               Joan L. Stehulak

Dated: 11/25/02