ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VINCENZO MAZZAMUTO,<br>　　　　Plaintiff, | : | CIVIL ACTION<br>NO. 1:CV-01-1157 |
| | : | |
| v. | : | |
| | : | |
| UNUM PROVIDENT<br>CORPORATION, et al.,<br>　　　　Defendants | : | JUDGE CONNER |

FILED
HARRISBURG, PA

DEC 12 2002

MARY E. D'ANDREA, CLERK
Per _____
　　　　Deputy Clerk

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S MOTION TO SUPPLEMENT RECORD AND IN
SUPPORT OF DEFENDANTS' MOTION TO STRIKE**

Dated:  December 11, 2002

STEVENS & LEE

By _____
E. Thomas Henefer
Attorney I.D. No. 55773
111 North Sixth Street
P.O. Box 679
Reading, Pennsylvania  19603
(610) 478-2000

Attorneys for Defendants

1

## I.   INTRODUCTION

Defendants hereby oppose plaintiff's motion to supplement the record which is yet another attempt to introduce extrinsic, irrelevant and inaccurate information. His goal is to shift the focus from his own case which should not survive summary judgment because, as extensive discovery has revealed, plaintiff cannot satisfy his burden of proof under Third Circuit law.  In this latest effort, plaintiff has attempted to introduce a supplemental expert report that provides a commentary on an inaccurate report from Sixty Minutes.  This is not a proper expert report, nor would any reasonable expert blindly rely on a Sixty Minutes broadcast to frame an opinion.

Plaintiff also attempts to introduce deposition transcripts of a former Provident Life and Accident Insurance Company employee, Dr. William Feist, who left Provident long before its parent acquired Paul Revere Life Insurance (which handled plaintiff's claim here) and long before plaintiff submitted his claim to Paul Revere.  Other courts have rejected Feist's testimony in similar circumstances for lack of relevance and foundation.

## II.   PROCEDURAL HISTORY

Plaintiff alleges claims for bad faith and breach of contract arising from the denial of his claim for disability benefits.  The deadlines for both discovery and expert reports expired in <u>June 2002</u>.  Timely summary judgment motions were filed by both parties.  Now, long after the deadlines have passed, plaintiff has once

1

again sought to introduce inaccurate, irrelevant and inadmissible information into the case through untimely expert reports and witness disclosures.

## III.  FACTUAL HISTORY

The simple reason why plaintiff wants to divert attention from the merits of his own claim is that he cannot satisfy his burden of proof.  As outlined in detail in defendants' summary judgment brief, plaintiff claims his alleged back and psychological problems render him unable to perform his occupational duties as a restaurant owner.  For years he consistently described those duties as sedentary:

- "[E]xecutive, office duties only" (Sum. Judgment Appendix, Exh. B at 330).
- "[M]anage employees, work schedules; book work; deal with food companies; phone; and administration and office duty" (Id. at 42-43).
- "Executive - 50%" and "Office - 50%" (Id. at 549).
- He "occasionally" had to lift or carry five-pound objects (Id. at 539).
- He had to sit for 3.5 total hours (as opposed to at a time), stand for 3.5 hours and walk for 1 hour (Id.).

The undisputed facts do not support plaintiff's claim that he cannot perform his occupational duties.  Indeed, even Dr. Bower conceded -- among other things -- that if plaintiff's back was the only problem (as his "expert" Mr. Rose contends), he could perform the occupational duties he described to Paul Revere (i.e., 20% bookkeeping, 20% office duties and 60% supervising employees).  (Id., Exh. G at 54-57 and 59).

SL1 313781v1/10305.060

Also instructive are plaintiff's non-occupational activities, such as Internet stock trading (which plaintiff has predictably tried to exclude from evidence). While plaintiff claims it is too stressful for him to do bookkeeping, pay bills and order supplies, he engaged in close to $6 million in stock trades in 2000 alone. (Id., Exh. C at 49-51; Exh. I).  Plaintiff made these investment decisions on his own, followed the market closely and made his trades by computer.  (Id. at 49, 53-54).  Many stocks were held for as little as a day or two.  (Id. at 49).  And, while plaintiff claims working at his restaurant is too stressful, he says losing over $375,000 in two years in stock trades did not bother him, or make him either anxious or angry.  (Id. at 54).

Because his case is so weak, plaintiff has made a series of attempts to shift the focus away from his own claim to irrelevant and inaccurate allegations by third parties unrelated to this case.  These efforts are outlined in greater detail in defendants' response to plaintiff's motion to reopen discovery.

Now, plaintiff has attempted two new avenues:  (1) having his so-called expert parrot the allegations of a Sixty Minutes broadcast, and (2) seeking to introduce deposition transcripts from Feist.  The Court should reject both of plaintiff's efforts for the reasons outlined below.

3

## IV.  ARGUMENT

### A.  IRRELEVANT INFORMATION DOES NOT SATISFY PLAINTIFF'S BURDEN OF PROOF

Plaintiff wants to distract the Court from the facts of this case because he cannot satisfy his burden of proof for "total" disability benefits of proving that he "cannot perform any of the important duties of his position."  Russell v. Paul Revere Life Ins. Co., 288 F.3d 78, 82 (3d Cir. 2002)(emphasis added).  Russell undermines plaintiff's claim thoroughly because the facts show that he has the ability to perform -- at least -- many of his occupational duties (such as bookkeeping and office duties) but has not returned to work.  Thus, under Russell, plaintiff is entitled to neither total nor partial disability benefits.  Id. at 82 ("As for benefits on partial disability, they are not payable unless the insured is working.").

Plaintiff has tried several strategies to deal with Russell such as ignoring it altogether and subsequently claiming it is irrelevant because it is an ERISA case.  But, as defendants noted, the applicable part of Russell is not the ERISA arbitrary and capricious standard of review but the holding which involves plaintiff's contractual burden of proof and contract interpretation.[1]  Plaintiff's most recent strategy is to try to change the topic from his burden of proof to a tabloid-style attack on UNUMProvident.  But the fact that plaintiff cannot satisfy his burden of

---

[1] Russell v. Paul Revere Life Ins. Co., 148 F. Supp. 2d 392, 404-05 (D. Del. 2001) (finding that "the policy language places upon the employee the initial burden to demonstrate that he or she can not perform any of the important duties of his position") aff'd, 288 F.3d 78 (3d Cir. 2002); see also Gallagher v. Reliance Standard Life Ins. Co., 305 F.3d 264 (4th Cir. 2002); McOsker v. Paul Revere Life Ins. Co., 279 F.3d 586, 588 (8th Cir. 2002); Yahiro v. Northwestern Mutual Life Ins. Co., 168 F. Supp. 2d 511, 517-518 (D. Md. 2001).

proof is no reason to allow him to interject untimely, inaccurate and irrelevant claims into the case.

## B. THE LATEST EXPERT REPORT SHOULD BE STRICKEN

### 1. Experts Cannot Rely on Unreliable "Evidence"

Rule 702 imposes three distinct restrictions on admission of expert testimony: qualifications, reliability and fit. In re Paoli Railroad Yard PCB Litig. v. Southeastern Pennsylvania Transp. Auth., 35 F.3d 717, 741-42 (3d Cir. 1994) (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 at 587-591 (1993)). The underlying objectives of Rule 702 and Daubert and its progeny would be undermined completely if an expert could simply parrot the speculative accusations of another witness whose testimony was found unreliable and inadmissible. In Re: Diet Drugs Products Liability Litigation, MDL Docket No. 1203, 2001 U.S. Dist. LEXIS 1174 at *60, (E.D. Pa. Feb. 1, 2001)(excluding expert opinion which relied on another expert whose opinion was inadmissible).

There is no doubt that Rose is relying on unreliable information. Sixty Minutes followed a ratings-driven strategy of trying to color the UNUMProvident companies by focusing on one or two claim decisions, coupled with inaccurate allegations by a handful of former employees. In fact, Sixty Minutes grossly mischaracterized the individual claims to which it referred.

SL1 313781v1/10305.060

It also ignored the facts about the UNUMProvident companies' claim payment history to present a picture of UNUMProvident which is distorted and untrue. Sixty Minutes avoided any meaningful discussion of facts such as:

- UNUMProvident companies paid over $3.6 billion in claims in 2001.

- UNUMProvident companies paid over $9 billion in claims since merger of companies in 1999.

- UNUMProvident companies handled over 400,000 new claims in 2001 and <u>paid 90% of the new claims</u>.

- Of the 10% of new claims denied, roughly half of the claimants were no longer claiming disability when payments would have begun and less than 2% of the new claims were denied because the claimant was found to not be disabled.

- <u>Less than four-tenths of 1% of all claims filed lawsuits.</u>

- For cases in litigation, courts ruled in UNUMProvident's favor more than 75% of the time.

These facts leave little doubt that Sixty Minutes is wrong. Its "report" would not be admissible under a variety of Rules of Evidence, such as Rule 402 (relevance), Rule 403 (prejudice, confusion and waste of time), Rule 404(b) (character evidence), Rule 602 (personal knowledge) and Rule 802 (hearsay). Thus, plaintiff is improperly attempting to use his so-called expert to introduce inaccurate allegations that should never be presented to the jury.

Indeed, Rule 703 (reliance by an expert on inadmissible evidence) is not satisfied here because "the standard [under Rule 703] is equivalent to Rule 702's reliability requirement -- there must be good grounds on which to find the data

reliable." <u>In re Paoli Railroad Yard</u>, 35 F.3d at 748.  Again, the Sixty Minutes report is unreliable.

Further, Rule 703 applies to evidence "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences."  No reasonable expert would blindly accept Sixty Minutes' tabloid journalism.  A reasonable expert would consider other evidence that could either corroborate or refute Sixty Minutes' point of view.  This is what an expert is required to do under <u>Daubert</u> and its progeny which requires that "the process or technique the expert used in formulating the opinion is reliable." <u>In re Paoli Railroad Yard</u>, 35 F.3d at 742.

But Rose's only "process or technique" is to blindly latch onto anything he can find to support his attack on defendants.  This follows his approach of acting as an advocate not an expert; an approach inconsistent with applicable law.

Finally, Rule 703 prohibits experts from disclosing facts to the jury that are otherwise inadmissible unless the court finds their probative value substantially outweighs their prejudicial effect.  Again, the Sixty Minutes allegations have no probative value and the prejudicial effect would be substantial; therefore, plaintiff cannot use Rose as a back-door means of presenting these allegations.

## 2.  The Supplemental Opinion Should Be Excluded Under Rule 403.

Fed. R. of Evid. 403 prohibits admission of evidence if its probative value is substantially outweighed by the danger of confusion of the issues or if it misleads

the jury. This applies to expert testimony. <u>JMJ Enterprises</u>, 1998 U.S. Dist. LEXIS 5098. Courts frequently exercise their discretion to exclude collateral evidence that, at best, possesses marginal relevance, like the testimony proffered here, because the dangers of unfair prejudice, confusion of the issues, misleading the jury and undue delay and waste of time outweigh the probative value of the evidence. <u>See</u> <u>e.g.</u>, <u>U.S. v. Sellers</u>, 906 F.2d 597, 602-03 (11th Cir. 1990).

Allowing Rose to parrot Sixty Minutes' allegations will lead to confusion and delays as defendants will be forced to pursue many issues, unrelated to this case, to impeach Rose for relying on inaccurate tabloid journalism. It is certain that Rose's unfounded attack on defendants' corporate culture will overshadow the central issues in this case that concern plaintiff's claim for disability benefits (again, this would suit plaintiff because he cannot satisfy his burden of proof).

For all these reasons, Rose's supplemental report will inevitably mislead and/or confuse the jury and distract them from the real issue in this case -- whether plaintiff can satisfy his burden of proof under <u>Russell</u>. Given the lack of probative value of Rose's supplemental opinion, it should be excluded under Rule 403.

## C. FEIST'S TESTIMONY SHOULD BE EXCLUDED

### 1. Feist's Testimony Is Irrelevant

As the Court knows, this case involves a dispute over Paul Revere's decision in 2001 to deny plaintiff's claim for benefits. Plaintiff now asks the Court for permission to introduce deposition testimony of a former employee of Provident

8

Life and Accident Insurance Company who (1) has no knowledge of Mazzamuto's claim, (2) never worked for Paul Revere, (3) never reviewed any Paul Revere file, (4) left Provident before it acquired Paul Revere, and (5) had little knowledge of even Provident's claim handling while employed there.

Feist starting working for Provident as an assistant medical director in 1982. See Exh. "A," (Excerpts from Feist's Deposition in Provident Life and Acc. Ins. Co. v. Fallor, No. A:99-2522 (C.D. Cal.)) at 8:22-24. He left Provident in February of 1996. Id. at 9:1-5. Feist had little to do with Provident's claims handling during his tenure. Instead, his responsibilities focused on medical evaluations in the Underwriting Department. Id. at 11:14-12:8. But in April of 1995, Feist was asked to step back into the disability claims area and take on a significant number of new job responsibilities. Id. at 17:2-9. He performed these additional responsibilities for ten months, feeling taken advantage of the entire time, until finally in February 1996, he left Provident to work with another insurance company. Id. at 103:13-23.

Since leaving Provident, Feist has given a number of depositions in which he has been critical of how Provident handled "round-tables," a fairly common practice in the insurance industry of bringing together a number of different medical and claims resources to evaluate claims. But because Provident purchased Paul Revere in March 1997, long after Feist was gone, he could not possibly have ever reviewed a Paul Revere claim file, much less Mazzamuto's file which was

9

arose in 2000, <u>more than four years after he left Provident</u>. The Court should not hesitate in excluding Feist's testimony from this case.

### 2. Feist Lacks Personal Knowledge Under Rule 602.

Feist makes allegedly substantive allegations regarding supposedly "bad faith" claims handling practices and procedures employed by Provident and Paul Revere. But even apart from the fact that he never worked for Paul Revere, his allegations are completely beyond the scope of his experience and knowledge.

Perhaps most importantly for this case, Feist admitted he was never present for any panel meetings regarding Paul Revere claims. Exh. "A" at 79:1-81:7. Again, he has no knowledge of Mazzamuto's claim or how Paul Revere handled it.

And even the theories he espouses (about Provident) are inconsistent with the facts. For example, while Feist implies that Provident used round-table meetings to improperly deny claims, he testified in <u>Thompson v. Provident Life and Acc. Ins. Co.</u>, No. A:98-CA-407-55 (W.D. Tex.) that the majority of the round-table reviews did not involve any improper action on the part of Provident. <u>See</u> Exh. "B" (Excerpts of Feist Deposition in <u>Thompson</u>) at 241:21-243:02.

Feist has also conceded (1) that he is *not* a claims expert (Exh. "B" at 228:16-229:13); (2) that where a claims representative had a question as to whether a claim was payable, it was appropriate to raise the question before the round table; (3) that there are legitimate reasons to cease paying claims other than just the question of whether a claimant is medically disabled; (4) that Provident *did not do*

11

*anything improper* in the great majority of claims; and (5) that he was *unaware* of what the company ultimately did with Provident claim reviews in which he was involved, and, thus, he did not know if those claims were terminated or otherwise. Id. at 241:21-251:02. In fact, Feist cannot recall a single episode where he recommended that a Provident claim be paid but his advice was disregarded. Id. at 258:11-259:10. See Exh. "C" (Excerpts from Feist deposition in Knee v. Provident Life and Acc. Ins. Co., CV-97-3771 (Ala.) at 73:2-74:2.

Overall, Feist had very minimal exposure even to Provident's claims department prior to Spring 1995. Exh. "B" at 200:20-201:20; Exh. "C" at 21:8-22:6. Feist did not begin sitting in on the round-table meetings until Spring of 1995. Id.

Feist has also testified that he saw only a total of about 75 claims or about 1/1000th of the claims that Provident processed each month during the 10 month period he participated in round table sessions. Exh. A at 126:9-127:10 and 107:9-20. He even concedes that he regularly fell asleep during these meetings. Exh. A at 106:18-107:7.

In short, Feist's testimony is utterly lacking of any factual basis to satisfy the personal knowledge requirement of Rule 602 and should be excluded.

### 3. Feist's Testimony Should Be Excluded Under Rule 403.

No witness, not even Feist, connects his opinions and feelings from the April 1995 to February 15, 1996 time period to the relevant time period in 2001 for

12

the handling of Mazzamuto's claim.  For this reason alone, under Rule 403, the danger of undue prejudice, confusion of the issues and misleading the jury substantially outweighs any probative value the testimony.

Similarly, allowing Feist to testify (by transcript or otherwise) will lead to a host of issues that will bog down the jury including credibility issues because Feist is not a trustworthy witness.  In fact, Feist *admitted* in the Fallor case that he submitted a false affidavit regarding his ability to review certain claims file in another case.  Exh. "A" at 79:13-81:5-7.

Bias will be another area of inquiry which will distract the jury from evaluating the merits of Mazzamuto's claim.  Before Feist was ever asked to attend any round-table discussions, he became unhappy with his job at Provident in 1993, after Harold Chandler became president and CEO.  Exh. "A" at 88:15-89:24.  In fact, Feist even started looking for a new job in November of 1994, *several months before he was asked to participate in claims or the round-table discussions.*  Exh. "A" at 88:15-89:24; Exh. "B" at 268:14-271:17.  Feist began looking for a new job before he began working in the Claims Department because he felt "threatened" and believed that he was going to be "phased out," *i.e.*, fired and replaced by a younger person.  Exh. "A" at 88:15-89:9, Exh. "B" at 271:18-272:23.

As a result of being asked to sit in on the round-table discussions in the Spring of 1995 Feist, a corporate officer, was required to work a few more hours each week without additional compensation.  Exh. "B" at 210:23-212:23.  And,

Feist began to feel "like [Provident was] taking advantage" of him. Exh. "A" at 103:13-23. In short, Feist left because of nothing more than the fact that he was a disgruntled employee.

### 4.  Feist's Testimony Should Be Excluded Under Rule 404(b)

Evidence allegedly tending to show a defendant's alleged improper conduct in the past is inadmissible to prove that defendant's alleged similar improper conduct in a pending case. This is because evidence of past improper conduct, even if proven, is of relatively slight probative value compared to the risk of prejudicial misuse by a juror. Rather than determining whether the defendant indeed acted inappropriately on the occasion at issue, the jury is much more likely to find against that defendant simply because it allegedly acted improperly in the past. *See* Rule 404(a); 2 Weinstein's Federal Evidence, § 404.10 (2d Ed. 2000); United States vs. Moccia, 681 F.2d 51, 63 (1st Cir. 1982).

In this vein, evidence of a defendant's specific improper conduct in the past is not admissible to prove that the defendant acted improperly in a pending case. Rule 404(b) F.R.E., United States vs. Coung, 18 F.3d 1132, 1136 (4th Cir. 1994); United States vs. Macey, 8 F.3d 462, 466 (7th Cir. 1993); United States vs. Jenkins, 7 F.3d 803, 806-807 (8th Cir. 1993).

Feist's testimony here is improper because there is no agreement there ever was an improper prior act, let alone any in connection with Mazzamuto's claim. It is a pure bootstrap approach to present a purely subjective personal opinion by a

14

single disgruntled former employee to be the foundation for the jury to infer that's what happened here, even though the testimony of every witness involved with Mazzamuto's case has testified otherwise. The probative value is substantially outweighed by the potential for prejudice, confusion and misleading the jury.

### 5.   Feist's Opinion Testimony Does Not Satisfy Rule 701

Lay opinion testimony or inferences are limited under Rule 701 to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witnesses' testimony or the determination of a fact in issue. Lay opinions cannot be based on speculation. U.S. vs. .59 Acres of Land, 109 F.3d 1493, 1495-1496 (9th Cir. 1997); Walton vs. Jennings, 999 F.3d 277, 283-84 (7th Cir. 1993). Feist's proposed testimony here is at most speculation, and is not the kind of lay opinion that should be allowed.

## V.   CONCLUSION

For the reasons set forth above, the Court should deny plaintiff's motion to reopen discovery.

Dated:  December 11, 2002          STEVENS & LEE

                                   By _E. Thomas Henefer_
                                   E. Thomas Henefer
                                   Attorney I.D. No. 55773
                                   111 North Sixth Street
                                   P.O. Box 679
                                   Reading, Pennsylvania  19603
                                   (610) 478-2000

                                   Attorneys for Defendants

SL1 313781v1/10305.060

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

PROVIDENT LIFE AND          )
ACCIDENT INSURANCE COMPANY, )
a Corporation,              )
                            )
            Plaintiff,      )
                            )
        vs.                 )   No. SACV 96-320 GLT (EEx)
                            )
MARTIN K. FALLOR, M.D.,     )
                            )
            Defendant.      )
_____)

(SEE NEXT PAGE FOR COMPLETE CAPTION)


DEPOSITION OF

WILLIAM EDGAR FEIST, M.D.

SANTA ANA, CALIFORNIA

APRIL 7, 1999


No. 99-2522

Reported by:
JACQUELINE A. MONTANA
CSR 11023

**SULLIVAN & COMPANY**
COURT REPORTERS
420 North McCadden Place
Los Angeles, CA 90004
TEL. 323.525.3860 FAX 323.938.8750

<pre>
 1                    UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3

 4   PROVIDENT LIFE AND           )
     ACCIDENT INSURANCE COMPANY,  )
 5   a Corporation,               )
                                  )
 6           Plaintiff,           )
                                  )
 7        vs.                     )  No. SACV 96-320 GLT (EEx)
                                  )
 8   MARTIN K. FALLOR, M.D.,      )
                                  )
 9           Defendant.           )
     ─────────────────────────── )
10   MARTIN K. FALLOR, M.D.,      )
                                  )
11           Counterclaimant,     )
                                  )
12        vs.                     )
                                  )
13   PROVIDENT LIFE AND           )
     ACCIDENT INSURANCE COMPANY,  )
14   a Corporation,               )
                                  )
15           Counterdefendant.    )
     ─────────────────────────── )
16

17

18

19

20

21

22

23

24

25
</pre>

2

SULLIVAN & COMPANY

1

2

3

4

5

6

7

8          DEPOSITION OF WILLIAM EDGAR FEIST, M.D.,

9          a witness herein, taken by the Defendant

10         and Counterclaimant Martin K. Fallor,

11         M.D., at 1325 East Dyer Road, Room 225,

12         Santa Ana, California, at 2:00 p.m.,

13         Wednesday, April 7, 1999, before

14         JACQUELINE A. MONTANA, CSR 11023.

15

16

17

18

19

20

21

22

23  No. 99-2522

24

25

3

1    before our judge.

2          Do you understand?

3    A.    Yes, sir, I do.

4    Q.    Doctor, would you please provide us with

5    your employment history.

6    A.    Okay.  Employment history?

7    Q.    Sure.

8    A.    Started medical school.  Graduated

9    medical school University of Kansas, 1966.  Served a

10   year of internship at the St. Luke's Hospital in

11   Kansas City, Missouri, from the middle of 1966 to '67.

12   Then from '67 to '69 I served in the U.S. Air Force in

13   Holloman Air Force Base, New Mexico, as a captain and

14   a general medical officer.  I returned back to Kansas

15   City in the fall of '69 and completed an internal

16   medicine residency at St. Luke's Hospital, Kansas

17   City, Missouri, in July of '72.  From July of '72 to

18   October of '77 I practiced internal medicine at

19   St. Luke's Hospital.  And then in the -- early January

20   of 1978 -- January '78 I started working for the

21   Businessman's Insurance in Kansas City, Missouri, as a

22   medical director -- assistant medical director and

23   then went in 1982 to Provident Life & Accident,

24   Chattanooga, as an assistant medical director.

25   Promoted to associate medical director in 1985, vice

8

1   president and medical director in 1990, and retained

2   that position until I retired from Provident in

3   February 1996 to work at my present company,

4   Protective Life Insurance Company in Birmingham,

5   Alabama.

6        Q.    And what job duty do you have at your

7   present company?

8        A.    My job duty -- my title is medical

9   director of Protective Life.

10       Q.    Now, you are here today without a

11  subpoena; is that correct?

12       A.    That's correct, sir.

13       Q.    And you traveled from Alabama to be here

14  today; is that correct?

15       A.    That's correct.

16       Q.    And are you charging a fee for your

17  appearance here today?

18       A.    No, sir.

19       Q.    Have your expenses to travel here been

20  reimbursed by my office?

21       A.    Yes.

22       Q.    Doctor, when were you first contacted in

23  connection with this case?

24       A.    I was contacted on Wednesday, March 31st,

25  when a lawyer from Southern California

9

1    A.    They were made at the end of last week.

2  I think, if memory serves, on Friday.  One of your

3  assistants at your office called me about the travel

4  arrangements, and I indicated what would be most

5  convenient for me.  And your office set those up and

6  sent the itinerary to me by fax.

7    Q.    Doctor, while you were employed at

8  Provident would you describe for us, please, your job

9  duties as it relates to the handling of claims at the

10  Provident.

11    A.    You're talking from my initial employment

12  in 1982?

13    Q.    Yes, sir.

14    A.    From my employment in 1982 till I became

15  medical director in 1990, the medical department was a

16  free-standing department, and we served as consultants

17  to virtually all the areas, the claims and the

18  underwriting and several areas of the company.  In

19  these cases underwriting and various sorts of claims

20  were brought to the medical director's office.  And

21  there were three of us working at that time, and the

22  secretary basically just distributed the cases between

23  the three of us as they came in.  So I would get

24  probably a third of underwriting, a third of the

25  claims, a third of the -- whatever, so to speak.

11

1      Q.      When you were working on claims during

2   this period of time, 1982 to 1990, would you please

3   tell us what your job duties were?

4      A.      Primarily it was to respond to an

5   endorsement for one of the claims adjusters in terms

6   of evaluating the situation and basically determining

7   whether the individual was disabled or not from a

8   medical standpoint, a medical evaluation perspective.

9      Q.      During that period of time, 1982 to 1990,

10  was there any protocol at Provident under which you

11  were to document your opinion as to whether an insured

12  was or was not disabled?

13     A.      It was -- in the endorsement form the

14  underwriter -- the claims adjuster would specifically

15  ask, is this person disabled or not, and that would be

16  one of a series of questions.  But basically the

17  medical director reviewing the file would say, yes,

18  this person is disabled, or, no, I don't think he is

19  disabled.

20     Q.      Would you, as a matter of that protocol,

21  make a note in the claim file about the conclusion you

22  reached as to whether an insured was or was not

23  disabled during that period, 1982 --

24     A.      '82.

25     Q.      -- I think it is --

12

SULLIVAN & COMPANY

1    director at that time.

2        Q.    In April of 1995 was there any change in

3    your job duties?

4        A.    Yes.    I was asked by Ralph Mohney to step

5    back in the disability claims arena, if you will, in

6    terms of working part time in the -- in the disability

7    claims process with the specific sections as well as

8    some evening sessions that were started at about that

9    point.

10       Q.    When you say, "with the specific

11   sections," what sections are you referring to?

12       A.    Well, I had a -- sort of a -- well, in

13   the spring of 1995 there were literally five different

14   sections where the disability claims were being

15   evaluated in the building complex, and I would go to

16   one section on Monday and Tuesday, Wednesday, just

17   rotate around.    And I'm a little unclear at this point

18   as to exact areas, but it would be psychiatric claims

19   on Thursday, complex claims on Friday, general claims

20   Wednesday, and so on and so forth.    Basically, just be

21   available in those five different areas for any claims

22   that they wished to have evaluated.

23       Q.    Now you say you were also asked to do

24   some evening work at the Provident; is that correct?

25       A.    Yes, sir.

17

1     Q.    Now, you're aware that when you sign an

2 affidavit or declaration, you're doing so under

3 penalty of perjury?

4     A.    Oh, of course.  Indeed.

5     Q.    Now, isn't it true that you signed a

6 declaration in which you asserted that you were

7 present at round-table sessions when Equitable and

8 Paul Revere disability claims were reviewed?

9     A.    Well, the declaration states that, but I

10 think that implication was that that business was

11 rolled into Provident's business when those

12 aforementioned entities were absorbed by Provident.

13     Q.    Well, isn't it correct that in the Kane

14 case you signed a declaration in which you said you

15 had personally been present at round-table sessions

16 when Paul Revere and Equitable disability claims were

17 reviewed?

18     A.    Well, I think it's a matter of semantics.

19 I think once those entities are rolled into Provident,

20 the -- the initial label is lost.

21     Q.    Now, you resigned or you retired from

22 Provident in February of 1996; isn't that correct?

23     A.    That's correct.

24     Q.    Do you know what company was responsible

25 for handling Equitable's disability claims prior to

79

1    February of 1996?

2        A.    I assume it must have been Provident.

3        Q.    I will represent to you that Paul Revere

4    handled Equitable's disability claims as of February

5    of 1996.

6        A.    I stand corrected.

7        Q.    Were you aware of that?

8        A.    No, sir, I was not.

9        Q.    Do you know when the merger between

10   Provident and Paul Revere was consummated?

11       A.    Sometime in the spring of '97.

12       Q.    April of 1997.

13             Does that sound correct?

14       A.    That's -- that's correct.

15       Q.    Do you know when the proposed merger was

16   announced between Paul Revere and Provident?

17       A.    The proposed merger was announced?

18       Q.    Yes.

19       A.    I don't know.  It must have been several

20   months before that April of '97 date, but I don't know

21   specifically.

22       Q.    Okay.  And that was after you left --

23   long after you left Provident; correct?

24       A.    About a year.  About a year, yes, sir.

25       Q.    Therefore it would have been impossible


                          80

                SULLIVAN & COMPANY

1    for you to have reviewed any Equitable or Paul Revere

2    disability claims at a round-table session where you

3    participated; correct?

4        A.    I think that's correct.

5        Q.    So your declaration that you submitted in

6    the Kane case was false; isn't that correct?

7        A.    Some inaccuracies apparently, yes.

8        Q.    Now, you've been contacted by attorneys

9    for other insureds who are suing Provident under

10   disability policies; correct?

11       A.    Beyond the ones that you've mentioned?

12       Q.    Yes.

13       A.    One in Alabama that I have, other than

14   the ones you've already mentioned.

15       Q.    What is that attorney's name?

16       A.    Boy.  Finkbinder.

17       Q.    I'm sorry?

18       A.    Skip Finkbinder.  Mobile, Alabama.

19   F-i-n-k-b-i-n-d-e-r, I think, but don't hold me to

20   that name.

21       Q.    Okay.  Do you know the name of the

22   insured that he represents?

23       A.    I can't recall her name right offhand.

24   She's a nurse anesthetist in the Mobile, Alabama,

25   area.

81

1      THE WITNESS:  I don't think I'd go quite that

2 far.

3      MR. GALTON:

4      Q.    Let me read your deposition testimony in

5 the Thompson case beginning at page 170, line 13.

6           "Question:  So you'll testify in any case

7 wherein a claim has been denied.  You will give

8 testimony against Provident.  Is that what you're

9 saying?

10          "Answer:  If asked, I will do so."

11          That was your deposition testimony,

12 wasn't it?

13     A.    I'll have to stand by that testimony,

14 sir.

15     Q.    Now, sir, you were happy at Provident

16 between 1982 and 1993; is that correct?

17     A.    That's correct.

18     Q.    But after Harold Chandler became the

19 president and CEO in 1993, you became unhappy; is

20 that -- is that correct?

21     A.    That's probably a fair statement.

22     Q.    Okay.  Mr. Chandler brought in younger

23 managers who tended to be M.B.A.s; is that -- was that

24 correct?

25     A.    That's correct.

88

1      Q.      And the -- it's your impression that
2  older managers were being phased out?
3      A.      That was my impression, yes, sir.
4      Q.      How old were you in the period of 1995,
5  1996?
6      A.      55.
7      Q.      Did you feel threatened when Mr. Chandler
8  became the CEO?
9      A.      Yes, I did.
10     Q.      In fact, you interviewed for another
11 position with another insurance company in November of
12 1994; isn't that correct?
13     A.      That's correct.
14     Q.      And that's before Mr. -- Mr. Mohney asked
15 you to attend any of the round-table sessions?
16     A.      That's correct, but I did qualify it by
17 saying that I became uncomfortable with
18 Harold Chandler in November of '93 because I saw a lot
19 of top people being lifted out.  I felt like I would
20 be eventually on the list.
21          So in 19 -- November of '94 I sort of
22 made the contact with a headhunter and said, "Let me
23 get my resume up.  Let me go out and do sort of a
24 get-acquainted."
25          I hadn't done the resume and the

89

1          A.      That's correct.

2          Q.      And you didn't receive any additional pay

3    for attending these night meetings?

4          A.      That's correct.

5          Q.      In fact, you were resentful of Mr. Mohney

6    for imposing these additional obligations, weren't

7    you?

8          A.      Well, I don't know that I was resentful

9    against Mohney.  I was resentful against the process.

10   I felt that the evening round-table sessions were

11   designed to do a purpose that I wasn't comfortable

12   with.  That's what I was uncomfortable with.

13         Q.      Well, you were unhappy that Mr. Mohney

14   didn't give you any recognition or appreciation for

15   working in the evenings over and above the regular

16   work?

17         A.      As well as the 15 to 20 hours extra.  I

18   had the same load.  My underwriting, my

19   administration, everything else remained the same.

20   That was just added on.

21                 And, you know, I don't feel that I was

22   really resentful against Mohney, but I just felt like

23   they were taking advantage of me.

24         Q.      Did you ever tell Mr. Mohney that you

25   were resentful at having to attend these round-table

103

MR. GALTON:

Q.    And isn't it correct that you sat -- you
did not sit at the table, but you would actually sit
to the rear against the wall?

A.    Well, I often sat at the table if there
was room.  Many times the room was -- was filled
greater than its capacity of the chairs to pull up to
the table.  I mean, in other words, the table would be
full of individuals, and then there would have to be
people sitting in the corners because there weren't
enough chairs -- enough room to pull all the chairs to
the table.

Q.    Is it -- would it be accurate to say that
you -- if -- that you were bored by these proceedings?

A.    Well, I wouldn't say I was bored.  I was
just really upset that this was going on in this
company that I knew and loved so well for so long.

Q.    Is it correct that you have -- you fell
asleep at some of these round-table sessions?

A.    I probably did, yeah.

Q.    Okay.  If others were to testify that
they observed you sleeping quite regularly at these
round-table proceedings, would you have any reason to
doubt their truthfulness?

MR. EISFELDER:  Excuse me.  Object to the form

106

1    of the question as being vague as to the meaning of

2    "quite regularly."  It's overly broad.

3        THE WITNESS:  Well, I wouldn't say that I slept

4    through the entire sessions.  I mean, I -- but I have

5    been known to doze off in such sessions.  I don't

6    think it in -- inhibited or denigrated my

7    participation in any way.

8        MR. GALTON:

9        Q.    Now, you did not participate in any

10    round-table sessions before April of 1995; is that

11    correct?

12        A.    That's correct.

13        Q.    And obviously you didn't participate in

14    any round-table sessions after February of 1996;

15    right?

16        A.    That's correct.

17        Q.    So your only knowledge of the round-table

18    proceedings would be for the limited period of time

19    that you have described; correct?

20        A.    That would be correct.

21        Q.    Now, in terms of the concept of this --

22    these round-table sessions, these were -- this was

23    intended to be a forum where different types of

24    specialists could come to discuss claims -- problem

25    claims or claims that had some areas of dispute; is

107

1     Q.    Was one of the -- the recommendations for

2  investigation sometimes made as a field visit by a

3  field claim representative?

4     A.    Yes, of course.

5     Q.    And would you agree that that's an

6  appropriate investigative resource?

7     A.    Yes.  That's a time-honored resource of

8  the insurance companies.

9     Q.    Now, during the approximately 10 months

10  that you attended round-table sessions, approximately

11  75 claims were presented; is that correct?

12     A.    To the best of my recollection, that's

13  true, yes, sir.

14     Q.    And these claims were all to one degree

15  or another questionable claims; correct?

16     A.    Yes.

17     Q.    But isn't it true that Provident handles

18  something on the order of 10,000 claims per month?

19     A.    I couldn't verify the figure, but I'm

20  sure you have.

21     Q.    And you don't know anything about the

22  tens or hundreds of thousands of claims that you had

23  no involvement with during that 10-month period?

24     A.    Obviously not.

25     Q.    And you've had no contact with the great

126

1  majority of the claims that Provident has handled;

2  correct?

3      A.    That's true.

4      Q.    Are you aware that of the 10,000

5  approximately claims decisions that Provident makes

6  each month whether to pay or to deny a claim,

7  approximately 95 percent of those decisions are for

8  payment?

9      A.    You've researched it.  I'm sure that's

10  true.

11      MR. GALTON:  I don't have anything further.

12

13                  -FURTHER EXAMINATION-

14      BY MR. EISFELDER:

15      Q.    Doctor, of the claims that were brought

16  to the round table while you were in attendance, was

17  it your observation that the vast majority of those

18  claims involved situations where there was no reported

19  change by the claims adjuster who was presenting the

20  claim regarding the insured's medical condition?

21      A.    That's correct.

22      Q.    Would your best estimate be that 90

23  percent or more of the claims that were presented at

24  the round table that you observed were claims in which

25  the medical condition of the claimant had not changed?

127

## DR. WILLIAM E. FEIST   [1-25-99]

### Page 0001

[01]       IN THE UNITED STATES DISTRICT COURT
[02]        FOR THE WESTERN DISTRICT OF TEXAS
[03]                 AUSTIN DIVISION
[04]
[05]   CASE NUMBER:  C.A. NO. A:98-CA-407-SS
[06]   DR. LYNNE E. THOMPSON
[07]            Plaintiff,
[08]          vs.
[09]   PROVIDENT LIFE AND ACCIDENT
[10]   INSURANCE COMPANY,
[11]            Defendant.
[12]
[13]   CASE NUMBER: C.A. NO. A: 98-CA-425-JN
[14]   JOE L. WALLACE,
[15]            Plaintiff,
[16]          vs
[17]   PROVIDENT LIFE AND ACCIDENT
[18]   INSURANCE COMPANY,
[19]            Defendant.
[20]
[21]        DEPOSITION OF DR. WILLIAM E. FEIST
[22]          In accordance with The Federal
[23]   Rules of Civil Procedure, I, MICKEY TURNER,

### Page 0002

[01]   am hereby delivering to Mr. David C. Kent,
[02]   the original transcript of the oral
[03]   testimony taken on the 25th day of January,
[04]   1999, along with exhibits.
[05]          Please be advised that this is
[06]   the same and not retained by the Court Reporter,
[07]   nor filed with the Court.
[08]
[09]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]

### Page 0003

[01]       IN THE UNITED STATES DISTRICT COURT
[02]        FOR THE WESTERN DISTRICT OF TEXAS
[03]                 AUSTIN DIVISION
[04]   CASE NUMBER: C.A. NO. A:98-CA-407-SS
[05]   DR. LYNNE E. THOMPSON
[06]            Plaintiff,
[07]          vs.
[08]   PROVIDENT LIFE AND ACCIDENT
[09]   INSURANCE COMPANY,
[10]            Defendant.
[11]
[12]   CASE NUMBER: C.A. NO. A: 98-CA-425-JN
[13]   JOE L. WALLACE,
[14]            Plaintiff,
[15]          vs.
[16]   PROVIDENT LIFE AND ACCIDENT
[17]   INSURANCE COMPANY,
[18]            Defendant.
[19]
[20]        S T I P U L A T I O N
[21]          IT IS STIPULATED AND AGREED by and
[22]   between the parties through their respective
[23]   counsel, that the video deposition of DR.

### Page 0004

[01]   WILLIAM E. FEIST may be taken before MICKEY
[02]   TURNER, Commissioner, at the offices of Foshee &
[03]   Turner at 220 Park Place Tower, Birmingham,
[04]   Alabama 35203, on the 25th day of January, 1999.
[05]          IT IS FURTHER STIPULATED AND AGREED
[06]   that it shall not be necessary for any
[07]   objections to be made by counsel to any
[08]   questions except as to form or leading
[09]   questions, and that counsel for the parties may
[10]   make objections and assign grounds at the time
[11]   of the trial, or at the time said deposition is
[12]   offered in evidence, or prior thereto.
[13]          IT IS FURTHER STIPULATED AND AGREED
[14]   that the notice of filing of the deposition by
[15]   the Commissioner is waived.
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]

### Page 0005

[01]                    INDEX
[02]   EXAMINATION BY:              PAGE NUMBER:
[03]   Mr. Kent                         11
[04]   Mr. Ehlinger                     113
[05]   Mr Davenport                     162
[06]   Mr. Kent                         292
[07]   Mr. Echerd                       337
[08]   Mr. Kent                         340
[09]
[10]   PLAINTIFF'S EXHIBITS:
[11]   1 - 4-24-95 Internal Memo         85
[12]   2 - 1997 Annual Report           157
[13]   4 - Securities And Exchange
[14]     Commission, Form 10-K  -       332
[15]   5 - Packet of Documents re:
[16]     Dr. Lynn Thompson's
[17]     Disability Claim              346
[18]
[19]   DEFENDANT'S EXHIBITS:
[20]   3 - Provident Vision Statement    223
[21]
[22]
[23]

### Page 0006

[01]       IN THE UNITED STATES DISTRICT COURT
[02]        FOR THE WESTERN DISTRICT OF TEXAS
[03]                 AUSTIN DIVISION
[04]   CASE NUMBER: C.A. NO. A:98-CA-407-SS
[05]   DR. LYNNE E. THOMPSON
[06]            Plaintiff,
[07]          vs.
[08]   PROVIDENT LIFE AND ACCIDENT
[09]   INSURANCE COMPANY,
[10]            Defendant.
[11]
[12]   CASE NUMBER: C.A. NO. A: 98-CA-425-JN
[13]   JOE L. WALLACE,
[14]            Plaintiff,
[15]          vs.
[16]   PROVIDENT LIFE AND ACCIDENT
[17]   INSURANCE COMPANY,
[18]            Defendant.
[19]   BEFORE:
[20]        MICKEY TURNER, Commissioner
[21]   APPEARANCES:
[22]        HUGHES & LUCE, LLP, by Mr. David C.
[23]   Kent, 1717 Main Street, Suite 2800, Dallas,

## DR. WILLIAM E. FEIST   [1-25-99]

### Page 0199

[01] advising people when -- advising your company.
[02] When they got an application, in you would
[03] examine the medical and the reviews to see if
[04] they were insurable and, if so, at what level?
[05]     A.   At what level, I am not sure.
[06]     Q.   At what risk they would be rated?
[07]     A.   Yeah, assessing the risk, yes, sir.
[08]     Q.   But you didn't actually make the
[09] underwriting decisions? The underwriters did
[10] that?
[11]     A.   They relied heavily on my decision.
[12] If I said to decline a case, they usually did,
[13] or if said take standard, they usually did.
[14]     Q.   The ultimate responsibility, though,
[15] was left with the underwriter?
[16]     A.   In a real sense, yes, sir.
[17]     Q.   Then, in '82, you went to work with
[18] Provident from '82 to '96, is that right?
[19]     A.   That's correct, sir.
[20]     Q.   When you became Medical Director in
[21] 1990 -- let me stop there. During that period
[22] of time, let's just go from '82 through -- was
[23] it February/March of '95, when you got asked by

### Page 0200

[01] Mr. Mohney to work on the round-table review?
[02]     A.   It was April of '95, according to
[03] this memo.
[04]     Q.   So basically, from 1982 through April
[05] of '95, your primary responsibility was
[06] underwriting medical advice for underwriters?
[07]     A.   Let's go back from 1982 to 1990.
[08]     Q.   When you became Medical Director.
[09]     A.   From 1982 to 1990, there were three
[10] physicians in Provident. We did all the
[11] underwriting, all the claims work and it was
[12] sort of like a -- you know, the secretary
[13] brought the cases in and she just spread them
[14] around, according to who was available.
[15]     So I did, from '82 to '90, I did both
[16] underwriting and claims work. And, then, from
[17] '90 to '95, it was hiatus, but in '95, April of
[18] '95, I was asked by Ralph Mohney to step back in
[19] as per this memo.
[20]     Q.   Let me just read your answer that you
[21] gave at page 21 of your prior deposition when
[22] you were asked: "Did you have any contact with
[23] claims prior to the April '95 time period?" You

### Page 0201

[01] testified: "Very minimal. Sometime, somewhere
[02] about '89 to '90, the disability income section
[03] hired sort of a dedicated physician to work in
[04] their area. And additionally position reported
[05] to the Medical Director, but somewhere between
[06] '89 and '95, the actual date escapes me, the
[07] physician in the accident department or
[08] disability income department reported to the
[09] Vice President of Claims and was not reporting
[10] to the Medical Director, the corporate Medical
[11] Director. So at that point I was really out of
[12] the loop. But, then, when I was asked to step
[13] back in the spring of '95, I was sort of
[14] assisting that position. He had his own
[15] responsibility and I was sort of helping him
[16] with some of the other cases that he couldn't
[17] get to."
[18]     Do you stand on that testify? Is
[19] that correct?
[20]     A.   Yes, sir.
[21]     Q.   Now, in 1993, there were some changes
[22] in management when Harold Chandler was brought
[23] in?

### Page 0202

[01]     A.   Yes, sir.
[02]     Q.   You don't like Harold Chandler, do
[03] you?
[04]     A.   He's a very fine man, but I'm not
[05] real happy with what he has done with the
[06] company.
[07]     Q.   Have you ever made any statements to
[08] anyone that you do not like Harold Chandler or
[09] his philosophy?
[10]     A.   Other than the testimony that you
[11] have in front of you, I have not.
[12]     Q.   You have never told anybody at
[13] Provident?
[14]     A.   No, sir.
[15]     Q.   Have you never told anybody outside
[16] of Provident?
[17]     A.   No, sir.
[18]     Q.   Words to the effect that you don't
[19] like Harold Chandler, you don't approve of his
[20] philosophy in running the company?
[21]     A.   I like him -- personally I think he's
[22] a great man, but what he's done with the
[23] company, I have umbrage with.

### Page 0203

[01]     Q.   I thought he was one of the reasons
[02] you say you left the company on February 29?
[03]     A.   Well, if you see a situation you are
[04] not comfortable with, many times it's better
[05] just to leave.
[06]     Q.   Well, did you leave the company
[07] because you thought that you were uncomfortable
[08] with him because you saw people your own age
[09] going out the door? Did you ever make that
[10] statement?
[11]     A.   You have probably got it right there
[12] in the deposition. Yeah, it happened all the
[13] time during that time period.
[14]     Q.   What did you think, that he was going
[15] to fire a man of your age?
[16]     A.   I thought it was a great poss -- good
[17] possibility, yes, sir.
[18]     Q.   Why was that? Why would he fire a
[19] man of your age? Just because you were older?
[20]     A.   Either didn't fit into his program or
[21] didn't go along with his plans, sure.
[22]     Q.   In what way didn't you fit into the
[23] program?

### Page 0204

[01]     A.   I didn't like the way he was handling
[02] the claims, the way he was running the company.
[03]     Q.   Were you a hard worker?
[04]     A.   Ask my wife. She thinks I'm a
[05] workaholic.
[06]     Q.   I would rather ask the people at
[07] Provident. I want to know if you think you were
[08] a hard worker?
[09]     A.   I think if you asked anybody that was
[10] at Provident during my tenure, you'd say I was
[11] probably the hardest working individual employed
[12] by that company.
[13]     Q.   Well, did you like Ralph Mohney?
[14]     A.   I didn't like what he was doing to
[15] the company, but he was a fine man.
[16]     Q.   When you say you didn't like what he
[17] was doing to the company, what was that?
[18]     A.   Well, the reorganizations we alluded
[19] to earlier about the claims and all of that.
[20]     Q.   Well, let me ask you about in '93.
[21] The way the old Provident used to handle claims,
[22] they were done out in the field, weren't they?
[23]     A.   That's correct.

## DR. WILLIAM E. FEIST    [1-25-99]

### Page 0205

[01]    Q.  Do you think that's a very good way
[02]  to handle claims?
[03]    A.  Well, it's a philosophical thing, I
[04]  think.
[05]    Q.  Did you take -- did you have a
[06]  difference of opinion when the company brought
[07]  in their claims in 1993?
[08]    A.  It was a change of philosophy, sir.
[09]  When the claims setup was set up in the branch
[10]  offices, the idea was that the claims
[11]  adjudication could be done in that branch office
[12]  for that geographical region.  And the idea of
[13]  bringing the people into Chattanooga was not a
[14]  problem.  I didn't have any problem with that.
[15]  It did allow better training, better monitoring
[16]  of their work and you could see the rationale
[17]  for that.  I had no problem with that.
[18]    Q.  There were some good sound business
[19]  reasons for bringing the claims back into the
[20]  home office?
[21]    A.  Well, obviously.  I mean, they had
[22]  better control.  They had dedicated people.
[23]  They could train them.  They could supervise

### Page 0206

[01]  them.  They virtually had claims people in
[02]  fifty branch offices across North America and
[03]  there's no way you can effectively monitor that
[04]  many people in that wide a distribution.
[05]    Q.  So, to some -- in many ways bringing
[06]  the claims back in and centralizing claims
[07]  handling in the early nineties was positive, it
[08]  was good development?
[09]    A.  I would say so, yeah.
[10]    Q.  Now, the psych unit was formed back
[11]  then?
[12]    A.  That's my understanding, somewhere in
[13]  that time.  I can't give you the specific date,
[14]  but somewhere in that time frame, yes.
[15]    Q.  Did they bring in doctors to work in
[16]  the psych unit?
[17]    A.  My recollection is that there was a
[18]  part-time local psychiatrist, whose name I can't
[19]  recall, who came in or reviewed cases, maybe,
[20]  you know, two half days a week and worked with
[21]  Dr. O'Connell.  But, other than that, there
[22]  were no consulting physicians that I'm aware of.
[23]    Q.  Before Dr. O'Connell, was there

### Page 0207

[01]  another doctor there?
[02]    A.  Dr. Charles Leagus, now deceased.
[03]    Q.  Did Dr. Leagus work in claims?
[04]    A.  Yes, sir.
[05]    Q.  Now, after Dr. Leagus left or died,
[06]  he was replaced by Dr. O'Connell?
[07]    A.  Yes, sir.
[08]    Q.  And then, Dr. O'Connell worked in
[09]  claims until his retirement?
[10]    A.  Yes, sir.
[11]    Q.  Did Dr. O'Connell report to you or to
[12]  Ralph Mohney?
[13]    A.  Most of his tenure he reported to
[14]  Ralph Mohney or Ralph Mohney's predecessor, Dr.
[15]  Freetag.  When I took over Medical Director in
[16]  the middle of 1990, all positions reported to
[17]  the Medical Director.  And, then, after that
[18]  time frame, we basically split the department up
[19]  into those physicians working in the group
[20]  department.  One physician, Dr. Leagus then, in
[21]  the accident department, and then later Dr.
[22]  O'Connell moved over to that department.
[23]    Q.  Okay.  So, Doctor, in 1990, then,

### Page 0208

[01]  your primary responsibility, you had
[02]  administrative duties you picked up as a
[03]  corporate Medical Director?
[04]    A.  Yes, sir.  Yes, sir.
[05]    Q.  But your primary responsibilities
[06]  were in the area of giving medical advice to
[07]  underwriting?
[08]    A.  This is correct.
[09]    Q.  The primary doctor in charge of
[10]  giving medical input, if you will, on claims was
[11]  Dr. O'Connell?
[12]    A.  Yes, sir.
[13]    Q.  And he wasn't in your reporting link?
[14]    A.  That's correct.
[15]    Q.  He reported to Doctor, I mean to Mr.
[16]  Mohney?
[17]    A.  Mohney, yes, that's correct.
[18]    Q.  Now, by 1995, the health care, the
[19]  group health care had been sold off?
[20]    A.  Yes, that's correct.
[21]    Q.  All right.  Now, you were asked in,
[22]  as I thought you said, that Mr. Mohney asked you
[23]  to start looking at some of the complex claims

### Page 0209

[01]  in April of '95?
[02]    A.  That's correct.
[03]    Q.  By April of '95, Harold Chandler had
[04]  been there, what, a couple of years?
[05]    A.  A year and a half, eighteen months.
[06]    Q.  Were you happy with the company in
[07]  April of '95, or had you already started having
[08]  some problems?
[09]    A.  I was having problems with the way
[10]  the company was being run.
[11]    Q.  Well, let's take it up through 1982
[12]  through the time you became Medical Director.
[13]  Were you happy at the company?
[14]    A.  Yes, sir.
[15]    Q.  And from '90 to '93, were you happy
[16]  at the company?
[17]    A.  Yes, sir.
[18]    Q.  All right.  Now, in '93, Chandler
[19]  comes in --
[20]    A.  November.
[21]    Q.  -- and he starts downsizing?
[22]    A.  Yes, sir.
[23]    Q.  He starts doing efforts to make the

### Page 0210

[01]  company more efficient because it has been
[02]  losing money?
[03]    A.  That's a fair summary, yes, sir.
[04]    Q.  You mention there had been payments,
[05]  there had been a big take down from -- of the
[06]  money increasing reserves?
[07]    A.  Yes, sir.
[08]    Q.  So they started trying to make the
[09]  claims handling process more efficient?
[10]    A.  That's correct.
[11]    Q.  You don't have any problem with that,
[12]  do you?
[13]    A.  No, I do not.
[14]    Q.  Now, some time in '93, though, it's a
[15]  new world, they are running the company
[16]  different than they had in the past?
[17]    A.  Undoubtedly.
[18]    Q.  Do you find, is there any problem
[19]  conceptually with trying to keep a company in
[20]  business?  Do you find -- take objection to
[21]  that?
[22]    A.  Oh, no, I have no problem with that.
[23]    Q.  Now, with respect to the changes, you

## Page 0211

[01] mentioned that you were asked to start sitting
[02] on the round-table reviews in April of '95 that
[03] increased your work, but it didn't increase your
[04] money?
[05] A. That's correct.
[06] Q. Did you resent that?
[07] A. Yes, indeed.
[08] Q. Did you ask somebody if you were
[09] going to have to start working nights you
[10] thought you ought to be paid for it?
[11] A. It wouldn't have done any good.
[12] They wouldn't have done it anyway.
[13] Q. Well, why didn't you go talk to
[14] somebody? Why didn't you ask Ralph Mohney?
[15] A. Ralph Mohney said, it's okay,
[16] something to the effect that the new application
[17] count is down, so you won't have so much
[18] underwriting, so you have more time to do the
[19] claims work, which, to me, is not a valid
[20] reason, but that was what he offered.
[21] Q. His perception was that you had a
[22] little extra time on your hands — would you
[23] like a drink of water?

## Page 0212

[01] A. Yeah.
[02] Q. I saw you looking around.
[03] A. Yeah, I would.
[04] Q. David, would you get him a glass and
[05] let me keep going here? So your perception was
[06] that Ralph thought you had some extra time on
[07] your hands?
[08] A. Right.
[09] Q. And he wanted you to start helping
[10] with some of those complex claims?
[11] A. I would guess that's probably a fair
[12] summary.
[13] Q. As I here you, though, you say, well,
[14] I was pretty busy and I don't mind working
[15] extra, but I think I ought to be paid for it?
[16] A. Or at least recognized. Ralph never
[17] recognized my efforts. He never said, "You are
[18] going a good job. We really appreciate it." It
[19] was, like, you know, he expected me to do it.
[20] Q. Do you think that that is one of the
[21] bases that you started becoming a little unhappy
[22] with this job you had had for so long?
[23] A. I would have to say so, yeah.

## Page 0213

[01] Q. Were there any other ways that you
[02] think you weren't appreciated?
[03] A. I can't think of any. I'm not sure
[04] what your —
[05] Q. Well, are there any other job
[06] dissatisfaction? Forget about these issues
[07] about round-table review. Did you have, other
[08] than maybe a disagreement with Chandler about
[09] his business practices, or —
[10] A. I never discussed Chandler's business
[11] practice with him.
[12] Q. I am trying to get at if you had
[13] other areas of discontent.
[14] A. No. No, I was — no, I did not.
[15] Q. What was your salary level at that
[16] time in —
[17] A. At that time?
[18] Q. In '95?
[19] A. In '95?
[20] Q. Yes, sir.
[21] A. It was around ninety-five thousand,
[22] I think.
[23] Q. Ninety-five thousand?

## Page 0214

[01] A. Ninety-five thousand annually, yes,
[02] sir.
[03] Q. You mentioned on your direct that
[04] you're getting retirement benefits. You were
[05] able to take early retirement?
[06] A. At age 55, yes, sir.
[07] Q. When did you become 55?
[08] A. September 25, 1995.
[09] Q. '95 and you retired in February of
[10] '95?
[11] A. That's correct.
[12] Q. Was the fact that you wanted to take
[13] early retirement, was that one of the reasons
[14] you did it?
[15] A. I thought it was a blessing I could
[16] do it, yeah.
[17] Q. What does that mean? By taking early
[18] retirement, what does that mean?
[19] A. It means that I get a retirement from
[20] Provident and I could move to another job. I
[21] just moved — finished my job on one week and
[22] started my new job the next week.
[23] Q. So the benefits that you were getting

## Page 0215

[01] from Provident by this early retirement, that
[02] was good?
[03] A. I wouldn't say it's good. It's
[04] whatever you get for being age 55 and working
[05] for a company for fourteen years.
[06] Q. And how much was that? How much is
[07] your early retirement?
[08] A. It's roughly twelve hundred dollars a
[09] month.
[10] Q. So you get twelve hundred dollars a
[11] month and you just went to work for somebody
[12] else?
[13] A. That's correct.
[14] Q. Are you making more money now then
[15] you did while you were at Provident?
[16] A. Oh, yeah, but it has been three years
[17] since I worked there. Just the natural
[18] acceleration of benefits, I mean, of
[19] cost-of-living increases.
[20] Q. I heard you testify that in April of
[21] '95, in addition to these round-table reviews
[22] you also started going around and talking and
[23] consulting with other claims departments. I

## Page 0216

[01] mean, other people in the claims department,
[02] different sections?
[03] A. These units that you see here.
[04] Q. Right.
[05] A. The psych unit, the — I never went
[06] to high litigation risks, you know, but there
[07] was about five different units that I would
[08] make, you know, weekly visits to.
[09] Q. Okay. So, if a claims examiner had a
[10] question about the medical in a file, he was
[11] free to consult with you, starting in about
[12] April of '95?
[13] A. Yes, sir.
[14] Q. And you did, in fact, that part of
[15] your job was to answer questions that a claims
[16] examiner would have about the medical?
[17] A. That's correct.
[18] Q. Nothing is wrong with that, is there?
[19] You don't find any — you don't take any issue
[20] with the right of a claims examiner to visit
[21] with you about medical?
[22] A. That's what I am there for. I mean,
[23] that's why Ralph asked me to do that.

## DR. WILLIAM E. FEIST    [1-25-99]

**Page 0223**

[01] doesn't he?
[02]    A.  I think that's correct.
[03]    Q.  Dr. Feist, are you familiar with the
[04] Vision Statement of Provident?
[05]    A.  I am not sure that I am.  When was
[06] that constructed?
[07]    MR. DAVENPORT:  What is your exhibit
[08] number?  Are we doing these consecutively?
[09]    MR. KENT:  Yes.
[10]    MR. DAVENPORT:  I will put
[11] Defendant's Exhibit 3.  How is that?
[12]
[13]    (Whereupon, Defendant's Exhibit 3
[14]    was marked for identification and
[15]    same is attached hereto.)
[16]
[17]    Q.  Let me hand you the Vision
[18] Statement, Exhibit Number 3.  Now, are you
[19] familiar with this Vision Statement and when it
[20] was promulgated by the claim department and when
[21] it was distributed throughout the company?
[22]    A.  Let me think a minute.  I don't
[23] believe I have seen this in this form

**Page 0224**

[01] heretofore.
[02]    Q.  Have you ever seen one similar to it?
[03]    A.  Oh, I am sure I have.  It has been
[04] three years since I worked there.
[05]    Q.  This was promulgated while you were
[06] still an employee of Provident, was it not, or
[07] one very similar to it?
[08]    A.  I have no recollection.  I cannot
[09] speak to that.
[10]    Q.  You don't know whether this was
[11] distributed to people?  Have you ever heard
[12] Ralph Mohney testify about it or talk about it?
[13]    A.  Not to my recollection.
[14]    Q.  So you know nothing about the
[15] Provident Vision Statement?
[16]    A.  I mean, I am not sure how the
[17] Provident Vision Statement relates to this
[18] claim.
[19]    Q.  Well, you told me that you were at
[20] round-table review.  Is it your testimony that
[21] prior to the time you left, you were not
[22] familiar with the Provident Vision Statement of
[23] the claim department?

**Page 0225**

[01]    A.  I guess I apparently wasn't, in a
[02] form that I remember.
[03]    Q.  In this Vision Statement, the
[04] statement is made about Individual Disability
[05] Claims Vision Statement, "To become the best
[06] claims management organization in the industry
[07] in all phases of operation."  Do you see that?
[08]    A.  Uh-huh (indicating affirmatively).
[09]    Q.  And then they said, "We will define
[10] the best in the industry to mean that we will
[11] administer claims in a courteous manner, prompt
[12] and courteous manner."  Do you see that?
[13]    A.  Yes, sir.
[14]    Q.  You will "Administer claims
[15] consistent with good faith claim practices,
[16] policy provisions and legal requirements."  Do
[17] you see that?
[18]    A.  Uh-huh (indicating affirmatively).
[19]    Q.  Dropping down lower, let me just go to
[20] one I wanted to question you on.  It says, "Pay
[21] all valid claims and aggressively defend the
[22] company against invalid and fraudulent claims"?
[23]    A.  I see that.

**Page 0226**

[01]    Q.  Do you take any issues with the fact
[02] that Provident has a duty to pay claims that it
[03] owes under the contract and defend against
[04] claims that are not owed?
[05]    A.  I would agree with that statement.
[06]    Q.  All right.  Now, did you ever tell
[07] anybody that you didn't agree with the
[08] obligation of Provident to pay valid claims or
[09] that you didn't agree with Provident's
[10] obligation to defend against invalid claims?
[11] That's what it's all about, isn't it?
[12]    A.  I think so.  I think this is a great
[13] mission statement, but I think the thing that I
[14] took umbrage with was the fact that we had
[15] claimants on claim for a number of years who had
[16] been considered valid — considered to have a
[17] valid disability and then many years later, it's
[18] revisited.
[19]    And my philosophy was that a claim
[20] should be evaluated carefully on the initial
[21] filing, that claim and a person should be
[22] judged disabled or not at that point.  And
[23] unless there was some major change in that

**Page 0227**

[01] individual's condition, there's no reason to
[02] look at it.  And I think that that's where
[03] Provident stepped over the line.
[04]    These gentlemen had been, both of
[05] these doctors had been considered disabled for a
[06] number of years and then somewhere in the
[07] process somebody picked it up and said, you
[08] know, maybe we didn't do it right.  Let's go
[09] back and revisit it.  And I think that's what I
[10] have a problem with.
[11]    Q.  Have you completed your response?
[12]    A.  Yes, sir.
[13]    MR. DAVENPORT:  Object.
[14] Nonresponsive, move to strike.
[15]    Q.  Dr. Feist, you don't hold yourself
[16] out as being a lawyer?
[17]    A.  No, I never said that.  I have never
[18] been to law school.
[19]    Q.  And you don't hold yourself out as
[20] being an expert on contract interpretation?
[21]    A.  I would have to say I don't have any
[22] expertise in contract interpretation; but I have
[23] some expertise in disability income contractual

**Page 0228**

[01] obligations with the company that wrote the
[02] policy.
[03]    MR. DAVENPORT:  I move to strike the
[04] balance of your answer beginning with "but I" as
[05] being nonresponsive.
[06]    Q.  Now, with respect to the claims
[07] decision itself, if I have understood you
[08] correctly, you don't make that decision?
[09]    A.  I would say in the bottom line, in
[10] the way Provident was structured, when I was
[11] working, when I was working there, I would make
[12] my recommendation and, again, I don't know what
[13] happened to it.
[14]    Q.  That's not my question.
[15]    A.  Unless something else came up later.
[16]    Q.  My question is:  You don't hold
[17] yourself out as an expert on claims handling?
[18]    That means making a determination of whether a
[19] specific set of facts entitle a claimant to
[20] receive benefits under an insurance contract.
[21] Is that fair?
[22]    A.  I think that's a fair statement, but
[23] I think in many cases the medical aspect of it

## DR. WILLIAM E. FEIST   [1-25-99]

### Page 0229

[01] is the crux of it. And you can talk legal and
[02] contractual and all of that other peripheral
[03] issues and the medical part of it is really
[04] where it is.
[05]         MR. DAVENPORT: I object to the
[06] portion of your response beginning with, "but I
[07] think." I think the following, the balance of
[08] your answer is being nonresponsive.
[09]     Q.  Even when you participated in
[10] round-table reviews, your sole responsibility
[11] was giving medical input and answers to
[12] questions that the claims adjustor raised?
[13]     A.  That's correct.
[14]     Q.  And as I understand your testimony,
[15] Dr. O'Connell and I guess Dr. Leagus probably
[16] had had a good deal more exposure to claims than
[17] you did?
[18]     A.  Well, the only difference between Dr.
[19] Leagus and Dr. O'Connell and myself was that
[20] they were successfully dedicated to disability
[21] claim. I suspect in overall experience, I was
[22] probably comparable with Dr. Leagus.
[23]     Q.  I am not talking about experience.

### Page 0230

[01] I'm talking about the percentage of time devoted
[02] to claims, would you agree in '95, for example,
[03] O'Connell was spending more time on claims than
[04] your fifteen hours a week?
[05]     A.  That was his full-time job, yes, sir.
[06]     Q.  And the answer to my question is
[07] what?
[08]     A.  Yes.
[09]     Q.  Now, did you testify that you did not
[10] think round-table reviews existed before April
[11] of 1995?
[12]     A.  Not in that format, no, sir.
[13]     Q.  What format?
[14]     A.  Where you had the, as the memo of
[15] April 24, '95 structures it, I don't recall that
[16] there was. Now, obviously, I wasn't directly
[17] involved in that --
[18]     Q.  That's my point.
[19]     A.  -- issue from 1990 to 1995.
[20]     Q.  That's my point of my question. You
[21] are reading my mail. Did you ever attend a
[22] round-table review session from 1990 to '95?
[23]     A.  No, sir.

### Page 0231

[01]     Q.  Not one single session?
[02]     A.  Not to my -- not to the best of my
[03] knowledge, no.
[04]     Q.  And you are coming in and telling the
[05] jury that, well, in February of '95, it was
[06] different from the old round-table reviews? Is
[07] that what you just said?
[08]     A.  In my experience it was, because I
[09] was asked to come to these round tables. I was
[10] not involved in any prior round tables.
[11]     Q.  Then, how can you purport to make a
[12] comparison of what happened in round-table
[13] reviews that you participated in to round-table
[14] reviews that you did not participate in? How
[15] could you know what went on?
[16]     A.  Well, I don't think that's an issue.
[17] I'm saying that I had round-table experience
[18] from '95 to '96, and I don't know what happened,
[19] what transpired in that interim.
[20]     Q.  You don't, I understand you don't
[21] know what the round-table reviews, how they were
[22] handled prior to the time you started
[23] participating in them in March of '95?

### Page 0232

[01]     A.  That is correct.
[02]     Q.  In your direct testimony, as I
[03] understand it, you think that in this period
[04] between the spring of '95 and February of '96
[05] when you left the company that you maybe looked
[06] at some, roughly, seventy-five questionable
[07] claims. Is that what you said?
[08]     A.  I think we were talking about the
[09] round table.
[10]     Q.  At the round table, that's right?
[11]     A.  To the best of my recollection, I
[12] obviously don't, at this point, recall.
[13]     Q.  And then you also talked to other
[14] people and the claims examiners, kind of
[15] one-on-one about medical questions?
[16]     A.  Yeah, it was my job to go to the
[17] section and one-on-one discuss cases.
[18]     Q.  Let's talk about just the one-on-one
[19] cases. You are not here to testify that in
[20] those situations involving those claims that the
[21] Medical Examiner was doing something improper in
[22] talking to you about medical questions?
[23]         MR. KENT: Claims people?

### Page 0233

[01]     A.  Claim people?
[02]     Q.  I am sorry, I missed it. What I am
[03] trying to say is, you are not saying --
[04]     A.  No, no, they were --
[05]     Q.  Let me restate my question, so when I
[06] read it to the jury it will make some sense.
[07] You are not saying that when you talked to the
[08] claims persons on a one-on-one basis in the
[09] '95-'96 time period and giving them information
[10] that those claims people were doing something
[11] improper in consulting with you?
[12]     A.  That was their job to get medical
[13] input, to get medical consultations about a
[14] case.
[15]     Q.  Because, as it stays in the Vision
[16] Statement, the company has a duty to continue
[17] the investigation of a disability claim, doesn't
[18] it, to investigate it and continue an
[19] investigation?
[20]     A.  Well, indeed, but, to me, if there's
[21] no change in an individual that is adjudicated
[22] to be disabled, it's not valid.
[23]         MR. DAVENPORT: Object to the balance

### Page 0234

[01] of your response as being nonresponsive.
[02]     Q.  Do you know how many claims
[03] processed, for example, in '95?
[04]     A.  How many claims processed in '95?
[05]     Q.  Yes.
[06]     A.  I have, really, no idea. I'm sure
[07] it's tens or maybe hundreds of thousands.
[08]     Q.  So you are not going to come in and
[09] tell the jury that you know anything about the
[10] tens or hundreds of thousands of claims that
[11] were being handled that you didn't have any
[12] input in?
[13]     A.  I obviously have no knowledge of
[14] that. I was uninvolved in that.
[15]     Q.  So, then, you would have had no
[16] contact whatsoever with the great majority of
[17] claims that Provident was handling. Is that
[18] fair?
[19]     A.  Yes, indeed.
[20]     Q.  So, then, in a given week, then, if I
[21] am listening to you, in a given week of your
[22] week, you might see two to three to four claims
[23] at your weekly round-table review that were --

## Page 0241

[01] Q.  Where if someone is, say, disabled
[02] because they claim they are depressed, the fact
[03] that they are getting disability benefits
[04] presents with the secondary gain and prohibits
[05] them from getting better?
[06] A.  I am fully aware of that concept,
[07] yes, sir.
[08] Q.  Also, Dr. Feist, you are aware,
[09] generally, that under the Provident policies, an
[10] insured has an obligation to be under the
[11] regular care and attendance of a duly qualified
[12] physician for any period of time they are on
[13] claim?
[14] A.  Oh, absolutely.  That's a given.
[15] Q.  And the purpose of that clause in the
[16] policy is to make sure that the insured gets
[17] treatment and hopefully gets well?
[18] A.  Sure.  That's the whole point of it.
[19] Q.  You don't take any issue with that?
[20] A.  I do not.
[21] Q.  Let's talk about the claims that were
[22] submitted to the round-table review while you,
[23] while you were there.  And, again, this is the

## Page 0242

[01] period between April of '95 and February of '96.
[02] Would it be a fair statement that not every
[03] claim involves a reserve of in excess of a
[04] million dollars?
[05] A.  I'm sure that's true.  I can't recall
[06] specifically, but, obviously, you've researched
[07] that and that's probably true.
[08] Q.  Would it be a fair statement that not
[09] every claim involved a situation where an
[10] insured had been on claim for a long period of
[11] time?
[12] A.  I'm sure that has happened, but it
[13] seems that would not be common.
[14] Q.  Would it be a fair statement that
[15] with regard to a majority of the round-table
[16] reviews, you did not think the company did
[17] anything improper?
[18] A.  That's probably a fair statement,
[19] yeah.
[20] Q.  As I understand it, you don't have a
[21] problem with the fact that a claims
[22] representative could have a legitimate question
[23] and bring the case to a round-table review?

## Page 0243

[01] You don't find anything --
[02] A.  No, not at all.
[03] Q.  In your prior deposition, I believe
[04] you told us that the claim representatives have
[05] a duty to actually do that if they don't feel a
[06] claim is payable pursuant to a policy.  They
[07] have a duty to seek help.
[08] A.  That's what they are hired by the
[09] company to do.  That's their job.
[10] Q.  In every claim that you saw during
[11] the round-table review, the claims
[12] representative had raised a question as to
[13] whether the claim was payable for some reason or
[14] another?
[15] A.  Indeed, yes.
[16] Q.  And the issues as to why the claim,
[17] the questions that the claims representative
[18] had, were they then discussed at the meeting?
[19] A.  Yes, that was the point of the
[20] meeting.
[21] Q.  All right.  Now, do you have any
[22] specific recollection, as you sit here today, of
[23] the details of any claim that was discussed?

## Page 0244

[01] A.  I do not.
[02] Q.  Well, you are not purporting to tell
[03] this jury that Ralph Mohney came in and said,
[04] "Guys, we have got this claim reserved at X
[05] dollars.  I don't care what the facts show.  I
[06] don't care what the medicine shows.  We just
[07] want to cut this claimant off."  Did he ever say
[08] that?
[09] A.  Not in so many words, but --
[10] Q.  Did he ever say that or words to that
[11] effect?
[12] A.  No.  No, he did not.
[13] Q.  After the questions were discussed
[14] as I listened to you, you said that a number of
[15] things could happen.  The first thing that could
[16] happen is the decision could go in favor of the
[17] insured.  The question could be answered and the
[18] claim in the insured's favor, the decision would
[19] be reached to continue payment of the claim,
[20] look at it another day?
[21] A.  Yeah.
[22] Q.  That happened, in fact, on
[23] situations, did it not?

## Page 0245

[01] A.  Oh, I'm sure it did, yes, of course.
[02] Q.  And again, whether the claim was
[03] payable or not, that's not solely a medical
[04] question; there may be legal issues involved?
[05] A.  Many issues, yes, sir.
[06] Q.  For example, somebody could be
[07] medically disabled, in other words, have a
[08] condition that shows they are medically
[09] disabled, but the claim could not be legally
[10] payable for some reason under the contract?
[11] A.  Indeed.
[12] Q.  For example, the illness could have
[13] manifested itself before the contract was
[14] issued?
[15] A.  Oh, yeah, preexisting.  Of course.
[16] Q.  Okay.  So there could be legal
[17] reasons why a claim wouldn't be payable even if
[18] it was medically justified?
[19] A.  Oh, indeed.
[20] Q.  All right.  Now, or the company after
[21] they heard everything could say, we are just
[22] going to deny the claim; the claim needs to be
[23] denied and should not have been paid?

## Page 0246

[01] A.  If they had valid reason to do so,
[02] that's within their prerogative.
[03] Q.  On some occasions, did that, in fact,
[04] happen, after round-table review a decision was
[05] reached to deny the claim?
[06] A.  It apparently was.  I don't have
[07] statistics on the number, but I'm sure that
[08] happened.
[09] Q.  But you don't remember the
[10] statistics, though?
[11] A.  No, sir, I do not.
[12] Q.  But isn't it a fact, Doctor, that in
[13] the great bulk of the questionable claims that
[14] were presented for round-table review when you
[15] were there, the decision was made to go get some
[16] additional information?
[17] A.  I think that's a fair statement.  The
[18] great majority of them were, yes.
[19] Q.  So at the end of the day, the people
[20] gave input and they said, "Okay, here's what you
[21] need do, we need more information"?
[22] A.  Uh-huh (indicating affirmatively).
[23] Q.  For example, send a questionnaire to

## DR. WILLIAM E. FEIST    [1-25-99]

### Page 0247

[01] the treating doctor, let's get some specific
[02] answers to these questions?
[03]    A.  Uh-huh (indicating affirmatively).
[04]    Q.  That was done, wasn't it?
[05]    A.  Yes, sir.
[06]    Q.  Or, let's get the tax returns.  Maybe
[07] there was a question in a, in a residual claim
[08] of the predictability earnings, we need to get
[09] confirmation of what those earnings were?
[10]    A.  That sometimes is a factor.
[11]    Q.  Or maybe there was a decision made,
[12] well, we need the field rep to go out and
[13] conduct a face-to-face interview and get more
[14] information from the insured?
[15]    A.  Indeed.
[16]    Q.  Then, as I understand it, too,
[17] another tool to get additional information was
[18] for the insured to undergo an independent
[19] medical examination?
[20]    A.  That's correct.
[21]    Q.  In fact, the company had the right to
[22] do that in its insurance contract, is that
[23] right?

### Page 0248

[01]    A.  That's correct.
[02]    Q.  You don't take any issue with the
[03] company's right to conduct an independent
[04] medical examination?
[05]    A.  No, I do not.
[06]    Q.  And, also, as I understood you, the
[07] decision could be reached to put an insured
[08] under surveillance?
[09]    A.  Oh, indeed.
[10]    Q.  You don't question that the company
[11] has the right to conduct surveillance?
[12]    A.  Certainly not, if they feel it's
[13] indicated.
[14]    Q.  Now, surveillance has many times
[15] validated a claim, has it not?
[16]    A.  In many cases, it will, yes.
[17]    Q.  Because a camera can't lie, can it?
[18]    A.  Probably not.
[19]    Q.  Okay.  An independent medical
[20] examination can, in fact, confirm a disability,
[21] validate a disability?
[22]    A.  Well, yeah, indeed.
[23]    Q.  And that happened on occasion, did it

### Page 0249

[01] not?
[02]    A.  I'm sure it did.
[03]    Q.  Now, at the time, Dr. Feist, when the
[04] company decided to get more information, most of
[05] the time they continued to pay the claim while
[06] they continued the investigation, didn't they?
[07]    A.  That's my understanding, yes, sir.
[08]    Q.  So, they would be giving the benefit
[09] of the doubt to the insured in that situation,
[10] even though they were questioning --
[11]    A.  At least through the duration of
[12] their investigation, I am sure, yes.
[13]    Q.  Now, on most occasions, if I
[14] understood you correctly on your direct
[15] testimony, the only time you saw a particular
[16] claim would be at the round-table review?
[17]    A.  Say that -- I am not understanding
[18] the question.
[19]    Q.  Most of the time when you saw a
[20] particular claim --
[21]    A.  At the round table.
[22]    Q.  -- at the round-table review --
[23]    A.  Yeah.

### Page 0250

[01]    Q.  -- that would be your only connection
[02] with the claim?
[03]    A.  Generally so, unless a given case
[04] would some back to the round table on a
[05] subsequent meeting for maybe additional
[06] discussion or whatever, but, in essence, that's
[07] true.
[08]    Q.  All right.  And so you weren't, you
[09] weren't, like, in a reporting loop that after
[10] the surveillance is completed, send it back to
[11] Dr. Feist?
[12]    A.  No, I was not.
[13]    Q.  So, many times, you don't know what
[14] the subsequent investigation showed or what the
[15] subsequent information showed?
[16]    A.  This is true, yes.
[17]    Q.  And you don't know what these
[18] round-table claims where they got additional
[19] information, which claims ultimately stayed on
[20] the books and kept getting paid?
[21]    A.  I had no record of that, no.
[22]    Q.  You just don't know what the company
[23] ultimately did on most of the round-table review

### Page 0251

[01] claims in which you participated; is that fair?
[02]    A.  That is true.
[03]    Q.  All right.
[04]    MR. EHLINGER:  Are you at a spot
[05] where we can talk about scheduling?  I have a
[06] flight to catch.  I don't know how long you
[07] have.
[08]    MR. DAVENPORT:  I have got about
[09] another, probably pretty close to about another
[10] ten minutes.  What time do you need to leave?
[11]    MR. EHLINGER:  Well, I have got to be
[12] at the airport around 5:15.
[13]    MR. DAVENPORT:  I am close to being
[14] through.  Do you want to break now and talk
[15] about scheduling what?
[16]    MR. EHLINGER:  That's it.  I just
[17] wanted to know where you thought you were going
[18] to be.  I'm sure he has a long redirect.  Can we
[19] do this off the record?  All we're talking about
[20] is scheduling.
[21]    VIDEO TECHNICIAN:  We are off the
[22] record at 4:43 P.M.
[23]

### Page 0252

[01]    (Whereupon, a discussion was held
[02] off the record.)
[03]
[04]    (Whereupon, Mr. Ross Ehlinger is no
[05] longer present at deposition.)
[06]
[07]    VIDEO TECHNICIAN:  On the record at
[08] 4:45 P.M.  Going back off the record.  This
[09] ends video tape number 2 of this deposition.
[10]
[11]    (Whereupon, a brief recess was taken.)
[12]
[13]    VIDEO TECHNICIAN:  We are on the
[14] record at 4:52 P.M.  This begins video tape
[15] number 3.
[16]    Q.  Dr. Feist, continuing your
[17] deposition, prior to 1995, did you play a role
[18] in selecting doctors to perform independent
[19] medical examinations?
[20]    A.  No, I did not.
[21]    Q.  Prior to 1995, do you know how
[22] medical providers to do that service were
[23] selected?

## DR. WILLIAM E. FEIST    [1-25-99]

### Page 0253

[01]    A.  My recollection was that the claims
[02]  adjuster who needed an independent medical
[03]  examiner would call a national company that
[04]  provided independent medical examiners in a
[05]  locale that was needed and have them do it.
[06]    Q.  In other words, there would be
[07]  certain vendors who would assist claims
[08]  representatives --
[09]    A.  Yeah.
[10]    Q.  -- in obtaining the names of outside
[11]  doctors?
[12]    A.  Yes, sir.
[13]    Q.  Do you know how the process occurs
[14]  after you left?
[15]    A.  I have no idea.
[16]    Q.  You don't contend that there's
[17]  anything improper in having a vendor select an
[18]  outside medical consultant, do you?
[19]    A.  No, I have no problem with that.
[20]    Q.  You don't claim that Provident would
[21]  go out and try to hire only independent medical
[22]  examiners who would parrot their deposition, or
[23]  parrot its position to try to deny disability?

### Page 0254

[01]    A.  I would hope not. I have no
[02]  indication that they have.
[03]    Q.  When they find doctors, these
[04]  generally would be Board certified doctors in
[05]  their specialty?
[06]    A.  Generally a Board certified, yes,
[07]  sir.
[08]    Q.  And then the company would send to
[09]  the doctor the medical information and the past
[10]  medical information, is that right?
[11]    A.  That's correct, and sometimes x-rays
[12]  and other records. You know, basically the
[13]  medical history and records.
[14]    Q.  Okay. You don't find -- when you
[15]  were at Provident, there was nothing inherently
[16]  bad about the process of using IMEs, is that
[17]  fair?
[18]    A.  No, I think that's a given in the
[19]  process.
[20]    Q.  All right. Now, let's talk about the
[21]  reasons as to why you would want an independent
[22]  medical examination on a claim. What about a
[23]  situation where a condition appears treatable

### Page 0255

[01]  but for some reason it doesn't seem to be
[02]  getting better? In other words, the insured
[03]  should be getting well, but he's not. That
[04]  might warrant an IME, mightn't it?
[05]    A.  Yeah.
[06]    Q.  Or let's say the condition is one
[07]  which would not normally disable an individual
[08]  from his occupation?
[09]    A.  There are gray areas where that could
[10]  be helpful, yes, sir.
[11]    Q.  Or what if there would be activities,
[12]  like the insured becomes aware of activities of
[13]  the insured which are inconsistent with the
[14]  claimed medical condition?
[15]    A.  I think that's a valid reason.
[16]    Q.  Or activities that are inconsistent
[17]  with the claim disability?
[18]    A.  Indeed.
[19]    Q.  All right. Did you testify that as
[20]  far as you know, Provident has always used IMEs?
[21]    A.  During the time that I was working
[22]  at Provident, my understanding is that they did
[23]  use IMEs.

### Page 0256

[01]    Q.  Okay. Now, what about a situation
[02]  where the claims representative is receiving
[03]  inconsistent information from more than one
[04]  treating physician? Would an IME help in that
[05]  situation?
[06]    A.  IME is often helpful, yes, sir.
[07]    Q.  And you know of situations where the
[08]  company has used IMEs in these kinds of
[09]  situations I am describing?
[10]    A.  Oh, certainly, yeah.
[11]    Q.  You don't know, or have any way to
[12]  know how often the IMEs were utilized by claims
[13]  representatives, do you?
[14]    A.  Not specifically, but many times they
[15]  would ask me when I was reviewing a case, should
[16]  we get an IME, and that not only should we get one,
[17]  which specialty should we request. In other
[18]  words, is it an internist or orthopedist or
[19]  whatever the situation might be.
[20]    Q.  Okay. Let me -- with respect to the
[21]  selection of IMEs, would that -- by outside
[22]  vendors, would that also apply to the
[23]  psychiatric IMEs as well?

### Page 0257

[01]    A.  To my knowledge, it would, yes.
[02]    Q.  With respect to these round-table
[03]  reviews, I want to visit with another question I
[04]  had. Were the participants free to express
[05]  opinions? I mean, was it kind of an open panel
[06]  discussion?
[07]    A.  It was open discussion, sure. I
[08]  mean, everybody had an opportunity to speak
[09]  their mind, so to speak..
[10]    Q.  And did you know the people that
[11]  participated most of the time?
[12]    A.  Well, surely. I know them and worked
[13]  with most of them. With all of them, basically.
[14]    Q.  Were you friends with them, for the
[15]  most part?
[16]    A.  For the most part. I don't know that
[17]  anybody disliked me or vice versa.
[18]    Q.  Do you think the people tried to do a
[19]  good job for the company, for the most part?
[20]    A.  I think so, sure.
[21]    Q.  Did you frequently express your
[22]  opinions?
[23]    A.  I expressed the medical aspect of it

### Page 0258

[01]  and, many times. If there was a medical
[02]  impairment that it was apparent that the claims
[03]  adjusters or any of the other individuals
[04]  present at the meeting didn't understand, I
[05]  would get up and give a brief description of the
[06]  impairment and what it was all about.
[07]    Q.  And, then, did you give a medical
[08]  opinion from time to time?
[09]    A.  Oh, surely. I mean, that was my role
[10]  to be there.
[11]    Q.  In your prior deposition, you
[12]  testified there was never a time that you
[13]  expressed an opinion that the medical evidence
[14]  justified disability when the claims adjustor
[15]  denied the claim and refused to follow your
[16]  advice. Do you stand on that?
[17]    A.  Read that again, please.
[18]    Q.  I think it's what I read to you
[19]  earlier. It's on page 73. In fact, you
[20]  already answered the question. I went over it
[21]  with you in your prior deposition. Here's my
[22]  point. My point is simply that when you -- you
[23]  never gave advice and then the claims adjustor

## Page 0268

[01] said, "I am sorry, you are right, the guy is
[02] disabled medically, but I'm going to deny the
[03] claim anyway; I'm going to disregard your
[04] advice"?
[05]   A.   I don't recall that, no.
[06]   Q.   You can't think of a single instance
[07] where you recommended that a claim be paid at a
[08] round-table review when they said they weren't
[09] going to follow your advice?
[10]   A.   I cannot remember.
[11]   Q.   You never criticized in writing the
[12] round-table review sessions to anyone while you
[13] were at Provident?
[14]   A.   This is correct.
[15]   Q.   You never voiced an opinion during
[16] any round-table review session that you thought
[17] someone was doing something improper there?
[18]   A.   I did not, but it would not have been
[19] the appropriate place to do that.
[20]     MR. DAVENPORT:  Now, when you said,
[21] "but I did not," I move to strike that portion
[22] of your answer as being nonresponsive.
[23]   Q.   If -- if I have listened to your

## Page 0260

[01] direct testimony, as I heard what you said, and
[02] especially now in light of your cross-
[03] examination, you seem to say that while so many
[04] things that were being conducted at round-table
[05] review were proper -- have I heard you say that
[06] right?
[07]   A.   That's correct.
[08]   Q.   You think that by conducting the
[09] review, you could put another spin on it, that
[10] we are doing something to try to find a loophole
[11] or something to try to deny the claim?
[12]   A.   Oh, I think even just the fact of
[13] bringing a given case to the round table is
[14] looking to see if there can be some way to get
[15] out of paying the claim.
[16]   Q.   But as my examination, I hope, has
[17] demonstrated, even according to you, there are a
[18] number of completely proper things, proper
[19] motives, proper procedures --
[20]   A.   Oh, surely.  Surely.
[21]   Q.   -- that were performed at the
[22] round-table review?
[23]   A.   Exactly, but --

## Page 0261

[01]     MR. KENT:  Let me object to the
[02] argumentative and side bar nature of the
[03] question, predicate of the question.
[04]     MR. DAVENPORT:  What was that?  I'll
[05] restate the question.  I haven't been trying to
[06] argue with him.  I will restate the question.
[07]   Q.   If I heard your testimony correctly,
[08] you have agreed with me that there were a number
[09] of things about the round-table review process
[10] that were entirely proper?
[11]   A.   Yeah.
[12]   Q.   Is that right?
[13]   A.   I think, I think the processes are
[14] proper, but the application of those processes,
[15] in many cases, was not what I felt was proper.
[16]   Q.   Let me follow up on that, because you
[17] know, you can sit here and look at this and on
[18] one side, I can say, here are all of the
[19] legitimate reasons for raising this claim, to
[20] examine it, to answer questions.  And I can say,
[21] Dr. Feist, you know, I hear what you have
[22] testified, but you don't even know what happened
[23] on a bulk of these claims down the road.  You

## Page 0282

[01] don't know whether they were denied or whatever.
[02] Is that fair?
[03]   A.   I think we are seeing some of the
[04] evidence of these claims as we sit here.
[05]   Q.   You are seeing two claims right now
[06] that are in dispute.  Okay?
[07]   A.   Dr. Knee a year ago, Norman Knee.
[08]   Q.   I don't know Dr. Knee?  That's not my
[09] case.
[10]   A.   That's the same situation.
[11]   Q.   Well, it's not the same situation.  I
[12] read the deposition.  These are entirely
[13] different types of disabilities and disability
[14] claims.
[15]     MR. KENT:  I would object to the
[16] argumentative --
[17]   A.   I would submit that the process is
[18] the same.
[19]   Q.   You don't even know if on these
[20] claims here today, they were presented for
[21] round-table review, do you?
[22]   A.   No, I don't, but I think there's a
[23] process going on in the company that led us to

## Page 0263

[01] being here today.
[02]     MR. DAVENPORT:  I move to strike
[03] his answer after the words, "no, I don't," as
[04] being nonresponsive.
[05]   Q.   Did you ever -- who did you report to
[06] when you were at Provident in 1995?
[07]   A.   Whom did I report to in 1995?  At
[08] the time, at 1995, I reported to Bob Nash, the
[09] Vice President of Underwriting.
[10]   Q.   Did you ever, at any time, voice any
[11] complaints or concerns to Bob Nash about
[12] anything relating to the round-table review
[13] process?
[14]   A.   Well, no, I didn't, but obviously he
[15] was in the life department and he had, really,
[16] nothing to do with the claims situation.
[17]   Q.   Do you know of anyone ever being
[18] hired for expressing an opinion at round-table
[19] review?
[20]   A.   Not to my knowledge, no.  They might
[21] not have been promoted to the next level, but
[22] never fired as far as I know.
[23]   Q.   Well, you never heard Ralph Mohney

## Page 0264

[01] say anything specifically that the round-table
[02] review was to deny the claim because of the
[03] reserve, forget about the facts?  He never made
[04] statements like that?
[05]   A.   He never made that statement, but the
[06] implication was there that this is a case that
[07] we've got to really work hard on, because
[08] there's a high reserve.
[09]   Q.   When you say the implication, you are
[10] interpreting words that were said, is that fair?
[11]   A.   That's correct, but I think the
[12] implication was there.
[13]   Q.   Well, you said that you thought that
[14] some of the claims that came to round-table
[15] review were high impact claims, meaning big
[16] dollars?
[17]   A.   Big dollars, yes, sir.
[18]   Q.   And you said some of the claims had
[19] been on claim for a long period of time?
[20]   A.   There were those many times, yes,
[21] sir.
[22]   Q.   Many of the claims that were at
[23] round-table review were, in fact, put on claim

## DR. WILLIAM E. FEIST   (1-25-99)

### Page 0265

[01] back in the old days of the examinations out in
[02] the field?
[03]    A.  That's probably true.  That's
[04] probably true.
[05]    Q.  And there's nothing wrong with an
[06] insurance company auditing claims on a regular
[07] basis, is there?
[08]    A.  No, certainly not.
[09]    Q.  To make sure that the claim is being
[10] properly handled, that it's being paid if it
[11] should be paid and it's being denied if it
[12] should be denied?
[13]    A.  I would agree with that.
[14]    Q.  All right.  And you, uh, you never
[15] expressed an opinion or an objection orally or
[16] in writing to anyone at Provident about the
[17] round-table review process, is that correct?
[18]    A.  Not specifically in writing nor in
[19] verbalization, but, my demeanor, it would be
[20] obvious that I was not happy there --
[21]    Q.  Well, I mean --
[22]    A.  -- attending those meetings.
[23]    Q.  -- if you're not saying why you are

### Page 0266

[01] not happy, your demeanor might be because you
[02] are having to work at night until 9:00 and not
[03] getting paid for it.  Do you think the people at
[04] Provident are somehow mind readers and could
[05] know why you were unhappy if you refused to tell
[06] them why?
[07]    MR. KENT:  Objection to argumentative
[08] counsel narrative.
[09]    A.  That's a speculative question.
[10] Obviously, if one has been asked to work fifteen
[11] to twenty hours a week extra, with no additional
[12] remuneration, you're not going to be happy.  And
[13] if you are not happy with what you had to spend
[14] the extra time on, you tend to be unhappy.
[15]    Q.  I guess what I'm trying to get at is,
[16] you had been at Provident for a number of years.
[17] You were an officer in the company?
[18]    A.  Yes, sir.
[19]    Q.  You were well compensated?
[20]    A.  Yes, sir.
[21]    Q.  You had been treated fairly by
[22] Provident, by your own testimony, at least
[23] through, what, '83 or '95?

### Page 0267

[01]    A.  I would say probably up until the
[02] early part of '95.
[03]    Q.  Okay.  So up through the early part
[04] of '95, you really didn't have any complaints
[05] with the company?
[06]    A.  Oh, I was very happy there.
[07]    Q.  All right.  Now, sometime in the
[08] spring of '96, you are going to, you are
[09] participating in claims very actively for really
[10] the first time, is that fair?
[11]    A.  I would not say the first time.  There
[12] was a hiatus.  I did claims from 1982 to 1990
[13] on a fairly regular basis, as I indicated.  Not
[14] a big percentage, but I had my finger in the
[15] pie.  And, then, from 1990 until 1995 there was
[16] a hiatus, but Dr. O'Connell and Dr. League came
[17] through our department periodically to research
[18] cases, to discuss cases.  I -- you know, I
[19] wasn't supervising Dr. O'Connell or Dr. League,
[20] but I knew what they were doing on a day-to-day
[21] basis.
[22]    Q.  Well, here's my point.  If you
[23] thought, and you really did think while you were

### Page 0268

[01] seeing a relatively small number of claims,
[02] given the large number of claims that were being
[03] processed --
[04]    A.  Oh, indeed.
[05]    Q.  -- that there was something improper,
[06] why didn't you say something to somebody before
[07] you left?
[08]    A.  As I alluded to earlier in my earlier
[09] testimony, I needed a job.  Until I had a
[10] position ready to move to, I didn't feel like I
[11] could or should say anything.  It's just as
[12] simple as that.  I mean, I've got a family to
[13] support.
[14]    Q.  You didn't think by placing a
[15] constructive criticism, if you had a valid one,
[16] it could be addressed or answered?
[17]    A.  I think the process was going on and
[18] whatever I said would not have any input on it
[19] or any impact on it.
[20]    Q.  Well, if you didn't ask anybody, how
[21] do you know that?  You didn't talk to Ralph, you
[22] didn't talk to your supervisor.  You didn't talk
[23] to anybody to express any objection to a process

### Page 0269

[01] in which you were participating,.
[02]    MR. KENT:  Objection, argumentative.
[03]    A.  Absolutely.  I mean, it's a practical
[04] matter, sir.  I have to work for a living.  I've
[05] got a family to support.  And until I have --
[06] you know, I was actively looking for another
[07] job, if you want to know, since November of '94.
[08] And throughout the year of 1995, I may have had
[09] six interviews over the country.  Until I had
[10] this job at Protective in Birmingham, I didn't
[11] feel I could say anything, and I didn't have
[12] this job until two weeks before I put in my
[13] resignation.
[14]    Q.  Is it your testimony you started
[15] looking for a job before you started the
[16] round-table review sessions in March of '95?
[17] Did I hear you right?
[18]    A.  Well, I had one interview in November
[19] of 1994, but the subsequent interviews would
[20] have been after April of '95.
[21]    Q.  So you were looking for a job before
[22] you ever sat on a round-table review session?
[23]    A.  I had one interview.  That was just

### Page 0270

[01] sort of -- you know, but once the round table
[02] came in April of '95, I became very serious
[03] about it.
[04]    MR. DAVENPORT:  Object, move to --
[05]    A.  And one of the things about changing
[06] jobs in the insurance industry is there's
[07] licensing and all sorts of things.  I had to
[08] take an examination to get licensed in Alabama
[09] so I could take this job and you don't do that
[10] lightly.  And you don't go around, you know,
[11] saying bad things about people at your own
[12] company until you have got a job in another
[13] company in hand.
[14]    MR. DAVENPORT:  Object.  Move to
[15] strike your answer as being nonresponsive,
[16] beginning with the words, " but once the round
[17] table."
[18]    Q.  Doctor, you will admit to the jury,
[19] than, that before you ever sat on one single
[20] round-table review session beginning March of
[21] '95 that you had already --
[22]    A.  April of '95.
[23]    Q.  April of '95, that you had already

## DR. WILLIAM E. FEIST   [1-25-99]

### Page 0271

[01] had an interview?
[02]    A.   One interview, but I became serious
[03] about getting another job —
[04]    Q.   Let me finish my question.
[05]    A.   — after that April of '95.
[06]    Q.   That you had already interviewed
[07] another employer for prospective employment for
[08] somewhere other than Provident; is that
[09] accurate?
[10]    A.   That is accurate, yes, sir.
[11]    Q.   Now, that doesn't seem very
[12] consistent with some of the testimony you gave
[13] on your direct examination that the reason you
[14] were leaving Provident is because of all of
[15] these bad things that were happening on
[16] round-table review, does it?
[17]    A.   I think it's consistent, absolutely.
[18]    Q.   Why would you look for another job in
[19] November of '94?
[20]    A.   It was preliminary.
[21]    Q.   Why?
[22]    A.   Well, if you really want to know, I
[23] was — Harold Chandler had come in a year before

### Page 0272

[01] in November of '83 and I basically saw the
[02] handwriting on the wall, I am either going to
[03] have to leave this company or get another job.
[04]    Q.   Why, because they were making people
[05] work and do their jobs well?
[06]    A.   They were rifting people that had
[07] experience and bringing in younger people.
[08]    Q.   Was that the reason you started
[09] looking around?
[10]    A.   Basically if you want to know, yes.
[11]    Q.   Because they were looking for younger
[12] people?
[13]    A.   Yes.
[14]    Q.   And you figured that your number was
[15] going to come up?
[16]    A.   Were it under a court of law, I would
[17] say, yes, sir.
[18]    Q.   Well, you are in a court of law right
[19] now?
[20]    A.   I understand that.
[21]    Q.   Do you understand that the testimony
[22] you have given here today is sworn, under oath
[23] testimony?

### Page 0273

[01]    A.   Yes, sir, I know that full well.
[02]    Q.   Do you understand that you would be
[03] subject to the same penalties for untruthfulness
[04] in this proceeding as you would be in open
[05] court?
[06]    A.   Absolutely, I am fully aware of that.
[07]    Q.   Dr. Feist, talking about these
[08] disability claims, is it a fair statement that
[09] there can be legitimate disputes over a
[10] disability claim?
[11]    A.   Oh, absolutely. That's the whole
[12] point of the thing.
[13]    Q.   You know that there can be disputes
[14] among lawyers over the law?
[15]    A.   I know that well.
[16]    Q.   You know that there can be disputes
[17] among good doctors that simply have different
[18] medical opinions?
[19]    A.   Oh, indeed.
[20]    Q.   A great deal of determining whether
[21] an insured is disabled is in this gray area, is
[22] it not?
[23]    A.   Oh, absolutely, yeah.

### Page 0274

[01]    Q.   And sometimes insureds aren't
[02] entirely candid with you in the claims process,
[03] are they?
[04]    A.   I think the great majority are very
[05] candid and honest. Granted, there are some who
[06] are not. There are systems and procedures in
[07] the process to weed out those that are
[08] fraudulent and to verify those who are
[09] legitimate.
[10]    Q.   All right. Have you ever known an
[11] insured to exaggerate subjective claims in the
[12] disability process?
[13]    A.   Of course.
[14]    Q.   Because it's in their interest to do
[15] so, isn't it?
[16]    A.   Sometimes it is, yes.
[17]    Q.   Now, where there are disputes over
[18] claims, do you think that Provident, just as
[19] much as a claimant, has a right to have a
[20] legitimate dispute determined by a jury in a
[21] court of law?
[22]    A.   Absolutely, that's why we are here. I
[23] mean, that's why we are here. Absolutely.

### Page 0275

[01]    Q.   Do you think Provident has ever
[02] correctly denied a claim?
[03]    A.   Has ever correctly denied a claim?
[04]    Q.   Yes.
[05]    A.   Oh, I'm sure they have.
[06]    Q.   Do you believe that great majority of
[07] claims that Provident denied should have in fact
[08] been denied under the contract or the applicable
[09] facts.
[10]    MR. KENT: I object to the question,
[11] because it calls for speculation as to claims he
[12] has not any knowledge of.
[13]    Q.   Do you believe that the company
[14] basically — do you think Provident is basically
[15] a good company?
[16]    A.   Oh, I think they basically are a good
[17] company. I think there are some cases where
[18] they shade the — walk the line.
[19]    Q.   Given the number of claims that are
[20] processed and handled, the number of claims that
[21] are paid, the number of claims that are denied,
[22] is it inevitable that some of those claims are
[23] going to wind up in the courthouse?

### Page 0276

[01]    A.   Obviously.
[02]    Q.   Do you think that every time a claim
[03] is denied a suit is filed?
[04]    A.   Oh, I'm sure there isn't.
[05]    Q.   Would you be surprised, Doctor, that
[06] in virtually every single claim that Provident
[07] denies where a claimant hires a lawyer, at least
[08] in Texas, that the insured always claims that
[09] Provident committed bad faith in some form or
[10] another in denying the claim?
[11]    A.   Absolutely, I'm sure that's true.
[12]    MR. KENT: Objection as to
[13] speculation on things he knows nothing about.
[14]    Q.   Do you think that Provident life has
[15] ever denied a claim relying on a contract where
[16] it does not act in bad faith?
[17]    A.   Where it does not act in bad faith?
[18]    Q.   Yes. Do you think it can deny a
[19] claim and just say there's a dispute over this,
[20] we don't think it's payable, without doing
[21] something sinister or doing something bad?
[22]    A.   That's purely speculation, but I'm
[23] sure that's true.

# Foshee & Turner
### REGISTERED PROFESSIONAL REPORTERS

1

1   NORMAN S. KNEE, D.O.,

2        Plaintiff.

3                          CIVIL ACTION NO.:

4                          CV-97-3771

5

6   PROVIDENT LIFE AND ACCIDENT INSURANCE

7   COMPANY,

8        Defendant.                    COPY

9

10       DEPOSITION OF WILLIAM FEIST, M.D.

11

12       The deposition of WILLAIM FEIST,

13   M.D. was taken before Jason Cohran on

14   the 8th Day of December, 1997, at the

15   offices of Foshee and Turner, 2001 Park

16   Place North, Suite 220, Park Place

17   Tower, Birmingham, Alabama, commencing

18   at 4:00 p.m., pursuant to the

19   stipulations set forth herein:

20

21

22

23

1         DEPOSITION OF WILLIAM FEIST, M.D.

2

3        In accordance with Rule 5 (d) of

4   The Alabama Rules of Civil Procedure,

5   as Amended, effective May 15, 1988, I,

6   JASON COHRAN, am hereby delivering to

7   ANDREW L. MILLER, the original

8   transcript of the oral testimony taken

9   on the 8th Day of December, 1997, along

10  with exhibits.

11       Please be advised that this is the

12  same and not retained by the Court

13  Reporter, nor filed with the Court.

14

15

16

17

18

19

20

21

22

23

1    claims reviews, and I spent about 15-20

2    hours a week visiting pretty much

3    one-on-one with the claims adjusters.

4    They would have a case and they would

5    come and discuss it with me.

6        Q.    Did you have any contact with

7    claims prior to that time?

8        A.    Very minimal.  Somewhere

9    about 1989-90, the disability income

10   section hired sort of a dedicated

11   physician to work in their area.  And

12   initially, that physician reported to

13   the medical director, but somewhere

14   between '89 and '95, the actual date

15   escapes me, the physician in the

16   accident department or disability

17   income department reported to the vice

18   president of claims and was not

19   reporting to the medical director, the

20   corporate medical director.

21        So, at that point, I was really

22   out of the loop, but then when I was

23   asked to step back in in the Spring of

**Foshee & Turner**
REGISTERED PROFESSIONAL REPORTERS

22

1    '95, I was sort of assisting that

2    physician.  He had his own

3    responsibility and I was sort of

4    helping him with some of the other

5    cases that he couldn't get to so to

6    speak.

7         Q.    When you were associate

8    medical director, beginning in 1985 --

9    strike that.  In 1982, you were hired

10   as assistant medical director?

11        A.    That's sort of the entry

12   level at that time, sort of the low man

13   on the totem pole, if you will.

14        Q.    That's the answer to my next

15   question.  As assistant medical

16   director, were you responsible for the

17   supervision of any other physician?

18        A.    No, at that point in time, it

19   was just sort of like you paid your

20   dues and got the promotion.

21   Unfortunately, there was no added

22   salary to that, just a little nicer

23   thing on your resume.  The duties did

1    guess they just dropped it as I recall.

2        Q.   Do you recall any times when

3    you recommended that a claim be paid

4    and a decision was made to deny it

5    nonetheless?

6        A.   I don't have any recollection

7    of that.  Generally, my role was to

8    give the medical part of it and the

9    administrative part, really.  I had no

10   control over it.

11       Q.   I'm not sure if that answered

12   my question.  My question is, do you

13   recall a time where you believe a claim

14   should have been paid, but it was

15   denied regardless of your --

16            MR. MILLER:  Objection.  The

17   doctor answered.  He says he doesn't

18   recall any such event.

19       A.   No, I don't recall.  I would

20   have to say that my role was to look at

21   the medical input and give the medical

22   part of it, and beyond that, it was

23   administrative.  I really had little

# Foshee & Turner
### REGISTERED PROFESSIONAL REPORTERS

74

1    opportunity to make a statement one way

2    or the other.

3        Q.    Actually, you mentioned a

4    second ago that Ralph Mohney would look

5    for anything he could find or look for

6    all the stones and turn them over, and

7    if he couldn't find anything, then the

8    claim would be dropped.  When you say

9    he was looking for stones, what exactly

10   do you mean by that?

11       A.    Well, I think he was looking

12   for any modality that he could think

13   of, you know, some legal loophole, for

14   example, proving that the attending

15   physician who was writing the

16   disability verification reports was

17   taking payoffs from the claimant,

18   suggesting surveilance, IMEs, just

19   anything you could think of it seemed

20   to me.

21       Q.    Do you think there is

22   anything inappropriate about sending a

23   claim in for an independent medical

## <u>CERTIFICATE OF SERVICE</u>

I, E THOMAS HENEFER, ESQUIRE, certify that on this date, I

served a certified true and correct copy of the foregoing Memorandum of Law

upon the following counsel of record, by first class mail, postage prepaid,

addressed as follows:

                    Richard C. Angino, Esquire
                    4503 North Front Street
                    Harrisburg, PA  17110-1708

                          E. Thomas Henefer

Date:  December 11, 2002

SL1 313781v1/10305.060