ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

VINCENZO MAZZAMUTO,           :    CIVIL ACTION
            Plaintiff,          :    NO. 1:CV-01-1157
                      :
    v.                   :
                      :
UNUM PROVIDENT                :    JUDGE CONNER
CORPORATION, et al.,          :
            Defendants          :

FILED
HARRISBURG, PA

DEC 1 2 2002

MARY E. D'ANDREA, CLERK
Per _____
             Deputy Clerk

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S MOTION TO ADD ADDITIONAL AUTHORITY IN
SUPPORT OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Dated:  December 11, 2002      STEVENS & LEE

By _E. Thomas Henefer_
    E. Thomas Henefer
    Attorney I.D. No. 55773
    111 North Sixth Street
    P.O. Box 679
    Reading, Pennsylvania  19603
    (610) 478-2000

    Attorneys for Defendants

## I.   INTRODUCTION

Defendants hereby oppose plaintiff's motion to add additional authority in support of his motion for summary judgment and in opposition to defendant's motion for summary judgment.

## II.   PROCEDURAL HISTORY

Plaintiff alleges claims for bad faith, under 42 Pa. C.S.A. § 8371, and breach of contract arising from the denial of his claim for disability benefits.  The deadline for summary judgment motions has passed and all of the briefing allowed by the Local Rules has been completed.

Now, several months after the parties have completed extensive summary judgment briefs, plaintiff has filed a motion to add additional authorities to his summary judgment papers.  Although his purpose is unclear, it appears that this is another effort by plaintiff to shift the focus away from his inability to satisfy his own burden of proof by alleging that defendants are bad companies engaged in some vast conspiracy to deny claims.  Thus, plaintiff now asks the Court to consider ten additional cases in which a court awarded some form of relief to a plaintiff claiming benefits from one or more of the defendants.

Notably, this is not a case where a party wants to advise the Court of some new case law that was unavailable as of the date the parties filed their summary judgment papers.  Instead, only <u>one</u> of the ten cases plaintiff identifies was decided after the parties had finished their summary judgment briefs.

## III. FACTUAL HISTORY

### The Facts On Plaintiff's Own Claim Support Defendants' Position

As outlined in detail in defendants' summary judgment brief, plaintiff claims he is disabled by back and psychological problems. The critical issue is whether he can perform his occupational duties as a restaurant owner. For years he consistently described those duties as sedentary:

- "[E]xecutive, office duties only" (Sum. Judgment Appendix, Exh. B at 330).
- "[M]anage employees, work schedules; book work; deal with food companies; phone; and administration and office duty" (Id. at 42-43).
- "Executive - 50%" and "Office - 50%" (Id. at 549).
- He "occasionally" had to lift or carry five-pound objects (Id. at 539).
- He had to sit for 3.5 total hours (as opposed to at a time), stand for 3.5 hours and walk for 1 hour (Id.).

The undisputed facts do not support plaintiff's claim that he cannot perform his occupational duties. Indeed, even Dr. Bower conceded -- among other things -- that if plaintiff's back was the only problem (as his "expert" Mr. Rose contends), he could perform the occupational duties he described to Paul Revere (i.e., 20% bookkeeping, 20% office duties and 60% supervising employees). (Id., Exh. G at 54-57 and 59).

Also instructive are plaintiff's non-occupational activities, such as Internet stock trading (which plaintiff has predictably tried to exclude from evidence), which prove that he can perform his occupational duties. While plaintiff claims it is too stressful for him to do bookkeeping, pay bills and order supplies, he engaged

2

in close to $6 million in stock trades in 2000 alone. (<u>Id.</u>, Exh. C at 49-51; Exh. I). Plaintiff made these investment decisions on his own, followed the market closely and made his trades by computer. (<u>Id.</u> at 49, 53-54). Many stocks were held for as little as a day or two. (<u>Id.</u> at 49). And, while plaintiff claims working at his restaurant is too stressful, he says losing over $375,000 in two years in stock trades did not bother him, or make him either anxious or angry. (<u>Id.</u> at 54).

### Plaintiff's Latest Effort To Shift The Focus Away From His Claim

Plaintiff has made a series of attempts to shift the focus away from his own dubious claim. This is the latest effort in which plaintiff now wants to address other cases by other claimants. None of the cases have anything to do with this case; nor do they establish any significant point of law concerning disability insurance policies. Rather, plaintiff's goal in raising these cases appears to be, at best, to distract the Court's attention from the shortcomings of his own case or, at worst, to suggest that defendants are bad companies in an effort to bias the Court's view of the case. As explained below, the Court should reject plaintiff's untimely effort to interject irrelevant case law into this case.

## IV. ARGUMENT

### A. UNTIMELY AND IRRELEVANT AUTHORITY SHOULD NOT BE USED TO SHIFT THE FOCUS FROM THE SHORTCOMINGS OF PLAINTIFF'S CASE

Plaintiff wants to distract the Court from the facts of this case because he cannot satisfy his burden of proof for "total" disability benefits of proving that he

SL1 314857v1/10305.060

"cannot perform any of the important duties of his position." Russell v. Paul Revere Life Ins. Co., 288 F.3d 78, 82 (3d Cir. 2002)(emphasis added). Russell undermines plaintiff's claim thoroughly because the facts show that he has the ability to perform -- at least -- many of his occupational duties (such as bookkeeping and office duties) but has not returned to work. Thus, under Russell, plaintiff is entitled to neither total nor partial disability benefits. Id. at 82 ("As for benefits on partial disability, they are not payable unless the insured is working.").

Plaintiff has tried several strategies to deal with Russell such as ignoring it altogether and subsequently claiming it is irrelevant because it is an ERISA case. But, as defendants noted, the applicable part of Russell is not the ERISA arbitrary and capricious standard of review but the holding which involves plaintiff's contractual burden of proof and contract interpretation.[1]

Plaintiff's most recent strategy is to focus on cases by other claimants which have nothing to do with his case. As explained below, irrelevant case law will not help plaintiff satisfy his burden of proof.

## B. PLAINTIFF'S UNTIMELY AUTHORITIES SHOULD BE REJECTED

Plaintiff's motion essentially asks the Court to ignore the Local Rules on briefing for summary judgment motions. As the Court is aware, the Local Rules

---

[1] Russell v. Paul Revere Life Ins. Co., 148 F. Supp. 2d 392, 404-05 (D. Del. 2001) (finding that "the policy language places upon the employee the initial burden to demonstrate that he or she can not perform any of the important duties of his position") aff'd, 288 F.3d 78 (3d Cir. 2002); see also Gallagher v. Reliance Standard Life Ins. Co., 305 F.3d 264 (4th Cir. 2002); McOsker v. Paul Revere Life Ins. Co., 279 F.3d 586, 588 (8th Cir. 2002); Yahiro v. Northwestern Mutual Life Ins. Co., 168 F. Supp. 2d 511, 517-518 (D. Md. 2001).

prescribe certain limited time periods for briefing summary judgment motions. See Local Rules 7.5, 7.6 and 7.7. There is no good cause to allow plaintiff to essentially re-write his legal argument by submitting ten new cases to the Court long after the briefing deadlines have passed. This is especially true where (a) only one of the ten cases was decided after the parties' summary judgment briefs were filed; and (b) none of the cases are relevant. For these reasons alone, the Court should deny plaintiff's motion.

## C.  PLAINTIFF'S "NEW" AUTHORITIES ARE IRRELEVANT

Disability disputes are determined by the applicable policy language, the applicable case law <u>and the facts which are unique to each claim</u>. Because the law is ascertainable and the policy provisions often do not vary significantly from case to case, the key issues are usually factual.  Indeed, the factual issues can involve issues such as the plaintiff's medical condition and records; the plaintiff's prior occupation; the plaintiff's education, training or experience; steps an insurer took to investigate a particular claim; and conversations between the insurer's representatives and the insured or others.  Simply put, from a factual perspective, no two disability claims are the same.

Accordingly, unless a particular case contains a legal holding germane to the case before the court, or has some particular factual analogies (i.e., how have courts construed a plaintiff's burden of proof in other cases involving illnesses of the same nature as the plaintiff's in the present case), cases about other disability

claims can have very little relevance to the dispute before the Court. For example, while plaintiff cites ten cases in which a court ruled against one or more of the defendants here, defendants can just as easily cite numerous recent cases in which courts have ruled in defendants' favor (or in favor of other UNUMProvident companies).[2]

Simply because defendants can cite cases where they have prevailed, does not mean that they should prevail here. Rather, they should prevail here because, as outlined above, plaintiff cannot satisfy his burden of proof under the policy and applicable law. Similarly, just because plaintiff compiled a list of decisions where a ruling adverse to the defendants was made does not mean he should prevail here, especially when he cannot satisfy his burden of proof.

Indeed, the cases plaintiff cites have no relevance to this case. For example, the vast majority of the cases turned on factual issues which were unique to the

---

[2] A simple LEXIS search for recent cases, which are by no means exclusive, reveals the following recent cases (attached hereto as exhibit A): Russell v. Paul Revere Life Ins. Co., 288 F.3d 78 (3d Cir. 2002)(affirming entry of summary judgment for Paul Revere); Pappas v. UNUM Life Ins. Co. of America, 2000 U.S. Dist. LEXIS 11308 (E.D. Pa. Aug. 10. 2000), aff'd, 261 F.3d 492 (3d Cir. 2001), cert. denied, 534 U.S. 1129 (2002)(affirming dismissal of bad faith and other state law claims under Rule 50); Brandi v. Good Lad Co. LTD Plan and Paul Revere Life Ins. Co., 1999 U.S. App. LEXIS 11974 (2d Cir. 1999)(affirming entry of summary judgment for Paul Revere); Sell v. UNUM Life Ins. Co. of America, 2002 U.S. Dist. LEXIS 22472 (E.D. Pa. Nov. 19, 2002)(granting summary judgment to UNUM Life Ins. Co. of America); Maniatty v. UNUMProvident Corp., 218 F. Supp. 2d 500 (S.D. N.Y. 2002)(granting summary judgment to UNUM Life Ins. Co. of America); Hevener v. Paul Revere Life Ins. Co., 2002 U.S. App. LEXIS 15893 (E.D. Pa. Aug. 26, 2002)(entering summary judgment for Paul Revere); Walker v. LTD Plan of Sponsor Tri-Valley Growers and UNUM Life Ins. Co., 2002 U.S. Dist. LEXIS 5035 (N.D. Cal. Mar. 25, 2002)(entering summary judgment for UNUM Life); Cardiner v. Provident Life and Acc. Ins. Co., 158 F. Supp. 2d 1088 (C.D. Cal. 2001)(dismissing bad faith claim under Rule 56); Hyatt v. UNUM Life Ins. Co. of America, 2001 U.S. Dist. LEXIS 10366 (D. Del. July 11, 2001)(applying de novo review under ERISA and entering summary judgment for UNUM Life Ins. Co. of America); Alford v. DCH Foundation Group and UNUM Life Ins. Co., 144 F. Supp. 2d 1183 (C.D. Cal. 2001)(entering summary judgment for UNUM Life); Reinersten v. Reid Psychological Systems and Paul Revere Life Ins. Co., 127 F. Supp. 2d 1021 (N.D. Ill. 2001)(applying de novo review under ERISA and entering summary judgment for Paul Revere); Redden v. UNUM Life Ins. Co., 2000 U.S. Dist. LEXIS 996 (D. Del. Jan. 18, 2000)(entering summary judgment for UNUM Life); Cini v. Paul Revere Life Ins. Co., 50 F. Supp. 2d 419 (E.D. Pa. 1999)(entering summary judgment for Paul Revere).

case, either because the Court disagreed with how the defendants evaluated the facts of a particular claim (such as <u>James</u>, <u>Stender</u>, <u>Dishman</u> and <u>Lain</u>),[3] or found that factual issues were in dispute so summary judgment could not be granted (such as <u>Cerni</u>, <u>Walker</u> and <u>Brosnan</u>).[4]

Other cases are not even summary judgment cases or rulings on the merits of a claim. For example, in <u>Cake</u>, the Court considered the defendant's motion to dismiss under Rule 12(b)(6) (which was granted in part). In <u>Soll</u>, the Court considered a series of evidentiary issues on motions in limine and did not pass on whether the denial of benefits was appropriate.

Plaintiff apparently cites one of the cases (<u>Brennan</u>) because the Court denied a motion to exclude testimony of Dr. Feist, a former Provident employee whose deposition transcripts plaintiff has sought to introduce in another motion. But other courts have disagreed and found Dr. Feist's testimony irrelevant or insufficient to raise a genuine issue of material fact under Rule 56. <u>Hyatt v. UNUM Life Ins. Co. of America</u>, No. 00-613-JJF, 2001 U.S. Dist. LEXIS 10366, at *14 n.7 (D. Del. July 11, 2001); <u>Yumukoglu v. Provident Life and Acc. Ins. Co.</u>, 131 F. Supp. 2d 1215, 1227 (D. N.M. 2001).

These cases are in accordance with Pennsylvania cases which hold that evidence of other claims are not relevant to bad faith claims under Pennsylvania

---

[3] <u>James</u> involved claim decisions dating back to 1993.
[4] In <u>Walker</u>, defendant's summary judgment motion was granted in part and denied in part. In <u>Cerni</u>, the Court found disputed issues of fact based on, among other things, the plaintiff's conduct and credibility.

7

law. E.g., <u>Cantor v. Equitable Life</u>, 1998 U.S. Dist. LEXIS 8435 at * 10-11 (E.D. Pa. 1998); <u>Kaufman v. Nationwide Mutual Ins. Co.</u>, 1997 U.S. Dist. LEXIS 18530 at * 6 (E.D. Pa. 1997); <u>Shellenberger v. Chubb Life</u>, 1996 U.S. Dist. LEXIS 2375 (E.D. Pa. Feb. 22, 1996); <u>North River Ins. Co. v. Greater New York Mutual Ins. Co.</u>, 872 F. Supp. 1411 (E.D. Pa. 1995).

In short, plaintiff's motion shows little more than the fact that with insurance companies the size of the UNUMProvident companies, there will be lawsuits (even though the percentage of claims ending up in litigation is very small) which will sometimes result in judgments for insureds and other times for the insurer. This conclusion is unremarkable and the Court should deny plaintiff's motion and not allow him to cloud the issues in the case with irrelevant and untimely authority.

## V.    CONCLUSION

For the reasons set forth above, the Court should deny plaintiff's motion to add additional authority.

Dated:  December 11, 2002          STEVENS & LEE

                                   By _____
                                   E. Thomas Henefer
                                   Attorney I.D. No. 55773
                                   111 North Sixth Street
                                   P.O. Box 679
                                   Reading, Pennsylvania  19603
                                   (610) 478-2000

                                   Attorneys for Defendants

3RD CASE of Focus printed in FULL format.

WILLIAM R. RUSSELL, III, Appellant v. PAUL REVERE LIFE INSURANCE COMPANY
No. 01-2824
UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT
288 F.3d 78; 2002 U.S. App. LEXIS 4732; 27 E.B.C. 2709

March 5, 2002, Argued
March 22, 2002, Filed

SUBSEQUENT HISTORY: [**1] The Publication Status of this Document has been Changed by the Court from Unpublished to Published April 22, 2002.

PRIOR HISTORY: Appeal from the United States District Court For the District of Delaware. D.C. No.: 96-cv-00474. District Judge: Honorable Gregory M. Sleet.

*Russell v. Paul Revere Life Ins. Co., 148 F. Supp. 2d 392, 2001 U.S. Dist. LEXIS 8816 (D. Del. 2001).*

DISPOSITION: Affirmed.
CASE SUMMARY

PROCEDURAL POSTURE: Plaintiff, an employee, sued defendant, the insurer, seeking review of the insurer's denial of his claim for long-term disability benefits pursuant to the Employee Retirement Income Security Act of 1974, *29 U.S.C.S. § 1001* et seq. The United States District Court for the District of Delaware granted the insurer summary judgment. The employee appealed the judgment.

OVERVIEW: The employee challenged the district court's standard review of the long-term disability policies, arguing that the district court should have employed a de novo standard of review rather than an arbitrary and capricious, deferential standard of review. Based on the language in the policies, the district court appropriately concluded that the policy provisions for residual disability benefits disclosed an expectation that the employee was to continue to work in some capacity and that the employee had the initial burden to demonstrate that he was unable to perform any of the important duties of his position before he was entitled to total disability benefits. Since the district court had carefully considered the employee's arguments, including the conflict of interest in the part of the plan administrator, it had not erred in granting summary judgment to the insurer.

OUTCOME: The judgment was affirmed.

CORE TERMS: duties, administrator, total disability, occupation, pain, deference, insurer, symptoms, disability, chronic, travel, arbitrary and capricious, conflict of interest, disability benefits, standard of review, documentation, eligibility, sedentary, insured, summary judgment, claimant, medical evidence, discretionary, surveillance, frequent, ceased, opined, capricious, modified, discretionary authority

CORE CONCEPTS -

COUNSEL: John M. Stull (Argued), Wilmington, DE. Edmond D. Johnson, The Bayard Firm, Wilmington, DE, Counsel for Appellant.

Mark E. Schmidtke (Argued), Hoeppner, Wagner & Evans, Valparaiso, IN. Gerald E. Burns, Klett, Rooney, Lieber & Schorling, Philadelphia, PA, Counsel for Appellee.

JUDGES: Before:   SCIRICA, ROSENN, Circuit Judges, and WARD, * District Judge.

* Honorable Robert J. Ward, United States District Court for the Southern District of New York, sitting by designation.

OPINIONBY: ROSENN

OPINION: [*79] OPINION OF THE COURT

ROSENN, Circuit Judge:

William R. Russell, III, claims that he sustained total disability while employed by Corporate Property Investors, Inc. (CPI), as a real estate asset manager. At the time, he was covered by both an individual policy for management employees and a group policy as an employee benefit plan. Both policies included a disability benefit, each covering 40% of the employee's salary and each issued by the Paul Revere Life Insurance Company

(the Insurer or Company). [**2] As a result of an alleged disability, Russell ceased active employment and applied for disability status under both policies.

The insurer initially approved the benefits but about a year later it discontinued them on the ground that Russell no longer met the total disability definition of both policies. Following denial of his claims and his appeals pursuant to the plans, Russell sued the insurer in the United States District Court for the District of Delaware pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 -1461 seeking review of the insurer's denial of his claim for long-term disability benefits. The defendant insurance Company moved for summary judgment and the District Court granted the motion. The plaintiff, Russell, timely appealed. We affirm.

I.

Russell alleged in his complaint that he was employed by CPI in March 1990 as a Vice President and within the next two years became a participant in the Company's Individual Limited Plan and in its Group Limited Plan. He further alleged that the defendant Company is a fiduciary of both plans with discretionary authority to determine eligibility for benefits. As Vice[**3] President - Asset Manager, his duties included, inter alia, "overseeing a portfolio of commercial real estate properties located in the states of New Jersey, California, and Washington." This, he claims, required him to travel from his office in New York approximately 25% of his time. In his Statement for Disability Benefits to the Company, Russell stated that he applied approximately 25% of his 40 hour week to coordinating the activities of various persons involved in the leasing and management of each property, and reviewing budgets, marketing plans and property appraisals for each property, including frequent travel to each property site. He also indicated that he spent 10 to 15 hours per week coordinating the work of in-house and outside personnel associated with this effort. Finally, he represented that about 5 to 10 hours per week were allocated to financial analysis, mortgage financing, selling, or purchasing additional interests. His claim designated his occupation as sedentary, which was defined as involving sitting, walking, or standing, and lifting objects between zero and 10 pounds. The Company did not dispute Russell's characterization of his duties.

In March 1995, at[**4] age 37, Russell filed a disability claim with defendant requesting total disability benefits under the Group and Individual Limited plans. Both policies essentially provide that an eligible employee is entitled to disability payments if "(1) because of injury or sickness, you cannot perform the important duties of your own occupation; and (2) you are under the regular care of a doctor; and (3) you do not work at all." The Company approved benefits under both plans retroactive to April 23, 1995. However, it ceased payment of the benefits under both policies on January 16, 1996, concluding that Russell no longer met the definition of total disability under either of them.

[*80] In the District Court and in his complaint, Russell claimed that he suffers from a complex set of symptoms involving chronic pain in his back, chest, upper right abdominal quadrant, muscle and joint pain, as well as digestive symptoms involving frequent painful eructation.

The District Court applied an arbitrary and capricious standard of review with a high level of deference to the Administrator but modified to the extent that the deference was not absolute. It therefore limited that review to the record before the[**5] *Administrator. Mitchell v. Eastman Kodak Co., 113 F.3d 433, 440 (3d Cir. 1997)*. The Court also noted that because the Company was the Plan Administrator, it had a conflict of interest. The Court, therefore, accorded the Administrator's decision "somewhat less deference."

Russell's claims to the Administrator were supported by written statements of his treating physicians, Dr. Frank Petito and Dr. Lucinda Harris. Both opined that Russell was "continuously unable to perform in his/her occupation." Dr. Harris, however, in a letter dated April 5, 1996, stated that she believed he was "capable of doing sedentary office work that does not require any heavy lifting or any extensive travel." She reiterated also that he suffers "chronic pain and believes him to be unable to do the level of work which he was doing prior to this chronic pain syndrome."

The language of both policies provides that the Company reserved the right to require "additional" or "continuing" proof of loss in order to continue paying benefits. The Company conducted a periodic review of the disability evidence, progress reports and activities check. Based on this review, it ceased payment of benefits under[**6] both policies on January 16, 1996.

The January 16, 1996, Company letters terminating benefits advised Russell that it was "unable to determine any restrictions and/or limitations that would prevent [him] from returning to [his] sedentary occupation." The Company specifically noted that Russell's complaints of "chronic abdominal pain, combined with periodic nau-

sea; as well as frequent muscle and joint pain . . . and an inability to work long hours," coupled with the medical information submitted by his attending physicians and the activities check, do not support a finding of total disability. The District Court agreed.

The District Court specifically found that the vast majority of the supporting claim documentation did not support a finding of total disability. The Court found that the medical examinations consistently were unable to find a cause of Russell's symptoms and that most of the examination results were "negative" or "normal." Although the Court found that an objective view of all the medical evidence supported the conclusion that Russell suffered chronic pain prior to his resignation from CPI, it also believed that Russell's tests and examinations were "persuasively[**7] captured" in Dr. Rand Compton's letter of March 14, 1994, to Dr. Petito, stating in pertinent part:

Besides his pain, there are no symptoms or signs that suggest a disease process. All of the laboratory tests done here and elsewhere have been completely normal, and given the chronicity of his problem, it is our opinion that there is no significant pathology that can account for his pain symptoms.

Dr. Compton, an independent consultant of the Mayo Clinic, had previously written a letter dated March 11, 1994, stating that multiple CT scans, ultrasounds, and accompanying laboratory tests failed to reveal any pathology or significant abnormalities. Dr. Compton's associate, Dr. Bruce, made a similar assessment in April [*81] 1994 in her letter to Dr. Petito, but stated that Russell was "quite fixed in his belief that he has a serious disease."

The District Court scrutinized the medical evidence presented by both parties, carefully analyzing the documentation of the treating physicians. Recognizing that Dr. Petito's overall assessment "would appear to support the finding of total disability," the Court also noted that Dr. Petito's report specifically referred to "extended hours" [**8] of work and "extensive travel" as the only important job duties that were precluded by Russell's "diminished" capacity. The Court also concluded that Dr. Harris's opinion suggested a disabling condition requiring accommodation as opposed to a cessation of all job related activities. Specifically noting that the opinion of Russell's attending physician should be given significant weight, the Court also considered the extensive body of medical documentation (70-plus documents) in support of Russell's claim. The Court observed that the vast majority of this documentation provides no diagno-

sis for Russell's symptoms and does not support a finding of total disability. Looking objectively at the medical evidence and the policy terms, the Court found it difficult to conclude that Russell was totally disabled from performing his duties as Real Estate Asset Manager.

In addition, the Court considered Russell's admitted level of participation in non-job related activities as inconsistent with a finding of total disability. Company-authorized surveillance of Russell's non-job activities revealed to the Court, as well as the Plan Administrator, that his hunting activities, although intermittent, [**9] required a level of exertion greater than that required by his important sedentary activities. Further, evidence of his errand running, loading and unloading baggage of various sizes, attending computer classes of several hours duration, also raised doubts of the severity of Russell's disabling condition.

Finally, the Court did not find that at any one time Russell was precluded from performing all of his important duties as defined under the Individual and Group policies. The Court concluded that an arbitrary and capricious standard, carefully administered, was not inappropriate and that under that standard summary judgment should be granted for the defendant Company.

II.

On appeal, Russell challenges the Court's standard of review of the policies, arguing that the "discretionary language in the plan document that provides only an inferential discretionary basis to support an application of the use of deferential, arbitrary and capricious standard of review" should result in the use of a de novo, factual, and procedural analysis of the decision of the Plan Administrator. He also argues that even under an arbitrary, capricious and deferential standard, the Plan Administrator's decision[**10] must be "reasonable," free of procedural errors, and supported by substantial evidence. Furthermore, he contends that where the insurer issues policies on which the disability determinations are made and the insurer actually makes the decision as to disability status and bears the costs thereof, there is a "structural conflict."

Finally, Russell asserts that there is ambiguity in the policy language with respect to disability benefits that mandates the use of the doctrine of contra preferentem as a rule of contractual interpretation. This doctrine, he argues, requires the ambiguous terms of the policies "be construed most strongly against the drafter of the insurance policy."

[*82] The District Court acknowledged that, under ERISA, review of the administrator's denial of benefits is generally de novo review. However, where the terms of the plan reserve to its administrator's discretion the determination of a claimant's eligibility for benefits, the administrator's decision is subject to review under the arbitrary and capricious standard this Court enumerated in *Mitchell, 113 F.3d at 437.* Where the administrator's decision is confronted with a potential conflict of interest,[**11] as it is in this case, the Court opined that the conflict must be considered in issuing the degree of deference to be given to his decision.

In his exhaustive and carefully crafted opinion, District Court Judge Sleet first examined the discretionary language of the plan. He noted that the Administrator's discretion to interpret the policy and determine the eligibility of applicants for benefits was reasonably inferred from the policy terms. Moreover, Russell conceded in his amended complaint that the Company was a fiduciary under both policies "with discretionary authority to determine the eligibility of benefits."

Because of the conflict of interest of the Plan Administrator with its obligation to pay the benefits due a claimant under the policies, Russell urged the District Court to accord little or no deference to the Administrator's decision. The Court acknowledged that a conflict of interest existed in this case and that a modified or heightened arbitrary or capricious standard of review was appropriate. Applying this standard and examining the policies as a whole, the District Court reasonably looked at the facts to determine the appropriate amount of deference. The Court concluded[**12] that Russell had to prove that he could not perform any of the important duties of his occupation. In scrutinizing the policy terms, the District Court noted that among the terms of both policies were provisions for residual disability benefits. They applied to insureds who can perform some of their occupational duties.

Taken as a whole, the Court appropriately concluded that these provisions disclose an expectation that the insured will continue to work in some capacity in his occupation unless the insured cannot perform any of the important duties of his job. The Court therefore found, inter alia, that "the policy language places upon the employee the initial burden to demonstrate that he or she can not perform any of the important duties of his position."

Although Russell seems to acknowledge that he can perform some of the important duties of his occupation, he contends that if he is unable to perform one of those duties, he is totally disabled and entitled to benefits accordingly. However, the policies provide for full benefits upon total disability. As for benefits on partial disability, they are not payable unless the insured is working. Russell had resigned and was not working. [**13] Russell had not provided any basis for the payment of full benefits in the face of evidence that he is able to perform some of the important duties of his occupation but elected not to work at all and spend his time in non-occupational tasks. Turning to the Residual Disability section of the policies, the Court rationalized that it provided for an expectation that a partially disabled employee "will continue to work, in some capacity, in his or her occupation."

In support of the Administrator's decision that Russell was, at the most, only partially disabled, the Labor Market Report prepared by Pembroke Associates identified job opportunities in Russell's occupation in Wilmington, Delaware, that would relieve him of the extensive travel that he and his treating physician found unduly burdensome. The Plan Administrator [*83] had submitted the claimant's file to three independent consulting doctors, each of whom opined that Russell was capable of performing some of his occupational duties and work, at least on a part time basis.

The District Court also carefully considered Russell's argument that the decision of the Plan Administrator should be reversed because it committed procedural irregularities[**14] with respect to the surveillance tapes. The District Court found that the Company "substantially complied with the requirements of the applicable regulations, and performed a 'full and fair review' commensurate with [the policies]." We agree.

III.

In summary, the District Court gave thorough consideration to Russell's claims and arguments, including the conflict of interest on the part of the Plan Administrator. It found that the conflict of interest did not unreasonably or improperly affect the Administrator's decision and that it complied with all of the applicable requirements. The court also limited its review to the evidence before the Plan Administrator. This was appropriate. Its failure to allow Russell to view the surveillance video tapes prior to filing his claim was insufficient to upset the determination of the Administrator as to preclude the award of summary judgment. After reviewing the briefs, arguments, and pertinent portions of the record, we perceive no error on the part of the District Court. The judgment of the District Court will be affirmed. Costs taxed against the appellant.

1ST CASE of Level 1 printed in FULL format.

CHARLES E. PAPPAS v. UNUM LIFE INSURANCE COMPANY OF AMERICA

01-772

SUPREME COURT OF THE UNITED STATES

534 U.S. 1129; 122 S. Ct. 1067; 151 L. Ed. 2d 970; 2002 U.S. LEXIS 670; 70 U.S.L.W. 3514

February 19, 2002, Decided

PRIOR HISTORY: [*1] Reported below: *2001 U.S. App. LEXIS 8622.*

JUDGES: Rehnquist, Stevens, O'Connor, Scalia, Kennedy, Souter, Thomas, Ginsburg, Breyer.

OPINION: Petition for writ of certiorari to the United States Court of Appeals for the Third Circuit denied.

2ND CASE of Level 1 printed in FULL format.

CHARLES E. PAPPAS, M.D., Appellant v. UNUM LIFE INSURANCE COMPANY OF AMERICA
No. 00-2484
UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT
261 F.3d 492; 2001 U.S. App. LEXIS 8622; 26 E.B.C. 1271

April 3, 2001, Argued
April 25, 2001, Decided
April 25, 2001, Filed

NOTICE:

[*1] DECISION WITHOUT PUBLISHED OPINION

SUBSEQUENT HISTORY: Certiorari Denied February 19, 2002, Reported at: *2002 U.S. LEXIS 670.*

PRIOR HISTORY: On Appeal from the United States District Court for the Eastern District of Pennsylvania.

(D.C. Civ. No. 97-07162). District Judge: Honorable Herbert J. Hutton.

JUDGES: BEFORE: ROTH, STAPLETON, and GREENBERG, Circuit Judges.

OPINION: Affirmed.

5TH CASE of Level 1 printed in FULL format.

CHARLES E. PAPPAS, v. UNUM LIFE INSURANCE COMPANY
CIVIL ACTION NO. 97-7162
UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2000 U.S. Dist. LEXIS 11308

August 10, 2000, Decided

**DISPOSITION:** [*1] Judgment entered in favor of Defendant and against Plaintiff.
CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff policyholder alleged defendant insurance company acted in bad faith in determining his disability claim. Defendant counterclaimed for a declaratory judgment for unjust enrichment and overpayment of benefits. The court granted defendant's Fed. R. Civ. P. 50 motion.

**OVERVIEW:** Plaintiff policyholder filed a state claim alleging defendant insurance company acted in bad faith in determining his disability claims. Defendant removed the action. Plaintiff had two disability income polices from defendant one of which was partially covered by a cost of living allowance (COLA) clause. Plaintiff applied for COLA benefits for his policies not covered. Plaintiff disclosed he had had carpal tunnel syndrome, which caused an exclusionary rider to take effect. Plaintiff received COLA benefits to which he was not entitled. Defendant counterclaimed for unjust enrichment and overpayment of benefits. The court granted defendant's Fed. R. Civ. P. 50 motion for judgment as a matter of law. A bench trial ensued on defendant's equitable counterclaims. The court determined plaintiff had been unjustly enriched and granted judgment in favor of plaintiff. The COLA had been paid to plaintiff as a matter of error. Under the terms of policy rider, plaintiff was not entitled to purchase COLA increases.

**OUTCOME:** Judgment granted for defendant. Plaintiff's cost of living adjustment benefits were subject to exclusionary rider because of plaintiff's carpal tunnel syndrome. The payments made to plaintiff were a mistake due to an administrative and or clerical oversight.

**CORE TERMS:** disability, carpal tunnel syndrome, radiculopathy, cervical, contributed, rider, unjust enrichment, coverage, counterclaim, disorder, disease, region, spinal, convenience, maximum benefit, incorrectly, equitable, issuance, insured, mistake of fact, jury trial, inequitable, conclusions of law, disability benefits,

persons claiming, adequate remedy, medical history, effective date, legally bound, overpayment

**CORE CONCEPTS -**

**COUNSEL:** For CHARLES E. PAPPAS, M.D., PLAINTIFF: JOHN E. SEEHOUSEN, LANGHORNE, PA USA.

For UNUM LIFE INSURANCE COMPANY OF AMERICA, DEFENDANT: E. THOMAS HENEFER, STEVENS AND LEE, READING, PA USA. SCOTT T. MAKER, UNUM LIFE INSURANCE/COMPANY OF AMERICA, PORTLAND, ME USA.

**JUDGES:** HERBERT J. HUTTON, J.

**OPINIONBY:** HERBERT J. HUTTON

**OPINION:** FINDINGS       OF       FACT       AND CONCLUSIONS OF LAW

AND FINAL JUDGMENT

HUTTON, J.

August 10, 2000

Plaintiff, on or about October 23, 1997, filed a state court complaint against Defendant UNUM Life Insurance Company ("UNUM" or "Defendant") which, inter alia, alleged UNUM acted in bad faith in determining his claim for disability benefits. On or about, November 21, 1997, Defendant removed the above captioned action to the United States District Court for the Eastern District of Pennsylvania. Thereafter, Defendant asserted counterclaims for a Declaratory Judgment, unjust enrichment, and overpayment of benefits. A trial on the merits commenced on July 18, 2000. On July 24, 2000, the Court granted Defendant's Rule 50 Motion, finding as a matter of law in favor of Defendant on Plaintiff's claims. [*2]

On July 25, 2000, the Court, in a bench trial, heard Defendant's equitable counterclaims for a Declaratory



Judgment and Unjust Enrichment. Defendant abandoned its claim for overpayment of benefits. Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1. Plaintiff purchased two individual disability income policies from UNUM.

2. The benefits payable under Plaintiff's policies were testified to at trial by Constance M. Cardamone, manager of the Portland Certified Public Accountant Team for UNUM. (See 7/25/00 Trans. at 6-34).

3. Disability benefits under policy LAD044461 are divided into two Coverage Groups, one providing for a maximum benefit of $ 4,339 per month, and the other providing for a maximum benefit of $ 3,100 per month. (See 7/25/00 Trans. at 9-11).

4. Disability benefits under policy LAD049933 insured a single coverage group with a maximum benefit of $ 6,199 per month. (See 7/25/00 Trans. at 12-13).

5. Initially, Plaintiff's policy LAD044461 contained a Cost of Living Adjustment ("COLA") rider which was applicable only to Coverage Group Two. (See 7/25/00 Trans. [*3] at 11).

6. Plaintiff was not entitled to purchase COLA increases under Policy Rider CLC86 as he did not satisfy the requirements of such entitlement; specifically that the Maximum Disability Benefit had not been adjusted pursuant to the rider while the insured was under a previous disability. (See 7/25/00 Trans. at 14-15).

7. On or about May 31, 1991, Plaintiff completed and submitted an Application for Change with respect to policies LAD044461 and LAD049933, requesting COLA benefits on the portions of the policies which were not subject to such benefit. (See 7/25/00 Trans. at 12).

8. Said Application for Change is by its terms preliminary with respect to its coverage as the language of the Agreement states that "the company will rely on the information provided in this application and any subsequent medical exams or tests and other questionnaires to determine whether to provide the requested coverage."

9. Plaintiff in the Application for Change represented that he had carpal tunnel syndrome but had a "good recovery."

10. As a result of Plaintiff's disclosure of his medical history and Defendant's investigation, the COLA benefits for which Plaintiff applied under the Application[*4] for Change were subject to an Exclusion Rider which states that "no benefit of any kind or amount is payable to anyone for any loss, impairment or disability due to, contributed to by, or resulting from carpal tunnel syndrome; radiculopathy or injury, disease or disorder of the cervical spinal region . . . ."

11. Plaintiff signed the Exclusion Rider on or about November 5, 1991, with an effective date of October 14, 1991, containing the language "once this Exclusion Rider is signed, it binds all persons claiming any interest under the policy."

12. On or about August 15, 1994, Plaintiff filed an Individual Disability Claim Form for benefits under his policies for a disabling condition due to "pain [in] shoulders and hands; numbness and weakness [in] hands []; from MVA."

13. On or about August 30, 1994, Plaintiff's physician, Ronald J. Horvath, M.D., completed an Attending Physician Statement which states that Plaintiff's primary diagnosis is "cervical disk syndrome, traumatic bilateral carpal tunnel [syndrome]."

14. Plaintiff confirmed this diagnosis when he testified as a Medical Doctor and Surgeon. Such testimony reads as follows:

Q: Doctor, do you have an opinion based[*5] on a reasonable degree of medical certainty as to whether the problems that you are experiencing, the numbness in your fingers and in your hand are related to the cervical radiculopathy, the carpal tunnel or some other source? . . .

A: I believe that the answer is yes. The dominant reason is due to radiculopathy and the inception of carpal tunnel syndrome following the accident. There are other reasons . . . . And it is the opinion of those who have seen me since professionally that there may have been a problem or a reaction to the surgery. Maybe something happened surgically that caused the problem.

(See 7/25/00 Trans. at 39-40 (emphasis added).

15. By the terms of the Exclusion Rider injuries "due to, contributed to by, or resulting from carpal tunnel syndrome; radiculopathy or injury, disease or disorder of the cervical spinal region . . ." are explicitly excluded

from the benefits provided under the COLA riders effective October 14, 1991.

16.   As a result of the complexity in determining the amount of Plaintiff's underlying disability claim, Rebekah Groves, an employee of UNUM, testified that although COLA benefits had been paid since 1994, it was not until August[*6] 1998 that UNUM discovered that it may be incorrectly paying COLA benefits and that such error was the result of an oversight due to "a lot of back and forth, back and forth with the financial unit in adjusting the benefits and changing the date of loss that it was just something that kind of got lost in the shuffle." (See 7/19/00 Trans. at 152-53). Given the complexity of Plaintiff's claim, as evidenced by the entire testimony of both Plaintiff and Defendant throughout the trial, the Court finds Rebekah Groves' explanation credible.

17.   Through the testimony of Constance M. Cardamone, Defendant demonstrated that through January 1, 2000, UNUM had paid a total of $ 88,361.23 under the COLA riders which were subject to the Exclusion Rider. (See 7/25/00 Trans. at 23-29).

18.   UNUM is currently paying $ 2,792.54 per month under the excluded COLA riders, thereby bringing the current total of COLA payments to $ 110,701.55. (See 7/25/00 Trans. at 29).

19.   Plaintiff's disability policies do not contain a provision for recovering incorrectly paid COLA benefits.

## II. CONCLUSIONS OF LAW

1.   The right to a jury trial in federal court, regardless of whether the claim[*7] arises under state law, presents a question of federal law.   See *City of Philadelphia Litigation v. City of Philadelphia, 158 F.3d 723, 726 (3d Cir. 1998)*.

2.   As a general rule, the right to a jury trial is protected by the Seventh Amendment, when the claim is a legal one, but not if it is equitable.   See *Hatco Corporation v. W.R. Grace & Co., 59 F.3d 400, 411 (3d Cir. 1995)*.

3.   The Court has discretion to afford declaratory relief pursuant to the Declaratory Judgment Act, *28 U.S.C. § 2201 (1994)*.   In exercising such discretion the Court should consider the following factors: (1) the likelihood that the declaration will resolve the uncertainty of obligation which gave rise to the controversy; (2) the convenience of the parties; (3) the public interest in a settlement of the uncertainty of obligation; and (4) the

availability and relative convenience of other remedies. See *Terra Nova Ins. Co. v. 900 Bar, Inc., 887 F.2d 1213, 1124 (3d Cir. 1989)*.

4.   Unjust enrichment under Pennsylvania Law is a claim sounding in equity.   See *Meehan v. Cheltenham Twp., 410 Pa. 446, 189 A.2d 593 (Pa. 1963)*.   The[*8] essential elements of a counterclaim of unjust enrichment are benefits conferred upon plaintiff, appreciation of such benefits by plaintiff, and the acceptance and retention of such benefits under circumstances that would make it inequitable for plaintiff to retain the benefit without payment for value.   See *Metropolitan Life Insurance Co. v. Brown, 1998 U.S. Dist. LEXIS 22991, No. CIV.A.97-2002, 1998 WL 1084680, at *4 (W.D. Pa. Dec. 1, 1998)*; see also *Burgettstown-Smith Twp. Joint Sewage Authority v. Langeloth Townsite Co., 403 Pa. Super. 84, 88, 588 A.2d 43 (Pa. Super. Ct. 1991)*.

5.   Defendant has no adequate remedy at law to recover incorrectly paid COLA benefits, thus it asserts equitable counterclaims for Declaratory Judgment and Unjust Enrichment.

6.   Under Pennsylvania law, an insurer may recover payments to the insured under a mistake of fact or as a result of fraud or misrepresentation.   See *Van Riper v. The Equitable Life Assur. Soc., 561 F. Supp. 26, 33 (E.D. Pa. 1982)*, aff'd, *707 F.2d 1397 (3d Cir. 1983)*; see also *Foster v. Federal Reserve Bank of Philadelphia, 113 F.2d 326, 327-28 (3d Cir. 1940)*.

7.   An agreement may[*9] not be avoided, regardless of consideration, if it contains language (in any form) that the signer intends to be legally bound. See *33 P.S. § 6 (1997)*.

8.   The COLA Exclusion Rider was issued pursuant to the unambiguous terms of Plaintiff's Application of Change as said application explicitly contemplates UNUM's investigation of Plaintiff's medical history prior to the issuance of modified coverage. Nevertheless, the Exclusion Rider is enforceable independently as it expresses an intent by the signer to be legally bound as evidenced by the language "once this Exclusion Rider is signed, it binds all persons claiming any interest under the policy." See *33 P.S. § 6 (1997)*.

9.   The terms of the Exclusion Rider are unambiguous in that it excludes payment of COLA benefits that are "due to, contributed to by, or resulting from carpal tunnel syndrome; radiculopathy or injury, disease or disorder of the cervical spinal region . . . ."

Case 1:01-cv-01157-CCC    Document 66    Filed 12/12/2002    Page 19 of 119

    2000 U.S. Dist. LEXIS 11308, *9    Page 208

10. By a preponderance of the evidence Defendant has shown that Plaintiff's COLA benefits, effective October 14, 1991, are subject to exclusion as Plaintiff's injuries are at a minimum "contributed to by" radiculopathy and/or carpal tunnel syndrome.[*10] Specifically the Court finds Plaintiff's Application for Disability Benefits, Plaintiff's Attending Physician Statement, and Plaintiff's July 25, 2000, testimony concerning the nature of his disability persuasive on this issue.  See 7/25/00 Trans. at 39-40).

11.  Defendant has demonstrated that the disputed COLA benefits were paid to Plaintiff upon a mistake of fact due to an administrative and/or clerical oversight.

12.  Plaintiff has received COLA benefits which were subject to the Exclusion Rider in the amount of $ 110,701.55.

13.  As Plaintiff was aware that the Exclusion Rider applied to injuries "due to, contributed to by, or resulting from carpal tunnel syndrome; radiculopathy or injury, disease or disorder of the cervical spinal region . . ." the Court finds that it would be inequitable for Plaintiff to retain benefits to which he was not entitled.

14.  Upon considering the appropriate factors with respect to the issuance of a Declaratory Judgment, the Court finds that such considerations weigh in favor of issuance.  Such action will alleviate the need for further litigation over Plaintiff's future entitlement to COLA benefits, serves no hardship upon the Plaintiff, furthers[*11] the convenience of the parties, clarifies Defendant's requirements under an otherwise uncertain obligation, and is an appropriate remedy as Defendant has no adequate remedy at law.

This Court's Final Judgment follows.

FINAL JUDGMENT

AND NOW, this 10th day of August, 2000, pursuant to Federal Rules of Civil Procedure 52(a) and 58, IT IS HEREBY ORDERED that judgment in the amount of $ 110,701.55 is entered in favor of Defendant and against Plaintiff Charles E. Pappas.

IT IS HEREBY FURTHER ORDERED that pursuant to 28 U.S.C. § 2201, the Court Orders that Defendant UNUM Life Insurance Company has no further obligation to provide Plaintiff, Charles E. Pappas, COLA benefits on his ongoing disability claim with respect to COLA benefits with an effective date of October 14, 1991.

BY THE COURT:

HERBERT J. HUTTON, J.

13TH CASE of Focus printed in FULL format.

FRANK A. BRANDI, Plaintiff-Appellant, -v.- GOOD LAD COMPANY LONG TERM DISABILITY PLAN and GOOD LAD COMPANY, Defendants, PAUL REVERE LIFE INSURANCE, CO., Defendant-Appellee.

98-9234

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

1999 U.S. App. LEXIS 11974

June 8, 1999, Decided

NOTICE:

[*1] RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

SUBSEQUENT HISTORY: Reported in Table Case Format at: *1999 U.S. App. LEXIS 23543.*

PRIOR HISTORY: Appeal from the United States District Court for the Southern District of New York (Martin, J.).

DISPOSITION: AFFIRMED.
CASE SUMMARY

PROCEDURAL POSTURE: Plaintiff employee appealed an order from the United States District Court for the Southern District of New York that granted defendants', employer and insurance carrier, motion for summary judgment in a suit by plaintiff to recover disability benefits.

OVERVIEW: Plaintiff employee suffered from a severe esophageal ulcer and his doctor advised defendant employer that plaintiff was unable to work. A few months later plaintiff's doctor noted that he no longer had any symptoms. Over six months later an orthopedic doctor diagnosed plaintiff with an orthopedic condition that made plaintiff permanently and totally disabled. Plaintiff requested disability benefits, and defendant insurance carrier denied coverage because plaintiff was not disabled during the entire elimination period of 180 days. Plaintiff sued, and the lower court granted defendants' motion for summary judgment. Plaintiff appealed, and the court affirmed because the evidence established that plaintiff did not suffer from his disability during the entire elimination period based upon his doctor's later notes that plaintiff's condition improved.

The court held that plaintiff was not entitled to benefits because he failed to cite his orthopedic condition when he filed his claim.

OUTCOME: The court affirmed summary judgment in favor of defendants because plaintiff did not suffer from his disability during the entire elimination period based upon his doctor's later notes that plaintiff's condition improved. The court also held that plaintiff was not entitled to benefits because he failed to cite his orthopedic condition when he filed his claim.

CORE TERMS: disability, disabled, ulcer, doctor, orthopedic, disability benefits, standard of review, summary judgment, misinterpreted, symptoms, disease

COUNSEL: APPEARING FOR APPELLANT: ABA HEIMAN, Woodbury, NY (Scheine, Fusco, Brandenstein & Rada, P.C., on the brief).

APPEARING FOR APPELLEE: ANDREW HAMELSKY, Paramus, NJ (Wright, Pindulic & Hamelsky, LLP, on the brief).

JUDGES: PRESENT: HON. JOSEPH M. MCLAUGHLIN, HON. DENNIS JACOBS, Circuit Judges. HON. ALVIN K. HELLERSTEIN, * District Judge.

* The Honorable Alvin K. Hellerstein of the United States District Court for the Southern District of New York, sitting by designation.

OPINION: SUMMARY ORDER

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of the district court be AFFIRMED.

Frank Brandi appeals from a judgment dismissing his claim for disability benefits, entered upon summary


judgment.

Brandi began working at the Good Lad Company in 1992. On December 1 of that year he began receiving coverage from a disability policy issued to[*2] the company by defendant-appellee Paul Revere Life Insurance Company.

On March 7, 1995 Brandi wrote the following letter to his employer: "I am resigning my position at Good Lad Co., effective April 30, 1995, for personal reasons. If you require additional time I will be happy to discuss that possibility with you." On March 10, 1995, Brandi wrote another letter to Good Lad: "On Monday--3/13- -I am going to the Doctor for a barium X-Ray of my throat. As soon as I am done I will come to Phila. I should be here by noon." Brandi did not return to work after March 10, 1995; Good Lad paid him through April 21, 1995.

On June 23, 1995 Brandi filed a claim for long term disability benefits. He listed "bleeding ulcers" as the basis for his claim and said that his disability began on March 13, 1995. Attached to the claim was a doctor's memo. Dr. Thomas Gould, a gastroenterologist who saw Brandi on March 13, said that Brandi suffered from "Severe esophageal ulcer disease" and was "unable to work."

Paul Revere denied the claim on September 21, 1995. It noted that Brandi's policy required that he have been disabled during the entire 180-day "Elimination Period" and during any time when benefits[*3] would be payable. According to the company, Brandi had failed to make the required showing. The letter referenced notes made by Gould after examinations of Brandi in April and May, in which the doctor noted Brandi's improvement. And after a June 1995 examination, Gould wrote that Brandi "has no symptoms which is amazing and has lost wt--looks better physically." (emphasis added).

On September 25, 1995, Brandi went to an orthopedic surgeon, Dr. Richard Memoli. Memoli diagnosed Brandi with several orthopedic conditions, noted that his movement was limited, and concluded that he "had a permanent and total disability preventing him from performing any type of occupation."

On October 16, 1995, Dr. Gould wrote to Paul Revere, saying that in denying Brandi's claim the company had "misinterpreted" Gould's notes, although he did not say how. He said that Brandi's disease was "minimally improved and progressive" and that he "recommended continued unemployment, no stress and medical therapy."

Brandi appealed the denial of benefits, and Paul Revere denied his appeal on October 4, 1996. The company noted that Dr. Gould's letter did not contradict his June 1995 conclusion that Brandi's ulcer[*4] condition had become asymptomatic; and that Brandi did not cite any orthopedic problem as a basis for his claim for disability; that he had not seen Dr. Memoli until after the "Elimination Period" had ended; and that other records submitted documenting the problem (from 1987 to 1993) were irrelevant to the question of whether Brandi was disabled in 1995. After receiving more evidence from Brandi, Paul Revere denied his claim again on April 7, 1997.

Brandi then filed the complaint in the instant action; Judge Martin granted Paul Revere summary judgment on August 17, 1998.

On appeal, Brandi argues that the district court erred by giving effect to two changes in Brandi's disability policy. One change unequivocally gave the company discretion in making claim decisions, affording the company the benefit of an arbitrary-and-capricious standard of review in court. The second change altered the definition of disability, so that someone who could work part-time (but not full-time) would not be considered disabled. The policy was revised in December 1994, but the amended policy was not published until May 2, 1995.

The district court, citing *Schonholz v. Long Island Jewish Medical [*5] Ctr., 87 F.3d 72 (2d Cir. 1996),* concluded that the changes applied to Brandi's claim. For purposes of this appeal, we can assume without deciding that they did not.

We affirm Paul Revere's denial of Brandi's benefit claim, even applying a de novo standard of review and even using the previous definition of disability. The key to the analysis is the policy's requirement that the claimant be disabled during the entire "Elimination Period." Dr. Gould's notes demonstrated that Brandi was making marked improvement during this time; indeed, by June 1995 he had no symptoms. Although Dr. Gould later claimed that his notes had been "misinterpreted," he provided no contrary explanation. Evidence about Brandi's ulcer condition from late 1995 and 1996 is irrelevant to the determinative question of whether he was disabled during the "Elimination Period."

We also affirm the denial of Brandi's claim insofar as it was predicated on his orthopedic problems, because



Brandi did not cite these conditions as a disability basis when he filed his claim. Moreover, the evidence he provided to support his claim did not show that he was disabled during the only relevant time: the Elimination Period. [*6]

For these reasons, the judgment of the district court is AFFIRMED.

2ND CASE of Level 1 printed in FULL format.

CHARLOTTE N. SELL v. UNUM LIFE INSURANCE COMPANY OF AMERICA, et al.
CIVIL ACTION No. 01-4851
UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2002 U.S. Dist. LEXIS 22472

November 19, 2002, Decided

**DISPOSITION:** Defendants' motion for summary judgment granted.

CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff plan participant sued defendant insurance company and employer under *29 U.S.C.S. § 1132*(a)(1)(B) of the Employee Retirement Income Security Act of 1974, *29 U.S.C.S. § 1001* et seq. The plan participant contended that her application for benefits under the long-term disability plan was improperly denied. Defendants moved for summary judgment.

**OVERVIEW:** The insurance company both funded and administered the benefits plan. As such, the court reviewed the insurance company's decision being deferential, but not absolutely deferential. The plan participant failed to raise a genuine issue of fact indicating that the insurance company's decision to discontinue her disability benefits was arbitrary and capricious. The plan participant argued that the insurance company failed to adequately consider a doctor's letter which stated that the insurance company had to consider the psychological aspects of her disability, and the Social Security Administration (SSA) disability decision. The doctor did not base his revised opinion on a new examination of the plan participant, but rather on the plan participant's SSA award and a letter purportedly sent to him by another doctor. The insurance company did not abuse its discretion by failing to give controlling weight to one doctor's interpretation of another doctor's letter, which itself was not submitted to the insurance company. Also, the insurance company considered the SSA award, but found that it did not support a finding that the plan participant was disabled from any gainful occupation.

**OUTCOME:** Defendants' motion for summary judgment was granted.

**CORE TERMS:** disability, administrator, disabled, arbitrary and capricious, occupation, disability benefits, sedentary, diagnosis, beneficiary, summary judgment, deferential, heightened, plan administrator, mental condition, administer, duty, medical evidence, sliding scale, light duty, pseudo-dementia, gainful, decision to deny, genuine issue, anomaly, terminated, conflict of interest, nonmoving party, earlier opinion, self-serving, selectively

CORE CONCEPTS -

COUNSEL: For Charlotte N Sell, PLAINTIFF: Quintes D Taglioli, Allentown, PA USA. Ruth Skoglund, Allentown, PA USA.

For UNUM, Knoll, Inc, DEFENDANTS: E Thomas Henefer, Stevens and Lee, Reading, PA USA.

JUDGES: [*1] HERBERT J. HUTTON, J.

OPINIONBY: HERBERT J. HUTTON

OPINION: MEMORANDUM AND ORDER

HUTTON, J.

November 19, 2002

The plaintiff, Charlotte N. Sell, is suing the defendants, UNUM Life Insurance Company of America ("UNUM") and Knoll, Inc., alleging a violation of the Employee Retirement Income Security Act of 1974 (ERISA), *29 U.S.C. § 1001*, et seq. n1 Sell believes that she is entitled to benefits under UNUM's Long-Term Disability Plan. Presently before the Court is Defendants' Motion for Summary Judgment (Docket No. 6). Because UNUM's decision to deny Sell's application for benefits was not arbitrary and capricious, Defendants' Motion is granted.

n1 Sell brings her action under *29 U.S.C. § 1132*(a)(1)(B), which provides, inter alia, that a beneficiary may sue to recover "benefits due to [the beneficiary] under the terms of the plan."

I. BACKGROUND

A. THE PLAN


Knoll's benefit plan contains several provisions that are important to this [*2]case. First, the plan pays benefits to beneficiaries based on a two-stage definition of disability. During the first 24 months of disability, an employee is considered disabled if the employee is "unable to perform any of the material and substantial duties of [the employee's] regular occupation." Defs.' App. at 522 (emphasis added). After this initial 24 month period, however, the plan's definition changes such that the employee must be "unable to perform the duties of any gainful occupation for which [the employee is] reasonably fitted by education, training or experience" in order to receive disability benefits. Id. (emphasis added). n2

n2 The plan defines "gainful occupation" as "an occupation that is or can be expected to provide you with an income at least equal to 60% of your indexed monthly earnings within 12 months of your return to work." Pl.'s App at 523.

Second, Knoll itself does not administer the plan. Instead, the plan is administered by UNUM, an insurance company. Importantly, [*3] it appears from the record that UNUM also funds the plan. Any payments to disabled Knoll employees come from UNUM's own funds.

Third, UNUM, as plan administrator, has discretionary authority to interpret and construe the terms and rules of the plan. The plan expressly gives UNUM "discretionary authority to determine [an employee's] eligibility for benefits and to interpret the terms and provisions of the policy." Id. at 516. The plan also provides that UNUM has the discretion to request any documents that it needs in making these decisions. Id. at 522.

B. SELL'S HISTORY AT KNOLL

In January 1970, Sell, currently 59 years old, began working for Knoll, Inc. as a wood crafter. For 28 years, Sell made furniture pieces, such as desktops and sofa frames, for Knoll. Defs.' App. at 108. Her job required her to "lift, push, pull, [and] use various mechanical devices in the fabrication of wood products." Id. at 304. During the course of her employment with Knoll, Sell developed chronic back and leg pain, myalgias, and fatigue. Id. at 308. She also suffers from depression, degenerative disc disease, and arthritis. Id.

On January 22, 1998, Sell became disabled and[*4] was no longer able to perform her job as a wood crafter.

On the following day, she began receiving short-term disability benefits under Knoll's employee benefits plan. Pl.'s Opp'n Mem. at 2. A few months later, Sell began receiving long-term disability benefits under the plan. Id.

In July 1998, after an initial denial, Sell was approved for Social Security disability benefits. Defs.' App at 125-33. The Administrative Law Judge found that Sell was disabled and could only perform "a limited range of sedentary work." Id. at 132. At this point, her combined company and Social Security benefits totaled approximately 60% of her former wages. Pl.'s Opp'n Mem. at 2. Knoll continued to receive long-term disability payments under the first prong of the plan's disability definition because she could not perform her old occupation. Id.

During the first 24 months of disability payments, UNUM ordered several tests to confirm Sell's condition. In April 1999, UNUM ordered an independent medical examination by Dr. Robert Mauthe. In his report, Dr. Mauthe found that Sell could perform sedentary to light duty work, despite a diagnosis of disc disease, depression, myofascial pain, and other[*5] conditions. Defs.' App. at 308. Sell's treating physician, Dr. Kenneth Truscott, confirmed this opinion in a letter dated May 25, 1999. Id. at 270. Finally, a Functional Capacity Evaluation ("FCE"), performed in April 1999, found that while Sell was not capable of performing her current occupation, which was a "Medium" level job under the Department of Labor ("DOL") standards, she could perform jobs termed either "light" or "sedentary" under those standards. Id. at 282-83.

In the Spring of 2000, the 24 month initial disability period expired, and UNUM began the process of determining whether Sell was disabled from "any occupation." Defs.' Summ. J. Mem. at 4. UNUM again wrote to Sell's treating physician, Dr. Truscott, asking whether Sell was still capable of performing "full time sedentary to light [duty] work." Defs.' App. at 212. Dr. Truscott responded with a conclusory but emphatic "Yes!" Id.

As a result, UNUM sent a letter to Sell, dated March 21, 2000, notifying her that her benefits were terminated because she was not disabled from "any occupation." Id. at 210. UNUM's letter cited the opinions of Drs. Truscott and Mauthe, as well as the 1999 FCE, as evidence[*6] that Sell could perform sedentary to light duty work. Id. Within a week of this letter, Dr. Truscott changed his opinion and stated that Sell was totally disabled. Id. at 141-42. In his letter to


UNUM, Dr. Truscott stated that Sell's condition had deteriorated since his prior opinion and that, based on her Social Security disability claim, she was totally disabled from any occupation. Id.

On June 30, 2000, Sell appealed UNUM's decision. Sell submitted a Key Functional Capacity Assessment and yet another letter from Dr. Truscott, dated July 10, 2000. Id. at 105-6. Dr. Truscott's new opinion was purportedly based on a letter and report he received from a treating neurologist named Dr. Thomas Hurlbutt. In his letter, Dr. Truscott noted that, while Dr. Hurlbutt's "objective" diagnosis did not show that Sell was disabled, the "subjective" affects of Sell's mental condition, coupled with her physical problems, make Sell disabled. Id. While Dr. Hurlbutt's report states only that Sell should not operate heavy machinery or perform multi-step tasks, Dr. Truscott claims that a letter Dr. Hurlbut sent to him supports his change in opinion. Id. at 175-76. In this letter, [*7] which was not submitted to this Court and does not appear in UNUM's records, Dr. Hurlbutt allegedly diagnosed Sell with "pseudo-dementia." Id. Dr. Truscott's letter concludes that this alleged diagnosis confirms Sell's disability.

For its part, UNUM directed one of its own physicians, Dr. F. A. Bellino, to review Sell's records. Based on his review of Sell's records, Dr. Bellino concluded that Sell was capable of performing sedentary to light duty work. Id. at 172-73. In his review, Dr. Bellino could find no record of Dr. Hurlbutt's pseudo-dementia diagnosis. Id. As a result, Dr. Bellino found no change in Sell's condition. UNUM denied Sell's appeal on August 8, 2000 and upheld that denial again on September 9, 2001. Pl.'s Summ. J. Mem. at 3.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment has the initial burden of showing the basis for its[*8] motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to go beyond the mere pleadings and present evidence through affidavits, depositions, or admissions on file showing a genuine issue of material fact for trial. Id. at 324. The substantive law determines which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). If the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then there is a genuine issue of fact. Id.

When deciding a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993). Moreover, a court may not consider the credibility or weight of the evidence in deciding a motion for summary judgment, even if the quantity of the moving[*9] party's evidence far outweighs that of its opponent. Id. Nonetheless, a party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. Trap Rock Indus., Inc. v. Local 825, 982 F.2d 884, 890 (3d Cir. 1992).

## III. DISCUSSION

### A. ERISA STANDARD OF REVIEW

The first step in evaluating an ERISA claim is to determine the appropriate standard of review. A denial of ERISA plan benefits is reviewed under a de novo standard unless the plan administrator has discretion to determine beneficiary eligibility and to construe plan terms. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989). In Firestone, the Court, relying on trust law principles, held that discretionary denials are reviewed under an arbitrary and capricious standard. Id. This is a deferential standard, and the court may not substitute its judgment for that of the plan administrator. Mitchell v. Eastman Kodak Co., 113 F.3d 433, 439 (3d Cir. 1997). Such discretion may be either explicit in the terms of the plan or implied from plan language. Luby v. Teamsters Health, Welfare & Pension Trust Funds, 944 F.2d 1176, 1180 (3d Cir. 1991).[*10]

In this Circuit, however, a "heightened arbitrary and capricious" standard applies when the plan administrator's decision was potentially affected by a conflict of interest. Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 378-79 (3d Cir. 2000). In Pinto, the Court examined the conflict that arises when an insurer, acting as plan administrator, both decides employee claims and pays those claims out of its own funds. Id. at 378-79. The Court held that district courts must consider such conflicts as a factor in evaluating the administrator's decision to deny a claim. Id. at 393-94.



In this case, UNUM and Sell agree that an arbitrary and capricious standard is appropriate because the plan gives UNUM discretion to determine eligibility. Pl.'s Opp'n Mem. at 5; Defs.' Summ. J. Mem. at 8-11. The parties differ, however, regarding whether Pinto's heightened standard should apply. UNUM argues that Pinto should not apply because "there is no evidence that a conflict of interest impacted the claim decision." Defs.' Summ. J. Mem. at 13.

UNUM's argument is misplaced. In Pinto, the Third Circuit held that "when an insurance[*11] company both funds and administers benefits, it is generally acting under a conflict of interest that warrants a heightened form of the arbitrary and capricious standard of review." *Pinto, 214 F.3d at 378.* In the instant case, UNUM does not dispute that it funds and administers Knoll's plan. Accordingly, Pinto's "heightened arbitrary and capricious standard" applies.

To say that Pinto's standard applies, however, does not end the inquiry. In Pinto, the Court adopted a "sliding scale" approach that increases the scrutiny of the review in proportion to the strength of the conflict at issue. *Id. at 391-93.* Under this approach, district courts are directed to "consider the nature and degree of apparent conflicts with a view to shaping their arbitrary and capricious review" of the plan administrator's decisions. *Id. at 393.* The greater the conflict, the less deferential the standard applied. Id. To determine the extent of the conflict, the Court must "not only look at the result - whether it is supported by reason - but at the process by which the result was achieved." Id.

In Pinto itself, the Court found several[*12] procedural flaws that caused it to give little deference to the administrator's decision. First, the administrator reversed an earlier decision allowing Pinto's benefits without any new medical evidence to support the reversal. *Id. at 393-94.* Second, the administrator selectively relied upon self-serving evidence supporting a denial of benefits but rejected contrary evidence supporting a continuation of Pinto's benefits. Id. Finally, the administrator ignored its own staff's recommendation that benefits be continued. Id. These procedural anomalies placed the Pinto case at the least deferential end of the arbitrary and capricious sliding scale. Id.

Defendant argues that such procedural anomalies are absent from the instant case. For example, in Pinto, the administrator gave significant weight to a negative SSA disability decision, yet ignored that agency's later decision to award disability benefits to Pinto. In contrast, in this case, UNUM paid disability benefits when Sell was

initially denied disability by the SSA. Def.'s Summ. J. Mem. at 12. Then, it discontinued these benefits when the plan's disability definition changed to require an employee[*13] to be disabled from any gainful occupation.

Sell states that this case belongs at the least deferential end of the sliding scale because UNUM, like the defendant in Pinto, selectively considered self-serving parts of the record while ignoring other evidence that supported her disability claim. Pl.'s Opp'n Mem. at 6. In Pinto, the Court was critical of the plan administrator's selective reliance on self-serving evidence favoring a denial of the employee's benefits. In this case, Sell states that UNUM selectively ignored evidence regarding her mental condition. For support, Sell points to Dr. Truscott's July 2000 letter, discussed above.

UNUM's decision to credit Dr. Truscott's earlier opinion and not credit his July 2000 letter is not a procedural anomaly of the type described in Pinto. In the instant case, UNUM acknowledges Dr. Truscott's later opinion, but chooses to give it little weight because it came only after Sell, one of Dr. Truscott's patients, was denied benefits. Def.'s Summ. J. Mem. at 12. In contrast, the Pinto Court was troubled by the plan administrator's selective use of the treating physician's opinion. In that case, the administrator gave credit [*14]to some of the physician's findings, but ignored his ultimate conclusion. *Pinto, 214 F.3d at 393-94.* In this case, the physician's ultimate conclusion appears to have shifted markedly based on whether his patient was receiving benefits.

Plaintiff points to no other procedural anomalies or conflicts that would warrant this case being placed on the heightened end of the sliding scale. As noted above, however, UNUM both funds and administers Knoll's benefits plan. As such, the Court will review UNUM's decision being "deferential, but not absolutely deferential." *Id. at 393.*

## B. APPLICATION OF THE HEIGHTENED ARBITRARY AND CAPRICIOUS STANDARD

Plaintiff primarily argues that Defendant abused its discretion because it did not adequately "test for, evaluate, or consider" the psychological aspects of Plaintiff's condition. Pl.'s Opp'n Mem. at 6. In support of this contention, Sell points to Dr. Truscott's July 2000 letter, which states that UNUM must consider the psychological aspects of Sell's disability, and the SSA disability decision, which includes a form detailing Sell's mental condition. Id. at 7-12. Sell states that UNUM failed to adequately[*15] consider this evidence in its decision to


deny her claim.

1. Dr. Truscott's Letter

Regarding Dr. Truscott's letter, Sell argues that UNUM did not give enough weight to Dr. Truscott's opinion concerning her mental condition. As noted above, in his letter, Dr. Truscott states that, while the objective data does not show Sell to be disabled, the subjective evidence shows a deteriorated mental state that supports her disability claim. Defs.' App. at 105-6. Dr. Truscott states that Sell's mental condition "takes [her] minimum sedentary level and drops is below functional status and, therefore, below substantial gainful activity." Id. at 105. In support of his opinion, Dr. Truscott points to Sell's SSA disability determination and to a report by Dr. Thomas Hurlbutt, a neurologist who examined Sell in March 2000.

In his attending physician's report, Dr. Hurlbutt determined that Sell should not operate heavy machinery or perform multi-step tasks. Id. at 176. Otherwise, Dr. Hurlbutt's brief report does not indicate that Sell is disabled. Dr. Truscott acknowledges that Dr. Hurlbutt's attending physician report does not "objectively" support a diagnosis that Sell is disabled.[*16] Id. at 105 ("There is objective data to support no true medical, actual neurologic impairments or conditions from an 'objective standpoint[.]'"). Instead, Dr. Truscott appears to base his opinion on a letter Dr. Hurlbutt allegedly wrote to him.

In this letter, which appears nowhere in the record and was not submitted to UNUM, Dr. Hurlbutt purportedly wrote that he "picked up on" a diagnosis of pseudo-dementia, which carries a "certain degree of disability." Id. Based on what Dr. Truscott calls Dr. Hurlbutt's "true medical opinion," Dr. Truscott concludes that Sell is disabled. Id. at 106.

In response, UNUM points to *Gooden v. Provident Life & Accident Ins. Co.*, 250 F.3d 329, 333-34 (5th Cir. 2001), n3 for the proposition that a plan administrator need not give overriding significance to a physician's letter, written after the patient's benefits were terminated, that contains no new medical evidence and is contrary to the physician's earlier opinion. Defs.' Reply Mem. at 4-5. In Gooden, the beneficiary's treating physician initially wrote an Attending Physician's Statement of Disability (APS) stating that Gooden could return to work. *Id. at 331*.[*17] After Gooden's benefits were terminated, the physician wrote another letter to the administrator stating that Gooden was permanently disabled and could not return to work. Id. The Court held

that this second letter, which was unaccompanied by any evidence of a change in medical condition, need not be given overriding significance. *Id. at 333-34*. The Court noted that there was substantial countervailing evidence, including the same physician's earlier report. Id.

n3 The Fifth Circuit, like the Third Circuit, applies a heightened arbitrary and capricious standard under a sliding scale approach when an outside entity, such as an insurance company, both funds and administers an employee benefits plan. *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 295-97 (5th Cir. 1999) (en banc).

Similarly, UNUM did not abuse its discretion when it failed to give Dr. Truscott's July 2000 letter controlling significance. First, like the letter in Gooden, Dr. Truscott's letter came[*18] after Sell learned that her benefits were terminated. Additionally, the letter was in direct contrast to Dr. Truscott's earlier opinion on Sell's condition. As noted above, Dr. Truscott, in response to a March 2000 inquiry from UNUM, agreed that Sell could perform full-time sedentary to light duty work. Defs.' App. at 212. Dr. Truscott changed his opinion only after his initial view was used to discontinue Sell's benefits. As the Gooden court concluded, UNUM cannot be faulted for failing to give this later opinion overriding significance in the face of significant contrary evidence, including Dr. Truscott's earlier view.

Second, like the letter in Gooden, Dr. Truscott's letter contains little, if any, medical evidence to support his change in opinion. As noted above, Dr. Truscott did not base his revised opinion on a new examination of Sell, but rather on two pieces of information, Sell's SSA award and a letter purportedly sent to him by Dr. Hurlbutt. Regarding the SSA award, while it is true that the ALJ opinion in Sell's case discusses Sell's mental condition, Dr. Truscott told UNUM in March 2000, seven months after the SSA award, that Sell could still perform sedentary[*19] to light duty work. As such, the SSA decision cannot form the basis for Dr. Truscott's new diagnosis. Regarding Dr. Hurlbutt's pseudo-dementia diagnosis, there is no medical evidence, other than Dr. Truscott's bald assertions, that Dr. Hurlbutt ever made such a diagnosis. While Dr. Truscott's interpretation of Dr. Hurlbutt's purported findings is some medical evidence of Sell's disability, UNUM did not abuse its discretion by failing to give controlling weight to one doctor's interpretation of another doctor's letter, which itself was not submitted to UNUM. n4


n4 Sell also argues that UNUM "should have obtained the neurologist's medical records" before it made the decision to deny her application. Pl.'s Opp'n Mem. at 10. Sell appears to be claiming that UNUM was under a duty to investigate Dr. Truscott's claim that Dr. Hurlbutt diagnosed Sell with "pseudo-dementia."

Sell misinterprets an ERISA plan administrator's role in the decision-making process. In Pinto, the Third Circuit made it clear that a plan administrator, even one subject to a possible conflict of interest, is not under a "duty to make a good faith, reasonable investigation" of the beneficiary's claim. *Pinto, 214 F.3d at 394, n.8.* As such, the proper inquiry is whether the administrator's decision is supported by the record before it at the time the decision was made. The administrator is under no duty to gather further information.

In this case, it appears that Sell gave UNUM neither Dr. Hurlbutt's records nor the letter Dr. Hurlbutt allegedly sent to Dr. Truscott. UNUM was under no duty to hunt down this information on its own. Accordingly, UNUM's failure to conduct an investigation into Dr. Truscott's claims was not an abuse of discretion.

[*20]

2. Sell's SSA Disability Decision

Regarding Sell's SSA disability decision, Sell argues that UNUM "failed to read the decision and the accompanying exhibits carefully." Pl.'s Opp'n Mem. at 12. Specifically, Sell points to the Psychiatric Review Technique form accompanying her SSA disability decision. This form states that Sell suffers from moderate depression resulting in sleep disturbance, loss of interest in activities, decreased energy, and difficulty concentrating. Defs.' App. at 134-36. Sell acknowledges that an award of Social Security disability benefits does not determine whether a beneficiary should receive similar benefits under an ERISA plan. Pl.'s Opp'n Mem. at 12. She argues, however, that UNUM failed to adequately consider this information when it denied her application for benefits. Id.

In response, UNUM states that it is not bound by the SSA's findings. In its final denial letter to Sell,

dated January 1, 2001, UNUM asserted "any determinations made by the Social Security Administration have no bearing on whether or not Ms. Sell is eligible for UNUM disability benefits." Defs.' App. at 88. UNUM correctly notes that it is bound by the terms of the plan it [*21]administers, not by the SSA's regulations.

UNUM was not arbitrary and capricious in its consideration of Sell's SSA disability award. An SSA disability award is not dispositive in determining whether a plan administrator's denial of benefits was arbitrary and capricious, but it is a factor to consider in that evaluation. *Dorsey v. Provident Life and Accident Ins. Co., 167 F. Supp. 2d 846, n. 11.* In the instant case, UNUM considered the SSA award, but found that it did not support a finding that Sell was disabled from any gainful occupation. This was not an abuse of discretion, particularly in light of the significant countervailing evidence including Dr. Mauthe's independent evaluation, Dr. Truscott's first opinion, UNUM's in-house medical review, and the Functional Capacity Assessments.

IV. CONCLUSION

Once the movant adequately supports its summary judgment motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to go beyond the mere pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial. In this case, Sell fails to raise a genuine issue of fact indicating that[*22] UNUM's decision to discontinue her disability benefits was arbitrary and capricious. According, UNUM's summary judgment motion is granted.

This Court's Final Judgment follows.

FINAL JUDGMENT

AND NOW, this 19th day of November, 2002, upon consideration of Defendants UNUM Life Insurance Company of America and Knoll, Inc.'s Motion for Summary Judgment (Docket No. 6), IT IS HEREBY ORDERED that Defendants' Motion is GRANTED.

IT IS HEREBY FURTHER ORDERED that Judgment is to be entered in favor of Defendants UNUM Life Insurance Company of America and Knoll, Inc.

BY THE COURT:

HERBERT J. HUTTON, J.

218 F. Supp. 2d 500 printed in FULL format.

LINDA MANIATTY, Plaintiff, -v.- UNUMPROVIDENT CORPORATION, FIRST UNUM LIFE INSURANCE CORPORATION, SBC GROUP LONG TERM DISABILITY PLAN, UBS WARBURG LONG TERM DISABILITY PLAN, UBS AG LONG TERM DISABILITY PLAN (and successors in interest), Defendants.

01 Civ. 0209 (JSR)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

218 F. Supp. 2d 500; 2002 U.S. Dist. LEXIS 16231

August 29, 2002, Decided
August 30, 2002, Filed

**DISPOSITION:** [**1] Complaint dismissed with prejudice.

CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff claimant received short-term and then long-term disability benefits following back surgery. Defendants terminated her benefits asserting she was no longer disabled. The decision was upheld. The claimant sued defendant insurance companies under *29 U.S.C.S. § 1132*(a)(1)(B) challenging that determination. On a largely stipulated record, the matter was presented for final determination.

**OVERVIEW:** In reviewing the denial of long-term disability benefits, the court applied the arbitrary and capricious standard. The claimant asserted that there was a conflict of interest, but admitted that it was not sufficient to alter the standard of review unless she could show that the conflict influenced the determination to deny her benefits. She wholly failed to meet that burden. The claimant argued that the denials of benefits were arbitrary and capricious principally because they placed more reliance on the analyses of the reviewing physicians than on the conclusions of the physicians who actually examined her, and also because they demanded objective evidence when subjective statements of pain should have been sufficient. It was not unreasonable for the administrator to conclude that the only material reason the treating physicians reached their diagnoses was based on their acceptance of the claimant's subjective complaints: an acceptance more or less required of treating physicians, but by no means required of the administrator.

**OUTCOME:** Judgment was entered dismissing the complaint with prejudice and the insurance companies were awarded judgment.

**CORE TERMS:** administrator, pain, subjective, disability, long-term, doctor, arbitrary and capricious, chronic, conflict of interest, disability benefits, plan administrator, de novo, syndrome, disabled, fatigue, discretionary authority, surgery, standard of review, treating, surgeon, termination, deferential, terminated, short-term, ailment, administrative record, return to work, reconsideration, neurological, beneficiary

CORE CONCEPTS -

COUNSEL: For Linda Maniatty, PLAINTIFF: ABA Heiman, Scheine, Fusco, Brandenstein & Rada, PC, Woodbury, NY USA.

For Unumprovident Corporation, First UNUM Life Insurance Company, SBC Group Long Term Disability Plan, UBS AG Long Term Disability Plan, DEFENDANTS: Louis Michael Lagalante, Gallagher, Harnett & Lagalante, LLP, New York, NY USA.

JUDGES: JED S. RAKOFF, U.S.D.J.

OPINIONBY: JED S. RAKOFF

OPINION: [*501] MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.

On September 23, 1997, plaintiff Linda Manniatty, at that time employed at the Swiss Bank Corporation ("SBC"), underwent back surgery. Thereafter, on January 20, 1998, she ceased working as a result of back pain and applied for disability benefits under the SBC Disability Plan (subsequently replaced by the UBS AG Disability Plan). From January 26, 1998 to July 9, 1998, she received short-term disability benefits and thereafter collected long-term benefits until October 18, 1999, when defendants terminated her benefits on the ground that she was no longer "disabled" under the definition of the applicable benefits plan. After the plan administrator (First UNUM Life Insurance Corporation[**2] and its par-

Case 1:01-cv-01137-CCC   Document 68   Filed 12/12/2002   Page 30 of 119

218 F. Supp. 2d 500, *501; 2002 U.S. Dist. LEXIS 16251, **2

Page 4
LEXSEE

ent, UNUMProvident Corporation, herein collectively referred to as "UNUM") upheld the termination of benefits, plaintiff commenced this action under ERISA, *29 U.S.C. § 1132*(a)(1)(B), challenging that determination. By agreement of the parties, the matter is now presented to the Court, on a largely stipulated record, for final determination.

"'Denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator' ... discretionary authority to interpret the plan." *Sullivan v. LTV Aerospace and Defense Co., 82 F.3d 1251, 1254 (2d Cir. 1996)* (quoting *Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 103 L. Ed. 2d [*502] 80, 109 S. Ct. 948 (1989).* When the administrator has such discretionary authority, the administrator's decision is to be reviewed for abuse of discretion, applying an "arbitrary and capricious" standard. *Sullivan,* at 1254. An exception to such deferential review occurs, however, when the administrator has a conflict of interest and the evidence shows that the administrator was "in fact influenced by the conflict of interest,[**3] " in which case the denial of benefits should is reviewed de novo. *Id.* at 1256.

Plaintiff concedes that the plan here applicable, as evidenced by a 1997 Summary Plan Description ("SPD"), provides the administrator with the kind of discretionary authority that would ordinarily lead to a deferential standard of review. *See* transcript of oral argument of August 8, 2001 ("tr."), at 15. n1 Specifically, page 15 of § 3.2 of the 1997 SPD provides that the plan administrator has "the sole authority to interpret the terms of the insurance policies ... and determine whether benefits are payable, and the sole responsibility for making any benefit payments." *See also id.* § 3.7. n2 Plaintiff argues, however, that UNUM had an "inherent" conflict of interest because it paid beneficiaries from its own assets rather than from the assets of the trust.

n1 Prior to making this concession, plaintiff challenged the admissibility of the SPD on a basis of alleged discovery violations, but after plaintiff's counsel twice conceded in open court that plaintiff was not prejudiced by the violations, see tr. at 13-14, the Court overruled the objection. Despite these concessions, plaintiff's counsel subsequently sought reconsideration of that ruling, on no better basis than that he now thinks the introduction of the SPD hurts his case. *See* Plaintiff's Reply to Defendants' Submission, at 1. This frivolous motion for reconsideration is hereby denied.

[**4]

n2 *See also* the "Plain Facts" section of the revised 1999 SPD: "the plan administrator ... shall have primary authority and responsibility ... to interpret [the plan's] provisions and construe all of its terms, establish and enforce .. rules and regulations, [and] determine eligibility the entitlements and amount of benefits that shall be payable."

However, as plaintiff admits, the existence of such a conflict is not sufficient to alter the standard of review unless the plaintiff can show that the conflict influenced the determination. *See Sullivan, 82 F.3d at 1255.* Plaintiff has wholly failed to meet that burden. Specifically, even after being given repeated opportunities to adduce such evidence, all plaintiff could produce was an indication that, some years after the plaintiff had challenged the termination of her long-term benefits by claiming, inter alia, that she now suffered not just from back pain but also from chronic fatigue syndrome, UNUM introduced a plan, growing out of a pilot program in Atlanta, to limit benefits to new customers claiming chronic fatigue[**5] syndrome. This does not remotely begin to carry plaintiff's burden to demonstrate that the plan administrators were influenced by a conflict of interest in the prior adjudication of a claim made by a beneficiary of a prior plan.

Accordingly, the Court reviews the administrator's determination under an arbitrary and capricious standard. Specifically, a court may set aside a decision to deny benefits as "arbitrary and capricious" only if it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir.1995)*(citation omitted). As the Pagan court explained: "This scope of review is narrow, [and] thus we are not free to substitute our own judgment for that of the [plan administrator] as if we were considering the issue of eligibility anew." *Id. See also Jordan v. Retirement Comm. of [*503] Rensselaer Polytechnic Inst., 46 F.3d 1264, 1271 (2d Cir. 1995).*

At a minimum, the administrative record ("AR") of this case shows the following. Until September, 1997, plaintiff worked as a bond trader at SBC. Much of her day was spent sitting, talking on the telephone or doing paperwork. [**6]AR 476-479. After plaintiff had back surgery on September 23, 1997, she returned to work, but, as noted above, stopped working on January 20, 1998, complaining of continuing pain in the area where she had had back surgery. She promptly submitted a claim for short-term disability benefits, which was approved and paid until July 1998, when, based on plaintiff's assertion that her back problems persisted,

218 F. Supp. 2d 500, *503; 2002 U.S. Dist. LEXIS 16231, **6

defendants began to pay long-term disability benefits. AR 458, 515, 531-545.

In October 1999, however, UNUM notified plaintiff that it would no longer continue to pay benefits because of a lack of objective evidence of continuing "disability," as defined by the applicable benefits plan. AR 266-267. n3 This initial decision to terminate plaintiff's long-term benefits was based primarily on the administrator's analysis of (a) reports by plaintiff's own doctors, (b) the report of a UNUM representative who met with plaintiff in May 1999, and (c) summary reports by a UNUM reviewing doctor and a reviewing nurse. See AR 266-267. With respect to the report of plaintiff's own doctor, one surgeon, Dr. Camissa, thought plaintiff's continuing pain was caused by a "chip in her back"; the surgeon[**7] who performed the operation, Dr. Lavyne, described the pain as "residual of nerve injury" and thought the injury would not improve; and a third doctor, Dr. Hart, reported sedentary capacity. AR 295-96. The UNUM representative noted plaintiff's complaints of pain and inability to sit, but also described "inconsistencies" based on the fact that she did not take pain medication, did not have trouble sleeping, walked two miles every day, and swam three times a week. AR 295-97. Finally, the reviewing doctors and nurse noted that even though Dr. Lavyne performed a number of diagnostic tests, he found no evidence of any muscoskeletical or neurological deficit nor any other disorder that would explain the pain described by plaintiff. The UNUM report found that plaintiff's complaint was therefore "subjective in nature, without objective evidence for continued lumbar dysfunction," AR 266, 280, and, on this basis, concluded that plaintiff was no longer disabled. AR 266-67. Plaintiff appealed.

n3 The plan defined "'Disability' and 'disabled' [to] mean that because of injury or sickness: 1. the insured cannot perform each of the material duties of his regular occupation; and 2. after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted, taking into consideration training, education or experience, as well as prior earnings." AR 51.

[**8]

In her initial appeal, plaintiff submitted a new report from Dr. Lavyne stating that plaintiff's "chronic back pain is disabling her ... [and she is] unable to return to work." AR 247. Yet the surgeon could still not point to any objective evidence supporting plaintiff's pain complaints, and UNUM's reviewing physician thus concluded that the evidence of pain was purely subjective and that there was no reason to reopen the case. AR 244. A Quality Review confirmed this decision. AR 221-22.

Plaintiff then took a final appeal, known as the "Final Administration Review." As part of this appeal, plaintiff claimed, for the first time ever, that, in addition to her back pain, she suffered from chronic fatigue syndrome and fibromyalgia, a related illness. Plaintiff submitted, inter alia, reports from two new doctors, Dr. Levine [*504] and Dr. Podell, purporting to support these new assertions, but again the findings were largely based on the plaintiff's own subjective reports. After reviewing all of the records, the reviewing physician noted that plaintiff's "subjective symptoms have consistently exceeded her objective findings," AR 207, and that the purely objective evidence indicated that[**9] plaintiff should be able to work an eight-hour day, provided she changed positions and periodically stood and walked, rather than just sit. Id. at 207-208. A vocational consultant retained by UNUM essentially agreed with the reviewing physician. See AR 191-194. Once again, plaintiff's appeal was denied.

Before this Court, plaintiff argues that the foregoing determinations were arbitrary and capricious principally because they placed more reliance on the analyses of the reviewing physicians than on the conclusions of the physicians who actually examined plaintiff and also because they demanded objective evidence when subjective statements of pain should have been sufficient. The former argument really collapses into the latter, however, because the administrator, far from ignoring the reports of the treating physicians, heavily relied on the fact that none of them adduced any objective evidence of plaintiff's complaints. In these circumstances, it was not unreasonable for the administrator to conclude that the only material reason the treating physicians were reaching their diagnoses was based on their acceptance of plaintiff's subjective complaints: an acceptance more or less[**10] required of treating physicians, but by no means required of the administrator.

While plaintiff argues that the plan itself does not state that objective evidence is necessary to establish disability, the plan does state that "proof" of continued disability must be provided, AR 64, and the very concept of proof connotes objectivity. In any event it is hardly unreasonable for the administrator to require an objective component to such proof. See Bailey v. Provident Life & Accident Ins. Co., 3:99 cv 394/LAC(D.C. Fla.

Case 1:01-cv-01157-CCC    Document 66    Filed 12/12/2002    Page 32 of 119

Page 6
LEXSEE

218 F. Supp. 2d 500, *504; 2002 U.S. Dist. LEXIS 16231, **10

June 13, 2000) ("Although ... subjective information should be considered, ... reliance on such complaints, without more, would result in insurance companies paying virtually all claims ... Therefore, Provident acted appropriately in rejecting Bailey's claim when it found insufficient objective support for a long-term disability claim.").

Thus, given the virtual absence of any material objective evidence to support plaintiff's claim, it can hardly be said that the administrator acted in an arbitrary and capricious matter in rejecting plaintiff's claims. Indeed, even if this Court were to apply a de novo standard of review, the same results would follow, for virtually[**11] the only objective evidence in the administrative record regarding plaintiff's allegedly continuing back pain is an MRI that showed a "small recurrent disc herniation" in 1998, well before defendants terminated their disability payments to plaintiff. AR 136. All subsequent tests designed to uncover neurological damage were negative (although another of plaintiff's physicians, Dr. Balensweig, did detect some mildly reduced reflexes on plaintiff's left side). AR 1201-1, 126, 132-36, 302, 431-432, 444, 519. This hardly constitutes a sufficient basis for any reasonable conclusion that plaintiff was so disabled as to qualify for long-term benefits, as op-

posed to being able to return to work under reasonable restrictions and limitations. AR 208.

With regard to the claims of chronic fatigue syndrome and fibromyalgia, the very fact that plaintiff did not raise these alleged ailments under her final appeal -- even though she claimed that she had been suffering from both for years, AR 80 -- is reason for skepticism. Once again, moreover, [*505] there is no material objective evidence of record establishing either ailment, just plaintiff's subjective reports. Without such evidence, the Court would[**12] reject these claims even under a de novo standard, and certainly it was reasonable for the administrator to do so. See *John v. Noe, 1998 U.S. Dist. LEXIS 2016,* *16 (S.D.N.Y. 1996)

Accordingly, for the foregoing reasons, the Clerk is directed to enter judgment dismissing the Complaint with prejudice and awarding judgment to defendants.

SO ORDERED.
Dated: New York, New York

August 29, 2002

JED S. RAKOFF, U.S.D.J.

10TH CASE of Focus printed in FULL format.

MARY ANNE T. HEVENER v. THE PAUL REVERE LIFE INS. CO.

Civil Action No. 02-415

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2002 U.S. Dist. LEXIS 15893

August 26, 2002, Decided

August 26, 2002, Filed; August 27, 2002, Entered

**DISPOSITION:** Defendant's motion for summary judgment was granted and plaintiff's counter-motion for summary judgment was denied. Judgment was entered in favor of Defendant and against Plaintiff.

CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff former employee sued defendant plan administrator, seeking unpaid benefits under a long-term disability benefits plan pursuant to the Employment Retirement Income Security Act of 1974, *29 U.S.C.S. § 1001* et seq. The administrator moved for summary judgment, and the employee filed a counter-motion for summary judgment. The employee also moved to reinstate previously dismissed claims.

**OVERVIEW:** The administrator determined that the employee was no longer qualified for benefits under the policy's definition of total disability and terminated disability benefits. The employee alleged that the administrator arbitrarily and capriciously applied a different definition of total disability after the first 24 months of benefits. The court applied a heightened standard review because the administrator made claims determinations and paid the benefits, and the standard of review fell in the middle of the Pinto sliding scale based upon the inherent conflict caused by the administrator's role in both funding and administering the claims and on the difference in level of sophistication of the parties. The court determined that the administrator was entitled to summary judgment. The policy made clear that the employee had to be totally disabled to be entitled to benefits. Also, the policy provided two different definitions of total disability, one applicable to the first 24 months of disability, and the other applicable thereafter. Based upon the medical opinions, the administrator did not act arbitrarily or capriciously in determining that the employee was not totally disabled.

**OUTCOME:** The court granted the administrator's summary judgment motion and denied the employee's summary judgment motion. The court also denied the employee's motion to reinstate previously dismissed claims.

**CORE TERMS:** summary judgment, heightened, administrator, totally disabled, sedentary, arbitrary and capricious, disc, disability, disease, pain, total disability, standard of review, vocational, sit, disability benefits, non-moving, medical evidence, insured, genuine issue of material fact, sliding scale, capable of performing, period of time, occupation, capriciously, eligibility, prolonged, disorder, opined, occ, conflict of interest

CORE CONCEPTS -

**COUNSEL:** [*1] For Mary Anne T Hevener, PLAINTIFF: Bradley H Kane, Dashevsky, Horwitz, Di Sandro, Kuhn, Dempsey and Novello, Philadelphia, PA USA.

For The Paul Revere Life Insurance Company, et al, DEFENDANT: Andrew F Susko, Philadelphia, PA USA.

**JUDGES:** John R. Padova, J.

**OPINIONBY:** John R. Padova

**OPINION: MEMORANDUM**

Padova, J.

August 26, 2002

The instant action arises on Defendant Paul Revere Life Insurance Company's Motion for Summary Judgment and Plaintiff Mary Anne T. Hevener's Counter-motion for Summary Judgment. For the reasons that follow, the Court grants Defendant's Motion. Plaintiff's Motion is denied.

I. BACKGROUND

The following is an action for unpaid benefits pursuant to the Employment Retirement Income Security Act of 1974 ("ERISA"), *29 U.S.C. § 1001* et seq. In May 1997, Plaintiff, an employee of Firstrust Bank, applied for and


began receiving disability benefits under an ERISA long-term disability benefits plan administered by Defendant Paul Revere Life Insurance Company. Plaintiff stopped working as the result of a disabling back condition. On February 26, 2001, Defendant terminated benefits, determining that Plaintiff was no longer[*2] qualified for benefits under the policy's definition of total disability. Plaintiff's appeals were denied.

Plaintiff filed this action, originally for breach of insurance contract and insurance bad faith, in the Court of Common Pleas of Philadelphia County. The suit was brought against multiple insurance entities n1 and Betty Johnson, the named administrative contact for the Plan. Defendants removed the action to this Court, which denied Plaintiff's Motion to Remand and determined that the disability plan is governed by ERISA. Plaintiff filed an Amended Complaint bringing an ERISA claim (Count II) as well as various state and federal law claims. Subsequently, the parties agreed to dismiss with prejudice various of the state law insurance claims, and to dismiss without prejudice the state law bad faith claim, the civil RICO claim, and the federal common law fraud claims. The claims were also dismissed against all Defendants except the Paul Revere Life Insurance Company.

n1 Originally named as Defendants were: Paul Revere Insurance Company, the Paul Revere Insurance Group, Provident, Provident Life and Accident Insurance Company, Unum Provident Corporation, Unum Life Insurance Company of America, and First Unum Life Insurance Company ("Paul Revere Defendants").

[*3]

Defendant moves for summary judgment on the ERISA claim. Plaintiff opposes the motion and has filed a counter-motion for summary judgment. Plaintiff also seeks reinstatement of the claims previously dismissed by agreement of the parties, and seeks summary judgment on the dismissed claims as well. For the reasons that follow, the Court grants Defendant's motion for summary judgment. Plaintiff's motion is denied in all respects. n2

n2 Plaintiff's request for reinstatement of the previously dismissed claims and for summary judgment on those claims is denied. The state insurance law

claims are completely barred because they were dismissed with prejudice. With respect to the other claims that were dismissed without prejudice, a stipulation without prejudice terminates the action (or parts of the action) as if never filed. *Martino v. Consolidated Rail Corp.*, 88-0532, 1988 U.S. Dist. LEXIS 14243, at *2 (E.D. Pa. Dec. 31, 1988) (citing *Cardio-Medical Assocs., Ltd. v. Crozer-Chester Med. Ctr.*, 95 F.R.D. 194, 196 (E.D. Pa. 1982), aff'd 721 F.2d 68 (3d Cir. 1983)). The stipulation is a final order. Id. Once the stipulation is filed, the parties may not vacate the dismissal. Id. Ordinarily, Plaintiff may only renew such claims by filing a new action. Id. None of the exceptions to this general rule, either through language in the stipulation or under Federal Rule of Civil Procedure 60, is applicable in this case.See *id.*1988 U.S. Dist. LEXIS 14243, [WL] at *2-3. Nor has Plaintiff sought, or been granted, leave to file a Second Amended Complaint. As none of the previously dismissed claims is before the Court, the Court may not reach the merits of those claims, such as granting summary judgment on the claims that are the subject of the stipulation. *Hinsdale v. H & R Block of Houston*, 66 F.3d 77, 80 (5th Cir. 1995).

[*4]

## II. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district[*5] court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After

Case 1:01-cv-01157-CCC    Document 66    Filed 12/12/2002    Page 35 of 119



the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, 477 U.S. at 322.* Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. *Anderson, 477 U.S. at 255.* "If the opponent [of summary judgment] has exceeded the 'mere scintilla' [of evidence] threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. *Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).*[*6]

Where, as here, cross-motions for summary judgment have been presented, the Court must consider each party's motion individually. Each side bears the burden of establishing a lack of genuine issues of material fact. *Reinert v. Giorgio Foods, Inc., 15 F. Supp. 2d 589, 593-94 (E.D. Pa. 1998).*

## III. DISCUSSION

### A. Standard of Review for ERISA Claim

A denial of benefits under *29 U.S.C. § 1132*(a)(1)(B) ordinarily is reviewed under a de novo standard. *Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989).* However, "ERISA mandates that [the reviewing Court] apply a deferential 'arbitrary and capricious' standard of review to benefits decisions when plan administrators are given discretionary authority to interpret the terms of the plan." *Reinert, 15 F. Supp. 2d at 596* (citing *Abnathya v. Hoffman-LaRoche, Inc., 2 F.3d 40, 44-45 (3d Cir. 1993));* see also *Firestone Tire & Rubber Co., 489 U.S. at 109.* In this case, language contained in the original group plan application provides:

The coverage applied for provides benefits[*7] for the employee welfare benefit plan established and maintained by the employer under the Employee Retirement Income Security Act (ERISA), unless otherwise exempted by law. The employer is the Plan Administrator unless otherwise noted. The Paul Revere Life Insurance Company, as claims administrator, has the full, final, binding and exclusive authority to determine eligibility for benefits and to interpret the policy under the plan as may be necessary in order to make claims determinations. The decision of claims administrator shall not be overturned unless arbitrary and capricious or unless there is no rational basis for a decision.

(Def.'s Ex. 7 ("Group Insurance Application") at 4.) The "arbitrary and capricious" standard is essentially the same as the "abuse of discretion" standard. *Abnathya, 2 F.3d at 45 n.4.* Under this standard, "the district court may overturn a decision of the Plan administrator only if it is 'without reason, unsupported by the evidence or erroneous as a matter of law.'" *Abnathya, 2 F.3d at 45* (quoting *Adamo v. Anchor Hocking Corp., 720 F. Supp. 491, 500 (W.D. Pa. 1989)).* "This scope of review is[*8] narrow, and 'the court is not free to substitute its own judgment for that of the [administrator] in determining eligibility for plan benefits.'" Id. (quoting *Lucash v. Strick Corp., 602 F. Supp. 430, 434 (E.D. Pa. 1984)).*

Where an insurance company both determines eligibility for benefits and pays benefits out of its own funds, however, the standard of review is "heightened" arbitrary and capricious review. *Pinto v. Reliance Std. Life Ins. Co., 214 F.3d 377, 378 (3d Cir. 2000).* This modified standard recognizes that when an insurance company both funds and administers benefits, it is "generally acting under a conflict" that warrants the heightened form of review. *Pinto, 214 F.3d at 378.* In this case, Defendant both funded and administered benefits under the long-term disability benefits plan. Under the terms of the policy, Defendant pays benefits under the policy. n3 (Def. Ex. 5 at PD8FACE) ("The Paul Revere Life Insurance Company agrees to pay the Group Insurance Benefits set forth in this Policy.") Defendant also is the administrator of claims. (Def.'s Ex. 7 at PRLMS00018.) Because Defendant makes claims determinations and[*9] pays the benefits, the heightened standard applies.

n3 Although the language suggests that the Defendant pays the cost of benefits, the papers are somewhat vague as to the ultimate source of funds to pay benefits under the policy. As the Court is granting Defendant's Motion for Summary Judgment under a heightened standard, which is a more rigorous standard of review from the standpoint of the Defendant, this distinction has no effect on the outcome of the disposition of the summary judgment motions here.

Under this "heightened" approach, the courts apply a "sliding scale" approach that integrates the conflict as


a factor in applying the arbitrary and capricious standard. *Pinto, 214 F.3d at 393.* Courts must consider the nature and degree of apparent conflicts with a view to shaping their arbitrary and capricious review of the benefits determinations of discretionary decisionmakers. Id. Factors a court may take into account in determining the appropriate degree of deference include: "the sophistication[*10] of the parties, the information accessible to the parties, . . . the exact financial arrangement between the insurer and the company [and] the current status of the fiduciary." *Id. at 392.* The degree of review increases in proportion to the intensity of the conflict. *Friess v. Reliance Standard Life Ins. Co., 122 F. Supp. 2d 566, 572 (E.D. Pa. 2000).* Though a court may not look outside the administrative record when reviewing an administrator's decision, a court may consider evidence outside the record to evaluate the level of an administrator's conflict of interest and to determine the appropriate standard of review. *Dorsey v. Provident Life & Accident Ins. Co., Civil Action No. 01-1072, 2001 U.S. Dist. LEXIS 16353,* at *8 (E.D. Pa. Oct. 5, 2001). Evidence of significant conflict of interest places a case at the far end of the sliding scale, under which the court reviews the administrator's decision with a "high degree of skepticism." *Pinto, 214 F.3d at 395.*

In this case, Plaintiff asserts that the higher standard of review applies, but makes little by way of specific argument that demonstrates a very high degree[*11] of heightened review is appropriate. There is no evidence here to suggest that Plaintiff was a sophisticated applicant for benefits who would be on equal footing with the Defendant, thus suggesting the appropriateness of heightened review. See *Davies v. Paul Revere Life Ins. Co., 147 F. Supp. 2d 347, 356 (M.D. Pa. 2001).* However, none of Plaintiff's allegations of procedural irregularities in the administration of the claim are sufficient to establish substantially heightened review. Accordingly, based on the inherent conflict caused by an insurer's role in both funding and administering the claims, and on the difference in level of sophistication of the parties, the Court will apply heightened review that falls in the middle of the Pinto sliding scale.

1. The 24-month limitation period

Plaintiff's Amended Complaint alleges various deficiencies in the administration of her disability claim. Her principal complaint is that the Defendant arbitrarily and capriciously applied a different definition of total disability after the first 24 months of benefits. Plaintiff argues that this change in definition was improper under the policy, and that even if it were [*12]part of the original policy, it was unconscionable and a violation

of Pennsylvania insurance law because it was deceptive and not included in the "exclusions" portion of the policy. Defendant contends that the definition change was clear in the policy and was valid. This change in definition, which Defendant explicitly applied in reevaluating Plaintiff's benefits claim, is the primary reason that benefits were ultimately denied.

Plaintiff's argument is without merit. The group disability policy explicitly provides:

We pay monthly disability benefits to an Employee who satisfies the following definitions. . . .

24 Month Own Occupation Benefit with Partial Disability

TOTAL DISABILITY or TOTALLY DISABLED means that during the Elimination Period and the first 24 months after completing the Elimination Period, the Employee:

1. is unable to perform the important duties of his own occupation on a Full-time or part-time basis because of an Injury or Sickness that started while insured under this Policy; and

2. does not work at all; and

3. is under Doctor's Care.

After 24 months of Own Occupation benefits have been paid, the Employee will continue[*13] to be Totally Disabled if he can not work in any occupation for which he is or may become suited by education, training or experience.

(Def.'s Ex. 5 at PD82000.)

Notwithstanding this clear language in the policy, Plaintiff argues that other language in the documentation promised to apply a different definition. Plaintiff points to a statement on the "general information" page of the policy explanation, which states: "If you are Disabled and not able to work for your Employer for an extended period of time, group long term disability insurance pays a cash benefit to replace a portion of the Earnings you lose from your Employer as a result of your Disability." (Pl.'s Ex. A "Booklet-Certificate Q&A" at CD8-GEN G-1.) Relying on this language, Plaintiff argues that the policy "promised to pay her [Plaintiff] indefinitely if she was unable to work for her employer." (Pl.'s Mem. at 26.) Plaintiff's reliance on this language is untenable. The language of the policy makes clear that in order



to be entitled to benefits, the employee must be totally disabled under the meaning of the policy. The policy provides two different definitions of total disability, one applicable to the first[*14] 24 months of disability, and the other applicable thereafter. There is nothing ambiguous about any of the language in the policy or supporting documentation that would support Plaintiff's position. Accordingly, Defendant's use of this definition as outlined in the policy cannot be considered to have been arbitrary and capricious, even under a heightened standard of review.

2. Finding of total disability

Plaintiff next claims that Defendant acted arbitrarily and capriciously by determining that Plaintiff was not totally disabled. In denying Plaintiff's claim, Defendant determined that Plaintiff was capable of performing sedentary work, and identified a number of sedentary positions for which she would be suited. (Def.'s Ex. 29 "Letter of Feb. 26, 2001"). Defendant based this decision upon the restrictions and limitations identified by Plaintiff's attending physician, Dr. Neil Mallis, (id.), and the report of a vocational expert, who identified sedentary positions using the criteria established by Dr. Mallis. (Def.'s Ex. 27.) Plaintiff appealed the decision, and in support of the appeal submitted two additional notes from Dr. Mallis. n4 (Def.'s Ex. 30.) On both levels of appeal, [*15] UNUMProvident upheld the denial of benefits, concluding that there was no objective medical evidence - including the new letters by Dr. Mallis - to indicate that Plaintiff was not capable of performing sedentary work like the work identified by Defendant's vocational expert. (Def.'s Ex. 31 "Letter of May 23, 2001"; Def.'s Ex. 35 "Letter of Oct. 23, 2001.")

---

n4 In the first, a note dated March 23, 2001, Dr. Mallis observed that Plaintiff "remains totally disabled from work due to her lower back disorder." (Def.'s Ex. 30.) In a subsequent, more detailed letter, he noted that:

The above-captioned patient [Ms. Hevener] has been under my care on a regular basis for the treatment of degenerative disc disease in the lumbar spine with associated multiple disc herniations.

The nature of this condition is one of a progressive disease, generally worsening over a period of time. As a direct result of this lumbar disc disease, the patient is unable to sit or stand for prolonged periods

of time, as this will exacerbate her symptoms.

(Def.'s Ex. 30.)

[*16]

Defendant's denial of Plaintiff's claim was not arbitrary and capricious. In denying the claim, Defendant did not dispute that Plaintiff was suffering from limitations and restrictions as the result of back injuries, and did not disregard objective medical evidence of her back disorder. See (Def.'s Ex. 10 "Statement of Dr. Mallis dated May 5, 1997"); (Def.'s Ex. 14 "Report of Dr. Erwin R. Schmidt dated January 13, 1998"). Rather, Defendant relied on the results of the vocational expert's report, which in turn were based on the restrictions provided by Plaintiff's own treating physician. See (Def.'s Ex. 29); (Def.'s Ex. 27). The consistency of the results of the vocational expert report and the restrictions given by Dr. Mallis were verified by a medical expert reviewer. (Def.'s Ex. 28 "Review by Dr. Frank dated July 7, 2000.")

Moreover, Dr. Mallis' statements and reports regarding Plaintiff's condition that are contained in the claims file largely support Plaintiff's ability to engage in the type of sedentary work recommended by the vocational expert. In his initial May 5, 1997 statement of her condition, he listed no heavy lifting, pulling, pushing, prolonged standing, or[*17] sitting as restrictions on her work abilities. (Def.'s Ex. 10.) In the functional capacity form dated November 23, 1999, Dr. Mallis indicated that Plaintiff's strength level was sedentary, in that she could lift less than 10 pounds occasionally, and that she could sit, stand, and walk up to a maximum of four hours during an 8-hour workday with breaks at least every half hour. (Def.'s Ex. 21.) In his subsequent functional capacity form dated June 8, 2000, Dr. Mallis indicated that Plaintiff could sit for one hour at a time 4-6 hours per day, could walk and stand 2 hours at a time 4-6 hours per day, and could lift 10 pounds occasionally. (Def.'s Ex. 26.)

Thus, Defendant's disability determination was largely based on Dr. Mallis' diagnoses and treatment notes. The only evidence that supports Plaintiff's position is the March 23, 2001 note from Dr. Mallis indicating that Plaintiff is "totally disabled from work due to her lower back disorder." (Def.'s Ex. 30.) However, Dr. Mallis' statement does not clarify, for example, whether she is totally disabled from her position at Firstrust Bank, or totally disabled from any other similar position, or whether she is able to carry out sedentary [*18]type work. Dr. Mallis' April 10, 2001 note is more specific,

but again states nothing about Plaintiff's ability to carry out sedentary work, except that he once again states that she is "unable to sit or stand for prolonged periods of time," which is consistent with his prior treatment notes. n5 See (Def.'s Ex. 30.) The restrictions in the April 10, 2001 note are unchanged from those indicated in prior notes in the claims file.

n5 Plaintiff also relies on Dr. Mallis' statement that "the nature of this condition is one of a progressive disease, generally worsening over a period of time." (Def.'s Ex. 30.) This statement, however, sheds little light on the issue of whether Plaintiff was currently able to perform sedentary work.

Moreover, to the extent that the Defendant disregarded aspects of Dr. Mallis' opinion, the decision was not arbitrary and capricious under heightened review in light of the other evidence considered by the Defendant. Aside from Dr. Mallis' treatment notes and reports, Defendant relied[*19] on: evaluations by the independent medical examination by Dr. Erwin R. Schmidt, Jr. n6 (Def.'s Ex. 14); a non-examination medical records review by Dr. Edward C. Alvino, M.D. n7 (Def.'s Ex. 20); and a non-examination file and record review by Dr. Michael Theerman. n8 (Def.'s Ex. 24.) Defendant also considered the administrative law judge opinion denying Plaintiff's claim for social security benefits n9 (Def.'s Ex. 25.); a home interview with the insured (Def.'s Ex. 22); and an interview with Dr. Mallis. (Def.'s Ex. 23.)

n6 In his January 13, 1998 report, Dr. Schmidt concluded that Plaintiff demonstrated: "objective findings of S1 nerve root irritation based on EMG evaluation. She demonstrates no other objective evidence of radiculopathy. She subjectively cannot sit for any period of time which precludes her working at the occupation described. This could relate to nerve root irritation, but there is no evidence of damage." (Def.'s Ex. 14.)

n7 In his June 14, 1999 report, Dr. Alvino opined that the medical records "would support the impression of 'chronic pain' . . ." He further opined that "I would think that the insured may be physically capable of performing an appropriate 'any occ' job with her reported diagnosis. . . . I would not expect that this 29 y.o. should remain totally precluded on a physical basis from performing an appropriate 'any occ' job . . ." (Def.'s Ex. 20.)

[*20]

n8 In his December 22, 1999 report, Dr. Theerman opined that: "A discogram on 9-10-99 was reportedly positive at four levels, but one of those levels which produced her exact pain had a totally normal disc. This is usually considered evidence of symptom magnification or embellishment, as a normal disc should not produce pain when injected. Therefore, there is some doubt as to the credibility of the insured's allegations. Nevertheless, we cannot ignore the extensive disc abnormalities found on her imaging studies, and therefore we cannot be sure that she does not have the degree of pain she alleges. It is quite possible for someone with her degree of disc disease to have that much pain. And if she truly has that much pain, then she could be precluded from 'any occ'." (Def.'s Ex. 24.)

n9 In the opinion, the ALJ determined that: "The medical evidence establishes that the claimant does not have an impairment or combination of impairments . . ." and "The claimant's testimony is not accepted to the extent she has described limitations exceeding what is shown by or could reasonably be expected from the objective medical evidence." (Def.'s Ex. 25.)

[*21]

Considering all of this evidence contained in the claims file, and applying heightened review, the evidence does not support Plaintiff's conclusion that the Defendant acted arbitrarily and capriciously in denying the claim, and is not sufficient to establish a genuine issue of material fact as to Plaintiff's ERISA claim. The Defendant's decision was based on restrictions and limitations specified by Plaintiff's own physician. The only medical conclusion which Defendant arguably disregarded was Dr. Mallis' one-sentence statement that Plaintiff was totally disabled as the result of her back disease, but even this statement lacks specificity or support in the objective medical record contained in the claims file. The Court grants Defendant's Motion for Summary Judgment and enters judgment in favor of Defendant and against Plaintiff. Plaintiff's Motion is denied in its entirety.

An appropriate Order follows.

ORDER

AND NOW, this 26th day of August, 2002, upon consideration of Defendant's Motion for Summary Judgment (Doc. No. 22), Plaintiff's Reply to Defendant's Motion for Summary Judgment and

Case 1:01-cv-01137-CCC    Document 66    Filed 12/12/2002    Page 39 of 119


Counter Motion for Summary Judgment (Doc. No. 23), and any and all supporting and[*22] opposing briefing thereto, IT IS HEREBY ORDERED that said Defendant's Motion (Doc. No. 22) is GRANTED and Plaintiff's Motion (Doc. No. 23) is DENIED. JUDGMENT is entered in favor of Defendant and against Plaintiff. This case shall be closed for statistical purposes.

BY THE COURT:

John R. Padova, J.

14TH CASE of Focus printed in FULL format.

JUDY L. WALKER, Plaintiff, v. LONG-TERM DISABILITY PLAN OF SPONSOR TRI-VALLEY
GROWERS, et al., Defendants.
No. C 00-02468 CRB
UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA
2002 U.S. Dist. LEXIS 5035

March 25, 2002, Decided
March 25, 2002, Filed, Entered in Civil Docket

**DISPOSITION:** [*1] Defendant's motion for summary judgment was granted and judgement was entered in favor of defendants and against plaintiff.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Relying on the Employee Retirement Income Security Act of 1974, plaintiff benefits recipient sued defendant insurer, the entity that also administered the recipient's long-term disability (LTD) plan, after the insurer terminated the recipient's benefit payments. The parties filed cross-motions for summary judgment.

**OVERVIEW:** The recipient suffered from fibromyalgia syndrome. In 1988, the previous insurer approved LTD payments for her. Until 1997, her treating physician submitted semi-annual reports opining that the recipient continued to be disabled. In 1997, defendant insurer purchased the LTD plan from the previous insurer. Based on a new investigation of the case, which included an independent medical examination and a review by a medical-vocational consultant, the insurer determined that the recipient was not disabled within the meaning of the plan--the insurer found that she could work full-time in sedentary positions. On review, the court determined, first, that abuse of discretion, rather than de novo review was appropriate. The insurer had an inherent conflict of interest, but the recipient did not show that the conflict caused a serious breach of the insurer's duty to her. In addition, the plan language was not ambiguous. Next, the court determined that the insurer did not abuse its discretion by concluding that the recipient was not disabled. The insurer did not disregard the treating physician's opinion, whose most recent report stated only that the recipient felt that she was disabled.

**OUTCOME:** The court granted the insurer's motion, implicitly denied the recipient's motion, and entered judgment in favor of the insurer and against the recipient.

**CORE TERMS:** conflict of interest, administrator, treating, decision to terminate, novo, abuse of discretion, diagnosis, administrative record, totally disabled, summary judgment, clearly erroneous, pain, treating physician, vocational, consultant, gainfully, material evidence, memorandum, occupation, patient, abused, substantial evidence, declaration, credibility, discretionary authority, gainful employment, subjective, disabled, tainted, diagnoses

**CORE CONCEPTS -**

**COUNSEL:** For JUDY L. WALKER, Plaintiff: Howard Bennett Hellen, Law Offices of Howard Bennett Hellen, Vista, CA.

For UNUM LIFE INSURANCE COMPANY OF AMERICA, defendant: Edwin A. Oster, Gregory P. Vidler, Barger & Wolen, Irvine, CA.

**JUDGES:** CHARLES R. BREYER, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** CHARLES R. BREYER

**OPINION:** MEMORANDUM AND ORDER

This is an ERISA action for recovery of discontinued long-term disability ("LTD") benefits. Plaintiff, Judy Walker ("Walker"), received LTD benefits for fibromyalgia syndrome ("FMS") for ten years. In 1998, defendant, Unum Life Insurance Co. of America ("Unum"), canceled Walker's benefits because it determined that she was no longer disabled as defined under her LTD policy (the "Plan").

Walker argues that Unum's decision was (1) tainted by a conflict of interest and therefore should be reversed under de novo review; and (2) even if a de novo review is not warranted, Unum abused its discretion and therefore the decision to terminate benefit payments should be reversed. Now before the Court are plaintiff and defendant's[*2] cross-motions for summary judgment. After carefully considering the pleadings filed by the parties,


and having given the parties the opportunity to make oral argument, defendant's motion for summary judgment is GRANTED.

## BACKGROUND

Walker started working for Tri-Valley Growers (Modesto) in 1972. She was a data communications specialist when she became ill in 1988. Her duties involved setting up and moving computer equipment and supervising data entry operators. Walker's salary was $ 3,180 per month in 1988, when she began to experience back and neck pain. She was referred to Paul Schunke, M.D. ("Dr. Schunke"), a Rheumatologist. Dr. Schunke diagnosed Walker's symptoms as being consistent with FMS, a condition in which the patient feels joint pain, dizziness, and nausea, but there is a lack of objectively recognizable manifestations.

Northwestern National Life Insurance Co. ("Northwestern"), the original policy issuer, approved LTD benefits for Walker in December 1988, including retroactive payments from the beginning of October 1988. Administrative Record at 000603 (hereinafter "AR"). Walker's gross monthly benefits were $ 2,120.11 per month, based on 2/3 of her earnings. Under[*3] the Plan, total disability occurs when the insurance company determines that:

You are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and you have a 20% or more loss in your indexed monthly earnings due to the sickness or injury. After 36 months of payments, you are disabled when UNUM determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training, or experience.
The Plan at 15.

The Plan defines "gainfully employed" as "an occupation that is or can be expected to provide you with an income at least equal to your gross disability payment within 12 months of your return to work." The Plan at 17. The Plan also vests discretion in the administrator to determine benefit eligibility by stating: "when making a benefit determination under the policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy." The Plan at 1.

Northwestern initially sent a medical-vocational consultant, Susan Yager ("Yager"), to visit Walker and[*4] consult with Dr. Schunke. On April 28, 1989, Yager

reported that Walker's pain was getting worse and Dr. Schunke apparently told Yager that he did not think the patient could return to her previous job or tolerate prolonged periods of sitting. Yager submitted three more reports in 1989, all of which confirmed the FMS diagnosis and Walker's continued inability to work.

Subsequently, Dr. Schunke submitted semi-annual reports to Northwestern regarding Walker's condition from October 30, 1989 to July 8, 1991. In his October 30, 1989 letter to Northwestern, Dr. Schunke wrote that Walker "should be considered permanently disabled as of November 1, 1989 because of muculoskeletal pain consistent with fibromyalgia syndrome." AR at 000519. Dr. Schunke then told Northwestern in 1990 that Walker was still totally disabled from working her usual job and a rehabilitation program would not be helpful. In a questionnaire submitted to Northwestern on February 15, 1991, Dr. Schunke wrote that Walker was unable to walk, stand or sit for more than an hour at a time, or lift more than five pounds. Dr. Schunke also believed that Walker's reports of pain were credible and he did not expect improvement within[*5] the next six months.

In July of 1991, Dr. Schunke again told Northwestern that Walker was permanently and totally disabled from working in any occupation. At this time Walker was also applying for Social Security disability benefits. An Administrative Law Judge initially denied Walker's Social Security disability benefits claim on September 14, 1991, because her "impairment does not prevent the claimant from performing her past relevant work." AR at 000490-94. However, on September 30, 1992, the Social Security Administration reversed its decision on appeal and found that Walker was entitled to retroactive benefits starting from August 2, 1989. AR at 000468-471. The reversal was based on "the functional capacity assessment provided by Dr. Schunke" and because Walker's testimony about her pain was "fully credible." n1 Dr. Schunke continued to submit annual reports from 1992 to 1997, stating that Walker was totally disabled from working in any occupation and was not suitable for any rehabilitation programs.

n1 Neither party suggests that a Social Security decision by an Administrative Law Judge controls this ERISA-based action.

[*6]

In January of 1997 Unum purchased Walker's Plan from Northwestern. Unum received a report from Dr.

Schunke on May 16, 1997, stating that Walker continued to be disabled from FMS. Unum then requested copies of Dr. Schunke's diagnostic testing, office notes, and office treatment records for Walker over the past year. AR at 000384. After that, Unum had investigators observe Walker for three days, including a visit on September 22, 1997. During the visit, Walker apparently told the investigators that her activities were limited because of the pain caused by her FMS, but that she was capable of doing some household chores and occasionally caring for a grandchild. An Unum registered nurse, Jacki West, then reviewed Walker's file and recommended speaking with Dr. Schunke.

On November 10, 1997, David W. Dickison, M.D., an Unum in-house medical consultant, spoke with Dr. Schunke and wrote a memo and letter memorializing their conversation. In his memo, Dr. Dickison wrote that Dr. Schunke was apparently surprised that Walker still received disability benefits and Dr. Schunke also allegedly told Dr. Dickison that most FMS patients, including Walker, could perform sedentary jobs. AR at 000358. [*7] Dr. Dickison's November 14, 1997 follow-up letter to Dr. Schunke records that Dr. Schunke told him that Walker "would appear to have at least sedentary work capacity" and that an independent medical examination ("IME") might be beneficial. AR at 000356-57. Dr. Schunke did not respond to this letter.

Unum then had an ergonomic physical therapist, Lyle Anderson ("Anderson"), perform a functional capacity evaluation of Walker on January 15-16, 1998 to see if she was capable of working. Anderson concluded that there were no physical limitations to Walker working a full-time job with light physical demands and that only her subjective feelings of pain prevented Walker from working. AR at 000323-337. Anderson's report was forwarded to Vance Roget, M.D. ("Dr. Roget"), a physical medicine and rehabilitation specialist hired by Unum to conduct an independent medical examination ("IME") of Walker. After conducting an IME on February 5, 1998, Dr. Roget found that Walker's symptoms of pain and headaches were consistent with FMS and that full recovery would be difficult because of the link between FMS and the patient's behavior and personality. However, Dr. Roget concluded that Walker could work[*8] because of her ability to:

tolerate sedentary work of 'gainful employment', as defined by Social Security, meaning that she can lift at least ten pounds occasionally, able to tolerate sitting for six hours in an eight hour workday, and standing/walking for at least two hours in an eight hour workday . . . and

as such she is able to perform sedentary work, and particularly has adequate fine motor abilities of her hands up to the occasional to frequent level, which is 33 to 34% or less than about two hours and forty-five minutes of an eight hour workday . . .
AR at 000290.

On May 5, 1998, Dr. Roget submitted an additional report stating that Walker could work full-time. AR at 000276-77. Based on the reports from Anderson and Dr. Roget, Unum began to investigate suitable employment opportunities for Walker in July of 1998. Initially, an Unum rehabilitation coordinator, Sue Howard, reviewed Walker's file and had "concerns about whether we are going to be able to identify any occupations for this claimant that would be gainful." AR at 000266. However, Ms. Howard indicated that she wanted to re-review the file once she learned more about Walker's previous supervisory duties. [*9] Unum then concluded that "gainful" employment under the Plan would be a position that paid $ 11 per hour. AR at 000266. After that, Unum had a vocational consultant, Laura Sewell, carry out a vocational analysis of Walker for potential job options. Ms. Sewell provided a list of five suitable occupations for Walker in the Modesto area that paid between $ 12-15 per hour. AR at 000261-63.

On September 21, 1998, Unum informed Dr. Schunke of its opinion that Walker no longer qualified for disability benefits, and requested his comments before making a "final determination." AR at 000260. Unum made a second request for Dr. Schunke's comments on October 29, 1998, and apparently left voice-mail messages for him on November 30 and December 16, 1998. AR at 000257-59. According to an internal Unum memo, Dr. Schunke called Unum on December 17 and told the insurance company, "that he does not want to comment, that he does not want to be involved in the disability decision. He views it as somewhat of a conflict as patients (sic) caregiver and would rather not comment on disability status." AR at 000255. Dr. Schunke then wrote Unum a letter on December 18, 1998. n2 In this letter, Dr. Schunke[*10] wrote that Walker "feels that she is unable to undertake any gainful employment because of exacerbation of her pain by activity involved in such employment" and that her condition has not improved since his initial diagnosis. AR at 000232.

n2 Unum maintains that it did not receive the December 18, 1998 letter until February 19, 1999.

Unum informed Walker of its decision to terminate


her benefits on December 21, 1998. Walker requested a review of the decision on February 19, 1999, and Unum denied her appeal in July of 1999. After Unum rejected a request to re-open its administrative review in May 2000, Walker filed this suit for reinstatement of her LTD benefits, interest, costs and attorney's fees. Pursuant to this lawsuit, Walker was examined by a Rheumatologist, Franklin Kozin, M.D., on March 15, 2001. Dr. Kozin concluded that Walker was totally disabled under the plan. Plaintiff subsequently retained a vocational consultant, Roger Thrush, who found that Walker could not be gainfully employed. Both parties[*11] have moved for summary judgment.

## DISCUSSION

### A. Motions for Summary Judgment in the Context of ERISA

While this review of a benefit determination is postured as summary judgment, the normal summary judgment standard is not applicable. Instead the Court must decide whether the applicable standard of review is de novo or abuse of discretion. See *Bendixen v. Standard Insurance Co., 185 F.3d 939, 942-43 (9th Cir. 1999); Martin v. Continental Casualty Co., 96 F. Supp. 2d 983, 990 (N.D. Cal. 2000).* The de novo standard of review is applied if the plaintiff shows that the administrator's decision was tainted by a conflict of interest, or under other limited circumstances that are fully analyzed below. See *Tremain v. Bell Industries, 196 F.3d 970, 976-77 (9th Cir. 1999); Lang v. Long-Term Disability Plan of Sponsor Applied Remote Technology, Inc., 125 F.3d 794, 798-99 (9th Cir. 1997).* Under de novo review, the plaintiff only needs to present more than a "mere scintilla" of evidence in support of continuing the LTD benefits to avoid summary judgment. *Ingram v. Martin Marietta Long Term Disability Income Plan, 244 F.3d 1109, 1114 (9th Cir. 2001).*[*12] Evidence outside of the administrative record may be examined when using the de novo standard of review. See *Tremain, 196 F.3d at 976-77.*

However, if de novo review does not apply, the abuse of discretion standard is used. *Bendixen, 185 F.3d at 942.* In looking at summary judgment in an ERISA case, the Bendixen court found that, "where the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." Id. Therefore, the applicable standard of review needs to be determined before deciding if summary judgment is warranted or not.

### B. De Novo Standard of Review

Plaintiff argues that the de novo standard of review should apply, primarily because Unum's decision to terminate was tainted by a conflict of interest. Walker also asserts that Unum abused its discretion in terminating benefits, and therefore the decision should be reversed even if de novo review is not granted. All of the potentially[*13] applicable situations in which de novo review of Walker's claim is justified will be examined before looking at whether there was an abuse of discretion.

#### 1. De Novo Review Applies If the Plan Does Not Give the Administrator Discretionary Authority to Terminate

In reviewing an administrator's decision to terminate an ERISA plan for LTD benefits the de novo standard is used "unless the benefit gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989); Taft v. Equitable Life Assurance Soc'y, 9 F.3d 1469, 1471 (9th Cir. 1994).* Here, Walker's Plan granted discretion to the insurance company by stating: "when making a benefit determination under the policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy." The Plan at 17.

Examples of language that gave discretionary authority to the administrator include, "the carrier will make all decisions on claims" or where the administrator[*14] is given "sole discretion to interpret the terms of the Plan." *Ingram v. Martin Marietta Long Term Disability Income Plan, 244 F.3d 1109, 1113.* Here, the Plan's language meets the requirement for granting discretionary authority because Unum was given unambiguous discretion to determine eligibility. See e.g., *Id. at 1113-14.*

#### 2. Conflict of Interest: De Novo Review Applies if the Decision to Terminate Was Tainted by a Conflict of Interest

Plaintiff's central argument is that Unum's decision to terminate her benefits was tainted by a conflict of interest and thus its decision should be reviewed under the de novo standard. Either side can point to evidence outside of the administrative record to show a conflict of interest or lack thereof. See *Tremain, 196 F.3d at 976-77.*

##### (a) Three-Part Conflict of Interest Test


The Ninth Circuit applies a three-part test to see if a conflict of interest tainted the insurer's decision to terminate benefits. *Snow v. Standard Ins. Co.*, 87 F.3d 327 330-31. First, there is a formal conflict when the same entity administrates the plan and pays benefits. See *id. at 330.* Here, [*15] it is undisputed that Unum is both the administrator and payor under the Plan, therefore the first part of the conflict test is satisfied.

However, under the second part of the test, the plaintiff must show that the inherent conflict "caused a serious breach of the plan's administrator's fiduciary duty to . . . the plan beneficiary." *Atwood v. Newmont Gold Co.*, 45 F.3d 1317, 1322. Therefore, the next step in the conflict analysis is to examine whether the plaintiff provides material probative evidence showing that the defendant's self-interest caused a breach of duty, otherwise the "traditional abuse of discretion review" will be applied. See *id. at 1323.* In addition, reliance on the insurance company's decision to terminate benefits without showing actual misconduct "is not enough to establish breach of fiduciary duty." *Atwood, 45 F.3d at 1323.*

Third, if the plaintiff presents material evidence of a conflict, the defendant then has an opportunity to rebut the presumption of a conflict by producing evidence to show that the conflict did not affect the decision to terminate benefits. *Lang, 125 F.3d at 798.*

(i) Material Evidence of a [*16] Conflict Through the Treating Physician Rule

Plaintiff contends that material evidence of Unum's conflict of interest is shown through its failure to give the proper amount of weight to the treating physician's (Dr. Schunke) opinion. Plaintiff's argument is largely based on a recent Ninth Circuit opinion where the court held that the administrator of an LTD plan should give "special weight to the opinions of treating physicians" in an ERISA claim and the failure to do so is evidence of a conflict. *Regula v. Delta Family-Care Disability Survivorship Plan*, 266 F.3d 1130, 1147 (9th Cir. 2001). This theory was adopted from the rule giving deference to treating physicians in Social Security cases. See *id. at 1139.* Under this rule, however, the administrator does not have to give absolute deference to the treating physician's opinions. See *id. at 1140.* In fact, when the nontreating physician's opinion contradicts with the treating physician's, but is based on independent clinical findings, "the opinion of the nontreating source may itself be substantial evidence." *Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).* [*17]

In *Regula*, the plaintiff's LTD benefits for a cervical disk injury were canceled after a doctor and psychiatrist appointed by the defendant submitted reports stating that the plaintiff could work. See *266 F.3d at 1134.* This conflicted with reports submitted contemporaneously by the plaintiff's treating physician and psychologist, both stating that he was totally disabled. See id. The plaintiff then submitted additional reports from the same treating physicians as part of his appeal of the initial decision to terminate. See id. The Regula court held that the administrator's decision to terminate based on reports contradictory to the treating physician's opinion constituted a "sudden and thinly supported departure" and therefore constituted "material, probative evidence of a conflict." *Id. at 1147.* The Ninth Circuit remanded the case to see if there was a conflict of interest, but found that the defendant's termination of benefits without a change in condition after eight years of renewal and a sudden rejection of the treating physician's diagnosis "constitutes material, probative evidence of a conflict." *Id. at 1146-47.*

Walker asserts that her situation[*18] parallels the one in *Regula*, because Unum rejected Dr. Schunke's diagnosis that Walker was totally disabled without showing a change in condition. In support, plaintiff points out that Dr. Schunke submitted reports to Northwestern and Unum from 1988 to 1997 stating that Walker was totally disabled and unable to work. Similarly, in *Regula*, the plaintiff's doctor consistently reported that the plaintiff was totally disabled. *Id. at 1134.* Additionally, plaintiff asserts that Unum continues to distort the truth regarding Dr. Schunke by maintaining that he changed his position regarding Walker's diagnosis in an interrogatory response. Therefore, plaintiff argues that her situation is indistinguishable from *Regula* and the decision to terminate should be reviewed under the de novo standard.

Here, however, Unum did not violate the treating physician rule, because its findings were based on independent clinical examinations. In 1997, Unum hired a physical therapist, Anderson, and a physical medicine and rehabilitation specialist, Dr. Roget, to examine Walker, with the apparent approval of Dr. Schunke. They both examined Walker in person and found that she was not totally [*19]disabled and could work a variety of sedentary jobs. Unum then hired a vocational consultant, who gave Unum a list of positions that would constitute gainful employment under the Plan. After that, Unum concluded that Walker was not totally disabled and informed Dr. Schunke of its opinion. Therefore, Unum did not violate the treating physician rule, because it based its conclusions on "independent clinical


findings," and it also gave specific reasons for denying Walker's claim that were "based on substantial evidence in the record." *Id. at 1140.*

Further, in Regula, the plaintiff's treating physicians (his doctor and psychologist), submitted reports at the same time as the contradictory reports provided by the physicians appointed by the defendant See *id. at 1134.* After the plaintiff's benefits were terminated, he then submitted additional reports from his psychologist and one of his treating physicians as part of the appeal of the defendant's initial decision. See id. Here, Unum made repeated attempts to contact Dr. Schunke and keep him informed of the process. From November 1997 to December 1998, Unum wrote Dr. Schunke three letters and left two voice-mail messages[*20] concerning Walker. Dr. Schunke's final report to Unum was submitted on May 16, 1997, and he did not examine Walker after Anderson and Dr. Roget examined her, or after Unum informed Walker of its decision to terminate her benefits. After all of Unum's inquiries, the only response given by Dr. Schunke was in his December 18, 1998 letter to Unum, where he stated that Walker "feels that she is unable to undertake any gainful employment" due to pain from FMS and that her condition has not improved. Unum states that it did not receive Dr. Schunke's letter until February 19, 1999. Nothing in his December 18 letter indicates that Dr. Schunke re-examined the patient and it appears that he simply reiterated Walker's previous assertions about her condition.

This is distinguishable from Regula, where the plaintiff's doctors were actively challenging the defendant's diagnosis through simultaneously examining the patient and submitting reports. There is no indication that Unum did not inform Dr. Schunke about its decision-making process and it appears that he and Walker had several opportunities to challenge Unum's diagnosis. In addition, Unum supports its interrogatory response stating that[*21] Dr. Schunke changed his opinion, by pointing to Dr. Dickison's letter to Dr. Schunke indicating that Dr. Schunke felt Walker could work. Dr. Schunke never disputed the validity of this letter and thus Unum could believe that he changed his opinion about her condition at one point. In conclusion, plaintiff fails to show a conflict of interest based on the treating physician rule and therefore de novo review is not justified on this basis.

(ii) Material Evidence of a Conflict Through Unum's Alleged Use of "Hand-Picked" Experts

The Regula court also noted that a conflict of interest

is inherent "when benefit plans repeatedly hire particular experts as physicians." *Id. at 1143.* Walker argues that Unum's conflict of interest is shown through its reliance on the "hand-picked" diagnoses of Anderson and Dr. Roget. Plaintiff correctly points out that evidence outside of the administrative record may be examined to look for a conflict. Plaintiff thus instructs the Court to rely on Dr. Kozin's declaration to support the conclusion that the Anderson and Dr. Roget diagnoses lacked credibility. Dr. Kozin points out that Dr. Roget is not a Rheumatologist and thus not a specialist[*22] in diagnosing FMS. Plaintiff also asserts that Anderson and Dr. Roget lacked credibility through their failure to consult with Dr. Schunke.

However, despite plaintiff repeatedly referring to Anderson and Dr. Roget as being Unum's "hand-picked" experts, there is no indication that Anderson and Dr. Roget were frequently used as experts by Unum, thus tainting their diagnoses. Nothing in Dr. Kozin's declaration indicates a conflict of interest through Unum "hand picking" its diagnosis, as indicated by Regula as possible grounds for conflict. Id. More importantly, plaintiff appeared to have several opportunities to challenge the Anderson and Dr. Roget diagnoses and their credibility after their examinations in early 1998 and through the appeal process that ended two years later. Dr. Kozin's examination of Walker took place on March 15, 2001, more than three years after the Anderson and Dr. Roget examinations and two years after her benefits were canceled. Therefore, there is no evidence of a conflict of interest through Unum "hand picking" its examining physicians.

(iii) Material Evidence of a Conflict Through Unum's Alleged Sudden Change in Position Regarding Its Diagnosis [*23] of Walker's Disability

In Lang v. Long-Term Disability Plan of Sponsor Applied Remote Technology, Inc., the administrator of an LTD policy suddenly shifted from concluding the plaintiff had a mental disorder not covered by her LTD plan and denying she had FMS, to admitting she had FMS, but denying that she was disabled by *FMS. 125 F.3d at 798-99.* There, the court found the administrator's sudden change in diagnosis was unsupported by evidence, indicating a conflict of interest. *Id. at 799.* Therefore, the Lang court reviewed the decision to terminate de novo, because the sudden switch in diagnosis was unsubstantiated. Id.

Walker appears to argue that her situation is analogous, because Unum suddenly switched diagnoses without any apparent change in her condition. However, Lang is dis-

tinguishable because Unum never denied that Walker had FMS, but instead denied that she was totally disabled under the Plan, and therefore never made a sudden change in its diagnosis. Lang is thus inapplicable to plaintiff's situation.

(iv) Material Evidence of a Conflict Through Unum Allegedly Using Definitions from Outside of the Plan[*24]

In Tremain v. Bell, the court found there was a conflict of interest and used the de novo standard when the administrator relied on a definition of disability that was not in the plaintiff's plan in terminating benefits. *Tremain, 196 F.3d at 977.* Plaintiff alleges that Tremain is "factually on point," because it also involves Unum terminating benefits after hiring a physician to conduct an IME when the treating physician said the plaintiff remained disabled. n3

> n3 Walker mistakenly stated that the defendant in Tremain was Unum - it was actually MetLife. See *Tremain, 196 F.3d at 972.*

However, plaintiff misstates the facts in Tremain and it does not support her conflict of interest theory. In Tremain, the administrator canceled plaintiff's benefits after two of her treating physicians concluded that she was not disabled based on the definition of "total disability" provided by the defendant. See *id. at 973.* However, the definition the doctors[*25] relied upon was more strict than the actual "total disability" definition in her plan, and two of her other treating physicians claimed that she was totally disabled under her plan's actual definition. See *id. at 974.* In addition, the administrator failed to substantiate how plaintiff's earning capacity was 50% of her former earnings. See id. Therefore, the court concluded a conflict of interest existed based on the administrator relying on the wrong total disability definition and the defendant's failure to substantiate plaintiff's earning capacity. See *id. at 977.*

Again, the situation in Tremain is inapplicable, as Unum never relied on definitions outside of the Plan to terminate benefits. Unum also substantiated its conclusions regarding Walker's earning capacity through the findings of Anderson, Dr. Roget, and Ms. Sewell, the vocational consultant.

(v) Material Evidence of a Conflict Through Unum's Internal Memoranda

Plaintiff also alleges that internal Unum memoranda regarding their policies in reviewing claims and handling "subjective" disorders such as FMS show a conflict of interest and mandate de novo review of its denial. [*26] First, Walker points to an internal Unum claims manual instructing agents to only arrange for an IME if the claimant's physician is "exhausted" as a source of information and to consult with the insured's treating physician before conducting an IME. The administrative record, however, indicates that Unum agents followed the manual procedures by consulting with Dr. Schunke before conducting an IME.

Second, plaintiff maintains that an internal Unum memorandum entitled "Subjective Claims Project" showed that Unum specifically targeted claims like FMS for denial, thus showing a conflict of interest. The "Subjective Claims" memorandum was written by John LoCascio, M.D. in 1991, and instructs agents to separate objective and subjective restrictions and limitations indicated in a claim. Dr. LoCascio wrote that some claims lack objective measurement and instructed claims handlers to:

rely on the agreement of several trained observers that such restrictions and limitations are justified. These observers may be the attending physician or consultants or IMEs. If you establish such a consensus, then the subjectively based IMEs are likely acceptable. If, however, you cannot establish such [*27]a consensus because of lack of data or because of disagreements among those submitting restrictions and limitations, more effort is probably indicated either in finding additional treating physicians or in obtaining an appropriate Independent Medical Exam.

There is nothing in the memorandum or its attachments supporting plaintiff's argument that it instructs or encourages claims handlers to target "subjective" claims for denial. The memorandum's focus is limited to pointing out that claims may have objective and/or subjective criteria and that it is important for claims handlers to analyze both. Further, it appears that Unum followed the somewhat confusing dictates of the memorandum by attempting to consult with Dr. Schunke after there was a divergence in opinion regarding Walker's restrictions and limitations. The thrust of plaintiff's argument, however, is that this memo indicates Unum's goal to deny claims like Walker's, and there is nothing in this document to support this argument. n4

> n4 Plaintiff alludes to Unum attempting to hide in-

formation through its reluctance to provide the manual and subjective claims memorandum. Unum was ordered to produce these documents by Judge Brazil on September 24, 2001. There was no indication of attempts to hide the documents and plaintiff's motion for sanctions was denied.

[*28]

In conclusion, plaintiff fails to show that Unum was acting under a conflict of interest, and therefore plaintiff cannot justify reviewing Unum's decision de novo based on a conflict of interest.

3. De Novo Review Based on Ambiguous Terminology in the Plan

Another theory plaintiff puts forward for de novo review of defendant's denial is that this case parallels Mongeluzo, where the trial court improperly denied the use of additional evidence to determine the application of the policy's ambiguous language to the plaintiff's illness. *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan, 46 F.3d 938, 944.* The Mongeluzo court held it was necessary to look at evidence of plaintiff's chronic fatigue syndrome outside of the administrative record to determine if his illness was covered under the policy's "mental illness" definition. See *id. at 944.* There, the court found that additional evidence was needed to determine the proper legal definition for the meaning of "'mental illness' or 'functional nervous disorder.'" Id.

Likewise, the trial court properly relied on experts to help define whether autism was a mental illness and thus not covered by the policy. *Kunin v. Benefit Trust Life Insurance Co., 910 F.2d 534, 536 (9th Cir. 1990).*[*29] Based on Kunin and Mongeluzo, plaintiff believes the Court should incorporate Dr. Kozin's declaration as part of the de novo review and find that Walker was totally disabled. P's Oppos. at 10-11.

Here, however, there is no dispute regarding the diagnosis of FMS, the cause of the illness, and the application of the Plan's language to plaintiff's illness: the only difference of opinion relates to plaintiff's ability to work. Dr. Kozin's declaration does not help to define ambiguous terminology, it only disputes Dr. Roget's findings regarding Walker's ability to work. In fact, Mongeluzo specifically warned against using additional evidence in this kind of situation: "We emphasize that a district court should not take additional evidence merely because someone at a later time comes up with new evidence that was not presented to the plan administrator."

*46 F.3d at 944.* Therefore, there is no dispute regarding ambiguous terminology and de novo review of defendant's denial should not be granted on this basis. n5

n5 This eliminates plaintiff's apparent argument that de novo review is justified by the doctrine of contra proferentem, under which all ambiguous terms are construed against the drafter. See *e.g., Snow, 87 F.3d at 330 n.1; Lang, 125 F.3d at 799.* There is no ambiguity in the Plan, therefore there is no ambiguity to interpret.

[*30]

C. Abuse of Discretion Standard of Review

Because there is no justification for using de novo review, the Court must determine if the administrator abused its discretion in denying plaintiff's benefits under ERISA. See *Firestone, 489 U.S. at 115; Ingram, 244 F.3d at 1113; Zavora v. Paul Revere Life Insurance Co., 145 F.3d 1118, 1122 (9th Cir. 1998); Lang, 125 F.3d at 797; Snow, 87 F.3d at 331; Atwood, 45 F.3d at 1321; Taft v. Equitable Life Assurance Society, 9 F.3d 1469, 1471 (9th Cir. 1994).* This determination is limited to reviewing the administrative record generated during the benefit denial process and subsequent appeal. *Snow, 87 F.3d at 333.* Under the abuse of discretion standard, the defendant "must have some reasonable basis for its decision denying benefits," but is given "substantial deference." *Zavora, 145 F.3d at 1123.* In sum, the decision to terminate benefits will not be reversed "where there is relevant evidence [that] reasonable minds might accept as adequate to support a conclusion even where it is[*31] possible to draw two inconsistent conclusions from the evidence." *Snow, 87 F.3d at 332.*

There are three ways to show that the defendant abused its discretion in an ERISA claim: "[1] it is an abuse of discretion for an ERISA plan administrator to make a decision without any explanation, or [2] in a way that conflicts with the plain language of the plan, or [3] that is based on clearly erroneous findings of fact." *Snow, 87 F.3d at 331.* Walker is arguing that Unum abused its discretion by making a decision that conflicted with the plain language of the Plan and that the decision was based on clearly erroneous findings of fact (factors [2] and [3]).

1. Abuse of Discretion Through the Decision to Terminate Conflicting with the Plan's "Gainfully Employed" Definition


Walker claims that Unum's decision violated the plain language of the Plan because defendant failed to show that she could be "gainfully employed" as defined in the Plan. The thrust of plaintiff's argument revolves around Dr. Roget stating that Walker could only work with her hands for 2 hours and 45 minutes per day.

Plaintiff's argument fails on two grounds. First, plaintiff's[*32] definition of "gainful employment" is erroneous. Under the Plan, the insured is gainfully employed if she has the potential to earn the equivalent of her gross monthly disability benefits--and not her salary--within one year of her benefits expiring. Therefore, the amount she needs to earn within a year is her gross monthly disability when she stopped working, which was 2/3 of her gross monthly earnings. That amount is $ 2,120.11 per month, and not the $ 3,180 plaintiff claims.

Second, Dr. Roget concluded that while Walker could only use her hands for a limited period of time, she could tolerate sitting for six hours and standing or walking for two hours in an eight hour day and do some light lifting. Based on his findings and plaintiff's experience and skills, Unum had a vocational consultant, Laura Sewell, find potential job options for Walker. Ms. Sewell submitted a list of five suitable jobs, all of which pay in the range of $ 12-15 per hour in Central California. This equals a salary of between $ 1,920-2,400 per month based on a 40 hour work week, well within the required amount of $ 2,120.11, especially considering that plaintiff would have one year to reach that amount. Further, [*33] Ms. Sewell incorporated Dr. Roget's findings, because none of the recommended jobs "require highly repetitive use of the hands for fine manipulation of keyboard use." That is, these jobs did not require Walker to work with her hands for more than 2 hours and 45 minutes per day. Therefore, the plain language of Unum's did not conflict with the Plan definition of "gainfully employed."

2. Abuse of Discretion Through Unum Making a "Clearly Erroneous" Decision to Terminate Plaintiff's Benefits

The standard for finding that the insurance company's decision was "clearly erroneous" requires having a "definite and firm conviction that a mistake has been committed." *Snow, 87 F.3d at 331.* As mentioned, the court's review is limited to examining the administrative record and "not whether it would have liked to have developed even more evidence or whether it would be interested in what other experts might think." *Id. at 332.* The pur-

pose of this instruction is to avoid "a morass of minutely detailed examinations of every decision made by plan administrators." *Id. at 333.*

Plaintiff points to a variety of factors in attempting to show that[*34] Unum's decision to terminate her LTD benefits was clearly erroneous: (1) Dr. Roget's lack of credibility; (2) the subsequent error of Ms. Sewell in relying on Dr. Roget's faulty report; and (3) Dr. Schunke consistently finding that she was permanently disabled.

Walker argues that Dr. Roget lacked credibility and that his findings were thus clearly erroneous because he is not a Rheumatologist and Dr. Kozin, a Rheumatologist, disagreed with Dr. Roget's conclusions. Therefore, Ms. Sewell's subsequent vocational report was also incorrect in showing that plaintiff could be gainfully employed. Instead, plaintiff instructs the Court to follow the declaration of plaintiff's vocational consultant, Roger Thrush, who found that Walker could not be gainfully employed based on Dr. Kozin's findings.

The arguments based on the declarations of Dr. Kozin and Mr. Thrush can be dismissed, because review is limited to the administrative record in finding an abuse of discretion. See *Snow, 87 F.3d at 333.* In addition, nothing in the administrative record shows that Walker challenged Dr. Roget's credibility based on him not being a Rheumatologist during the initial decision-making process [*35]or subsequent appeal. Therefore, plaintiff fails to show that Unum was clearly erroneous and abused its discretion through basing its decision on Dr. Roget and Ms. Sewell's findings.

Plaintiff's argument that the decision was clearly erroneous because of its inconsistency with Dr. Schunke's findings is based on the deference to treating physician rule announced in Regula. As mentioned, the Ninth Circuit instructs the district court to defer to the claimant's treating physician and use the treating physician's opinions "to test the reasonableness of the administrator's positions." *Regula, 266 F.3d at 1140.* The treating physician's opinions can only be rejected if the defendant's decision to terminate benefits is "based on substantial evidence in the record." Id. Therefore, plaintiff argues that "special weight" should be given to Dr. Schunke's opinion that Walker was permanently disabled and conclude that Unum's decision was clearly erroneous. See *id. at 1144.*

This line of reasoning is rejected for the same reasons previously stated in the failure to find a conflict of interest based on Regula. First, Unum did not vi-


olate the treating[*36] physician rule by ignoring Dr. Schunke. In fact, it appears that Unum sought his opinion on several occasions from the beginning of its review process. Dr. Schunke's only comment during the decision making process and subsequent appeal was that plaintiff "feels that she is unable to undertake any gainful employment." There is no doubt that plaintiff felt she was unable to work, but Dr. Schunke's opinion fails to contradict Unum's findings that Walker could be gainfully employed.

In addition, while Dr. Schunke's diagnosis that Walker was permanently disabled until 1997 and could not work are part of the administrative record and should be considered, it is impossible to test "the reasonableness of the administrator's positions" if the reports are not contemporaneous, as they were in Regula. *Id. at 1134.* Thus, even if the Court gives special weight to Dr. Schunke, his opinions fail to show that Unum's findings were "clearly erroneous." Unlike the defendant in Regula, Unum did not ignore the treating physician's findings and Dr. Schunke did not directly contradict Unum's findings during the initial review and subsequent appeal. Therefore, Unum's decision was not[*37] "clearly erroneous" and it did not abuse its discretion.

In conclusion, Unum's decision is supported by substantial evidence in the record: (1) Dr. Dickison's memorandum and follow-up letter recording Dr. Schunke's uncontradicted opinion that Walker could work; (2) Anderson finding that Walker had the ability to work based on a functional capacity evaluation; (3) Dr. Roget's concluding that Walker had the physical ability to work after conducting an IME; (4) Ms. Sewell's subsequent vocational report stating that Walker could be gainfully employed under the Plan; and (5) and Dr. Schunke's failure to certify her alleged disability during the decision and appeal process, despite Unum's repeated attempts to contact him.

### D. Less Deferential Abuse of Discretion Standard

Finally, plaintiff argues that the Court should apply a less deferential abuse of discretion review in ERISA claims where a formal conflict of interest exists by virtue of the fact that the same entity administers the plan and pays benefits. Here, Unum administers the Plan and pays benefits, as outlined in the conflict of interest discussion. The Snow court held that when the plan administrator is also the[*38] insurer, it "must be weighed as a factor in determining whether there is an abuse of discretion." *87 F.3d at 330* (quoting *Firestone, 489 U.S. at 115*). In this situation, review is still for abuse of discretion, but is "less deferential" to the administrator's

decision. *Tremain, 196 F.3d at 976; Regula, 266 F.3d at 1144-45.*

It is unclear, however, how this less deferential standard should be applied where there is no actual conflict of interest. The Snow court noted the administrator and insurer were the same company. *87 F.3d at 333.* However, after the court failed to find a conflict, it applied a traditional abuse of discretion review and would not "find clear error when substantial evidence in the record supports those determinations." *Id. at 333.* There, the plaintiff's LTD benefits for chronic fatigue syndrome ("CFS") were denied for failure to the insurance company defendant. See *id. at 329-30.* The insurance company denied the plaintiff's LTD benefits despite the treating physician's diagnosis of CFS. See id. However, despite the formal conflict and the treating physician's[*39] opinion, the court did not find that the insurance company abused its discretion based on "evidence in the record to support the decision of the Plan administrator." *Id. at 332.* In short, it is not clear that Snow actually applied heightened abuse of discretion review.

Plaintiff may wish to distinguish this situation from Snow, by pointing to the newly announced treating physician rule in ERISA-based claims from Regula. See *id., 266 F.3d at 1147.* However, Regula does not address the weight the district court should give to the formal conflict of interest. In conclusion, the formal conflict of interest in this case does not counter the substantial evidence in the administrative record supporting Unum's decision to terminate plaintiff's LTD benefits. Even under heightened abuse of discretion review the Court would not reverse the decision of the Plan administrator.

### CONCLUSION

Plaintiff fails to show a conflict of interest or any other justification for applying the de novo standard of review. Therefore, the Court will only examine the administrative record and apply the abuse of discretion standard in evaluating Unum's decision to terminate[*40] plaintiff's LTD benefits. Unum did not abuse its discretion, because its decision was not in conflict with the Plan definition and it was not clearly erroneous. Accordingly, defendant's motion for summary judgment is GRANTED.

IT IS SO ORDERED.

Dated: March 25, 2002

CHARLES R. BREYER



2002 U.S. Dist. LEXIS 5035, *40

UNITED STATES DISTRICT JUDGE

JUDGMENT

Having granted defendants' motion for summary judg-
ment, judgement is hereby entered in favor of defendants
and against plaintiff, Judy L. Walker.

IT IS SO ORDERED.

Dated: March 25, 2002

CHARLES R. BREYER

UNITED STATES DISTRICT JUDGE

158 F. Supp. 2d 1088 printed in FULL format.

BARRY M. CARDINER, Plaintiff, vs. PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, and DOES 1 through 100, inclusive, Defendants. PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, Counterclaimant, vs. BARRY M. CARDINER, Counterdefendant.

CASE NO. CV 00-2021 DT (AIJx)

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

158 F. Supp. 2d 1088; 2001 U.S. Dist. LEXIS 18088

July 10, 2001, Decided

July 10, 2001, Filed, Entered

**DISPOSITION:** Defendant's request for judicial notice and motion for partial summary judgment were granted.

**CORE TERMS:** stockbroker, disability, symptom, psychiatric, disorder, insured, occupation, stress, depression, insurer, psychotherapist, disabled, doctors, duty, career, summary judgment, patient, totally disabled, genuine issue, psychological, depressive, rebuttal, judicial notice, declaration, consultant, attending, fair dealing, impairment, diagnosis, anxiety

**COUNSEL:** For BARRY M CARDINER, plaintiff: Frank N Darras, Michael B Horrow, David T Bamberger, Shernoff Bidart Darras, Claremont, CA.

For PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, defendant: Stephen H Galton, Ann C Schneider, Edith S Shea, Galton & Helm, Los Angeles, CA.

For PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, counter-claimant: Stephen H Galton, Ann C Schneider, Edith S Shea, Galton & Helm, Los Angeles, CA.

For BARRY M CARDINER, counter-defendant: Frank N Darras, Michael B Horrow, David T Bamberger, Shernoff Bidart Darras, Claremont, CA.

**JUDGES:** Dickran Tevrizian, Judge, United States District Court.

**OPINIONBY:** Dickran Tevrizian

**OPINION:** [*1089]

ORDER GRANTING DEFENDANT PROVIDENT

LIFE AND ACCIDENT INSURANCE COMPANY'S REQUEST FOR JUDICIAL NOTICE; AND GRANTING DEFENDANT PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

I. Background

A. Factual Summary

This action is brought by Plaintiff Barry M. Cardiner ("Plaintiff") against Defendant Provident Life and Accident Insurance Company ("Provident") for breach of contract and breach of the duty of good faith and fair dealing.

The following facts are undisputed n1:

> n1 In his Separate Statement, Plaintiff attempts to dispute the proffered facts by listing the declarations he submitted in support of his opposition to this motion. Plaintiff does not specify which paragraphs or portions of the declarations controvert the fact at issue. As such, Plaintiff's attempt to create a genuine issue must fail. Moreover, upon a review of these declaration, it appears that these declarations contain contrasting opinions and conclusions of law rather than a dispute as to the accuracy of the proffered facts.

[*1090]

Provident issued individual disability Policy No. 6-335-8080449 ("Policy") to Plaintiff effective September 24, 1987. In September 1990, Plaintiff submitted a claim to Provident contending that on or after September 21, 1990, he was totally disabled from his occupation

Case 1:01-cv-01157-CCC    Document 88    Filed 12/12/2002    Page 52 of 119

158 F. Supp. 2d 1088, *1090; 2001 U.S. Dist. LEXIS 18088

Page 4
F. Supp. 2d

from dysthymic disorder and post-traumatic stress disorder ("PTSD"). His disability claim was supported by his attending psychiatrist, Dr. Davidson, who stated Plaintiff was "unable to concentrate, relax, or work properly."

On an occupational questionnaire, Plaintiff described his job duties as a stockbroker as including "cold calls" to prospects, speaking to clients trying to sell them stocks and bonds, managing some clients' portfolios, and trading commodity futures and options. In explaining why his disability prevented him from performing such duties, Plaintiff stated that his extreme stress level and chronic depression caused physical and emotional pain which prevented him from doing his job. Provident confirmed with Plaintiff's employer, Oppenheimer, that he voluntarily resigned.

Following the 90 day elimination period in the Policy, Provident began paying Plaintiff's disability claim. As permitted by the Policy, Provident obtained periodic supplementary statements of claim from Plaintiff and attending physician's statements ("APS forms") from his treating physicians. Provident periodically solicited reports from Plaintiff's attending physicians throughout the course of his claim.

In late 1992, Provident requested information from his then treating psychiatrist, Geoffrey A. Tucker, including comment on rehabilitation efforts. Dr. Tucker advised that there was no goal to return Plaintiff to work as a stockbroker, due to "severe anxiety, depression and guilt." According to Dr. Tucker, Plaintiff "cannot drive by a brokerage house or listen to news of Wall Street without exacerbating his symptoms and decreasing his ability to function."

In an interview with Provident in December 1990, Plaintiff stated that he had earned in excess of $ 100,000 per year while working as a stockbroker at Oppenheimer & Company, that he was a "high producer," that he worked approximately 12 hours daily making "cold calls," and that he was "unable to deal" with the then current depressed stock market and that he had gone into a major depression. The interviewer noted "no outward indication either physical or mental of disability." However, during the interview, Plaintiff "reiterated the fact that due to stress, depression and anxiety caused by positive HIV testing, he stopped working at Oppenheimer." As a follow-up on the interview, Provident requested that Plaintiff give authorization to speak with Dr. Davidson regarding his claim of experiencing stress, depression and anxiety as a result of his positive HIV testing. Plaintiff responded that the interviewer had misunderstood, and that his illness "was brought on by [his] work," not his HIV status, and that

he had merely "expressed to him [his] concerns on the effect that the work related illness would have on activating and accelerating the HIV virus."

In June 1991, Provident interviewed Plaintiff's supervisors at Oppenheimer. In contrast to Plaintiff's reports of work related stress, anxiety and depression, the supervisors reported that Plaintiff had "done fairly well as a salesman and displayed no outward signs of depression. He performed his duties like anyone else, and there were no problems with absenteeism, irritability, work deficiencies or for that matter any obvious work impairment. He did not complain of work stress to anyone, to their knowledge." Further, [*1091] Plaintiff did not file a worker's compensation claim in connection with his purported work-related stress.

In June 1992, Plaintiff requested that Provident permanently waive its requirement of the submission of periodic APS forms. Provident informed him that it would consider modifying the frequency of the APS requirement after he was evaluated by an independent medical examiner, but, due to the psychiatric nature of his claim, a permanent waiver would not be appropriate.

On July 9, 1992, Plaintiff was examined at Provident's request by a psychiatrist, Bruce Kagan, M.D. As indicated by his report of the examination, Dr. Kagan took a thorough history from Plaintiff, who stated that his depression began in September 1989 due to work related stress, but he continued to work until he decided to stop working as a stockbroker in 1990. Plaintiff described his dissatisfaction of the long working hours associated with stockbrokering, guilt when clients lost money, and what he perceived to be unethical and possibly illegal activities which his employers required of him. Plaintiff reported that an unnamed internist "felt that all his symptoms were of psychological origin and not physical in nature and recommended a vacation." Plaintiff noticed a significant improvement in his symptoms, reporting that "his physical symptoms took approximately six months to disappear." He further reported having stopped antidepressant medication in March 1991 "because of the improvement in his depressive symptoms." Plaintiff also stated that upon stopping work as a stockbroker, he undertook a variety of physical and mentally challenging activities, including art courses, scuba diving, and volunteer counseling of AIDS patients at the Shanti Foundation. Dr. Kagan's report of his mental status examination states:

Appearance and behavior. The patient is neat, cooperative, and appropriately dressed. There is no psychomotor agitation or retardation. Sensorium is clear. He is alert and oriented x3. His cognitive functions appear grossly intact and his memory appears quite in-

Case 1:01-cv-01137-CCC Document 88 Filed 12/12/2002 Page 53 of 119

Page 5
158 F. Supp. 2d 1088, *1091; 2001 U.S. Dist. LEXIS 18088
F. Supp. 2d

tact. Mood is mildly anxious. Affect is appropriate and wide-ranging. His thought is coherent, relevant, and goal-directed. There is no evidence of psychotic thinking. No hallucinations. No delusions. There is no suicidal or homicidal ideation.

Despite this relatively normal examination, Plaintiff's own noted improvement, and his ruling out a diagnosis of PTSD, Dr. Kagan gave Plaintiff a diagnosis of "major depression, recurrent, without psychotic features, in partial remission" and concluded that Plaintiff was totally disabled from performing the duties of his employment as a stockbroker in the usual and customary manner. While Dr. Kagan felt Plaintiff was disabled at that time, he commented, "It is . . . possible, although it cannot be predicted with any certainty, that with further psychotherapy and appropriate medication the patient might possibly be able to resume his previous duties."

On July 22, 1992, Plaintiff's own attending psychiatrist, Dr. Davidson, had submitted an APS form stating that Plaintiff was no longer disabled at all from dysthymic disorder. With respect to Plaintiff's purported PTSD, Dr. Davidson opined that Plaintiff would be able to return to work by August 1992 except in "high pressured sales." Further, in a report dated November 6, 1992, Dr. Davidson further downgraded Plaintiff's disability, stating merely that his "post-traumatic stress symptoms remain so as to make work as a stockbroker unwise." [*1092]

Dr. Kagan's report was referred to Provident's psychiatric consultant, who commented that it supported Plaintiff's claim. Provident thereafter routinely paid Plaintiff's claim and referred it to its "special handling unit," where attending physician's statements were required to complete APS forms only semi-annually (rather than monthly), and later only annually. However, Provident reserved its right to require more frequent APS forms in the event Provident determined that was appropriate.

Notwithstanding his claimed disability status, Plaintiff remained quite active during the pendency of his claim, as indicated by his comments to Dr. Kagan and the periodic claimant's statements he submitted to Provident and information obtained through discovery. For example, Plaintiff acted as a volunteer counselor with the L.A. Shanti Foundation, Counseling West, and/or AIDS Project Los Angeles from the commencement of his claim through September 1996. From January 1991 to June 1993, Plaintiff attended Ryokan College and earned a Master's Degree in Counseling Psychology. He interned at Counseling West to acquire the 200-

250 hours of practicum necessary to earn his Master's Degree. He then completed 3000 hours (including counseling hours) required to obtain a Marriage, Family and Child Counselor ("MFCC") license, which he obtained in December 1997. He began private practice as a psychotherapist in September 1998 on his own, and later, also at Management Team Networks. Plaintiff continues his private practice - very successfully - to this day. He also dabbled in computer related activities with a couple of employers (DesignerNet and LFP, Inc.) from 1996 through 1998. Moreover, contraindicated by Dr. Tucker's opinion that the mere mention of Wall Street would set off Plaintiff's depressive symptoms, Plaintiff completed forms relating to financial accounts with PaineWebber, in which he (a) designated his investment objectives as "growth" and "speculation," (b) acknowledged the "special risks associated with uncovered option writing which expose the investor to potentially significant loss," and (c) authorized and approved the trading of options in his account despite those risks; and Plaintiff engaged in occasional trading. Further, Plaintiff racked up significant credit card debt, much of which is attributable to dining out, travel and tennis. Indeed, Plaintiff's wild spending habits forced him to file a Chapter 7 bankruptcy petition in 1997.

In 1997, Plaintiff's file was transferred to Provident's psychiatric unit for further assessment of whether he remained "totally disabled." Provident determined that it would be appropriate to schedule a field visit with Plaintiff to assess his present condition, obtain additional medical records, and request additional independent medical examinations. Provident also asked Plaintiff to describe his current work in "computer consulting" as indicated in one of his statements.

On December 22, 1997, Provident interviewed Plaintiff again, and learned that he had completed his course work at Ryokan College, received his MFCC license, worked part-time as a psychotherapist in Beverly Hills, seeing four to six patients per week, and worked part-time for LFP Publications. The interviewer noted Plaintiff was "somewhat anxious" but was "healthy appearing with no outward indication of ill health." Plaintiff indicated that he was "asymptomatic for any HIV-related symptoms and does not take medication for this condition." However, Plaintiff continued to insist that he had "'major depression' which is exacerbated by any thought or mention of the 'stock market' or whenever he 'thinks of Oppenheimer,'" as well as panic attacks and depressive moods. [*1093]

On March 31, 1998, Plaintiff was examined at Provident's request by P. Jan Geiseler, M.D., a specialist in infectious diseases and an Associate Professor

Case 1:01-cv-01137-CCC    Document 88    Filed 12/12/2002    Page 54 of 119

158 F. Supp. 2d 1088, *1093; 2001 U.S. Dist. LEXIS 18088

Page 6
F. Supp. 2d

of Clinical Medicine at the University of Southern California Medical School. Dr. Geiseler evaluated Plaintiff's HIV condition and found that Plaintiff had not developed any opportunistic infections or other signs of AIDS, that he had maintained a regular schedule of activities except those of a stockbroker since September 1990, and that he was not taking any medications for his HIV condition, other than experimental anti-neoplastin drugs and anti-depressant medications for his psychiatric condition. Dr. Geiseler concluded that Plaintiff's HIV infection did not impair him from any regularly scheduled activities and that he did not seem to have any real effect from his chronic HIV infection. He deferred an opinion regarding Plaintiff's psychiatric condition to a specialist in that area. Provident's medical consultant, William Dowell, M.D., reviewed Dr. Geiseler's report and determined that it showed Plaintiff's HIV condition was not disabling.

Plaintiff was next examined by Charles H. Hinkin, Ph.D., a psychologist affiliated with the Neuro-Psychiatric Institute at UCLA Medical Center. Dr. Hinkin reviewed Plaintiff's medical records and other pertinent information provided by Provident from its claim file (including Dr. Geiseler's report) and evaluated Plaintiff on July 25, 1998. Dr. Hinkin took a thorough history and administered a battery of standard psychological tests to Plaintiff and concluded on the basis of the record review, psychological testing and his personal interview that Plaintiff had no cognitive deficits which would prevent him from returning to work as a stockbroker. In fact, Plaintiff tested within normal limits on all cognitive testing and "performed well on measures of executive, or frontal systems function, those behaviors which monitor, direct, and control behavior." Further, although Dr. Hinkin found that Plaintiff had a low grade depression, he did not find it disabling, and found no signs of depression or anxiety during six hours of psychological examination. Dr. Hinkin reasoned that Plaintiff's endorsement of severe depressive symptoms could possibly have been "overstated . . . in an effort to justify his disability claim" (although Dr. Hinkin ruled out "gross" exaggeration and malingering). Dr. Hinkin stated that Plaintiff's behavior pattern over the years since filing his claim "is not consistent with either major depressive disorder or PTSD - two diagnoses that he currently carries." Dr. Hinkin continued:

. . . Patients with such disorders do not have their symptoms remit as soon as they go on vacation. While it is possible that Mr. Cardiner's symptoms in 1990 were of sufficient severity and chronicity to warrant a diagnosis of major depressive disorder, given Mr. Cardiner's description of the fluctuating course of his symptoms,

it instead appears that in 1990 Mr. Cardiner may have experienced an adjustment disorder with depressed and anxious features triggered by occupational dissatisfaction. By his report, he grew tired of the ethically questionable manner in which he sometimes felt compelled to act, felt bad when his investment advice failed to prove profitable, and grew to dislike the stress associated with working on a commission basis. Apparently, Mr. Cardiner found that the psychological price attendant to such a high stress job exceeded the financial benefits associated with such a career. Many individuals come to such conclusions in their life and opt to leave the 'rat race' and pursue less stressful alternative careers, or as Mr. Cardiner has done, pursue a career where one can 'give something back' to others. Such a career choice is commendable. [*1094] However, it appears to be a choice and not secondary to psychiatric disease or disorder. Indeed, it could be argued that attending graduate school and trying to create and manage a private practice is also quite stressful. Currently, based on his apparent adequate social and occupational functioning, Mr. Cardiner does not appear to be suffering from a disabling psychiatric disorder and clearly does not meet the diagnostic criteria for PTSD or major depressive disorder. The DSM-IV diagnostic criteria requires exposure to an extreme, traumatic stress involving death or serious injury or other threats to one's physical integrity or witnessing an event that involves death, injury, or a threat to the physical integrity of another person or learning about unexpected or violent death[,] serious injury or threats of death/injury experienced by a family member or close associate. Among the examples of such events listed in the DSM-IV, are torture, combat, and violent personal assault such as rape. A stressful job falls short of such standards and is not outside the range of usual human experience.

With regards to major depressive disorder, by the patient's report he does not suffer from clinically significant distress or impairment in social, occupational, or other important area of function. Rather, by his report, he is presently functioning quite well. Also, Mr. Cardiner reports periods of virtually symptom-free function, particularly when on vacation. Since major depressive episodes do not typically remit while on holiday, this too argues against a present diagnosis of major depressive disorder.

Dr. Hinkin also found it unlikely that Plaintiff's emotional symptoms correlated to his HIV positive status, a possibility raised by Dr. Kagan in 1992. Although Dr. Hinkin surmised that Plaintiff "might" experience a "relapse" of symptoms if he returned to stockbrokering, Dr. Hinkin concluded that Plaintiff was not totally disabled

from his employment as a stockbroker, and that he had made a choice to avoid the stresses of that occupation to pursue a more rewarding career as a psychotherapist.

Provident determined that Dr. Hinkin's report did not support Plaintiff's disability claim. However, it sent a copy of the report to Plaintiff's psychiatrist, Dr. Tucker, and invited him to submit additional clinical information for Provident's review. After reviewing Dr. Hinkin's report and based upon the information received to date, Provident concluded that Plaintiff's career change was a "choice" and not secondary to psychiatric disease or disorder. On August 18, 1998, Provident wrote to Plaintiff notifying him that, on the basis of the conclusions of the two independent examiners, Dr. Geiseler and Dr. Hinkin, benefits would be discontinued on his claim. The letter stated that an additional three months of benefits through October 25, 1998 would be paid to aid in transition.

In conjunction with Dr. Hinkin's psychological evaluation, Plaintiff had also undergone an independent medical examination by Saul J. Faerstein, M.D., a psychiatrist. Plaintiff was examined by Dr. Faerstein on July 27, 1998 for three hours, and Dr. Faerstein reviewed pertinent medical records and other information provided by Provident, including the reports of Drs. Geiseler and Hinkin. Dr. Faerstein's opinion reaffirmed Provident's determination that Plaintiff did not return to stockbrokering due to choice rather than disability. Dr. Faerstein reported to Provident by telephone that Plaintiff had been depressed but was no longer totally disabled from working as a stockbroker and had made a choice to pursue an alternate occupation as a psychotherapist. In his October 6, 1998 report, Dr. Faerstein explained [*1095] that Plaintiff had had an episode of major depression in the early 1990s, but that the condition had remitted within the first year of treatment. Thereafter Plaintiff had functioned adequately so as to maintain an active social life, return to school and function successfully as a student, become a psychotherapist, and engage in a wide variety of activities without any significant impairment. Dr. Faerstein noted that Dr. Tucker's records did not reflect treatment consistent with a disabling illness and regarded Plaintiff's extensive activities since claiming disability:

. . . The records [of Dr. Tucker] which were reviewed of therapy between 1992 and 1998 were sparse and noted continuing anxiety and depression and the prescriptions of Xanax and Zoloft which remained unchanged. The attending physician's statements were essentially unchanged over a six year period with continuing documentation of disability based on a projection of what might occur should he return to his former occu-

pation. No other antidepressants were tried until apparently 1998 when Wellbutrin was added to the regimen. These notes between 1992 and 1998 also do not document the extensive activities in which Mr. Cardiner has become involved, first as a volunteer and then a remuneration. The records do not document his return to school, his ability to obtain an advanced degree, to pass licensing examinations, and to function as a psychotherapist.

Dr. Faerstein's examination did not reveal any significant psychiatric illness, as he explained:

It was my clinical opinion that Mr. Cardiner did not present as an individual with significant anxiety or depression. During the psychiatric examination I conducted, his affect was bright, alert, and cooperative, and he manifested none of the symptoms one would see in a depressed or anxious individual. Although he reported he was anxious because of the significance of the psychiatric evaluation for his disability status, he did not function or manifest any signs of anxiety during the three-hour examination. This was consistent with his presentation during the psychological testing as well.

Dr. Faerstein acknowledged that Plaintiff certainly had job dissatisfaction as a stockbroker, but that he was not disabled from performing the duties of his previous occupation. Dr. Faerstein believed that it was speculative as to whether Plaintiff's psychiatric symptoms might reoccur if he returned to his former occupation as a stockbroker:

It is clear from listening to Mr. Cardiner describe his opinions about the brokerage industry that he objects to many of the practices of this industry and he has made a choice not to engage in many of the practices that other brokers and salesmen engage in because of his moral and ethical objections to those activities. I would agree with previous examiners that if Mr. Cardiner were to return to the brokerage industry and he were to engage in illegal and unethical practices in that industry, he would again become depressed and anxious and might manifest the same symptoms he had in 1990. However, I do not believe that if he returned to that industry where he functioned for ten years before his disability, practicing honestly and ethically as a stockbroker, he would necessarily experience any of these symptoms.

Since his improvement during the first year of therapy after he left Oppenheimer Funds, Mr. Cardiner has carried on an active social and occupational life, first as a volunteer in his community, and then as a student obtaining an advanced degree and functioning as a psychother-

Case 1:01-cv-01137-CCC   Document 60   Filed 12/12/2002   Page 56 of 119

158 F. Supp. 2d 1088, *1095; 2001 U.S. Dist. LEXIS 18088

Page 8
F. Supp. 2d

apist. There are many stresses [*1096] in the life of a psychotherapist, including his work with AIDS patients and suicidal patients. I can assure you that the work of a conscientious psychotherapist involves stresses on a par with those in many other professions, but Mr. Cardiner does not report that any of his symptoms have impaired his work in this field and he is seeking to increase the number of hours he meets with patients.

* * *

It is my assessment from the records reviewed, from Mr. Cardiner's presentation, and from his history that the symptoms of his initial Major Depressive Disorder remitted within the first year of treatment, and he had plateaued and functioned at an adequate level as to be able to maintain an active social life, to return to school, to function successfully as a student, to become a psychotherapist, and to engage in a wide variety of activities including vocational activities without any significant impairment. I did not find that he presently suffers from any significant impairment or disability from his psychiatric condition. I cannot say for sure whether this is due to the absence of any psychiatric disorder or to the successful treatment and the medications he currently takes. In either case, he is not psychiatrically disabled as a result of a psychiatric disorder.

The opinions offered by other evaluators that Mr. Cardiner would be disabled to be a stockbroker because of what might happen should he return to that environment appear to be speculative and appear certainly to be fueled by Mr. Cardiner's negative attitudes towards the brokerage business, which are understandable considering his experience there. Such beliefs and attitudes, however, are more consistent with the diagnosis of Occupational Problem rather [than] any psychiatric disorder which would disable him. This is the category in DSM-IV which describes "job dissatisfaction and uncertainty about career choices." Mr. Cardiner certainly has job dissatisfaction with the brokerage business, but he has no uncertainty about his career choices and appears to be happy, fulfilled, and satisfied with his new career as a psychotherapist. Based upon his current diagnosis, appearance, level of function, and psychological capabilities, he is not disabled from performing the duties of his previous occupation. I believe he has made a conscious choice not to return to that profession, a choice he is certainly entitled to make.

Provident forwarded Dr. Faerstein's report to Dr. Tucker for review and comment.

In December 1998, Plaintiff provided recent reports of testing performed by his attending HIV specialist, Dr. Hitt, for Provident's consideration. Thereafter, Provident obtained updated medical records from Dr. Hitt. Provident reviewed the information and determined that it did not support disability from Plaintiff's HIV condition.

On March 29, 1999, Plaintiff wrote to Provident forwarding a package of reports rebutting the opinions of Provident's independent medical examiners. The packet consisted of separate lengthy reports from Dr. Tucker responding to both Dr. Hinkin's and Dr. Faerstein's reports, a report from Jane E. Lewis, Ph.D., a psychologist, and an October 6, 1998 letter regarding Plaintiff's HIV status from Dr. Hitt. Notably, Dr. Hitt's letter indicated that Plaintiff's HIV status had not significantly deteriorated. The rebuttal reports from Drs. Tucker and Lewis disputed the conclusions of Drs. Hinkin and Faerstein that Plaintiff was not psychiatrically disabled and had made a choice to change his occupation from a stockbroker to a psychotherapist. [*1097] Dr. Lewis' report was supported by the results of independent psychological testing of Plaintiff that she had conducted on December 14, 1998 and January 3, 1999.

Plaintiff's rebuttal reports were reviewed by a psychological consultant, David A. Goldsmith, Ph.D. Dr. Goldsmith found Dr. Tucker's "rebuttals" to be biased (due to his role as a supportive advocate for Plaintiff) and lacking in objective support. He also found Dr. Lewis's evaluation to be biased, flawed by her test selection, and lacking in objective support, but he deferred final comment pending review of her raw test data.

Dr. Lewis forwarded her raw test data on April 28, 1999. A "Patient Information" sheet contained in Dr. Lewis's records disclosed that Cardiner had been referred to her on December 13, 1998 by his attorney of record in this action, Frank Darras. Dr. Goldsmith reviewed the raw testing data from Dr. Lewis and rendered a final report on May 7, 1999. The raw data did not alter his earlier impressions. Dr. Goldstein opined that Plaintiff had developed an aversion to being a stockbroker, that he felt bad when he failed clients, that he found his work upsetting and stressful, that he wanted to escape and avoid a career in which he was unfulfilled and felt "trapped," and that he made a conscious choice not to pursue therapy goals that could have enabled him to return to work in his former occupation as stockbroker. Although Dr. Goldsmith found that Plaintiff met the diagnostic criteria for a mental disorder, he concluded that Plaintiff's mental disorder did not impose deficiencies that rendered him unable to accomplish the specific duties of a stockbroker.

Based on Dr. Goldsmith's analysis, Provident wrote

Case 1:01-cv-01137-CCC    Document 88    Filed 12/12/2002    Page 57 of 119

158 F. Supp. 2d 1088, *1097; 2001 U.S. Dist. LEXIS 18088

Page 9
F. Supp. 2d

to Plaintiff on August 13, 1999 reaffirming Provident's decision to discontinue further benefits to him, as previously communicated in Provident's August 18, 1998 letter.

Following the 90-day elimination period, Provident paid a total of $ 555,231 in benefits for the period between December 25, 1990 through October 25, 1998.

B. Procedural Summary

On January 27, 2000, Plaintiff filed the Complaint in the Superior Court of the State of California for the County of Los Angeles.

On February 25, 2000, Provident filed a Notice of Removal of Civil Action based on diversity.

On March 24, 2000, Provident filed an Answer and Counterclaim for declaratory judgment.

On April 10, 2000, Plaintiff filed a Reply to Counterclaim.

On May 22, 2000, this Court held a Mandatory Status Conference and set the discovery cut-off date of December 29, 2000, the pre-trial conference date of March 12, 2001 and the trial date of May 8, 2001. Pursuant to stipulation, these dates were continued as follows: discovery cut-off date to March 30, 2001, the pre-trial conference date to June 11, 2001 and the trial date to August 14, 2001. Pursuant to stipulation, these dates were again continued as follows: discovery cut-off date to May 30, 2001 and the pre-trial conference date to July 9, 2001.

On June 18, 2001, Provident filed a Motion for Partial Summary Judgment, which is currently before this Court. Specifically, Provident seeks summary judgment with respect to Plaintiff's cause of action for breach of the implied covenant of good faith and fair dealing and Plaintiff's claim for punitive damages.

[*1098]
II. Discussion

A. Standard

Under the Federal Rules of Civil Procedure, summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986).* If the moving party satisfies the burden, the party opposing the motion must set forth specific facts

showing that there remains a genuine issue for trial. See id.; Fed. R. Civ. P. 56(e).

A non-moving party who bears the burden of proof at trial to an element essential to its case must make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element of the case or be subject to summary judgment. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).* Such an issue of fact is a genuine issue if it reasonably can be resolved in favor of either party. See *Anderson, 477 U.S. at 250-51, 106 S. Ct. at 2511.* The non-movant's burden to demonstrate a genuine issue of material fact increases when the factual context renders her claim implausible. See *Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).* Thus, mere disagreement or the bald assertion that a genuine issue of material fact exists no longer precludes the use of summary judgment. See *Harper v. Wallingford, 877 F.2d 728 (9th Cir. 1989); California Architectural Building Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).*

If the moving party seeks summary judgment on a claim or defense on which it bears the burden of proof at trial, it must satisfy its burden by showing affirmative, admissible evidence.

Unauthenticated documents cannot be considered on a motion for summary judgment. See *Hal Roach Studios v. Richard Feiner and Co., 896 F.2d 1542, 1550 (9th Cir. 1990).*

On a motion for summary judgment, admissible declarations or affidavits must be based on personal knowledge, must set forth facts that would be admissible evidence at trial, and must show that the declarant or affiant is competent to testify as to the facts at issue. See Fed. R. Civ. P. 56(e). Declarations on "information and belief" are inappropriate to demonstrate a genuine issue of fact. See *Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).*

B. Provident's Request for Judicial Notice

Provident asks this Court to take judicial notice of the "Civil Minutes - General" dated February 10, 1999 pertaining to Provident's motion for summary judgment issued in an action filed in the United States District Court, Central District of California, entitled Fontaine v. Provident Life and Accident Ins. Co., Case No. 97-7675 WDK (C.D. Cal. Feb. 10, 1999).

A court must take judicial notice if a party requests it and supplies the court with the requisite information.

Case 1:01-cv-01157-CCC    Document 88    Filed 12/12/2002    Page 58 of 119

158 F. Supp. 2d 1088, *1098; 2001 U.S. Dist. LEXIS 18088

Page 10
F. Supp. 2d

Fed. R. Evid. 201(d). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). This Court may take judicial notice of facts outside the pleadings without converting [*1099] the motion to one for summary judgment. See *Mack v. South Bay Beer Distributors, 798 F.2d 1279, 1282 (9th Cir. 1986)*(citing *Sears, Roebuck & Co. v. Metropolitan Engravers, Ltd., 245 F.2d 67, 70 (9th Cir. 1956)*).

This Court may take judicial notice of its own records, and documents that are public records and capable of accurate and ready confirmation by sources that cannot reasonably be questioned. See *MGIC Indem. Corp. v. Weisman, 803 F.2d 500, 504 (9th Cir. 1986)* (courts may take judicial notice of matters of public record outside the pleadings); *United States v. Wilson, 631 F.2d 118, 119 (9th Cir. 1980)*("In particular, a court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases.").

Based on the foregoing, this Court grants Provident's request and takes judicial notice of the aforementioned document.

C. Analysis

1. Summary judgment is warranted with respect to the first cause of action for breach of the covenant of good faith and fair dealing

Provident seeks summary judgment with respect to Plaintiff's first cause of action for breach of the covenant of good faith and fair dealing.

At the outset, this Court notes that there is no dispute that from 1990 until 1997, Provident was properly paying disability benefits to Plaintiff. In 1997, Plaintiff's file was transferred to Provident's psychiatric unit for further assessment of whether he remained "totally disabled." On August 18, 1998, Provident wrote to Plaintiff notifying him that benefits would be discontinued on his claim, following an additional three months of benefits through October 25, 1998 to aid in transition. On August 13, 1999, Provident again wrote to Plaintiff reaffirming its decision to discontinue further benefits to Plaintiff. It is this termination of benefits which is the subject of this action.

An insurer is subject to liability in tort when it unreasonably and in bad faith withholds payment of the claim of its insured. See *Egan v. Mutual of Omaha Ins. Co., 24 Cal. 3d 809, 818-19, 169 Cal. Rptr. 691, 620 P.2d 141 (1979)*. As one court has observed, "the ultimate

test of liability in the first party cases is whether the refusal to pay policy benefits was unreasonable." *Austero v. National Cas. Co., 84 Cal. App. 3d 1, 32, 148 Cal. Rptr. 653 (1978)*. The breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself. See *California Shoppers, Inc. v. Royal Globe Ins. Co., 175 Cal. App. 3d 1, 54-55, 221 Cal. Rptr. 171 (1985)*. "Bad faith implies unfair dealing rather than mistaken judgment . . . ." Id. (internal quotations and citation omitted). An insurer may be found liable in bad faith if it fails to adequately investigate a claim (see *Egan, 24 Cal. 3d at 817)*, denies coverage based on an unduly restrictive policy interpretation or standard known to be improper (see *Love v. Fire Ins. Exch., 221 Cal. App. 3d 1136, 1148, 271 Cal. Rptr. 246 (1990)*, unreasonably delays in processing or paying claims (see id.), or forces the insured to file suit in order to recover policy benefits (see *Brandt v. Superior Court, 37 Cal. 3d 813, 820, 210 Cal. Rptr. 211, 693 P.2d 796 (1985)*. It is noted, however, that even where a claim is ultimately found to be payable under policy terms, a court can conclude as a matter of law that the insurer's denial of a claim is not unreasonable. See *Franceschi v. American Motorists Ins. Co., 852 F.2d 1217, 1220 (9th Cir. 1988)*. "The reasonableness of an insurer's claims handling [*1100] conduct in a first party coverage case becomes a question of law, properly determined on summary judgment, where the evidence is undisputed and but one inference can be drawn. [Citations omitted.]" *Nager v. Allstate Ins. Co., 83 Cal. App. 4th 284, 288, 99 Cal. Rptr. 2d 348 (2000)*.

Plaintiff argues that Provident breached its implied duty of good faith and fair dealing based on the following: (1) unreasonable failure to pay benefits; (2) failure to objectively investigate; (3) failure to thoroughly investigate; (4) conducting unnecessary investigation; (5) misrepresenting policy provisions; (6) failing to give legal definition of "disability" to IME (independent medical examination) doctors; (7) interpreting disability policy provisions inconsistent with California law; (8) failing to promptly investigate and communicate; and (9) imposing additional preconditions beyond policy. In support of his argument, Plaintiff offers specific instances of what he alleges is bad faith. This Court addresses each in turn.

a.

Plaintiff argues that all of Plaintiff's treating physicians found him disabled, including Provident's own chosen psychiatric examiner, Dr. Kagan, and psychological consultant, Dr. Gray. n2 It is undisputed that these doctors did find Plaintiff disabled; however, their

158 F. Supp. 2d 1088, *1100; 2001 U.S. Dist. LEXIS 18088

Page 11
F. Supp. 2d

findings took place in 1990 to 1993. As such, this Court fails to see the relevance of this argument since Provident based its decision to terminate benefits based on its review of Plaintiff's status just prior to its decision. Indeed, Plaintiff attempts to make much of the fact that Provident "disregards the in-house and consultant physicians who had advised that the insured was disabled" and attempts to establish bad faith by Provident's re-evaluation in 1997. Provident responds that it was entitled to investigate and evaluate Plaintiff's claim on a periodic basis to determine whether he was entitled to further benefits, even though he has been paid benefits in the past. This Court agrees. Courts have held that the insurer has the right and opportunity to examine the insured when and so often as it may reasonably require. See *Erreca v. Western States Life Ins. Co., 19 Cal. 2d 388, 401, 121 P.2d 689 (1942)*(citing Sec. 10339, Ins. Code). "The right periodically to examine the insured for proof of continued disability is a condition to the future liability of the insurer provided the policy so recites." Id. Here, the Policy provides that Provident has the right to have the insured examined "as often as is reasonable while a claim is pending." (See Provident, Exh. 1, Policy at p. 16.) Thus, the mere fact of Provident's investigation in 1997 is insufficient to evidence bad faith. n3

    n2 In 1992, Plaintiff's claim was referred to Dr. Gray, Provident's psychological specialist consultant, who wrote a claim file note stating that the case is legitimate, that the IME supports the claim and that he discussed this case with a stockbroker and that "it fits 100 percent."

    n3 In addition, Provident states that in 1997, it determined that, in retrospect, it had been liberal in its investigation of Plaintiff's claim since Plaintiff remained quite active during the pendency of his claim, to an extent completely at odds with his diagnosis. This Court also agrees with Provident that Plaintiff could have suffered no harm from Provident's earlier lapses in investigation; if Plaintiff was not "totally disabled" for any portion of time between the commencement and termination of his claim, then Plaintiff benefitted significantly.

    b.

Plaintiff argues that Provident used medical examiners - Drs. Hinkin, a psychologist, and Faerstein, a psychiatrist - who were blatantly biased in favor of defendants and not independent of each other. In support of this argument, [*1101] he lists the "track records" of Drs. Hinkin and Faerstein. For example, he provides the following: since 1990, there have been 20-25 times that Dr. Hinkin has been engaged to provide expert testimony, and in all those cases, Dr. Hinkin was hired by an insurance company or its lawyer; Dr. Hinkin has never given testimony for an insured; during 1997-1999, Dr. Faerstein was paid by Provident 18 times to perform independent medical examinations of Provident insureds. Plaintiff provides the following regarding the relationship between Dr. Hinkin and Dr. Faerstein: they had worked together on lawsuits in the past; they are friends; Dr. Faerstein regularly selects and recommends Dr. Hinkin in cases where Dr. Faerstein is retained as an expert; there were six disability cases in which Dr. Hinkin and Dr. Faerstein were retained by the same insurance company in 1998-1999. Defendant responds that this evidence does not support bias. This Court agrees.

The mere fact that these doctors have been hired by insurers rather than insureds does not support bias. Indeed, if this were the case, then most experts in any case would be deemed bias. Significantly, Plaintiff offers no evidence that these doctors routinely find for the insured when faced with contrary evidence. With respect to the relationship between Drs. Hinkin and Faerstein, Plaintiff attempts to raise suspicion which is unsupported by the facts. As Provident points out, Drs. Hinkin and Faerstein are both affiliated with the UCLA Medical School. As such, it is not surprising that they are friends and have worked together. Plaintiff also attempts to make much of the fact that Dr. Faerstein waited for Dr. Hinkin's report before he completed his own. However, Dr. Faerstein offered a reasonable explanation:

An independent psychiatric examination depends on a number of data bases to reach a conclusion. It includes the examination of the claimant, but it also includes a review of past treatment records, in includes review of materials concerning his work, it includes any other evaluations, medical records that may be present, treatment records, evaluations, but it also includes psychological testing which is an integral part of the psychiatric evaluation, and Dr. Hinkin had done psychological testing, and the results of the testing were a very important part of the opinion that I was going to reach concerning dysfunctional level, impairments, and that data is part of my opinion.

(See Schneider Decl., Exh. 48.) Thus, Plaintiff's attempt to base his bad faith claim on the above evidence fails.

    c.

Case 1:01-cv-01157-CCC    Document 86    Filed 12/12/2002    Page 60 of 119

Page 12
F. Supp. 2d

158 F. Supp. 2d 1088, *1101; 2001 U.S. Dist. LEXIS 18088

Plaintiff argues that Provident terminated benefits without having received an IME report from Dr. Faerstein which Provident said would be important to the future consideration of his claim. Provident does not dispute this, but it argues that it ultimately considered that report before making its final claim determination.

This Court agrees that Provident erred in communicating to Plaintiff that his examination by Dr. Faerstein would be important to the consideration of his claim and then terminating his benefits prior to receiving Dr. Faerstein's report. However, this Court disagrees that its doing so rises to the level of bad faith. Provident's August 18, 1998 letter terminating Plaintiff's benefits is clear that its decision was based on the examinations by Drs. Geiseler and Hinkin; it did not represent that it had received a report by Dr. Faerstein. Dr. Geiseler concluded that Plaintiff's HIV infection did not impair Plaintiff from any regularly scheduled activities and that he did not seem to have any real effect from his chronic HIV infection. Provident's medical consultant reviewed Dr. Geiseler's [*1102] report and determined that it showed Plaintiff's HIV condition was not disabling. Dr. Hinkin concluded that Plaintiff was not totally disabled from his employment as a stockbroker and that Plaintiff made a choice to avoid the stresses of that occupation to pursue a more rewarding career as a psychotherapist. Based on these two doctors' reports, Provident discontinued Plaintiff's benefits, and in doing so, this Court concludes that Provident acted reasonably as a matter of law.

Following the termination of benefits, Provident received Dr. Faerstein's report. Dr. Faerstein's report ultimately confirmed Provident's denial of benefits because it concluded that Plaintiff was not disabled from performing the duties of his stockbroker occupation. Thus, while this Court cannot rely on Dr. Faerstein's report to support a conclusion that Provident acted reasonably at the time it terminated benefits in August of 1998, Dr. Faerstein's report supports the reasonableness of Provident's actions in dealing with Plaintiff's claim after August 1998. Of course, if Dr. Faerstein's report had not supported Provident's termination of benefits and Provident maintained its denial, then a bad faith claim would be more viable.

Plaintiff further argues that since Provident denied coverage without having received Dr. Faerstein's IME report, the IME report was not reasonably required for, or material to, the resolution of a claim dispute, and therefore, requiring Plaintiff to attend that IME was an act of bad faith. This Court disagrees with this argument. There is no evidence that Provident intended to disregard Dr. Faerstein's report. Indeed,

Dr. Faerstein's report was forwarded to Dr. Tucker, Plaintiff's treating physician, for comment and review, and Dr. Tucker issued a report rebutting Dr. Faerstein's and Dr. Hinkin's reports. Dr. Tucker's rebuttal report, along with Dr. Lewis's, were reviewed by a psychological consultant, Dr. Goldsmith, who concluded that Plaintiff's mental disorder did not impose deficiencies that rendered him unable to accomplish the specific duties of a stockbroker. n4

n4 Plaintiff argues that Provident denied coverage based on Dr. Hinkin's report without even having given that report to Plaintiff's treating physicians for review and comment. However, it is undisputed that Dr. Tucker received Dr. Hinkin's report shortly thereafter and wrote a rebuttal report and that Dr. Lewis also wrote a rebuttal report on behalf of Plaintiff, and that both reports were received and considered by Provident in reaffirming its decision to discontinue benefits.

d.

In support of his bad faith claim, Plaintiff states that Provident never gave the rebuttals by Drs. Tucker and Lewis to Drs. Hinkin and Faerstein, the doctors whose findings were being challenged. This Court fails to see the significance of this argument. Provident never represented to Plaintiff that this would be the process by which it would review Plaintiff's claim. In addition, it would appear to be an exercise in futility for the doctors involved to continually review each other's rebuttal reports. In any event, the rebuttal reports were reviewed by a psychological consultant, Dr. Goldsmith. Dr. Goldsmith found Dr. Tucker's report to be biased and lacking in objective support, and he found Dr. Lewis's evaluation to be biased, flawed by her test selection and lacking in objective support, but he deferred final comment pending review of her raw test data. Dr. Goldsmith then rendered a final report upon receipt of this raw test data from Dr. Lewis, which did not alter his earlier impressions. n5

n5 Plaintiff also argues that Provident improperly used a review by Dr. Goldsmith, an in-house employee psychologist who never met or examined the insured, to uphold its termination of benefits. Again, Plaintiff imposes a requirement which he may deem important, but this Court must look to what was actually done by Provident to determine whether it acted in bad faith.

[*1103]

158 F. Supp. 2d 1088, *1103; 2001 U.S. Dist. LEXIS 18088

Page 13
F. Supp. 2d

e.

Plaintiff argues that bad faith is evidenced by the concealment of the opinions of Drs. Hinkin and Faerstein from Plaintiff by instructing them to not share the report and findings of the IME with the insured. This Court finds no "concealment." Provident provided the reports to Plaintiff's treating physician and stated:

The report has not been shared with your patient. We offer the report to you as a courtesy and in the event that it may contain useful information for your consideration. It is up to your best clinical judgment to share or discuss the findings of the report with your patient.

f.

Plaintiff claims that bad faith is evidenced by the fact that all of the examiners agreed that there is a significant risk of relapse should Plaintiff return to his stockbroker occupation. However, Plaintiff oversimplifies the examiner's statements.

Dr. Hinkin stated that "given his history and current aversion to his old career, it would not be surprising to see a similar symptom constellation to what he suffered in 1990 re-occur should he return to work as a stockbroker," and he also stated that Plaintiff "does not appear to be suffering from any cognitive or affective impairments that would prevent a return to work (though it is entirely possible that he might suffer a relapse should he do so)." These statements must be read in conjunction with the rest of Dr. Hinkin's report. Dr. Hinkin stated that Plaintiff experienced a significant degree of psychiatric distress in 1990 and that his job was undeniably stressful and high pressure and likely was the primary precipitant of that psychiatric disorder. However, because Plaintiff reported that when he took a vacation, his symptoms entirely remitted, only to reoccur when he returned to work and that once he went out on disability, his symptoms dissipated so much that Plaintiff admitted to periods with virtually no symptomatology, Dr. Hinkin found that Plaintiff "may have experienced an adjustment disorder with depressed and anxious features triggered by occupational dissatisfaction." Importantly, Dr. Hinkin concluded that Plaintiff does not appear to be suffering from a disabling psychiatric disorder and that "it appears that [Plaintiff] has chosen to make a career change because he has found work as a stockbroker to be too stressful and insufficiently rewarding" and that this "appears to be a choice and not a result of psychiatric impairment."

Similarly, Dr. Faerstein stated that "if [Plaintiff] were to return to the brokerage industry and he were to engage in illegal and unethical practices in that industry, he

would again become depressed and anxious and might manifest the same symptoms he had in 1990." However, Dr. Faerstein continued to state that he "does not believe that if he returned to that industry where he functioned for ten years before his disability, practicing honestly and ethically as a stockbroker, he would necessarily experience any of these symptoms." Importantly, he further stated:

The opinions offered by other evaluators that [Plaintiff] would be disabled to be a stockbroker because of what might happen should he return to that environment appear to be speculative and appear certainly to be fueled by [Plaintiff's] negative attitudes towards the brokerage business, which are understandable considering his experience [*1104] there. Such beliefs and attitudes, however, are more consistent with the diagnosis of Occupational Problem rather than any psychiatric disorder which would disable him.

(Emphasis in original.)

Thus, based on the entire context of these doctors' statements regarding a risk of relapse, this Court concludes that Plaintiff's bad faith argument fails as a matter of law. n6

n6 Plaintiff also relies on a case, *Brosnan v. Provident Life and Accident Ins. Co., 31 F. Supp. 2d 460 (E.D. Pa. 1998),* for the proposition that failure to consider the risk of relapse is compensable. However, in Brosnan, the Court was examining a breach of contract claim and concluded that the record contained sufficient evidence from which a reasonable jury could find that the plaintiff is totally disabled as defined in the policies.

g.

Plaintiff argues that Provident failed to inform either Dr. Hinkin or Dr. Faerstein about California's definition of "disability" and that it instead instructed these doctors to apply the Policy definition of "disability," which requires a greater showing than allowed under California law. This Court finds that these arguments lack merit.

In its letter to Drs. Hinkin and Faerstein, Provident clearly set forth the Policy definition of disability. Specifically, it provided:

DEFINITION OF DISABILITY:

'Totally disabled means the inability to perform the ma-

Case 1:01-cv-01137-CCC    Document 88    Filed 12/12/2002    Page 62 of 119

Page 14
158 F. Supp. 2d 1088, *1104; 2001 U.S. Dist. LEXIS 18088    F. Supp. 2d

terial and substantial duties of your occupation."

'Under the personal attendance of a physician which is appropriate for the condition causing disability.'

(See Provident Exh. 18, p. 18-3; Exh. 20, p. 20-3.) This definition is the definition provided in the Policy. (See id. at Exh. 1.)

With respect to his argument that Provident required a greater showing of disability than required by California law, Plaintiff relies on the case of *Moore v. American United Life Ins. Co., 150 Cal. App. 3d 610, 197 Cal. Rptr. 878 (1984)*. However, in Moore, the policy at issue was a general, non-occupational disability policy, which indemnifies against total and permanent disability which prevents the insured from performing the work of any occupation (see *id. at 616);* whereas, here, the policy at issue is an occupational disability policy, which indemnifies against total and permanent disability which prevents the insured from performing the duties pertaining to a defined occupation. Under a general, non-occupational disability policy, "total disability for purposes of coverage results whenever the employee is prevented from working 'with reasonable continuity in his customary occupation or in any other occupation in which he might reasonably be expected to engage in view of his station and physical and mental capacity.'" *Id. at 618* (quoting *Erreca v. West. States Life Ins. Co., 19 Cal. 2d 388, 394-395, 121 P.2d 689 (1942))*. Thus, Plaintiff's reliance on this case and this definition of total disability is misplaced.

h.

Finally, in an attempt to bolster his bad faith claim, Plaintiff offers a list of things which he argues Provident did not do or did improperly. Because each of these items standing alone lacks much merit, it is clear that Plaintiff is merely attempting to establish "quantity" over "quality" in the hopes that a bad faith claim will emerge. This Court concludes that Plaintiff's attempt fails.

Plaintiff asserts the following: the doctors Provident utilized did not speak with the treating physicians; Provident committed numerous delays in providing Plaintiff with copies of Dr. Hinkin's raw data and Dr. Faerstein's report and in responding [*1105] to letters and phone inquiries from Plaintiff and Dr. Tucker; Provident instructed Drs. Hinkin and Faerstein to "objectify any subjective self-reports by the Insured through interviews with collateral sources" and "comment [] upon whether the insured is vocationally impaired based on objective information"; Lucy Baird, author of the August 18, 1998 denial letter, failed to speak with the doctors n7; Darrin Robinson, a subsequent claims rep-

resentative assigned to Plaintiff's case, did not speak to any of the doctors. n8

n7 Plaintiff lists other things Ms. Baird did not do. (See Opposition, p. 12.)

n8 Plaintiff lists other things Mr. Robinson did not do. (See Opposition, pp. 15-16.)

Precedent dictates that the insurer is subject to liability in tort when it unreasonably and in bad faith handles, or withholds payment of, the claim of its insured, and several examples of such bad faith have emerged, as discussed above. In analyzing the particular facts of a case, this Court must look to the actions of the insurer in its handling of the claim at issue. While certain actions that an insurer may have failed to take are important in analyzing its overall handling, a mere recitation of actions that an insurer should have taken is not dispositive. Indeed, if this were the case, then most insureds could easily claim bad faith. As this Court has previously stated, "that Defendant did not exhaust all possible tests is not dispositive." *Phelps v. Provident Life and Accident Ins. Co., 60 F. Supp. 2d 1014, 1023 (C.D. Cal. 1999)*. Here, Provident paid disability benefits to Plaintiff for approximately 7 years. It then reevaluated Plaintiff's claim. As detailed in the undisputed facts, Provident then interviewed Plaintiff, had Plaintiff examined by Dr. Geiseler, and then by Dr. Hinkin. As a result of these examinations and resulting reports, Provident terminated benefits. This Court has read the reports of Drs. Geiseler and Hinkin, and based on the facts presented above and these reports, this Court concludes that Provident acted reasonably as a matter of law. In addition, following this initial denial, it is undisputed that Plaintiff was examined by Dr. Faerstein, that Plaintiff provided rebuttal reports and recent reports of testing performed by his attending HIV specialist, that these reports were reviewed by Dr. Goldsmith and that Provident then reaffirmed its decision to discontinue further benefits. Again, this Court has read these subsequent reports, and based on the facts and these reports, concludes that Provident acted reasonably as a matter of law. It is not unreasonable for an insurer to resolve good faith doubts about the claim against the claimant. It is well-established that the insurer is entitled to give its own interests consideration in addition to those of its insured. See id.

In sum, the record in this case supports a conclusion that, at a minimum, there existed a genuine issue as to Provident's liability. With respect to the breach of contract claim, a fact finder may ultimately disagree with the opinions of the medical examiners relied upon

Case 1:01-cv-01157-CCC    Document 88    Filed 12/12/2002    Page 88 of 119

158 F. Supp. 2d 1088, *1105; 2001 U.S. Dist. LEXIS 18088

Page 15
F. Supp. 2d

by Provident, but nothing in the record suggests that these examiners rendered opinions without bases and that Provident unreasonably relied upon them. Indeed, while ultimately it may be found that Plaintiff is not totally disabled and benefits may be owed to Plaintiff, Provident had a reasonable basis to terminate benefits at that time.

i.

Finally, this Court notes Plaintiff's proffered explanation as to why Provident assertedly acted in bad faith. It claims that during the 1980's, Provident had aggressively marketed it form 335 policy, which is the one Plaintiff purchased. He states that these policy provisions were so liberal that Provident ultimately took a [*1106] $ 423 million charge to create a reserve for expected future losses. He states that the only way that Provident could limit its losses was to improperly use the claim department to help improve profitability and that Provident targeted certain known problem areas - including mental/nervous claims - for aggressive claims handling, focusing on more "skillful" selection of IME doctors and measuring employee success in terms of claim terminations.

In opposition, Provident offers its explanation as to why and how it changed its business as a result of a stagnancy in 1993. It also asserts evidentiary objections to Plaintiff's declaration submitted in support of Plaintiff's argument.

This Court does not need to address the legitimacy of Provident's business reorganization. Even if this Court accepted Plaintiff's evidence, Plaintiff fails to establish any link between Provident's actions with respect to this specific claim and the alleged plan attributed to Provident. For example, Plaintiff fails to show how the "practice" of denying claims affected and influenced the denial of his specific claim in particular. Nonetheless, as detailed above, Plaintiff's claim was individually examined, and Plaintiff's proffered evidence of a change in Provident's "goals" does not create a genuine issue for trial. n9

n9 Based on this determination, Provident's objections to the portions of the Declaration of Stephen Prater offered in support of this argument are necessarily moot. In addition, Provident asserts objections to the declarations of Andrew Bernstein, Mark Mills, and David Bamberger, submitted by Plaintiff. This Court notes that the majority of the content of these declarations mirror the arguments made by Plaintiff herein and is offered to support Plaintiff's arguments. To the extent that this Court has considered said evidence in its analysis, the objections are overruled, and to the extent said evidence has not been relied upon, said objections are deemed moot.

j.

In sum, Provident has shown the absence of a genuine issue for trial, and Plaintiff has failed to set forth specific facts showing that there remains a genuine issue for trial. Thus, in light of the foregoing analysis, this Court concludes that Provident is entitled to summary judgment with respect to Plaintiff's first cause of action for breach of the covenant of good faith and fair dealing.

2.    Plaintiff's Claim For an Award of Punitive Damages is Moot

With respect to his first cause of action for breach of the covenant of good faith and fair dealing, Plaintiff seeks an award of punitive damages. Provident contends that it is entitled to judgment on Plaintiff's punitive damages claim. Based on this Court's conclusion that Provident is entitled to summary judgment with respect to Plaintiff's first cause of action, the issue of punitive damages is necessarily moot.

C. Conclusion

Accordingly, this Court grants Defendant Provident Life and Accident Insurance Company's Motion for Partial Summary Judgment.

IT IS SO ORDERED.

DATED: JUL 10 2001

Dickran Tevrizian, Judge

United States District Court

2001 U.S. Dist. LEXIS 10366 printed in FULL format.

JAMES J. HYATT, II, Plaintiff, v. UNUM LIFE INSURANCE COMPANY OF AMERICA, Defendant.

Civil Action No. 00-613-JJF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2001 U.S. Dist. LEXIS 10366

July 11, 2001, Decided

DISPOSITION: [*1] Defendant's motion for summary judgment granted.

CORE TERMS: arbitrary and capricious, disabled, heightened, administrator, summary judgment, plan administrator, decision to deny, non-moving, full-time, handwritten note, disability, deferential, claimant, insurer, standard of review, entitlement, eligibility, contradict, eligible, cleared, information available, evidence adduced, procedure used, genuine issue, moving party, automatically, abnormalities, credibility, administers, analyzing

COUNSEL: For Plaintiff: Ben T. Castle, Esquire, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware.

For Defendant: Laurence V. Cronin, Esquire, SMITH, KATZENSTEIN & FURLOW LLP, Wilmington, Delaware.

JUDGES: FARNAN, District Judge.

OPINIONBY: FARNAN

OPINION: MEMORANDUM OPINION

July 11, 2001
Wilmington, Delaware

FARNAN, District Judge.

Presently before the Court is Defendant UNUM Life Insurance Company of America's Motion for Summary Judgment (D.I. 28). For the reasons stated below, the Court will grant the motion.

BACKGROUND

On October 16, 1998, Plaintiff James J. Hyatt, II ("Plaintiff") was involved in a non-work related biking accident in which he suffered a fractured right femur in his hip joint. n1 At the time of the accident, Plaintiff was employed by The Pep Boys as a loss prevention supervisor, and was eligible for short and long term disability benefits under the benefits plan ("the Policy") issued to The Pep Boys by Defendant UNUM Life Insurance Company of America ("Defendant"). Plaintiff received short term disability ("STD") benefits for a six month period from October 16, 1998 through April 15, 1999, even [*2] though Plaintiff was terminated from his employment with The Pep Boys on February 16, 1999. (D.I. 30 at 000557).

n1 Plaintiff was twenty-seven years old at the time of the accident.

When Plaintiff's entitlement to STD benefits under the Policy expired on April 15, 1999, Plaintiff's claim was forwarded to Defendant's long term disability ("LTD") section. On May 4, 1999, Defendant learned from Plaintiff's treating physician, Dr. Kamali, that Plaintiff had been cleared for full-time employment on April 26, 1999. Based on this information, Defendant's LTD section determined that Plaintiff should receive LTD benefits from April 15, 1999 until April 25, 1999, totaling $ 466.75. Defendant's representative, Holly Bawlick, informed Plaintiff of this decision in a telephone conversation on May 10, 1999 and in a letter dated May 11, 1999.

Plaintiff spoke with a representative of Defendant, Mark Halton, on November 24, 1999, in an attempt to reopen his claim for LTD benefits. Plaintiff informed Mr. Halton that he had consulted [*3] a new doctor in October 1999, who had diagnosed Plaintiff as having Reflex Sympathetic Dystrophy ("RSD"). Mr. Halton told Plaintiff that his eligibility for LTD benefits had expired when he did not return to work on April 26, 1999, the date that he had been cleared to work full-time, but Mr. Halton nonetheless encouraged Plaintiff to submit additional medical records. Plaintiff had Dr. Kamali submit updated medical records on January 11,


2000, and after reviewing these records, Defendant denied Plaintiff's claim for LTD benefits on January 18, 2000, because, according to Defendant, there were "no treatment records from April 26, 1999 to the present that support your inability to work." (D.I. 30 at 000432).

On February 10, 2000, Plaintiff's counsel wrote Defendant in order to initiate an appeal of the denial of benefits. On March 30, 2000, Defendant's disability claims specialist assigned to Plaintiff's appeal concluded that the denial of benefits was proper because Plaintiff never submitted documents indicating that he had been continuously disabled from April 26, 1999 to the present.  Plaintiff filed this lawsuit on June 27, 2000, claiming that Defendant's decision denying Plaintiff [*4] of LTD benefits violated the Employee Retirement Income Security Act ("ERISA") (D.I. 1). After the completion of discovery, Defendant filed the instant motion for summary judgment. (D.I. 28).

STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976).* However, a court should not make credibility determinations or weigh the evidence. n2 *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000).* To defeat a motion for summary judgment, Rule 56(c) requires the non-moving party to: [*5]

do more than simply show that there is some metaphysical doubt as to the material facts. . . . In the language of the Rule, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is "no genuine issue for trial."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* Thus, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny the motion. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct.* 2505 (1986).

n2 To properly consider all of the evidence without making credibility determinations or weighing the evidence, a "court should give credence to the evidence favoring the [non-movant] as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000).*

[*6]

DISCUSSION

A. Heightened Arbitrary and Capricious Standard

When a benefits plan provides that the plan administrator has discretion to interpret an applicant's eligibility for benefits under the plan, a reviewing court can overturn the plan administrator's decision only if said decision was "arbitrary and capricious." *Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc., 222 F.3d 123, 129 (3d Cir. 2000).* A plan administrator's decision is deemed "arbitrary and capricious" only if it is "clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." Id. (citations omitted). This means that the reviewing court should not substitute its own judgment for that of the plan administrator, but rather, should be deferential to the plan administrator's judgment. Id.

However, when an insurance company "both funds and administers benefits" under a plan, as Defendant does in the instant case, "it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review." *Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 378 (3d Cir. 2000).* [*7] Under this standard, a reviewing court must implement a sliding scale approach to the facts of each case, in that, the greater the plan administrator's conflict of interest, the less deference that will be afforded to the plan administrator's decision. Id. at 391-92. In doing so, the court must assess the substance of the decision as well as the process used to obtain the decision. n3 Id. at 393. See also *Goldstein v. Johnson & Johnson, 251 F.3d 433, 2001 WL 567719, at *7 (3d Cir. 2001).* A plan administrator does not have an affirmative duty to conduct a "good faith reasonable investigation" when assessing a particular claim; therefore, the reviewing court simply applies the heightened arbitrary and capricious standard "given the information available" to the

plan administrator at the time the decision to deny benefits was made. *Pinto, 214 F.3d at 394 n.8; Lasser v. Reliance Standard Life Ins. Co., 130 F. Supp. 2d 616, 628* (D.N.J. Feb. 8, 2001). n4 The Policy in the instant case states in relevant part that: "in making any benefits determination under [the Policy], [Defendant] shall have the discretionary [*8] authority both to determine an employee's eligibility for benefits and to construe the terms of [the Policy]." (D.I. 30 at 000630).

n3 Pinto also listed a number of factors for a court to consider, including: (1) the sophistication of the parties, (2) the information available to the parties, (3) the financial arrangement between the employer and the insurance company, and (4) the current status of the plan administrator. *214 F.3d at 392.* As one court has noted, however, the Pinto decision is perplexing because the decision does not analyze any of these factors, but rather, automatically applied a heightened arbitrary and capricious standard simply because an insurance company administered and funded the plan. *Cimino v. Reliance Standard Life Ins. Co., 2001 U.S. Dist. LEXIS 2643, 2001 WL 253791,* at *3 (E.D. Pa. Mar. 12, 2001). The Cimino court concluded that, since no evidence relevant to these factors had been presented to the court, the safe approach would be to "automatically" apply the heightened arbitrary and capricious standard when analyzing the decision and the process used to reach that decision. Id. In the instant case, little or no evidence has been adduced relevant to the above four factors, and the Court therefore concludes that the approach taken in Cimino is appropriate here. Accordingly, it will apply the heightened arbitrary and capricious standard when analyzing the substance of Defendant's decision and the procedure used to reach that decision.

[*9]

n4 Pinto and Lasser refute the relevance of Plaintiff's argument that, under state contract law, an insurer has a duty to conduct a reasonable good-faith investigation and to assist a claimant in bringing a claim. (D.I. 33 at 5)(citing *Tackett v. State Farm Fire & Cas. Inc., 653 A.2d 254 (Del. 1995); Ace v. Aetna Life Ins. Co., 139 F.3d 1241 (9th Cir. 1998)).*

In sum, when reviewing an insurer's decision to deny benefits where, as here, the insurer funds and administers the plan and has discretion to interpret the provisions of the plan, a reviewing court should only be "deferential" under the heightened arbitrary and capricious standard of review, not extremely deferential. *Pinto, 214*

*F.3d at 393.*

## B. Application of the Heightened Arbitrary and Capricious Standard

Under the terms of the Policy, an employee is "disabled" only if he cannot "perform each of the material duties of his regular occupation." (D.I. 30 at 000636). Moreover, an employee's entitlement to LTD benefits ceases under the Policy on the date of his or her termination [*10] from employment, except that the employee remains eligible for LTD benefits after his termination during (i) the elimination period, or (ii) while benefits are being paid. (D.I. 30 at 000646).

Defendant contends that summary judgment is warranted because no reasonable jury could conclude that Plaintiff was continuously disabled beginning on April 26, 1999. (D.I. 29 at 16-17)(citing *Redden v. UNUM Life Ins. Co. of Am., 2000 U.S. Dist. LEXIS 996, 2000 WL 135137* (D. Del. Jan. 18, 2000). In particular, Defendant contends that it was informed in early May 1999 that Plaintiff was capable of full-time employment as of April 26, 1999 by a handwritten note from Plaintiff's treating physician, Dr. Kamali, and through a telephone conversation with a receptionist from Dr. Kamali's office, (D.I. 30 at 000118; D.I. 30 at 000557), and that Plaintiff never produced any medical records to refute this evidence. (D.I. 29 at 16-17). Accordingly, Defendant contends that Plaintiff ceased being disabled on April 26, 1999, and thus, lost his entitlement to LTD benefits. (D.I. 29 at 16-17). In response, Plaintiff cites to facts that allegedly establish that Defendant's decision was arbitrary and capricious. (D.I. 33 [*11] at 6-14).

### 1. Substance of Defendant's Decision

In an attempt to prove that the substance of Defendant's decision to deny Plaintiff LTD benefits was arbitrary and capricious, Plaintiff primarily contends that he suffered from RSD on April 26, 1999, but that he was not diagnosed with RSD until he consulted a second orthopedic surgeon in October 1999. (D.I. 33 at 6; D.I. 33, Exh. A at P 8-9). Plaintiff further contends that he was unable to work in any capacity on April 26, 1999 or anytime thereafter, as a result of this ailment and that Defendant knew that he had not returned to work. (D.I. 33, Exh. A at P 2-7). Based on the evidence in the record at this juncture, the Court concludes that there is no medical evidence asserted by Plaintiff that in any way reasonably contradicts that Plaintiff was able to perform his job, as of April 26, 1999, as Dr. Kamali indicated.

Plaintiff also cites to medical records submitted by Dr. Kamali, dated November 29, 1999, stating that Plaintiff: "is still unable to return to his regular work, but may

return to light duty job of walking no more than 1-1 1/2 hours a day." (D.I. 30 at 000531; D.I. 33, Exh. B at 26). Plaintiff contends that Defendant [*12] completely ignored this note and continued to rely on the note clearing Plaintiff for full-time work on April 26, 1999. Plaintiff argues that Defendant's failure to contradict this medical information establishes that Defendant's denial of LTD benefits to Plaintiff was arbitrary and capricious. (D.I. 33 at 8-10). The Court looks to the time frame when Plaintiff was first eligible for LTD benefits in order to determine whether Defendant was arbitrary and capricious. In this regard, the Court observes that Defendant has repeatedly maintained that the November 29, 1999 record had little or no significance in its decision to deny LTD benefits because the November information does not support Plaintiff's assertion that he suffered from RSD or that he was disabled in April 1999. (D.I. 34 at 8-9; D.I. 33, Exh. B at 26; D.I. 30 at 000414 n5 ). Moreover, earlier medical records submitted by Dr. Kamali support a reasonable inference that Plaintiff's condition deteriorated in the fall of 1999. Specifically, an August 27, 1999 entry states that Plaintiff was "doing much better, walking with little or no limp. Range of hip motion is full and painless. . . . He is back to school and he is doing [*13] well." (D.I. 30 at 000533). Therefore, the Court concludes that Plaintiff has failed to meet his burden of proving that Defendant acted in an arbitrary and capricious manner. n6

n5 Plaintiff contends that this handwritten note of Defendant's claims reviewer, (D.I. 30 at 000414), which states that "all medical evidence establishes [Plaintiff] has RSD. Medical evidence establishes he suffers from disabling condition," is sufficient evidence to defeat Defendant's motion. (D.I. 33 at 13). However, Defendant contends that this note is a summary of Plaintiff's counsel's letter to Defendant. (D.I. 34 at 10)(citing D.I. 30 at 000412-000414, 000410, 000425-000426). After reviewing the cited documents, the Court concludes that the handwritten note is consistent with Defendant's interpretation. Moreover, this handwritten note was prepared in February 2000, so even if Defendant's claims reviewer had concluded that Plaintiff was disabled at the time this entry was made, it does not support the conclusion that Plaintiff was disabled in April 1999.

n6 Plaintiff also cites to a November 1999 record from St. Francis Pain Center to prove that he suffered from "right anterolateral thigh pain" since his October 1998 injury. (D.I. 33 at 9)(citing D.I. 30 at 000085). However, this record specifically notes that this pain "has essentially gotten worse over the last 3-4 months." (D.I. 30 at 000085). This record therefore supports the conclusion that Plaintiff's condition was not sufficiently severe for him to be considered "disabled" until sometime after April 1999.

[*14]

Next, Plaintiff cites to several notes written by Dr. Alex Bodenstab, dated October 14, 1999 and November 23, 1999, in support of his claim that he was disabled in April 1999. (D.I. 33 at 9-10)(citing D.I. 30 at 000004; D.I. 30 at 000472). Although these notes discuss the severity of Plaintiff's symptoms, and the November 23, 1999 note indicates that Plaintiff was unable to work at that time, they do not contradict Dr. Kamali's note which cleared Plaintiff to return to full-time work on April 26, 1999. Without some evidence that Dr. Kamali's medical opinion in April 1999 was erroneous, the evidence adduced by Plaintiff is consistent with the conclusion that Plaintiff's condition deteriorated after April 1999, and that, therefore, Plaintiff was not "disabled" until sometime after April 1999. Thus, the Court concludes that Plaintiff has failed to establish that Defendant's decision violated the heightened arbitrary and capricious standard. See *Redden, 2000 WL 135137*, at *6 (holding that proof that claimant was disabled in October 1996 and in January 1997 does not prove that claimant was disabled "on every day in between"). n7

n7 Plaintiff also offers testimony of Dr. William Feist, a former vice president and medical director of "UNUM-Provident," that was adduced during unrelated litigation, establishing that "UNUM-Provident" put into place new procedures in 1993 in order to deny legitimate disability claims. (D.I. 33 at 14). In light of the evidence adduced by Defendant that: (1) Dr. Feist worked for "Provident Life and Accident," which did not merge with Defendant until June 30, 1999, and (2) Dr. Feist ceased working for Provident Life and Accident in February 1996, the Court concludes that Dr. Feist's testimony is irrelevant to the instant dispute. (D.I. 34, Exh. B; D.I. 33, Exh. D at 12).

[*15]

2. Procedure in Making the Decision

Plaintiff also contends that the procedure used by Defendant in reaching its decision was improper. Specifically, Plaintiff contends that Defendant failed to conduct an independent medical examination at any time, and that it failed to seek an in-house medical review of Plaintiff's appeal file in order to evaluate Plaintiff's RSD

20TH CASE of Focus printed in FULL format.

PATRICIA ALFORD, Plaintiff, v. DCH FOUNDATION GROUP LONG-TERM LIFE INSURANCE COMPANY OF AMERICA; and UNUM LIFE INSURANCE COMPANY OF AMERICA, Defendants.

CASE NO.: CV 00-05238 ABC (CWx)

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

144 F. Supp. 2d 1183; 2001 U.S. Dist. LEXIS 8845

June 1, 2001, Decided

June 1, 2001, Filed; June 4, 2001, Entered

**DISPOSITION:** [**1] Plaintiff's Motion to Expand DENIED, Defendant's MSJ's Motion for Summary Judgment GRANTED and Plaintiff's MSJ's Motion for Summary Judgment DENIED. Plaintiff's Complaint DISMISSED in its entirety with prejudice.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff claimed entitlement to benefits under a long-term disability benefits plan governed by the Employee Retirement Income Security Act, *29 U.S.C.S. § 1001* et seq. Plaintiff moved to augment and expand the record under review. Plaintiff and defendant both moved for summary judgment.

**OVERVIEW:** It appeared that sometime in 1993, plaintiff, a registered nurse, suffered a stroke. She began to have periods of lethargy, disorientation, and other problems. She worked until the time of her disability claim in 1995. Defendant's policy granted the insurer discretionary authority in making any benefits determination, both to determine eligibility and to construe the policy terms. Plaintiff sought relief pursuant to *29 U.S.C.S. §§ 1132*(a)(1)(B), 1133. She sought, inter alia, benefits retroactive to November 1, 1996, the date on which her benefits were determined no longer payable. Under an abuse of discretion standard of review, limited to the administrative record, the court held that defendant did not abuse its discretion in terminating benefits. Plaintiff could not argue that any of her claim forms asserted an entitlement to benefits based on a 40 hour week. The court declined to order a remand for consideration of arguments newly raised, in part because the level of benefits paid from July 21, 1995, was a reasonable and a defensible interpretation of plaintiff's claim documents and the policy.

**OUTCOME:** The court denied the motion to expand. It denied plaintiff's motion for summary judgment. It granted defendant's motion for summary judgment. The complaint was dismissed in its entirety, with prejudice.

**CORE TERMS:** disability, administrator, occupation, disabled, seizure, abuse of discretion, claimant, regular, ongoing, social security, administrative record, work week, thirty-two, insured, diabetes, disability benefits, summary judgment, conflict of interest, documentation, vocational, beneficiary, neck, consultant, entitlement, medical information, earning, pain, fiduciary, nurse, registered nurse

**CORE CONCEPTS -**

**COUNSEL:** For PLAINTIFF: Lawrence D. Rohlfing, Esq., Santa Fe Springs, CA.

For DEFENDANT: Edwin A. Oster, Esq., Gregory P. Vidler, Esq., BARGER & WOLEN, Irvine, CA.

**JUDGES:** AUDREY B. COLLINS, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** AUDREY B. COLLINS

**OPINION:** [*1186] ORDER RE: PLAINTIFF'S MOTION TO EXPAND ADMINISTRATIVE RECORD; PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ERISA)

This case involves Plaintiff's claimed entitlement to benefits under a long-term [*1187] disability benefits plan governed by the Employee Retirement Income Security Act ("ERISA"), *29 U.S.C. § 1001* et. seq. Three separate Motions came on regularly for a hearing before this Court on June 1, 2001: (1) Plaintiff's Motion to Augment and Expand the Record Under Review ("Motion to Expand"); (2) Plaintiff's Motion for Summary Judgment ("Plaintiff's MSJ"); and (3) Defendant's Motion for Summary Judgment ("Defendant's MSJ"). After consideration of the papers, the case file, [**2] and the parties' oral arguments, and for the reasons indicated below, the Court hereby DENIES the Motion to Expand, GRANTS Defendant's MSJ, and DENIES Plaintiff's MSJ. Therefore, the Court also DISMISSES Plaintiff's entire Complaint, with prej-

Case 1:01-cv-01137-CCC   Document 68   Filed 12/12/2002   Page 69 of 119

144 F. Supp. 2d 1183, *1187; 2001 U.S. Dist. LEXIS 8845, **2

Page 158
FOCUS

udice.

## I. PROCEDURAL HISTORY

Plaintiff PATRICIA ALFORD ("Alford," or "Plaintiff") commenced this civil action by filing an initial Complaint on May 15, 2000. n1 The Complaint names DCH FOUNDATION GROUP LONG-TERM DISABILITY PLAN and UNUM LIFE INSURANCE COMPANY OF AMERICA ("UNUM," or "Defendant") as the nominal Defendants. Only UNUM has ever appeared and defended in the action, however, and is by all accounts the sole operative Defendant.

n1 This case was originally assigned to the Honorable Robert J. Kelleher. It was reassigned to this Court on May 22, 2000.

On January 31, 2001, the parties submitted, and the Court signed, a Stipulation and Order setting out a briefing and hearing schedule for expected motions to expand the record, and for summary judgment, and also[**3] selecting pre-trial and trial dates in this matter. n2 Under the schedule set by the Stipulation and Order, on April 2, 2001 the parties filed the three instant Motions. The Motions were originally noticed for a hearing on April 30, 2001. Also on April 2, 2001, the Administrative Record ("AR") in this case was lodged by Defendant. n3 On April 16, 2001, the parties filed their oppositions to each of the three Motions (the "Expand Opposition," the "PMSJ Opposition," and the "DMSJ Opposition"). On April 23, 2001, they filed their replies (the "Expand Reply," the "PMSJ Reply," and the "DMSJ Reply"). Along with the moving and opposing papers, the parties also filed the requisite statements of uncontroverted facts, statements of genuine issues, etc.

n2 The respective pre-trial and trial dates of June 4 and June 12, 2001 also set by this Stipulation and Order have since been vacated.

n3 There are two different numbers on each page of the AR lodged by Defendant, and it is not always clear to which of these the parties refer in their respective papers. For purposes of clarity, the Court will use a format of "AR # " to indicate a page therein (e.g., AR 452). These citations will correspond to the pages numbered as UALF-000 # # #

[**4]

On April 20, 2001, the Court ordered additional briefing by the parties on the possible application of the "notice-prejudice" rule crafted by California courts to the facts of this case. See, e.g., *UNUM Life Ins. Co. of America v. Ward, 526 U.S. 358, 366-77, 143 L. Ed. 2d 462, 119 S. Ct. 1380 (1999); Cisneros v. UNUM Life Ins. Co. of America, 134 F.3d 939, 944-47 (1998)* (finding that California notice-prejudice rule, which holds that an insurer is required to prove actual prejudice as a result of a delayed notice of claim or submission of proof in order to deny benefits, is not preempted by ERISA and therefore applies with full force). The Court gave Defendant until April 30, 2001 to file a supplemental brief of no more than ten pages, and Plaintiff until May 7, 2001 to file a sur-reply of the same length. In view of the time required for this additional briefing, the Court also continued the [*1188] hearing on the three already-pending Motions from April 30, 2001 to May 14, 2001.

In its May 9, 2001 Minute Order, the Court determined that the "notice-prejudice" rule does not apply to this case, given that the question here is not delay in initial notice[**5] of an ERISA claim. As stated in that Minute Order, this case will therefore be decided under standard principles applicable to review of Plan decision-making under ERISA. Accordingly, the Court decided to go forward on these three Motions. However, some time having been lost both the parties and the Court in briefing and considering the possible application of the "notice-prejudice" rule, the Court concluded it was necessary to order a short continuance in the hearing on the three instant Motions. The Court therefore moved the hearing by two days, to May 16, 2001. This proved to be an insufficient extension of time. Therefore, on May 14, 2001, the Court again continued the hearing, to May 31, 2001. The hearing was later moved by Stipulation and Order to June 1, 2001.

## II. FACTUAL BACKGROUND

Most of the facts are undisputed in this case, and indeed most or all are contained in the AR lodged by Defendant. The Court therefore cites primarily to the AR as its evidentiary record. Where the facts, are in dispute, that is so indicated. Because the Court considers Defendant's MSJ, the Court construes these facts in Plaintiff's favor.

## A. Plaintiff's Employment and The Long-Term [**6] Disability Plan

For instance, it is undisputed that, prior to suffering from the alleged disability which led to this ac-

144 F. Supp. 2d 1183, *1188; 2001 U.S. Dist. LEXIS 8845, **6

Page 159
FOCUS

tion, Plaintiff was employed by Downey Community Hospital ("DCH," or "DCH Foundation Hospital"), as a registered nurse. See AR 679; Statement of Uncontroverted Facts in support of Plaintiff's MSJ ("PMSJ UF") P 1; Defendant's Response to Plaintiff's Statement of Uncontroverted Facts ("PMSJ UF Resp.") P 1. According to her initial claim forms, Plaintiff Alford was hired by DCH in 1989. See AR 679. She worked there up until the time of her disability claim in 1995, apparently primarily in the operating room. See, e.g., AR 362, AR 558. On May 1, 1993, a long-term disability insurance policy (No. 502337), purchased by DCH through UNUM, became effective and applicable to Plaintiff. See AR 257, 691, 679.

Terms of the DCH Foundation Hospital Group Long-Term Disability Plan (the "Plan") are set forth in the policy of insurance issued by UNUM. See AR 257-280. n4 The policy documents grant UNUM discretionary authority, in making any benefits determination, both to determine eligibility and to construe the terms of the policy. See AR 262.

        n4 It appears that the Plan documents are also repeated at AR 691-722. However, both parties refer to this "first copy" of the policy.

[**7]

For covered employees in Class 2 under the policy terms (a Class which apparently included Alford), the following definition applies:

"Disability" and "disabled" mean that because of injury or sickness:

1. the insured cannot perform each of the material duties of [her] regular occupation; and

2. after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which [she] is reasonably fitted, taking into consideration training, education or experience, as well as prior earnings; or

[*1189] 3. the insured, while unable to perform all of the material duties of [her] regular occupation on a full - time basis, is:

a. performing at least one of the material duties of [her] regular occupation or another occupation on a part-time or full-time basis; and

b. earning currently at least 20% less per month than [her] indexed pre-disability earnings due to that same injury or sickness.

AR 268. Furthermore, the policy also requires proof of disability, as well as timely proof that the disability is ongoing and being treated:

When the Company receives proof that an insured[**8] is disabled due to sickness or injury and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit after the end of the elimination period [180 days]. The benefit will be paid for the period of disability if the insured gives to the Company proof of continued:

1. disability; and

2. regular attendance of a physician.

The proof must be given upon request and at the insured's expense.

AR 274. Plaintiff filed a claim form under the terms of this policy on August 18, 1995. See AR 679-682; PMSJ UF P 2; PMSJ UF Resp. P 2. The employer statement filed therewith listed her last day of work as being April 21, 1995. It also noted that Plaintiff changed to a part-time position in April, 1995 in lieu of lay-off. See AR 679-680.

B. Plaintiff's Medical Condition(s)

Though details of Plaintiff's claimed disability are not fully described in any of the parties' submissions, from descriptions in subsequent medical reports, and Plaintiff's own notes on the claim forms and elsewhere, a basic picture of her injuries and illnesses emerges. It appears that sometime in 1993, perhaps in early July, Plaintiff suffered[**9] a stroke. See AR 362; AR 681. She then began to have periods of lethargy, confusion, and disorientation. See id. It seems that these may have been a result of the stroke. See id.

Plaintiff experienced severe headaches and episodes of numbness over the next two years or so. See id. Abnormalities identified as "brain lesions" showed up on an MRI taken of Plaintiff. See AR 362; AR 683. At some point prior to May, 1995, Plaintiff also began having partial complex seizures and occasional grand mal seizures. See AR 362; AR 628; AR 683-684. Complicating treatment of her seizures was the fact that

Case 1:01-cv-01157-CCC    Document 66    Filed 12/12/2002    Page 71 of 119

144 F. Supp. 2d 1183, *1189; 2001 U.S. Dist. LEXIS 8845, **9

Page 160
FOCUS

Plaintiff was also a Type I diabetic on an insulin pump. See AR 362. According to her treating physician in 1995, Dr. Andrew Charles (Neurologist), Plaintiff's diabetes made seizure control with medication a difficult proposition. See AR 684. Inevitable episodes of hypoglycemia experienced due to her diabetes also contributed to her periods of confusion and disorientation. See AR 362. In 1995, Plaintiff was under the care of Dr. David Berger (Endocrinologist) for her diabetes. See AR 362. His notes indicated that at that time her diabetes symptoms were relatively[**10] under control. See AR 647. Further complicating matters, however, Plaintiff also suffered from asthma and hypothyroidism. She was also a smoker (in 1995). See AR 362. As an apparent result of her diabetes, at that time Plaintiff also suffered from peripheral neuropathy (numbness in her extremities). See AR 363.

Finally, Plaintiff was apparently also suffering from back and neck problems and pain, dating back to at least 1991, when she was reportedly involved in an automobile accident. See AR 363. She had difficulties with both her neck and lower back, and had a documented cervical [*1190] disc herniation without neural compromise. See id. She also had a bilateral carpal tunnel release in October, 1994, although she seemed to have a complete recovery after the procedure. See id. n5

n5 The Court does not suggest that this is a complete index of the symptoms or underlying conditions from which Plaintiff may have been suffering in 1995. However, this description does indicate what seem to have been her primary complaints at the time she filed her claim.

[**11]

According to the report of UNUM's on-site physician, based on his review of Plaintiff's medical files conducted in 1997, Plaintiff began having performance issues in her work as an operating room nurse at least by August, 1994, in the form of making errors, having difficulty staying awake, and/or exhibiting a very short attention span. See AR 362. This observation is confirmed by internal correspondence between Plaintiff's supervisors. See AR 399. It appears these problems came to a head in March or April of 1995. Effective April 3, 1995, she was apparently transferred from her post as an operating room nurse to an ostensibly less demanding (part-time) job in Home Health (traveling to patients' homes to administer care). See AR 398. It appears she was offered this post as an alternative to being laid off. See AR

680. However, she reportedly continued to have some difficulty following instructions, was observed to have a very short attention span, and was described as having a tendency to literally get up and wander off. In addition to these and other problems, her peripheral neuropathy was said to interfere with her ability to take a pulse. See AR 398.

[**12] C. Plaintiff's Initial Claim(s) for Benefits

Based on these ongoing difficulties, Plaintiff's tenure in the Home Health department was relatively brief, lasting only about two weeks. Apparently, her last day of work was April 21, 1995. This is the date Plaintiff listed on her disability claim form(s). See AR 679; see also AR 398 (memorandum detailing a supervisor's concerns). Plaintiff filed her UNUM claim on August 18, 1995. See AR 681-682. She was forty-five years old on the date she filed for UNUM disability benefits (DOB: October 22, 1949). See id. On August 29, 1995, to supplement her claim, Plaintiff's treating neurologist, Dr. Charles, completed a Physician's Statement to accompany Plaintiff's claim that listed her primary "Symptoms" as consisting of "Episodic alteration in consciousness consistent with complex partial seizures." AR 683.

Dr. Charles also listed as a "secondary condition" Plaintiff's "Brittle diabetes mellitus with frequent hypoglycemic episodes." Id. Dr. Charles listed the date of onset for an inability to work as being June 1, 1995. n6 He stated that he had first seen Plaintiff in June of 1994, had last seen her on August 25, 1995, and[**13] that she had regular visits with him every three months. See id. Dr. Charles listed the medications Plaintiff was taking as Tegretol and Insulin. See id. In support of his conclusion that Plaintiff was disabled, he stated that Plaintiff could not perform any function where loss of consciousness would be a risk to herself or others, nor could she perform any heavy lifting. He stated that the seizures continued despite medication, and that her diabetes made seizure control difficult. See AR 684.

n6 This June 1, 1995 date was apparently for some period the date that UNUM used as the initial date of disability. It was then revised to April 21, 1995, to reflect Plaintiff's last day of work at DCH.

On September 1, 1995, UNUM acknowledged receipt of Plaintiff's claim for benefits. See AR 286. On September 8, 1995, [*1191] UNUM sent a letter to Plaintiff, stating that it needed more detailed infor-

Case 1:01-cv-01157-CCC   Document 66   Filed 12/12/2002   Page 72 of 119



144 F. Supp. 2d 1183, *1191; 2001 U.S. Dist. LEXIS 8845, **13

Page 161
FOCUS

mation about her restrictions and limitations, and a detailed description of the requirements of her occupation, in[**14] order to determine whether she met the definition of "disability" and "disabled" as given in the DCH Foundation Hospital policy (which was laid out in the letter). See AR 668. UNUM stated that it had requested documentation from DCH as to the physical requirements of Plaintiff's occupation, and that it was also contacting Dr. Berger and Dr. Charles to get medical information "necessary to continue the evaluation of your claim." Id. The letter stated that the evaluation would be completed once this information was received, and Plaintiff was invited to help by encouraging her physicians to promptly supply the necessary responses. See id.

By letter dated October 6, 1995, UNUM again indicated that the information thus far received was insufficient for it to agree to pay benefits. See AR 628. Though the letter acknowledged that records received from Dr. Berger indicated a seizure prior to May 26, 1995, UNUM noted that his treatment notes also reflected that Plaintiff had reportedly been doing well since, and that she was looking for work. "There presently is no medical information in file to substantiate any restrictions and/or limitations other than your own subjective [**15]complaints. . . . we ask that you provide us with medical evidence to support your inability to perform each of the material duties of your occupation. . . . if we do not receive medical certification within 30 days of the date of this letter, we will have no alternative but to assume you are no longer claiming disability benefits . . . [and] to deny further liability on your claim." AR 629 ("October 6 Letter").

On May 18, 1995, prior to having applied for disability benefits under the UNUM policy, Plaintiff had also applied for Social Security disability benefits. Her initial efforts on this claim were no more successful, as her claim for benefits based on inability to work as a result of "Diabetes" and "Brain Lesions" was denied, inter alia, on August 2, 1995, and again on November 9, 1995. See AR 631; AR 530. n7

n7 These denials were later overturned by Administrative Law Judge ("ALJ") Lana H. Parke. On December 3, 1996, ALJ Parke determined that Plaintiff was entitled to benefits as of April 21, 1995. See AR 552.

[**16]

D. The First Denial of Plaintiff's Claim

During the thirty-day period given by the October 6 Letter for Plaintiff to respond to UNUM with additional information, phone calls by Plaintiff and her brother to UNUM representative Robert Castellon, Disability Benefit Specialist, resulted in extensions in the thirty-day response period, first to November 13, 1995, and then to November 22, 1995. See AR 625-627. Plaintiff saw Dr. Charles (neurologist) on November 1, 1995. On November 16, 1995, Dr. Charles submitted to UNUM a letter, dated November 1, 1995, in which Dr. Charles repeated many of the findings in the initial Physician's Statement submitted along with the original claim forms, including: that Plaintiff was subject to complex partial seizures, and had recently had at least one focal motor seizure; that the cause of her seizures was not clear, but was most likely related to undiagnosed brain lesions (on MRI); and that her diabetes might contribute to the seizures, and made it difficult to control them with medication. See AR 623 ("November 1 Letter"). n8

n8 The November 1 Letter also stated that Plaintiff "is disabled for one year, although this may be extended . . ." AR 623.

[**17]

[*1192] Following receipt of the November 1 Letter from Dr. Charles, the staff at UNUM conducted a review of her case, requested additional information and clarification from Dr. Charles, and also had Plaintiff fill out an Education and Employment History form, listing among other things the duties of her job at DCH (as a registered nurse working primarily in operating rooms). See AR 614-622. They also referred her file, including the assessment(s) of disability by Dr. Charles, to an occupational/vocational consultant, Alan Ey, CRC. See AR 612-613.

On January 18, 1996, UNUM representative Castellon sent another letter to Plaintiff, which referenced all the information received to that point by UNUM, including the notes previously received from Dr. Berger (which Castellon described as indicating that Plaintiff was doing better and was looking for work), the November 1 Letter from Dr. Charles, and the evaluation by the vocational consultant. See AR 609-610. The letter noted that Dr. Charles had stated in his November 1 Letter that Plaintiff was prevented "from performing any task which would be compromised by sudden losses of consciousness or awareness," but stated

Case 1:01-cv-01157-CCC    Document 80    Filed 12/12/2002    Page 73 of 119

144 F. Supp. 2d 1183, *1192; 2001 U.S. Dist. LEXIS 8845, **17

Page 162
FOCUS

that their vocational[**18] consultant believed that based on her restrictions and limitations and her background, "that [she] would be able to engage in [her] occupation as a Registered Nurse." AR 610. n9 The letter said no benefits were payable, and that UNUM was closing the file. Plaintiff was told to submit new information to Castellon, and/or make a written request for review within sixty days. See id.

> n9 Earlier in the letter, Castellon stated that the policy insured Plaintiff "for the occupation of a Registered Nurse . . . which can require physical demands ranging from sedentary to heavy, depending on where the occupation is being performed and the specific tasks . . ." AR 609. "[A] nurse must be unable to perform the material duties that cover the full range of occupational demands [to be disabled]." Id.

E. Plaintiff's First Appeal

On March 7, 1996, Plaintiff's brother (William Alford) wrote a letter to UNUM, contesting the decision to deny benefits. See AR 608. He said that "there may be more[**19] medical evidence for review," and also noted that Plaintiff was continuing with her application for Social Security disability benefits. See id. The letter also requested that UNUM provide any documents "you feel support the denial of benefits and a complete copy of the vocational consultant's evaluation . . ." AR 608. In the interim, Plaintiff was seen by Dr. Jacob Rabinovich (Orthopaedic Surgeon). Dr. Rabinovich prepared a letter-report dated March 14, 1996. See AR 592-602. On May 1, 1996, Plaintiff forwarded a copy of Dr. Rabinovich's report to UNUM. See AR 591; AR 576-590.

The March 14, 1996 report by Dr. Rabinovich was focused on the Plaintiff's complaints of continued pain to her neck and back (and of radiating pain down her left leg). See AR 592. Dr. Rabinovich did include a review of the medical records provided to him, which spanned from January 23, 1991 to June 21, 1994 (as well as a "normal" stress echocardiogram performed November 8, 1995), though they were clearly not all of the records for that period. The focus of this review was Plaintiff's neck and spine problems, though Dr. Rabinovich did also comment on her other problems (e.g., her treatments for[**20] diabetes, her neurological complaints, etc.). The report concluded that Plaintiff, based on the pain, and lack of mobility, in

her neck and spine, was "unable to return to work in her prior job duties . . ." AR 600. Dr. Rabinovich opined that this was not [*1193] likely a pre-DCH disability, but was likely 50% a result of Plaintiff's "arduous job duties" at DCH, and 50% a result of two prior automobile accidents. See AR 600-601.

At this point in the case, Plaintiff's claim was apparently taken over on behalf of UNUM by Nancy Doyle, a Senior Benefit Analyst. n10 In her notes on a form headed with "ERISA REVIEW," Doyle went through all of the various stages of the case, including the initial application, the "loss of consciousness" restrictions and limitations identified by Dr. Charles, the parallel Social Security application (and denial), the November 1 Letter from Dr. Charles, the vocational consultant (Ey) evaluation, the January 18, 1996 denial, and the appeal therefrom by Plaintiff's brother. Doyle's notes also referred to the orthopaedic evaluation by Dr. Rabinovich, but noted that it was "re neck & back problems not related to her disability claim." AR 575 (emphasis in original). [**21]Doyle referred the file to an on-site medical consultant for UNUM, Dr. Richard Herman, for a records review, and for comment on Plaintiff's reasonable restrictions and limitations. See AR 571.

> n10 The Court assumes this was the first stage of ERISA "review."

Dr.   Herman reviewed Plaintiff's records on September 25, 1996, with the understanding that she was claiming disability from partial complex seizures and diabetes. However, he concluded that the records from Dr. Berger, the "short note" (the November 1 Letter) from Dr. Charles (which was apparently not accompanied by any medical records), and the report prepared by Dr. Rabinovich were "not complete enough for me to render an opinion regarding any impairment." AR 570. He said he would need: additional records from Dr. Charles, including any test results; neurological records from a Dr. Randolph Shey; and also any neurosurgical records from Dr. Harley Deere (two of Plaintiff's prior physicians). See id. Due to this finding (or lack thereof), as well[**22] as on other grounds, UNUM once again denied Plaintiff's claim.

Nancy Doyle communicated this denial by letter and by phone on September 27, 1996. See AR 569 (Doyle notes on phone call); AR 564-566 ("September 27 Letter"). In the September 27 Letter, Doyle once again laid out the definition of "disability" and "disabled" given by the policy, and revisited the history of

Case 1:01-cv-01157-CCC    Document 88    Filed 12/12/2002    Page 74 of 119

144 F. Supp. 2d 1183, *1193; 2001 U.S. Dist. LEXIS 8843, **22

Page 163
FOCUS

Plaintiff's claim. Noting the limitation in Dr. Charles' August 29, 1995 Physician's Statement and November 1 Letter that Plaintiff could not work in any position where her potential loss of consciousness might pose a risk, Doyle pointed out that as per the vocational consultant's recommendation it seemed Plaintiff's experience "would be suitable for . . . transfer to nursing positions within the registered nurse occupation which would not involve potential danger to patients" from loss of consciousness. AR 565. Doyle referenced the vocational consultant's observation that Plaintiff might be able to work in "sedentary to light duty positions such as Physician's Office Nurse, Home Health Nurse Supervisor, and Insurance Rehabilitation Nurse." Id. Doyle explained this analysis:

Our policies are designed[**23] to protect the insured worker from the inability to perform his or her occupation, not the individual requirements of the job or the specific requirements of the work place. Although you may not be able to return to your specific job with your previous employer, this does not preclude you from performing your occupation with a different employer in a different position which can be performed with your restrictions and limitations. Our determination of liability is not based on the availability of jobs, but on whether or [*1194] not you are capable of returning to work in your own occupation.

Id. Doyle implied this was the basis for the January 18, 1996 denial.

Doyle also indicated that UNUM's on-site physician had concluded there was insufficient medical documentation to support impairments precluding Plaintiff's work capacity. As for Dr. Rabinovich's report, Doyle noted that it did not refer to any abnormal testing performed after June, 1994, and did not otherwise support disability. See id.

Doyle stated that there were no medical records supporting the claim for disability in the months prior to and following the date of disability in 1995, nor any documentation of[**24] a progressive worsening of Plaintiff's seizure condition prior to her last day of work April 21, 1995. n11 See id. Doyle described the work restrictions placed by Dr. Rabinovich (no heavy lifting, or any repeated pushing, pulling, or repeated flexion of the spine) as "prophylactic," and indicated that these would not preclude the "sedentary and light duty" positions that had been identified by the vocational consultant. See id. Based on these findings, Doyle concluded that Plaintiff's "file documentation, including the medical and vocational evidence, [did] not support that

[Plaintiff was] precluded from performing the material duties of the above-referenced nursing positions within your regular occupation as a registered nurse at the time . . . you stopped working as of 4/21/95. Therefore, it is our determination that your claim was appropriately denied on 1/18/96, and your claim remains closed." Id. Along with this letter, Doyle provided a copy of the (Ey) vocational evaluation.

n11 The letter from Doyle also identified some confusion about the actual last day of work for Plaintiff (e.g., her employer reported it as April 21, 1995, Dr. Charles' Physician's Statement referred to June 1, 1995, Dr. Berger's notes indicated the next Friday after March 28, 1995 would be her last day but also indicated that she was unemployed by April 28, 1995, and on her own claim form Plaintiff listed July 3, 1993 as her "last day of work"). "Significant questions are raised regarding the basis for your last day of work . . ." AR 566. It does seem, however, that Doyle decided to go ahead with the April 21 date.

[**25]

This decision was subsequently upheld by the UNUM Quality Review department, and affirmed on October 28, 1996. See AR 561 (October 28, 1996 memorandum from Carlene Anderson, in Quality Review, to Al Hemond in Western Regional Benefits); see also AR 560, AR 562-563. This was apparently intended to be UNUM's final action on Plaintiff's claim.

F. Plaintiff's Request for Further Review

On December 3, 1996, Plaintiff's prior denial of Social Security disability benefits was overturned by ALJ Parke. The decision said that Plaintiff was entitled to benefits beginning on April 21, 1995. See AR 552. The ALJ relied on medical records from 1987 to 1995, as well as a smaller number of records from 1996. The latest records in the list of referenced exhibits were those of Dr. Berger, ostensibly including records up to October 30, 1996 (Exhibit 28). See AR 554.

At this point, Plaintiff engaged an attorney to take over seeking benefits under the UNUM policy. On February 27, 1997, Plaintiff's counsel Lawrence Rohlfing sent a letter to UNUM contesting the "final" decision rendered on September 27, 1996. See AR 558-559. n12 Rohlfing first referenced the ALJ decision[**26] to grant Social Security benefits, and promised to provide a copy of that



144 F. Supp. 2d 1183, *1194; 2001 U.S. Dist. LEXIS 8845, **26

Page 164
FOCUS

decision. Rohlfing then went on to attack the substantive bases for UNUM's decision to deny her benefits. [*1195] He argued that the (Ey) vocational opinion did not state that Plaintiff would be able to work in what he identified as her "regular occupation as an operating room nurse." AR 558. Rohlfing concluded that Plaintiff was entitled to benefits per the "regular occupation" definition of disability for the first twenty-four months, because she could not work as an operating room nurse. See id.

n12 Rohlfing has remained Plaintiff's counsel up to the present.

He further concluded that Plaintiff would be entitled to benefits thereafter because even the occupations identified by the vocational consultant paid less than 80% of Plaintiff's pre-disability earnings, so that Plaintiff would be able to qualify for the post-twenty-four month definition of disabled under the third prong thereof. See id.

The 3 numbered paragraphs defining[**27] disability sets P 1 as always required. In addition to an inability to perform the regular occupation, the person must have that inability and either the inability to engage in any gainful occupation or the inability to earn at least 80% of the pre-disability earnings. Your decision completely fails to discuss disability under the 80% provision of the policy. If your decision is that Patricia Alford could work at the jobs identified at the earnings level stated, and if she worked at 1 of those jobs, you would still owe LTD benefits. . . . Furthermore, Patricia Alford's 24th month of disability entitlement will not pass until October of this year. [P] These are the issues that would get litigated in the event of the filing and service of a complaint in the United States District Court. . . .

AR 559. Subsequently, on March 13, 1997, Rohlfing again wrote to UNUM (addressing the letter, as with the first, to Nancy Doyle), attaching, inter alia, the December 3, 1996 ALJ decision. See AR 546-556.

On March 18, 1997, Doyle responded to Rohlfing by letter, with a brief acknowledgment of the recent correspondence. Though the letter was a bit ambiguous, it appeared to agree[**28] to a further review. See AR 557. A subsequent letter from Doyle to Rohlfing, dated April 9, 1997, referenced the February 27 and March 13, 1997 letters from Rohlfing, but stated "after further review we find that our previous decision to deny further benefits was correct and we are upholding [it]."

AR 545. No reasoning was given. However, Doyle did point out that the ALJ decision forwarded by Rohlfing listed medical records not then contained in the claim file (Exhibits 14-16, 18, 19, 21, 22, 24, 26 and 27), n13 and said that if Plaintiff submitted the records "within 30 days," UNUM's on-site physician would do a further review. See id.

n13 Exhibit 14: Dr. Deere 03/21/91-04/14/94; Exhibit 15: Dr. Shey 05/17/94-05/31/94; Exhibit 16: Dr. Michael Perley 04/19/94-09/27/94; Exhibit 18: DCH 07/26/94-04/21/95; Exhibit 19: UCLA Medical Center 04/27/95-01/04/96; Exhibit 21: Cherry Medical Grp.--Psych. Eval. dated 10/20/95; Exhibit 22: Dr. Charles Physical Capacities Eval. 04/04/96; Exhibit 24: Doctors Hospital of Lakewood 02/20/87-07/13/92; Exhibit 26: Dr. Alyssa Watanabe 02/27/96; Exhibit 27: DCH 01/23/91-12/08/95.

[**29]

G. Review of Additional Medical Records

On May 1, 1997, Rohlfing did apparently submit a "complete copy" of the ALJ "exhibit file on Ms. Alford's Social Security case," though the list of Exhibits fronting the voluminous submission attached to Rohlfing's cover letter does not appear to match the Exhibit List to which Doyle referred in inquiring about the medical records. See AR 371 (cover letter); AR 372-373 (Exhibit List); AR 374-542 (records). The Exhibits omitted were those numbered 24-28 on the previous list. n14 [*1196] The records submitted included the procedural history of Plaintiff's Social Security claim for benefits and various reports prepared for that purpose (Exhibits 1-10), questionnaires completed by Plaintiff for purposes of securing Social Security benefits (Exhibits 11-13), medical records from 1991 to 1995 (Exhibits 14-20), and a Consultative Psychiatric Evaluation Report prepared by Dr. Khang Nguyen on October 20, 1995 (Exhibit 21). Exhibit 22, a Physical Capacities Evaluation Form dated April 4, 1996, apparently completed by Dr. Charles, does not seem to be included in the AR, and the Court can only presume it was also omitted from the documents submitted [**30]by attorney Rohlfing.

n14 In addition to those already listed above, the records omitted were among the more recent ones

Case 1:01-cv-01157-CCC    Document 80    Filed 12/12/2002    Page 76 of 113

144 F. Supp. 2d 1183, *1196; 2001 U.S. Dist. LEXIS 8845, **30

Page 165
FOCUS

available. Exhibit 25: Dr. Rabinovich 02/08/96; Exhibit 28: Dr. Berger 03/28/95-10/30/96.

On July 21, 1997, Doyle responded by letter, acknowledging the receipt of "additional medical information in support of Ms. Alford's re-appeal . . ." AR 544. Doyle said UNUM had requested review by an on-site physician, a review which was expected to be completed within three to four weeks. See id. The record does indicate that the very same day, July 21, 1997, a "high priority" Medical Review Request was sent by/from Nancy Doyle, once again to Dr. Herman. See AR 370.

Dr. Herman was pointed to his prior review on September 25, 1996, which, Doyle's Request reminded him, "did not find sufficient medical documentation to support" disability. Id. In referring to the ALJ decision on the Social Security benefits, Doyle's Request stated that she found it "puzzling" because "the majority of records" [**31] on which it apparently relied "are related to . . . carpal tunnel syndrome and prior [auto accidents]." Id. She also called the October 20, 1995 Psychiatric Evaluation by Dr. Nguyen "unremarkable." Id. Doyle asked Dr. Herman to review his prior report, and the information submitted on May 1, 1997. Doyle noted that, "vocationally, we do not argue that [Plaintiff] cannot return to work as a home health nurse, but as [a Registered Nurse] could do other [Registered Nurse] positions which would not involve direct patient care. Does the additional medical information change our prior medical assessment?" Id.

On July 25, 1997, Dr. Herman performed the requested "re-review" of Plaintiff's file. See AR 362-364. Dr. Herman's review first gave a medical history of Plaintiff's various conditions, including: her apparent stroke in 1993; her following periods of lethargy, confusion, and disorientation; her MRI abnormalities; her severe headaches and episodes of numbness; her 1995 onset of seizures; her Type I diabetes; her asthma; her hypothyroidism; her peripheral neuropathy; her back and neck problems (stemming from a 1991 auto accident); and her 1994 bilateral carpal[**32] tunnel release. See AR 362-363. Dr. Herman noted that Plaintiff began having performance problems at work in 1994, and her transfer to home Health did not solve the problems. See AR 362. He observed that Dr. Charles, Plaintiff's neurologist, had put her on disability soon after (1995), and that Dr. Charles had stated that she should not work where loss of consciousness was a danger. See id.

Dr. Herman noted that Dr. Charles had concluded that Plaintiff's seizures were difficult to control, in part because of her diabetes. Also, "Dr. Charles's records describe recurrent intermittent episodes of confusion in spite of treatment with Tegretol." AR 362. In April, 1995, n15 [*1197] Charles had apparently "restricted her from driving due to drowsiness secondary to medications." Id. Referring to the October 20, 1995 Psychiatric Evaluation, Dr. Herman observed that Dr. Nguyen had also noted Plaintiff's history of seizures and memory impairment, and had discovered that Plaintiff's father suffered from Alzheimer's Disease. However, Dr. Herman also noted that Dr. Nguyen had concluded there was no psychiatric illness and that Plaintiff's intellectual function was preserved. See[**33] AR 363-364. "This conclusion was based primarily on claimant's ability to do proverbs and serial sevens but did not involve any detailed neuropsyche testing." AR 364. On forms filled out for purposes of securing the Social Security benefit, Dr. Herman noted that both Plaintiff and her brother had described periods of blackouts and confusion "where claimant can not follow even simple instructions and has problems with concentration." AR 364.

n15 Dr. Herman's report actually referenced a "4/97" date for this restriction, but this was clearly a typographical error. There were no records from Dr. Charles from 1997 in the records which were sent to Dr. Herman for review. Furthermore, it is clear that the opinion to which Dr. Herman referred is a short letter written by Dr. Charles to Plaintiff's supervisor(s) on April 28, 1995. See AR 390. In that letter, sent to Pat Pritchard at DCH, Dr. Charles stated, inter alia:

Although her seizures are generally well controlled with medication, we are in the process of adjusting her medications to ensure that she does not have any seizure activity. In the meantime, she should not drive, and she may have some drowsiness due to increased medication. I therefore consider her disabled with regard to her present position as a home-health staff RN for at least 3 months.

AR 390 (emphasis added). Thus, Dr. Herman must have intended "4/95."

[**34]

H. Request(s) for Additional Information

Though acknowledging these claims and diagnoses, Dr. Herman came to the ultimate conclusion that he could not yet render an opinion:

Evaluation of this claimant is made difficult by the lack

Case 1:01-cv-01157-CCC    Document 66    Filed 12/12/2002    Page 77 of 118



144 F. Supp. 2d 1183, *1197; 2001 U.S. Dist. LEXIS 8845, **34

Page 166
FOCUS

of medical documentation as to the severity of her impairment. If she is indeed having frequent periods of confusion, an inability to concentrate and memory loss then she would have no work capacity. If these are infrequent episodic problems related only to seizures and, in between, her intellectual functioning is intact then she may have some work capacity. The evaluation for Social Security by Dr. Nguyen seems rather superficial and does not really give us much information except that claimant does have times in which she intellectually functions well. However, two supervisors describe [a] confusion severe enough to make them worry about claimant's safety which suggests a rather significant impairment. I will attempt to call or write to Dr. Charles to get additional information about any neuropsyche testing that may have been done or any potential treatment. I would also need to know the frequency and extent of the impairment. [**35] If claimant had work capacity from a cognitive perspective then [some] accommodations might have to be made for her neck and low back. . . . I have written a letter to Dr. Charles but will still try to reach him by telephone. Another option might be to call the endocrinologist if we do not get a response from Dr. Charles.

AR 364 (signed and dated July 25, 1997). Dr. Herman did, it appears, send a letter to Dr. Charles, dated July 26, 1997, asking for "help in answering a few questions." AR 367. The letter asked, for instance, whether Plaintiff had ever undergone any neuropsychological testing, or whether any was planned in the future. It also asked whether Dr. Charles felt that Plaintiff's periods of confusion were frequent and severe enough to prevent any work capacity, or whether she might be able to work in a less demanding nursing position. Finally, it asked about Plaintiff's mental function between seizures (i.e., it stayed normal vs. she suffered a residual deficit), [*1198] frequency of seizures and their type (i.e., partial complex vs. grand mal), whether Plaintiff was presently able to drive, and/or her chances for improvement. Dr. Herman urged Dr. Charles to call or[**36] write in response. See AR 367.

On August 1, 1997, Rohlfing acknowledged and responded to Doyle's July 21, 1997, letter, and thanked her for the response. See AR 543. He also requested that "when you have your on site physician review the records, I request the opportunity to provide issues and comments in writing." Id. (citing 29 C.F.R. § 2560.503-1(g)(i)-(iii)).

On October 29, 1997, Doyle (on behalf of UNUM) again wrote to Rohlfing (Plaintiff's counsel), indicating that there was a delay in the UNUM on-site physician's review of the additional information sent in on May 1, 1997 precipitated by the on-site physician's inability to get any response from Dr. Charles to his queries for clarification or additional information. See AR 365. To this October 29 letter, Doyle attached a copy of the letter sent by Dr. Herman to Dr. Charles, said that the letter had been sent after Dr. Herman was unsuccessful in raising Dr. Charles by telephone, and stated that "to date we have not received a response from Dr. Charles." Id. Doyle asked if Rohlfing might be able to help secure a response from Dr. Charles, or if he could provide contact information[**37] for any other physician who might be able to answer questions raised by UNUM's on-site physician. She also requested that Rohlfing provide documentation of the amount of monthly Social Security benefits that Plaintiff was receiving. See id. In closing, she said: "We would welcome the opportunity to reach a final determination regarding Ms. Alford's re-appeal; however we do not have adequate medical information at this time." Id.

On December 9, 1997, Rohlfing responded to the October 29, 1997 letter from Doyle. He stated that he had personally written to Dr. Charles on October 29, 1997, and asked if Dr. Herman had yet heard anything from him. He also enclosed a copy of the award letter from Social Security, indicating the benefit level. See AR 350.

Finally, Rohlfing made the following assertions in this December 9, 1997 letter to Doyle, with regard to assessing Plaintiff's claim:

I want to remind you of my request of August 1, 1997, to review and comment upon any medical documents on which you base any decision. Please recall that on February 25, 1997, we took [sic] position that Patricia Alford's usual and customary work consisted of an operating room nurse.[**38] It seems fairly clear from information we have that Patricia Alford has [sic] entitlement to benefits through October 1997. With respect to ongoing benefits, I want to either statementize or depose Mr. Ey. I want to take that action before you make any final decision with respect to benefits [sic] October 1997. In order for me to properly ask Mr. Ey questions, I need to know exactly what residual functional capacity you believe Patricia Alford retains . . .

AR 350. Rohlfing concluded by saying that he looked forward to the resolution of Plaintiff's claim, and to "getting Patricia Alford back into pay status with UNUM." AR 351 (with enclosures).

I. Negotiations and Settlement Discussions

144 F. Supp. 2d 1183, *1198; 2001 U.S. Dist. LEXIS 8845, **38

Page 167
FOCUS

Following this letter, Doyle and Rohlfing began engaging in more discussions about Plaintiff's claim, a possible settlement thereof, and Plaintiff's disability status and appropriate benefits under [*1199] the policy. In a phone call on December 17, 1997, it appears Doyle asked if Alford might be interested in settling the claim for a total of twenty-four months' worth of benefits ("regular occupation" period), with Social Security offset but a minimum monthly benefit of[**39] $ 100.00 per month. See AR 348 (Doyle's notes on phone call). Doyle also noted she told Rohlfing UNUM had yet to hear from Dr. Charles or from any other physician, and Rohlfing again stated that he had sent a letter to Dr. Charles on October 29, 1997. Finally, Doyle's notes indicate that she asked Rohlfing what documentation he needed from her (as per his December 9, 1997 letter), and that Rohlfing eventually stated that he did not in fact need anything more from her. See id.

On January 7, 1998 and again on February 3, 1998, Rohlfing sent letters to Doyle which, inter alia, acknowledged their recent phone conversation(s) about settlement and the contents of the claim file. See AR 332 ("January 7 Letter"); AR 326 ("February 3 Letter"). The January 7 Letter also attached Exhibit 19 from the Social Security claim file, which consisted of records from Dr. Charles between June 7, 1994 and August 24, 1995. n16 In that letter, Rohlfing objected to and criticized the vocational consultant's conclusions as to nursing jobs in which Plaintiff might be able to work despite her seizures, arguing that she had neither the experience nor the training to do some of the jobs he had[**40] identified, and that her condition(s) would preclude her from doing the others. In closing, the January 7 Letter said Plaintiff was considering the settlement offer. See AR 333.

n16 Rohlfing particularly pointed out the April 28, 1995 letter to Plaintiff's supervisor(s) at DCH, advising that Plaintiff was disabled at that point for at least three months. Rohlfing indicated that this confirmed an onset of her disability of no later than April 28, 1995.

The February 3 Letter followed up on an issue apparently first discussed by Rohlfing and Doyle in their December 17, 1997 telephone conversation: the number of hours per week Plaintiff was considered to have been working at the time that she went out on disability (thus, her earning potential on her "last day worked," or "LDW"). In that section of the claim form(s) initially filed by Plaintiff in August, 1995 which were completed by her employer, DCH, Plaintiff was listed as having been employed for a regular work week of sixteen hours per week. See AR 679. [**41] Thus, it is apparent that as of December 17, 1997, Doyle was operating on the assumption that this would be the basis for calculation of benefits to replace pre-disability wages. See AR 348.

In the February 3 Letter, Rohlfing argued that the basis should instead be thirty-two hours per week, based on Plaintiff's employment status immediately prior to her last day of work on April 21, 1995. He based this conclusion on employment records received from DCH, and attached copies of those records to the February 3 Letter to Doyle:

The employee history form indicates that as of April 9, 1995, Patricia Alford changed to part-time status. This consisted of 32 hours per week at the same rate of pay, specifically $ 21.10 per hour. The [enclosed] personnel action form . . . confirms part-time status change to 32 hours per week. The final personnel action form indicates discharge as of August 16, 1995, because of an inability to return from a medical leave of absence. Please add this documentation to the claim file.

AR 326. Rohlfing concluded by noting that "you and I did discuss some sort of settlement. Obviously, the additional earnings and schedule for 32 hours per week[**42] makes a big difference in any potential [*1200] settlement offer. Please advise me of your current posture." Id.

On February 16, 1998, Doyle apparently called and confirmed the thirty-two hour work week with the pertinent person at DCH. See AR 324 (Doyle's notes on phone call). This seemed to signal acceptance on behalf of UNUM that any calculation of the payable benefits would be based on a thirty-two hour work week. Her notes also indicate that she had confirmed Plaintiff's "DOD" (date of disability) to be April 21, 1995, having also apparently cleared this up with DCH. See id.

On February 17, 1998, Doyle and Rohlfing had another telephone conversation, in which Doyle, inter alia, indicated that UNUM was now willing to calculate Plaintiff's benefit based on a thirty-two hour work week. See AR 320-321 (Doyle's notes on phone call). Using that basis, Doyle offered a new settlement figure of $ 11,244.48, which was twenty-four months of benefits minus Social Security offsets for those months, calculated based on a thirty-two hour work week. See id.

144 F. Supp. 2d 1183, *1200; 2001 U.S. Dist. LEXIS 8845, **42

Page 168
FOCUS

Doyle and Rohlfing also apparently discussed the erstwhile Dr. Charles, from whom Doyle did not believe Dr. Herman, or[**43] anyone else with UNUM, had ever heard. Rohlfing was apparently surprised to hear this. Doyle explained that Dr. Herman was actually no longer working with UNUM, but that she had no indication that he had ever heard from Dr. Charles. Doyle explained again that Dr. Herman's July 25, 1997 report, while noting that Plaintiff's complaints were serious enough to warrant comment and concern for safety from her supervisors at DCH, also noted that the medical records were not complete. However, based on the implications of that report, Doyle indicated that she would be nonetheless willing to settle Alford's claim for the twenty-four month "regular occupation" period, for the amount described above. See id.

On March 20, 1998, Rohlfing again wrote to Doyle, to follow up on his two previous letters. "I am also under the impression that Dr. Charles has finally both spoken to and corresponded with Dr. Herman." AR 319. Rohlfing asked Doyle to confirm or deny whether there had in fact between communication(s) between the two physicians, and also to provide him with any result of those communications. "Please provide me with a copy of Dr. Herman's report and analysis . . ." Id. The letter[**44] also touched on other issues, such as a prior disability leave taken by Plaintiff from September 1993 to January 1994, due to hand surgery, as well as a proposed transfer to Home Health at that time that never went through. See id. As for references in Dr. Berger's May, 1995 treatment notes to Plaintiff looking for work (see October 6 Letter), the letter emphasized that Plaintiff's entire search for work consisted of perusing a copy of "Nurse Week." See id. Rohlfing also acknowledged the settlement discussions, but conceded that he had lost his notes thereon, and asked to be reminded of their status. See id.

J. Final Settlement Offer and Final Denial

After sending a letter on April 3, 1998 acknowledging Rohlfing's March 20, 1998 letter, and after attempting to call on April 13, 1998, Doyle sent Rohlfing a letter dated June 26, 1998. See AR 313-315 (the "June 26 Letter"). Along with the June 26 Letter, Doyle attached a copy of Dr. Herman's July 25, 1997 review of Plaintiff's records. She also made clear that Dr. Herman had never heard from Dr. Charles, or from any other physician who might provide insight into Plaintiff's condition(s), despite UNUM's[**45] efforts to enlist Plaintiff's help in securing this cooperation. See AR 313. Doyle acknowledged that along with Rohlfing's January 7, 1998

letter, he had included records from Dr. [*1201] Charles from 1994 and 1995, including an April 28, 1995 report (letter) from Dr. Charles to DCH indicating that Plaintiff should be disabled as a home health nurse for at least three months. See id. However, she noted that the most recent medical record UNUM had from Dr. Charles was his letter/report dated November 1, 1995. In that letter, Doyle observed, Dr. Charles stated that Plaintiff's condition was not continually disabling, but prevented her from performing any job where loss of consciousness would endanger safety. She noted that he also stated Plaintiff would remain disabled for one year. See id.

Doyle also acknowledged that, as they had discussed on the phone, the personnel file documents submitted on February 3, 1998 supported a thirty-two hour work week for Plaintiff prior to her April 21, 1995 date of disability. See id. Therefore, Doyle indicated, UNUM had recalculated Plaintiff's payable benefit based thereon, so that it would now be a basic monthly benefit of $ 1,755.52 (or[**46] sixty percent of basic monthly earnings of $ 2,925.87 prior to disability), before the deduction for the Social Security benefits received. See id.

Doyle emphasized in the June 26 Letter that UNUM did not have any "ongoing treatment records supporting Ms. Alford's disability or to support that she has been under the regular attendance of a physician since Dr. Charles' 11/1/95 report." AR 314. Nonetheless, the June 26 Letter indicated that, based on Dr. Charles' November 1, 1995 opinion and the necessarily incomplete review by Dr. Herman, UNUM was prepared to accept that Plaintiff was unable to perform her regular occupation "as a home health nurse" through November 1, 1996 (one year from the date of Dr. Charles' opinion letter). See id. "Therefore, we are willing to pay Ms. Alford's net benefits, after the social security offset, from 7/21/95, the end of the policy 90 day elimination period wherein no benefits are payable, through 11/1/96. Thereafter, we have no proof of [Plaintiff's] continuing disability." Id.

While sympathizing with the difficulty Rohlfing was experiencing in reaching Dr. Charles, Doyle stated that UNUM was simply unable to make an assessment of [**47]continuing disability without the submission of further medical information "from Dr. Charles or any other attending physician . . . to certify the extent of Ms. Alford's impairments due to her medical condition from 1995 through the present." Id. While conceding that Plaintiff might remain disabled, Doyle stated that "we do not have sufficient medical documentation to assess her condition since 11/1/95." Id. The letter then

Case 1:01-cv-01157-CCC    Document 80    Filed 12/12/2002    Page 80 of 119

144 F. Supp. 2d 1183, *1201; 2001 U.S. Dist. LEXIS 8845, **47

Page 169
FOCUS

concluded with a "final" offer:

If you do not wish to submit additional medical information to support Ms. Alford's ongoing disability since 1995, we will agree to a settlement of 24 months of net benefits after the social security offset. . . . [P] In the event that Ms. Alford is not interested in our settlement offer, we will pay her benefits through 11/1/96. She will then need to submit ongoing medical records from the end of 1995 through the present in order that we may assess her ongoing medical condition to determine [entitlement to benefits].

AR 315. Doyle promised to contact Rohlfing soon, by phone. See id.

The June 26 Letter was apparently transmitted by facsimile on June 29, 1998. On the cover sheet thereto, Doyle[**48] asked Rohlfing to call her to discuss its contents. She also indicated that she would soon be transferring out of the UNUM appeals section "and would like a response from you before the end of this week if possible." AR 312. According to Doyle's phone notes, Doyle and Rohlfing spoke [*1202] that day (June 29, 1998) by telephone, and went through the terms of the June 26 Letter. Doyle explained that UNUM had allowed "ample time" for the submission of additional medical information from Dr. Charles or any other attending physician, and was now offering a choice: twenty-four months of benefits, or payment through November 1, 1996 with a chance for further payment upon additional documentation. Rohlfing promised to discuss the offer(s) with Plaintiff and respond. See AR 311.

The next day, on June 30, 1998, Doyle's phone notes reflect that Doyle and Rohlfing again communicated by telephone. See AR 309. In this conversation, Rohlfing evidently told Doyle that Plaintiff did not want to settle for twenty-four months of benefits. Rohlfing said that Plaintiff would be sending additional medical records supporting continued treatment for a disabling condition. The two also discussed delivery[**49] of the check for benefits through November 1, 1996. See id.

On July 2, 1998, Doyle sent what would be her last letter as a representative of UNUM in this case to Rohlfing, attached to which was apparently a check for benefits payable through November 1, 1996:

As we discussed over the telephone, our review concludes that although we were unable to complete our medical investigation due to the lack of response from Ms. Alford's physician, Dr. Charles, we will accept Dr. Charles' opinion in his 11/1/95 report that Ms. Alford

would continue to be disabled from her regular occupation as a registered nurse for another year due to . . . loss of consciousness . . .

AR 306. The check covered July 21, 1995 to November 1, 1996. See id.

Doyle emphasized that UNUM would need additional medical records from November, 1995 onward "to determine whether Ms. Alford would be eligible for continuing benefits . . ." AR 307. Doyle also pointed out that the policy required that a claimant submit proof of continued disability and regular attendance, and that this "proof must be given upon request and at the insured's expense." Id. (quoting the policy).

Also on July 2, 1998, in[**50] a letter which apparently crossed in the mail with Doyle's letter, Rohlfing wrote Doyle a formal rejection of the prior twenty-four month settlement offer. "She believes that her ongoing medical treatment will justify benefits beyond November 1996 and she therefore cannot in good conscience accept an offer to settle her claim for benefits ending July 21, 1997. Patricia Alford advises me that she has continued to receive treatment from Dr. Charles and Dr. Berger through April 1998. She started receiving treatment at Kaiser Permanente in May 1998." AR 299. Rohlfing asked Doyle to send him a blank attending physician form, so that Plaintiff's then-current physician could complete it. He also submitted, with the letter, a "Long Form Medical Report" (questionnaire) completed by Dr. Berger on October 30, 1996. See AR 301-304. n17 Rohlfing assumed this form ought to allow UNUM "to extend benefits for a reasonable period of [*1203] time beyond October 30, 1996. Please advise me in this regard." AR 299.

n17 The "Long Form Medical Report" completed by Dr. Berger is not accompanied by any supporting medical records. It indicates Plaintiff had been a patient since 1990 for insulin-dependent Diabetes Mellitus. See AR 301. Dr. Berger described symptoms of hyper- and hypoglycemia, hand pain, headaches, neck pain after an hour of work, and back pain after an hour of work. He indicated Plaintiff was forced to lie down for 20-30 minutes a day due to back and neck pain, and that her dosage of Tegretol could cause drowsiness. He said neck and back pain placed limits on her movement, and ability to lift or carry. He noted memory and comprehension problems, and possible unforeseen blackouts. See id.

Case 1:01-cv-01137-CCC    Document 86    Filed 12/12/2002    Page 81 of 119

144 F. Supp. 2d 1183, *1203; 2001 U.S. Dist. LEXIS 8845, **51

Page 170
FOCUS

[**51]

K. The Final Re-Denial of Benefits

On August 5, 1998, another UNUM Senior Benefit Analyst, Bonnie Gilfillan, responded to Rohlfing's July 2, 1998 letter, saying that UNUM had "completed another review regarding the denial of benefits on your Long Term Disability claim." AR 296 ("August 5 Letter"). Citing the policy definition of "disability" or "disabled," and the proof-of-claim requirement in the policy, Gilfillan described UNUM's finding:

A review of Ms. Alford's claim file, which now includes the Long Form Medical Report completed by David Berger, M.D. on October 30, 1996 which you kindly provided, was completed. Dr. Berger's form does not indicate when or if the claimant was examined prior to its completion. The form does note that the claimant started treating with Dr. Berger on July 17, 1990 but there is no reference to her date of last treatment. Furthermore, the form notes that Ms. Alford is being seen on a monthly basis by Dr. Berger which would indicate that there is a substantial amount of medical information which we have not yet been provided. [P] Without these records we can not consider a subsequent period of disability beyond November 1, 1996. Should[**52] you wish to obtain and provide us with copies of such information, we would be more than happy to reconsider Ms. Alford's claim for continued disability benefits beyond this period. Specifically, we would request that you furnish us with Dr. Berger's office notes and treatment records documenting the severity of her conditions and evidencing that she is under regular care as required by the policy. Please forward any additional information to my attention at the above listed address within the next sixty days. [P] At this time and after this further review, we find that our previous decision to terminate benefits as of November 1, 1996 was correct based on the medical information [in the file].

AR 297. This was, once again, apparently intended to be UNUM's final decision, absent submission of any additional medical information.

L. The Contested Additional Submission

Up to this point, the communications between Plaintiff's counsel and the representatives of UNUM are a matter of the record, and the parties basically agree on all the preceding events. At this point, however, the parties substantially differ on what happened next.

Plaintiff's counsel (Rohlfing) [**53] claims that on

October 23, 1998, he sent a letter to Gilfillan/UNUM, to which were allegedly attached further medical records on Plaintiff's condition. The letter and the records allegedly sent are attached as Exhibit 2 to Plaintiff's Motion to Expand, and it is these documents which Plaintiff seeks to add to the AR for the Court's review. See Motion to Expand at 7-9. n18 UNUM denies receiving either the letter or attached records in 1998. See Expand Opposition at 1. Indeed, UNUM asserts that Plaintiff's counsel did not submit additional documentation until April 20, 2000. See id.

n18 These records and the October 23, 1998 letter, which Defendant denies ever receiving, are not on their own part of the AR, except to the extent that the records were also included in a more comprehensive submission of records by Rohlfing on April 20, 2000 (see below). They are composed of (1) 1998 notes from Dr. Berger, for visits in January, February, March, and April, 1998, (2) blood tests conducted on Alford by Dr. Berger in February, March, and April, 1998, and (3) Residual Functional Capacity Questionnaires completed by Dr. Charles (July 30, 1998), Dr. Donald Chen (August 5, 1998), and Dr. Berger (September 15, 1998). See Exhibit 2 to Motion to Expand (the "1998 Records").

[**54]

[*1204] In support of his claim that the October 23, 1998 packet was both sent and received, Rohlfing points to a notation in the AR which is dated November 30, 1998. See AR 249. Though the computer-generated report to which Plaintiff refers is ambiguous, it appears that on that date Bonnie Gilfillan ordered Plaintiff's file from "FBO." See id. There is a "DATE MAIL REC'D" field in the report into which 10/29/98 is entered. Further, there is an "X" in the space next to "RE-ERISA W/MEDICAL," suggesting the "MAIL REC'D" pertained to ERISA re-review. Rohlfing's name and address are listed, preceded by a "VERY IMPORTANT" reminder: "IF THE REQUEST IS FOR A RE-ERISA AND THE MAIL HAS BEEN SENT FROM AN ATTORNEY, PLEASE INDICATE THE ATTY ADDRESS BELOW SO THE ACK LETTER CAN BE SENT TO THE ATTORNEY INSTEAD OF THE CLAIMANT!!!" Id.

Rohlfing argues that this notation indicates that Gilfillan/UNUM received his October 23, 1998 letter (and attached medical records) on October 29, 1998, prompting Gilfillan to order Plaintiff's file again. See

144 F. Supp. 2d 1183, *1204; 2001 U.S. Dist. LEXIS 8845, **54

Page 171
FOCUS

Motion to Expand at 9. Furthermore, Rohlfing argues that another notation in the AR indicates that "UNUM intended to conduct a quality review as of[**55] December 3, 1998." Id. For this supposition, Rohlfing points to another computer-generated report, dated December 3, 1998, in which Karen Pience, of Disability Benefits (UNUM), sent/re-sent n19 a request for Plaintiff's file. See AR 250. The report states: "this file is currently in Quality Review. Check with Bonnie Gilfillan." Id. Plaintiff's counsel claims that this shows that the October 23, 1998 correspondence and records initiated a process of quality review. Defendant disputes this interpretation of these notations, claiming instead that a quality review followed the August 5, 1998 decision.

> n19 The report actually lists the file request as having been made by two different persons: Karen Pience, and/or Christine Blier. The file was to be sent to Chris Shepard, Administrative Assistant (B359).

Plaintiff's counsel insists that as a result of this review, on January 14, 1999, "UNUM made an internal but undisclosed decision to uphold the prior determination." Motion to Expand at 9. In support of[**56] this conclusion, Rohlfing points to an internal UNUM memorandum dated January 14, 1999 (Geoff Crain to Laura Bickford) with an "X" in the box for "This file has been (X) Upheld," and with text stating: "We have completed our handling of the attached file, and are now returning the file to your office for further handling." n20 AR 248.

> n20 It is worth noting that in the "From" field on the memorandum, the name "Chris Shepard" is typed, but is lined out and has the name "Geoff Crain" handwritten above it. Chris Shepard is the name of the person to whom the file was allegedly to be sent on December 3, 1998.

Defendant UNUM disputes that any such quality review indicates the receipt of the alleged October 23, 1998 correspondence. Rather, UNUM contends that the notation identified by Plaintiff, as well as another computer-generated report on the file generated by Geoffrey Crain on January 14, 1999 (AR 305), simply "document [] the return of Alford's file from Quality Review where the last decision regarding her claim[**57] for benefits was made in August 1998. No

additional records were received by UNUM until April 2000." Defendant's Response to Plaintiff's Statement of Additional Material Facts P 22. The report generated by Geoffrey Crain on January 14, 1999 (AR 305) shows the last date of action on Plaintiff's claim as being August 5, 1998, the date on which Gilfillan sent the "final" denial letter.

[*1205] L. Final Correspondence on the Claim

Whether or not these additional records were sent and received in October, 1998 is the only real factual dispute. For instance, the parties again agree that following this (alleged) submission of the October 23, 1998 letter, and attached 1998 medical records, the next communication between anyone acting on behalf of Plaintiff, and any UNUM representative, was not until March 17, 2000. On that date, Plaintiff's counsel (Rohlfing) wrote a letter addressed to Gilfillan on behalf of UNUM, inquiring about the status of Plaintiff's claim:

> You last wrote to me on August 5, 1998. At that time, you indicated that UNUM would not pay benefits beyond November 1, 1996. That letter did not specify whether Patricia Alford had additional appeal rights . . . . I[**58] sent additional records to you on October 23, 1998 . . . I did not receive a response. Please advise if UNUM considers the August 5, 1998, denial final and not subject to further appeal.

AR 294. In this letter, Rohlfing made no attempt to explain the lapse of almost seventeen months since his alleged October 23, 1998 letter.

On April 20, 2000, apparently not having received a response to his March 17 letter, Rohlfing again wrote to Gilfillan. See AR 1. To this letter, Rohlfing attached well over two hundred pages of medical records. See AR 2-241. Rohlfing's cover letter simply stated:

> I wrote to you last month concerning the above matter. I have secured additional evidence relevant to this case. I enclose for your review and inclusion in the claim file the records from Kaiser Permanente and David Berger, MD. Please rectify the deficiency in the processing of this matter. Ms. Alford would sincerely like this matter resolved favorably to her as soon as possible.

AR 1. The letter was stamped received by UNUM on April 24, 2000.

The attached records, which comprise the first two hundred and forty one pages of the administrative record, are made up of medical[**59] records pertain-

144 F. Supp. 2d 1183, *1205; 2001 U.S. Dist. LEXIS 8845, **59

Page 172
FOCUS

ing to Plaintiff's treatment in 1998, 1999, and 2000 at Kaiser Permanente (beginning in May, 1998), n21 and Dr. Berger's records on his treatment of Plaintiff from 1993 to April, 1998 (which appear to include the January, February, March, and April, 1998 chart notes also allegedly submitted by Rohlfing on October 23, 1998). Thus, for the first time, Plaintiff had submitted a relatively complete medical history, and medical records spanning from 1993 to early in 2000. n22

n21 The Kaiser Permanente records cover several different areas of treatment, including: visits to an orthopedist, and physical therapy, for back and neck pain, visits to an endocrinologist for her diabetes, neurology visits, and various other appointments and complaints.

n22 The parties dispute whether Plaintiff previously submitted the records for 1998. However, Plaintiff has never argued, nor presented any evidence, that any records covering the period between October 30, 1996 and January, 1998 were ever submitted prior to April 20, 2000.

[**60]

An internal "Fileplan" prepared by John J. Schifano of UNUM on May 5, 2000 summarized the April 20, 2000 submission as a "late re-appeal." AR 243. Schifano noted that the August 5, 1998 letter by Bonnie Gilfillan meant "denial was upheld in Quality Review." Id.

On May 8, 2000, Schifano sent the final letter of denial in this case. See AR 293. The full text of that letter is as follows:

This will acknowledge receipt of your March 17, 2000 letter and additional information n23 concerning Ms. Alford's [*1206] Long-Term Disability claim. [P] On August 5, 1998, Bonnie Gilfillan informed you to forward any additional information concerning Ms. Alford's claim within 60-days from the date of her letter. In your March 17, 2000 letter, you claim you submitted additional records to us on October 23, 1998. These records were received in our office on April 24, 2000, more than 18-months after Ms. Gilfillan's correspondence. Furthermore, I question why you did not follow-up with our office concerning the submission of the additional records in October 1998. Finally, even if you had submitted the records on October 23, 1998, this was more than 60-days after August 5, 1998, well beyond[**61] the additional two-months Ms. Gilfillan allowed. [P] Please be advised, since so much time

has passed, we can not review Ms. Alford's claim. Ms. Gilfillan's previous decision upholding the denial of benefits remains our company's position on this matter. [P] We regret that this decision was not more favorable to you.

AR 293. Thus, UNUM never considered the additional medical records submitted by Rohlfing in April, 2000 (nor those allegedly submitted in October, 1998). Accordingly, while the records submitted in 2000 are part of the AR, in the sense that they are included in that official compilation of Plaintiff's UNUM file lodged with the Court, they were never a basis for any decision rendered by UNUM, and are not properly part of the record against which the Court measures UNUM's decisions.

n23 Based on the text of the internal report generated by Schifano it appears the "additional information" to which he referred consisted of the records submitted with the April 20, 2000 letter. See AR 243. It is clear that the May 8, 2000 letter is what Schifano referred in this internal "Fileplan" as a "late re-appeal uphold." Id.

[**62]

Following receipt of this "final" letter of denial, on May 15, 2000, Plaintiff Alford filed the instant Complaint, initiating this litigation. Rohlfing remains Plaintiff's counsel. Plaintiff seeks relief under the auspices of ERISA, and reinstatement of benefits, pursuant to 29 U.S.C. §§ 1132(a)(1)(B) and 1133 (suit for benefits).

## III. DISCUSSION

The parties agree that this action arises under ERISA, and that it must be governed by standards and principles applicable thereto. They disagree as to the standard of review that ought to be applied, the record subject to review, and the proper outcome of that review. Plaintiff appeals from a decision by UNUM to deny/discontinue benefits under the long-term disability insurance policy held by her employer. Plaintiff seeks benefits retroactive to November 1, 1996, the date on which her benefits were determined no longer payable by UNUM. n24 She asks this Court to reverse UNUM's termination of her benefit payments.

144 F. Supp. 2d 1183, *1206; 2001 U.S. Dist. LEXIS 8845, **62

Page 173
FOCUS

n24 Plaintiff also seeks to recover allegedly "underpaid benefits" for the July 21, 1995 to November 1, 1996 period during which benefits were deemed payable by UNUM. Specifically, Plaintiff seeks allegedly underpaid benefits from July 21, 1995-November 1, 1996 of $ 3,642.46, benefits from November 1, 1996 to May 1, 2001 totaling $ 48,999.60, and ongoing benefits from that point on. See, e.g., Plaintiff's MSJ at 3.

[**63]

As is recognized by each of the parties' papers, the first issue that the Court must address is the appropriate standard of review to apply in gauging whether UNUM's termination (or underpayment) merits reversal. In other words, before addressing the substantive grounds and forms of relief in the parties' Motions, the Court must determine the standard under which it will review UNUM's decision-making. Thus, in what follows, the Court addresses first the appropriate standard of review (Part IV.A). After making that determination, the Court then decides, pursuant to Plaintiff's [*1207] Motion to Expand, to what record to apply that standard (Part IV.B). Finally, after settling the standard and the record, the Court determines, pursuant to the parties' summary judgment Motions, whether UNUM's decision(s) must be reversed, under this standard of review and on the delimited record (Part IV.C).

The Court has jurisdiction over this ERISA case pursuant to 29 U.S.C. § 1132(e). Plaintiff alleges that she was wrongfully denied long-term disability benefits, and seeks reinstatement thereof.

A. Abuse of Discretion is the Appropriate Standard of Review

A denial[**64] of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) n25 is reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989); see Atwood v. Newmont Gold Co., Inc., 45 F.3d 1317, 1321 (1995). Where this discretionary authority is given to the administrator by the terms of the plan, the exercise of that discretion is reviewed for abuse of discretion. See Tremain v. Bell Industries, Inc., 196 F.3d 970, 976 (9th Cir. 1999).

n25 Plaintiff's Complaint is styled as an ac-

tion for a declaratory judgment under 29 U.S.C. § 1132(a)(1)(B) that Plaintiff is entitled to benefits for November 1, 1996 and beyond. Plaintiff identifies the decision(s) subject to this Court's review as being the August 5, 1998 "final" denial of Plaintiff's claim for benefits, and/or the preceding July 2, 1998 denial of same. Plaintiff also seeks recovery of alleged "underpayment" of benefits, as well as an award of attorneys' fees.

[**65]

The parties do not dispute that the Plan at issue in this case confers discretionary authority on the administrator (UNUM). This is explicitly provided in the policy language thereof, which states: "In making any benefits determination under this policy, the Company shall have the discretionary authority both to determine an employee's eligibility for benefits and to construe the terms of this policy." AR 262. Pursuant to the test announced in Firestone, therefore, this policy language confers discretionary authority, and the Court's sole inquiry, as an initial matter, is whether UNUM abused that discretion.

Plaintiff argues, however, that the Court should apply a "less deferential" standard of review because of the inherent conflict of interest created by UNUM's dual role as both administrator and payor under the Plan. Plaintiff argues that the materiality of the conflict of interest in this case warrants de novo review, instead. See, e.g., Plaintiff's MSJ at 6. Defendant disagrees. See PMSJ Opposition at 3.

Where a plan administrator is also the insurer, the "inherent" conflict of interest created by this dual role "must be weighed as a 'factor in determining whether[**66] there is an abuse of discretion.'" Firestone, 489 U.S. at 115 (citation omitted); see also Tremain, 196 F.3d at 976; Lang v. Long-Term Disability Plan of Sponsor Applied Remote Technology, Inc., 125 F.3d 794, 797 (9th Cir. 1997); Snow v. Standard Ins. Co., 87 F.3d 327, 330 (9th Cir. 1996). "Our review in such a circumstance, although still for abuse of discretion, is 'less deferential.'" Tremain, 196 F.3d at 976 (citations omitted).

The mere existence of the "inherent conflict" created by a dual role as both administrator and insurer is not alone reason for this Court to depart from a review of UNUM's decision-making for abuse of discretion. See Lang, 125 F.3d at 797 ("the presence of conflict does not automatically remove the deference we ordinarily [*1208] accord to ERISA administrators who are authorized by the plan to interpret a plan's provisions.").

Case 1:01-cv-01157-CCC   Document 80   Filed 12/12/2002   Page 85 of 119

144 F. Supp. 2d 1183, *1208; 2001 U.S. Dist. LEXIS 8845, **66

Page 174
FOCUS

Indeed, even the "less deferential" review applicable to inherently conflicted plan administrators or fiduciaries "does not alter our traditional abuse of discretion review in the absence of specific facts indicating that [the administrator's][**67] conflicting interest caused a serious breach of the plan administrator's fiduciary duty . . ." *Atwood, 45 F.3d at 1322* (emphasis added); see also, e.g., *Bendixen v. Standard Ins. Co., 185 F.3d 939, 943-44 (9th Cir. 1999)*.

As the Ninth Circuit stated in Atwood, and has since affirmed on several occasions, the "less deferential" standard applicable to a conflicted administrator/fiduciary consists of a two-step analysis:

First, we must determine whether the affected beneficiary has provided material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary. If not, we apply our traditional abuse of discretion review. On the other hand, if the beneficiary has made the required showing, . . . [we] act very skeptically in deferring to the discretion of . . . [a materially conflicted administrator].

*Atwood, 45 F.3d at 1323; see also, e.g., Tremain, 196 F.3d at 976; Friedrich v. Intel Corp., 181 F.3d 1105, 1109 (9th Cir. 1999).* In other[**68] words, "the beneficiary needs to shoulder the [initial] burden of providing 'material, probative evidence . . .'" that the conflict led to a breach of fiduciary obligations. *Friedrich, 181 F.3d at 1109.* This is the "first step" of the "conflicted administrator" analysis.

Once the affected beneficiary has made a sufficient showing, the "second step" of the analysis shifts the burden to the administrator:

If the beneficiary comes forward with such evidence, "the plan bears the burden of producing evidence to show that the conflict of interest did not affect the decision to deny benefits." If the plan does not meet its burden, courts review the decision to deny benefits de novo.

*Friedrich, 181 F.3d at 1109* (citing *Atwood, 45 F.3d at 1323*); see also *Newman v. Standard Ins. Co., 997 F. Supp. 1276, 1279 (C.D. Cal. 1998)*. "Only if the administrator does meet its burden is it entitled to the deferential abuse of discretion standard of review." *Newman, 997 F. Supp. at 1279.* Conversely, a court only departs from this deferential standard where: (1) the affected beneficiary has[**69] produced material, probative evidence establishing self-interested decision-making; and

(2) the administrator fails to rebut this showing by producing its own evidence that its apparent self-interest had no effect on a decision.

Plaintiff has failed to satisfy the first step of this analysis, in that she has produced no "material, probative evidence" that any self-interest, or conflict of interest, n26 on UNUM's part affected its decision-making or otherwise led to a breach of fiduciary obligations. There is no allegation or evidence that UNUM has offered inconsistent bases for denial, changed its interpretation of plan documents, failed to follow internal procedures for making [*1209] claims or appealing denials, or otherwise allowed a conflict of interest to taint its decision(s).

n26 Though it is not entirely clear what evidence of self-interest or breach of a fiduciary obligation would be considered "probative," the cases thus far finding this first step of the test satisfied have focused primarily on evidence that the administrator inconsistently interpreted the terms of the policy, or offered varying reasons for a denial of benefits which seemed driven by a specific intent to deny. See, e.g., *Lang, 125 F.3d at 798; Tremain, 196 F.3d at 977.* Also, it may be "material" that an administrator fails to follow its internal procedures for providing claimants with claim-filing documents, notice of denial, and/or review thereof. See *Friedrich, 181 F.3d at 1110.*

[**70]

A mere allegation that the claims and review procedure in this case was somehow "unfair" does not satisfy the Atwood standard. In the case upon which Plaintiff primarily relies, Friedrich, the Ninth Circuit determined that the record supported findings that there had been insufficient notice of denial, an unfair review procedure, and inadequate dialogue regarding the beneficiary's claim. Furthermore, the court concluded that the trial testimony supported a finding that the "claims administrator . . . administered Friedrich's claim as an adversary 'bent on denying her claim' and 'oblivious to her fiduciary obligations as administrator of the LTD Plan.'" *Friedrich, 181 F.3d at 1110.* Plaintiff has offered no similar evidence here. Rather, she relies on mere assertions which are not supported by the long record of review, re-review, and re-re-review by UNUM evident in this case.

For instance, Plaintiff first claims that a material con-

144 F. Supp. 2d 1183, *1209; 2001 U.S. Dist. LEXIS 8845, **70

Page 175
FOCUS

flict of interest is revealed by the fact that UNUM calculated Plaintiff's BMB ("basic monthly benefit") for the period of time during which it paid benefits (from July 21, 1995 to November 1, 1996) based on a thirty-two[**71] hour work week rather than a forty hour work week, when UNUM knew or should have known that Plaintiff changed to part-time status only slightly before filing her claim for total disability. Plaintiff's argument appears to be that she was already "disabled" pursuant to the policy terms when she switched to a thirty-two hour work week, so that it was a breach of UNUM's fiduciary obligations not to calculate benefits based on a forty hour week. See Plaintiff's MSJ at 5-6. Despite the fact that it was Plaintiff's counsel who insisted that the BMB should be calculated for a thirty-two hour work week (disputing the sixteen hour work week initially identified by Plaintiff's employer), that same counsel now argues that UNUM ought to have, on its own come to the conclusion that a thirty-two hour work week basis was improper.

This argument is nonsensical. First, the Court cannot find that UNUM's reliance on a thirty-two hour work week reveals its conflict of interest, when it was Plaintiff who insisted on this number of hours. Second, before filing this Complaint (in over four years of chances to do so) Plaintiff never argued to UNUM that a forty hour work week was a more appropriate[**72] basis. The Court can hardly hold UNUM accountable for not looking beyond Plaintiff's own claimed number of hours worked to determine whether Plaintiff was "wrong" about the basis for BMB. And third, even assuming that a forty hour work week would be a more appropriate basis for this calculation, there is no evidence that the "failure" to apply this basis resulted from a conflict of interest. At most, UNUM took Plaintiff at her word on her scheduled work week.

Plaintiff's second apparent basis for invoking a less deferential standard of review is UNUM's alleged "refusal" to consider the further evidence of her disability purportedly submitted by her attorney on October 23, 1998. n27 However, this is also not "material, probative evidence" tending to show the impact of a conflict of interest. Even assuming that these materials were submitted, and that UNUM "refused" to consider their contents, this is at most grounds for arguing that UNUM abused its discretion. This does not offer a basis for finding that UNUM should be stripped of discretion, as it does not show that [*1210] UNUM acted in its own self-interest of breached a fiduciary duty. n28

pers whether this is offered as a basis for departing from an "abuse of discretion" standard, or is merely offered as alleged evidence of actual abuse of discretion by UNUM. The Court errs on the side of caution here.

[**73]

n28 The same conclusion applies to what might be a third piece of "evidence" offered by Plaintiff in support of de novo review (again, it is often difficult to discern the purpose of Plaintiff's papers): the rejection of Dr. Berger's October 30, 1996 opinion as sufficient proof of ongoing disability beyond November 1, 1996. At most, UNUM's decision that this opinion did not support payment of benefits beyond November 1, 1996 was an exercise of its discretion under the policy, reviewed by this Court for an abuse thereof. Plaintiff again offers no reasonable basis for concluding that this fact ought to diminish the deference granted to UNUM by discretionary language in the policy.

The Court's conclusion that Plaintiff has failed to offer any "material, probative evidence" of a conflict of interest, beyond the mere fact of its existence, renders unnecessary any proof by UNUM that this conflict had no effect on its decision-making in this case. The "first step" of the analysis has not been satisfied. Accordingly, the standard of review will remain abuse of discretion. The Court has[**74] considered the "inherent" conflict of interest in UNUM's "dual role," but finds no evidence that it breached its fiduciary obligation(s).

B. The Court's Review Is Limited to the Administrative Record

When the abuse of discretion standard is applied, the review is generally limited to the administrative record. See, e.g., *Taft v. Equitable Life Assurance Society, 9 F.3d 1469, 1471 (9th Cir. 1993)*. This is because "permitting a district court to examine evidence outside the administrative record would open the door to the anomalous conclusion that a plan administrator abused its discretion by failing to consider evidence not before it." Id.; see also *Mizzell v. Paul Revere Life Ins. Co., 118 F. Supp. 2d 1016, 1020 (C.D. Cal. 2000)*. n29 In other words, in assessing whether a particular decision constitutes an abuse of discretion, it only makes sense to limit review of that decision to the record upon which the decision was based. Normally, this is the administrative record lodged for purposes of appeal.

n27 It is not entirely clear in Plaintiff's garbled pa-

n29 This limitation to the administrative record

Case 1:01-cv-01157-CCC Document 86 Filed 12/12/2002 Page 87 of 119

144 F. Supp. 2d 1183, *1210; 2001 U.S. Dist. LEXIS 8845, **74

Page 176
FOCUS

may be contrasted with the limited admission of evidence to supplement an administrative record "only when . . . additional evidence is necessary to conduct an adequate de novo review of the benefit decision." *Mongeluzo v. Baxter Travenol Long Term Dis. Ben. Plan, 46 F.3d 938, 944 (9th Cir. 1995)*.

[**75]

In this case, Plaintiff argues that the "administrative record," for purposes of this appeal, should be expanded to include the letter and attached documents allegedly sent to UNUM by Plaintiff's counsel on October 23, 1998. Plaintiff argues that because this evidence was "presented" to UNUM, it ought to be included in the "record" on which the Court reviews UNUM's denial. n30 See Motion to Expand at 4-9. In other words, Plaintiff claims this evidence was "before" UNUM in 1998.

> n30 Plaintiff's counsel takes pains to argue that the record for review should be comprised of that evidence which was "presented" to the claims administrator, rather than just that which was "considered" thereby. See Motion to Expand at 5-7. However, counsel's papers fail to articulate the significance of this distinction, apply it to the facts of this case, or support it with relevant controlling authority.

This case presents an unusual circumstance. Generally, when the plaintiff seeks to augment the administrative record for[**76] purposes of an ERISA appeal, it is in the context of a de novo review, or for the limited purpose of demonstrating a conflict of interest. n31 Neither of those purposes [*1211] applies here. In this case, instead, Plaintiff seeks to include documents allegedly sent to the administrator, but which never formed the basis for any decision on Plaintiff's claim.

> n31 See *Thomas v. Continental Casualty Co., 7 F. Supp. 2d 1048, 1055 (C.D. Cal. 1998)* ("In most abuse of discretion cases, evidence outside the administrative record is completely inadmissible. . . . However, the rule in de novo cases is not so absolute."); *Tremain, 196 F.3d at 977* ("Evidence outside the administrative record . . . may be considered to determine if a plan administrator's decision was affected by its conflict of interest.");

For purposes of summary judgment, this Court cannot decide the disputed question of whether UNUM did in fact receive the documents allegedly submitted by Plaintiff on October 23, 1998. n32[**77] However, this decision is not necessary to the Court's resolution of this issue.

> n32 Indeed, in deciding Defendant's MSJ, below, the Court assumes that UNUM did in fact receive these 1998 documents. See Part IV.C.

This is because the records allegedly submitted by Plaintiff in October, 1998 were no part of the grounds for any "decision" by UNUM which Plaintiff has asked this Court to review. The Complaint, as is appropriate, is addressed to UNUM's August 5, 1998 "final" decision not to extend benefits beyond November 1, 1996. See Complaint P 10 ("Defendant made a final administrative decision denying the claim on or about August 5, 1998, and has not afforded plaintiff with further review opportunity or appeal."). It is primarily this decision which must be measured against the administrative record. Therefore, the relevant record is that on which this "final" decision was made.

Even assuming that Plaintiff's counsel sent, and UNUM received, the documents in Exhibit 2 to the Motion to Expand, records[**78] "received" in October, 1998 could not possibly have been considered in the August 5, 1998 decision by UNUM to deny benefits beyond November 1, 1996. In the parlance adopted by Plaintiff's counsel, therefore, these records were neither "presented" to, nor "considered" by, the administrator, for purposes of the decision now on review. See, e.g., *Bendixen, 185 F.3d at 944* ("Because the report was not before the plan administrator at the time of the denial, the district court was limited to that record and could not consider the report in its review."). n33

> n33 The "report" in question in Bendixen was a physician's report, presumably attesting to the plaintiff's long-term disability, which "was given to Standard after its second review had been completed and a final determination has been made." Id. Similarly, in this case, even if the Court assumes that Plaintiff's counsel did submit the 1998 medical records on October 23, 1998, he did so only after UNUM engaged in several reviews of Plaintiff's file, and rendered a final decision.

144 F. Supp. 2d 1183, *1211; 2001 U.S. Dist. LEXIS 8845, **79

Page 177
FOCUS

[**79]

Because this Court is primarily concerned with the propriety of the August 5, 1998 affirmance of the decision to grant benefits only through November 1, 1996, documentation "received" only after that decision was rendered is not properly part of the "record" against which it must be judged. n34 Accordingly, there is no basis to expand the official administrative record. For all of the foregoing reasons, Plaintiff's Motion to Expand the record is hereby DENIED.

n34 The Court treats the question of whether these documents must be made part of the "administrative record" on review separately from the question of whether these documents have any relevance to overall review of UNUM's exercise of discretion in this case. Therefore, the Court concludes that these documents are not part of a formal "record" of that evidence underpinning UNUM's administrative denial (in 1998). However, for purposes of the summary judgment Motions, the Court does assume that the records were sent and received, so as to assess UNUM's behavior following the "final" denial of benefits on August 5, 1998.

[**80]

[*1212] C. UNUM Did Not Abuse Its Discretion in Terminating Benefits

On the record thus delimited, the Court reviews UNUM's decisions for an abuse of the discretion granted by the DCH policy. In its own Motion for Summary Judgment, Plaintiff contends that UNUM abused its discretion: by "underpaying" Plaintiff's benefits for the period of coverage from July 21, 1995 to November 1, 1996; and by improperly denying Plaintiff benefits beyond November 1, 1996. In Opposition, and its own Motion, Defendant argues: that any allegedly "underpaid benefits" cannot constitute abuse of discretion, since this argument was never presented to UNUM during its administrative process, and in any case Plaintiff's benefits were calculated properly per the policy; and that UNUM also did not abuse its discretion in its termination of Plaintiff's benefits as of November 1, 1996. The Court now considers the parties' cross-motions for summary judgment; for Defendant's MSJ, the Court assumes and construes all of the facts in Plaintiff's favor.

1. The Abuse of Discretion Standard in an ERISA Review

Under the abuse of discretion standard, a decision by an ERISA administrator "will not be disturbed[**81] if reasonable." *Firestone, 489 U.S. at 111.;* see also *Zavora v. Paul Revere Life Ins. Co., 145 F.3d 1118, 1123 (9th Cir. 1998)* ("an ERISA administrator is entitled to substantial deference . . . [so long as it has] some reasonable basis for its decision denying benefits."). Nearly any reasonable basis will do. For example, "even decisions directly contrary to evidence in the record do not necessarily amount to an abuse of discretion." *Taft, 9 F.3d at 1473;* see *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 63 F. Supp. 2d 1145, 1158 (C.D. Cal. 1999)* (noting Ninth Circuit equates abuse of discretion with arbitrary and capricious).

It is an abuse of discretion for ERISA plan administrators "to render decisions without any explanation, or to construe provisions of the plan in a way that conflicts with the plain language of the plan." *Bendixen, 185 F.3d at 944.* Moreover, "an administrator . . . abuses its discretion if it relies on clearly erroneous findings of fact in making benefit determinations." *Taft, 9 F.3d at 1473.* The Court may not, however, "substitute its judgment for[**82] that of the administrator . . ." *Voight v. Metropolitan Life Ins. Co., 28 F. Supp. 2d 569, 576 (C.D. Cal. 1998).* Finally, there need only be "substantial evidence" to support an administrator's decision. See *Snow, 87 F.3d at 332.*

2. Legal Standard on a Motion for Summary Judgment

The party moving for summary judgment has the initial burden of establishing that there is "no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c); see *British Airways Bd. v. Boeing Co., 585 F.2d 946, 951 (9th Cir. 1978); Fremont Indemnity Co. v. California Nat'l Physician's Insurance Co., 954 F. Supp. 1399, 1402 (C.D. Cal. 1997).*

If the moving party has the burden of proof at trial (e.g., a plaintiff on a claim for relief, or a defendant on an affirmative defense), the moving party must make a "showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986)* (quoting from Schwarzer, Summary Judgment Under the Federal Rules: [**83] Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 487-88 (1984)). Thus, if the moving party has the burden of proof at trial, that party "must establish beyond peradventure all of the essential elements of the claim or defense to warrant [*1213] judgment in [its] favor."

144 F. Supp. 2d 1183, *1213; 2001 U.S. Dist. LEXIS 8845, **83

Page 178
FOCUS

*Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir. 1986)* (emphasis in original); see *Calderone, 799 F.2d at 259*.

If the opponent has the burden of proof at trial, the moving party has no burden to negate the opponent's claim. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. The moving party does not have the burden to produce any evidence showing the absence of a genuine issue of material fact. *Id. at 325*. "Instead, . . . the burden on the moving party may be discharged by 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Id. (citations omitted).

Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings [**84]. . . The adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. Pro. 56(e) (emphasis added). A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish the essential elements to that party's case, and on which that party would bear the burden of proof at trial. *Celotex, 477 U.S. at 322-23*. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in favor of the nonmovant. *Id. at 248*. However, the court must view the evidence presented "through the prism of the substantive evidentiary burden." *Id. at 252*.

### 3. The Alleged "Underpayment" of Benefits

Plaintiff argues that UNUM impermissibly erred in calculating Plaintiff's payable benefits from July 21, 1995 to November 1, 1996 based[**85] on a thirty-two rather than a forty hour work week. Plaintiff claims that at the time of her (short-lived) transfer to a part-time position, she was already "disabled" under the 20% loss in earnings prong of the policy definition, and that UNUM should have known that it was improper to base BMB on an already-reduced part-time salary. Following a convoluted series of calculations and offsets, Plaintiff seeks an additional sum of $ 3,642.46 which she claims she is owed.

Plaintiff does not and cannot argue that any of her claim forms asserted an entitlement to benefits based on a forty hour week. Nor does she dispute that it was in fact her present counsel who insisted (as far back as December 17, 1997) that Plaintiff's benefits should be calculated based on a thirty-two hour week. It was also Plaintiff's own claim form which listed her last day of work as April 21, 1995. n35 Plaintiff never claimed that her "disability" actually started when she was transferred to the Home Health department on April 3, 1995. Indeed, Plaintiff originally claimed only a sixteen hour week. In the nearly five years of administrative review of her claim for benefits, Plaintiff never once[**86] asserted that thirty-two hours was an improper basis for benefits, or that she was entitled to a larger benefit.

---

n35 Notwithstanding Plaintiff's reference therein to July 3, 1993.

---

Accordingly, as Defendant points out, it is simply impossible to find that UNUM "abused its discretion" in not considering [*1214] evidence or argument which was never presented to the administrator. UNUM was never given the opportunity to "abuse its discretion" on this issue.

This means that in any case there is absolutely no basis for the Court to simply award Plaintiff the additional "underpaid" benefits. It would be reversible error for this Court to grant relief based on evidence which was never presented to the administrator, or at least was obscured by Plaintiff's own argument on entitlement to benefits. Determinations of entitlement to benefits, and amounts thereof, are supposed to be made in the first instance by the plan administrator, not by a court sitting in review thereof. n36 This is most consistent with the administrative[**87] exhaustion requirement read into ERISA. n37

---

n36 This restraint is consistent with the general goal of ERISA of balancing review with administrative efficiency: "A primary goal of ERISA was to provide a method for workers and beneficiaries to resolve disputes over benefits inexpensively and expeditiously. Permitting or requiring district courts to consider evidence from both parties that was not presented to the plan administrator would seriously impair the achievement of that goal." *Taft, 9 F.3d at 1472* (citations omitted).

n37 See *Diaz v. United Agricultural Employee Welfare Benefit Plan and Trust, 50 F.3d 1478, 1483*

144 F. Supp. 2d 1183, *1214; 2001 U.S. Dist. LEXIS 8845, **87

Page 179
FOCUS

*(9th Cir. 1995)* ("Quite early in ERISA's history, we announced as the general rule governing ERISA claims that a claimant must avail himself or herself of a plan's own internal review procedures before bringing suit in federal court.").

Therefore, the most that Plaintiff might seek would be a remand to the administrator for consideration of the argument(s) [**88] newly raised in this appeal. However, the Court also declines to order a remand, for at least two very compelling reasons. First, where Plaintiff has delayed nearly five years in articulating an entitlement to benefits in excess of those beyond those which she initially claimed, she may not now be heard to complain that UNUM ought to have disregarded her own claim forms and her counsel's arguments, and extended her greater benefits than those to which her own claim entitled her. The passage of time is reason enough not to force UNUM to revisit this issue.

Second, and more importantly, the Court finds that the level of benefits paid by UNUM from July 21, 1995 was both a reasonable and a defensible interpretation of Plaintiff's own claim documents and the policy terms. As Defendant points out, the policy provides that an insured's "Basic Monthly Earnings" should be determined by reference to "the insured's monthly rate of earnings just prior to the date disability begins." AR 261 (emphasis added). Plaintiff's own claim form listed her last day of work at DCH as April 21, 1995, and it was Plaintiff's counsel who insisted that she was working thirty-two hours a week in the period [**89] "just prior" to this date. Notwithstanding the basis for benefits newly argued by Plaintiff on appeal, UNUM did not abuse its discretion in basing benefits on a thirty-two hour week. n38

n38 While Plaintiff's theory may also be a potentially reasonable interpretation of the policy terms, it is not for this Court to choose among competing interpretations. UNUM's basis for its calculation of benefits is a defensible reading of the policy; this ends the inquiry. UNUM reserved the discretion to make just this sort of interpretation.

Therefore, the Court DENIES Plaintiff's MSJ on this ground, and finds that Defendant is entitled to judgment as a matter of law on Plaintiff's claim that she was deprived of adequate benefits for the July 21, 1995 - November 1, 1996 period. The Court GRANTS Defendant's MSJ to [*1215] the extend that it seeks dis-

missal of this basis for relief.

4. Termination of Benefits As Of November 1, 1996

Plaintiff's primary argument, of course, is that UNUM abused its discretion on August 5, 1998 (and[**90] thereafter) in determining that she was not entitled to benefits beyond November 1, 1996. Plaintiff seeks reinstatement of benefits retroactive to that date, and a declaration of entitlement to future benefits subject to the terms of the policy.

To the extent it can be determined, from Plaintiff's counsel's somewhat disjointed papers, it appears that Plaintiff's challenge to UNUM's decision to terminate her benefits as of November 1, 1996 is composed of essentially three components. First, counsel argues that Plaintiff was not afforded the "full and fair review" of her claim guaranteed by ERISA. Second, counsel contends that UNUM's June and August, 1998 decision(s) to terminate Plaintiff's benefits were not supported by "substantial evidence," and were an abuse of discretion. And third, counsel claims that the Court must look not only to these 1998 decisions, but also to UNUM's subsequent decision in rejecting or failing to consider the October 23, 1998 submission, which allegedly gave further support to Plaintiff's ongoing disability claim. See Plaintiff's MSJ at 6-7, 12-17, 10-11; DMSJ Opposition at 5-14.

Defendant responds that the Ninth Circuit test for an abuse of discretion [**91] requires only that a plan administrator not make a decision without providing any explanation, or a decision that conflicts with the plain language of the plan, or a decision that is based on clearly erroneous findings of fact. See PMSJ Opposition at 12; Defendant's MSJ at 18 (citing *Snow, 87 F.3d at 331*). Defendant contends that not only is it clear that none of these conditions is met, but due to the almost total lack of evidence of either ongoing disability or care of a physician beyond November 1, 1996, UNUM did not abuse its discretion in terminating Plaintiff's benefits beyond that date. See id.

This case does not present the issue that is usually preeminent in an ERISA disability benefits case: a choice among several competing physicians' opinions as to the disability status of the individual. Instead, this case is determined by the very lack of medical records. On the evidence presented, UNUM simply did not abuse its discretion.

a. A "Full and Fair" Review

Case 1:01-cv-01157-CCC    Document 66    Filed 12/12/2002    Page 81 of 119

144 F. Supp. 2d 1183, *1215; 2001 U.S. Dist. LEXIS 8845, **91

Page 180
FOCUS

Plaintiff first argues that UNUM failed to provide a "full and fair review" of its denial of her claim for benefits. She cites to Section 503 of ERISA *(29 U.S.C. § 1133),*[**92] which requires that a plan:

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood . . ., and (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review . . . of the decision denying the claim.

*29 U.S.C. § 1133* (emphasis added). Specifically, Plaintiff cites the regulation(s) written to implement the criteria for an administrative review of a denial of benefits, *29 C.F.R. § 2560.503-1* (1998).

The "Scope and purpose" subsection of this regulation spells out that Section 503 "sets out certain minimum requirements for employee benefit plan procedures pertaining to claims . . . for plan benefits, consideration of such claims, and review of claim denials . . ." *29 C.F.R. § 2560.503-1(a)* [*1216] (1998). n39 Remaining subsections give details:

(e) Notification to claimant of decision. (1) If a claim is wholly or partially denied, notice of the[**93] decision, meeting the requirements of paragraph (f) of this section, shall be furnished to the claimant within a reasonable period of time after receipt of the claim by the plan. (2) If notice of the denial of a claim is not furnished . . . within a reasonable period of time, the claim shall be deemed denied and the claimant shall be permitted to proceed to the review stage described in paragraph (g) of this section. (3) For purposes of paragraphs (e)(1) and (e)(2), of this section, a period of time will be deemed to be unreasonable if it exceeds 90 days after receipt of the claim by the plan . . .

(f) Content of notice. A plan administrator . . . shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant:

(1) The specific reason or reasons for the denial; (2) Specific reference to pertinent plan provisions on which the denial is based; (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and (4) Appropriate information as to the steps to be taken if the participant [**94]or beneficiary wishes to submit his or her claim

for review.

(g) Review procedure. (1) Every plan shall establish and maintain a procedure by which a claimant or [his/her] duly authorized representative has a reasonable opportunity to appeal a denied claim to an appropriate named beneficiary or to a person designated by such fiduciary, and under which a full and fair review of the claim and its denial may be obtained. Every such procedure shall include but not be limited to provisions that a claimant . . . may:
(i) Request a review upon written application to the plan; (ii) Review pertinent documents; and (iii) Submit issues and comments in writing . . . (3) A plan may establish a limited period within which a claimant must file any request for review of a denied claim . . . In no event may such a period expire less than 60 days after receipt by the claimant of written notification of denial of a claim.

(h) Decision on review. (1)(i) A decision by an appropriate named fiduciary shall be made promptly, and shall not ordinarily be made later than 60 days after the plan's receipt of a request for review . . . (4) The decision on review shall be furnished to the claimant within[**95] the appropriate time described in paragraph (h)(1) of this section. If the decision on review is not furnished within such time, the claim shall be deemed denied on review.

*29 C.F.R. §§ 2560.503-1(e),* (f), (g), and (h) (1998).

n39 This regulation was later amended, on November 21, 2000, but the language as cited is that applicable in 1998, the same language applicable from 1984 until 2000 (previous amendment April 30, 1984).

As one court in this district notes, there are few cases directly addressing the legitimacy of ERISA appellate processes. See *Mizzell, 118 F. Supp. 2d at 1023.* However, the Ninth Circuit recently stated:

In simple English, what this regulation calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries. If benefits are denied in whole or in part, the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis [*1217] for the denial; [**96] if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. There is nothing extraordinary about this . . . [provision].

144 F. Supp. 2d 1183, *1217; 2001 U.S. Dist. LEXIS 8845, **96

Page 181
FOCUS

*Booton v. Lockheed Medical Benefit Plan, 110 F.3d 1461, 1463 (9th Cir. 1997)*; see also *id. at 1465* (restating this "simple" proposition).

Plaintiff fails to identify what about the review procedures in this case were not "full and fair," or how any alleged departure from the procedural requirements established by this regulation led to any substantive prejudice to her claim for benefits. See, e.g., *Parker v. BankAmerica Corp., 50 F.3d 757, 768-69 (9th Cir. 1995)* (a procedural violation of ERISA does not warrant an award of benefits unless it caused a substantive violation or itself worked a substantive harm). Plaintiff seems to focus on UNUM's non-response to counsel's alleged submission of additional documentation in October, 1998. See, e.g., Plaintiff's MSJ at 6; DMSJ Opposition at 5. However, counsel cannot articulate any basis for concluding, even if the Court assumes that UNUM received these documents, made some decision thereon, [**97] and never told Plaintiff that it was nonetheless denying her claim, that this was a procedural violation. Rather, as Plaintiff herself points out, under *29 C.F.R. § 2560.503-1(h)(4)*, the non-publication of any such denial on review would merely mean the appeal is "deemed" denied.

There is nothing to suggest that UNUM failed to provide a "full and fair review" of Plaintiff's claim (or its initial denial thereof). Quite to the contrary, UNUM repeatedly provided Plaintiff with timely and adequate notice, in the form of letters from claims agents which clearly laid out the pertinent language of the policy, identified the reason(s) for denial of benefits, and informed Plaintiff that in order to receive benefits she would have to provide evidence that she was both disabled (from her occupation) and under a physician's care on an ongoing basis. Indeed, from the initial denial on January 18, 1996, UNUM engaged in over two and one-half years of "review" of Plaintiff's claim, and ultimately reversed in part its initial denial of benefits, in June and August of 1998. This review was at least "full and fair."

b. The Decision(s) to Terminate Benefits[**98]

Plaintiff also argues that the June and August, 1998 decision(s) not to extend payment of disability benefits beyond November 1, 1996 were an abuse of discretion, not supported by "substantial evidence." However, this Court cannot agree with Plaintiff's characterization.

Under abuse of discretion review, the Court must uphold a plan administrator's decision to deny benefits unless it was "arbitrary and capricious," "clearly erroneous," was offered without any explanation, or was contrary to the plain language of the policy document. There need only be a "reasonable basis" for an administrator's decision, and a decision is sustainable even where directly contrary to evidence in the record. Under this standard, UNUM's decision(s) must be affirmed. Far from being arbitrary and capricious, UNUM's actions throughout the pendency of Plaintiff's claim (1995 through 1998) were solicitous of Plaintiff's interests, extended her every opportunity to augment her claim, and even granted benefits in the absence of full documentation.

At the time that UNUM made its final decision on August 5, 1998, Plaintiff had still never provided UNUM with records establishing her ongoing disability or regular[**99] treatment by a physician beyond November 1, 1996. Indeed, UNUM was somewhat generous in accepting Dr. Charles' November 1, 1995 assertion that [*1218] Plaintiff would remain disabled "for a year" in the apparent absence of underlying medical records showing an objective basis for that assertion. Despite repeated requests for any records of treatment post-dating Dr. Charles' November 1, 1995 opinion letter, prior to August 5, 1998 UNUM never received anything other than Dr. Berger's October 30, 1996 claim form, and Dr. Rabinovich's March 14, 1996 report on Plaintiff's spinal difficulties. There was a virtual absence of "proof" of ongoing disability or treatment.

Plaintiff insists that the Long Form Medical Report completed by Dr. Berger on October 30, 1996 should have been enough, on its own, to substantiate Plaintiff's claim for benefits, and that UNUM's alleged "disregard" thereof was an abuse of discretion. See Plaintiff's MSJ at 12-15. Plaintiff argues there was no "substantial evidence" in the record upon which UNUM could rely to "reject" Dr. Berger's opinion, and it was therefore required to "accept" it and pay benefits thereon.

However, Plaintiff misconstrues the basis for UNUM's[**100] August 5, 1998 denial. This was not a "rejection" of Dr. Berger's opinion, per se, but rather a recognition that Plaintiff had not yet satisfied her obligation to provide sufficient proof of ongoing disability. Though ERISA is infused with principles of trust and fiduciary obligations, it is still at heart a determination of contractual obligations, and conformance therewith. See, e.g., *Cisneros v. UNUM Life Ins. Co. of America, 134 F.3d 939, 943-44 (9th Cir. 1998)* (noting that contractual proof-of-claim requirements would determine timeliness of proof, but for the applicability of the California "notice-prejudice" rule). As Defendant points out, "Dr. Berger's report only emphasized the

Case 1:01-cv-01157-CCC    Document 66    Filed 12/12/2002    Page 93 of 119

144 F. Supp. 2d 1183, *1218; 2001 U.S. Dist. LEXIS 8845, **100

Page 182
FOCUS

great gap in medical evidence, documents that UNUM requested once again from Alford and her attorney." PMSJ Opposition at 14. Plaintiff's proof of ongoing disability and treatment was a condition precedent to her receipt of benefits, under the policy language. n40 In the absence of sufficient proof, UNUM incurred no obligation to pay these benefits.

---

n40 This requirement is explicit. See AR 274 ("When the Company receives proof that an insured is disabled . . . and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit . . . The benefit will be paid for the period of disability if the insured gives to the Company proof of continued: 1. disability; and 2. regular attendance of a physician. The proof must be given upon request and at the insured's expense.") (emphasis added).

[**101]

Though Plaintiff had provided some proof of disability, there was very little to suggest that it would stretch beyond November 1, 1996. All of the actual medical records to that point submitted to UNUM were from treatment performed prior to the end of 1995. To substantiate disability (and treatment) in 1996 and beyond, Plaintiff had submitted only Dr. Charles' November 1, 1995 opinion, Dr. Rabinovich's March 14, 1996 opinion, and Dr. Berger's October 30, 1996 opinion. n41 UNUM was somewhat generous to accept Dr. Charles' opinion that Plaintiff would be disabled for the following year; it was under no obligation to make a similar assumption on the basis of Dr. Berger's opinion. n42 This is particularly true because Dr. Berger himself [*1219] offered no opinion as to the potential duration of Plaintiff's ongoing disability. He simply stated that, based on her partial complex seizures, she was at that point unable to return to work in her regular occupation. n43 In the absence of medical records supporting Dr. Berger's opinion, and with the lack of specifics (e.g., restrictions and limitations, or duration of inability to work past October 30, 1996) therein, UNUM[**102] was within its rights in requiring further documentation of ongoing disability.

---

n41 As Plaintiff concedes, the ALJ's determination on December 3, 1996 that she was entitled to Social Security disability benefits was not binding on UNUM. See *Madden v. ITT Long Term Disability*

*Plan for Salaried Employees, 914 F.2d 1279, 1286 (9th Cir. 1990).* This decision also relied primarily on medical records up through 1995. It is thus nearly irrelevant to UNUM's determination as to Plaintiff's status.

n42 Notwithstanding Plaintiff's counsel's belief that the October 30, 1996 report should allow UNUM "to extend benefits for a reasonable period of time beyond October 30, 1996." AR 299 (July 2, 1998 letter).

n43 Moreover, Dr. Berger was Plaintiff's then-treating physician for her diabetes, but his opinion that she was disabled from work was based on the possibility of "partial complex seizures," for which he was not her treating physician. The same observation is true of Dr. Berger's recounts of neck and back problems experienced by Plaintiff.

[**103]

Far from being arbitrary and capricious, UNUM's August 5, 1998 decision to grant benefits through November 1, 1996, but to terminate benefits on that date, was substantially supported by the record then before the administrator. Though Plaintiff was apparently continuing to see physicians during that period, and ostensibly might even have been able to substantiate her ongoing disability, she failed to meet the contractual condition precedent of submitting that proof to UNUM. UNUM acted within its discretion in choosing to terminate benefits.

c. The Alleged Additional Evidence

Even assuming, as the Court must for summary judgment purposes, that Plaintiff's interpretation of notations in the administrative record is correct, and that Plaintiff's counsel did submit, and UNUM received, additional records following the August 5, 1998 decision, this does not alter the Court's conclusion that UNUM did not abuse its discretion in this case. First of all, even Plaintiff admits that the additional treatment records were allegedly submitted after the sixty day deadline established by Gilfillan's August 5, 1998 letter already had lapsed. Though UNUM had thus far been gracious about repeatedly[**104] accepting late submissions from Plaintiff, and engaging in numerous ongoing discussions about her claim, it was also entitled to have the processing of her claim at some point come to a final conclusion.

It was not unreasonable to ask Plaintiff to submit any further records underlying Dr. Berger's (or Dr. Charles') opinion within sixty days, particularly where

Case 1:01-cv-01137-CCC    Document 66    Filed 12/12/2002    Page 94 of 119

144 F. Supp. 2d 1183, *1219; 2001 U.S. Dist. LEXIS 8845, **104

Page 183
FOCUS

UNUM had repeatedly requested records from the end of 1995 and beyond. Therefore, the records allegedly sent on October 23, 1998 (received on October 29, 1998) were untimely, as an initial matter, and UNUM might well have ignored them for that reason.

Moreover, even if UNUM (or this Court) were to consider those records allegedly submitted on October 23, 1998, it would still not have been an abuse of discretion to deny Plaintiff's entitlement to disability benefits as of November 1, 1996. This is because even the records submitted on October 23, 1998 only covered Plaintiff's visits to Dr. Berger in 1998, and only included Residual Functional Capacity Forms completed by Drs. Berger, Charles, and Chen in 1998. Plaintiff still provided no medical records from late 1995 to early 1998. This left a gap of nearly[**105] two years between physicians' opinions submitted, and over two years between actual medical records received. There was still no actual proof of any treatment beyond November 1, 1996.

Thus, even if the Court assumes that UNUM received the further submission on October 29, 1998, this submission would not require a conclusion that Plaintiff was disabled and entitled to benefits as of November 1, 1996. Indeed, the latest treatment [*1220] records prior to 1998 that UNUM had been provided at that point were from sometime in 1995.

Plaintiff did not finally provide any treatment records relating to 1996 and 1997 until Plaintiff's counsel finally, eighteen months later on April 20, 2000, submitted over two hundred pages of further medical treatment history spanning 1993 to 2000. This submission of records, even were it sufficient to establish disability, was far too late to be within any "reasonable" appeal period to which Plaintiff was entitled. Almost two years beyond the "final" denial on August 5, 1998, Plaintiff's counsel finally provided records which UNUM had been requesting since early 1996. Why these records were never provided in response to UNUM's many earlier requests is[**106] unclear. What is clear is that UNUM was not required to consider records submitted more than four years after Plaintiff's written appeal of its initial denial.

The most difficult circumstance presented by this case is that it does appear that Plaintiff suffers from many serious conditions, any one of which might have been sufficient to render her "disabled" under the terms of the policy. The records finally submitted in 2000 do appear to suggest that Plaintiff continues to undergo a substantial range of treatments for her various ailments.

However, where evidence of those conditions was not presented to UNUM in a timely fashion, as required by the terms of the insurance policy governing this action, the Court can hardly say that UNUM abused its discretion in finding insufficient basis to pay out ongoing benefits. This is not a case in which UNUM rejected evidence of disability presented by Plaintiff; it simply found that Plaintiff had failed to present sufficient proof. UNUM gave Plaintiff innumerable opportunities to supplement her file, and even paid benefits up through November 1, 1996 despite the lack of overwhelming proof of disability to that point (and perhaps contrary[**107] to the opinion of its own vocational consultant). It was entitled to close Plaintiff's claim at some point, and it did so only after over two and one half years of review and re-review of its denial.

Based on this record, the Court finds that Plaintiff has failed to establish the existence of any genuine issue of material fact that might tend to show an abuse of discretion on UNUM's part. Therefore, the Court finds that UNUM is entitled to judgment as a matter of law. The Court hereby DENIES the remaining bases for Plaintiff's MSJ, and hereby GRANTS Defendant's MSJ, in full. Even construing the evidence in the light most favorable to Plaintiff, as it must, the Court can find no basis to support a right to reinstatement. Accordingly, the Court hereby DISMISSES Plaintiff's Complaint, in full, with prejudice.

## V. CONCLUSION

For the foregoing reasons, the Court finds no basis to order the administrative record to be augmented with the documents contained in Exhibit 2 to Plaintiff's Motion to Expand. Accordingly, the Court hereby DENIES the Motion to Expand. Further, the Court concludes that on this record UNUM acted within its discretion both in calculating a level of benefits[**108] from July 21, 1995 to November 1, 1996 based on a thirty-two hour work week, and in finding that Plaintiff had not shown an entitlement to benefits beyond that period. Thus, the Court also DENIES Plaintiff's MSJ, and GRANTS Defendant's MSJ. The Court hereby DISMISSES Plaintiff's Complaint, in its entirety, with prejudice.

DATED: June 1, 2001

AUDREY B. COLLINS

UNITED STATES DISTRICT JUDGE

42ND CASE of Focus printed in FULL format.

RICHARD P. REINERTSEN and REID PSYCHOLOGICAL SYSTEMS, an Illinois partnership, on behalf of the Reid Long Term Disability Benefit Plan, Plaintiffs, v. THE PAUL REVERE LIFE INSURANCE COMPANY, a Massachusetts corporation, Defendant.

Case Number: 99 C 6102

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

127 F. Supp. 2d 1021; 2001 U.S. Dist. LEXIS 331

January 12, 2001, Decided

**DISPOSITION:** [**1] Defendant's Motion to Strike Portions of the Declarations of Richard P. Reinertsen and Stephen M. Coffman and all pleading references to said materials (21-1) denied. Defendant's Motion for Summary Judgment (13-1) granted. Plaintiffs' Motion for Summary Judgment (10-1) denied.

CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiffs and defendant cross-moved for summary judgment pursuant to Fed. R. Civ. P. 56 in plaintiffs' case alleging defendant unreasonably denied plaintiffs' claim for disability benefits, as a residually disabled employee, contrary to plaintiffs' plan, and the provisions and policies of the Employee Retirement Income Security Act, 29 U.S.C.S. §§ 1132(a)(1)(B) and (3).

**OVERVIEW:** Plaintiffs alleged that defendant unreasonably denied plaintiff claimant's claim for disability benefits, as a residually disabled employee, contrary to the governing long-term disability insurance plan (Plan), and the provisions and policies of the Employee Retirement Income Security Act (ERISA), 29 U.S.C.S. §§ 1132(a)(1)(B) and (3). The parties cross-moved for summary judgment. The court found, first, that while the group policy was silent on discretion with the plan administrator and the summary plan description granted discretion to the administrator, the group policy controlled. De novo review was the default, and proper, standard. Next, the court found that while plaintiff claimant satisfactorily proved he was unable to perform all the important functions of his job, he did not show, as required under the Plan, that he was earning less than 80 percent of his earnings prior to disability. While it was laudable that plaintiff employer provided plaintiff claimant his full salary for half the work, the fact remained that plaintiff claimant suffered no loss of income, as required under the Plan. The court granted defendant summary judgment.

**OUTCOME:** The court granted defendant's and denied plaintiffs' motion for summary judgment, finding plaintiff did not yet meet the conditions precedent for qualifying for residual disability benefits under the plan; plaintiff claimant was not earning less than 80 percent of his prior earnings; silence in group plan regarding administrator's discretion required de novo review.

**CORE TERMS:** group policy, earning, residually, disabled, duty, disability benefits, summary judgment, occupation, doctor, full-time, residual, administrator, work performance, stroke, disability, administrative record, unable to perform, memory, hemorrhage, novo, declaration, decreased, silent, sub judice, partially disabled, plan administrator, functioning, performing, salary, silence

CORE CONCEPTS -

**COUNSEL:** For RICHARD P REINERTSEN, REID PSYCHOLOGICAL SYSTEMS, plaintiffs: Peter A. Silverman, James H. Bowhay, Figliulo & Silverman, Chicago, IL.

For THE PAUL REVERE LIFE INSURANCE COMPANY, defendant: Steven R. McMannon, Christopher John Robison, Michael J. Smith & Associates, Michael J. Smith, Attorney at Law, Chicago, IL.

**JUDGES:** ARLANDER KEYS, United States Magistrate Judge.

**OPINIONBY:** ARLANDER KEYS

**OPINION:** [*1022]

MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiffs Richard P. Reinertsen ("Mr. Reinertsen") and Reid [*1023] Psychological Systems ("Reid"), and Defendant The Paul Revere Insurance Company's ("Paul Revere") cross-motions for

127 F. Supp. 2d 1021, *1023; 2001 U.S. Dist. LEXIS 551, **1

Page 22
FOCUS

summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiffs allege that Paul Revere unreasonably denied Mr. Reinertsen's claim for disability benefits, as a residually disabled employee, contrary to the governing long-term disability insurance plan (the "Plan"), and[**2] the provisions and policies of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and (3) (West 2000). Conversely, Paul Revere contends that its decision to deny Mr. Reinertsen's claim for residual disability benefits was proper, appropriate and legally justified. Because the Court finds that Mr. Reinertsen has not met, at this time, the conditions precedent for qualifying for residual disability benefits under the Plan, and for the reasons set forth below, the Court grants Paul Revere's Motion for Summary Judgment, and denies Plaintiffs' Motion for Summary Judgment. n1

    n1 Paul Revere also has submitted a Motion to Strike Portions of the Declarations of Richard P. Reinertsen and Stephen M. Coffman, Tabs C-1 and C-2, and All Pleading References to Said Materials ("Motion to Strike"). As explained supra, the Court denies this Motion.

## BACKGROUND

The crux of this case is whether Paul Revere is legally justified in refusing to pay residual disability[**3] benefits to Mr. Reinertsen. This is an ERISA case, and all parties agree that the Plan at issue in this case is an ERISA plan n2, that Paul Revere is both the fiduciary under the Plan and the insurer that contracted to provide Reid with long-term disability insurance for its employees, and that Mr. Reinertsen is a Plan employee.

    n2 The Plan is an employee welfare benefit plan, governed by ERISA, as defined in 29 U.S.C. §§ 1002(1), 1003(a)(1). (Def.'s LR56.1 P 4.)

Reid is an Illinois partnership in the business of developing and marketing pre-employment screening tools that assist employers in the hiring process. (Plaintiffs' Rule 56.1(a) Statement of Material Facts ("Pl.'s SMF") at P 2; Defendant's LR56.1(a)(3) Statement of Material Facts ("Def.'s LR56.1") at P 2.) Mr. Reinertsen began working for Reid in 1977, and, eventually, worked his way up to the position of Executive Vice-President of Sales by 1987. (Pl.'s SMF P 8.) In April 1994, during his employment with Reid, Mr. Reinertsen suffered [**4]a severe subarachnoid brain hemorrhage, followed by a stroke on the right side of his body. (Id. at P 9.) He was hospitalized for fourteen days in April and May 1994. (Id. at P 8.) Although Mr. Reinertsen subsequently returned to work full-time by June 1994, according to Plaintiffs, it became increasingly apparent, over a period of time (Plaintiffs do not provide a date, however), that Mr. Reinertsen had been partially disabled by the hemorrhage and stroke, resulting in noticeable deficiencies in his work performance. (Pl.'S SMF PP 13-18.)

For instance, at the time of his stroke in 1994, Mr. Reinertsen held the position of Executive Vice-President of Sales, responsible for sales company-wide, with duties that included the supervision of approximately fifteen employees, extensive travel, giving sales presentations to and maintaining relationships with major clients, training the sales force, and general supervision of marketing. (Pl.'s SMF P 10.) This top-level executive position requires both the mental and physical ability to travel extensively. (Id.) While, prior to his hemorrhage and stroke, Mr. Reinertsen was fully able to perform these tasks, after his illness, Mr. [**5] Reinertsen gradually began to experience problems with his memory and cognitive functioning, as well as other debilitating symptoms, which, according to Plaintiffs, made him unable to perform important duties of his job. (Id. at P 11.) Specifically, Plaintiffs claim that Mr. Reinertsen's job performance has suffered from the following:
[*1024]
(a) decreased ability to articulate his thoughts, including frequent groping for words and loss of his train of thoughts;

(b) continual fatigue and an appearance that he is in pain;

(c) reduced ability to engage in abstract thinking or to process and integrate complex information, frequently missing the key points or points;

(d) impaired memory;

(e) failure to display the wit and humor that characterized his personality prior to the stroke;

(f) great difficulty with conducting sales meetings and with subsequent support activities of professional follow-through, requiring duplication of efforts with other employees having to assist him in these tasks;

(g) difficulty in working with numbers; and

127 F. Supp. 2d 1021, *1024; 2001 U.S. Dist. LEXIS 351, **5

Page 23
FOCUS

(h) pain and disorientation as a result of changes in air pressure experienced during frequent air travel required[**6] as part of his job.

(Pl.'s SMF P 14.) Despite these performance deficiencies, Mr. Reinertsen has continued to work full-time since June 1994, and Reid, as his employer, has laudably tried to accommodate his health problems. Nonetheless, both Mr. Reinertsen and Reid acknowledge that, since the 1994 hemorrhage and stroke, Mr. Reinertsen, while working full-time, has been only half as productive in his position as Executive Vice-President of Sales as he was before the illness. (Id. at P 13.) Consequently, starting in 1998, Reid reduced Mr. Reinertsen's responsibilities, and gave him a new position, as Executive Vice-President of Sales -- Western Region, where only four to six sales or sales support employees reported to him (as opposed to the fifteen employees who reported to him when he was responsible for sales company-wide). (Id. at P 15.)

Despite these reduced responsibilities, Reid continued to find that Mr. Reinertsen was not able to satisfactorily perform all of the important duties and demands of his occupation. (Pl.'s SMF P 16.) According to Reid, Mr. Reinertsen still continued to experience short and long term memory loss, was repeatedly absent due to recurring[**7] episodes of ill and unstable health, had a continuing inability to process complex information, had difficulties staying technically current, and lacked good business judgment. (Id.) As a result, Reid had to have other employees monitor and aid Mr. Reinertsen in the performance of his job. (Id.) Reid also explains that Mr. Reinertsen's decline in work performance is illustrated, in part, by a 35% fall in the Western Division sales figures in 1998, from $ 5,728,000 in 1997 to $ 3,702,000 in 1998. (By comparison, revenues for the Eastern Division -- for which Mr. Reinertsen was not responsible -- increased by 21% in 1998.) n3 (Id. at P 17.)

n3 Paul Revere attempts to refute this example by arguing that, from 1996 to 1997, sales actually increased for the Western Region, thereby implying that Mr. Reinertsen could not have been that impaired since 1994. (See Def.'s Response to Pl.'s Motion for Summary Judgment ("Def.'s Response") at 17.) But, as pointed out by Plaintiffs, Mr. Reinertsen was not Vice-President of the Western Region until 1998, so the fact that sales increased from 1996 to 1997 is irrelevant, and does not dimin-

ish Plaintiffs' argument that Mr. Reinertsen's work performance was deteriorating.

[**8]

Furthermore, because of Mr. Reinertsen's diminished capacity, and his consequent lack of productivity, Reid maintains that it reduced Mr. Reinertsen's compensation by at least 50% (although Plaintiffs do not provide a date as to when this occurred). Significantly, however, Reid admittedly continued to pay Mr. Reinertsen the same compensation as before his illness, claiming that Mr. Reinertsen only "earned" 50% for his reduced work capacity, and that the remaining 50% constituted "special pay" as recognition of Mr. Reinertsen's significant contribution to Reid as a 20-year employee. (Pl.'s SMF P 20.) [*1025]Stating further, Reid contends that, had Mr. Reinertsen not been a long-term employee who was eligible for "special pay", his pay would have been reduced by at least 50% because of his disability and resultant lack of work performance. n4 (Id.)

n4 Despite Reid's implication that "special pay" is something the company has as a policy, Reid has presented no documents describing or defining "special pay", and there is no evidence that Reid has ever provided "special pay" to other employees, or even contemplated offering it to other employees.

[**9]

As a result of Mr. Reinertsen's continual deterioration in work performance, on March 9, 1998 -- four years after the initial hemorrhage and stroke -- Mr. Reinertsen applied to Paul Revere for partial disability benefits, as a residually disabled employee, under the Plan. n5 (Pl.'s SMF P 21.) The Group Policy provides for the payment of monthly benefits to an employee who is "residually disabled", which is defined as follows:

RESIDUAL DISABILITY or RESIDUALLY DISABLED means, as a result of Injury or Sickness, the Employee is unable to perform the important duties of his own occupation on a Full-time basis, but:

1. he is able to perform one or more of the important duties of his own occupation, or any other occupation, on a Full-time or part-time basis; and

2. he is earning less than 80% of his Prior Earnings.

(Pl.'s SMF P 22; Def.'s LR56.1 P 64.) While both

Case 1.01-cv-01137-CCC    Document 66    Filed 12/12/2002    Page 98 of 119

127 F. Supp. 2d 1021, *1025; 2001 U.S. Dist. LEXIS 551, **9

Page 24
FOCUS

Plaintiffs and Defendant agree that the aforementioned definition of Residual Disability is correct, they disagree about the applicable definition of "Prior Earnings."

n5 The relevant documents that relate to Mr. Reinertsen's disability claim include the Group Policy Number G-28229, which is a group long-term disability income insurance policy ("Group Policy"), revisions thereto, and the Summary Plan Description Booklet-Certificate of Insurance ("SPD"). (Def.'s LR56.1 P 5.) While Paul Revere argues that both aforementioned documents constitute "Plan documents," Plaintiffs contend that both documents are not considered "Plan documents." (Pl's Response to Def.'s LR56.1 P 5.)

[**10]

Plaintiffs contend that the Group Policy excludes "special pay" from the definition of "Earnings" by relying on the following definition in the "General Provisions" section:

EARNINGS (EMPLOYEES) means, for the purposes of determining an Employee's Total Disability benefit, the Employee's basic annual, monthly or weekly pay, based on a work week of not more than forty hours. Earning received from commissions and productivity incentives are included, but bonuses, overtime and other special pay are not.

(Pl.'s SMF P 23; Def.'s Appendix in Support of Its Motion for Summary Judgment ("Def.'s App."), Ex. E, Group Policy at PRLSP00401.) Paul Revere argues that the definition of "Earnings" that Plaintiffs rely on is erroneous, as it only refers to an employee's "Total Disability benefit" -- not benefits for residually disabled individuals. Rather, according to Paul Revere, the correct definition of "Loss of Earnings", for residually disabled individuals, means the employee's prior monthly earnings minus the employee's "Actual Monthly Residual Earnings" after the date of disability. (Def.'s LR56.1 P 65; Def.'s App., Ex. E, Group Policy at PRLSP00413.) Furthermore, according[**11] to Paul Revere, pursuant to the Plan documents, "Actual Monthly Residual Earnings" for a Reid employee, such as Mr. Reinertsen, means the employee's salary, wages, commissions, bonuses, fees, and income earned for services performed. (Id. at P 66.) Therefore, according to Paul Revere, "special pay" is not exempt from the definition of "Actual Monthly Residual Earnings."

Plaintiffs counter that Paul Revere's so-called definition, or understanding, of "Earnings" is incorrect, because Paul Revere's definition already assumes that an employee has met the definition of residually disabled, and is only used to calculate [*1026] ensuing benefits. Furthermore, Plaintiffs argue that their definition should be applicable to residually disabled individuals -- as well as totally disabled individuals -- because there is no alternative definition of "Earnings" in the "General Provisions" section of the Group Policy for residually disabled individuals. In other words, according to Plaintiffs, the "Earnings" definition in the Plan is meant to apply to both totally disabled and residually disabled individuals. As will be explained supra, the Court finds that, under either approach, Mr. Reinertsen[**12] has still not met, at this time, the requisite loss in earnings, which is a condition precedent under the Plan for disability benefits.

As part of his application for residual disability benefits, Mr. Reinertsen submitted evidence to Paul Revere documenting his inability to perform certain important duties of his occupation due to decreased levels of cognitive functioning and short term memory skills, including materials from his employer and doctors. (Pl.'s SMF P 26.) Without performing an independent examination of Mr. Reinertsen, on July 10, 1998, Paul Revere denied his application for residual disability benefits, claiming: (1) that "no evidence" had been provided to Paul Revere that Mr. Reinertsen "has been unable to perform any of his important occupational duties or to work on less than a full-time basis"; and (2) that Mr. Reinertsen had not suffered an earnings loss in excess of 20 percent. (Id. at P 27; Def.'s LR56.1 P 37.)

Pursuant to his rights under the Plan and ERISA, on September 28, 1998, Mr. Reinertsen appealed Paul Revere's denial of his application. (Def.'s LR56.1 P 40.) As part of the appeal process, additional evidence was submitted by Reid, Mr. Reinertsen[**13] and Mr. Reinertsen's doctors concerning his partial disability and his inability to perform important duties of his occupation. (Pl.'s SMF P 28.) On April 1, 1999, Paul Revere again denied Mr. Reinertsen's application for residual disability benefits, without undertaking an independent medical examination. The reasons Paul Revere set forth were the same as those offered in the initial denial, with the addition that Paul Revere stated that it did not feel that Mr. Reinertsen had visited doctors enough to satisfy the requirement that he was receiving "Doctor's Care." n6 (Id. at P 29.)

127 F. Supp. 2d 1021, *1026; 2001 U.S. Dist. LEXIS 331, **13

Page 25
FOCUS

n6 "Doctor's Care" under the Plan is defined as "the regular and personal care of a Doctor that, under prevailing medical standards, is appropriate for the condition causing the Disability." (Def.'s App., Ex. E, Group Policy at PRLSP00401.) As will be explained supra, the Court finds that Mr. Reinertsen was, indeed, seeking treatment consistent with his partial disability, and therefore, was seeking "Doctor's Care" as defined in the Plan.

[**14]

As stressed by Plaintiffs, in the application process and in the appeal, Paul Revere never retained any doctor to examine Mr. Reinertsen, or even interviewed him, his doctors, or his employer. (Id. at P 32.) Paul Revere counters that it undertook a thorough investigation and review of the medical records regarding Mr. Reinertsen's medical condition, completed an exhaustive review of his job responsibilities and activities from 1994 through the claims review process, and made repeated inquiries about Mr. Reinertsen's earnings, wages, salary and/or compensation received from Reid. After its thorough review, Paul Revere argues that it correctly determined that, because Mr. Reinertsen had returned to work in 1994 as Executive Vice-President on a full-time basis, and handled the same job responsibilities as he performed before his 1994 brain injury, he was still performing the important functions of his job, and therefore was not residually disabled. (Def.'s LR56.1(a) PP 11-13.) As will be explained supra, the Court finds that there is, indeed, sufficient evidence to conclude that Mr. Reinertsen was unable to perform important functions of his job. n7

n7 The specific medical and other evidence submitted by Mr. Reinertsen will be discussed fully in the "Analysis" section of this Opinion.

[**15] [*1027]

Finally, another contention between the parties is the significance of the language in the SPD, which undisputedly grants discretion to the Plan administrator (in this case Paul Revere), in determining whether an employee qualifies for benefits. The SPD states that the Claims Administrator (Paul Revere) has "full, final, complete, conclusive and exclusive discretion to determine eligibility for coverage and benefits under the Group Policy, to determine the amount of any benefits payable under the Group Policy, and to construe and interpret the

terms and conditions of the Group Policy and all related documents." (Pl.'s SMF P 25.) Significantly, it also states that "if there are discrepancies among the plan, the Group Policy and this SPD, the Group Policy will control." (Pl.'s Response to Def.'s LR56.1 at P 63.)

While both Plaintiffs and Defendant agree that the SPD grants discretion to Paul Revere, and that the Group Policy describing the Plan does not afford any discretion to the administrator, (or, more accurately, is silent with respect to such discretion), the parties dispute which language is controlling. As will be explained supra, the Court finds that the language in[**16] the Group Policy (not the SPD) is controlling, and consequently, that no discretion is afforded to Paul Revere in making disability determinations.

PROCEDURAL HISTORY

On September 15, 1999, Plaintiffs filed a two-count Complaint against Paul Revere. Count one is Mr. Reinertsen's claim for disability benefits under the Plan, where he requests a declaration that he is residually disabled under the Plan and, consequently, has a right to receive benefits. n8 (Complaint P 28(a).) Count two is Reid's claim for breach of fiduciary duty, where it requests an award of losses to the Plan, and an award of profits which were made through the use of the assets of the Plan, resulting from the breach of Paul Revere's fiduciary duties. (Complaint P 31.)

n8 Alternatively, Mr. Reinertsen requests that the reduction in compensation requirement be declared contrary to public policy. (Complaint P 28(a).)

On November 24, 1999, this case was reassigned to this Court pursuant to Local Rule 73.1. On October 30, 2000, Plaintiffs[**17] and Defendant submitted cross-motions for summary judgment, the present motions before the Court.

ANALYSIS

There are three primary issues that must be resolved in the case sub judice: (1) the Court's appropriate level of review; (2) whether Mr. Reinertsen was unable to perform some of the "important duties of his own occupation"; and (3) whether he met the loss in compensation requirement under the Plan. First, the Court must determine the appropriate standard of review of a denial of benefits under ERISA. The Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is

Case 1:01-cv-01157-CCC    Document 80    Filed 12/12/2002    Page 100 of 119

127 F. Supp. 2d 1021, *1027; 2001 U.S. Dist. LEXIS 331, **17

Page 26
FOCUS

to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989).* Where a plan confers power on the administrator (or fiduciary) to exercise discretion, the appropriate standard of review is the deferential "arbitrary and capricious" one. *Id. at 111-12.* Second (and third), after deciding what level of review to[**18] apply, the Court must determine whether, under the appropriate level of review, Mr. Reinertsen has met the conditions precedent of the Plan, namely whether he is not performing an important function of his job, and whether he meets the 20% reduction in compensation requirement.

## I. The Court Should Apply a De Novo Review of the Plan.

In deciding what level of review to apply (e.g., de novo or arbitrary and [*1028]capricious), the Court reviews the language of the Plan de novo, as it would review the language of any contract. *Mers v. Marriott Intern. Group Accidental Death and Dismemberment Plan, 144 F.3d 1014, 1019-1020 (7th Cir. 1998).* The Seventh Circuit recently held in *Herzberger v. Standard Ins. Co., 205 F.3d 327, 330-331 (7th Cir. 2000),* that the default rule, if a plan does not specify the level of review or is ambiguous, is to be plenary (i.e. de novo review). Considering the importance of "fringe benefits covered by ERISA plans to modern employees," the "conferral of discretion is not to be assumed." *Id. at 331.*

The case sub judice appears to present a case of first impression in the Seventh Circuit, however. While[**19] the Group Policy does not afford discretion -- indeed, it is silent on discretion, thereby implicating the default rule of de novo review -- the SPD unambiguously confers discretion on the plan administrator or fiduciary. Both Plaintiffs and Defendant cite a myriad of cases that they argue support their respective positions concerning the correct level of review. However, as will be explained, each case can be distinguished from the facts of the case at bar, and does not fully address the unique situation present here.

Plaintiffs argue that in *Postma v. Paul Revere Life Ins. Co., 223 F.3d 533, 540 (7th Cir. 2000),* the court, in interpreting virtually identical terms in a Paul Revere disability policy, concluded that the policy did not afford discretion to the Plan administrator. However, in *Postma,* there was no SPD that provided for dis-

cretion. Indeed, Paul Revere does not contend that the Group Policy provides discretion -- it concedes that it is silent -- but it argues that the Group Policy should be considered together with the SPD, which unambiguously does provide for discretion. In support of this position, Paul Revere argues that Plan documents encompass[**20] both the Group Policy and the SPD, and that, read together, it is unequivocally clear that the Plan, as a whole, provides for discretion.

Paul Revere further argues that the Seventh Circuit has reviewed wording in SPDs to determine whether the Plan, as a whole, affords discretion. Paul Revere cites *Wilczynski v. Kemper Nat. Ins. Co., 178 F.3d 933 (7th Cir. 1999)* and *Health Cost Controls of Illinois, Inc. v. Washington, 187 F.3d 703 (7th Cir. 1999),* cert. denied, *528 U.S. 1136, 145 L. Ed. 2d 930, 120 S. Ct. 979 (2000),* for this proposition. n9 But, as Plaintiffs point out, Wilczynski is not entirely favorable to Paul Revere's position. In Wilczynski, the district court applied the arbitrary and capricious standard, citing language from the plan. But, on appeal, the Seventh Circuit noted that the district court had relied on language in the SPD -- not the Plan itself -- in conferring discretion, thereby implying that the district court had used the wrong language. n10 *Wilczynski, 178 F.3d at 934.* While the Seventh Circuit then reviewed the plan language and the SPD, n11 it ultimately decided that it did not need to determine[**21] the appropriate standard of review [*1029] because, as a practical matter, the administrator's termination of benefits was justified even under the less deferential (de novo) standard of review.

n9 Paul Revere also relies on *Mers, supra,* to argue that courts have used language in SPDs to grant discretion to the administrator. But, in Mers, there was no discussion of the language in the underlying policy with respect to granting discretion. Hence, just as *Postma, supra,* only dealt with language in the group policy -- not the SPD --, Mers only deals with language in an SPD -- not the policy. Thus, both cases are distinguishable from the case sub judice, because, here, we are dealing with language in both the Group Policy and SPD -- not just one or the other.

n10 Specifically, Wilczynski states: "The representations of the parties before this Court lead us to believe that the district court was relying on the Summary Plan Description, rather than the Plan itself, to confer discretion. The Plan does not contain the language quoted by the district court nor any comparable language that might justify the arbitrary

Case 1:01-cv-01157-CCC    Document 80    Filed 12/12/2002    Page 101 of 119

127 F. Supp. 2d 1021, *1029; 2001 U.S. Dist. LEXIS 331, **21

Page 27
FOCUS

and capricious standard of review." *Wilczynski, 178 F.3d at 934.*

[**22]

n11 In a footnote, the Seventh Circuit noted that it was not convinced that the SPD language even conferred discretion. See *Wilczynski, 178 F.3d at 934, fn 2.*

Paul Revere argues that the significance of Wilczynski is that the Seventh Circuit reviewed both the language in the SPD and the policy, even though it ultimately decided that it did not need to determine the appropriate level of review. Similarly, as argued by Paul Revere, the court in Health Cost also reviewed an SPD and the underlying policy, even though the court ultimately held that there was no conflict between the relevant provisions. *Health Cost, 187 F.3d at 711-712.* While this Court acknowledges that courts often review the terms in an SPD -- and not just the terms of the group policy -- the pertinent question is what happens when there is a conflict between the provisions.

Plaintiffs concede that the SPD provides for discretion, but argue that this only means that there is a bona fide conflict between the Group Policy, which provides objective terms for determining whether someone[**23] is residually disabled, and the SPD, which affords discretion. Plaintiffs correctly assert that, as a matter of law, when there is a conflict between the policy and the SPD, the terms of the policy govern, unless the participant detrimentally relied on the terms in the SPD (which is not the case here). As stated in *Health Cost, supra, 187 F.3d at 711:*

When . . . the plan and the summary plan description conflict, the former governs, being more complete -- the original, as it were, which the summary plan description excerpts and translates into language that may be imprecise because it is designed to be intelligible to lay persons -- unless the plan participant or beneficiary has reasonably relied on the summary plan description to his detriment.

Furthermore, as pointed out by Plaintiffs, Paul Revere's own SPD explicitly states that "if there are discrepancies among the plan, the Group Policy and this SPD, the Group Policy will control." (Pl.'s Response to Def.'s LR56.1 at P 63.)

While acknowledging the law in the Seventh Circuit concerning conflicts between policies and SPDs, and the wording in its own SPD, Paul Revere vehemently maintains that there[**24] is no conflict in the case sub judice. Rather, Paul Revere argues that silence in one

document (i.e. the Group Policy) does not operate as a contradiction of the expressed terms of another plan document (i.e. the SPD), and largely relies on the Seventh Circuit case, *Mers, supra,* for this proposition. But, in Mers, the court stated the common sense rule that an SPD's silence on an issue does not estop a plan administrator from relying on more detailed policy terms when no direct conflict exists. See *Mers, 144 F.3d at 1024.* Indeed, since an SPD is a summary, it is obvious that the underlying policy would encompass more detail. Here, however, it is the SPD which affords discretion -- in essence, more detail -- and the underlying policy does not. Therefore, Mers' common sense rule does not apply.

In sum, none of the cases mentioned by the parties fully address the precise issue here, where an SPD grants discretion and the Group Policy is silent. However, a case in the Second Circuit (that neither party mentioned) addresses this issue, and provides persuasive authority that the Court should apply de novo review in the case at bar. In *Clark v. Bank of New York, 801 F. Supp. 1182 (S.D. N.Y. 1992),*[**25] the SPD provided for discretion and the group policy was silent. In holding that an SPD cannot expand the plan administrator's authority, the court stated:

Although a plan summary may expand employees' rights when the summary conflicts with the plan itself, no court has found that a plan summary can expand the plan administrator's authority. Although the plan summary states that the plan administrator has authority to interpret the Plan, the Plan itself is [*1030]silent as to the plan administrator's discretionary authority. Because I decline to diminish the rights of plan participants based on the plan summary, especially where the plan summary conflicts with the Plan itself, I find that defendant has failed to prove that the Plan vested [plan administrator] with discretionary authority. Therefore, [plan administrator's] determination that plaintiffs did not qualify under the Plan for severance benefits must be reviewed under a de novo standard of review.

*801 F. Supp. at 1190* (emphasis added). Significantly, the court in Clark, while stating that the Plan itself was "silent" with respect to discretion, nonetheless found a conflict[**26] between the silence of the policy and the affirmative grant of discretion by the SPD -- the exact situation here. Although Paul Revere argues that silence does not mean a conflict per se, this Court finds that, in the context of granting authority to a plan administrator, unless the policy affirmatively grants discretion, then de novo review applies, even if the SPD provides otherwise. This approach is consistent with the

Case 1:01-cv-01157-CCC    Document 80    Filed 12/12/2002    Page 102 of 119

127 F. Supp. 2d 1021, *1030; 2001 U.S. Dist. LEXIS 331, **26

Page 28
FOCUS

Seventh Circuit's rationale in *Herzberger, supra,* which held that, unless the plan affirmatively grants discretion, then the default rule of de novo review applies. While Herzberger did not involve contrary language in an SPD, it made clear that there must be an affirmative grant of discretion in the plan or policy (it even applied safe harbor language). Hence, silence -- and not an affirmative grant -- is, indeed, a conflict with discretionary language in the SPD, and, in the Seventh Circuit (as well as in Paul Revere's own Plan) the Group Policy takes precedence over conflicting language in the SPD (unless the plan participant detrimentally relied on the contrary SPD provision, which is not the case here). Therefore, whether Mr. Reinertsen[**27] qualified for residual disability benefits under Paul Revere's Plan must be reviewed under a de novo standard of review.

## II. Under a De Novo Standard of Review, Mr. Reinertsen Has Not Met Both Condition Precedents of the Plan.

It is the burden of the plan participant, in this case Mr. Reinertsen, to prove that he is entitled to residual disability benefits under the Plan. See *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 179 (7th Cir. 1994). Under the Plan, in order to qualify as residually disabled, Mr. Reinertsen must prove that he is unable to perform the important duties of his own occupation on a full-time basis, but that (1) he is able to perform one or more of the important duties of his own occupation, or any occupation, on a full-time or part-time basis; and (2) he is earning less than 80% of his prior earnings. (Pl.'s SMF P 22.) After a plan participant meets the aforementioned definition, he or she is considered "residually disabled." However, according to the terms of the Group Policy, that individual is not eligible to receive any benefits, until he or she completes the "Elimination Period", n12 which in the case sub judice is 90 days. As [**28]will be explained, while the Court finds that Mr. Reinertsen has satisfactorily proved that he is unable to perform all of the important functions of his job, he has not met, at this time, the loss in earnings requirement.

n12 "Elimination Period" means the length of time that the Employee must be Totally or Residually Disabled before benefits begin. (Def.'s App., Ex. E, Group Policy at PRLSP00411.)

A. Mr. Reinertsen is Not Able to Perform All of the Important Duties of His Occupation.

The Court finds, under its de novo review, that there is ample evidence that Mr. Reinertsen is partially disabled and unable to perform all of the important duties of his occupation as a senior executive. The Court finds Paul Revere's contention that Mr. Reinertsen has been working full-time since 1994, with no decrease in job responsibilities or performance, [*1031] and therefore not partially disabled, to be inconsistent with the evidence in the administrative record. As a preliminary matter (which is interrelated with the present [**29]question concerning evidence of Mr. Reinertsen's partial disability), Paul Revere requests that the Court strike portions of Mr. Reinertsen and Mr. Coffman's n13 declarations in support of Plaintiffs' Motion for Summary Judgment, and also to strike Dr. Stephen Rothke's medical report, which was not before the plan administrator (Paul Revere) when it decided to deny Mr. Reinertsen's claim for disability benefits. For the following reasons, the Court denies Paul Revere's Motion to Strike.

n13 Mr. Coffman is Reid's President.

Paul Revere incorrectly argues that Mr. Reinertsen's declaration attempts to introduce medical/expert testimony regarding his medical condition, for which he is not competent to testify. However, the Court finds that it is proper for Mr. Reinertsen to describe how his work performance has gradually deteriorated since his 1994 stroke and hemorrhage, of which there is no dispute. Mr. Reinertsen's descriptions of his work performance problems are not only relevant to whether he is able to perform[**30] all of the important functions of his job, but also consistent, as will be shown supra, with the medical evidence. Furthermore, the Seventh Circuit has noted that a "witness does not need to be a doctor to discuss his or her health in general terms." *Collins v. Kibort,* 143 F.3d 331, 337 (7th Cir. 1998). Hence, the Court will not strike Mr. Reinertsen's descriptions of work performance problems, such as his complaints of decreased levels of cognitive functioning, reduced memory skills, and other debilitating symptoms.

The Court will also not strike Mr. Coffman's descriptions of Mr. Reinertsen's work deficiencies. Indeed, Dr. Prigatano's neuropsychological report (dated February 23, 1999) n14 -- a report that Paul Revere heavily relies on to argue that Mr. Reinertsen is not residually disabled -- states that Mr. Reinertsen's performance on neurological tests indicated "there are subtle problems in concentration, memory, and difficulty in modulating affect" and significantly, that "the question of his handling his old job responsibilities can only partially be answered by the neurophysiological examina-

127 F. Supp. 2d 1021, *1031; 2001 U.S. Dist. LEXIS 331, **30

Page 29
FOCUS

tion" and that "one would also need documentation from his supervisors[**31] as to whether or not he in fact has shown a progressive decline in his performance that would preclude him from working in an executive position." (Pl.'s Appendix of Evidentiary Materials ("Pl.'s App.), Tab C-1, Prigatano Neuropsychological Report at p. 7.) In other words, Dr. Prigatano explicitly states that there needs to be documentation from supervisors as to whether Mr. Reinertsen can fully perform his job. As such, Plaintiffs submitted the declaration from Mr. Coffman, Reid's President and Mr. Reinertsen's immediate supervisor, who had first-hand knowledge of Mr. Reinertsen's work deficiencies. Indeed, as posited by Plaintiffs, who else but the President of Reid, who was also Mr. Reinertsen's immediate supervisor, would be more qualified to testify about Mr. Reinertsen's deterioration in work performance? n15 Additionally, Mr. Coffman's assertions [*1032]about Mr. Reinertsen, and his gradual performance deterioration, are consistent with Dr. Prigatano's report, which indicated that, although on some aspects Mr. Reinertsen's memory is within the average range, assuming that he was functioning in the "bright-normal range" prior to the 1994 stroke, "average performance may not be normal[**32] for him." (Id.)

n14 Dr. Prigatano's report was submitted to Paul Revere during the appeal process. Hence, this report is properly part of the administrative record.

n15 Besides his declaration in support of Plaintiffs' Motion for Summary Judgment, Mr. Coffman also sent a letter with Mr. Reinertsen's March 1998 application for disability benefits. In this letter, he stated: "It has become increasingly apparent that Mr. Reinertsen's physical and mental health continues to deteriorate as a result of the challenging demands and increasing responsibility of his position as Executive Vice President of Sales. It is my sincere concern that Mr. Reinertsen can not continue to contribute to [Reid's] Sales/Management without severe health consequences. Additionally, we have observed his inability to perform at the level of service required by a member of Senior Management." (Def.'s App., Ex. C, Mr. Coffman's March 9, 1998 letter.) Furthermore, on January 25, 1999 -- during the appeal process -- Mr. Coffman sent another letter to Paul Revere, stating in relevant part: "Due to the aneurysm he experienced in 1994, he [Mr. Reinertsen] has been unable to perform all of the important duties and demands of his occupation on a full time basis. He is, and has been, experiencing short and long term memory loss and

has been absent from the day-to-day operations of our business due to these reoccurring episodes of ill and unstable health. Furthermore, as a member of Senior Management, his inability to process complex information, stay technically current and use good business judgment has been significantly limited. Other [Paul Revere] personnel have had to monitor and support Mr. Reinertsen's efforts because of his inability to perform his job requirements on a full time basis." (Pl.'s App., Tab F, Coffman January 25, 1999 letter.)

[**33]

Furthermore, both Mr. Reinertsen and Mr. Coffman's declarations are entirely consistent with the other evidence before the Court. First, there is no dispute that, in 1998, Mr. Reinertsen was relieved of his responsibilities as Executive Vice-President of Sales for the entire company -- a position where he supervised at least fifteen employees -- and given a position, as Executive Vice-President of Sales -- Western Region -- where he is only responsible for four to six employees. n16

n16 In addition, there is evidence that the sales for 1998 decreased in the Western Region -- when Mr. Reinertsen was in charge of that region -- while the 1998 sales increased for the Eastern Region -- where Mr. Reinertsen was not in charge.

Second, Mr. Reinertsen's attending physician, Dr. Douglas E. Anderson, filled out a form for Mr. Reinertsen's March 1998 application for disability benefits, checking the box indicating that he considered Mr. Reinertsen to be "continuously unable to work in his/her occupation." (Def.'s App., [**34] Ex. C, Physician's Statement of Disability Application.) Significantly, Dr. Anderson also noted that Mr. Reinertsen's present limitations include "decreased memory, decreased attention span." (Id.) Furthermore, in a June 10, 1998 letter to Paul Revere, Dr. Anderson wrote:

It is apparent that this patient has had continuing difficulties since a severe subarachnoid hemorrhage the etiology of which has never been fully documented despite multiple angiograms and MRIs of both the brain and spinal cord. He is partially disabled following this subarachnoid hemorrhage and subsequent episodic retroorbital pain due to a decreased level of cognitive functioning and short term memory skills.

Case 1:01-cv-01137-CCC    Document 80    Filed 12/12/2002    Page 104 of 119

127 F. Supp. 2d 1021, *1032; 2001 U.S. Dist. LEXIS 331, **34

Page 30
FOCUS

(Pl.'s App., Tab D, Anderson June 10, 1998 letter.)

Although Paul Revere did not have its own doctors meet with Mr. Reinertsen, it erroneously concluded that Mr. Reinertsen was fully engaged in his occupational activities and responsibilities, and that there was no evidence that his job responsibilities had diminished. Paul Revere harps on the fact that Mr. Reinertsen has been working sixty hours a week since his 1994 stroke. But, as pointed out by Plaintiffs, the number of hours Mr. [**35] Reinertsen works is irrelevant under the Plan's definition of a residual disability. Indeed, the definition specifically states that an employee may be working full-time and still be residually disabled -- the question is the employee's level of functioning, not the hours he works.

Paul Revere also selectively cites to Dr. Prigatano's report concerning Mr. Reinertsen's level of work performance, claiming that Dr. Prigatano concluded that there was no indication from a neuropsychological assessment that Reinertsen was precluded from performing his occupational duties. This summary of his report is incorrect, as Dr. Prigatano states that, [*1033] while Mr. Reinertsen's" overall performance . . . is average, I do believe there are subtle problems in concentration, memory and difficulty modulating affect." (Pl.'s App., Tab C-1, Prigatano Neuropsychological Report at p. 7.) He also concludes that, while Mr. Reinertsen is not precluded from work, average performance on the neuropsychological tests does not necessarily mean normal performance for this patient. n17 (Id.) Finally, Dr. Prigatano clearly states that, whether Mr. Reinertsen's occupational duties are impaired is a question that would[**36] need to be answered, in part, by his employer, Reid. Therefore, despite Paul Revere's insistence that Mr. Reinertsen is not occupationally impaired, there is abundant evidence that he is, indeed, not performing all of the important functions of his job. n18

n17 While Dr. Prigatano does state that Mr. Reinertsen's cognitive condition "would not preclude him from work," this statement does not mean, as Paul Revere repeatedly contends, that Mr. Reinertsen is not residually disabled. Indeed, being residually disabled means that an individual can work on a full or part-time basis. (If the participant could not work at all, he would be totally disabled -- not residually disabled). Rather, the question is whether there are some important duties that the participant cannot do, despite the participant's working full or part-time.

n18 Plaintiffs and Defendant spend a substantial part of their respective briefs arguing about whether this Court should consider Dr. Steven E. Rothke's medical report dated May 27, 2000. Paul Revere asserts that this report was not provided to it during the ERISA process and, in fact, was not provided to it until over a year after Mr. Reinertsen's claim for disability benefits had been adjudicated. Consequently, according to Paul Revere, this report should be stricken (indeed, it is part of Paul Revere's Motion to Strike) because it was not properly part of the administrative record. Plaintiffs argue that, under a de novo review, the Court may consider evidence outside of the administrative record. While the Court agrees that under de novo review it may consider evidence outside of the administrative record (see *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan, 195 F.3d 975 (7th Cir. 1999)*), it is not necessary in the case at bar. While Dr. Rothke's medical record clearly supports Plaintiffs' claim that Mr. Reinertsen cannot perform all of the important duties of his occupation (indeed, Dr. Rothke's report states that Mr. Reinertsen meets the definition of "Residual Disability" as defined in Paul Revere's Group Policy, and that Reid has already modified Mr. Reinertsen's executive position as much as can be reasonably done to accommodate his reduced neuropsychological capabilities (Pl.'s App., Tab C-2, Rothke May 27, 2000 report at pp. 9-10.)), the Court finds that this conclusion can be inextricably drawn from the abundant evidence already before the Court in the administrative record.

[**37]

B. Nonetheless, Mr. Reinertsen Has Not Met the Earnings Requirement Under the Group Policy.

In order to meet the definition of a residually disabled individual under the Plan, Mr. Reinertsen must prove that he is earning less than 80% of his Prior Earnings. "Prior Earnings" is defined in the Group Policy as the greater of: (1) the Employee's average monthly earnings from all employment for the 12 whole calendar months immediately preceding his last regular day of active Full-time work; or (2) the Employee's highest average monthly earnings from all employment for any period of 2 successive years during the 5 year period immediately preceding his last regular day of active Full-time work. (Def's App., Ex. E, Group Policy at PRLSP00413.) According to Plaintiffs, the only definition in the Group Policy of the term "Earnings" used in "Prior Earnings" is contained in the "General

Case 1:01-cv-01157-CCC    Document 80    Filed 12/12/2002    Page 105 of 119

127 F. Supp. 2d 1021, *1033; 2001 U.S. Dist. LEXIS 331, **37

Page 31
FOCUS

Provisions" section, which states that "Earnings" includes "commissions and productivity incentives," while "bonuses, overtime and other special pay are not" included. (Id. at PRLSP00401.) While this definition of "Earnings" in the "General Provisions" section states that it is for the purpose of determining[**38] an employee's "Total Disability" benefit, there is no other definition of "Earnings" in the General Provisions for determining an employee's residual disability benefit. Accordingly, Plaintiffs argue that this definition, although specifying that it is for [*1034] totally disabled employees, must also apply to residually disabled employees

Paul Revere contends that the unambiguous definition of "Earnings" in the General Provisions section of the Group Policy clearly does not apply to residually disabled individuals, but only to totally disabled individuals. Furthermore, Paul Revere offers an alternative definition, relying on the calculation of "Loss of Earnings" in the "Benefit Calculation for Residual Disability" section of the Group Policy. Since "Loss of Earnings" is calculated by subtracting an employee's "Actual Monthly Residual Earnings" from his or her "Prior Earnings", and "Actual Monthly Residual Earnings" is defined as an employee's "salary, wages, commissions, bonuses, fees, and income earned for services performed" (and does not exclude "special pay") (Def.'s App., Ex. E, Group Policy at PRLSP00413), then, according to Paul Revere, Mr. Reinertsen has not suffered an adequate[**39] loss in earnings as required by the Plan. (See Def.'s Reply Memorandum in Support of Motion for Summary Judgment ("Def.'s Reply") at 11.) Plaintiffs maintain, however, that Paul Revere's definition of "Earnings" (by using the formula for "Loss of Earnings") already assumes that an employee is residually disabled, and is only used to calculate ensuing benefits -- not to determine who meets the definition of a residually disabled employee.

The Court finds that it does not need to resolve which parties' definition of "Earnings" is applicable to the case sub judice, because, assuming the more favorable definition advocated by Plaintiffs, the Court finds that Mr. Reinertsen has still not suffered an "Earnings Loss" within the meaning of the Plan. While Plaintiffs' definition of "Earnings" excludes "special pay", neither the Group Policy nor any policy of Reid defines "special pay." Nonetheless, Plaintiffs argue that "special pay" must encompass the present situation, where an employer pays an employee "loyalty" payments for 20 years of service, even though the employee is partially disabled and only half as productive. Importantly, despite the fact that the burden of proving the[**40] conditions

precedent under the Plan is on Plaintiffs, Reid has no written policy describing this unique arrangement, and there is no evidence that Reid has ever contemplated providing "special pay" or "loyalty" payments to other employees. Furthermore, as pointed out by Paul Revere, Plaintiffs never stated when this arrangement of "special pay" began. n19 As explained in the Group Policy, once an employee meets the definition of a residually disabled individual, that employee must wait the time period set forth in the "Elimination Period," -- which in this case is 90 days -- before receiving benefits. n20 [*1035] Since Mr. Reinertsen never provided a date when "special pay" began (and it is his burden to provide such information), Paul Revere cannot determine the beginning and end of the "Elimination Period."

n19 Plaintiffs argue that, because Paul Revere failed to apprize Plaintiffs that "special pay" is considered "earnings" under the Plan, Paul Revere is, essentially, estopped from denying Mr. Reinertsen's claim on the basis that he did not satisfy the requisite loss of earnings in excess of 20%. In a May 9, 1998 letter, however, Paul Revere specifically requested more information from Mr. Reinertsen concerning the date on which he was first claiming Residual Disability, and payroll records describing his earnings from 1994 to 1998. (Def.'s App., Ex. C, May 9, 1998 letter at PRLCL00075.) Furthermore, the administrative record is replete with letters from Paul Revere, repeatedly advising Plaintiffs that Mr. Reinertsen had not demonstrated a greater than 20% loss in earnings, and had not provided it with any payroll or other financial information which could potentially establish the loss in earnings requirement. Therefore, the Court finds that Paul Revere is not estopped from asserting that Mr. Reinertsen has not met the earnings requirement, or that special pay is considered earnings.

[**41]

n20 Furthermore, according to the Group Policy, an employee who meets the definition of a residually disabled individual must also be receiving "Doctor's Care", which is defined as the "regular and personal care of a Doctor that, under prevailing medical standards, is appropriate for the condition causing the Disability" (Def.'s App., Ex. E, Group Policy at PRLSP00401.) While Paul Revere claims, as another reason to deny benefits, that Mr. Reinertsen is not receiving "Doctor's Care", the Court finds, after reviewing the administrative record, that Mr. Reinertsen has diligently followed his physicians' instructions. Furthermore, the Court finds it in-

Case 1:01-cv-01157-CCC   Document 86   Filed 12/12/2002   Page 106 of 119

127 F. Supp. 2d 1021, *1035; 2001 U.S. Dist. LEXIS 331, **41

Page 32
FOCUS

credible that Paul Revere could conclude that Mr. Reinertsen is not receiving "Doctor's Care" -- which implicates "prevailing medical standards' -- when Paul Revere never had any of its own medical professionals evaluate Mr. Reinertsen.

In any event, while the Court finds it laudable that Reid has been so devoted to Mr. Reinertsen by providing him full salary for half the work, the incontrovertible fact is that, between 1994 and 1999, Mr. Reinertsen's[**42] salary has remained constant at $ 94,999.92. (Pl.'s App., Tab A, 1, Reinertsen's Declaration.) n21 In a January 25, 1999 letter to Paul Revere, Mr. Coffman, Reid's President, admitted as much, writing that Reid "has not reduced Mr. Reinertsen's compensation in consideration of his longevity with the company and the adverse affect that reduced compensation would have on him and his family." (Def.'s App., Ex. C, Coffman Jan. 25, 1999 letter at PRLCL00314.) To the Court, and apparently to Paul Revere, it is irrelevant why Reid is paying Mr. Reinertsen's full salary. The underlying purpose of the Plan is to compensate partially disabled employees who are working, but not realizing as much compensation. If Mr. Reinertsen is realizing as much compensation as before his illness, it is irrelevant that he is truly only "earning" 50%, as Reid contends. If "special pay" is defined, as Plaintiffs argue it should be, to encompass loyalty payments (even though Reid has no written policy describing loyalty payments or special pay), then any employer and employee could frustrate the loss in earnings requirement under the Plan.

n21 His salary is not his total compensation, however, because Mr. Reinertsen also received substantial commissions and bonuses. His total compensation for 1994 was $ 146,222.49; for 1995 was $ 163,563.62; for 1996 was $ 170,517.37; for 1997 was $ 182,443.66; for 1998 was $ 186,522.86; and for 1999 was $ 179,100.78. (Pl.'s App., Tab A,1, Reinertsen's Declaration.) Under the definition of "Earnings" advocated by Plaintiffs, "Earnings" would include his salary and commissions, but not his bonus or "special pay."

[**43]

Significantly, however, this does not mean that, at a later time, Mr. Reinertsen would not qualify as a residu-

ally disabled individual under the Plan. In other words, once Mr. Reinertsen meets the loss in earnings requirement, and then waits 90 days (the Elimination Period), he will likely qualify for residual benefits under the Plan. In this regard, the Court has already found, under its de novo review of the current administrative record, that Mr. Reinertsen is not performing some of the important functions of his job. It appears that the only obstacle remaining, therefore, is the loss in earnings requirement in excess of 20%.

CONCLUSION

For the reasons set forth above, the Court grants Defendant's Motion for Summary Judgment, and denies Plaintiffs' Motion for Summary Judgment. Accordingly,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment be, and the same hereby is, DENIED.

Dated: January 12, 2001

ENTER:

ARLANDER KEYS

United States Magistrate Judge

JUDGMENT IN A CIVIL CASE

Decision by Court. This action came to hearing before[**44] the Court. The issues have been heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment be, and the same hereby is, DENIED.

Date: 1/12/2001

29TH CASE of Focus printed in FULL format.

CATHERINE B. REDDEN, Plaintiff, v. UNUM LIFE INSURANCE COMPANY OF AMERICA,
Defendant.

Civil Action No. 97-656 MMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2000 U.S. Dist. LEXIS 996

January 7, 2000, Argued
January 18, 2000, Decided

NOTICE:

[*1]  FOR ELECTRONIC PUBLICATION ONLY

DISPOSITION: Summary judgment granted in favor of UNUM.

CASE SUMMARY

PROCEDURAL POSTURE:  Defendant filed motion for summary judgment on plaintiff's claim for long term disability insurance, asserting under Employee Retirement Income Security Act, *29 U.S.C.S. § 1132*(a)(1)(B), the standard of review on the denial was arbitrary and capricious, and in any event, plaintiff failed to prove disability during entire elimination period.

OVERVIEW:  After denial of claim for long term disability benefits, plaintiff sued.  Defendant requested summary judgment, asserting the standard of review under the Employee Retirement Income Security Act, *29 U.S.C.S. § 1132*(a)(1)(B), was arbitrary and capricious, not de novo, and in any event, plaintiff failed to prove disability during entire elimination period.  The court found plaintiff could only receive benefits under the policy if she proved that she was "disabled" for an "elimination period," from August 6, 1996 through January 7, 1997. Because the policy did not imply discretionary authority, or was at least ambiguous as to whether it impliedly granted defendant discretionary authority, the court reviewed the denial de novo. Plaintiff did not establish she was disabled during the entire time.  As to plaintiff's bookend theory, being disabled on two respective dates, without more, did not mean she was disabled on every day between.  Summary judgment was granted to defendant.

OUTCOME:  Summary judgment was granted to defendant. The court reviewed defendant's decision de novo because the policy did not imply discretionary authority to defendant, or was at least ambiguous on whether it impliedly granted defendant discretionary authority. Plaintiff failed to prove, however, that she was entitled to long term disability benefits.

CORE TERMS:  disabled, elimination, discretionary authority, disability benefits, disability, occupation, administrator, duty, continuously, short term, standard of review, summary judgment, unable to work, de novo, regular, ambiguous, vests, time period, insured, favorable, arbitrary and capricious, burden of proving, claim form, tenderness, functional, part-time, claimant, bookend, exam, lift

CORE CONCEPTS -

COUNSEL: James F. Bailey, Jr., Esquire, Bailey & Wetzel, P.A., Wilmington, Delaware, for plaintiff.

Laurence V. Cronin, Esquire, Smith, Katzenstein & Furlow LLP, Wilmington, Delaware, for defendant.

JUDGES: Murray M. Schwartz, Senior District Judge.

OPINIONBY: Murray M. Schwartz

OPINION: MEMORANDUM OPINION

Argued: January 7, 2000
Dated: January 18, 2000

Murray M. Schwartz
Senior District Judge

I. INTRODUCTION

On November 10, 1997, Plaintiff Catherine B. Redden

filed a complaint in the Superior Court in New Castle County, Delaware, seeking a declaratory judgment entitling her to short term disability benefits from Defendant UNUM Life Insurance Company of America ("UNUM"). Prior to service of the complaint, on November 12, 1997, Redden filed an amended complaint alleging entitlement to long term disability benefits instead of short term disability benefits. On December 15, 1997, UNUM removed the case to this Court, pursuant to 28 U.S.C. § 1441(b), on the basis that Redden was seeking benefits under a disability policy governed by the Employee Retirement Income Security Act[*2] ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). The Court stayed this action several times to allow Redden time to exhaust her administrative remedies. During the stays, UNUM repeatedly denied Redden long term disability benefits. On April 27, 1999, after Redden had exhausted her administrative remedies, the Court lifted the stay. Discovery was completed by August 27, 1999.

On September 10, 1999, UNUM filed a motion for summary judgment. UNUM argues that the Court should examine UNUM's decision to deny Redden long term disability benefits under an arbitrary and capricious standard, rather than de novo review. In addition, UNUM contends that, regardless of the standard of review, UNUM's decision to deny benefits to Redden was correct because Redden failed to fulfill her burden of proving she was disabled for the entire elimination period in the policy. For the reasons discussed below, the Court reviews UNUM's decision de novo but holds that Redden has failed to prove that she is entitled to long term disability benefits.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment should be granted if, on the record, there is no genuine issue of material fact and the moving[*3] party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231, 234 (3d Cir. 1999); Fed. R. Civ. P. 56. In considering a motion for summary judgment, the Court views the record and inferences therefrom in the light most favorable to Redden, the non-moving party. See Showalter, 190 F.3d at 234.

## III. FACTS

On May 8, 1995, Redden, then employed by Provident Mutual Insurance Company, was injured when her car was struck from the rear by another car. After missing about three months from work while receiv-

ing medical treatment, she returned to her position at Provident Mutual. She continued to work for approximately six months but missed some time due to the continuing effects of her injuries. Redden last worked at Provident Mutual on August 5, 1996. Since that time she has been out of work, complaining that she has been unable to work due to "neck and low back pain" and "chronic pain/depression from auto accident." Affidavit of Stella M. Frohlin, D.I. 18, A-185. n1 On May 5, 1997, Redden was involved [*4]in another automobile collision, which resulted in a worsening of her symptoms. A-322.

n1 For the remainder of this opinion, this affidavit is referred to simply by its page numbers, A-xxx.

While employed by Provident Mutual, Redden was covered by a long term disability insurance policy (the "Policy") administered by UNUM. Under the terms of the Policy, Redden ceased to be covered by the policy on August 6, 1996, when she terminated active employment with Provident Mutual. Redden can only receive long term disability benefits under the Policy if she can prove that she was "disabled" for an "elimination period" of 154 consecutive days from August 6, 1996 through January 7, 1997. The Policy defines "disabled" as:

1. the insured cannot perform each of the material duties of his regular occupation; and

2. after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education or experience. [*5]

On November 12, 1997, Redden filed the amended complaint alleging entitlement to long term disability benefits instead of short term disability benefits. n2 On December 15, 1997, UNUM removed the case to this Court. On January 28, 1998, the Court stayed the case so that Redden could pursue her remedy internally with UNUM. On May 4, 1998, Redden filed a claim with UNUM for long term disability benefits under the Policy. A-182. On October 23, 1998, UNUM denied the claim, relying in part on the record from the denial of short term disability benefits. A-325. On November 23, 1998, Redden filed an internal appeal of the denial of long term disability benefits, which was denied on February 15, 1999. A-328, 331. On April 27, 1999, the Court lifted the stay.



n2 Redden had previously filed a claim with UNUM for short term disability benefits on August 16, 1996, which was denied on November 27, 1996. A-079. Redden had also filed internal appeals of that decision on December 6, 1996 and again on April 8, 1997, which were both denied. A-084, 104, 117, 127. On November 10, 1997, Redden filed the complaint seeking a declaratory judgment entitling her to short term disability benefits from UNUM.

[*6]

The pertinent facts underlying Redden's injuries, treatment and alleged disability are fleshed out in the Discussion.

IV. DISCUSSION

ERISA, *29 U.S.C. § 1132*(a)(1)(B), requires this Court to review UNUM's denial of long term disability benefits to Redden. See *Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437 (3d Cir. 1997)*. First, the Court must determine whether to review UNUM's decision under an arbitrary and capricious or a de novo standard of review. See id. Next, the Court must apply that standard of review to analyze whether, resolving all factual disputes in favor of Redden, UNUM was correct in denying Redden benefits. See id.

A. Standard of Review

ERISA does not explicitly set forth a standard of review for actions brought under *29 U.S.C. § 1132*(a)(1)(B). See id. However, in *Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989)*, the Supreme Court held the Court should review plan determinations de novo unless the plan vests the administrator with discretionary authority to determine eligibility for benefits. See *Mitchell, 113 F.3d at 437*[*7] (citing *Bruch, 489 U.S. at 115*). Where the administrator has discretionary authority, the court should apply an arbitrary and capricious standard and only overturn the administrator's decision if it was unreasonable. See id. (citing *Bruch, 489 U.S. at 114*).

In determining whether a plan grants discretion to the administrator, the Court focuses primarily on the text of the plan. See *Heasley v. Belden & Blake Corp, 2 F.3d 1249, 1258 (3d Cir. 1993)*. The plan need not contain explicit language granting discretionary authority to the administrator. See *Luby v. Teamsters Health, Welfare, and Pension Trust Funds, 944 F.2d 1176, 1180 (3d Cir. 1991)*. The grant of discretionary authority may also be

implied by the plan. See id. However, if the plan is ambiguous as to whether the administrator has discretionary authority, then, under the doctrine of contra profentum, the Court exercises de novo review. See *Heasley, 2 F.3d at 1258*.

The parties agree and the Court concurs that the Policy does not expressly grant UNUM discretionary authority. UNUM makes two arguments as to why the Policy implies that UNUM[*8] has discretionary authority. First, UNUM argues that the Policy grants it discretion because the Policy requires that the claimant provide proof that he has been disabled n3 for the entire elimination period. n4 The Policy requires that "proof of claim must be given to" UNUM and must cover:

i. the date the disability started;

ii. the cause of the disability; and

iii. how serious the disability is.

Policy § VI.F. UNUM argues that requiring this proof of a claim impliedly vests UNUM with discretion over granting or denying benefits.

n3 As previously rehearsed, the Policy defines "disabled" as:
1. the insured cannot perform each of the material duties of his regular occupation; and
2. after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education or experience.
Policy § II.
n4 In Redden's case, the Policy defines "elimination period" as "a period of [154] consecutive days of disability. . . beginning on the first day of disability." Policy §§ I, II.

[*9]

However, merely requiring a claimant to prove that she is disabled does not invest the administrator with discretionary authority over the plan. See *McBride v. Continental Cas. Co., 1999 U.S. Dist. LEXIS 6782, 1999 WL 301811*, at *4 (E.D.Pa. 1999). A requirement of proof only implies discretionary authority if some discretionary level of proof is required. See *Landau v. Reliance Std. Life Ins. Co., 1999 U.S. Dist. LEXIS 279, 1999 WL 46585*, at *3 (E.D.Pa. 1999) (citing *Pinto v. Reliance Std. Life Ins. Co., 156 F.3d 1225 (3d*



Cir. 1996)) (plan that requires "substantial proof" of a claim vests the administrator with discretionary authority); *Nolen v. Paul Revere Life Ins. Co., 32 F. Supp. 2d 211, 215 (E.D.Pa. 1998)* (plan that requires "proof satisfactory to" the administrator vests the administrator with discretionary authority). Unlike the plans in Landau and Nolen, the UNUM Policy does not contain any delineation of a discretionary quantum of required proof. Therefore, at the very least, the proof term of the Policy is ambiguous as to whether UNUM has discretionary authority.

Second, UNUM contends that the Policy implies discretionary authority because it allows UNUM the "right[*10] and opportunity" to have its own physician examine the claimant. n5 However, other courts have interpreted similar language to not imply discretionary authority. See *Cannon v. The Vanguard Group, Inc., 1998 U.S. Dist. LEXIS 8624, 1998 WL 310663,* at *2-3 (E.D.Pa. 1998). Likewise, this language is, at best, ambiguous as to whether it grants UNUM discretionary authority.

n5 This provision provides that UNUM:
at its own expense, will have the right and opportunity to have an employee/career agent, whose injury or sickness is the basis of a claim, examined by a physician or vocational expert of its choice. This right may be used as often as reasonably required. Policy § VI.G.

Because the Policy does not imply discretionary authority or is at least ambiguous as to whether it impliedly grants UNUM discretionary authority, the Court will review de novo UNUM's denial of benefits to Redden. This standard of review applies equally to UNUM's interpretation of the Policy and to its factual determinations. See *Luby, 944 F.2d at 1183-84.*[*11]

B. Review of UNUM's Decision

The parties do not dispute UNUM's interpretation of the Policy. The parties agree that Redden has the burden of proving that she was totally disabled continuously for the entire 154 day elimination period. The elimination period spans August 6, 1996 through January 7, 1997. The pivotal issue then becomes whether Redden has proven that she could not "perform each of the material duties of her occupation" continuously during the entire elimination period. The Court reviews de novo all of the evidence in the record.

The Court first evaluates the evidence of disability from August 6, 1996 through October 7, 1996. There is documentary evidence indicating Redden was disabled continuously during this time period. According to Craig Sternberg, M.D., a physiatrist, Redden became unable to work due to her physical injuries on August 6, 1996. A-032. Dr. Sternberg placed her out of work continuously from that date through September 16, 1996, at which point he returned her to work status. A-195. However, Dr. Sternberg asserts that, subsequent to that date, Redden was under the care of her family physician, Ronald Goodman, D.O. n6 Id. The record contains[*12] two "out of work" slips placing her out of work from September 11, 1996 through October 7, 1996. A-152-153. Although the slips appear to originate from one of Dr. Goodman's offices, the Court cannot discern the identity of the doctor who signed the slips. Id. Nonetheless, this evidence provides some support that Redden was disabled continuously from August 6, 1996 through October 7, 1996.

n6 In fact, Dr. Sternberg examined Redden on January 2, 1997, January, 15, 1997, and January 24, 1997, but did not make any finding about her past, present, or future ability to work in her occupation. See A-132-133; B-3-4; A-138-139.

In contrast, the record also contains some evidence that she was not disabled continuously during this time period. First, in a Physician Statement, dated March 24, 1998, Dr. Goodman states he did not first examine Redden until October 11, 1996, after Dr. Sternberg returned her to work on September 16, 1996. A-276. On September 24, 1996, Norman H. Eckbold, M.D., a physician for another[*13] insurance carrier, reported that Redden "has subjective complaints with no objective orthopedic or neurologic functional deficits referable to the spine or extremities." A-159. He also concluded that Redden's "subjective complaints at this time are not compatible with the physical examination in which I found no objective functional deficits referable to the spine or extremities." Id. Dr. Eckbold cleared Redden to "return to work without restrictions" based on the finding that she had "no objective functional defects." A-159.

Also, on September 13, 1996, Redden saw Robert B. Townsend, M.D., a neurologist to whom she was referred by Dr. Sternberg. A-164-166. Dr. Townsend performed a physical examination and a neurological examination and ordered an electromyogram (EMG). Id. In a report dated October 10, 1996, Dr. Townsend con-

cluded "I find no evidence at this time for a nerve or nerve root injury." Id. In the cervical exam, he noted that she had decreased range of motion, no paraspinous muscle spasm, and "tenderness everywhere, according to the patient." Id. In the lower back exam, Dr. Townsend noted that she had a diminished range of motion, "diffuse claims of tenderness,[*14] " a "negative straight leg raise, negative flip test" and "no sciatic notch tenderness." Id. In the neurological exam, he concluded that "sensory examination was within normal limits to pin prick, light touch, vibratory, proprioceptive and temperature sensations." Id. Also, the EMG report showed "Normal study. No electrodiagnostic evidence of a neuropathic or myopathic process is seen." A-163. Dr. Townsend concluded that, "I see no reason why Ms. Redden couldn't work at a light duty job at this time." A-166. Moreover, on October 28, 1996, Dr. Eckbold reviewed Dr. Townsend's report, and reached the same conclusion as he had in his September 24, 1996 report. A-170.

From the above recitation, it is obvious there is conflicting evidence as to whether Redden was disabled from August 6, 1996 through October 7, 1996. For purposes of summary judgment, the Court will resolve all factual disputes in favor of Redden, and concludes that she has proven she was disabled continuously for this portion of the elimination period.

However, the same cannot be said for the remainder of the elimination period. There is nothing in the record to establish that Redden was disabled from October 8, 1996 through[*15] January 7, 1997. In fact, the evidence supports a conclusion Redden was not disabled during this entire period. First, although there is evidence in the record that Redden visited Dr. Goodman for treatment on October 11, 1996, October 18, 1996, and November 1, 1996, there is nothing in the evidentiary record that Dr. Goodman made a medical diagnosis, provided treatment, or declared her unable to work during these visits. A-174.

Second, on December 3, 1996, Dr. Goodman excused Redden "for 1/2 day of work" from December 3, 1996 through December 16, 1996. A-175. Redden urges that this excuse slip, authorizing work for only half days during this time period, establishes that Redden was "disabled" within the meaning of the policy. The Court disagrees. The Policy defines "disabled" as being unable to "perform each of the material duties of [the] regular occupation." Policy § II. But, the Policy also defines "partially disabled" as being able to perform "at least one of the material duties of [the] regular occupation on a part-time or full-time basis." Id. Reading these two

provisions together, the term "disabled" means being unable to perform all of the duties of the occupation[*16] on a full-time basis. If a person is able to perform any of the material duties of the occupation on at least a part-time basis then the person will only be "partially disabled." Viewing Dr. Goodman's excuse slip in the light most favorable to Redden, it states that Redden can work at her regular occupation on a part-time basis. It follows, this excuse slip is evidence that Redden was not "disabled" for this two week period during the elimination period.

There is no other contemporaneous evidence in the record of any medical diagnosis or treatment from October 8, 1996 through January 7, 1997. Viewing the evidence in the light most favorable to Redden, she has failed to carry her burden of proof that she was "disabled," within the meaning of the Policy, for the latter portion of the elimination period.

To counter the conclusion that she was disabled for the entire elimination period, Redden relies on three documents not contemporaneous to the elimination period. First, she points to a letter written by Dr. Sternberg to Dr. Goodman on January 15, 1997, after the end of the elimination period. Plaintiff's Appendix, D.I. 22, B-3-4. n7 In that letter, Dr. Sternberg states that since he[*17] last saw Redden and returned her to work on September 16, 1996, "she apparently was placed again out of work and has not yet returned back to work yet." Id. This statement provides no evidence that any physician actually found Redden unable to work continuously from September 16, 1996 through January 7, 1997. Moreover, Redden has pointed to nothing in the record, other than that already discussed, that she was placed out of work during this time period. Therefore, this statement by Dr. Sternberg fails to support Redden's claim of disability during the entire elimination period.

n7 Referred to simply by its page numbers, B-x.

Next, Redden relies on a report made by Sheerin Javed, M.D., on June 29, 1998. B-5-6. This medical opinion is completely irrelevant to whether Redden was disabled during the elimination period because it was made one and half years after the elimination period ended and after Redden had suffered injuries in a second motor vehicle accident on May 5, 1997. A-287. Even if this report were [*18]relevant it does not demonstrate that Redden was disabled. Based only on this single visit, Dr. Javed concluded that Redden may have chronic pain syndrome and does not have fibromyalgia.



Id. Dr. Javed also recommended that Redden could not lift more than 15-20 pounds or stand for more than 3-4 hours per day and should not stoop, bend, stretch, or lift for more than 4-6 hours per day. Id. However, Redden's position required her to sit for 6 hours per day, walk and stand for 2 hours per day, and did not require her to push, pull, lift, or carry. A-105. Therefore, even if Dr. Javed's report were relevant, it fails to support her being unable to "perform each of the material duties" of her occupation.

Finally, Redden attempts to find support for her disability in a State of Delaware disability claim form filled out by Dr. Goodman on January 28, 1997. B-7. In that report, Dr. Goodman states that Redden is unable to work in her usual occupation and will continue to be unable to work for a period of five months. Id. Redden argues that this document, together with evidence of her disability from August 6, 1996 through October 7, 1996, serve as bookends. Redden's contention is[*19] that since she was found disabled on October 7, 1996, and since Dr. Goodman found her disabled again on January 28, 1997, she must have been disabled continuously between those two dates.

This bookend theory has two major fallacies. First, being disabled on the respective dates, without more, does not mean that she was disabled on every day between October 7, 1996 and January 28, 1997. Second, the claim form does not support the bookend theory. On the form, Dr. Goodman fails to comment on Redden's ability to work during the previous months that constituted the elimination period. Moreover, Redden has pointed to no other evidence in the record to support her contention. It follows, the disability claim form fails to support Redden's claim that she was disabled during the entire elimination period.

In conclusion, Redden failed to adduce evidence to satisfy her burden of proving that she was continuously disabled during the entire elimination period from August 6, 1996 through January 7, 1997. Since there are no genuine issues of material fact, and Redden has not met her burden, summary judgment will be granted in favor of UNUM. The Court will enter an order granting UNUM's motion for[*20] summary judgment.

57TH CASE of Focus printed in FULL format.

CARL J. CINI, Plaintiff, v. THE PAUL REVERE LIFE INSURANCE COMPANY Defendant.
CIVIL ACTION NO. 98-1701
UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA
50 F. Supp. 2d 419; 1999 U.S. Dist. LEXIS 8361

June 7, 1999, Decided
June 8, 1999, Filed

**DISPOSITION:** [**1] Defendant The Paul Revere Life Insurance Company's motion for summary judgment GRANTED and JUDGMENT ENTERED in favor of The Paul Revere Life Insurance Company and against Carl J. Cini.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Defendant insurance company filed a motion for summary judgment in plaintiff employee's action for wrongful denial of residual long term disability benefits under the Employee Retirement Security Act of 1974, *29 U.S.C.S. § 1001* et seq.

**OVERVIEW:** Plaintiff employee filed for residual long term disability benefits for a spinal problem that made it difficult for him to sit for long periods of time. Plaintiff's position with his employer necessitated that plaintiff do much bookwork and required him to sit. Plaintiff got into an accident and was out of work over 90 days which was the required elimination period during which plaintiff was supposed to be totally disabled from his own occupation to receive benefits. However, plaintiff's doctors had not required that he be off work for 90 days, but had, in fact, cleared him for a return to work before the 90 day period was up. Therefore, defendant insurance company denied plaintiff's request for benefits. The court ruled in favor of defendant, holding that defendant's third-party review of the records, plus defendant's exceptional re-opening of the case to consider new materials submitted by plaintiff, showed a good faith effort and a lack of arbitrariness and capriciousness in the decision making process. Therefore, summary judgment was granted to defendant.

**OUTCOME:** Defendant insurance company's motion for summary judgment was granted because, given the third-party review and re-opening of the case, defendant's decision was neither arbitrary nor capricious and the denial of benefits to plaintiff employee was supported by substantial evidence.

**CORE TERMS:** clavicle, fracture, fibromyalgia, pain, x-ray, arbitrary and capricious, spondylolisthesis, elimination, healing, administrator, diagnosis, callus, summary judgment, fractured, matter of law, totally disabled, impairment, part-time, disabling, duties, disability benefits, plan administrator, partially disabled, returning to work, clarification, recommended, clinically, aerobic, mild, genuine issue of material fact

**CORE CONCEPTS -**

**COUNSEL:** For CARL J. CINI, PLAINTIFF: JOHN F. CORDISCO, CORDISCO AND BRADWAY, BRISTOL, PA USA.

For PAUL REVERE LIFE INSURANCE COMPANY, DEFENDANT: ANDREW F. SUSKO, ELIZABETH A. (CROKE) VENDITTA, WHITE AND WILLIAMS, PHILA, PA USA.

**JUDGES:** LOWELL A. REED, JR., J.

**OPINIONBY:** LOWELL A. REED, JR.

**OPINION:** [*420] MEMORANDUM

Reed, J.

June 7, 1999

Plaintiff Carl J. Cini ("Cini") initially filed suit in the Court of Common Pleas of Philadelphia County against the Paul Revere Insurance Company ("Paul Revere") alleging that Paul Revere wrongfully denied his claim for residual long term disability benefits under a group disability insurance policy. Paul Revere removed the action to this Court pursuant to federal question jurisdiction under the federal Employee Retirement Insurance Security Act of 1974, *29 U.S.C. § 1001*, et seq., as amended ("ERISA"). Presently before the Court is the motion of Paul Revere for summary judgment (Document No. 14) and response of plaintiff Cini and the reply of Paul Revere thereto. [**2] Jurisdiction is proper pursuant to *28 U.S.C. § 1331*. For the reasons set forth below, the motion will be granted.

50 F. Supp. 2d 419, *420; 1999 U.S. Dist. LEXIS 8361, **2

Page 69
FOCUS

## I. Background n1

n1 The facts in this memorandum are either not in dispute or were in the files of Paul Revere at the time Paul Revere evaluated and denied Cini's claim.

Cini is an account manager for Fishers Ambulance Service. According to his employer, Cini is the coordinator of all paperwork generated daily by the company. Each day Cini makes sure all the work is turned in and recorded. Cini also keeps a record log of all completed work. Not only is Cini the primary quality control person but he also is in charge of distributing paperwork to various billing staff to process and maintains contact with the various facilities and customers with which his employer deals. Cini's duties include filing, dispatching, personnel evaluations and all the statistical analysis required by the company and its customers. Cini's duties also require him to work on a computer. (Appendix of the Motion[**3] for Summary Judgment of Defendant, Paul Revere Life Insurance Company, ("Def. App.") at 57).

The genesis of this lawsuit began in January of 1997, when Cini made a claim against Paul Revere for residual long term disability benefits. The claim presented a primary diagnosis as spondylolisthesis, a condition which Cini had since 1963 and with which he had been working 20 hours per week as of December 16, 1996, and a secondary diagnosis of fibromyalgia. n2 Under the terms of the policy, there is a 90 day non-payable elimination period, which is the "length of time that the employee must wait before benefits [*421] begin" and "during this elimination period, you must be totally disabled from your own occupation." (Def. App. at 255, 267). On February 6, 1997, Cini's claim was denied because Cini's Statement for partial or residual disability benefits only indicated a reduction in hours and, therefore, Cini had not met the 90 day elimination period.

n2 Spondylolisthesis is the forward displacement of one vertebra over another, usually of the fifth lumbar over the body over the body of the sacrum, or the fourth lumbar over the fifth, usually due to a developmental defect in the pars interarticularis. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1563 (28th ed. 1994). Spondylolysis is the dissolution of a vertebra. Id.

Fibromyalgia was not defined. See id. However, myalgia is pain in a muscle or muscles. Id. at 1085. Fibro relates to fibers. Id. at 627. Thus, it can be inferred that fibromyalgia is pain in fibromuscular tissue. See id. at 628, 1095 (defining myositis as the inflammation of a voluntary muscle and fibromyositis as the inflammation of fibromuscular tissue.).

[**4]

In response to the denial, Cini informed Paul Revere that he had had an accident on September 1, 1996, and was out of work thereafter until December 16, 1996. Thereafter, Paul Revere received a corroborating correspondence from Cini's employer, informing it that Cini had been accidentally injured on September 1, 1996, and out from work from September 2nd until December 6th and had been working part-time since his return on December 16th. (Def. App. at 39). Paul Revere then informed Cini that under the circumstances, his claim would be reconsidered.

On March 20, 1997, Paul Revere sent Cini's claim to Michael Theerman, M.D., for an independent review. On April 9th, Paul Revere denied Cini's claim for failure to meet the elimination period. On June 19th, Cini appealed the denial. Paul Revere sent Cini's claim file to Marvin Goldstein, M.D., for an independent review. On August 16th, Paul Revere again denied Cini's claim because his doctor had recommended that he return to work prior to the end of the elimination period. After some administrative confusion, Paul Revere re-opened the administrative record again for reconsideration of Cini's claim. Again, Paul Revere sent the augmented[**5] medical record to Goldstein for review and again Paul Revere denied Cini's claim because he failed to meet his burden of proving total disability during the ninety day elimination period beginning September 2, 1996.

The medical records available and reviewed by Paul Revere show that Cini suffered from spondylolisthesis since 1963. (Def. App. at 6). He has a long history of chronic low back pain. Over the last several years, however, his back was causing Cini more pain. In particular, his doctor noted that prolonged sitting was causing Cini problems. (Id. at 32).

On September 1, 1996, Cini fell from a horse and fractured his right clavicle (the collar bone). (Def. App. at 33). On September 3rd, Cini saw Dane Wukich, M.D., an orthopedist, for treatment of his fractured clavicle. (Cini's family physician, Joseph O'Neill, M.D., referred Cini to Wukich.) On an October 17th follow-

Case 1:01-cv-01157-CCC    Document 80    Filed 12/12/2002    Page 115 of 119

50 F. Supp. 2d 419, *421; 1999 U.S. Dist. LEXIS 8361, **5

Page 70
FOCUS

up visit, Cini's clavicle was x-rayed. The x-ray showed no callus formation. (Def. App. at 26). Office notes from the visit also indicate that Cini had less motion and tenderness at the fracture site. (Def. App. at 34).

Wukich's office notes also reflect that Cini was experiencing increased back pain. [**6] Wukich noted that in the last seven to eight years Cini had gained a significant amount of weight and that "a weight reduction program would, in all likelihood, help his back pain to a great degree." (Def. App. at 31, 32). Nevertheless, Wukich ordered an MRI. The results of an October 30th MRI showed a bilateral spondylolysis and Grade I spondylolisthesis in his lower back. However, this condition had not changed since the previous study done a year earlier. (Def. App. at 28). There was no compression fracture or degenerative disk disease. (Id.). The apophyseal joints were normal and the bony pelvis and hips were intact. (Id.).

Wukich saw Cini again on in November of 1996. In a letter to O'Neill dated November 26th, Wukich noted that Cini's pain was "definitely less" but that the x-ray of Cini's clavicle showed there was "no significant healing." (Def. App. at 36). Nevertheless, Wukich stated that "clinically I know that it is healing." n3 (Id.). Wukich [*422] stated that he explained to Cini that his spondylolisthesis was rather mild and that "a fair number of people have it without being symptomatic." (Id.). Finally, Wukich wrote that "[Cini] also feels that he is unable[**7] to work full time 40 hours per week. I've asked him to talk to work about considering four hours per day. He'll get back to us with that." (Id.).

n3 Wukich saw Cini again on January 9, 1997. On examination, there was no longer any tenderness at the fracture site. X-rays showed satisfactory position and alignment. Although there was still no radiographic sign of healing, Wukich concluded that as of January 9th, the clavicle had "gone to a clinical union." (Def. App. at 81, 119). An x-ray taken May 22, 1997, showed that the fracture had healed.

Wukich then referred Cini to Robert Moidel, M.D., a rheumatologist, for his back problems. Moidel saw Cini for the first time on December 12, 1996. His initial impression was that Cini "probably has fibromyalgia which is mainly affecting his back area." (Def. App. at 124). Moidel recommended that Cini do low impact aerobic exercises. In a follow-up letter to Cini's attorney dated June 13, 1997, Moidel confirmed his prior diagnosis of fibromyalgia. (Id. at 106). [**8] Moidel

also explained that patients who have fibromyalgia often experience more pain when they are sedentary and often feel better when they are physically active. (Id.). Thus, he had recommended low impact aerobic exercises. Moidel further stated that "for a period of several months at the end of 1996 [Cini] was partially disabled from a combination of his right clavicular fracture and fibromyalgia symptoms." (Id.).

Also in a follow-up letter to Cini's attorney, Wukich stated that Cini had suffered from a delayed union of the clavicle fracture and in addition had a diagnosis of fibromyalgia, chronic low back pain and some post-immobilization adhesive capsulitis of this shoulder. Wukich opined that Cini was disabled as a result of the clavicle fracture from September 1, 1996 until the May 22, 1997. (Id. at 107).

In its denial of August 16, 1997, Paul Revere addressed each of the alleged disabling conditions. (Def. App. at 137). Specifically, with respect to Cini's fractured clavicle, on November 26, 1996, Wukich reported that Cini's pain was "definitely less" and that although the x-ray did not reveal fracture callus, "clinically I know that it is healing and that[**9] it's a little bit early to see the fracture callus." (Def. App. at 36). With respect to Cini's diagnosis of spondylolisthesis, Paul Revere noted that Wukich had explained to Cini that "his spondylolisthesis is rather mild." (Def. App. at 138). Finally, with respect to Cini's diagnosis of fibromyalgia, Paul Revere observed that Moidel recommended low impact aerobics and stated that Cini was only partially disabled for a period of months at the end of 1996. n4 Paul Revere also noted that shortly after Cini's diagnosis of fibromyalgia, he returned to work on a part-time basis. Thus, Paul Revere concluded that Cini had not shown a level of impairment which precluded him from performing his occupation on a full-time basis through the ninety day elimination period which expired on or about December 1, 1996.

N4 Wukich declined to render an opinion regarding whether the fibromyalgia was disabling. (Def. App. at 107).

After Paul Revere denied Cini's claim on August 16, 1996, Cini submitted two letters of "clarification" [**10] from Moidel and Wukich. On September 25, 1997, Moidel wrote that he wished to correct his letter of June 13, 1997, wherein he stated that Cini was only partially disabled at the end of 1996. Moidel explained that what he really meant was that Cini was totally dis-

Case 1:01-cv-01157-CCC    Document 86    Filed 12/12/2002    Page 116 of 119

50 F. Supp. 2d 419, *422; 1999 U.S. Dist. LEXIS 8361, **10

Page 71
FOCUS

abled for several months at the end of 1996 and only partially disabled as of December 16, 1996. (Id. at 147).

Wukich's clarification letter of September 25, 1997 stated that he "did not release [Cini] to return to work on 11/26/96." (Def. App. at 146). Wukich explained that he told Cini to discuss the possibility that he might be able to work part time. Wukich instructed Cini to "get back to him" at which time Wukich would discuss the situation with Cini and make a determination of whether Cini was capable of returning to work. (Id.). Wukich stated that on November 26, 1996, he referred Cini to a [*423] rheumatologist and, therefore, it was his opinion that Cini was not released to work until after he had seen Moidel later in December of 1996. (Id.).

After receiving this additional information, Paul Revere, in its terms, "exceptionally" re-opened the administrative record. Paul Revere again sent the whole record[**11] to Goldstein for an independent review. Goldstein found that Moidel's letter of September 25, 1997 was inconsistent with his earlier letter. (Def. App. at 158). Additionally, Wukich's denial that he released Cini to work did not alter Goldstein's opinion that Wukich's comments on November 26, 1996, showed that Cini was capable of returning to work. Goldstein also noted that Wukich never mentioned the clavicle fracture in the Attending Physician Statement accompanying Cini's initial claim for disability benefits. Finally, Goldstein noted that despite Wukich's assertion that Cini was not released to work until after he had seen Moidel, none of Moidel's notes mention Cini's work status.

## II. Legal Standard

Defendant has moved pursuant to Federal Rule of Civil Procedure 56 for summary judgment. Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted when, "after considering the record evidence in the light most favorable to the nonmoving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). For a dispute to be "genuine," the[**12] evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). If the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 89 L. Ed. 2d 538,

106 S. Ct. 1348 (1986). The non-moving party may not rely merely upon bare assertions, conclusory allegations, or suspicions. *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

## III. Discussion

Under ERISA, the applicable standard of review for a denial of benefits pursuant to 29 U.S.C. § 1132 depends upon the actual language in the plan. An administrator's factual findings and plan interpretation are reviewed de novo if the ERISA-defined plan does not grant the administrator discretion to make determinations with regard to employee benefits. *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 438 (3d Cir. 1997); see also *Firestone Tire & Rubber Co.* [**13]*v. Bruch*, 489 U.S. 101, 112-13, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989). When a plan grants an administrator discretionary authority, an administrator's factual finding and plan interpretation are reviewed under an arbitrary and capricious standard. *Mitchell*, 113 F.3d at 438-39.

The parties agree that an arbitrary and capricious standard of review applies here because the Plan in question grants Paul Revere the requisite discretion to interpret the Plan's terms. Accordingly, the Court must, as a matter of law, review the administrator's decision to deny Cini benefits under an arbitrary and capricious standard. An administrator's decision is arbitrary and capricious where it is "without reason, unsupported by substantial evidence, or erroneous as a matter of law." *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993) (internal quotations omitted). When considering whether an administrator's decision was arbitrary and capricious, the Court may only consider the evidence which was before the plan administrator at the time of the final denial. *Mitchell*, 113 F.3d at 440. Provided that the plan administrator's decision is rational, the Court is not free to substitute[**14] its own judgment for that of the plan administrator's in determining the eligibility for plan benefits even if the Court disagrees with the decision of the plan [*424]administrator. *Mitchell*, 113 F.3d at 439; *Abnathya*, 2 F.3d at 45.

In its final denial letter of November 29, 1997, Paul Revere determined that Cini had not shown that he was totally disabled for entire elimination period. Specifically, Paul Revere considered Wukich's explanation that his letter of November 26, 1996, was not intended to be a work release. Paul Revere determined that November 26th letter nevertheless showed that Cini was in fact capable of resuming his occupational duties on a part-time basis, but simply needed to verify with his employer that such an accommodation was available.

Case 1:01-cv-01157-CCC    Document 86    Filed 12/12/2002    Page 117 of 119

50 F. Supp. 2d 419, *424; 1999 U.S. Dist. LEXIS 8361, **14

Page 72
FOCUS

Paul Revere reiterated that the objective medical evidence did not support a finding of total disability. The pain from his right clavicle was less, his doctor was convinced that it was healing properly, his MRI reflected no change (from a prior MRI taken when Cini was working full-time) and his spondylolisthesis was mild. Thus, Paul Revere concluded that as of November 26, 1996, neither the fracture which occurred on September[**15] 1, 1996, nor his spondylolisthesis caused a level of impairment such that Cini was precluded from returning to work for four hours a day.

Similarly, with respect to Cini's diagnosis of fibromyalgia, Paul Revere noted that Cini's appointment with Moidel did not occur until December 12, 1996, and that the findings were unremarkable. Although Moidel noted that likelihood of fibromyalgia, his only recommendation for treatment was low impact aerobics -- not a restriction of any occupational duties. Thus, Paul Revere determined that Cini's fibromyalgia did not present a level of impairment between November 26, 1996, and December 12, 1996, which prevented Cini from returning to work.

Paul Revere also noted that on his original claim form, Cini indicated that he could only perform the occupational duties of an accounts manager for 20 hours per week due to the symptoms associated with spondylolisthesis and fibromyalgia (there was no mention of disability based upon problems associated with his fractured clavicle). In his original Attending Physician's Statement, Dr. Wukich stated that Cini was precluded from performing heavy lifting and prolonged sitting or standing.

After examining the[**16] entire record and the conclusions drawn by Paul Revere based upon that record, the Court cannot find that Paul Revere's denial of benefits was arbitrary and capricious. Cini had the burden of providing to Paul Revere proof that he qualified for benefits under the policy. Paul Revere determined that Cini failed to satisfy this burden. I find that Paul Revere conducted a thorough review of Cini's claim and provided reasonably cogent reasons why the evidence offered did not satisfy Cini's burden of establishing the he was totally disabled as defined by the policy during the entire elimination period.

Paul Revere's decision was not without reason, unsupported by the substantial evidence or erroneous as a matter of law. There is clinical evidence in the record that Cini's clavicle was sufficiently healed such that he could return to work on a part-time basis. n5 Additionally, his

spondylolisthesis [*425] was mild and had remained unchanged for over a year (during which time Cini was working). Similarly, there is no evidence that his fibromyalgia prevented him from working part-time between November 26, 1996, and December 12, 1996 (when he saw Moidel). Cini simply did not produce evidence which[**17] convinced Paul Revere that he had an impairment of a totally disabling proportion for the entire elimination period.

n5 While it is true that Wukich stated that he believed Cini to be disabled as a result of the fractured clavicle until May 22, 1997 (when x-rays showed fracture callus), his opinion is refuted by the fact that Cini had been working since December 16, 1996. It is also inconsistent with his earlier statement on November 26, 1996 that the clinical evidence indicated that the fracture was healing despite the fact that a callus was not apparent by x-ray. In addition, it is completely at odds with his statement that clinically the clavicle had healed more than five months prior to May 22, 1997. Finally, in his initial Attending Physician's Statement Wukich makes no mention of a clavicle fracture as a disabling condition. Nor has Cini provided any evidence that he could not perform the functions of his occupation as an account manager because of his fractured clavicle and certainly not after it showed signs of healing and it was no longer causing him pain. Thus, Paul Revere's conclusion that Cini had failed to demonstrate that he was totally disabled as a result of the clavicle fracture after November 26, 1996, is not unreasonable or unsupported by the substantial evidence.

[**18]

Cini nevertheless argues that there are factual issues which preclude the granting of summary judgment. Cini argues that there is a factual dispute over whether Paul Revere considered either of the clarification letters submitted after his August 16, 1997 denial. It is clear that both letters were reviewed and commented on by Goldstein (to whom Paul Revere sent the record for an independent view). Goldstein found that Moidel's letter was "inconsistent" with his earlier statements. Also, Wukich's letter did not alter Goldstein's view that Cini was capable of working as of November 26, 1996. Finally, Paul Revere cited Wukich's clarification letter in its final denial. Thus, the record does not support Cini's contention that Paul Revere ignored his physician's attempt to clarify their prior reports.

Case 1:01-cv-01157-CCC    Document 86    Filed 12/12/2002    Page 118 of 119

50 F. Supp. 2d 419, *425; 1999 U.S. Dist. LEXIS 8361, **18

Page 73
FOCUS

Cini also argues that Paul Revere disregarded the results from his x-ray taken on November 26, 1996 which did not show a fracture callus. On the contrary, Paul Revere explicitly referred to the x-ray. However, Paul Revere considered it in the context of Wukich's determination that although the x-ray does not show signs of healing, Wukich "knew" that clinically it was healing, that it was[**19] early for an x-ray to show the formation of a fracture callus and that Cini was definitely feeling less pain. Thus, the record indicates that Paul Revere considered the x-ray, but that in light of Wukich's conclusion that Cini was healing in combination with the diminution in pain, decided that the lack of callus formation did not indicate the existence of a totally disabling impairment.

Finally, Cini argues that Paul Revere did not consider that Cini was right hand dominant. To this end, Cini has attached an affidavit attesting to the fact that he is right hand dominant. However, in reviewing the decision of a plan administrator to deny benefits under an arbitrary and capricious standard, the review is limited to the evidence that was before the plan administrator at the time of its decision. *Mitchell, 113 F.3d at 440.* Cini's late submission is beyond the evidentiary scope of this appeal and will be disregarded. n6

N6 Cini also argues that there is a factual dispute over whether the Paul Revere had substantial evidence to support the denial of benefits. Cini misconstrues that nature of his argument. In truth, he

is simply arguing that Paul Revere's decision was arbitrary and capricious because it did not have substantial evidence to support its decision. This is not a factual dispute. The Court has already explained that the denial of benefits was not unreasonable, was based upon a rational analysis of the evidence available and, therefore, was not arbitrary and capricious.

[**20]

IV. Conclusion

Because there are no genuine issues of material fact and because Paul Revere's decision was not arbitrary and capricious, the motion will be granted. An appropriate Order follows.

ORDER

AND NOW this 7th day of June, 1999, upon consideration of motion of defendant The Paul Revere Life Insurance Company for summary judgment (Document No. 14), the response of plaintiff Carl J. Cini and reply of defendant thereto, the supporting memoranda, pleadings, discovery record and exhibits submitted by the parties; having found that there is no genuine issue of material fact and that the defendant is entitled to judgment as a matter of law, for the reasons set forth in the foregoing memorandum, it is hereby ORDERED that the motion is GRANTED and JUDGMENT IS HEREBY ENTERED in favor of The Paul Revere Life Insurance Company and against Carl J. Cini.

LOWELL A. REED, JR., J.

## CERTIFICATE OF SERVICE

I, E THOMAS HENEFER, ESQUIRE, certify that on this date, I

served a certified true and correct copy of the foregoing Memorandum of Law

upon the following counsel of record, by first class mail, postage prepaid,

addressed as follows:

      Richard C. Angino, Esquire
      4503 North Front Street
      Harrisburg, PA  17110-1708

      E. Thomas Henefer

Date:  December 11, 2002

SL1 314857v1/10305.060