



UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FILED
HARRISBURG, PA

DEC 1 8 2002

| | |
|---|---|
| VINCENZO MAZZAMUTO,<br>        Plaintiff, | CIVIL ACTION – LAW |
| v. | NO. 1:CV-01-1157 |
| UNUM   PROVIDENT   CORPORATION;<br>PAUL   REVERE   LIFE   INSURANCE<br>COMPANY;  and  NEW  YORK  LIFE<br>INSURANCE COMPANY<br>        Defendants | JUDGE CONNER<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF'S REPLY BRIEF TO DEFENDANTS' MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFF'S MOTION TO SUPPLEMENT RECORD AND IN
OPPOSITION TO PLAINTIFF'S MOTION TO ADD ADDITIONAL AUTHORITY**

Plaintiff suggests the Court review the two articles attached to this Brief as **Exhibits A
and B** as to the issue before it.  The first article by Langerman deals with proving bad faith intent
by "Evidence of Pattern and Practice."  The article specifically references Unum Provident and
its pattern and practice of "Claim payment goals and incentive programs."  See also, "Expanding
Coverage and Litigating in Disability and Life Insurance Cases" by Wolfson, again specifically
referencing UNUMProvident (**Exhibit B**).

Please note that UNUM with Mr. Mazzamuto as to his 1996 claim and again in the
instant 2000 claim, has directly sought to assert "misrepresentation on the application," *i.e.*,
pre-existing condition in 1996 and misrepresentation of duties in the 2000 claim.  Also see,

Unum's reliance upon "2.  no objective evidence of disability" and "3.  Redefining 'own occupation'" treatment.  . . . "Insurers often try to define the plaintiff's occupation differently than the insured in order to deny coverage."  . . . "Another tactic is for the insurance company to ask the insured for a description of his or her duties and then seize on the one or two duties he or she may still be able to perform as an excuse for denying the benefits."

Respectfully submitted,

ANGINO & ROVNER, P.C.

Richard C. Angino, Esquire
I.D. No. 07140
4503 N. Front Street
Harrisburg, PA  17110
(717) 238-6791
Attorney for Plaintiff

Date:   December 18, 2002

# PROVING INSURANCE COMPANY BAD FAITH: TEN THINGS I HAVE LEARNED ALONG THE WAY

Richard W. Langerman
The Langerman Law Offices
350 East Virginia Avenue
Suite 100
Phoenix, Arizona 85004
(602) 240-5525
richard@langermanlaw.com

## I. Proving Bad Faith Intent—Evidence of Pattern and Practice

Proof of insurer bad faith generally requires something more than that the company's decision was wrong. Generally, the plaintiff must also prove some *subjective* component to the insurer's wrongful decision. For example, under Arizona law, a plaintiff must establish that the insurer's decision lacked a reasonable basis (an objective standard) and that the insurer knew or recklessly disregarded the absence of a reasonable basis (a subjective component).[1]

Ordinarily, a plaintiff establishes bad intent based on evidence contained in the insurer's claim file. For example, the file may show that the insurer *failed to thoroughly investigate* the claim, or that the insurer *failed to fairly collect all evidence*, including evidence that supported the claim. Finally, the claim file may show that the insurer *failed to objectively evaluate information* in the file or failed to give equal consideration to information that supported the insured's claim.

While plaintiffs often establish bad faith (and even punitive conduct) solely from evidence contained in the claim file, generally large punitive damage verdicts in bad faith cases are based on evidence of bad conduct which goes beyond the handling of the insured's specific claim. In other words, the plaintiff shows that the denial in his or her case was not an isolated incident, but rather, was part of a "pattern and practice" of wrongful conduct.

*Claim handling practices*

Proof that an insurer has a *practice* of handling claims in a certain manner gives rise to an inference that other similar claims were handled in a similar fashion. Thus, plaintiff's counsel often ask claim handlers: "Did you handle this claim in the same manner that you handle other

---

[1] *See, e.g.*, Zilisch v. State Farm Mut. Auto. Ins. Co., 995 P.2d 276, 280 (Ariz. 2000).

claims involving . . . . ."  If the claim handler answers, "Yes," then the plaintiff has established a "pattern" of [wrongful] conduct.  On the other hand, if the answer is, "No," then there is an inference that the claim handler singled out this insured for special [improper] treatment.

A plaintiff may establish an insurer's practices through many different means.  Such practices are often established through the company's claim handling procedures.  An insurer's claim handling procedures are usually established by showing that the practice is required by the company's claim manuals or in other memoranda describing claim handling procedures.  Additionally, claim handling procedures may also be found in training materials used to educate newly hired employees.

While manuals and training materials are the most obvious source of insurer claim practices, other documents can also be used to establish claim handling practices.  For example, *claim department forms* often demonstrate what the company's internal claim handling practices are.  Similarly, *quality assurance manuals* may contain information regarding the company's claim handling practices.

*Pattern of conduct—Other similar claims*

While evidence of an insurer's claim handling procedures may support an *inference* that the claim handling conduct in a specific case is not a single, isolated incident, plaintiffs may also obtain *direct* evidence showing a pattern of [wrongful] claim handling conduct.  Such evidence may include documents from other claim files showing similar treatment of other insureds.[2] However, discovery of other claim files is difficult because insurers routinely object that it would be too burdensome to locate such files and the other files contain confidential information.  Additionally, even if the court orders production of claim files involving other similar claims, a plaintiff must rely on the insurer's interpretation of what constitutes "similar" conduct or what constitutes a "similar" claim.

Another source of other similar claims is your state Department of Insurance.  Generally, the Department of Insurance maintains copies of *consumer complaints*, and sometimes even categorizes such complaints.  Additionally, if the Department of Insurance receives enough complaints, the department will conduct a market conduct examination of the insurer.  Such *market conduct examinations* often contain information showing a pattern of insurer misconduct.

Evidence of a pattern of insurer misconduct can also be obtained from other, less obvious sources.  Thus, for example, the insurer's internal databases may contain records that can be used to prove a pattern of misconduct.  For example, health insurance companies are required to provide the insured with an *explanation of benefits* whenever a claim is denied.  Generally, these forms are computerized.  Thus, if the company uses the same denial code for all denials based on

---

[2]*See* Colonial Life & Accident Ins. Co. v. Superior Court, 647 P.2d 86, 90 (Cal. 1982) (evidence from other claim files is discoverable to show a pattern of misconduct).

preexisting conditions, the company's computer database can be used to generate a list of all claims denied based on purported preexisting conditions. Additionally, property insurers often have *preferred* contractors who are used to provide repairs for the company's insureds. Thus, if a claim involves a refusal to replace all matching carpet throughout the house because only a portion of the carpet was damaged, records of the preferred carpet contractor can be subpoenaed to provide evidence of other similar claim handling conduct.

*Claim payment goals and incentive programs*

An insurer's intent to deny claims may also be established by showing that the company established goals or targets regarding the amount to be paid by the claim department.[3] There are many different kinds of *claim payment goals*. Common claim payment goals include reducing the average amount paid per claim or reducing the combined ratio of the local and regional unit. Additionally, some companies establish an amount of reserves to be saved as a result of fraud investigations.

As part of the claim initiatives instituted by Provident in 1995, the company established a goal to increase by 10 percent the amount of claim reserves returned to surplus as a result of terminations. Provident also established a performance measurement that is referred to as the Net Termination Ratio. Provident defined Net Termination Ratio as the amount of reserves returned to surplus as a result of terminated claims as a percentage of the amount of reserves on newly opened claims. Provident's goal was to terminate 90 percent as many claims as were received each month.

While plaintiffs often ask for information or documents showing claim payment goals, insurers routinely deny the existence of such programs. Two common sources of information regarding claim payment goals are *performance evaluation programs* and *incentive programs*. Many insurers now use Performance, Planning, and Review assessments (PP&Rs) in order to evaluate claim department personnel. Part of the PP&R process involves establishing a performance plan for each employee. Many times the performance plan includes claim payment goals. Similarly, many insurers now use incentive programs to reward better performing employees. In some instances, these incentive programs are tied to the accomplishment of claim goals such as a reduction in the combined ratio for the local or regional claim unit.

In addition to *direct* evidence of claim payment goals in employee performance plans or incentive programs, there are other sources of *indirect* evidence of such goals. For example, insurers often require *operations reports* from various units in the company. Thus, the branch offices often prepare monthly and/or quarterly reports to the regional office and the regional office, in turn, prepares monthly/quarterly reports for the company's home office. While these

---

[3]*See Zilisch*, 995 P.2d at 280 (claim payment goals are evidence of bad faith); Campbell v. State Farm Mut. Auto. Ins. Co., 2001 WL 1246676 (Utah Oct. 19, 2001) (claim payment goals support a finding of punitive conduct).

operations reports rarely identify the goals established for each local unit, the local manager will often tout his or her operation if an interim goal has been met and will be required to explain any shortfall if an interim goal has not been met. Similarly, the company may hold annual or biannual meetings in which the company's senior level management report to middle level managers the results of the claim department operations. Many times these meetings include handouts or even video presentations from home office personnel. Such presentations may contain information regarding the expectation (i.e., the goal) for the local units operations.

Occasionally, information regarding claim payment goals may be obtained from reports to third parties. For example, all insurers regularly provide *reports to insurance rating companies* such as Moodys, A.M. Best, and Standard and Poors. If the rating companies have recently downgraded the insurer's rating, the insurer will be trying to persuade the rating companies that new initiatives have been developed in order to turn around the declining results of the company. Occasionally, the reports to the rating companies include information about newly established claim handling procedures as well as the expected results of the initiatives in reducing the amount of claim payments.

## II.  Who to Sue in an Insurance Bad Faith Case

The duty of good faith and fair dealing is ordinarily limited to the parties to an insurance contract.[4] Under some circumstances, however, a bad faith claim may be brought against a person/entity who is not a party to the insurance contract. These situations include suits against insurance holding companies and claim handling companies.

*Insurance holding companies*

Many insurers are part of an insurance holding company system. An insurance holding company system is a group of affiliated companies, one or more of which sells insurance. Well-known insurance holding company systems include the Farmers Insurance Group, the UnumProvident companies, and AIG.

Insurance holding company systems are regulated by statute. An insurance holding company is a company that has the power to "control" an insurance company. Under insurance holding company system statutes, control may be defined as:

> The possession, direct or indirect, of the power to direct or cause
> the direction of the management and policies of a person, whether
> through the ownership of voting securities, by contract other than a
> commercial contract for goods or non-management services, or

---

[4]*See, e.g.*, Gruenberg v. Aetna Ins. Co., 510 P.2d 1032, 1038-39 (Cal. 1973); Timmons v. Royal Globe Ins. Co., 653 P.2d 907, 912-13 (Okla. 1982).

> otherwise, unless the power is the result of an official position with
> or corporate office held by the person.  Control shall be presumed
> to exist if any person, directly or indirectly, owns, controls, holds
> with the power to vote or holds proxies representing 10% or more
> of the voting securities of any other person.[5]

Insurance holding companies exercise control over insurers either through ownership of stock
(such as UnumProvident's ownership of  Unum, Provident, and Paul Revere) or through the use
of management contracts (such as Farmers Group, Inc.'s control over the insurers in the Farmers
Insurance Group or AIG's relationship with the insurers of its group).  At least one jurisdiction
has held that if an insurance holding company effectively controls an insurer (i.e., the insurer is
the "alter ego" of the holding company), then the holding company can be found vicariously
liable for the tortious conduct of the insurer if justice requires.[6]  The Arizona Supreme Court in
the *Gatecliff* case relied on well settled corporation law in reaching this conclusion:

> We have previously stated that despite the well settled law that a
> corporation is a separate legal entity, when one corporation so
> dominates and controls another as to make the other a simple
> instrumentality or adjunct to it, the courts will look beyond the
> legal fiction of distinct corporate existence, as the interests of
> justice require.[7]

Proof of "control" under an alter ego theory of liability is often based, in part, on evidence in the
registration statements filed by the insurance company with the Department of Insurance in the
states where the insurer operates.  Under insurance holding company system acts, whenever
another company acquires effective control of an insurer, the acquiring company must file a
registration statement.  These registration statements are called *Form A Registration Statements*.
A Form A Registration Statement contains information about the acquiring company and how it
will exercise control over the domestic insurer.[8]

Insurers who are part of insurance holding company systems must also file a *Form B
Registration Statement*.[9]  The Form B Registration Statement contains information regarding the
capital structure of the insurer and identifies all other members of the insurance holding company
system.  The Form B Registration Statement also includes information about agreements

---

[5]*See* ARIZ. REV. STAT. § 20-481(3).

[6]*See* Gatecliff v. Great Republic Life Ins. Co., 821 P.2d 725, 729 (Ariz. 1991).

[7]*Id.*

[8]*See, e.g.*, ARIZ. REV. STAT. §§ 20-481.02 and 20-481.03.

[9]*See, e.g.*, ARIZ. REV. STAT. § 20-481.10.

between the affiliated companies such as cost sharing agreements and management or service contracts.

Both Form A and Form B Registration Statements usually include a representation that the parent company "controls" the subsidiary insurer.

*Claim handling companies*

Most insurance holding company systems are structured so that all claims are handled by only one of the affiliated companies. Courts have generally held that where an affiliated company (within an insurance holding company system) handles all claims for a domestic insurer, then the claim handling company may be directly liable for the tortious conduct of its claim handling employees.[10] Additionally, other courts have concluded that claim handling companies (even if not within an insurance holding company system) may be liable based on a joint venture theory of liability.[11]

---

[10]*See, e.g., Gatecliff*, 820 P.2d at 730 (citing Delos v. Farmers Group, Inc., 155 Cal. Rptr. 843 (Cal. App. 1979)); Williams v. Farmers Insurance Group, Inc., 781 P.2d 156 (Colo. App. 1989); Farmers Group, Inc. v. Trimble, 768 P.2d 1243 (Colo. App. 1988).

[11]*See, e.g.,* Sparks v. Republic Nat'l Life Ins. Co., 647 P.2d 1127, 1137-38 (Ariz. 1982); Wolf v. Prudential Ins. Co. of America, 50 F.3d 793, 798 (10th Cir. 1995); Albert H. Wohlers & Co. v. Bartgis, 969 P.2d 949 (Nev. 1998).

Attachment

## Appendix to Proving Bad Faith

*Items to request in discovery to prove bad faith*

1.    Insurance practices

      a.      Claim manuals and memorandum
      b.      Claim department training materials
      c.      Claim department forms
      d.      Quality assurance manuals and audit procedures

2.    Evidence of a pattern of wrongful conduct

      a.      Other claim files involving similar claims
      b.      Department of Insurance consumer complaints
      c.      Department of Insurance Market Conduct Examinations
      d.      Internal databases—Explanation of Benefit forms
      e.      Files of preferred contractors

3.    Claim payment goals/incentive plans

      a.      Reduction in average claim costs

      b.      Savings generated by fraud unit

      c.      Performance measurements

            (1)      Performance evaluations—PP&Rs
            (2)      Incentive plans
            (3)      Operation reports
            (4)      Management conference handouts/presentations
            (5)      Communications with insurance rating companies

4.    Liability of affiliated companies

      a.      Form A Registration statement
      b.      Form B Registration statement
      c.      Management contracts
      d.      Service/claim handling agreements

# EXPANDING COVERAGE AND LITIGATING IN DISABILITY AND LIFE INSURANCE CASES

Alice J. Wolfson
Bourhis, Wolfson & Schlichtmann
1050 Battery Street
San Francisco, California 94111
(415) 392-4660
ALICEW28@aol.com

## I. Disability

*The current problem—the baby-boomers turn 50*

Between 1983 and 1989, insurance carriers recognizing a lucrative market—young, affluent, healthy professionals—started a huge marketing campaign to sell "own occupation," "non-cancelable" disability policies, often with benefits payable for life and often with substantial cost of living increases (COLA) built in for little or no extra charge. These policies were designed to insure an individual in the event of a disability that resulted in the inability to perform the material and substantial duties of his or her "own" occupation. In most instances, the definition of occupation was narrow, i.e., anesthesiologist, not just doctor, trial attorney, not simply attorney. Therefore, if an anesthesiologist became allergic to the chemicals in the anesthesia he or she administered and could no longer practice in his or her specialty, he or she would still be eligible to collect benefits even if he or she could practice in another field of medicine. Similarly, if a trial attorney lost his or her voice and could no longer speak in court, he or she would be eligible for benefits even if she could still perform legal research.

But what was once seen as a cash cow for the large disability carriers like Provident Life and Accident, Unum, Paul Revere, and others, has turned into a fiscal disaster for insurers, and broken promises and financial ruin for insureds who faithfully paid premiums for 15 or 20 years with the expectation that if they became disabled, they had taken the necessary steps to protect their financial assets.

Large disability carriers such as Provident, now UNUMProvident and formerly Provident Companies, have admitted that between 1983 and 1989, it aggressively marketed and sold these "own occupation" disability policies. Because of competition in the market, and its desire for increased premiums, Provident, among others, relaxed its underwriting standards and wrote huge numbers of these policies, expecting to invest these premiums and to earn substantial returns because of high interest rates in place at the time.

By the early 1990s, however, interest rates began to drop. This was during the same time that claims on these policies began to increase. At least one company, Provident Life and Accident was forced, in December 1993, to bolster its claim reserves by $423 million.

Provident's Senior Vice-President of Risk Management, Tom Heys, explained that
Provident had short-sightedly sold these policies considering the numbers of claims it
would ultimately be called upon to pay:

> The . . . 1980's were characterized by a highly competitive,
> growth oriented market environment.  Product provisions
> and underwriting were liberalized . . . as . . .
> competitors . . . attempted to grow share.  The product sold
> . . . can neither be canceled nor its price raised, covering the
> own occupation of the individual . . . .
>
> In hindsight, it is generally viewed that the policies sold
> during the period were poorly underwritten and
> underpriced.  This was common among competitors, but
> Provident seems to have taken it a few steps further.
> Provident in many *cases,* won the market share battle and,
> in fact, was very successful in certain high population
> growth states, such as California . . . .  Provident was also
> slow to recognize that deteriorating experience on this
> block of business in terms of taking early action.  As a
> result, it is felt that, as other companies were tightening
> their offerings, many of the poor risks went to Provident.

Mr. Heys' analysis was echoed in the 1995 *Best's Insurance Report* regarding Provident
which states, "over the past four years, [Provident's] individual disability operations have
experienced significant operating deficits primarily due to adverse claim experience and
*additions* to reserves."  In its amendment to its 1993 10-K report filed with the SEC,
Provident described how it had underestimated its exposure on "own occupation"
policies.  It also explained that its assumptions about interest rates had been incorrect and
that it could no longer obtain high investment returns on the premiums it collected for
these policies.  Provident publicly told the SEC that one of its principal solutions to its
losses was "improved claim handling procedures," a euphemism for increased claims
denials and terminations.

In the 1990s, the relatively young upper middle class professionals who bought these
policies were aging.  As the population aged, claims increased.  Provident could not
control the number of new claims being made under these policies.  Nor could it control
interest rates in the marketplace.  The only thing it could control was the payment of
claims.  It therefore developed numerous practices and procedures which can be
interpreted to be designed to deny more claims.

Nor was Provident alone in experiencing losses in the "own occupation" block of
business.  As a result, regardless of the insurance company involved, there is a consistent
pattern to the defenses insurers are using to deny or terminate these claims.

1.     Misrepresentation on the application

Even though, by the time a claim is made, most insureds have had these polices
for over 10 or 15 years, as soon as a high-dollar claim is made, the insurance
company will scrutinize the application searching for a misrepresentation which
would allow it to rescind the policy. Most states have incontestability statutes
protecting the insured and limiting the rights of the insurer to rescind after the
policy is in force for two years. Only if the carrier selected that option, in some
states, such as California, it allows the insurer to wiggle out from the
incontestability provision if the misrepresentation was deliberate or fraudulent.
Even if 20 years have passed, if the incontestability clause in the policy contains
an exception for fraud, the insurer will attempt to and can rescind the policy.

Another loophole in the incontestability clause is the "first Manifest" provisions
in policies in which sickness is defined as a condition that "first manifests itself
after the date of issue." Although these policies all contain incontestability
clauses precluding the insurer from denying claims after the policy has been in
force for two years, courts have split on the issue of whether the first manifest
provision preempts the incontestability clause. The tide, however, may be
turning. Since 1997, the highest courts in Delaware,[1] Hawaii,[2] Maryland,[3]
Minnesota,[4] New York,[5] and California[6] have resolved this issue in favor of
insureds and have limited the ability of the insurer to deny disability benefits
because the condition first manifested before the policy's issue date as long as the
insured did not claim benefits during the two year incontestability period.

2.     No objective evidence of disability: (Lose we win, win you lose)

Although you may never come across a disability insurance policy that requires
the insured to submit objective evidence of disability, this is now the gold
standard that insurers are requiring their insureds to meet before they will pay or
continue to pay benefits. An insured with debilitating back pain without positive
findings on an MRI is in for a long fight. In fact, Provident, in two separate
internal documents, lists soft tissue injury, depression, or a stress-related
condition as an indicator of a "questionable claim." Disability due to back pain,

---

[1]Penn Mut. Life Ins. Co. v. Oglesby, 695 A.2d 1146, 889 F. Supp. 770 (Del. 1997).

[2]Estate of Doe v. Paul Revere Ins. Group, 86 Haw. 262, 948 P.2d 1103 (1997).

[3]Mutual Life v. Insurance Comm., 352 Md. 561, 723 A.2d 891 (1999).

[4]Kersten v. Minnesota Mut. Life Ins. Co., 608 N.W.2d 869 (Minn. 2000).

[5]New England Mut. Life Ins. Co. v. Doe, 93 N.Y.2d 122, 688 N.Y.S.2d 459 (1999).

[6]Galanty v. Paul Revere Life Ins. Co., 23 Cal. 4th 368, 1 P.3d 658 (Cal. 2000).

strain, headache, depression, or soft-tissue injury is also seen as an indicator of disability insurance fraud.

Do not think, however, that if your client has positive MRI results he or she is home free. Once you present objective evidence, the insurer will probably argue that the MRI results do not correlate with the insured's subjective complaints of pain. Another favorite defense is that at least half the population is walking around with the same MRI results as your plaintiff and they are not disabled so neither is your client. At a recent deposition in an "own occupation" disability case in which the plaintiff had a 10 millimeter bulging disc clearly visible on MRI, the in-house medical consultant discounted the MRI because, in his opinion, that particular disc would not result in referred pain to the hip (the place plaintiff was complaining of pain). When confronted with an IME report stating, "On review of the medical records the patient has a significant . . . disk herniation . . . . This is a very unusual disk herniation that will result in referred pain to the left hip. This can result in significant and prolonged pain complaints," the claims consultant testified that he interpreted the IME report to mean that it would be very unusual for such a herniation to cause pain to the hip. These findings are routinely made despite an insurance company's obligation to conduct a fair and evenhanded investigation.[7]

3.    Redefining "own occupation"

In general, courts have considered a claimant to be totally disabled under an "own occupation" policy when he or she is unable to perform the material and substantial duties of his or her regular occupation, even though he or she may be able to do some nonessential tasks of his or her occupation. In California, total disability requires that the insured be unable to perform the "material and substantial" duties of his or her own occupation in the usual and customary fashion with reasonable continuity.[8]  Even the ability to work during a period of claimed disability does not negate a finding of total and continuous disability if the insured employee is nevertheless unable to work with *reasonable continuity*.[9] The California Supreme Court has ruled that:

> [T]otal disability does not signify an absolute state of
> helplessness but means such a disability as renders the
> insured unable to perform the substantial and material acts

---

[7] Egan v. Mutual of Omaha Ins. Co., 24 Cal. 3d 809 (1979).

[8] Erreca v. Western State Life Ins. Co., 19 Cal. 2d 388, 396 (1942). *Accord* Solberg v. Aetna Life Ins. Co., 151 Conn. 637 (1964); Groff v. Paul Revere Life Ins. Co., 887 F. Supp. 1515 (S.D. Fla. 1993); Mcgrail v. Equitable Life Assurance Soc'y of the U.S., 292 N.Y. 419, 55 N.E.2d 483 (N.Y. 1944); Niccoli v. Monarch Life Ins. Co., 332 N.Y.S.2d 803 (N.Y. Sup. Ct. 1972).

[9] Moore v. American United Ins. Co., 150 Cal. App. 3d 610, 618 (1984).

> necessary to the prosecution of a business or occupation in
> the usual and customary way. Recovery is not
> precluded . . . because the insured is able to perform
> sporadic tasks, or give attention to simple or
> inconsequential details incident to the conduct of
> business . . . .[10]

Moreover, an insured must also be able to perform the material and substantial duties of his or her occupation in the *usual and customary way*. In *Rahman v. Paul Revere Life Ins. Co.*,[11] the court held that an emergency room cardiologist whose disability prevented him from running from patient to patient was totally disabled even though he could still practice cardiology in other areas. Similarly, in an unpublished case from California's central district, *Rosenthal v. Paul Revere*,[12] the court held that an associate trial attorney who could not perform to a high level under heavy stress for long hours was totally disabled as a trial attorney even if he or she could work for as much as eight hours a day. The court explained that the important duties of a trial attorney included being able to work long hours.

Insurers often try to define the plaintiff's occupation differently than the insured in order to deny coverage. A favorite tactic is to claim that the insured has two occupations and that while disabled from one, he or she can still perform the other. Thus, for example, a musician who had started to book other musicians when she was too busy to take the job herself, was denied benefits after she could no longer play music because she could still be a "booking agent," despite the fact that she no longer had the overflow to book. Or take the case of the podiatrist who has had four shoulder and hand surgeries and is unable to continue working as a podiatric surgeon but who wrote a single book on running several years before he became disabled. The insurance company has taken the position that he has two occupations, author and podiatrist, and is not disabled as an author.

Another tactic is for the insurance company to ask the insured for a description of his or her job duties and then seize on the one or two duties he or she may still be able to perform as an excuse for denying the benefits. This can reach particularly bizarre levels as in the case of a court reporter who could no longer take transcription in court but could still do editing of a transcript. The insurance company has taken the position that she is partially, not totally, disabled because she can edit the transcripts she can no longer record even though its own expert has labeled the editing as a different occupation.

---

[10]*Erreca*, 19 Cal. 2d at 396.

[11]684 F. Supp. 192 (N.D. Ill. 1988).

[12]Case No. CV-98-4246 GAF (Central Dist. Cal. 2000).

Insurers are also increasingly taking the position that the insured's inability to perform the substantial and material duties of his or her job is a matter of choice and not due to disability. This is more likely to be true when the disabling condition is labeled "subjective," i.e., depression, fibromyalgia, or back pain without objective findings. In these instances, a solid history of treatment for the disabling condition as well as proof of sufficient income before the disability will help in prevailing against the insurance company.

4.     ERISA preemption

On October 2, 1995, Provident circulated an internal memo instructing its individual disability claims management team to "initiate active measures to get new *and existing* policies covered by ERISA." Provident had concluded that the "advantages of ERISA coverage in litigious situations are enormous: state law is preempted by federal law, there are no jury trials, there are no compensatory or punitive damages, relief is usually limited to the amount of benefit in question, and claims administrators may receive a deferential standard of review." To bolster this contention, Provident indicated that if 12 individual claims that had an aggregate settlement of $7.8 million had been covered by ERISA, Provident's liability would have been between 0 and $0.5 million.

With this much at stake, insurance companies are ignoring the fact that these policies were sold as individual policies, that they were not dependent on the insured's continued employment at the original place of business, that many of the insureds are individual owners of personal corporations, and other obvious factors that would clearly indicate that the policies *are not* covered by ERISA. If an insurance company denies a claim and then, for the first time, instructs the insured that the policy is ERISA, look carefully at the facts of your case and the law. Although not dispositive, the fact that the insurance company has always administered the policy as an individual rather than a group policy can be useful in combating this defense.

5.     The IME or insurance medical evaluation

A favorite tool for insurance companies seeking to deny or terminate benefits is the IME or "Independent" Medical Evaluation. Usually, the greater the benefits and the longer the insured is disabled, the more likely it is that he or she will be sent for an insurance medical examination. In fact, some insurance companies have stated that increased use of the IME results in a higher rate of claim terminations. More often than not, the IME will form the pretext for the denial of the claim. It is extremely important to carefully scrutinize the report and ask the treating physician for his or her opinion. In addition, promulgate discovery requests aimed at determining the number of times that this IME provider has been hired to do IMEs for this particular insurance company. Because many insurers now use companies that specialize in providing IME referrals, make sure that you do not limit the wording of your request to IME providers who have



actually been retained by the insurance company. If you do, the insurance company will almost surely respond that it has never "hired" the named provider requiring another round of discovery requests and further delaying resolution.

The kind of information the insurance company sends to the IME provider should also be scrutinized and can become an important element in a bad faith lawsuit. At least one large disability carrier has a practice of highlighting "certain notations we thought particularly significant." In *Rosenthal*,[13] the trial court addressed this issue and noted that the claims personnel "made sure that the doctor understood Paul Revere's position" by highlighting "certain notations we thought particularly significant." The court commented that such conduct put Paul Revere's employees "in a mode more properly described as adversarial rather than evaluative . . . ."

It is also important to ascertain the definition of disability the insurer has given to the evaluator. If it is incorrect or biased in any way you may be able to invalidate the entire IME and prove that the insurer did not conduct a fair and evenhanded investigation as required by law.[14]

Although often difficult to obtain, requesting the financial records of the IME provider to ascertain how much of his or her income is derived from the provision of IMEs can produce valuable information. The more an IME provider's income is dependent on insurance company money, the more likely it is that you will get a report adverse to the insured.

Sometimes the IME actually supports the insured's claim. Then, the insurance company will wait about six months and send the insured for another IME, hoping for better results. Eventually, the insurance company will find a doctor who will say the magic words, "there is no objective evidence of disability." Not surprisingly, what is considered "objective" by the insurer often has little to do with the actual disability. One insurance company claims file note specifically instructs the claim's handler not to use a particular IME provider again because his report supported the insured's claim of disability.

6.     Increased use of surveillance

Unlike an IME, where the policy actually reserves the insurer's right to have the insured examined, nothing in the policy gives the insurer the right to conduct routine surveillance when an insured makes a claim. Yet increasingly, this is exactly what is happening and long before the insurer has any reason to question the veracity of the insured's claim. Hoping to "catch" the insured doing something, anything, that could be interpreted as contradicting the reports of disability, insurers are increasingly turning to "sub rosa" surveillance. An

---

[13]*Id.*

[14]Egan v. Mutual Of Omaha Ins. Co., 24 Cal. 3d 809 (1979).

investigator is hired who follows the insured from a distance and videotapes his or her activities. The tapes and often the investigator's written report are then supplied to the independent medical examiner in the hopes of biasing the opinion.

If surveillance has played any part in the denial, *always* view the tapes themselves. *Never* rely on the investigator's written description of the tapes. Make sure to note the times that various activities take place. Are large chunks removed and spliced together? Does the investigator comment on whether the insured appears to be disabled rather than simply recite the activities he or she has observed. Many times the investigative reports are so editorialized that they bear almost no resemblance to the actual videos. In that case make sure you determine if the claims person actually viewed the tape or relied on the written report.

Insurers are increasingly ordering post-termination surveillance. The very fact that the insurer is investigating after it has denied the claim is probative of a failure to conduct a thorough investigation. If the insurer did not have enough information to support its denial, then clearly the claim should not have been denied. Searching for a way to prop up a faulty claim termination decision is further evidence of bad faith.

## II. Life Insurance

*The problem: deceptive sales practices*

In the past several years there has been an explosion in cases alleging deceptive sales practices in the marketing of life insurance policies. Although the cases that have been litigated fall generally into three categories, retirement (selling life insurance under the guise of retirement funding), churning and vanishing premiums, it is in the area of vanishing premiums that the rise in sales abuses and the explosion in litigation has really taken place.

As with "own occupation" disability cases, vanishing premium litigation is also a product of the 1980s. At a time of high interest rates, insurance companies introduced new and complicated interest-sensitive products by demonstrating to perspective customers how they could completely fund a life insurance policy by making a limited number of premium payments that would "vanish" in a set number of years with no further cash outlay by the insured. Future premium payments would be funded by the dividends that would be paid on the initial premiums. Not only would the premiums vanish, but many of the illustrations, on company letterhead, indicated that the projected death benefits actually increased over the face value of the policy. Without having to make any further cash outlays, the insured would be fully protected.

The assumption that interest rates would continue to rise was incorrect. In the late 1980s and early 1990s interest rates began to fall. On some policies, even a one percent

decrease in the interest rate could cause the payments that were supposed to vanish to continue for years.

By the early 1990s, premiums that were supposed to vanish became due. Policyholders who thought their policies were paid up began to complain when they started to receive bills for the "vanished" premiums. Insureds not only complained, they also began to sue in record numbers. Although many of these cases have been brought as class actions in numerous jurisdictions in both state and federal courts (as of May 1999, over one 150 such cases had been filed),[15] it is still possible in many instances to bring these cases as individual actions. Whether as a class or individual action, the following represent the most commonly pled causes of action.

1.    Misrepresentation and fraud

The gravamen of a deceptive sales practices case rests in fraud and misrepresentation. Plaintiffs allege that they were induced to purchase the policies by the fraudulent statements made by the agents of the insurance company. Insurers defend against this cause of action by claiming that the policy and not the misleading representations made at the time of sale is controlling. A persuasive argument against this defense has been that the fraud alleged pertains to the misrepresentations used to induce the insured to purchase the policy and not the contract itself.

Since the majority of the policies were purchased in the 1980s, insurers will always raise an issue of the statute of limitations defense. Fraud, however, tolls the statute of limitations and is usually subject to the delayed discovery rule. Therefore, this cause of action can extend the liability of the insurer to the present time. Similarly, insurers will also try to claim that the fraudulent misrepresentations related to future events. This defense, too, can be defeated since the statements were fraudulent when made and the insurer knew, or reasonably should have known, that the statements were false.

Plaintiffs will also have to prove that they justifiably relied on those misrepresentations unless your plaintiff is an insurance agent. Because insurance policies are considered policies of adhesion, it is usually possible to prevail over this defense.

2.    Conspiracy to defraud

In this cause of action the plaintiff names both the insurance company and the insurance agent. An obvious advantage here is in that naming the local agent may prevent removal to federal court. In addition, it prevents the insurer from

---

[15] Among the companies who have settled class actions are American General, CIGNA, Connecticut General, Crown Life, Equitable of Iowa, Great West, John Hancock, Manulife, MetLife, National Life of Vermont, Nationwide, Pacific Life, Phoenix Home life, Prudential, State Farm, State Mutual, Sun Life, and Transamerica.

attempting to escape liability by claiming that the agent and not the company was at fault. In California, agents may be liable for conspiring with their principal to defraud a policyholder.[16]

In *Younan*, the Court of Appeals held that:

> A cause of action for conspiracy will lie against agents and employees of insurers even though the former are not parties to the agreement of insurance when they join the insurer in a conspiracy to defraud the insured. As such they are jointly liable with those with whom they conspire to commit the tort.[17]

The delayed discovery rule applies equally to a conspiracy to defraud claim. In addition, a conspiracy claim is not time barred because the statute of limitations does not begin to run "until the 'last overt act' pursuant to the conspiracy has been completed."[18] Given the fact that the premiums have not vanished and the plaintiff is still required to make payments it can be argued that the last overt act has not been completed.

3.    Breach of contract and breach of an oral contract

Whether the plaintiff pleads breach of a written or oral contract, more likely than not, these causes of action may present insurmountable statute of limitation problems given the time lag between obtaining the policies and recognizing the breach. Generally, courts apply the "date-of-the-injury rule" to determine when the statute of limitations begins to run. However, courts have occasionally applied the "delayed discovery rule" to a breach of contract cause of action when it would be "manifestly unjust to deprive plaintiffs of a cause of action before they are aware that they have been injured."[19] A breach of an oral contract occurs when the policy issued differs from the oral representations made. If you plead breach of an oral contract the insurer will raise the parol evidence rule barring the admission of oral statements to prove the terms of a written contract. However, here plaintiffs can argue that the oral contract for the procurement of coverage

---

[16]Younan v. Equifax, 111 Cal. App. 3d 498, 511 (1980); Doctors' Co. v. Superior Court, 49 Cal. 3d 39, 48 (1989) (approving *Younan*); Applied Equipment Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 512-513 (1994); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 1598 (1995).

[17]*Younan*, 111 Cal. App. 3d at 511.

[18]Wyatt v. Union Mortgage Co., 24 Cal. 3d 773, 786 (1979); Molko v. Holy Spirit Ass'n, 46 Cal. 3d 1092, 1127 (1988); Aaroe v. First Am. Title Ins. Co., 222 Cal. App. 3d 124, 128 (1990); Livett v. F.C. Fin. Assocs., 124 Cal. App. 3d 413, 418 (1981).

[19]April Enterprises, Inc. v. KTTV, 147 Cal. App. 3d 805, 826 (1983).

*was never reduced to writing.*  The policy is a separate and different contract and not the oral contract entered into by the agent with the insured.

4.     Other causes of action

In addition to the above, plaintiffs have also argued such things as conversion/constructive trust, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, negligence, negligent supervision, unjust enrichment, and violation of Securities and Exchange Act and Rule 10(b)-5.  A full analysis of all of these causes of action is beyond the scope of this paper.

*Incontestability*

As with disability policies, there is a statutory requirement in most states for life insurance policies to contain incontestability clauses.  These clauses are designed "to require the insurer to investigate and act with reasonable promptness if it wishes to deny liability on the ground of false representation or warranty by the insured."[20]  In 1920, Justice Holmes stated that the purpose of an incontestability clause was "to create an absolute assurance of the benefit, free as may be from any dispute of fact except the fact of death, and as soon as it reasonably can be done."[21]

In California, the first case to discuss an incontestability clause was *Dibble v. Reliance Life Insurance Co.*[22]  In *Dibble*, the California Supreme Court held that an incontestability clause "precludes any defense after the stipulated period on account of false statements warranted to be true, even though such statements were fraudulently made . . . ."[23]  In 1935 for group policies and in 1974 for individual policies, the California Legislature enacted statutes requiring incontestability clauses in every life insurance policy.

The question of whether a life insurance policy that had been fraudulently obtained was subject to the incontestability clause was addressed by the California Supreme Court in *Amex Life Assurance Co. v. Superior Court*.[24]  In *Amex*, the insured, Morales, knew that he was HIV-positive when he applied for the insurance policy.  The condition had "manifested itself" prior to the issuance of the policy *and he sent an imposter to take the medical exam* so that he could obtain the policy.  Despite this blatant fraud, a unanimous Supreme Court nevertheless upheld the decision of the lower court ordering Amex to pay

---

[20]G. COUCH, 18 COUCH ON INSURANCE § 72/2, at 283 (1983).

[21]Northwestern Life Ins. Co. v. Johnson, 254 U.S. 96, 101-102 (1920).

[22]170 Cal. 199 (1915).

[23]*Id.* at 208.

[24]14 Cal. 4th 1231 (1997).

the claim.  *Amex was not simply prohibited from rescinding the policy; it was prohibited from denying the claim.*

The California Supreme Court described the manner in which the incontestability clause requires the insurer to conduct its investigation before and up to two years after the policy is issued, but no later than that date.

> The incontestability clause requires the insurer to investigate fraud before it issues the policy or within two years afterwards.  The insurer may not accept the premiums for two years and investigate a possible defense only after the beneficiaries file a claim . . . .  Amex ignored this information and merely accepted the premiums for the entire period of contestability.  Then it became too late for it to claim for the first time that an imposter took the medical examination . . . .  The beneficiaries should be assured they will receive the expected benefits, and not a lawsuit upon the insured's death.  The incontestability clause protects that right.[25]

The court reasoned that the insurance company is equally able to discover any potential fraud before the lapse of the incontestability clause as after.  "[P]resumably, it would be no easier to discover fraud two years after the events than at the outset."[26]

1.      The imposter defense (an exception)

While considered by the *Amex* court and rejected, some states recognize what is known as the "imposter" defense to the incontestability clause in life insurance policies.  Two of the most often quoted cases utilizing this defense are *Maslin v. Columbian National Life Insurance Co.*[27] and *Ludwinska v. John Hancock Mutual Life Insurance Co.*[28]  In these cases, an imposter obtains the life insurance policy in the name of another.  The rationale applied by the courts is that no contract ever existed insuring the life of the deceased.  Since the invocation of the incontestability clause presupposes a valid contract, it does not apply to a policy which is void *ab initio.*  Courts that have allowed this defense have done so under these narrow facts.  In general, once the policy has been in effect for two years,

---

[25]*Id.* at 1271.

[26]*Id.* at 1272.

[27]3 F. Supp. 368 ( S.D.N.Y. 1932).

[28]318 Pa. 84 (1935).  *See also* Petaccio v. New York Life Ins. Co., 189 A. 697 (1937); Valant v. Metropolitan Life Ins. Co., 23 N.E.2d 922 (1939); Obartuch v. Security Mut. Life Ins. Co., 114 F.2d 873 (7th Cir. 1940); Maxwell v. Cumberland Life Ins. Co., 748 P.2d 392 (1987).

the incontestability clause will act to bar an insurer from denying coverage because of a misrepresentation in the application.

## III. Conclusion

Insurance is a product in which the only thing the insured is purchasing is a promise of protection in a time of need. Nowhere is this better demonstrated than in the areas of life insurance where the deceased expected to provide for his or her loved ones or in the case of disability insurance. "'Among the considerations in purchasing . . . insurance, as insurers are well aware, is the peace of mind and security it will provide in the event of an accidental loss . . . .'"[29] These considerations are particularly cogent in disability insurance. The very risks insured against presuppose that if and when a claim is made, the insured will be disabled and in strait financial circumstances and, therefore, particularly vulnerable to oppressive tactics on the part of an economically powerful entity."[30] An insurer who unreasonably denies these benefits to its insureds does so at its own peril.

As the population ages, the 30-year-old professionals who took out these policies in the 1980s are now turning 50. Increasingly, they are looking to their disability policies, policies on which they have been paying high-dollar premiums for over 20 years, to pay the benefits they were promised. And the promise is being broken. Insurance companies are fighting as if their lives depended on it, throwing huge litigation budgets against their insureds rather than pay the benefits that are owed. These cases, however, can by won and it is worth the investment to achieve a fair outcome for your client.

---

[29]Crisci v. Security Ins. Co., 66 Cal. 2d 425, 434 (1967).

[30]Fletcher v. Western Nat'l Life Ins. Co., 10 Cal. App. 3d 376, 404 (1976).

## CERTIFICATE OF SERVICE

I, Richard C. Angino, Esquire, hereby certify that a true and correct copy of the foregoing **PLAINTIFF'S REPLY BRIEF TO DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO SUPPLEMENT RECORD AND IN OPPOSITION TO PLAINTIFF'S MOTION TO ADD ADDITIONAL AUTHORITY** was served by United States first-class mail, postage prepaid, upon the following:

E. Thomas Henefer, Esquire
Stevens & Lee
111 North Sixth Street
P. O. Box 679
Reading, PA  19603-0679
    Counsel for Paul Revere Life Insurance Company and New York Life Insurance Company

 

Richard C. Angino

Dated: 12/18/02

254599.1\RCA\RT