**FILED**
HARRISBURG, PA

MAR 3 1 2003

**MARY** E. D'ANDREA, CLERK
Per_____

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VINCENZO MAZZAMUTO,<br>    Plaintiff, | CIVIL ACTION – LAW |
| v. | NO. 1:CV-01-1157 |
| UNUM   PROVIDENT   CORPORATION;<br>PAUL   REVERE   LIFE   INSURANCE<br>COMPANY;  and  NEW  YORK  LIFE<br>INSURANCE COMPANY<br>    Defendants | JUDGE CONNER<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION IN LIMINE**

Plaintiff, Vincenzo Mazzamuto, by and through counsel, Angino & Rovner, P.C. hereby

objects to Defendants' Motion in Limine to exclude the testimony of Plaintiff's witnesses.

1.    Plaintiff's Initial Disclosures which were provided in October 2001 are attached

as **Exhibit A.**

2.    On February 13, 2002, Defendants propounded Defendant New York Life's First

Set of Interrogatories, which requested, inter alia,

> 20.    Identify all physicians Plaintiff has treated with from January 1,
> 1995 to the present and identify all documents that reflect, refer or relate, in whole
> or in part, to the treatment Plaintiff received.

\* \* \*

22.     If you . . . will utilize an expert witness to testify on your behalf at the time of trial in regard to the issue of liability and/or damages in the above-captioned action:

(a)     Identify fully each and every such expert;

(b)     State the substance of facts as to which you expect each such expert to testify;

(c)     State the substance of the opinions as to which you expect each such expert to testify;

(d)     State the summary of the grounds for each such opinion;

(e)     State whether the facts and opinions listed above are contained in a written report, memorandum or other transcript, and if they are, attach a copy of the same; . . .

23.     With respect to each person whom you expect to call as an expert witness at the time of trial of this matter, state:

(a)     His/Her age;

(b)     The name and address of his/her present employer, or if self-employed, his/her occupation;

(c)     His/her educational background, specifying colleges attended, dates of attendance, degrees attained, and post-graduate degrees attained;

(d)     The name and address of every person, firm or corporation by which he/she was employed within the last ten (10) years and a detailed description of his/her duties at each such place of employment; or if he/she was self-employed, state specifically and in detail the description of his/her duties and responsibilities;

(e)     The expert's field of specialization; and

(f)     List all publications authored by said person, including the title of the work, the name of the periodical or book in which it was printed, and the date of its printing.

24.     Identify any and all fact witnesses who will testify on your behalf at the time of trial and state a brief summary of their testimony.

**Exhibit B.**

3.      Plaintiff responded by filing Answers on March 15, 2002.  **Exhibit C**.

4.      Defendants took the deposition of Mr. Mazzamuto (**Exhibit D**) and Mrs. Mazzamuto (**Exhibit E**) and Mr. Mazzamuto's treating physician (**Exhibit F**).

5.      Plaintiff conducted discovery by filing Interrogatories and Request for Production and taking depositions.

6.      Plaintiffs learned of potential witnesses through the passage of time and through discovery.

7.      In accordance with Judge Kane's Order of February 28, 2002, Plaintiff's Trial Witness List per Rule 26(a)(3) of the Federal Rules of Civil Procedure was provided to Defense Counsel in September 2002.

8.      Plaintiff's Trial Witness List was later updated to add (1) Therese A. Sindelar of New York Life, and (2) Salvatore Ferrigno, an agent for New York Life, and (3) Dr. Ted Kosenske, a treating physician.  **Exhibit G**.

9.      Plaintiff has been filing expert reports and disclosing the names of potential witnesses pertaining to company-wide unfair practices and responding to informal requests for information up to the present time.

10.     The Court has extended the time for identifying witnesses to April 7, 2003.

11.     Defendants have objected to Plaintiff's designated witnesses:

| | |
|---|---|
| Antonino Mazzamuto | Plaintiff's son |
| Francesco Mazzamuto | Plaintiff's son |
| Angelo Mazzamuto | Plaintiff's son |
| Antonia Tripoli | Plaintiff's sister |
| Pam Hagerich | Plaintiff's neighbor |

| Vincenzo Randazzo | Plaintiff's employee |
|---|---|
| James S. Marshall | electrician who provides service to Plaintiff's restaurant |
| Ted Kosenske, M.D. | Plaintiff's treating physician at Pain Clinic |
| Salvatore Ferrigno | New York Life agent |

12.     Six months have passed since Plaintiff supplied defense counsel with his initial witness list and two months since Plaintiff has supplemented the witness list when Defendants raised no objection, nor sought leave to conduct any discovery regarding these witnesses.

13.     Everybody who knows Mr. Mazzamuto, including family, vendors to the restaurant, customers and treating physicians, knows that he is disabled.

14.     Many of the witnesses in the list were revealed to Defendants during the discovery in this case, by virtue of the facts that Defendants were provided employee lists and made a site visit.  Plaintiff testified that his sons work at the restaurant.  See. **Exhibit E**, relevant parts of the deposition of Mrs. Mazzamuto, and **Exhibit D**, relevant parts of the deposition of Plaintiff.

15.     Dr. Kosenske, who has treated Plaintiff for back pain since Plaintiff's 1996 injury and application for disability benefits, has supplied records to Defendants since his 1996 disability claim.  See, **Exhibit H**, a document which Defendants produced in discovery in this case, and is well known to Defendants.  Plaintiff released Dr. Kosenske's records to Defendants when both claims for disability benefits were made. **Exhibit I.**

16.     Salvatore Ferrigno is Defendant New York Life's agent, who sold the pertinent policies to Mr. Mazzamuto.  See, **Exhibit J**, a document which Defendants produced in discovery in this case, which is attached to Plaintiff's Brief.  Mr. Ferrigno is well known to Defendants, and there were exchanges of 1996 documents in the claim.  Mr. Ferrigno advised

New York Life that Plaintiff was unaware of any pre-existing conditions upon application for disability insurance and was genuinely entitled to disability benefits when Plaintiff made his earlier claim for disability in 1996.

17.    Defendants made a personal observation of Plaintiff. **Exhibit K.**

18.    The family members, neighbor, and employee identified as witnesses were all available for identification by Defendants and depositions if desired by Defendants, both before and after the provision of the witness list in September 2002. Moreover, fully six months have passed since Plaintiff provided this list to Defendants. If Defendants felt a need to depose witnesses that Defendants previously overlooked, Defendants had plenty of time to request same.

19.    Accepting Defendants' argument would require parties who are untrained in the law to identify all witnesses at the earliest phase of the case, prevent counsel from considering the worth of calling witnesses for trial and prohibit a party from ever calling any witness whose identity was learned in discovery. This is a preposterous result, not mandated by Federal Rules of Civil Procedure.

WHEREFORE, Plaintiff respectfully requests that Defendants' Motion in Limine to exclude nine witnesses identified over six months ago be DENIED.

Respectfully submitted,

ANGINO & ROVNER, P.C.

s/Richard C. Angino
Richard C. Angino, Esquire
I.D. No. PA07140
Joan L. Stehulak, Esquire
I.D. No. PA29496
4503 N. Front Street
Harrisburg, PA  17110
(717) 238-6791
Attorney for Plaintiff

Date:  March 31, 2003

## CERTIFICATE OF SERVICE

I, Richard C. Angino, Esquire, hereby certify that a true and correct copy of the foregoing

Plaintiff's Response to Defendants Motion in Limine was served by United States first-class

mail, postage prepaid, upon the following:

E. Thomas Henefer, Esquire
Stevens & Lee
111 North Sixth Street
P. O. Box 679
Reading, PA  19603-0679
      Counsel for Paul Revere Life Insurance Company and New York Life Insurance
      Company

                                               _____ s/Richard C. Angino _____

Dated:  March 31, 2003

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VINCENZO MAZZAMUTO, | CIVIL ACTION – LAW |
| Plaintiff, | |
| v. | NO. 1 CV-01-1157 |
| UNUM PROVIDENT CORPORATION; PAUL REVERE LIFE INSURANCE COMPANY; and NEW YORK LIFE INSURANCE COMPANY, | JUDGE KANE |
| Defendants. | JURY TRIAL DEMANDED |

## PLAINTIFF'S INITIAL DISCLOSURES AS REQUIRED BY FED.R.CIV.P. 26

Pursuant to Fed. R. Civ. P. 26 (a)(1), Plaintiff, by and through his counsel, Angino & Rovner, P.C., provides the following:

### I.    Fed.R.Civ.P. 26(a)(i)(A) – Individuals

1.  Plaintiff Vincenzo Mazzamuto, c/o Angino & Rovner, P.C., 4503 North Front Street, Harrisburg, PA   17110

2.  Mrs. Gerri Mazzamuto, Plaintiff's wife.

3.  Therese A. Sindelar, New York Life Claim Representative, PO Box 6916, Cleveland, OH 44101, 800-695-9873

4.  Gloria E. Phelps, New York Life Claim Representative, PO Box, OH 44101, 800-695-9873

5.  Melissa Magner, UNUM Claim Representative, 18 Chestnut Street, Worchester Massachusetts 01608-1528.

6.  Peter J. Russo, Attorney at Law. 5010 East Trindle Road, Suite 200, Mechanicsburg, PA 17050, 717/591-1755

7.  Douglas J. Bower, M.D., Masland Associates, Medical Arts Building, 220 Wilson Street, Carlisle, PA 17013, 717/249-1929

Exhibit A

8.      Alexander Spring Rehab, Inc., 27 Brookwood Avenue, Carlisle, PA 17013, 717/245-2341

## II.      **Fed.R.Civ.P. 26(a)(1)(B) – Documents**

Plaintiff believes that Defendant is currently in possession of all documents, not privileged, in the possession, custody, and control of the Plaintiff.  Those items include such things as medical records, correspondence, claim forms, applications, etc.  Plaintiff also discloses the existence of medical records of all treating physicians currently in Plaintiff's possession, specifically the records of Pain Management Clinic, Carlisle Hospital, Alexander Spring Rehab, Dr. Bower, and Harrisburg Hospital.

## III.      **Fed.R.Civ.P. 26(a)(1)(C) – Damages**

Plaintiff seeks disability benefits from the time of the disabling events of November 2000, and all damages permitted under 42 Pa. C.S.A. §8371 for actions arising under insurance policies.

## IV.      **Fed.R.Civ.P. 26(a)(1)(D) – Insurance**

This section is not applicable to the Plaintiff.

Respectfully submitted,

ANGINO & ROVNER, P.C.

_____
Richard C. Angino, Esquire
I.D. No. 07140
4503 N. Front Street
Harrisburg, PA  17110
(717) 238-6791
Attorney for Plaintiff

Date:

## <u>CERTIFICATE OF SERVICE</u>

I, Richard C. Angino, an employee of Angino & Rovner, P.C., hereby certify that a true

and correct copy of **Plaintiff's Initial Disclosures as Required by Fed.R.Civ.P. 26** was served

by United States first-class mail, postage prepaid, upon the following:

E. Thomas Henefer, Esquire
Stevens & Lee
111 North Sixth Street
PO Box 679
Reading, PA 19603-0679
  Attorney for Defendants

              _____

              Richard C. Angino

Dated:

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VINCENZO MAZZAMUTO,<br>Plaintiff | : | Case No. 1:01-CV-1157 |
| | : | |
| v. | : | |
| | : | |
| UNUM PROVIDENT<br>CORPORATION, PAUL REVERE<br>LIFE INSURANCE COMPANY and<br>NEW YORK LIFE INSURANCE<br>COMPANY, | : | JUDGE KANE |
| Defendants | : | |

## DEFENDANT NEW YORK LIFE INSURANCE COMPANY'S
## FIRST SET OF INTERROGATORIES ADDRESSED TO PLAINTIFF

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant, New York Life

Insurance Company ("New York Life") hereby requests Plaintiff to answer the interrogatories

listed below within thirty (30) days.

## I. DEFINITIONS

A.    The term "person," as used herein, means any natural person, partnership,

corporation, or other business entity and all present and former officers, directors, agents,

employees, attorneys and others acting or purporting to act on behalf of such natural person,

partnership, corporation or other business entity.

B.    The term "complaint" as used herein means the Complaint filed in the above-

captioned action.

C.    The terms "you" and "your," as used herein, mean the named plaintiff and each

other person acting or authorized to act on her behalf.

D.    The term "policy," as used herein, means each rule, procedure, or directive,

formal or informal, and each common understanding of a course of conduct which was

1

*Exhibit B*

recognized as such by your employees or other persons acting on your behalf, which was in effect at any time during the period covered by these discovery requests.

E.     The terms "and" and "or," as used herein, shall be construed conjunctively or disjunctively as required to include within the scope of each discovery request any information which might be excluded by the opposite construction.

F.     The term "identify" or "identity" when used in reference to:  (1) an individual, means to give the person's full name; all known aliases; the present or the last known business and home addresses; present position or business affiliation, and position or business affiliation at all times during the time period covered by the Complaint; (2) any other person, means to give the person's official, legal and formal name or the name under which the person acts or conducts business; the address of the person's place of business, profession, commerce or home; and the identity of the person's principal or chief executive officer or person who occupies the position most closely analogous to a chief executive; (3) a document, means to describe specifically the "document," its date, its author (and, if different, the signer or signers), type of document (e.g., "letter") each addressee and known recipient, its present or last known location and custodian, the manner and date of its disposition if any such "document" was, but is no longer, in your possession or subject to your control, and all other means of identifying it with  sufficient particularity to satisfy the requirements for its inclusion in a demand or request for its production pursuant to Rule 34 of the Federal Rules of Civil Procedure, or by a subpoena duces tecum; and (4) a communication, means to identify the pertinent "document" or "documents" if the communication is written, or to identify the participants and set forth the date, manner, place and substance of the communication if it is non-written.

G.     The term "document," as used herein, means the original and all copies of any written, printed, typed or other graphic matter of any kind or nature and any other tangible thing

2

in your possession, custody or control, wherever located. Any copy containing thereon or having attached thereto any alterations, notes, comments, or other material not included in the originals or copies referred to in the preceding sentence shall be deemed a separate document within the foregoing definition. The term "documents" includes, but is not limited to:

1.      All contracts, agreements, letter agreements, representations, warranties, certificates and opinions;

2.      All letters or other forms of correspondence or communication, including envelopes and notes, telegrams, cables, telex messages and other messages, including reports, notes, notations and memoranda of or relating to telephone conversations or conferences;

3.      All memoranda, reports, test results, financial statements or reports, notes, scripts, transcripts, tabulations, studies, analyses, evaluations, projections, work papers, corporate records or copies thereof, expressions or statements of policy, lists, comparisons, questionnaires, surveys, charts, graphs, summaries, extracts, statistical statements or records, compilations and opinions or reports of consultants;

4.      All desk calendars, appointment books and diaries;

5.      All minutes, records or transcripts of meetings and conferences, and lists of persons attending meetings or conferences;

6.      All reports and summaries of interviews and negotiations;

7.      All books, articles, press releases, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, instructions and manuals;

8.      All motion pictures and photographs (whether developed or undeveloped), tape recordings, microfilms, phonographs, tapes or other records, punch cards, magnetic tapes, discs, data cells, drums, print-outs and other data compilations from which information can be obtained; and

3

9.    Drafts of any document, revisions of drafts of any document and original or preliminary notes.

H.    The term "communications," as used herein, means all statements, admissions, denials, inquiries, discussions, conversations, negotiations, agreements, contracts, understandings, meetings, telephone conversations, letters, correspondence, notes, telegrams, telexes, advertisements, or any other form of written or verbal intercourse.

I.    The term "relate(s) to," as used herein, means constitute(s), refer(s) to, reflect(s), concern(s), pertain(s) to or in any way logically or factually connect(s) with the matter described in the discovery request.

## II. RULES OF CONSTRUCTION

In construing these discovery requests:

A.    The singular shall include the plural and the plural shall include the singular.

B.    A masculine, feminine or neuter pronoun shall not exclude the other genders.

C.    Unless otherwise specified in a particular discovery request, these discovery requests seek all responsive information pertaining to the period of January 1, 1993 through the date of these requests, or such longer period for which you have sought or will seek discovery.

## III. INSTRUCTIONS

A.    To the extent any information called for by these discovery requests is unknown to you, so state, and set forth such remaining information as is known.  If any estimate can reasonably be made in place of unknown information, also set forth your best estimate, clearly designated as such, in place of unknown information, and describe the basis upon which the estimate is made.

B.    To the extent any discovery request is objected to, set forth all reasons therefor.  If you claim privilege as a ground for not answering any discovery request in whole or in part,

4

describe the factual basis for your claim of privilege in sufficient detail to permit the court to adjudicate the validity of the claim. If you object in part to any discovery request, answer the remainder completely.

C.     These discovery requests shall be deemed continuing and require additional responses if further information is obtained between the time the responses are served and the time of trial. Such additional responses shall be served from time to time, but not later than 30 days after such additional information is received.

## IV. INTERROGATORIES

1.     Identify the name and, if known, the address and telephone number of each individual likely to have discoverable information that you may use to support your claim against New York Life, specifically identifying the subject of information that each identified person is likely to have.

Answer:

2.     Identify, with a description by category and location of all documents, data compilations, and tangible things that are in your possession, custody, or control that may be used by you to support your claim against New York Life.

Answer:

5

3.     Provide a computation of any and all categories of damages claimed by you with respect to your claim against New York Life and identify all documents or other evidentiary material on which your computation is based.

Answer:

4.     Identify all persons or entities, whether corporations, partnerships, sole proprietors, or otherwise, who have employed you since January 1, 1990, providing your date(s) of employment with all such businesses, and identifying your immediate supervisor(s) for each such employment.  If you have been self-employed for any period during this time, please so indicate and provide the date(s) of such employment.

Answer:

5.     Identify all healthcare providers from whom you have sought any treatment for any reason since January 1, 1990, and for each healthcare provider identified, set forth the nature of the treatment provided, the reason for the treatment, the illness or condition which was treated, and the dates the treatment was provided.

Answer:

6.     Identify each and every person or entity to whom you have submitted an application or inquiry regarding possible employment or work of any type, whether orally or in

writing, since January 1, 1995, and for each person or entity so identified, set forth the response received by you as a result of such application or inquiry.

    Answer:

7.    If you contend that any officer, agent, employee, or representative of New York Life has made a statement or admission against or adverse to their interest or position in this lawsuit, whether in writing or orally, identify such statement and/or admission, specifying the individual who made the statement and when and to whom it was made.

    Answer:

8.    Identify all individuals who are aware that you have been unable to work, and for each person so identified state, to the best of your knowledge, the substance of the knowledge of each, and identify any relevant documents relating to that person's knowledge of your alleged inability to work.

    Answer:

9.    Identify all persons who have knowledge of any facts which support your contention that New York Life engaged in bad faith. For each person identified state, to the best of your knowledge, the substance of the knowledge of each person.

    Answer:

SL1 233295v1/10305.060

10.    Have you taken any vacations, or engaged in any traveling since January 1, 1995, including, but not limited to, any trips or travels related to holidays and/or visiting family members?  If your answer is yes, please list the dates for all such vacations or travels, the destinations to which you traveled, and the length of time during which you stayed at any such destinations.

Answer:

11.    To the best of your knowledge, have you given to anyone, including, but not limited to, any insurance company representative, any representative of the Social Security Administration, or any representative of New York Life, any statements, comments or reports concerning your claim for disability?  If so, please identify all such statements (i.e., state to whom and where such statement was made, what was said, and the person(s) who has possession of any such statement).

Answer:

12.    Identify all persons who have been employed by Vinny's Restaurant, Inc. from January 1, 1995 to the present.

Answer:

8

13.   Describe in detail and itemize all damages that you claim to have suffered as a result of the actions of New York Life.

Answer:

14.   Identify when plaintiff ceased working at Vinny's Restaurant, Inc., including all dates, due to his diagnosis and treatment for his cardiac and back condition, and when he resumed working at Vinny's Restaurant, Inc. (if at all) in any capacity thereafter.

Answer:

15.   Identify whether plaintiff has ever applied for, or received, any disability benefits including, but not limited to, any benefits under the Social Security Act, or any disability insurance policy other than under the policy at issue in this case.

Answer:

16.   If plaintiff has received disability benefits, identify each and every policy or other entity (including, but not limited to, the Social Security Administration) from whom benefits have been received, the dates on which they were received, the amount of monthly benefits received, all persons who are knowledgeable about the benefits received, and all other documents that refer or relate, in whole or in part to such benefits.

Answer:

9

17.     Identify the weekly salary or hourly wages received by plaintiff from January 1, 1993 to the present and all documents that reflect, refer or relate, in whole or in part, to such salary or wages.

Answer:

18.     To the extent not covered by the preceding interrogatory, identify all compensation and/or money received by plaintiff from Vinny's Restaurant, Inc. from 1995 to the present and identify all documents that reflect, refer or relate, in whole or in part to such compensation and/or money.

Answer:

19.     Identify the number of hours plaintiff has worked per week at Vinny's Restaurant, Inc. from 1995 to the present and identify all documents that reflect, refer or relate, in whole or in part, to the treatment plaintiff received.

Answer:

20.     Identify all physicians plaintiff has treated with from January 1, 1995 to the present and identify all documents that reflect, refer or relate, in whole or in part, to the treatment plaintiff received.

Answer:

10

21.     Identify the condition that is causing plaintiff's alleged disability and identify all documents that reflect, refer or relate, in whole or in part, to the said condition.

Answer:

22.     If you have engaged or will utilize an expert witness to testify on your behalf at the time of trial in regard to the issue of liability and/or damages in the above-captioned action:

(a)     Identify fully each and every such expert;

Answer:

(b)     State the substance of facts as to which you expect each such expert to testify;

Answer:

(c)     State the substance of the opinions as to which you expect each such expert to testify;

Answer:

11

(d)     State the summary of the grounds for each such opinion;

Answer:

(e)     State whether the facts and opinions listed above are contained in a written report, memorandum or other transcript, and if they are, attach a copy of the same; and

Answer:

(f)     If the opinion of any expert listed above is based in whole or in part on any code or regulation, governmental or otherwise, or based in whole or in part on any text or treatise, to the extent that you have not already done so, identify said code, regulation, text or treatise, and specifically set forth the section relied upon.

Answer:

23.     With respect to each person whom you expect to call as an expert witness at the time of trial of this matter, state:

(a)     His/Her age;

Answer:

12

        (b)     The name and address of his/her present employer, or if self-employed, his/her occupation;

Answer:

        (c)     His/her educational background, specifying colleges attended, dates of attendance, degrees attained, and post-graduate degrees attained;

Answer:

        (d)     The name and address of every person, firm or corporation by which he/she was employed within the last ten (10) years and a detailed description of his/her duties at each such place of employment; or if he/she was self-employed, state specifically and in detail the description of his/her duties and responsibilities;

Answer:

        (e)     The expert's field of specialization; and

Answer:

        (f)     List all publications authored by said person, including the title of the work, the name of the periodical or book in which it was printed, and the date of its printing.

Answer:

13

24.    Identify any and all fact witnesses who will testify on your behalf at the time of trial and state a brief summary of their testimony.

Answer:

Dated: February _13_, 2002

**STEVENS & LEE**

By _~~signature~~_

E. Thomas Henefer
Attorney I.D. No. 55773
Kirk L. Wolgemuth
Attorney I.D. 45792
111 North Sixth Street
P.O. Box 679
Reading, Pennsylvania 19603
(610) 478-2000

**Attorneys for Defendants**

14

SL1 233295v1/10305.060

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VINCENZO MAZZAMUTO,<br>    Plaintiff, | CIVIL ACTION – LAW |
| v. | NO. 1:CV-01-1157 |
| UNUM PROVIDENT CORPORATION;<br>PAUL REVERE LIFE INSURANCE<br>COMPANY; and NEW YORK LIFE<br>INSURANCE COMPANY<br>    Defendants | JUDGE KANE<br><br>JURY TRIAL DEMANDED |

### PLAINTIFF'S ANSWERS TO
### DEFENDANT NEW YORK LIFE INSURANCE COMPANY'S
### FIRST SET OF INTERROGATORIES ADDRESSED TO PLAINTIFF

1.      Identify the name and, if known, the address and telephone number of each individual likely to have discoverable information that you may use to support your claim against New York Life, specifically identifying the subject of information that each identified person is likely to have.

    Answer:

**Objection. To the extent this interrogatory seeks facts known or opinions held by experts retained for the purposes of litigation but not identified as trial witnesses, it exceeds the permissible scope of expert discovery under Federal rules. In further response but without waiving said objection, Plaintiff believes that Defendant is currently in possession of said documents which would include such things as Plaintiff's medical records, correspondence, claim forms, applications, etc.   See, Plaintiff's Initial Disclosures. Plaintiff's treating physicians (See list of providers, Interrogatory #5). Plaintiff reserves the right to supplement response to this interrogatory.**

2.      Identify, with a description by category and location of all documents, data compilations, and tangible things that are in your possession, custody, or control that may be used by you to support your claim against New York Life.

Exhibit C

<u>Answer</u>: **Plaintiff believes that Defendant is currently in possession of all documents, not privileged, in the possession, custody, and control of the Plaintiff. Those items include such things as medical records, correspondence, claim forms, applications, etc. See list of medical providers in Plaintiff's answers to interrogatories. If Defendant believes it does not have records of any of the providers listed, Plaintiff will make them available at the specific request and expense of Defendant.**
**Plaintiff reserves the right to supplement response to this interrogatory.**

3. Provide a computation of any and all categories of damages claimed by you with respect to your claim against New York Life and identify all documents or other evidentiary material on which your computation is based.

<u>Answer</u>:
**See, Complaint. Again, Plaintiff believes that Defendant is currently in possession of many of said documents. Plaintiff will supplement response to this interrogatory.**

4. Identify all persons or entities, whether corporations, partnerships, sole proprietors, or otherwise, who have employed you since January 1, 1990, providing your date(s) of employment with all such businesses, and identifying your immediate supervisor(s) for each such employment. If you have been self-employed for any period during this time, please so indicate and provide the date(s) of such employment.

<u>Answer</u>    **Vinny's Restaurant Inc., 330 S. Hanover St., Carlisle, PA 17013**
**Little Luigi restaurant, Carlisle, PA for a short while, 1992**
**Plaintiff reserves the right to supplement response.**

5. Identify all healthcare providers from whom you have sought any treatment for any reason since January 1, 1990, and for each healthcare provider identified, set forth the nature of the treatment provided, the reason for the treatment, the illness or condition which was treated, and the dates the treatment was provided.

<u>Answer</u>:

DOUGLAS J. BOWER, M.D., Masland Associates, Medical Arts Bldg., 220 Wilson St., Carlisle, PA, chronic low back pain, chronic anxiety, coronary artery disease, constipation, hyperlipidemia and general complaints handled by a family physician. See, medical records and reports in possession of Defendant.

CARLISLE REGIONAL MEDICAL CENTER, Carlisle,PA, 7/22/00 heart attack, 8/4/00 admission for chest pain, 8/4/00 cardiology consult with William P. Apollo, M.D., radiology dept.: 6/5/96 x-ray and MRI of lumbosacral spine, 9/16/96 IVP with tomography, 6/4/99 KUB, 6/8/99 CT scan of abdomen and pelvis, 8/4/00 chest x-ray,7/22/00 chest x-ray, 12/5/00 upper GI, 10/17/01 MRI of lumbar spine

HARRISBURG HOSPITAL, Harrisburg, PA, 7/24/00 admission for coronary angiography and angioplasty, Moffitt, Pease & Lim, cardiologists

HOLY SPIRIT HOSPITAL, Camp Hill, PA, monitored cardiac rehabilitation program, 11/00

PAIN MANAGEMENT CLINIC OF CARLISLE HOSPITAL, 5 Sprint Dr., Carlisle, PA, see records. lumbar epidural injections on 7/10/96, 7/30/96, 8/20/96, 10/30/96, 1/7/97, 3/5/97, 5/22/97, 9/22/97, 3/4/98, 7/15/98, 2/22/99, 3/21/00, 10/18/00, 1/31/01, 4/4/01, and 6/8/01. Ted D. Kosenske, M.D.

ALEXANDER SPRING REHAB, 27 Brookwood Ave., Carlisle, PA, treatment for low back pain and radicular symptoms, therapeutic exercise, traction, joint mobilization, body mechanics education, modalities, 11/27/00 – 2/16/01.

J. CRAIG JURGENSEN, M.D., neurology, 850 Walnut Bottom Rd., Carlisle, PA, EMG nerve conduction study lower extremities for pain in legs and back, 3/01

CARLISLE ENDOSCOPY CENTER, 9/4/01 colonoscopy and biopsy of colon polyp

HERSHEY MEDICAL CENTER, Hershey, PA, Dr. Gelb, 2001 surgical opinion for back

DR.EDWARD DAGEN, urologist, 9 Brookwood Ave., Carlisle, PA  - bladder, kidney stone (2000), and prostate

Plaintiff reserves the right to supplement response to this interrogatory.


6.     Identify each and every person or entity to whom you have submitted an application or inquiry regarding possible employment or work of any type, whether orally or in writing, since January 1, 1995, and for each person or entity so identified, set forth the response received by you as a result of such application or inquiry.
    Answer:     None

7.  If you contend that any officer, agent, employee, or representative of New York Life has made a statement or admission against or adverse to their interest or position in this lawsuit, whether in writing or orally, identify such statement and/or admission, specifying the individual who made the statement and when and to whom it was made.

Answer:
**Plaintiff reserves the right to supplement response to this interrogatory.**

8.  Identify all individuals who are aware that you have been unable to work, and for each person so identified state, to the best of your knowledge, the substance of the knowledge of each, and identify any relevant documents relating to that person's knowledge of your alleged inability to work.

Answer:   **my family, my doctors, my customers. See, medical records of providers previously listed. Plaintiff reserves the right to supplement response to this interrogatory.**

9.  Identify all persons who have knowledge of any facts which support your contention that New York Life engaged in bad faith. For each person identified state, to the best of your knowledge, the substance of the knowledge of each person.

Answer:
**Objection. To the extent this interrogatory seeks facts known or opinions held by experts retained for the purposes of litigation but not identified as trial witnesses, it exceeds the permissible scope of expert discovery under Federal rules. In further response but without waiving said objection, Defendants should have knowledge. See, Complaint. Plaintiff reserves the right to supplement response to this interrogatory.**

10.   Have you taken any vacations, or engaged in any traveling since January 1, 1995, including, but not limited to, any trips or travels related to holidays and/or visiting family members? If your answer is yes, please list the dates for all such vacations or travels, the destinations to which you traveled, and the length of time during which you stayed at any such destinations.

Answer:   **Other than occasional visits to a relative in New Bloomfield, one week in summer either to Ocean City, Maryland, or Ocean City, NJ; not every year depending on the situation. Traveling time 3 or 4 hours. Once made reservations for Virginia and canceled because of anxiety. The trip was too long and I was afraid that I would not be able to make it., or my legs would go numb and I had my wife and son with me. I don't feel at ease when I am not close to home. I'm afraid that my health might give me problems and my doctor is not close.**

11.   To the best of your knowledge, have you given to anyone, including, but not limited to, any insurance company representative, any representative of the Social Security Administration, or any representative of New York Life, any statements, comments or reports concerning your claim for disability? If so, please identify all such statements (i.e., state to whom and where such statement was made, what was said, and the person(s) who has possession of any such statement).

Answer:
**Defendant should have all paperwork submitted to it regarding Plaintiff's claim for disability. See documents submitted to Social Security in response to Request for Production of Documents.**

12.   Identify all persons who have been employed by Viny's Restaurant, Inc. from January 1, 1995 to the present.

Answer:

**See**, payroll registers supplied with Plaintiff's response to **Request for Production of Documents.**

13.     Describe in detail and itemize all damages that you claim to have suffered as a result of the actions of New York Life.

Answer:
**See, Complaint. Plaintiff reserves the right to supplement response to this interrogatory.**

14.     Identify when plaintiff ceased working at Viny's Restaurant, Inc., including all dates, due to his diagnosis and treatment for his cardiac and back condition, and when he resumed working at Viny's Restaurant, Inc. (if at all) in any capacity thereafter.

Answer:     **7/22/00 day of heart attack last day  - doesn't work yet.**

15.     Identify whether plaintiff has ever applied for, or received, any disability benefits including, but not limited to, any benefits under the Social Security Act, or any disability insurance policy other than under the policy at issue in this case.

Answer:     **2001 – Social Security Disability benefits**

16.     if plaintiff has received disability benefits, identify each and every policy or other entity (including, but not limited to, the Social Security Administration) from whom benefits have been received, the dates on which they were received, the amount of monthly benefits received, all persons who are knowledgeable about the benefits received, and all other documents that refer or relate, in whole or in part to such benefits.

Answer:
**Have received disability benefits from Defendant**

17.  Identify the weekly salary or hourly wages received by plaintiff from January 1, 1993 to the present and all documents that reflect, refer or relate, in whole or in part, to such salary or wages.

Answer:

**See, payroll registers supplied in response to Request for Production of Documents for the years 1995, 1996, 1997, 1998, 1999, 2000, and 2001. Also see, W-2s and tax returns for the years 1993 and 1994 supplied in response to Request for Production of Documents. Plaintiff previously supplied tax returns for the years 1995 – 2000. Plaintiff has not worked since July 2000.**

18.  To the extent not covered by the preceding interrogatory, identify all compensation and/or money received by plaintiff from Vinny's Restaurant, Inc. from 1995 to the present and identify all documents that reflect, refer or relate, in whole or in part to such compensation and/or money.

Answer:

**See response to interrogatory #17.**

19.  Identify the number of hours plaintiff has worked per week at Vinny's Restaurant, Inc. from 1995 to the present and identify all documents that reflect, refer or relate, in whole or in part, to the treatment plaintiff received.

Answer:

**See Plaintiff's applications submitted to Defendant. Plaintiff has not been able to work since July 2000.**

20.     Identify all physicians plaintiff has treated with from January 1, 1995 to the present and identify all documents that reflect, refer or relate, in whole or in part, to the treatment plaintiff received.

Answer:

**See Plaintiff's response to Interrogatory #5. If Defendant believes it does not have records of any of the providers listed, Plaintiff will make them available at the specific request and expense of Defendant.**

21.     Identify the condition that is causing plaintiff's alleged disability and identify all documents that reflect, refer or relate, in whole or in part to the said condition.

Answer:

**back problem (stenosis of the spine); not being able to do what is needed causes also stress which is not good for my heart. See medical records of providers previously listed.**

22.     If you have engaged or will utilize an expert witness to testify on your behalf at the time of trial in regard to the issue of liability and/or damages in the above-captioned action:

     (a)     Identify fully each and every such expert;

Answer:

**Plaintiffs have not yet determined whom they will call as expert witnesses at trial. Upon completion of discovery, when such a designation is made, Plaintiffs will seasonably supplement their response to this interrogatory in compliance with the requirements of Federal 26(a)(2).**

     (b)     State the substance of facts as to which you expect each such expert to testify;

Answer:

**See Plaintiff's answer to Interrogatory #22(a).**

     (c)     State the substance of the opinions as to which you expect each such expert to testify;

Answer:

**See Plaintiff's answer to Interrogatory #22(a).**

(d)     State the summary of the grounds for each such opinion;

Answer:
**See Plaintiff's answer to Interrogatory #22(a).**


(e)     State whether the facts and opinions listed above are contained in a written report, memorandum or other transcript, and if they are, attach a copy 'of the same; and

Answer:
**See Plaintiff's answer to Interrogatory #22(a).**

(f)     if the opinion of any expert listed above is based in whole or in part on any code or regulation, governmental or otherwise; or based in whole or in part on any text or treatise, to the extent that you have not already done so, identify said code, regulation, text or treatise, and specifically set forth the section relied upon.

Answer:
**See Plaintiff's answer to Interrogatory #22(a).**


23.     With respect to each person whom you expect to call as an expert witness at the time of trial of this matter, state:

(a)     His/Her age;
Answer:
**See Plaintiff's answer to Interrogatory #22(a).**

(b)     The name and address of his/her present employer, or if self-employed, his/her his/her occupation;

Answer:
**See Plaintiff's answer to Interrogatory #22(a).**

(c)     His/her educational background, specifying colleges attended, dates of attendance, degrees attained, and post-graduate degrees attained;

Answer:
**See Plaintiff's answer to Interrogatory #22(a).**

(d)     The name and address of every person, firm or corporation by which he/she was employed within the last ten (10) years and a detailed description of his/her duties at each such place of employment; or if he/she was self-employed, state specifically and in detail the description of his/her duties and responsibilities;

Answer:
**See Plaintiff's answer to Interrogatory #22(a).**

(e)     The expert's field of specialization; and

Answer:
**See Plaintiff's answer to Interrogatory #22(a).**

(f)     List all publications authored by said person, including the title of the work, the name of the periodical or book in which it was printed, and the date of its. printing.

Answer:
**See Plaintiff's answer to Interrogatory #22(a).**

24.     Identify any and all fact witnesses who will testify on your behalf at the time of trial and state a brief summary of their testimony.

Answer: **Plaintiffs have not yet determined whom they will call as fact witnesses at trial. Upon completion of discovery, when such a designation is made, Plaintiffs will seasonably supplement their response to this interrogatory.**

Respectfully submitted,

ANGINO & ROVNER, P.C.

Richard C. Angino, Esquire
I.D. No. 07140
Joan L. Stehulak, Esquire
I.D. No. 29496
4503 N. Front Street
Harrisburg, PA  17110
(717) 238-6791
Attorney for Plaintiff

# CERTIFICATE OF SERVICE

I, Joan L. Stehulak, Esquire, hereby certify that a true and correct copy of the foregoing

**PLAINTIFF'S ANSWERS TO DEFENDANT NEW YORK LIFE INSURANCE**

**COMPANY'S FIRST SET OF INTERROGATORIES ADDRESSED TO PLAINTIFF** was

served by United States first-class mail, postage prepaid, upon the following:

E. Thomas Henefer, Esquire
Stevens & Lee
111 North Sixth Street
P. O. Box 679
Reading, PA  19603-0679
    Counsel for Paul Revere Life Insurance Company and New York Life Insurance
    Company

                        Joan L. Stehulak

Dated: 3/15/02

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

VINCENZO MAZZAMUTO,      :
                               :
             Plaintiff      :
                               :
        VS                   :
                               :
UNUM PROVIDENT CORPORATION,   :
PAUL REVERE LIFE INSURANCE    :
COMPANY and NEW YORK LIFE      :
INSURANCE COMPANY,            :
                               :
         Defendant     : NO. 1:01-CV-1157

: : : : : : : : : : : : : : : : : : : : : : : : : : : : :

WITNESS:            VINCENZO MAZZAMUTO

DATE:               MAY 10, 2002

PLACE:             ANGINO & ROVNER
                      4503 NORTH FRONT STREET
                      HARRISBURG, PA

TAKEN BY:         DEFENDANT

**SUZANNE MINELLO COURT REPORTING**
**573 INDIAN RUN DRIVE**
**HUMMELSTOWN, PA 17036**
**(717) 671-7007**

Exhibit D

1    came here, but I just took my cousin's invitation,

2    which today is my brother-in-law.

3          Q.     So your cousin lived in Carlisle?

4          A.     He's back in the old country now.

5          Q.     At the time he was in the Carlisle

6    area?

7          A.     Yes, yes.

8          Q.     Tell me about the restaurant that you

9    own today?  How large is it?  What type of customers

10    do you have?  What type of food do you serve?

11          A.     It is about 2700 square foot.  We

12    accommodate 78 seats, approximately 78.  We serve

13    Italian dinners, of course, we make subs and pizza.

14          Q.     Do you serve lunch there?

15          A.     Yes, we do lunch and dinners.

16          Q.     Has the physical structure of the --

17    you mentioned it had about 2700 square feet; is that

18    right?

19          A.     Approximately.

20          Q.     Has that been about the same size since

21    the time that you opened the restaurant, or has there

22    been any physical additions to the building?

23          A.     No, a little remodeling, not really

24    addition, no.

25          Q.     Where within the restaurant do you work

1    when you're working, if you're working -- let me back

2    up for a second.  Let's go back say to 1998 before

3    this latest claim for disability benefits, where

4    within the restaurant would you personally do the

5    work that you did?

6         A.    Most of the time during lunch hour was

7    at the cash register and take care of clientele.

8    After that, you know, make sure that everything would

9    have been under control, make your orders, you know,

10   for food to be delivered.  As the day goes, is that

11   what you're asking me?

12        Q.    Right, right.

13        A.    Then you get ready for dinner and stay

14   out front by the cash register and take care of

15   customer again, you know.  After they order the food,

16   you usually had either some of my kids or some

17   employees deliver the food at the table.

18        Q.    Where in the restaurant would you do

19   things like place orders for food?  I take it that is

20   what you're saying when you place orders that it is

21   for food products and things like that that you need

22   to sell in the restaurant?

23        A.    Where I was buying the food from?

24        Q.    Yes.  In other words, where would you

25   sit within the restaurant building --

1      Q.     When you're placing orders for food

2  products and things of that sort, are you sitting

3  down or are you standing up or does it vary?

4      A.     Mostly I was sitting down when I placed

5  the order, yes.

6      Q.     You mentioned employees, how many

7  employees typically does the restaurant have?

8             MR. ANGINO:  At what time?

9              THE WITNESS:  At the moment, I don't

10  really know.  My wife is taking care of the business.

11  BY MR. HENEFER:

12      Q.     Would it be fair to say that 1998 is a

13  good year to use because you weren't disabled that

14  year?

15      A.     I try to take it back a little bit.

16  Memory is not my typical stuff, but including --

17  because most of my family always work as employee

18  there, I would say four other -- altogether about

19  eight, nine workers.

20              MR. ANGINO:  Including your family?

21              THE WITNESS:  Including the family.

22  BY MR. HENEFER:

23      Q.     Are you including yourself in that

24  group?

25      A.     Yes, that includes me.

1      Q.    And Mrs. Mazzamuto?

2      A.    Yes.

3      Q.    So you had two children working there?

4      A.    It varies.  You know how kids go, you

5 know, they never work other places unless when they

6 go to college.

7      Q.    Eventually, we'll do what is marking as

8 exhibits, these documents, but these are payroll

9 registers that Mr. Angino produced for us when we

10 asked for them.  Would these list the people who were

11 employed in a given year?

12      A.    Whatever it says then that is what they

13 are.

14      Q.    This would be the list, this would

15 effectively list the employees --

16      A.    I organize those papers; that is my

17 accounting sheet work.

18      Q.    Now, in the desk in the room that we've

19 been discussing there is a fax machine and a

20 telephone; is that right?

21      A.    Yes, telephone and fax machine with the

22 phone, yes.

23      Q.    Do you have a computer there that you

24 work with?

25      A.    No, too dumb for computer.

1   once a month or --

2       A.      You know, you're there, you gotta -- I

3   hope you understand me -- whenever somebody is not

4   there.  You cannot depend on people and I learned

5   that the hard way in this country.  They fall asleep

6   every morning and we never fall asleep.

7              MR. HENEFER:  Off the record.

8              (At this time there was a brief

9              discussion held off the record.)

10  BY MR. HENEFER:

11      Q.      Mr. Mazzamuto, is there anything else

12  that you can think of that you would do kind of in a

13  typical day at the restaurant when you're working

14  there?

15      A.      Spring would come, I would go outside

16  and take care of the shrubs.  The winter come and I

17  used to plow the snow.

18              MR. ANGINO:  He also told me that he

19  would help with the unloading of deliveries, you

20  know, things that would come in boxes.

21              THE WITNESS:  When they come, you know,

22  dealing with the driver and move everything in

23  storage.

24  BY MR. HENEFER:

25      Q.      When was the last time that you did any

Case 1:01-cv-01157-CCC   Document 129   Filed 03/31/2003   Page 41 of 100

1    mean?  That goes, like I said, that area operates as

2    fast food, all I have in there.  It becomes

3    restaurant once the customer sits down.  Only for the

4    sit down people if I'm clear enough.

5         Q.     What are the hours that the restaurant

6    is open?

7         A.     Well, 10:30 to 10:00 and Friday and

8    Saturday it is 10:30 to 11:00 at night.

9         Q.     Is it closed at any point during that

10   time frame?

11        A.     No.

12        Q.     Do you have busy times and slow times?

13        A.     Busy time is lunch and busy time is

14   dinner.  The place is located on the Main Street and

15   I can be busy any other time.  Sometimes I ready to

16   go home and a bus load of kids might stop if they are

17   coming home from the game.

18        Q.     How many customers would you say on

19   average you would have in a given day?

20        A.     200, 250.

21        Q.     Okay.

22        A.     On a weekend you might go up to 500 on

23   a Friday.  It is hard to say.  Sometime you make as

24   good as money that you make on a Friday with so many

25   customers, you know, with the less customer we still

1  would you get those?

2      A.      Lately, I've been going every month or

3  every other month.  Last time we called, I wanted to

4  go the same day.  I guess they didn't have an opening

5  and I've got to go the 23rd.  Am I right, the 23rd,

6  the 22nd?

7          MRS. MAZZAMUTO:  The 24th.

8          MR. ANGINO:  She can't answer.

9          MS. MAZZAMUTO:  The 24th.

10          MR. HENEFER:  This is your deposition,

11  even though your wife was sworn under oath.

12          THE WITNESS:  Sorry.

13  BY MR. HENEFER:

14      Q.      Are you still treating with the same

15  doctor that you've been treating with for the back

16  problem?

17      A.      For the shots always the same guy.

18      Q.      Dr. Kazinski?

19      A.      Dr. Kazinski.

20      Q.      Are you still treating with Dr. Bower?

21      A.      He's been my doctor, his branch, he's

22  been our doctor since '93, '94, '92, I don't remember

23  exactly.  We've been in there for years now.

24      Q.      Have you treated with anyone for the

25  anger that you've talked about?  Have you gone, for

1    day, you know, she called me at the house and that

2    was after she told me that I shouldn't be talking to

3    her.  She called me and I said, What are you doing?

4    You calling me now?  She says, No, I just calling to

5    see how you are doing.  I said, Thank you for your

6    big concern about me.  She asked me about my heart

7    condition and meanwhile I told her about the back.  I

8    don't know if that was the time.

9         Q.     Is there anything in that paragraph

10   that I read to you that you heard that you disagree

11   with?

12        A.     I don't remember exactly how it goes.

13             MR. ANGINO:  Is this generally correct?

14             THE WITNESS:  Yes, we had a

15   conversation with her, yes.

16             MR. ANGINO:  So this is generally

17   correct, but you disagree with what she said in this

18   other part; is that what you said?

19             THE WITNESS:  Yes.  I mean, either she

20   misunderstand -- if we talk about this, either she

21   misunderstand the situation that I only do.  It is

22   impossible only.  I mean everybody in Carlisle know

23   me.  They know me, I'm the owner.  Where ever I go

24   they say, Vinny, I go to the restaurant, I haven't

25   seen you there.  You know what I mean?  How do you

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


VINCENZO MAZZAMUTO,       :
                           :
        Plaintiff      :
                           :
        VS                :
                           :
UNUM PROVIDENT CORPORATION,  :
PAUL REVERE LIFE INSURANCE   :
COMPANY and NEW YORK LIFE    :
INSURANCE COMPANY,        :
                           :
        Defendant      : NO. 1:01-CV-1157
: : : : : : : : : : : : : : : : : : : : : : : : : : : :


WITNESS:           GERARDA MAZZAMUTO


DATE:              MAY 10, 2002


PLACE:            ANGINO & ROVNER
                   4503 NORTH FRONT STREET
                   HARRISBURG, PA


TAKEN BY:         DEFENDANT


**SUZANNE MINELLO COURT REPORTING**
**573 INDIAN RUN DRIVE**
**HUMMELSTOWN, PA 17036**
**(717) 671-7007**

Exhibit E

1    A.    Yes.

2    Q.    The two of you have been married ever

3  since?

4    A.    Yes.

5    Q.    You have how many children?

6    A.    Four.

7    Q.    And their names?

8    A.    Antonio, Angelo, Francesco and Luigi.

9    Q.    Four boys?

10    A.    Four boys.

11    Q.    Have you worked at Vinny's Restaurant

12  since the time it was opened until now, or have you

13  worked sometimes but not all that time?

14    A.    All of the time.

15    Q.    Even when you were raising your

16  children?

17    A.    Yes.

18    Q.    Before Mr. Mazzamuto became ill in July

19  of 2000 with a heart attack, what type of work were

20  you doing before that, and if you can just tell me

21  what type of work you're doing now and how the two

22  are different?

23    A.    Back then, before my husband had the

24  heart attack, I would go in and make some salads,

25  subs, things like that.  Now, I do what he used to do

1    ask your husband the questions about whether you can

2    have some sort of a chair or high stool or something

3    of that sort around the cash register.  What is your

4    view on that?  Do you think that you can have that

5    there?

6         A.    No, because the way our business runs

7    is you've got the people when they come in and you're

8    at the counter and there is cash register, okay, so

9    you take their order and then, of course, they need

10   their drinks.  You have to move over to the right to

11   make their drinks and then you go back to the left to

12   hand them the drinks.  Then you ring them up and they

13   pay.

14         Then you have to either turn around to

15   hand the tickets to the salad table or run to the

16   pizza table to hand up the tickets or you have to

17   spread out the order to whoever has to make up the

18   food so you cannot sit down.

19         Also, if it is pick-up orders, you have

20   to go either to the pizza oven, if it is hot foot, to

21   get them off the oven or turn around and get the

22   salads or go in the kitchen because maybe something

23   is not ready with the order so you've got to be

24   moving at all times.

25         Q.    Could you have a seat or some sort of a

1    high stool there so you could sit, for example, when

2    you're just dealing with the people's money or

3    writing down what their order is and then get up and

4    get the drink, can you do that?

5         A.    I would feel that it would be more

6    work, more pain to do that then just standing there

7    because at least you're moving.  You couldn't

8    possibly sit down at the way our pizza shop is set up

9    or the way we work.

10              MR. HENEFER:  I'm going to talk to my

11   client about this, Richard, but I'm thinking at some

12   point it might be worthwhile if I can go to the

13   restaurant and take a look around, take some

14   pictures, get a sense of what it looks like and how

15   it works.

16              MR. ANGINO:  You really should.  That

17   is no problem.  Off the record.

18                   (At this time there was a brief

19                   discussion held off the record.)

20   BY MR. HENEFER:

21        Q.    You have, so we can get this out of the

22   way, literally get this out of the way, you've

23   brought with you prescriptions.  Other than the

24   epidural steroid injections that Mr. Mazzamuto has

25   described that he's taking, would you mind going

1   through and reading those for us so that it is into

2   the record?

3       A.    I'll try to pronounce them right.

4       MR. HENEFER:   Let's do this instead, if

5   it is not too much of an imposition, Richard, can you

6   send me a letter with a list.

7       MR. ANGINO:   I think that would be

8   easier.

9   BY MR. HENEFER:

10       Q.    Mrs. Mazzamuto, have you personally had

11   any discussions with any representatives from any of

12   the insurance companies about the disability claim

13   that we're here talking about today?

14       A.    The first time I called when my husband

15   had the heart attack for the forms and I spoke to a

16   lady -- don't remember the name -- and she was

17   supposed to send me forms, when my husband had the

18   heart attack.

19       Then I spoke, I think, once to Ms.

20   Melissa Magner, because we weren't getting any

21   letters or anything regarding this disability thing.

22   That was one of the times she really didn't want to

23   discuss it with me because we had Mr. Russo and she

24   said she couldn't talk to me either.

25       She said, I told your husband I could

1  not discuss this with you since you have a lawyer.  I

2  really don't think that I ever, to what I can

3  remember, spoke to anyone else there.

4       Q.    Without going through all of the

5  documents, let me represent to you in the file there

6  are two memos that look like this, you would not have

7  seen this document before, which reflect that you had

8  called Paul Revere twice I believe in September of

9  2000.  Would that be around the time that you called

10  looking for the forms?

11       A.    Well, let's see, my husband had the

12  heart attack in July.  Yeah, I only called for the

13  forms probably, you know, if it was two times for the

14  forms and I did not discuss anything with the people.

15       Q.    Do you think that the September time

16  frame, does it sound like it is right to you?

17       A.    Honestly, I'm really terrible with

18  dates.

19            MR. ANGINO:  Did it seem like a couple

20  of months after?

21            THE WITNESS:  Yes, it was regarding the

22  claim, the disability claim forms, whenever I did

23  call.

24            MR. ANGINO:  Just to make the record

25  complete, when using disability complaint forms, did

1     you notify somebody before you called for the

2     disability claim forms in terms of telling them that

3     your husband had a heart attack, somebody from the

4     insurance company?

5                THE WITNESS:  No, that was New York

6     Life or whoever, the number that I was -- I got it

7     off of one of the letters and I called for the claim

8     forms.

9     BY MR. HENEFER:

10           Q.    I had asked your husband some questions

11    about the Social Security disability claim that has

12    been filed.  Do you know the name of the lawyer that

13    he's working with?

14           A.    Yes, the name of the woman representing

15    him is Mrs. Trudy McCraw.

16           Q.    Where is she located?

17           A.    In Carlisle.

18           Q.    I had asked your husband about that

19    appointment at Social Security set up for him in July

20    of last year.  Do you recall that?

21           A.    Well, which one?

22           Q.    Well, I mean, were there more than --

23    do you recall Social Security asking your husband to

24    go see somebody about this claim?

25           A.    Yes, the doctor, the psychologist.

1      Q.     Were there any other doctors that he

2  had to go see?

3      A.     No.

4      Q.     Did you go with him when he went to see

5  the psychologist?

6      A.     Yes, I did.

7      Q.     Were you there when the psychologist

8  asked the questions?

9      A.     Yes, I was.

10      Q.     Did the psychologist comment to you in

11  any way about what he thought?

12      A.     No, he did not.

13      Q.     Did you get a report, did you and your

14  husband get a report from the psychologist?

15      A.     I really don't remember if he sent us

16  one or if I asked him for one.  I don't really

17  recall.

18      Q.     Do you recall this morning I reviewed

19  certain forms with your husband that were forms as he

20  described it were filled out by you taking

21  information from him?

22      A.     Yes.

23      Q.     Just without going through all of the

24  forms, generally speaking you were making an effort

25  to be as complete and thorough and accurate as you

1    could for the insurance company?

2         A.    Sometimes my wording is different than

3    -- you could probably say something in five words and

4    it will probably take me ten.  I probably don't even

5    explain it right because you're a lawyer and I'm a

6    high stool graduate.

7         Q.    Well, we've seen how attorneys ask

8    questions so I'm not so sure.  To your knowledge was

9    there any information in those forms that were

10   incorrect?

11             MR. ANGINO:  Several times they were 40

12   hours.

13   BY MR. HENEFER:

14        Q.    Other than the 40 hour issue, are you

15   aware of any information in the forms that was

16   incorrect?

17        A.    Not that I can -- no, not that I can

18   see.  Unless, maybe, I used a word that I thought

19   means one thing and maybe, you know, like the only

20   word that was discussed before, you know, the way

21   that people just take it.

22        Q.    Somebody might interpret something a

23   little differently than you meant it?

24        A.    Right.

25        Q.    You're not aware other than the 40

1  hours that it is wrong on the forms?

2       A.    Right.

3            MR. HENEFER:  I have no further

4  questions.

5

6                 EXAMINATION

7  BY MR. ANGINO:

8       Q.    I normally don't ask questions, but

9  just so the record is complete.  When you were asked

10  whether you knew that there was anything incorrect,

11  are there many things that your husband does in his

12  job that aren't actually in those forms?

13       A.    Well, you can specify things, there is

14  a lot of things that he used to do, but you don't

15  just say one by one.  If you say, Well, I say, I run

16  the pizza shop now.  Well, what do I mean by run the

17  pizza shop?  Do I just stand there and look at

18  everybody?  Do I, you know, do the counter, which is

19  -- should be my job now?  Instead if there is a lot

20  of dishes to wash, you know, I let my son at the

21  counter and I go and wash the dishes.  There is a lot

22  of --  one word can involve a lot of things.

23       Q.    As an example, from what I learned and

24  from what we all learned in this deposition, the

25  person who is in charge spends most of his or her

1  time at the counter, but none of these forms say the

2  person is at the counter, the person is taking money,

3  the person is greeting people; is that right?

4          A.    Right.

5          MR. ANGINO:  Nothing further.

6

7          (At this time the deposition in

8           the above-captioned case was

9           concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

VINCENT MAZZAMUTO,                  :
                      PLAINTIFF :
      V                             :
                                    : CASE NO. 1:CV-01-1157
UNUMPROVIDENT CORPORATION,          :
ET AL.,                             :
                      DEFENDANT :

DEPOSITION OF:  DOUGLAS BOWER, M.D.

TAKEN BY:       DEFENDANT

BEFORE:         LORRAINE C. FRICK, REPORTER,
                NOTARY PUBLIC

DATE:           APRIL 16, 2002, 3:00 P.M.

PLACE:          220 WILSON STREET
                SUITE 109
                CARLISLE, PENNSYLVANIA

APPEARANCES:

      ANGINO & ROVNER
      BY: RICHARD C. ANGINO, ESQUIRE

          FOR - PLAINTIFF

      STEVENS & LEE, P.C.
      BY: KIRK L. WOLGEMUTH, ESQUIRE

          FOR - DEFENDANT

COPY

Exhibit F

```
                              WITNESSES

        NAME                    DIRECT           CROSS

DOUGLAS BOWER, M.D.

     BY:  MR. WOLGEMUTH           3               --

     BY:  MR. ANGINO             --               64
```

STIPULATION

     It is hereby stipulated by and between counsel for the respective parties that sealing, certification and filing are hereby waived; and that all objections except as to the form of the question are reserved until the time of trial.

     DOUGLAS BOWER, M.D., called as a witness, being duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WOLGEMUTH:

    Q    Dr. Bower, my name is Kirk Wolgemuth. I represent Unum in this matter involving Mazzamuto versus Unum Insurance Company. I'd like to start by asking you have you ever been deposed before?

    A    I have not.

    Q    Just so you understand, I'm sure Mr. Angino has explained how this works, but I get to ask questions and you get to answer the questions. In order to keep Lorraine happy, when I ask you a question, you need to answer verbally because she can't really record a head nod or a shake or something like that.

    A    Correct.

    Q    And during the process of me asking questions, if you don't understand a question, please ask me to repeat it because otherwise I'll expect that you understood the question and that your answer was accurate.

1    A    Okay.

2         MR. ANGINO:   Are going to have usual stipulations on

3    this?

4         MR. WOLGEMUTH:   Yes, I guess.   I mean, Doctor, do you

5    want to read your deposition to look for errors that the

6    stenographer may have made during the process or would you be

7    willing to waive the reading of the deposition and just rely on

8    her expertise?

9         THE WITNESS:   What's usual?

10        MR. ANGINO:   Well, as far as usual, doctors are more

11   finicky in this regard and they often times do like to look at

12   them.   Non doctors often times waive it.   One of the things

13   when I mentioned usual stipulations, they say nothing is waived

14   except the form of the question.   That saves me from objecting

15   to certain questions that might be asked because after the

16   particular record is transcribed, if there are things there

17   that I want to object to, I can object to them at that time.

18   So when I say do you want to go along with usual stipulations,

19   that's what it means.

20        MR. WOLGEMUTH:   I mean, usual stipulations are fine.

21   The only one I thought you might be interested in is whether

22   you want to read and see --

23        THE WITNESS:   I think I'll read it over.

24        MR. WOLGEMUTH:   All right.

25   BY MR. WOLGEMUTH:

1     Q     Doctor, please state your full name and business

2   address.

3     A     It's Douglas John Bower, B-o-w-e-r.  It's 220 Wilson

4   Street, Suit 109, Carlisle, Pennsylvania, 17103.

5     Q     Doctor, could you just briefly describe your

6   educational background?

7     A     Undergraduate degree in chemistry with a minor in

8   biology from Boston University 1980, medical degree from Boston

9   University School of Medicine 1984, internship in internal

10  medicine, Naval Hospital, San Diego, '84, '85, residency in

11  internal medicine, Naval Hospital, San Diego, '86 to '88.

12    Q     What have you been doing since 1988?

13    A     1988 I served as a general internist in the Navy in

14  various locations until 1993 when I separated from active Naval

15  service and moved here to Carlisle.

16    Q     And have you been practicing medicine since 1993?

17    A     I have been practicing medicine continuously since

18  1988.

19    Q     Have you been practicing medicine here in Carlisle

20  since 1993?

21    A     I have.

22    Q     You've been employed by Masland Associates during

23  that time?

24    A     It's Masland Associates.

25    Q     Masland?

1    A.   Correct.  I'm actually a partner in Masland

2   Associates at this point.

3    Q   Doctor, can you tell me what the practice of internal

4   medicine is?

5    A   The practice of internal medicine is basically the

6   non surgical adult medical practice.  We take care of most

7   chronic adult illnesses that don't require surgery.  Here at

8   our practice we also do a lot of what's called primary care

9   which is seeing people for acute problems such as, you know,

10  sprains and strains and colds in addition to taking care of

11  chronic medical conditions like high blood pressure, kidney

12  disease, arthritis, things of that sort.

13   Q   Is it similar to like a family practice except that

14  you just concentrate on adults?

15   A   It's different than family practice in that family

16  practice tends not to have as much training in the chronic

17  adult illnesses.  You are correct.  We do not see children.  We

18  don't deliver babies as family practice physicians use to do

19  anyway.  And, in fact, in the probably prior to '90, we were

20  thought of more as a specialist.  These days the subspecialists

21  from internal medicine seem to get that moniker and we're more

22  generalists now.  So it's similar but we seem to have more

23  expertise when it comes to a lot of chronic adult illnesses.

24   Q   Are you Board certified in internal medicine?

25   A   I am.

```
1        Q    Are you Board certified in any other areas of

2   medicine?

3        A    I am not.

4        Q    Would you consider yourself an expert in back

5   conditions?

6        A    I am not an expert in back conditions.

7        Q    How about an expert in cardiac conditions?

8        A    I would say I am expert in cardiac conditions.

9        Q    And what do you base that --

10       A    That we take care of a vast array of people with

11  chronic cardiac conditions.  In the world of medicine in 2002,

12  it's getting more and more that the cardiologists or the

13  subspecialists in cardiac disease take care of mainly procedure

14  oriented aspects of a lot of the heart conditions and they

15  return to us for ongoing management of their chronic medical

16  conditions and their chronic heart problems, manipulations of

17  medications, dealing with symptoms, making decisions about

18  admitting them to the hospital, et cetera.

19       Q    Is there a reason why the physicians that perform the

20  procedures wouldn't do the same type of thing that you do in

21  treating them afterwards?

22       A    They're too busy and they make a lot more money doing

23  procedures than they do seeing patients in office and having to

24  talk to them and listening to them for a half an hour at a

25  time.
```

Case 1:01-cv-01157-CCC   Document 129   Filed 03/31/2003   Page 62 of 100

1    Q    Fair enough.  Doctor, obviously you know Mr. Vincent

2  Mazzamuto.

3    A    I do.

4    Q    Can you just give me a summary of your treatment of

5  him from the first time you saw him up through June of 2000.

6    A    Okay.  I think I took over the care of Mr. Mazzamuto

7  probably sometime in 1994, 1995, was previously followed by

8  another physician here, primarily at that point more just

9  chronic health problems dealing with smoking, occasional low

10  back pain, being overweight.  Again, he had intermittent

11  problems with his back which we saw him for here which resulted

12  in treatment with physical therapy, medications.  He got X-ray

13  studies, and I think he was not -- he was out of work for some

14  period of time during that initial period, went back to work,

15  unfortunately continued smoking and subsequently developed

16  coronary artery disease and ended up with a small heart attack

17  and was admitted to the hospital.  I can look for the exact

18  date if you need that information.

19    Q    And the small heart attack was prior to June of 2000?

20    A    I'd have to check the records find out.

21    Q    That's fine.

22    A    Actually he had his procedure done in July of 2000 so

23  it was probably just in that time frame there.

24    Q    Okay.  So prior to July of 2000, there wasn't any

25  heart attacks?

1     A     Well, there were no heart attacks at that point.

2     Q     But you were treating him for heart conditions.

3     A     Well, no, we were treating him basically for high

4  cholesterol and smoking which are the things that lead to heart

5  disease so he did not have a heart condition diagnosable.

6  Clearly it was there because, you know, things don't just

7  appear the day you get the symptoms from them.  They manifest

8  themselves through the years.

9          Since his heart attack was fairly mild, he's had

10  increasing problems both with his back but also with severe

11  anxiety, and in the last maybe year to 18 months, I'd say at

12  least half of what I have been dealing with him with has been

13  because of sort of severe unrelenting anxiety, and this has

14  manifested itself in some aggressive behavior, you know,

15  irritability.  He's had several episodes of chest pain which

16  resulted in hospital admissions which turned out after the fact

17  not to be from recurrent problems with his heart and sort of a

18  morbid fear of a heart attack, of dying and that I think has

19  been his major limiting factor that I have been seeing him for.

20          Now, throughout this whole period though he's had

21  ongoing worsening problems with his lower back, and these had

22  been manifesting themselves with low back pain, pain and

23  numbness down his legs.  He's been seen by physical therapy.

24  We've had him on numerous prescription medicines.  We've had

25  him seen by the pain clinic which is run by the anesthesia

1   department at the Regional Medical Center and he's had local

2   steroid shots into his back called epidural steroid injections

3   and was recently seen by Dr. Gelb who's an orthopedic back

4   specialist at Hershey Medical Center.

5        Q    Dr. Bower, what is central spinal stenosis?

6        A    Central spinal stenosis is where there's an

7   impingement on the spinal cord itself by either bony

8   enlargement of one part of the vertebrae, you know, or

9   arthritis which causes -- where like bone spurs that form that

10  impinge centrally.  The spinal cord is housed within the

11  posterior aspect of the vertebrae.  The vertebrae themselves

12  have a disc that joins each separate vertebrae together.  There

13  are arches that come off the back and there's a canal through

14  the middle of that which the spinal cord runs, and if you have

15  arthritic changes or sometimes congenital narrowing, there

16  could be a narrowed area that impinges on the spinal cord.

17       Q    And Mr. Mazzamuto has central spinal stenosis in the

18  lumbar area of his back?

19       A    He does have central spinal stenosis in the lumbar is

20  one of the problems with his back.

21       Q    Is that congenital or is that caused by some other

22  reasons?  Do you have --

23       A    It can be congenital.  I don't know specifically in

24  Mr. Mazzamuto's case how much is congenital and how much may

25  come from arthritis.

1       Q    Doctor, what is dysuria?

2       A    Dysuria is just pain with urination or discomfort

3 with urination.

4       Q    That's prostrate related or --

5       A    It can be prostate related.  It can be from

6 infection.  He does have chronic -- we don't really know why he

7 has dysuria to tell you the truth.  He's been seen by a

8 neurologist.  He probably has, you know, for lack of a better

9 term an irritable bladder, and, again, so dysuria is just

10 simply a symptom of difficulty or pain or a discomfort with

11 urination.  It can come from the prostrate.  He has prostatic

12 enlargement which all men his age have, but beyond that, I

13 can't give you another reason for his dysuria.

14       Q    And in your opinion, that condition, the dysuria is

15 not in any way disabling to him, is it?

16       A    The dysuria by itself is not disabling to him.  He

17 periodically has boughts where he has urgency of urination

18 meaning that when he gets the urge to go to the bathroom, he

19 almost has to go now, and for a while that was more severe than

20 it is now, and it did limit him in the ability to travel

21 distances and things like that because he became so anxious

22 that he would need to have to go to the bathroom that he

23 basically stopped going places for fear that he would end up in

24 a situation where he would have to go and wouldn't be able to

25 get to where he needed to be.

1    Q    And, Doctor, what is hyperlipidemia?

2    A    Hyperlipidemia is elevated cholesterol and

3    triglycerides.  Lipids are the combination of those two things.

4    Q    Now, Doctor, you might want to refer to your notes to

5    answer this next question, but had you imposed any work

6    restrictions on Mr. Mazzamuto through June of 2000?

7    A    Let me check.

8         MR. ANGINO:  How far back do you want to him go, like

9    from the beginning?

10   BY MR. WOLGEMUTH:

11   Q    Well, I really -- no, not since the beginning,

12   Dr. Bower.  As of -- maybe that's a better way to structure the

13   question.  As of June of 2000, was he under any work

14   restrictions?

15   A    I would probably have to say without looking at every

16   note that other than general recommendations of things that he

17   should avoid such as lifting and bending, I did not probably

18   prescribe, you know, work restrictions in that he is his own

19   boss, and unlike someone who goes back to work at a factory

20   where they have a supervisor who can compel them to do things

21   that are uncomfortable, you know, he is his own boss in this

22   regard and so other than asking him to refrain from things

23   which he felt would be uncomfortable, I don't think I probably

24   gave him written prescription as to what he could and couldn't

25   do.

1      Q     Fair enough.  What was your understanding of what his

2  work duties were as of June of 2000?

3      A     Well, my understanding based on talking to him and

4  also going to his restaurant from time to time is that he

5  basically at one point or other does everything at his

6  restaurant.  Now, he is the owner but he also spends time in

7  the kitchen.  He does, you know, some of the office work which

8  I think he shares with his wife.  He works the counter.  He

9  comes out to the dining room.  So, you know, he probably at one

10  point or other does all the various functions that takes to run

11  a small restaurant so cooking, supply, taking things you in,

12  you know, the equipment and the food products, and he shares

13  that responsibility with other members of his family and some

14  employees.

15      Q     How many times have you visited while he was at his

16  restaurant roughly?

17      A     Between five and ten times I'd say.

18      Q     During those five or ten times that you visited him,

19  did you ever see him actually cooking?

20      A     I've seen him cooking.  I've seen him at the counter.

21  I've seen him sitting in the back.

22      Q     Have you ever seen him lifting anything during those

23  times?

24      A     No.

25      Q     Did he ever tell you at any time during your

Case 1:01-cv-01157-CCC   Document 129   Filed 03/31/2003   Page 68 of 100

1    conversations again as of June of 2000 that he had to lift

2    heavy things at work?

3        A    I don't think he specifically told me that he had to

4    lift heavy things at work.

5        Q    Doctor, I'd like to direct your attention now to July

6    22 of 2000 when Mr. Mazzamuto had a myocardial infarction.

7        A    Correct.

8        Q    Can you tell me basically what that heart attack

9    involved?

10       A    The heart attack unfortunately again involved the

11   blockage of one branch of a heart artery, and I believe he

12   subsequently had what's called a PTCA, percutaneous

13   transluminal coronary angioplasty to sort of restore

14   circulation at this point.  He has a very small area of scar

15   tissue in his heart based on follow-up studies, but overall his

16   heart and muscle function is normal.

17       Q    And that artery was the left anterior descending

18   artery?

19       A    Correct.

20       Q    After they did that angioplasty, the result was

21   basically only ten percent residual stenosis?

22       A    Correct.

23       Q    And I believe you opined that basically his heart

24   function is normal?

25       A    His heart pumping functioning is normal.

Case 1:01-cv-01157-CCC   Document 129   Filed 03/31/2003   Page 69 of 100

1    Q    Was there any significant blockage in any other

2    artery?

3    A    Let me check.  His discharge summary says he does

4    have multi vessel disease.  I can try to find the -- oh, here's

5    the cath report.  Do you want the actual percentages?

6    Q    Yes.

7    A    Okay.  He has a 30 percent blockage in the right

8    coronary artery proximally which means in the beginning part, a

9    40 percent distally and several small 20 to 30 percent

10   sequential stenoses.  So these are irregularities of just the

11   caliber of the heart of the heart arteries themselves.

12   Q    Now, in somebody of his age, is that type of blockage

13   that you just mentioned, is that significant or insignificant?

14   A    Well, it's significant.  It's not uncommon, but it's

15   significant, and, again, when looking at heart disease, when

16   you have a heart attack, it's not necessarily a 70, 80 or 90

17   percent blockage that gradually closes down.  It's a plaque of

18   any size, usually probably at least 30 percent to 40 percent

19   which can acutely rupture and you go from 40 percent, a clot

20   forms when the plaque ruptures and you go from 40 percent to a

21   hundred percent instantly.  So while when you're looking at a

22   catheterization, what you put a balloon into, the cardiologist

23   generally will not do that with something probably less than 60

24   percent occlusion.  It doesn't mean that things that are

25   smaller, 20 and 30 and 40 percent lesions are safe.

1    Q    And generally, what type of treatment would you

2   prescribe for somebody with Mr. Mazzamuto's heart condition

3   even though the function is normal?

4    A    You would keep him on medication to lower his

5   cholesterol because it's been proven that if you keep the

6   cholesterol low, it stabilizes the blockages that are there,

7   keeps them from rupturing, keeps them from becoming unstable

8   and over time can help cause the plaques to actually regress

9   and actually get smaller so that there's less obstruction down

10  the line.

11       Often people are kept on certain medications such as

12  betta blockers at least initially, that's a kind of blood

13  pressure and heart medication soon after coming out of the

14  hospital, asprin, an asprin tablet every day which acts as a

15  minor blood thinner which again helps prevent that acute clot

16  from forming, and, again, you know, Mr. Mazzamuto does not have

17  diabetes so blood sugar control is not an issue with him.

18       Q    Do you know what medications were prescribed after

19  July 26th for Mr. Mazzamuto?

20       A    I do.  Let me get them for you.  These obviously have

21  changed through time.  He is on Lopressor which is a betta

22  blocker, he is on Zocor which is a cholesterol lowering

23  medication, he is on asprin, coated asprin called Ecotrin, he

24  had nitroglycerin to take if needed for chest pain.  Do you

25  want other medicine that were not related to his heart?

1    Q    No, no.

2    A    Okay.

3    Q    Now, after he had his heart attack, he also underwent

4    cardiac rehab?

5    A    Hum-hum.

6    Q    Generally what's the purpose of that?

7    A    Cardiac rehab is to try to get people to get back

8    into activity in a monitored setting to make sure that they

9    don't have recurrent symptoms of their heart disease and try to

10   get their heart reconditioned.

11   Q    And Mr. Mazzamuto completed that rehab?

12   A    To the best of my knowledge, he completed it.

13   Q    That's about in November, November 24th of 2000?

14   A    I will accept that as being correct.

15   Q    Was he under any type of cardiac restrictions at the

16   end of his rehab?

17   A    At the end of rehab, no.  There were no cardiac

18   restrictions other than to not smoke.

19   Q    Now, would you refer to your August 23, 2000 visit.

20   A    Okay.

21   Q    In your notes, Doctor, I believe it's referenced that

22   he was working at that time?

23   A    Correct.

24   Q    Do you recall because I don't think it says

25   specifically in your notes how often he was working, any type

1    of recollection?

2         A    I have no idea.

3         Q    You don't know if it was full-time or part-time?

4         A    Again, because it's a family business, those

5    distinctions are not often made in our office.  Again, he's his

6    own boss at that point, so, again, the need to document

7    strictly with a note with explicit instructions to provide for

8    his employer what he can do and what he can't do so I have no

9    knowledge at that point of whether he was working his normal

10   full schedule or less than a full schedule.

11        Q    And your note also reflects that it's not clear if

12   he's going to be able to handle the stresses of his business.

13   Again, what stresses do you recall he was relating to you?

14        A    Well, both he and his wife as well who I see on

15   occasion that the fact that he would become very upset easily,

16   and, you know, when he would go to the restaurant, small things

17   would make him get very angry, and when he got very angry, he

18   would get chest discomfort, he would get short of breath, he

19   would -- and his wife actually told me at one point that, you

20   know, she was fearful of letting him back in the restaurant,

21   and, again, that's when we were starting to treat, you know,

22   some of his anxiety symptoms.

23        Q    And I believe your notes also reflect to emotionally

24   labile?

25        A    Labile.

1      Q    What does that mean?

2      A    That means that his emotions can have big swings so

3  he can go from being calm to very upset sort of at the drop of

4  a hat.

5      Q    At the time were you treating him for any type of

6  anxiety?

7      A    Well, we did.  We started him on that visit with

8  Wellbutrin.  Wellbutrin is an anti-depressant and anti-anxiety

9  and also has some properties that seem to help people quit

10  smoking so he was kind of put on it for all those reasons.

11      Q    Is Wellbutrin the chemical that's in Zyban?

12      A    It is.  It was Wellbutrin long before it was Zyban

13  though, same thing.

14      Q    Are there any types of side effects from taking

15  Wellbutrin?

16      A    There's always side effects to any medication.  There

17  are usually very few side effects, but, you know, any

18  particular person could be sedated from it, any particular

19  person could feel cloudy in the head from it, any particular

20  person could have an upset stomach or be allergic to it.  It's

21  generally fairly well tolerated though when it comes to most

22  side effects.

23      Q    Would you be agree that anxiety attacks can be a

24  aside effect of Wellbutrin?

25      A    It can be both a side effect of Wellbutrin, but

1    Wellbutrin is also used to treat it, to treat anxiety.

2        Q    And hallucinations could be a side effect of

3    Wellbutrin?

4        A    It's possible but not very common.

5        Q    Now, explain to a layman how a drug like Wellbutrin

6    can both cause anxiety and treat anxiety at the same time?

7        A    Well, everyone is different, and, again, like I said,

8    very few people actually get anxiety from Wellbutrin.  Certain

9    stomach pills such as Prilosec, an example, a stomach acid

10   medication such as Prilosec which is given to reduce acid in

11   the stomach in patients with ulcers who have severe stomach

12   pain from their ulcers, in a small percentage of people,

13   Prilosec causes stomach pain so in the same manner, any

14   medication which affects the brain though in the majority of

15   patients may alleviate anxiety, there's also always a small sub

16   set of people that could have a paradoxical or unexpected

17   reaction where in their particular case, it doesn't do what it

18   does in most people but has other affects such as causing

19   anxiety or causing sedation when most people do not get

20   sedated.

21       Q    Can Wellbutrin cause loss of sleep, especially after

22   you initially take it?

23       A    It can cause loss of sleep, again rarely and again

24   but for some people who are not sleeping well because of

25   anxiety or depression, it can improve their sleep.

1     Q    Do you know specifically how Wellbutrin assists

2    people in not smoking?

3     A    Well, I don't think that's well worked out.  I think

4    in some, you know, circles it's thought that many people smoke

5    because smoking is their way of alleviating their anxieties and

6    stress.  Again, you get nicotine in various other chemicals

7    which do have a relaxing affect and that if you can some other

8    way improve their sense of anxiety or relieve their symptoms of

9    anxiety that there's less tendency to have to reach for a

10    cigarette to self-medicate.

11     Q    At any time after August of 2000 to the present, did

12    you ever consider the fact that his anxiety may be caused by

13    the drug Wellbutrin rather than by any other condition?

14     A    Well, he had anxiety prior to starting the

15    Wellbutrin, so again, the Wellbutrin was given as a response to

16    his symptoms so clearly some of his anxiety could not have been

17    from the Wellbutrin because it was there before the Wellbutrin

18    came to town.

19          Let me check my medication list because we actually

20    changed medications on several occasions to see if we could

21    better help his symptoms.  He ended on a medication called

22    Neurontin which is a seizure medicine.  It was prescribed for

23    his chronic back pain but it's also used for psychiatric

24    reasons now, for mood stabilization.  Wellbutrin was stopped

25    for a period of time.  He was tried on another anti-depressant

1    called Celexa.  He was tried on another anti-depressant and

2    anxiety medication, and when I say anti-depressant, you can

3    assume anti-anxiety and anti-depressant, they have both

4    properties called Effexor.  He was given Lorazepam which is

5    another anti-anxiety agent.  So he was on Wellbutrin for a

6    time, and that was stopped and then other agents were tried in

7    their place so trying to find which medicine gave him the best

8    symptom relief and I think Wellbutrin was stopped.  It was

9    restarted at one point as well.  So he had anxiety with and

10   without Wellbutrin.

11        Q    All right.  Doctor, I'd like to refer you to your

12   October 4, 2000 visit.

13        A    Okay.

14        Q    And once again you indicate in your notes that he was

15   too stressed while at the restaurant?

16        A    Yes.

17        Q    Any recollection as to what specific stressors he was

18   referring to at that time?

19        A    I don't have specific recollections at that point.  I

20   assume it was more again of what I had previously mentioned

21   with getting very upset with small things, seemingly minor

22   problems causing him to get very upset, very angry and again

23   back to the emotional lability that we talked about prior.

24        Q    At that time were you concerned that some of his

25   symptoms might be related to stress?

1     A    Yes.

2     Q    Now, the cardiac symptoms I guess I'm referring to.

3     A    Yes, chest pain, correct, yes.

4     Q    On your November 29th, 2000 visit, at that time I believe your diagnosis or impression was coronary artery disease with no evidence of recurrent ischemia?

7     A    Correct.

8     Q    And ischemia is chest pains?

9     A    Well, ischemia is lack of oxygen to the heart muscle which would manifest itself as chest pain.

11     Q    And I believe you also diagnosed chronic low back pain which was well controlled on Neurontin?

13     A    At that point.

14     Q    And also he had anxiety which he was doing well on Wellbutrin?

16     A    At that visit.

17     Q    You also diagnosed abdominal pain from constipation?

18     A    Correct.

19     Q    Now, directing your attention to your December 29th, 2000 visit, I believe at that time you indicate in your notes that his back has been doing fairly well?

22     A    December 19th?

23     Q    I think it's December 29th.

24     A    I have 19th, December 19th.

25     Q    Let me just check.  I might have a typo on my -- I'm

1    sorry, December 19th.

2        A    Yes, that his back pain was stable meaning that it

3    wasn't any worse.

4        Q    And once again you found that his coronary artery

5    disease was doing fairly well.

6        A    Correct, he was not having symptoms at that time.

7        Q    And his back pain was stable.

8        A    Correct.

9        Q    Let's move on to your January 11th, 2001 visit.  At

10   that time I believe your notes indicated that he certainly has

11   done well.

12       A    He's had no new problems.

13       Q    And when you had stated that, were you referring to

14   his heart condition, his back condition, his anxiety or all of

15   them?

16       A    Well, primarily his heart and his anxiety.  Again,

17   unless he complains specifically of back problems, I may not

18   have covered that on every visit, but I think at that point he

19   was not smoking.  He had tried to go back to the YMCA to try to

20   exercise, and on those fronts I think he was doing fairly well

21   at that point.

22       Q    At that visit, I believe your notes reflect he had no

23   true angina symptoms?

24       A    Correct.

25       Q    And you had mentioned that he was going to the YMCA

1   to exercise.  What type of exercising was he doing?

2       A    I don't know specifically.  I believe he was trying

3   to use the treadmill.  I'm not sure.  I don't know whether he

4   did weights or anything else at that point.

5       Q    Did you prescribe any type of exercise or was it

6   something he just picked up himself?

7       A    I think it was something he carried on -- I'm not

8   sure he'd been to cardiac rehab yet or not but I think it was

9   just basically for weight reduction and I did not give him a

10  written prescription of exercise, no.

11      Q    The YMCA that he'd be going to, where would that be?

12      A    At the Carlisle YMCA.

13      Q    Carlisle.  I believe you also reported at that time

14  that his abdominal condition was stable.

15      A    Correct.

16      Q    And the anxiety was stable.

17      A    Correct.

18      Q    Let's move on to your March 12th, 2001 visit.  At

19  that time you reported anterior right thigh burning.

20      A    Hum-hum.

21      Q    What was that related to, Doctor?

22      A    My impression at that time was that that was probably

23  coming from pinching of the nerves from his back.

24      Q    Did you recommend any specific treatment or refer him

25  on for any specific treatment?

1    A    I think we sent him to get nerve studies to see

2    whether or not they could document for sure that a nerve was

3    actually being pinched in the back.

4    Q    Now, I notice that you had done a straight leg test.

5    A    Hum-hum.

6    Q    Would you agree with me, Doctor, that that test is

7    generally done to determine whether there is a nerve issue and

8    pain going down the sciatic nerve?

9    A    It's usually done to document whether or not there's

10   a ruptured or a herniated disc because sciatic nerve

11   impingement can happen on several levels.  It can happen in the

12   spine, it can happen outside of the spine so that's an easy

13   test to see if you can find evidence that the disc is pressing

14   on a nerve root.

15   Q    And for Mr. Mazzamuto's case, the burning that he had

16   reported in your opinion would have been something caused from

17   the inside of the spine.

18   A    Yes, we're not sure at that point but again it's a

19   good starting point.

20   Q    Have you learned since about anything that was

21   outside the spine that might have been causing --

22   A    I have not, no.

23   Q    And that test at that time on your March 12th, 2001

24   visit was negative.

25   A    Correct.

1    Q    And I also noted that you referred to his tendon

2    reflexes were symmetric.

3    A    Correct.

4    Q    What does that signify?

5    A    That means again at least in two of the lower lumbar

6    levels that the nerve pathways are intact, that the reflexes

7    have to go from both the knees and the ankle up to the spine

8    and then back down again to make the muscle jerk so that was a

9    normal finding.

10   Q    And if you had found an abnormal finding, that would

11   have been indicative of --

12   A    That could be indicative of again a ruptured disc or

13   something pressing on one of the nerve roots.

14   Q    And I believe your diagnosis or impression at that

15   time was that the thigh pain was neuropathic, and would that

16   refer back to what you had just described?

17   A    Correct.  Again, I also said that it could be a

18   peripheral nerve.  There's a nerve called the lateral femoral

19   cutaneous nerve that wraps around to the front.  Sciatic pain

20   often goes down the back of the leg.  He had some -- anterior

21   means front so his pain was more in the front so I wasn't clear

22   what was causing the problem and that's why since his exam

23   didn't really reveal any objective findings at that point, we

24   wanted to get more specific data because as good as the

25   physical exam is, the nerve studies and the MRIs and things

1    such as that are better.

2         Q    And at that time you again found that his stress and

3    chronic anxiety was stable?

4         A    At this point, yes.

5         Q    And his CAD, his coronary artery disease was stable.

6         A    Coronary artery disease, correct, correct.

7         Q    Now, the diagnostic test that you had recommended,

8    the EMG, that was done subsequently on March 28th?

9         A    I assume so.  Let me see if I can find it in the

10   record here.

11        Q    Doctor, if you'd like to look at mine to save some

12   time . . . .

13        A    That would be wonderful.  Thank you.  It was done.

14        Q    And that was done on March 28th, 2001?

15        A    Yes, it was.

16        Q    And basically the -- what do you call the person that

17   does that type of test?

18        A    This person is a neurologist.  Sometimes it's a

19   neurologist and other times it's a physiatrist that will do

20   that test.

21        Q    What were the neurologist's findings?

22        A    There were no abnormalities at that time.

23        Q    Doctor, tell me, can you have abnormalities in your

24   lower back that would cause pain say one time of the month and

25   then 30 days later there would be abnormalities without, you

1    know, like a traumatic event happening or something?

2         A    You mean could the symptoms fluctuate from time to

3    time?

4         Q    Yes.  Well, I guess two things, one, can the symptoms

5    fluctuate from time to time, and, two, would the actual

6    abnormality that's causing the symptoms be there one day and

7    not there the next day?

8         A    Well, it could be depending upon what the abnormality

9    is.  Besides hard structures such as bones, and, you know, a

10   disc which may or may not be ruptured, there are surrounding

11   tissues.  There's things that can be strained and there's

12   things that swell so it is possible.  Again, very often people

13   with arthritis of the lower back, you can get an X-ray on

14   Monday and on Wednesday in the following month and their

15   arthritis is always there but their back pain symptoms are not

16   stable and sometimes some activity or exertion can strain the

17   soft tissues and they could have a marked change in their

18   symptoms even though the X-ray is the same this month as it was

19   last month because not all of those things show up on X-rays.

20        Q    So the fact that there was no evidence of nerve

21   damage on March 28th, what does that tell you in terms of his

22   symptoms that he had two weeks prior, anything?

23        A    That there didn't seem to be a chronic structural

24   impingement of the nerve at that point.  And sometimes again in

25   early stages, the nerve studies may not pick it up on the early

1    stages.

2        Q    Doctor, I'm going to refer you to your April 27th,

3    2001 visit.

4        A    Hum-hum.

5        Q    I believe at that time you reported that his or he

6    reported to you that his back was acting up?

7        A    Correct.

8        Q    And there's also some emotional problems, and, in

9    fact, I think you reported what's called a, and I'll spell it,

10   h-y-p-n-a-g-o-g-i-c, hallucination.

11       A    Correct.

12       Q    Can you pronounce that for me?

13       A    Hypnagogic.

14       Q    To what would you attribute the hypnagogic

15   hallucination to?

16       A    Well, the fact or the thing that we attributed it to

17   at that point that maybe it was from one of his mediations that

18   was being added to help with his anxiety.

19       Q    Is that the time that you changed the Wellbutrin to

20   Celexa?

21       A    I don't believe so.  I believe that we had added an

22   additional anxiety agent on the prior visit called Buspar which

23   is Buspirone, and that was as an adjunct for anxiety control.

24   His symptoms of hypnagogic hallucinations and disorientation

25   developed and I think we just stopped the Buspar at that point

1    but the Wellbutrin was still going.

2         Q    Is Buspirone or Buspar a drug similar to Wellbutrin?

3         A    No.  Buspar is a medicine entirely of its own class

4    which is primarily for anxiety alone.

5         Q    Are there similar side effects, potential side

6    effects of taking Buspar as we discussed earlier with

7    Wellbutrin?

8         A    There are again but very rarely.  Buspar is usually

9    accused of not having any affect either good or bad so it's not

10   used very commonly.  But like I said, it's always possible, and

11   if a symptom develops soon after starting a new medicine, we

12   normally blame the medicine first before looking for other

13   reasons.

14        Q    Would you agree with me that the medicines that were

15   prescribed for the anxiety, if they were the cause of the

16   hallucination were most -- I mean, let me rephrase that.  The

17   medications he was taking for his heart, would they cause such

18   hallucination?

19        A    No, so.

20        Q    So it was most likely one of the medications

21   prescribed for the anxiety that was causing the problem?

22        A    Correct, and as the Buspar was the newest medicine

23   added, and that's when the symptoms developed, the assumption

24   was that that's the ideology, either the Buspar by itself or

25   the combination of the Buspar with the Wellbutrin, but since it

1  was the new one, it was the one that was stopped.

2       Q    Exactly what is a hypnagogic hallucination?

3       A    Hypnagogic hallucinations are hallucinations you get

4  when you're at the transition zone between sleep and

5  wakefulness where you're not quite awake and you're not quite

6  asleep and you can't really tell whether what you're seeing is

7  a dream or whether it's reality, and, again, some people will

8  have that from certain medications, some people experience it

9  when they're sick with a high fever and they're sort of half

10 awake and half asleep and they're coming out of a dream and

11 they can't quite separate what was the dream they're coming out

12 of and what's the reality they're waking up into.

13      Q    Since that time, since April 22nd, 2001, has he ever

14 reported such an experience again?

15      A    I don't recall.  He's had periods that he complained

16 of confusement, but I don't recall any of the hypnagogic

17 hallucinations after the Buspar was stopped.

18      Q    And at that time you again reported that there was no

19 recurrent symptoms related to his coronary disease?

20      A    Correct.

21      Q    Doctor, directing your attention to your June 19th,

22 2001 visit.

23      A    Hum-hum.

24      Q    At that time I believe you reported that he had

25 e-p-i-g-a-s-t-r-i-c --

Case 1:01-cv-01157-CCC   Document 129   Filed 03/31/2003   Page 87 of 100

1      A    Epigastic.

2      Q    Epigastric and lower chest burning.  What would that

3 be?

4      A    Epigastic means the upper abdomens and it's the area

5 of the stomach, and, again, based on his story, I did not think

6 it was from his heart.  I felt it was more likely related to

7 acid indigestion or reflux or something of that nature and we

8 put him on a medication which specifically lowers acid level in

9 his stomach.

10     Q    And what medication is that?

11     A    That's Acifex.

12     Q    On that visit again there was no -- according to your

13 notes no current cardiac symptoms?

14     A    Correct.

15     Q    And his chronic anxiety was fairly controlled?

16     A    Correct.

17     Q    And I notice there was no mention of back pain at

18 that visit?

19     A    Correct.

20     Q    Let's move on to your July 9th, '01 visit.

21     A    Okay.

22     Q    At that time you had reported increasing problems

23 with mood swings?

24     A    Hum-hum.

25     Q    Was there any specific reason that you're able to

1    identify as to why there was an increase in mood swings?

2        A    Because his wife came in the week prior and said that

3    he's seemingly having a lot more problems with emotional

4    lability and emotional problems.

5        Q    Did you talk to Mr. Mazzamuto about that?

6        A    I did.

7        Q    And what was his response?

8        A    Well, again, he says that he was, you know, he was

9    upset, and I can read from my note, that he has a fear of dying

10   when no one is around.  He says I get irritated.  He gets angry

11   with minimal provocation.  And, again, there was a question

12   whether the Buspar had been causing some of that.  I look here

13   and it seems that actually we didn't stop the Buspar after the

14   hallucinations.  We lowered the dose and we stopped the Buspar

15   as of July 9th so that was a misstatement I had before.  I

16   thought we had stopped it then but we just lowered the dose.

17       Q    Now, was there times that Mr. Mazzamuto would

18   specifically be alone that would cause these fears about dying

19   alone?

20       A    Well, he was alone because during part of this period

21   of time when he was very irritable and very labile, I believe

22   his wife told him that she did not want him at the restaurant.

23   She was fearful that he would get very upset and that would

24   trigger a heart problem with him and so he would be at home

25   alone because his wife would be at the restaurant taking care

1    of the business.

2         Q    Do you recall either from Mrs. Mazzamuto or

3    Mr. Mazzamuto how often he was at the restaurant prior to, you

4    know, that conversation where she said I don't want you there

5    as much or at all?

6         A    I can't tell you a specific number of hours or number

7    of days a week.  I don't know.

8         Q    I believe that you had diagnosed as that visit,

9    Doctor, anxiety with depression.

10        A    Correct.

11        Q    I notice that that's the first time you had mentioned

12   depression in your office notes.  Is there a particular reason

13   why you had included that diagnosis?

14        A    Well, I think it just became clear from talking to

15   him at that point that besides just being nervous that he was

16   now suffering from again a depressed mood.  When you're talking

17   about anxiety and depression, it's very rare that someone has

18   entirely one or entirely the other.  Now, you may -- it's a

19   spectrum and the two often keep company together.  Now, you may

20   be primarily anxious or may be primarily depressed but there's

21   usually a mixing of the symptoms which explains why the

22   medicines to treat one treat the other very well.  So it just

23   turned out that at this time it was clear both from his wife

24   talking about how he acts and his, you know, fearfulness of

25   dying that that anxiety when it's there constantly can lead to

1    feelings of depression or dysphoria which is sort of the

2    medical term for that.

3        Q    You didn't have any specific or you're not a Board

4    certified psychiatrist or psychologist or anything like that;

5    correct?

6        A    No.

7        Q    In terms of the patients you treat, do you treat a

8    large proportion of them for those type of symptoms?

9        A    We do.  Psychiatric availability in Cumberland County

10    is terrible so we see the lion share of people when it comes to

11    at least the initial presentation of anxiety and depression,

12    panic.  It's very very hard to get anyone to see a psychiatrist

13    in this neck of the woods.  They're in a very short supply and

14    we end up taking care of lots of psychiatric conditions as a

15    result of that.

16        Q    Would you generally at some point refer them on for

17    specific treatment?

18        A    If they don't respond to the common medication that

19    we are familiar with, you can try, but, again, it's very hard.

20    There's very limited availability.  There's not always someone

21    to refer to.

22        Q    Doctor, going to your August 20, '01 visit.

23        A    August 6th, August 31st.

24        Q    I might have another typo in my notes.

25        A    Yes.

1    Q    Yes, probably August 6th.

2    A    Okay.

3    Q    Yes, it is.  At that time you basically treated him

4    for follow-up for his back problems?

5    A    I think it was for also to see how he was feeling

6    since we changed his -- got rid of the Buspar entirely and

7    started Celexa on the previous visit to see how that was going

8    as well.

9    Q    I believe you reported that since your last visit

10   that he's had few changes?

11   A    Correct.

12   Q    I believe you also reported that the side effects

13   from the Buspar appear to have been gone?

14   A    The side effects from the Buspar were gone, correct.

15   Q    I notice you also reported sexual dysfunction.  Is

16   that also a side effect of the psychotropic --

17   A    It's a side effect of many of the anti-depressants,

18   either difficulty with orgasm or delayed orgasm.

19   Q    Now, his comment to you about not being there while

20   having intercourse, would that be similar to that hypnagogic

21   type of --

22   A    No.  Again, hypnagogic hallucinations are much more

23   vivid and much more separated from reality.  I think he was

24   saying there more that he just felt, you know, somewhat

25   deadened where he just really wasn't involved in the act at

1   that point and that he was sort of going through the motions.

2   I didn't think of it as being sort of an hallucination or

3   anything like that.

4       Q    And your diagnosis included stable low back pain?

5       A    Correct.

6       Q    And high cholesterol, high triglycerides.

7       A    Correct.

8       Q    And no current cardiac problems or symptoms.

9       A    Correct.

10      Q    Doctor, I think the next visit which was August

11  31st --

12      A    That was with Dr. Taylor.

13      Q    With Dr. Taylor, correct.  She reports in her notes

14  that he was again working out at the Y.

15      A    It says that, yes, he walked slowly for 10 or 20

16  minutes limited by his back pain, correct.

17      Q    Was there any other exercises that you became aware

18  of other than walking that he might have been doing that you

19  obtained from Dr. Taylor?

20      A    No.  I don't think I talked with her specifically

21  about that visit.

22      Q    And Dr. Taylor is a physician in your practice?

23      A    Correct.

24      Q    I believe there was no mention of back pain during

25  that visit?

1          A     I think it was a visit focused primarily on his

2     constipation or his abdominal discomfort.

3          Q     And that problem, Doctor, is that caused from his

4     heart medications?

5          A     It's hard to say.  I mean, he's been on the same

6     medication for some time.  Many people have constipation

7     intermittently from a variety of reasons.

8          Q     All right.  Doctor, let's move on to your September

9     17th visit.  Was the next visit September 17th?

10         A     Correct.

11         Q     And, again, he reported a recurrence of back

12     discomfort?

13         A     Correct.

14         Q     Did he give any indications to you what the cause of

15     that was?

16         A     He did not.

17         Q     I believe he also reported that he was stressed when

18     he was at work?

19         A     Correct.

20         Q     Again, Doctor, any recollection specifically of what

21     he was doing at work, how long he was working?

22         A     Do not know again the nature of how long he was

23     actually --

24              MR. ANGINO:  Objection to the form of the question.

25     He wasn't working.  You said he's at work.  He wasn't working.

BY MR. WOLGEMUTH:

Q    I'll rephrase the question.   Doctor, in your notes, your notes reflect that he reported that he was stressed when at work.

A    Correct.

Q    Did he inform you whether he was performing any work duties at that time or --

A    I don't think I specifically asked that.   I have no recollection of him saying specifics about what he was doing.

Q    Did he give you any indication how often he was at work?

A    He did not.

Q    And, again, he indicated that he was still working out at the Y.   Was there any discussion of what exercises he was doing?

A    Again, I believe it was just still his walking program.   I don't recall, you know, whether he was doing anything else at that point.

Q    I believe you reported that at that time that his anxiety was stable?

A    Actually it says partially treated at this point because he reported he was still having problems of anxiety and worry.

Q    I'm sorry, Mr. Mazzamuto reported to you that his anxiety was relatively stable.

1      A    Correct, but he was still having anxiety symptoms.

2      Q    Again, your impression at that point was stable

3  coronary artery disease without symptoms?

4      A    Correct.

5      Q    And chronic low back pain with an exacerbation?

6      A    Correct.

7      Q    Doctor, let's move on to your December 19th, '01

8  visit.

9      A    Okay.

10      Q    I believe at that time he reported back pain again?

11      A    Correct.

12      Q    Reported no chest pain.

13      A    None that I have reported, correct.

14      Q    And that his mental state was stable.

15      A    Correct.

16      Q    And in your impression or diagnosis, you have chronic

17  low back pain currently disabling.

18      A    Correct.

19      Q    Now, I believe, Doctor, that's the first time that I

20  notice in your notes from June of 2000 to December of 2001 that

21  you had indicated that the back pain was currently disabling.

22      A    Correct.  And I use it more as a descriptor, you

23  know.  Disabled and disability are not really medical

24  descriptions per se.  You know, they're legal definitions, so,

25  again, you know, there is no IC9 code for disabling back pain.

1     I was using it more as an adjective than a definition of a work

2     prescription or something of that that he was relating to me

3     that he really couldn't do anything with it.

4          Q    Was there any specific symptoms that he was

5     discussing with you in that time that lent you to add that

6     adjective to your diagnosis?

7          A    I think it was just that the back pain was

8     relentless.  You know, it was happening when he was at rest, it

9     was interrupting his sleep, it was disruptive to his lifestyle

10    and that it just seemed to -- again, the disruption to his

11    lifestyle in general, not just with a particular activity, but

12    he was having a worsening of his symptoms, you know, sort of

13    throughout the day, not just with doing, you know, bending or

14    lifting or something like that.

15         Q    And at that time in December of 2001, you noticed or

16    you noted that his depression and anxiety was borderline

17    compensated?

18         A    Correct.

19         Q    What exactly does that mean?

20         A    Just that he was getting by but I didn't feel that

21    his symptoms were under good control, that he was seemingly,

22    you know, functioning to some degree in the world but he

23    clearly was not without symptoms.  He was not in remission from

24    his symptoms of anxiety or depression.

25         Q    And his coronary artery was stable again?

1      A    Correct.

2      Q    Doctor, have you seen Mr. Mazzamuto since December

3  19th, 2001?

4      A    I believe so, yes.  I saw him in February of 2002.

5      Q    Was that the only time in 2002?

6      A    And again in March of 2002.

7      Q    May I see your notes quickly, Doctor?

8      A    You may.

9      Q    Doctor, I notice in your notes dated February 14th,

10  2002 that you note that his coronary artery disease is without

11  current symptoms?

12      A    Correct.

13      Q    He had chronic low back pain and severe anxiety with

14  resultant depression?

15      A    Correct.

16      Q    Now, I noticed you had changed one of the

17  psychotropics again?

18      A    Correct.

19      Q    Any specific reason?

20      A    Well, again because he was still symptomatic where he

21  was still having symptoms of anxiety and still depressed

22  despite being on the other medication.  We thought we would try

23  something different to see if he could get a better response.

24      Q    Doctor, I'm looking at your notes of your visit dated

25  March 14th, 2002.  Your notes reflect that he -- or since last

Case 1:01-cv-01157-CCC   Document 129   Filed 03/31/2003   Page 98 of 100

1   being seen that he continues to do poorly and he has episodes

2   of chest discomfort which comes on after eating like a pig.

3           Would I be accurate to state that you don't think

4   that was from cardiac conditions rather from overeating?

5       A    Correct.

6       Q    And, again, you report cardiac coronary disease

7   without clear recurrence of symptoms and that you didn't feel

8   his current chest pains were cardiac in nature.

9       A    Correct.

10      Q    And that he has chronic back pain and sciatica.

11      A    Sciatica, correct.

12      Q    Did he have any specific symptoms that day that

13  caused you to indicate the sciatica?

14      A    He states the pain still shoots into his legs

15  periodically and that it's actually there most of the time and

16  waxes and wanes.

17      Q    You also reflected, Doctor, in your diagnosis that

18  the anxiety and the depression is now becoming his biggest

19  problem?

20      A    Correct, that's my opinion.

21      Q    After making that diagnosis, did you refer him to any

22  psychologist or psychiatrist or do you think you're still

23  qualified to continue treating him for those problems?

24      A    Again, the problem runs into where to refer him to,

25  and, again, you know, so we generally take things as far as we

1  can.  I think I would probably end up referring him sometime in

2  the near future, number one, if he's willing to go, and, number

3  two, you know, if he doesn't have much improvement.  I think,

4  you know, besides his back and his, you know, his business

5  which he's concerned about, obviously this whole process of

6  disability is still yet another stress in his life, you know,

7  so there's lots of things that are sort of compounding.  So I

8  would love it if there was a psychiatrist easily available.  I

9  think I probably would have referred him prior to this time,

10  but it's not an easy thing to do so I have not done it yet.

11      Q    Has he ever discussed the claim or lawsuit that he

12  has with you in terms of any stress that that may be causing

13  him?

14      A    I think he's discussed the fact that, you know, he's

15  worried, he's worried about finances, that he's worried, you

16  know.  Obviously we fill out lots of forms and he brings them

17  in and so when he brings them in he's worried that, you know,

18  he's filling out all those forms and we're doing all of this

19  and he has not, you know, gotten really any satisfaction from

20  that yet.  That's sort of the limit of what I know about it.

21      Q    Doctor, I'd like to direct your attention to the

22  attending physician's statement that you signed on November

23  15th, 2000.  Would you have a copy of that in your files?

24      A    Is it a letter?

25      Q    It was a form.

1      A      If you want to show me the one you're referring to,

2      that would make things much faster.

3      Q      Sure, if I can find it.

4      A      Is it an Unum form?

5      Q      Yes.  Here you go.

6      A      Okay.

7      Q      Doctor, I'm going to discuss the restrictions that

8      you have identified in that APS which is dated November 15th,

9      2000.  I believe you identified no prolonged standing?

10     A      Correct.

11     Q      Can you tell me how long he would be able to stand?

12     What does prolonged mean?

13     A      Well, prolonged really means until you get pain, and

14     again I don't have a strict definition for Mr. Mazzamuto in

15     general.  I would think that, you know, in his case somewhere

16     between 15 and 30 minutes.

17     Q      Did he give you any specific evidence to, you know,

18     substantiate how long he can stand without pain?

19     A      He didn't say in terms of minutes but he did say that

20     he would be at the counter, his back would hurt, he would sit

21     down, he would sit down for a while, his back would hurt, he

22     would stand up.  He was in sort of constant alternating

23     positions between sitting and standing because any, you know,

24     long period of time in any particular position caused increased

25     discomfort for him.