1      Q    When he was at the counter was he not able to sit

2    while he was there?

3      A    Well, the counter is probably about this high so I

4    guess --

5            MR. ANGINO:  Pointing out about four or five feet.

6            THE WITNESS:  Four or five feet, I'm sorry, yes.  So

7    to actually see the customer on the other side, you'd have to

8    stand.  You could sit while you were waiting for customers or

9    sit to the side.  He has a desk off to the side of the

10   restaurant a little outside of the customer area.

11   BY MR. WOLGEMUTH:

12     Q    Okay.  And in terms of how long he could stand over

13   say an eight hour period, do you have an opinion as to what

14   that amount of time would be or --

15     A    In aggregate?

16     Q    In aggregate or alternate sitting, standing?

17     A    Again, my impression is that he'd probably be

18   changing positions every, you know, 15 to 20 minutes maybe.

19     Q    Doctor, you also report no heavy lifting.

20     A    Correct.

21     Q    And just what is that second --

22     A    Secondary to back.

23     Q    Okay.

24     A    It wasn't his heart that was restricting him.  It was

25   his back that was restricting that.

1      Q    When you say no heavy lifting, what type of weight

2 are you referring to?

3      A    Greater than 20 pounds.

4      Q    Any restrictions on lifting lighter weights than

5 that?

6      A    I did not give him any at that point, no.

7      Q    Do you have any medical reasons or any opinion that

8 would cause you to prescribe restrictions less than 20 pounds?

9      A    Not at that point, no.

10     Q    In terms of lifting lower or less than 20 pounds, is

11 that something he could do constantly or occasionally over --

12     A    Probably occasionally at best at that point.

13     Q    And I believe you also said that he can't work in a

14 stressful situation.

15     A    Correct.

16     Q    And, again, exactly what type of stressful situation

17 were you referring to?

18     A    Well, again, it was intentionally vague because

19 clearly it was getting to the point at that point that his

20 restaurant itself was a stressful situation, that just being

21 there constituted the stress.

22     Q    Okay.  And so that's what you're referring to.

23     A    Correct, just being at the restaurant because based

24 upon both his report and his wife's report, just being there

25 seemed to set him off, and, again, the emotional lability, you

1  know, quick to anger, quick to being upset and for very --

2  probably very small provocation.

3       Q    At that time you opined that his prognosis for

4  recovery was fair?

5       A    That's what I thought.

6       Q    Doctor, I'd like to refer you next to a letter that

7  you had sent to an insurance company Paul Revere dated November

8  3rd, 2000.  Do you have that in your file?

9       A    If you have it, I would --

10      Q    I'll look for it.

11      A    I've got it.

12      Q    At that time you reported that his heart condition

13  was stabilized and not a great limitation on him in the future.

14      A    Correct.

15      Q    Do you still believe that his heart condition is

16  stabilized and it's not a great limitation on him?

17      A    At this point I think his heart does not limit him at

18  all.  If he continues to smoke which unfortunately he has begun

19  again in response to his stress, he's certainly at risk for a

20  future heart attack, but at this point his heart muscle works

21  normally.

22      Q    I believe you also had reported that his back was

23  aggravated by weight gain?

24      A    Correct.

25      Q    And that he shouldn't work at the restaurant.

Case 1:01-cv-01157-CCC   Document 129-2   Filed 03/31/2003   Page 4 of 38

1     A    Correct.

2     Q    And, again, I believe you identified no prolonged

3 standing and he had difficulty bending and no heavy lifting?

4     A    Correct.

5     Q    Again, that's only what, two weeks prior to your

6 November 15th, 2000 so you're referring to the same weights?

7     A    Correct.

8     Q    Now, at that time, Doctor, in November of 2000, did

9 you have any indication of how long Mr. Mazzamuto would stand

10 during the day while he worked?

11    A    Again, I don't have specifics as to what exactly he

12 would do, you know, how long he stood, how long he sat, you

13 know, while he was at the restaurant, no.

14    Q    In terms of like bending, would same thing, you

15 wouldn't really have any idea how long he would have to bend

16 during the time he would work at the restaurant?

17    A    I have no professional way of knowing how often he

18 would have to bend.  I assume he would have to do it on a

19 fairly frequent basis.  Having seen the restaurant, you know,

20 there's food stuffs on various shelves, there's pizza ovens

21 that are up high, there's things down below the counter.  I

22 would assume it's a constant motion but that's as a customer,

23 not as a physician.

24    Q    And, again, lifting, same thing, you never really saw

25 him lifting anything there?

1      A      No, I mean, I've seen, you know, I've seen big cans

2   of institutional food products that are used to make the subs

3   and the vegetables and things like that.   I assume that they

4   probably weigh, you know, 10 or 12 pounds, you know, those

5   sorts of things.

6      Q      But there was no problem lifting that kind of weight

7   though?

8      A      Not one time, but I think since bending without

9   lifting anything is a problem, obviously if you have to lift

10  something of light weight, just the fact that you had to bend

11  to lift it would be a problem in and of itself.

12     Q      Doctor, let me ask you a question.   Have you treated

13  individuals with similar type of back problems that

14  Mr. Mazzamuto has that continue to work?

15     A      I have people who have back pain who continue to

16  work.   It's hard to say that they have, you know, the same as,

17  you know, as Mr. Mazzamuto has.   His MRIs have sort of numerous

18  findings on them, and the problem is that pain is not something

19  you can objectively measure with a test or a scan or an X-ray.

20  And, you know, so much of it comes from, you know, what the

21  symptoms are presented to you.   So I would say that I probably

22  have patients who have back pain who continue to work.   My

23  impression of Mr. Mazzamuto is that he has fairly significant

24  back pain and probably I don't have people with his degree of

25  discomfort that hold down physical jobs, you know, physically

1    demanding jobs.

2        Q    Would you have people that have his level of

3    discomfort holding down sedentary or light type of jobs?

4        A    I probably have people with his level of discomfort

5    who at times can hold down light jobs though others because of

6    even sitting causing problems end up in difficulty and end up

7    having to restrict their work because of that.

8        Q    So you agree with me that as a physician it's very

9    difficult to objectively quantify whether somebody is

10   completely disabled without assuming what they're telling you

11   and assuming their level of pain as truthful?

12       A    Well, again, disabled is not a medical definition,

13   you know, and so it's there is no exact way of monitoring does

14   somebody's pain that they report equal the pain that they feel.

15   There's absolutely no way of knowing that.  He does not have

16   normal X-rays of his back.  He does not have normal MRIs, you

17   know, of his spine.  He has seen Dr. Gelb who, you know, who

18   has at least stated that surgery might be an option to help

19   reduce his pain.  Mr. Mazzamuto is very fearful of undergoing

20   surgery and that has not been pursued.  But, yes, you know, you

21   can never say a hundred percent that what he's reporting as

22   pain is true.  You have to accept some of what the person tells

23   you.

24       Q    And maybe a different way of asking that or similar

25   question, Doctor, if another physician like yourself or a back

1    specialist looked at Mr. Mazzamuto's records, every record that

2    you have, and would it be reasonable for him, medically

3    reasonable for him to say after looking at all those records

4    saying, Mr. Mazzamuto, you could do a job that is sedentary or

5    light work?

6        A    I guess anything is possible.  I think it's unlikely.

7        Q    I don't think I asked you if it was possible or

8    unlikely.  I asked you whether it was medically reasonable for

9    another physician to look at those same records and deliver an

10   opinion or prepare an opinion saying that he could do those or

11   that he is able to perform sedentary or light duty work.

12       A    I don't think it would be reasonable but I assume

13   another physician might say that or could say that.

14       Q    I understand that that you might not agree with that

15   opinion.

16       A    Right.

17       Q    But you at least have to acknowledge that that

18   opinion could be reasonable.

19            MR. ANGINO:  He said no.

20            THE WITNESS:  I said I don't think it's reasonable.

21   That doesn't mean another physician won't find it to be

22   reasonable.

23   BY MR. WOLGEMUTH:

24       Q    That's fair enough.  And just so I understand,

25   Doctor, I'm sure you've said this twice already, but there's

1  nothing with his cardiac condition preventing him from doing

2  any type of sedentary or light type of work?

3       A    His cardiac condition at this point other than

4  fueling his anxiety has no limitations on him at this point.

5       Q    Now, Doctor, is there there anything preventing --

6  anything medically preventing Mr. Mazzamuto from doing

7  bookkeeping type work?

8       A    Again, having to change positions frequently might

9  make it uncomfortable for him.  Whether or not he -- can he

10  push a button with a calculator, yes, he can.  Can he sit and

11  concentrate for long periods of time to do that, I don't know

12  that he can.

13       Q    You agree with me that your records other than the

14  hypnagogic hallucination and I think one reference to some

15  confusion didn't indicate any type of cognitive problems that

16  he's having from his anxiety, depression and/or the medications

17  you're prescribing for it?

18       A    He does have problems with concentration in that

19  again because he gets upset so easily with things that I think

20  he is easily distractible that again I've never been a

21  bookkeeper so I don't know what level of concentration it takes

22  to look at long series of figures and numbers and dutifully put

23  them in all the little spots.  I think that would be difficult

24  for him, mainly, you know, from the back because it's hard to

25  sit in a position hunched over a ledger and from the mind

1    position because again his anxiety again is unrelenting and I

2    think it would interfere with his concentration.  Anxiety and

3    depression bring with them often difficulty with concentrating,

4    difficulty with memory because the brain is otherwise occupied

5    turning away on these sort of unreasonable fears and thoughts

6    so that other things that you're supposed to be paying

7    attention to you don't.  Your attention is not as sharp as it

8    should be.  Things can be easily missed, things can be easily

9    forgotten.  So, again, I wouldn't want him doing my books.

10        Q    Do you agree with me that there's nothing in your

11   notes reflecting he had any problem adding numbers, subtracting

12   numbers?

13        A    There's nothing in my notes to reflect that.

14        Q    Any type of medical condition or diagnosis that would

15   prevent him from performing office duties such as calling food

16   suppliers, checking prices, talking to service men, talking to

17   customers?

18        A    Well, again, other than the fact that if something

19   went wrong on the phone, he might fly into a rage at the

20   supplier who was late or who didn't understand what he was

21   saying or, again, he can physically dial the phone and talk on

22   the phone as long as, you know, he has an accent and here in

23   central Pennsylvania some people have trouble talking with

24   people with accents, but I could see where he may not again be

25   able to sort of coordinate all the things that one needs to

1  coordinate when you're trying to arrange shipments with various

2  suppliers because again that lack of concentration, that lack

3  of ability to sort of focus.  When you're chronically anxious,

4  you lose your focus.  You get overwhelmed by the details so

5  that you can't put things in order and say, okay, I'm going to

6  take on task one, then move on to task two, then move on to

7  task three and organize your life.  You see tasks one through a

8  hundred in front of you and you can't figure out where to start

9  and you get overwhelmed.  That's sort of a common problem you

10  see with that and I think Mr. Mazzamuto would have that

11  problem.

12      Q    You say you think he would have it.  Is there any

13  evidence reflected in your notes that he is having those

14  problems?

15      A    I don't think he's doing those things so I did not

16  put that in my notes.

17      Q    To your knowledge, Doctor, during the year 2001 and

18  2002, has he been performing any of the bookkeeping duties or

19  office duties at his restaurant?

20      A    That I don't know.  You'd have to ask him and his

21  wife.  My understanding or my thought, and, again, this is not

22  based on him telling me directly, my thought is that his wife

23  has taken over more and more of that.  That was my assumption

24  anyway.  It may not be correct.

25      Q    Any medical condition that would prevent him from

1  supervising employees?

2      A    Again, ditto from my last answer.  The fact that

3  difficulty with his personality, small things his employees

4  might do again causing him to become incredibly emotional and

5  incredibly upset, you know, going off in anger or rage that

6  again I would think would make him a very poor supervisor.

7      Q    So I guess what you're saying is that it's not that

8  it would prevent him from doing it, it's just that he could

9  have ramifications from employees quitting or --

10      A    Well, again, that's like saying is he able to fly a

11  plane.  Well, I assume he could sit at the controls.  Doesn't

12  mean the plane would land and then crash into a building.  You

13  know, the guys in Al Qaeda, they didn't know how to land.  They

14  knew how to fly the plane so were they qualified to fly the

15  plane.  That's your call.

16      Q    Doctor, there was a physician I believe employed by

17  Unum that opined on March 27 of 2001 that he found no evidence

18  of any cardiac condition which would preclude sedentary or

19  light physical activity on a full-time basis.  I'm assuming you

20  would agree with that?

21      A    Already have.

22      Q    Again, from your testimony, especially the last few

23  questions that I asked you, it appears that the majority of his

24  problems presently are psychiatric.

25      A    Here's my general take on Mr. Mazzamuto.  The primary

1  problem that is limiting his sort of functioning with his wife

2  and his family is his psychiatric problem, that the fact that

3  he has this now sort of unrelenting anxiety, this depression,

4  this sort of irrational fears about, well, maybe not so

5  irrational in some degree because he's smoking again, he's

6  gained weight, he's engaging in behaviors which could put him

7  on a very desperate course.

8          His heart condition while not in any way disabling at

9  this point unfortunately I believe triggered a lot of this

10  anxiety.  You know, up until that point he was a tough Italian

11  guy who could do anything and he could smoke and he could run

12  his restaurant.  His back bothered him.  This heart event I

13  think showed in his mortality.  His dad I think died of heart

14  disease or vascular disease of some kind.  So the heart problem

15  is only there in that if fuels his anxiety.  Again, his back

16  problem is a big limitation.  You know, this is not a guy who

17  programs computers for a living.  He doesn't do brain work as

18  his primary job so there's lots of physical things I think he

19  can't do because of his back, but, you know, again, my opinion

20  and I've stated it several times is it's his psychiatric

21  problems right now that are his primary limiting factor.  His

22  back problem runs a close second.  His heart other than being

23  an impetus to his anxiety, again his heart works fine right

24  now.  That's not an issue.  It's not he's going to have a heart

25  attack if he picks up a can of tomatoes.

1    Q    And if Mr. Mazzamuto identified his work duties as 20

2  percent bookkeeping, 20 percent office duties and 60 percent

3  supervising employees, anything in his back condition that

4  would prevent him from doing those type of job duties?

5    A    I think he would be uncomfortable again with sitting

6  over a desk with the bookkeeping.  You know, what can people

7  do, pain tolerance and things like that are all individual.

8  Again, with the back, if that was his only issue, could he

9  muddle through further, he probably could.  I think it's the

10  whole constellation though.  You can't just isolate a

11  particular, you know, it's just the back or it's just the heart

12  or it's just the anxiety.  It's his work and his job and his

13  life are one big milieu and I think his medical conditions all

14  tie together.  It's very hard to tease out individual things

15  and say, well, you can -- I mean, I can't do it.  I can't tease

16  those things apart.

17    Q    Doctor, at what point in your treatment of

18  Mr. Mazzamuto did his psychiatric duties or psychiatric

19  conditions get to the point where, you know, as you testified

20  just recently that he might have problems concentrating, he

21  might have problems doing other things?  Can you give me a

22  point as to --

23    A    Well, I think there was some suspicion of it.  I

24  think when his wife came to talk to me that she was concerned,

25  you know, again to give me another view of what he does because

1   again I don't see him day to day at work.  I don't see him day

2   to day at home.  And I think when her level of concern was such

3   that she actually scheduled an appointment to tell me, you

4   know, Vinny is in trouble, Vinny is having all these problems,

5   and I can look back at the notes and see what that date was.  I

6   mean, I think that's when it became more, gee, we have to get

7   his anxiety down because that way he will able to quit smoking

8   so he won't have another heart attack to, gee, this guy is

9   really having trouble functioning now.

10          It was -- it sounded like he was potentially going to

11   have marital problems as a result of this that, you know, how

12   he was interacting with her was becoming a problem, you know,

13   above and beyond what goes on at the restaurant so I think

14   whatever date that was it was -- I can look back but there was

15   a brief paragraph that just said that his wife had come to

16   speak to me.

17          I think that's probably when it really became clear

18   that the psychiatric problem had really manifested itself and

19   that we weren't -- you know, he wasn't getting as good symptom

20   relief as maybe I thought he was when he would come in by

21   himself, and, you know, again, he puts on -- you know, he wants

22   to put on a good show, how are you doing, well, not bad, you

23   know, again so I think that's when I got more of an idea that

24   there was really something that this was the biggest problem

25   and the back probably moved down on the list.

1      Q    And would you agree, Doctor, that basically he

2  completed cardiac rehab that there was nothing medically

3  limiting or cardiac wise limiting him from performing his job

4  duties at the restaurant?

5      A    Correct.

6      Q    And from say January of 2001 through the present, is

7  there anything that you can identify other than he might have a

8  problem like stooping over a desk doing book work related to

9  his back that would prevent him from doing the job duties of,

10  you know, office duties?

11          MR. ANGINO:  I have to object to the form of the

12  question.  He has gone on for probably 15, 20 minutes showing

13  you all the ways in which he's limited from doing those things.

14          MR. WOLGEMUTH:  I don't think that's really an

15  objection to the form of the question, is it?

16          MR. ANGINO:  It is because, you know, you're asking

17  him now to isolate 15 minutes of testimony.  Are you not?

18  BY MR. WOLGEMUTH:

19      Q    I'm asking in terms of his job duties of bookkeeping,

20  office duties and supervising employees, during that time

21  period January of 2001 to the present, are there any specific

22  job duties other than doing bookkeeping that you think his back

23  would prevent him from doing?

24      A    Well, oh, I think that supervising employees requires

25  that you sort of get up and down, and, you know, again, it's

1   not IBM with 50,000 employees.  It's like a couple guys behind

2   a counter, and again, and the problem that came up is that if

3   something isn't going right, he feels he has to jump in, he

4   gets upset, they're not doing it right.  So, yeah, but what's

5   the back and what's -- you know, again, I can't say that the

6   back by itself, but if he's sitting there supervising and he

7   doesn't think that pizza man A is doing the right thing and he

8   jumps up to try to do something and then his back hurts more

9   and then he gets really upset with the guy, again, I think it's

10  a combination of things.  I think the back could figure into

11  his ability to be a good supervisor because a supervisor has to

12  be able to do a lot of the stuff that he's supervising.

13        You know, these are people that, you know, I don't

14  know what the turnover in his restaurant is, but, you know, my

15  understanding of the restaurant trade is that other than his

16  kids who don't turnover at all, well, there are -- again, you

17  have to train people, you have to show them what to do, it's

18  not a high paying job where you have job stability, and, you

19  know, maybe not the highest motivation of people work in pizza

20  shops as paid employees.  If you're a family member, you work

21  there, you're motivated, but if you're a paid employee, you

22  could be a college kid, you could be somebody who doesn't

23  really give a damn, and, again, that sets up a scenario where

24  well, he's got to show them how to do it, he's go to do this,

25  you do it this way, now you hurt your back, then you get upset

1    because the guy is not doing it right.  So I think there's lots

2    of scenarios where as the combination of his back and his

3    mental state that he would not be a good supervisor at this

4    point.

5        Q    Doctor, do you have the PDR?

6        A    Dr. Brazel has the 2002 PDR right here.  Is that what

7    you're working out of?

8        Q    Yes, I'm looking at the page that discusses

9    Wellbutrin.

10       A    Do you have a page number on your copy?

11       Q    Unfortunately I don't.

12       A    We'll get it.  All right.

13       A    Okay.  I've got Wellbutrin in front of me.

14       Q    I'm looking at the I guess the precautions and

15   warnings part of it.

16       A    All right.  Okay.  I have the warnings.

17       Q    It says here that Wellbutrin should not be used in

18   combination with Zyban or any other medications that contain

19   Bupropion.

20       A    Right.

21       Q    Exactly what is Bupropion?

22       A    Wellbutrin.  That's the generic name so what they're

23   saying is if you're on Wellbutrin, then you shouldn't give him

24   Zyban because you're really giving him a double dose of the

25   same thing.

1    Q    I got it.  Okay.  And some of the side effects of

2    taking this, I know we discussed them earlier but I believe

3    that they can include delusions, hallucinations, psychosis,

4    paranoia and confusion?

5    A    They all include that.  It doesn't tell you how

6    frequently it happens though.  Again, if you look up any

7    anti-depressant or any anxiety agent or any antipsychotic

8    you'll probably get the exact same list because these things,

9    they're listed if anybody gets it in clinical trials, it's

10   listed as a potential side effect.  It doesn't give you any

11   kind of a weighted average that it's a common side effect or

12   it's a frequent side effect.  If somebody takes the medicine

13   and they get killed in a car crash, that goes down as a

14   possible side effect of the medicine because maybe it was

15   somehow influenced so it's all possible but it doesn't mean

16   it's likely.

17          MR. WOLGEMUTH:  Okay.  All right, Doctor.  That's all

18   the questions I have.

19                      CROSS-EXAMINATION

20   BY MR. ANGINO:

21   Q    Doctor, my name is Richard Angino, and although I

22   normally don't ask many questions at a discovery deposition, I

23   think in this particular situation I'd like to ask you a few.

24          Doctor, I've had an opportunity to go over your

25   records as has counsel for the defense, and I'm looking at an

1    attending physician's statement and you don't have to look at

2    it.   It's dated 10-23-96.   And the physician's statement

3    requires that you and other doctors complete what in this case

4    are numerous questions that went from 1 through -- that go from

5    1 to 17 and they include such questions as diagnosis and

6    current conditions to disabled and how long people have been

7    disabled and things such as that.   And in this particular

8    attending physician's statement, you indicated that Mr.

9    Mazzamuto had been disabled from April -- I guess April 3, '96

10   through October 23, '96 for low back and central spinal

11   stenosis.

12          When you were going through your forms there, there

13   appeared to be a fairly significant number of forms like this

14   that you've been asked to complete; is that correct?

15       A    That's correct.

16       Q    And do they come to you as often as monthly?

17       A    Sometimes.

18       Q    And so that you've been filling out these forms

19   apparently for Mr. Mazzamuto at different intervals ever since

20   1996; is that right?

21       A    That's correct.

22       Q    And so you've told this insurance company that he was

23   totally disabled at least for that period of time back in 1996;

24   is that right?

25       A    Correct.

1     Q     And you told them then that he had a central spinal

2     stenosis and he had low back pain since 1996 and before that;

3     is that right?

4          A     Correct.

5          Q     And so this insurance company has known at least as

6     to the back problems back to 1996; is that right?

7          A     Correct.

8          Q     So when Mr. Mazzamuto has his heart condition and

9     also had back problems, those back problems had a long history;

10    is that right?

11         A     Correct.

12         Q     And this insurance company knew about those back

13    problems for this long history; is that right?

14         A     Correct.

15         Q     Now, as far as you know, Mr. Mazzamuto has done the

16    same type of job as long as he's been working as far as you

17    know; is that right?

18         A     As far as I know since he came to America based on

19    the pictures in his restaurant.

20         Q     So this man from the time he came to this country has

21    worked in that type of surrounding, and just from his back you

22    indicated that he was totally disabled back in 1996; is that

23    right?

24         A     Correct.

25         Q     Now, he did then go back to work for a period of time

1  until he had the heart condition, but would you anticipate that

2  back condition to be getting better or worse as he aged?

3      A    It gets worse over time.

4      Q    So that this spinal stenosis won't go away; is that

5  right?

6      A    It will not.

7      Q    And as he gets older, is that low back pain probably

8  going to get worse as well?

9      A    It will worsen because the arthritis and the disc

10  disease that he's got will get worse.

11      Q    So that if he was disabled in 1996 just from the back

12  condition, what you're saying is after he had this heart attack

13  and after he developed anxiety, he still had that back

14  condition; is that right?

15      A    Correct, the back is still there.

16      Q    So an insurance company that now doesn't want to pay

17  him because of the type of work he did, is there any difference

18  in the type of work he did in '96?

19      A    No, same job.

20      Q    So if this insurance company back in '96 paid him for

21  his disability just from his back but now doesn't want to pay

22  him when he has the back, he has the anxiety and he had the

23  initial heart condition, can you understand the basis for that?

24          MR. WOLGEMUTH:  Objection.

25  BY MR. ANGINO:

1      Q    I mean, can you medically understand the basis for

2  that?

3      A    Again, I cannot, no.

4      Q    And, Doctor, although you were asked some questions

5  about your expertise being an internist and treating adults,

6  would a large percentage of your patients be older adults?

7      A    Yes, the majority are older.

8      Q    And when you have older adults, do you have patients

9  that have back problems?

10     A    Yes.

11     Q    Do you have patients that have anxiety?

12     A    Lots of them.

13     Q    Do you have patients that have cardiac problems?

14     A    Lots of them.

15     Q    So whether you're an expert or not, you are obviously

16  expert enough to be treating these patients for back problems,

17  anxiety and for heart conditions; is that right?

18     A    I think so.

19     Q    And you feel you're qualified to treat them; is that

20  right?

21     A    I do.

22     Q    And not only being qualified to treat them, are you

23  qualified to be able to express a medical opinion as to whether

24  you feel they're disabled from doing types of work if the types

25  of work are described to you?

1     A    I think so.

2     Q    And in this particular case with Mr. Mazzamuto, you

3  have not only what he's told you but you've -- I think you said

4  10, 15 times at least have been to his restaurant; is that

5  right?

6     A    Correct.

7     Q    So you've seen with your own eyes what he does; is

8  that right?

9     A    I've seen what goes on in the restaurant, correct.

10    Q    When you see him and he's standing behind a counter

11 that's four feet tall, you see a man that has to stand; is that

12 right?

13    A    Correct.

14    Q    And when you see the kinds of cans that are around

15 that have the product for the pizza, you assume somebody has to

16 from time to time pick up those cans and things; is that right?

17    A    Correct.

18    Q    And even pizzas have some weight to them; is that

19 right?

20    A    Oh, yes, of course.

21    Q    And as far as bending, stretching and all of those

22 types of activities, have you seen Mr. Mazzamuto doing those

23 things as he serves people?

24    A    I have not directly witnessed it when I was there.

25    Q    But you have directly witnessed his cooking; is that

1  right?

2      A    Correct.

3      Q    And you've witnessed the small type of operation that

4  is there; is that right?

5      A    Correct.

6      Q    And you've witnessed that the people performing those

7  operations have to do a variety of tasks; is that right?

8      A    Lots of different movements and motions.

9      Q    And as far as you know, Mrs. Mazzamuto has assumed

10  over the last few years virtually all if not all of the tasks

11  that Mr. Mazzamuto was doing before.

12      A    My understanding again is that she's been doing much

13  more of the supervisory work that goes on there.

14          MR. ANGINO:  I have no further questions.

15          MR. WOLGEMUTH:  I don't either.  All done.  Thanks,

16  Doctor.

17          (Whereupon, the deposition was concluded at 4:15

18  p.m.)

19

20

21

22

23

24

25

1   COUNTY OF LANCASTER       :
                            SS

2   COMMONWEALTH OF PENNSYLVANIA  :

3         I, Lorraine C. Frick, a Notary Public, authorized to

4   administer oaths within and for the Commonwealth of

5   Pennsylvania, do hereby certify that the foregoing is the

6   testimony of DOUGLAS BOWER, M.D.

7         i further certify that before the taking of said

8   deposition, the witness was duly sworn; that the questions and

9   answers were taken down stenographically by the said

10   Reporter-Notary Public, and afterwards reduced to typewriting

11   under the direction of the said Reporter.

12         I further certify that the said deposition was taken

13   at the time and place specified in the caption sheet hereof.

14         I further certify that I am not a relative or

15   employee or attorney or counsel to any of the parties, or a

16   relative or employee of such attorney or counsel, or

17   financially interested directly or indirectly in this action.

18         I further certify that the said deposition

19   constitutes a true record of the testimony given by the said

20   witness.

21         IN WITNESS WHEREOF, I have hereunto set my hand this

22   2th day of April, 2002.

23

24

25

Lorraine C. Frick, Reporter
Notary Public

Notarial Seal
Lorraine C. Frick, Notary Public
Lancaster, Lancaster Co., PA
My Commission Expires April 10, 2005

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT COURT OF PENNSYLVANIA

| | |
|---|---|
| VINCENZO MAZZAMUTO,<br>    Plaintiff, | CIVIL ACTION – LAW |
| | NO. 1:CV-01-1157 |
| v. | |
| UNUM PROVIDENT CORPORATION;<br>PAUL REVERE LIFE INSURANCE<br>COMPANY; and NEW YORK LIFE<br>INSURANCE COMPANY<br>    Defendants | JUDGE KANE |
| | JURY TRIAL DEMANDED |

## PLAINTIFFS' TRIAL WITNESS LIST
## PURSUANT TO F.R.C.P. 26(a)(3)

### Fact Witnesses

Plaintiff Vincenzo Mazzamuto
501 Limestone Road
Carlisle, PA 17013

Gerarda Mazzamuto
501 Limestone Road
Carlisle, PA 17013

Melissa Mulry
18 Chestnut Street
Worcester, MA
UnumProvident employee

John Clarke, M.D.
Unum consultant

John W. Fogarty
18 Chestnut Street
Worcester, MA (UnumProvident employee)

Antonino Mazzamuto
501 Limestone Road
Carlisle, PA 17013

250539.1\RCA\GAB

Exhibit G

Francesco Mazzamuto
501 Limestone Road
Carlisle, PA  17013

Angelo Mazzamuto
Indiana University of Pennsylvania
c/o 501 Limestone Road
Carlisle, PA  17013

Antonia Tripoli
22 Carlisle Street
New Bloomfield, PA  17068

Pam Hagerich
432 Limestone Road
Carlisle, PA  17013

Vincenzo Randazzo
52 East Penn Street
Carlisle, PA  17013

James S. Marshall
1003 Forge Road
Carlisle, PA  17013

Therese A. Sindelar
New York Life
PO Box 6916
Cleveland, OH 44101

Salvatore Ferrigno
3993 Huntington Pike, Suite 105
Huntington Valley, Pennsylvania 19006
(215-938-0572)

## Expert Witnesses

Gordon K. Rose, CLU, ChFC
735 Virginia Rail
Kiawah Island, SC 29455

Douglas Bower, M.D.
Masland Associates
220 Wilson St, Suite 109
Carlisle, PA 17103

Stanley E. Schneider, Ed.D.
412 Erford Rd.
Camp Hill, PA 17011
(Social Security Disability exam)

Patrick Fergal McSharry
(former Unum employee)

Robert C. Steinman, M.D. **(as on cross)**
Defendant expert

Abram Hostetter, M.D. **(as on cross)**
Defendant expert

Ted Kasenske, M.D.
The Pain Management Clinic
  of Carlisle Hospital
5 Sprint Drive
Carlisle, PA  17013


## Depositions Pursuant to
## F.R.C.P. 26(a)(3)(B)




Plaintiffs reserve the right to supplement this list.

Respectfully submitted,

ANGINO & ROVNER, P.C.


_____
Richard C. Angino, Esquire
I.D. No. 07140
4503 N. Front Street
Harrisburg, PA  17110
(717) 238-6791
Attorney for Plaintiff

Date

MAZZAMUTO, VINCENZO          PAINCLINIC                    MR #030320

**DATE:** 11/13/96

This is a 41 year old gentleman with spinal stenosis.  He states he has been doing relatively well after the last epidural steroid injection.  He continues to take the gabapentin and feels this is helping his pain.  Again, he does not want to proceed with an operation and he states that he will give me a call whenever his pain returns and he will request another injection.

TDK/vfn
D: 11/13/1996 - 03:21 pm
T: 11/13/1996                                             Ted D. Kosenske, M.D.
cc Dr. Bower

Dx

Proc

Pt#

FC

CC

NYLCL00100

Exhibit H

MAZZAMUTO, VINCENZO                PAIN CLNC                    MR #030320

**DATE:** 10/03/96

This is a 41-year-old gentleman with spinal stenosis.  He states that his back pain is better but he is still having burning down his legs.  I want to increase his Gabapentin to 300 mg t.i.d. to 600 mg t.i.d.  I will see him in one month.  Interestingly, he states that his irritable bowel syndrome is much improved on the Gabapentin.

TDK/bks
D: 10/03/1996 - 04:07 pm
T: 10/04/1996                                          Ted D. Kosenske. M.D.
cc Dr. Douglas J. Bower

Dx:

Proc:

Pt. #:

FC:

CC:

NYLCL00101

MAZZAMUTO, VINCENZO          PAIN CLNC                    MR #030320


**DATE:**
**PERFORMED BY:** Dr. Ted D. Kosenske


This is a 41-year-old gentleman with spinal stenosis.  He states he is approximately 40% better after the first two lumbar epidural steroid injections.  We will proceed with a third injection today.

**PROCEDURE:** Lumbar epidural steroid injection.

Sterile prep was performed with the patient in the sitting position.  An 18 gauge Tuohy needle was then placed at the L3/L4 interspace.  Using loss of resistance technique, the epidural space was located without difficulty.  There was negative aspiration of blood or CSF.  There were no paresthesias elicited.  Ten cc of preservative free normal saline with 80 mg of Depo-Medrol were slowly injected into the epidural space without patient complaint.  The patient tolerated the procedure well without complications.  I will see him in a few weeks.  I am going to start him on a trial of gabapentin 300 mg t.i.d.  He does complain of numbness and he is unsure whether this is resolving.  He also states emphatically that he does not want an operation at this time.  Again, I will see him in a few week.


TDK/lmw
D: 08/20/1996 - 04:28 pm
T: 08/20/1996                                        Ted D. Kosenske, M.D.
cc  Dr. Douglas J. Bower


Dx

Proc

Pt#

FC

CC

NYL-CL-00102

**CARLISLE HOSPITAL**
                    **PROCEDURE NOTE**



# UNUM.

*Protecting everything you work for*

January 22, 2001

Carlisle Hospital
Attn: Medical Records Department
246 Parker Street
Carlisle, PA 17013

Re: Vincenzo Mazzamuto
DOB: 5/25/55
Soc. Sec # 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

Claim #13-h3236167-002

Dear Medical Records:

Vincenzo Massamuto is a patient of yours and a client of ours. Your assistance is requested in connection with a claim for disability presented by the above named insured. Enclosed is a signed authorization enabling you to release this information to us.

We are interested in obtaining a copy of the medical records, including **history, office notes, diagnostic tests results consultations objective testing admission/discharge summaries and chart notes** on the above named policyholder. We would appreciate your immediate attention to this request. Should you have any questions, or if a fee is involved please call me at 1-508-929-6840. A Tax Identification number is required for any prepayment requests. Our FAX number is 508-751-7430.

Thank you for your cooperation.

Sincerely,

Robin L Andrews

Route # 775-52
Enc. Authorization

UNUMPROVIDENT CORPORATION
First Unum Life Insurance Company as administrator for New York Life Insurance Company
18 Chestnut Street, Worcester, Massachusetts 01608-1528
508.799.4441

Unum is the marketing brand of UnumProvident Corporation

Exhibit I



 *The Company You Keep®*

New York Life Insurance Company

April 15, 1997

New York Life Insurance Co.
Attn. Gloria Phelps

Re: Claim # N 214 282    Policy # H3 236 167

Dear Gloria:

In response to our conversation regarding my client Vincenzo Mazzamuto, claim # N 214 282, I want to state that at the time of delivery of Mr. Mazzamuto's policy, I found an amendment attached to his policy to be signed by the PI and returned to the G.O.. The G.O. explained to me that the amendment was issued due to the medical history of my client found from his APS.

I reviewed the amendment which states that Q.#3L of Non-Med should be answered intended to be yes. At that time, I wondered why the policy was issued with such an amendment, because I was unaware of any medical history related to Mr. Mazzamuto.

At the time of delivery I asked Mr. Mazzamuto to sign the amendment before taking his policy explaining to him why the company attached this amendment to his policy. My client was surprised to hear that his APS (Attending Physician Statement) said that he had a back problem because he was never told by his doctor that he actually had a back problem. My client did go to his family doctor to have a check-up on his back due to some minor back discomfort, but after a few days he felt fine , therefore he never went back to his doctor and was never informed from his doctor that he had any problems.

My client's doctor never notified my client of any problems, therefore he thought that everything was O.K. with him and there was no problems with his back.

In conclusion,  I want to let you know that I have known Mr. Mazzamuto for a long time and that I know he put this claim through in good faith due to an accident not related to any previous medical history. As a matter of fact, he has fully recovered due to his accident and is back to work full-time. So, clearly he has not intended to put this claim through as any kind of fraud.

It is clear that NYL knew of my client's medical history before issuing his policy.

New York Life Insurance Company
New York Life Insurance and Annuity Corporation
(A Delaware Corporation)
51 Madison Avenue, New York, NY 10010

NYLCL00211

Exhibit J

Case 1:01-cv-01157-CCC   Document 129-2   Filed 03/31/2003   Page 34 of 38



*The Company You Keep*®                              **New York Life Insurance Company**

I hope you understand my statement and can take care of this matter in a good NYL tradition.

Thank you for your time and cooperation.

Sincerely,

Salvatore Ferrigno

New York Life Insurance Company
New York Life Insurance and Annuity Corporation
(A Delaware Corporation)
51 Madison Avenue, New York, NY 10010

NYLCL00210

Date composed 01 15 2001 03:07 PM
Tracking No:   Wor-01 01 15-150234 MMAR

# Field Service Request Transmittal Form

## Field Investigator:

Field Investigator:
Assign Date:
Completion Date:

Region (New)
State

## Claimant Information Section

| Claimant Name: | Vincenzo Mazcamuto | Home Phone: | 717-243-0383 |
|---|---|---|---|
| Street 1: | 501 Limestone Road | Date of Birth: | 05/25/55 |
| Street 2: | | SSN#: | 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 |
| City, State & Zip: | Carlisle, PA   17013 | Occupation: | Restaurant Owner |
| | | Diagnosis | Cardiac |

## General Detail Section

| Claim Rep Name: | Melissa Magner | Previous Claim Rep: | Melissa Magner |
|---|---|---|---|
| Claim Rep Phone: | 6710 | | Cardiac |
| Consultant: | Diane Cahill | Consultant Phone Ext: | 6556 |
| Cost Code | 8169 | Claim Rep Mail Code | |
| Priority (in days): | ○ 15  ● 30  ○ 60 | Represented by Attorney: | ○ Yes  ● No |
| Prior Field Handling: | ○ Yes  ● No | Attachments | ● Yes  ○ No |
| Name of Last Field Rep: | | Joint Referral: | ○ Yes  ● No |
| Contact Before Investigation: | ○ Yes  ● No | If Joint Referral is Yes, name of GENEX Rep: | |

**Toll Free Phone Numbers:** Worcester:  888-226-7959 ;   Portland: 800-228-4568 ;  Glendale: 800-424-2008 ; Chattanooga:  800-451-8464

## Employer Information Section

| Employer Name: | Vinny's Restaraunt | Street 1: | 330 South Hanover Street |
|---|---|---|---|
| Business Phone: | 717-249-6417 | Street2: | |
| | | City, State & Zip: | Carlisle,PA   17013 |

NYLCL00526

Exhibit K

# Reason for Referral

| Interview 3rd Party: ☐ Yes | Name of 3rd Party: | Relation to Insured: | Special Handling: ○ Yes ○ No |
|---|---|---|---|

Special Handling:

| Interview MD: ☐ Yes | Interview Employer: ☐ Yes | Interview Insured: ☒ Yes | Miscellaneous: ☐ Yes |
|---|---|---|---|
| Interview MD: ☐ Yes | Interview Employer: ☐ Yes | Interview Insured: ☒ Yes | Miscellaneous: ☐ Yes |

**Column 1 (Interview MD):**
- ☐ Current status - TX
- ☐ Functional capabilities
- ☐ History
- ☐ Obtain med records
- ☐ Obtain surg schedule
- ☐ Pre-existing condition
- ☐ Prognosis
- ☐ Rehab
- ☐ R.T.W. in another occ.
- ☐ TD vs PD
- ☐ Other

**Column 2 (Interview Employer):**
- ☐ Agent interview
- ☐ Collect overpayment
- ☐ Duties
- ☐ Income
- ☐ Position held open
- ☐ Retrain for other position
- ☐ Salary Cont.
- ☐ W.C. Info.
- ☐ Other

**Column 3 (Interview Insured):**
- ☐ Agent interview
- ☐ BOE
- ☐ Collect Overpayment
- ☐ Complete job description
- ☐ Contestable
- ☐ Continue claim interview
- ☐ Determine if IME is advisable
- ☒ Extent of disability
- ☐ First handling
- ☐ Initial claim interview
- ☐ Late notice
- ☐ Obtain and review documents
- ☐ Reformation/Recision action
- ☐ Rehabilitation
- ☐ Residual
- ☐ Unannounced Visit
- ☐ Waiver of premium
- ☒ Other
- Extent of disability
- Other

**Column 4 (Miscellaneous):**
- ☐ Contestible death
- ☐ Waiver of premium
- ☐ Legal Issue
- ☐ Other

**REMARKS:**

Please do an unannounced visit to the insured's restaraunt. Is he working? Who is running it as you can see? Is it a busy restaraunt? What is the size of the restaraunt? Please then set up an appointment to meet with the insured. Insured had a heart attack in July. It doesn't appear he had any complications and it would appear that he would be back to work if the heart was his only impairment. However, the ap indicates anxiety and back pain. The insured's symptoms are all due to his back. He claims that he hurt his back when being put into the ambulance for his MI. However, the back problem existed before this. His first claim was for his back. Please find out exactly what his limitations and restrictions are. He was working before with this back problem, why can he not work now. Please find out what his current treatment plan is. What is he on for medications? Is he seeing anyone for his anxiety problems? Thank you, Melissa

# Claim Information Section

| Date of Disability / Loss | Claim Close Date | Claim Reopen Date | Decision Date | Gen Suspense Date | Pmt Suspense Date | |
|---|---|---|---|---|---|---|
| 07/22/2000 | | | | | | |

| Claim Code | Form No. | Amount | Benefit Period | Elim Period | Issue Date | Residual / Other |
|---|---|---|---|---|---|---|
| 1. 13h3236167002 | 9132 | $5,000.00 | 65 | 90 | 08/28/93 | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

NYLCL00525

# ACTION LOG

Claimant: Vincenzo Mazzamuto

Claim #: 13-H3236167-002

| Date of Action | Follow-Up Date | Action Taken | Result of Action Taken | Date Completed |
|---|---|---|---|---|
| 01/04/2001 | | nn call | | |
| 01/04/2001 | | dr.'s ltr faxed from attorney's office | | |
| 01/15/2001 | | nn letter, occ des. Form, pr and need meds before pay. Ordered meds–Bower and Carlisle Hospital | | |
| 01/15/2001 | | license check/research analyst | 01/22/2001 | |
| 01/15/2001 | | field referral request (unannounced to restaurant) | | |
| 01/22/2001 | | pr and occ form returned completed | | |
| 02/02/2001 | | voc. Analysis completed | | |
| 01/31/2001 | | carlisle hospital rec'd | | |
| 02/22/2001 | | Jill review | | |
| 03/08/2001 | | forwarded to med for review | | |
| 03/19/2001 | | attorney ltr asking for status | | |
| 03/20/2001 | | response to ltr | | |
| 03/27/2001 | | med review completed by Dr. Clarke. Does not appear that the insured is eligible for benefits | | |
| 03/28/2001 | | management review | | |
| 04/06/2001 | | field report received | | |
| 03/26/2001 | | status ltr again | | |
| 03/28/2001 | | telephoned att. And read med review over phone | | |
| 04/20/2001 | | ltr to attorney denying claim for benefits | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

NYLCL00562

# ACTION PLAN & LO

Individual Disability Claims

INSURED: Vincenzo Mazzarmito          HOME TELEPHONE: 717 243 0383

ADDRESS: 501 Limestone Rd             WORK TELEPHONE: ____/____

CITY: Carlisle          STATE: PA          ZIP: 17013

DOB: 5/25/55    SSN: 190/56/5244    DATE OF DISABILITY: 7/22/00

☑ Sickness or ☐ Accident    Received by Claim Rep: __/__/__    DATE OF NOTICE: __/__

DIAGNOSIS: Heart attack, anxiety, back pain

OCCUPATION AT CLAIM: Rest. owner/president

Attorney Representation: Name_____ Tel. ____/____

## COVERAGE INFORMATION

| CLAIM # | ISSUE DATE | FORM # | CLAIM PERIOD | MONTHLY BENEFIT | BENEFIT PERIOD | OWN OCC PERIOD | RESID AT |
|---|---|---|---|---|---|---|---|
| H3230167 | 8-28-93 | 9132 | 90 | 5000 | 65 | yes | yes |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Exclusions/Riders/Waivers

☐ Yes - Guarantee Issue  ☐ Yes - FICA   Expected RTW __/__/__   RTW exceeded 6 Months? ☐ Yes

☐ Yes - Contestable   ☐ Yes - ERISA   ☑ Yes - Late Notice   New Notice Call 1/4/01

## RECOMMENDED ACTION

☐ Employer Letter          ☑ APS _____     ☐ DEQY          ☐ SS Letter
☐ FICA Letter              ☑ AP Rec _____     ☐ SEQY          ☐ License Check
☑ Field Referral           ☑ Hosp Rec _____     ☐ Casualty Index Bureau  ☐ Waiver of Premium
☐ Reservation of Rights    ☐ W/C Rec _____     ☐ Data Base Search (super bureau etc)
☐ GENEX Referral           ☐ Other Carriers _____   ☐ Financial Review
☑ Verify occ.              ☐ HMO/PPO/Maj Med _____   ☐ Tax Returns/4506 _____
☐ Request occ. desc from EY  ☐ Third Party Action     ☐ Other recommendations (see below)

Recommendations: get recs: back to 98. Write Ita to ① send to field (unannounced to restaurant) get OOL.

CLAIM REPRESENTATIVE: Melissa Magner          DATE: 1/8/01

CONSULTANT: Diane Cahill          DATE: 1/8/01

NYLCL00561