CondenseIt!

## Page 1

```
 1            UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2
   VINCENZO MAZZAMUTO,        :
 3       Plaintiff           : CIVIL ACTION - LAW
                             :
 4       Versus              : NO. 1:CV-01-1157
                             :
 5 UNUM PROVIDENT CORPORATION,: JUDGE KANE
   PAUL REVERE LIFE INSURANCE :
 6 COMPANY; and NEW YORK LIFE :
   INSURANCE COMPANY,        :
 7       Defendants          : JURY TRIAL DEMANDED

 8

 9       DEPOSITION OF DOUGLAS JOHN BOWER

10              * * *

11       Verbatim transcript of deposition
         held at 220 Wilson Street, Carlisle,
12       Pennsylvania, on Wednesday,

13              March 6, 2003
                3:22 p.m.
14
                * * *
15

16

   APPEARANCES:
17
   ANGINO & ROVNER, P.C.
18 4503 North Front Street
   Harrisburg, PA  17110
19
   BY:  RICHARD C. ANGINO, ESQUIRE
20
        For - Plaintiff
21
   STEVENS & LEE
22 111 North Sixth Street
   Post Office Box 679
23 Reading, PA  19603-0679

24 BY: KIRK L. WOLGEMUTH, ESQUIRE

25      For - Defendants
```

## Page 2

```
 1            INDEX TO WITNESS

 2        Direct Cross Redirect Recross

 3 Douglas John Bower....   5   49   128   141

 4

 5

 6

 7

 8            INDEX TO EXHIBITS

 9                             Identified

10 Plaintiff Exhibit:

11 1 - Copy of document entitled
       Carlisle Hospital and Health
12     Services, Department of
       Radiology, Carlisle Imaging
13     Associates, P.C., dated
       06/05/1996......................   11
14
   2 - Copy of document entitled Normal
15     Canal and Stenotic Canal..........  18

16 3 - Copy of packet of documents
       beginning with Attending
17     Physician's Statement for
       Vincenzo Mazzamuto................  23
18
   4 - Copy of document entitled Fig.
19     2: Posture typical of a patient
       with Spinal Stenosis..............  35
20
   5 - Copy of letter dated April 16,
21     2000 to Mrs. Trudy McGraw, The
       Wellington, from Douglas J.
22     Bower, M.D.......................  37

23

24

25
```

## Page 3

```
 1            INDEX TO EXHIBITS

 2                             Identified

   Defense Exhibit:
 3
   1 - Copy of packet of documents
 4     beginning with Office Note
       for Vincent Mazzamuto dated
 5     9/18/02..........................  48

 6 2 - Copy of letter dated April 16,
       2002 from Ms. Trudy McGraw, The
 7     Wellington, from Douglas J.
       Bower, M.D.......................  114
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## Page 4

1        S T I P U L A T I O N
2        It is hereby stipulated by and between
3 counsel for the respective parties that signing,
4 sealing, certification and filing are waived.
5        MR. SIMMERS:  My name is Arkie Simmers.
6 I'm a paralegal with Angino & Rovner.  Our offices
7 are located at 4503 North Front Street in
8 Harrisburg, and I'm operating the video and audio
9 equipment for today's deposition.
10       The date is March 26, 2003, and it 3:22
11 p.m. We are here on behalf of the plaintiff to take
12 the deposition Doctor Douglas J. Bower at 220 Wilson
13 Street at Carlisle, PA.  Doctor Bower will be
14 testifying in this case Vincenzo Mazzamuto versus
15 Unum Provident Corporation, Paul Revere Life
16 Insurance Company, and New York Life Insurance
17 Company in the United States District Court for the
18 Middle District of Pennsylvania, No. 1:CT-01-1157.
19       Will the attorneys please introduce
20 themselves and who they represent.
21       MR. ANGINO:  My name is Richard Angino,
22 and I represent Mr. Mazzamuto.
23       MR. WOLGEMUTH:  My name is Kirk
24 Wolgemuth, and I represent the Defendants, Unum
25 Provident, Paul Revere and New York Life.

Exhibit A

Page 5

1    MR. SIMMERS:  Will be court reporter
2  please swear in the witness.
3        DOUGLAS JOHN BOWER,
4        being duly sworn,
5        testified as follows:
6        DIRECT EXAMINATION
7  BY MR. ANGINO:
8    Q  What is your full name?
9    A  Douglas John Bower.
10    Q  What is your office address?
11    A  220 Wilson Street, Suite 109, Carlisle,
12  Pennsylvania.
13    Q  Are you a physician?
14    A  Yes, I am.
15    Q  And can you tell us just briefly about
16  where you went to college and medical school, and
17  did your internship and residency?
18    A  Okay.  I went to undergraduate and medical
19  school at Boston University, Boston, Massachusetts.
20  I did my internal medicine residency and internship
21  at the Naval Hospital in San Diego, and served in
22  the Navy as an internist for nine years prior to
23  joining the practice here.
24    Q  As far as dates, would that have been
25  college done in 1984, medical school done when?

Page 6

1    A  College 1976 to 1980.  Medical school 1980
2  to 1984.  Internship 84 - 85, and residency 86 to
3  88.
4    Q  And when you completed all of that, were
5  you board certified in any particular specialty?
6    A  I was board certified in internal -- I am
7  board certified in internal medicine as of September
8  of 1988.
9    Q  Could you tell the jury what internal
10  medicine is?
11    A  Internal medicine is the nonsurgical --
12  treatment of nonsurgical diseases of adults usually
13  in terms of things such as arthritis, diabetes,
14  heart disease, lung disease.  It also now
15  encompasses primary care, which is, again, basically
16  the general care of patients as their first
17  provider.
18    Q  And with what medical association are you
19  currently a partner?
20    A  I'm a partner at the Masland Associates.
21    Q  Located in?
22    A  In Carlisle, Pennsylvania.
23        MR. ANGINO:  Any questions as to
24  qualifications?
25        MR. WOLGEMUTH:  I will reserve what few I

Page 7

1  have for cross.
2        Before we continue, just so we know for
3  the record, any objections we will stop the
4  videotape and we will place them on the transcript.
5        MR. ANGINO:  That's a good idea.  We
6  don't want to waste any more video than we need to.
7  BY MR. ANGINO:
8    Q  Doctor, with regard to Masland, when did
9  you first begin your practice here?
10        MR. ANGINO:  Do we have DND, do not
11  disturb kind of thing?
12        MR. SIMMERS:  Off the record.
13        (Off the record.)
14        MR. SIMMERS:  We are back on the video
15  record.  The time is 3:26 p.m.
16        (On the video record.)
17  BY MR. ANGINO:
18    Q  Doctor, with regard to your practice at
19  Masland's, when did that start?
20    A  December of 1993.
21    Q  And did you shortly thereafter have as a
22  patient Mr. Mazzamuto?
23    A  Yes, I did.
24    Q  Can you tell us as far as your practice
25  whether there is any emphasis or at least

Page 8

1  preponderance of individuals as far as age and
2  chronicity of their complaints?
3    A  Well, in internal medicine most of our
4  patients tend to be older and even elderly.  We see
5  many patients with chronic medical conditions,
6  again, such as blood pressure, arthritis, diabetes,
7  heart disease.  So the majority of our patients,
8  and, in fact, most of our reimbursement is actually
9  of the Medicare age group.  You know, we do see
10  younger patients as well, but I would say the
11  majority of our patients are older patients with
12  chronic disease management.
13    Q  You don't deliver babies or take care of
14  children, and things like that?
15    A  We do not deliver babies, we don't take
16  care of children.  We don't do major surgical
17  procedures.
18    Q  So that of the things that you do do, you
19  do a lot of that, is that right?
20    A  That is correct.
21    Q  Would one of the areas that you see a
22  number of patients be the area of the back and back
23  complaints?
24    A  Low back pain is a very common problem in
25  seeing chronic -- in many older people.

Page 9

1   Q  And are you able to diagnosis back
2 conditions?
3   A  We often are the people who diagnosis back
4 conditions that leads -- initiate treatment.
5   Q  So that you not only would diagnosis the
6 back condition, you would initiate treatment, and if
7 sometimes they get complicated or if they need
8 surgery, then do you refer them to specialists?
9   A  Yes.  We refer on to surgical specialists,
10 either orthopedists or neurosurgeons, as well as the
11 allied health field such as physical therapy.
12   Q  With regard to these older patients, do
13 they sometimes have conditions such as anxiety, and
14 depression, and emotional problems?
15   A  Sure.  It's very common.
16   Q  And do you take care of them?
17   A  Yes, we do.
18   Q  Do you likewise diagnosis and medicate
19 them?
20   A  Yes, we do.
21   Q  And, again, if the condition gets to be
22 severe, do you refer them on occasion?
23   A  We do refer on occasion although mental
24 health assets in central Pennsylvania are not easy
25 to come by.  There are not many psychiatrists in

Page 10

1 this area, so we do a lot of the primary management
2 of psychiatric problems with traditional
3 antidepressant and antianxiety medications.
4   Q  Thirdly, I assume if people who are older,
5 many of them have heart conditions, is that right?
6   A  Very common, yes.
7   Q  And, again, you diagnosis and treat them,
8 is that right?
9   A  Yes we do.  Yes, I do.
10   Q  And, again, if there are situations such
11 surgery or certain kinds of specific tests, you
12 refer them on to other people?
13   A  We refer to the cardiologist for that,
14 that's correct.
15   Q  With regard to Mr. Mazzamuto, did he
16 develop a back condition back in 1996?
17   A  Yes, he did.
18   Q  And do you have your records?
19   A  I have my records with me, yes.
20   Q  With regard to Mr. Mazzamuto, was he in
21 1996 sent for what they call an MRI?
22   A  Yes, he was.
23   Q  And I am handing you what we will mark as
24 P-1.
25

Page 11

1 Copy of document entitled
Carlisle Hospital and
2 Health Services, Department
of Radiology, Carlisle
3 Imaging Associates, P.C.,
dated 06/05/1996 - produced
4 and marked for
identification as Exhibit
5     No. P-1.
6     MR. ANGINO:  What we can do is with
7 regard to these we will mark them after we are done.
8 Is that satisfactory if we go through them?
9     MR. WOLGEMUTH:  Okay.  I'm going to place
10 an objection on the records.  Can we go off the
11 video.
12     MR. SIMMERS:  Yes.  Off the video
13 record.  The time is 3:30 p.m.
14     (Off the video record.)
15     MR. WOLGEMUTH:  I'm going to do this now,
16 Richard, so I don't interrupt you later.
17     I certainly don't mind him referring to
18 these exhibits, and testifying from exhibits, and,
19 you know, if he relied upon them, he can -- but I
20 don't want them attached to the transcript as an
21 exhibit.  I believe the only one that I would not
22 object to attachment would be the portion of the
23 Attending Physician's Statement, not the November 3,
24 2000 report, and I guess it's an Attending
25 Physician's Statement dated it looks like 8/29 --

Page 12

1 I'm not sure what that is, 00 or 01.
2     MR. ANGINO:  What we will do is your
3 objections are noted.  When we get to Court, it's
4 not so much being attached to a deposition, we are
5 going to be at trial, so the Court will have to make
6 a decision.  The Judge will have to make them a part
7 of the record.  Whether he would let the jury see
8 them or whether they would go out with the jury will
9 be decisions that he will make.
10     MR. WOLGEMUTH:  That's fine.
11     MR. ANGINO:  All right.  Back on the
12 record.
13     MR. SIMMERS:  Back on the video record.
14 The time is 3:31 p.m.
15     (On the video record.)
16 BY MR. ANGINO:
17   Q  Doctor, within your file did you have what
18 is noted as P-1, a Carlisle Hospital, Department of
19 Radiology, MRI?
20   A  Yes, we did.
21   Q  And can you, first of all, by stating what
22 is radiology, and what is an MRI?
23   A  Well, radiology is a field of medicine
24 which attempts to obtain images of internal body
25 structures through various means.  You can use

CondenseIt!

Page 13

1  x-rays, you can use sound waves, which is called
2  ultrasonography, or you can use MRI, which actually
3  uses the body's own magnetic emanations under the
4  field of a magnet field to obtain computerized
5  reconstructed pictures of internal body parts.
6      Q  And as a result of complaints that
7  Mr. Mazzamuto was having with respect to his back,
8  did you refer him to a specialist in radiology?
9      A  Yes, we did.
10     Q  Is this customary in your profession to
11 refer individuals to radiologists, and to reply upon
12 the reports that you get back?
13     A  Yes.  As the field of radiology has gotten
14 more and more complex, the studies are more and more
15 difficult to read for people who don't do it on a
16 regular basis, so, therefore, I find that I need to
17 rely upon the expertise of the radiologists for
18 their readings of complex films such as CAT scans
19 ultrasounds, and MRIs.
20     Q  With regard to those reports, do you rely
21 upon them in your treatment as to medications, and
22 how you treat particular patients?
23     A  I rely upon them for all those things.
24     Q  With regard to what's been marked as P-1,
25 could you start with the second full paragraph,

Page 14

1  there is spinal stenosis, and just read that
2  paragraph were the impression please?
3      A  Okay.  There is spinal stenosis.  The AP
4  diameter of the canal is smoothly and considerably
5  narrow, and this is most prominent at the L3-4 disk
6  level.  There is no significant disk herniation or
7  bulging, and this is thought to be due to
8  developmental stenosis rather than to disk
9  herniation  or hypertrophic changes of the facet
10 joints.  The stenosis gradually dissipates above and
11 below these levels.  The cerebral spinal fluid in
12 the area of the stenosis does not appear bright.
13 This is probably due to the relative lack of fluid,
14 with crowding of the nerves roots, as well as loss
15 of fluid signal due to increased flow to this area
16 due to the stenosis.  No focal intrathecal mass is
17 seen.  Marrow signal was normal.
18     Impression.  Central spinal stenosis which
19 gradually worsens to a maximum at the L3-4 level.
20 This probably extends from L2 though approximately
21 the L5 vertebral body levels.
22     Q  All right.  Doctor, on your desk is a
23 spine.  Could you use it to tell the jury what part
24 of the anatomy we are dealing with, and perhaps if
25 you can explain what disks are, and what the various

Page 15

1  vertebral bodies are, and the spinal cord, things
2  such as that?
3      A  Okay.  Well, this is a model of the lower
4  part of the spine.  The spine is divided into
5  several spots -- parts.  The neck is the cervical
6  spine, in the chest it's the thoracic spine, the
7  lower back is the lumbar spine, and the very bottom,
8  which is called the tailbone, is also the sacrum,
9  which is actually five vertebrae fused together into
10 one.
11     You know, the spine is put together by a
12 series of vertebral bodies, individual bones, which
13 are held together by a disk and various ligaments in
14 the back.
15     Now, the disk is here, this robbery
16 component, in between the two bony bodies of these
17 vertebrae.  This is the first lumber vertebra, this
18 is the fifth lumbar vertebra, and the numbers are
19 sequential.
20     The disk serves as a space or point of
21 attachment for the spine.  It's a tough fibrous band
22 circumferential with a gelatinous core, acts as sort
23 of a shock absorber.  You know, back pain can come
24 from the disk if the disk is degenerating.  If it
25 ruptures, the core of -- the gelatinous core can

Page 16

1  sometimes protrude through the rupture of the
2  fibrous outside, and actually impinge on the spinal
3  cord or the nerve endings.  So that's one cause of
4  low back pain, and that's one of the reasons we get
5  MRIs, is to see if a disk is ruptured.  In
6  Mr. Mazzamuto case that was not the case.
7      The spinal cord actually runs behind the
8  large bodies of the vertebrae within an arch that's
9  made up of bony prominences coming from two
10 sequential vertebrae.  You have the spine off the
11 back, and you have the lateral portions of the next
12 vertebra forming a canal, which, if you look at it
13 on end, you can see there's a space where the spinal
14 cord runs.
15     Q  Is that red thing the spinal cord?
16     A  That's the -- it's a yellowish --
17 yellowish --
18     Q  Okay.
19     A  -- robbery model here.
20     If there is spinal stenosis, what it means
21 is that this canal here behind the body of the
22 vertebrae becomes narrowed, and that could become
23 narrowed for several reasons.  They talk about it in
24 there.  One is congenital, meaning the when the
25 spine was formed it's was just more narrow than

Page 17

1 normal, and that can actually progress as times go
2 on.
3      The second thing that could happens is
4 these joints here where the two vertebrae come
5 together can get arthritis, and bony growth around
6 them can occur, and so you can get spinal stenosis
7 coming in from this arthritis section, and, again,
8 they say it doesn't appear that Mr. Mazzamuto has
9 that.
10      So those are the two kinds of spinal
11 stenosis, and I believe this is red thing here is a
12 herniated disk that they put on there. I didn't
13 notice that was there.
14   Q Where would 3 and 4 be, which is what they
15 -- the Doctor says is the maximum?
16   A Well, the maximum is between these two
17 vertebrae, this is 1, 2, and this is 3, and then
18 this is 4. And, again, usually -- if you notice the
19 nerves emerge from the spaces between two contiguous
20 vertebral bodies. So if you have L3 here, the space
21 where the nerve comes out is L3-4, which is the
22 space in between those two, and so this is the level
23 where he sees a narrowing in the spinal canal.
24
25

Page 18

1      Copy of document entitled
       Normal Canal and Stenotic
2      Canal - produced and
       marked for identification
3        as Exhibit No. P-2.
4   Q Doctor, I'm showing you P-2, and can you
5 tell us what that is?
6      MR. WOLGEMUTH: Objection.
7      MR. SIMMERS: Off the video record. The
8 time is 3:38 p.m.
9      (Off the video record.)
10      MR. WOLGEMUTH: I'm going to object to
11 P-2 in addition to the previous objections that I
12 raised because, unless this is representative or an
13 actual picture of the extent of Mr. Mazzamuto's
14 stenosis, I don't think it's relevant to this
15 proceeding. I think Doctor Bower already adequately
16 described what spinal stenosis is.
17      MR. ANGINO: Go on the record.
18      MR. SIMMERS: We are back on the video
19 record. The time is 3:38 p.m.
20      (On the video record.)
21 BY MR. ANGINO:
22   Q Doctor, I'm showing you P-2. Can you tell
23 us what that is?
24   A All right. That's a picture -- a
25 transverse section.

Page 19

1   Q Do you want to show it to the jury please?
2   A Okay. Basically it's a transverse section
3 of the spinal cord. Essentially if you took the
4 spine, put it like this, and chopped it off, so you
5 can get an end on look at the spine, you are looking
6 at the top of a vertebral body.
7   Q And does it show an example of a spinal
8 stenosis?
9   A Yeah. This is the normal spinal canal
10 here, and a stenotic canal would look something like
11 that in this particular case. It's a narrowing of
12 that canal opening.
13   Q And, Doctor, are you meaning to imply that
14 that's the exact size of Mr. Mazzamuto or is it just
15 an example of how a spinal stenosis can show
16 narrowing of what is a normal spine?
17   A This is just a general example of a spinal
18 stenosis. It is not a representation of
19 Mr. Mazzamuto's spine.
20   Q Doctor, with regard to spinal stenosis,
21 does that generally lead to back pain?
22   A It generally does when it progresses
23 beyond a certain point.
24   Q And do you have a spine diagram or
25 picture?

Page 20

1   A We have several.
2   Q You have several. Can you show us how
3 this leads to pain?
4   A Well, again, I'm not -- probably this
5 would be a better one to look at. Again, as -- what
6 we are looking at here, as we are looking at the
7 spine with basically these posterior elements cut
8 off so you can actually look down directly onto the
9 spinal cord as it sits in front of the vertebral
10 bodies, the spinal cord sits within this canal,
11 nerve roots emerge in between each of the spinal
12 sections. If there is a narrowing of this canal,
13 again, as we described before, this space gets
14 narrower, the canal -- or the spinal cord can
15 actually become impinged by that pressure, and
16 obviously bending of the spine can lead to
17 increasing pressure as the forces are exerted upon
18 it because of the bend and the curve in the spine.
19      So the spinal cord is what normally gets
20 impinged upon rather than the nerves roots
21 themselves. There can be narrowing of these holes
22 as well on the side, in which case the nerve endings
23 as they came out would also be impinged upon.
24   Q In addition to having back pain, can you
25 also have what we call leg pain?

Page 21

1  A   Yes.  When you have a nerve that's
2  impinged, you can have symptoms anywhere that nerve
3  goes, and in the lower part of the back the nerve
4  roots that emerge from the spine at that point
5  eventually form the nerves, and go down the leg.  So
6  you if you have compression of either the spinal
7  cord or the nerve endings as they emerge for the
8  particular nerves that form the femoral nerve and
9  other nerve, the sciatic nerve, that goes down the
10  leg, you can get pain along the entire tract of that
11  nerve, and you can also get muscle weakness because
12  nerves not only provide sensation, they also provide
13  the control for the voluntary muscles as well.
14  Q   So you can get muscle weakness, you can
15  have pain.  Can you get burning pain?
16  A   Well, you can get any pain that you can
17  imagine.  The nerves are the sensation.  You know,
18  typical pains that people describe when it's
19  actually a nerve pain, which is call neuropathic
20  pain, would be burning, stinging, it can be icy
21  cold, it can be numb, you know, or as I say here,
22  jaggy.
23  Q   So if somebody who has a spinal stenosis
24  complains of back pain and/or burning pain and/or
25  numbness, is that telling you as a Doctor that

Page 22

1  there's impingement upon the spinal cord and/or the
2  nerve roots that emanate from the spinal cord?
3  A   That's a sign that there's a nerve
4  impingement somewhere in the system.
5  Q   And with regard to Mr. Mazzamuto, do your
6  records show that starting in the period of 1996 he
7  started to complaint of all of what we have just
8  described, back pain, radiating numbness, radiating
9  burning pain into his legs?
10  A   Yes, they do.
11  Q   And with regard to that, did there come a
12  time in 1996 where this pain was of such an
13  intensity that he was disabled from work?
14       MR. WOLGEMUTH:  Objection.
15       MR. SIMMERS:  Off the video record.  The
16  time is 3:43 p.m.
17       (Off the video record.)
18       MR. WOLGEMUTH:  My objection is to
19  relevance because I really don't think that
20  Mr. Mazzamuto's disability in 1996 is relevant to
21  the issues that are raised in 2000.
22       MR. ANGINO:  Back on the record.
23       MR. SIMMERS:  Back on the video record.
24  The time is 3:43 p.m.
25       (On the video record.)

Page 23

1  BY MR. ANGINO:
2  Q   Doctor, there is a packet of materials
3  starting with 1996 Attending Physician's
4  Statements.  Do you have such a packet in front of
5  you?
6  A   Yes I do.
7  Q   And did that packet come from your file?
8  A   This is a copy of a packet from forms that
9  were from our file, yes.
10  Q   And we have marked that as P-3.
11       Copy of packet of documents
       beginning with Attending
12       Physician's Statement for
       Vincenzo Mazzamuto -
13       produced and marked for
       identification as Exhibit
14       No. P-3.
15       Doctor, is it customary in your particular
16  profession when a person has a condition that is
17  disabling that you get paperwork from insurance
18  companies to complete?
19  A   Yes, that's a very common thing.
20  Q   And with Mr. Mazzamuto back in 1996, did
21  you receive material that you needed to complete
22  under the heading Attending Physician's Statement?
23  A   Yes, I did.
24  Q   And is the date there 10/23/96?
25  A   Yes, it is.

Page 24

1  Q   With regard to that attending statement,
2  is that your handwriting?
3  A   Yes, it is.
4  Q   And with regard to the diagnosis that you
5  made back in 1996, what was it?
6  A   It was number one, low back pain, and
7  number 2, central spinal stenosis.
8  Q   What you have just been describing to us,
9  is that right?
10  A   That is correct.
11  Q   And when you go through the physician
12  statement, does the insurance company ask you
13  questions such as medications that the patient is
14  taking?
15  A   Yes, they do.
16  Q   And what type of medication was
17  Mr. Mazzamuto taking back in 1996?
18  A   At that point he was on a medication
19  called Relafen, which is an -- what's called a
20  nonsteroidal antiinflammatory medication.  It helps
21  with both inflammation and pain, usually helps with
22  an arthritic and bony conditions.  He was also on
23  Gabapentin, which goes by the brand name of
24  Neurontin, which is actually a seizure medication,
25  but is now used commonly as an adjunct to pain,

Page 25

1  especially neuropathic pain, pain that comes from
2  nerve injury or compression.
3      Q   Were you asked when his symptoms first
4  appeared, and did you supply dates for them?
5      A   Yes, I did.
6      Q   And what did you indicate as far as when
7  his symptoms first appeared?
8      A   That they first appeared for this episode
9  in January of 1996, and then again in March of 1996.
10     Q   And is there a place for you to complete
11 where it says when patient first consulted you?
12     A   Yes, and that was April of 1996 when he
13 came in with those complaints.
14     Q   And is there another point where it says
15 has patient ever had same or similar conditions?
16     A   Yes, there was.
17     Q   And what did you mark for that?
18     A   I wrote that, when I had reviewed the
19 record, he had been seen for low back discomfort in
20 1992, and it had subsequently resolved.
21     Q   And is there a question as to whether the
22 patient was still under your care for the condition
23 -- the back condition?
24     A   Yes.
25     Q   And did you mark that with a yes?

Page 26

1      A   Yes, I did.
2      Q   And did you mark the date that he was last
3  treated?
4      A   Yes. As of that form it was as of October
5  23, 1996.
6      Q   Is there question No. 10 that asks about
7  restrictions or limitations?
8      A   Yes, there is.
9      Q   And what was your restriction or
10 limitation?
11     A   At that time it was just no prolonged
12 standing.
13     Q   So that as far as your medical opinion at
14 that time you felt he shouldn't stand for long
15 periods, is that right?
16     A   Correct.
17     Q   And what happens to someone with this type
18 of condition, this stenosis, when a person stands?
19     A   Well, depending upon your posture, again, as you
20 you stand, you can actually have, again, as you
21 straighten the spine out, standing upright can
22 sometimes cause further compression. Now, depending
23 upon what the actual extent of the stenosis is, and
24 what the actual orientation when you would look at
25 it, different postures may affect it differently,

Page 27

1  and in some people standing bothers them, in some
2  people bending bothers them, and in some people both
3  of them bother -- you know, both positions can
4  bother people.
5      Q   Was there a question No. 13 where they
6  asked if Mr. Mazzamuto was continuously totally
7  disabled?
8      A   Yes, there was.
9      Q   And did you find that he had been
10 continuously totally disabled?
11     A   I did.
12     Q   From what period to what period?
13     A   From April 3 of 1996 to October 23 of
14 1996.
15     Q   And is there a second page to that --
16 actually not a second page, but did you likewise
17 complete another one on 11/18/96?
18     A   Yes, I did.
19     Q   And with regard to that Attending
20 Physician's Statement of Disability, was your
21 diagnosis the same, low back pain, central spinal
22 stenosis?
23     A   Yes, it was.
24     Q   And was there a question 3 where it said
25 what are the subjective and object -- subjective

Page 28

1  symptoms and objective findings, and what did you
2  answer?
3      A   I answered that there was. He had low
4  back pain, intermittent numbness of both lower
5  extremities as the subjective of the symptoms,
6  meaning the symptoms that the patient themselves
7  report, and objective symptoms, which are things
8  that are demonstrated on the physical examination or
9  on tests, is that he diminished strength in both
10 legs, and that he had had an MRI which documented
11 the central spinal stenosis.
12     Q   So that before when I was asking you
13 general questions, he had the pain, he had the
14 numbness, and he had the weakness, is that right?
15     A   That is correct.
16     Q   So all the signs that one finds with nerve
17 impingement he was demonstrating as long ago as
18 1996, is that right?
19     A   That is correct.
20     Q   And in terms of treatment and progress,
21 did you note on the record when you treated him, and
22 did you note under progress that he had improved?
23     A   Yes, I did.
24     Q   And when they ask you about the extent of
25 his disability, did you say that he was no longer

Page 29

1 disabled? Is that what it is?
2   A That as of October 23 he was no longer
3 disabled, correct.
4   Q So this was a period of total disability
5 that had gone from the period that you had
6 indicated, which was April through October, is that
7 right?
8   A That is correct.
9   Q The next document that you have
10 there as a part of this packet of material is it a
11 letter dated November 3 of 2000?
12   A Yes, it is.
13   Q So that there's a gap of time of four
14 years, and during that four year period of time had
15 Mr. Mazzamuto returned to his work?
16   A Yes, he had.
17   Q Did he continue, however, to have back
18 pain, and did he continue to obtain injections for
19 that back discomfort?
20   A Yes, he did.
21   Q So that with something such as this spinal
22 stenosis it doesn't go away, is that right?
23   A The spinal stenosis itself does not go
24 away.
25   Q And although there may be improvements at

Page 30

1 times, what is the progression of stenosis over
2 time?
3   A Generally the stenosis gets worse over
4 time with aging.
5   Q And was that the case with Mr. Mazzamuto?
6   A That is the case.
7   Q And in the year 2000 on July 22 did
8 Mr. Mazzamuto have a heart attack?
9   A Yes, he did.
10   Q And following that heart attack did he
11 have, again, problems with his back?
12   A Yes, he did.
13   Q And in addition to having the heart attack
14 and problems with his back, did he develop emotional
15 problems?
16   A Yes, he did. He developed severe anxiety.
17   Q And as had occurred in 1996, were you
18 requested to supply information from his disability
19 insurance carrier as to his condition?
20   A Yes, I was.
21   Q And did you do that by way of letter dated
22 November 3, 2000?
23   A Yes, I did.
24   Q And was that letter addressed to Paul
25 Revere and New York Life Insurance Company?

Page 31

1   A Yes, it was.
2   Q And did you -- would you read the first
3 paragraph please?
4   A Dear Sir or Madam.
5     I'm writing this letter to clarify the
6 medical facts of my patient, Vincenzo Mazzamuto, who
7 apparently has policies with your companies. I find
8 it difficult to coherently fill out the forms on his
9 medical-- since -- as his medical problems are
10 several, some of which are long-standing and do not
11 easily fit into the category such as when did
12 symptoms appear. Mr. Mazzamuto has had a long
13 history of low back pain, and, in fact, for many
14 years has undergone numerous treatments and physical
15 therapy, and an MRI in the past did reveal central
16 spinal stenosis, which gradually worsened to a
17 maximum at the L3-L4 level and extends from L2 to
18 L5. This has given him periodic problems with lower
19 back discomfort, symptoms of radiculopathy, and
20 urinary irritability.
21   Q Can you tell us what radiculopathy is?
22   A Radiculopathy is another term that a nerve
23 going down -- down a limb is being affected.
24   Q And what about urinary irritability?
25   A Urinary irritability he was seen for

Page 32

1 several occasions because of the sensation that he
2 couldn't empty his bladder completely, and had to go
3 frequently.
4   Q Continue with the paragraph please.
5   A Prolonged standing and heavy lifting has
6 aggravated it. He has been seen in physical
7 therapy, treated in a local pain clinic with local
8 injections, as well as prescription analgesics,
9 nonsteroidal antiinflammatory agents, and other
10 atypical chronic pain medications.
11   Q And did you mention then in the second
12 full paragraph the complication of the heart attack?
13   A Yes, I did.
14   Q And you described what occurred there?
15   A I did.
16   Q And with the third paragraph did you talk
17 about a readmission to the hospital with chest pain?
18   A Yes, I did.
19   Q And then would you read the fourth full
20 paragraph please?
21   A As the patient has attempted to return to
22 work after his recovery from his heart attack, his
23 back worsened again. Also the stress and anxiety
24 which has been provoked because of his recent
25 cardiac problems, and manifested themselves with

Page 33

1 significant anxiety when he is back in a work
2 situation.
3    Q  Can you read the next paragraph please?
4    A  Sure.  While his heart condition has
5 currently stabilized, and should hopefully not pose
6 a great limitation to him in the future (assuming
7 ongoing risk factor modification is successful, such
8 as smoking cessation, cholesterol lowering, et
9 cetera), the amount of weight he has gained from his
10 smoking cessation has re-exacerbated his chronic
11 and progressive back problem.  At the present time
12 he is not able to do the work required in running
13 his restaurant because he cannot stand for long
14 periods of time, has difficulty bending, and is
15 restricted from heavy lifting.  It is unlikely he
16 will be able to return to work in the foreseeable
17 future.
18    Q  And then were you asked for a prognosis?
19    A  Yes, I was.
20    Q  And what did you say?
21    A  His prognosis for recovery is fair over
22 the next six to twelve months.
23    Q  How about the next paragraph?
24    A  On his last visit of October 4 he weighed
25 206 pounds, his blood pressure was 112 over 80, his

Page 34

1 pulse was 48 and regular.  He was proceeding with
2 his cardiac rehabilitation program and was to
3 follow-up at the pain clinic for further symptomatic
4 treatment of his back.  At the present time the
5 patient has not achieved a medical plateau.  It is
6 my hope that once his weight stabilizes after his
7 smoking cessation -- after his smoking cessation is
8 consolidated, and he has completed his cardiac
9 rehabilitation, he may be able to attempt weight
10 loss, and hopefully improve his back situation in
11 the future.
12    Q  And the next paragraph?
13    A  The final results of this may not be
14 evident, however, for the next six months.
15    Q  In addition to sending a letter on
16 November 2, were you asked to complete a form, which
17 is the next part of the packet, which carries the
18 date of November 15, 2000?
19    A  Yes, I did.
20    Q  And is it in a similar form to the other
21 form that you had completed back in 1996?
22    A  Yes, it is.
23    Q  And with regard to that particular form,
24 did you state that he continued to be totally
25 disabled?

Page 35

1    A  Yes, I did.
2    Q  As to paragraph 16, did you indicate what
3 his current restrictions were?
4    A  Yes, I did.
5    Q  And what were they?
6    A  Cannot be in stressful situations, no
7 prolonged standing, no lifting.
8    Q  Doctor, the next page is that, again,
9 another form that you completed?
10    A  Yes, it is.
11    Q  And with regard to these forms, do you
12 routinely get them either monthly or bimonthly, and
13 do you complete them, and send them back to the
14 insurance company?
15    A  Different companies seem to have different
16 intervals at which they require them but, yes, we
17 get them repeatedly to sort of keep up with the
18 ongoing situation, and we fill them out and send
19 them back.
20    Q  As the years went by since the year 2000,
21 has Mr. Mazzamuto's condition worsened?
22    A  His back situation has worsened.
23    Copy of document entitled
   Fig. 2: Posture typical of
24    a patient with Spinal
   Stenosis - produced and
25

Page 36

1    marked for identification
   as Exhibit No. P-4.
2
3    Q  And with regard to the worsening of his
4 back condition, has he started to developed more of
5 what we call a stoop, and I'm showing you another
6 exhibit?
7    MR. WOLGEMUTH:  Objection.
8    MR. SIMMERS:  Off the video record.  The
9 time is 3:57 p.m.
10    (Off the video record.)
11    MR. WOLGEMUTH:  Again, I think this
12 picture is not representative of Mr. Mazzamuto's
13 posture.  I don't think it's relevant to his
14 testimony, and I think it's inflammatory.
15    MR. ANGINO:  Back on the record.
16    MR. SIMMERS:  Back on the video record.
17 The time is 3:57 p.m.
18    (On the video record.)
19 BY MR. ANGINO:
20    Q  Can you hold the picture up, Doctor, and
21 tell us, although Mr. Mazzamuto is not as pronounced
22 yet as this particular individual, has he through
23 the past three years begun do develop more and more
24 of a stoop?
25    A  He does have a stooped posture.

Condensclt!!

Page 37

1  Q   What causes a stoop in posture, Doctor?
2  A   Well, usually, again, as I had mentioned
3 earlier, depending upon the exact anatomy of the
4 stenosis, people are going to try to find the most
5 comfortable position to relieve the pressure on the
6 spinal cord or the impinging nerve, and usually by
7 curving forward slightly you can relieve some of
8 that pressure to a point.
9  Q   Doctor, approximately a year ago were you
10 requested to provide an update of Mr. Mazzamuto's
11 condition, and did you do that by way of letter of
12 April 16, 2002?
13  A   Yes, I did.
14  Q   And I'm marking this as P-4?
15      MR. WOLGEMUTH: P-5.
16      MR. ANGINO: P-5.
17      Copy of letter dated April
       16, 2000 to Mrs. Trudy
       McGraw, The Wellington,
18      from Douglas J. Bower, M.D.
       - produced and marked for
19      identification as Exhibit
20      No. P-5.
21 BY MR. ANGINO:
22  Q   Do you have that in front of you, Doctor?
23  A   Yes, I do.
24  Q   Doctor, perhaps if you would start with
25 the second full paragraph, and it's a short letter,

Page 38

1 read it to us please?
2  A   Okay. As I mentioned to you in past
3 correspondence, Mr. Mazzamuto has three primary
4 medical conditions. His first problem revolves
5 around his severe low back pain, which has been
6 chronic and unrelenting despite numerous aggressive
7 interventions. He has been on multiple medications,
8 received therapy from a pain clinic, received local
9 epidural steroid injections, and numerous
10 prescription medications, all with only partial
11 success. Despite this aggressive therapy,
12 Mr. Mazzamuto is still severely limited in his
13 ability to stand, bend, sit for long periods of
14 time, and is unable to work.
15      His second, and perhaps most severe
16 problem, is that of chronic anxiety and depression.
17 This has become especially manifest over the last
18 several years, and has proved to be somewhat
19 refractory to multiple medications -- medical
20 interventions.
21  Q   What is refractory?
22  A   Refractory means not responding to
23 treatment.
24  Q   Continue please.
25  A   This problem was complicated by his third

Page 39

1 problem, which is that of coronary artery disease.
2 As a result of his heart problems, Mr. Mazzamuto is
3 extremely fearful of suffering a heart attack and
4 dying.
5      At the present time I feel that
6 Mr. Mazzamuto is beings treated maximally, but the
7 combination of the three previously mentioned
8 conditions still renders him unable to work.
9 Because of his severe anxiety, he is unable to even
10 consider the possibility of back surgery, and he's
11 extremely fearful that surgery will either render
12 him paralyzed or induce further myocardial
13 infarction. As such, I do not think it wise to
14 pursue this option. We will continue our efforts
15 with medical therapy in an effort to improve
16 Mr. Mazzamuto's quality of life, but I feel that we
17 have probably plateaued in our abilities to improve
18 his level of function. As such, it has been our
19 recommendation that he not return to work.
20  Q   Doctor, with regard to Mr. Mazzamuto, he's
21 been your patient now for almost ten years, do you
22 know the type of work he does?
23  A   Yes, I do.
24  Q   What type of work does he do?
25  A   He is self-employed. He owns and runs a

Page 40

1 restaurant.
2  Q   And, Doctor, are you aware from actually
3 going to his restaurant ten to fifteen times the
4 type of work he does?
5  A   Yes, I am.
6  Q   Did I supply you a copy of a video which
7 shows the type of work he does?
8  A   Yes, you did.
9  Q   Doctor, has Mr. Mazzamuto and
10 Mrs. Mazzamuto also explained to you at different
11 times what he does?
12  A   Yes, they have.
13  Q   Can you tell us what are the things that
14 you have observed or things that you are aware of
15 that make his current condition, the three things
16 that he has, the emotional condition, the back
17 condition, and the heart condition, such that he is
18 unable to work?
19  A   Okay. Well, first, and to keep it simple,
20 the heart condition at this point is probably not
21 relevant, and probably does not contribute at this
22 point to his disability or in his inability to work,
23 so we will focus on the other two conditions.
24      As regards to his back condition, he runs
25 a basically pizza and sub restaurant. You know,

Page 41

1 there's a counter that you stand at when you order.
2 The food is prepared in a standing position.
3 There's various stations. There's places where you
4 make pizza, places where you make hot food, places
5 where you make subs. It all requires frequent
6 bending, stooping, prolonged standing. Supplies are
7 kept overheard, supplies are kept, you know,
8 underneath. So you are either reaching forward to
9 grab things or you are reaching underneath cupboards
10 and cabinets to grab things.
11      You know, as a restaurant, most materials
12 that arrive arrive in bulk. You know, these are big
13 jars of things. There are cases of materials. You
14 know, large cans of various commercial grade food
15 items.
16      So all of those things are basically the
17 antithesis of what Mr. Mazzamuto is currently able
18 to do. He can't stand for prolong periods of time.
19 He can't do a lot of bending. He can't do a lot of
20 lending forward. You know, he cannot do lifting of
21 heavy objects or, you know, putting away heavy
22 objects in storage containers or storerooms, you
23 know, things of that nature.
24      Q  Approximately how long could he stand
25 before he would start to get pain?

Page 42

1      A  Well, based on my conversations with him,
2 I think he can normally stand in a particular
3 position maybe ten or fifteen minutes before he
4 needs to change position, and, you know, the thing
5 with that is it's almost a constant need to change
6 positions. He might sit for a period of time, and
7 then need to stand. He might stand for a period of
8 time, and then need to sit. He might sit, and then
9 need to lie down. And so people are constantly
10 shifting position in an effort to try to find some
11 point of maximum relief.
12      Q  And, Doctor, the counter that he stands
13 behind is it about four feet tall?
14      A  Four, maybe slightly higher. Yeah, about
15 that.
16      Q  So it wouldn't be very practical to sit
17 there, and to wait on customers, is that right?
18      A  No, you probably really couldn't sit
19 there, you would be down below the counter level.
20      Q  Additionally, there's not much space
21 there, is there?
22      A  It's a small restaurant, and the work
23 spaces are quite tight and cramped, and there are
24 several people all doing things simultaneously
25 there.

Page 43

1      Q  From your observation particular of the
2 video, does it seem to be a fast paced kind of
3 place?
4      A  Especially during, you know, the peak
5 hours of a restaurant, you know, the lunch rush, the
6 dinner rush. There's lots of activity, and a lot of
7 people doing lots of things all simultaneously, and
8 the pace of the work of each of the workers is quite
9 brisk.
10      Q  What about the emotional element? I think
11 you indicated he also has emotional problems,
12 depression, things such as that?
13      A  Well, when he first attempted to go back
14 to work, again, as a small business owner, my
15 observation is that you would sort of have to be
16 involved in all aspects, and he has family members,
17 but he also has employees who work at the
18 restaurant. His past habit had been that if
19 something needed to be done, and nobody was doing
20 it, he could jump in and do it. When he was no
21 longer able to do that, he would get extremely
22 frustrated, he would get angry, he would lose his
23 temper, and that sort of emotional stress would lead
24 to things such as chest discomfort, which
25 fortunately is only his heart, but just a

Page 44

1 manifestation of the stress. It's also promoted him
2 to take back the habit of smoking, which, again, is
3 further damaging to his health down the line. So
4 being in the restaurant when he really couldn't
5 contribute to anything turned out to be something
6 that aggravated his emotional stress and his anxiety
7 levels.
8      Q  Did it even get to a point where he
9 started to have problems outside the restaurant with
10 his wife because of the emotional --
11      A  He ended up with lots of problems both at
12 the restaurant and with his wife. He was irritable,
13 he was grouchy, he would snap at her. He was having
14 lots of difficulty focusing, lots of difficulty
15 concentrating, and, as such, much of the work that
16 he normally would do with the bookkeeping, the
17 paperwork, things like that, I think fell to his
18 wife to pick up the slack, and, you know, the fact
19 that he wasn't doing that made him feel guilty, but
20 at the same time he really wasn't capable of doing
21 it.
22      Q  Would you say that Mr. Mazzamuto is a
23 relatively short man?
24      A  He is a short man.
25      Q  What would you estimate his height, maybe

Page 45

1 if you have it?
2   A  I don't have it here.  We don't do a good
3 job with measuring people.  I would say he's
4 probably about 5-6, but I don't think I have it.
5   Q  So 5-6, and at one point I think you said
6 he weighed like 206 pounds or something?
7   A  He did.
8   Q  And I assume that's what we call obese?
9   A  That is medical obesity, and he's heavier
10 now.
11   Q  Even heavier now?
12   A  He is.
13   Q  So that when somebody has a stenosis, and
14 one has pain, and one then doesn't do much, the
15 tendency I guess is to put on weight, is that right?
16   A  Well, that's true, and, again, if one is
17 not working, and is at home, and is anxious, some
18 people will deal with anxiety by not eating, and
19 some people deal with it by eating, and if you don't
20 have much else to do, and you eat, and you don't
21 have any physical activity, you gain weight.
22   Q  And what effect does this additional
23 weight then have upon the back?
24   A  Well, the weight obviously adds more
25 strain to the back.  The weight is, you know, in the

Page 46

1 front in the belly, and it pulls everything forward,
2 and puts more torque and more strain on the spine.
3 The spine has to support the weight, and, again, it
4 further aggravates the back pain.
5   Q  So that it's almost like a never ending
6 process, you have got the back condition, you don't
7 do things, you get heavier, more aggravation on the
8 back?
9   A  Do less, get heavier, and it spirals.
10   Q  Doctor, if that column gets narrow enough
11 around the spinal cord, can it actually lead to what
12 we call paralysis?
13   A  It could --
14   MR. WOLGEMUTH:  Objection.
15   MR. SIMMERS:  Off the video record.  The
16 time is 4:07 p.m.
17   (Off the video record.)
18   MR. WOLGEMUTH:  You are asking the Doctor
19 for a speculate opinion that has no applicability to
20 Mr. Mazzamuto.
21   MR. ANGINO:  Well, no, it's not
22 speculative.  All the books say that it can lead to
23 paralysis and certain conditions.  So all I asked
24 was his opinion if it can, and I'm not -- with
25 regard to the future, the law is clear, he doesn't

Page 47

1 have to say, you know, that it's going to happen or
2 probably will happen, but it can.  Just like, you
3 know, if you have a head injury, you can have a
4 seizure, you know, if you would wind with certain
5 things, doesn't mean you are going to.  So that was
6 the direction of my question.
7   MR. WOLGEMUTH:  Well, my objection is on
8 the record.
9   MR. ANGINO:  Okay.
10   MR. SIMMERS:  We are back on the video
11 record.  The time is 4:08 p.m.
12   (On the video record.)
13 BY MR. ANGINO:
14   Q  Doctor, I'm not meaning to imply that
15 paralysis is a common thing that can occur with the
16 stenosis, but can it happen?
17   A  It can happen.
18   Q  Doctor, with regard to Mr. Mazzamuto, with
19 your background as his private physician over a
20 period of almost nine years, and having treated him
21 from the time that his back condition developed
22 which resulted in his earlier disability, and the
23 period of time from that earlier disability to the
24 disability that followed in 2000, Doctor, do you
25 have an opinion based upon reasonable medical

Page 48

1 certainty as to whether Mr. Mazzamuto is totally and
2 continuously disabled from doing the type of work
3 that he did, which is to own and operate a pizza
4 restaurant?
5   A  Yeah, I feel that he is totally and
6 permanently disabled from the kind of work he has
7 previously done.
8   MR. ANGINO:  You may cross examine.
9   MR. WOLGEMUTH:  What exhibit number are we
10 at, 6?
11   MRS. STILL:  I believe, yes.
12   MR. WOLGEMUTH:  Doctor, I'm going to give
13 you a packet of documents, which are your notes.
14 I'm just going to mark them as 6 before we start, so
15 I don't have to do that later.
16   MR. ANGINO:  You might want to mark it
17 D-1 because I have been marking them for use at
18 trial.  So we would call this as D-1.
19   MR. WOLGEMUTH:  Okay.  That's fine.
   Copy of packet of documents
20   beginning with Office Note
   for Vincent Mazzamuto dated
21   9/18/02 - produced and
   marked for identification as
22   Exhibit D-1.
23
24   MR. WOLGEMUTH:  I'm not going to refer to
25 them quite yet.

Page 49

1    THE WITNESS:  Okay.
2         CROSS EXAMINATION
3  BY MR. WOLGEMUTH:
4    Q  Now, Doctor, you had testified that you
5  are board certified in internal medicine, correct?
6    A  That is correct.
7    Q  Okay.  And you agree with me that you are
8  not board certified in psychiatry?
9    A  I am not.
10   Q  Do you even know what the requirements are
11 for board certification in psychiatry?
12   A  I assume it's completing a psychiatric
13 residency, and passing a standardized board
14 examination.
15   Q  Okay.  And you agree with me that you are
16 not board certified in orthopedic surgery?
17   A  I am not board certified in orthopedic or
18 neurosurgery for that matter.
19   Q  Okay.  And you are not board certified in
20 physiatry?
21   A  I am not.
22   Q  Okay.  What is physiatry?
23   A  Physiatry is rehabilitation medicine.
24 Doctors who do -- you know, work at rehabilitation
25 hospitals, work with injured patients, work with

Page 50

1  people post-surgery like the Mechanicsburg South
2  Rehabilitation unit, things such as that matter.
3    Q  Okay.  And neurology or a neurosurgeon
4  that would be somebody that operates on the back?
5    A  Neurologists are medical physicians who
6  diagnose neurologic diseases.  Neurosurgeons operate
7  on nervous structure, which includes both back and
8  brain.
9    Q  Okay.  Now, Doctor, would you agree with
10 me that you are not an expert in orthopedic
11 conditions?
12   A  I am not an expert in all orthopedic
13 conditions, that's correct.
14   Q  And would you also agree with me that you
15 are not an expert in psychiatric conditions?
16   A  I'm not an expert in psychiatric
17 conditions.
18   Q  Now, Doctor, you had previously provided
19 medical records to Mr. Angino in response to a
20 request that he had for Mr. Mazzamuto's records, and
21 I think you even provided us with medical records
22 pursuant to subpoena.  Do you recall that?
23   A  I have provided many records.  I assume
24 that's correct.
25   Q  And the records that you provided to us

Page 51

1  would have been all the records that you had?
2    A  Correct.
3    Q  And the records that you provided include
4  your progress notes or your office notes?
5    A  That's correct.
6    Q  Doctor, would you agree with me that, as a
7  physician, it's very important to include any
8  significant condition in your office notes?
9    A  Well, it depends on the nature of the
10 visit.  You know, when Mr. Mazzamuto comes to see
11 me, he doesn't necessary come to see me on every
12 visit with the, you know, express purpose of talking
13 about his back pain or, you know, there are routine
14 physical examinations, there are, you know, acute
15 illnesses, and not every medical condition of that
16 patient is covered and documented with every exam,
17 no, that's not -- we don't have that much time.
18   Q  Okay.  But you would agree with me,
19 Doctor, that if Mr. Mazzamuto came in, and was
20 complaining about back pain, most likely it would
21 have been significant enough that you would have
22 recorded it in that days' office visit notes?
23   A  If that's what we were dealing with, yeah.
24   Q  Or, similarly, if he had come in and
25 complained about some type of anxiety problem or

Page 52

1  depression problem, and discussed it with you, you
2  would have included it in your office notes for that
3  visit?
4    A  I would think so, yeah.
5    Q  And you would agree with me that -- excuse
6  me -- that something that would prevent somebody
7  from working would be a significant condition or
8  something that you most likely would include in your
9  office notes?
10   A  I would include it, but if it's been an
11 ongoing condition for a period of a long time every
12 office visit is not necessarily focused upon his
13 disability or lack of disability.  So if it was a
14 brand new issue, we might spend a lot more time with
15 it, but if it's an old thing that really hasn't
16 changed, we might not.  You know, again, we have
17 quite tight schedules, and trying to deal with each
18 problem with each visit isn't always possible, and,
19 again, the documentation hopefully addresses the
20 main points of that particular visit, again,
21 primarily for the purpose of, you know, keeping
22 track of his medical conditions and treatment, not
23 necessarily for supporting insurance claims or
24 disability claims.
25   Q  Okay.  But if it's something that was

Page 53

1  significant and something that you discussed, most
2  likely it have ended up in your notes?
3      A  It would have been in the notes in some
4  form, sure.
5      Q  All right.  And, Doctor, do you agree with
6  me that it's important to include the treatment that
7  you are rendering in your office notes?
8      A  Sure.
9      Q  And do you agree that you include -- or
10 it's important to include the treatment that you are
11 rendering because other physicians might actually be
12 reviewing your notes, and rendering treatment based
13 upon your office notes?
14     A  Sure.
15     Q  And, similarly, you would agree that it's
16 important to include any medications that you are
17 prescribing in your office notes?
18     A  They are in the notes or the medication
19 flow sheet, yeah.  They should be there in some
20 form.
21     Q  And, again, that's for your own benefit,
22 and for the benefit of other treating physicians --
23     A  Right.
24     Q  -- who might be using those notes?
25        Doctor, would you agree that it's

Page 54

1  important to include things like therapy, individual
2  or group therapy, in your notes if Mr. Mazzamuto was
3  receiving it or if you had prescribed it?
4      A  What are you talking psychiatric therapy
5  or what?  I'm not sure what therapy you are
6  referring to.
7      Q  Well, it would be a number.  Psychiatric
8  therapy, if you had prescribed psychiatric therapy,
9  would you include that fact in your office notes?
10     A  You mean medication?
11     Q  No.  In addition to medication.  I'm
12 talking about, you know, counseling --
13     A  See a psychiatrist?
14     Q  Seeing a psychiatrist?
15     A  Correct.
16     Q  You would include that in your office
17 notes?
18     A  Yes, I would.
19     Q  Okay.  And if you had recommended therapy
20 such as physical therapy -- in fact, I think you do
21 reference physical therapy in your notes frequently?
22     A  Right.
23     Q  And, Doctor, would you agree that if your
24 office notes are incomplete that Mr. Mazzamuto may
25 not get the proper treatment from other physicians?

Page 55

1      A  Any physicians I guess who had or were
2  reviewing those notes, correct.
3      Q  And generally, Doctor, would you agree
4  that when Mr. Mazzamuto relays symptoms or gives you
5  information, describes his condition, that you would
6  include that, and you would include it accurately in
7  your notes?
8      A  I would probably make sure it is included
9  accurately, though if it was repetitious from a past
10 visit, I may not reiterate the same facts with every
11 visit in every note.
12     Q  Now, Doctor, do you know what a global
13 assessment of functioning is or a GAF?
14     A  I have heard of it.
15     Q  Do you agree that it's a tool to evaluate
16 and rate a patient's overall psychological
17 functioning?
18     A  Yes.
19     Q  Doctor, do you agree that the GAF scale is
20 a scale from 1 to 100 based upon the individual's
21 psychological, social, and occupational functioning?
22     A  I don't know have knowledge of whether
23 it's a scale from 1 to 10 or 1 to 100.  I don't know
24 that.
25     Q  Well, did you agree that such a test as a

Page 56

1  GAF would be helpful in diagnosing and treating a
2  patient with psychiatric conditions?
3      A  I think if you were screening people, and
4  you weren't sure if they were depressed or anxious,
5  it might be another tool you could us.
6      Q  So, Doctor, since you don't really know
7  what a GAF score is or the scale is, you wouldn't
8  really be able to understand what a GAF score of say
9  31 to 40 would represent?
10     A  Well, I would assume it would be someone
11 who's significantly depressed and nonfunctional.
12 There are many -- there are many depression --
13 there's a depression index.  There are many tools
14 one can use to screen a population for depression if
15 you think the diagnosis is in doubt.
16     Q  Doctor, do you agree with me that nowhere
17 in your office notes do you have a reflected GAF
18 score for Mr. Mazzamuto?
19     A  I certainly agree with that since I don't
20 use it.
21     Q  Now, Doctor, would you agree that certain
22 types of medical tests or procedures or examinations
23 are done to help evaluate a patient's complaints?
24     A  Yes, I agree with that.
25     Q  And do you agree that the medical tests

Condenselt!™

Page 57

1 are used to find the cause of an individual's
2 problems or complaints?
3    A  I think medical tests are used to diagnose
4 medical complaints when the cause is not evident,
5 sure.
6    Q  And that medical tests are used to help a
7 physician prescribe treatment for someone's
8 complaints?
9    A  In some cases, sure.
10    Q  And sometimes medical tests reveal that
11 there's no problem after all?
12    A  Sometimes they do.
13    Q  And in this -- and, Doctor, sometimes the
14 medical tests reveal that the condition can be
15 treated or even cured?
16    A  Well, I think sometimes medical tests,
17 sure, show that something can be treated.  You know,
18 the cure thing is -- I mean, that's really an open
19 question to think about what you talking about.  So
20 I will say yes, I agree with the fact that it shows
21 that there may be an alternate treatment.
22    Q  And, Doctor, would you agree that the use
23 -- or without the use of medical tests that you may
24 be left to reply upon or accept the patient's
25 subjective complaints?

Page 58

1    A  I think that happens all the time.
2    Q  And in this case you acknowledge that you
3 didn't request a GAF score for Mr. Mazzamuto?
4    A  That is true.
5    Q  Doctor, would you agree that a mental
6 status exam is another tool used to evaluate a
7 patient's overall psychological function?
8    A  It's used to evaluate people mainly when
9 they are having periods of confusion trying to
10 especially rule out things such a dementing process
11 like Alzheimer's disease.
12    Q  And, Doctor, the things that you would
13 look at in a mental status exam, do you agree that
14 one of the things you would access is the person's
15 appearance?
16    A  Yes.
17    Q  Motor behavior?
18    A  Huh uh (yes).
19    Q  Speech?
20    A  Uh huh (yes).
21    Q  Attitude?
22    A  Uh huh (yes).
23    Q  Mood?
24    A  Sure.
25    Q  Affective expression?

Page 59

1    A  Yes.
2    Q  Whether they are having hallucinations?
3    A  Correct.
4    Q  Thought processes?
5    A  Uh huh (yes).
6    Q  Extreme of thought?
7    A  Uh huh (yes).
8    Q  Thought content?
9    A  Yes.
10    Q  Whether they have abstract thinking?
11    A  Yep.
12    Q  The ability to concentrate?
13    A  Uh huh (yes).
14    Q  Their orientation?
15    A  Uh huh (yes).
16    Q  Their memory?
17    A  Yep.
18    Q  Their judgment?
19    A  Correct.
20    Q  Their insight?
21    A  Uh huh (yes).
22    Q  And their reliability?
23    A  That's correct.
24    Q  Now, Doctor, would you agree that it would
25 be important to perform a mental status exam before

Page 60

1 treating an individual with a psychiatric condition?
2    A  Not necessarily, no.
3    Q  And why is that?
4    A  Because, again, depending upon what the
5 symptoms are that they are presenting with, you
6 know, whether they come in feeling anxious, if they
7 come in expressing thoughts of fear, sadness.  That,
8 again, if they don't come in with complaints or
9 family members of hallucinations or confusion,
10 depression is a very common problem, and again, you
11 get information that you think you need, but you
12 don't have to get every test on every patient just
13 because it's a test that pertains to that particular
14 medical condition.  So no, I don't think it's
15 required to do a mini mental status exam or a full
16 mental status exam on every patient that you are
17 going to consider putting on anxiety or
18 antidepressant medications.  No.
19    Q  Fair enough, Doctor, but do you agree with
20 me that of those fifteen or twenty items in the
21 mental status exam that maybe four or five of them
22 are appropriate to examine in determining whether
23 somebody is depressed or anxious?
24    A  I think they are important.  Again, I
25 think that they can also be obtained at times from

Page 61

1 just interacting with the patient, from having
2 normal conversations with them, and from, you know,
3 sort of having an ongoing relationship with them
4 that some of those information can also be obtained
5 that way as well.
6    Q   And would you agree, Doctor, that some of
7 the things that you might be looking at would be the
8 person's mood?
9    A   Uh huh (yes).
10    Q   And their affective expression?
11    A   Yes.
12    Q   Their motor behavior?
13    A   Well, motor behavior I guess in a way has
14 to do with more of a neurologic assessment, but
15 sure.
16    Q   Their speech?
17    A   More of -- yeah, what their gait, their
18 record of -- excuse me -- their gait -- or their
19 pace of speech, and whether it's fluent or whether
20 it makes any sense at all.
21    Q   And finally their thought content?
22    A   Uh huh (yes).
23    Q   Doctor, do you agree that nowhere in your
24 office notes do you reflect that you performed a
25 mental status examination on Mr. Mazzamuto?

Page 62

1    A   I will take your word for it.
2    Q   Doctor, I'm sure you would agree that one
3 way to treat somebody with anxiety and depression is
4 through the use of medications?
5    A   Correct.
6    Q   And another way of treating them or
7 treating somebody with conditions of anxiety and
8 depression might be some type of therapy?
9    A   Could be.
10    Q   Individual therapy, group therapy?
11    A   Correct.
12    Q   And would you agree that the only
13 treatment that you have implemented for
14 Mr. Mazzamuto is a regime of medicines?
15    A   Correct.
16    Q   And would you agree that you have not
17 recommended a psychologist or a psychiatrist?
18    A   I don't think I have recommended a
19 psychologist, no.
20    Q   And I believe that you had stated in your
21 direct testimony, Doctor Bower, that the reason you
22 didn't refer Mr. Mazzamuto to a psychologist or
23 psychiatrist was the lack of availability?
24    A   Well, what I said that was psychiatrists
25 are in short supply. I did not say that

Page 63

1 psychologists or counselors are in short supply.
2    Q   Okay. Doctor, your office is located in
3 the Carlisle area?
4    A   Yes, it is.
5    Q   I'm just going to read a list of
6 individuals, and would you identify if any of these
7 are psychiatrist or whether they are psychologists?
8 Margery Andrews?
9    A   Psychologist.
10    Q   Kay Balsonus?
11    A   I don't know. Psychologist, social
12 worker, counselor or something.
13    Q   Okay. Brenda Barrick?
14    A   Don't know her.
15    Q   Joann Chambers?
16    A   I think psychologist.
17    Q   John Paul Checket?
18    A   I assume a psychologist. I don't think
19 he's a physician.
20    Q   Joann Koslet?
21    A   Some kind of a counselor.
22    Q   Nancy Demuth?
23    A   She's a psychologist.
24    Q   How about Catherine Ellis?
25    A   Don't know her.

Page 64

1    Q   Kenneth France?
2    A   Don't know, but not a psychiatrist.
3    Q   Edward Franco?
4    A   Psychologist. Has his own group.
5    Q   Delores Hogg?
6    A   Probably the wife of an attorney. I don't
7 know. Steven Hogg's an attorney. I don't know
8 about Delores.
9    Q   Franco Psychological Associates?
10    A   Well, that's back to Franco. We mentioned
11 him already.
12    Q   How far, Doctor, is Harrisburg from
13 Carlisle?
14    A   My professional medical opinion about
15 eighteen miles.
16    Q   Is that too far to refer one of your
17 patients for psychiatric treatment?
18    A   It's not too far, it's -- but it is a
19 matter of getting there, and it's a matter of,
20 again, availability of openings. You know, because
21 somebody's in the phone book doesn't necessarily
22 mean that they are easily available or seeing new
23 patients.
24    Q   Have you ever examined the availability of
25 psychiatrists in the Harrisburg area?

Page 65

1    A  I know there are psychiatrists there,
2  sure.
3    Q  Did any of them come to mind in referring
4  Mr. Mazzamuto?
5    A  I didn't really think to -- I didn't think
6  that I wanted to refer Mr. Mazzamuto to a
7  psychiatrist.
8    Q  And the reason?
9    A  Again, I think he was -- we had him under
10  therapy here.  I don't think he wants to go to a
11  psychiatrist.  You know, with his cultural
12  background I don't think he was interested in seeing
13  a psychiatrist.  Unfortunately mental health issues
14  are often colored by the fact that, you know, people
15  view them differently than other medical issues, and
16  while some people are very comfortable to come here
17  and get treatment, they don't have a desire to go to
18  a psychiatrist or a psychologist.
19    Q  Doctor, do agree with me that you had
20  testified early that you think that Mr. Mazzamuto's
21  level of functioning has plateaued?
22    A  It's -- yeah, I do.
23    Q  And notwithstanding that fact, you still
24  don't want to refer Mr. Mazzamuto to a psychiatrist?
25    A  I could ask him if he wanted to go.

Page 66

1    Q  As a physician would you recommend if you
2  thought it was in his best interests to go?
3    A  Well, again, at this point he seems to be
4  doing fairly well in his current situation with
5  regard to his marital -- you know, the marital
6  issues he was having, his anxiety in that now that's
7  he's not at the restaurant on a regular basis.  So,
8  no, I mean, again, I don't feel compelled to refer
9  him to a psychiatrist unless he tells me that he's
10  having more distress as it pertains to his anxiety
11  and depression, that if the medications are
12  controlling things, you know, whether sending him to
13  a psychiatrist is going to better that situation at
14  this point I don't know.  It doesn't change his back
15  issue, but, you know --
16    Q  Doctor, you had testified earlier that his
17  psychological condition was his major condition at
18  this point?
19    A  That was at this point.  That was right
20  after his heart attack.  That was back in the year
21  2000.
22    Q  Okay.  Presently what is his major
23  condition?
24    A  His major condition or disabling
25  condition?

Page 67

1    Q  Disabling condition.
2    A  His back.
3    Q  Doctor, do you recall when I took your
4  deposition on April 16, 2002?
5    A  I remember you being here.  I will take
6  your word for the date.
7    Q  Okay.  Do you recall at that time that you
8  were under oath?
9    A  I do recall that.
10    Q  Do you recall it was something similar to
11  this where I had asked questions and you provided
12  answers?
13    A  Very similar to this, correct.
14    Q  And Mr. Mazzamuto's counsel, Mr. Angino,
15  was there?
16    A  He sure was.
17    Q  And you promised to tell the truth,
18  correct?
19    A  I try to.
20    Q  Doctor, I'm going to read a question and
21  your answer.  It's on page 59.  I just want to be
22  sure that I'm reading this to you correctly.
23    A  Go ahead.
24    Q  On page 59?
25    A  Uh huh (yes).

Page 68

1    Q  The question is and if Mr. Mazzamuto
2  identified his work duties as twenty percent
3  bookkeeping, twenty percent office duties, and sixty
4  percent supervising employees, anything in his back
5  condition that would prevent from doing those types
6  of job duties?
7        Answer: I think he would be uncomfortable
8  again with sitting over a desk with the
9  bookkeeping.  You know, what can people do, pain
10  tolerance and things like that are all individual.
11  Again, with his back, if that was his only issue,
12  could he muddle through further, he probably could.
13        Did I read that right?
14    A  Yes, you did.
15        MR. ANGINO:  And it's referring just to
16  his bookkeeping.
17        THE WITNESS:  Correct.
18  BY MR. WOLGEMUTH:
19    Q  Doctor, in treating somebody with anxiety
20  or depression, do you agree that an appropriate
21  treatment would be to recommend that that person
22  confront his anxiety, confront the situations that
23  caused the anxiety to help him become less anxious?
24    A  Not necessarily, no.  I mean, it depends
25  -- and sometimes anxiety is an internal thing, it's

Condenselt!

Page 69

1 a brain chemical thing. You know, I don't think --
2 are you talking about if they fall of the horse, and
3 they are anxious, so they get on the horse?
4      MR. ANGINO: I'm going to at this point
5 make an objection, and we will go off the record.
6      MR. SIMMERS: Off the video record. The
7 time is 4:29 p.m.
8      (Off the video record.)
9      MR. ANGINO: I have given great leeway to
10 your asking him questions about seeking a
11 psychiatrist, and seeking various forms of
12 psychiatric type treatment. The case is about
13 whether somebody is disabled or not disabled. We
14 are not here questioning the Doctor's treatment or
15 lack of treatment or referral, we are questioning
16 whether he's disabled. According to Doctor Bower,
17 he is disabled. So I think the relevancy or the
18 likelihood of this leading to any relevant
19 information, even if we were in a deposition, would
20 be highly suspect. The fact that we are actually in
21 a court setting, and we are asking questions of the
22 Doctor, my objection at trial, as it is in this
23 deposition since it's being taken for the forum --
24 for the purpose of trial -- is that continuing to
25 ask this Doctor questions about why and why he

Page 70

1 didn't refer Mr. Mazzamuto to a psychiatrist, and
2 what would psychiatrist do, and might the
3 psychiatrist be able to help things, that has
4 nothing at all to do with a case where Mr. Mazzamuto
5 is suing his insurance carrier that sold him a
6 policy that said that if he is disabled they were
7 going to pay him, and they haven't paid him.
8      So you can go back on record.
9      MR. SIMMERS: I'm back on the video
10 record. The time is 4:31 p.m.
11      (On the video record.)
12 BY MR. WOLGEMUTH:
13    Q Doctor, how do you determine if an
14 individual is disabled from anxiety or depression?
15    A Well, first, again, let me preference
16 that, again, I'm not a psychiatrist, and so I think
17 that if somebody was unable to undergo the rigors of
18 whatever was required of them in their job, if they
19 were unable to concentrate, focus, recall, retain or
20 perform the function of their job because their
21 anxiety was such that it prevented them from
22 functioning, that would constitute disability. Now,
23 disability is a legal definition, usually not a
24 medical diagnosis, but that's how I would probably
25 -- if the condition leads to an inability to

Page 71

1 perform the tasks that are central to the job, then
2 I would say you are disabled whether it's from
3 anxiety or backs or whatever.
4    Q Okay. Doctor, I'm going to refer to what
5 I have marked as D-1, which are your office notes.
6 You agree with me, Doctor, that they are your office
7 notes?
8    A Uh huh (yes). They are from my record,
9 correct.
10    Q Now, turn to the office notes for August
11 23, 2000?
12    A Okay.
13    Q Do you have them?
14    A Yes, I do.
15    Q And do you agree with me, Doctor, that
16 nowhere in your office notes do you include any
17 assessment of Mr. Mazzamuto's mood?
18    A It says he is more emotionally labile. I
19 don't know if that plot plays into mood per se.
20 That's a reflection of his mental state or whatever
21 you want to call it, mood or affect or whatever.
22 It's kind of a global -- a global assessment.
23    Q Okay. And do you agree that there's
24 nothing in your notes for that day that reflect your
25 assessment of his motor behavior?

Page 72

1    A Yeah, I don't think that has any bearing
2 on anything at that point.
3    Q Now do you refer to his speech or his
4 thought content?
5    A No. Again, that's normally something one
6 does when somebody is delirious or demented or
7 having, you know -- again, that would be for
8 different sorts of mental disorders, not for
9 somebody who's anxious or depressed.
10    Q Okay. Now, Doctor, I believe that you do
11 identify that Mr. Mazzamuto suffered from anxiety
12 symptoms?
13    A Uh huh (yes).
14    Q But you agree that you don't specifically
15 identify what those symptoms were?
16    A Correct.
17    Q And, in fact, your notes don't reflect
18 whether those symptoms were present while he was in
19 your office, do they?
20    A They do not.
21    Q And do you agree, Doctor, that your office
22 notes don't reflect what specific duties or
23 activities were causing Mr. Mazzamuto's anxiety?
24    A No, they do not reflect what duties were
25 causing his anxiety, they just reflected that he was

Page 73

1 anxious after his recent hospitalization for a heart
2 attack.
3    Q  Okay.  Now, Doctor, I would like you to
4 turn to your office notes for November 29 of 2000.
5 Find them?
6    A  November 19.  Got it.
7    Q  And, Doctor, am I correct that at that
8 time you indicated that Mr. Mazzamuto's chronic low
9 back pain was stable?
10    A  Let's see.  It says chronic low back pain
11 controlled on Neurontin.
12    Q  Well controlled on Neurontin?
13    A  Correct.
14    Q  And I believe you state that at that time
15 his anxiety was doing well on Wellbutrin?
16    A  It was doing well, correct.
17    Q  All right.  Doctor, let's move on to your
18 office notes of August 11 of 2001.  Find that?
19    A  Uh huh (yes).
20    Q  Do you agree with me, Doctor, at that time
21 you diagnosed or your impression was that his
22 chronic anxiety was stable?
23    A  Correct.
24    Q  And would you agree that your definition
25 of stable or your use of the world stable means at

Page 74

1 that time he was no -- that he was not expressing
2 current symptoms of anxiety?
3    A  It did not seem to be interfering with him
4 at that point.
5    Q  Doctor, do you agree with me that your
6 notes don't reflect any type of specific work
7 restrictions?
8    A  They don't.  Again, he's self-employed, so
9 I don't really necessary give notes or give work
10 restrictions to people who are in charge of their
11 own business.  I'm not even sure he was working at
12 that point to tell you the truth.  That was in his
13 -- after his myocardial infarction, and he was
14 undergoing cardiac rehab.  Whether he was at the
15 restaurant on a fulltime basis at that point I don't
16 know, but I don't think he was.
17    Q  Okay.  Doctor, let's move on to your March
18 12, 2001 notes?
19    A  Okay.
20    Q  And, once again, Doctor, would you agree
21 that your notes don't reflect any assessment of his
22 mood or affective expression?
23    A  Right.  Because he came in with numb legs,
24 and that's what we were focusing on on that visit.
25    Q  So your notes that reflect any type of

Page 75

1 symptom that you would assess in terms of any type
2 of anxiety or depression on that specific day?
3    A  Right.  Again, yeah, I think the focus on
4 that visit was primarily because of the numbness in
5 his leg.  It does note that he was having chest
6 pain, and, again, I think there was a thought that,
7 again, since his heart had been re-tested and it was
8 normal, that, in fact, the chest pain might be a
9 symptom of anxiety.  He was actually re-hospitalized
10 soon after he was out of the hospital for what
11 turned out to be not heart pain, and, again, chest
12 pain is a common symptom of anxiety as well.  But I
13 think this visit was primarily regarding -- again,
14 the major focus of the visit was about the numbness
15 in his legs.
16    Q  Okay.  Then, Doctor, on page -- that page
17 25 is that a continuation of your March 12 visit?
18    A  I don't think so.  No, that's -- oh, 25.
19 Yeah, 25 to 24 that's all one note.
20    Q  Okay.  So the impression on page 24, I
21 believe No. 3 ongoing stress and chronic anxiety?
22    A  Uh huh (yes).
23    Q  So you apparently you did mention his
24 chronic stress at that point?
25    A  Well, again, if you -- the second

Page 76

1 paragraph in the note on page 24 said he had an
2 episode where he became very upset at an insurance
3 agent, felt some chest pain, took two or three
4 nitros, felt like he was going to break out in a
5 cold sweat, and, again, having recently undergone
6 cardiac evaluation, which didn't show any further
7 blocked arteries in his heart, I was taking that as
8 a sign of perhaps his stress and anxiety, that he
9 was getting chest pain, again, from emotional upset.
10    Q  Okay.  So this office visit just involved
11 the numbness to the lower leg?
12    A  That was the -- that was the initial
13 reason.  It doesn't just involve it, it was the
14 major focus.  No office visit in internal medicine
15 or primary care ever deals with just one primary
16 thing, there's always an, oh, by the way.
17    Q  And once again, Doctor, for March -- the
18 March 12, 01 office notes, you, again, don't reflect
19 any type of work restrictions for Mr. Mazzamuto?
20    A  I do not for the same reason I said
21 previously, he's self-employed.
22    Q  Doctor, let's move on to the June 19, 2001
23 notes.  Do you agree with me, Doctor, that your
24 notes reflect at that time, which is the middle --
25 in June of 2001, that his chronic anxiety was fairly

CondenseIt!

1  well controlled?
2      A  That's what it says.
3      Q  Would that mean that at that point then
4  you didn't make the assessment of his mood or his
5  motor behavior or his speech because it was well
6  controlled?
7      A  Probably because of just his mood and his
8  general -- his general affect, which is, again, his
9  personality.  Again, the motor behavior and speech
10  things I think you can leave out because that's
11  generally not a big issue for my concern here.
12      Q  And, again, Doctor, I know you have answer
13  the same question, but that office note doesn't
14  reflect any type of work restrictions for the same
15  reasons?
16      A  For the same reason, that because he is
17  his own employ -- he's his own boss, he has the
18  ability to not do things if he knows they are
19  bothering him.  If you work for somebody else, you
20  don't have that ability without getting into
21  trouble.
22      Q  And as -- the fact that Mr. Mazzamuto
23  is self-employed, would you then really have to
24  rely upon him telling you whether he's able to
25  performed these duties in assessing his ability to

1  do that?
2      A  Not really, no.  All I'm saying is that he
3  does not have an external authority figure hanging
4  over him that will reprimand him if he starts doing
5  something that hurts and he stops because he's his
6  own boss.
7          I think when it comes to chronic pain, and
8  when it comes to back pain, to a great degree you
9  are always dependent on the person to tell you
10  because there is no lab test for pain, there is no
11  x-ray test for pain.  You can document lack of nerve
12  function, but there's absolutely nothing you can do
13  to objectively test for pain.  Pain is a subjective
14  symptom.  It's becoming very popular in medicine
15  now.  It's now the fifth vital sign.
16          Now -- or every person who has any kind of
17  discomfort, again, back to your scale before, you
18  know, we are supposed to now be doing a 1 to 10 pain
19  scale.  That's now, that's not then, but, again,
20  it's a totally objective phenomenon.  So, yeah, when
21  I say see these people here, I'm trying to make them
22  better.  I'm not seeing them for the purpose of,
23  gee, what if at some point they are suing somebody
24  or they are being sued, how can I best document
25  their complaints today to make it look good later on

1  when the lawyers get a hold of the records.  Again,
2  there was a time when medical records were for
3  medical issues, now are just legal documents, but I
4  go on too long.
5      Q  Again, Doctor, the point I was trying to
6  make, the fact that you don't include work
7  restrictions for someone like Mr. Mazzamuto is
8  really up to Mr. Mazzamuto whether or not he can
9  perform these job duties, do you agree with that?
10      A  Sure.  I do agree.
11      Q  Doctor, in July 9 of 2001 -- do you have
12  your office notes there in front of you?
13      A  I do.
14      Q  Okay.  And do you agree with me that at
15  that point -- I'm sorry, Doctor.  I want you to
16  refer to your August 20, 2001?
17      A  August 6 or August 31?
18      Q  I might have a --
19      A  There's a 6th on that page.
20      Q  Yeah.  Just bear with me a second.
21      A  No.  Tell you what, let's move on to your
22  December 19, 01.
23      A  Okay.
24      Q  Do you agree with me that at that time you
25  found his depression and anxiety to be borderline

1  compensated?
2      A  Yeah, that's what I wrote.
3      Q  What exactly does that mean, Doctor?
4      A  Well,, he was getting by, but he was still
5  having symptoms.  He was having -- again, he was
6  somewhat anxious, but he wasn't having, you know,
7  terrible problems at that point.
8      Q  And you were medicating him at that time?
9      A  I would have to look back at my medicine
10  flow sheets to tell you that, but I'm sure he was
11  still on something at that point.  I can tell you
12  that in a minute.
13          In December of 01 he was still on Ativan,
14  he had just stopped Celexa, and we had not yet
15  started Effexor.  So that's -- wait a second.  Oh,
16  he was still on Celexa.  So, yes, he was still on an
17  anxiety depressant medicine, Celexa, and he was
18  taking Ativan as needed at that point.  So, yes, he
19  was being medicated at that point.
20      Q  And what is Ativan, Doctor?
21      A  Ativan is a benzodiazepin antianxiety
22  medicine similar to Valium.  It gives fairly prompt
23  relief from anxiety, but it's fair short acting.  So
24  it's used for sporadic control of anxiety symptoms,
25  but it's not something that, you know, you would

Page 81

1 have to take it multiple times a day for it to last
2 all day long. It's almost for breakthrough symptoms
3 you could say.
4 Q Okay. And, Doctor, at the end of your
5 first paragraph in the December 19, 2001 notes you
6 state that his mental state is stable?
7 A I guess -- yes, that's what I wrote.
8 Q And would that be referring, again, to his
9 anxiety and depression issues?
10 A Anxiety and depression.
11 Q Now, Doctor, in your notes of February 14,
12 2002 you again diagnose -- I'm sorry. Do you have
13 it?
14 A I have it now, yep.
15 Q You again diagnosis severe anxiety and
16 resultant depression?
17 A Uh huh (yes).
18 Q And, again, Doctor, do you agree that your
19 office notes don't reflect any type of assessment of
20 his mood, expression, behavior, speech or thought
21 content?
22 A That's true. I just wrote that he came in
23 for ongoing evaluation of his anxiety symptoms,
24 although I did not list them.
25 Q And, Doctor, would that also be true for

Page 82

1 your office notes of March 14, 2002?
2 A That's true, other than saying that he
3 just does poorly, and that he's smoking more, and
4 more uncomfortable, but I did not comment on any
5 other specific symptoms.
6 Q Now, Doctor, under your No. 1, under
7 impression, I believe you state that the severe
8 anxiety and depression now becoming his biggest
9 problem?
10 A As of that visit, sure.
11 Q You mean that that problem was bigger than
12 his back problem? Is that what you meant by that?
13 A I think at the point of that visit,
14 correct. From his -- the symptoms he was having,
15 difficulty sleeping problems, you know, in that
16 regard I think as of that visit. I felt for that
17 visit it was his biggest problem, sure.
18 Q Doctor, I want to refer you to your -- I
19 think it's your April 22, 2002?
20 A Okay.
21 Q And, once again, I believe you identified
22 under impression as severe anxiety and depression?
23 A Uh huh (yes).
24 Q And, again, do you agree that you didn't
25 make any specific assessment of those five factors

Page 83

1 that I have been discussing with you?
2 A I sure do.
3 Q Doctor, you said there was a skin rash.
4 Was that a side effect of a medication?
5 A I don't know. I said it is possibly from
6 the Effexor, but it wasn't there at that time, and
7 it's always hard to diagnose a skin rash that's no
8 longer there.
9 Q And, Doctor, your notes reflect at that
10 time that his back was at baseline?
11 A Right.
12 Q What does that mean?
13 A It means it's the same as it was before.
14 Q Not getting any worse?
15 A Well, didn't comment that it was getting
16 worth. It was no better than previous evaluations.
17 Q Doctor, I would like to direct your
18 attention to your office notes of May 29, 2002.
19 Under your impression, do you agree that you
20 reported that his chronic anxiety was improved, but
21 still not resolved?
22 A Correct.
23 Q And you also reported no current symptoms
24 of ischemia?
25 A Correct. That means that he's not having

Page 84

1 chest pain referable to blocked arteries in his
2 heart.
3 Q Doctor, Mr. Mazzamuto apparently referred
4 to a niece or a nephew that had some type of medical
5 condition. Did he ever express that that itself was
6 causing him any type of anxiety or depression?
7 A He did. In fact, the previous note,
8 December 13 of 02 dealt with that. He had a niece
9 who had developed a brain tumor, and was undergoing
10 therapy at that point.
11 Q Okay. The stressor anxiety that was
12 related to that issue, that's something that just
13 arose recently, that's something that wasn't
14 occurring for the past year or years?
15 A No. That was -- I mean, again, I think
16 that I might have heard about it slightly before
17 that visit, but that was new I believe as of that
18 visit. That has not been one of his ongoing
19 problems, that's a relatively recent event in the
20 last year.
21 Q Doctor, let's move on to your August 2,
22 2002 notes. At that time you reported that his
23 coronary disease we had no current symptoms?
24 A Correct.
25 Q And that pretty much confirms what

Page 85

1 testimony you had on direct examination by
2 Mr. Angino?
3    A  Correct.
4    Q  And do you agree that you reported his
5 chronic anxiety was stable on his current medicine?
6    A  Correct.
7    Q  And, once again, Doctor, there's no
8 discussion about any type of work restrictions in
9 that office note for the reasons you previously
10 identified?
11    A  Correct.
12    Q  Okay.  Doctor, let's move on to the office
13 notes of September 18, 2002.  Do you agree with me
14 that in September you reported that his chronic
15 anxiety was seemingly better or under better control
16 today?
17    A  That's what I said, correct.
18    Q  Doctor, you also reported that there was a
19 noninvasive study of his lower extremity, and found
20 them to be normal?
21    A  We were looking at the circulation to his
22 lower extremity, seeing if they were getting
23 adequate blood flow.  If you have blocked arteries
24 to you leg arteries, and you are walking, that can
25 be a reason do get lower extremity pain.  So we sent

Page 86

1 him to a vascular surgeon to make sure that some of
2 his leg discomfort was not coming from poor blood
3 supply.  He did the studies, he said the blood
4 supply is normal.
5    Q  Okay.  Now, I believe you had testified on
6 direct, Doctor, that you believe that Mr. Mazzamuto
7 had an impingement from stenosis?
8    A  Again, based on his MRI findings, the
9 symptoms he describes, and, again, he was evaluated
10 fairly -- fairly completely by an orthopedic
11 surgeon, specialist, board certified in back
12 surgery, Doctor Gelb, who was previously at Hershey,
13 who, in fact, thought his symptoms all came from his
14 back, and recommended that he thought that surgery
15 might be an option for him if Mr. Mazzamuto was
16 willing to undergo that.  Of course, he gave him no
17 guarantees, and said there's lots of potential
18 problems, but Doctor Gelb seemed to be quite
19 satisfied that his back was a big problem, and
20 thought that it was causing his symptoms, and again,
21 you know, part of these notes here where not
22 everything is covered with every visit, you know,
23 that was going on in the background.  He was seeing
24 Doctor Gelb in 2000 and 2001 before Gelb left for
25 Baltimore, and you are right, and I sort of accept

Page 87

1 the opinion of the specialist in that area that it's
2 a big problem for him.  So, yeah, I don't necessary
3 do everything for his back every time he comes in.
4 He's been seen by a back specialist who says, yeah,
5 you got a back problem, and I can operate on you if
6 you want.
7    Q  Okay.  And do you agree, Doctor, that at
8 one point he had an EMG done?
9    A  He did have an EMG done, and it was
10 normal.
11    Q  And what does that reflect, Doctor?
12    A  It means that there was no sign on that
13 test that the peripheral nerves in his legs were
14 being pinched.
15    Q  Okay.  In fact, did you see any tests at
16 all that suggest that his nerves were being impinged
17 or pinched?
18    A  Again, the MRI as long as ago 1996 which
19 says the spine is being pinched.  It says, you know
20 -- and so yeah.  Again, not -- tests don't always
21 all agree with each other, so you have to take the
22 whole clinical scenario.  So, again, you know, it
23 says the stenosis -- you know, that it impinges, and
24 it actually pinches off so that there's no flow of
25 cerebral spinal fluid in the area.  So, again, we

Page 88

1 have got symptoms that go along with a problem from
2 the spinal stenosis, we got a back specialist at
3 Hershey who tells me, yeah, this guy's got a back
4 problem, I have an EMG that says no, these nerves
5 here are not being pinched, but --
6    Q  Okay.  And that EMG was done more recently
7 than the 1996 MRI, do you agree?
8    A  I agree.
9    Q  Doctor, I want to direct your attention to
10 -- let me see if I can find this.  Just bear with
11 me a second.
12    Okay.  Your May 29, 1996 office notes?
13    A  Okay.
14    Q  I think you report there at the end of
15 your first paragraph that he has had several falls,
16 recently slipping out a chair, which seems to have
17 aggravated the problem?
18    A  Uh huh (yes).  That's correct.
19    Q  In your office note of April 3, 1996, I
20 believe you report that he had fallen in January,
21 and then fell again last week hurting his back?
22    A  Correct.  That's why on the initial
23 insurance forms when it says when did this begin, I
24 couldn't be specific, and I sort of wrote both
25 January and April because, again, there seemed to be

Condenselt!

Page 89

1  two events that kind of triggered that most recent
2  -- or that particular flare up.
3      Q  Okay.  And, Doctor, you are aware, aren't
4  you, that Mr. Mazzamuto claimed that he hurt his
5  back in July of 2000 while riding in the ambulance
6  to the hospital from the day he had his heart
7  attack?
8      A  I'm sure, again, maybe he aggravated it
9  then.  Again, I don't -- I think his back problem
10  long predates that, but, again, you know, chronic
11  back problems can be flared up by injuries, falls,
12  twists, you know, bad body positioning, things like
13  that.  So that I didn't know that he was claiming
14  that the ambulance ride had anything to do with it,
15  but, again, lots of things -- you know, lying on a
16  catheterization table can be a very uncomfortable
17  thing for somebody with a chronic back condition,
18  but I think it's clear that his back problem dates
19  back, again, in the previous notes, as far back as
20  1992.
21      Q  Okay.  And do you agree with me, Doctor,
22  that slipping and falling on the ice, and falling
23  out of a chair are more of a significant trauma than
24  receiving a bump in a ambulance ride?
25      A  I would agree that falling on the ice is

Page 90

1  probably the most significant of those things.
2  Again, I don't know what the bump in the ambulance
3  was.  We live in Pennsylvania, there's lots of
4  potholes.  I will refer judgment on that one.
5      Q  Now, Doctor, I believe you had testified
6  some of the work restrictions when Mr. Angino was
7  asking you, that he shouldn't lift more than twenty
8  pounds?  Does that sound about right?
9      A  Yeah.
10      Q  Did Mr. Angino ever tell you exactly what
11  he had to lift while he was working?
12      A  Did he tell me, no.  I was -- I have been
13  in the restaurant, I have seen the video of the
14  restaurant that Mr. Angino provided for me.
15      Q  So you agree that Mr. Mazzamuto never
16  specifically told you what -- that he had to lift
17  heavy things at work?
18      A  He did not tell me in my office that he
19  had to lift heavy things at work.
20      Q  You are claiming that you saw him lifting
21  heavy things?
22      A  I'm claiming that I saw heavy things in
23  the restaurant that go along with work in the
24  restaurant, and I'm not claiming to be an expert on
25  restaurants, but, again, he tells me he can't do the

Page 91

1  things at work, he did not specifically tell me that
2  he can't lift twenty pounds, that he can't lift a
3  particular thing.  Again, I think that his back is a
4  problem, and I know that there are twenty pounds
5  items in his place of business.  There are cases of
6  cheese, there are big vats of pizza dough, there are
7  big jars of -- of, you know, peppers.  So, again,
8  you know, could he lift something twenty pounds, he
9  sure could.  Can he do it over and over again, can
10  he do it repetitively, you know, can he do it day in
11  and day out, no, I don't think he can.
12      Q  He can do it occasionally though, lift up
13  to twenty pounds, can't he?
14      A  Yeah.  Anybody can do anything
15  occasionally, but that's not the same as, you know,
16  doing your job.
17      Q  And do you agree with me, Doctor Bower,
18  that Mr. Mazzamuto told you that he would have to
19  sit down and stand up in order to accommodate the
20  pain that he had?
21      A  Sit down, stand up, and occasionally lay
22  down.  It's kind of a continual shifting of
23  positions.
24      Q  Now, Doctor, would you turn to your office
25  notes for 10/23/96?

Page 92

1      A  Okay.
2      Q  Okay.  At that time I believe you reported
3  that Mr. Mazzamuto still had intermittent -- I'm
4  sorry -- intermittent numbness in his both legs?
5      A  Uh huh (yes).
6      Q  And he still has low back pain, which is
7  improved?
8      A  Correct.
9      Q  And that he can basically work for about
10  one to two hours during the day.  He's at the
11  restaurant much longer than that, but he's normally
12  seated, and not participating actively in the
13  physical labor?
14      A  At that point that was true because he
15  couldn't.
16      Q  Okay.  And that's what Mr. Mazza -- I'm
17  sorry -- Mazzamuto told you back in October of 1996?
18      A  That's truth.
19      Q  In fact, October 23, 1996?
20      A  Right.  Another interesting thing from
21  that date is that his weight was 186 pounds then
22  too, and it's now 222 pounds.  So things have
23  changed since 96.
24      Q  Okay.  Doctor, you agree with me the fact
25  that you recorded that he was working one to two

Condenselt!

Page 93

1 hours a day, but basically at the restaurant much
2 longer than that, but he was normally seated, and
3 participating actively in the physical labor
4 indicates to you that Mr. Mazzamuto was working
5 prior to that time, to October 23, 1996?
6    A  He was at the restaurant.  Again, because
7 he is not subject to -- that he's not subject to an
8 employer's whim as to what constitutes work, he owns
9 the place, so sure, he goes in.  Now, what day -- is
10 he working, you know, is he just wanting to make
11 sure things are going well?  I mean, that's --
12 again, it's a much fuzzier area in my mind.
13    Again, I'm not an employment labor law
14 specialist, but the fact that it's his own business
15 I think blurs the lines between when are you
16 working, when are you there.  You know, what -- it's
17 not the same as being employed by somebody elsewhere
18 where, when you are at the job, you are expected to
19 do something now, now, now, now, and so, again, had
20 he been at the restaurant during that time, yeah,
21 I'm sure he was.  He owns it.  His family owns it.
22 His wife's there.  His kids are there.  But is he
23 working?  I mean, he putters -- I mean, I don't
24 know.  I don't know what means.
25    Q  Well, let's just go back to your notes.

Page 94

1 You basically said -- you say can basically work for
2 about one to two hours during the day.  That means
3 --
4    A  Right, that's what he told me.
5    Q  He was telling you he was working at least
6 one to two hours?
7    A  He was doing some stuff one to two hours a
8 day.
9    Q  But he was there a lot longer than that,
10 but just sitting down, and not really participating
11 actively in the physical labor?
12    A  Correct.
13    Q  That's what it says?
14    A  That's what it says.
15    Q  Now, Doctor, I want to refer you to
16 Plaintiff's Exhibit 3.  It's a document that
17 Mr. Angino had previously given you.  Do you have
18 that handy?
19    A  Sure.
20    Q  That's the Attending Physician's
21 Statement?
22    A  Dated which date?
23    Q  10/23/96?
24    A  Uh huh (yes).
25    Q  Okay.  Now, just so we are not confusing

Page 95

1 anybody, the date on P-3, 10/23/96, is that same
2 date --
3    A  It is.
4    Q  -- on the office note of 10 23/96?
5    A  Right.
6    Q  Do you agree?
7    A  Uh huh (yes).
8    Q  Okay.  And on No. 13 you had indicated
9 that Mr. Mazzamuto was disabled from April 13, 1996
10 through October 23, 1996, which is the same day as
11 the office note?
12    A  The day that I saw him, correct.
13    Q  So clearly, Doctor Bower, the statement
14 that you made on the Attending Physician's Statement
15 dated October 23, 1996, couldn't have been correct?
16    MR. ANGINO:  Objection.
17    MR. SIMMERS:  Off the video record.  The
18 time 5:04 p.m.
19    (Off the video record.)
20    MR. ANGINO:  He just told you he only
21 could work one or two hours a day.  Disability means
22 you can't work your job regular hours.  I mean, how
23 can you say to him that, you know, they are
24 inconsistent.  That's my objection.
25    Back on the record.

Page 96

1    MR. SIMMERS:  Back on the video record.
2 The time is 5:04 p.m.
3    (On the video record.)
4    THE WITNESS:  Well, again, I think he was
5 disabled up until that point.  I saw him that day.
6 Whether he was at his restaurant for a couple of
7 hours or doing things for a couple of hours, again,
8 I don't think that constitutes, you know, being not
9 disabled.  That's -- I mean, he's puttering around,
10 he's doing a few things, but he wasn't clearly doing
11 his normal activities.  He wasn't doing his normal
12 job.  So I don't think that's inconsistent.
13 BY MR. WOLGEMUTH:
14    Q  You agree with me, Doctor, that that No.
15 13 doesn't say dates of continuous personal
16 disability?
17    A  Well, I guess it doesn't, no.
18    Q  In your own mind you know the difference
19 between personal disability and total disability?
20    A  I would assume a total disability you
21 can't do anything.
22    Q  Okay.  And per Mr. Mazzamuto's discussion
23 with you on the same day, October 23, 1996 --
24    MR. ANGINO:  I'm going to have to go off
25 the record again.

**CondenseIt!**

Page 97

1 　MR. SIMMERS: Off the video record. The
2 time is 5:05 p.m.
3 　(Off the video record.)
4 　MR. ANGINO: The Supreme Court has said
5 that the fact that you can go into your office and
6 do some work for a couple of hours a day does not
7 mean you are partially disabled, it means you are
8 totally disabled. Partial disability has to mean
9 that you work an eight-hour day, and you could only
10 do part of your work. So when you are asking the
11 Doctor questions that have to do with the law, you
12 know what the Supreme Court has said with regard to
13 that. So I'm going to object to a question being
14 asked to a Doctor about a legal issue that you darn
15 well know the answer, and it doesn't have anything
16 to do with that.
17 　MR. WOLGEMUTH: Okay. Well, I would like
18 to respond to that objection. The only relevant
19 issues here are what the contractual language
20 between a policy that Mr. Mazzamuto had and the
21 language contained therein. So regardless of what
22 Supreme Court decision you are referring to, I can
23 ask these question, and I intend to, and I will ask
24 the questions.
25 　MR. ANGINO: And I can continue to object

Page 98

1 to them --
2 　MR. WOLGEMUTH: Yes, you can.
3 　MR. ANGINO: -- on that basis that
4 basically total disability means under the law, as I
5 understand the law, to mean that you cannot do your
6 job as you did it before. Partially disability
7 means you can go and do eight hours, forty hours a
8 week, but there's certain parts of your job you
9 can't do. So we can -- this is all a matter of
10 record.
11 　MR. WOLGEMUTH: Let's go back on the
12 record.
13 　MR. SIMMERS: Back on the video record.
14 The time is 5:06 p.m.
15 　(On the video record.)
16 BY MR. WOLGEMUTH:
17 　Q Doctor, referring again to P-3, Item No.
18 14, which states dates of partial disability, you
19 put a zero or slash through that?
20 　A Right.
21 　Q Okay. So in your view Mr. Mazzamuto was
22 totally disabled from 4/13/96 through 10/23/96?
23 　A In my opinion, sure.
24 　Q And he wasn't partially disabled?
25 　A Not in my way of viewing partial

Page 99

1 disability in Mr. Mazzamuto's employment situation,
2 no.
3 　Q Okay. At the very least, Doctor, you
4 agree with me that he could perform some of his job
5 duties as of October 23, 1996?
6 　A He could do some of his job duties for a
7 short period of time.
8 　Q Now, Doctor, Mr. Mazzamuto's anxiety and
9 depression, is that preventing him from doing his
10 job duties like bookkeeping?
11 　A At some points it seemed that it did.
12 Whether it's -- you know, again, I don't know that
13 right off about -- right for this moment, but,
14 again, there were some points when he was telling me
15 he was too aggravated, he was too -- he would get
16 upset about everything, he couldn't concentrate,
17 and, again, and part of it was also that he just
18 couldn't sit for long enough. But at various points
19 during this whole saga there had been times when his
20 anxiety has prevented him from being able to
21 concentrate. He couldn't focus.
22 　Again, it's a fluxing state as you can
23 tell by all the notes we have been going through
24 that, you know, things worsen a little bit, they get
25 better a little bit, they worsen a little bit.

Page 100

1 There's a constant ebb and flow to this, it's not a
2 static situation.
3 　Q And you agree that at least it's my
4 understanding that his anxiety was -- and depression
5 was prohibiting him from being able to do like his
6 office duties, duties like as calling a food
7 supplier, checking prices, talking to service
8 people, talking to customers?
9 　A Correct, that was my understanding.
10 　Q And, again, just so I understand, and what
11 you are telling the jury is the reason he can't do
12 these type of job duties is because he might fly off
13 the handle in a rage or something to that effect?
14 　A At that point in the past there was that
15 possibility. I think at this point he's doing
16 better in that regard. You know, that -- I don't --
17 I think some of these anxiety issues have improved,
18 and, again, at some points the anxiety was his
19 biggest problem, at some points the back was his
20 biggest problem. When he was having a heart attack,
21 at that point it was his biggest problem. But the
22 relative importance of these things, again, has
23 fluxed.
24 　Now, could he call a food supplier
25 tomorrow, and at that occasion do well in a limited

Page 101

1  -- he probably could. Can he do it day in and day
2  out, again, back -- you know, part of the reason
3  that his stress levels are better now, and that he's
4  doing better from his anxiety is he's not in the
5  restaurant.
6      At least that's my understanding of why
7  he's doing somewhat better, is that his family has
8  basically sent him home, and said, you know, stay
9  out of here, we don't want you getting upset. We
10 don't -- they are afraid that if he gets upset, his
11 blood pressure will go up, he will have a heart
12 attack, and I don't think that's a likely scenario,
13 but, again, they certainly see that he does get
14 upset if things aren't going well at the restaurant
15 especially because physically then, when the back
16 comes into it, he can't intervene, and just do it
17 himself.
18   Q  And, again, your opinion, the reason he
19 can't do these I will call them administrative type
20 duties is because of problems like the focusing, and
21 concentrating, and the inability to focus and
22 concentrate?
23   A  I think at some points it could be focus
24 and concentrating. At some points it could be
25 because his back just doesn't allow him to sit and

Page 102

1  stand over the paperwork for a long periods of time,
2  and, again, a lot of this takes place in the
3  restaurant, where, again, he's sort of immersed in
4  the whole milieu of all the other stuff that's going
5  on, which comes to, again, re-aggravating the
6  anxiety issues because, when things are going poorly
7  or something is not right in the restaurant, he's
8  been having trouble dealing with that because, again
9  -- my understanding -- this is not -- you know, of
10 just knowing him, as a small business owner -- I
11 mean, I think small business owners, you know, have
12 their fingers enmeshed with their business, and, you
13 know, if you can't jump in and do things, it's a
14 very frustrating scenario.
15     Again, could he do booking occasionally,
16 again, I'm sure he has good days and bad days as we
17 all do. I don't know whether he could sit at his
18 desk and do his bookkeeping everyday at the
19 restaurant, and call suppliers everyday at the
20 restaurant and perform adequately, I don't know.
21   Q  Doctor, do you agree with me that on those
22 notes that -- the office notes that I have
23 identified as D-1, which I think are all -- most of
24 your current notes through the end of 2002, that you
25 have nothing -- or that you don't indicate anywhere

Page 103

1  in there that Mr. Mazzamuto was actually having
2  problems coordinating things at work or focusing
3  things at work?
4    A  I'm not sure if that's ever not documented
5  in there or not. I have had discussions with his
6  wife. On other occasions, again, not as part of one
7  of his office visits, so it weren't show up on the
8  record, but, again, I guess I -- you know, I don't
9  know whether I specifically mentioned that or not
10 because, again, the focus of my visits here were
11 basically trying to take care of Mr. Mazzamuto.
12     It was only after the fact, when asked to
13 fill out a form that says what can he do and what
14 can't he do, which is really not my concern when I'm
15 seeing him in the office, is to then try to go back
16 and figure out based upon what I know about him
17 medically and mentally, and come up with an
18 assessment, get those work restrictions you keep
19 asking about because, again, in my day-to-day
20 practice with Mr. Mazzamuto we don't spent a lot of
21 time with me telling him you can't lift things, you
22 -- you know, you can't be in a stressful situation,
23 you can't do those things, again, because he has --
24 my understanding is he has the ability to not do
25 those things if he doesn't -- you know, if he

Page 104

1  doesn't have to. There's somebody compelling him to
2  do those things.
3     So, again, when I fill out a form like
4  this, it's in some ways an artificial situation
5  where I now have to go back, look at my notes, look
6  at what I know about Mr. Mazzamuto, and then try to
7  put into plain language for an insurance company or
8  for disability or whatever what I believe to be the
9  limits of his disabilities, what I believe to be his
10 impairments, not that I necessarily felt the need to
11 spat all that in my medical record because in my
12 doctor-patient interaction with him that wasn't
13 really relevant at that point.
14     In 1996 when I'm seeing Mr. Mazzamuto for
15 his back, for his anxiety after his heart attract,
16 my focus is not based upon how can I best document
17 here his mental status exam so that at some point
18 somebody questions whether or not he truly has
19 anxiety, it will be well documented in the record.
20 I was just trying to take care of his anxiety, his
21 depression. These forms from the insurance company
22 isn't -- is an attempt to basically quantify as best
23 I can what I know about him, and in part upon them
24 what I think reasonable restrictions would be, but
25 they don't show up in the records because at the

Condenseit!™

1 point of the records being made they really weren't
2 relevant to his medical care.
3    Q  But you agree with me, Doctor Bower, that,
4 if Mr. Mazzamuto was telling you, Doc, I'm having
5 problems concentrating at work, I fly off in a rage,
6 I --
7       MR. ANGINO:  Objection.
8       MR. SIMMERS:  Off the video record.  The
9 time is 5:14 p.m.
10       (Off the video record.)
11       MR. ANGINO:  You know he hasn't worked
12 since the year 2000.  How in the world are you
13 asking him questions that he's going to say was he
14 flying off the -- you know, this -- how can you
15 press --
16       MR. WOLGEMUTH:  Mr. Angino, Doctor Bower
17 is testifying that part of Mr. Mazzamuto's
18 disability is his psychiatric condition, which
19 prevents him doing administrative duties, his other
20 type of duties.
21       MR. ANGINO:  Right, but your question to
22 him was is he telling you that he can't do it at
23 work if he's not at work.  I mean, the question I
24 have to say is such that you are implying to this
25 Doctor that Mr. Mazzamuto has been in some way

1 working at all since the year 2000, and as he is
2 working since 2000 he is experiencing things as he
3 tries to work with figures, as he tries to do the
4 job when you took his deposition, you know he hasn't
5 worked since the year 2000.  So that's my
6 objection.
7       MR. WOLGEMUTH:  Okay.  I will rephrase the
8 question.
9       MR. SIMMERS:  We are back on the video
10 record.  The time is 5:16 p.m., and we are now on
11 tape 2.
12       (On the video record.)
13       MR. WOLGEMUTH:  I will rephrase my
14 question, Doctor Bower.
15 BY MR. WOLGEMUTH:
16    Q  Prior to July of 2000 do you agree with me
17 that your office notes don't reflect any type of
18 indication that Mr. Mazzamuto was having problems
19 with concentration at work, with using the ability
20 to focus at work, with being overwhelmed by the
21 details at work, problems supervising employees
22 because of anxiety or depression?
23       MR. ANGINO:  Prior to when?
24       MR. WOLGEMUTH:  July of 2000.
25       MR. ANGINO:  I will have to -- again, I

1 object, and go off the record.
2       MR. SIMMERS:  Off the video record.  The
3 time is 5:17 p.m.
4       (Off the video record.)
5       MR. ANGINO:  Prior to July of 2000 he
6 didn't have his heart attack.  Prior to July of 2000
7 I don't know that his records have anything to do
8 with emotionalism, so--
9       MR. WOLGEMUTH:  When did he have his
10 heart attack?
11       MR. ANGINO:  In July 22 of 2000.
12       MR. WOLGEMUTH:  He hasn't worked since
13 July of 2000, correct?
14       MR. ANGINO:  Pardon me?
15       MR. WOLGEMUTH:  He hasn't worked since --
16       MR. ANGINO:  And he hasn't worked since
17 then.  So you are saying prior to July, how can he
18 have emotional problems -- okay.
19       MR. WOLGEMUTH:  That's my question.
20       MR. SIMMERS:  We are back on the video
21 record.  The time is 5:17 p.m.
22       (On the video record.)
23       THE WITNESS:  Prior to July of 2000 my
24 records do not indicate that he emotional problems
25 which kept him from doing administrative tasks.

1       MR. WOLGEMUTH:  Thank you.
2 BY MR. WOLGEMUTH:
3    Q  Now, Doctor, are you aware that
4 Mr. Mazzamuto has described his responsibilities
5 that he performed at the restaurant to include only
6 executive and office duties?
7       MR. ANGINO:  I'm going to object again.
8 Off the record.
9       MR. SIMMERS:  Off the video record.  The
10 time is 5:18 p.m.
11       (Off the video record.)
12       MR. ANGINO:  You have constantly referred
13 to his application when he applied for insurance
14 back in 1992, and a particular form that he filled
15 out at one time.  You know darn well that he
16 supplied you with a statement he says I have to
17 stand virtually all the time.  So to ask this Doctor
18 if he knows of something, how could he possibly know
19 what you have in your records, which is in his
20 application, and which is a form that he filled
21 out?  So I strongly object to your using such a
22 question to this Doctor as to something that he
23 wouldn't know.
24       MR. SIMMERS:  Back on the video record.
25 The time is 5:19 p.m.

Page 109

1    (On the video record.)
2    THE WITNESS: No.
3  BY MR. WOLGEMUTH:
4    Q  You are not aware of that?
5    A  I'm not aware of that.
6    Q  Okay. And if the records reflected that
7  in this case, Doctor, would it surprise you?
8    A  I would think so, sure, especially seeing
9  him at the restaurant in years gone by.
10   Q  And, Doctor, would -- were you aware that
11 the plan described his duties to include managing
12 employees, preparing work schedules, book work,
13 interaction with food companies, administration and
14 office duties?
15   A  That wouldn't surprise me if they were
16 included.
17   Q  Doctor, were you aware that Mr. Mazzamuto
18 described his duties to include fifty percent
19 supervising, twenty-five percent bookkeeping,
20 twenty-five percent other duties, occasionally
21 lifting five pounds, sitting and standing three and
22 a half hours, walking for an hour?
23   A  That would surprise me, sure.
24   Q  That would surprise you?
25   A  That would surprise me.

Page 110

1    Q  Now, Doctor, I'm going to read some
2  questions and answers from Mr. Mazzamuto's
3  deposition that was taken on May 10, 2002.
4    Question: It looks like you did close to
5  $6 million in actual transactions, buying and
6  selling?
7    MR. ANGINO: Objection.
8    MR. SIMMERS: Off the video record. The
9  time is 5:20 p.m.
10   (Off the video record.)
11   MR. ANGINO: Where he's going on this is
12 that --
13   MR. WOLGEMUTH: Is this an objection or
14 are you coaching the witness to --
15   MR. ANGINO: No, no.
16   MR. WOLGEMUTH: -- respond to a specific
17 question?
18   MR. ANGINO: No. I'm objecting on the
19 grounds --
20   MR. WOLGEMUTH: Let's hear your objection
21 then.
22   MR. ANGINO: The basis of my objection is
23 the relevancy of asking the Doctor for an opinion
24 with regard to his stock investments. I don't think
25 it's within his area to answer questions.

Page 111

1    MR. WOLGEMUTH: Okay. We have it.
2    MR. SIMMERS: Back on the video record.
3  The time is 5:21 p.m.
4    (On the video record.)
5  BY MR. WOLGEMUTH:
6    Q  I'm reading from page 51 of
7  Mr. Mazzamuto's deposition.
8    The question is it looks like you did
9  close to six million in actual
10 transaction as buying and selling?
11   Answer: Well, that is the in and out,
12 yes.
13   I would like to read from page 49 of his
14 deposition.
15   Question: Were you making your own
16 investment buying and selling decisions in 2000?
17   Answer: Yes.
18   Mr. Mazzamuto -- the next question:
19   Mr. Mazzamuto would it be fair to say that
20 in the year 2000 with all these stock transactions
21 that you were following the stock market fairly
22 closely at least on CNN?
23   Answer: Yes.
24   Now, Doctor, Mr. Mazzamuto was asked if
25 the things I just discussed with you caused any

Page 112

1  anger and anxiety. His answer was no.
2    Now, my question to you, Doctor, is do you
3  agree with me that Mr. Mazzamuto's ability to be a
4  stock trader, to make investment decisions himself,
5  to lose over $300,000 trading stocks, to invest it
6  and brought over $6 million in stocks in one year
7  would be inconsistent with his alleged inability to
8  perform his supervisory and other office duties due
9  to his anxiety and depression?
10   MR. ANGINO: I have to object again, but
11 I don't need to go off the record. It's -- all of
12 the things that you have been asking him is subject
13 to my first objection. Go ahead.
14   THE WITNESS: Well, I guess it depends
15 upon when during the year 2000 this all happened,
16 you know, how much of it was pre-heart attack, and
17 how much post-heart attack. You know, again, I
18 think that it -- if he did successfully -- now, if
19 he lost $300,000, maybe he wasn't do so well. I
20 don't know. I mean, I think if he was a wheeler
21 dealer, and closing business deals, you know, yes,
22 that would go against some of the other things we
23 had talked about all together, but the year 2000
24 includes seven months before his heart attack and
25 five months after his heart attack, and I don't have

CondenseIt!

## Page 113

1 the specifics, and maybe you don't either, as to
2 when that all happened, were most of those trades
3 before, were most of them after, I don't know.  So,
4 again --
5 BY MR. WOLGEMUTH:
6    Q  Well, Doctor, I believe the records will
7 reflect that the transaction occurred during the
8 entire year of 2000 and into 2001.  And my question
9 is do you agree that engaging in that type of
10 activity's inconsistent with his complaints of
11 anxiety and lack of focus and concentration doing
12 simple administrative tasks?
13    A  It could be inconsistent if it was a
14 persistent pattern, sure.
15    Q  And, again, Doctor, Mr. Mazzamuto
16 testified that doing those activities didn't make
17 his anxious or didn't make him angry.  Is that
18 consistent with somebody that is anxious, and
19 somebody that is suffering from depression?
20    A  I don't think it's consistent, but I think
21 it also flies against what has been told to me by
22 his wife, and other, you know, things that have
23 happened at the restaurant, and whether his story,
24 you know, again -- again, it is inconsistent.
25    Q  Doctor, I believe that your office notes

## Page 114

1 had reflected that Mr. Mazzamuto's psychiatric
2 condition actually became worse during the course of
3 2001?  Do you agree with that statement?
4    A  I do.
5    Q  Okay.  And, again, do you agree with me
6 that at that time -- at that time you didn't refer
7 him to a psychiatrist or psychologist?
8    A  I agree with that one hundred percent.
9    Copy of letter dated April
   16, 2002 from Ms. Trudy
10   McGraw, The Wellington,
   from Douglas J. Bower,
11   M.D. - produced and marked
   for identification as
12       Exhibit No. D-2.
13    Q  Doctor, I want to show you what I have
14 marked as D-2, and this letter has been previously
15 identified, but since I have them connected, I will
16 just give you both of them.
17       Doctor, this report that was dated April
18 16, 2002, it was addressed to Trudy McGraw.  Do you
19 know who that person was or is?
20    A  I do not recall.  We get so many requests
21 from so much information from so many different
22 people.  I cannot -- my recollection is that she was
23 a nurse, but working for either a legal firm or a
24 insurance firm or some -- but I -- at this point I
25 can't tell you who she is.

## Page 115

1    Q  Was it possible that this letter was
2 drafted and in effort to Mr. Mazzamuto's Social
3 Security application?  Would that ring a bell?
4    A  Yeah, that sounds right.  When he was --
5 well, it might have been another legal person who
6 was working for Social Security --
7    Q  I'm sorry.
8    A  -- and just wanted another summary of his
9 condition.
10    Q  Okay.  And were you aware as to the reason
11 of this individual's request as to why you were
12 drafting a report?
13    A  Sure.  Yeah.
14    Q  So you knew it was going to assist him in
15 his --
16    A  It was going to document -- or to support
17 his claim for disability through Social Security.
18    Q  Okay.  So you were aware then that the
19 federal government was going to rely on your opinion
20 that you express in this letter in making a
21 determination of his benefits?
22    A  Uh huh (yes).
23    Q  Now, Doctor, I believe at that time on
24 April 16, 2002, in the first paragraph you basically
25 found him severely limited in his ability to stand,

## Page 116

1 bend or sit for prolonged periods of time, and is
2 unable to work as a result of that reason?
3    A  Correct.
4    Q  And then you identified a second problem,
5 and perhaps even more severe problem, is that of his
6 chronic anxiety and depression?
7    A  Correct.
8    Q  So as of April 16, 2002 you believed that
9 the anxiety and depression was a more severe problem
10 than the back condition?
11    A  It was perhaps.  Again -- you know, again,
12 it's very hard to rank these things all the time,
13 but, again, I think I wanted to stress the fact that
14 probably at that point his anxiety was a major
15 problem, and it was one of the things that was
16 interfering with his ability to improve in that he
17 was smoking, in that he was gaining weight, in that
18 he -- you know, again, wasn't -- couldn't really
19 deal with the possibility of surgery.  So, yeah,
20 it's a confounding factor in everything else.
21    Q  Okay.  And I believe the -- you identify a
22 third problem, and that is of coronary artery
23 disease?
24    A  Right.
25    Q  Now, you agree with me that he has

CondenseIt!™

Page 117

1 coronary artery disease, but his heart is stable?
2    A  His heart is stable at this point.
3    Q  Okay.  So the heart wouldn't have been
4 disabling as of April 16 --
5    A  As of April 16 it -- and as of today I
6 don't think it's disabling.
7    Q  Okay.  Doctor, I believe you touched upon
8 this in your direct testimony, but you say because
9 of his severe anxiety he's even unable to even
10 consider the possibility of back surgery as he's
11 extremely fearful that the surgery will render him
12 either paralysed or induce further myocardial
13 infarction?
14    A  Correct.  That was his opinion especially
15 back when the subject of surgery was first being
16 thrown around after he saw Doctor Gelb, that he
17 didn't -- he, in fact, told me that he just wouldn't
18 consider it.
19    Q  Doctor, you would agree with me that that
20 fear is a complete irrational fear?
21    A  The fear of a heart attack I think is an
22 irrational fear.  The fear of a not successful
23 outcome, whether it's paralysis or just that you are
24 left no better -- again, a standard line I use for
25 my patients is that back surgery is a -- it's a

Page 118

1 court of last resort.  When you can no longer go on,
2 you go for back surgery because there is no
3 guarantee of success, and there's no guarantee of
4 improvement, and at times there's worsening.  So
5 that part of it I don't think is -- maybe paralysis
6 is irrational, though, again, look at any informed
7 consent that is required these days, and it's
8 there.  And if -- you know, if you a little hesitant
9 to begin with, and you were told there's a risk of
10 paralysis, a risk of impotence, a risk of bleeding,
11 a risk of infection -- you know, these are what we
12 are required to tell people these days when we do
13 things to them.  Even if they are not highly likely,
14 we got to tell them, and that does scare people.
15 And, again, you know, this was a year plus -- almost
16 a year ago.  Again, I'm not sure whether he would
17 have that same opinion today, but at the time that
18 this was all going on, and when he first saw Doctor
19 Gelb -- because clearly you don't send somebody to a
20 back surgeon if you already know that, you know,
21 they don't want to have surgery, but it was after he
22 met with Doctor Gelb, and after Doctor Gelb
23 explained things to him that he said no way, not
24 getting close to me.
25    Q  Is the opinion that surgery will not help

Page 119

1 him or will help him?
2    A  The opinion is that surgery may help him,
3 and you can -- I don't know if you have Doctor
4 Gelb's records in your file, but, again, you can
5 read his actual things that he told him.
6    Q  Doctor, I'm going back to the anxiety and
7 depression.  I believe you report that the condition
8 has been what -- somewhat refractory to multiple
9 medical interventions?
10    A  Correct.
11    Q  Does that mean --
12    A  That we tried several different
13 medications, and, you know, again, he had periodic
14 worsening.  I think these days it's a little better,
15 but, again, at the point of that -- at the time of
16 that letter, yeah, we had tried several things, and
17 it still wasn't, you know, satisfactory.
18    Q  Okay.  So back in April about a year ago,
19 April of 2002, you had tried various medical --
20 various medicines, and they weren't working that
21 well?
22    A  They were not getting the effect of
23 totally relieving his anxiety, correct.
24    Q  Presently that's better?
25    A  I believe it is better.

Page 120

1    Q  And has -- have you changed medications?
2 Have you changed something to make it better?
3    A  I think his circumstances have changed.
4 He's -- like I said, he's basically been ejected
5 from the restaurant, so he's not involved in that on
6 a regular basis any more.
7    Q  And to your knowledge, Doctor, he hasn't
8 worked at the restaurant since July of 2000, right?
9    A  Again, I don't know how -- you know, has
10 he been in the restaurant, I'm sure he's been in the
11 restaurant a lot.  Now, what constitutes work is a
12 whole other problem.  I mean, that I don't know.
13 Again, he's still the owner of the restaurant, he
14 goes in there, he eats there, his family is there.
15 Does he pick up something once when he's there, I
16 have no idea, I don't spy on him.
17    Q  Okay.  So you --
18    A  I don't know.
19    Q  What you are saying is, Doctor, from July
20 of 2000 to the present you are not really certain
21 what his responsibility have been there?
22    A  I'm not sure what his actual activities
23 have been there.
24    Q  Fair enough.  Did you consider, Doctor,
25 treating that fear that he expressed to you about

CondenseIt!™

Page 121

1  his back surgery? Is that something you would treat
2  as a physician treating people with psychiatric
3  and --
4      A  Well, we were, we were treating his
5  anxiety. I mean, I don't know that there's a
6  specific fear of back surgery treatment, but, I
7  mean, again, we were -- we have continually altered
8  his medications when it comes to his anxiety and
9  things like that.
10     Now, if somebody doesn't want to have
11 surgery, can you coerce them into it or can you --
12 again, you know, people have different thoughts
13 about that, and, you know, again, is it irrational
14 to fear back surgery? Well, maybe it's irrelevant
15 to think you are going to get a heart attack from
16 it, and maybe it's irrational to think you are going
17 to be paralyzed, but is it irrational just not to
18 want to have surgery, again, I don't know whether
19 that's irrational. But, no, we didn't do any
20 specific therapy in an effort to make him more
21 agreeable to having surgery.
22     MR. WOLGEMUTH:  Okay. Just go off the
23 record for a second.
24     MR. SIMMERS:  Off the video record. The
25 is time is 5:34 p.m.

Page 122

1      (Off the record.)
2      MR. SIMMERS:  Back on the video record.
3  The time is 5:36 p.m.
4      (On the video record.)
5  BY MR. WOLGEMUTH:
6      Q  Just so I understand it, Doctor, as of
7  today, as of March 26, 2003, you are claiming that
8  his back condition is his most disabling condition,
9  and his psychiatric condition is secondary?
10     A  Correct. I think that's the ranking as I
11 now see it.
12     Q  Okay. And, Doctor, when I took your
13 deposition back in April 16, 2002, was your opinion
14 different?
15     A  I think at that point the anxiety symptoms
16 were higher, and I think, you know, again, he was
17 still -- again, when I look at him as a patient, I
18 see beyond just these issues, and he's smoking, he's
19 gaining weight, you know, I see the realm of the
20 heart issue coming back onto the scene. It's not a
21 present problem, but all that stuff I think was
22 smoldering back then as well, that his weight was
23 going up, he wasn't taking care of himself, he
24 wasn't doing any activity of any kind, you know,
25 and, again, I think that at that point my opinion of

Page 123

1  him was that the anxiety was the thing that was
2  putting most of the risk into his life, and was more
3  apparent to him at that point than anything else.
4  It was also something did, again, kept him from
5  considering surgery.
6      Since that time he hasn't been working.
7  He seems to be doing better from a mental
8  standpoint, but his back doesn't seem like it's
9  getting any better. So I think those probably have
10 flipped flopped over the last couple of years. The
11 anxiety after the heart attack was severe for a
12 while. It peaked and valleyed. We changed things
13 around. Time has gone by, I think the anxiety has
14 lessened, but, you know, it's still there. He
15 still, you know, again, has symptoms, but I think
16 the back is clearly his major disabling feature at
17 this point.
18     Q  Okay. And I just want to read a portion
19 of your testimony, Doctor, just to make sure -- to
20 make sure that this -- what I'm reading summarizes
21 your current or you opinion as of April of 02. I'm
22 reading from page 58, beginning on line 19:
23     My opinion, and I have stated several
24 times, it's his psychiatric problems right now that
25 are his primary limiting factor. His back problem

Page 124

1  runs a close second.
2      A  That's what I -- yes, that's true.
3      Q  Okay. And that was your opinion as of
4  April of O2?
5      A  That was my opinion as of a year ago,
6  correct.
7      Q  One or two more questions, Doctor. You
8  had testified on direct that while treating
9  individuals with severe psychiatric problems that
10 you have on occasion referred them?
11     A  Huh uh (yes), I have.
12     Q  Where did you refer them?
13     A  We have gotten a psychiatrist, Doctor
14 Rosenthal, who's local now. Again, he doesn't see
15 people quickly, and he doesn't seem them often, but
16 he's available. You know, these are people that,
17 you know, again, that we really have no great
18 experience in managing, people who become psychotic,
19 people who -- you know, schizphrenics, and things
20 like that, and just, you know, people who just
21 aren't functioning whatsoever.
22     But, yeah, we do have -- there's a couple
23 -- there's the Stevens Center, but, again, the
24 problem with the Stevens Center is it takes a long
25 time to get in, and then the personnel is constantly

Condensclt!

Page 125

1 changing, and there's a lot of dissatisfaction of
2 what happened to people once they are there, and
3 it's local. There are psychiatrists there, but,
4 again, it's just not a great resource because
5 there's no continuity, you see somebody for a month
6 or two, and then it's a new body, it's a new face.
7 And, again, they will take a fifteen minute, you
8 know, how's it going, great, here's your medicines,
9 good-bye. And so those options didn't see like they
10 would add significantly to his care.
11    Q Okay. And you do agree that there are
12 plenty of psychiatrists in the Harrisburg area?
13    A Again, I guess a better question is are
14 there plenty of available psychiatric patient
15 appointments available in Harrisburg, and that I
16 don't know. There is certainly a shortage of
17 psychiatric and mental health care in general in
18 central Pennsylvania. I don't know how many
19 psychiatrists there are in Harrisburg.
20    Q Okay. Fair enough, Doctor. Doctor, you
21 had testified that -- excuse me -- that
22 Mr. Mazzamuto is walking or his posture has --
23 includes like a little -- what do you call it, a
24 hunch or a stoop?
25    A Yeah, he just -- he leans forward. He

Page 126

1 leans forward.
2    Q And you also I believe stated that you had
3 seen the video that Mr. Mazzamuto had made of his
4 day in the life of the --
5    A I did.
6    Q -- restaurant? When you viewed that
7 video, did you observe him having that stoop or that
8 problem, you know, with his back?
9    A In the video he actually seemed to have
10 more of a stoop then I have observed him be here.
11    Q More of a stoop?
12    A More of a stoop.
13    Q Okay. Final question, Doctor.
14 Mr. Mazzamuto has L3-L4 stenosis?
15    A He has L2 through L5 stenosis, worse at L3
16 -- maximum at L3 as of 1996.
17    Q Okay. You stated that correctly. I
18 didn't mean to misrepresent it.
19    A That's okay.
20    Q The nerve roots that come out at L3-L4,
21 what parts of the legs do they feed? What's -- the
22 dermatomes or am I stating that correctly?
23    A Well, again, the thing is he's not -- he's
24 not actually -- the nerve roots are not really what
25 seems to be impinged as much as the spinal cord.

Page 127

1    Again, he doesn't have the impingement on the
2 outside as my understanding where the nerves are
3 coming out, the cord itself is being compressed.
4    So it's not as -- see, with a disk, you
5 very clearly often just pinch a nerve at a
6 particular place, which gives you one side symptoms
7 in a very defined dermatomal distribution. But,
8 again, my understanding from reading the reports is
9 that his problem is more of the entire complex, if
10 you look at it, is being pressed backwards. It's
11 not necessarily just this nerve root being clipped.
12    So he's going to have -- again, he doesn't
13 have a pure L2 radiculopathy or 2 -- L-4 because,
14 again, when you have a ruptured disk, it's usually
15 unilateral, it's on one side, and it's very focal.
16    He has diffuse bilateral leg pain. So --
17 so, again, it's not the same as a nerve root
18 problem. I mean, I don't think his -- his is not a
19 nerve root problem, it more of the cord itself is
20 being pressed, and the cord has all the fibers from
21 all the roots at that level down, so it could hit
22 anything.
23    Q So if there's compression on the cord,
24 that pressure could reflect on symptoms on any --
25 various types of distribution?

Page 128

1    A Well, on both sides because, again, the
2 nerve -- it's the fibers that are in the cord,
3 little pieces of them then branch out, and become
4 the nerve roots. If you pinch it at the cord, what
5 you can get any of those fibers regardless of which
6 root they are going to eventually become. If you
7 get pinched at this opening here, it gets one purely
8 defined root, and, again, and that's the things that
9 really lay out nicely in a dermatomal distribution,
10 and that may clip off a particular reflex or be numb
11 along the side, or the front, or the back of the
12 leg, or go down the back, which is consistent with
13 sciatica.
14    But he has bilateral symptoms, and he has
15 them in both sides and they are more diffuse than
16 that, and, again, my understanding of why that was
17 is that, again, it's not a clean nerve root problem
18 from a lateral compression, it's a cord being
19 pinched by the central canal. That's why it's a
20 central stenosis rather than a radicular symptom on
21 one side or the other. He has bilateral symptoms.
22    MR. WOLGEMUTH: Thank you, Doctor.
23 That's all the questions I have.
24         REDIRECT EXAMINATION
25 BY MR. ANGINO:

Condensed!t!

Page 129

1  Q Doctor, we will try to kind of go through
2 some things in a summary fashion.
3      Mr. Mazzamuto's date of birth is what?
4  A 5/25/55.
5  Q So May of 1955?
6  A Correct.
7  Q So that as of 1992 he would have been like
8 forty-seven or so?
9  A 1992. No, he would have been
10 thirty-seven.
11  Q Thirty-seven?
12  A Thirty-seven.
13  Q So in 1992 he was thirty-seven, and at
14 that time he was already diagnosed as having the
15 stenosis, is that correct?
16  A No. I think the diagnosis of stenosis
17 came in 96. I think he's had -- he had back pain
18 which predates my involvement, but when I fill out
19 the forms and they say have you ever had a similar
20 condition in the past, the back pain, looking back
21 through the notes when Doctor Robinson took care of
22 him, I found that he had had back pain back in
23 1992. I don't think it was diagnosed as spinal
24 stenosis at that point.
25  Q I think the record will show by the time

Page 130

1 your testimony comes forth that there was an x-ray
2 back in 1992 that did show the stenosis, and if that
3 is true, then there would have been an x-ray as
4 early as 1992 when Mr. Mazzamuto was thirty-seven
5 years of age showing already a stenosis, is that
6 right?
7  A If there's an x-ray, yes, that's true.
8      MR. WOLGEMUTH: Okay. Objection.
9      MR. SIMMERS: Off the video record. The
10 time 5:45 p.m.
11      (Off the video record.)
12      MR. WOLGEMUTH: I'm not aware of any 1992
13 x-ray, so I'm just objecting to preserve --
14      MR. ANGINO: Sure, preserve it. You will
15 find though that there was something when he was in
16 a hospital, but his back was x-rayed and there was
17 because that's why they tried to get out of in
18 1996. They were contending that he knew --
19      MR. WOLGEMUTH: Knew of that condition of
20 that or something?
21      MR. ANGINO: Yeah. So you will find
22 that.
23      MR. SIMMERS: We are back on the video
24 record. The time is 5:46 p.m.
25      (On the video record.)

Page 131

1 BY MR. ANGINO:
2  Q Doctor, from what I understand from your
3 testimony Mr. Mazzamuto's stenosis is a combination
4 of a congenital condition where he has a narrow
5 canal, and what we call degenerative arthritis, is
6 that correct?
7  A Correct, but, again, the arthritis
8 component would be more laterally, it doesn't seem
9 to be contributing. It seems that the congenital
10 part of it is just gradually increasing.
11  Q All right. So this congenital component
12 as he got older it's getting narrower and narrower,
13 is that right?
14  A Correct.
15  Q So that what we have is a man who already
16 at thirty-seven is having back pain, is already
17 showing up, if it does show up, in an x-ray as being
18 stenosis already there. By the time 1996 comes by
19 we are talking in terms of another four years, so
20 he's now at forty-one years of age, and you were
21 asked questions about some records back in 1996.
22 This was the same time period where I asked you
23 questions as to the MRI, and you read about the MRI,
24 but if you look at your notes with regard to those
25 early periods of time, I'm looking at what appears

Page 132

1 to be -- it's cut off here -- 24 of 96. Do you
2 know --
3  A Right.
4  Q That particular period of time here what
5 it's saying is his legs have been getting numb.
6 Last night he got out of bed. He fell down because
7 of the numbness, is that right?
8  A Correct.
9  Q And if you turn to the next, it's May    29
10 of 1996, legs have a pinching sensation. Very weak
11 yesterday. Lower back pain. Fell yesterday. Legs
12 gave out, is that correct?
13  A Correct.
14  Q So we are talking now thirty-seven,
15 forty-one. Now, four years later in the year 2000
16 he is now forty-five years of age in the year 2000,
17 is that right?
18  A That's correct.
19  Q And what's your opinion about is this
20 going to continue to get worse, continue to get
21 narrower, so when he's age forty-one narrower than
22 it was when he was age thirty-seven?
23  A I think it will continue to progress.
24  Q Okay. And the situation is that back when
25 he was thirty-seven in 1996 you did write some of

CondenseIt!

## Page 133

1 those forms for the same New York Life Company
2 that's involved in this case, is that right?
3     A  That's correct.
4     Q  And back in that period of time he was
5 doing the same job, is that right?
6     A  That's correct.
7     Q  And, Doctor, we know from the records that
8 they paid him for his loss in 1996.
9     MR. WOLGEMUTH:  Objection.
10     MR. SIMMERS:  Off the video record. The
11 time is 5:49 p.m.
12     (Off the video record.)
13     MR. WOLGEMUTH:  Again, what we did in
14 1996 is not relevant to what we did in 2000.
15     MR. ANGINO:  All right.  Back on the
16 record.
17     MR. SIMMERS:  Back on the video record.
18 The time is 5:49 p.m.
19     (On the video record.)
20 BY MR. ANGINO:
21     Q  Doctor, in 1996 the only condition that he
22 had for which you filled out the forms was the back,
23 is that right?
24     A  That's correct.
25     Q  By the time the year 2000 came about, and

## Page 134

1 you started filling out the forms, you had three
2 conditions then, is that right?
3     A  That's correct.
4     Q  You had the heart, you had the back, and
5 you had the emotional element, is that right?
6     A  That's correct.
7     Q  And, Doctor, with regard to the back, from
8 what you have told us the back was even worse than
9 in 2000 than it would have been in the year 1996,
10 he's four years older, and now he also has an
11 emotional component, is that right?
12     A  That's correct.
13     Q  Would you expect the emotional component
14 to make his condition worse as far as doing a job of
15 any sort?
16     A  When it's bad, yes.
17     Q  Okay.  Doctor, I have been listening
18 patiently for the questions that have been asked of
19 you, and when I was out in your waiting room there I
20 saw a woman in a wheelchair.  I assume occasionally
21 you have patients who are in wheelchairs, is that
22 right?
23     A  That's correct.
24     Q  And those patients in wheelchairs probably
25 can call a supplier, and get certain supplies in, is

## Page 135

1 that right?
2     A  Some of them who are mentally fit, yes,
3 they can.
4     Q  And a number of the questions that defense
5 was asking you about can you do some books, can you
6 call some suppliers, can you -- even quadriplegics
7 can do that, is that right?
8     A  With the right equipment, sure.
9     Q  Sure.  So even somebody who has no arms,
10 has no legs certainly can do the types of things
11 that he was asking you questions can
12 Mr. Mazzamuto do, such as do some books or make some
13 calls or even supervise, is that right?
14     A  Under extreme conditions, I guess sure.
15     Q  Sure.  So when you were asking questions,
16 and you were filling out forms, when you use the
17 world total disability, were you using a practical
18 definition of whether somebody can go out and get a
19 job and do the job?
20     A  My opinion was for the global -- the
21 global assessment of the entire patient as to
22 whether or not he could fulfill his job requirements
23 or do his job.
24     Q  And as far as you understood his job, it
25 was a man who was standing behind a counter, it was

## Page 136

1 a man who was walking around, it was a man who was
2 cooking at times, it was a man who was lifting at
3 times, as well as ordering some things, and picking
4 up the orders, it involved that global -- that --
5 all of those things, is that right?
6     A  That was my understanding of his job.
7     Q  And so that if he couldn't do all of those
8 things, then it was your opinion he was totally
9 disabled, is that right?
10     A  That's correct.
11     Q  And as far partial disability, would you
12 assume at least from a practical standpoint since we
13 are dealing with potentially a legal issue, is that
14 you can only do a part of your job, but you still
15 can put in an eight-hour day, you can still do forty
16 hours a week, somebody will still hire you, is that
17 right?
18     A  Yes.  Partial disability in my way of
19 thinking is that you have restrictions as to what
20 you are allowed to do, but you still fulfill most of
21 the requirements of your job.
22     Q  One thing I heard that was really strange
23 was he said now the MRI was taken in 1996, but the
24 EEG was taken later.
25     MR. WOLGEMUTH:  Objection.

Page 137

1    MR. ANGINO:  Do you remember that
2 question?
3    MR. WOLGEMUTH:  It was an EMG.
4    MR. ANGINO:  Okay.  I'm sorry.  I will
5 rephrase it.
6 BY MR. ANGINO:
7    Q  Doctor, do you recall a question being
8 asked of you that an MRI was taken in 1996, but an
9 EEG --
10   A  EMG.
11   Q  -- EMG, was taken later?
12   A  I do.
13   Q  The fact that an MRI was in 1996, if you
14 would take that test later, the condition would not
15 be better, is that right?
16   A  My assumption would be it would either be
17 the same or worse.
18   Q  That's right.  So actually the fact that
19 the MRI was 1996, and we are now into the year 2003,
20 the assumption is that his back condition from an
21 MRI is worse or at least the same, is that right?
22   MR. WOLGEMUTH:  Objection.  Objection.
23   MR. SIMMERS:  Off the video record.  The
24 time 5:53 p.m.
25   (Off the video record.)

Page 138

1    MR. WOLGEMUTH:  You are asking the Doctor
2 to speculate.  There is no current MRI.
3    MR. ANGINO:  Okay.  Back on the record.
4    MR. SIMMERS:  Back on the video record.
5 The time is 5:53 p.m.
6    (On the video record.).
7 BY MR. ANGINO:
8    Q  Doctor, are you certain as far as
9 reasonable certainty in medicine could be that, if
10 an MRI showed a condition in 1996, and you took an
11 MRI today in 2003, it would be at least as bad, if
12 not worse?
13   A  In this condition, yes.
14   Q  Yes.  You don't get better from this
15 condition as far as an MRI shows?
16   A  The bony changes don't change, no.
17   Q  And, Doctor, there is a mention -- a
18 person you mentioned on several occasions, Doctor
19 Gelb, is it?
20   A  Doctor Gelb.  G-E-L-B.
21   Q  And Doctor Gelb is an orthopedic surgeon,
22 is that right?
23   A  He was the orthopedic surgeon in charge of
24 back surgery at Hershey Medical Center.
25   Q  So here's a man with the credentials of

Page 139

1 being an orthopedic surgeon in charge of back
2 surgery at Hershey Medical Center, and when I had
3 asked you questions earlier about when you were
4 looking for somebody for specialist to do surgery,
5 you would refer them to orthopedic surgeons, and
6 that is the type of person that Doctor Gelb was, is
7 that right?
8    A  Either an orthopedic surgeon who does back
9 speciality or a neurosurgeon.  I think even then you
10 want to go to somebody who specializes primarily on
11 the back since there are orthopedic surgeons who
12 spend most of their time doing hips and knees and
13 shoulders, but Doctor Gelb was a back only
14 gentlemen.
15   Q  And Doctor Gelb would be the type of
16 physician upon whom you would rely, refer, and
17 utilize in your treatment and care, is that right?
18   A  Correct.
19   Q  And Doctor Gelb confirmed, did he not,
20 your diagnosis that he has this stenosis, is that
21 right?
22   A  It was his opinion in the letter that he
23 had the stenosis, and that his symptoms were coming
24 from it, and that surgery would be an option.
25   Q  So that basically he supported what you

Page 140

1 were doing in terms of prescribing medication for
2 back pain coming from a stenosis, is that right?
3    A  He did.
4    Q  But he said there might be another option,
5 is that right?
6    A  He said that surgery might be another
7 option.
8    Q  And as far as surgery, you said there are
9 various reasons to go with surgery or not to go with
10 the surgery, and a decision either way would be a
11 rationale one, is that right?
12   A  That's correct.
13   Q  Now, much of the questioning asked of you
14 dealing with the emotional element, when you work
15 with your medical records, and somebody comes in,
16 and they say to you I'm depressed, or I'm irritable,
17 or my wife and I are having some real problems
18 emotionally, and things like that, do the medical
19 records generally show what the effect of the
20 anxiety is on someone's daily life?
21   A  Sometimes they do, and sometimes they
22 don't.
23   Q  Okay.  But when you use the word labile,
24 what do you mean?
25   A  Rapidly changing.

1   Q  So that one minute you are happy, the next
2  minute you might be sad, you may be responding to
3  something that's insignificant in an abnormal way,
4  would that be fair?
5   A  I think that would be correct.
6   Q  And with regard to that, assuming that a
7  lot of the questions asked of you dealt with the
8  period of 2000, 2001, 2002, and now we are into
9  2003, assuming that Mr. Mazzamuto is not even
10  working at that time, whether the emotional
11  condition is primary or close or whether the back is
12  a close second, you are giving these relevant
13  positions not in terms of his work, but in terms of
14  the way he appears, is that right?
15   A  That's correct.
16   Q  So that although the questions asked of
17  you in a case of law where we are dealing with
18  disability could be misinterpreted by the jury as to
19  have to do with his work, you were using it not in a
20  work context?
21   A  That's correct.
22   MR. ANGINO:  I have no further questions.
23   MR. WOLGEMUTH:  Three or four questions,
24  Doctor.
25      RECROSS EXAMINATION

1  BY MR. WOLGEMUTH:
2   Q  Counsel just asked you a question as to,
3  you know, if you were reviewing Mr. Mazzamuto's
4  position at his restaurant to include things like
5  lifting, and cooking, and ordering, and supervising,
6  and look at it globally, I believe your testimony is
7  that you believe he is unable to perform those
8  duties?
9   A  That's correct.
10   Q  Now, if you were wrong in your assessment
11  of what he does there, do you agree that your
12  opinion would be incorrect?
13   A  Well, if my opinion of what he does is
14  wrong in that he is current -- or he is able -- he's
15  doing all those things, well, yeah, it would be
16  wrong.
17   Q  I think you are misunderstanding my
18  question.  If -- in fact, Doctor, if Mr. Mazzamuto
19  doesn't do or wasn't doing a lot of lifting, and a
20  lot of cooking, and a lot of heavy work like that
21  prior to, you know, his heart attack in July of
22  2000, if he wasn't doing those duties, but doing
23  more administrative and more supervisory duties,
24  would you agree that the opinion you are rendering
25  pursuant to Mr. Angino's question would be

1  incorrect.
2   MR. ANGINO:  I have to object just
3  because you left out the main thing, the standing.
4   MR. WOLGEMUTH:  Okay.  I will do the
5  standing.
6   MR. ANGINO:  Because that's the principal
7  one, yeah.
8   MR. WOLGEMUTH:  Okay.  I will include
9  standing as one of his --
10   THE WITNESS:  Right.  It could be wrong
11  under some conditions though.  Again, there have
12  been times when his emotional state would have
13  prevented him from doing some of those things, and
14  there are times when probably it wouldn't have.
15  BY MR. WOLGEMUTH:
16   Q  Okay.  So, Doctor, what I hear you saying
17  that -- that presently, you know, again, looking at
18  all those job duties, Mr. Mazzamuto could do some of
19  those duties?
20   A  He could do some of those duties for some
21  period of time.  Now, what the result of that would
22  be on whether his symptoms would flare again, would
23  the anxiety rebound, would his back get worse, I
24  don't know.
25      Now, as I said before, anybody can do

1  almost anything now and again for a short period of
2  time in an extreme circumstance, but when I'm
3  looking at this disability, my understanding is is
4  it's something he can kind of do day in and day out
5  on a regular basis, and again, I think he could
6  probably do some of those things some of the time,
7  but, you know, based on what he -- where he's been
8  before, you know, if he's back there doing
9  administrative things, and suddenly something is
10  going wrong, and he can't really do anything about
11  it because his back holds him back, could he get all
12  emotional again, could he get -- you know, fly off
13  in a rage, could he do all those things that he was
14  doing for a period of time, I think it's possible to
15  go back.  It's possible it couldn't, and I don't
16  know that.  I can't see the future.
17   Q  Okay.  And, Doctor, Mr. Angino had asked
18  you about, you know, the development of stenosis,
19  and the progression of stenosis.  Would you agree
20  with me that surgery could relieve the effects of
21  stenosis?
22   A  Surgery can relieve it in many cases, but,
23  again, the result are always you don't know.
24   Q  Okay.  And do you agree, Doctor, that
25  something like steroid shots that, in fact,

Page 145

1 Mr. Mazzamuto gets, could also alleviate the
2 symptoms of stenosis?
3    A  Well, they can, but he has had numerous
4 rounds of them, and they have been short-lived at
5 best, and they come back.  Stenosis is harder to
6 deal with than a herniated disk because, again, you
7 are dealing what a bony problem, and bones don't
8 regress.  There's always a little inflammation
9 around the bones, the soft tissues could swell, and
10 that's why you can get these varying symptoms, but
11 the problem is the bone in a stenotic canal it's
12 always bone, it's always hard, and it doesn't
13 change.  It doesn't shrink, it doesn't move, it
14 doesn't go anywhere.  It's the surrounding tissues
15 that you might have a little impact with.
16        With a ruptured disk because that's a
17 gelatinous material, things like steroid shots and
18 stuff are often much more beneficial, and can you
19 give you much more long lasting success, but
20 Mr. Mazzamuto has had numerous epidural steroid
21 shots, and even when he gets them now, sometimes
22 they seem to give him some benefit for a while,
23 sometimes they don't.  But this is a harder thing to
24 treat with medicine and epidural steroid injections
25 because of the nature that it's a bony encroachment,

Page 146

1 it's not a soft tissue problem primarily.
2    Q  Okay.  And the surgery, what would they
3 do, they would try to take out the bony
4 impingements, is that --
5    A  No.  Well, usually what they do is they
6 actually take off the backs of the spine here to
7 open up the canal from the other side.  Now, can
8 they get in there and try to shave things away, I
9 don't know the details of that kind of surgery, but
10 when they do a decompression, they usually take out
11 some of these posterior elements because, again,
12 it's being pushed from this side, so if you pull
13 thing off on that side, it gives it more room, more
14 places to expand.
15        MR. WOLGEMUTH:  That's all the questions
16 I have, Doctor.
17        MR. ANGINO:  Thank you.
18        MR. SIMMERS:  This concludes the
19 deposition.  The time is 6:03 p.m.
20        I hereby certify that the proceedings and
21 evidence taken by me in the within matter are fully
22 and accurately indicated in my notes, and that this
23 is a true and correct transcript of same.
24
25        Mary Ann Still

From : McGraw Hait & Deitchman        PHONE No. : 975 9446        Aug.02 2002  3:54PM  P01

# SOCIAL SECURITY ADMINISTRATION
## Office of Hearings and Appeals

## DECISION

**IN THE CASE OF**

**CLAIM FOR**

VINCENZO MAZZAMUTO
(Claimant)

Period of Disability and
Disability Insurance Benefits

(Wage Earner)

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
(Social Security Number)

## INTRODUCTION

On April 24, 2001, the claimant protectively filed an application for disability insurance benefits. The claim was denied initially, and a Request for Hearing was timely filed on October 1, 2001. Because there is sufficient evidence to establish disability based upon the evidence in the record, an oral hearing was not held. The claimant alleges disability beginning July 22, 2000 due to stenosis of the spine, a heart attack, and stress (Ex. 1E). Trudy H. McGraw, an attorney, represents the claimant in this matter.

The general issue is whether the claimant is entitled to a period of disability and disability insurance benefits under Sections 216(i) and 223 of the Social Security Act. The specific issue is whether he is under a disability, which is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

With respect to the claim for disability insurance benefits, there is an additional issue pertaining to insured status. A review of the claimant's earnings record reveals that he has earned sufficient quarters of coverage to remain insured at least through the date of this decision.

After careful consideration of the entire record, I conclude that a fully favorable decision on behalf of the claimant is appropriate at step five of the sequential evaluation process.

## EVALUATION OF THE EVIDENCE

Exhibit B

VINCENZO MAZZAMUTO (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)

The claimant is a 47-year-old individual with a limited seventh grade education and past relevant work as a restaurant owner. He has not engaged in substantial gainful activity at any time since the alleged onset date.

The claimant has the following medically determinable severe impairments: degenerative disc disease and coronary artery disease. The medical evidence of record establishes that the claimant has a significant history of low back pain since at least 1996. The medical records reveal that the claimant experiences severe low back pain, which has been chronic and unrelenting despite numerous aggressive interventions. Treatment records show that the claimant has been on multiple medications, that he has received physical therapy, that he has received treatment from a pain clinic, and has received numerous local epidural steroid injections, all of which have only minimally attenuated his symptoms. In addition to debilitating back pain, the evidence also establishes that the claimant suffered a myocardial infarction and required cardiac catheterization on July 24, 2000. Although the evidence establishes that the claimant's coronary condition is relatively stable, he continues to experience debilitating back pain. An August 4, 2000 medical report indicates that the claimant was experiencing worsening back pain with radiculopathy into the posterior aspect of both thighs. On March 12, 2001, the claimant was still complaining of back pain going down his right buttock and down into his leg as well as anterior right thigh burning. It was noted that walking and sitting for any length of time seem to aggravate this condition. Upon examination, there was tenderness to palpation in the lumbosacral spine. A lumbar spine MRI performed on October 17, 2001 revealed degenerative desiccation and diffuse degenerative bulge of the L3-4 and L4-5 intervertebral discs. The neural canal was significantly narrowed at L3-4 consistent with focal spinal stenosis. A December 19, 2001 treatment note indicates that the claimant has difficulty sleeping because of the pain. Daniel E. Gelb, M.D. indicated in an orthopedic evaluation report of January 4, 2002 that the claimant continues to have primary back pain with significant symptoms in the legs, which occur either with prolonged standing or sitting. Dr. Gelb concluded that the claimant is a candidate for lumbar decompression. Douglas J. Bower, M.D. indicated in a report of January 31, 2002 that the claimant's most significant problem is his low back discomfort. Dr. Bower indicated that the claimant has ongoing discomfort, both with sitting and standing and that he is unable to lift. Dr. Bower concluded that the claimant was incapable of working (Exs. 1F-6F and 12F-15F).

The claimant stated in the record that he experiences bad back pain with pinching, trembling, and a burning sensation in his legs. He reported that sitting and standing for any length of time aggravate his pain and noted that he must rest between activities. The claimant reported that pain disturbs his sleep regularly and that pain interferes with his ability to concentrate. He indicated that medications cause constipation as a side effect.

The allegations of the claimant are credible based on the medical evidence and the criteria of 20 CFR 404.1529 and SSR 96-7p.

The claimant does not have an impairment that meets or equals the criteria of any listed impairment. A determination must therefore be made of whether he retains the residual functional capacity to perform the requirements of his past relevant work or can adjust to other work.

From : McGraw Hait & Deitchman        PHONE No. : 975 9446        Aug.02 2002 3:57PM P01

VINCENZO MAZZAMUTO (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)

I realize that the claimant also has a severe anxiety disorder. However, since a fully favorable decision is appropriate based on physical impairments alone, functional limitations attributable to the claimant's mental impairment have not been assessed.

The evidence of record supports a finding that the claimant retains the residual functional capacity to lift or carry and push or pull 2-3 pounds occasionally and no weight frequently, stand or walk 1 hour per 8-hour workday and sit 4 hours per 8-hour workday with a sit/stand option. Additionally, he is only able to engage in bending, stooping, kneeling, climbing, crawling, or crouching on an occasional basis. Based on these limitations, the claimant retains the residual functional capacity for significantly less than the full range of sedentary work.

I have given significant weight to the above-mentioned opinion dated April 16, 2002, of Dr. Bower finding the claimant unable to work (Ex. 15F), as it is supported by the clinical findings contained in the record as well as the degree of treatment required. As for the opinion dated June 18, 2001 of the State Agency medical consultant finding that the claimant retained the capacity to perform light work activity (Ex. 8F), it has been given limited weight as it is inconsistent with the other substantial evidence, some of which was unavailable for review by the State Agency consultant.

In his former work as a restaurant owner, the claimant was required to perform skilled light exertional level work activity. Because the claimant is limited to significantly less than the full range of sedentary work, he is precluded from the performance of his past relevant work.

As the claimant has demonstrated that he lacks the residual functional capacity to perform the requirements of any past relevant work, the burden shifts to the Social Security Administration to show that there are other jobs that the claimant can perform. This determination is made in conjunction with the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations (20 CFR Part 404). Appendix 2 contains a series of rules that direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's age, education, work experience, and residual functional capacity.

Born May 25, 1955, the claimant was 44 years old on July 22, 2000. For the purpose of this decision, he is considered to be a younger individual. He has a limited education and has a skilled work background. However, considering the nature and extent of the claimant's functional limitations, it is reasonable to conclude that there are no occupations to which the claimant's acquired work skills could transfer.

The claimant's capacity for the full range of sedentary work is reduced by additional limitations that narrow the range of work he can perform. Considering these limitations within the guidelines of Social Security Ruling 96-9p, there are no occupations with jobs existing in significant numbers in the national economy which the claimant could perform. A finding of "disabled" may therefore be reached within the framework of Medical-Vocational Rule 201.25.

From : McGraw Hait & Deitchman        PHONE No. : 975 9446        Aug. 02 2002  3:59PM  P01

VINCENZO MAZZAMUTO (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)                          Page 4 of 5

In accordance with a finding that the claimant has been under a disability beginning
July 22, 2000, he is entitled to disability insurance benefits on the basis of his application
protectively filed on April 24, 2001.

## FINDINGS

After careful consideration of the entire record, I make the following findings:

1. The claimant has not engaged in substantial gainful activity since July 22, 2000.

2. The medical evidence establishes that the claimant has the following severe impairments:
   degenerative disc disease and coronary artery disease.

3. The claimant has no impairment that meets or equals the criteria of any impairment listed in
   Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's assertions concerning his ability to work are credible.

5. The claimant retains the residual functional capacity to lift or carry and push or pull 2-3
   pounds occasionally and no weight frequently, stand or walk 1 hour per 8-hour workday and
   sit 4 hours per 8-hour workday with a sit/stand option. Additionally, he is only able to
   engage in bending, stooping, kneeling, climbing, crawling, or crouching on an occasional
   basis. Based on these limitations, the claimant retains the residual functional capacity for
   significantly less than the full range of sedentary work.

6. The claimant is unable to perform the requirements of his past relevant work.

7. The claimant's residual functional capacity for the full range of sedentary work is reduced by
   additional limitations.

8. On July 22, 2000, the claimant was a younger individual.

9. The claimant has a limited education.

10. The claimant has a skilled work background. However, considering the nature and extent of
    the claimant's functional limitations, it is reasonable to conclude that there are no
    occupations to which the claimant's acquired work skills could transfer.

11. Considering the claimant's additional limitations, he cannot make an adjustment to any work
    that exists in significant numbers in the national economy; a finding of disabled is therefore
    reached within the framework of Medical-Vocational Rule 201.25.

12. The claimant has been under a disability, as defined in the Social Security Act, since
    July 22, 2000 (20 CFR §404.1520(f)).

From : McGraw Hait & Deitchman       PHONE No. : 975 9446       Aug.02 2002  4:00PM  P01

VINCENZO MAZZAMUTO (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)                                    Page 5 of 5

## DECISION

It is my decision that, based on the application protectively filed on April 24, 2001, the claimant is entitled to a period of disability commencing July 22, 2000, and to disability insurance benefits under Sections 216(i) and 223, respectively, of the Social Security Act.


EDWARD T. MORRISS
Administrative Law Judge

_____ **JUL 2 5 2002** _____
Date

 New York Life  Insurance Company
New York Life Insurance and Annuity Corporation
(A Delaware Corporation)
NYLIFE Insurance Company of Arizona
(Not licensed in Every State)
PO Box 6916 Cleveland OH 44101, (800) 695-9873
*The Company You Keep*



June 14, 2002


Vincenzo Mazzamuto
501 Limestone Rd
Carlisle PA  17013


Policy:  44 904 932
Claim:  368 799


Dear Mr. Mazzamuto:

I am writing in reference to the above claim for Waiver of Premium Disability benefits on the above policy. Thank you again for your patience while we reviewed this life claim.

The Waiver of Premium Benefit provision of your policy contract states, in part, that total disability means that because of disease or bodily injury, you cannot do any of the essential acts and duties of your job or any other job for which you are suited based on schooling, training or experience.  If you are able to do some, but not all of these acts and duties, disability is not total.

However, the Company has taken a more liberalized view of total disability as it pertains to an insured's occupation.  This liberalization allows us to waive premiums for up to two years after the onset of the disability based on your being totally disabled from performing the material duties of your occupation as a restaurateur. This is an administrative exception and does not affect the terms of your contract.

Therefore, I am pleased to inform you that we will waive the premiums on the above policy from July 22, 2000, the first date we have evidence of your total and continuous disability (under the liberalized terms stated above), to the premium due August 4, 2002.

A check for a refund of the August 2000 and 2001 Annual premiums has been sent under separate cover.

Mr. Mazzamuto, I wish you continued success in your future endeavors.  Please let me know if you have any questions.


Sincerely,


Therese A. Sindelar    Ext 8724          cc:  Salvatore Ferrigno V44


*Exhibit* C

# the INSURANCE FORUM®



Joseph M. Belth, Editor
Ann I. Belth, Business Manager
Jeffrey E. Belth, Circulation Manager

*. . . for the unfettered exchange of ideas about insurance*

**Vol. 30, No. 6**                                        **June, 2003**

## UNUMPROVIDENT CORPORATION AND THE GEORGIA COMMISSIONER

UnumProvident Corporation, through its operating subsidiaries, dominates the disability insurance market in the United States. The companies' controversial claims practices are discussed in our February 2003 special issue on UnumProvident and our April/May 2003 special issue on insurance claims.

On March 19, John W. Oxendine, the insurance commissioner of Georgia, issued an order stemming from a market conduct examination of the UnumProvident companies' claims practices. The order raises procedural questions, and UnumProvident issued a distorted press release about the order.

### The Order

Commissioner Oxendine fined four UnumProvident companies a total of $1 million, ordered them to change their claims practices, and placed them on probation for two years. Also, he will continue to examine their claims practices during the probationary period, and the continuing examination will include quarterly reviews of Georgia claims that are denied. The text of the order is in the box on page 215.

The order did not name Colonial Life & Accident Insurance Company (Columbia, SC), a subsidiary of UnumProvident. In response to my inquiry, a spokesman for the Georgia insurance department said Colonial was not included in the examination because the department had not received complaints about Colonial's claims practices.

### Unofficial Comments

Articles about Commissioner Oxendine's order appeared in several news outlets. The articles included comments that were attributed to him, but that did not appear in the order or in the press release accompanying the order. Some of the comments were in quotation marks. Others were not, suggesting they

were paraphrases of what he said. Here are the unofficial comments attributed to Commissioner Oxendine:

- **People were being denied claims unfairly.**
- **Policyholders complained about disability claims being rejected or, once approved, being canceled later.**
- **We believe there was a corporate philosophy of pushing the envelope to the edge, of looking for every technicality possible to get out of paying the claim.**
- **We told them they are going to change the way they do business and change their fundamental corporate philosophy.**
- **No longer will claims personnel override medical decisions.**
- **The department met resistance initially, but the company became more cooperative when I started imposing a fine of $5,000 a day.**
- **The quarterly review process is extremely unusual. I've never seen it done in the country before.**
- **The fine is the largest ever levied by the insurance department.**
- **UnumProvident wasn't accused of breaking the law.**

### CONTENTS OF THIS ISSUE

| Item | Page |
| --- | --- |
| UnumProvident Corporation and the Georgia Commissioner | 213 |
| Income Taxation of Distributions to Policyholders in Demutualizations | 216 |
| UnumProvident Corporation and the *Fortune* Lists of "Most Admired" Companies | 219 |

Copyright © 2003 Insurance Forum, Inc.

Exhibit D

*The Insurance Forum*

June 2003

## The Confidentiality Issue

In our February 2003 issue, which went to the printer in late December, I mentioned the Georgia department's market conduct examination of the UnumProvident companies' claims practices. When I called the department in the middle of December, the spokesman said he expected the report of the examination to be made public by the end of December. When I called in early January, he said he expected the report to be made public by the end of January. When I called in early February, he said he did not know when the report would be made public.

After I received the order, I filed a request under the Georgia statute governing access to public records. I asked for a copy of the report covering the initial phase of the market conduct examination, now that the initial phase is completed. The request was denied because the examination "has been extended for an additional period of two years," and because "examination reports and records of pending examinations are not available for public disclosure until they are finalized." Describing the examination as "pending" at this late date (the examination began more than two years ago) is a clever way to keep the report confidential for at least two more years.

Commissioner Oxendine should have treated the initial phase of the market conduct examination as complete upon issuance of the order, and should have made the report on the initial phase available to the public. His failure to do so deprives the public of timely access to important information.

## The Missing Allegations

Allegations that the UnumProvident companies' claims practices violate Georgia statutes or regulations are missing from Commissioner Oxendine's order. Indeed, as indicated above, he was quoted in a news article as saying he was not accusing the companies of breaking the law. In the absence of such allegations, imposing fines raises questions about the procedures followed by the Georgia department.

What was the basis for the fines? What purposes were served by the fines? Why did the UnumProvident companies pay the fines? Surely the fines were not "necessary at this time for the protection of Georgia consumers," as stated in the order. As for punishment or deterrence, fines totaling $1 million are no more than a light slap on the wrist for an organization with annual premium revenue of more than $6 billion.

Under normal procedures, the regulator alleges violations, and the company denies the allegations. If the matter is settled, the agreement would involve a fine or other punishment, and the company would not admit to the violations. If the matter is not settled, the matter would go to an administrative law judge or a court. In short, the absence of allegations in this instance is extraordinary.

## Avoiding the Issue

Because of the missing allegations, I inquired about the basis for the fines. In response, the department spokesman said the parties agreed on the fines. That response avoids answering the question.

I think UnumProvident agreed to the fines—and may even have suggested the fines—for three reasons. First, UnumProvident wanted the order to contain no allegations, because allegations by a regulator might have been damaging to the company in its defense of the many lawsuits relating to claims practices. Second, UnumProvident wanted the report of the market conduct examination to remain confidential. Third, UnumProvident wanted to help Commissioner Oxendine issue an order that would appear significant.

## The UnumProvident Press Release

UnumProvident issued a distorted press release about Commissioner Oxendine's order. UnumProvident referred to the order as an "agreement" in the title of the press release ("UnumProvident Reaches Agreement with Georgia Department of Insurance") and throughout the text of the press release. UnumProvident referred to the $250,000 fine imposed on each of the four companies as a "settlement amount." UnumProvident failed to mention that the companies were placed on probation. UnumProvident said the "settlement amount stemmed largely from early delays on the part of the company in responding to requests for information," and failed to mention the practices that the companies were ordered to change. UnumProvident characterized the market conduct examination as a "standard oversight function," and failed to mention that complaints triggered the examination. UnumProvident blamed the problems

*The Insurance Forum* is published monthly by Insurance Forum, Inc., P. O. Box 245, Ellettsville, Indiana 47429-0245. www.theinsuranceforum.com. Telephone (812) 876-6502. ISSN 0095-2923. The subscription price is $90 per year.

Reprints of this 8-page June 2003 issue are $5 each. They are $2.50 each when at least 20 reprints of the issue are sent in one shipment. Further discounts apply to orders of at least 250 reprints.

The September 2002 special ratings issue is $20. The April/May 2003 special issue on insurance claims is $20. The February 2003 special issue on UnumProvident is $10.

We do not impose any mailing, shipping, or handling charges, but we require prepayment by check, MasterCard, or Visa. To enter a credit card order by telephone, call toll-free 1-888-876-9590 (U. S. only). Indiana addressees please add 6% sales tax.

© 2003 Insurance Forum, Inc. All rights reserved. *The Insurance Forum* may not be reproduced in whole or in part without permission in writing from the publisher.

Copyright © 2003 Insurance Forum, Inc.

fits of $8.5 million. Thomas R. Watjen, who was vice chairman and chief operating officer, was appointed president and chief executive officer on an interim basis. Two outside members of the board of directors were appointed co-chairmen. Another outside director was appointed to chair a search committee of the board, which will consider Mr. Watjen as well as external candidates.

Neither the UnumProvident press release nor the newspaper articles I have seen mention Ralph W. Mohney, who Mr. Chandler brought in "to move Provident from a claim payment to a claim management approach." Whether the firing of Mr. Chandler and the appointment of a new chief executive will produce substantive changes in the UnumProvident companies' claims practices remains to be seen.

*Let's hope so*
*GKR*

## INCOME TAXATION OF DISTRIBUTIONS TO POLICYHOLDERS IN DEMUTUALIZATIONS

The Internal Revenue Service (IRS) and the mutual insurance companies that demutualized in recent years told policyholders about the income tax treatment of the distributions the policyholders received in exchange for their ownership interests in the companies. Early this year, C. D. Ulrich, a certified public accountant who has studied the subject carefully, brought to my attention his belief that the treatment mentioned by the IRS and the companies is incorrect, that the treatment is extracting from policyholders billions of dollars of unwarranted taxes, and that policyholders who have already paid taxes on distributions should file amended tax returns and seek refunds.

When Mr. Ulrich contacted me, I found it difficult at first to believe that there might be no statutory authority for the tax treatment mentioned by the IRS and the companies. After studying the matter, however, I believe that the treatment mentioned by the IRS and the companies is open to serious question. The purposes of this article are to describe the tax treatment mentioned by the IRS and the companies, discuss the absence of statutory support for that treatment, describe the tax treatment Mr. Ulrich suggests, and indicate what a policyholder might do.

### A Note on Terminology

A mutual insurance company is a corporation that is engaged in the business of insurance, has no shareholders, has policyholders who are customers with ownership interests, and is operated exclusively for the benefit of the policyholders. I say individual policyholders have "ownership interests"—rather than saying they are owners—because they have some but not all the characteristics of owners. A policyholder has the right to vote on certain matters and the right to share in certain distributions, but those rights terminate when his or her policy terminates. In short, a mutual insurance company's policyholders as a group own the company, and individual policyholders of the company have ownership interests.

Some mutual insurance companies, including especially those who downplay the rights of the policyholders, call the policyholders "members" and say they have "membership interests." The IRS uses the phrases "equity interests" or "proprietary interests." In this article, except when quoting others, I use the expression "ownership interests."

### The IRS/Company Approach

Here, in brief, is how the IRS and the demutualizing companies explain the income tax treatment of demutualization distributions. For the policyholder who receives shares of stock, there is no immediate taxable income; however, when the shares are sold, the policyholder's basis in the shares is zero and the full amount received in the sale is a capital gain. For the policyholder who receives cash, the full amount received is taxed immediately as a capital gain. In either case, whether it is a long-term capital gain or a short-term capital gain depends on when the policyholder first acquired his or her ownership interest; because the typical policyholder purchased his or her first policy in the company more than one year before the distribution, the amount received in most instances is a long-term capital gain. In this article, I refer to the tax treatment described by the IRS and the companies as the "zero basis approach."

### One Company's Explanation

Provident Mutual Life Insurance Company (Provident) demutualized in 2002 and immediately became a subsidiary of Nationwide Financial Services, Inc. (Nationwide). In exchange for their ownership interests, eligible Provident policyholders received shares of stock in Nationwide.

Nationwide said in an information brochure sent to each policyholder with the distribution that the value of his or her ownership interest in Provident was $28.0146 (the volume-weighted average sales price per share during the 15 trading days ended September 24, 2002) multiplied by the number of shares allocated to the policyholder. The joint proxy statement/prospectus (proxy) sent to policyholders in August 2002, in the section entitled "Material Federal Income Tax Consequences," said on page 58 that "your tax cost or 'basis' for any shares you receive will be zero." The law firm of Debevoise & Plimpton provided a tax opinion to Provident's board of directors. The opinion, dated August 2, 2002, was in the proxy and included this sentence:

                                Copyright © 2003 Insurance Forum, Inc.

on "disruptions" associated with the 1999 merger, and failed to mention the continuing complaints about the companies' claims practices.

## The Chandler Firing

Commissioner Oxendine's order was consented to by J. Harold Chandler, chairman, president and chief executive officer of UnumProvident and its sub-sidiaries. Twelve days later, on March 31, UnumProvident announced that the board of directors fired Mr. Chandler. The firing was not necessarily related to the Georgia situation or any other single development.

In accordance with his current employment contract, which was executed in 1999, Mr. Chandler will receive $17 million—severance pay of $8.5 million (three times base salary and bonus) and pension bene-

---

### COMMISSIONER OXENDINE'S ORDER (MARCH 19, 2003)

**WHEREAS**, the Commissioner of Insurance (hereinafter the "Commissioner") commenced an examination of the records and activities of Unum Life Insurance Company of America, The Paul Revere Life Insurance Company, Provident Life and Accident Insurance Company, and Provident Life and Casualty Insurance Company (hereinafter the "Respondents"); and

**WHEREAS**, pursuant to Georgia law, the Commissioner may use information discovered or developed during the course of an examination in furtherance of any legal or regulatory action which the Commissioner may, in his sole discretion, deem appropriate; and

**WHEREAS**, during the initial period of examination, the Commissioner has determined that certain issues associated with the handling of claims, complaint resolution, and record maintenance warrant further examination; and

**WHEREAS**, notwithstanding the further examination of Respondents as set forth herein, the Commissioner has determined that certain actions are necessary at this time for the protection of Georgia consumers.

**NOW THEREFORE**, upon consideration thereof, the Commissioner hereby places Respondents on regulatory probation for a period of 2 years. The terms are as follows:

1. Each of the Respondents shall immediately pay a monetary penalty in the amount of $250,000.

2. The market conduct examination of the Respondents, initiated by Certificate 2000-MC15 and initially covering the period of January 1, 1999 through November 30, 2000 (the "initial exam period") shall be extended and continue through the period of regulatory probation. The scope of the examination will include further investigation of certain issues identified during the initial exam period and the monitoring of current claims handling practices as described below.

3. As part of the continuing market conduct examination of the Respondents, a quarterly review of Georgia claims by a qualified examiner with knowledge and experience in the area of disability insurance to be selected by the Commissioner shall be performed for each quarter for 2 years from the date of this Order. Claims to be reviewed will be claims and/or complaints (whether previous, pending, or future) submitted by Georgia residents, and the claims and/or complaints selected shall include but not be limited to consumer complaints received by the Commissioner and Respondents and random samples of denied claims.

4. Respondents agree to be sensitive to claims in which a narrow interpretation of policy provisions or

legal principles may lead to an unfair result. Respondents will consider, and, on a case-by-case basis, will make exceptions to such narrow interpretations, particularly in claim cases involving more subjective determinations, in order to accomplish a fair result. Any such exception will be consistent with the medical findings in the case, normal and customary application of the relevant policy provisions and applicable legal principles.

5. Claims personnel will not overrule medical opinions relating to the disability status of a claim that is provided by a more highly trained and/or qualified professional without concurrence of an equally trained and/or qualified professional.

6. Respondents shall provide improved communications to claimants regarding denial and the availability of the appeals process. Such communications shall accurately and clearly explain the disability definition and basis for denial and refer to specific language in the policy that is relevant to the decision.

7. Respondents shall maintain copies of applicable policy forms or provisions in the claim files. Additionally, Respondents shall adhere to Respondents' policy of maintaining copies of medical records in the claim files.

8. Respondents shall improve tracking and availability of claims files and complaint files.

9. Respondents shall meet all applicable time standards for appropriately responding to claims filings and correspondence.

10. Respondents shall respect the privacy of claimants and will, in the process of collecting, using and determining disclosure of claim information to any third parties, act in accordance with applicable laws, regulations, policy provisions and claim policies of the Respondents.

11. Respondents shall bear all costs associated with the extended examination.

**FURTHER**, by consenting to this Order, Respondents agree to comply with all of the above-referenced terms of this Order and to comply with all applicable Georgia law and regulations. Respondents admit no violation of Georgia law or regulation and do not admit that the inclusion of any matter in this Order implies failure of prior compliance.

**FURTHER**, all terms and conditions contained herein are hereby **ORDERED**, this 19th day of March, 2003.

[*Editor's note*: Commissioner Oxendine signed the order. J. Harold Chandler, who was chairman, president and chief executive officer of the four UnumProvident companies at the time, consented to the order.]

---

Copyright © 2003 Insurance Forum, Inc.



**NEW FROM THE ATLA EXCHANGE**

*Order Today & Save $50*

# UnumProvident Bad Faith:
# Deposition and Trial Transcript Collection

*Developed Exclusively for ATLA Plaintiff Lawyers*

ATLA EXCHANGE
www.exchange.atla.org

The controversial claims handling processes of UnumProvident, the country's largest disability insurer, continues to be the subject of media and legal scrutiny. Some of Unum's employees have spoken out about the company's controversial claims handling process, where it has been widely reported that troublesome claims were discussed by employees with the goal of denying or cutting off benefits. This packet includes deposition and trial testimony from current and former Unum employees and consultants, including physicians, executives, and claims adjusters, and provides a look into Unum's claims handling inner sanctum. Inside you'll find testimony in support of the process, with opposing testimony from other deponents. A must-have for lawyers with cases against Unum. [June 2003; 718 pages]

---

## MORE NEW PACKETS FROM THE ATLA EXCHANGE

**Debt Collection Litigation Packet**—Addresses issues that may arise during the collection process, including a collection attorneys' compliance with the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq., and the Soldiers' and Sailors' Civil Relief Act of 1940, 50 U.S.C. App. §§ 501-593, and the effect of bankruptcy filings. Included are sample letters to debtors, payment plans, spread-sheets, and client communications. [June 2003; 800 pages]

**Low Impact Litigation Packet**—Addresses key issues that arise in assessing and trying low impact, connective tissue cases. Contains strategies from ATLA colleagues experienced in winning these cases and in maximizing damages for their injured clients. Includes court documents, discussion about biomechanical engineers and other potential defense witnesses, ATLA Education papers, *TRIAL* articles, and other materials that will guide you through the nuances of trying and winning a low impact case. [April 2003; 839 pages]

**Life Expectancy and Neurological Injury: Debunking the Defense "Experts"**—Introduces you to the defense "experts" and alerts you to the tactics they will use to deprive your client of meaningful compensation. Includes arguments on how to persuade the court to exclude this unreliable testimony, and other court documents and depositions. Created in collaboration with ATLA members who have faced these "experts" and have succeeded in arguing for exclusion of this testimony. [April 2003; 972 pages]

### Didn't find what you were looking for?

The ATLA Exchange has Litigation Packets on a variety of hot litigation topics. Plus, as an ATLA voting member, you can access thousands of documents that give you a competitive advantage. With free full-text searching, you can find depositions, pleadings, expert testimony, and other case information, contributed by your ATLA colleagues, including more information on UnumProvident.

Log on to **www.exchange.atla.org** and see what the Exchange can offer you. Or call 800-344-3023 or 202-965-3500, ext. 615.

| | PRICE PER PACKET | DISCOUNT PRICE PER PACKET |
|---|---|---|
| Exchange Users | $225 | $175 |
| Gold Plan Members | $195 | $145 |
| Platinum Plan Members | $150 | $100 |

### ORDER TODAY!
**Phone:** 800-344-3023 or 202-965-3500, ext. 615
**Fax:** 202-337-0977
**Mail:** ATLA Exchange, 1050 31st Street, NW, Washington, DC 20007
**Online:** www.exchange.atla.org (enter promotion code **ELP6UPF**)

*Offer expires July 15, 2003. Prices subject to change.*

---

☐ **Send me:**

☐ UnumProvident Bad Faith: Deposition and Trial Transcript Collection
☐ Debt Collection Litigation Packet
☐ Low Impact Litigation Packet
☐ Life Expectancy and Neurological Injury: Debunking the Defense "Experts"

Subtotal for Litigation Packets          $_____
*Litigation Packets are available on CD-ROM only.*

### Shipping & Handling
☐ Standard Delivery (3-5 Business Days) - $7.50
☐ Rush Orders for Express Delivery (Next Business Day) - $35

Shipping & Handling          $_____
**GRAND TOTAL**               $_____

Name_____

ATLA ID#_____

Firm_____

Address_____

City/State/ZIP_____

Telephone_____

Fax_____

E-mail_____

☐ Check is enclosed (payable to ATLA Exchange)

☐ Charge my:  ☐ MasterCard   ☐ VISA   ☐ AMEX

Card #_____

Expiration Date_____

Signature_____
                                          E2RE 6UPF

**Terms and Conditions of Use.** I certify that this query is made on behalf of a plaintiff (or defendant in a criminal case) and I am in no way associated with any defendants or defense interests in this matter. I certify that I am a Regular, Sustaining, Life, or President's Club member of ATLA, or an employee of such an attorney member, and that I seek access to this material for the sole and exclusive purpose of assisting clients of my law firm in the prosecution of their cases, and for the purpose of sharing knowledge of my firm with other attorneys concerned on behalf of their clients with common questions of law and fact. Since I am making an Exchange request, I allow my name and case summary to be added to the Exchange database. By using the ATLA Exchange, I agree to respond when contacted by other members investigating cases similar to my case summary and to share case information and documents with those members.

Signature_____Date_____

~ THE ATLA EXCHANGE IS ENDOWED BY ROBERT A. CLIFFORD ~



Exhibit E

0556

## UNUM.

*Protecting everything you work for*

April 20, 2001

Peter J. Russo
Attorney At Law
Suite 200, 5010 East Trindle Road
Mechanicsburg, PA 17050

Re: Vincenzo Mazzamuto
Claim # 13-H3236167-002

Dear Mr. Russo:

Thank you for the courtesies you extended me during our recent telephone conversation. As we discussed, we would be in contact with you, in writing to outline the status of Mr. Mazzamuto's claim. We would like to take this opportunity to do so.

According to Mr. Mazzamuto's policy, Total Disability means that the insured can not due the substantial and material duties of his or her regular job. The cause of the total disability must be an injury or sickness.

Residual Disability means, during the elimination period, that due to an injury or sickness as define in the policy, the insured:

    A.  is not able to do one or more of the substantial and material duties of his or her regular job; or

    B.  directly and apart from any other cause, has a loss of income as defined in the rider of at least 20%.

After the elimination period has been satisfied, residual disability means the insured has a loss of income as defined in the rider of at least 20%. The loss of income must result directly from the same or related injury or sickness used to satisfy the elimination period. The loss of income must not result from any other cause.

On Mr. Mazzamuto's initial claim form, received in our office on December 15, 2000, he indicated that his employer's name was Vinny's Restaurant, Inc. and that his duties consisted of "executive 50% and office 50%." He indicated that he was the president. On an Insured's Statement of Occupational Duties and Employment issued with the claim form, Mr. Mazzamuto indicated that he "supervised employees 20 hours per week; 50% of the time, bookkeeping 10 hours per week; 25%

*Exhibit F*

UNUMPROVIDENT CORPORATION
The Paul Revere Life Insurance Company as administrator for New York Life Insurance Company
18 Chestnut Street, Worcester, Massachusetts 01608-1528

of the time and other office duties 10 hours per week; 25% of the time." A copy of this form has been enclosed for your reference.

Mr. Mazzamuto and I spoke on the telephone on January 4, 2001. At this time, he indicated that he was owner of Vinny's Restaurant and that his duties were mostly managerial. He stated that he does the books, orders food, writes checks, etc. He had his workers to everything else such as cook, wait tables, etc. Mr. Mazzamuto indicated that he would very rarely help out with these duties. Only when someone didn't show up for work on short notice is when he would help out. The insured also stated that he was a very "nervous" person and that he thinks that he may have had too many years in the business. His wife and son are running the restaurant at this time.

On January 15, 2001, we forwarded an Occupational Description to our Mr. Mazzamuto for completion. This form was returned to our office on January 22, 2001. Mr. Mazzamuto indicated on this form that his duties consisted of bookkeeping 15-20% of the time, office duties 15-20% of the time and employee administration 50-60% of the time. A copy of this form has been enclosed for your reference.

Please note that you indicated to me that you do not feel that Mr. Mazzamuto's occupational description is correct. Mr. Mazzamuto has indicated numerous times throughout his claim file that his occupational duties consisted of office, executive and administration duties only. You stated that you know that "Mr. Mazzamuto is only one of two cooks." This appears to be contradictory to the statements and descriptions provided to us by Mr. Mazzamuto. Please also understand that Mr. Mazzamuto filed a disability claim with The New York Life Insurance Company in 1996. At this time, he indicated that again, his occupational duties consisted of office, executive and administration duties only.

You further mentioned that at the time of application for disability coverage in 1993, you recall that Mr. Mazzamuto's duties were more extensive and that he physically ran and operated the restaurant. Upon review of Mr. Mazzamuto's two applications for disability coverage, the first signed and dated by him on June 3, 1993 and the second on August 28, 1993, he specifically indicated that his duties consisted of "executive office duties only." Copies of these documents have been enclosed for your reference. You indicated that you may contact the writing agent to inquire as to why his duties were indicated as stated. Mr. Russo, please understand that regardless of what Mr. Mazzamuto's occupation and occupational duties were at the time of application, it is his duties at the time of claim for disability benefits that we would be evaluating.

On Mr. Mazzamuto's initial claim form, he indicated that he was unable to work as of Jul 29, 2000 due to a heart attack. Dr. Douglas Bower completed the Attending Physician's Statement portion of this form. He indicated that Mr. Mazzamuto's subjective symptoms were anxiety, worry, and low back pain. He restricted the insured from no prolonged standing and no heavy lifting (secondary to his back). Dr. Bower wrote that Mr. Mazzamuto's limitations were "cannot work in stressful situations." On the Medical Provider's Statement, also completed by Dr. Bower, he indicated that the insured also suffered an acute MI.



During my telephone conversation with Mr. Mazzamuto on January 4, 2001, he indicated that he suffered a heart attack in July 2000 and when the paramedics put him into the ambulance, his back "snapped." He stated that he has had a back condition for a number of years and this re-injured an injury that was "already there." As stated, his back problems have never went away and the ambulance occurrence "just made it worse." I asked the insured about his heart condition. He indicated that it was "better" and that he attended cardiac rehabilitation. Mr. Mazzamuto stated that it is his back condition that is restricting him from not returning to work. He indicated that there is a letter from his doctor regarding his back condition and requested that I telephone your office and ask "Melissa" to forward the letter to me.

I telephoned Melissa, per Mr. Mazzamuto's request, and she forwarded me a copy of a letter from Dr. Douglas Bower, via fax. The letter was dated on November 3, 2000, and indicated that Mr. Mazzamuto had a long history of low back pain. A MRI in the past revealed central spinal stenosis which gradually worsened to a maximum at the L3-L4 level and extends from L2-L5. Prolonged standing and heavy lifting aggravate it. He has been seen in physical therapy, treated in a pain clinic with local injections as well as prescription analgesics, nonsteroidal anti-inflammatory agents and other atypical chronic pain medications. Dr. Bower indicated that this condition was complicated when he was admitted to the hospital for his heart condition. He was readmitted to the hospital at a later date, with chest pain, and this pain was subsequently felt to be non-cardiac in nature. Dr. Bower further stated "as the patient has attempted to return to work after his recovery from his heart attack, his back has worsened again, also the stress and anxiety which has been provoked because of his recent cardiac problems, and manifested themselves with significant anxiety when he is back in a work situation." It was noted that Mr. Mazzamuto's heart condition was stabilized and should hopefully not pose a great limitation on him in the future. Dr. Bower stated "at the present time he is not able to do the work required in running his restaurant because he cannot stand for a prolonged period of time, has difficulty bending, and is restricted from heavy lifting."

Upon review of all additional medical documentation, it is noted that Mr. Mazzamuto was hospitalized on July 22, 2000 for the new onset of angina, with CPK evidence of a small subendocardial Myocardial Infarction. Cardiac Catheterization demonstrated a 90% distal LAD stenosis which was dilated to a 10% residual. Other stenoses included a 50% Dg1 and several 30-40% RCA narrowings. His ejection fraction was reported as 55%. He was readmitted several weeks later for recurrent chest pain, which was different from the pain of the MI and felt not to be cardiac in origin. On August 29, 2000, he had a stress echocardiogram test and walked for 7 minutes of the Bruce Protocol (approximately 10 METs), with a peak heart rate of 115 on beta blockers, an ejection fraction of 50% increasing with exercise, apical akinesis and no evidence of inducible ischemia. In an office note dated January 11, 2001, Dr. Bower indicated that Mr. Mazzamuto was doing well, and exercising without difficulty, but had continued back pain.

With respect to Mr. Mazzamuto's lower back pain, it appears that he has had a long history of lower back pain that has been treated with Neurontin, NSAIDs, Flexeril and epidural steroid injections, about twice yearly. A CT scan on September 15, 1992 reported spinal stenosis at the L3-4 level and



L4-5 level. Following a flare-up in pain after a fall on ice in 1996, a MRI on June 5, 1996 again reported the spinal stenosis at L3-4, felt to be developmental in origin, with no evidence of DJD or disc herniation. His pain at the time was described as burning located centrally in the lower back, extending down the lateral thighs to the knees. Although prolonged standing was said to lead to leg numbness, no abnormality on neurologic exam was reported. In an office visit September 22, 1997, Mr. Mazzamuto reported that his back was better but bothered him after three hours of standing.

Mr. Mazzamuto's back pain reportedly increased again following hitting a bump during his ambulance ride to the hospital in July 2000. His most recent epidural injections were on October 18, 2000 and January 31, 2001.

With respect to Mr. Mazzamuto's cardiac condition, there appears to be no information to support a cardiac impairment which would preclude work involving sedentary to light physical activity on a full-time (40 hour a week) schedule. His physician has restricted him from stressful situations, but there does not appear to be any information to support a present cardiac impairment related to stress, either terms of a significant stress-reduced rhythm disorder or angina.

Please also note, that we forwarded Mr. Mazzamuto's claim file to our Field Claim Representative, Mr. Brian Coar. Mr. Coar met with Mr. Mazzamuto at his home on April 4, 2001. During this interview, Mr. Mazzamuto indicated that he does not really have any pain in his heart anymore and that his shortness of breath concerns him. He also stated that he is afraid that if he goes back to work and is in a stressful situation, he may have another heart attack and die. He also indicated that some of his fear stems from the history of heart problems in his family. Please note that Mr. Mazzamuto's disability policy provides for benefits when he is unable to perform the duties of his occupation on either a full or part-time basis. His policy does not provide benefits in the event he may experience a condition which may cause a disability in the future.

With reference to Mr. Mazzamuto's claimed orthopedic condition, back pain, it is noted that he claims that the pain increases with prolonged standing and his physicians restrict him from prolonged standing or walking, heavy lifting, and bending. His job does not appear to involve heavy lifting (per Mr. Mazzamuto's statements). The degree to which he is required to stand or walk for a prolonged, uninterrupted periods of time, over 15-20 minutes at a time, is not clear. However, based on the insured's numerous occupational descriptions, it appears that his job duties are sedentary and light in nature. It should also be noted that his lower back pain tends to wax and wane and although he appears to have had prolonged exacerbation's after episodes of trauma (slipping on ice and a bump during an ambulance ride), the discomfort has subsided in the past, at least enough to return to work. Also, there does not appear to be any structural change in his condition associated with the recent exacerbation.



Based on all medical information in Mr. Mazzamuto's claim file, it does not appear that there are restrictions or limitations that would prevent Mr. Mazzamuto from working in his occupation on a full-time basis. Therefore, we find that he is ineligible for disability benefits under his contract.

However, if you would like to submit additional information for further consideration of his claim please send it to my attention. If you have no new information to provide but would like to appeal our determination, please send a written request for a review to:

> UNUMProvident
> Quality Performance Support
> 18 Chestnut Street
> Worcester, MA 01608

Please be sure to include his social security number and claim number. Your written request should include your comments and views of the issues you wish UNUMProvident to consider. If UNUMProvident does not receive the written request within 90-days of the date of this notice, we will assume you agree with our determination.

Sincerely yours,

Melissa Magner, X6710
Claim Representative
The New York Life Insurance Company
UNUMProvident Corporation

Enc: copy of occ descriptions