FILED
HARRISBURG, PA

JUL 1 1 2003

MARY E. D'ANDREA, CLERK
Per_____
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VINCENZO MAZZAMUTO,<br>Plaintiff, | : | CIVIL ACTION<br>NO. 1:CV-01-1157 |
| | : | |
| v. | : | |
| | : | |
| UNUM PROVIDENT<br>CORPORATION, et al.,<br>Defendants | :<br>:<br>: | JUDGE CONNER |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION OF THE COURT'S DECISION PRECLUDING EXPERT TESTIMONY OF GORDON K. ROSE, DENYING PLAINTIFF'S MOTION TO AMEND COMPLAINT, AND GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CLAIM FOR BAD FAITH DAMAGES

## I.    INTRODUCTION

Defendants UNUM Provident Corporation, Paul Revere Insurance Company and New York Life Insurance Company ("Defendants"), hereby oppose Plaintiff's motion for reconsideration. Plaintiff's motion should be denied because Plaintiff fails to offer newly discovered evidence requiring the Court's review and fails to demonstrate a manifest error of law. Instead, the Court properly applied the applicable law and correctly held, based on the undisputed facts, that (1) testimony

1

of Gordon K. Rose should be excluded, (2) Plaintiffs presented an improper basis

for amending their complaint, and (3) Defendants were entitled to judgment as a

matter of law on Plaintiff's bad faith claim.

## II.    PROCEDURAL HISTORY

Plaintiff alleges claims for bad faith and breach of contract arising from the

denial of his claim for disability benefits.  On August 9, 2002, Defendants filed a

motion for summary judgment.  Plaintiff filed his brief in opposition on August 26,

2002.  On March 17, 2003, after consideration of the parties' submissions, the

Court issued an order granting in part Defendants' motion for summary judgment

with regard to Plaintiff's bad faith claim.  On May 6, 2003, the Court reaffirmed its

grant of summary judgment by denying Plaintiff's motion for reconsideration.

On August 9, 2002, Defendants filed a motion in limine to exclude the

testimony of Gordon Rose.  Plaintiff filed his response on August 26, 2002, and the

Court granted Defendants' motion excluding Rose's testimony on February 7, 2003.

On February 21, 2003, Plaintiff filed a motion for reconsideration of the Court's

decision excluding Rose.  However, the Court denied reconsideration in its May 6,

2003 Order.

On February 19, 2003, Plaintiff filed a petition to amend the complaint.

Defendants responded on March 6, 2003, and the Court denied Plaintiff's petition

to amend in its May 6, 2003 Order.

Now, despite the Court's detailed opinions explaining the bases for its rulings, Plaintiff has filed a motion for reconsideration contesting the Court's reasoning and judgment with regard to all three rulings.

## III.  COUNTERSTATEMENT OF THE FACTS

In his motion, Plaintiff contests three separate rulings that Plaintiff insists require reconsideration by the Court.  In neither his motion nor his brief, however, does he present any new facts.  A review of the Court's Orders and Opinions in each of the three rulings demonstrates that the facts that were relevant at the time of the rulings, remain the only relevant facts today.  Nor is there any intervening change in the law.  In fact, to the extent that there is any pertinent new law, it undermines Plaintiff's position even further.

### A.  EXCLUSION OF GORDON ROSE

Plaintiff originally intended to offer the testimony of Rose as an insurance expert for the purpose of rendering an opinion on Defendants' insurance practices. [Opinion dated February 7, 2003, p. 8].  After reviewing the Rose report and considering the arguments expressed by all parties, the Court excluded Rose's testimony and report.  [Id. at 10].  The Court found that (1) Plaintiff's claims presented no complicated insurance related issues requiring an expert, (2) Rose's reports were largely conclusory and would be unhelpful to the factfinder, and (3)

3

the potential prejudice of Rose's testimony substantially outweighed its probative value. [Id. at 9-10].

In its May 6, 2003 Order, the Court denied Plaintiff's motion for reconsideration because (1) Plaintiff failed to identify a manifest error of law or fact, and (2) the entry of summary judgment in favor of Defendants on the bad faith count rendered Rose's testimony irrelevant. [Order dated May 6, 2003, p. 15].

## B. DENIAL OF PLAINTIFF'S AMENDED COMPLAINT

Plaintiff originally filed his petition to amend the Complaint in February 2003, to set forth a new "pattern and practice" theory in support his bad faith claim. [Opinion dated May 6, 2003, p. 15-16]. The Court exercised its discretion under Rule 15 to deny the petition. [Id.]. The Court found that (1) by waiting until eight months after the close of discovery to request to add a new theory of liability, Plaintiff's had unduly delayed, (2) given the circumstances, allowing the amendment would unduly prejudice the Defendants, and (3) given the earlier dismissal of Plaintiff's bad faith claim, the amendment would be futile. [Id.].

## C. DEFENDANTS' SUMMARY JUDGMENT GRANTED ON PLAINTIFF'S BAD FAITH CLAIM

The Court previously denied a motion by Plaintiff for reconsideration of the Order granting summary judgment on Defendants' behalf on the bad faith count. The Court reaffirmed its grant of summary judgment because there was sufficient record evidence indicating that Defendants had a reasonable basis for denying

4

Plaintiff's claim for benefits. [Opinion dated May 6, 2003, p. 12-14]. As the Court held in its original opinion, Plaintiff cannot meet his burden of proving, <u>by clear and convincing evidence</u>, a lack of a reasonable basis for denying benefits under the policy. [Opinion dated March 17, 2003, p. 6-7].

Although he once again seeks reconsideration, Plaintiff offers no newly discovered evidence, or intervening change in law requiring the Court's reconsideration. In fact, the only pertinent new case law further undermines Plaintiff's position.

## IV.  COUNTER STATEMENT OF THE QUESTION PRESENTED

### A.  SHOULD THE COURT DENY PLAINTIFF'S MOTION FOR RECONSIDERATION WHERE THERE IS NO NEWLY DISCOVERED EVIDENCE AND NO MANIFEST ERROR?

[Suggested Answer: Yes.]

## V.  ARGUMENT

There are very few accepted reasons for reconsideration, and none are present here. A motion for reconsideration should be granted <u>only</u> to correct manifest errors of law or fact or to present newly discovered evidence. <u>Harsco Corp. v. Zlotnicki</u>, 779 F.2d 906, 909 (3d Cir. 1985). Courts in the Third Circuit apply a stringent standard for determining whether to grant a motion for reconsideration. <u>Petruzzi's, Inc. v. Darling Delaware Co., Inc.</u>, 983 F.Supp. 595, 611 (M.D. Pa. 1997). Reconsideration is an "extraordinary remedy" and should be

denied "when the motion is merely a re-styling or rehash of issues previously presented." GFL Advantage Fund, Ltd. v. Colkitt, No. 4:97-CV-0526, 2000 U.S. Dist. LEXIS 21747, at *4 (M.D. Pa. July 17, 2000).

The Court should not consider "new evidence or a new legal theory which could have been presented on the original motion. Id. at *5. "Mere disagreement with the court is a ground for appeal, not a motion for reconsideration." Id.

Here, Plaintiff fails to (1) present new evidence not previously available, or (2) to demonstrate a need to correct a clear error of law or prevent a manifest injustice. Instead, Plaintiff appears to be arguing that the Court was simply wrong.

Neither the exclusion of Gordon Rose nor the denial of the amended complaint will be relevant if Plaintiff fails to convince the Court to reconsider and reverse its grant of summary judgment on the bad faith claim. Thus, it makes sense to address the bad faith claim first.

## A. PLAINTIFF PRESENTS NO NEW EVIDENCE IN SUPPORT OF A BAD FAITH CLAIM AND THERE IS NO MANIFEST ERROR OF LAW

In his latest motion for reconsideration, Plaintiff appears to be arguing that the Court erred in granting summary judgment[1] because it did not account for events transpiring after Defendants originally denied Plaintiff's claim for benefits.[2] In effect, Plaintiff argues that the Court erred by focusing only on the facts and

---

[1]    Although Plaintiff repeatedly refers to a "motion to dismiss" the bad faith claim, Defendants assume Plaintiff is referring to Defendants' August 9, 2002 Motion for Summary Judgment.

6

circumstances relevant to his claim for benefits.  But this is not "clear error", it is the proper procedure for evaluating a claim for benefits.  For the reasons explained below, Plaintiff's motion should be denied.  In fact, there is nothing in this <u>second</u> motion for reconsideration that provides any basis for a different result (i.e., denial) than the result on the <u>first</u> motion for reconsideration.

### 1.    Plaintiff fails to present newly discovered evidence not previously available.

Plaintiff may not resubmit and rely upon evidence available before the Court's ruling, and the Court may properly disregard any such evidence.  <u>Harsco</u>, 779 F.2d at 909; <u>Plaisted v. Geisinger Medical Center</u>, 210 F.R.D. 539, 542 (M.D. Pa. 2002) (court is justified in refusing to consider evidence that could have been submitted with the original motion).  Here, Plaintiff presents nothing new for the Court to reconsider.  In fact Plaintiff fails to identify any new fact or law warranting the Court's attention.

Instead, Plaintiff rehashes his irrelevant and inaccurate argument that there have been "many other courts" in other jurisdictions that have allowed the question of bad faith to go to a jury.  [Plaintiff's Brief, p. 4, ¶ 2].  By doing so, Plaintiff acknowledges that this information is not newly discovered but, in fact, was part of the record.

---

[2]    The complete lack of any logical structure to Plaintiff's brief renders each of his arguments ambiguous at best.

In support of his motion for reconsideration, Plaintiff attaches a magazine article about a Georgia insurance commission action and a commercial advertisement by the American Trial Lawyers Association (essentially an advocacy group for the plaintiffs' bar). Neither exhibit mentions Mazzamuto, Mazzamuto's claim for benefits, or Mazzamuto's claims for breach of contract or bad faith practices. This appears to be a rehash of the same argument Plaintiff set forth in his previous motion for reconsideration; that is, the notion that the Court should have focused on matters unrelated to Plaintiff's claim (such as tabloid news coverage about Defendants) rather than focus on the specific facts of Plaintiff's claims. Yet, what Plaintiff fails to acknowledge is that courts examine each particular claim of bad faith based on the facts and circumstances of the individual's claim for benefits.

To Defendants' knowledge, (and Plaintiff cites no authority), <u>no court</u> has found it necessary to delve into other unrelated claims or news articles, much less a magazine advertisement from the plaintiffs' bar. In fact, under Pennsylvania law, evidence of <u>other</u> bad faith claims is not relevant. <u>E.g.,</u> <u>Cantor v. Equitable Life</u>, 1998 U.S. Dist. LEXIS 8435 at * 10-11 (E.D. Pa. 1998); <u>Kaufman v. Nationwide Mutual Ins. Co.</u>, 1997 U.S. Dist. LEXIS 18530 at * 6 (E.D. Pa. 1997); <u>Shellenberger v. Chubb Life</u>, 1996 U.S. Dist. LEXIS 2375 (E.D. Pa. Feb. 22,

1996); <u>North River Ins. Co. v. Greater New York Mutual Ins. Co.</u>, 872 F. Supp. 1411 (E.D. Pa. 1995).

In fact, in a decision handed down just two weeks ago, the Third Circuit came out strongly against the introduction of evidence from unrelated and irrelevant bad faith claims. <u>W.V. Realty Inc. v. Northern Ins. Co.</u>, No. 02-2910, 2003 U.S. App. LEXIS 13182 (3d Cir. June 27, 2003), attached hereto as Exhibit 1. In <u>W.V. Realty</u>, the Court reversed a lower court verdict and ordered a new trial after holding that the court erred when it allowed the introduction of evidence of other unrelated bad faith cases against the defendant insurer.[3] 2003 U.S. App. LEXIS 13182 at *23-27. The Third Circuit reasoned that evidence of other bad faith lawsuits was irrelevant to the facts of the particular case. <u>Id.</u> at *22-23. Furthermore, the Court reasoned that probative value of other unrelated bad faith claims is substantially outweighed by its prejudicial effect and clearly violates of Fed R. Evid. 403. <u>Id.</u> at *21. Thus, Plaintiff's request for reconsideration and offer of evidence from unrelated and irrelevant lawsuits goes against binding Third Circuit precedent.

Instead, disability disputes are determined by the applicable policy language, the applicable case law, and the facts which are unique to each claim. <u>See Mann v. UNUM Life Ins. Co. of America</u>, No.02-1346, slip op., (E.D. Pa. Mar. 19,

2003)(holding that bad faith under the Pennsylvania statute involves only an assessment of "whether the insurer acted recklessly or with ill will towards the plaintiff in a particular case, not whether the defendant's business practices were generally reasonable."), attached hereto as Exhibit 1.

### 2. There was no manifest error.

The Court properly stated and applied the standard for proving bad faith under 42 Pa. C.S.A. § 8371, as well as Plaintiff's burden of proof for avoiding summary judgment. To prevail on his claim of bad faith, Plaintiff "must prove that defendants: (1) did not have a reasonable basis for denying benefits under the policy, and (2) knew or recklessly disregarded the lack of reasonable basis in denying the claim." [Opinion dated March 17, 2003, p. 6 (citing the Pennsylvania's bad faith statute, Keefe v. Prudential Property and Casualty Ins. Co., 203 F.3d 218, 225 (3d Cir. 2000) and Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997))].

Also, the Court properly stated that Plaintiff had the burden of proving "both elements by clear and convincing evidence," [Opinion, p. 6 (citing Klinger, 115 F.3d at 233 and Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 750 (3d Cir. 1994))], sufficient to "enable a reasonable jury to find bad faith . . . ." [Opinion, p. 6 (citing Simon v. UNUMProvident Corp., No. 99-6638, 2002 U.S.

---

[3]    In addition, the Third Circuit held that even if there is a finding of bad faith, that does not necessarily mean that an award of punitive damages is necessary or appropriate. W.V. Realty 2003 U.S. App. LEXIS 13182 at *30-

Dist. LEXIS 9331, at *19 (E.D. Pa. May 23, 2002) and <u>Krisa v. Equitable Life</u>

<u>Assurance Soc.</u>, 113 F. Supp. 2d 694, 703 (M.D. Pa. 2000))].

     Armed with the proper standard and the proper facts, the Court concluded

that the evidence demonstrated that Defendants had a reasonable basis for denying

Plaintiff's claim for benefits and, therefore, Plaintiff could not prove by clear and

convincing evidence the first element of his claim of bad faith.

     Despite the Court's accurate and thorough reasoning and conclusions,

Plaintiff now argues that the Court erred because, in effect, some courts have let

the question of bad faith be considered by a jury.

> There have been many courts already throughout the
> country and even in the Eastern District [sic] that have
> permitted bad faith actions to proceed against UNUM
> Provident based upon exactly the same claims made by
> Mr. Mazzamuto and as point of fact, Your Honorable
> Court may be the only one or one of a very few who have
> granted UNUM Provident's Motion for Dismissal [sic] of
> a bad faith claim and/or claim for unfair insurance
> practices under the existing conditions of June 20, 2003.

[Plaintiff's Brief, p. 4]. To this, Plaintiff mysteriously cites <u>Simon</u>, 2002 U.S. Dist.

LEXIS 9331, without any explanation if its relevance.

     Nevertheless, <u>Simon</u> is but one of the many cases that state the proper

standard (also cited by the Court here) for avoiding summary judgment on bad

faith: a "plaintiff must present evidence that would enable a reasonable jury to find

---

31.

11

bad faith" by clear and convincing evidence. <u>Simon</u>, 2002 U.S. Dist. LEXIS 9331, at *18-19. While the <u>Simon</u> court held that the defendant was not entitled to summary judgment because the plaintiff had "adduced sufficient evidence from which a jury could find under the clear and convincing standard that Defendants acted in bad faith . . . ," 2002 U.S. Dist. LEXIS 9331, at * 22-23, the Court here found otherwise. In other words, the plaintiff in <u>Simon</u> did what Plaintiff here has not: established by clear and convincing evidence that a reasonable jury could find bad faith. The Court here recognized this distinction, and properly granted summary judgment. There was no manifest error and there is no proper grounds for reconsideration.

## B.  PLAINTIFF PRESENTS NO NEW EVIDENCE AND THERE IS NO MANIFEST ERROR OF LAW IN THE COURT'S ORDER EXCLUDING GORDON ROSE

In the February 7, 2003 Order, the Court excluded the proffered testimony of Plaintiff's so-called bad faith expert in part because Plaintiff's claims presented <u>no complicated insurance related issues</u> requiring an expert. [<u>See</u> Opinion dated February 7, 2003, p. 9-10]. And, in denying Plaintiff's February 21, 2003 Motion for Reconsideration, the Court again reasoned that "<u>the jury could understand the concept of insurance bad faith</u> without assistance from an expert." [Opinion dated May 6, 2003, p. 15 (emphasis added)]. Despite the Court's unequivocal statements, Plaintiff once again argues that "Mr. Rose should be permitted to testify to enable

SL1 365824v1/10305.060

the jury to understand insurance related claims handling processes" [Plaintiff's Brief, p. 4], but offers no new evidence and cites no intervening law to support his position.

Plaintiff's mere disagreement with the Court's proper exercise of discretion is <u>not</u> a valid basis for granting reconsideration. <u>GFL Advantage</u>, 2000 U.S. Dist. LEXIS 21747, at *5. In addition, because Plaintiff fails to present new evidence and there is no manifest error, the Court should deny Plaintiff's motion for reconsideration.

In short, the Court should deny Plaintiff's <u>second</u> motion for reconsideration for the very same reasons the Court denied Plaintiff's <u>first</u> motion for reconsideration on this issue.

## C. PLAINTIFF PRESENTS NO NEW EVIDENCE AND THERE IS NO MANIFEST ERROR OF LAW IN THE COURT'S ORDER DENYING PLAINTIFF'S PETITION TO AMEND THE COMPLAINT

In its May 6, 2003 Order, the Court's denied Plaintiff's petition to amend the Complaint because (1) Plaintiff unduly delayed seeking the amendment, and (2) Defendants would suffer substantial prejudice if the amendment were permitted. [Opinion dated May 6, 2003, p. 15-16]. The Court also held that Plaintiff's motion to amend to add a "pattern and practice" theory of liability was moot because of the earlier grant of summary judgment on the bad faith claim. [<u>Id.</u> at 15]. In other words, the amendment would be futile. Nothing has changed in the two months

13

since the Court rendered its opinion (other than the fact that even more time has passed).

Nevertheless, Plaintiff now seeks reconsideration and asserts that the Court's May 6, 2003 decision was clearly erroneous. [Plaintiff's Motion, ¶ 13]. In support of his motion for reconsideration, Plaintiff presents no new evidence and cites no intervening law. Instead, Plaintiff once again merely disagrees with the Court's conclusions and declares that "[y]our Court's prior decisions do not have current factual or legal support." [Plaintiff's Brief, p. 3]. As stated above, disagreement with the Court's proper exercise of discretion is <u>not</u> a valid basis for granting reconsideration. <u>GFL Advantage</u>, 2000 U.S. Dist. LEXIS 21747, at *5. Plaintiff presents no valid basis for reconsideration pursuant to Rule 15, and his motion should be denied.

## VI.  CONCLUSION

For the reasons set forth above, the Court should deny Plaintiff's motion for

reconsideration.

Dated:  July 10, 2003                    STEVENS & LEE

                                         By _____
                                         E. Thomas Henefer
                                         Attorney I.D. No. 55773
                                         111 North Sixth Street
                                         P.O. Box 679
                                         Reading, Pennsylvania  19603
                                         (610) 478-2000

                                         Attorneys for Defendants

15

LEXSEE 2003 U.S. App. LEXIS 13182

**W.V. REALTY INC.; NEW MONTAGE MANOR, INC. v. NORTHERN INSURANCE COMPANY OF NEW YORK, Appellant**

**No. 02-2910**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*2003 U.S. App. LEXIS 13182*

**April 10, 2003, Argued**

**June 27, 2003, Filed**

**PRIOR HISTORY:**
APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA. D.C. Civil No. 00-cv-00525. District Judge: The Honorable A. Richard Caputo.

**DISPOSITION:**
Final judgment of District Court dated January 7, 2002 vacated. Post-trial order of District Court dated June 10, 2002 vacated in all but one respect. Case remanded for new trial.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff insured sued defendant insurance company alleging bad faith with regard to the insured's business interruption claim. The jury found in favor of the insured and awarded punitive damages pursuant 42 Pa. Cons. Stat. § 8371. The United States District Court for the Middle District of Pennsylvania denied the insurance company's motion for judgment as a matter of law and its motion for a new trial. The insurance company appealed.

**OVERVIEW:** The roof over a banquet hall collapsed under the weight of accumulated snow and the insurance company was called upon to pay both building damages and business interruption losses under the policy. The building damage claim was resolved fairly expeditiously, but for a variety of reasons attempts to resolve the business interruption claim failed. The court of appeals found that the admission at trial of a discovery violation by the insurance company was not probative of its bad faith in resolving the insured's business interruption claim, but was unfairly prejudicial in the way it was

presented because it involved other bad faith cases against the insurance company. The admission at trial of allegations contained in a third-party complaint brought by the insurance company against the contractor who built the banquet hall was also highly prejudicial, in part because, in closing argument, the insured's counsel characterized the allegations as "fraud upon the court." However, denial of motion for judgment as a matter of law was proper because the record contained sufficient admissible evidence supporting a finding of bad faith on the part of the insurance company.

**OUTCOME:** The judgment was vacated and the matter was remanded for a new trial.

**LexisNexis(TM) HEADNOTES - Core Concepts**

*Constitutional Law > Trial by Jury in Civil Actions*
*Insurance Law > Bad Faith & Extracontractual Liability > Punitive Damages*
[HN1] In Pennsylvania, the punitive damages remedy in a statutory bad faith action under 42 Pa. Cons. Stat. § 8371 triggers the Seventh Amendment jury trial right. Section 8371 does not, however, provide for the right to a jury trial in state court.

*Civil Procedure > Trials > Judgment as Matter of Law*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN2] An appellate court reviews a district court's decision denying a motion for judgment as a matter of law de novo, and apply the same standard that the district court did, namely whether, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is

insufficient evidence from which a jury reasonably could find liability.

*Civil Procedure > Relief From Judgment > Motions for New Trial*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN3] A district court's decision to deny a party's motion for a new trial is reviewed for abuse of discretion.

*Insurance Law > Bad Faith & Extracontractual Liability > Punitive Damages*
[HN4] 42 Pa. Cons. Stat. § 8371.

*Insurance Law > Bad Faith & Extracontractual Liability > Payment Delay*
[HN5] Under Pennsylvania's bad faith insurance law, the term "bad faith" is not defined in the statute, but the Pennsylvania Superior Court has defined it as any frivolous or unfounded refusal to pay proceeds of a policy. To make out a claim of bad faith, a plaintiff must show by clear and convincing evidence that the insurer (1) did not have a reasonable basis for denying benefits under the policy; and (2) knew or recklessly disregarded its lack of reasonable basis in denying the claim.

*Torts > Insurance Claims > Insurers Bad Faith*
*Insurance Law > Bad Faith & Extracontractual Liability > Punitive Damages*
[HN6] Under Pennsylvania insurance law, the Pennsylvania Superior Court holds that bad faith is actionable regardless of whether it occurs before, during or after litigation. The Superior Court made it quite clear, however, that this did not mean that insureds may recover under Pennsylvania's bad faith statute for discovery abuses by an insurer or its lawyer in defending a claim predicated on its alleged prior bad faith handling of an insurance claim. This general proposition comes with the caveat that using litigation in a bad faith effort to evade a duty owed under a policy would be actionable under 42 Pa. Cons. Stat. § 8371.

*Torts > Insurance Claims > Insurers Bad Faith*
*Insurance Law > Bad Faith & Extracontractual Liability*
[HN7] In Pennsylvania, in those cases in which nothing more than discovery violations were alleged, courts have declined to find bad faith.

*Torts > Insurance Claims > Insurers Bad Faith*
*Insurance Law > Bad Faith & Extracontractual Liability*
[HN8] Under Pennsylvania' insurance law, those cases in which courts have permitted bad faith claims to go forward based on conduct which occurred after the

insured filed suit all involved something, beyond a discovery violation, suggesting that the conduct was intended to evade the insurer's obligations under the insurance contract.

*Evidence > Relevance > Prior Acts, Crimes & Wrongs*
[HN9] See Fed. R. Evid. 404(b).

*Civil Procedure > Pleading & Practice > Pleadings > Interpretation*
[HN10] The Federal Rules of Civil Procedure permit parties to file pleadings containing inconsistent factual and legal allegations. As a general rule, however, the allegations asserted in an earlier lawsuit may be introduced by the adversary as evidence in a second action. Some courts have made an exception to the general rule of admissibility for third-party pleadings.

*Evidence > Procedural Considerations > Judicial Admissions*
[HN11] Legal conclusions may not be used as evidentiary admissions.

*Civil Procedure > Appeals > Standards of Review > Harmless & Invited Errors*
[HN12] In a civil case, an error is harmless if it is highly probable that it did not affect the complaining party's substantial rights.

*Torts > Damages > Punitive Damages*
[HN13] Pennsylvania holds that punitive damages may be awarded to punish a defendant for outrageous conduct, which is defined as an act which, in addition to creating actual damages, also imports insult or outrage, and is committed with a view to oppress or is done in contempt of plaintiffs' rights. Both intent and reckless indifference will constitute a sufficient mental state.

**COUNSEL:**
Ignatius J. Melito, Esq. (Argued) Melito & Adolfsen, New York, NY. William J. Schmidt, Esq., White & Williams, Philadelphia, PA, Attorneys for Appellant.

Michael R. Mey, Esq. (Argued) Wormuth, Mey & Sulla, Scranton, PA.   Jill H. Miller, Esq., Scranton, PA, Attorneys for Appellees.

**JUDGES:**
Before: BARRY, ROSENN, Circuit Judges and POLLAK, * District Judge

> * The Honorable Louis H. Pollak, Senior District Judge, United States Court for the Eastern District of Pennsylvania, sitting by designation.

**OPINIONBY:**
BARRY

**OPINION:**

### OPINION OF THE COURT

BARRY, *Circuit Judge*:

#### INTRODUCTION

The roof over a banquet hall collapsed under the weight of accumulated snow and the insurer was called upon to pay both building damages and business interruption losses under the policy. The building damage claim was resolved fairly expeditiously, but for a variety of reasons -- some good and some bad -- attempts to resolve the business interruption claim dragged on with the insurer's conduct with reference to that claim emanating in a complaint alleging bad faith, pursuant to *42 Pa. Cons. Stat. § 8371*.

This appeal follows a trial in which the jury found that the defendant, Northern Insurance Company of New York ("Northern"), had acted in bad faith and awarded punitive damages. We will remand for a new trial due, first, to the admission at trial of a discovery violation committed by Northern which was not probative of its bad faith in resolving the plaintiffs' business interruption claim, but which was unfairly prejudicial in the manner in which it was presented and because that presentation involved other bad faith cases against Northern. The admission at trial of allegations contained in a third-party complaint brought by Northern against the contractor who built the banquet hall provides an additional ground for reversal. This evidence was highly prejudicial, in part because, in closing argument, plaintiffs' counsel characterized the allegations as "fraud upon the Court." We also find, however, that the record contains sufficient admissible evidence supporting a finding of bad faith on the part of Northern; hence, its motion for judgment as a matter of law was properly denied. n1

---

n1 Northern's argument that plaintiffs were not entitled to a jury trial is rejected without further discussion. *See Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 236 (3d Cir. 1997)* ([HN1] "The punitive damages remedy in a statutory bad faith action under *§ 8371* triggers the *Seventh Amendment* jury trial right[.]"). *Section 8371* does not, however, provide for the right to a jury trial in state court. *Mishoe v. Erie Ins. Co., 2003 Pa. LEXIS 917*, Nos. 87 & 88 MAP 2001, *2003 WL 21255990*, at *7 (Pa. May 30, 2003).

I.

Plaintiff W.V. Realty, Inc. owned the building at issue in this case -- a 46-room motel, a restaurant and a banquet facility, located in Moosic, Pennsylvania. Plaintiff New Montage Manor, Inc. ran the motel, restaurant and catering business. Northern issued an insurance policy to plaintiffs which provided coverage for building and property damage up to $ 1,360,000 and coverage for business interruption losses up to $ 650,000.

In January of 1996, after the roof over the banquet hall portion of the building collapsed, plaintiffs submitted claims for both damage to the building and business interruption losses. The business interruption portion of the policy covered plaintiffs for (1) net income (net profit or loss before income taxes) that would have been earned or incurred were it not for the necessary suspension of operations as a result of the roof collapse, and for (2) continuing normal operating expenses incurred, including payroll. These items were covered from the date of loss through what the policy called the "period of restoration," that is, the amount of time that it would reasonably take to repair the property damage.

Northern determined that the restoration period in this case was six months. n2 Plaintiffs contested Northern's determination on two grounds. First, plaintiffs believed that the period of restoration should be longer given the nature of the event business. A two-year period, in their view, would account for the fact that all of the events which had been scheduled for 1996 and 1997 were cancelled in the wake of the roof collapse. Even if the banquet hall were rebuilt by the beginning of 1997 and plaintiffs could begin to again make reservations, they would not be able to recover their lost sales because weddings and other events are booked an average of fourteen months in advance. In the alternative, plaintiffs argued that they should be reimbursed for events which were cancelled during the six-month period of restoration, but which were to occur outside of it, as well as for events that they were not able to book during that period because there was no facility available to show prospective customers.

---

n2 This six-month "period of restoration" was arrived at by adding the three months which Northern's expert determined would be a reasonable amount of time within which to rebuild the catering hall to the two months which Northern chose to allot for adjustment and review

of the claim, to an additional thirty days provided for in the policy.

Soon after the roof collapse, plaintiffs began complaining to Northern about the financial problems that they were experiencing. On January 31, 1996, John J. Weichec, the Northern adjuster assigned to the case, noted in his claim file that plaintiffs were having cash flow problems because they had to re-book several weddings at other facilities and because they were not receiving new deposits. Weichec also noted that if plaintiffs forwarded documentation pertaining to the returned deposits for his review and verification, he would arrange for an advance. Between February and June, Northern advanced $ 25,358.31 to plaintiffs to reimburse them for the returned deposits and other expenses.

On April 3, 1996, plaintiffs wrote to Northern and explained that their bank would not make a decision regarding whether to rebuild until it knew the amount of money plaintiffs would receive for their business interruption losses. Weichec called Northern's accountants to encourage them to finish their evaluation of the claim as soon as possible. The accountants did so a month later, concluding that based on a six-month restoration period and without adopting plaintiffs' argument that they should be reimbursed for losses attributable to the six-month period but falling outside of it, plaintiffs were entitled to $ 49,494.88 for their business interruption losses. On May 16, 1996, Weichec wrote to plaintiffs explaining that the accountant's report was finished but that he was not forwarding it to them because plaintiffs had informed him that they had new information regarding their continuing expenses.

At the heart of plaintiffs bad faith case is the fact that Weichec did not immediately provide them with the undisputed portion of their claim, *i.e.* the $ 49,494.88 less what had already been advanced to them, as soon as the accountants were finished. n3 Northern was admittedly aware that plaintiffs were experiencing financial difficulties. They were unable to make the pre-payment required to obtain an independent estimate of their building loss, their bills included shut-off notices from some of their utility companies, and their bank was threatening to foreclose on their mortgage which, we note, it did in August 1996.

n3 A neutral umpire eventually determined that the $ 25,358.31 that Northern advanced to plaintiffs was not, in fact, an element of plaintiffs' business interruption losses because they constituted extra, as opposed to continual, expenses under the policy.

On August 29, 1996, Northern's accountants, in an updated report, concluded that plaintiffs were entitled to $ 65,322.70 for their business interruption losses over the relevant six-month period. In the Fall of 1996, Northern issued two checks for the outstanding balance of $ 39,964.39. In January of 1998, plaintiffs submitted an expert's report assessing their losses for 1996 and 1997 in the amount of $ 695,000.

Because the parties were unable to agree on an adjustment of plaintiffs' loss, the appraisal process provided for in the policy was initiated. Each side selected an appraiser and the Court of Common Pleas appointed a neutral umpire, with the direction that "the umpire and appraisers are directed to proceed with determining the amount of the Plaintiff's losses and claims, in accordance with the terms and conditions of the insurance policy issued by the Defendant." On December 6, 1999, an award was issued by the neutral umpire, joined by the appraiser selected by plaintiffs, in which plaintiffs' losses were itemized as follows:

| | |
|---|---|
| Business interruption: | $ 695,706.39 |
| Subject to policy limit of: | $ 650,000.00 |
| Extra expenses for returned deposits: | $ 25,358.31 |
| Building and personal property: | $ 549,840.00 |
| Debris removal: | $ 16,200.00 |
| TOTAL: | $ 1,241,398.30 |

The umpire also awarded interest from October 6, 1996 (30 days after the date all necessary information was submitted to Northern to evaluate the loss) until the date

the loss was paid. On appeal, the Court of Common Pleas affirmed in part and reversed in part, finding that interest was only warranted on the amount owed thirty days after the award was issued. The Superior Court affirmed the Court of Common Pleas.

In February of 2000, plaintiffs sued Northern for bad faith in the Court of Common Pleas; the case was subsequently removed to federal court. The District Court granted Northern's motion for summary judgment on plaintiffs' bad faith claim with regard to Northern's payout on the building damage claim. Thus, the sole issue left for trial was whether Northern acted in bad faith with regard to the business interruption claim.

On August 31, 2001, shortly before trial and admittedly because it would look better for Northern at trial, Northern finally paid plaintiffs what was owed them under the award. The jury awarded plaintiffs $ 650,000 in punitive damages. After trial, the District Court denied Northern's motion for judgment as a matter of law, finding that plaintiffs produced evidence upon which a jury could properly find that Northern acted in bad faith. The Court also denied Northern's motion for a new trial based on, among other things, plaintiffs' use at trial of a list of other bad faith claims and of Northern's pleading in a subrogation action, and, in the alternative, for remittitur or a new trial on damages. The District Court awarded plaintiffs attorneys' fees totaling $ 248,260, costs in the amount of $ 36,424.88, and interest of $ 554,946.43. This appeal followed.

II.

[HN2] We review the District Court's decision denying a motion for judgment as a matter of law *de novo*, and apply the same standard that the District Court did, namely whether, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability. *Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993)*. [HN3] The District Court's decision to deny Northern's motion for a new trial is reviewed for abuse of discretion. *See Wilburn v. Maritrans GP Inc., 139 F.3d 350, 363 (3d Cir. 1998)*.

Pennsylvania's bad faith statute provides as follows:

[HN4] "In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions: (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%. (2) Award punitive damages against the insurer. (3) Assess court costs and attorney fees against the insurer."

42 Pa.C.S. § 8371. [HN5] The term "bad faith" is not defined in the statute, but the Pennsylvania Superior Court has defined it as "'any frivolous or unfounded refusal to pay proceeds of a policy.'" *Terletsky v. Prudential Prop. and Cas. Ins. Co., 437 Pa. Super. 108, 649 A.2d 680, 688 (Pa. Super. 1994)* (quoting Black's Law Dictionary 139 (6th ed. 1990)). To make out a claim of bad faith, a plaintiff must show by clear and convincing evidence that the insurer (1) did not have a reasonable basis for denying benefits under the policy; and (2) knew or recklessly disregarded its lack of reasonable basis in denying the claim. *Keefe v. Prudential Prop. and Cas. Ins. Co., 203 F.3d 218, 225 (3d Cir. 2000)*.

Turning first to Northern's motion for a new trial, the judgment of the District Court will be vacated and the case remanded for the reasons that follow. During discovery, plaintiffs served a request for the production of documents which request sought copies of all lawsuits filed against Northern and two related companies. After a conference with the District Court, the request was narrowed to "all lawsuits filed against [Northern and the other two companies] regarding lawsuits filed against them for bad faith and claims where co-insurance penalties were applied to blanket insurance coverage." Northern responded in answer thereto that there were none.

After plaintiffs themselves found fifteen bad faith cases involving Northern, they filed a motion for sanctions. The District Court found that Northern's *counsel's* failure to disclose the bad faith cases was inadvertent and excusable and, thus, substantially justified. n4 At the same time, the Court found that *Northern's* conduct in considering the request was not substantially justified and the bad faith cases should have been disclosed under a reasonable reading of the request for the production of documents. The Court awarded plaintiffs the counsel fees and expenses incurred in securing the information which Northern had not provided.

n4 Northern's trial counsel explained to the District Court that, due to a miscommunication, in-house counsel believed he was to produce cases involving *both* bad faith claims and co-insurance penalties applied to blanket coverage. The Court accepted trial counsel's explanation that another bad faith case in which he had been personally involved had slipped his mind.

At trial, Lloyd Johnson, in-house counsel for Northern, was called by plaintiffs and questioned about the original request for the production of documents, the conference with the District Court, and the correspondence between counsel which ensued. Johnson was then questioned about an affidavit signed by Donna Sofinowski, a claim litigation specialist, in which she stated that "after careful review" she was unaware of any lawsuits involving "claims for bad faith and/or claims where co-insurance penalties were applied to blanket insurance coverage." Plaintiffs' counsel questioned Johnson about the fact that Sofinowski did not in fact conduct a careful review but instead relied on Johnson's representation that there were no such lawsuits.

Plaintiffs' counsel then asked Johnson whether it was true that "as a matter of fact, it turned out that there were hundreds of lawsuits[.]" Defense counsel objected and a conference was held out of the hearing of the jury. The District Court overruled the objection, but instructed plaintiffs' counsel not to "beat it" -- meaning, presumably, not to beat it to death. Despite this instruction, plaintiffs' counsel's next question to Johnson was as follows: "Mr. Johnson, I asked you as a matter of fact there turned out to be hundreds of these lawsuits, is that correct?" After Johnson responded in the affirmative, counsel handed him what counsel described as "a compilation of those lawsuits" and asked him to identify it. Defense counsel again objected, and the Court told plaintiffs' counsel that he could only ask Johnson to identify the document but could not suggest what that document was. But, of course, the horse was already out of the barn for the jury had been told that the twenty page spreadsheet which Johnson identified listed the "hundreds" of bad faith lawsuits against Northern and the other two companies. While plaintiffs' counsel did not move the compilation itself into evidence, the damage had been done for the jury saw that compilation and certainly knew what it was.

Plaintiffs' counsel was also permitted to ask Johnson to read from the District Court's opinion granting plaintiffs' motion for sanctions. Twice -- first on direct examination and then again on redirect -- Johnson was told to read the following excerpt from the opinion aloud to the jury: "I must note that considering this was a discovery request, company counsel adopted an overly restricted view of the request, and it therefore is not without cause to believe such a restrictive construction was convenient, if not intentional." He also was told to read an excerpt in which the Court stated that it could not find "substantial justification" for Northern's failure to disclose the bad faith cases. And the attack on Johnson continued in plaintiffs' closing argument:

The actions of [Mr. Johnson] were convenient at best and justified the imposition of a punishment on Northern Insurance Company for not being honest. I said Mr. Johnson, lawyers are supposed to be honest with the Court and counsel. He said, yes. I said the whole process depends on that honesty, isn't that right? And he said yes. And I asked him, that's not what the conclusion was about your conduct in this case?

Finally, the full opinion was admitted into evidence.

[HN6] The Pennsylvania Superior Court has held that bad faith is actionable regardless of whether it occurs before, during or after litigation. *O'Donnell v. Allstate Ins. Co., 1999 PA Super 161, 734 A.2d 901, 906 (Pa. Super. 1999)*("We refuse to hold that an insurer's duty to act in good faith ends upon the initiation of suit by the insured."). The Superior Court made quite clear, however, that this did not mean that insureds may recover under Pennsylvania's bad faith statute "for discovery abuses by an insurer or its lawyer in defending a claim predicated on its alleged prior bad faith handling of an insurance claim." *Id. at 908* (quoting *Slater v. Liberty Mut. Ins. Co., 1999 U.S. Dist. LEXIS 3753, No. 98-1711, 1999 WL 178367*, at *2 n.3 (E.D. Pa. March 30, 1999). This general proposition comes with the caveat that using litigation in a bad faith effort to evade a duty owed under a policy would be actionable under *Section 8371*.

[HN7] In those cases in which nothing more than discovery violations were alleged, courts have declined to find bad faith. In *O'Donnell*, the trial court instructed the jury that they were not to consider conduct of the insurer which post-dated the institution of suit. Despite its holding that bad faith which occurs after the institution of suit is actionable, the Superior Court nevertheless upheld the jury's defense verdict. The Court found that there was no evidence that the allegedly frivolous interrogatories propounded by the insurer were part of an attempt to improperly prolong its investigation into the insured's claim, as opposed to winning the lawsuit which had been filed against it. *Id. at 909. See also Sanders v. State Farm, 47 Pa. D. & C. 4th 129, 145 (Ct. Com. Pl. 2000)*(granting summary judgment in favor of the insurer where the insured alleged that, in a bad faith action brought by the insured, the insurer filed multiple and duplicative pleadings and motions); *Slater, 1999 U.S. Dist. LEXIS 3753, 1999 WL 178367* at *1 (denying insured's request for leave to amend to add an allegation of bad faith conduct based on fact that, in suit for insurance bad faith, insurer withheld material documents, raised insupportable objections to discovery requests, delayed in producing discoverable material, failed to produce pertinent material within the discovery deadline and failed to produce materials within the time

promised by defense counsel). *But see Rottmund v. Continental Assurance Co., 813 F. Supp. 1104, 1109 (E.D. Pa. 1992)*(allowing case to go forward where insured alleged that insurer's "intentional misdesignation of a corporate deponent" and "concealment of the absence of new facts and circumstances which would justify the defendant's denial of its own prior allegations regarding the identity of the murderer of David Artz" could constitute bad faith).

On the other hand, [HN8] those cases in which courts have permitted bad faith claims to go forward based on conduct which occurred after the insured filed suit all involved something, beyond a discovery violation, suggesting that the conduct was intended to evade the insurer's obligations under the insurance contract. *See, e.g., Cooper v. Nationwide Mut. Ins. Co., 2002 U.S. Dist. LEXIS 21552, No. 02-2138, 2002 WL 31478874,* at * 4 (E.D. Pa. Nov. 7, 2002)(refusing to dismiss for failure to state a bad faith claim where insured's complaint alleged that the insurer "engaged in obstructive conduct and induced him to discontinue his state court suit by misrepresenting its intent to evaluate and settle his claim[ ]"); *General Refractories Co. v. Fireman's Fund Ins. Co., 2002 U.S. Dist. LEXIS 25324, No. 01-5810, 2002 WL 376923,* at *3 (E.D. Pa. Feb. 28, 2002)(refusing to dismiss for failure to state a claim where insurer allegedly "made misrepresentations to the court and filed abusive motions" in insurance coverage litigation brought by the insured); *Krisa v. The Equitable Life Assurance Soc., 109 F. Supp. 2d 316, 321 (M.D. Pa. 2000)* (refusing to dismiss for failure to state a claim where insurer allegedly filed baseless counterclaim against insured in insurance coverage litigation brought by the insured).

Plaintiffs have not explained why they believe Northern's discovery violation constituted insurance bad faith, or why that violation falls into the category of using litigation to evade an obligation under the policy. Plaintiffs do not claim, for example, that Northern failed to disclose other bad faith lawsuits in which it had been involved knowing that even though eventually its failure to disclose them would be discovered, the progress of the litigation would be delayed as would the day of reckoning when Northern would be required to turn over the balance it owed under the neutral umpire's award. n5

n5 The amended complaint includes a claim that Northern committed bad faith by failing to promptly pay plaintiffs, as well as a claim that Northern's failure to pay constituted a breach of the insurance contract. Evidence that Northern used the discovery process to create delay would

be probative and therefore admissible because it would support both of these claims.

We conclude that the discovery violation in this case fell into the "pure discovery violation" category as opposed to the "discovery violation as insurance bad faith" category. There is simply no evidence that Northern failed to disclose the bad faith cases in order to avoid paying plaintiffs' business interruption claim. The discovery violation was, therefore, not probative of bad faith and was inadmissible at trial under *Federal Rules of Evidence 401 and 402.* n6 So, too, it follows, was the reading of excerpts from the District Court's opinion imposing sanctions for that violation.

n6 As *O'Donnell* makes clear, there are some cases in which the insurer's conduct during the course of the litigation is both a violation of discovery rules and a violation of the insurer's fiduciary duty to the insured. *See O'Donnell, 734 A.2d at 909* ("The court [in *Slater*] specifically noted that its holding does not preclude a finding of liability for an insurer's 'bad faith conduct arising in the insurer-insured relationship which happens to occur during the pendency of an action[.]'"). We note that an insurer's dishonest conduct during discovery could potentially violate its fiduciary duty of candor. *See, e.g., Black's Law Dictionary* 625 (6th ed. 1990)(defining "fiduciary" *inter alia* as "a person having duties involving good faith, trust, special confidence, and candor towards another"). *See also U.S. Fire Ins. Co. v. Royal Ins. Co., 759 F.2d 306, 310 (3d Cir. 1985)*(explaining that "the good faith standard requires more than proof of sincerity; the evaluation of the case by the insurance company must be honest, intelligent and objective")(citing *Shearer v. Reed, 286 Pa. Super. 188, 428 A.2d 635, 638 (Pa. Super. 1981)*). Northern's conduct in this case did not arise out of the insurer-insured relationship and was not, therefore, a breach of the fiduciary duty of honesty.

But even if we assume that the discovery violation was committed in connection with an effort on the part of Northern to avoid its obligations under the policy, the evidence of that violation would have still been inadmissible, but now under *Rule 403,* because its

probative value was substantially outweighed by its unfair prejudicial effect.

On the one hand, there is the evidence of the discovery violation which we assume, for purposes of argument, was probative of an effort to delay payment. Other evidence admitted at trial established, however, that even after the Superior Court affirmed the decision of the Court of Common Pleas, which in turn affirmed the decision of the neutral umpire, Northern waited over three and a half months to pay the balance it owed. In the end, by its own admission, it only paid because trial was looming. The probative value of the discovery violation was diminished by the fact that it was not the only evidence that Northern intentionally delayed payment of the balance it owed.

The unfair prejudicial effect of the discovery violation arises from the fact that the information that Northern failed to disclose happened to be other bad faith lawsuits which had been brought against it. The jury may well have concluded, in contravention of the strictures of the Rules of Evidence, that the fact that hundreds of other bad faith lawsuits had been filed against Northern made it more likely that it committed bad faith in this lawsuit. *Cf. Fed. R. Evid. 404 (b)*([HN9] "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."). It seems, at least to us, that plaintiffs questioned Lloyd Johnson about the other bad faith lawsuits not so much to demonstrate that Northern committed an intentional discovery violation as to establish a pattern of bad faith culminating in the "action" in this case "in conformity therewith."

There would have been no unfair prejudice had the District Court permitted evidence of an insurance bad faith discovery violation to be admitted into evidence without permitting plaintiffs to disclose to the jury that the information sought by them and withheld by Northern happened to be other bad faith cases. As it was, the jury not only was permitted to learn that the discovery violation related to other bad faith lawsuits, information that was irrelevant, but it was permitted to learn that there were "hundreds" of them. Moreover, the District Court did not explain to the jury that, in deciding whether Northern acted in bad faith in this case, it could consider the fact that Northern committed a discovery violation but not the fact that there were other bad faith lawsuits against Northern.

It was also error to admit as evidence of bad faith allegations contained in the amended complaint in a subrogation action brought by Northern against the contractor who built the banquet facility. In the amended complaint, Northern alleged that it had paid plaintiffs an amount in excess of $ 1,200,000, and that this amount

was "the fair and reasonable cost for temporary repairs, permanent building repairs, replacement of damaged contents, replacement of damaged business property, business interruption [and] additional expenses." These allegations were made despite the fact that at the time the amended complaint was filed, Northern had paid out approximately $ 318,000 to plaintiffs and was refusing to pay out anything more. At the bad faith trial, several witnesses were questioned about the subrogation complaint; plaintiffs' expert characterized it as "at the best bad lawyering and at the worst a fraud on the court." Then, in summation, plaintiffs' counsel repeated the phrase "fraud upon the court" and added that the fraud was knowing, deliberate and reckless.

[HN10] The Federal Rules of Civil Procedure permit parties to file pleadings containing inconsistent factual and legal allegations. *See Indep. Enters. Inc. v. Pittsburgh Water and Sewer Auth., 103 F.3d 1165, 1175 (3d Cir. 1997)*. As a general rule, however, "the allegations asserted in an earlier lawsuit may be introduced by the adversary as evidence in [a] second action[.]" 5 Wright & Miller § 1283, at 541-542. *See also, e.g., Wilson v. Bradlees of New England, Inc., 250 F.3d 10, 16 (1st Cir. 2001); LWT, Inc. v. Childers, 19 F.3d 539, 542 (10th Cir. 1994)*. Some courts have made an exception to the general rule of admissibility for third-party pleadings. *See e.g., Schneider v. Lockheed Aircraft Corp., 212 U.S. App. D.C. 87, 658 F.2d 835, 843 (D.C. Cir. 1981)*(citing cases).

We need not decide whether a defendant's allegations in a complaint against a third party can be used against the defendant in the primary action because, even assuming that they can, the probative value of the evidence here was minimal and the prejudicial effect great. The probative value was minimal, first, because the allegations contained in the subrogation complaint were not, as plaintiffs claim, evidence that Northern was "seeking to advance its own interest at the expense of its insured." Northern's claim against the contractor for negligence was contingent on plaintiffs' claim against Northern, but plaintiffs' claim against Northern would not be affected one way or the other by Northern's allegations in the subrogation complaint. Moreover, Northern's recovery would be limited by what it had actually paid out, not by the allegations in the complaint. In an affidavit submitted to the District Court, Northern's subrogation counsel explained that he amended the complaint, which initially alleged $ 300,000 in damages, to allege $ 1.2 million "to protect Northern's interest in recovering all amounts that had already been paid on this claim and any amounts that might be paid in the future." That he was surely entitled to do. Finally, the question of what was a "fair and reasonable" amount to pay plaintiffs on their bad faith claim is in part a legal one, and [HN11]

legal conclusions may not be used as evidentiary admissions. *See Giannone v. U.S. Steel Corp.*, *238 F.2d 544, 548 (3d Cir. 1956)*("Bearing in mind that legal conclusions are not admissions ... we do not find that the broad language that [the defendant/third-party plaintiff] used against [the third-party defendant] reasonably capable of interpretation as factual admissions of faulty maintenance.").

The evidence of the allegations in the subrogation complaint was unfairly prejudicial in large part because of the way in which that evidence was presented to the jury. The language used by plaintiffs' expert and by their counsel -- that the allegations constituted "fraud upon the court" and that the fraud was knowing, deliberate and reckless -- was false and inflammatory. n7 The prejudice was enhanced by the fact that the subrogation complaint was referred to repeatedly throughout the trial. It was mentioned in plaintiffs' opening argument, brought up with several witnesses and highlighted again in plaintiffs' closing. The probative value of the evidence was substantially outweighed by its prejudicial effect.

> n7 We note that even if the allegations that the amount of the claim was $ 1.2 million and that this amount was fair and reasonable did constitute "fraud upon the court," this would not be probative of *insurance* bad faith.

We cannot find that the errors committed here were harmless. *See Betterbox Communications Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 329 (3d Cir. 2002)([HN12] "In a civil case, an error is harmless if it is highly probable that it did not affect the complaining party's substantial rights."). Thus, a new trial will be necessary. n8 Although Northern's motion for a new trial should have been granted, it was not entitled to judgment as a matter of law, and in that respect we will affirm the post-trial order of the District Court. There was sufficient evidence submitted to the jury on the issue of bad faith even when the improperly admitted evidence is stripped away. There was evidence, for example, that between January 12, 1996 and August of 1996, when plaintiffs were forced to surrender the property to the bank, they did not earn any money from their catering business, as they had no place to hold events, but continued to incur bills for its mortgage, utilities, insurance, employees and taxes. Northern was aware of all of this and aware that plaintiffs' utilities were about to be terminated and that the bank was threatening foreclosure. During this time, Northern paid nothing for the ongoing business interruption losses.

> n8 There were other errors which we note, albeit without further discussion. Plaintiffs were permitted to question Weichec on a decision of the Court of Appeals for the Fourth Circuit in a distinguishable case and ask why, when he became aware of the decision, he did not seek a legal ruling. Plaintiffs thereafter argued to the jury that this failure was evidence of bad faith. They were also permitted to question Weichec on Northern's offer, after the appraisal award, to settle the entire matter, including the bad faith claim, and then argue to the jury that the offer was itself evidence of bad faith.

Northern argues to us that it reimbursed plaintiffs for, among other things, the returned deposits and that, while the appraiser characterized these monies as "extra expenses," "the fact that the appraisal process declared three years later that the payments should be characterized as extra expense items does not negate the fact that they were advanced by Wiechec at the time." Northern also argues that "plaintiffs' need for sums far in excess of the remaining undisputed amount of $ 25,000, rendered the issue of advances largely academic."

According to Northern's own Claims Division Property Manual, however, "today, it is doubtful that any insurer would risk not making an advance on the undisputed portion of a claim." Weichec, therefore, arguably violated Northern's own policy when, in May of 1996, he did not forward the undisputed amount due despite knowing that plaintiffs were in need of funds. At trial, he offered no explanation for his decision. He testified that no advance was paid "because we were going to change the valuation," but admitted that the valuation was only going to increase. The jury was, therefore, entitled to find that the delay on Northern's part was unjustified and that it constituted bad faith.

But while there was a basis for a finding of bad faith, there was no basis for an award of punitive damages even had there been no trial error. [HN13] Pennsylvania has adopted *Section 908* of the Restatement (Second) of Torts, which provides that punitive damages may be "awarded to punish a defendant for outrageous conduct, which is defined as an act which, in addition to creating 'actual damages, also imports insult or outrage, and is committed with a view to oppress or is done in contempt of plaintiffs' rights.' ... Both intent and reckless indifference will constitute a sufficient mental state." *Klinger v. State Farm Mut. Auto. Ins. Co.*, 115 F.3d 230, 235 (3d Cir. 1997)(quoting *Delahanty v. First Pa. Bank,*

*N.A., 318 Pa. Super. 90, 464 A.2d 1243, 1263 (Pa. Super. 1983).*

This case is distinguishable from a case such as *Klinger,* in which we upheld an award of punitive damages because the insurer made no offer to pay despite the plaintiff 's serious injury and the insurer's clear liability. Here, neither liability nor the amount due was clear. While Weichec may not have had a completely open mind with regard to what plaintiffs believed to be the proper restoration period -- and it was the dispute over the appropriate restoration period that caused much of the delay -- plaintiffs' interpretation was a somewhat unorthodox one based on the unique nature of their business, but no similarly unique terms were in the standard policy which governed this matter. While Northern's decision not to advance plaintiffs the undisputed portion of their business interruption losses in May of 1996 is surely some evidence of bad faith, it,

without more, does not support an award of punitive damages. n9

> n9 If, at the retrial, there is a finding of bad faith, under *42 Pa. Cons. Stat. § 8371* -- the bad faith statute -- plaintiffs can receive interest, court costs and attorneys' fees as they did following the first trial.

III.

The final judgment of the District Court dated January 7, 2002 will be vacated as will, in all but one respect, the post-trial order of the District Court dated June 10, 2002. The matter will be remanded for a new trial.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WILLIAM A. MANN,                    :        CIVIL ACTION
            Plaintiff              :
                                    :
        v.                          :
                                    :
UNUM LIFE INSURANCE COMPANY         :
OF AMERICA, at al.                  :
            Defendants              :        NO. 02-1346

## ORDER

AND NOW, this 19ᵗ day of March, 2003, upon
consideration of the plaintiff's motion in limine (Docket # 19),
the plaintiff's renewed motion to compel (Docket # 26), and the
defendants' motion for a protective order (Docket # 31), and
following oral argument on January 23, 2003, IT IS HEREBY ORDERED
that, for the reasons explained in a memorandum of today's date,
the motion in limine is DENIED, the motion to compel is DENIED,
the portion of the motion for a protective order that relates to
the plaintiff's requests for reserve information is GRANTED, and
the portion of the motion for a protective order that relates to
the timeliness of the corporate designee notice is DENIED AS
MOOT.

                                    BY THE COURT:


                                    MARY A. MCLAUGHLIN,   J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WILLIAM A. MANN,                    :          CIVIL ACTION
                Plaintiff           :
                                    :
         v.                         :
                                    :
UNUM LIFE INSURANCE COMPANY         :
OF AMERICA, at al.                  :
                Defendants          :          NO. 02-1346

MEMORANDUM

March 19, 2003

McLaughlin, J.

        Before the Court are three issues that have been raised
by the plaintiff's motion in limine, the plaintiff's motion to
compel, or the defendants' motion for a protective order.  These
issues are: whether the plaintiff should be allowed to introduce
at trial the videotaped testimony of Dr. Patrick Fergal McSharry,
a former employee at the Chattanooga office of one of the
defendants; whether the defendants shall be required to produce
statistical information about the defendants' handling of other
claims; and whether the defendants shall be compelled to produce
information about the impact of reserves on the defendants'
profitability, the defendants' general reserve setting and
release procedures, and the specific reserve amount set for the

1

plaintiff's claim[1].

　　　Because the plaintiff has not shown that the testimony of Dr. McSharry is relevant and because its admission would violate other rules of evidence, the Court denies the motion in limine.  The Court also denies the plaintiff's motion to compel statistical information.  The Court grants the portion of the motion for a protective order that relates to the reserve information[2].

I.  Motion in Limine- Dr. McSharry's Testimony

　　　The plaintiff's complaint presents a claim of bad faith under 42 Pa. C.S.A. § 1871.  To succeed on this claim, the plaintiff must prove that the defendant insurer lacked a reasonable basis for denying benefits to the plaintiff, and that the insurer knew of, or recklessly disregarded, its lack of a reasonable basis.  Tereletsky v. Prudential Property and Casualty Ins. Co., 649 A.2d 680, 688 (Pa. Super. 1994).

---

[1]　The motion in limine seeks the admission of Dr. McSharry's testimony.  The plaintiff's motion to compel requests the statistical information.  The defendants raised the reserve information issues in their motion for a protective order in response to the plaintiff's requests for such information.

[2]The motion for a protective order also raised an issue regarding timeliness of the notice of the deposition at issue. The defendants have agreed to set aside this issue.  In the order accompanying this memorandum, the Court denies this part of the motion for a protective order as moot.

The plaintiff has also pled and is pursuing a claim for breach of contract. In order to prove this claim, the plaintiff must show that 1) there was a contract between the defendant and the plaintiff; 2) the defendant breached a duty imposed by that specific contract; and 3) damages resulted. J.F. Walker Co. inc. v. Excalibur Oil Grp., 2002 Pa. Super. 39 (2002).

Both of these claims focus on the defendants' conduct towards the plaintiff specifically, not the defendants' general conduct. The Court finds that the testimony of Dr. McSharry is not relevant to either of these claims because the testimony relates only to the general business practices of the defendants, not to the handling of the plaintiff's claim.

I agree with the reasoning of Judge Cahn in Hyde Athletic Indus. Inc. v. Continental Casualty Co., 969 F. Supp. 289, 307 (E.D. Pa. 1997). The bad faith statue addresses only whether the insurer acted recklessly or with ill will towards the plaintiff in a particular case, not whether the defendants' business practices were generally reasonable. This reasoning also applies to the plaintiff's breach of contract claim, which relates only to the terms of any contract between the parties and not the defendants' general business practices. Unless the plaintiff can show a link between his specific case and the allegedly unreasonable general business practices, such practices

are irrelevant to the plaintiff's claim.  See <u>Kosierowski v.</u>
<u>Allstate Ins. Co.</u>, 51 F. Supp. 2d 583 (E.D. Pa. 1999)(granting
summary judgment in bad faith case despite evidence of
defendant's use of flawed computer program because no evidence of
a link between the computer program and the handling of
plaintiff's claim).

Dr. McSharry's testimony is relevant only to the
general reasonableness of the defendants' procedures, not to the
handling of the plaintiff's claim or to the purported breach of
any contract between the parties.

It is undisputed that Dr. McSharry was not involved in
and had no knowledge of the handling of the plaintiff's claim.
The plaintiff argues that Dr. McSharry's testimony is still
relevant, however, because it provides evidence of a company-wide
policy in place in all of the defendants' offices, which was then
applied to the plaintiff's claim.  There is no evidence that
there was a company-wide policy or that such a policy was applied
to the plaintiff's case.

Dr. McSharry testified at length about the claim review
practices employed by the Chattanooga office.  It is clear from
Dr. McSharry's testimony that his knowledge relates only to his

personal experience in that office[3].  There is no evidence that
the unwritten patterns and practices followed by those in the
Chattanooga office were the general business practices of the
company as a whole.  Dr. McSharry does not state or allege that
the practices were based on company-wide policy or were engaged
in pursuant to orders from anyone outside the Chattanooga office.
The plaintiff has presented no other evidence that would indicate
that those reviewing the plaintiff's claim engaged in the same
practices about which Dr. McSharry testified.  Without any
indication of a link to the instant case, Dr. McSharry's
testimony is irrelevant and inadmissible.

　　　In addition to being irrelevant, Dr. McSharry's
testimony would inject several additional issues into the trial.
These issues include evidence about Dr. McSharry's employment and
termination, his own lawsuit against the defendants, and about
the patterns and practices of the Chattanooga office and those
with whom Dr. McSharry worked.  The undue delay, waste of time,
and potential confusion of the issues that would result far
outweigh any probative value the testimony has, mandating its
exclusion under Federal Rule of Evidence 403.

　　　Additionally, it is questionable whether the plaintiff

---

　　　[3]The plaintiff's claim was not handled through that office
nor by individuals associated with that office.

has met the requirements for the admission of hearsay deposition testimony under Federal Rule of Evidence 804(b).

Under this Rule, former testimony may be admitted if the declarant is unavailable. The plaintiff argues that Dr. McSharry is unavailable because Magistrate Judge Wulliam B. Mitchell Carter of the District Court for the Eastern District of Tennessee has issued an order stating that no further depositions of Dr. McSharry would be taken without the express prior permission of that court. In order to get this permission, the party wishing to depose Dr. McSharry must petition the court and show why the additional testimony is necessary.

The plaintiff has not petitioned Magistrate Judge Carter for permission to depose Dr. McSharry. Because the plaintiff has not explored this avenue of obtaining Dr. McSharry's testimony, it would be premature to find that the testimony cannot be procured by process or other reasonable means.

It is also questionable whether the plaintiff has demonstrated that the defendants had the motive and opportunity to develop the testimony of Dr. McSharry as required by Rule 804(b)(1). The deposition testimony at issue was taken as part of six separate lawsuits, unrelated to this case, filed against the defendants and other affiliates. The defendants allege that

cross-examination was cut off before it was complete, at the end of one and one-half days.  It is questionable whether one and one-half days is sufficient to fully develop the testimony of a witness who has been subpoenaed for deposition in at least twenty claims against the defendants.

In addition to showing that the defendants had the opportunity to develop Dr. McSharry's testimony, the plaintiff also has to show that "the earlier treatment of the witness is the rough equivalent of what the party against whom the statement is offered would do at trial if the witness were available to be examined by the party." Kirk v. Raymark Indus., 61 F.3d 147, 166 (3d Cir. 1995), cert. denied 516 U.S. 1145 (1996).  It is not clear that the defendants had the same motive to cross-examine Dr. McSharry during the deposition as they would have in this case, which involves a claimant, claim, and claims handling office that are different from those in the cases at issue in the deposition[4].

_____

[4]The plaintiff also alleges that the testimony is admissible under Federal Rule of Civil Procedure 32.  Rule 32, however, allows the admission in one case of a deposition taken in a different case only where the parties and the subject matter of the two cases are the same.  Neither of these requirements are met in this case - the parties are different, as is the subject matter.  Some courts in other circuits have allowed deposition testimony to be introduced although these two requirements were not strictly met.  See Wright, et al., Federal Practice & Procedure, § 2150, n. 9 (collecting cases)  Even in those cases,

## II.  Motion to Compel - Statistical Information

The plaintiff seeks discovery of statistical information about numerous claims that are factually distinct from the claim at issue in this case.  Even if the plaintiff could use this statistical information to show that the defendants engaged in inappropriate behavior towards other claimants, this would be evidence only of a general business practice.  The statistical evidence, like Dr. McSharry's testimony, would have no bearing on the plaintiff's specific claim.  This information is therefore irrelevant and not discoverable.

## III.  Motion to Quash - Reserve Information

The plaintiff seeks to discover information about: (1) the initial claim reserve set for the plaintiff's claim and any adjustments made to that reserve; and (2) information about the companies' general reserve setting policies, including information about reserve setting and release procedures and the impact of reserves on the companies' financial status.  The

---

however, the courts required that the proponent of the testimony show that the other had the same motive to cross-examine the witness in the deposition as they would have in the trial.  Id.

defendants have moved for a protective order to prevent the plaintiff from discovering this information.

The plaintiff argues that the amount of the individual reserve is relevant because it reflects the value that the defendants put on the claim. He argues that the general reserve setting and release policies and the impact of reserves on the companies' financial status are relevant to show that the companies have an incentive to deny claims with a high reserve to improve its financial status. The defendants argue that the reserve information sought is irrelevant and protected by the work product doctrine.

A.  Specific Reserve Set for the Plaintiff's Claim

The defendants have stated, and the plaintiff does not dispute, that the reserve for the plaintiff's claim was initially set in accordance with the Pennsylvania Insurance Commissioner's regulations. The amount of the initial reserve set is therefore irrelevant to the plaintiff's claim. If the reserve was set according to the regulations, the defendants had no discretion in setting the amount of the reserve, and the reserve amount is not a reflection of the defendants' judgment about the value of the claim. The amount of the reserve required by the regulations is not otherwise relevant to the plaintiff's bad faith or contract

claims.  The amount of the initial reserve is, therefore, not discoverable.

After the initial reserve was set, the reserve amount was adjusted as the case progressed.  The plaintiff seeks discovery of these modifications to the reserve.  This information is not discoverable because it is protected work product.

Materials prepared in anticipation of litigation that reflect the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning litigation are not discoverable.  Fed. R. of Civ. P. 26(b)(3); see also Hickman v. Taylor, 329 U.S. 495 (1947).

The defendants have stated, and the plaintiff has not disputed, that any adjustments made to the reserve after the initial reserve was set were made upon input by the defendants' legal department.  The reserve adjustments reflect the thoughts and conclusions of the defendants' legal department or other employees about the value of the claim in light of the potential or pending litigation, including consideration of such factors as the likelihood of success in litigation and the cost of defending the claim.  Any adjustments to the initial reserve reflect the mental impressions, thoughts, and conclusions of the defendants' legal department and other employees.  Such information is

legal department and other employees.  Such information is
protected opinion work product and is not discoverable.  See
Simon et al. v. G.D. Searle & Co., 816 F.2d 397, 401-02 (8th Cir.
1987)(reserve information is protected by the work product
doctrine); Rhone-Poulenc Rorer, Inc. v. The Home Indemnity Co. et
al. 139 F.R.D. 609, 614-15 (E.D. Pa. 1991)(same); Leksi, Inc. v.
Federal Ins. Co. et al., 129 F.R.D. 99, 106 ( D. N.J.
1989)(same).


B.    General Reserve Information

        The information about the defendants' general reserve
setting procedures and financial information is also not
discoverable.  This information would demonstrate the general
business practices of the defendants and would only be relevant
to the plaintiff's claim if he could demonstrate a link between
the reserve policies and the plaintiff's claim.  Because the
information about the specific reserve set in the plaintiff's
claim is not discoverable, there is no way that the plaintiff can
demonstrate this link.  Without the specific reserve information,
the general reserve information is irrelevant and not
discoverable.


        An appropriate order follows.

11

## **CERTIFICATE OF SERVICE**

I, E THOMAS HENEFER, ESQUIRE, certify that on this date, I

served a certified true and correct copy of the foregoing Proposed Order upon the

following counsel of record, by first class mail, postage prepaid, addressed as

follows:

> Richard C. Angino, Esquire
> 4503 North Front Street
> Harrisburg, PA  17110-1708

_____
E. Thomas Henefer

Date:  July __, 2003

## CERTIFICATE OF SERVICE

I, E THOMAS HENEFER, ESQUIRE, certify that on this date, I

served a certified true and correct copy of the foregoing Memorandum of Law

upon the following counsel of record, by first class mail, postage prepaid,

addressed as follows:

Richard C. Angino, Esquire
4503 North Front Street
Harrisburg, PA  17110-1708

E. Thomas Henefer

Date:  July 10, 2003