# DECLARATION OF LINDA NEE

I, Linda Nee, state of my own personal knowledge:

1. I am over the age of eighteen years, and I am competent to testify herein.

2. I make this declaration on personal knowledge and information, except otherwise indicated.

3. I was employed by UNUM Life Insurance Company ("UNUM Life" hereinafter) in Portland, Maine, as a Disability Benefit Specialist from January 15, 1994, to June 29, 1999. On June 30, 1999, UNUM Life Insurance Company merged with Provident Life Insurance Company ("Provident" hereinafter), forming UNUMProvident Corporation ("UNUM" hereinafter). After the merger with Provident, I became a Lead Customer Care Specialist. I remained a senior Lead Customer Care Specialist at UNUM through November 15, 2002, when I was terminated from that position.

## UNUMProvident's Pattern and Practice Of Claims Denials

4. During my tenure as a Lead Customer Care claims handler for UNUM for the years 1994 through 2002, I observed numerous claims handling processes that were instituted and practiced to maximize UNUMProvident's profits without regard to UNUMProvident's obligations to legally and fairly evaluate claims submitted by persons insured under UNUMProvident's group long-term disability insurance contracts. These procedures and practices were used to maximize UNUMProvident's profits at the detriment of insureds.

### 1994-1997 (Pre-Merger)

### Financial Targets and Incentives During the Years 1994 – 1997

5. UNUM Life management set financial targets for the closure of claims in accordance with the salary band levels of the claimants, and the reserve values on each particular claim. For example, Disability Benefit Specialists were informed by management of their respective collective claim reserve target per month (based on band level), which included a dollar amount of "uncontrollable closures", plus the dollar amount the specialist was required to "bring in" by settlements (i.e., claim closures achieved through negotiation). This predetermined target included a specified projection for signed settlement agreements, which resulted in the closing of files. A claim handler's failure to meet these goals negatively affected his/her performance rating at the end of the year. For example, claims handlers who achieved their monthly targets were financially rewarded at the end of the year, whereas claims handlers who failed to meet target closures of claims were penalized with poor performance ratings and ineligibility for promotion.

6. Each month, UNUM Life management identified claims paid in the claims department by their monthly indemnity amount. A list of the claims and the monthly indemnity amounts were printed and distributed to claims handlers with instructions to utilize all available resources to create a supportable basis for terminating claims. Claims with higher monthly benefits received a larger portion of risk management resources, meaning more money was appropriated and spent on resources, including but not limited to investigators, database searches, surveillance, vocational consultants, and other methods, to seek justification to deny or terminate claim payments. In general, claims paying in excess of $3,000.00 per month were targeted for termination. Claims payers were routinely provided by management with sorted lists of claims as targets for closure. Most often these lists provided sorts by benefit amount, age, claim duration, and claim reserve amounts. Instructions were given to concentrate on those claims with the highest reserve amounts for the purpose of denying the claims.

Activities within each department group were developed by management to encourage competition and obtain increased claims denials. Examples of such activities included the blowing of whistles at the start of weekly contests to determine which claims handler would be able to deny the first claim. If successful, the claims handler was awarded a prize for being the first to deny a claim. Often the ringing of bells on the floor was a signal identifying the denial of a claim. Prizes routinely awarded to the claims handlers included movie passes, gasoline cards, cinema passes, free book certificates, lawn furniture, summer recreation items, and twenty-five dollar certificates to local restaurants. I encountered managers walking up and down the rows of claims handlers asking them if they had closed a claim in the last five minutes at the end of a month or financial quarter. "Shareholder Awards" were given out at the end of each month to the claims handler who closed the most in claim reserve value at the end of each month. These activities and awards were frequent and common at the end of a month or financial quarter.

Claims handlers were required to work overtime on Saturdays and were not permitted to perform their regular jobs. Instead, the overtime weekend work was directed by management with lists of claims and activities on which management asked the claims handlers to obtain necessary documentation eventually leading to claim denials. Claims handlers were paid three hundred dollars per Saturday worked to engage in activities leading to the mass denial of claims before the merger with UNUMProvident in the third and fourth quarter of 1999. Additional monetary awards were given to those claims handlers who were able to close the highest amount of reserve value.

7. UNUM Life management regularly utilized a code identified as "90" at the end of a month or quarter for the purpose of reducing the reserve set aside on a particular claim without resorting to denying the claim outright or terminating benefits at that time. Specifically, certain claims were coded by management as "expected" closures using "90" codes. Once claims were coded as such, it was expected the

Baron 16266

claim would close in three months, or 90 days, after the end of the financial period. In order to meet this goal, claims handlers utilized private investigators and other risk management resources to gather information to support claims termination. Therefore, at the time a claim was given a "90 Code" the claim remained in active payment status without a corresponding insurance reserve amount, and there was an immediate contribution to profit despite the fact that the claim would continue to be paid for the next three months. Claims with the highest monthly indemnity amounts were sorted and claims handlers were instructed by the Mangers to "90 Code" the claims at the end of any financial period.

8. UNUM Life paid yearly bonuses to employees who met the above-referenced financial goals of terminating or denying claims as set within the particular departments. Company-wide bonuses were approved by the Corporate Compensation Committee and were announced each February. These incentive bonuses ranged from 6-10% of each employee's annual salary, and were distributed to employees by February 15th of the current year for all employees employed by October 1st of the year previous.

Post Merger June 30, 1999

Reorganization

9. Claims Handlers. After UNUM Life merged with Provident, the group long-term disability claims department was reorganized and subjected to micromanagement by senior management, under the direction of Ralph Mohney and Timothy Arnold. Specifically, claims handlers lost their autonomy in the processing and paying of claims, and could not longer render appropriate claims decisions based on the results of medical investigation leading to approval decisions. Their responsibilities were reduced to making eligibility reviews, referring claims through medical and vocational resources, and requesting medical data relevant to the claim. The claims handlers were then permitted to make only a preliminary decision as to whether to approve or deny a claim. Once claims handlers made this initial determination, the claims were forwarded to consultants for "validation."

As a Lead Customer Care Specialist, I include myself in the group of employees that I classify in general as claims handlers that reported to the consultants and senior management.

In the third and fourth quarter of 1999, as a Lead Customer Care Specialist I was involved in a project whereby the new Provident Leadership sent a team of Consultants to the Portland Campus for the purpose of reviewing claims previously managed pre-merger by UNUM Life Insurance. I was asked to pull approximately 300 ERISA group Long Term Disability claims which were reviewed by the Provident Consultant Team. At the end of the project, it was

Baron 16267

communicated to senior and lead specialists that the "new Provident philosophy" regarding medical reviews was that the opinions of the insureds primary care physicians was no longer relevant and the claim decisions going forward would be a direct result of the opinion of the UNUMProvident Physician staff. As a result after fourth quarter 1999, claims handlers were instructed to disregard the medical opinions of primary care physicians, or, to place their opinions second to that of the UNUMProvident Physician. This "new philosophy" represented a significant change in that prior to the merger, UNUM Life Insurance required claims handlers to obtain a "medical consensus" of opinion before making a decision on a claim. After the merger with Provident, a "medical consensus" was no longer required, and the claims decision regarding impairment was made wholly by the UNUMProvident Physician Consultant. Since the Consultants and Directors often dictated medical documentation to the Physician Consultant, medical opinions rendered were biased in favor of UNUMProvident.

10. <u>Consultants</u>. Acting as the business and technical mangers, the consultants had the authority to overrule a claims handler's decision to pay benefits to a claimant without performing additional risk management, or without including the claims handler in the decision-making process. Claims handlers were expected to follow the direction of the Consultant, even when the claims recommendation submitted for validation was appropriate given the medical and vocational reviews apparent in the submission of information in support of the claim. Thus, the validation process often required the claims handler to support claims decisions which were contrary to the supportive data, or which the claims handlers recognized as inappropriate. Since the Consultants had unlimited access to OMAR and insurance reserve amounts for each individual claim, decisions were often rendered by the Consultant based on the attainment of financial projections previously established by upper management. Failure to support the business decisions made by the consultants and managers resulted in probation and/or termination. Additionally, if a claims handler challenged the consultant's decision to overrule his/her decision, the claims handler generally received a negative performance review, and was socially ostracized from the working unit.

11. In addition, consultants had the authority to materially rewrite communications to claimants to such a degree that the communication was all but unrecognizable by the original claims handler who drafted the letter. The claims handlers were expected, however, to mail these altered letters under their signature, thereby misrepresenting to the customer and policyholder the actual author of the communication. As a Lead Customer Care Specialist, I was required to submit my letters in draft form to the consultant who reviewed them for the purpose of making changes to bolster UNUM's decision to deny benefits. I was then required to sign off on the letter even though I had not composed it in its entirety. The revisions to my letters by consultants were often material, and not merely stylistic or editing. Had I been granted autonomy, and not faced the risk of losing my position or suffering some other type of adverse employment consequence, I often would not have signed letters as revised by consultants.

Baron 16268

12. After the merger, only consultants and managers were provided information regarding the amount of money that UNUM set as an insurance claim reserve on each particular claim. Claims handlers were no longer provided access to this information. Consultants decisions to approve or deny claims were often based on the reserve amounts for each particular claim. As they had access to reserve information on a system called "OMAR", the consultants, together with the directors, determined which claims decisions would be made (i.e., validated) according to predetermined claim reserve targets.

13. "Metrics" were used to keep database records about each claims handler's approval/denial rates. These records were retained on a system referred to internally at UNUM as "OMAR." Information regarding each claims handler's approval/denial rates was accessible by database sort to managers during bi-weekly meetings and was referenced as a measure of performance for each claims handler. Of particular note, the overdue ERD's (Expected Recovery Dates) were consistently pointed out to all customer care specialists since overdue expected recovery dates reflected those claims which were projected as of a specific date, but which had not been denied. Overdue ERD's were perceived by management as an indication that the claims payer was not efficiently managing claims targeted for denial (resolution) on a specific date. This measurement was reflected on the claims payers annual performance.

## Financial Incentives

14. At the time of the merger, UNUM removed incentive bonuses from claims handlers, providing them instead to managers and consultants. UNUM replaced incentive bonuses with a performance reward (PRP) for claims handlers. The PRP amounts varied between $200.00 to $1200.00. Managers could recommend any claims handler for a PRP within the given range. On paper, this monetary reward was given for project work, or any other reason for which the manager felt a claims handler should be rewarded. In reality, it was my experience that those claims handlers who consistently met high claims reserve projections were given the PRPs. For example, those claims handlers in my unit who denied non-ERISA individual disability claims with higher monthly indemnities usually received the PRPs. In addition, those claims handlers who consistently met the ERD projections and supported the "UNUMProvident claims process" received the PRP's.

## Financial Projections and Denials of Claims

15. The financial projections or the number of resolutions/denials for each unit were discussed at monthly staff and departmental meetings. During these meetings, UNUM's Portland claims office denials were compared with other UNUM location offices. We were often told at these meetings that the denial and termination rate of the Glendale, California office was the highest of all of UNUM's offices, and was something that we should strive to meet. At one of the

Baron 16269

Psyche/Cardiac Impairment Unit meetings requested by the current Impairment Head, Mary Fuller, the claims handlers were told not to inform the insured of their appeal rights under the ERISA statues when calling to communicate their claim denial. We were told that our Quality Review division had recently received an overwhelming number of requests for ERISA review, and that going forward, although we did notify the claimant's in writing of appeal rights, we were not to inform them of the right to appeal when making our denial calls.

16. The claims set for termination at the monthly staff and departmental meetings occurred in several different ways. Some claims were justifiably set for closure because the claimant's treating physician released the individual to work. Others were directed to close by consultants and managers, following a Team Roundtable, blitz search (discussed further below), or simply because the consultant and/or manager had set that claim to close for "business reasons." These claims were frequently identified as a result of consultant claim file reviews, or file reviews performed by managers who sought out higher monthly indemnity claims.

17. At the end of each month, consultants and other senior managers pressured claims handlers to deny claims that were declared at the outset of the month as projected denials by consultants and senior management. We periodically received e-mail updates of our progress in meeting targeted projections, and Consultants and Directors visited our offices frequently to check on our progress concerning meeting our "resolutions." (Claim denials) Inability or difficulty on the part of the claims handler to meet "projected denial targets", was viewed by management as a performance issue.

18. Blitz searches are utilized by UNUM to meet monthly projections. Blitz searches generally describe one of two scenarios: when consultants and managers go on a hunt to seek claims to deny, or when particular units are asked to work overtime to find claims to close. When asked to work overtime as a part of a blitz search, claims handlers were instructed to review each of their claims, starting at the beginning of the alphabet and moving onward, in an effort to seek any justification to close a claim. Justifications to close a claim included notations in an office note that indicated that the claimant was "getting better" or was "doing well." Such a notation would be sufficient to deny a claim, regardless of whether the claimant's treating physician had cleared the claimant to return to work. Once a claim handler located a justification to deny a claim, the claim handler would then rush the claim file to a nurse, also working overtime, for a medical review. The nurse was responsible for completing a medical summary of the claim, highlighting the information used to justify the denial, and setting aside the medical review for a "medical walk-in." A "medical walk-in" was when the nurse stops by a medical director or physician's office for a sign-off on the denial. The "medical walk-in" occurred at a later date, however, it was quite common for the Consultant to return files to the Impairment Unit Physicians for a documentation re-write, or other documented medical support for a denial.

## Reserve Manipulation

19. The reserves at UNUM were constantly manipulated so as not to negatively effect UNUM's financial reporting. Claims processing was often manipulated to achieve this goal. If new claim reserves were opened and closed within the same month, profitability was not affected. Therefore, if claim decisions, both approvals and denials, could be held for periods of time, managers were able to create their own financial results within any given period. Although UNUM required all customer claims handlers to sign customer service guidelines, these guidelines were consistently disregarded due to the hold up and manipulation of claims decisions by consultants. These delays often resulted in claims handlers answering letters and telephone calls from angry claimants. It was my frequent observation that the Consultants collectively chose which claims to "validate" and which claims would remain "invalidated" until after the 1st of a new month, so as to "bring in" the projected target for that month without going over the projected targets.

20. "Reservation of rights" was another tactic utilized by UNUM to manipulate its reserves. If a claim was tagged as being paid under a "reservation of rights," UNUM was not responsible for reserving an entire uptake of reserve on that particular claim. Therefore, if consultants or managers were faced with a number of claims they had to pay by the end of the month, a certain amount of claims were approved under "reservation of rights" so as to lessen the amount of reserves that had to be set aside by the company. The reservation of rights designation was then be lifted on a staggered basis, during months when there was not a large uptake of reserves at issue. In addition, Managers who had access to the PACE system used in the Worcester, MA office would notify the claims handlers of non-ERISA Individual Disability claims which had been denied on any given month. If there was also a group LTD claim for the same claimant in the Portland Office, the manager would order the claims handler to close the group LTD claim without sufficient review or cause to deny such a claim. These were referred to as "common claims" or "shared claims." I was personally instructed by a director, at the end of a month, to inappropriately deny a group LTD claim because the Individual Disability claim located in the Worcester office had been closed.

## Tactics UNUM Perpetrates To Deny Legitimate Claims

21. **Roundtables.** "Roundtables" were regularly utilized by UNUM as a tool to formulate a basis to deny claims. Roundtables encompass both Team Roundtables and Multi-Disciplinary Roundtables, both of which occur at different times, but with the same goals: to deny claims and to ensure that the claims handlers were utilizing all available resources to "build" documentation to support claim denials.

22. **Team Roundtables.** Team Roundtables generally occurred at the outset of a new claim. When a new claim came into UNUM, it was assigned to a particular unit, which was based upon the claimant's impairment. The claim was then triaged by

consultants and managers in the unit, who reviewed the claims for "quick hits". "Quick hits" included claims that consultants and/or managers believed could be resolved quickly and easily. "Quick hits" were assigned to a particular claims handler, who was then instructed to be present at a certain date and time for a Team Roundtable.

23. Team Roundtables generally included some or all of the following individuals at UNUM: consultants, managers, nurse consultants, and vocational consultants. The overall purpose of a Team Roundtable was to seek and provide medical, vocational, and consultant validation to claims previously identified as "quick hits." The claims were then ready to be immediately denied and/or approved at the discretion of the consultant, manager and resources. Any resistance on the part of the claims handler to the group decision was viewed negatively by management and the claims handler was viewed as a non-team player. Disagreement or negative comments made against the decision of the consultant (inappropriate decisions) and/or Director present at the roundtable were commented upon as performance issues in the claims handlers next performance report.

Based on the collection of all objective medical evidence provided in support of a claim, documentation provided by risk resources, conversations with both the insured and the policyholder, there was never an occasion within the UNUMProvident claims process for a claims handler to render an opinion or a decision which he/she felt was appropriate to the claim without individual performance issues being raised. "Push back" on the part of the claims handler in support of appropriate claims decisions was viewed negatively by management since many of the decisions made were favorable to the insured and unfavorable to UNUMProvident's projected financial targets.

24. **Multi-Disciplinary Roundtables.** Multi-Disciplinary Roundtables were generally held for claims that had monthly benefit amounts sufficient to support more complex and expensive risk management resources. Multi-Disciplinary Roundtables generally included the following individuals: the impairment head, who is generally a Vice President, Tim Arnold, if he was in Portland, a consultant, physician and/or medical director, manager, nurse, legal department representative, and the claims handler. The claims handler's only role was to present the claim to the group. Once the claim was presented, the claims handler took a secondary role, while the group discussed the claim and the various risk management tools that could be utilized to deny the claim. The claims handler then left the roundtable with either a plan for denying the claim, or a list of risk management items in which she/he must engage before denying the claim. This might include sending the claim for a medical review, or engaging in surveillance. Legal resources attended the Multi-Disciplinary Roundtable as their participation supported this forum and all documentation generated therein as being "privileged and proprietary" and immune from disclosure to claimants upon request. The Multi-Disciplinary Roundtable was responsible for hearing different claims

throughout the day, and was often "set up" as a staged forum when potential customers were being taken on a tour on any day.

25. In general, "roundtables" were used to develop a method for terminating a particular claim. Since two thirds of UNUMProvident's qualified claims handlers have either been terminated, or left the company, a secondary purpose of the roundtables were to insure that all efforts were being made by the new and inadequately trained workforce to "resolve" the claims as of a specific date. (ERD)

26. During roundtables, consultants had the authority to request physicians or medical directors to change, or to alter, their "write ups" or opinions of claims so as to perfect and/or support claim denial decisions in such a way that the decision would be unopposed at the ERISA and Quality Review appeal level. Physicians were expected to make the requested documentation changes upon the request of the consultant, director, or impairment head.

27. I have been present at roundtables on many occasions and have personally observed the claims consultant verbally pressure physicians or medical directors to change their medical opinions regarding a claimant's restrictions and limitations and/or a claimant's ability to work at any occupation. Under the pressure of this group review of claims files, I observed instances whereby a physician or medical director then changed, amended, supplemented or rewrote his/her medical report in order to accommodate the demands of the claims consultant in providing written documentation to support a claim denial or termination. I have also been present at MDR when the Impairment Head directed that the Physician take specific steps to document claims for immediate denial.

28. Vocational consultants are often directed to rewrite their reviews to better support UNUM's position during roundtables. These communication requests routinely took place by e-mail and therefore were not placed within the official claim file. I have personally observed, and been present when a vocational consultant refused to conduct a TSA (Transferable Skills Analysis) because the results were anticipated to be favorable to the claimant and continuation of benefits.

29. **Failure To Follow Internal Guidelines For Claims Handling.** UNUM developed internal claims handling guidelines, which, according to internal policy, were required to be followed in the processing of each individual claim. For example, once a claim was received at UNUM, claims handlers were required to seek the claimant's medical records from all treating physicians, to engage in a vocational review and transferable skills analysis, and to have an internal physician or medical consultant review the claim file. Claims handlers routinely refrained from requesting some or all of these requirements for the express purpose of denying claims. Often times, a claims handler would request a particular review, such as a transferable skills analysis, and a manager or

Baron 16273

consultant would overrule the request, because conducting the review would lead to a result unfavorable to UNUMProvident.

30. Prior to my termination, I requested a transferable skills analysis to determine whether jobs existed that the claimant was able to perform given her experience and training. The vocational consultant told me that should she perform such an analysis on this particular claim, the results would be unfavorable to UNUM. As a result, my consultant and vocational specialist denied my request for a transferable skills analysis on this claim, which would have normally been required as part of the claims process, had the decision been expected to be favorable to UNUMProvident.

31. Claims handlers often utilize, or refrain from utilizing, independent medical examinations ("IME") to deny legitimate claims. Specifically, a claims handler will often ask a medical director about his/her opinion regarding the expected result of the IME prior to requesting the exam. If the medical director expected the result to be unfavorable to UNUM, claims handlers would refrain from scheduling the IME. The IME Network (Corporate Enterprise) maintains lists of commonly used Physician's who consistently render examinations and documentation favorable to UNUM.

32. Similarly, while physicians or medical directors were required to review all the medical records in a claimant's file prior to rendering a denial decision on a particular claim, it was often the case that nurses engaged in the file review and rendered determinations regarding the claimant's restrictions and limitations and disability. These reports were referred to as a "Clinical Referral". In drafting the Clinical Referral, the nurse often would not objectively report the medical information, but would carefully sift through the claimant's medical records in an effort to locate information that could be used to deny a claim, and would report on this information exclusively. Information that could be used to support an insured's claim was often omitted from the Clinical Referral. This Clinical Referral was provided to physicians and/or medical directors to review before making a decision on a particular claim. On such occasions, it was the often the case that the physician would refrain from reviewing the claimant's medical records prior to making a disability decision, but would limit his/her review to the Clinical Referral as told to him by the RN who previously reviewed the claim.

33. UNUM's internal claims handling guidelines require that physicians knowledgeable in the specialty of the claimant's illness review the claimant's medical records. However, it was often the case that physicians without expertise in certain areas were asked to review certain claims in order to render a determination as to the claimant's disability. This was primarily because claim handlers who felt the pressure to deny certain claims would seek out certain physicians at UNUM with a reputation for writing reports favorable to UNUM, regardless of their area of specialty.

34. Senior management and consultants had the authority to override a physician's decision to support a claimant's disability and/or restrictions and limitations. Senior managers and consultants further had the authority to require physicians to sign off on a claim denial, which is often subsequently closed for "business purposes." It was my observation that Consultants often asked the Impairment Unit Physicians to amend or change their documented review to better support denials of claims.

35. <u>Targeting of Specific Types of Claims</u>. UNUM often targeted claims for closure depending on the nature of the claimant's illness. For example, the most highly targeted illnesses at UNUM were those that were "self-reported" in nature, such as Chronic Fatigue Syndrome (CFS) and Fibromyalgia. Claims based on CFS and Fibromyalgia were "quick hits" for denial. UNUM utilized two tactics to deny or limit its liability for "self-reported" claims: 1) they were classified as "mental" and limited under the two-year mental illness limitation contained in most UNUM long-term disability policies, and 2) they were routinely denied on the basis that they were not impairments and were therefore not disabling. These tactics were utilized regardless of the nature of the claimant's treatment (i.e., regardless of whether or not the claimant carried a mental health diagnosis or received treatment from a mental health professional) or the opinion of the claimant's treating physicians. Claims with monthly benefit amounts in excess of 4,000.00 we also targeted for denial by utilizing increased resources such as medical and vocational for the purposes of documenting the claim for potential denial.

36. UNUM physicians utilized a 25-page position paper or template for evaluation and termination of claims based upon self-reported symptoms. This position paper instructed physician consultants on how to discredit claims based on self-reported symptoms for purposes of avoiding liability on these claims.

37. When working as a claims handler in the psyche/cardiac impairment unit at UNUM, I inquired as to why numerous claims based on CFS and Fibromyalgia were sent to my unit for handling despite the fact that the claimants were not utilizing psychiatric resources nor had they been diagnosed with mental health conditions. I was informed at that time of the existence of the above referenced 25-page position paper, and was given a copy of the paper for review by a physician at UNUM. The paper explained how to handle claims based upon self-reported symptoms and specifically described what position physicians should take when reviewing claims based upon self-reported symptoms. I was instructed to return this "position paper" to the Physician who provided it to me because "no one else was allowed to view it."

38. It is also important to note it was my observation during my tenure as a Lead Customer Care Specialist within the psyche/cardiac impairment unit, that claims were frequently paid under the mental/nervous provisions of their policies in order to avoid the reserve loss difference between payment for twenty-four

months and payment to age 65, or the duration of the claim. Since the claim payment system (BAS) provided for the increase and decrease of claims reserves depending upon the expected payment duration of a claim, business decisions were frequently made within the Impairment Units to pay claims under the twenty-four month mental/nervous limitation, so as to manipulate the overall financial status of the company per impairment unit per month or quarter, and to meet previously determined projection results. The managers and consultants made these business decisions. As a Lead Customer Care Specialist, I frequently brought claims with "physical impairments" being paid under the 24 month limitation to management's attention, however, I was told that once a claim came to the psyche impairment unit, it could not then be transferred out for payment to another impairment unit where it would be paid to duration or age 65.

### Tactics Utilized By UNUM To Prevent Claimants From Accessing A Full And Fair Review Of Claim Denials

39. **Purging of Claim Files.** UNUM's legal department issued a directive to the claims department in the form of a memorandum, and instructions located on a searchable database referred to as Knowledge. Net, providing directions on how to handle requests for claim files. The memorandum described what file documentation may be photocopied and provided to attorneys and/or the insured when a files were requested. Although the legal department's directive indicated that all information used in making a claims decision should be provided to the requestor, it was noted that some UNUM documentation was considered to be "privileged", and should not be included in the file provided to anyone outside the organization. Definitions of specific information deemed to fall within the "privileged" category were not specified. As a result, I observed that documentation removed from claim files was largely at the discretion of the claims handler and manager.

40. The process to provide a copy of a claim file included: 1) requesting the administrative assistant photocopy the original claim file and return it to the claims handler, 2) information defined as "privileged" and "proprietary", such as communications between the claims handler and a UNUM attorney, manager, or consultant, as well as records of conversations concerning claim status, roundtable discussions and team presentations, were removed from the photocopy of the file, and 3) the purged photocopy file was then sent to the attorney or claimant who requested the file.

41. It has been my personal experience with particularly complex and sensitive long-term disability claims, that after removing what I considered to be "privileged" file documentation per the direction of UNUM's in-house lawyers, my manager then removed further information, which she (Patricia Bailer) felt should not be included in the claim copy provided to the claimant or his/her attorney.

Baron 16276

42. Many of the most important conversations regarding claims are not documented in the claimants' claim files, but rather occur on an ad-hoc basis between claims handlers, consultants and/or managers. These were the conversations where claims handlers were instructed to refrain from engaging in particular reviews of claims files (i.e., vocational or medical reviews), or were instructed to utilize particular in-house physicians to deny claims. As a result, claimants were provided with limited information as to the decision-making process UNUM underwent to deny his/her claim for benefits.

## Summary

43. As an experienced Lead Specialist, it was my observation that two-thirds of the qualified claims handlers employed by UNUM either left the company or were terminated since the merger, leaving a relatively new workforce who was inadequately trained and inexperienced in managing all of the UNUM products in a quality and timely fashion. Claims handlers were required to manage insurance products for which they were not trained such as full insured and self-insured Short Term Disability and Life Waiver. As of the date of my termination very few claims handlers knew how to process the Life Waiver product, however, all persons involved in the customer care organization under Tim Arnold and upper management were required to continue management of products for which they had no experience or training. As a result, I observed error upon error and informed management of such. No actions were taken to correct or resolve errors brought to the Impairment Head's attention.

    As a Lead Customer Care Specialist, I reported many errors to management in the areas of claims adjudication. Examples of such errors included non payment of additional benefits under the "Revenue Income Provision" of the group disability policy. Having conducted an independent search of claims with policy provisions requiring such payments, I found 55 claims where no such payments were being made. When I informed management of these errors I was instructed by my manager to not mention the errors, "since many people were leaving the company, we did not want them to feel they didn't know what they were doing." I corrected the errors myself and made the required payments on those claims which came to my attention. Other areas of frequent error included, non payment of "Cost of Living Increases", and additonal contractual benefits contained in a "Disability Plus Rider" within the group policies.

44. It was further my observation at the time of the Provident merger that the claims process used in the Chattanooga office as well as in the Paul Revere companies, was put in place in Portland, Maine, Worcester, Massachusetts, and in Glendale, California. Colonial Life also used the same claims practices and processes. These companies are all under the umbrella of UNUMProvident with CEO Harold Chandler, Ralph Mahoney and Tim Arnold directing the claims process from the home office in Chattanooga. The Glendale office was reported in general staff meetings to have the highest claim denial rate in job vs. occupation issues,

13

Baron 16277

and the Worcester office handled individual disability insurance claims and remained extremely under budget with minimal employee support and resources.

Under the penalty of perjury under the laws of the State of Maine and pursuant to 28 U.S.C., section 1746, I verify that the foregoing is true and correct.

Date: 2/18/2003

Linda Nee
Portland, Maine

Sworn to and subscribed before me

this 18 day of February 2003

NOTARY PUBLIC

County of York
Limerick, Maine

SHERRY A. NORTON
[notary stamp, partially illegible]
My Commission Expires [illegible]

# DECLARATION OF LINDA NEE

Linda Nee declares:

1. I am over the age of eighteen years, am competent to testify herein.

2. I was employed by UnumProvident and its predecessors as a Disability Benefit Specialist prior to merger with UNUMProvident, and as a Lead Customer Care Specialist after the merger with the Provident Companies from January 15th 1994 through November 15th 2002.

3. During my tenure as a Lead Customer Care claims handler for UNUMProvident for the years 1994 through 2002, I witnessed the following claims handling practices:

    1994-1997
    a. Management's setting of financial targets in accordance with salary band levels and reserve values. Disability Benefit Specialists were required to deliver a specified uncontrollable reserve "take down" on a monthly basis dependent on salary levels. This predetermined target included a specified projection for signed settlement agreements. The achievement or non-achievement of these goals were directly related to the claims payers performance rating at the end of the year.

    b. The payment of yearly bonuses to employees for meeting the reserve profits within the organization. Bonuses ranged from 6-10% of each employee's annual salary, and were distributed to all employees employed by October 1 for the year in which the bonus was declared by the Corporate Compensation Committee.

    c. The sorting of claims in the department by the monthly indemnity amount; printing and distribution of this information to the claims payers with the instructions to apply all available resources in an effort to close the claim. Claims with higher monthly benefits received a larger portion of risk management resources.

    d. The use of "90" codes at the end of a month or quarter. "90 codes" were used as part of the claims payment system as a way of "reducing claims reserves" without an actual denial of a claim. Managers directed the coding of the payment system at month or quarter end to code certain "expected" closures using "90 codes." It was expected the claim would actually close three months after the end of the financial period, and risk resources were applied to the claim to affect

the closure of the claim within three months following the end of a financial period.

1997-2002

a. Post merger with The UNUMProvident Companies, claims practices were reorganized into a micromanaged process involving Consultants. Claims handlers lost their autonomy in the processing of claims and responsibilities were reduced to eligibility reviews, following the claims through the medical and vocational resources, collecting medical data relevant to the claim. The claims were then forwarded to the Consultant for "validation."

b. Acting as the business and technical mangers, the Consultants have the authority to validate the claims specialist's approval/denial decision, or to over rule the specialist and either return the claim to the claims payer for additional risk management, or force a denial on the claim. Any actions or challenges posed by the claims payer regarding the Consultant decision on a claim becomes a performance issue for the claims specialist. The claims specialist is often placed on probation for a period of time for challenging the consultant's authority to make final decisions regarding the claims process.

c. Reserve targets and "metrics" were placed underground by the UNUMProvident organization allowing only managers and consultants access to reserve values. "Metrics" are used to keep data base records on a system referred to as "OMAR" for the purpose of collecting data concerning each claims payer's approval/denial rates. This information is provided to the claims specialist during 1/1's with their manager's as and indication of performance in making claims decisions.

d. Consultants have the authority to alter approval, denial and claimant communications letters to such a degree so that the actual writing of the communication by the claims payer is unrecognizable. The claims handlers are expected to send out these altered letters under their signature, thereby misrepresenting to the customer and policyholder who the actual author of the communication is.

e. The medical review process at UNUMProvident is such that Registered Nurses review the medical information submitted in support of a disability claim, and subsequently "walks in his/her review to the Physician, who then "signs off" on the claim based on the RN's review. UNUMProvident requires the sign-off of a physician for claim denials, when in most cases the Physician at UNUM in the specialty appropriate for the impairment does not review the actual claim documents. Even in incidences when a physician takes issue

with claim decisions, UNUMProvident managers can override a physician's decision to support restrictions and limitations, and required him/her to sign off on a claim which is subsequently closed. Physician's are only required to "sign off" on claims being closed, however, they are often asked to review complex claims to provide documentation leading to a denial or termination in the future.

f. Consultants have the authority to ask Physician's during roundtables and team presentations to change, or so alter their "write ups" of claims so as to perfect and/or support claim denial decisions in such a way that the decision will be unopposed at the ERISA appeal level upon review. Physician's usually make the requested documentation changes.

g. Claim decisions forwarded to the Consultants are routinely held up for periods of time without validation in an effort to manipulate the financial status of the company. If new claim reserves are opened and closed within the same month, profitability is not affected. Therefore, if claim decisions, both approvals and denials can be held for periods of time, managers are able to create their own claim financial results within any given period. In the meantime, customer service issues are created placing the claims handler in a position of handling calls from both the insured and the policyholder regarding the payment status of the claims.

h. UNUMProvident's legal department issues directives as to what information can be photocopied and provided to attorneys, insured when a copy of file documentation is requested. Inter-company communications between Consultants, claims handlers and manager's is considered to be "privileged" and claims handler's are instructed to remove this documentation from the file before forwarding to the requestor.

4. Specific examples I have observed which would be deemed questionable under UNUM Insurance company would include the blowing of whistles to begin a "blitz" search to find claims and close them; relating specific reserve "take down targets" for each claims specialist to performance; the payment of yearly bonuses based on reaching budgeted targets and claims strategy. Since the merger with UNUMProvident, I have observed Consultants returning claims to Physicians for the altering of their previous claim reviews; altering of communications and rewriting of letters written to the insured and policyholders; removal of interoffice communications before sending copies of files to attorneys, and as a result of a subpoena; manager's asking claims handlers to close claims as a "business decision" at the end of a month or quarter, overriding the medical opinion of a Medical Director; the

indiscriminate closing of a shared LTD/ID claim without any medical review; apathy on the part of management to encourage quality claim adjudication by requiring claims handlers to process insurance products for which they have no training or experience; apathy on the part of management to affect change in the quality of the claims management process when it is brought to their attention that contractual provisions favorable to the claimant are being overlooked or not paid. Claims handlers are required to mange fully insured and self insured STD without experience, and currently, the Life Waiver product is being managed by claims handlers who are not familiar with this product, and cannot provide quality handling. As an experienced Lead Specialist, it is my observation that two thirds of the qualified claims handlers employed by UNUMProvident have either left the company or have been terminated since the merger, leaving a relatively new workforce in place, inadequately trained, and inexperienced in managing all of the UNUMProvident products in a quality fashion.

5. From a technical perspective if benefits have never been paid on a claim, and a decision is made to NOT support the payment of benefits, the claim is said to be "denied". If, however, the claim was initially paid, then NOT supported, the claim is said to be "terminated." Both "denied" and "terminated" claims are said to be "closed" which refers to the releasing of the claim reserve and the acknowledgement that no further risk management will be applied to the claim.

6. Since the merger with UNUMProvident, employees have been severely micromanaged into supporting the Provident agenda and claims management process. On occasions when the claims practices have been challenged by individuals on the floor, management has consistently applied performance management by putting employees on warning, then probation for a period of time, followed by termination for what they describe as "poor performance." As an experienced Lead Customer Care Specialist I have consistently brought unfair claims practices and inappropriate consultant's claims decisions to management's attention. As a result, over the last two years I have been consistently tagged a "disgruntled employee." Approximately a year ago I challenged an inappropriate directive given to me by my former manager, Paul Keenan, to close a shared LTD/ID claim without having a prior medical review completed on the LTD information submitted by the claimant in support of their claim. My suggestion was to ask a physician to review the claim documentation prior to closing the claim. I was placed on 60 days probation for failure to "support the business decisions of the company." Other issues such as sending what were considered to be inappropriate emails were also cited in the written probation. After going out on STD for a medical condition (UNUMProvident originally denied my claim which was subsequently upheld on appeal), I was transferred to another unit in the psyche unit under the Director, Pat Bailer. In September I was awarded a monetary performance award of five hundred dollars for a project working with my

team to educate them on the Life Waiver product. My manger asked me to close a claim by advance pay and close which was inappropriate and my assigned consultant began holding up my claims decisions in her office, rewriting communications (unusual because of my Lead status). I observed my consultant directing a physician to change his written documentation and pointed this out. I also pointed out to my manger, discrepancies in the claims files I had been reviewing indicating our team was not adjudicating policy provisions correctly. A good example of this is in the administering of our LTD policy provision for the payment of Revenue Income Protection benefits. Upon investigation I was able to determine a large quantity of claims for which UNUMProvident had not paid the Retirement Protection benefit, or had applied the provision inaccurately. I was told by my manger not to make waves with this information since too many employees were leaving UNUMProvident and we would not want to give the impression to people that they were not doing things correctly. In early November, my Consultant asked me to apply several claims processes which were inappropriate, and I refused to comply with the directive. I was placed on probation for thirty days on 11/4/2002 and was terminated on 11/15/2002 for "inappropriate behavior." I was not allowed to return to my office to collect my personal belonging, instead they were inventoried by an office assistant and mailed to me by airborne express.

It has been my observation within the last 12 months, several middle aged, experienced women in my department with tenure have been terminated. Mary Fuller, Vice President, with the company for 18 years was terminated, Barbara Greenstein, Vocational Consultant, with the company for 20 years, terminated, Cindy Bellefountaine, with the company 15 years, terminated, Nancy Bogg, Vocational Consultant with the company 10 years resigned after being pressured, Constance Cardamone, with the company 20 years resigned after being pressured, and myself with the company just short of 9 years terminated 14 months before qualifying for pension and subsidized medical benefits. Claims handlers who have resigned within the last six months are as many as 40 within the last year. A pattern has developed for terminating older women eligible for a pension, who were employees under the old UNUM, for performance issues. When terminated, employees are lured away from their work stations, their personal belongings are packed by security and the individual is escorted to the door. UNUMProvident's motive is to avoid the opportunity of the employee of taking any UNUM documents with them prior to leaving the building, aside from the humiliation of being seen by your peers as you leave the building escorted by security. UNUMProvident sends a very powerful message to either support the claims process in place or be terminated.

It has been my observation in risk managing claims from the various UNUM locations that the UNUMProvident Consultant claims process is identical to that of the Portland Office. At the time of the Provident merger, the claims process used in the Chattanooga office as well as in the Paul Revere companies, was put in place in Portland, ME; Worcester, MA, and in Glendale, CA. As part of the old UNUM and a subsidiary of UNUMProvdient, Colonial Life also uses the same claims practices and processes. These companies are all under the umbrella of UNUMProvident with CEO Harold Chandler and Ralph Mahoney directing the claims process from the home office in Chattanooga. The Glendale office is reported to have the highest claim denial rate in job vs. occupation issues, and the Worcester office handles ID claims and remains extremely under budget.

7. It is my observation that All Impairment Units (Psyche Cardiac, Orthopedic, Cancer, General Medical) in all UNUMProvident locations follow the same medical claims review process of Consultant validation and authority to make claims decisions based on business projections.

8. UNUMProvident has recently enacted what is referred to as the "New Clinical Model." This means that claims payers, using an online medical reference called MDA, can document information from this resource and make their own medical decisions regarding impairments and whether claims should be approved or denied. Keeping in mind that any decision a claims handler makes initially can be overruled by a Consultant, this change in the process has made little change in the medical review process other than to allow non-qualified claims handlers to review medical documentation and offer opinions on the content.

I declare under the penalty of perjury under the laws of the State of Maine and the United States of America that the foregoing is true and correct.

Date: 2/18/2003

*Linda Nee*
Linda Nee
Portland, Maine

Sworn to and subscribed before me

this 18 day of February 2003

*[signature]*
NOTARY PUBLIC

County of York
Limerick, Maine

SHERRY A. NORTON
Notary Public, Maine
My Commission Expires January 19, 2007

Declaration of Linda Nee
Page 6

Baron 16264