LEXSEE 2003 U.S. App. LEXIS 13182

W.V. REALTY INC.; NEW MONTAGE MANOR, INC. v. NORTHERN INSURANCE COMPANY OF NEW YORK, Appellant

No. 02-2910

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

2003 U.S. App. LEXIS 13182

April 10, 2003, Argued

June 27, 2003, Filed

**PRIOR HISTORY:**
APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA. D.C. Civil No. 00-cv-00525. District Judge: The Honorable A. Richard Caputo.

**DISPOSITION:**
Final judgment of District Court dated January 7, 2002 vacated. Post-trial order of District Court dated June 10, 2002 vacated in all but one respect. Case remanded for new trial.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff insured sued defendant insurance company alleging bad faith with regard to the insured's business interruption claim. The jury found in favor of the insured and awarded punitive damages pursuant 42 Pa. Cons. Stat. § 8371. The United States District Court for the Middle District of Pennsylvania denied the insurance company's motion for judgment as a matter of law and its motion for a new trial. The insurance company appealed.

**OVERVIEW:** The roof over a banquet hall collapsed under the weight of accumulated snow and the insurance company was called upon to pay both building damages and business interruption losses under the policy. The building damage claim was resolved fairly expeditiously, but for a variety of reasons attempts to resolve the business interruption claim failed. The court of appeals found that the admission at trial of a discovery violation by the insurance company was not probative of its bad faith in resolving the insured's business interruption claim, but was unfairly prejudicial in the way it was presented because it involved other bad faith cases against the insurance company. The admission at trial of allegations contained in a third-party complaint brought by the insurance company against the contractor who built the banquet hall was also highly prejudicial, in part because, in closing argument, the insured's counsel characterized the allegations as "fraud upon the court." However, denial of motion for judgment as a matter of law was proper because the record contained sufficient admissible evidence supporting a finding of bad faith on the part of the insurance company.

**OUTCOME:** The judgment was vacated and the matter was remanded for a new trial.

**LexisNexis(TM) HEADNOTES - Core Concepts**

*Constitutional Law > Trial by Jury in Civil Actions*
*Insurance Law > Bad Faith & Extracontractual Liability > Punitive Damages*
[HN1] In Pennsylvania, the punitive damages remedy in a statutory bad faith action under 42 Pa. Cons. Stat. § 8371 triggers the Seventh Amendment jury trial right. Section 8371 does not, however, provide for the right to a jury trial in state court.

*Civil Procedure > Trials > Judgment as Matter of Law*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN2] An appellate court reviews a district court's decision denying a motion for judgment as a matter of law de novo, and apply the same standard that the district court did, namely whether, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is

2003 U.S. App. LEXIS 13182

insufficient evidence from which a jury reasonably could find liability.

*Civil Procedure > Relief From Judgment > Motions for New Trial*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN3] A district court's decision to deny a party's motion for a new trial is reviewed for abuse of discretion.

*Insurance Law > Bad Faith & Extracontractual Liability > Punitive Damages*
[HN4] 42 Pa. Cons. Stat. § 8371.

*Insurance Law > Bad Faith & Extracontractual Liability > Payment Delay*
[HN5] Under Pennsylvania's bad faith insurance law, the term "bad faith" is not defined in the statute, but the Pennsylvania Superior Court has defined it as any frivolous or unfounded refusal to pay proceeds of a policy. To make out a claim of bad faith, a plaintiff must show by clear and convincing evidence that the insurer (1) did not have a reasonable basis for denying benefits under the policy; and (2) knew or recklessly disregarded its lack of reasonable basis in denying the claim.

*Torts > Insurance Claims > Insurers Bad Faith*
*Insurance Law > Bad Faith & Extracontractual Liability > Punitive Damages*
[HN6] Under Pennsylvania insurance law, the Pennsylvania Superior Court holds that bad faith is actionable regardless of whether it occurs before, during or after litigation. The Superior Court made it quite clear, however, that this did not mean that insureds may recover under Pennsylvania's bad faith statute for discovery abuses by an insurer or its lawyer in defending a claim predicated on its alleged prior bad faith handling of an insurance claim. This general proposition comes with the caveat that using litigation in a bad faith effort to evade a duty owed under a policy would be actionable under 42 Pa. Cons. Stat. § 8371.

*Torts > Insurance Claims > Insurers Bad Faith*
*Insurance Law > Bad Faith & Extracontractual Liability*
[HN7] In Pennsylvania, in those cases in which nothing more than discovery violations were alleged, courts have declined to find bad faith.

*Torts > Insurance Claims > Insurers Bad Faith*
*Insurance Law > Bad Faith & Extracontractual Liability*
[HN8] Under Pennsylvania' insurance law, those cases in which courts have permitted bad faith claims to go forward based on conduct which occurred after the insured filed suit all involved something, beyond a discovery violation, suggesting that the conduct was intended to evade the insurer's obligations under the insurance contract.

*Evidence > Relevance > Prior Acts, Crimes & Wrongs*
[HN9] See Fed. R. Evid. 404(b).

*Civil Procedure > Pleading & Practice > Pleadings > Interpretation*
[HN10] The Federal Rules of Civil Procedure permit parties to file pleadings containing inconsistent factual and legal allegations. As a general rule, however, the allegations asserted in an earlier lawsuit may be introduced by the adversary as evidence in a second action. Some courts have made an exception to the general rule of admissibility for third-party pleadings.

*Evidence > Procedural Considerations > Judicial Admissions*
[HN11] Legal conclusions may not be used as evidentiary admissions.

*Civil Procedure > Appeals > Standards of Review > Harmless & Invited Errors*
[HN12] In a civil case, an error is harmless if it is highly probable that it did not affect the complaining party's substantial rights.

*Torts > Damages > Punitive Damages*
[HN13] Pennsylvania holds that punitive damages may be awarded to punish a defendant for outrageous conduct, which is defined as an act which, in addition to creating actual damages, also imports insult or outrage, and is committed with a view to oppress or is done in contempt of plaintiffs' rights. Both intent and reckless indifference will constitute a sufficient mental state.

**COUNSEL:**
Ignatius J. Melito, Esq. (Argued) Melito & Adolfsen, New York, NY. William J. Schmidt, Esq., White & Williams, Philadelphia, PA, Attorneys for Appellant.

Michael R. Mey, Esq. (Argued) Wormuth, Mey & Sulla, Scranton, PA. Jill H. Miller, Esq., Scranton, PA, Attorneys for Appellees.

**JUDGES:**
Before: BARRY, ROSENN, Circuit Judges and POLLAK, * District Judge

* The Honorable Louis H. Pollak, Senior District Judge, United States Court for the Eastern District of Pennsylvania, sitting by designation.

**OPINIONBY:**
BARRY

**OPINION:**

**OPINION OF THE COURT**

BARRY, *Circuit Judge*:

*INTRODUCTION*

The roof over a banquet hall collapsed under the weight of accumulated snow and the insurer was called upon to pay both building damages and business interruption losses under the policy. The building damage claim was resolved fairly expeditiously, but for a variety of reasons -- some good and some bad -- attempts to resolve the business interruption claim dragged on with the insurer's conduct with reference to that claim emanating in a complaint alleging bad faith, pursuant to *42 Pa. Cons. Stat. § 8371*.

This appeal follows a trial in which the jury found that the defendant, Northern Insurance Company of New York ("Northern"), had acted in bad faith and awarded punitive damages. We will remand for a new trial due, first, to the admission at trial of a discovery violation committed by Northern which was not probative of its bad faith in resolving the plaintiffs' business interruption claim, but which was unfairly prejudicial in the manner in which it was presented and because that presentation involved other bad faith cases against Northern. The admission at trial of allegations contained in a third-party complaint brought by Northern against the contractor who built the banquet hall provides an additional ground for reversal. This evidence was highly prejudicial, in part because, in closing argument, plaintiffs' counsel characterized the allegations as "fraud upon the Court." We also find, however, that the record contains sufficient admissible evidence supporting a finding of bad faith on the part of Northern; hence, its motion for judgment as a matter of law was properly denied. n1

---

n1 Northern's argument that plaintiffs were not entitled to a jury trial is rejected without further discussion. See *Klinger v. State Farm Mut. Auto. Ins. Co.*, 115 F.3d 230, 236 (3d Cir. 1997) ([HN1] "The punitive damages remedy in a statutory bad faith action under § 8371 triggers the *Seventh Amendment* jury trial right[.]"). Section 8371 does not, however, provide for the right to a jury trial in state court. *Mishoe v. Erie Ins. Co.*, 2003 Pa. LEXIS 917, Nos. 87 & 88 MAP 2001, 2003 WL 21255990, at *7 (Pa. May 30, 2003).

I.

Plaintiff W.V. Realty, Inc. owned the building at issue in this case -- a 46-room motel, a restaurant and a banquet facility, located in Moosic, Pennsylvania. Plaintiff New Montage Manor, Inc. ran the motel, restaurant and catering business. Northern issued an insurance policy to plaintiffs which provided coverage for building and property damage up to $ 1,360,000 and coverage for business interruption losses up to $ 650,000.

In January of 1996, after the roof over the banquet hall portion of the building collapsed, plaintiffs submitted claims for both damage to the building and business interruption losses. The business interruption portion of the policy covered plaintiffs for (1) net income (net profit or loss before income taxes) that would have been earned or incurred were it not for the necessary suspension of operations as a result of the roof collapse, and for (2) continuing normal operating expenses incurred, including payroll. These items were covered from the date of loss through what the policy called the "period of restoration," that is, the amount of time that it would reasonably take to repair the property damage.

Northern determined that the restoration period in this case was six months. n2 Plaintiffs contested Northern's determination on two grounds. First, plaintiffs believed that the period of restoration should be longer given the nature of the event business. A two-year period, in their view, would account for the fact that all of the events which had been scheduled for 1996 and 1997 were cancelled in the wake of the roof collapse. Even if the banquet hall were rebuilt by the beginning of 1997 and plaintiffs could begin to again make reservations, they would not be able to recover their lost sales because weddings and other events are booked an average of fourteen months in advance. In the alternative, plaintiffs argued that they should be reimbursed for events which were cancelled during the six-month period of restoration, but which were to occur outside of it, as well as for events that they were not able to book during that period because there was no facility available to show prospective customers.

---

n2 This six-month "period of restoration" was arrived at by adding the three months which Northern's expert determined would be a reasonable amount of time within which to rebuild the catering hall to the two months which Northern chose to allot for adjustment and review

of the claim, to an additional thirty days provided for in the policy.

Soon after the roof collapse, plaintiffs began complaining to Northern about the financial problems that they were experiencing. On January 31, 1996, John J. Weichec, the Northern adjuster assigned to the case, noted in his claim file that plaintiffs were having cash flow problems because they had to re-book several weddings at other facilities and because they were not receiving new deposits. Weichec also noted that if plaintiffs forwarded documentation pertaining to the returned deposits for his review and verification, he would arrange for an advance. Between February and June, Northern advanced $ 25,358.31 to plaintiffs to reimburse them for the returned deposits and other expenses.

On April 3, 1996, plaintiffs wrote to Northern and explained that their bank would not make a decision regarding whether to rebuild until it knew the amount of money plaintiffs would receive for their business interruption losses. Weichec called Northern's accountants to encourage them to finish their evaluation of the claim as soon as possible. The accountants did so a month later, concluding that based on a six-month restoration period and without adopting plaintiffs' argument that they should be reimbursed for losses attributable to the six-month period but falling outside of it, plaintiffs were entitled to $ 49,494.88 for their business interruption losses. On May 16, 1996, Weichec wrote to plaintiffs explaining that the accountant's report was finished but that he was not forwarding it to them because plaintiffs had informed him that they had new information regarding their continuing expenses.

At the heart of plaintiffs bad faith case is the fact that Weichec did not immediately provide them with the undisputed portion of their claim, *i.e.* the $ 49,494.88 less what had already been advanced to them, as soon as the accountants were finished. n3 Northern was admittedly aware that plaintiffs were experiencing financial difficulties. They were unable to make the prepayment required to obtain an independent estimate of their building loss, their bills included shut-off notices from some of their utility companies, and their bank was threatening to foreclose on their mortgage which, we note, it did in August 1996.

n3 A neutral umpire eventually determined that the $ 25,358.31 that Northern advanced to plaintiffs was not, in fact, an element of plaintiffs' business interruption losses because they constituted extra, as opposed to continual, expenses under the policy.

On August 29, 1996, Northern's accountants, in an updated report, concluded that plaintiffs were entitled to $ 65,322.70 for their business interruption losses over the relevant six-month period. In the Fall of 1996, Northern issued two checks for the outstanding balance of $ 39,964.39. In January of 1998, plaintiffs submitted an expert's report assessing their losses for 1996 and 1997 in the amount of $ 695,000.

Because the parties were unable to agree on an adjustment of plaintiffs' loss, the appraisal process provided for in the policy was initiated. Each side selected an appraiser and the Court of Common Pleas appointed a neutral umpire, with the direction that "the umpire and appraisers are directed to proceed with determining the amount of the Plaintiff's losses and claims, in accordance with the terms and conditions of the insurance policy issued by the Defendant." On December 6, 1999, an award was issued by the neutral umpire, joined by the appraiser selected by plaintiffs, in which plaintiffs' losses were itemized as follows:

| | |
|---|---|
| Business interruption: | $ 695,706.39 |
| Subject to policy limit of: | $ 650,000.00 |
| Extra expenses for returned deposits: | $ 25,358.31 |
| Building and personal property: | $ 549,840.00 |
| Debris removal: | $ 16,200.00 |
| TOTAL: | $ 1,241,398.30 |

The umpire also awarded interest from October 6, 1996 (30 days after the date all necessary information was submitted to Northern to evaluate the loss) until the date

the loss was paid. On appeal, the Court of Common Pleas affirmed in part and reversed in part, finding that interest was only warranted on the amount owed thirty days after the award was issued. The Superior Court affirmed the Court of Common Pleas.

In February of 2000, plaintiffs sued Northern for bad faith in the Court of Common Pleas; the case was subsequently removed to federal court. The District Court granted Northern's motion for summary judgment on plaintiffs' bad faith claim with regard to Northern's payout on the building damage claim. Thus, the sole issue left for trial was whether Northern acted in bad faith with regard to the business interruption claim.

On August 31, 2001, shortly before trial and admittedly because it would look better for Northern at trial, Northern finally paid plaintiffs what was owed them under the award. The jury awarded plaintiffs $650,000 in punitive damages. After trial, the District Court denied Northern's motion for judgment as a matter of law, finding that plaintiffs produced evidence upon which a jury could properly find that Northern acted in bad faith. The Court also denied Northern's motion for a new trial based on, among other things, plaintiffs' use at trial of a list of other bad faith claims and of Northern's pleading in a subrogation action, and, in the alternative, for remittitur or a new trial on damages. The District Court awarded plaintiffs attorneys' fees totaling $248,260, costs in the amount of $36,424.88, and interest of $554,946.43. This appeal followed.

II.

[HN2] We review the District Court's decision denying a motion for judgment as a matter of law *de novo*, and apply the same standard that the District Court did, namely whether, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993). [HN3] The District Court's decision to deny Northern's motion for a new trial is reviewed for abuse of discretion. *See Wilburn v. Maritrans GP Inc.*, 139 F.3d 350, 363 (3d Cir. 1998).

Pennsylvania's bad faith statute provides as follows:

[HN4] "In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions: (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%. (2) Award punitive damages against the insurer. (3) Assess court costs and attorney fees against the insurer."

42 Pa.C.S. § 8371. [HN5] The term "bad faith" is not defined in the statute, but the Pennsylvania Superior Court has defined it as "'any frivolous or unfounded refusal to pay proceeds of a policy.'" *Terletsky v. Prudential Prop. and Cas. Ins. Co.*, 437 Pa. Super. 108, 649 A.2d 680, 688 (Pa. Super. 1994) (quoting Black's Law Dictionary 139 (6th ed. 1990)). To make out a claim of bad faith, a plaintiff must show by clear and convincing evidence that the insurer (1) did not have a reasonable basis for denying benefits under the policy; and (2) knew or recklessly disregarded its lack of reasonable basis in denying the claim. *Keefe v. Prudential Prop. and Cas. Ins. Co.*, 203 F.3d 218, 225 (3d Cir. 2000).

Turning first to Northern's motion for a new trial, the judgment of the District Court will be vacated and the case remanded for the reasons that follow. During discovery, plaintiffs served a request for the production of documents which request sought copies of all lawsuits filed against Northern and two related companies. After a conference with the District Court, the request was narrowed to "all lawsuits filed against [Northern and the other two companies] regarding lawsuits filed against them for bad faith and claims where co-insurance penalties were applied to blanket insurance coverage." Northern responded in answer thereto that there were none.

After plaintiffs themselves found fifteen bad faith cases involving Northern, they filed a motion for sanctions. The District Court found that Northern's *counsel's* failure to disclose the bad faith cases was inadvertent and excusable and, thus, substantially justified. n4 At the same time, the Court found that *Northern's* conduct in considering the request was not substantially justified and the bad faith cases should have been disclosed under a reasonable reading of the request for the production of documents. The Court awarded plaintiffs the counsel fees and expenses incurred in securing the information which Northern had not provided.

---

n4 Northern's trial counsel explained to the District Court that, due to a miscommunication, in-house counsel believed he was to produce cases involving *both* bad faith claims and co-insurance penalties applied to blanket coverage. The Court accepted trial counsel's explanation that another bad faith case in which he had been personally involved had slipped his mind.

At trial, Lloyd Johnson, in-house counsel for Northern, was called by plaintiffs and questioned about the original request for the production of documents, the conference with the District Court, and the correspondence between counsel which ensued. Johnson was then questioned about an affidavit signed by Donna Sofinowski, a claim litigation specialist, in which she stated that "after careful review" she was unaware of any lawsuits involving "claims for bad faith and/or claims where co-insurance penalties were applied to blanket insurance coverage." Plaintiffs' counsel questioned Johnson about the fact that Sofinowski did not in fact conduct a careful review but instead relied on Johnson's representation that there were no such lawsuits.

Plaintiffs' counsel then asked Johnson whether it was true that "as a matter of fact, it turned out that there were hundreds of lawsuits[.]" Defense counsel objected and a conference was held out of the hearing of the jury. The District Court overruled the objection, but instructed plaintiffs' counsel not to "beat it" -- meaning, presumably, not to beat it to death. Despite this instruction, plaintiffs' counsel's next question to Johnson was as follows: "Mr. Johnson, I asked you as a matter of fact there turned out to be hundreds of these lawsuits, is that correct?" After Johnson responded in the affirmative, counsel handed him what counsel described as "a compilation of those lawsuits" and asked him to identify it. Defense counsel again objected, and the Court told plaintiffs' counsel that he could only ask Johnson to identify the document but could not suggest what that document was. But, of course, the horse was already out of the barn for the jury had been told that the twenty page spreadsheet which Johnson identified listed the "hundreds" of bad faith lawsuits against Northern and the other two companies. While plaintiffs' counsel did not move the compilation itself into evidence, the damage had been done for the jury saw that compilation and certainly knew what it was.

Plaintiffs' counsel was also permitted to ask Johnson to read from the District Court's opinion granting plaintiffs' motion for sanctions. Twice -- first on direct examination and then again on redirect -- Johnson was told to read the following excerpt from the opinion aloud to the jury: "I must note that considering this was a discovery request, company counsel adopted an overly restricted view of the request, and it therefore is not without cause to believe such a restrictive construction was convenient, if not intentional." He also was told to read an excerpt in which the Court stated that it could not find "substantial justification" for Northern's failure to disclose the bad faith cases. And the attack on Johnson continued in plaintiffs' closing argument:

The actions of [Mr. Johnson] were convenient at best and justified the imposition of a punishment on Northern Insurance Company for not being honest. I said Mr. Johnson, lawyers are supposed to be honest with the Court and counsel. He said, yes. I said the whole process depends on that honesty, isn't that right? And he said yes. And I asked him, that's not what the conclusion was about your conduct in this case?

Finally, the full opinion was admitted into evidence.

[HN6] The Pennsylvania Superior Court has held that bad faith is actionable regardless of whether it occurs before, during or after litigation. *O'Donnell v. Allstate Ins. Co.*, 1999 PA Super 161, 734 A.2d 901, 906 (Pa. Super. 1999)("We refuse to hold that an insurer's duty to act in good faith ends upon the initiation of suit by the insured."). The Superior Court made quite clear, however, that this did not mean that insureds may recover under Pennsylvania's bad faith statute "for discovery abuses by an insurer or its lawyer in defending a claim predicated on its alleged prior bad faith handling of an insurance claim." *Id. at 908* (quoting *Slater v. Liberty Mut. Ins. Co.*, 1999 U.S. Dist. LEXIS 3753, No. 98-1711, 1999 WL 178367, at *2 n.3 (E.D. Pa. March 30, 1999). This general proposition comes with the caveat that using litigation in a bad faith effort to evade a duty owed under a policy would be actionable under *Section 8371*.

[HN7] In those cases in which nothing more than discovery violations were alleged, courts have declined to find bad faith. In *O'Donnell*, the trial court instructed the jury that they were not to consider conduct of the insurer which post-dated the institution of suit. Despite its holding that bad faith which occurs after the institution of suit is actionable, the Superior Court nevertheless upheld the jury's defense verdict. The Court found that there was no evidence that the allegedly frivolous interrogatories propounded by the insurer were part of an attempt to improperly prolong its investigation into the insured's claim, as opposed to winning the lawsuit which had been filed against it. *Id. at 909.* See also *Sanders v. State Farm*, 47 Pa. D. & C. 4th 129, 145 (Ct. Com. Pl. 2000)(granting summary judgment in favor of the insurer where the insured alleged that, in a bad faith action brought by the insured, the insurer filed multiple and duplicative pleadings and motions); *Slater*, 1999 U.S. Dist. LEXIS 3753, 1999 WL 178367 at *1 (denying insured's request for leave to amend to add an allegation of bad faith conduct based on fact that, in suit for insurance bad faith, insurer withheld material documents, raised insupportable objections to discovery requests, delayed in producing discoverable material, failed to produce pertinent material within the discovery deadline and failed to produce materials within the time

promised by defense counsel). *But see Rottmund v. Continental Assurance Co., 813 F. Supp. 1104, 1109 (E.D. Pa. 1992)*(allowing case to go forward where insured alleged that insurer's "intentional misdesignation of a corporate deponent" and "concealment of the absence of new facts and circumstances which would justify the defendant's denial of its own prior allegations regarding the identity of the murderer of David Artz" could constitute bad faith).

On the other hand, [HN8] those cases in which courts have permitted bad faith claims to go forward based on conduct which occurred after the insured filed suit all involved something, beyond a discovery violation, suggesting that the conduct was intended to evade the insurer's obligations under the insurance contract. *See, e.g., Cooper v. Nationwide Mut. Ins. Co., 2002 U.S. Dist. LEXIS 21552, No. 02-2138, 2002 WL 31478874, at * 4 (E.D. Pa. Nov. 7, 2002)*(refusing to dismiss for failure to state a bad faith claim where insured's complaint alleged that the insurer "engaged in obstructive conduct and induced him to discontinue his state court suit by misrepresenting its intent to evaluate and settle his claim[ ]"); *General Refractories Co. v. Fireman's Fund Ins. Co., 2002 U.S. Dist. LEXIS 25324, No. 01-5810, 2002 WL 376923, at *3 (E.D. Pa. Feb. 28, 2002)*(refusing to dismiss for failure to state a claim where insurer allegedly "made misrepresentations to the court and filed abusive motions" in insurance coverage litigation brought by the insured); *Krisa v. The Equitable Life Assurance Soc., 109 F. Supp. 2d 316, 321 (M.D. Pa. 2000)* (refusing to dismiss for failure to state a claim where insurer allegedly filed baseless counterclaim against insured in insurance coverage litigation brought by the insured).

Plaintiffs have not explained why they believe Northern's discovery violation constituted insurance bad faith, or why that violation falls into the category of using litigation to evade an obligation under the policy. Plaintiffs do not claim, for example, that Northern failed to disclose other bad faith lawsuits in which it had been involved knowing that even though eventually its failure to disclose them would be discovered, the progress of the litigation would be delayed as would the day of reckoning when Northern would be required to turn over the balance it owed under the neutral umpire's award. n5

---

n5 The amended complaint includes a claim that Northern committed bad faith by failing to promptly pay plaintiffs, as well as a claim that Northern's failure to pay constituted a breach of the insurance contract. Evidence that Northern used the discovery process to create delay would be probative and therefore admissible because it would support both of these claims.

---

We conclude that the discovery violation in this case fell into the "pure discovery violation" category as opposed to the "discovery violation as insurance bad faith" category. There is simply no evidence that Northern failed to disclose the bad faith cases in order to avoid paying plaintiffs' business interruption claim. The discovery violation was, therefore, not probative of bad faith and was inadmissible at trial under *Federal Rules of Evidence 401 and 402*. n6 So, too, it follows, was the reading of excerpts from the District Court's opinion imposing sanctions for that violation.

---

n6 As *O'Donnell* makes clear, there are some cases in which the insurer's conduct during the course of the litigation is both a violation of discovery rules and a violation of the insurer's fiduciary duty to the insured. *See O'Donnell, 734 A.2d at 909* ("The court [in *Slater*] specifically noted that its holding does not preclude a finding of liability for an insurer's 'bad faith conduct arising in the insurer-insured relationship which happens to occur during the pendency of an action[.]'"). We note that an insurer's dishonest conduct during discovery could potentially violate its fiduciary duty of candor. *See, e.g., Black's Law Dictionary 625 (6th ed. 1990)*(defining "fiduciary" inter alia as "a person having duties involving good faith, trust, special confidence, and candor towards another"). *See also U.S. Fire Ins. Co. v. Royal Ins. Co., 759 F.2d 306, 310 (3d Cir. 1985)*(explaining that "the good faith standard requires more than proof of sincerity; the evaluation of the case by the insurance company must be honest, intelligent and objective")(citing *Shearer v. Reed, 286 Pa. Super. 188, 428 A.2d 635, 638 (Pa. Super. 1981))*. Northern's conduct in this case did not arise out of the insurer-insured relationship and was not, therefore, a breach of the fiduciary duty of honesty.

---

But even if we assume that the discovery violation was committed in connection with an effort on the part of Northern to avoid its obligations under the policy, the evidence of that violation would have still been inadmissible, but now under *Rule 403*, because its

probative value was substantially outweighed by its unfair prejudicial effect.

On the one hand, there is the evidence of the discovery violation which we assume, for purposes of argument, was probative of an effort to delay payment. Other evidence admitted at trial established, however, that even after the Superior Court affirmed the decision of the Court of Common Pleas, which in turn affirmed the decision of the neutral umpire, Northern waited over three and a half months to pay the balance it owed. In the end, by its own admission, it only paid because trial was looming. The probative value of the discovery violation was diminished by the fact that it was not the only evidence that Northern intentionally delayed payment of the balance it owed.

The unfair prejudicial effect of the discovery violation arises from the fact that the information that Northern failed to disclose happened to be other bad faith lawsuits which had been brought against it. The jury may well have concluded, in contravention of the strictures of the Rules of Evidence, that the fact that hundreds of other bad faith lawsuits had been filed against Northern made it more likely that it committed bad faith in this lawsuit. *Cf. Fed. R. Evid. 404 (b)*([HN9] "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."). It seems, at least to us, that plaintiffs questioned Lloyd Johnson about the other bad faith lawsuits not so much to demonstrate that Northern committed an intentional discovery violation as to establish a pattern of bad faith culminating in the "action" in this case "in conformity therewith."

There would have been no unfair prejudice had the District Court permitted evidence of an insurance bad faith discovery violation to be admitted into evidence without permitting plaintiffs to disclose to the jury that the information sought by them and withheld by Northern happened to be other bad faith cases. As it was, the jury not only was permitted to learn that the discovery violation related to other bad faith lawsuits, information that was irrelevant, but it was permitted to learn that there were "hundreds" of them. Moreover, the District Court did not explain to the jury that, in deciding whether Northern acted in bad faith in this case, it could consider the fact that Northern committed a discovery violation but not the fact that there were other bad faith lawsuits against Northern.

It was also error to admit as evidence of bad faith allegations contained in the amended complaint in a subrogation action brought by Northern against the contractor who built the banquet facility. In the amended complaint, Northern alleged that it had paid plaintiffs an amount in excess of $ 1,200,000, and that this amount was "the fair and reasonable cost for temporary repairs, permanent building repairs, replacement of damaged contents, replacement of damaged business property, business interruption [and] additional expenses." These allegations were made despite the fact that at the time the amended complaint was filed, Northern had paid out approximately $ 318,000 to plaintiffs and was refusing to pay out anything more. At the bad faith trial, several witnesses were questioned about the subrogation complaint; plaintiffs' expert characterized it as "at the best bad lawyering and at the worst a fraud on the court." Then, in summation, plaintiffs' counsel repeated the phrase "fraud upon the court" and added that the fraud was knowing, deliberate and reckless.

[HN10] The Federal Rules of Civil Procedure permit parties to file pleadings containing inconsistent factual and legal allegations. *See Indep. Enters. Inc. v. Pittsburgh Water and Sewer Auth.*, 103 F.3d 1165, 1175 (3d Cir. 1997). As a general rule, however, "the allegations asserted in an earlier lawsuit may be introduced by the adversary as evidence in [a] second action[.]" 5 Wright & Miller § 1283, at 541-542. *See also, e.g., Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10, 16 (1st Cir. 2001); *LWT, Inc. v. Childers*, 19 F.3d 539, 542 (10th Cir. 1994). Some courts have made an exception to the general rule of admissibility for third-party pleadings. *See e.g., Schneider v. Lockheed Aircraft Corp.*, 212 U.S. App. D.C. 87, 658 F.2d 835, 843 (D.C. Cir. 1981)(citing cases).

We need not decide whether a defendant's allegations in a complaint against a third party can be used against the defendant in the primary action because, even assuming that they can, the probative value of the evidence here was minimal and the prejudicial effect great. The probative value was minimal, first, because the allegations contained in the subrogation complaint were not, as plaintiffs claim, evidence that Northern was "seeking to advance its own interest at the expense of its insured." Northern's claim against the contractor for negligence was contingent on plaintiffs' claim against Northern, but plaintiffs' claim against Northern would not be affected one way or the other by Northern's allegations in the subrogation complaint. Moreover, Northern's recovery would be limited by what it had actually paid out, not by the allegations in the complaint. In an affidavit submitted to the District Court, Northern's subrogation counsel explained that he amended the complaint, which initially alleged $ 300,000 in damages, to allege $ 1.2 million "to protect Northern's interest in recovering all amounts that had already been paid on this claim and any amounts that might be paid in the future." That he was surely entitled to do. Finally, the question of what was a "fair and reasonable" amount to pay plaintiffs on their bad faith claim is in part a legal one, and [HN11]

legal conclusions may not be used as evidentiary admissions. *See Giannone v. U.S. Steel Corp.*, 238 F.2d 544, 548 (3d Cir. 1956)("Bearing in mind that legal conclusions are not admissions ... we do not find that the broad language that [the defendant/third-party plaintiff] used against [the third-party defendant] reasonably capable of interpretation as factual admissions of faulty maintenance.").

The evidence of the allegations in the subrogation complaint was unfairly prejudicial in large part because of the way in which that evidence was presented to the jury. The language used by plaintiffs' expert and by their counsel -- that the allegations constituted "fraud upon the court" and that the fraud was knowing, deliberate and reckless -- was false and inflammatory. n7 The prejudice was enhanced by the fact that the subrogation complaint was referred to repeatedly throughout the trial. It was mentioned in plaintiffs' opening argument, brought up with several witnesses and highlighted again in plaintiffs' closing. The probative value of the evidence was substantially outweighed by its prejudicial effect.

---

n7 We note that even if the allegations that the amount of the claim was $ 1.2 million and that this amount was fair and reasonable did constitute "fraud upon the court," this would not be probative of *insurance* bad faith.

---

We cannot find that the errors committed here were harmless. *See Betterbox Communications Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 329 (3d Cir. 2002)([HN12] "In a civil case, an error is harmless if it is highly probable that it did not affect the complaining party's substantial rights."). Thus, a new trial will be necessary. n8 Although Northern's motion for a new trial should have been granted, it was not entitled to judgment as a matter of law, and in that respect we will affirm the post-trial order of the District Court. There was sufficient evidence submitted to the jury on the issue of bad faith even when the improperly admitted evidence is stripped away. There was evidence, for example, that between January 12, 1996 and August of 1996, when plaintiffs were forced to surrender the property to the bank, they did not earn any money from their catering business, as they had no place to hold events, but continued to incur bills for its mortgage, utilities, insurance, employees and taxes. Northern was aware of all of this and aware that plaintiffs' utilities were about to be terminated and that the bank was threatening foreclosure. During this time, Northern paid nothing for the ongoing business interruption losses.

---

n8 There were other errors which we note, albeit without further discussion. Plaintiffs were permitted to question Weichec on a decision of the Court of Appeals for the Fourth Circuit in a distinguishable case and ask why, when he became aware of the decision, he did not seek a legal ruling. Plaintiffs thereafter argued to the jury that this failure was evidence of bad faith. They were also permitted to question Weichec on Northern's offer, after the appraisal award, to settle the entire matter, including the bad faith claim, and then argue to the jury that the offer was itself evidence of bad faith.

---

Northern argues to us that it reimbursed plaintiffs for, among other things, the returned deposits and that, while the appraiser characterized these monies as "extra expenses," "the fact that the appraisal process declared three years later that the payments should be characterized as extra expense items does not negate the fact that they were advanced by Wiechec at the time." Northern also argues that "plaintiffs' need for sums far in excess of the remaining undisputed amount of $ 25,000, rendered the issue of advances largely academic."

According to Northern's own Claims Division Property Manual, however, "today, it is doubtful that any insurer would risk not making an advance on the undisputed portion of a claim." Weichec, therefore, arguably violated Northern's own policy when, in May of 1996, he did not forward the undisputed amount due despite knowing that plaintiffs were in need of funds. At trial, he offered no explanation for his decision. He testified that no advance was paid "because we were going to change the valuation," but admitted that the valuation was only going to increase. The jury was, therefore, entitled to find that the delay on Northern's part was unjustified and that it constituted bad faith.

But while there was a basis for a finding of bad faith, there was no basis for an award of punitive damages even had there been no trial error. [HN13] Pennsylvania has adopted *Section 908* of the Restatement (Second) of Torts, which provides that punitive damages may be "awarded to punish a defendant for outrageous conduct, which is defined as an act which, in addition to creating 'actual damages, also imports insult or outrage, and is committed with a view to oppress or is done in contempt of plaintiffs' rights.' ... Both intent and reckless indifference will constitute a sufficient mental state." *Klinger v. State Farm Mut. Auto. Ins. Co.*, 115 F.3d 230, 235 (3d Cir. 1997)(quoting *Delahanty v. First Pa. Bank,*

*N.A., 318 Pa. Super. 90, 464 A.2d 1243, 1263 (Pa. Super. 1983)*.

This case is distinguishable from a case such as *Klinger*, in which we upheld an award of punitive damages because the insurer made no offer to pay despite the plaintiff's serious injury and the insurer's clear liability. Here, neither liability nor the amount due was clear. While Weichec may not have had a completely open mind with regard to what plaintiffs believed to be the proper restoration period -- and it was the dispute over the appropriate restoration period that caused much of the delay -- plaintiffs' interpretation was a somewhat unorthodox one based on the unique nature of their business, but no similarly unique terms were in the standard policy which governed this matter. While Northern's decision not to advance plaintiffs the undisputed portion of their business interruption losses in May of 1996 is surely some evidence of bad faith, it, without more, does not support an award of punitive damages. n9

> n9 If, at the retrial, there is a finding of bad faith, under *42 Pa. Cons. Stat. § 8371* -- the bad faith statute -- plaintiffs can receive interest, court costs and attorneys' fees as they did following the first trial.

III.

The final judgment of the District Court dated January 7, 2002 will be vacated as will, in all but one respect, the post-trial order of the District Court dated June 10, 2002. The matter will be remanded for a new trial.